# EXHIBIT NN

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
2/13/2026 8:49 PM
By: Narzralli Baksh , Deputy

Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 844-7100
*Attorneys for Petitioners Center for Biological Diversity and Wishtoyo Foundation*

Linda Krop (Bar No. 118773)
lkrop@environmentaldefensecenter.org
Jeremy M. Frankel (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Tel: (805) 963-1622
*Attorneys for Petitioners Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## IN AND FOR THE COUNTY OF SANTA BARBARA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,<br><br>Petitioners/Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive,<br><br>Respondents/Defendants.<br>———————————————<br>SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,<br><br>Real Parties in Interest. | Case No.: 25CV02244<br>[Consolidated with Case No. 25CV02247]<br><br>**DECLARATION OF JULIE TEEL SIMMONDS IN SUPPORT OF PETITIONERS' AND PLAINTIFFS' COMBINED OPPOSITION TO REAL PARTIES IN INTEREST'S NOTICE OF MOTION AND MOTION FOR RECONSIDERATION OF PRELIMINARY INJUNCTION**<br><br>[Filed Concurrently with Opposition; Request for Judicial Notice; and [Proposed] Order]<br><br>Date:     February 27, 2026<br>Time:     10:00 a.m.<br>Dept.:     4<br>Judge:    Honorable Donna D. Geck<br><br>Action Filed: April 15, 2025 |

Declaration of Julie Teel Simmonds ISO Petitioners' Combined Oppo. to Real Parties Motion for Reconsideration

| | |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation, | Case No. 25CV02247<br>[Consolidated with Case No. 25CV02244] |

Petitioners/Plaintiffs,

v.

CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, an agency of the State of California; OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive,

Respondents/Defendants.

SABLE OFFSHORE CORP., a Delaware Corporation; and PACIFIC PIPELINE COMPANY, a Delaware Corporation,

Real Parties in Interest.

Declaration of Julie Teel Simmonds ISO Petitioners' Combined Oppo. to Real Parties Motion for Reconsideration

I, Julie Teel Simmonds, hereby declare as follows:

1.      I am an attorney at law admitted to practice before the courts of the State of California and am an attorney of record for Petitioners Center for Biological Diversity and Wishtoyo Foundation in the above-captioned case. I have personal knowledge of the facts set forth herein, which are known by me to be true and correct, and if called as a witness, I could and would competently testify to them. I submit this declaration in support of Petitioners' concurrently-filed Opposition to Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company's (Sable) Notice of Motion and Motion for Reconsideration of Preliminary Injunction.

2.      In 2020, following the Refugio State Beach oil spill, Sable's predecessor, Plains All American Pipeline, the Office of the State Fire Marshal (OSFM), and PHMSA (among other parties) executed a Consent Decree that was entered by a federal district court. I obtained this document from the U.S. Environmental Protection Agency website: https://www.epa.gov/sites/default/files/2020-03/documents/plainsallamericanpipelinelp.pdf. A true and correct copy of excerpts of that Consent Decree are attached as **Exhibit A**.

3.      On December 31, 2025, the California Natural Resources Agency (CNRA) published an updated Summary of State Regulation of Crude Oil Pipelines in Santa Barbara County, which identifies several approvals Sable has yet to secure. I obtained this document from the CNRA website at: https://resources.ca.gov/-/media/CNRA-Website/Files/NewsRoom/Educational-Portal/Pipeline-Summary-12-31-2025-ADA-comp.pdf. A true and correct copy of the summary is attached hereto as **Exhibit B**.

4.      On October 22, 2025, OSFM issued Sable a letter noting that "OSFM identified a requirement of the State Waivers that has not yet been met and that Sable must complete prior to any potential restart. . . [these] findings alone and the inconsistencies with the State Waiver requirements prevent restart under the law." I obtained this document from the United States Securities and Exchange Commission ("SEC") website at: https://www.sec.gov/Archives/edgar/data/1831481/000183148125000086/osfm-lettertosable.htm. A true and correct copy of the letter is attached hereto as **Exhibit C**.

5.      On November 26, 2025, Sable sent a letter to PHMSA requesting that PHMSA determine

Declaration of Julie Teel Simmonds ISO Petitioners' Combined Oppo. to Real Parties Motion for Reconsideration

that the pipelines are "interstate" and that it take over jurisdiction of the pipelines. This document is part of the administrative record lodged in Petitioners' Ninth Circuit Court of Appeals case, *Environmental Defense Center, et al. v. U.S. Department of Transportation, et al.*, No. 25-8509. A true and correct copy of the letter is attached hereto as **Exhibit D.**

6. On December 19, 2025, Sable submitted an application to PHMSA for an Emergency Special Permit. I obtained the Application Letter from PHMSA's docket for the Emergency Special Permit at: https://www.regulations.gov/docket/PHMSA-2025-1502/document. A true and correct copy of the application is attached hereto as **Exhibit E**.

7. Petitioners challenged PHMSA's approval of Sable's restart plan and the agency's issuance of an Emergency Special Permit by filing a Petition for Review in the Ninth Circuit Court of Appeals (as required by federal law relating to the issuance of special permits) on December 24, 2025. A true and correct copy of the Petition for Review in *Environmental Defense Center, et al. v. U.S. Department of Transportation, et al.*, No. 25-8509 is attached hereto as **Exhibit F**.

8. On December 31, 2025, the Ninth Circuit Court of Appeals denied Petitioners' Emergency Motion. A true and correct copy of the Court's Order is attached hereto as **Exhibit G**.

9. On January 23, 2026, the State of California filed its own Petition with the Ninth Circuit Court of Appeals (No. 26-508) challenging PHMSA's assumption of jurisdiction over the pipelines and issuance of an Emergency Special Permit and Restart Plan Approval. I was sent a courtesy copy of this document by counsel for OSFM on January 23, 2026. A true and correct copy of the Petition is attached hereto as **Exhibit H**.

10. On January 30, 2026, counsel for PHMSA filed a Motion to Consolidate OSFM's and Petitioners' Ninth Circuit Court of Appeals Petitions and requested that the Opening Briefs in both matters be due on March 23, 2026, which I was served through the Ninth Circuit's Appellate Case Management System (ACMS). A true and correct copy of the Motion is attached hereto as **Exhibit I**.

11. On February 5, 2026, the Court granted the Motion to Consolidate and set forth a schedule for briefing and a hearing in July 2026. I received the Court's Order through the Ninth Circuit's ACMS. Petitioners intend to fully brief why the pipelines remain intrastate in their Opening Brief. A true and correct copy of the Court's Order is attached hereto as **Exhibit J**.

12.    On December 16, 2025, the Santa Barbara County Board of Supervisors voted to deny the transfer of development permits from ExxonMobil to Sable. I obtained the Board's Action Letter from this County of Santa Barbara website:

https://cosantabarbara.app.box.com/s/wlihoyv3ntcd76py99nh2nemm555qco6. A true and correct copy of the Board's Action Letter is attached hereto as **Exhibit K**.

13.    On May 18, 2016, PHMSA sent OSFM a letter memorializing the understanding between the two agencies with respect to OSFM's oversight of the pipelines. This document is part of the administrative record lodged in Petitioners' Ninth Circuit Court of Appeals case. A true and correct copy of the letter is attached hereto as **Exhibit L**

14.    On October 14, 2020, the United States District Court for the Central District of California issued an Order to Enter Consent Decree. This document is part of the administrative record lodged in Petitioners' Ninth Circuit Court of Appeals case. A true and correct copy of the order is attached hereto as **Exhibit M**.

15.    On January 7, 2026, the parties appeared before the Court on Petitioners' Ex Parte Application for an Immediate Status Conference and Sable's Ex Parte Application for an Order to Shorten Time on its Motion for Reconsideration. A true and correct copy of the certified transcript from the hearing is attached hereto as **Exhibit N**.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 13th day of February, 2026.

/s/ *Julie Teel Simmonds*
JULIE TEEL SIMMONDS (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 844-7100
*Attorney for Petitioners Center for Biological Diversity and Wishtoyo Foundation*

3

Declaration of Julie Teel Simmonds ISO Petitioners' Combined Oppo. to Real Parties Motion for Reconsideration

# INDEX OF EXHIBITS

Declaration of Julie Teel Simmonds

| Exhibit | Description | Page No. |
|---|---|---|
| Exhibit A | Consent Decree, *United States et al. v. Plains All American Pipeline et al.*, Case No. 2:20-cv-02415 (C.D. Cal., March 21, 2020) | 1 |
| Exhibit B | CA Natural Resources Agency Summary of State Regulation of Crude Oil Pipelines in Santa Barbara County (December 31, 2025) | 30 |
| Exhibit C | Letter, Office of State Fire Marshal to Sable Re: State Waiver Requirements Prior to Restart of Lines CA-324 and CA-325A/B (October 22, 2025) | 45 |
| Exhibit D | Letter, Sable to PHMSA Re: Interstate Pipeline Determination (November 26, 2025) | 48 |
| Exhibit E | Letter, Sable to PHMSA Re: Application for Emergency Special Permit (December 19, 2025) | 54 |
| Exhibit F | Petition for Review, *Environmental Defense Center et al. v. PHMSA*, Case No. 25-8059 (9th Cir., December 24, 2025) | 95 |
| Exhibit G | Order Granting Sable Intervention and Denying Motion for Stay of PHMSA Restart Approval, *Environmental Defense Center et al. v. PHMSA*, Case No. 25-8059 (9th Cir., December 31, 2025) | 125 |
| Exhibit H | Petition for Review, *State of California v. PHMSA et al.*, Case No. 26-508 (9th Cir., January 23, 2026) | 128 |
| Exhibit I | Motion to Consolidate and Set New Briefing Schedule, *Environmental Defense Center et al. v. PHMSA*, Case No. 25-8059 (9th Cir., January 30, 2026) | 159 |
| Exhibit J | Order Consolidating Cases *Environmental Defense Center et al. v. PHMSA*, Case No. 25-8059 (9th Cir., February 5, 2026) | 166 |
| Exhibit K | Letter, Santa Barbara County to Environmental Petitioners Re: Board of Supervisors Actions on December 16, 2025 (December 23, 2025) | 169 |
| Exhibit L | Letter, PHMSA to Office of State Fire Marshal Re: MOU (May 18, 2016) | 236 |

| Exhibit M | Order to Enter Consent Decree, *United States et al. v. Plains All American Pipeline et al.*, Case No. 2:20-cv-02415 (C.D. Cal., October 14, 2020) | 240 |
|-----------|----------------------------------------------------------------------------------------------------------------------------------------------|-----|
| Exhibit N | Transcript of Ex-Parte Hearing, *Center for Biological Diversity et al. v. California Department of Forestry and Fire Protection et al.*, 25CV02244 (Santa Barbara Sup. Ct., January 7, 2026) | 243 |

# EXHIBIT A

## Declaration of Julie Teel Simmonds

BRUCE S. GELBER
Deputy Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
Washington, D.C. 20530
BRADLEY R. O'BRIEN (CA Bar Number: 189425)
Senior Attorney
ANGELA MO (CA Bar Number: 262113)
Trial Attorney
Environmental Enforcement Section
United States Department of Justice
301 Howard Street, Suite 1050
San Francisco, California 94105
Tel: (415) 744-6484;
Tel: (202) 514-1707
E-mail: brad.obrien@usdoj.gov
E-mail: angela.mo@usdoj.gov
Counsel for Plaintiff United States of America

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, and the PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* DEPARTMENT OF FISH AND WILDLIFE, PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* CENTRAL COAST REGIONAL WATER QUALITY CONTROL BOARD, *ex rel.* CALIFORNIA DEPARTMENT OF PARKS AND RECREATION, *ex rel.* CALIFORNIA STATE LANDS COMMISSION, *ex rel.* CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION'S OFFICE OF STATE FIRE MARSHAL, and THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>        Plaintiffs,<br><br>                    v.<br><br>PLAINS ALL AMERICAN PIPELINE, L.P. and PLAINS PIPELINE, L.P.,<br><br>        Defendants. | Civil Action No.<br><br>2:20-cv-02415<br><br>**CONSENT DECREE** |

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

**Teel Declaration**
**Page 2**

XAVIER BECERRA
Attorney General of California
ERIC M. KATZ
Supervising Deputy Attorney General
MICHAEL ZARRO (CA Bar Number: 110171)
JESSICA BARCLAY-STROBEL (CA Bar Number: 280361)
Deputy Attorneys General
300 South Spring Street, Suite 1702
Los Angeles, California 90013
Tel: (213) 269-6635
E-mail: Jessica.BarclayStrobel@doj.ca.gov
*Counsel for Plaintiffs California Department of Fish and Wildlife, Central Coast Regional Water Quality Control Board, and California Department of Forestry and Fire Protection's Office of State Fire Marshal*

XAVIER BECERRA
Attorney General of California
CHRISTINA BULL ARNDT
Supervising Deputy Attorney General
NICOLE RINKE (CA Bar Number: 257510)
MITCHELL E. RISHE (CA Bar Number: 193503)
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, California 90013
Tel: (213) 269-6394
E-mail: Mitchell.Rishe@doj.ca.gov
*Counsel for Plaintiffs California Department of Parks and Recreation and California State Lands Commission*

MARGARET WU (CA Bar Number: 116588)
Deputy General Counsel
BARTON LOUNSBURY (CA Bar Number: 253895)
Senior Counsel
University of California
Office of the General Counsel
1111 Franklin Street, 8th Floor
Oakland, California 94607-5200
Tel: (510) 987-9800
E-mail: barton.lounsbury@ucop.edu
*Counsel for Plaintiff The Regents of the University of California*

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

indirect claim for reimbursement related to the Refugio Incident from the OSLTF or pursuant to any other provision of law.

87.     The United States reserves the right to seek reimbursement from Defendants for claims relating to the Refugio Incident paid after the date on which the Consent Decree is lodged with the Court from the OSLTF pursuant to 33 U.S.C. § 2712.

### XVIII.   TRANSFER AND ACQUISITION OF ASSETS

88.     In the event Defendants sell or transfer ownership of or operating responsibility for Lines 901, 903, or 2000, or any lines built to replace Lines 901 or 903, Defendants will obtain from the transferee an agreement to be bound by those provisions of this Consent Decree and Appendices B and D that are specifically applicable to the asset(s) acquired, unless Defendants have already completed the required action or unless OSFM agrees to relieve the transferee of the obligations of any otherwise applicable provision.  Those provisions of Appendix B are:

> a.     For existing but non-operational segments of Lines 901 and 903, paragraphs 1.A, 1.B, 1.E, 2.B, 2.C., 4, 5, 6, 7.A, 12.A of Appendix B;
>
> b.     For the operational segment of Line 903 from Pentland to Emidio, paragraphs 1.C, 1.E, 4, 5, 6, 7.A of Appendix B;
>
> c.     For any lines built to replace Lines 901 or 903, paragraphs 2.A.1, 5, 7.B, 12.A of Appendix B; and
>
> d.     For Line 2000, paragraphs 1.D, 1.E, 4, 5, 6, 7.A, 12.B. of Appendix B.

89.     In the event Defendants sell or transfer ownership of or operating responsibility for Lines 901, 903, or 2000, or any lines built to replace Lines 901 or 903, Defendants shall provide a copy of this Consent Decree to the prospective transferee at least fourteen (14) Days prior to such transfer.  Defendants shall

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree
**Teel Declaration
Page 4**

Case 2:26-cv-05342-SVW-SSC    Document 36-1    Filed 05/14/26    Page 13 of 837   Page
ID #:17056
Case 2:20-cv-02415    Document 6-1    Filed 03/13/20    Page 54 of 102    Page ID #:1479

provide written notice of any such transfer to OSFM within ten (10) Days after the date Defendants publicly disclose the transaction or the date the transaction is closed, whichever is earlier.  Prior to the transfer, Defendants may notify OSFM that Defendants have completed certain required actions of this Consent Decree, or request that OSFM relieve the transferee of certain obligations of otherwise applicable provisions, such that the transferee will not be bound by those requirements.  Defendants shall provide to Plaintiffs documentation demonstrating the transferee's agreement to be bound by the relevant provisions of the Consent Decree.  Defendants shall provide to the transferee copies of those portions of relevant emergency response plans that relate to the transferred asset.

90.    In the event of the sale or transfer pursuant to an arm's-length transaction of Defendants' Regulated Pipelines other than Lines 901, 903, or 2000, or any lines built to replace Lines 901 or 903, to an independent third-party transferee, the transferee shall not be subject to the requirements of this Consent Decree.  Defendants shall provide a copy of this Consent Decree to the transferee at least fourteen (14) Days prior to such transfer.  Defendants shall provide written notice of any such transfer, including documentation demonstrating that the Consent Decree was provided to the transferee, to PHMSA within ten (10) Days after the date Defendants publicly disclose the transaction or the date the transaction is closed, whichever is earlier.  Defendants' obligations under this Consent Decree with respect to all non-transferred assets shall not be affected.

91.    For all Regulated Pipeline assets that Defendants assume operating responsibility for after the Effective Date, Plains is obligated to apply Article II (Company Wide Provisions) of Appendix B of this Consent Decree to the newly acquired assets.

## XIX.  COSTS

92.    Except as otherwise stated in this Consent Decree, the Parties shall bear their own costs related to this action and this Consent Decree, including

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

**Teel Declaration**
**Page 5**

# APPENDIX B

## *(PHMSA Injunctive Relief)*

# APPENDIX B

## ARTICLE I – CALIFORNIA-SPECIFIC PROVISIONS

1. **State Waivers for Lines 901, 903, and 2000 (not to include any replacement lines):**

   A.    Prior to restarting Line 901, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 901.  Plains must receive a State Waiver from the OSFM prior to restarting Line 901.

   B.    Prior to restarting non-operational segments of Line 903, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 903.  Plains must receive a State Waiver from the OSFM prior to restarting Line 903.

   C.    Within 90 days of entry of the Consent Decree (CD), Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 903.  The State Waiver shall apply to the currently operational segment of Line 903 from Pentland to Emidio.

   D.    Within 90 days of entry of the CD, Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 2000.

   E.    To the extent that a State Waiver directly incorporates terms identified in section 4 (Integrity Management) below, as being applicable to Lines 901, 903, or 2000, Plains shall not contest the inclusion of those terms in the relevant State Waiver.  Plains reserves its rights to contest on any grounds any additional terms that the OSFM may require as part of each State Waiver if one is received.  Nothing in this CD shall be construed to limit the authority of the OSFM to require additional terms or conditions in the State Waiver.  Further, nothing in the State Waiver shall be construed to limit the applicability of the terms set forth in the CD.

2. **Replacement, Restart, or Abandonment of Lines 901 and 903:**

   A.    Plains shall replace the existing Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland with non-insulated pipe, if Plains is able to timely obtain: (1) agreements from shippers to transport sufficient quantities of product to make the cost of replacing the segments economically viable; (2) the Federal, State, and Local permits that may be required; and (3) whatever additional rights are needed, including rights-of-way that may be needed from landowners.  Obtaining required commercial commitments, permits, rights-of-way, and any other rights necessary for replacement is the sole responsibility of Plains.

1

**Teel Declaration
Page 7**

    1.    On any replacement segments of Lines 901 or 903, Plains shall, prior to commencing operation of such segment(s):

        a.    Test for potential AC/DC interference.  Where potential AC/DC interference exists, proper mitigation of interference shall be designed and installed during construction of replacement lines.

        b.    Conduct a close interval survey (CIS) and AC/DC interference survey.

        c.    Based on the CIS and AC/DC interference surveys, place additional cathodic-protection test stations at locations where the surveys demonstrate potential cathodic-protection deficiencies, following review and consultation with the OSFM regarding proposed test station locations.

B.    As an alternative to replacement of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may restart the existing pipelines in accordance with the CD (including Appendix D) and applicable law.

C.    As an alternative to replacement or restart of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may abandon all or any segments in accordance with all applicable laws and regulations.

3.    **Third-Party Analysis of Line 2000 ILI Data**

A.    Plains shall select, subject to OSFM's approval, a third-party consultant to review and analyze ILI data for Line 2000 and provide a report to the OSFM on its findings.

B.    The consultant shall:

    1.    Review all ILI results and reports that Plains has received from ILI vendors for Line 2000;

    2.    Review Plains' processes and procedures for analyzing ILI data, and Plains' analysis of Line 2000 ILI results, and suggest potential improvements, if any, to Plains' current processes or procedures for analyzing ILI data;

    3.    Analyze Plains' implementation of its ILI assessment procedures for Line 2000.

    4.    Evaluate ILI vendor specifications to ensure that proper criteria and technology considerations are taken in to account in selecting the specific inspection tool(s) used in the future, with consideration given to best available technology for reliably detecting corrosion, general corrosion, selective seam-weld corrosion, and seam anomalies;

2

**Teel Declaration**<br>**Page 8**

5. Consider disclosed industry standards and regulations, including, but not limited to: 49 CFR § 195.452, the California Elder Pipeline Safety Act, ASME B31.4 (Pipeline Transportation Systems for Liquids and Slurries), ASME B31G (Manual for Determining Strength of Corroded Pipelines) or RSTRENG, API 1160 (Managing System Integrity for Hazardous Liquid Pipelines), API 1163 (In-Line Inspection Systems Qualification), ANSI/ASNT ILI-PQ (In-Line Inspection Personnel Qualification and Certification), NACE SP0169 (Control of External Corrosion on Underground or Submerged Metallic Piping Systems), and the PRCI Pipeline Repair Manual;

6. Comply with additional requirements specified in the scope of work.

C. The third-party consultant shall prepare a written report reflecting its findings, conclusions, and any recommendations for improvement found in conducting the analysis.

1. The consultant may recommend improvements to Plains' ILI analysis process and procedures to improve the quality and integration of ILI data into its IMP going forward. Plains shall give due consideration to the results of the analysis and recommendations of the consultant but will maintain discretion over whether and how to implement any recommendations.

2. The report shall include a list of documents and data reviewed in conducting the analysis, which shall be provided to the OSFM, if requested.

3. Within 150 days of entry of the CD, the consultant shall provide a draft report to the OSFM and Plains for comment at the same time. Plains and the OSFM may provide comments to the consultant on the report within 21 days of receipt of the draft.

4. Within 45 days after receiving comments (if any) from Plains and the OSFM, the consultant shall provide a final report to PHMSA, the OSFM and Plains.

4. **Integrity Management**

A. For any operating segments of Lines 901, 903, and 2000 (not to include any replacement lines):

1. Plains shall implement the following measures and amend its IMP, as needed, to include the requirements of this section for the applicable lines:

a. In addition to other dig criteria specified by regulation or in its IMP, Plains shall remediate all internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall

3

Document 6-1   Filed 08/13/20   Page 83 of 102   Page ID #:1706

loss, within one year of discovery.  If Plains is unable to remediate such anomalies within one year of discovery, Plains shall notify OSFM and temporarily reduce the operating pressure and/or take further remedial action in accordance with 49 C.F.R. § 195.452 until the anomaly is remediated (or until otherwise authorized by OSFM).

b.    Analyze a sample of additional anomalies of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten, unless fewer than ten anomalies are reported within that range, in which case Plains would examine the number of anomalies called.

c.    When sizing anomalies, apply interaction/clustering criteria of 6t by 6t for applicable ILI tools;

d.    Require its ILI tool vendor to include in the vendor's inspection report all metal loss anomalies of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance;

e.    Any time a shrink sleeve is exposed during an anomaly investigation, remove the shrink sleeve, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy;

f.    Send all field measurements to the tool vendor within 90 days of completing all digs for any ILI, provided that available data must be submitted prior to the next ILI run, and conduct annual meetings with the tool vendor to discuss tool performance;

g.    For any use of magnetic flux leakage (MFL) tools, require its ILI tool vendor to manually grade any metal loss anomalies initially identified by the ILI tool as greater than or equal to 20% of wall loss (i.e., have human eyes on the raw data and not simply rely on a computer algorithm), and require that the vendor's ILI report note any differences between what the computer algorithm reported and the vendor's manual grade;

h.    Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, re-run the ILI tool to cover the area of failure;

i.    Integrate and analyze available data in its P&M process, including:

    i.    Assessment data from ILI tool runs;

    ii.   Dig and repair data;

4

**Teel Declaration
Page 10**

iii.    Corrosion data, such as survey results, chemical treatments, and cleaning-pig results;

iv.    Operational data, such as pressure and flow data;

v.    Emergency response data, such as tactical response plans and results of recent drills on the pipeline, including locations of conduits to water, as identified in emergency response plans;

vi.    Evaluation of the capability of the leak detection system, which shall include identification of each leak detection segment between block valves, consideration of length and size of the pipeline, type of product carried, proximity to high consequence areas, swiftness of leak detection (the time period required for a leak to be operationally isolated and/or the pipeline to be shut down), type and location of valves, valve closure time, EFRD analysis results, the location of nearest response personnel, leak history, and risk assessment results;

vii.    Other pipeline characteristics, such as length, diameter, presence in HCAs and Environmentally and Ecologically Sensitive Areas (as defined in regulations promulgated pursuant to California Government Code § 8574.7(d), including 14 CCR 817.04(k)(3)(A)), maximum operating pressure, normal operating pressure, coating type, elevation data, water crossings, proximity to water bodies, casings, geohazard threats, maximum flow rate, and maximum rupture volume.

2.    ILI Measures

a.    <u>Initial ILI Runs</u>.  Each year during the first two years after entry of the CD, Plains shall conduct at least two ILIs using: (1) a high-resolution MFL tool; and (2) a UT tool with an inertial measurement unit (IMU).  Plains shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data.  If a UT tool run is unsuccessful, Plains shall identify the limitations that prevented the UT tool run from being successful, consider changes to increase the likelihood of a successful UT tool run, and use best efforts to rerun the UT tool within six months (subject to tool availability).

i.    All ILI assessments in the first two years shall include a sizing tool and a tool capable of identifying dents.

5

**Teel Declaration**
**Page 11**

ii.    In each of the first two years, Plains shall run the second ILI tool as soon as practicable after running the first ILI tool, but no later than 90 days after completion of the first ILI tool run.  If one of the two tool runs is unsuccessful, Plains shall re-run the tool that was unsuccessful (but need not re-run the tool that was successful) even if the re-run of the unsuccessful tool run would occur more than 90 days from the successful tool run.

b.    <u>Subsequent ILI Runs</u>.  After the first two years, Plains shall run at least one MFL or one UT tool every year, using a different ILI tool type (MFL or UT) in each alternating year.  Alternatively, Plains may run a UT tool each year.  If, however, any UT tool run is unsuccessful, Plains shall document the reasons why the UT tool was unsuccessful, consider changes to increase the likelihood of a successful UT tool run, and may use MFL technology to complete that year's ILI, but must run a UT tool the following year.

c.    <u>All ILI Runs</u>.  Plains shall provide ILI results and reports to the OSFM within 30 days from its availability to Plains.

5.    **<u>Valves</u>**

A.    Within one year after entry of the CD for any operating segments of Lines 901, 903, and 2000, and for any new pipeline segments replacing those lines, Plains shall conduct EFRD analyses, which shall include consideration of:

1.    Swiftness of leak detection and pipeline shutdown capabilities, type of commodity carried, rate of potential leakage, volume that can be released, topography or pipeline profile, potential for ignition (for spilled commodity), proximity to power sources, location of nearest response personnel, specific terrain between the pipeline and the HCA, and benefits expected by reducing the spill size.

2.    Valve placement and method of valve actuation for all valves (not including valves used for instrumentation purposes, such as on tubing on transmitter calibration manifolds).

B.    Plains shall submit the EFRD analyses to OSFM within one year of entry of the CD.

C.    Where practical, Plains shall confirm that check valves that are necessary for the safe operation of the pipeline are in good working order at intervals required by other valve maintenance activities and associated procedures.

6

**Teel Declaration
Page 12**

6. **Risk Analysis**

    A.    For any operating segments of Lines 901, 903, or 2000 (not to include any replacement lines):

        1.    Plains shall submit a risk analysis under proposed regulation 19 CCR § 2111(c) to OSFM (dated January 17, 2019 and publicly noticed in the California Regulatory Notice Register on February 15, 2019), or the final version of such regulation as it may be made effective in the future, regardless of whether or not those lines would otherwise be subject to the proposed regulations.

            a.    The information in the risk analysis shall be limited to the information listed in proposed regulation 19 CCR § 2111(c).

            b.    Plains' responsibility under this subsection is limited to providing the risk analysis to OSFM; Plains will maintain discretion over whether and how to implement the results of the analysis. The OSFM may review and comment on the risk analysis submitted by Plains consistent with provisions found in the proposed regulations, 19 CCR 2100 et seq.

            c.    The risk analysis shall be due within one year from entry of the CD.

7. **Leak Detection**

    A.    For any operating segments of Lines 901, 903, or 2000 (not to include any replacement lines), Plains shall confirm in writing to the OSFM within 30 days of entry of the CD that it has installed a Computational Pipeline Monitoring (CPM) Real Time Transient Model (RTTM) that is compliant with API 1130.

    B.    Within 12 months after initiating operation of any replacement lines for Lines 901 or 903, Plains shall verify and certify to the OSFM that all Pipeline and Instrumentation Drawings (P&IDs) reflect correct "as-built" information.

8. **Non-waiver**

    A.    Nothing in this CD shall excuse Plains from otherwise complying with the AB 864 regulations when they are promulgated.

**ARTICLE II – COMPANY-WIDE PROVISIONS ON REGULATED PIPELINES**

9. **Integrity Management**

    A.    New Procedures for Interim Reviews and Assessments

7

**Teel Declaration
Page 13**

1.    Plains shall modify Section 9.5 of its Integrity Management Plan ("Continual Evaluation and Assessment of Pipeline Integrity") to provide for an annual, but not to exceed 15 months, Interim Review of each pipeline segment it operates to determine whether, since the last assessment (whether it was an Interim Assessment or a full periodic assessment under Section 6), conditions have changed or new information has been obtained that could significantly impact already-identified threats or create new threats for that segment.  If so, Plains shall evaluate whether it should implement any P&M measure(s) to address that threat prior to the next regularly-scheduled assessment.  Section 9.5 shall list all the categories of potential threats to be considered as part of the Interim Review and the types of conditions, information and data that will be included in the information analysis conducted under 49 CFR § 195.452(g).

2.    Plains shall modify Section 9.5 of its IMP to provide new forms for P&M measures or actions to be taken as a result of an Interim Review.  Section 9.5 shall provide that Plains' Integrity Engineer may recommend any P&M measures that may be appropriate, including any P&M measures that could be recommended following a full assessment performed under Section 6 of its IMP.

3.    Plains shall submit its proposed modifications of Section 9.5 to PHMSA no later than 60 days after entry of the CD.  If PHMSA does not object or request any modification within 60 days, Plains shall proceed to implement the revised procedures in Section 9.5, which shall be completed within 18 months from entry of the CD.

B.    Documentation for P&M Recommendations

1.    Within 90 days from entry of the CD, Plains shall revise Part B of its P&M Recommendation form (F11-2), to expand the scope and content of comments in the "Basis of Recommendation" field to provide a narrative explanation that reflects, at a minimum:

a.    What drew the engineer's attention and caused him or her to make the recommendation (such as an anomaly, pattern, trend or potential correlation observed in the data, a particular event or occurrence, a particular change in the operation or configuration of the line or in its surrounding environment, "lessons learned" from another event or occurrence, a corporate goal or initiative, etc.);

b.    The specific risk (likelihood or consequence of failure, or both) or concern that the recommended measure is intended to investigate or address; and

8

**Teel Declaration
Page 14**

      c.     The goal or intended outcome that the recommended P&M measure is intended to achieve with regard to that specific risk or concern.

2. In the new forms for the Interim Review procedure described in Paragraph A above, Plains shall likewise provide a narrative explanation of the bases for any recommended P&M measures.

3. In Part B of its Preventive and Mitigative Evaluation Recommendation Form (F11-2), Plains shall continue to identify the anticipated completion date for the P&M measure in the column titled "Deadline Date."

C. Tracking of P&M Measures

Plains shall document P&M measures recommended but not implemented.  Plains shall document implemented P&M measures through to completion, whether undertaken pursuant to an Interim Review under Section 9.5 or a full assessment under Section 6, such that these actions will be properly documented under 49 CFR § 195.452(l).

10. **Valves and O&M**

A. Within two years after entry of the CD, Plains shall conduct EFRD analyses for all Regulated Pipelines for which it has not previously completed an EFRD analysis.

B. Within two years of entry of the CD, Plains shall develop and implement procedures to:

1. If a valve fails to respond properly on first actuation command, document the failure and review historical records for that valve to identify any systemic issues.

2. Adjust Plains' surge analyses and Emergency Response Plans, if necessary, to account for identified systemic issues associated with valve closure times.

3. Timely communicate to the Control Room the status of valve maintenance activity for those valves on Regulated Pipelines that are capable of being operated by the Control Room.

4. Verify that personnel assigned to operator-qualification tasks for valve maintenance are qualified to perform those tasks.

C. Plains shall make all repairs necessary to keep valves in good working order within one year of discovery that the valve is not operating as intended, or, if not possible, Plains shall provide timely notification (including justification) to PHMSA or OSFM as applicable.

9

**Teel Declaration
Page 15**

D.  For all field personnel who perform maintenance on facilities, equipment, or devices, Plains shall provide training:

1.  Within two years of entry of the CD, that addresses the importance of complying with Plains' policy requiring notification of Control Room personnel before beginning maintenance activities on any such facility, equipment, or device that could change the status of any pump, valve, CPM device, SCADA device, pressure or flow metering or rate that is monitored by the Control Room.  Plains shall include in the training a requirement that employees shall notify the Control Room before entering a facility to perform maintenance, or, if not possible, immediately after entering.

E.  Plains shall improve existing valve maintenance recordkeeping to include confirmation whether the valve has been actually operated during maintenance.

11.  **Leak Detection**

A.  Within 90 days after entry of the CD, Plains shall create and maintain a list of its regulated mainline pipelines, excluding gathering lines and Delivery Lines, to indicate which of the following three rupture-detection methods, if any, are used on each line: (1) Rate of Change Combination alarm; (2) low discharge pressure alarm; or (3) 5-minute computational pipeline monitoring (CPM) alarm.

1.  Within one year after entry of the CD, for any regulated mainline pipeline identified in the list created pursuant to this paragraph that does not utilize at least one of the three rupture detection methods, Plains shall implement at least one.

B.  For the term of the CD, Plains shall conduct annual training for controllers on attributes and benefits of various methods of leak detection, including Analog High/Low Threshold, Alarm Deadband, Creep Deviation, and Analog Rate of Change.

C.  Within 18 months of entry of the CD, for its CPM systems, Plains shall analyze and evaluate the use of accumulated deviation rolling time periods longer than 24 hours.

1.  Plains shall document its analysis and provide it to PHMSA for comment, but Plains shall maintain discretion over what actions to take, if any, and how to implement the results of its analysis.

D.  Within six months of entry of the CD, Plains shall have in place a written procedure for Selection of Leak Detection Method for its Regulated Pipelines.

1.  Plains shall provide the Selection of Leak Detection Method procedure to PHMSA for comment, but Plains shall maintain discretion over and be

10

**Teel Declaration<br>Page 16**

responsible for the final content and implementation of the Selection of Leak Detection Method procedure.

E.    Plains will hold periodic (at least annual) meetings to solicit feedback from Control Room and operations maintenance personnel regarding potential improvements to leak detection.  The results of the meetings will be documented and shared with appropriate personnel.  The recommendations will be evaluated and documented.

F.    Instrumentation and Display

1.    To minimize and prevent false operating conditions from being displayed, Plains shall, per API 1175 (Pipeline Leak Detection – Program Management (1st Edition, December 2015)), within three years from entry of the CD or such earlier time as required by regulations:

a.    Provide a procedure by which operations maintenance personnel and/or Control Room personnel identify and record when instrumentation has been impeded on an unplanned basis and is no longer providing accurate and updated values on pressure, flow, or temperature due to scheduled or planned maintenance activities.

b.    Track these conditions through to resolution, including instrumentation relocation when necessary.

12.    **Control Room Management**

A.    For Lines 901 and 903, prior to resuming operations on segments currently not in service or commencing operations on any replacement for those lines, Plains shall:

1.    Complete point-to-point verification reviews for all components of its SCADA system, including displays, alarm setpoint values, and alarm log descriptors;

2.    Update its piping and instrumentation diagrams, software, manuals, and operating procedures to accurately reflect the existing field configuration;

3.    Confirm that all Lo-Lo and Hi-Hi SCADA alarms are configured and programmed as critical safety related alarms for pressures and flows, and that alert notifications are correct and accurate; and

4.    Update the names of all facilities, equipment, devices, measurement points and locations in console displays, the Control Room Management Plan and Control Center General Procedures, shift reports, and form templates to reflect current operating conditions (updating or removing out-of-date names).

11

**Teel Declaration
Page 17**

B.      For Line 2000, within six months after entry of the CD, Plains shall confirm to the OSFM that all Alarm Descriptors on the control console are accurate.

C.      Plains shall implement the Control Room Management Plan measures and Control Center General Procedures measures referenced in paragraph 23(a) of the CD.

13.    **Emergency Response and Oil Spill Response Plans**

A.      California-Specific Provisions:

1.      Plains shall review and update its Bakersfield District Response Zone Plan periodically, as required by applicable regulations, including 14 CCR 816.05.  Plains' review shall include the portions of its Response Plan that address identification of culverts along the pipelines' rights-of-way, potential receptors, access to potential spill sites, and procedures to assure protection of the environment from oil spills. To the extent that Plains has a Tactical Response Plan, Plains shall make it available to the Governments upon reasonable request and as needed in connection with a drill or response to a spill.

B.      Company-Wide Provisions

1.      Plains shall, at least once before two years from the date of entry of the CD, and at least one additional time prior to termination of the CD, survey its rights-of-way for all regulated mainline pipelines of at least 24" diameter, by foot or air patrol, to identify all culverts and shall ensure the emergency response plans covering those pipelines (a) reflect the locations of all culverts identified, and (b) address potential containment and recovery techniques for spills that may occur near identified culverts.

2.      Within 180 days of entry of the CD (or within 180 days of a new employee being hired, or an existing employee being assigned to relevant duties) Plains shall provide or confirm that it has provided all employees who may reasonably be involved in spill response with NIMS ICS training at the 100 and 200 levels. Within 180 days of entry of the CD, Plains shall also provide or confirm that it has provided ICS training at the 300 and 400 level to any employee who may reasonably be expected to coordinate with the Incident Management Team during a spill response.  Plains shall provide refresher training to employees within two years after initial training and shall maintain certification of such training and make such documents available to Plaintiffs upon request.

3.      Going forward from the date of the CD, Plains shall include in its contracts with all Oil Spill Response Organizations (OSROs) a requirement that the OSROs' employees and contract employees receive training at the same level specified for Plains employees, based on their responsibilities, prior to participating in any incident response on behalf of

12

-86-

**Teel Declaration
Page 18**

Plains. Plains shall require its OSRO contractors and subcontractors to register with a third-party online compliance verification system and shall use that online verification system to spot-check the NIMS ICS Training histories for randomly-selected OSRO personnel who participate in Plains' table-top drills. Plains' spot-check shall include a reasonable number of OSRO personnel participating in the drills to help ensure that all OSRO personnel participating in incident response are trained at the ICS levels specified herein.

4.   Within 180 days of entry of the CD, Plains shall provide or confirm that it has provided all Control Room supervisors with training regarding the Control Room's emergency response responsibilities and procedures. Plains shall provide this training annually thereafter. Plains shall maintain auditable documentation that supervisors have received such training and shall make such documentation available to PHMSA upon request.

5.   Plains shall notify PHMSA (and, for California Lines, California OSPR and OSFM) of company-sponsored and organized drills in accordance with applicable regulations, including table tops (either with or without equipment deployment). Plains shall provide PHMSA (and, for California Lines, California OSPR and OSFM) with after-action reports for each table-top drill involving equipment deployment within 90 days of completion of the drill. Plains shall include lessons learned in such after-action reports and shall consider such lessons learned for incorporation into future drills or exercises.

6.   For the term of the CD, a representative of Plains' Control Room management team shall participate in any after-action or "hot wash" activity designed to identify areas of improvement following a release, and shall share, in documented form, the information obtained with relevant Control Room personnel.

14.   **Safety Management System (SMS)**

A.   Plains shall continue to implement its SMS, which is based on recommended practices in American Petroleum Institute (API) RP 1173 (Pipeline Safety Management Systems (1st Edition, July 2015)).

1.   Prior to the termination of the CD, Plains shall hire a third party to assess the conformance of its SMS to API RP 1173. Plains shall direct the third party to transmit a copy of the final report to PHMSA. Plains' responsibility under this paragraph shall be limited to engaging the third party to prepare the report and providing the report to PHMSA. Any nonconformance identified by the third party shall not be a violation of the CD.

13

**Teel Declaration
Page 19**

B.        Plains shall participate in the API Pipeline SMS Group to exchange ideas, information, and lessons learned about implementation of API RP 1173.

15.      **Drug and Alcohol Program**

A.        Within one year of entry of the CD, Plains shall review and revise its drug and alcohol misuse plans to comply with post-accident and random drug and alcohol testing required by 49 C.F.R. §§ 199.105(b), (c), and 49 C.F.R. § 199.225(a). This shall include a review of all covered positions among Control Room personnel and field personnel for inclusion in the plans for post-accident testing. Covered positions shall include any person with authority to shut down a pipeline, including Control Room shift supervisors. Plains shall ensure adequate implementation and documentation for all post-accident drug/alcohol tests as required by 49 C.F.R. § 199.117(a)(5) and 49 C.F.R. §§ 199.227(b)(4), (c)(1)(v) and in accordance with its procedures. Should Plains determine that it is not possible to administer a post-accident drug/alcohol test on a covered employee whose performance of a covered function either contributed to the accident or could not be completely discounted as a contributing factor within the time specified in the regulations, Plains shall document why the test was not administered within such time.

14

**Teel Declaration
Page 20**

# APPENDIX C

## (*Intentionally left blank*)

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P. Consent Decree*

**Teel Declaration**
**Page 21**

# APPENDIX D

## *(Remaining Corrective Actions from the PHMSA CAO)*

## APPENDIX D

1.    All outstanding corrective actions in PHMSA's closed Corrective Action Order (CAO), CPF No. 5-2015-5011H, as amended, are hereby merged into this Consent Decree, as outlined below, and subject to the sole regulatory oversight of the OSFM.

   a. **Line 901 Shutdown.** Plains shall not operate Line 901 until authorized to do so by the OSFM.

   b. **Restart Plan for Line 901.** If Plains seeks to restart Line 901, Plains shall develop and submit, at least 60 days in advance of a scheduled restart, a written Restart Plan for Line 901 to the OSFM for review and approval. Once approved by the OSFM, the Restart Plan shall be incorporated by reference into this Consent Decree. The Restart Plan shall include:

   1)    Documentation of the completion of all mandated actions, and a management of change plan to ensure that all procedural modifications are incorporated into Plains' operations and maintenance procedures manual;

   2)    Provisions for adequate patrolling of Line 901 during the restart process and shall include incremental pressure increases during start-up, with each increment to be held for at least two hours;

   3)    Sufficient surveillance of the pipeline during each pressure increment to ensure that no leaks are present when operation of the line resumes;

   4)    A specific day-light restart that includes advance communications with local emergency response officials;

   5)    Master Control Room enhancements, including:

   a) Implementation of advanced leak-detection

- 1 -

**Teel Declaration
Page 23**

capabilities that include mass balance and line pack calculations (the total volume of liquid present in a pipeline section). The leak-detection improvements shall include:

1.  Revised alarm threshold adjustments;

2.  Additional required instrumentation; installation of additional safety valves as a result of Plains' EFRD evaluation;

b)  Review and update of the alarm set-point values of pressures and flows to account for hydraulics and the interaction of topography, pipeline status (running and shutdown), sensor location, and historical pressure and flow values by configuration, in order to provide a basic level of leak detection when the pipeline is down and not running.  Dynamic alarm limits based on pipeline status shall be used if hydraulically required;

c)  Implementation of modifications to the existing alarm priority/severity system to incorporate low and high pressure and flow values in major or safety-related alarm (SRA) categories;

d)  Implementation of emergency shutdown programming associated with Line 901 that can be executed by the Shift Supervisor or Controller;

e)  Development and implementation of training associated with the emergency shutdown programming described above; and

f)  Provision of additional controller training that

incorporates awareness of abnormal operations and reduced-pressure operational characteristics, including alarm set-point revisions for conditions similar to the Refugio Incident.

6) Elimination and documentation of actions taken to prevent inappropriate uncommanded Valve 460 (Sisquoc Conoco) status and position changes;

7) Installation of additional safety valves as a result of Plains' EFRD evaluation;

8) Installation of additional pressure sensors as a result of Plains' surge study;

9) Initiation of a UT ILI within seven days after steady-state operation is achieved in accordance with an ILI schedule approved by the OSFM. The tool run shall be initiated during daylight hours. If the tool run does not collect a complete data set, the UT tool shall be promptly re-run. A report from the ILI tool vendor shall be completed within 30 days of running the tool. Plains shall complete its review and analysis of the ILI report within 15 days of receiving the report. Provisions shall be made to address any immediate repairs that result from an initial data analysis of the UT ILI run; and

10) **Corrosion Prevention.** Plains shall include a long-term plan to address corrosion under insulation (CUI) on Line 901 that meets the requirements of 49 C.F.R. Part 195, Subpart H, in any Restart Plan. Plains may address the inadequate corrosion prevention through any method approved by the OSFM, including but not limited to the provisions contained in CAO Amendment No. 3, Section 2(a)-(c).

c. **Return to Service of Line 901.** After the OSFM approves the Restart Plan, Plains may return Line 901 to service but the operating pressure shall not exceed eighty percent (80%) of the actual operating pressure in effect immediately prior to the Refugio Incident on May 19, 2015.

d. **Removal of Pressure Restriction of Line 901.** The OSFM may allow the removal or modification of the pressure restriction upon a written request from Plains demonstrating that restoring the pipeline to its pre-Refugio Incident operating pressure is justified, based on a reliable engineering analysis showing that the pressure increase is safe, considering all known defects, anomalies, and operating parameters of the pipeline. The OSFM may allow the temporary removal or modification of the pressure restriction upon a written request from Plains demonstrating that temporary Preventive and Mitigative (P&M) measures will be implemented prior to and during the temporary removal or modification of the pressure restriction. The OSFM's determination shall be based on consideration of the Refugio Incident's cause and Plains' evidence that P&M measures provide for the safe operation of Line 901 during the temporary removal or modification of the pressure restriction.

e. **Line 903 Shutdown.** After purging Line 903, Plains shall not operate Line 903 between Gaviota and Pentland stations until authorized to do so by the OSFM.

f. **Restart Plan for Line 903.** If Plains seeks to restart the Gaviota-to-Pentland segment of Line 903, Plains shall develop and submit, at least 60 days in advance of a scheduled restart, a written Restart Plan for the Gaviota-to-Pentland segment of Line

903 to the OSFM for review and approval. Once approved by the OSFM, the Restart Plan shall be incorporated by reference into this Consent Decree. In addition to all the requirements set forth in the above subparagraphs 1.b.1)-11), excluding subparagraph 1.b.6), the Restart Plan shall include:

1) Provisions for adequate patrolling during the restart process and the inclusion of incremental pressure increases during start-up, with each increment to be held for at least two hours;

2) Sufficient surveillance of the pipeline during each pressure increment to ensure that no leaks are present when operation of the line resumes; and

3) Provisions for a daylight restart and advance communications with local emergency response officials.

g. **Line 903 Return to Service.** After the OSFM approves the Restart Plan for the Gaviota-to-Pentland segment of Line 903, Plains may return that segment to service, but the operating pressure shall not exceed eighty percent (80%) of the highest pressure sustained for a continuous 8-hour period between April 19, 2015, and May 19, 2015, for Line 903 (Gaviota-to-Sisquoc and Sisquoc-to-Pentland segments).

h. **Removal of Pressure Restriction for Line 903.** After a return to service, Plains may request the OSFM to remove the pressure restriction for the Gaviota-to-Pentland segment of Line 903.

1) The OSFM may allow removal or modification of the pressure restriction upon a written request from Plains demonstrating that restoring the pipeline to its pre-Refugio Incident operating pressure is justified, based on a reliable

engineering analysis showing that the pressure increase is safe, considering all known defects, anomalies, and operating parameters of the pipeline.

2)    The OSFM may allow the temporary removal or modification of the pressure restriction upon a written request from Plains demonstrating that temporary P&M measures will be implemented prior to and during the temporary removal or modification of the pressure restriction. The OSFM's determination shall be based on consideration of the Refugio Incident's cause and Plains' evidence that P&M measures provide for the safe operation of Line 903 during the temporary removal or modification of the pressure restriction.  Requests for removal of the pressure restriction may be submitted by pipeline segment.

i.  **Notifications.**  Plains shall provide notification to the OSFM within five business days of any of the following events: any investigation and remediation field actions for identified anomalies (i.e., digs and repairs), ILI tool runs, and/or startup dates.

j.  **Reporting Requirements for Lines 901 and 903.**  If and when Plains has concluded all items in this Appendix D, Plains shall submit a final Appendix D Documentation Report to the OSFM for review and approval.

1)    The OSFM may approve the Appendix D Documentation Report incrementally without approving it in its entirety.

2)    Once approved by the OSFM, the Appendix D Documentation Report shall be incorporated by reference into this Consent Decree.

3)      The Appendix D Documentation Report shall include but not be limited to:

A.   Table of Contents;

B.   [*intentionally left blank.*]

C.   [*intentionally left blank.*]

D.   Summary of all tests, inspections, assessments, evaluations, and analysis to the extent required under this Appendix D;

E.   [*intentionally left blank.*]

F.   [*intentionally left blank.*]

G.   Lessons learned while fulfilling the requirements of this Appendix D.

# EXHIBIT B

## Declaration of Julie Teel Simmonds

## Summary of State Regulation of Crude Oil Pipelines in Santa Barbara County
December 31, 2025
(Updates in red)

Sable Offshore Corporation is attempting to restart the Santa Ynez Unit oil and gas operation in Santa Barbara County. The Santa Ynez Unit includes three offshore platforms in federal waters connected to shore by offshore pipelines, onshore pipelines, the Ellwood Pier, mooring buoys, and the Las Flores Canyon Processing Facility.  The onshore pipelines include pipelines identified as CA-324 and CA-325 that were responsible for the 2015 Refugio Oil Spill.

This summary outlines the many state agencies that oversee the Santa Ynez Unit operations, including oil pipeline construction, maintenance and operations, which would need to approve various actions to allow these pipelines to restart. This summary has been assembled to build public understanding of the regulatory processes over these pipelines.

## Overview

California's lands and offshore waters have hosted significant crude oil extraction for well over a century. Since the mid-1980's, however, crude oil extraction has declined each year largely due to decreasing levels of easily accessible crude oil.

Today, the state has three active crude oil/petroleum extraction platforms off its coast in state waters and eight active platforms in federal waters. These platforms are connected to the shore via undersea pipelines that transport crude oil from the offshore platforms to onshore facilities that process the oil for sale. This oil is eventually transported to refineries to be converted into products such as gasoline and diesel fuel.

California state government enforces a broad set of laws and regulations over many aspects of crude oil infrastructure. This includes oversight of the extraction, transport, and refining of crude oil. These laws and regulations exist to protect public health and safety and to safeguard California's natural resources and environment.

## Oversight By Agency

Multiple state agencies regulate the pipelines owned and operated (pipelines CA-324 and CA-325) by Sable Offshore Corporation in Santa Barbara County that the company is attempting to restart. Each of these state entities has specific authorities and obligations over these pipelines that is detailed in state law and discharges these responsibilities through regulatory and oversight processes.

The state entities with oversight over these pipelines include (in alphabetical order):

1. California Coastal Commission
2. California Department of Conservation, California Geologic Energy Management Division (CalGEM)

**Teel Declaration
Page 31**

3. California Department of Fish and Wildlife (CDFW), including the Office of Oil Spill Prevention and Response (OSPR)
4. California Department of Forestry and Fire Protection (CAL FIRE), Office of the State Fire Marshal (OSFM)
5. California Department of Parks and Recreation (State Parks)
6. Central Coast Regional Water Quality Control Board
7. Central Valley Regional Water Quality Control Board
8. State Lands Commission

These state entities, with the exception of the two regional Water Quality Control Boards, exist within the California Natural Resources Agency. The regional Water Boards fall under the umbrella of the California Environmental Protection Agency.

Below is a short summary of the referenced state entities with regulatory oversight over these pipelines.

**CALIFORNIA COASTAL COMMISSION**
*Issues permits for approved development activity in coastal areas.*

- FOCUS: Environmental protection and public access to state coastal areas.
- ROLE & AUTHORITY: Under the California Coastal Act of 1976, the California Coastal Commission has permitting responsibility for non-exempt pipeline work and other development associated with the pipeline in the Coastal Zone, including any enforcement actions for permitting requirements. The Commission also has federal consistency review authority under the Coastal Zone Management Act of certain pipeline-related activities in federal waters.
- ACTIONS UNDERWAY: Commission staff is coordinating with Santa Barbara County, which shares the permitting jurisdiction, on permitting processes related to Sable's work along the pipeline.  Commission staff continues to direct Sable to apply for a Coastal Development Permit to resolve Coastal Act violations that occurred both onshore and offshore.
    o *On September 27, 2024*, Commission staff issued a Notice of Violation letter to Sable due to then recent and ongoing development activities that were occurring on and around the pipeline within the Coastal Zone without any Coastal Act authorization, requesting that Sable cease and desist.
    o *On October 4, 2024,* Commission staff issued a Notice of Intent to issue an Executive Director Cease and Desist Order and requested confirmation that all work on the pipeline had ceased and that Sable would apply for a Coastal Development Permit for the work that had already occurred.
    o *On November 12, 2024,* the Commission's Executive Director issued a Cease and Desist Order to Sable, directing Sable, among other things, to submit an application for a Coastal Development Permit *"for any proposed future work to be undertaken along the Pipelines, as well as for after-the-fact ('ATF') authorization for unpermitted development that has already occurred."*
        ▪ Sable temporarily ceased its onshore activities.  The Cease and Desist Order expired on February 10, 2025.  The deadline established in the Order

**Teel Declaration
Page 32**

for Sable to apply for a Coastal Development Permit expired on March 12, 2025.  Sable has not filed an application.

- *On February 18, 2025*, Sable filed a complaint against the Commission in Santa Barbara Superior Court, challenging two Notices of Violation and the Executive Director Cease and Desist Order issued on November 12, 2024. Sable is seeking declaratory and injunctive relief and inverse condemnation damages.

o *On February 11, 2025*, Commission staff issued a Notice of Violation letter to Sable regarding unpermitted development activities which had taken place offshore, in state coastal waters. This letter asked Sable to cease any further unpermitted development activities and apply for after-the-fact authorization for those development activities already undertaken.

o *Around February 14, 2025*, four days after the Executive Director Cease-and-Desist order had expired, Sable recommenced its onshore activities in the coastal zone, and *on February 18, 2025*, the Commission's Executive Director issued a second Executive Director Cease and Desist order addressing the unpermitted development activities Sable had recommenced onshore. This order, among other things, directed Sable to, again, cease any further development activities at the onshore locations. This Executive Director Cease and Desist Order also included notice of the Executive Director's intent to pursue a future Cease and Desist Order and other further enforcement actions from the Coastal Commission.  Sable did not cease its activities or comply with the order.

o On *April 10, 2025*, the Commission held a five-hour, noticed, public hearing, at the conclusion of which it issued Sable a Cease and Desist Order and Restoration Order and imposed an administrative penalty.  The Cease and Desist Order required, among other things, that Sable cease operations until securing Coastal Act authorization or a formal, final exemption determination for any work it wished to pursue.  It also required that Sable seek after-the-fact Coastal Act authorization for work already completed and prospective authorization for anticipated work.  The administrative penalty requires Sable to pay approximately $18 million, with a potential reduction to approximately $15 million if Sable complies with the requirement to seek Coastal Act authorization and pursues the most expeditious permitting approach.  Sable continued its work and did not apply for authorization under the Coastal Act.

o *On April 16, 2025*, the Commission filed a cross-complaint and an application for a temporary restraining order (TRO) and preliminary injunction (PI) against Sable to enforce the April 10, 2025 Cease and Desist Order.  That same day, Sable amended its complaint against the Commission to add a challenge to the Commission's April 10 actions.

o *On April 17, 2025*, the trial court reversed its tentative ruling in favor of the Commission, denied the Commission's request for a TRO, and set a hearing for May 14, 2025, on an Order to Show Cause (OSC) why a PI should not issue.

- *On April 21, 2025*, the Commission filed a notice of appeal of the denial of the TRO, and on April 22, 2025, the Commission filed a writ petition with the Court of Appeal seeking immediate injunctive relief.
- *On May 6, 2025*, the trial court issued an order moving the OSC hearing to May 28, 2025, and requiring the parties to submit briefs by May 14, 2025, on the question of whether the trial court retains jurisdiction to consider the issuance of a PI at an OSC hearing, given the Commission's appeal and writ petition.
- *On May 15, 2025*, the Court of Appeal denied the Commission's April 22, 2025 request for a writ but confirmed that the trial court retained jurisdiction to act on the Commission's request for a PI, and the trial court denied the Commission's request to hold the OSC hearing on the Commission's request for a PI sooner than May 28, 2025, given the resolution of the jurisdictional issue.
- *On May 16, 2025*, the Commission filed a demurrer to several of the causes of action in Sable's First Amended Complaint.
- *On May 28, 2025*, the trial court granted the Commission's request for a PI and directed the Commission to submit a proposed order.  After multiple rounds of objections to the Commission's proposed order from Sable, the court overruled the objections on June 9 and signed the order that the Commission had proposed on June 10.
- *On June 4, 2025*, the court held a case management conference and set the case (including both Sable's case against the Commission and the Commission's cross-complaint against Sable to enforce its orders) for trial in October 2025.
- *On June 13, 2025*, Sable filed a motion to stay the Cease-and-Desist Order that the Commission had issued on April 10 and that the court's preliminary injunction prohibits Sable from violating.  Sable also filed a demurrer to the Commission's cross-complaint.
- *On June 18, 2025*, the trial court sustained the Commission's demurrer to one cause of action in Sable's complaint but overruled it with respect to the other causes of action.
- *On July 9, 2025,* the trial court held a hearing on the motion Sable filed on June 13, 2025, asking the court to stay the Commission's Cease-and-Desist Order.  The court denied the motion.
- *On July 15, 2025*, Sable filed a petition with the Court of Appeal for a writ of supersedeas to stay the effectiveness of the preliminary injunction issued by the trial court.
- *On July 23, 2025*, the trial court overruled Sable's demurrer to the Commission's cross-complaint, granted the Commission's motion to bifurcate the case such that only Sable's petition for a writ of mandate would go to trial in October, and denied the Commission's motion for a protective order to preclude all post administrative hearing discovery.
- *On July 29, 2025*, Sable filed a petition for a writ of mandate with the Court of Appeal to overturn the trial court's July 9 ruling and stay the Commission's Cease-and-Desist Order.

**Teel Declaration
Page 34**

- o *On August 4, 2025*, the Court of Appeal denied both Sable's July 15 petition for a writ of supersedeas and its July 29 petition for a writ of mandate.
- o ~~Trial on Sable's first cause of action (petition for a writ of mandate) is set for October 15, 2025.~~
- o On *October 15, 2025*, <u>trial was held on Sable's first cause of action (petition for writ of mandate). The</u> trial court ruled in favor of the Commission and against Sable, declining to issue the requested writ, rejecting Sable's challenges to the Commission's action, and upholding the Commission's April 10 orders and penalties. It also scheduled a hearing and case management conference for December 3 to resolve the remaining issues.
- o *On November 5, 2025*, Sable filed three things with the Court of Appeal: (1) Sable's opening brief on its appeal of the preliminary injunction that the trial court granted on May 28 and issued on June 10; (2) a petition for a writ of mandate, asking the Court of Appeal to overturn the October 15 trial court decision; and (3) a motion to consolidate the prior two items.
- o *On November 6, 2025*, the Commission filed a motion for judgment on the pleadings in the trial court, seeking to enforce its cross-complaint.
- o On *November 24, 2025*, the Court of Appeal denied Sable's petition for a writ of mandate seeking to overturn the trial court's October 15 ruling, as well as Sable's request to consolidate that proceeding with its pending appeal of the preliminary injunction that the trial court granted on May 28 and issued on June 10.
- o ~~A hearing is scheduled for~~ <u>On</u> *December 3, 2025*, ~~for~~ the trial court ~~to rule on~~ <u>denied</u> the Commission's motion for judgment on the pleadings<u>, granted</u> ~~and~~ Sable's motion~~s (1)~~ for leave to file a second amended complaint<u>, continued Sable's motion</u> ~~and (2)~~ to compel discovery<u>, and set a briefing schedule</u> ~~; at which  hearing the court indicated it would also~~ <u>for the parties to</u> address whether any of Sable's claims remain viable given the court's October 15 ruling<u>, with a hearing set for January 21</u>.
- o *On December 23, 2025,* following PHMSA's determination that Sable's lines CA-324 and CA-325 are interstate pipelines subject to PHMSA's regulatory jurisdiction, PHMSA's approval of Sable's Restart Plan, and PHMSA's approval of Emergency Special Permits for Sable, the Commission sent a letter to PHMSA, requesting review of the Restart Plan and Special Permit applications under Subpart D of the Coastal Zone Management Act (CZMA) to determine if the applications trigger federal consistency review as unlisted permits/licenses. The Commission is also reviewing PHMSA's jurisdiction determination to assess whether PHMSA must submit a consistency determination pursuant to Subpart C of the CZMA, which gives the Commission authority to review federal agency activities that have reasonably foreseeable effects on any coastal resource or use.
- FOR MORE INFORMATION: Contact the [California Coastal Commission](#) at [ExecutiveStaff@coastal.ca.gov](#) or the Commission's Public Information Officer at (415) 200-8052.

**Teel Declaration**
**Page 35**

**CALIFORNIA DEPARTMENT OF CONSERVATION: GEOLOGIC ENERGY MANAGEMENT DIVISION (CalGEM)**

*Oversees and regulates oil processing and production facilities.*

- FOCUS: Public health and safety, environmental quality.
- ROLE & AUTHORITY: The Department of Conservation oversees compliance for oil production facility management. While the department has oversight of the Las Flores Canyon oil processing facility, CalGEM approval is not required prior to restarting the pipeline. CalGEM does, however, have a role in ensuring compliance with other regulatory partners in completing an oil spill plan, a pipeline management plan, various testing and maintenance requirements, bonding to cover decommissioning costs, and oversight of any potential oil production work happening near communities (called health protection zones).
- ACTIONS UNDERWAY:
    - *On December 17, 2024*, the Department of Conservation sent a letter to Sable notifying them of the need for an additional inspection of facilities, and production and bonding requirements.
    - On *May 9, 2025,* the Department of Conservation sent a letter to Sable notifying them that a bond in the amount of $31.9 million must be filed and outlining additional production facility requirements.
- FOR MORE INFORMATION: Contact Department of Conservation Public Affairs at PAO@conservation.ca.gov or the Office of the Director at (916) 322-1080.

**CALIFORNIA DEPARTMENT OF FISH AND WILDLIFE/CDFW OFFICE OF SPILL PREVENTION AND RESPONSE**

*Manages natural resources for their ecological value and for public use.*

- FOCUS: Protecting wildlife.
- ROLE & AUTHORITY:  Exercises oversight as a landowner, as well as through its authority to protect fish and wildlife, and separately through one of its offices that oversees prevention, preparation for, and response to oil spills. CDFW-OSPR reviews and approves oil spill response plans and works to ensure that facilities have the financial resources necessary to cover the costs of oil spill scenarios. Under the Endangered Species Act and other Fish and Game Code laws, CDFW also oversees the review and approval process for evaluating impacts to wildlife due to altering the adjacent landscape.
- ACTIONS UNDERWAY:
    - *In October 2024*, CDFW-OSPR certified that Sable had the financial resources to cover the costs of a reasonable worst-case scenario oil spill.
    - *On November 22, 2024*, CDFW-OSPR sent a second notice to Sable sharing that its offshore contingency plan (C-Plan #CA-00-7239) was deficient.  On December 20, 2024, Sable submitted corrections to its plan.  CDFW-OSPR is reviewing these corrections and must respond by January 19, 2025.
        - Additional corrections were submitted by Sable on December 20, 2024 and January 17, 2025. CDFW-OSPR has reviewed the plan and found no deficiencies.

**Teel Declaration**
**Page 36**

- *On March 26, 2025*, following the completion of a formal review, CDFW OSPR issued an approval letter for the C-Plan and an updated COFR for #CA-00-7239.

o *On December 17, 2024*, CDFW-OSPR sent a third notice to Sable sharing that its onshore contingency plan (C-Plan #CA-00-7217) was deficient. On January 9, 2025, Sable submitted corrections to its plan. CDFW-OSPR is reviewing these corrections and must respond by February 9, 2025.

- OSPR has reviewed the plan and found no deficiencies.
- On *March 26, 2025*, following the completion of a formal review, CDFW OSPR issued an approval letter for C-Plan #CA-00-7217

o *On December 17, 2024,* CDFW also issued a notice of potential violation (NOPV) for Fish and Game Code violations. This notice requests that Sable discontinue any work on CDFW properties and contact CDFW to discuss remedial measures and other actions to address impacts. Specifically, the NOPV explained that Sable appeared to have: (a) violated Fish and Game Code section 1602(a)(1) by failing to notify CDFW prior to undertaking activities subject to that section, as well as sections 5650 and 5652; and (b) conducted work outside a 50-foot-wide pipeline easement on CDFW property. The NOPV requested Sable to discontinue any work on CDFW property inconsistent with the easement and to contact CDFW to discuss remedial measures and other actions to address impacts on fish and wildlife resources at the locations identified in the NOPV.

    o Sable submitted three notifications to CDFW under Fish and Game Code section 1602(a)(1), all to complete remediation work at the locations identified in the notifications.

        • *On February 18, 2025*, CDFW received a notification (No. EPIMS-SBA-57481-R5) pertaining to Sable's previous work at Site 280.65.19 (Unnamed Drainage East of Baron Ranch). *On March 18, 2025*, CDFW notified Sable that its notification was complete and because the project would not substantially adversely affect an existing fish or wildlife resource, a streambed alteration agreement was not required.

        • *On March 13, 2025*, CDFW received a second notification (No. EPIMS-SBA-58088-R5) pertaining to the three locations in Santa Barbara County that CDFW identified in the NOPV: Sites R5-1, R5-2, and R5-3. *On April 14, 2025*, CDFW determined the notification was complete. CDFW also determined the work at the three locations identified in the notification will not substantially adversely affect an existing fish or wildlife resource, and therefore a streambed alteration agreement would not be needed for any of the work. CDFW explained this in a letter to Sable dated April 14, 2025.

        • *On March 4, 2025*, CDFW received a third notification (No. EPIMS-SLO-57972-R4) pertaining to the location that CDFW identified in the NOPV: Site R4-1.

            o *On April 3, 2025*, CDFW sent Sable a letter, explaining the third notification was incomplete. *On April 25, 2025*, Sable

**Teel Declaration**
**Page 37**

submitted additional information to CDFW in response to CDFW's April 3, 2025, letter.

- o *On May 27, 2025*, CDFW sent Sable a letter explaining the third notification with the additional information was complete. The letter also explained that CDFW will have until *July 28, 2025*, to submit to Sable a draft streambed alteration agreement for the work described in the notification if CDFW determines an agreement is needed.
- o *On July 25, 2025*, CDFW submitted to Sable a draft streambed alteration agreement for the work described in the third notification.
- o *On August 26, 2025*, Sable responded to the draft streambed alteration agreement, requesting minor changes.
- o *On September 5, 2025*, CDFW submitted a revised draft streambed alteration agreement to Sable that included the changes discussed between CDFW and Sable. If Sable signs the revised draft agreement and CDFW subsequently signs, it will become the final agreement.

- *On August 27, 2025*, CDFW received a fourth notification from Sable that included nine sites where Sable had previously completed work. None of the sites was included in CDFW's NOPV.
    - o *On September 29, 2025*, CDFW deemed the notification complete. CDFW has until *December 1, 2025* to submit a draft streambed alteration agreement for each of the work sites if an agreement is needed.
    - o On *December 1, 2025*, CDFW submitted a draft streambed alteration agreement to Sable that covers all nine work sites identified in Sable's fourth notification.
- *On February 7, 2025*, one of Sable's contractors, SCS Engineers, requested a letter of permission from CDFW to access the Carrizo Plains Ecological Reserve to conduct work within a pipeline easement that precedes CDFW's ownership of the property. *On November 12, 2025*, CDFW granted permission.

- o Sable Offshore Corp continues to maintain compliance with OSPR's exercise requirements for both the offshore (CA-00-7217) and onshore (CA-00-7239) contingency plans. Both of Sable Offshore Corp's plans are Tier 1, which has the greatest drill and exercise requirements. There are two exercises scheduled for the remainder of the year:
    - o CA-00-7217 – Offshore plan. Exercise is scheduled for 7/17/25.
        - ▪ 7/25/2024 Exercise. Received credit for multiple objectives
    - o CA-00-7239 – Onshore plan. Exercise scheduled for 9/18/2025.
        - ▪ 9/18/2024 Exercise. Received credit for multiple objectives
- o OSPR's contingency plan exercise program is outlined in Title 14, California Code of Regulations (CCR), Section 820.1.  The program establishes

**Teel Declaration**
**Page 38**

exercise requirement tiers based upon plan holders largest Reasonable Worst-Case Spill (RWCS) volume.

- o For facilities, the regulations establish 10 objectives; objectives (1) and (2) must be successfully achieved annually. Any number of objectives (3) through (10) may be tested during an exercise, but over any consecutive three-year period all objectives in (3) through (10) must be tested and successfully achieved.

- • FOR MORE INFORMATION: Contact Department of Fish and Wildlife Public Information Officer at  Steve.Gonzalez@wildlife.ca.gov or (916) 804-1714.

**CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION (CAL FIRE): OFFICE OF THE STATE FIRE MARSHAL**

*Oversees and regulates the safety and operation of intrastate pipelines moving hazardous liquid in California.*

- • FOCUS: Protecting public safety and spill prevention.
- • ROLE & AUTHORITY: With other regulatory partners, inspects, regulates, and oversees the overall safety of hazardous liquid pipelines. Prior to restarting any pipeline, the State Fire Marshal must approve a thorough list of requirements and regulations, including Sable's proposed plans for using technology to minimize oil spill impacts, a detailed risk analysis, safety compliance reports, pipeline integrity evaluations, field verifications and maintenance plans, start-up and safety inspection plans, and waiver applications proving equal or greater levels of safety than required regulations.
- • ACTIONS UNDERWAY:
  - o CAL FIRE Office of the State Fire Marshal (OSFM) approved a risk analysis and implementation plan for Sable's use of best available technologies in 2021.
  - o *On December 17, 2024*, OSFM submitted waivers for federal review.
    - ▪ *On February 11, 2025,* PHMSA provided its notification of non-objection.
  - o Sable has completed most of the required pipeline repairs, and OSFM has inspected the field work. OSFM must verify records of those repairs. OSFM has completed two additional PHMSA-required inspections since August 15; both inspections resulted in minor recommended suggestions and no significant findings.
  - o All remaining oversight items, including approving the pressure testing results of lines and Sable's submission of an updated start-up plan, which OSFM must review and approve, remain open and must be completed prior to restarting the pipeline. Following Sable's submission to OSFM of the final start-up plan, OSFM will review the plan and provide recommendations for approval or denial of the plan.
  - o *On June 2, 2025*, Center for Biological Diversity and Environmental Defense Center separately moved ex parte for temporary restraining orders in Santa Barbara County Superior Court to prevent OSFM from issuing authorizations or proceeding with restart of the Las Flores Pipeline System.  The Superior Court granted each petitioner's request for a temporary restraining order and the judge clarified from the

**Teel Declaration**
**Page 39**

bench that the orders would stop not just approval of the restart plan, but all activity by CAL FIRE relating to Lines 324 and 325. The court set a hearing on the requests for preliminary injunction for July 18, 2025.

- o *On July 18, 2025*, the court issued a preliminary injunction that allows OSFM to resume pipeline safety inspections on lines CA-324 and CA-325, as warranted.   The court's order contained several other requirements, including that the restart of the Las Flores Pipelines would remain enjoined until 10 court days after Sable filed a notice with the court indicating that Sable had received all necessary approvals and permits for restart of the Las Flores Pipelines and that Sable intended to restart the lines.  OSFM will continue to uphold the laws and the court orders related to this case as staff works to ensure actions taken by the operator to restart lines 324 and 325 meet all pipeline safety requirements under the purview of OSFM.
- o *On September 11, 2025*, Sable submitted its updated restart plan to OSFM. These documents are currently under review by OSFM staff.
- o *On October 22, 2025,* the State Fire Marshal sent a letter to Sable notifying the company of deficiencies in its compliance with the State Waivers, which prevent the restart of the pipelines.  OSFM continues to review the restart plan submitted by Sable in September and reserves its rights to provide additional direction or comment as part of that review.
- o *On December 17, 2025*, OSFM was notified that PHMSA determined Lines CA-324 & CA-325, operated by Sable Offshore Corp. in Santa Barbara County, are interstate pipelines and thus within PHMSA's federal jurisdiction. In its decision, PHMSA indicated that it would assume regulatory authority of the lines going forward.
- o *On December 22, 2025,* OSFM was notified that PHMSA approved Sable's Restart Plan for Lines CA-324 & CA-325.
- o *On December 23, 2025,* PHMSA issued Emergency Special Permits to Sable that allow alternative safety measures in lieu of compliance with regulations relating to cathodic protection. These permits are similar in nature to the State Waivers issued by OSFM in December 2024 and consented to by PHMSA in February 2025, but contain a significant modification relating to pre-operation repairs.

- FOR MORE INFORMATION: Contact <u>CAL FIRE</u> Communications at <u>calfire.dutypio@fire.ca.gov</u> or (916) 651-FIRE (3473).

**CALIFORNIA DEPARTMENT OF PARKS AND RECREATION**
*Protecting and managing California state park land in areas where onshore pipelines are located.*

- FOCUS: Environmental protection, state-owned land stewardship.
- ROLE & AUTHORITY: The California Department of Parks and Recreation manages public land for public benefits in areas where onshore pipelines may cross. The Department may grant easements for pipelines on this property. Specifically, this would include an easement to accommodate a four-mile section for pipeline maintenance in Gaviota State Park. The previous 30-year easement expired in 2016. Since then, the Department has issued individual permits for accessing and maintaining the pipeline.
- ACTIONS UNDERWAY:

**Teel Declaration**
**Page 40**

- o *On December 20, 2024*, the Department of Parks and Recreation sent a letter to Sable requesting a full project description to evaluate their request for an easement.
- o The Department of Parks and Recreation evaluated a request to perform maintenance anomaly digs and associated repair work along a four-mile section of pipeline on State Parks property.
- o *On May 9, 2025*, the Department of Parks and Recreation issued a Right of Entry Permit to Sable to perform the 18 anomaly digs within Gaviota State Park, with work to commence on May 12, 2025.
- o *As of June 6, 2025*, the work authorized by the Right of Entry Permit is complete, except for some of the restoration requirements, including restoring San Julian Road, which provides access to a local elementary school and some park visitor access. The section of road is not within the Coastal Zone.
- o *On June 27, 2025*, staff sent Sable a letter detailing the steps for submitting a complete easement application.
- o As of *August 12, 2025*, Sable has sent an easement request package. State Parks is reviewing and working with Sable to provide any other information needed for State Parks' review.
- o *On November 13, 2025*, State Parks informed Sable it will be preparing an Initial Study to determine the proper CEQA documentation for Sable's easement request at Gaviota State Park.

- FOR MORE INFORMATION: Contact Department of Parks and Recreation Communications at newsroom@parks.ca.gov.

**CENTRAL COAST AND CENTRAL VALLEY REGIONAL WATER QUALITY CONTROL BOARDS**
*Protecting the state's water ways and drinking water.*

- FOCUS: Water quality and environmental public health.
- ROLE & AUTHORITY: The Central Coast and Central Valley Regional Water Quality Control Boards oversee water resources for the State of California within their respective jurisdictions, implementing the Clean Water Act and the Porter-Cologne Water Quality Control Act.  The Regional Water Boards regulate the discharge of waste, such as sediment, that could occur during pipeline repair or construction. This includes issuing permits for dredging and land disturbances, and discharges of waste and stormwater.
- ACTIONS UNDERWAY FOR CENTRAL COAST REGIONAL WATER QUALITY CONTROL BOARD:
  - o *On December 13, 2024*, following an inspection, the Central Coast Regional Water Quality Control Board issued violation and non-compliance notices for unauthorized waste discharge into Santa Barbara County waterways, as well as a directive to seek permit coverage. Sable must take corrective action, submit a waste discharge report, and apply for appropriate permits.
  - o *On January 22, 2025*, the Central Coast Regional Water Quality Control Board issued Sable a directive to submit a technical report describing Sable's activities at all pipeline work locations and associated potential discharges to waterways. The technical report was due March 10, 2025.

**Teel Declaration**
**Page 41**

- On March 8, 2025, Sable submitted an incomplete response to the Central Coast Regional Water Quality Control Board's January 22, 2025 directive to submit a technical report.
- On April 15, 2025, Sable submitted additional incomplete information in response to the Central Coast Regional Water Quality Control Board's January 22, 2025 directive to submit a technical report.

o On January 31, 2025, Sable submitted an application for waste discharge requirements for its work at one waterway location.

- On March 20, 2025, the Central Coast Regional Water Quality Control Board issued authorization to Sable to restore the one waterway location identified in its January 31, 2025 application.

o On February 28, 2025, the Central Coast Regional Water Quality Control Board inspected additional project work locations discovered as a result of public complaints.  Staff observed unauthorized work within waters of the state and discharges of waste to waters of the United States.

o On March 4, 2025, Sable submitted two applications for coverage under the statewide permit for stormwater discharges associated with construction and land disturbing activities. The applications are under review.

o On March 13, 2025, Sable submitted applications for waste discharge requirements for its work at four additional waterway locations.

- On June 2, 2025, the Central Coast Regional Water Quality Control Board issued authorization to Sable to restore the four waterway locations identified in its March 13, 2025 applications.

o On April 7, 2025, Central Coast Regional Water Quality Control Board staff notified Sable and the public that the Board will consider adopting a resolution to refer alleged violations of the California Water Code for potential civil judicial enforcement to the California Office of the Attorney General at a public hearing on April 17, 2025.

o On April 15, 2025, the Central Coast Regional Water Quality Control Board issued a second notice of violation for unauthorized waste discharge into Santa Barbara County waterways and for failure to submit the technical report due on March 10, 2025.

o On April 16, 2025, the Central Coast Regional Water Quality Control Board issued a second directive to seek permit coverage.

o On April 17, 2025, at a public hearing, the Central Coast Regional Water Quality Control Board adopted a resolution referring alleged violations of the California Water Code for potential civil judicial enforcement to the California Office of the Attorney General.

o On May 27, 2025, Central Coast Regional Water Quality Control Board staff inspected recently conducted work sites in Gaviota State Park and adjacent to the Park.

o On June 11, 2025, Sable submitted a response disagreeing with assertions in the April 15, 2025 notice of violation.

- o *On July 24, 2025,* Central Coast Regional Water Quality Control Board issued a third notice of violation for Sable's continued failure to submit the technical report due on March 10, 2025.
- o On *August 19, 2025*, Sable submitted applications for waste discharge requirements for its work at nine additional waterway locations.
  - ▪ On *December 16, 2025*, the Central Coast Regional Water Quality Control Board issued authorizations to Sable to restore eight additional waterway locations identified in its August 19, 2025 applications.
- o On *September 30, 2025*, Sable resubmitted an application for waste discharge requirements for its work at one waterway location, to align its application for the location with the correct waste discharge requirements permitting mechanism. An application for this waterway location was previously submitted on August 19, 2025.
  - ▪ On *November 13, 2025*, the Central Coast Regional Water Quality Control Board issued authorization to Sable to restore the one waterway location identified in its September 30, 2025 application.
- o On *October 3, 2025,* the Central Coast Regional Water Quality Control Board filed a complaint against Sable in Santa Barbara Superior Court seeking civil penalties for Sable's alleged failure to comply with the Board's investigative order, failure to seek required permits after being so requested, and unlawful discharges of waste.
  - ▪ On *November 25, 2025*, Sable filed an answer to the complaint denying the key allegations in the complaint and asserting several affirmative defenses.
- ACTIONS UNDERWAY FOR CENTRAL VALLEY REGIONAL WATER QUALITY CONTROL BOARD:
  - o *On March 20, 2025*, Pacific Pipeline Company submitted an application to the Central Valley Regional Water Quality Control Board to obtain coverage under State Water Resources Control Board Order 2003-0003-DWQ, *Statewide General Waste Discharge Requirements for Discharges to Land with a Low Threat to Water Quality, for* a proposed discharge of approximately 6.1 million gallons of water used in hydrostatic testing of the Las Flores Pipeline System to a 20-acre agricultural area in Kern County.
  - o *On April 9, 2025*, the Central Valley Regional Water Quality Control Board issued a notice to Pacific Pipeline Company, which authorized the proposed discharge pursuant to State Water Resources Control Board Order 2003-0003-DWQ.
  - o *On June 6, 2025*, Pacific Pipeline Company sought authorization from the Central Valley Regional Water Quality Control Board to increase the discharge of water associated with hydrostatic testing authorized under State Water Resources Control Board Order 2003-0003-DWQ to 8.9 million gallon.
  - o *On July 8, 2025*, the Central Valley Regional Water Quality Control Board authorized Pacific Pipeline Company's request to increase the discharge authorized under State Water Resources Control Board Order 2003-0003-DWQ.
- FOR MORE INFORMATION: Contact the State Water Resources Control Board at opa@waterboards.ca.gov or (916) 341-5252.

**Teel Declaration
Page 43**

**STATE LANDS COMMISSION**

*Oversees and approves leases for offshore pipelines, piers, and buoys.*

- FOCUS: Safety of offshore pipelines to shore, spill prevention, environmental protection.
- ROLE & AUTHORITY: Under the Public Resources Code, the State Lands Commission must review and approve assignment of leases from the current owner (ExxonMobil) to Sable for offshore pipelines from federal platforms to shore, piers, and mooring buoys. Per this role and overview, Sable could restart the pipelines only if the terms and requirements of the current lease and operating agreements are met. This includes Sable performing detailed inspections of the pipeline line (in-line inspections), pressure testing (called hydrotesting), and using remotely operated vehicles to monitor the pipeline.
- ACTIONS UNDERWAY:
  - Ongoing review of assignment of leases as of December 20, 2024, with the most recent discussion at the State Lands Commission on December 17, 2024.
  - *On May 9, 2025*, Staff issued a letter to Exxon and Sable stating that the inspections required by the Commission's leases, for the portion of the offshore pipelines in state waters, and under the Commission's jurisdiction, have been completed and reviewed. This is not directly related to the repair work on the onshore pipeline.
- FOR MORE INFORMATION: Contact the State Lands Commission External Affairs at ExternalAffairsChief.Public@slc.ca.gov or (916) 574-1992.

**Teel Declaration**
**Page 44**

# EXHIBIT C

## Declaration of Julie Teel Simmonds

STATE OF CALIFORNIA—NATURAL RESOURCES AGENCY                                      Gavin Newsom, Governor



**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**OFFICE OF THE STATE FIRE MARSHAL**
P.O. Box 944246
Sacramento, California 94244-2460
(916) 568-3800
Website:  www.fire.ca.gov



October 22, 2025


Lance Yearwood
Vice President
Sable Offshore Corp
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**SUBJECT:    STATE WAIVER REQUIREMENTS PRIOR TO RESTART OF LINES CA-324 AND CA-325A/B**


Dear Mr. Yearwood,

On December 17, 2024, the CAL FIRE - Office of the State Fire Marshal (OSFM) issued State Waivers for the above captioned pipelines. The Pipeline and Hazardous Materials Safety Administration (PHMSA) issued the concurrence with the terms of the State Waivers on February 11, 2025. Those State Waivers were issued in accordance with the terms of the Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and the People of the State of California, DOJ Case REF. NO. 90-5-1-1-1130 (Appendix B, Article 1.1.D).

Sable sought the State Waivers to manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection (CP) due to the shielding effects of the polyurethane foam and the polyethylene tape wrap surrounding the pipelines. It is critical to stress that a State Waiver prescribes alternative measures that provide an equal or greater level of safety than the required regulation. The OSFM granted the State Waivers on the condition that Sable complies with the specific requirements contained therein.

On September 11, 2025, Sable submitted a restart plan to OSFM for review and approval. OSFM's review of the restart plan is ongoing. During this process, OSFM identified a requirement of the State Waivers that has not yet been met and that Sable must complete prior to any potential restart. Pursuant to item 9 in the State Waivers, Sable must repair all immediate and 180-day repair conditions prior to restart. Those conditions are further clarified in the sections titled "Immediate Repair Conditions" and "180-Day Repair Conditions." Most pertinent here is the 180-day repair condition language (see Condition 35 in the CA-324 State Waiver and Condition 36 in the CA-325A/B State Waiver) that includes "anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth." Footnotes 7 and 9 further

*"The Department of Forestry and Fire Protection serves and safeguards the people and protects the property and resources of California."*

**Teel Declaration**
**Page 46**

Lance Yearwood
October 22, 2025
Page 2

clarify that remediation means "a permanent repair method." The State Waivers require all such anomalies to be remediated, including tool tolerance. According to OSFM records, Sable has not satisfied this condition in the State Waivers.

The above findings alone and the inconsistencies with the State Waiver requirements prevent restart under the law. The OSFM continues to review the restart plan submitted by Sable in September, and while OSFM is providing this initial notification of deficiency to Sable regarding the State Waiver requirements, OSFM may have further comment or requirements arising out of that review.

Sincerely,

DANIEL BERLANT
State Fire Marshal

cc:    James Hosler, OSFM, Assistant Deputy Director
       Alin Podoreanu, OSFM, Supervising Pipeline Safety Engineer
       Joshua Cleaver, CAL FIRE, Staff Counsel

**Teel Declaration**
**Page 47**

# EXHIBIT D

## Declaration of Julie Teel Simmonds

# Exhibit D



November 26, 2025


Linda Daugherty
Acting Associate Administrator for Pipeline Safety
Pipeline and Hazardous Materials Administration (PHMSA)
United States Department of Transportation
1200 New Jersey Ave, SE
Washington, DC 20590


*Via E-Mail and U.S. Mail*


Dear Ms. Daugherty,

Sable Offshore Corp. (Sable) is writing to notify the Pipeline and Hazardous Materials Safety Administration (PHMSA) of its determination that a pipeline facility that it operates on the Outer Continental Shelf (OCS) and in southern California constitutes an interstate pipeline facility under the Pipeline Safety Act (PSA). Consequently, Sable believes that PHMSA is the agency responsible for pipeline safety regulatory oversight on the portions of the pipeline facility that are subject to 49 C.F.R. Parts 194, 195 and 199. Sable requests from PHMSA concurrence with Sable's determination, as well as guidance on the orderly transition of regulatory oversight from the California Office of the State Fire Marshal (OSFM) to PHMSA.

Sable shares PHMSA's commitment to pipeline safety and looks forward to working with the agency. Sable also notes that this transition only affects the interstate status of the subject pipelines, and will not otherwise change the regulatory classification of the pipelines. All portions of the pipelines that are currently subject to the pipeline safety regulations at 49 C.F.R. Parts 194, 195, and 199 will remain subject to those programs going forward.

**Background**

In 2024, Sable acquired certain assets, including, among other things, three offshore oil production platforms on the OCS off the coast of Santa Barbara, CA (Hondo, Heritage, and Harmony platforms), offshore subsea pipelines transporting oil from these platforms to onshore pipelines that, in turn, transport oil to the Las Flores Canyon facility to process crude oil for subsequent transportation, and onshore pipelines to transport oil from Las Flores Canyon to the Pentland Station terminal in Kern County, CA (Las Flores Pipeline). Sable operates all of these assets as part of a single system that moves crude oil from the OCS into California. Attachment A to this letter contains a map of these assets.

Teel Declaration
Page 50

*Sable Offshore Corp.*
*Determination of Interstate Classification*
*November 26, 2025*

Prior to October 2022, Plains All American (Plains) owned and operated the Las Flores Pipeline (then-called Lines 901 and 903), and ExxonMobil owned the offshore platforms, subsea lines, and the Las Flores Canyon processing facility. Before 2016, Plains filed Interstate Commerce Act (ICA) tariffs with the Federal Energy Regulatory Commission (FERC) for Lines 901 and 903, and these pipelines were considered interstate pipelines subject to PHMSA's regulatory oversight. On February 12 and April 29, 2016, respectively, Plains cancelled these tariffs following the May 2015 release. On May 18, 2016, PHMSA sent a letter to OSFM indicating that, as a result of the cancelled tariffs, these pipelines were considered intrastate pipelines, subject to the regulatory jurisdiction of OSFM, pursuant to its state certification from PHMSA under 49 U.S.C. § 60105(a). The May 2016 letter indicated that the determination of intrastate status is "subject to change based on future events or newly-discovered facts."

## Interstate Classification

Since PHMSA's May 2016 letter, there have been intervening events affecting the pipelines, which merit reassessment of the interstate versus intrastate status of these assets. As noted, Sable operates each of the offshore and onshore assets described above, which is distinct from the arrangement considered by PHMSA in 2016 where different, unrelated entities operated portions of the facility. Sable has determined that this pipeline facility is properly considered as an interstate hazardous liquid pipeline facility PSA, and therefore subject to PHMSA's exclusive regulatory authority under 49 U.S.C. § 60104(c).

This conclusion is based on applicable language from the PSA and PHMSA's hazardous liquid pipeline safety regulations at 49 C.F.R. Part 195. Under 49 U.S.C. § 60101(a)(5), a "hazardous liquid pipeline facility" is broadly defined as inclusive of "a pipeline, a right of way, a facility, a building, or equipment intended to be used in transporting hazardous liquid." The term "transporting hazardous liquid" is, in turn, defined at § 60101(a)(22) as "the movement of hazardous liquid by pipeline, or the storage of hazardous liquid incidental to the movement of hazardous liquid by pipeline, in or affecting interstate or foreign commerce", but excludes, in relevant part, "onshore production, refining, or manufacturing facilities". Furthermore, the term "interstate or foreign commerce" is defined at § 60101(a)(8)(B) to mean, in the context of hazardous liquid, commerce between "a place in a State and a place outside that State."

Although PHMSA has generally considered the presence of a filed tariff to be an indicator of whether a line is interstate, PHMSA has recognized in Appendix A to its Part 195 regulations that there are certain situations in which a pipeline facility is interstate "despite the lack of a filing with FERC," providing specific examples of such circumstances. In one example, PHMSA stated that hazardous liquid pipelines that "originate[] on the Outer Continental Shelf" may be considered interstate pipeline facilities, regardless of whether the operator filed tariffs with FERC for them. See Part 195, Appendix A, Example 7.

As noted above, the assets that Sable operates include offshore lines connecting offshore production platforms to an onshore processing facility, as well as the Las Flores Pipeline. Collectively, these pipelines constitute a "pipeline facility" through which hazardous liquid

2

**Teel Declaration**
**Page 51**

*Sable Offshore Corp.*
*Determination of Interstate Classification*
*November 26, 2025*

moves in transportation from its point of production on the OCS to the onshore Pentland Station terminal in California, and are not otherwise excluded in the PSA's definition of "transporting hazardous liquid." As this pipeline facility originates on the OCS (which is located outside of California), and then travels within California, it constitutes commerce between a place in California and a place outside California and is thus properly considered as "interstate" pursuant to the PSA and Part 195, Appendix A.

**Transition of Regulatory Authority**

Sable seeks to coordinate with PHMSA to obtain concurrence with this determination and rescind the May 18, 2016 letter to OSFM, and to establish an orderly process to transition regulatory oversight over the pipeline facility from OSFM to PHMSA. This includes, among other things, a framework for review of Sable's procedures, transitioning OSFM's December 17, 2024 State Waivers to federally administered special permits, review and approval of a Restart Plan submitted consistent with the 2020 Consent Decree in *U.S. et al v. Plains All American Pipeline, LP and Plains Pipeline, LP*, No. 20-cv-2415 (C.D. Cal.), as well as, more generally, Sable's performance of restart actions consistent with the applicable provisions of this Consent Decree. Sable will provide all reasonable assistance to PHMSA in coordinating with OSFM to facilitate this transition. Transition of regulatory oversight to PHMSA does not affect Sable's adherence to Part 195 or its performance of action items indicated in the Consent Decree. Moreover, applicable injunctive measures specified in the Consent Decree, as well as the applicable requirements of the State Waivers, will be incorporated on a prospective basis into Sable's procedures, which are enforceable under Part 195.

Sable appreciates the positive working relationship it has developed with OSFM staff and looks forward to developing a similarly productive relationship with PHMSA going forward.

Sincerely,

J. Caldwell Flores
President and Chief Operating Officer
Sable Offshore Corp.

Cc:    Ben Fred (PHMSA)

3

**Teel Declaration**
**Page 52**

*Sable Offshore Corp.*
*Determination of Interstate Classification*
*November 26, 2025*

ATTACHMENT A – Map of Assets Acquired by Sable



**Teel Declaration
Page 53**

# EXHIBIT E

## Declaration of Julie Teel Simmonds



December 19, 2025

<u>VIA ELECTRONIC MAIL</u>

Linda Daugherty
Acting Associate Administrator for Pipeline Safety
Pipeline and Hazardous Materials Safety Administration (PHMSA)
US Department of Transportation
1200 New Jersey Avenue, SE
Washington, DC 20590

***RE:    Application for Emergency Special Permit***
***        Sable Offshore Corp.***

Dear Ms. Daugherty,

Sable Offshore Corp. (Sable) respectfully submits this Application for Emergency Special Permit pursuant to 49 U.S.C. § 60118(c)(2) and 49 C.F.R. § 190.341(g).  As part of this Application, Sable requests that PHMSA issue an Emergency Special Permit covering two pipeline segments (Lines CA-324 and CA-325) that together, constitute the Las Flores Pipeline, which is part of an interstate pipeline facility that Sable operates from the Outer Continental Shelf (OCS) off the coast of Santa Barbara, California to Kern County, California, known as the Santa Ynez Pipeline System (SYPS).  The Application seeks waiver of certain PHMSA regulations under 49 C.F.R. Part 195 to implement Appendix B, Article I.1.A of a Consent Decree issued in Civil Action No. 2:20-CV-02415 in the US District Court for the Central District of California.

Sable is committed to pipeline safety and is proposing to comply with substantial alternative measures that provide an equivalent, if not greater, measure of safety as compared to the base requirements under Part 195.  These measures include, but are not limited to, significantly increased frequency of In-Line Inspection (ILI) tool runs and more stringent anomaly repair criteria.  Moreover, Sable is proposing substantially the same measures in this Application that have already been reviewed and approved by the California Office of the State Fire Marshal (OSFM) through issuance of State Waivers dated December 17, 2024 granting waiver of the same standards for CA-324 and 325, at a time when these pipelines were considered intrastate. As part of the State Waiver process, PHMSA has also evaluated and approved the State Waivers pursuant to its federal oversight authority in 49 U.S.C. § 60118(d) by issuing letters of no-objection to OSFM on February 11, 2025.[1]

---

[1] See Docket Nos. PHMSA-2025-0002 and PHMSA-2025-0003.

1

Sable seeks this Emergency Special Permit from PHMSA due in part to Sable's November 26, 2025 determination, and PHMSA's December 17, 2025 concurrence of Sable's determination that Lines CA-324 and 325 (formerly known as Lines 901 and 903, respectively) are properly classified as interstate pipeline segments that are part of the interstate SYPS pipeline facility. By operation of 49 U.S.C. § 60104(c), the SYPS is subject exclusively to PHMSA's regulatory oversight in regards to pipeline safety.  As a result, and for the additional reasons provided in this application (including the existence of a national energy emergency as determined by the President), Sable respectfully requests that PHMSA issue a special permit on an expedited basis to replace the December 17, 2024 State Waivers issued by OSFM for CA-324 and 325.  Sable has patterned its application on Pacific Pipeline Company's July 10, 2023 applications for state waivers, with updates to reflect substantial integrity-related work completed since those applications were filed.

Recognizing that an Emergency Special Permit, if granted, is temporary, Sable is also preparing an application for a non-emergency Special Permit.

Below please find the information specified in 49 C.F.R. § 190.341 in support of this Application:

**(1)** *__The name, mailing address, and telephone number of the applicant and whether the applicant is an operator;__*

Sable Offshore Corp. PPC (Operator ID #40881)
Attn: Lance Yearwood
845 Texas Avenue
Suite 2800
Houston, TX 77002
(713) 579-8118

**(2)** *__A detailed description of the pipeline facilities for which the special permit is sought, including:__*

   **(i)** *__The beginning and ending points of the pipeline mileage to be covered and the Counties and States in which it is located__*

Sable operates the SYPS pipeline facility that encompasses, among other things, a Part 195-regulated emulsion line that transports oil from offshore oil production platforms to the Las Flores Canyon Processing Facility (LFC), LFC, and the Las Flores Pipeline, consisting of Part 195-regulated Lines CA-324 and CA-325.  A special permit is sought specifically for two pipelines that are part of Sable's SYPS pipeline facility: Lines CA-324 and CA-325.  Line CA-325 can be further divided into two segments: CA-325A and CA-325B.   Table 2-1 summarizes relevant information.  A map of the pipeline system is included as *Attachment A* and further details about these pipelines are below:

2

**Teel Declaration**
**Page 56**

**Table 2-1: Pipelines Applicable to Emergency Special Permit Application**

| Pipeline Facility Name | Pipeline Segment Name | Location | Mileage | California County or Counties |
|---|---|---|---|---|
| SYPS | CA-324 | Las Flores Canyon Processing Facility to Gaviota Pump Station | 10.86 | Santa Barbara |
| SYPS | CA-325A | Gaviota Pump Station to Sisquoc Pump Station | 38.72 | Santa Barbara |
| SYPS | CA-325B | Sisquoc Pump Station to Pentland Station | 74.84 | Santa Barbara; San Luis Obispo; Kern |

### a. Description of Lines CA-324 and 325

The CA-324 24-inch pipeline segment (formerly referred to as Line 901) is approx. 10.86 miles in length and generally parallels U.S. Highway 101 along the south coast between the Las Flores Canyon consolidated oil and gas processing facility and the Gaviota Station.  This pipeline segment is located north of U.S. 101 and generally follows powerline and/or natural gas pipeline rights-of-way across coastal terraces and incised canyons.

The CA-325A 30-inch pipeline segment (formerly referred to as Line 903 – Gaviota to Sisquoc) is approx. 38.72 miles in length.  This pipeline segment extends west from the Gaviota Station to an MOV located east of Gaviota Creek and U.S. Highway 101.  It then enters Gaviota State Park approx. 0.5 miles east of U.S. Highway 101 and extends westerly across the gently sloping coastal terrace and Cañada del Barro before dropping into the Cañada de la Gaviota drainage area.  It then crosses U.S. Highway 101 and Gaviota Creek (Cañada de la Gaviota) immediately south of the U.S. Highway 101  "Caltrans" rest stop area.  The pipeline segment then extends west and north from the Gaviota Creek MOV.

CA-325A continues west up a broad spur ridge to the ridge crest and the westerly boundary of Gaviota State Park.  The pipeline segment traverses narrow ridge crests, crosses out of the Park and onto Hollister Ranch for approx. 0.5 miles, and then crosses back into the Park before descending toward the west fork of Gaviota Creek (Betty Creek).  The right-of-way passes west of the Vista del Mar School and Las Cruces Adobe and then crosses beneath Highway 1 west of its intersection with U.S. Highway 101.  The pipeline segment continues northward along the west side of U.S. Highway 101 through the Santa Ynez Mountains.  It crosses long expanses of grasslands across the Las Cruces Ranch and steep walled canyons that form part of the Nojoqui Creek watershed.  North of Moonshine Creek, the route crosses ridges with rock outcroppings.

3

**Teel Declaration**
**Page 57**

The pipeline crosses beneath the Santa Ynez River west and south of Buellton and continues north across the Purisima and Solomon Hills.  It crosses the northern edge of the San Rafael Mountains and the eastern edge of the Santa Maria Valley.  The pipeline segment crosses beneath the Sisquoc River and continues north across the River Valley.  It traverses moderately to severely sloping foothills at Kelly Canyon and extends west to the Sisquoc Station at the southern end of Santa Maria Canyon.

The CA-325B 30-inch pipeline segment (formerly referred to as Line 903 – Sisquoc to Pentland) is approx. 74.84 miles in length.  The pipeline segment follows Santa Maria Canyon after leaving the Sisquoc Station.  It then extends northeast towards Tepusquet Road.  The route crosses relatively gentle terrain until it reaches the crest of the Sierra Madre Mountains where it traverses steep slopes approaching Suey Canyon and Buckhorn Canyon.  The pipeline segment follows the northern edge of the Sierra Madre Mountains south of State Highway 166 through the Los Padres National Forest.  The route crosses rugged terrain across the crests of the Sierra Madre Mountains, descends the mountains, crosses the Sierra Madre Ridge Road, and enters the Cuyama River Valley near Gypsum Canyon.  At the Cuyama River crossing, CA-325B exits Santa Barbara County and enters San Luis Obispo County. The pipeline segment continues for approx. 44.5 miles through ranch land, terminating at the Pentland Station in Kern County.

Table 2-2 indicates High Consequence Areas (HCAs) along the Lines CA-324 and 325.

**TABLE 2-2: HIGH CONSEQUENCE AREA SUMMARY**

| Pipeline Segment Designation | Total Mileage | High Consequence Area (HCA) Type |
|---|---|---|
| CA-324 | 10.86 | Impact to ecologically sensitive regions (coastline) |
| CA-325A | 38.72 | Impact to the city of Buellton (population center, drinking water), and ecologically sensitive regions |
| CA-325B | 74.84 | Impact to ecologically sensitive regions |

Lines CA-324 and 325 traverse multiple Counties as well as State and Federal land. Approximate mileage is included in Table 2-3, below.

4

**Teel Declaration**
**Page 58**

**TABLE 2-3: JURISDICTIONAL MILEAGE**

| | Jurisdiction | CA-324 (miles) | CA-325A (miles) | CA-325B (miles) | Total (miles) |
|---|---|---|---|---|---|
| **County** | Santa Barbara County | 10.9 | 38.7 | 23.8 | 73.4 |
| | San Luis Obispo County | 0 | 0 | 37.2 | 37.2 |
| | Kern County | 0 | 0 | 13.8 | 13.8 |
| | Total | 10.9 | 38.7 | 74.8 | 124.4 |
| **Sub-Jurisdiction** *(Note 1)* | California State Parks and Recreation (Gaviota State Park) | 0 | 4.1 | 0 | 4.1 |
| | U.S. Forest Service | 0 | 0 | 6.3 | 6.3 |
| | U.S. Fish and Wildlife (Bitter Creek Wildlife Refuge) | 0 | 0 | 4.5 | 4.5 |
| | California Dept. of Fish and Wildlife (Carrizo Plain Ecological Reserve) | 0 | 0 | 4.5 | 4.5 |
| | Bureau of Land Management | 0 | 0 | 1.0 | 1.0 |
| | City of Buellton | 0 | 1.1 | 0 | 1.1 |
| | Total | 0 | 5.2 | 16.3 | 21.5 |

*Note 1: Mileage included in County jurisdiction*

**(ii)** *<u>Whether the pipeline is interstate or intrastate and a general description of the right-of-way including proximity of the affected segments to populated areas and unusually sensitive areas</u>*

The SYPS pipeline facility that Sable operates, including segments CA-324 and 325 that are parts of the SYPS, are all interstate. CA-324 and 325 have potential to impact High Consequence Areas (HCAs), including unusually sensitive areas. A map of the pipeline facility is included as Attachment A and further details about CA-324 and 325 and its right-of way are provided above.

**(iii)** ***Relevant pipeline design and construction information including the year of installation, the material, grade, diameter, wall thickness, and coating type;***

    **a.** ***Pipeline Design and Construction Information***

Line CA-324 is manufactured of low carbon steel.  It contains predominantly 0.344-inch nominal wall thickness, high frequency electric resistance welded (HF-ERW) API 5L X65 pipe manufactured in 1985 and 1986 by Nippon Steel Corp., Hikari Works mill, in Japan using plate steel with UOE pipe forming process.  A summary of CA-324 line pipe specifications is included in Table 2-4.

CA-325A/B is manufactured of low carbon steel.  It contains various grades and wall thicknesses of double submerged arc welded (DSAW) API 5L pipe manufactured between 1984 and 1986, from a variety of mills in Belgium, Brazil, France, Germany, and Israel, summarized in Table B-4.  Additionally, it includes small portions of replaced sections with newer pipe, including HF-ERW.  A summary of CA-325A/B line pipe specifications is included in Table 2-4.

6

**TABLE 2-4: LINE PIPE SPECIFICATIONS**

| Pipeline Segment Designation | Outside Diameter (in) | Nominal Wall Thickness (in) | Grade | Seam Type | Year Installed | Length (mi) |
|---|---|---|---|---|---|---|
| CA-324 Las Flores Canyon to Gaviota | 24 | 0.344 | X65 | HF-ERW | 1990 | 10.69 |
| | 24 | 0.375 | X65 | HF-ERW | 1990 | 0.02 |
| | 24 | 0.5 | X60 | HF-ERW | 1990 | 0.16 |
| CA-325A Gaviota to Sisquoc | 30 | 0.281 | X70 | DSAW | 1986 | 21.85 |
| | 30 | 0.344 | X65 | DSAW | 1986 | 12.47 |
| | 30 | 0.375 | X65 | DSAW | 1986 | 2.27 |
| | 30 | 0.375 | X65 | DSAW | 2014 | 0.12 |
| | 30 | 0.406 | X65 | DSAW | 1986 | 0.38 |
| | 30 | 0.406 | X65 | HF-ERW | 2000 | 0.03 |
| | 30 | 0.438 | X70 | DSAW | 1986 | 0.17 |
| | 30 | 0.5 | X60 | DSAW | 1986 | 0.75 |
| | 30 | 0.5 | X70 | DSAW | 1986 | 0.28 |
| | 30 | 0.562 | X65 | DSAW | 1986 | 0.06 |
| | 30 | 0.75 | X65 | DSAW | 1986 | 0.35 |
| CA-325B Sisquoc to Pentland | 30 | 0.281 | X70 | DSAW | 1986 | 19.29 |
| | 30 | 0.344 | X65 | DSAW | 1986 | 17.03 |
| | 30 | 0.344 | X65 | DSAW | 2007 | 0.24 |
| | 30 | 0.375 | X65 | DSAW | 1986 | 12.88 |
| | 30 | 0.375 | X70 | DSAW | 2017 | 0.16 |
| | 30 | 0.375 | X70 | DSAW | 2018 | 0.02 |
| | 30 | 0.406 | X65 | DSAW | 1986 | 0.12 |
| | 30 | 0.438 | X70 | DSAW | 1986 | 24.41 |
| | 30 | 0.5 | X60 | DSAW | 1986 | 0.13 |
| | 30 | 0.5 | X70 | DSAW | 1986 | 0.28 |
| | 30 | 0.625 | X65 | DSAW | 1986 | 0.01 |
| | 30 | 0.75 | X70 | DSAW | 1986 | 0.27 |

*b. Coating*

Lines CA-324 and 325 are externally coated with the following coating system as illustrated in Figure 2-5:

- Coal tar urethane (CTU) coating in intimate contact with the steel pipe
- Layer of rigid thermal polyurethane (PU) foam insulation
- Outer layer of polyethylene (PE) tape wrap

7

**FIGURE 2-5: EXTERNAL COATING SYSTEM DIAGRAM**



Shrink sleeves, which provide a barrier between the steel pipeline and soil for corrosion prevention, are present at original construction pipeline field joints.  The use of the PU foam and PE tape was selected at the time of original construction to minimize heat loss of the crude oil within the pipeline during transit.  The pipeline segments have an impressed-current cathodic protection (CP) system that was energized at the time of installation.  The CP system consists of active rectifiers at Las Flores Canyon Station, Gaviota Station, and Sisquoc Station, a critical bond and new, deep well anode bed at Pentland, as well as over 140 test stations across the entire CA-324 and CA-325A/B pipeline segments.  The PU insulation and PE tape wrap has the ability to shield the cathodic protection.  As a result, the CP current may not reach the pipe surface to arrest corrosion in the limited instance the CTU coating becomes disbonded.  As a result, despite ongoing operation of the cathodic protection system in compliance with applicable regulations, the pipeline remains at risk of corrosion under insulation (CUI).

The CP system remains active and provides a level of external corrosion deterrence, and it is highly effective on portions of the pipeline without insulation (e.g. fusion bonded epoxy (FBE) and epoxy-coated regions).  Cathodic protection has and will continue to be implemented, tested, and maintained on the pipeline at appropriate levels and in compliance with applicable regulations.  Additionally, the use of modern, advanced in-line inspection technologies, along with explicit integrity management programs and procedures for robust characterization, validation, and criteria for anomaly repair support supplemental integrity management steps that exceed regulatory corrosion protection requirements and enable safe, responsible operation.  Comprehensive conditions for effective management of the threat of external corrosion are described in subsequent sections in this Application.

8

***(iv)*** ***Relevant operating information including operating, leak history, and most recent testing or assessment results;***

*a.* ***Operating Information and Leak History***

Lines CA-324 and 325 were previously owned and operated by Plains All American Pipeline LP to transport crude oil, and were formerly known as Lines 901 and 903, respectively.  These pipeline segments have remained under "active" status pursuant to PHMSA's Part 195 regulations,[2] but have not transported crude oil since May 19, 2015.

Prior to May 19, 2015, there were no releases from CA-324 or 325 which met reportable criteria under PHMSA's Part 195 standards.  On May 19, 2015, CA-324 (then known as Line 901) experienced a release on a section of buried pipe.  PHMSA's Failure Investigation Report (May 2016) attributed the rupture of the pipeline to "progressive external corrosion of the insulated, 24-inch diameter steel pipeline."  PHMSA's findings indicate that the direct cause of the Line 901 failure was external corrosion that thinned the pipe wall to a level where it ruptured suddenly and released crude oil.  PHMSA's investigation identified the following categories of contributory causes:

1.  Ineffective protection against external corrosion of the pipeline
    - The condition of the pipeline's coating and insulation system fostered an environment that led to the external corrosion.
    - The pipeline's cathodic protection (CP) system was not effective in preventing corrosion from occurring beneath the pipeline's coating/insulation system.

2.  Failure to detect and mitigate the corrosion
    - The in-line inspection (ILI) tool and subsequent analysis of ILI data did not characterize the extent and depth of the external corrosion accurately.

Subsequently, PHMSA issued Corrective Action Orders (CAOs) to the operator (Plains).  On October 14, 2020, a Consent Decree was entered by the United States District Court for the Central District of California.

In October 2022, Pacific Pipeline Company (PPC), then a subsidiary of ExxonMobil, acquired CA-324 and 325 from Plains.  In 2024, Sable acquired PPC, and currently serves as the designated operator of CA-324 and 325, as well as other components of the SYPS pipeline facility.

Maximum Operating Pressure (MOP) information for CA-324 and 325 is provided in Tables 2-6 and 2-7.

---

[2] See Pipeline Safety: Clarification of Terms Relating to Pipeline Operational Status, 81 Fed. Reg. 54,512 (Aug. 12, 2016) ("The regulations consider pipelines to be either active and fully subject to all relevant parts of the safety regulations or abandoned.")  See also, PHMSA December 17, 2025 Determination of Interstate Classification, p.3, n.8, confirming active status of Las Flores Pipeline.

9

**TABLE 2-6: SUMMARY OF MOP BASIS**

| Pipeline Designation | Explanation of MOP Basis |
|---|---|
| CA-324 | 100 psi above max steady-state & transient pressure profile |
| CA-325A | 100 psi above max steady-state & transient pressure profile |
| CA-325B | 50 psi above max steady-state & transient pressure profile for Mile Post 49.57 to Mile Post 107.55. 80% of hydrostatic test pressure and 72% SMYS based upon the low elevation point (663 ft) at Mile Post 121.91 for Mile Post 107.55 to Mile Post 124.42 |

**TABLE 2-7: DOCUMENTED MOP and %SMYS**

| Pipeline Designation | %SMYS | Documented MOP (psig) |
|---|---|---|
| CA-324 | 55.8% | 1003 |
| CA-325A | 69.3% | 1000 |
| CA-325B (MP 49.57-107.55) | 71.5% | 1292 |
| CA-325B (MP 107.55-124.42) | 72.0% | 1170 |

10

b.  *Most Recent Testing and Assessment Results*

i.       *Hydrostatic Testing*

CA-324 was originally hydrostatically pressure-tested on November 25, 1990 to 1765 pounds per square inch gauge (psig), as calculated at the highest elevation.  CA-325A was originally hydrostatically pressure-tested in nine separate segments between pressures of approx. 778 to 1757 psig, as calculated at the highest elevations of each segment, between October 14, 1986 and December 3, 1986.  CA325B was originally hydrostatically pressure-tested within eleven separate segments between pressures of 686 to 1753 psig, as measured at the highest elevations of each segment, between January 13, 1986 and November 8, 1986.  Portions of pipe replaced after original construction hydrotest were tested at or above the originally established test pressure and established maximum operating pressure (MOP) prior to being placed into service.

Sable hydrostatically pressure-tested Lines CA-324 and 325 from March 30 through May 27, 2025, dividing the lines in 8 segments.  Lines CA-324 and CA-325A were spike-tested as well to 150% and 139% of MOP, respectively.

A summary of the percent of specified minimum yield strength (% SMYS) and the corresponding MOP, as established by the construction hydrotest records, is included above in Table 2-7.  A summary of hydrotest records by segment are included in Table 2-8.

11

**TABLE 2-8: HYDROSTATIC TEST SUMMARY**

| Pipeline Segment | Location | Date | Begin Station | End Station | Type | High Point Min Pressure (psig) | Low Point Max Pressure (psig) | Elevation Adjusted MOP (psig) (Note 1) |
|---|---|---|---|---|---|---|---|---|
| CA-324 | Las Flores Sta | 5/12/25 | 0+00 | 573+75 | Spike (150%) | 1166 | 1514 | 1003 |
| | | | | | 8-hour (125%) | 915 | 1264 | 1003 |
| CA-325A | Gaviota Sta | 5/27/25 | 554+21 | 1337+21 | Spike (139%) | 872 | 1400 | 1000 |
| | | | | | 8-hour (125%) | 730 | 1260 | 1000 |
| | MP 25.71 | 3/30/25 | 1338+21 | 2602+76 | Spike (139%) | 800 | 1289 | 1000 |
| | | | | | 8-hour (125%) | 660 | 1149 | 1000 |
| CA-325B | Sisquoc Sta | 4/13/25 | 2603+76 | 3186+76 | 8-hour (125%) | 892 | 1625 | 1292 |
| | MP 60.63 | 4/14/25 | 3187+76 | 3914+76 | 8-hour (125%) | 751 | 1614 | 1292 |
| | MP 74.44 | 4/22/25 | 3915+76 | 4455+76 | 8-hour (125%) | 1209 | 1379 | 1292 |
| | MP 84.65 | 5/2/25 | 4456+76 | 5669+76 | 8-hour (125%) | 922 | 1253 | 1292 |
| | MP 107.64 | 5/9/25 | 5670+76 | 6554+49 | 8-hour (125%) | 459 | 1473 | 1170 |
| | Pentland Sta | | | | | | | |

*Note 1: This value is simply the resultant, corresponding, MOP based upon the hydrostatic test record. It does not reflect the MOP value Sable assigns the pipelines and is only included for context.*

12

*ii.        In-Line Inspection History*

The following Table 2-9 provides a summary of CA-324, CA-325A, and CA-325B In-Line Inspection (ILI) activities, as of July 2023. Note that CA-324 Las Flores Canyon to Gaviota has been inspected since the 2015 release, in February and December of 2022 (circumferential magnetic flux leakage (MFL-C) and ultrasonic wall measurement (UTWM) surveys, respectively). Also note that CA-325A Gaviota to Sisquoc, and CA-325B Sisquoc to Pentland, have been inspected since the 2015 release, with axial magnetic flux leakage (MFL-A) surveys in September and October 2023, respectively.

**TABLE 2-9: IN LINE INSPECTION SUMMARY**

| Pipeline Segment | Date of Inspection | Technology | Vendor |
|---|---|---|---|
| CA-324 | 6/18/07 | Def+MFL+IMU | Rosen |
| | 7/3/12 | Def+MFL+IMU | Rosen |
| | 5/6/15 | Def+MFL+IMU | Rosen |
| | 2/23/22 | CMFL | Baker Hughes |
| | 12/10/22 | UTWM | Baker Hughes |
| CA-325A | 1/1/03 | Def+MFL+IMU | Tuboscope |
| | 3/20/08 | Def+MFL+IMU | Rosen |
| | 4/29/13 | Def+MFL+IMU | TD Williamson |
| | 9/20/23 | AMFL | Baker Hughes |
| CA-325B | 10/1/94 | Unknown | Tuboscope |
| | 1/8/03 | Def+MFL | Tuboscope |
| | 10/21/06 | Def+MFL | Tuboscope |
| | 3/10/12 | Def+MFL | TD Williamson |
| | 6/12/13 | AMFL | TD Williamson |
| | 10/1/23 | AMFL | Baker Hughes |

13

**(3)  *A list of the specific regulation(s) from which the applicant seeks relief;***

Sable seeks relief from 49 C.F.R. 195.452(h)(4)(iii)(H), requiring remediation within 180 days of discovery of corrosion of or along a longitudinal seam weld.

Moreover, Sable is seeking this Emergency Special Permit pursuant to Appendix B.1.A and B of the Consent Decree entered in Civil Action No. 2:20-CV-02415 (C.D. Cal. 2020), stating that a "State Waiver" for limited effectiveness of cathodic protection must be applied for and received prior to restarting Lines 901 and 903 (now CA-324 and 325).  Given that Lines CA-324 and 325 were then-considered intrastate at the time of the Consent Decree but are now considered interstate (removing any regulatory jurisdiction of OSFM over these pipelines), Sable interprets these provisions to require obtaining a special permit from PHMSA for limited effectiveness of cathodic protection prior to restarting CA-324 and 325.  Sable already had received State Waivers from OSFM pursuant to this language of the Consent Decree in December 2024.  Sable now seeks a special permit from PHMSA (the current safety regulator of CA-324 and 325) that substantially carries over the conditions entered in those State Waivers.

**(4)  *An explanation of the unique circumstances that the applicant believes make the applicability of that regulation or standard (or portion thereof) unnecessary or inappropriate for its facility;***

**A.  *General External Corrosion Under Insulation***

CA-324 and 325 were shut down in 2015 following the above-described release on CA-324.  A Consent Decree was entered by the US District Court for the Central District of California on October 14, 2020, that requires a State Waiver prior to restarting CA-324 and CA-325A/B.  CA-324 and 325 are comprised of buried and insulated pipe.  The pipeline has a coal-tar coating system and insulation wrap that provides corrosion deterrence.

Sable seeks approval to manage external corrosion of CA-324 and 325 through a supplemental combination of accelerated reassessments, usage of the appropriate assessment tools, integration of data from the appropriate alternating ILI technologies, enhanced anomaly response criteria targeted at corrosion under insulation, and advanced data analysis techniques to account for potential growth of corrosion under insulation including feature interaction criteria for anomaly assessment.

**B.  *Selective Seam Weld Corrosion (SSWC)***

The PHMSA Fact Sheet on Selective Seam Corrosion (known in industry as SSC or SSWC) describes SSWC as "a localized corrosion attack along the bond line of low-frequency electric resistance welded (LF-ERW) and electric flash welded (EFW) piping, that leads to the development of a wedge-shaped groove that is often filled with corrosion products."

14

[1] The Fact Sheet goes on to say that "LF-ERW or EFW pipe manufacturing processes first came into use in the 1920s.  Both types of pipe are manufactured by forming steel plates into round cylinders and then joining the longitudinal edges through a welding process.  Due to technology and quality control issues with some of the pipe manufactured prior to 1970, the weld bondline may be susceptible to corrosion processes.  This is particularly true if the pipeline has the following conditions present:

- Exposure to corrosive conditions due to poor or absent coating;
- Ineffective cathodic protection; or
- The presence of non-metallic inclusions in the weld bondline region (e.g., contaminants present during the manufacturing process).

SSWC is generally not considered to be a concern with pipe manufactured after 1970 due to the use of cleaner steels having greatly reduced sulfur contents and the replacement of low frequency welding equipment with high frequency equipment in the manufacturing process."  As noted above, Line CA-324 contains exclusively high frequency ERW (HF-ERW) longitudinal seamed pipe manufactured in 1985 and 1986.  When ILI tools call corrosion along the seam, it may simply be corrosion incidental to the seam rather than preferential.  Indeed, SSWC has not been observed in the previous direct examinations that make up the extensive dig history on this system.  Therefore, the threat of SSWC is not considered applicable to Line CA-324.  As such, selection of future inspection technologies will prioritize the identification and characterization of external blunt metal loss as the primary threat to this buried, insulated line, namely ultrasonic wall measurement (UTWM) and axial magnetic flux leakage (MFL-A) technologies.

Note that Sable only accepts calls from circumferential magnetic flux leakage (MFL-C), spiral magnetic flux leakage (SMFL), ultrasonic crack detection (UTCD) and/or electro magnetic acoustic transducer (EMAT) ILI systems when applying criteria for corrosion interaction with the longitudinal seam weld, as these technologies are designed for and, therefore are best suited for detection of the longitudinal seam weld and axially oriented corrosion.  MFL-A and/or UTWM are not designed for detection of the longitudinal seam weld or axially oriented corrosion, so calls from those ILI systems are not reviewed for longitudinal seam weld interaction.

CA-324 was inspected using an MFL-C tool in February 2022, to better characterize the threat of external metal loss under insulation. Since SSWC has not been observed in the previous direct examinations that make up the extensive dig history on this pipeline, Sable is therefore requesting PHMSA to issue a special permit which allows for the use of engineering analysis and protocols to differentiate between corrosion anomalies that do not present a specific risk to the seam weld and associated heat affected zones in lieu of the current requirement under 49

---

[1] PHMSA Fact Sheet on Selective Seam Corrosion, December 1, 2011;
<https://primis.phmsa.dot.gov/comm/FactSheets/FSSelectiveSeamCorrosion.htm>

15

**Teel Declaration**
**Page 69**

C.F.R. § 195.452(h)(4)(iii)(H).  Remediation and repair activities would then be scheduled according to the findings of the proposed evaluation.

**(5)  _A description of any measures or activities the applicant proposes to undertake as an alternative to compliance with the relevant regulation, including an explanation of how such measures will mitigate any safety or environmental risks_**

The Application includes memorializing certain integrity management procedures included in the Consent Decree in addition to further measures beyond Part 195 to maintain the integrity of the pipeline, including measures specific to SSWC.  Many of these measures were negotiated and agreed upon as part of the Consent Decree.

A comprehensive list of these proposed measures is contained in draft Emergency Special Permit conditions, at Attachment B.  These measures include, among other things, temperature limitations and monitoring, hydrostatic testing, including spike test, requirements (which Sable has already completed), a five-fold more frequent than required by § 195.452 ILI assessment schedule, a substantially more stringent set of anomaly repair criteria, corrosion growth rate analysis, in-field direct examination, and additional recordkeeping and reporting requirements, as compared to the baseline Integrity Management requirements in Part 195.  These measures, in their totality, in addition to hundreds of recently completed anomaly repairs under the repair conditions of the Consent Decree, will substantially minimize the possibility that future conditions that threaten the integrity and safety of the pipeline will go undiscovered or unremediated.

**(6)  _A description of any positive or negative impacts on affected stakeholders and a statement indicating how operating the pipeline pursuant to a special permit would be in the public interest_**

Grant of a special permit would create many positive impacts on affected stakeholders and operating the covered pipeline segments in accordance with the special permit would be in the public interest based on the fact that granting it would facilitate restart of Lines CA-324 and 325 which would address the national energy emergency that has been declared by the President this year, as explained further in Item (10).  Moreover, grant of this special permit would create the following additional positive impacts:

- Facilitating the restart of CA-324 and 325, which would boost California-produced oil and reduce California's need for imported oil to meet regional fuel demand by the public and the numerous military facilities in California and provide energy security;

- Reduce refinery feedstock price per barrel by over a projected $3;

- Reduce greenhouse gas emissions by approximately 500,000 tons;

16

**Teel Declaration**
**Page 70**

- Favorably contribute to local employment, both through generating hundreds to thousands of direct jobs, and thousands more indirect jobs such as through contractors and affiliated employees;

- Limit impacts to the environment and potential locations for cultural resources by reducing unnecessary anomaly digs in areas of low or no risk;

- Reduce the environmental impacts associated with long-haul tanker shipments of crude oil to California from current import sources such as Iraq, Brazil and Ecuador;

- Maintain the priority of pipeline maintenance activities to sections of the pipelines in greatest need of monitoring for pipeline safety;

- Reduce unnecessary excavation around other critical infrastructure;

- Reduce the permitting workload of public agencies along the pipeline right-of-way;

- Reduce the general risks and impacts, to both the workforce and the public, associated with excavations in and along public highways and other rights-of-way.

**(7) _A certification that operation of the applicant's pipeline under the requested waiver would not be inconsistent with pipeline safety_**

Sable certifies that operation of CA-324 and 325 under the requested special permit is not inconsistent with pipeline safety and maintains equivalent or greater protection than that prescribed under 49 C.F.R. Part 195.

**(8) _If the application is for a renewal of a previously granted waiver or special permit, a copy of the original grant of the waiver or permit; and_**

N/A; this is an initial application.  Note however that this application seeks to carry forward substantially the same conditions as two existing state waivers issued by CA OSFM on December 17, 2024, as referenced above.

**(9) _Any other information PHMSA may need to process the application including environmental analysis where necessary._[1]**

---

[1] Section 23 of DOT Order 5610.1D (July 1, 2025) states that "Emergency circumstances may require immediate actions that preclude following standard NEPA procedures" and that "Immediate emergency actions necessary to protect the lives and safety of the public or protect valuable resources should never be delayed in order to comply

17

Note that Sable is not seeking relief from 49 C.F.R. § 195.563 and the requirements to provide cathodic protection for buried pipelines. The cathodic protection system remains active and continues to be maintained on CA-324 and 325. Rather, Sable proposes the aforementioned inspection and remediation actions as a means of addressing the limitations of cathodic protection PHMSA observed for buried, insulated pipe.

Cathodic protection will continue to be implemented on the pipeline system at appropriate levels in adherence to 49 C.F.R. 195 and tested at appropriate intervals. Cathodic protection will continue to function with high effectiveness at pipeline repair locations where the thermal insulation has been removed.

As noted above, Sable already received State Waivers from OSFM in December 2024 (which PHMSA evaluated and approved) regarding waiver of the same standards for CA-324 and 325. Due to the fact that these pipelines have since been designated as interstate, Sable is seeking from PHMSA a special permit containing substantially the same conditions as reflected in these State Waivers (with adjustments for tasks already completed by Sable under the State Waivers).

### *(10)* *Conditions Necessitating Grant of Special Permit on Emergency Basis*

Pursuant to 49 C.F.R. § 190.341(i), applications for emergency special permits must include further information beyond that provided above. This additional information is described herein:

### *(i)* *An explanation of the actual or impending emergency and how the applicant is affected;*

Pursuant to 49 U.S.C. § 60118(c)(2)(A), PHMSA is authorized to waive compliance with any part of an applicable standard under Part 195 on terms it considers "appropriate without prior notice and comment" if it determines that: "(i) it is in the public interest to grant the waiver; (ii) the waiver is not inconsistent with pipeline safety; and (iii) the waiver is necessary to address an actual or impending emergency involving pipeline transportation, including an emergency caused by a natural or manmade disaster." Although the term "emergency" is not defined in this provision, the statute's reference to both natural and manmade types of circumstances indicates a broad scope of exigent conditions that may constitute an emergency.[1]

---

with NEPA." Notwithstanding, Sable reserves the right to supplement this Application with additional information on environmental impacts (or lack thereof) associated with this proposed emergency special permit.

[1] See also "Emergency." Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/emergency ("an unforeseen combination of circumstances or the resulting state that calls for immediate action").

18

As noted in § 190.341(g), "emergency" events may be "local, regional, or national in scope" and includes a wide variety of conditions, including, among others, "significant fuel supply disruptions," "war-related activities," or other similar events.  On January 20, 2025, President Trump issued Executive Order 14156, determining and declaring pursuant to the National Emergencies Act (50 U.S.C. 1601 et seq) that the energy production and transportation capacity of the United States "are all far too inadequate to meet our Nation's needs" and that "hostile state and non-state foreign actors have targeted our domestic energy infrastructure, weaponized our reliance on foreign energy, and abused their ability to cause dramatic swings within international commodity markets."  EO 14156 specifically notes that these problems "are most pronounced in our Nation's Northeast and West Coast, where dangerous State and local policies jeopardize our Nation's core national defense and security needs and devastate the prosperity of not only local residents but the entire United States population."  EO 14156 concludes that our nation's "insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy," and that "in light of these findings, [the President] hereby declare[s] a national emergency."

EO 14156 also instructs executive agencies, such as PHMSA, to "identify and exercise any lawful emergency authorities available to them, as well as all other lawful authorities they may possess, to facilitate the … production, transportation, refining, and generation of domestic energy resources…"  It also directs agencies to "identify and use all lawful emergency or other authorities available to them to facilitate the supply, refining, and transportation of energy in and through the West Coast of the United States…"  EO 14156 defines "energy" as inclusive of, among other things, "crude oil", and defines "transportation" as inclusive of movement of energy specifically through pipelines.

Based on EO 14156, there exists an energy shortage on the West Coast that rises to the level of an emergency condition.  Pursuant to EO 14156's directive to agencies to exercise lawful emergency-related authorities to address this condition, Sable requests that PHMSA issue the applied-for special permit on an emergency basis.

In addition to the energy emergency determined in EO 14156, there are independent bases for a finding of actual or impending emergency and the issuance of an Emergency Special Permit under 49 U.S.C. § 60118(c)(2) and 49 C.F.R. § 190.341(g).  Specifically, current crude oil supply conditions in California create the additional risks of a motor fuel supply emergency in the state.  The reduction in regional sources of crude caused by declining onshore production, the current inability to move oil out of the Santa Ynez Unit and lack of adequate pipeline transportation into California has increased the state's reliance on the foreign imports of crude oil from countries such as Iraq, Ecuador and Brazil.  Oil from these locations must be shipped significant distances to California by ocean-going tanker at greater expense and environmental impact than oil produced in-state.  California's reliance on foreign crude creates significant risk of disruptions given current geopolitical conditions.  Issuance of Emergency Special Permit

19

**Teel Declaration
Page 73**

would facilitate the prompt and safe restart of CA-324 and CA-325, which would immediately and significantly improve energy security by offsetting the need for imported crude.

Grant of the requested special permit on an emergency basis is also indicated due to a potential gap in coverage under the State Waivers previously issued to Sable for CA-324 and 325 when these pipelines were considered intrastate.  As CA-324 and 325 have since been reclassified as interstate pipelines, it is necessary to immediately grant a special permit to replace the State Waivers that now have limited effect pursuant to operation of 49 U.S.C. § 60104(c).

***(ii)    A citation of the regulations that are implicated and the specific reasons the permit is necessary to address the emergency (e.g., lack of accessibility, damaged equipment, insufficient manpower)***

As noted above, Sable seeks relief from 49 C.F.R. 195.452(h)(4)(iii)(H), requiring remediation within 180 days of discovery of corrosion of or along a longitudinal seam weld.  Sable also seeks a special permit pursuant to Appendix B.1.A and B of the Consent Decree entered in Civil Action No. 2:20-CV-02415 (C.D. Cal. 2020), stating that a "State Waiver" for limited effectiveness of cathodic protection must be applied for and received prior to restarting Lines 901 and 903 (now CA-324 and 325).  In order to address the ongoing energy shortage that acutely affects the West Coast, it is necessary to restart CA-324 and 325 to facilitate transportation of crude oil produced upstream of the SYPS and to provide adequate supply of crude to regional refineries to positively affect fuel supplies.  Since restart of these pipelines is predicated on grant of a special permit pursuant to the Consent Decree, granting Sable's application on an emergency basis would facilitate the expedited provision of relief towards the ongoing fuel shortage.

***(iii)    A statement indicating how operating the pipeline pursuant to an emergency special permit is in the public interest (e.g., continuity of service, service restoration)***

Operation of CA-324 and 325 pursuant to an emergency special permit would expediently help to address the pressing energy security and supply issues that acutely affect the West Coast, as noted in EO 14156.  Not granting the special permit on an emergency basis would unnecessarily delay provision of such relief and would contradict EO 14156's explicit directive that agencies exercise emergency-related authorities to address such energy shortage and security issues.   In particular, operation of CA-324 and 325 would serve as a vital source of crude oil transportation to local and regional refineries (amounting to 10-15% of current California-wide production levels), would help reverse unfavorable market conditions for refineries by lowering the cost of feedstock crude by over $3 per barrel, and displace the need for imported oil and gasoline from other nations to California, which have dramatically increased in 2025.  It would also reduce the economic and political leverage that entities in these foreign nations can exploit to threaten the domestic petroleum market.

***(iv)        A description of any proposed alternatives to compliance with the regulation (e.g., additional inspections and tests, shortened reassessment intervals)***

Sable proposes the alternatives to compliance with the regulation outlined above in item (5) and in the attached draft special permit conditions.  As noted above, these conditions are substantially the same as those finalized in the State Waivers previously issued by OSFM for these pipelines.

***(v)        A description of any measures to be taken after the emergency situation or permit expires—whichever comes first—to confirm long-term operational reliability of the pipeline facility.***

Sable will separately apply for a non-emergency special permit to replace the emergency special permit upon its expiration.

Sable believes that the proposed Emergency Special Permit reflects a conservative and measured approach to the identification and remediation of external corrosion metal loss features on CA-324 and 325, will adequately manage risk factors associated with cathodic protection, and enable safe, long-term operation of the pipeline.

We appreciate PHMSA's consideration of this Application.  Should you have any questions, or require anything further to conduct your review of this Application please do not hesitate to contact me.

Sincerely,

J. Caldwell Flores
President and Chief Operating Officer
Pacific Pipeline Company / Sable Offshore Corp.

21

**Attachment:  A:   Lines CA-324 and 325 System Map**



22

**Teel Declaration**
**Page 76**

**Attachment B:**
**Proposed Emergency Special Permit Conditions**

23

# U.S. DEPARTMENT OF TRANSPORTATION
# PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION
# DRAFT EMERGENCY SPECIAL PERMIT

## Special Permit Information:

| | |
|---|---|
| **Docket Number:** | PHMSA-2025-0546 |
| **Requested By:** | Sable Offshore Corp. |
| **Operator ID #:** | 40881 |
| **Original Date Requested:** | December 19, 2025 |
| **Original Issuance Date:** | December [   ], 2025 |
| **Code Section(s):** | 49 CFR § 195.452(h)(4)(iii)(H) |

**Proposed Grant of Emergency Special Permit:**

By this order, subject to the terms and conditions set forth below, the Pipeline and Hazardous Materials Safety Administration (PHMSA) Office of Pipeline Safety (OPS)[1] proposes to grant this emergency special permit to Sable Offshore Corp. (Sable) for two hazardous liquid pipelines (Lines CA-324 and CA-325) that are constituents of the interstate Santa Ynez Pipeline System (SYPS) pipeline facility, located on the Outer Continental Shelf (OCS) and in California.

## I.      Purpose and Need:

Sable sought this special permit to waive requirements of 49 CFR §195.452(h)(4)(iii)(H) as applicable to Lines CA-324 and CA-325.  The regulation requires remediation within 180 days of discovery of corrosion of or along a longitudinal seam weld.  These pipelines present a risk of such corrosion under insulation that may occur as a result of limited effectiveness of cathodic protection due to shielding effects of polyurethane foam and polyethylene tape wrap installed on these pipelines.   Sable proposes an alternative approach to appropriately manage this risk, which approach was previously reviewed and

---

[1] Throughout this special permit, the usage of "PHMSA" or "PHMSA OPS" means the U.S. Department of Transportation's Pipeline and Hazardous Materials Safety Administration Office of Pipeline Safety.

approved as part of State Waivers issued by the California Office of State Fire Marshal (OSFM) on December 17, 2024 to Sable for Lines CA-324 and CA-325.

Sable sought this special permit to implement the terms of a Consent Decree entered in Civil Action No. 2:20-CV-02415 by the US District Court for the Central District of California, which provides, among other things, that a "State Waiver" must be applied for and received from OSFM prior to restarting Lines CA-324 and 325. These pipelines were formerly considered intrastate at the time of entry of this Consent Decree, and were regulated by OSFM pursuant to its state certification received under 49 USC § 60105(a). However, these pipelines are now considered interstate pursuant to Sable's designation on November 26, 2025, and PHMSA's concurrence on December 17, 2025, of the SYPS as an interstate pipeline facility. As a result, PHMSA, and not OSFM, is the sole pipeline safety regulatory agency with authority to grant waiver of the pipeline safety regulations. This change in designation immediately affects the measures implemented in the two State Waivers issued by OSFM for CA-324 and 325 in December 2024.

Sable requested PHMSA to grant a special permit for the above reasons on an emergency basis pursuant to 49 U.S.C. § 60118(c)(2) and 49 CFR § 190.341(g). Sable noted the existence of a national energy emergency pursuant to declaration made under the National Emergencies Act (50 USC 1601 et seq) in Executive Order 14156 (January 20, 2025), which remains active. Executive Order 14156 declares that energy production and transportation capacity are inadequate to meet domestic needs, and that this shortage is particularly pronounced on the West Coast (including in California), and that this shortage is enabling foreign actors to target domestic energy infrastructure, weaponize the United States' reliance on foreign energy, and cause dramatic swings within international commodity markets. Executive Order 14156 further instructs federal agencies to "use all lawful emergency and other authorities available to them to facilitate the supply, refining, and transportation of energy in and through the West Coast of the United States." Executive Order 14156 specifically defines "energy" to include "crude oil", and "transportation" to include movement by pipeline.

Sable noted that grant of this special permit on an emergency basis would facilitate the restart of Lines CA-324 and 325 to provide relief in response to the acute energy shortage conditions identified in Executive Order 14156 within California and in the West Coast region of the United States.

Sable further noted that grant of this special permit on an emergency basis is appropriate to address the gap in coverage under the current OSFM State Waivers created by redesignation of Lines CA-324 and 325 as interstate, given that the proposed special permit is substantially the same as that which was

25

previously reviewed and approved by OSFM and PHMSA for issuance of the State Waivers.

**II.      Special Permit Segments**

This permit pertains to the specified special permit segments and corresponding special permit inspection area defined in this section.

**Special Permit Segments:**

| Special Permit Segment Name | Location | Mileage | California County or Counties |
|---|---|---|---|
| CA-324 | Las Flores Canyon Processing Facility to Gaviota Pump Station | 10.86 | Santa Barbara |
| CA-325A | Gaviota Pump Station to Sisquoc Pump Station | 38.72 | Santa Barbara |
| CA-325B | Sisquoc Pump Station to Pentland Station | 74.84 | Santa Barbara; San Luis Obispo; Kern |

**III.      Conditions**

PHMSA proposes to grant this special permit subject to Sable implementing each of the following conditions.  These conditions must be implemented and complied with in addition to all applicable requirements of 49 CFR Part 195 except for compliance with requirements in 49 CFR §195.452(h)(4)(iii)(H).

**General Conditions:**

1)      The Special Permit Segments may only be used to transport crude oil.

2)      Prior to transporting crude oil in the Special Permit Segments, Sable must develop and implement procedures for the conditions and requirements described in this emergency special permit.

26

3)      Sable shall not exceed maximum operating pressure (MOP) limits for the Special Permit Segments, as follows:

    **a)**    The MOP of Line CA-324 cannot exceed 1003 pounds per square inch gauge (psig).

    **b)**    The MOP of Line CA-325A (the segment of Line CA-325 between Gaviota and Sisquoc stations) cannot exceed 1000 psig.

    **c)**    The MOP of Line CA-325B (the segment of Line CA-325 between Sisquoc and Pentland stations) cannot exceed 1292 psig.

4)      Sable shall not exceed maximum operating temperature limits for crude oil transported in the Special Permit Segments, as follows:

    **a)**    The maximum operating temperature of the crude oil that is transported in Line CA-324 must not exceed 140 degree Fahrenheit for more than 12 consecutive hours.

    **b)**    The maximum operating temperature of the crude oil that is transported in Line CA-325A (the segment of Line CA-325 between Gaviota and Sisquoc stations) must not exceed 125 degrees Fahrenheit for more than 12 consecutive hours.  Temperature transmitters must be installed on Line CA-325 at Gaviota station to monitor the temperature of Line CA-325A.

    **c)**    The maximum operating temperature of the crude oil that is transported in Line CA-325B (the segment of Line CA-325 between Sisquoc and Pentland stations) must not exceed 110 degrees Fahrenheit for more than 12 consecutive hours.  Temperature transmitters must be installed on Line CA-325 at Sisquoc station to monitor the temperature of Line CA-325B.

5)      This emergency special permit does not relieve Sable from complying with applicable requirements under 49 CFR Part 195, other than those waived in this emergency special permit.

6)      This emergency special permit does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).

7)      In-line inspections (ILIs) performed pursuant to this emergency special permit must include:

    **a)**    Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion, defined as follows:

**Teel Declaration**
**Page 81**

    i.   Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.

    ii.   General corrosion means uniform or gradually varying loss of wall thickness over an area.

**b)**   Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI).

**c)**   Use of a tool that is at least capable of reliably detecting and sizing crack or crack-like anomalies at a 90 percent POD and POI.

**8)**   Prior to placing CA-324 in operation, Sable must perform fracture toughness tests on the existing 24" pipe from CA-324 in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from the predominant existing 24" pipe, specifically API 5L X65 HF-ERW pipe with a nominal thickness of 0.344" that was manufactured by Nippon Steel Corp. in the 1980s.  At least three (3) separate tests must be performed to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ)[2], and the HF-ERW long seam weld on the pipe to represent the fracture toughness of CA-324 (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the HF-ERW long seam weld). The lowest fracture toughness value must be applied to conditions 11, 16, 17, and 21. Sable may use pipe samples taken opportunistically during ongoing maintenance and repair efforts on Line CA-324.[3]

**9)**   Prior to placing Line CA-325 (including CA-325A and CA-325B) in operation, Sable must perform fracture toughness tests on the existing 30" pipe from CA-325A/B in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from both of the two following predominant existing 30" pipe specifications:

**a)**   API 5L X70 pipe with a nominal thickness of 0.281" that was manufactured by the various pipe mills in the 1980s.

**b)**   API 5L X65 pipe with a nominal thickness of 0.344" that was manufactured by the various pipe mills in the 1980s.

At least three (3) separate tests must be performed from each pipe mill, for both of the two pipe specifications listed above, to obtain the fracture toughness values of the pipe body, heat affected

---

[2] The heat affected zone (HAZ), as used in this emergency special permit, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.

[3] Sable has already completed all of the testing required in this condition and must submit all fracture toughness results to PHMSA prior to restarting Line CA-324.

**Teel Declaration**
**Page 82**

zone (HAZ), and the DSAW long seam weld on the pipe to represent the fracture toughness of CA-325A/B (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the DSAW long seam weld). The lowest fracture toughness value must be applied to conditions 11, 16, 17, and 21. Sable may use pipe samples taken opportunistically during ongoing maintenance and repair efforts on Line CA-325A/B.[4]

10)    All existing immediate and 180-day repair conditions must be evaluated and remediated pursuant to the Consent Decree repair criteria prior to restarting CA-325A/B.[5] Upon restart Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by PHMSA. Sable must utilize the Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results to identify, evaluate and remediate any immediate and 180-day repair conditions that are listed in this emergency special permit.

11)    Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines.* If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

12)    Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of its CA-325A/B.

13)    Pressure Testing:[6]

   a)    Prior to placing CA-324 in operation, Sable must conduct a spike hydrostatic pressure test of CA-324 at a minimum pressure that is at least 1.5 times the maximum operating pressure (MOP) or 100% specified minimum yield strength (SMYS), for a minimum of 15 minutes after the spike test pressure is stabilized.  Sable must field evaluate and

---

[4] Sable has already completed the testing required in this condition and must submit all fracture toughness results to PHMSA prior to restarting Line CA-325.

[5] Sable has already completed the repairs required in this sentence and must submit all of the results to PHMSA prior to restarting CA-324 and CA-325.

[6] Sable has already completed all of the testing and repairs required in this Condition and must submit the results to PHMSA prior to restart.  No failures occurred during the required pressure testing.

remediate the following anomalies before performing the spike hydrostatic test on CA-324:

    i.   All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

    ii.  All anomalies that have a predicted failure pressure less than or equal to 1.6 times MOP.

**b)**  Immediately following the spike hydrostatic pressure test specified in Condition 13(a), Sable must conduct an 8-hour hydrostatic pressure test of CA-324 at a minimum of 1.25 times the MOP.

**c)**  Prior to placing Line 325A (segment of Line 325 between Gaviota and Sisquoc stations) in operation, Sable must conduct a spike hydrostatic pressure test of *CA-325A* at a minimum pressure that is at least 1.39 times the MOP, for a minimum of 15 minutes after the spike test pressure is stabilized. Sable must ensure that the spike hydrostatic pressure at the highest elevation of each testable segment is at least 1.39 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-325A:

    i.   All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

    ii.  All anomalies that have a predicted failure pressure less than or equal to 1.5 times MOP.

**d)**  Immediately following the spike hydrostatic pressure test specified in Condition 13(c), Sable must conduct an 8-hour hydrostatic pressure test of CA-325A at a minimum of 1.25 times the MOP.

**e)**  Prior to placing Line 325B (segment of Line 325 between Sisquoc and Pentland stations) in operation, Sable must conduct a hydrostatic pressure test of *CA-325B* at a minimum pressure of 1.25 times the MOP, for a minimum of 8 hours. Sable must ensure that the hydrostatic pressure at the highest elevation of each testable segment is at least 1.25 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the hydrostatic test on CA-325B:

    i.   All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

    ii.  All anomalies that have a predicted failure pressure less than or equal to 1.4 times MOP.

30

**f)** Sable must obtain the Test ID for each hydrostatic pressure test from PHMSA (or OSFM if such testing was performed prior to November 26, 2025) and have the approved independent testing firm forward separately the certified test results to PHMSA or the OSFM, as applicable.

**g)** Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 C.F.R., Part 195 Subpart E – Pressure Testing and monitored by an independent testing firm listed under PHMSA or OSFM (as applicable) approved hydrostatic testing companies.

**h)** Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported to the PHMSA via email at [].

**i)** Section(s) of the Special Permit Segments that failed during the required hydrotesting must be repaired by removing and replacing the failed section. PHMSA reserves the right to revoke this emergency special permit if failure(s) raise the concern that the Special Permit Segments cannot be safely operated.

**14)** In-Line Inspection (ILI) Assessment and Frequency:

**a)** Prior to performing in-line inspections of the Special Permit Segment, Sable shall provide PHMSA with a written notification to [email] describing its assessment plan with the following information:

    **i.** Dates for integrity assessment

    **ii.** In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[7] to assess the integrity of the subject pipe segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications;

    **iii.** In-line inspection tool vendor(s)

    **iv.** Required tool specifications including operational specifications and anomaly sizing tolerances

    **v.** Tool validation methodology

    **vi.** Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications

    **vii.** Criteria used to identify locations for excavation and field verification

    **viii.** Non-destructive examination

---

[7] Industry standards referenced in this emergency special permit must utilize the editions that are incorporated by reference in 49 CFR 195.3 unless another edition is explicitly specified in this emergency special permit.

31

**b)** Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.

**c)** Metal Loss Tool(s):

  **i.** Initial ILI tool runs – Each year, during the first two (2) years of operating the Special Permit Segments, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU). Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months. If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.

  **ii.** Subsequent ILI tool runs – After the first two (2) years of operating the Special Permit Segments, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the Special Permit Segment within 30 days after it was deemed to be unsuccessful. All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

**d)** Crack Detection Tools - Sable shall conduct at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15 months[8] or the ILI assessment must be assessed at more frequent intervals if condition 21 determined a shorter assessment interval.

  **i.** These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.

---

[8] Sable may petition PHMSA to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval.  Changes to the reassessment interval are subject to PHMSA approval.

32

**Teel Declaration**
**Page 86**

    **ii.** USCD Performance Specification Requirements

        **1.** The USCD tools must have a probability of detection that is $\geq 90\%$ for axial and circumferential cracks.

        **2.** The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.

        **3.** The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.

        **4.** The depth sizing accuracy for cracks must be $\pm 0.8$ mm for axial cracks and $\pm 1$ mm for circumferential cracks.

**e)** Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

**f)** Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the Special Permit Segment in which the ILI tool velocity was outside of the specified tool velocity range.

**g)** All ILI tool runs must obtain the Test ID from PHMSA prior to run.

**h)** Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.

**i)** Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

**j)** Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals. Sable must document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[9] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different. If a trend is identified where the tool has been

---

[9] A minimum of four (4) independent direct examination excavations must be used for unity plots.

33

consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

k) Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013).

15) Discovery of Condition: The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

16) Immediate Repair Conditions:[10]

a) A crack or crack-like anomaly that meets any of the following criteria:

i. Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.

ii. Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.

b) Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.

c) Any external cluster corrosion or external general corrosion that is located on the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[11]

17) 180-Day Repair Conditions:[12]

a) A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.

b) Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.

c) All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[13]

---

[10] The criteria specified in this emergency special permit is supplemental to, and does not relieve Sable from complying with, the requirements set forth in 49 CFR 195.452(h)(4)(i). All immediate repair conditions must be remediated with a permanent repair method.

[11] Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria. General corrosion means uniform or gradually varying loss of wall thickness over an area.

[12] The criteria specified in this emergency special permit is supplemental to, and does not relieve Sable from complying with, the requirements set forth in 49 CFR 195.452(h)(4)(iii), except for those associated with 49 CFR 195.452(h)(4)(iii)(H). All immediate repair conditions must be remediated with a permanent repair method.

[13] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41%

34

    **d)** For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

**18)** Corrosion Growth Rate Analysis (CGRA):

    **a)** Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to prior ILI) and perform pipeline remediations needed to assure the integrity of the Special Permit Segments is maintained.[14] The timing of remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.

    **b)** The CGRA procedure must include ILI data matching methods[15] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.

    **c)** Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.

    **d)** When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates.[16]

    **e)** All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

**19)** Pressure Reduction: If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in this emergency special permit, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

**20)** In Field Direct Examination of Pipe:

---

metal loss depth. If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify PHMSA, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 C.F.R. §195.452 until the indication is remediated or until otherwise authorized by the PHMSA.

[14] At a minimum, Sable must include signal matching between ILI data sets.

[15] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

[16] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

35

a) Direct examinations[17] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[18] PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.

b) Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition. However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:

    i. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.

    ii. Sable must increase the metal loss anomaly's depth by 20% when they input it into the formula for calculating the number of wraps needed for repair method 5.

    iii. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs. If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

c) Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

d) Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy. Sable must recoat in accordance with their coating repair procedure.[19]

e) All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

21) Integrity Management:

---

[17] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.

[18] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complemented by shear wave technology or inspection by phased array ultrasonic testing.

[19] The coating procedure must be submitted to PHMSA prior to the effective date of this emergency special permit.

**Teel Declaration
Page 90**

a) A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.

    i. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 C.F.R. §192.712(d)(1).

    ii. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 C.F.R. §192.712(d)(2).

b) Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.

c) When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

d) Sable must send all field measurements to the ILI tool vendor within 90 days of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

e) Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the Special Permit Segments. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by PHMSA prior to being selected.

f) Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC) interference or direct current (DC) interference or shorting that could contribute to external corrosion is occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

22) Data Requirements for Predicted Failure Analysis:

a) Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining

37

uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

b) The analyses performed in accordance with this emergency special permit must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in *traceable, verifiable, and complete* records.

23) Recordkeeping:

a) Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this emergency special permit shall be kept for the life of the Special Permit Segments and must be submitted to the PHMSA, in the manner requested (electronic, hardcopy, or other format) within 30 days.

b) Sable must maintain the following records:

    i. Technical approach used for the analysis

    ii. All data used and analyzed

    iii. Pipe and longitudinal weld seam properties

    iv. Procedures used to implement emergency special permit conditions

    v. Evaluation methodology used

    vi. Models used

    vii. Direct in situ examination data

    viii. All in-line inspection tool assessments information evaluated

    ix. Pressure test data and results

    x. All in-the-ditch assessments performed on the Special Permit Segments

    xi. All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results

    xii. All finite element analysis results

    xiii. The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology

    xiv. The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods

    xv. Safety factors used for fatigue life and/or predicted failure pressure calculations

    xvi. Reassessment time interval and safety factors

    xvii. The date of the review

    xviii. Confirmation of the results by qualified technical subject matter expert(s)

    xix. Approval by responsible Sable management personnel

    xx. Records of additional preventive and mitigative (P&M) measures performed

38

**Teel Declaration
Page 92**

        xxi.   Reports required by this emergency special permit.

24)     Reporting:

    a)   Any release on the Special Permit Segments shall be reported to the PHMSA at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery via email at [email].[20]

    b)   An email notification shall be made at least three (3) days prior to a Special Permit Segment being exposed for non-emergency purposes of field evaluation and repair via email at [email]. The email notification shall include, if applicable:

       i.   Tool type and run date

      ii.   Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)

     iii.   Dig sheets

     iv.   Field contact information for Sable

      v.   Time and location of the field evaluation and repair.

    c)   Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run via email at [] and include:

       i.   Tool type

      ii.   Run date

     iii.   Summary of Conditions Report[21]

     iv.   Final Vendor Report and Pipe Tally

    d)   Sable shall provide a report to the PHMSA by June 15th of every year for the duration of this emergency special permit. The report shall be addressed to [CONTACT].  At a minimum, the annual report shall contain the following, if applicable:

       i.   A Closure Report for the previous calendar (CY) which contains:

         1.   Features that were remediated in previous CY, including documentation for in-the-ditch assessments and repairs

         2.   Identify features that remain to be assessed

         3.   Unity Plots for previous ILI runs

      ii.   Fracture mechanics and pressure cycling analyses in accordance with Condition 21(a);

     iii.   The third-party ILI expert reviews in accordance with condition 21(e).

---

[20] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state or federal regulations.

[21] PHMSA may stipulate specific formatting or other information (e.g., condition type, anomaly details, remaining strength calculation method, failure pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

iv.   AC and DC Interference surveys that are due in accordance with condition 21(f).

v.   A copy of the CGRA for prior year including:

1.   Mean corrosion growth rate for the Special Permit Segments

2.   Distribution graph of the corrosion growth rate for the Special Permit Segments (e.g. occurrences (#) vs. corrosion rate (mpy)

25)   Limitations:

a)   This emergency special permit is limited to an initial term of sixty (60) days from the date of issuance. If Sable elects to seek renewal of this emergency special permit, it must submit a renewal request to PHMSA pursuant to 49 CFR 190.341(g).

b)   Should Sable fail to comply with any conditions of this emergency special permit or should PHMSA determine that this emergency special permit is no longer appropriate or is inconsistent with pipeline safety, PHMSA may revoke the emergency special permit and require Sable to comply with all appropriate regulatory requirements.

c)   PHMSA may order the Special Permit Segments to be shutdown at any time.

d)   PHMSA may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for failure to comply with this emergency special permit. The terms and conditions of any compliance order shall take precedence over the terms of this emergency special permit.

e)   In the event of conflict between the conditions of this emergency special permit and industry standards, the emergency special permit conditions shall prevail.

f)   If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the emergency special permit, Sable must provide the PHMSA written notice of the change within 30 days of the consummation date. In the event of such transfer, PHMSA reserves the right to revoke, suspend, or modify the emergency special permit.

# EXHIBIT F

Declaration of Julie Teel Simmonds

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ENVIRONMENTAL DEFENSE
CENTER, GET OIL OUT!, SANTA
BARBARA COUNTY ACTION
NETWORK, SIERRA CLUB, SANTA
BARBARA CHANNELKEEPER,
CENTER FOR BIOLOGICAL
DIVERSITY, and WISHTOYO
FOUNDATION,

                    Petitioners,

vs.

U.S. DEPARTMENT OF
TRANSPORTATION, SEAN DUFFY, in
his official capacity as Secretary of the U.S.
Department of Transportation, PIPELINE
AND HAZARDOUS MATERIALS
SAFETY ADMINISTRATION, and PAUL
ROBERTI, in his official capacity as
Administrator of the Pipeline and
Hazardous Materials Safety
Administration,

                    Respondents.

Docket No. _____

[Agency Docket No. 2025-1502]

## PETITION FOR REVIEW

Linda Krop
lkrop@environmentaldefensecenter.org
Margaret M. Hall
mhall@environmentaldefensecenter.org
Jeremy M. Frankel
jfrankel@environmentaldefensecenter.org

Julie Teel Simmonds
jteelsimmonds@biologicaldiversity.org
David Pettit
dpettit@biologicaldiversity.org
CENTER FOR BIOLOGICAL
DIVERSITY

**Teel Declaration**
**Page 96**

ENVIRONMENTAL DEFENSE
CENTER
906 Garden Street
Santa Barbara, CA 93101
Tel: (805) 963-1622
*Attorneys for Petitioners Environmental
Defense Center, Get Oil Out!, Santa
Barbara County Action Network, Sierra
Club, and Santa Barbara Channelkeeper*

2100 Franklin Street, Suite 375
Oakland, CA 94612
Tel: (510) 844-7100
*Attorneys for Petitioners Center for
Biological Diversity and Wishtoyo
Foundation*

## PETITION FOR REVIEW

Pursuant to 49 U.S.C. Section 60119(a)(1), Federal Rule of Appellate Procedure 15, and Ninth Circuit Rule 15-1, the Environmental Defense Center (EDC), Get Oil Out! (GOO!), Santa Barbara County Action Network (SBCAN), Sierra Club, Santa Barbara Channelkeeper (SBCK), Center for Biological Diversity (CBD), and Wishtoyo Foundation (collectively, "Petitioners") hereby petition this Court for review of orders issued by the Pipeline and Hazardous Materials Safety Administration (PHMSA), an agency within the United States Department of Transportation.

Specifically, on December 22, 2025, PHMSA issued an order approving a Restart Plan (the "Approval") for defective oil pipelines CA-324 and CA-325 (together, the "Pipeline System"), allowing them to return to service ten years after causing a catastrophic oil spill at Refugio State Beach Park, in Santa Barbara County, California. The Approval allows the 120-mile Pipeline System to operate despite its lack of protection from corrosion — the root cause of the 2015 oil spill.

1

Teel Declaration
Page 97

PHMSA's Approval is attached hereto as **Exhibit A**. Additionally, on December 23, 2025, PHMSA issued an order granting an "emergency special permit" to Sable Offshore Corp. under 49 U.S.C. Section 60118(c)(2)(A), waiving compliance with federal pipeline safety regulations ("Emergency Special Permit"). PHMSA's Emergency Special Permit is attached hereto as **Exhibit B**.

In issuing the Approval and Emergency Special Permit, PHMSA bypassed the required public notice, opportunity for public participation, statement of reasons for its decisions, and other conditions generally required for pipeline safety regulation waivers under the federal Pipeline Safety Act (PSA), 49 U.S.C. § 60101 *et seq.*; 49 C.F.R. § 190.341. PHMSA likewise failed to conduct any environmental review under the National Environmental Policy Act (NEPA). 42 U.S.C. § 4321 *et seq.*; U.S. Department of Transportation, DOT Order 5610.1D (2025).

Pursuant to 49 U.S.C. Section 60119(a), orders issued by PHMSA under the PSA — e.g., the Approval and Emergency Special Permit— must be challenged by filing a Petition for Review directly in the court of appeals for the District of Columbia or the circuit in which the petitioner(s) resides within eighty-nine days after its issuance. Accordingly, Petitioners have timely and properly sought review of PHMSA's orders directly in this Court.

Judicial review of PHMSA orders is conducted under the standards set

2

forth in Section 706 of the Administrative Procedure Act (APA). 49 U.S.C. § 60119(a)(3). As grounds for this Petition for Review, Petitioners allege that PHMSA's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" and/or "without observance of procedure required by law," including for, but not limited to, the following reasons:

(1)   PHMSA did not meet the requirements for issuing an Emergency Special Permit, specifically that (a) it is "in the public interest" to grant the waiver; (b) the waiver is "not inconsistent with pipeline safety;" and (c) the waiver "is necessary to address an actual or impending emergency involving pipeline transportation." 49 U.S.C. § 60118(c)(2)(A)(i)-(iii).

(2)   In issuing the Approval and Emergency Special Permit orders, PHMSA failed to provide public notice, an opportunity for public participation, a statement of reasons for its decisions, and other required elements for non-emergency waivers of pipeline safety requirements under the PSA. *See* 49 U.S.C. § 60118(c)(1)(A), (B). Likewise, PHMSA failed to follow its procedures for the issuance of non-emergency special permits

3

under 49 C.F.R. Section 190.341.

(3)     PHMSA failed to conduct required environmental review under

NEPA, 42 U.S.C. § 4321 *et seq.*

Petitioners are non-profit organizations whose missions include protecting the environment along California's coast and inland areas. Advocating for the protection and preservation of the environment from oil and gas development and transportation is central to their work. Petitioners have members who live and recreate near, and otherwise utilize, the land and waters along the route of the Pipeline System. They have a substantial interest in PHMSA's decision to issue the Approval and Emergency Special Permit because restarting the Pipeline System would allow for the resumption of oil and gas drilling off the Gaviota coast and transportation of oil by pipeline, thereby threatening to degrade the environment, including from another oil spill from the Pipeline System, and ground-disturbing activities related to pipeline repairs and inspections. Thus, PHMSA's action has adverse impacts on the Petitioners and their members' interests in the resources and ecosystems found along the Pipeline System route.

4

Respectfully submitted this 24th day of December, 2025.

*/s/ Linda J. Krop*
Linda Krop
Margaret M. Hall
Jeremy M. Frankel
ENVIRONMENTAL DEFENSE
CENTER
*Counsel for Petitioners*
*Environmental Defense Center, Get*
*Oil Out!, Santa Barbara County*
*Action Network, Sierra Club, and*
*Santa Barbara Channelkeeper*

*/s/ Julie Teel Simmonds*
Julie Teel Simmonds
David Pettit
CENTER FOR BIOLOGICAL
DIVERSITY
*Counsel for Petitioners Center for*
*Biological Diversity and Wishtoyo*
*Foundation*

5

**Teel Declaration**
**Page 101**

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a) and this Court's Rule 26.1, Petitioners Environmental Defense Center (EDC), Get Oil Out! (GOO!), Santa Barbara County Action Network (SBCAN), Sierra Club, by and though the Santa Barbara-Ventura Chapter ("Sierra Club"), Santa Barbara Channelkeeper (SBCK), the Center for Biological Diversity (CBD), and Wishtoyo Foundation state as follows:

These Petitioners are non-profit organizations and do not have any parent corporations or any publicly held corporations that own 10 percent or more of their stock.

Respectfully submitted this 24th day of December, 2025.

> /s/ Linda J. Krop
> Linda Krop
> Margaret M. Hall
> Jeremy M. Frankel
> ENVIRONMENTAL DEFENSE CENTER
> *Counsel for Petitioners Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper*
>
> /s/ Julie Teel Simmonds
> Julie Teel Simmonds
> David Pettit
> CENTER FOR BIOLOGICAL DIVERSITY
> *Counsel for Petitioners Center for Biological Diversity and Wishtoyo Foundation*

**Teel Declaration
Page 102**

## CERTIFICATE OF SERVICE

I hereby certify that on December 24, 2025, I caused a true and correct copy of the Petition for Review, Exhibits A & B thereto, and Corporate Disclosure Statement to be served using the Appellate Electronic Filing system. I also caused the foregoing documents to be served on the following Respondents by third party commercial carrier Nationwide for delivery by December 26, 2025:

*Respondents*

Sean Duffy, Secretary of Transportation
U.S. Department of Transportation,
Pipeline and Hazardous Materials Safety Administration
1200 New Jersey Avenue, SE
Washington, D.C. 20590

Paul J. Roberti, Administrator
U.S. Department of Transportation,
Pipeline and Hazardous Materials Safety Administration
1200 New Jersey Avenue, SE
Washington, D.C. 20590

Office of Chief Counsel
U.S. Department of Transportation,
Pipeline and Hazardous Materials Safety Administration
1200 New Jersey Avenue, SE
Washington, D.C. 20590

Pamela Bondi
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

I also emailed courtesy copies of the foregoing documents to applicants' counsel as follows:

7

| Duncan Joseph Moore<br>djmoore@paulhastings.com<br>Benjamin J. Hanelin<br>benjaminhanelin@paulhastings.com<br>Natalie C. Rogers<br>natalierogers@paulhastings.com<br>PAUL HASTINGS, LLP<br>1999 Avenue of the Stars, 27th Floor<br>Century City, CA 90067 | Attorneys for Sable Offshore Corp. and Pacific Pipeline Company |
| --- | --- |
| Jeffrey D. Dintzer<br>Jeffrey.dintzer@alston.com<br>Matthew C. Wickersham<br>Matt.wickersham@alston.com<br>Garrett B. Stanton<br>Garrett.stanton@alston.com<br>ALSTON & BIRD LLP<br>350 South Grand Avenue, 51st Floor<br>Los Angeles, CA 90071 | Attorneys for Sable Offshore Corp. and Pacific Pipeline Company |
| Trevor D. Large<br>tlarge@flasllp.com<br>Victoria C. Diffenderfer<br>vdiffenderfer@flasllp.com<br>FAUVER LARGE ARCHBALD & SPRAY<br>820 State Street, 4th Floor<br>Santa Barbara, CA 93101 | Attorneys for Sable Offshore Corp. and Pacific Pipeline Company |

/s/ Julie Teel Simmonds
Julie Teel Simmonds

8

**Teel Declaration**
**Page 104**

# Exhibit A



**U.S. Department
of Transportation
Pipeline and Hazardous
Materials Safety
Administration**

12300 W. Dakota Ave., Suite 340
Lakewood, CO 80228

**VIA ELECTRONIC MAIL TO: lyearwood@sableoffshore.com**

December 22, 2025

Mr. Lance Yearwood
Vice President
Pacific Pipeline Company / Sable Offshore Corp.
845 Texas Avenue, Suite 2920
Houston, Texas 77002

RE:  **Approval of Sable Offshore Corp.'s Restart Plan for the Las Flores Pipeline System Line CA-324 and Line CA-325**

Dear Mr. Yearwood:

From December 4 to December 12, 2025, the Pipeline and Hazardous Materials Safety Administration (PHMSA) received several documents from Sable Offshore Corp. These documents included:

1. Line CA-324 and Line CA-325 Fill Plan and Startup Procedures
2. A letter requesting the removal of pressure restrictions for Line CA-324
3. A letter requesting the removal of pressure restrictions for Line CA-325
4. The Las Flores Pipeline Linefill Positioning Plan Assignments
5. The Las Flores Pipeline Linefill Contact List

These documents addressed the Restart Plan for Line CA-324 and Line CA-325 (previously known as Plains Line 901 and Line 903, respectively). In addition, PHMSA conducted a field inspection with Sable Offshore Corp. to discuss its process and safety procedures for the pipeline restart.

PHMSA has reviewed these documents and hereby approves the submitted Restart Plan. This approval is valid from the date of this letter.

Should you have any questions or concerns, please contact me at (720) 963-3160 or by email at dustin.hubbard@dot.gov.

Sincerely,

Dustin Hubbard
Director, Western Region
Pipeline and Hazardous Materials Safety Administration

cc:    Trent Fontenot, Sr. Vice President - Operations, tfontenot@sableoffshore.com
Jim Hosler, Assistant Deputy Director – Pipeline Safety and CUPA, CalFire,
jim.hosler@fire.ca.gov

# Exhibit B

# U.S. DEPARTMENT OF TRANSPORTATION

# PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION

# EMERGENCY SPECIAL PERMIT

## Special Permit Information:

| | |
|---|---|
| **Docket Number:** | 2025-1502 |
| **Requested By:** | Sable Offshore Corp. PPC |
| **Operator ID#:** | 40881 |
| **Date Requested:** | December 19, 2025 |
| **Issuance Date:** | December 23, 2025 |
| **Expiration Date:** | February 21, 2026 |
| **Code Section:** | 49 CFR § 195.452(h)(4)(iii)(H) |

## Grant of Special Permit:

By this order, subject to the terms and conditions set forth below, the Pipeline and Hazardous Materials Safety Administration (PHMSA) Office of Pipeline Safety (OPS)[1] grants this emergency special permit to Sable Offshore Corp. PPC (Sable) for 124.42 miles of 24- and 30-inch diameter hazardous liquid pipelines, Lines CA-324 and CA-325 (*special permit segments*), transporting crude oil from Las Flores Canyon to Pentland in Santa Barbara, San Luis Obispo, and Kern counties, California. This emergency special permit waives compliance from 49 CFR § 195.452(h)(4)(iii)(H), which requires corrosion of or along a longitudinal seam weld be scheduled for evaluation and remediation within 180 days of discovering the condition.

## I.    Purpose and Need

On December 19, 2025,[2] Sable requested an emergency special permit for relief from the requirement to evaluate and remediate corrosion occurring at longitudinal seam welds within 180 days. The *special permit segments* are under polyurethane foam and polyethylene tape wrap insulation, which can inhibit the effectiveness of cathodic protection and contribute to a risk of corrosion due to shielding effects. Sable proposed an alternative approach to safely manage this risk, which was previously reviewed and approved as part of two state waivers issued by the California Office of State Fire Marshal (OSFM) on December 17, 2024 to Sable for the *special permit segments*. PHMSA previously reviewed the state waivers pursuant to 49 U.S.C. § 60118(d).

---

[1] Throughout this special permit, the usage of "PHMSA" means the U.S. Department of Transportation (DOT), Pipeline and Hazardous Materials Safety Administration, Office of Pipeline Safety.
[2] Sable submitted supplemental information related to its application on December 23, 2025.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC                    Page 1 of 16
Emergency Special Permit – Corrosion Mitigation – California

**Teel Declaration
Page 109**

Sable sought this special permit to implement the terms of a Consent Decree entered in Civil Action No. 2:20-CV-02415 by the U.S. District Court for the Central District of California, which provides, among other requirements, that a "State Waiver" must be applied for and received from OSFM prior to restarting Lines CA-324 and CA-325. The *special permit segments* were previously considered intrastate at the time of entry of the Consent Decree and were regulated by OSFM pursuant to its state certification with PHMSA under 49 U.S.C. § 60105(a). However, the *special permit segments* are now considered interstate pursuant to Sable's designation on November 26, 2025, and PHMSA's concurrence on December 17, 2025. As a result, PHMSA has exclusive pipeline safety regulatory agency over Lines CA-324 and CA-325.  The conditions ordered by OSFM in the two state waivers are now being re-issued by PHMSA as a special permit subject to Federal oversight and enforcement.

Sable requested PHMSA grant a special permit for the above reasons on an emergency basis pursuant to 49 U.S.C. § 60118(c)(2) and 49 CFR § 190.341(g). In its application, Sable stated that expedited review of its application was warranted in light of the national energy emergency declared by the President under the National Emergencies Act (50 U.S.C. § 1601 et seq.) in Executive Order 14156 (January 20, 2025). In Executive Order 14156, the President declared a national energy emergency based on a finding that "[t]he United States' insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy."[3]  The Executive Order directs agencies, such as PHMSA, to "identify and exercise any lawful emergency authorities available to them, as well as all other lawful authorities they may possess, to facilitate," among other activities, the "production, transportation, refining, and generation of domestic energy resources."[4]  The Executive Order further directs agencies to "identify and use all lawful emergency or other authorities available to them to facilitate the supply, refining, and transportation of energy in and through the West Coast of the United States . . . ."[5]

Sable's application stated that grant of this special permit on an emergency basis would facilitate the restart of Lines CA-324 and CA-325 to provide relief in response to the acute energy shortage conditions identified in Executive Order 14156 within California and in the West Coast region of the United States.[6]  Sable further noted that grant of this special permit on an emergency basis is appropriate to address the gap in coverage under the OSFM State Waivers created by redesignation of Lines CA-324 and CA-325 as interstate, given that the proposed special permit is substantially the same as that which was previously reviewed and approved by OSFM and PHMSA for issuance of the State Waivers.

This emergency special permit allows Sable to operate Lines CA-324 and CA-325 without being subject to the requirement to evaluate and remediate corrosion of or along a longitudinal seam weld within 180 days.  On the condition that Sable comply with the terms and conditions set forth below, the emergency special permit waives compliance with 49 CFR § 195.452(h)(4)(iii)(H) for the *special permit segments*.

---

[3] Exec. Order 14156: Declaring a National Energy Emergency (Jan. 20, 2025), Sec. 1.
[4] Exec. Order 14156: Declaring a National Energy Emergency (Jan. 20, 2025), Sec. 2(a).  The order's definition of "energy" or "energy resources" includes "crude oil," and its definition of "transportation" includes "the physical movement of energy, including through, but not limited to, pipelines." Sec. 1(a); 1(c).
[5] Exec. Order 14156: Declaring a National Energy Emergency (Jan. 20, 2025), Sec. 3(b).
[6] For more information regarding these effects, see Attachments C, D, E, and F.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Teel Declaration
Page 110

## II. Special Permit Segments

This emergency special permit pertains to the specified pipeline segments which make up the Las Flores Pipeline called Line CA-324 and CA-325. Line CA-325 can be further divided into two segments: Lines CA-325A and CA-325B. The Las Flores Pipeline is part of the Santa Ynez Pipeline System (SYPS), an interstate pipeline facility that Sable operates from the Outer Continental Shelf off the coast of Santa Barbara to Kern County, California. A map of the special permit segments is available in Revised Attachment A.

**Special Permit Segments:**

| Special Permit Segment Name | Location | Mileage | California County or Counties |
|---|---|---|---|
| CA-324 | Las Flores Canyon Processing Facility to Gaviota Pump Station | 10.86 | Santa Barbara |
| CA-325A | Gaviota Pump Station to Sisquoc Pump Station | 38.72 | Santa Barbara |
| CA-325B | Sisquoc Pump Station to Pentland Station | 74.84 | Santa Barbara; San Luis Obispo; Kern |

## III. Conditions

PHMSA grants this emergency special permit subject to Sable implementing each of the following conditions. These conditions must be implemented and complied with in addition to all applicable requirements of 49 CFR Part 195 except for compliance with limitations on scheduling instances of corrosion on or near longitudinal seam welds for evaluation and remediation within 180 days of discovery in 49 CFR § 195.452(h)(4)(iii)(H), which would be waived.

**General Conditions:**

1) The *special permit segments* may only be used to transport crude oil.

2) Prior to transporting crude oil in the *special permit segments*, Sable must develop and implement procedures for the conditions and requirements described in this emergency special permit.

3) Sable shall not exceed maximum operating pressure (MOP) limits for the *special permit segments*, as follows:

   a) The MOP of Line CA-324 cannot exceed 1003 pounds per square inch gauge (psig).

   b) The MOP of Line CA-325A (the segment of Line CA-325 between Gaviota and Sisquoc stations) cannot exceed 1000 psig.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 3 of 16

Teel Declaration
Page 111

c) The MOP of Line CA-325B (the segment of Line CA-325 between Sisquoc and Pentland stations) cannot exceed 1292 psig.

4) Sable shall not exceed maximum operating temperature limits for crude oil transported in the *special permit segments*, as follows:

a) The maximum operating temperature of the crude oil that is transported in Line CA-324 must not exceed 140 degrees Fahrenheit for more than 12 consecutive hours.

b) The maximum operating temperature of the crude oil that is transported in Line CA-325A (the segment of Line CA-325 between Gaviota and Sisquoc stations) must not exceed 125 degrees Fahrenheit for more than 12 consecutive hours. Temperature transmitters must be installed on Line CA-325 at Gaviota station to monitor the temperature of Line CA-325A.

c) The maximum operating temperature of the crude oil that is transported in Line CA-325B (the segment of Line CA-325 between Sisquoc and Pentland stations) must not exceed 110 degrees Fahrenheit for more than 12 consecutive hours. Temperature transmitters must be installed on Line CA-325 at Sisquoc station to monitor the temperature of Line CA-325B.

5) This emergency special permit does not relieve Sable from complying with applicable requirements under 49 CFR Part 195, other than those waived in this emergency special permit.

6) This emergency special permit does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).

7) In-line inspections (ILIs) performed pursuant to this emergency special permit must include:

a) Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion, defined as follows:

i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.

ii. General corrosion means uniform or gradually varying loss of wall thickness over an area.

b) Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI).

c) Use of a tool that is at least capable of reliably detecting and sizing crack or crack-like anomalies at a 90 percent POD and POI.

8) Prior to placing CA-324 in operation, Sable must perform fracture toughness tests on the existing 24" pipe from CA-324 in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from the predominant existing 24" pipe, specifically API 5L X65 HF-ERW pipe with a nominal thickness of 0.344" that was manufactured by Nippon Steel Corp. in the 1980s. At least three (3) separate tests must be performed to obtain the fracture toughness values of the

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 4 of 16

Teel Declaration
Page 112

pipe body, heat affected zone (HAZ)[7], and the HF-ERW long seam weld on the pipe to represent the fracture toughness of CA-324 (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the HF-ERW long seam weld). The lowest fracture toughness value must be applied to conditions 11, 16, 17, and 21. Sable may use pipe samples taken opportunistically during ongoing maintenance and repair efforts on Line CA-324.[8]

9) Prior to placing Line CA-325 (including CA-325A and CA-325B) in operation, Sable must perform fracture toughness tests on the existing 30" pipe from CA-325A/B in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from both of the two following predominant existing 30" pipe specifications:

    a)  API 5L X70 pipe with a nominal thickness of 0.281" that was manufactured by the various pipe mills in the 1980s.

    b)  API 5L X65 pipe with a nominal thickness of 0.344" that was manufactured by the various pipe mills in the 1980s.

At least three (3) separate tests must be performed from each pipe mill, for both of the two pipe specifications listed above, to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ), and the DSAW long seam weld on the pipe to represent the fracture toughness of CA-325A/B (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the DSAW long seam weld). The lowest fracture toughness value must be applied to conditions 11, 16, 17, and 21. Sable may use pipe samples taken opportunistically during ongoing maintenance and repair efforts on Line CA-325A/B.[9]

10) All existing immediate and 180-day repair conditions must be evaluated and remediated pursuant to the Consent Decree repair criteria prior to restarting CA-325A/B.[10] Upon restart Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by PHMSA. Sable must utilize the Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results to identify, evaluate and remediate any immediate and 180-day repair conditions that are listed in this emergency special permit.

11) Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines.* If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss

---

[7] The heat affected zone (HAZ), as used in this emergency special permit, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.

[8] Sable indicated in its application that it has already completed all of the testing required in this condition. Sable must submit all fracture toughness results to PHMSA prior to restarting Line CA-324.

[9] Sable indicated in its application that it has already completed the testing required in this condition. Sable must submit all fracture toughness results to PHMSA prior to restarting Line CA-325.

[10] Sable indicated in its application that it has already completed the repairs required in this sentence. Sable must submit all of the results to PHMSA prior to restarting CA-324 and CA-325.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California
Page 5 of 16

Teel Declaration
Page 113

anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

12) Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of CA-324 and CA-325A/B.

13) Pressure Testing:[11]

    a) Prior to placing CA-324 in operation, Sable must conduct a spike hydrostatic pressure test of CA-324 at a minimum pressure that is at least 1.5 times the maximum operating pressure (MOP) or 100% specified minimum yield strength (SMYS), for a minimum of 15 minutes after the spike test pressure is stabilized. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-324:

        i. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

        ii. All anomalies that have a predicted failure pressure less than or equal to 1.6 times MOP.

    b) Immediately following the spike hydrostatic pressure test specified in Condition 13(a), Sable must conduct an 8-hour hydrostatic pressure test of CA-324 at a minimum of 1.25 times the MOP.

    c) Prior to placing Line CA-325A (segment of Line 325 between Gaviota and Sisquoc stations) in operation, Sable must conduct a spike hydrostatic pressure test of CA-325A at a minimum pressure that is at least 1.39 times the MOP, for a minimum of 15 minutes after the spike test pressure is stabilized. Sable must ensure that the spike hydrostatic pressure at the highest elevation of each testable segment is at least 1.39 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-325A:

        i. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

        ii. All anomalies that have a predicted failure pressure less than or equal to 1.5 times MOP.

    d) Immediately following the spike hydrostatic pressure test specified in Condition 13(c), Sable must conduct an 8-hour hydrostatic pressure test of CA-325A at a minimum of 1.25 times the MOP.

    e) Prior to placing Line CA-325B (segment of Line 325 between Sisquoc and Pentland stations) in operation, Sable must conduct a hydrostatic pressure test of CA-325B at a minimum pressure of 1.25 times the MOP, for a minimum of 8 hours. Sable must ensure that the hydrostatic pressure at the highest elevation of each testable segment is at least 1.25 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the

---

[11] Sable indicated in its application that it has already completed all of the testing and repairs required in this Condition. Sable must submit the results to PHMSA prior to restart and confirm that no failures occurred during the required pressure testing.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 6 of 16

Teel Declaration
Page 114

hydrostatic test on CA-325B:

    i.   All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

    ii.  All anomalies that have a predicted failure pressure less than or equal to 1.4 times MOP.

f)   Sable must obtain the Test ID for each hydrostatic pressure test from PHMSA (or OSFM if such testing was performed prior to November 26, 2025) and have the approved independent testing firm forward separately the certified test results to PHMSA or the OSFM, as applicable.

g)   Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 CFR Part 195 Subpart E – Pressure Testing and monitored by an independent testing firm listed under PHMSA or OSFM (as applicable) approved hydrostatic testing companies.

h)   Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported to PHMSA.[12]

i)   Section(s) of the *special permit segments* that failed during the required hydrotesting must be repaired by removing and replacing the failed section. PHMSA reserves the right to revoke this emergency special permit if failure(s) raise the concern that the *special permit segments* cannot be safely operated.

14)   In-Line Inspection (ILI) Assessment and Frequency:

a)   Prior to performing in-line inspections of the *special permit segment*, Sable shall provide PHMSA with a written notification to PHMSA describing its assessment plan with the following information:

    i.   Dates for integrity assessment

    ii.  In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[13] to assess the integrity of the subject pipe segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications;

    iii. In-line inspection tool vendor(s)

    iv. Required tool specifications including operational specifications and anomaly sizing tolerances

    v.  Tool validation methodology

    vi. Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications

---

[12] All submissions to PHMSA required by this emergency special permit shall be submitted through email to the OPS Western Region Director, Dustin Hubbard, email address: Dustin.Hubbard@dot.gov or his designee.

[13] Industry standards referenced in this emergency special permit must utilize the editions that are incorporated by reference in 49 CFR 195.3 unless another edition is explicitly specified in this emergency special permit.

Teel Declaration
Page 115

    vii. Criteria used to identify locations for excavation and field verification

    viii. Non-destructive examination

b) Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.

c) Metal Loss Tool(s):

    i. Initial ILI tool runs – Each year, during the first two (2) years of operating the *special permit segments*, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU). Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months. If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.

    ii. Subsequent ILI tool runs – After the first two (2) years of operating the *special permit segments*, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the *special permit segment* within 30 days after it was deemed to be unsuccessful. All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

d) Crack Detection Tools - Sable shall conduct at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15 months[14] or the ILI assessment must be assessed at more frequent intervals if condition 21 determined a shorter assessment interval.

    i. These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.

    ii. USCD Performance Specification Requirements

        1. The USCD tools must have a probability of detection that is

---

[14] Sable may petition PHMSA to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to PHMSA approval.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 8 of 16

Teel Declaration
Page 116

≥ 90% for axial and circumferential cracks.

2. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.

3. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.

4. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks.

e) Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

f) Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the *special permit segment* in which the ILI tool velocity was outside of the specified tool velocity range.

g) All ILI tool runs must obtain the Test ID from PHMSA prior to run.

h) Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.

i) Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

j) Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals. Sable must document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[15] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different. If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

k) Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second

---

[15] A minimum of four (4) independent direct examination excavations must be used for unity plots.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 9 of 16

Teel Declaration
Page 117

Edition, April 2013).

15)    Discovery of Condition: The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

16)    Immediate Repair Conditions:[16]

    a)    A crack or crack-like anomaly that meets any of the following criteria:

        i.    Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.

        ii.    Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.

    b)    Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.

    c)    Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[17]

17)    180-Day Repair Conditions:[18]

    a)    A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.

    b)    Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.

    c)    All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[19]

    d)    For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

18)    Corrosion Growth Rate Analysis (CGRA):

    a)    Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to

---

[16] The criteria specified in this emergency special permit is supplemental to, and does not relieve Sable from complying with, the requirements set forth in 49 CFR 195.452(h)(4)(i). All immediate repair conditions must be remediated with a permanent repair method.

[17] Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria. General corrosion means uniform or gradually varying loss of wall thickness over an area.

[18] The criteria specified in this emergency special permit is supplemental to, and does not relieve Sable from complying with, the requirements set forth in 49 CFR 195.452(h)(4)(iii), except for those associated with 49 CFR 195.452(h)(4)(iii)(H). All immediate repair conditions must be remediated with a permanent repair method.

[19] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth. If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify PHMSA, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 CFR § 195.452 until the indication is remediated or until otherwise authorized by PHMSA.

Teel Declaration
Page 118

prior ILI) and perform pipeline remediations needed to assure the integrity of the *special permit segments* is maintained.[20] The timing of remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.

b) The CGRA procedure must include ILI data matching methods[21] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.

c) Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.

d) When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates.[22]

e) All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

19) Pressure Reduction: If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in this emergency special permit, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

20) In Field Direct Examination of Pipe:

a) Direct examinations[23] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[24] PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.

b) Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition. However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:

    i. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.

    ii. Sable must increase the metal loss anomaly's depth by 20% when

---

[20] At a minimum, Sable must include signal matching between ILI data sets.

[21] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

[22] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

[23] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.

[24] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complemented by shear wave technology or inspection by phased array ultrasonic testing.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 11 of 16

**Teel Declaration
Page 119**

they input it into the formula for calculating the number of wraps needed for repair method 5.

    iii. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs. If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

c) Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

d) Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy. Sable must recoat in accordance with their coating repair procedure.[25]

e) All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

21) Integrity Management:

a) A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.

    i. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 CFR § 192.712(d)(1).

    ii. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 CFR § 192.712(d)(2).

b) Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.

c) When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

d) Sable must send all field measurements to the ILI tool vendor within 90 days

---

[25] The coating procedure must be submitted to PHMSA prior to the effective date of this emergency special permit.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 12 of 16

Teel Declaration
Page 120

of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

e) Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the *special permit segments*. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by PHMSA prior to being selected.

f) Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC) interference or direct current (DC) interference or shorting that could contribute to external corrosion is

g) occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

22) Data Requirements for Predicted Failure Analysis:

a) Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

b) The analyses performed in accordance with this emergency special permit must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in traceable, verifiable, and complete records.

23) Recordkeeping:

a) Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this emergency special permit shall be kept for the life of the *special permit segments* and must be submitted to PHMSA, in the manner requested (electronic, hardcopy, or other format) within 30 days.

b) Sable must maintain the following records:

    i. Technical approach used for the analysis

    ii. All data used and analyzed

    iii. Pipe and longitudinal weld seam properties

    iv. Procedures used to implement emergency special permit conditions

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 13 of 16

Teel Declaration
Page 121

    v.      Evaluation methodology used

    vi.    Models used

    vii.   Direct in situ examination data

    viii.  All in-line inspection tool assessments information evaluated

    ix.    Pressure test data and results

    x.      All in-the-ditch assessments performed on the *special permit segments*

    xi.    All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results

    xii.   All finite element analysis results

    xiii.  The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology

    xiv.  The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods

    xv.   Safety factors used for fatigue life and/or predicted failure pressure calculations

    xvi.  Reassessment time interval and safety factors

    xvii.  The date of the review

    xviii. Confirmation of the results by qualified technical subject matter expert(s)

    xix.  Approval by responsible Sable management personnel

    xx.   Records of additional preventive and mitigative (P&M) measures performed

    xxi.  Reports required by this emergency special permit.

24)    Reporting:

    a)  Any release on the *special permit segments* shall be reported to PHMSA at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery.[26]

    b)  An email notification shall be made at least three (3) days prior to a *special permit segment* being exposed for non-emergency purposes of field evaluation and repair to PHMSA. The email notification shall include, if applicable:

        i.  Tool type and run date

        ii.  Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)

---

[26] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state, or Federal regulations.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 14 of 16

Teel Declaration
Page 122

  iii. Dig sheets

  iv. Field contact information for Sable

  v. Time and location of the field evaluation and repair.

c) Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run to PHMSA and include:

  i. Tool type

  ii. Run date

  iii. Summary of Conditions Report[27]

  iv. Final Vendor Report and Pipe Tally

d) Sable shall provide a report to PHMSA by June 15th of every year for the duration of this special permit, including any renewals. The report shall be submitted to PHMSA. At a minimum, the annual report shall contain the following, if applicable:

  i. A Closure Report for the previous calendar (CY) which contains:

   1. Features that were remediated in previous CY, including documentation for in-the-ditch assessments and repairs

   2. Identify features that remain to be assessed

   3. Unity Plots for previous ILI runs

  ii. Fracture mechanics and pressure cycling analyses in accordance with Condition 21(a);

  iii. The third-party ILI expert reviews in accordance with condition 21(e).

  iv. AC and DC Interference surveys that are due in accordance with condition 21(f).

  v. A copy of the CGRA for prior year including:

   1. Mean corrosion growth rate for the *special permit segments*

   2. Distribution graph of the corrosion growth rate for the *special permit segments* (e.g. occurrences (#) vs. corrosion rate (mpy)

The above conditions are based on PHMSA's review and consideration of information provided by Sable, including information in their emergency special permit application which can be found at Docket No. PHMSA-2025-1502 in the Federal Docket Management System located at www.regulations.gov. PHMSA has determined the conditions listed above would be necessary to ensure this Emergency Special Permit is not inconsistent with pipeline safety.

---

[27] PHMSA may stipulate specific formatting or other information (e.g., condition type, anomaly details, remaining strength calculation method, failure pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

Teel Declaration
Page 123

## IV.  Limitations:

This special permit is subject to the limitations set forth in 49 CFR § 190.341, as well as the following limitations:

1) This emergency special permit is limited to an initial term of sixty (60) days from the date of issuance. If Sable elects to seek renewal of this emergency special permit, it must submit a renewal request to PHMSA pursuant to 49 CFR § 190.341(g).

2) Should Sable fail to comply with any conditions of this emergency special permit or should PHMSA determine that this emergency special permit is no longer appropriate or is inconsistent with pipeline safety, PHMSA may revoke the emergency special permit and require Sable to comply with all appropriate regulatory requirements.

3) PHMSA may order the *special permit segments* to be shutdown at any time.

4) PHMSA may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for failure to comply with this emergency special permit. The terms and conditions of any compliance order shall take precedence over the terms of this emergency special permit.

5) In the event of conflict between the conditions of this emergency special permit and industry standards, the emergency special permit conditions shall prevail.

6) If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the emergency special permit, Sable must provide PHMSA written notice of the change within 60 days of the consummation date. In the event of such transfer, PHMSA reserves the right to revoke, suspend, or modify the emergency special permit.

AUTHORITY:  49 United States Code 60118 (c)(1) and 49 CFR § 1.97.

Issued in Washington, D.C., on <u>December 23, 2025</u>.

LINDA GAIL DAUGHERTY
Digitally signed by
LINDA GAIL DAUGHERTY
Date: 2025.12.23
15:48:57 -05'00'

Linda Daugherty
Acting Associate Administrator
  for Pipeline Safety

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 16 of 16

Teel Declaration
Page 124

# EXHIBIT G

## Declaration of Julie Teel Simmonds

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

**DEC 31 2025**

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER; et al., <br><br> Petitioners, <br><br> v. <br><br> PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION, <br><br> Respondent, <br><br> ----------------------------------------- <br><br> SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY, <br><br> Intervenors - Pending. | No. 25-8059 <br><br> Agency No. 2025-1502 <br><br> Pipeline and Hazardous Materials Safety Administration <br><br> ORDER |

Before: HURWITZ and BRESS, Circuit Judges.

The motion (Docket Entry No. 4) for leave to intervene is granted.

The motion (Docket Entry No. 8) to stay the Pipeline and Hazardous

Materials Safety Administration's December 22, 2025 approval of the Restart Plan

and December 23, 2025 Emergency Special Permit is denied. *See Nken v. Holder*,

556 U.S. 418, 434 (2009) (defining standard for stay pending appeal).

This petition is expedited. The clerk will place this case on the next available

calendar. *See* Gen. Ord. 3.3(f).

The opening brief is due January 26, 2026. The answering brief is due February 17, 2026. Intervenors' brief is due March 3, 2026. The optional reply brief is due 14 days after intervenors' brief is filed.

No streamlined extensions of time will be approved under Ninth Circuit Rule 31-2.2(a). Any request for an extension of time to file a brief must be made by written motion under Ninth Circuit Rule 31-2.2(b).

# EXHIBIT H

## Declaration of Julie Teel Simmonds

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

STATE OF CALIFORNIA,

*Petitioner*,

V.

PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION, PAUL ROBERTI, IN HIS OFFICIAL CAPACITY AS ADMINISTRATOR OF THE PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION, UNITED STATES DEPARTMENT OF TRANSPORTATION, AND SEAN DUFFY, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF TRANSPORTATION,

*Respondents*,

## PETITION FOR REVIEW

ROB BONTA
*Attorney General of California*
ANNADEL A. ALMENDRAS
DEBORAH M. SMITH
  *Senior Assistant Attorneys General*
MYUNG J. PARK
VANESSA MORRISON
  *Supervising Deputy Attorneys General*

MATTHEW BULLOCK
MICHAEL S. DORSI
MITCHELL RISHE
RAFAEL J. HURTADO
REBECCA HUNTER
  *Deputy Attorneys General*
STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
Telephone: (415) 510-3802
Fax: (415) 703-1107
Michael.Dorsi@doj.ca.gov
Mitchell.Rishe@doj.ca.gov
  *Attorneys for State of California*

January 23, 2026

## PETITION FOR REVIEW

Pursuant to 49 U.S.C. Section 60119(a)(1), Federal Rule of Appellate Procedure 15, and Ninth Circuit Rule 15-1, the State of California, by and through Attorney General Rob Bonta and Office of the State Fire Marshal (OSFM), a unit of the California Department of Forestry and Fire Protection, petitions this Court for review of orders issued by the Pipeline and Hazardous Materials Safety Administration (PHMSA), an agency within the United States Department of Transportation.

This Petition challenges three unlawful orders by PHMSA.

First, on December 17, 2025, PHMSA issued an order (the "Federalization Order") purporting to assume exclusive federal jurisdiction over the Las Flores Pipelines—a pair of onshore pipelines designated CA-324 and CA-325 that, in sequence, originate at Las Flores Canyon in Santa Barbara County, California, and terminate at the Pentland Station terminal, in Kern County, California. The assertion of federal jurisdiction is erroneous, and, if allowed to stand, would displace OSFM from its role in regulating pipeline safety for the Las Flores Pipelines. PHMSA's December 17, 2025, Federalization Order is attached to this Petition as Exhibit 1.

Second, on December 22, 2025, PHMSA issued an order approving a Restart Plan (the "Restart Approval Order") for the Las Flores Pipelines, allowing

them to return to service without completion of OSFM's requirements imposed pursuant to the consent decree—to which PHMSA and OSFM are signatories—after the catastrophic 2015 oil spill on these lines near Refugio State Beach, in Santa Barbara County, California. *See United States, et al. v. Plains All American Pipeline, L.P., et al.*, Case No. 2:20-cv-02415, ECF Nos. 6, 6-1, and 33 (C.D. Cal. 2020). The Restart Approval Order, if permitted to become effective, would allow the Las Flores Pipelines to operate (a) despite the failure to finish required repairs and remediation on the pipelines to address the lack of corrosion protection, which PHMSA determined to be the root cause of the Refugio Oil Spill, and (b) without complying with OSFM's alternative conditions, outlined in the OSFM State Waivers.[1] Pursuant to 49 USC § 60118(d), PHMSA did not object to granting of these waivers by OSFM for the CA-324 and CA-325 pipelines. A copy of PHMSA's Restart Approval Order is attached to this Petition as Exhibit 2.

Third, on December 23, 2025, PHMSA issued an order granting an "Emergency Special Permit" (the "Emergency Special Permit") to the Las Flores Pipelines' owner, Sable Offshore Corp., pursuant to 49 U.S.C. Section

---

[1] A State Waiver is an order that allows a state to impose additional safety requirements on a pipeline facility where continued operation would violate State or federal pipeline safety laws. Every State Waiver must be submitted to PHMSA for review; if PHMSA does not object to the terms of the order, it will issue. The State Waivers issued to Sable are available on CAL FIRE's web page Pathways for Restarting CA-324 and CA-325, https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa/pathways-for-restarting-pipelines.

60118(c)(2)(A), waiving compliance with federal pipeline safety regulations. The Emergency Special Permit bypassed federal procedures for approval of a special permit and lacks any legal or factual basis. PHMSA's Emergency Special Permit is attached to this Petition as Exhibit 3.

Pursuant to 49 U.S.C. Section 60119(a), orders issued by PHMSA under the Pipeline Safety Act ("PSA") may be challenged by filing a Petition for Review directly in the federal court of appeals where the petitioner resides, and the petition must be filed within 89 days of the issuance of PHMSA's order. Accordingly, Petitioner has timely and properly sought review of PHMSA's orders directly in this Court.

Judicial review of PHMSA orders is conducted under the standards of Section 706 of the Administrative Procedure Act. 49 U.S.C. § 60119(a)(3). As the basis for this Petition for Review, Petitioner alleges that PHMSA's actions and orders were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A) & (D).

Petitioner prays for an order setting aside PHMSA's orders dated December 17, 22, and 23, 2025.

Respectfully submitted this 23rd day of January, 2026.

ROB BONTA
*Attorney General of California*

*/s/ Michael S. Dorsi*
MICHAEL S. DORSI
*Deputy Attorney General*
455 Golden Gate Ave, Suite 11000
San Francisco, CA 94102
Tel: (415) 510-3802
Email: Michael.Dorsi@doj.ca.gov
*Attorneys for State of California*

## STATEMENT OF RELATED CASES

The following related case is pending:  *Environmental Defense Center, et al. v. Pipeline and Hazardous Materials Safety Administration*, Ninth Circuit Court of Appeals Case No. 25-8059.

# Exhibit 1

Exhibit 1
to Petition for Review



| | |
|---|---|
| U.S. Department<br>of Transportation | 1200 New Jersey Avenue SE<br>Washington, D.C. 20590 |

**Pipeline and Hazardous
Materials Safety
Administration**

December 17, 2025

Via Electronic Mail to: cflores@sableoffshore.com

J. Caldwell Flores
President and Chief Operating Officer
Sable Offshore Corp.
845 Texas Ave. Ste 2920
Houston, TX 77002

Re:  Determination of Interstate Classification

Dear Mr. Flores:

This responds to your letter of November 26, 2025 regarding the Las Flores Pipeline owned and operated by Sable Offshore Corp. (Sable). Your letter notifies the Pipeline and Hazardous Materials Safety Administration (PHMSA) that Sable has determined the pipeline to be an interstate pipeline facility under the Pipeline Safety Act (PSA) and requests PHMSA transition regulatory oversight from the California Office of the State Fire Marshal (OSFM) to PHMSA.

As noted in your letter, portions of the Las Flores Pipeline (previously known as Lines 901 and 903) have been considered intrastate since 2016 and subject to regulatory oversight by OSFM pursuant to its certification with PHMSA under 49 U.S.C. § 60105(a). Prior to 2016, Lines 901 and 903 were considered interstate and regulated by PHMSA. The classification change in 2016 corresponded to the pipelines' previous owner cancelling tariffs with the Federal Energy Regulatory Commission (FERC). In 2024, Sable acquired Lines 901 and 903 and other assets comprising the Las Flores Pipeline, including offshore pipelines transporting crude oil from the Outer Continental Shelf (OCS) and an onshore processing facility at Las Flores Canyon. Sable operates the Las Flores Pipeline assets as a single pipeline system transporting crude oil from the OCS to the Pentland Station terminal in Kern County, California.

Upon receipt of your letter, PHMSA initiated a review of the Las Flores Pipeline. This review included an on-site inspection on December 9 through December 11, 2025. OSFM representatives accompanied PHMSA on the inspection. PHMSA also reviewed Sable's written procedures and records and conducted field observations of the Las Flores facility, the pump stations at Gaviota and Sisquoc, the control room in Santa Maria, and the offshore Harmony platform. In addition, PHMSA reviewed the 2025 program inspections conducted by OSFM. For

**Teel Declaration
Page 135**

the following reasons, PHMSA agrees with your determination that the Las Flores Pipeline is an interstate pipeline.

The PSA authorizes PHMSA to prescribe and enforce minimum safety standards for pipeline transportation and for pipeline facilities.[1] The PSA vests with PHMSA exclusive regulatory authority over interstate pipelines and preempts States from adopting or continuing in force safety standards for interstate pipelines.[2] With respect to intrastate pipelines, the PSA provides a State authority may regulate the intrastate pipelines within its borders upon submission to PHMSA of an annual certification.[3] Both the PSA and the Federal pipeline safety regulations define interstate and intrastate pipelines.[4] An interstate pipeline is a pipeline or part of a pipeline used to transport hazardous liquids in interstate or foreign commerce; an intrastate pipeline is a hazardous liquid pipeline that is not an interstate pipeline.

Determining whether a hazardous liquid pipeline is an interstate or intrastate pipeline requires a factual inquiry.[5] To assist in that determination, PHMSA adopted Appendix A to 49 CFR Part 195 providing a statement of agency policy and interpretation on the delineation between Federal and State jurisdiction.[6] In short, "if there is a tariff or concurrence filed with FERC governing the transportation of hazardous liquids over a pipeline facility . . . then [PHMSA] will, as a general rule, consider the facility to be an interstate pipeline facility within the meaning of the [PSA]." The absence of a FERC tariff generally means a pipeline is intrastate; however, in certain situations, PHMSA will consider a pipeline to be interstate despite the lack of a filing with FERC. Several examples of this are listed in Appendix A. As it relates to the Las Flores Pipeline, one example provides that a pipeline originating on the OCS will be considered an interstate pipeline even if the pipeline does not have a tariff with FERC.[7]

PHMSA's evaluation of the Las Flores Pipeline confirms that it transports crude oil from the OCS to an onshore processing facility at Las Flores Canyon and continues the transportation of crude oil from Las Flores Canyon to Pentland, California. Consistent with Appendix A, the Las

---

[1] 49 U.S.C. § 60101 et seq.

[2] 49 U.S.C. § 60104(c). *See* Olympic Pipe Line Co. v. City of Seattle, 437 F.3d 872, 878 (9th Cir. 2006) (discussing how the "PSA differentiates between the regulation of interstate and intrastate hazardous liquid pipelines.")

[3] 49 U.S.C. § 60105(a). OSFM has a certification with PHMSA to regulate intrastate hazardous liquid pipelines in California.

[4] 49 U.S.C. § 60101(a)(7), (a)(8)(B), (a)(10); 49 CFR § 195.2. *See* S. Pac. Pipe Lines Inc. v. DOT, 796 F.2d 539 (D.C. Cir. 1986) (finding PHMSA's definition of interstate and intrastate pipelines reasonable under the PSA).

[5] Transportation of Liquids by Pipeline, 46 Fed. Reg. 38,357, 38,359 (Jul. 27, 1981) (PHMSA's predecessor agency (hereafter PHMSA) explained that it had "reviewed examples of what it believes are the most frequent and likely configurations of liquid pipelines and pipeline facilities and considered various ways of cataloging or classifying them as either interstate or intrastate."); *see also* Shell Oil Co. v. City of Santa Monica, 830 F.2d 1052, 1064 (9th Cir. 1987) (noting that whether the pipeline was interstate or intrastate turned on a disputed issue of fact).

[6] Transportation of Hazardous Liquids by Pipeline; Regulation of Intrastate Pipelines, 50 Fed. Reg. 15,895, 15,897 (Apr. 23, 1985).

[7] 49 CFR Part 195, App. A. "Example 7. Pipeline Company P operates a pipeline that originates on the Outer Continental Shelf. P does not file any tariff for that line with FERC. [PHMSA] will consider the pipeline to be an interstate pipeline facility."

Flores Pipeline is an interstate pipeline.[8] As portions of the Las Flores Pipeline were previously considered to be intrastate and regulated by OSFM, PHMSA is notifying OSFM that the Las Flores Pipeline is subject to the regulatory oversight of PHMSA. Please direct further correspondence on this matter to Dustin Hubbard, Director, Western Region, Office of Pipeline Safety, PHMSA, at (720) 963-3183.

Sincerely,

LINDA GAIL DAUGHERTY
Digitally signed by LINDA GAIL DAUGHERTY
Date: 2025.12.17 07:56:55 -05'00'

Linda Daugherty
Acting Associate Administrator for Pipeline Safety

cc:    James Hosler, Chief, Pipeline Safety Division, OSFM
       Varun Shekhar, Shareholder, Babst Calland Clements & Zomnir, PC

---

[8] PHMSA regulations consider the Las Flores Pipeline to be an "active" pipeline. *See* Pipeline Safety: Clarification of Terms Relating to Pipeline Operational Status, 81 Fed. Reg. 54,512 (Aug. 12, 2016) ("The regulations consider pipelines to be either active and fully subject to all relevant parts of the safety regulations or abandoned.")

# Exhibit 2

Exhibit 2
to Petition for Review

**Teel Declaration**
**Page 138**



| | |
|---|---|
| **U.S. Department**<br>**of Transportation**<br>**Pipeline and Hazardous**<br>**Materials Safety**<br>**Administration** | 12300 W. Dakota Ave., Suite 340<br>Lakewood, CO 80228 |

**VIA ELECTRONIC MAIL TO: lyearwood@sableoffshore.com**

December 22, 2025

Mr. Lance Yearwood
Vice President
Pacific Pipeline Company / Sable Offshore Corp.
845 Texas Avenue, Suite 2920
Houston, Texas 77002

RE:     **Approval of Sable Offshore Corp.'s Restart Plan for the Las Flores Pipeline System Line CA-324 and Line CA-325**

Dear Mr. Yearwood:

From December 4 to December 12, 2025, the Pipeline and Hazardous Materials Safety Administration (PHMSA) received several documents from Sable Offshore Corp. These documents included:

1. Line CA-324 and Line CA-325 Fill Plan and Startup Procedures
2. A letter requesting the removal of pressure restrictions for Line CA-324
3. A letter requesting the removal of pressure restrictions for Line CA-325
4. The Las Flores Pipeline Linefill Positioning Plan Assignments
5. The Las Flores Pipeline Linefill Contact List

These documents addressed the Restart Plan for Line CA-324 and Line CA-325 (previously known as Plains Line 901 and Line 903, respectively). In addition, PHMSA conducted a field inspection with Sable Offshore Corp. to discuss its process and safety procedures for the pipeline restart.

PHMSA has reviewed these documents and hereby approves the submitted Restart Plan. This approval is valid from the date of this letter.

Should you have any questions or concerns, please contact me at (720) 963-3160 or by email at dustin.hubbard@dot.gov.

Sincerely,

**DUSTIN B HUBBARD** Digitally signed by DUSTIN B HUBBARD
Date: 2025.12.22 13:19:33 -07'00'

Dustin Hubbard
Director, Western Region
Pipeline and Hazardous Materials Safety Administration

cc:     Trent Fontenot, Sr. Vice President - Operations, tfontenot@sableoffshore.com
        Jim Hosler, Assistant Deputy Director – Pipeline Safety and CUPA, CalFire,
        jim.hosler@fire.ca.gov

# Exhibit 3

Exhibit 3
to Petition for Review

**Teel Declaration**
**Page 141**

# U.S. DEPARTMENT OF TRANSPORTATION

# PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION

# EMERGENCY SPECIAL PERMIT

## Special Permit Information:

| | |
|---|---|
| **Docket Number:** | 2025-1502 |
| **Requested By:** | Sable Offshore Corp. PPC |
| **Operator ID#:** | 40881 |
| **Date Requested:** | December 19, 2025 |
| **Issuance Date:** | December 23, 2025 |
| **Expiration Date:** | February 21, 2026 |
| **Code Section:** | 49 CFR § 195.452(h)(4)(iii)(H) |

## Grant of Special Permit:

By this order, subject to the terms and conditions set forth below, the Pipeline and Hazardous Materials Safety Administration (PHMSA) Office of Pipeline Safety (OPS)[1] grants this emergency special permit to Sable Offshore Corp. PPC (Sable) for 124.42 miles of 24- and 30-inch diameter hazardous liquid pipelines, Lines CA-324 and CA-325 (*special permit segments*), transporting crude oil from Las Flores Canyon to Pentland in Santa Barbara, San Luis Obispo, and Kern counties, California.  This emergency special permit waives compliance from 49 CFR § 195.452(h)(4)(iii)(H), which requires corrosion of or along a longitudinal seam weld be scheduled for evaluation and remediation within 180 days of discovering the condition.

## I.    Purpose and Need

On December 19, 2025,[2] Sable requested an emergency special permit for relief from the requirement to evaluate and remediate corrosion occurring at longitudinal seam welds within 180 days.  The *special permit segments* are under polyurethane foam and polyethylene tape wrap insulation, which can inhibit the effectiveness of cathodic protection and contribute to a risk of corrosion due to shielding effects. Sable proposed an alternative approach to safely manage this risk, which was previously reviewed and approved as part of two state waivers issued by the California Office of State Fire Marshal (OSFM) on December 17, 2024 to Sable for the *special permit segments*.  PHMSA previously reviewed the state waivers pursuant to 49 U.S.C. § 60118(d).

---

[1] Throughout this special permit, the usage of "PHMSA" means the U.S. Department of Transportation (DOT), Pipeline and Hazardous Materials Safety Administration, Office of Pipeline Safety.

[2] Sable submitted supplemental information related to its application on December 23, 2025.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 1 of 16

**Teel Declaration
Page 142**

Sable sought this special permit to implement the terms of a Consent Decree entered in Civil Action No. 2:20-CV-02415 by the U.S. District Court for the Central District of California, which provides, among other requirements, that a "State Waiver" must be applied for and received from OSFM prior to restarting Lines CA-324 and CA-325. The ***special permit segments*** were previously considered intrastate at the time of entry of the Consent Decree and were regulated by OSFM pursuant to its state certification with PHMSA under 49 U.S.C. § 60105(a). However, the ***special permit segments*** are now considered interstate pursuant to Sable's designation on November 26, 2025, and PHMSA's concurrence on December 17, 2025. As a result, PHMSA has exclusive pipeline safety regulatory agency over Lines CA-324 and CA-325.  The conditions ordered by OSFM in the two state waivers are now being re-issued by PHMSA as a special permit subject to Federal oversight and enforcement.

Sable requested PHMSA grant a special permit for the above reasons on an emergency basis pursuant to 49 U.S.C. § 60118(c)(2) and 49 CFR § 190.341(g). In its application, Sable stated that expedited review of its application was warranted in light of the national energy emergency declared by the President under the National Emergencies Act (50 U.S.C. § 1601 et seq.) in Executive Order 14156 (January 20, 2025). In Executive Order 14156, the President declared a national energy emergency based on a finding that "[t]he United States' insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy."[3]  The Executive Order directs agencies, such as PHMSA, to "identify and exercise any lawful emergency authorities available to them, as well as all other lawful authorities they may possess, to facilitate," among other activities, the "production, transportation, refining, and generation of domestic energy resources."[4]  The Executive Order further directs agencies to "identify and use all lawful emergency or other authorities available to them to facilitate the supply, refining, and transportation of energy in and through the West Coast of the United States . . . ."[5]

Sable's application stated that grant of this special permit on an emergency basis would facilitate the restart of Lines CA-324 and CA-325 to provide relief in response to the acute energy shortage conditions identified in Executive Order 14156 within California and in the West Coast region of the United States.[6]  Sable further noted that grant of this special permit on an emergency basis is appropriate to address the gap in coverage under the OSFM State Waivers created by redesignation of Lines CA-324 and CA-325 as interstate, given that the proposed special permit is substantially the same as that which was previously reviewed and approved by OSFM and PHMSA for issuance of the State Waivers.

This emergency special permit allows Sable to operate Lines CA-324 and CA-325 without being subject to the requirement to evaluate and remediate corrosion of or along a longitudinal seam weld within 180 days.  On the condition that Sable comply with the terms and conditions set forth below, the emergency special permit waives compliance with 49 CFR § 195.452(h)(4)(iii)(H) for the ***special permit segments***.

---

[3] Exec. Order 14156: Declaring a National Energy Emergency (Jan. 20, 2025), Sec. 1.
[4] Exec. Order 14156: Declaring a National Energy Emergency (Jan. 20, 2025), Sec. 2(a).  The order's definition of "energy" or "energy resources" includes "crude oil," and its definition of "transportation" includes "the physical movement of energy, including through, but not limited to, pipelines." Sec. 1(a); 1(c).
[5] Exec. Order 14156: Declaring a National Energy Emergency (Jan. 20, 2025), Sec. 3(b).
[6] For more information regarding these effects, see Attachments C, D, E, and F.

**Teel Declaration
Page 143**

## II. Special Permit Segments

This emergency special permit pertains to the specified pipeline segments which make up the Las Flores Pipeline called Line CA-324 and CA-325. Line CA-325 can be further divided into two segments: Lines CA-325A and CA-325B. The Las Flores Pipeline is part of the Santa Ynez Pipeline System (SYPS), an interstate pipeline facility that Sable operates from the Outer Continental Shelf off the coast of Santa Barbara to Kern County, California. A map of the special permit segments is available in Revised Attachment A.

**Special Permit Segments:**

| Special Permit Segment Name | Location | Mileage | California County or Counties |
|---|---|---|---|
| CA-324 | Las Flores Canyon Processing Facility to Gaviota Pump Station | 10.86 | Santa Barbara |
| CA-325A | Gaviota Pump Station to Sisquoc Pump Station | 38.72 | Santa Barbara |
| CA-325B | Sisquoc Pump Station to Pentland Station | 74.84 | Santa Barbara; San Luis Obispo; Kern |

## III. Conditions

PHMSA grants this emergency special permit subject to Sable implementing each of the following conditions. These conditions must be implemented and complied with in addition to all applicable requirements of 49 CFR Part 195 except for compliance with limitations on scheduling instances of corrosion on or near longitudinal seam welds for evaluation and remediation within 180 days of discovery in 49 CFR § 195.452(h)(4)(iii)(H), which would be waived.

**General Conditions:**

1) The *special permit segments* may only be used to transport crude oil.

2) Prior to transporting crude oil in the *special permit segments*, Sable must develop and implement procedures for the conditions and requirements described in this emergency special permit.

3) Sable shall not exceed maximum operating pressure (MOP) limits for the *special permit segments*, as follows:

   a) The MOP of Line CA-324 cannot exceed 1003 pounds per square inch gauge (psig).

   b) The MOP of Line CA-325A (the segment of Line CA-325 between Gaviota and Sisquoc stations) cannot exceed 1000 psig.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 3 of 16

**Teel Declaration
Page 144**

   c)  The MOP of Line CA-325B (the segment of Line CA-325 between Sisquoc and Pentland stations) cannot exceed 1292 psig.

4)   Sable shall not exceed maximum operating temperature limits for crude oil transported in the *special permit segments*, as follows:

   a)  The maximum operating temperature of the crude oil that is transported in Line CA-324 must not exceed 140 degrees Fahrenheit for more than 12 consecutive hours.

   b)  The maximum operating temperature of the crude oil that is transported in Line CA-325A (the segment of Line CA-325 between Gaviota and Sisquoc stations) must not exceed 125 degrees Fahrenheit for more than 12 consecutive hours. Temperature transmitters must be installed on Line CA-325 at Gaviota station to monitor the temperature of Line CA-325A.

   c)  The maximum operating temperature of the crude oil that is transported in Line CA-325B (the segment of Line CA-325 between Sisquoc and Pentland stations) must not exceed 110 degrees Fahrenheit for more than 12 consecutive hours. Temperature transmitters must be installed on Line CA-325 at Sisquoc station to monitor the temperature of Line CA-325B.

5)   This emergency special permit does not relieve Sable from complying with applicable requirements under 49 CFR Part 195, other than those waived in this emergency special permit.

6)   This emergency special permit does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).

7)   In-line inspections (ILIs) performed pursuant to this emergency special permit must include:

   a)  Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion, defined as follows:

      i.  Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.

      ii.  General corrosion means uniform or gradually varying loss of wall thickness over an area.

   b)  Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI).

   c)  Use of a tool that is at least capable of reliably detecting and sizing crack or crack-like anomalies at a 90 percent POD and POI.

8)   Prior to placing CA-324 in operation, Sable must perform fracture toughness tests on the existing 24" pipe from CA-324 in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from the predominant existing 24" pipe, specifically API 5L X65 HF-ERW pipe with a nominal thickness of 0.344" that was manufactured by Nippon Steel Corp. in the 1980s. At least three (3) separate tests must be performed to obtain the fracture toughness values of the

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 4 of 16

**Teel Declaration
Page 145**

pipe body, heat affected zone (HAZ)[7], and the HF-ERW long seam weld on the pipe to represent the fracture toughness of CA-324 (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the HF-ERW long seam weld). The lowest fracture toughness value must be applied to conditions 11, 16, 17, and 21. Sable may use pipe samples taken opportunistically during ongoing maintenance and repair efforts on Line CA-324.[8]

9)  Prior to placing Line CA-325 (including CA-325A and CA-325B) in operation, Sable must perform fracture toughness tests on the existing 30" pipe from CA-325A/B in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from both of the two following predominant existing 30" pipe specifications:

   a)  API 5L X70 pipe with a nominal thickness of 0.281" that was manufactured by the various pipe mills in the 1980s.

   b)  API 5L X65 pipe with a nominal thickness of 0.344" that was manufactured by the various pipe mills in the 1980s.

At least three (3) separate tests must be performed from each pipe mill, for both of the two pipe specifications listed above, to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ), and the DSAW long seam weld on the pipe to represent the fracture toughness of CA-325A/B (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the DSAW long seam weld). The lowest fracture toughness value must be applied to conditions 11, 16, 17, and 21. Sable may use pipe samples taken opportunistically during ongoing maintenance and repair efforts on Line CA-325A/B.[9]

10) All existing immediate and 180-day repair conditions must be evaluated and remediated pursuant to the Consent Decree repair criteria prior to restarting CA-325A/B.[10] Upon restart Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by PHMSA. Sable must utilize the Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results to identify, evaluate and remediate any immediate and 180-day repair conditions that are listed in this emergency special permit.

11) Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines*. If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss

---

[7] The heat affected zone (HAZ), as used in this emergency special permit, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.

[8] Sable indicated in its application that it has already completed all of the testing required in this condition. Sable must submit all fracture toughness results to PHMSA prior to restarting Line CA-324.

[9] Sable indicated in its application that it has already completed the testing required in this condition. Sable must submit all fracture toughness results to PHMSA prior to restarting Line CA-325.

[10] Sable indicated in its application that it has already completed the repairs required in this sentence. Sable must submit all of the results to PHMSA prior to restarting CA-324 and CA-325.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 5 of 16

**Teel Declaration
Page 146**

anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

12) Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of CA-324 and CA-325A/B.

13) Pressure Testing:[11]

a) Prior to placing CA-324 in operation, Sable must conduct a spike hydrostatic pressure test of CA-324 at a minimum pressure that is at least 1.5 times the maximum operating pressure (MOP) or 100% specified minimum yield strength (SMYS), for a minimum of 15 minutes after the spike test pressure is stabilized. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-324:

   i. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

   ii. All anomalies that have a predicted failure pressure less than or equal to 1.6 times MOP.

b) Immediately following the spike hydrostatic pressure test specified in Condition 13(a), Sable must conduct an 8-hour hydrostatic pressure test of CA-324 at a minimum of 1.25 times the MOP.

c) Prior to placing Line CA-325A (segment of Line 325 between Gaviota and Sisquoc stations) in operation, Sable must conduct a spike hydrostatic pressure test of CA-325A at a minimum pressure that is at least 1.39 times the MOP, for a minimum of 15 minutes after the spike test pressure is stabilized. Sable must ensure that the spike hydrostatic pressure at the highest elevation of each testable segment is at least 1.39 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-325A:

   i. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

   ii. All anomalies that have a predicted failure pressure less than or equal to 1.5 times MOP.

d) Immediately following the spike hydrostatic pressure test specified in Condition 13(c), Sable must conduct an 8-hour hydrostatic pressure test of CA-325A at a minimum of 1.25 times the MOP.

e) Prior to placing Line CA-325B (segment of Line 325 between Sisquoc and Pentland stations) in operation, Sable must conduct a hydrostatic pressure test of CA-325B at a minimum pressure of 1.25 times the MOP, for a minimum of 8 hours. Sable must ensure that the hydrostatic pressure at the highest elevation of each testable segment is at least 1.25 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the

---

[11] Sable indicated in its application that it has already completed all of the testing and repairs required in this Condition. Sable must submit the results to PHMSA prior to restart and confirm that no failures occurred during the required pressure testing.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 6 of 16

**Teel Declaration
Page 147**

hydrostatic test on CA-325B:

    i. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

    ii. All anomalies that have a predicted failure pressure less than or equal to 1.4 times MOP.

f) Sable must obtain the Test ID for each hydrostatic pressure test from PHMSA (or OSFM if such testing was performed prior to November 26, 2025) and have the approved independent testing firm forward separately the certified test results to PHMSA or the OSFM, as applicable.

g) Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 CFR Part 195 Subpart E – Pressure Testing and monitored by an independent testing firm listed under PHMSA or OSFM (as applicable) approved hydrostatic testing companies.

h) Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported to PHMSA.[12]

i) Section(s) of the **special permit segments** that failed during the required hydrotesting must be repaired by removing and replacing the failed section. PHMSA reserves the right to revoke this emergency special permit if failure(s) raise the concern that the **special permit segments** cannot be safely operated.

14) In-Line Inspection (ILI) Assessment and Frequency:

a) Prior to performing in-line inspections of the **special permit segment**, Sable shall provide PHMSA with a written notification to PHMSA describing its assessment plan with the following information:

    i. Dates for integrity assessment

    ii. In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[13] to assess the integrity of the subject pipe segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications;

    iii. In-line inspection tool vendor(s)

    iv. Required tool specifications including operational specifications and anomaly sizing tolerances

    v. Tool validation methodology

    vi. Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications

---

[12] All submissions to PHMSA required by this emergency special permit shall be submitted through email to the OPS Western Region Director, Dustin Hubbard, email address: Dustin.Hubbard@dot.gov or his designee.

[13] Industry standards referenced in this emergency special permit must utilize the editions that are incorporated by reference in 49 CFR 195.3 unless another edition is explicitly specified in this emergency special permit.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC    Page 7 of 16
Emergency Special Permit – Corrosion Mitigation – California

**Teel Declaration
Page 148**

vii.  Criteria used to identify locations for excavation and field verification

viii.  Non-destructive examination

b) Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.

c) Metal Loss Tool(s):

i.  Initial ILI tool runs – Each year, during the first two (2) years of operating the *special permit segments*, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU). Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months. If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.

ii.  Subsequent ILI tool runs – After the first two (2) years of operating the *special permit segments*, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the *special permit segment* within 30 days after it was deemed to be unsuccessful. All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

d) Crack Detection Tools – Sable shall conduct at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15 months[14] or the ILI assessment must be assessed at more frequent intervals if condition 21 determined a shorter assessment interval.

i.  These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.

ii.  USCD Performance Specification Requirements

1.  The USCD tools must have a probability of detection that is

---

[14] Sable may petition PHMSA to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval.  Changes to the reassessment interval are subject to PHMSA approval.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 8 of 16

**Teel Declaration
Page 149**

≥ 90% for axial and circumferential cracks.

2. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.

3. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.

4. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks.

e) Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

f) Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the *special permit segment* in which the ILI tool velocity was outside of the specified tool velocity range.

g) All ILI tool runs must obtain the Test ID from PHMSA prior to run.

h) Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.

i) Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

j) Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals. Sable must document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[15] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different. If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

k) Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second

---

[15] A minimum of four (4) independent direct examination excavations must be used for unity plots.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 9 of 16

**Teel Declaration
Page 150**

Edition, April 2013).

15) Discovery of Condition: The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

16) Immediate Repair Conditions:[16]

a) A crack or crack-like anomaly that meets any of the following criteria:

    i. Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.

    ii. Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.

b) Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.

c) Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[17]

17) 180-Day Repair Conditions:[18]

a) A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.

b) Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.

c) All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[19]

d) For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

18) Corrosion Growth Rate Analysis (CGRA):

a) Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to

---

[16] The criteria specified in this emergency special permit is supplemental to, and does not relieve Sable from complying with, the requirements set forth in 49 CFR 195.452(h)(4)(i). All immediate repair conditions must be remediated with a permanent repair method.

[17] Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria. General corrosion means uniform or gradually varying loss of wall thickness over an area.

[18] The criteria specified in this emergency special permit is supplemental to, and does not relieve Sable from complying with, the requirements set forth in 49 CFR 195.452(h)(4)(iii), except for those associated with 49 CFR 195.452(h)(4)(iii)(H). All immediate repair conditions must be remediated with a permanent repair method.

[19] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth. If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify PHMSA, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 CFR § 195.452 until the indication is remediated or until otherwise authorized by PHMSA.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 10 of 16

Teel Declaration
Page 151

prior ILI) and perform pipeline remediations needed to assure the integrity of the *special permit segments* is maintained.[20] The timing of remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.

b) The CGRA procedure must include ILI data matching methods[21] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.

c) Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.

d) When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates.[22]

e) All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

19) Pressure Reduction: If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in this emergency special permit, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

20) In Field Direct Examination of Pipe:

a) Direct examinations[23] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[24] PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.

b) Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition. However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:

    i. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.

    ii. Sable must increase the metal loss anomaly's depth by 20% when

---

[20] At a minimum, Sable must include signal matching between ILI data sets.

[21] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

[22] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

[23] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.

[24] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complemented by shear wave technology or inspection by phased array ultrasonic testing.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC    Page 11 of 16
Emergency Special Permit – Corrosion Mitigation – California

**Teel Declaration
Page 152**

they input it into the formula for calculating the number of wraps needed for repair method 5.

iii. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs. If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

c) Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

d) Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy. Sable must recoat in accordance with their coating repair procedure.[25]

e) All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

21) Integrity Management:

a) A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.

i. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 CFR § 192.712(d)(1).

ii. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 CFR § 192.712(d)(2).

b) Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.

c) When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

d) Sable must send all field measurements to the ILI tool vendor within 90 days

---

[25] The coating procedure must be submitted to PHMSA prior to the effective date of this emergency special permit.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 12 of 16

**Teel Declaration
Page 153**

of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

e) Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the *special permit segments*. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by PHMSA prior to being selected.

f) Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC) interference or direct current (DC) interference or shorting that could contribute to external corrosion is

g) occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

22) Data Requirements for Predicted Failure Analysis:

a) Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

b) The analyses performed in accordance with this emergency special permit must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in traceable, verifiable, and complete records.

23) Recordkeeping:

a) Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this emergency special permit shall be kept for the life of the *special permit segments* and must be submitted to PHMSA, in the manner requested (electronic, hardcopy, or other format) within 30 days.

b) Sable must maintain the following records:

   i. Technical approach used for the analysis

   ii. All data used and analyzed

   iii. Pipe and longitudinal weld seam properties

   iv. Procedures used to implement emergency special permit conditions

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC                    Page 13 of 16
Emergency Special Permit – Corrosion Mitigation – California

**Teel Declaration
Page 154**

v.      Evaluation methodology used

vi.     Models used

vii.    Direct in situ examination data

viii.   All in-line inspection tool assessments information evaluated

ix.     Pressure test data and results

x.      All in-the-ditch assessments performed on the *special permit segments*

xi.     All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results

xii.    All finite element analysis results

xiii.   The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology

xiv.    The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods

xv.     Safety factors used for fatigue life and/or predicted failure pressure calculations

xvi.    Reassessment time interval and safety factors

xvii.   The date of the review

xviii.  Confirmation of the results by qualified technical subject matter expert(s)

xix.    Approval by responsible Sable management personnel

xx.     Records of additional preventive and mitigative (P&M) measures performed

xxi.    Reports required by this emergency special permit.

24)    Reporting:

a)  Any release on the *special permit segments* shall be reported to PHMSA at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery.[26]

b)  An email notification shall be made at least three (3) days prior to a *special permit segment* being exposed for non-emergency purposes of field evaluation and repair to PHMSA. The email notification shall include, if applicable:

i.  Tool type and run date

ii. Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)

---

[26] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state, or Federal regulations.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 14 of 16

**Teel Declaration
Page 155**

      iii. Dig sheets

      iv. Field contact information for Sable

      v. Time and location of the field evaluation and repair.

c) Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run to PHMSA and include:

      i. Tool type

      ii. Run date

      iii. Summary of Conditions Report[27]

      iv. Final Vendor Report and Pipe Tally

d) Sable shall provide a report to PHMSA by June 15th of every year for the duration of this special permit, including any renewals. The report shall be submitted to PHMSA. At a minimum, the annual report shall contain the following, if applicable:

      i. A Closure Report for the previous calendar (CY) which contains:

         1. Features that were remediated in previous CY, including documentation for in-the-ditch assessments and repairs

         2. Identify features that remain to be assessed

         3. Unity Plots for previous ILI runs

      ii. Fracture mechanics and pressure cycling analyses in accordance with Condition 21(a);

      iii. The third-party ILI expert reviews in accordance with condition 21(e).

      iv. AC and DC Interference surveys that are due in accordance with condition 21(f).

      v. A copy of the CGRA for prior year including:

         1. Mean corrosion growth rate for the *special permit segments*

         2. Distribution graph of the corrosion growth rate for the *special permit segments* (e.g. occurrences (#) vs. corrosion rate (mpy)

The above conditions are based on PHMSA's review and consideration of information provided by Sable, including information in their emergency special permit application which can be found at Docket No. PHMSA-2025-1502 in the Federal Docket Management System located at www.regulations.gov. PHMSA has determined the conditions listed above would be necessary to ensure this Emergency Special Permit is not inconsistent with pipeline safety.

---

[27] PHMSA may stipulate specific formatting or other information (e.g., condition type, anomaly details, remaining strength calculation method, failure pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 15 of 16

**Teel Declaration
Page 156**

## IV.  Limitations:

This special permit is subject to the limitations set forth in 49 CFR § 190.341, as well as the following limitations:

1)  This emergency special permit is limited to an initial term of sixty (60) days from the date of issuance. If Sable elects to seek renewal of this emergency special permit, it must submit a renewal request to PHMSA pursuant to 49 CFR § 190.341(g).

2)  Should Sable fail to comply with any conditions of this emergency special permit or should PHMSA determine that this emergency special permit is no longer appropriate or is inconsistent with pipeline safety, PHMSA may revoke the emergency special permit and require Sable to comply with all appropriate regulatory requirements.

3)  PHMSA may order the *special permit segments* to be shutdown at any time.

4)  PHMSA may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for failure to comply with this emergency special permit. The terms and conditions of any compliance order shall take precedence over the terms of this emergency special permit.

5)  In the event of conflict between the conditions of this emergency special permit and industry standards, the emergency special permit conditions shall prevail.

6)  If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the emergency special permit, Sable must provide PHMSA written notice of the change within 60 days of the consummation date. In the event of such transfer, PHMSA reserves the right to revoke, suspend, or modify the emergency special permit.

AUTHORITY:  49 United States Code 60118 (c)(1) and 49 CFR § 1.97.

Issued in Washington, D.C., on <u>December 23, 2025</u>.

**LINDA GAIL DAUGHERTY**  Digitally signed by LINDA GAIL DAUGHERTY
Date: 2025.12.23
15:48:57 -05'00'

Linda Daugherty
Acting Associate Administrator
 for Pipeline Safety

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 16 of 16

**Teel Declaration
Page 157**

# CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of January, 2026, the foregoing Petition for Review and exhibits were served on Respondents by sending a copy via certified mail, return receipt requested, to each of the following addresses:

Paul J. Roberti, Administrator
U.S. Department of Transportation,
Pipeline and Hazardous Materials Safety Administration
1200 New Jersey Avenue, SE
Washington, D.C. 20590

Office of Chief Counsel
U.S. Department of Transportation,
Pipeline and Hazardous Materials Safety Administration
1200 New Jersey Avenue, SE
Washington, D.C. 20590

Sean Duffy, Secretary of Transportation
U.S. Department of Transportation,
Pipeline and Hazardous Materials Safety Administration
1200 New Jersey Avenue, SE
Washington, D.C. 20590

Pamela Bondi
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue, N.W. Washington,
D.C. 20530- 0001

Dated: January 23, 2026

/s/ Michael S. Dorsi
MICHAEL S. DORSI

# EXHIBIT I

## Declaration of Julie Teel Simmonds

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

No. 25-8059

ENVIRONMENTAL DEFENSE CENTER, et al.,
*Petitioners*,
v.
PIPELINE & HAZARDOUS MATERIALS SAFETY ADMINISTRATION, et al.,
*Respondents*.

No. 26-508

STATE OF CALIFORNIA,
*Petitioner*,
v.
PIPELINE & HAZARDOUS MATERIALS SAFETY ADMINISTRATION, et al.,
*Respondents*.

On Petition for Review of Actions by the Pipeline & Hazardous Materials Safety
Administration

**MOTION TO CONSOLIDATE AND SET NEW BRIEFING SCHEDULE**

| | |
|---|---|
| Of Counsel: | ADAM R.F. GUSTAFSON<br>*Principal Deputy Assistant Attorney General* |
| BENJAMIN FRED | |
| TIMOTHY O'SHEA | REBECCA JAFFE |
| KATHLEEN MAITLAND | MATTHEW R. OAKES |
| *Attorneys* | *Attorneys* |
| PHMSA | Environment and Natural Resources Division |
| | U.S. Department of Justice |
| CHARLES ENLOE | Post Office Box 7415 |
| *Attorney* | Washington, D.C. 20044 |
| U.S. Dept. of Transportation | matthew.oakes@usdoj.gov - (202) 598-0402 |

**Teel Declaration
Page 160**

Respondent the Pipeline and Hazardous Materials Safety Administration (PHMSA) moves to consolidate two recently filed petitions that both challenge the same two PHMSA actions. The two petitions that should be consolidated are *Environmental Defense Center v. PHMSA*, No. 25-8059 (filed Dec. 24, 2025), and *State of California v. PHMSA*, No. 26-508 (filed Jan. 23, 2026). Both petitions challenge: (1) PHMSA's December 23, 2025, grant of an "Emergency Special Permit" to Sable Offshore Corp., pursuant to 49 U.S.C. Section 60118(c)(2)(A), that waives compliance with a specific federal regulatory provision; and (2) PHMSA's December 22, 2025, approval of a Restart Plan for the Las Flores Pipeline (designated CA-324 and CA 325) owned by Sable Offshore Corp. California's petition also challenges a December 17, 2025, letter in which PHMSA stated that the Las Flores Pipeline is an interstate pipeline subject to PHMSA's jurisdiction. No party opposes consolidation, and the parties have negotiated a proposed briefing schedule, should the Court consolidate these matters.

The three challenged actions are interrelated, and consolidation would promote judicial economy and prevent duplicative briefing and argument. "Consolidated review . . . avoids inconsistency and conflicts . . . while ensuring the timely and efficient resolution of administrative cases." *Ruud v. U.S. Dep't of Lab.,* 347 F.3d 1086, 1090 (9th Cir. 2003). "[I]t is more efficient for one three-judge panel to consider all the issues arising out of the same record than it is for

two or more three-judge panels to review the same record in order to adjudicate the issues separately." *United States v. Reese*, 993 F.2d 254, 256 (D.C. Cir. 1993). This Court consolidates petitions for review challenging related actions. *See Lloyd v. U.S. Dep't of Lab.*, 637 F.2d 1267, 1268 (9th Cir. 1980) (petitions "were consolidated because they arise from a common factual setting or because they involve a common legal issue-namely").

The Federal Rules of Appellate Procedure authorize consolidation. "When the parties have filed separate timely notices of appeal, the appeals may be joined or consolidated by the court of appeals." Fed. R. App. P. 3(b)(2). "Consolidation under Federal Rule of Appellate Procedure 3(b) may be ordered where the court in its discretion deems it appropriate and in the interests of justice . . . ." *United States v. State of Wash.*, 573 F.2d 1121, 1123 (9th Cir. 1978). Although Rule 3(b)(2) references notice of appeal, courts have also applied the rule to petitions for review. *E.g., Legal Env't Assistance Found., Inc. v. U.S. E.P.A.*, 400 F.3d 1278, 1279 (11th Cir. 2005) (sua sponte consolidating under Federal Rule of Appellate Procedure 3(b)(2) petitions that were "factually similar and procedurally identical").

This Court has held that "each of the matters to be consolidated must be within the jurisdiction of the court." *United States v. State of Wash.*, 573 F.2d 1121, 1123 (9th Cir. 1978). The federal government cannot represent—at this

preliminary stage—that the Court has jurisdiction over both petitions and all the claims that Petitioners may raise. But the United States does not challenge the timeliness of the petitions for review, and timeliness is the primary concern of Rule 3(b)(2): "When the parties have filed separate *timely* notices of appeal, the appeals may be joined or consolidated by the court of appeals." Fed. R. App. P. 3(b)(2) (emphasis added).

The parties have agreed to jointly propose the following briefing schedule:

| **Brief** | **Party** | **Deadline** |
|---|---|---|
| Opening Brief | Petitioners in original Case No. 25-8059 (NGO Petitioners) | March 23 |
| Opening Brief | Petitioners in original Case No. 26-508 (State Petitioners) | March 23 |
| Combined Answering Brief | Federal Respondents | May 8 |
| Intervenors' Brief | | May 18 |
| Optional Reply Briefs | All Petitioners | June 8 |

The Court should consolidate because both petitions challenge the same two PHMSA actions, and because all actions challenged are interrelated. The motion for an extension of time to file the opening brief in Case No. 25-8059 is due to new extraordinary and compelling circumstances, namely, the filing of a related case by the California Attorney General in Case No. 26-508.

Teel Declaration
Page 163

Respectfully submitted,


ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*

Of Counsel:

ROBERT N. STANDER
*Deputy Assistant Attorney General*

BENJAMIN FRED
TIMOTHY O'SHEA
KATHLEEN MAITLAND                                      /s/ *Matthew R. Oakes*
*Attorneys*                                            REBECCA JAFFE
Pipeline and Hazardous Materials Safety   MATTHEW R. OAKES
Administration                                         *Attorneys*
                                                       Environment and Natural Resources Division
CHARLES ENLOE                             U.S. Department of Justice
*Attorney*                                             Post Office Box 7415
U.S. Dept. of Transportation              Washington, D.C. 20044
                                                       (202) 598-0402
                                                       matthew.oakes@usdoj.gov

**CERTIFICATE OF COMPLIANCE**

I hereby certify:

1. This document complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2) because, excluding the parts of the document exempted by Rule 32(f), this document contains 660 words.

2. This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

/s/ *Matthew R. Oakes*
MATTHEW R. OAKES
*Attorney*

# EXHIBIT J

## Declaration of Julie Teel Simmonds

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

FEB 5 2026

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

|  |  |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER; et al., | No. 25-8059 |
| Petitioners, | Agency No. 2025-1502 Department of Transportation, National Transportation Safety Board |
| v. | ORDER |
| PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION, |  |
| Respondent, |  |
| ---------------------------------------- |  |
| SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY, |  |
| Intervenors. |  |

|  |  |
|---|---|
| STATE OF CALIFORNIA, | No. 26-508 |
| Petitioner, | Agency No. 2025-1502 Department of Transportation, National Transportation Safety Board |
| v. |  |
| PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION, |  |
| Respondent. |  |

**Teel Declaration
Page 167**

The motion (Docket Entry No. 37 in 25-8059; Docket Entry No. 10 in 26-508) to consolidate these petitions is granted.

The opening briefs are due March 23, 2026. The consolidated answering brief is due May 8, 2026. The optional reply briefs are due June 8, 2026.

The clerk will place these cases on the calendar for July 2026. *See* 9th Cir. Gen Ord. 3.3(f). No streamlined extensions of time to file a brief will be approved. *See* 9th Cir. R. 31-2.2(a)(1).

FOR THE COURT:

MOLLY C. DWYER
CLERK OF COURT

2

# EXHIBIT K

## Declaration of Julie Teel Simmonds

December 23, 2025


Steven Rusch
VP, Regulatory and Environmental Affairs
Sable Offshore Corporation
845 Texas Ave., Suite 2920
Houston, Texas 77002
Via email at srusch@sableoffshore.com

Linda Krop
Environmental Defense Center
906 Garden Street
Santa Barbara, CA 93101
Via email at lkrop@environmentaldefensecenter.org

Miyoko Sakashita
Center for Biological Diversity
1212 Broadway, Suite 800
Oakland, CA 94612
Via email at miyoko@biologicaldiversity.org

**BOARD OF SUPERVISORS
HEARING OF DECEMBER 16, 2025**

---

*RE:*   *Board Action Letter*
*Appeals of the Planning Commission Approval of the Sable Offshore Corporation Change of Owner, Operator, and Guarantor of the Santa Ynez Unit, POPCO Gas Plant, and Las Flores Pipeline Final Development Plan Permits*
*Case Nos. 24APL-00025 and 24APL-00026*

---

Dear Mr. Rusch, Ms. Krop, and Ms. Sakashita,

On December 16, 2025, the Board of Supervisors took the following actions on Case Nos. 24APL-00025 and 24APL-00026 for the appeals of the Planning Commission's approval of the Sable Offshore Corporation Change of Owner, Operator, and Guarantor of the Santa Ynez Unit, Pacific Offshore Pipeline Company (POPCO) Gas Plant, and Las Flores Pipeline Final Development Plan Permits.

**Teel Declaration
Page 170**

Supervisor Lavagnino moved, seconded by Supervisor Lee and carried by a vote of 3 to 1 (Nelson no, Hartmann recused) to:

1.  Approve the appeals, Case Nos. 24APL-00025 and 24APL-00026;

2.  Make the required findings for denial of the Change of Owner, Operator, and Guarantor for the respective Santa Ynez Unit (SYU), Pacific Offshore Pipeline Company (POPCO) Gas Plant, and Las Flores Pipeline System Final Development Plan (FDP) Permits;

3.  Determine that denial of the requests is exempt from CEQA pursuant to CEQA Guidelines Section 15270(a); and

4.  Deny the Change of Owner, Operator, and Guarantor for the respective SYU, POPCO Gas Plant, and Las Flores Pipeline System FDP Permits.

**The attached findings reflect the Board of Supervisors actions of December 16, 2025.**

Sincerely,

Lisa Plowman
Planning & Development Director


xc:

      Case File: 24APL-00025 and 24APL-00026
      Deputy County Counsel: Jennifer Richardson
      Deputy Director: Errin Briggs
      Planner: Jacquelynn Ybarra
      Planning Commissioner Michael Cooney, First District
      Planning Commissioner John Parke, Third District
      Planning Commissioner Roy Reed, Fourth District


**Attachments:**    **Attachment 1 – Findings**
                     **Attachment 2 – Board Minute Order (Item #25-01067)**

<u>**ATTACHMENT 1: FINDINGS OF DENIAL**</u>

**1.0   CEQA FINDINGS**

**1.1   CEQA EXEMPTION**

The Board of Supervisors finds that the Sable Offshore Corporation's (Sable) Change of Owner, Operator, and/or Guarantor for the Santa Ynez Unit (SYU), Pacific Offshore Pipeline Company (POPCO) Gas Plant, and Las Flores Pipeline System Final Development Plan (FDP) permits are not subject to the requirements of the California Environmental Quality Act (CEQA), as CEQA Guidelines Section 15270 [Projects Which are Disapproved] exempts projects if a public agency rejects or disapproves of the project. Please see Attachment C, Notice of Exemption.

**2.0   ADMINISTRATIVE FINDINGS**

The Board Agenda Letter dated December 16, 2025, the Set Hearing Board Letter dated October 21, 2025, the Board Agenda Letter dated November 4, 2025, the Set Hearing Board Letter dated February 4, 2025, the Board Agenda Letter dated February 25, 2025, and the Planning Commission Staff Report dated October 22, 2024, including all of their attachments for the Sable Offshore Corporation's Change of Owner, Change of Operator and Change of Guarantor for the SYU Permit No. 87-DP- 32cz (RV06), the Change of Guarantor and Change of Operator for the POPCO Gas Plant Permit No. 93-FDP-015 (AM03), and the Change of Guarantor and Change of Operator for the Las Flores Pipeline System Permit No. 88-DPF-033 (RV01)z, 88-CP-60 (RV01) (88- DPF-25cz; 85-DP-66cz; 83-DP-25cz), are incorporated by reference herein.

Sable submitted separate applications for each of the three Facilities requesting the following:

1. A Change of Owner, Operator, and Guarantor for the SYU Final FDP permit;
2. A Change of Operator and Guarantor for the POPCO Gas Plant FDP permit; and
3. A Change of Operator and Guarantor for the Las Flores Pipeline System FDP permit.

Because each application requires a Change of Operator, and the findings required for a Change of Operator cannot be made, all the applications are denied.  The discussion below is limited to the required findings which cannot be made for the requests.

**2.1   CHANGE OF OWNER, OPERATOR, AND GUARANTOR FOR THE SANTA YNEZ UNIT ONSHORE FACILITIES, FINAL DEVELOPMENT PLAN PERMIT NO. 87-DP-32cz (RV06)**

**2.1.1   Findings required for Change of Operator**

In compliance with Section 25B-10 of the County Code, the planning commission [or the Board if on appeal] shall approve an application for change of operator only if the planning commission [or the Board if on appeal] makes the following findings.

*(9) Operator Capability. The proposed operator has the skills and training necessary to operate the permitted facility in compliance with the permit and*

Change of Owner, Operator and/or Guarantor
SYU, POPCO Gas Plant, Las Flores Pipeline System Final Development Plan Permits
Hearing Date: December 16, 2025
Attachment 1, Page 2

> *all applicable county codes and has a good working knowledge of the crucial compliance plans listed in Sec. 25B-10.1.f. The director shall require relevant records of compliance, and corrective actions taken subsequent to any major incidents for facilities, if any, that are similar in nature to those that are the subject of the permit, as may be necessary to make findings. These records shall be used to provide sufficient assurance that the proposed operator does not reflect a record of non-compliant or unsafe operations systemic in nature for similar facilities to those being considered for operatorship.*

The Board of Supervisors finds that Sable reflects a record of non-compliant or unsafe operations systemic in nature for the Facilities being considered for operatorship, and therefore does not have the skills, training, and resources necessary to operate the permitted Facilities in compliance with the applicable permits and all applicable county codes. Sable acquired the Facilities on February 14, 2024, and first applied for the changes in Owner, Operator, and/or Guarantor in March of 2024. The Planning Commission acted on the requests on October 30, 2024, and the Board heard the requests on appeal on February 25, 2025.  Given the unique circumstances of the Board's previous tie-vote on February 25, 2025, subsequent litigation, and remand for a rehearing, the Board has now had over a year and a half of Sable's compliance records pertaining to the Facilities to review, and is not limited to records of compliance for similar facilities as outlined in Finding 25B-10(a)(9).  In that time, Sable has amassed a significant track record of systemic noncompliance for the Facilities. This noncompliance demonstrates a lack of diligence, and a pattern and practice of failing to notify regulatory agencies and obtain authorization before beginning work, failing to maintain and/or provide necessary and accurate information to regulators, failing to comply with applicable laws, ignoring regulatory agency directives, and failing to competently operate and take all necessary measures to protect the environment. Further, Sable has made statements reflecting contempt for California's regulations and regulators. The Board finds evidence that Sable is not capable of following state law, and state agency directives indicate that Sable will be likewise incapable of operating the Facilities in compliance with the county permits and all applicable county codes. The Board of Supervisors has reviewed the following records, which it considers relevant records of systemic noncompliance for the reasons stated above. The Board also incorporates by reference the Board Agenda Letter dated December 16, 2025 and all attachments, as well as all public comments presented at and in advance of the Board Hearings held on February 25, 2025, November 4, 2025 and December 16, 2025.

**Teel Declaration**
**Page 173**

Change of Owner, Operator and/or Guarantor
SYU, POPCO Gas Plant, Las Flores Pipeline System Final Development Plan Permits
Hearing Date: December 16, 2025
Attachment 1, Page 3

***Evidence that Sable has repeatedly undertaken activities prior to notifying regulators and obtaining prior authorizations***

*County of Santa Barbara*

- In May 2025, Sable unloaded 57 diesel trucks to fill onsite crude oil tanks at the SYU without notifying the County. This required a Management of Change Protocol with the Systems Safety and Reliability Review Committee (SSRRC) per SYU FDP Permit Condition XI-2.a. (Safety Inspection and Maintenance Programs). (*Email from County consultant Jay Sheth to Justin Crowell on May 9, 2025.*)

- In May 2025, Sable unloaded liquified petroleum gas to partially fill the SYU Offspec Propane Bullet without notifying the County. This required review and consideration with the SSRRC per SYU FDP Permit Condition XI-2.a. (*Email from County consultant Jay Sheth to Errin Briggs on May 15, 2025.*)

- In May 2025, P&D was informed by its petroleum engineering consultant Jay Sheth that Sable had started moving oil from the platforms to the onshore SYU prior to formally notifying the County. (*Email from Steve Rusch to Lisa Plowman on May 21, 2025.*)

- In November 2024, Sable submitted retroactive Zoning Clearance applications for Las Flores Pipeline anomaly digs it had begun in September 2024. The County ultimately determined that no new County permits were required for the work, but authorization should have been sought prior to initiating the digs.

- The presentation by staff at the California Coastal Commission's state compliance hearing on April 10, 2025, which includes the images below, provides photographic evidence that Sable began anomaly digs roughly two months before submitting Zoning Clearance applications to the County.




Change of Owner, Operator and/or Guarantor
SYU, POPCO Gas Plant, Las Flores Pipeline System Final Development Plan Permits
Hearing Date: December 16, 2025
Attachment 1, Page 4



### State Lands Commission

- On May 19, 2025, Sable announced that as of May 15, 2025, it has restarted production at the SYU and had begun flowing oil production to Las Flores Canyon.
- On May 23, 2025, the Chair of State Lands Commission Eleni Kounalakis sent a letter to Sable stating that Sable was required to communicate with State Lands Commission staff before initiating any oil flow through its offshore pipeline and its failure to do so *"undermines trust of Sable's motives, demonstrates a lack of understanding of the significant concerns held by many regarding the resumption of activities, and raises serious questions about Sable's willingness to be a transparent operator."*

### Central Coast Regional Water Quality Control Board (Water Board)

- A Report on an *"Inspection of Unauthorized Discharges to Waters by Sable Offshore"* documents observations by Water Board staff of violations observed during a February 28, 2025 site visit.
- The Water Board sent Sable notices of violation and/or non-compliance notices for unauthorized waste discharges into Santa Barbara County waterways on December 13, 2024, April 15, 2025, and April 16, 2025.
- In a staff report for a meeting held on April 17-18, 2025, Water Board staff wrote: *"Sable's practice of performing unauthorized work in waters of the state and United States has inhibited the Central Coast Water Board from ensuring that appropriate mitigation and best management practices are in place to protect water quality."*
- The Water Board passed a resolution on April 18, 2025 referencing alleged violations of the California Water Code for potential civil judicial enforcement to the California Office of the Attorney General.

### California Attorney General

- On October 3, 2025, the Attorney General filed a Civil Complaint (Case No. 25CV06285) against Sable alleging three causes of action under the Water Code:

**Teel Declaration**
**Page 175**

Change of Owner, Operator and/or Guarantor
SYU, POPCO Gas Plant, Las Flores Pipeline System Final Development Plan Permits
Hearing Date: December 16, 2025
Attachment 1, Page 5

(1) failure to comply with an investigative order, (2) failure to report waste discharges, and (3) discharge of waste without permit requirements. The complaint alleges *"…Sable deliberately avoided its obligation to obtain waste discharge requirements before commencing work…."* and *"…Sable's blatant and knowing failure to first obtain waste discharge requirements…before commencing excavation work that could affect water quality."*

*California Department of Fish and Wildlife (CDFW):*
- On December 17, 2024, CDFW sent Sable a notice of potential violation explaining that Sable appeared to have: (a) violated Fish and Game Code section 1602(a)(1) by failing to notify CDFW prior to undertaking activities subject to that section, as well as sections 5650 and 5652; and (b) conducted work outside a 50-foot-wide pipeline easement on CDFW property.  The notice includes photographic evidence as shown below.







Photo 11 (Site R5-1). Aerial photo taken by Warden Ryan Hitchings on November 18, 2024, showing the extent of the grading within the stream and the straw waddles placed. The upstream vegetation pictured was identified as mule fat growing in standing surface water.

Photo 23 (Site R5-4). Photo taken from the linear center of the impact area, facing upstream by Environmental Scientist Andrew Aitken on November 25, 2024, showing the sediment pile in the riverbed and extending into the flowing stream. The vegetation is willow trees the sediment piles have compressed and partially buried.

***Evidence that Sable fails to maintain and/or provide necessary, timely, and accurate information to regulators***

*Water Board*
- On January 22, 2025, the Water Board sent Sable a directive to submit a technical report describing Sable's activities at all Las Flores Pipeline work locations and associated potential discharges to waterways.  Sable failed to do so.
- In the staff report for the Water Board's regular meeting of April 17-18, 2025, Water Board staff wrote that Sable's refusal to provide specified information regarding its work locations and work scope has inhibited the Water Board's ability to assess impacts to beneficial uses.

Change of Owner, Operator and/or Guarantor
SYU, POPCO Gas Plant, Las Flores Pipeline System Final Development Plan Permits
Hearing Date: December 16, 2025
Attachment 1, Page 6

- On July 24, 2025, the Water Board sent another notice of violation for Sable's continued failure to submit the technical report.

<u>California Attorney General</u>
In its civil complaint, the Attorney General alleges Sable's representations to the Water Board were *"patently false."* The complaint describes Sable as *"uninformed and unprepared"* and alleges:

- *"One would expect a responsible oil production company running 125 miles of underground pipeline with unique integrity challenges through the high consequence areas of Santa Barbara and San Luis Obispo Counties would have that information readily available in a database for use by its integrity and environmental management teams. Not so."*
- *"…the location of streams, channels and drainage along Sable's pipeline route is something any responsible operator should have at their fingertips."*
- *"…Sable management misinformed the Regional Water Board by assuring staff that Sable had assessed how its excavation work could affect water quality."*

**Evidence that Sable fails to comply with applicable laws**

- The Santa Barbara County Air Pollution Control District issued Sable Notices of Violation for the following:
  i. Failure to operate a vapor recovery compressor (July 15, 2025).
  ii. Failure to operate the flare pilot system flame at all times when combustible gases are being vented (July 15, 2025).
  iii. Failure to operate the Waste Gas Incinerator Continuous Emissions Monitoring System for SOx for 5 days (August 18, 2025).
  iv. Failure to conduct the boiler source test by due date (August 20, 2025).
- On May 23, 2025, the Chair of State Lands Commission Eleni Kounalakis sent a letter to Sable stating that Sable's May 19, 2025 press release entitled, *"Sable Offshore Corp. Reports Restart of Oil Production at the Santa Ynez Unit and Anticipated Oil Sales from the Las Flores Pipeline System in July 2025,"* was misleading because the well-testing activities Sable had undertaken did not constitute a resumption of commercial production or a full restart of the SYU. Subsequently, two Securities and Exchange Commission (SEC) lawsuits were filed alleging Sable misled investors by making false and misleading announcements that it had restarted operations at the SYU when it had not.
- On October 31, 2025, the news outlet Hunterbrook published an article and audio recording of an October 2025 meeting between Sable's Chief Executive Officer (CEO) Jim Flores and select investors where Flores appears to leak insider information. After initially claiming the audio was artificial intelligence (AI) generated, Sable published a notice that its Board of Directors had formed a

Change of Owner, Operator and/or Guarantor
SYU, POPCO Gas Plant, Las Flores Pipeline System Final Development Plan Permits
Hearing Date: December 16, 2025
Attachment 1, Page 7

Special Committee of independent directors to undertake an independent investigation of the allegations contained in the Hunterbrook report.

***Evidence that Sable Ignores Regulatory Agency Directives***

- As described in the Tentative Ruling in Santa Barbara County Superior Court Case No. 25CV 00974 (October 14, 2025), adopted by the Court on October 15, 2025: On November 12, 2024, the California Coastal Commission's Executive Director issued an Executive Director Cease and Desist Order ordering Sable to cease and desist from conducting any further unpermitted development on the Las Flores Pipeline.
- On February 18, 2025, the Coastal Commission's Executive Director issued a second Cease and Desist Order.
- Sable nonetheless resumed onshore anomaly repair work on the Las Flores Pipeline because County staff had determined the work was covered by existing permits. Although County staff and the Coastal Commission disagreed about whether new permits are necessary, the County did not authorize Sable to ignore the directives of the Coastal Commission. The photograph below is from the Coastal Commission's hearing on April 10, 2025 and shows Sable continued anomaly repair work after the second Cease and Desist Order was issued.



***Evidence that Sable Fails to Competently Operate and Take All Necessary Measures to Protect the Environment***

- An August 6, 2025 Hazardous Materials Spill Report documents that 280 gallons of Hydrochloric Acid (HCL) spilled at the SYU because tube fittings failed causing a release of the material to spill out onto the ground.

**Teel Declaration
Page 178**

Change of Owner, Operator and/or Guarantor
SYU, POPCO Gas Plant, Las Flores Pipeline System Final Development Plan Permits
Hearing Date: December 16, 2025
Attachment 1, Page 8

- An August 27, 2025 Hazardous Materials Spill Report documents that 5,000 cubic feet of Anerobic Biosolid sludge material spilled during a power washing operation at the SYU.
- The Coastal Commission staff report dated March 28, 2025 on the recommendations and findings for cease and desist order, restoration order, and administrative civil penalty stated and provided evidence that Sable staged excavators in particularly sensitive areas, such as above a pool of water where a southwestern pond turtle and two southern California steelhead were swimming, and that erosion control measures were lacking or had been installed improperly and were therefore ineffective, as shown in the photographs below.





Change of Owner, Operator and/or Guarantor
SYU, POPCO Gas Plant, Las Flores Pipeline System Final Development Plan Permits
Hearing Date: December 16, 2025
Attachment 1, Page 9



***Evidence of Sable's Contempt for California's Environmental Regulations and Regulators***

An audio recording and unofficial transcript of a call in October 2025 between Sable's CEO Jim Flores and a select group of investors shows Flores disparaging California environmental laws and regulators and suggesting ExxonMobil was not capable of achieving what Sable has because ExxonMobil follows the law.   Examples from the transcribed audio include the following:

- 3:28: Describing a proposed offshore storage and treating (OS&T) plan so Sable does not have to *"depend on California's emotional winds of environmentalism"*
- 13:58: when asked why ExxonMobil wouldn't want the Facilities back, Flores responds: *"they would not do what we've done"* and *"they're not adept to operate in California because the California moves the goalpost so bad. They cheat so bad"*. And that Exxon will *"follow the rules and the rules keep changing and we're more adaptable than they are."*
- 26:35: *"Now we've got some bogus you know you know Santa Barbara County DA has some civil charges and they ramp them up to criminal and stuff. They they're trying all kind of stuff all the crazies."*

## 2.2    CHANGE OF OPERATOR AND GUARANTOR FOR THE PACIFIC OFFSHORE PIPELINE COMPANY GAS PLANT, FINAL DEVLOPMENT PLAN PERMIT NO. 93-FDP-015 (AM03)

### 2.2.1    Findings required for Change of Operator

In compliance with Section 25B-10 of the County Code, the planning commission shall approve an application for change of operator only if the planning commission makes the following findings.

> *(9) Operator Capability. The proposed operator has the skills and training necessary to operate the permitted facility in compliance with the permit and all applicable county codes and has a good working knowledge of the crucial compliance plans listed in Sec. 25B-10.1.f. The director shall require relevant*

**Teel Declaration**
**Page 180**

Change of Owner, Operator and/or Guarantor
SYU, POPCO Gas Plant, Las Flores Pipeline System Final Development Plan Permits
Hearing Date: December 16, 2025
Attachment 1, Page 10

*records of compliance, and corrective actions taken subsequent to any major incidents for facilities, if any, that are similar in nature to those that are the subject of the permit, as may be necessary to make findings. These records shall be used to provide sufficient assurance that the proposed operator does not reflect a record of non-compliant or unsafe operations systemic in nature for similar facilities to those being considered for operatorship.*

The Board of Supervisors finds that this finding cannot be made for the reasons stated in Finding 2.1.1. above.

**2.3   CHANGE OF OPERATOR AND GUARANTOR FOR THE LAS FLORES PIPELINE SYSTEM, FINAL DEVLOPMENT PLAN PERMIT NO. 88-DPF-033 (RV01)z, 88-CP-60 (RV01)(88-DPF-25cz;85-DP-66cz; 83-DP-25cz)**

**2.3.1   Findings required for Change of Operator**

In compliance with Section 25B-10 of the County Code, the planning commission shall approve an application for change of operator only if the planning commission makes the following findings.

> *(9) Operator Capability. The proposed operator has the skills and training necessary to operate the permitted facility in compliance with the permit and all applicable county codes and has a good working knowledge of the crucial compliance plans listed in Sec. 25B-10.1.f. The director shall require relevant records of compliance, and corrective actions taken subsequent to any major incidents for facilities, if any, that are similar in nature to those that are the subject of the permit, as may be necessary to make findings. These records shall be used to provide sufficient assurance that the proposed operator does not reflect a record of non-compliant or unsafe operations systemic in nature for similar facilities to those being considered for operatorship.*

The Board of Supervisors finds that this finding cannot be made for the reasons stated in Finding 2.1.1. above.

# County of Santa Barbara

# BOARD OF SUPERVISORS



one COUNTY | one FUTURE

*First District - Roy Lee*
*Second District - Laura Capps, Chair*
*Third District - Joan Hartmann*
*Fourth District - Bob Nelson, Vice Chair*
*Fifth District - Steve Lavagnino*

*Mona Miyasato, County Executive Officer*

## Action Summary

**Tuesday, December 16, 2025**

**9:00 AM**

**JOSEPH CENTENO BETTERAVIA GOVERNMENT ADMINISTRATION BUILDING, BOARD HEARING ROOM 511 EAST LAKESIDE PARKWAY, SANTA MARIA**

The Board of Supervisors meets concurrently as the Board of Directors of the Flood Control & Water Conservation District, Water Agency, the Santa Barbara Fund for Public and Educational Access and other Special Districts.

Live Web Streaming of the Board of Supervisors Meetings, Agendas, Supplemental Materials and Minutes of the Board of Supervisors are available on the internet at: www.countyofsb.org.

BOARD OF SUPERVISORS                    Action Summary                    December 16, 2025

## 9:00 A.M. ..... Convened to Regular Session

## Roll Call

**Present:**      5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

## Pledge of Allegiance

## Moment of Silence in memory of Public Works employee Nian Gonzales

## Approval of Minutes of the December 9, 2025 Meeting

**A motion was made by Supervisor Nelson, seconded by Supervisor Hartmann, to approve the minutes. The motion carried by the following vote:**

**Ayes:**      5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

---

Teel Declaration
Page 183

BOARD OF SUPERVISORS                Action Summary                December 16, 2025

## County Executive Officer's Report

**25-00001**

County Executive Officer's Report: Receive a report from the County Executive Officer (CEO) on County programs, County staff updates and achievements, staff recognitions, updates on major projects, updates on state and federal legislation, and upcoming events of interest to the Board and the public. There will be no Board discussion except to ask questions or refer matters to staff; and no action will be taken unless listed on a subsequent agenda.

Swearing-In for New County Fire Chief Garrett Huff

**County Executive Officer, Mona Miyasato announced the following:**

**Chief Deputy District Attorney Jennifer Karapetian was named Attorney of the Year by Santa Barbara Women Lawyers, recognizing her exceptional contributions to the legal profession and the community; and**

**The County held a swearing-in ceremony for the new Fire Chief, formally welcoming Chief Garrett Huff into his new role following Chief Mark Hartwig's retirement.**

Teel Declaration
Page 184

BOARD OF SUPERVISORS               Action Summary                    December 16, 2025

## Administrative Agenda

*All matters listed hereunder constitute a consent agenda, and will be acted upon by a single roll call vote of the Board.  Matters listed on the Administrative Agenda will be read only on the request of a member of the Board or the public, in which event the matter shall be removed from the Administrative Agenda and considered as a separate item.*

## Resolutions to be Presented

**A-1)**    SUPERVISOR HARTMANN                                    **25-01074**

Adopt a Resolution of Commendation honoring Sheriff's Deputy, Special Duty Vincent Ray Buck upon his retirement from the Sheriff's Department after over 22 years of faithful and dedicated service to the citizens of Santa Barbara, Tulare, Lassen and San Luis Obispo Counties.

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be adopted.**

**RESOLUTION NO. 25-265**

**The motion carried by the following vote:**

**Ayes:**        5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

**A 2)**    SUPERVISOR NELSON                                       **25-00965**

Adopt a Resolution of Commendation honoring Angelica Muñoz upon her retirement from the Probation Department after over 22 years of faithful and distinguished service to the citizens of Santa Barbara County.

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be adopted.**

**RESOLUTION NO. 25-266**

**The motion carried by the following vote:**

**Ayes:**        5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

**Teel Declaration
Page 185**

**BOARD OF SUPERVISORS**          Action Summary          December 16, 2025

---

**A-3)**      <u>SUPERVISOR NELSON</u>                                           **25-01075**

Adopt a Resolution of Commendation honoring Martin Jay Wilder upon his retirement from the Public Works Department after 37 years of faithful and dedicated service to the citizens of Santa Barbara County.

> **A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be adopted.**
>
> **RESOLUTION NO. 25 267**
>
> **The motion carried by the following vote:**

  **Ayes:**  5 - Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

## Honorary Resolutions

**A-4)**      <u>SUPERVISOR CAPPS</u>                                            **25-01091**

Adopt a Resolution of Commendation honoring Deborah Hartman upon her retirement from the Social Services Department after over 28 years of faithful and dedicated service to the citizens of Santa Barbara County.

> **A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be adopted.**
>
> **RESOLUTION NO. 25-268**
>
> **The motion carried by the following vote:**

  **Ayes:**  5 - Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

---

**Teel Declaration
Page 186**

## Administrative Items

**A-5)**        <u>BEHAVIORAL WELLNESS DEPARTMENT</u>        **25-01066**

Consider recommendations regarding First Amendments to the Behavioral Health Student Services Act Grant Agreements with the Behavioral Health Services Oversight and Accountability Commission for Round 4, Category 3: Sustainability and Round 4, Category 4: Other Priorities grant funds for Fiscal Years 2024-2028, as follows: (4/5 Vote Required)

a) Approve, ratify, and authorize the Director of the Department of Behavioral Wellness or designee to execute a First Amendment (No. 24MHSOAC018.A1) to the Behavioral Health Student Services Act, Round 4, Category 3: Sustainability Grant Agreement with the Behavioral Health Services Oversight and Accountability Commission to extend the term end date to March 31, 2028; modify reporting requirements; and reallocate grant year budget amounts with no change to the total maximum grant award amount of $449,650.00;

b) Approve, ratify, and authorize the Director of the Department of Behavioral Wellness or designee to execute a First Amendment (No. 24MHSOAC057.A1) to the Behavioral Health Student Services Act, Round 4, Category 4: Other Priorities Grant Agreement (No.24MHSOAC057) with the Behavioral Health Services Oversight and Accountability Commission to extend the term end date to March 31, 2028, and modify reporting requirements with no change to the total maximum grant award amount of $300,000.00; and

c) Determine that the above-recommended actions are not a project that is subject to environmental review under the California Environmental Quality Act (CEQA), pursuant to CEQA Guidelines section 15378(b)(4), finding that the actions are governmental funding mechanisms and/or fiscal activities that will not result in direct or indirect physical changes in the environment.

> **A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**
>
> **a) and b) Approved, ratified and authorized; and**
>
> **c) Approved.**
>
> **The motion carried by the following vote:**

    **Ayes:**    5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

**Teel Declaration**
**Page 187**

Action Summary                          December 16, 2025

A-6)        <u>BEHAVIORAL WELLNESS DEPARTMENT</u>                          **<u>25-01076</u>**

Consider recommendations regarding a First Amended and Restated Business Associate Agreement (BAA) under the Health Insurance Portability and Accountability Act of 1996 with California Mental Health Services Authority (CalMHSA) (No. 1327-BAA-2022-SB), as follows:

a) Approve, ratify, and authorize the Chair to execute a First Amended and Restated BAA under the Health Insurance Portability and Accountability Act of 1996 (No. 1327-BAA-2022-SB [Rev. 10.28.25] First Amended and Restated) with CalMHSA to meet current State and federal requirements; and

b) Determine that the above-recommended action is not a project that is subject to environmental review under the California Environmental Quality Act (CEQA), pursuant to CEQA Guidelines section 15378(b)(5), finding that the action consists of an administrative activity of the government that will not result in direct or indirect physical changes in the environment.

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**

**a) Approved, ratified and authorized; Chair to execute; and**

**b) Approved.**

**The motion carried by the following vote:**

**Ayes:**        5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

---

**Teel Declaration
Page 188**

BOARD OF SUPERVISORS                    Action Summary                    December 16, 2025

**A-7)**      <u>BEHAVIORAL WELLNESS DEPARTMENT</u>                               **25-01079**

Consider recommendations regarding a First Amendment to the Services Agreement with the Santa Barbara County Education Office (SBCEO) for Mental Health Services for School-Based Programs for Fiscal Years 2022-2025, as follows:

a) Approve, ratify, and authorize the Chair to execute a First Amendment to the Agreement for Services of Independent Contractor with SBCEO (Board Contract No. 22-194) to update certain standard terms and conditions and program budget requirements to comply with state requirements or business needs; extend the term of the Agreement to end on March 31, 2028; reduce the number of Navigators to 4.50 Full-Time Equivalent (FTE) within the Behavioral Mental Health Services Oversight and Accountability Commission (formerly Mental Health Services Oversight and Accountability Commission (MHSOAC)) Behavioral Health Student Services Act (formerly Mental Health Student Services Act (MHSSA)) Program, terminate the now Behavioral Health Services Oversight and Accountability Commission (BHSOAC) Behavioral Health Student Services Act (BHSSA) Program, effective December 31, 2026; add the BHSOAC BHSSA Round 4, Categories 3 and 4 Program, effective March 28, 2025; update Standard Indemnification and Insurance Provisions; add Addendum BHSOAC Grant Agreements No. 24MHSOAC018, No. 24MHSOAC018.A1, No. 24MHSOAC057 and No. MHSOAC057.A1; and increase the contract amount by $390,386.00, for a revised total maximum contract amount not to exceed $1,983,918.00, for the period of January 1, 2023, through March 31, 2028, contingent upon the Board's approval of BHSOAC Grant Agreement Amendments No. 24MHSOAC018.A1 and No. 24MHSOAC057.A1 at the December 16, 2025 Board hearing;

b) Delegate authority to the Director of the Department of Behavioral Wellness or designee to make changes to staffing requirements per Exhibits A-1 and A-2; all without altering the total maximum contract amount and without requiring the Board of Supervisors' ability to rescind the delegated authority at any time; and

c) Determine that the above-recommended actions are not a project that is subject to environmental review under the California Environmental Quality Act (CEQA), pursuant to CEQA Guidelines section 15378(b)(4), finding that the actions are governmental funding mechanisms and/or fiscal activities that will not result in direct or indirect physical changes in the environment.

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**

**a) Approved, ratified and authorized; Chair to execute;**

**b) Delegated; and**

**c) Approved.**

**The motion carried by the following vote:**

**Ayes:**        5 -      Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

**Teel Declaration**
**Page 189**

BOARD OF SUPERVISORS                    Action Summary                    December 16, 2025

**A-8)**   BEHAVIORAL WELLNESS DEPARTMENT                    **25-01081**

Consider recommendations regarding a Memorandum of Understanding (MOU) between the Housing Authority of the City of Santa Barbara (HACSB) and the Department of Behavioral Wellness (BWell) for In-Kind Match Services for Permanent Supportive Housing Program Services at 3055 De La Vina Street for Fiscal Years (FYs) 2025-2026 and 2026-2027, Second District, as follows:

a) Approve and authorize the Director of BWell, or designee, to execute a MOU with the HACSB for the provision of permanent supportive housing program services at 3055 De La Vina Street in Santa Barbara, in return BWell will provide an in-kind match through services provided by its Housing Assistance and Retention Team (HART) for the period of December 1, 2025 through April 30, 2027;

b) Delegate to the Director of BWell or designee the authority to extend the term of the Agreement upon written mutual agreement with the HACSB, which is subject to funding availability, without requiring the Board of Supervisors' approval of an amendment of the Agreement, subject to the Board of Supervisors' ability to rescind this delegated authority at any time; and

c) Determine that the above-recommended actions are not a project that is subject to environmental review under the California Environmental Quality Act (CEQA), pursuant to CEQA Guidelines section 15378(b)(4) and (b)(5), finding that the actions are governmental funding mechanisms and/or administrative or fiscal activities that will not result in direct or indirect physical changes in the environment.

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**

**a) Approved and authorized;**

**b) Delegated; and**

**c) Approved.**

**The motion carried by the following vote:**

**Ayes:**      5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

---

**Teel Declaration
Page 190**

BOARD OF SUPERVISORS                    Action Summary                    December 16, 2025

**A-9)**        BEHAVIORAL WELLNESS DEPARTMENT                                    **25-01094**

Consider recommendations regarding the California Mental Health Services Authority (CalMHSA) Healthcare Effectiveness Data Information Sets (HEDIS) Performance Measurement Program Participation Agreement (PA) for Fiscal Years 2025-2029, as follows: (4/5 Vote Required)

a) Approve, ratify, and authorize the Chair to execute the multi-year PA (11635-SB-QM-25_26), with CalMHSA for the HEDIS Performance Measurement Program for Measurement Year (MY) 2025 and Reporting Year (RY 2026), for a maximum contract amount of $60,750.00, from January 1, 2025, through December 31, 2029;

b) Approve the Budget Revision Request No. 0010898, increasing appropriations of $30,375.00, in the Behavioral Wellness Department, Mental Health Services Fund, for services and supplies by an increase in Cost Reimbursement Federal billing and State sources;

c) Delegate to the Director of the Department of Behavioral Wellness or designee the authority to adjust Program timeliness and technical requirements per Exhibit A of the Agreement and approve additional analysis of HEDIS data per Exhibit B, all without altering the terms of the Agreement or maximum agreement amount and without requiring the Board's approval of an amendment of the Agreement, subject to the Board's ability to rescind this delegated authority at any time; and

d) Determine that the above actions are a government funding mechanism or other government fiscal activity that does not involve any commitment to any specific project that may result in a potentially significant physical impact on the environment to and is therefore not a project under the California Environmental Quality Act (CEQA) pursuant to section 15378(b)(4) of the CEQA Guidelines.

> **A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**
>
> **a) Approved, ratified and authorized; Chair to execute;**
>
> **b) Approved;**
>
> **c) Delegated; and**
>
> **d) Approved.**
>
> **The motion carried by the following vote:**

**Ayes:**        5 -     Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

**Teel Declaration
Page 191**

BOARD OF SUPERVISORS                          Action Summary                          December 16, 2025

A-10)       BEHAVIORAL WELLNESS DEPARTMENT                                        **25-01083**

Consider recommendations regarding a Third Amendment to the Services Agreement with the Council on Alcoholism and Drug Abuse (CADA) for Alcohol and Drug Program and Mental Health Services for Fiscal Years 2023-2027, as follows:

a) Approve, ratify, and authorize the Chair to execute a Third Amendment to the Agreement for Services of Independent Contractor with CADA (a local vendor) (Board Contract No. 23-091) to terminate perinatal services from the Early Intervention Services, Outpatient Treatment Services, and Intensive Outpatient Treatment Services program as of October 29, 2025; to update the Designated Representative and Notices Contact for CADA; modify certain standard terms and conditions, certain general Alcohol and Drug Program programmatic provisions, Contingency Management Program provisions relating to recovery principles, certain general Alcohol and Drug Program financial provisions, and service codes; and reduce the contract amount by $139,400.00 for a revised, total maximum contract amount of $15,179,350.00 with no change to the contract term of July 1, 2023, through June 30, 2027:

i) Approve, ratify, and authorize the Director of the Department of Behavioral Wellness' issuance of a Notice of Intent to Partially Terminate the Agreement;

ii) Approve and authorize the Director of Behavioral Wellness' issuance of a Notice of Partial Termination of the Agreement; and

iii) Approve, ratify, and authorize the Director of Behavioral Wellness or designee to take actions necessary for the partial wind-down of the Agreement, subject to the Board's ability to rescind this delegated authority at any time; and

b) Determine that the above-recommended actions are not a project that is subject to environmental review under the California Environmental Quality Act (CEQA), pursuant to CEQA Guidelines sections 15378(b)(4), finding that the actions are governmental funding mechanisms and/or fiscal activities that will not result in direct or indirect physical changes in the environment.

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**

**a) i) through iii) Approved, ratified and authorized; Chair to execute; and**

**b) Approved.**

**The motion carried by the following vote:**

**Ayes:**       5 -     Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

---

*County of Santa Barbara*                          *Page 10*

**Teel Declaration
Page 192**

**A-11)**   BEHAVIORAL WELLNESS DEPARTMENT, PUBLIC DEFENDER'S OFFICE   **25-01065**

Consider recommendations regarding the Grant Agreement with the California Board of State and Community Corrections for Proposition 47 Cohort 5 Safe Neighborhoods and Schools Act Grant for Justice and Healing Collaborative with Behavioral Wellness and Public Defender for Fiscal Years 2025-2029, as follows: (4/5 Vote Required)

a) Approve, ratify, and authorize the Director of the Department of Behavioral Wellness, or designated representative, to execute the California Board of State and Community Correction Standard Agreement No. 1416-25 for the Proposition 47 Cohort 5 Safe Neighborhoods and Schools Act Program to provide pre-trial services to individuals with behavioral health challenges for a total grant maximum amount of $8,000,000.00 for the term of October 1, 2025 through June 30, 2029:

i) Approve and authorize the Director of the Department of Behavioral Wellness or designee to execute any amendments to Board of State and Community Corrections Standard Agreement No. 1416-25 and any and all other documents required or deemed necessary to secure these funds and participate in the Proposition 47 Cohort 5 Program without having to return to the Board for approval, subject to the Board's authority to rescind this delegated authority at any time; and

ii) Direct the Director of the Department of Behavioral Wellness or designee to obtain concurrence from Risk Management, Auditor-Controller, and County Counsel before exercising the delegated authority for the above recommended action;

b) Adopt an amendment to the Salary Resolution (No. 07-207), effective December 22, 2025, to add one (1.0) full-time equivalent [FTE]) Deputy Public Defender III and one (1.0) FTE Alcohol and Drug Mental Health Services (ADMHS) Case Worker to the Public Defender's Office;

c) Approve Budget Revision Request No. 0010896, to increase appropriations of $1,320,725.00 in Behavioral Wellness Mental Health Service Act Fund for Salaries and Benefits ($185,525.00), Services and Supplies ($974,370.00), and other Financing Uses ($160,830.00) funded by unanticipated revenue Intergovernmental Rev-State ($1,320,725.00); increase appropriations of $160,430.00 in Public Defender General Funds for Salaries and Benefits ($153,694.00), Services and Supplies ($6,736.00) funded by unanticipated revenue from Intergovernmental Rev-State ($160,430.00); increase appropriations of $400.00 in Probation General Funds for Services and Supplies ($400.00) funded by unanticipated revenue from Intergovernmental Rev-State ($400.00); and

d) Determine that the above-recommended actions are not a "Project" that is subject to environmental review under the California Environmental Quality Act (CEQA), pursuant to CEQA Guidelines section 15378(b)(4), finding that these actions are a governmental funding mechanism and/or fiscal activity that will not result in direct or indirect physical changes in the environment.

**Teel Declaration
Page 193**

**BOARD OF SUPERVISORS**                    Action Summary                    December 16, 2025

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**

**a) i) and ii) Approved, ratified and authorized;**

**b) Adopted; and**

**RESOLUTION NO. 25-269**

**c) and d) Approved.**

**The motion carried by the following vote:**

**Ayes:**      5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

**A-12)**    CLERK-RECORDER-ASSESSOR-ELECTIONS DEPARTMENT                    **25-01064**

Consider recommendations regarding Certification of Election Results of the Statewide Special Election, held on November 4, 2025, as follows:

a) Accept and file the Certified Statement of the Results of the Official Canvass and Official Election Summary for the Statewide Special Election held on November 4, 2025, as required by law; and

b) Determine that the above action is not a project under the California Environmental Quality Act (CEQA) pursuant to CEQA Guidelines Section 15378(b)(5), because it consists of organizational or administrative activities of governments that will not result in direct or indirect physical changes in the environment.

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**

**a) Accepted and filed; and**

**b) Approved.**

**The motion carried by the following vote:**

**Ayes:**      5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

**Teel Declaration
Page 194**

**A-13)**     <u>COMMUNITY SERVICES DEPARTMENT</u>                     **<u>25-01023</u>**

Consider recommendations regarding the Goleta Beach Parking Lot Pavement Rehabilitation Phase 2, Project No. PRJ-001053, Award of Construction Contract, Second District, as follows:

a) Approve the plans and specifications on file in the Community Services Department for the Goleta Beach Parking Lot Pavement Rehabilitation Phase 2;

b) Award, approve and authorize the Chair to execute, a contract in the amount of $1,164,425.70 to the lowest responsible bidder, PaveWest LLC, for the Project, subject to the provisions of the documents and certifications as set forth in the plans and specifications applicable to the Project and as required by California law;

c) Authorize the Director of Community Services to order changes or additions in the work being performed for the Project via change orders in the amount not to exceed $70,721.00 as authorized under California Public Contract Code Section 20142; and

d) Determine that pursuant to the California Environmental Quality Act (CEQA) Guidelines Section 15162, no substantial changes are proposed to the project, and no new information of substantial importance has come to light regarding environmental effects of the project, and therefore these actions are within the scope of the project covered by the Notice of Exemption approved by the Board of Supervisors for this project on October 1, 2024, and no new environmental document is required.

**A motion was made by Supervisor Capps, seconded by Supervisor Nelson, that this matter be acted on as follows:**

**a) Approved;**

**b) Awarded, approved and authorized; Chair to execute;**

**c) Authorized; and**

**d) Approved.**

**The motion carried by the following vote:**

**Ayes:**     5 -   Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

**Teel Declaration**
**Page 195**

**BOARD OF SUPERVISORS**                    Action Summary                    December 16, 2025

A-14)    <u>COMMUNITY SERVICES DEPARTMENT</u>                                **25-01073**

Consider recommendations regarding Fiscal Year 2025-2026 Countywide Library System Agreement, as follows: (4/5 Vote Required)

a) Approve, ratify and authorize the Chair of the Board of Supervisors to execute a one-year Agreement for Operation of a Countywide Library System, by and between the County and the Cities of Carpinteria, Santa Barbara, Goleta, Lompoc and Santa Maria for the period of July 1, 2025 through June 30, 2026, in the total amount not to exceed $5,147,814.00;

b) Approve Budget Revision Request No. 0010921 to establish appropriations of $130,000.00 for infrastructure improvements for the Goleta Valley Library funded by AB1600 Goleta Library Impact Fees; and

c) Determine that the above recommended actions are not the approval of a project that is subject to environmental review under the California Environmental Quality Act (CEQA) pursuant to CEQA Guidelines Section 15378(b)(5), finding that the action involves government organizational or administrative activities which do not involve any commitment to any specific project which may result in a potentially significant physical impact on the environment.

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**

**a) Approved, ratified and authorized; Chair to execute;**

**b) and c) Approved.**

**The motion carried by the following vote:**

**Ayes:**    5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

---

*County of Santa Barbara*                    *Page 14*

**Teel Declaration
Page 196**

**BOARD OF SUPERVISORS**                    Action Summary                    December 16, 2025

A-15)   **COMMUNITY SERVICES DEPARTMENT**                    **25-01077**

Consider recommendations regarding the approval of Subrecipient Agreements with Good Samaritan Shelter (GSS) for the Ongoing Operations of the Hope Village and Hedges House of Hope Interim Housing facilities, as follows:

a) Approve and authorize the Chair of the Board of Supervisors to execute a Subrecipient Agreement with GSS for the distribution of Housing and Homelessness Incentive Program, Round 3 (HHIP-3) funding in the amount of $825,000.00 and Homeless Housing Assistance and Prevention Program, Round 5 (HHAP-5) funding in the amount of $825,000.00, for a total of $1,650,000.00 for Operations and Services of Hope Village Interim Housing Facility in accordance with the five year operational support plan;

b) Approve and authorize the Chair of the Board of Supervisors to execute a Subrecipient Agreement with GSS for the distribution of HHAP-5 funding in the amount of $1,229,400.00 for Operations and Services of Hedges House of Hope Interim Housing Facility in Isla Vista in accordance with the five-year operational support plan; and

c) Determine that the above-recommended actions are exempt from the California Environmental Quality Act (CEQA) pursuant to CEQA Guidelines Section 15269(c); and finding that the actions consist of specific actions necessary to prevent or mitigate an emergency; Government Code Section 8698.4, finding that the County has declared a shelter crisis and the action includes leasing of County-owned land for a homeless shelter and financial assistance; and direct staff to file a Notice of Exemption on these bases.

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**

**a) and b) Approved and authorized; Chair to execute; and**

**c) Approved.**

**The motion carried by the following vote:**

**Ayes:**         5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

---

**Teel Declaration
Page 197**

**BOARD OF SUPERVISORS**                    Action Summary                    December 16, 2025

---

**A-16)**          COMMUNITY SERVICES DEPARTMENT                              **25-01089**

Consider recommendations regarding an Agreement to Provide Affordable Housing and Rental Restrictive Covenant for SBSR, LLC Apartments 22DVP-00000-00004, Second District, as follows:

a) Approve the execution by the Board Chair of an Agreement to Provide Affordable Housing and Rental Restrictive Covenant and Preemptive Right with SBSR, LLC; and

b) Determine that the above recommended action is exempt from the California Environmental Quality Act (CEQA) pursuant to CEQA Guidelines Section 21159.25, Exemption: Residential or Mixed-Use Housing Projects.

> **A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**
>
> **a) Approved; Chair to execute; and**
>
> **b) Approved.**
>
> **The motion carried by the following vote:**

Ayes:          5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

---

*County of Santa Barbara*                    *Page 16*

**BOARD OF SUPERVISORS**          Action Summary                    December 16, 2025

A-17)     <u>COMMUNITY SERVICES DEPARTMENT</u>                    **25-01090**

Consider recommendations regarding approval of Sub-Recipient Agreements for the Housing and Disability Advocacy Program (HDAP), as follows:

a) Approve and authorize the Chair of the Board of Supervisors to execute a Subrecipient Agreement with Good Samaritan Shelter (GSS) for the distribution of State of California HDAP funds for outreach, case management and housing assistance, for the period of January 1, 2026, through June 30, 2026, in an amount not to exceed $121,356.00;

b) Approve and authorize the Chair of the Board of Supervisors to execute a Subrecipient Agreement with Legal Aid Foundation of Santa Barbara County (Legal Aid) for disability benefits advocacy and legal services for the period of January 1, 2026, through June 30, 2026, in an amount not to exceed $95,000.00; and

c) Determine that the above recommended actions are exempt from the California Environmental Quality Act (CEQA) per CEQA Guidelines Section 15378(b)(4) since the recommended actions are government fiscal activities which do not involve commitment to any specific project which may result in a potentially significant physical impact on the environment.

> **A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**
>
> **a) and b) Approved and authorized; Chair to execute; and**
>
> **c) Approved.**
>
> **The motion carried by the following vote:**

**Ayes:**     5 -   Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

**Teel Declaration
Page 199**

BOARD OF SUPERVISORS                    Action Summary                    December 16, 2025

A-18)    COMMUNITY SERVICES DEPARTMENT                                    25-01092

Consider recommendations regarding a County HOME Loan to Hollister Lofts L.P., for a Permanent Supportive Housing Development Project, Second District, as follows:

a) Approve and authorize the Chair of the Board of Supervisors to execute a County HOME Funding Loan Agreement; and Regulatory Agreement; setting forth terms, conditions and requirements for Hollister Lofts, L.P. (Owner), acceptance of the County Loan;

b) Approve and authorize the Chair of the Board of Supervisors to execute a Subordination Agreement, wherein the County agrees to Subordinate its HOME loan to a Construction Loan provided by Banc of California (Construction Loan);

c) Approve and authorize the Chair of the Board of Supervisors to execute a Subordination Agreement, wherein the County agrees to subordinate its County Land Loan Agreement (Land Loan), to the Construction Loan; and

d) Determine that the approval of this Item is not subject to environmental review under the California Environmental Quality Act (CEQA) pursuant to California Government Code Section 65913.4 as it being developed "by right" subject to AB2162 and provides affordable permanent supportive rental housing.

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**

**a) through c) Approved and authorized; Chair to execute; and**

**d) Approved.**

**The motion carried by the following vote:**

Ayes:        5 -   Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

---

*County of Santa Barbara*                    *Page 18*

**Teel Declaration
Page 200**

BOARD OF SUPERVISORS                    Action Summary                    December 16, 2025

A-19)    COMMUNITY SERVICES DEPARTMENT                              25-01100

Consider recommendations regarding an Agreement to Provide Affordable Housing and Rental Restrictive Covenant for San Marcos Ranch Development, 24ZCI-00083, Second District, as follows:

a) Approve and authorize the Chair of the Board of Supervisors to execute an Agreement to Provide Affordable Housing and Rental Restrictive Covenant and Preemptive Right with San Marcos Holdings, LLC, SWBradford LLC, Ryan W. Hale, Trustee of the Bradford 2023 Irrevocable Trust dated April 18, 2023, and Natalie Penn Hodges, as Trustee of the Brett Edward Hodges Irrevocable Trust dated January 30, 2023 (Market Rate Parcel Owners) and San Marcos Ranch Associates, LP (Affordable Parcel Owner) for the San Marcos Ranch Development (Covenant), and direct its recordation;

b) Authorize the Director of the County's Community Services Department to approve future transfers of interest in the subject property, and to approve and execute amendments to the Covenant with such transferees; and

c) Determine that the proposed actions are exempt from the California Environmental Quality Act (CEQA) guidelines, pursuant to Santa Barbara County Code Section 35.39.010.C, finding that the proposed project has been designed to comply with the applicable development code requirements for a "use by right" development, as such the required entitlement is a zoning clearance and the County shall not require an Environmental Impact Report under CEQA.

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**

**a) Approved and authorized; Chair to execute;**

**b) Authorized; and**

**c) Approved.**

**The motion carried by the following vote:**

Ayes:        5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

---

*County of Santa Barbara*                    *Page 19*

**Teel Declaration**
**Page 201**

**BOARD OF SUPERVISORS**                    **Action Summary**                    December 16, 2025

**A-20)**    COUNTY EXECUTIVE OFFICE                                        **25-01088**

Approve Budget Revision Request No. 0010919 (Majority Vote Required); and Budget Revision Request Nos. 0010818; 001089; 0010908; 0010913; 0010916; 0010922; 0010923; 0010925; and 0010929 (4/5 Vote Required).

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be approved. The motion carried by the following vote:**

**Ayes:**    5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

**A-21)**    COUNTY HEALTH DEPARTMENT                                    **25-01084**

Consider recommendations regarding approval of the Emergency Medical Care Committee (EMCC) adopted Bylaws and Appointments, as follows:

a) Approve Bylaws for the EMCC adopted by unanimous consent of EMCC members in attendance on July 16, 2025;

b) Appoint two new committee members to the EMCC as follows:

i) Garrett Huff, County Fire District representative, Santa Barbara County Fire District; and

ii) Dave Schierman, private ambulance provider representative, American Medical Response;

c) Affirm the appointment of Ryland McCracken, Montecito Fire District, on November 5, 2024, as the Public Agency Paramedic appointment by the County Health Director to correct a clerical error on the listed public agency; and

d) Determine the above actions do not constitute a "Project" subject to environmental review under the California Environmental Quality Act (CEQA) pursuant to CEQA Guidelines section 15378(b)(5), as the actions are organizational or administrative activities that will not result in direct or indirect physical changes to the environment.

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**

**a) Approved;**

**b) i)  and ii) Appointed;**

**c) Affirmed; and**

**d) Approved.**

**The motion carried by the following vote:**

**Ayes:**    5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

---

**Teel Declaration**
**Page 202**

BOARD OF SUPERVISORS                    Action Summary                    December 16, 2025

A-22)    <u>COUNTY HEALTH DEPARTMENT</u>                                    **25-01085**

Consider recommendations regarding the Acceptance of $25,000.00 Grant Award from Maddie's Fund, as follows: (4/5 Vote Required)

a) Approve, ratify, and authorize the Director of the County Health Department, or designee, to accept a Grant Award received by the Santa Barbara County Animal Services in the amount of $25,000.00 from Maddie's Fund to fund veterinary care;

b) Approve and authorize the Director of the County Health Department, or designee, to make any certifications and assurances that may be required by the Grant Agreement;

c) Approve Budget Revision Request No. 0010892 in the amount of $25,000.00 for unanticipated revenue for use in the Animal Services Fiscal Year 2025-2026 budget; and

d) Determine that the recommended actions are not a "Project" within the meaning of the California Environmental Quality Act (CEQA) and are exempt per CEQA Guidelines section 15378(b)(5), because the recommended actions consist of organizational or administrative activities of governments that will not result in direct or indirect physical changes to the environment.

**Lee Heller addressed the Board**

**A motion was made by Supervisor Capps, seconded by Supervisor Nelson, that this matter be acted on as follows:**

**a) Approved, ratified and authorized;**

**b) Approved and authorized; and**

**c) and d) Approved.**

**The motion carried by the following vote:**

Ayes:        5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

---

*County of Santa Barbara*                    *Page 21*

**Teel Declaration**
**Page 203**

**A-23)**     <u>COUNTY HEALTH DEPARTMENT</u>        **25-01096**

Consider recommendations regarding Animal Shelter Pet Food Agreements with Mars and Central Pet Distribution, as follows:

a) Authorize the County Health Director, or designee, to enter into an Agreement with Mars Petcare US, Inc., for exclusive purchasing of Mars and/or its Affiliates' pet food products to feed pets in shelter, and to provide certain data to Mars and its Affiliates in compliance with all applicable laws;

b) Authorize the County Health Director, or designee, to (1) submit a wholesale account application to Central Pet Distribution (Vendor Number 227694) in the form of the Central Pet Distribution Mars Shelter Program New Account Application, (2) enter in a purchasing contract with Central Pet Distribution in accordance with County purchasing guidelines, and (3) to submit orders under the Central Pet Agreement, in the form of the Central Pet Mars Shelter Food Order Form, an aggregate amount not to exceed $60,000.00 annually; and

c) Determine that the recommended actions are not a "Project" within the meaning of the California Environmental Quality Act (CEQA) and are exempt per CEQA Guidelines section 15378(b)(5), because the recommended actions consist of organizational or administrative activities of governments that will not result in direct or indirect physical changes to the environment.

**Lee Heller addressed the Board.**

**A motion was made by Supervisor Capps, seconded by Supervisor Nelson, that this matter be acted on as follows:**

**a) and b) Authorized; and**

**c) Approved.**

**The motion carried by the following vote:**

**Ayes:**     5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

**Teel Declaration
Page 204**

BOARD OF SUPERVISORS                    Action Summary                    December 16, 2025

**A-24)**        GENERAL SERVICES DEPARTMENT                                    **25-01059**

Consider recommendations regarding a Second Amendment to the Calle Real Water Loop Phase 2 Construction Contract, County Project 25014 (WD PRJ-000861), as follows: (4/5 Vote Required)

a) Approve and authorize the Chair of the Board of Supervisors to execute a Second Amendment to Board Contract No. 24134 with Tierra Contracting, Inc. for the construction of the Calle Real Water Loop Phase 2 Project (Project) extending the contract Term from December 31, 2025 to March 31, 2026; and

b) Determine that the Project continues to be exempt from the California Environmental Quality Act (CEQA) pursuant to Section 15302 of the State Guidelines for the Implementation of CEQA which consists of replacement or reconstruction of existing structures and facilities where the new structure will be located on the same site as the structure replaced and have substantially the same purpose and capacity as the structure replaced, and that a Notice of Exemption on this basis was approved by the Board on August 27, 2024 and filed.

> **A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**
>
> **a) Approved and authorized; Chair to execute; and**
>
> **b) Approved.**
>
> **The motion carried by the following vote:**

Ayes:        5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

**Teel Declaration**
**Page 205**

BOARD OF SUPERVISORS                    Action Summary                    December 16, 2025

A-25)      GENERAL SERVICES DEPARTMENT                                          25-01060

Consider recommendations regarding an Amendment to the Professional Services Agreement with Ravatt Albrecht and Associates for expanded design and construction support for the Santa Maria Probation Juvenile Justice Center Units 1/2/3 Remodel Project No. PRJ-000139 (21055), Fourth District, as follows: (4/5 Vote Required)

a) Approve, ratify and authorize the Chair of the Board to execute an updated Professional Services Agreement with Ravatt Albrecht Architects in a base contract not to exceed amount of $297,450.00, which includes $200,000.00 under Contract No. CN3119, as amended under CO9627, CO10936, CO11211, and CO12421, and, as of the effective date of the Agreement, amends, restates, and supersedes Contract CN3119, to provide additional design services to include requested design changes in the security scope by Probation, and construction administration services for the design and bid documents for the Units 1/2/3 housing units remodel Project No. PRJ-000139(21055);

b) Approve and authorize the Director of General Services, or his Assistant Director or Capital Projects Division Manager designee, to approve supplemental service orders in a maximum aggregate amount not to exceed $9,745.00 for a maximum aggregate contract amount not to exceed $307,195.00; and

c) Find that the recommended actions are not a project under the California Environmental Quality Act (CEQA) pursuant to sections 15378(b)(4) and 15378(b)(5) of the CEQA Guidelines because they consist of administrative and fiscal activities of government that will not result in indirect physical changes in the environment.

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**

**a) Approved, ratified and authorized; Chair to execute;**

**b) Approved and authorized; and**

**c) Approved.**

**The motion carried by the following vote:**

Ayes:          5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

**Teel Declaration
Page 206**

BOARD OF SUPERVISORS                    Action Summary                    December 16, 2025

A-26)     GENERAL SERVICES DEPARTMENT                                   **25-01082**

Consider recommendations regarding the termination of a contract with UltraSystems Environmental Incorporated for Orcutt Library Environmental Services, Project No. PRJ-000233 (20056); Fourth District, as follows: (4/5 Vote Required)

a) Approve and authorize the Director of General Services to execute a 30-day Notice of Termination of Agreement dated December 16, 2025, terminating for convenience the Professional Services Agreement with UltraSystems Environmental Incorporated for Environmental Consulting services for the new Orcutt Library Project (Agreement), County Project No. PRJ-000233 (20056);

b) Delegate authority to the Director of the General Services, or his designee, to take actions necessary for the close-out of the Agreement, subject to the Board's ability to rescind this delegated authority at any time; and

c) Determine the above actions are not a project under the California Environmental Quality Act guidelines pursuant to Section 15378(b)(5) because it consists of organizational or administrative activities of governments that will not result in direct or indirect physical changes in the environment.

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**

**a) Approved and authorized;**

**b) Delegated; and**

**c) Approved.**

**The motion carried by the following vote:**

Ayes:          5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

---

*County of Santa Barbara*                    *Page 25*

**Teel Declaration
Page 207**

BOARD OF SUPERVISORS | Action Summary | December 16, 2025

**A-27)**    GENERAL SERVICES DEPARTMENT    **25-01078**

Consider recommendations regarding the Ground Lease Agreement with Santa Barbara Volleyball Club (SBVC), 4550 Hollister Avenue, Goleta, CA 93110; APN No. 061-040-050 (portion), Second District, as follows:

a) Approve and authorize the Chair to execute the fifteen (15) year Ground Lease Agreement between the County and SBVC, a 501(c)(3), for the development of an indoor volleyball facility with restrooms, storage, reception, and 18 parking spaces on a portion County-owned property at 4550 Hollister Avenue, Goleta, CA 93110 (APN 061-040-050);

b) Find, that pursuant to Section 12A-10.3 of the Santa Barbara County Code, that the County-owned property at 4550 Hollister Avenue, Goleta, CA 93110 is not and will not be needed for County purposes and the proposed activity meets the social needs of the population of the County;

c) Approve the waiver of rent in exchange for SBVC's demolition of existing structures and construction of a new youth sports facility to meet the social needs of the County at its sole cost, to be financed through philanthropic donations and fundraising; and

d) Find that the proposed action is an organizational or administrative activity that will not result in direct or indirect physical changes in the environment and is therefore not a project under California Environmental Quality Act Guidelines 14 CCR 15378(b)(5).

> **A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**
>
> **a) Approved and authorized; Chair to execute;**
>
> **b) through d) Approved.**
>
> **The motion carried by the following vote:**

**Ayes:**    5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

**Teel Declaration
Page 208**

**A-28)**    <u>GENERAL SERVICES DEPARTMENT</u>                                    **<u>25-01086</u>**

Consider recommendations regarding the Casa Nueva - Heating Ventilation and Air Conditioning (HVAC) and Building Energy Management System (BEMS) Upgrade, as follows:

a) Approve, and authorize the Chair of the Board to execute, a General Construction Contract (Agreement) with Mesa Energy System, Inc. in the base contract amount of $797,426.00, with a contingency amount not to exceed $52,371.00, for a maximum aggregate contract amount not to exceed $849,797.00, for construction and commissioning of new HVAC equipment with BEMS improvements at the Casa Nueva Building located at 260 N. San Antonio Rd. in Santa Barbara, CA 93110 (APN 059-140-029);

b) Authorize the Director of General Services, or his designee, to approve change orders to the Agreement in an aggregate amount not to exceed $52,371.00; and

c) Determine that the project is statutorily exempt from the provisions of California Environmental Quality Act pursuant to California Public Resources Code Sections 15301 (minor alterations to existing facilities) and 15303 (limited construction of small facilities) of Title 14 of the California Code of Regulations and direct staff to file a Notice of Exemption on that basis.

> **A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**
>
> **a) Approved and authorized; Chair to execute;**
>
> **b) Authorized; and**
>
> **c) Approved.**
>
> **The motion carried by the following vote:**

**Ayes:**    5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

**Teel Declaration**
**Page 209**

**A-29)** GENERAL SERVICES DEPARTMENT                                                **25-01099**

Consider recommendations regarding the First Amendment of the Professional Service Agreement for Community Workforce Coordinator Services, First and Third Districts, as follows: (4/5 Vote Required)

a) Approve and authorize the Chair to execute the First Amendment to a Professional Service Agreement, Board Contract No. 24270 (SCON-001812), with Vanir Construction Management, Inc.; correcting the base contract amount to $241,500.00 in section 2.02 of the Agreement to match the original cost proposal and Exhibit C of the same Agreement and increasing the maximum contract limit from $248,170.00 to $278,870.00, to continue to provide Community Workforce Agreement compliance services for General Services (Capital) and Public Works (Transportation and Resource Recovery) Projects;

b) Approve and authorize the Director of General Services, or his Assistant Director or Capital Division Manager designee, to approve Supplemental Service Orders in a maximum aggregate amount not to exceed $37,370.00, for a maximum aggregate contract amount not to exceed $278,870.00;

c) Authorize the Director of General Services to approve an extension to the Term of the Agreement as necessary up to an additional 18 months until June 31, 2028;

d) Approve Budget Revision Request No. 0010926 to establish appropriations of $30,700.00 for projects in the General Services Capital Outlay Fund for Fiscal Year (FY) 2025-2026; and

e) Continue to find that the recommended actions are not a project under the California Environmental Quality Act (CEQA) pursuant to sections 15378(b)(4) and 15378(b)(5) of the CEQA Guidelines, because they consist of administrative and fiscal activities of government that will not result in direct or indirect physical changes in the environment, and that a Notice of Exemption on these bases was approved and filed on May 6, 2025.

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**

**a) Approved and authorized; Chair to execute;**

**b) Approved and authorized;**

**c) Authorized; and**

**d) and e) Approved.**

**The motion carried by the following vote:**

**Ayes:** 5 - Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

**Teel Declaration
Page 210**

Action Summary

A-30)       GENERAL SERVICES DEPARTMENT                                **25-01080**

Consider recommendations regarding a Professional Service Agreement for Orcutt Library Architectural and Engineering Services, Project No. PRJ-000233 (20056)-Orcutt Library Facility, Fourth District, as follows:

a) Approve and authorize the Chair to execute a Professional Services Agreement (Agreement) with RRM Design Group (Consultant) for architectural and engineering services for Phase 1 and Phase 2 of the Orcutt Library Design (Project), County Project No. PRJ-000233 (20056) Fourth District, in the amount of Six-Hundred Ninety-Nine Thousand, Five-Hundred Fifty-Three Dollars and Zero Cents ($699,553.00);

b) Authorize the Director of General Services or his Capital Division Chief designee to approve Supplemental Service Orders in an aggregate amount not to exceed Sixty-Nine Thousand, Nine-Hundred Fifty-Five Dollars and Zero Cents ($69,955.00) to address changes or additions to the work being performed under the Professional Services Agreement with RRM Design Group;

c) Authorize the Director of General Services to: (i) amend the Agreement to extend the Term of the Agreement by up to six (6) additional months; and (ii) terminate the Agreement in accordance with the provisions of the Agreement; and

d) Find that the proposed action(s) are exempt from the California Environmental Quality Act (CEQA) pursuant to Section 15262 of the CEQA Guidelines, which exempts feasibility and planning studies for possible future actions that have not been approved, adopted, or funded by the agency.

> **A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**
>
> **a) Approved and authorized; Chair to execute;**
>
> **b) and c) Authorized; and**
>
> **d) Approved.**
>
> **The motion carried by the following vote:**

**Ayes:**      5 -   Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

**Teel Declaration**
**Page 211**

**A-31)**        <u>GENERAL SERVICES DEPARTMENT</u>                    **25-01017**

Consider recommendations regarding Haven Energy Battery Energy Storage System Memorandums of Understanding (MOUs), as follows:

a) Approve and authorize the Chair to execute an MOU with Haven Energy, Inc. to memorialize the initial steps toward the installation of a battery energy storage system at the Santa Barbara Social Services Building (234 Camino del Remedio, Santa Barbara, CA 93110);

b) Approve and authorize the Chair to execute an MOU with Haven Energy, Inc. to memorialize the initial steps toward the installation of a battery energy storage system at the Naomi Schwartz Building (130 E. Victoria St., Santa Barbara, CA 93101); and

c) Determine that the proposed actions are not a "project" as defined by the California Environmental Quality Act (CEQA) Guidelines Section 15378(b) (5), as it is an administrative activity that will not result in direct or indirect changes in the environment.

> **A motion was made by Supervisor Hartmann, seconded by Supervisor Capps, that this matter be acted on as follows:**
>
> **a) and b) Approved and authorized; Chair to execute; and**
>
> **c) Approved.**
>
> **The motion carried by the following vote:**

    **Ayes:**        4 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, and Supervisor Lavagnino

    **Noes:**        1 -    Supervisor Nelson

**Teel Declaration**
**Page 212**

**BOARD OF SUPERVISORS**                          Action Summary                          December 16, 2025

A-32)    GENERAL SERVICES DEPARTMENT, INFORMATION                          **25-01068**
TECHNOLOGY DEPARTMENT

Consider recommendations regarding the Lease Agreement with Rancho San Julian-Los Palos Colorados LLC. at White Hills, Santa Barbara County for Public Safety Radio Network, Third District, as follows:

a) Approve and authorize the Chair to execute the Ground Lease Agreement, between the County of Santa Barbara and Rancho San Julian-Los Palos Colorados- LLC, a California limited liability company, for a term of twenty years and six months until June 30, 2046, for a total leased area of approximately 3,250 square foot area of land; and

b) Determine that the recommended action of approving the Lease is exempt from the California Environmental Quality Act (CEQA) pursuant to Section 15303, New Construction or Conversion of Small Structures, and Section 15304, Minor Alterations to Land, and approve and direct staff to file and post the Notice of Exemption on that basis.

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**

**a) Approved and authorized; Chair to execute; and**

**b) Approved.**

**The motion carried by the following vote:**

Ayes:        5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

**Teel Declaration
Page 213**

**BOARD OF SUPERVISORS**                    Action Summary                    December 16, 2025

**A-33)**        HUMAN RESOURCES DEPARTMENT                                    **25-01105**

Consider recommendations regarding authorization to Execute Side Letter Agreements with SEIU Local 620 and SEIU Local 721 for Temporary Labor Cost-Saving Measures in the Department of Social Services (DSS), as follows:

a) Authorize the County Human Resources Director, or designee to execute Side Letter Agreements with SEIU Local 620 and SEIU Local 721 establishing a six-month temporary delay in merit eligibility for represented employees in the DSS, consistent with ratified Tentative Agreements;

b) Approve the application of the same six-month merit eligibility delay to unrepresented Confidential, Management, and Executive employees assigned to DSS and covered under Resolution 24-187; and

c) Determine that the above actions are not a project under the California Environmental Quality Act (CEQA), because pursuant to sections 15378(b)(4) and 15378(b)(5) the recommended actions consist of organizational, administrative, or fiscal activities of government that will not result in direct or indirect physical changes in the environment.

> **A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**
>
> **a) Authorized; and**
>
> **b) and c) Approved.**
>
> **The motion carried by the following vote:**

**Ayes:**        5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

---

**Teel Declaration**
**Page 214**

| BOARD OF SUPERVISORS | Action Summary | December 16, 2025 |
|---|---|---|

**A-34)**   <u>PLANNING AND DEVELOPMENT DEPARTMENT</u>                     **25-01057**

Consider recommendations regarding the adoption (Second Reading) of an Ordinance Amending Fees for Planning and Development Services, as follows:

a) Determine that the adoption of an Ordinance Amending Fees for Planning and Development Department Services is not subject to the requirements of the California Environmental Quality Act (CEQA), pursuant to CEQA Guidelines Sections 15273(a)(1) and 15378(b)(5); and

b) Adopt (Second Reading) "An Ordinance Amending Fees for Planning and Development Services".

**Karin Hauenstein addressed the Board.**

**A motion was made by Supervisor Capps, seconded by Supervisor Hartmann, that this matter be acted on as follows:**

**a) Approved; and**

**b) Adopted.**

**ORDINANCE NO. 5271**

**The motion carried by the following vote:**

Ayes:        4 -   Supervisor Lee, Supervisor Capps, Supervisor Hartmann, and Supervisor Lavagnino

Noes:        1 -   Supervisor Nelson

**Teel Declaration
Page 215**

| BOARD OF SUPERVISORS | Action Summary | December 16, 2025 |
|---|---|---|

**A-35)**    PLANNING AND DEVELOPMENT DEPARTMENT    **25-01061**

Consider recommendations regarding the Fisher Edison Property Trust New Agricultural Preserve Contract, Buellton area, Third District, as follows:

a) Adopt a resolution creating Agricultural Preserve New Contract No. 25AGP-00004 consisting of 44.88 acres located at 2000 West Highway 246, in the Buellton area (APNs 099-230-014 and 099-230-005);

b) Approve and authorize the Chair to execute Agricultural Preserve New Contract No. 25AGP-00004;

c) Authorize recordation by the Clerk of the Board; and

d) Find that the proposed action is exempt from the California Environmental Quality Act (CEQA) pursuant to State CEQA Guidelines Section 15317 [Open Space Contracts or Easements].

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**

**a) Adopted;**

**RESOLUTION NO. 25 270**

**b) Approved and authorized; Chair to execute;**

**c) Authorized; and**

**d) Approved.**

**The motion carried by the following vote:**

**Ayes:**    5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

**Teel Declaration
Page 216**

**BOARD OF SUPERVISORS**  Action Summary  December 16, 2025

**A-36)**    <u>PROBATION DEPARTMENT</u>  **25-01070**

Consider recommendations regarding an Assembly Bill (AB) 143 Backfill Allocation Spending Report for Fiscal Year (FY) 2024-2025 for Criminal Justice Fees Eliminated by AB 1869, as follows:

a) Consider and adopt the Report, the Board of Supervisors' Annual Report for FY 2024-2025 as required by Government Code section 29553 subsection (f), documenting the County's spending of State backfill allocations which provide fiscal relief for revenues lost from fees repealed by Chapter 92, Statutes of 2020 (AB 1869);

b) Authorize the Chair to sign the letter regarding the submission of the above referenced Report, and direct Probation staff to submit the letter and Report to the State of California Director of Finance, the Legislative Analyst's Office, and the Joint Legislative Budget Committee; and

c) Determine pursuant to California Environmental Quality Act (CEQA) Guidelines 15378(b)(5) that the above actions are not a project subject to CEQA review, because they are government administrative activities that do not result in direct or indirect physical changes to the environment.

> **A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**
>
> **a) Considered and adopted;**
>
> **b) Authorized; Chair to execute; and**
>
> **c) Approved.**
>
> **The motion carried by the following vote:**

**Ayes:**    5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

**Teel Declaration**
**Page 217**

**BOARD OF SUPERVISORS**                    Action Summary                    December 16, 2025

**A-37)**      <u>PROBATION DEPARTMENT</u>                                              **25-01071**

Consider recommendations regarding the Assembly Bill (AB) 199 Backfill Allocation Spending Report for Fiscal Year (FY) 2024-2025 for Criminal Justice Fees Eliminated by AB 177, as follows:

a) Consider and adopt the Board of Supervisors' Annual Report for FY 2024-2025 as required by Government Code section 29554 subsection (f), documenting the County's spending of State backfill allocations which provides fiscal relief due to the repeal of the fees specified in Chapter 257, Statutes of 2021 (AB 177);

b) Authorize the Chair to sign the letter, regarding the submission of the above referenced Report, and direct Probation staff to submit the letter and Report to the State of California Director of Finance, the Legislative Analyst's Office, and the Joint Legislative Budget Committee; and

c) Determine pursuant to California Environmental Quality Act (CEQA) Guidelines 15378(b)(5) that the above actions are not a project subject to CEQA review, because they are government administrative activities that do not result in direct or indirect physical changes to the environment.

> **A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**
>
> **a) Considered and adopted;**
>
> **b) Authorized; Chair to execute; and**
>
> **c) Approved.**
>
> **The motion carried by the following vote:**

**Ayes:**        5 -   Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

---

**Teel Declaration
Page 218**

**BOARD OF SUPERVISORS**                    Action Summary                    December 16, 2025

A-38)        <u>PUBLIC WORKS DEPARTMENT</u>                                      **25-01036**

Consider recommendations regarding the adoption (Second Reading) of a proposed Transportation Impact Mitigation Fee Ordinance for the Public Works Department services, as follows:

a) Adopt the Ordinance (Second Reading) updating transportation impact mitigation fees for the Santa Barbara County Public Works Department, pertaining to the Goleta and Orcutt Planning Areas;

b) Adopt the updated fee schedule to take effect upon the effective date of the Ordinance; and

c) Find that the proposed actions are administrative activities of the County approving charges that are for the purpose of meeting operating expenses, which will not result in direct or indirect physical changes in the environment, and are therefore not subject to the California Environmental Quality Act (CEQA) under CEQA Guidelines Section 15273(a)(l), not a "project" as defined for purposes of the CEQA under CEQA Guidelines Sections 15378(b)(4) and (b)(5).

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**

**a) Adopted;**

**ORDINANCE NO. 5272**

**b) Adopted; and**

**c) Approved.**

**The motion carried by the following vote:**

Ayes:        5 -   Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

**Teel Declaration**
**Page 219**

**A-39)**        <u>PUBLIC WORKS DEPARTMENT</u>                                    **25-01062**

Consider recommendations regarding Amendment No. 1 for Services of Independent Contractor for the Santa Maria River Levee Bike Trail Project, County Project No. 862372, Fifth District, as follows:

a) Approve and authorize the Chair to execute Amendment No. 1 to the Agreement for Services of Independent Contractor for the Santa Maria River Levee Bike Trail Project, County Project No. 862372(PRJ-000619), increasing the cost by $23,003.07 for a total not to exceed contract amount of $334,175.07 and extending the period of performance to December 31, 2027;

b) Approve and authorize the Director of Public Works, or designee, to, in accordance with the Agreement: extend the period of performance for up to one additional year (Section 4.B); make immaterial amendments (Section 34); and suspend performance (Section 46.); and

c) Determine the above actions are not a "project" under the California Environmental Quality Act guidelines pursuant to Section 15378(b)(5) because it consists of organizational or administrative activities of governments that will not result in direct or indirect physical changes in the environment.

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**

**a) Approved and authorized; Chair to execute;**

**b) Approved and authorized; and**

**c) Approved.**

**The motion carried by the following vote:**

**Ayes:**        5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

**Teel Declaration
Page 220**

BOARD OF SUPERVISORS                    Action Summary                    December 16, 2025

A-40)    PUUBLIC WORKS DEPARTMENT                                          25-01063

Consider recommendations regarding Cooperative Agreement between California Department of Transportation (Caltrans) and County for construction of Santa Claus Lane Streetscape Improvements and Coastal Access Project - Phase 2; State Project No. 525000106, County Project No. 720864, First District, as follows:

a) Approve and authorize the Chair to execute a Cooperative Agreement with Caltrans for the allocation of construction funding and reimbursement to the County of Santa Barbara for work on the Santa Claus Lane Streetscape Improvements and Coastal Access Project Phase 2;

b) Approve and authorize the Director of Public Works or designee to advertise for bids for the project as described in the Cooperative Agreement; and

c) Consider the environmental effects of the project as shown in the Final Mitigated Negative Declaration (19NGD-00000-00005) dated September 16, 2019, adopted by the County of Santa Barbara on September 25, 2019, and find that pursuant to California Environmental Quality Act Guidelines Section 15162(a), no substantial changes are proposed, and there are no substantial changes in circumstances or new information of substantial importance regarding significant impacts or feasibility of mitigation measures and alternative, and therefore approval of the Recommended Actions are within the scope of the Final Mitigated Negative Declaration (19NGD-00000-00005).

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**

**a) Approved and authorized; Chair to execute;**

**b) Approved and authorized; and**

**c) Approved.**

**The motion carried by the following vote:**

Ayes:          5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

---

*County of Santa Barbara*                    *Page 39*

**Teel Declaration
Page 221**

BOARD OF SUPERVISORS                    Action Summary                    December 16, 2025

A-41)    SOCIAL SERVICES DEPARTMENT                    25-01072

Consider recommendations regarding the Third Amendment to the Agreement with Santa Barbara Family Care Center dba Children's Resource and Referral of Santa Barbara County, as follows:

a) Approve, ratify, and authorize the Chair to execute Third Amendment to the Agreement with Santa Barbara Family Care Center dba Children's Resource and Referral of Santa Barbara (local vendor), to provide Emergency Child Care Bridge Program for Foster Children to increase the total contract amount not to exceed to $1,523,832.00 for the period of July 1, 2024 through June 30, 2026; and

b) Determine that the activity is not a "Project" subject to California Environmental Quality Act (CEQA) review per CEQA Guideline Section 15378(b)(5), since the activity is an organizational or administrative activity of government that will not result in direct or indirect physical changes in the environment.

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**

**a) Approved, ratified and authorized; Chair to execute; and**

**b) Approved.**

**The motion carried by the following vote:**

Ayes:        5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

## Board of Supervisors

A-42)    SUPERVISOR LEE                    25-01093

Approve the appointment of Adriana Gonzales-Smith to the Air Pollution Control District Community Advisory Council, open term, First District.

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be approved. The motion carried by the following vote:**

Ayes:        5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

**Teel Declaration
Page 222**

BOARD OF SUPERVISORS                    Action Summary                    December 16, 2025

A-43)    <u>SUPERVISOR LEE</u>                                    <u>**25-01097**</u>

Consider recommendations regarding a contribution to Mission Canyon Association for Maintenance of Tunnel Trailhead, as follows: (4/5 Vote Required)

a) Approve and authorize a contribution of $2,098.00 to the Mission Canyon Association for trailhead maintenance services, funded by the First District's Discretionary Funds held in Dept 990 fund balance;

b) Approve Budget Revision Request No. 0010912 to increase appropriations of $2,098.00 in the General County Programs General Fund for Services and Supplies, funded by a release of Committed Emerging Issues fund balance;

c) Find that the above program is necessary to meet the social needs of the population of the County, including public health, safety, and recreational access; and

d) Determine that the above actions are organizational or administrative activities of government that will not result in direct or indirect physical changes in the environment and are not a project under the California Environmental Quality Act (CEQA) pursuant to section 15378(b)(5) of the CEQA Guidelines.

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**

**a) Approved and authorized; and**

**b) through d) Approved.**

**The motion carried by the following vote:**

**Ayes:**    5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

---

*County of Santa Barbara*                    *Page 41*

**Teel Declaration**
**Page 223**

| BOARD OF SUPERVISORS | Action Summary | December 16, 2025 |
|---|---|---|

A-44)    <u>SUPERVISOR LAVAGNINO</u>                                                    **<u>25-01101</u>**

Consider recommendations regarding the contribution of Fifth District Discretionary Funds to Guadalupe Community Action Coalition, as follows:

a) Approve and authorize the contribution of $10,000.00 to Guadalupe Community Action Coalition, a 501(c)(3) nonprofit, (EIN No. 99-1740664), to support the Royal Theater Renovation Project, from the Fifth District General County Programs Department 990 discretionary fund;

b) Find that the project provides a community benefit that meets the social needs of the County; and

c) Determine that the above actions are organizational or administrative activities of the government that will not result in direct or indirect physical changes in the environment and are not a project under the California Environmental Quality Act (CEQA) pursuant to section 15378(b)(5) of the CEQA Guidelines.

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**

**a) Approved and authorized; and**

**b) and c) Approved.**

**The motion carried by the following vote:**

**Ayes:**        5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

---

*County of Santa Barbara*                    *Page 42*

**Teel Declaration
Page 224**

A-45)    SUPERVISOR LAVAGNINO                                    25-01102

Consider recommendations regarding the Contribution of Fifth District Discretionary Funds to Family Service Agency of Santa Barbara County, as follows:

a) Approve and authorize the contribution of $1,500.00 to Family Service Agency of Santa Barbara County, a 501(c)(3) nonprofit, (EIN No. 95-1644031), to support their Toys for Tots Program, from the Fifth District General County Programs Department 990 discretionary fund;

b) Find that the project provides a community benefit that meets the social needs of the County; and

c) Determine that the above actions are organizational or administrative activities of the government that will not result in direct or indirect physical changes in the environment and are not a project under the California Environmental Quality Act (CEQA) pursuant to section 15378(b)(5) of the CEQA Guidelines.

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**

**a) Approved and authorized; and**

**b) and c) Approved.**

**The motion carried by the following vote:**

Ayes:        5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

| BOARD OF SUPERVISORS | Action Summary | December 16, 2025 |
|---|---|---|

**25-00002**

### Public Comment Period

*THE PUBLIC COMMENT PERIOD IS RESERVED FOR COMMENT ON MATTERS WITHIN THE SUBJECT MATTER JURISDICTION OF THE BOARD OF SUPERVISORS. EACH PERSON MAY ADDRESS THE BOARD FOR UP TO THREE MINUTES AT THE DISCRETION OF THE CHAIR, FOR A TOTAL PUBLIC COMMENT PERIOD OF NO MORE THAN 15 MINUTES.  (Resolution No. 09-368) (25-00002)*

*WHEN TESTIFYING BEFORE THE BOARD OF SUPERVISORS, PERSONAL ATTACKS AND OTHER DISRUPTIVE BEHAVIOR ARE NOT APPROPRIATE.*

**Re: Expressed concerns regarding oil production in Santa Barbara County and thanked the Board for approving recent oil related appeals   Drew Hart addressed the Board**

**Re: Promoted YouTube channel "Coast Audits"; and Expressed concerns regarding politically driven celebrations involving a 501(c)(4) nonprofit organization   Karin Hauenstein addressed the Board**

**Re: Expressed concerns regarding the affordable housing policy, revenue neutrality, and the County's ability to recover the full cost of Planning and Development (P&D) fees   Andy Caldwell addressed the Board**

**Teel Declaration**
**Page 226**

BOARD OF SUPERVISORS                    Action Summary                    December 16, 2025

---

**12:00 P.M. ..... Recessed to Closed Session**

## <u>Closed Session</u>

**<u>25-01106</u>**

CONFERENCE WITH LEGAL COUNSEL-EXISTING LITIGATION
(Paragraph (1) of subdivision (d) of Government Code section 54956.9)

Luis Miguel Alejandro Lazaro v. Santa Barbara County Sheriff's Office et al., Santa Barbara County Superior Court Case No. 24CV05620.

**Report from Closed Session**

**No reportable action taken.**

---

*County of Santa Barbara*                    *Page 45*

**Teel Declaration
Page 227**

BOARD OF SUPERVISORS                    Action Summary                    December 16, 2025

## Departmental Agenda
## Planning Items and Public Hearings

**1)**         COUNTY EXECUTIVE OFFICE                                    **25-01104**

HEARING - Consider recommendations regarding the 2025 Annual Report and Accomplishments from Federal and State Legislative Advocates and 2026 Legislative Platform Adoption, as follows: (EST. TIME: 30 MIN.)

a) Receive and file the annual report and accomplishments for 2025 from the County's State legislative advocates, Hurst, Brooks, Espinosa, LLC., and Federal legislative advocate, Thomas Walters and Associates;

b) Adopt the County of Santa Barbara 2026 Legislative Platform as approved by the Legislative Program Committee at its December 8, 2025 meeting; and

c) Determine that the above actions are not a project under the California Environmental Quality Act (CEQA), because pursuant to sections 15378(b)(4) and 15378(b)(5) the recommended actions consist of organizational, administrative or fiscal activities of government that will not result in direct or indirect physical changes in the environment.

COUNTY EXECUTIVE OFFICER'S RECOMMENDATION: POLICY

*HEARING TIME: 10:05 AM - 10:38 AM (33 MIN.)*

**Received and filed staff presentation and conducted a public hearing.**

**A motion was made by Supervisor Hartmann, seconded by Supervisor Capps, that this matter be acted on as follows:**

**a) Received and filed;**

**b) Adopted the County of Santa Barbara 2026 Legislative Platform as amended during the December 16, 2025 Board of Supervisors meeting to include additional language to amend the 2026 Legislative Platform plank under Housing, as follows:**

**"Support clarifying reforms to the Builder's Remedy that balance the State's housing objectives with local discretion, and ensure communities are not compelled to approve projects that disregard zoning, safety, infrastructure, or neighborhood context-including extreme or out-of-scale proposals filed solely due to technical housing-element timing issues"; and**

**c) Approved.**

**The motion carried by the following vote:**

**Ayes:**      5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

**Teel Declaration
Page 228**

BOARD OF SUPERVISORS                     Action Summary                      December 16, 2025

**2)**          COMMUNITY SERVICES DEPARTMENT                               **25-01098**

HEARING - Consider recommendations regarding a Request for Proposals (RFP) for Workforce Housing Development, First District, as follows: (EST. TIME: 30 MIN.)

a) Receive a presentation and direct staff to publish a RFP, as revised by direction provided by the Board during the hearing, to solicit proposals from experienced development teams to partner with the County to plan, finance, design, construct, operate and maintain a new affordable housing development at 117 East Carrillo Street (APN 029-211-025) in the City of Santa Barbara;

b) Provide staff direction regarding the following for inclusion in the RFP:

i) Whether the County should voluntarily subject the Project to the County's zero net policy regarding construction of public buildings; and

ii) Tenant income levels for this Project; and

c) Determine that the proposed actions do not constitute a "Project" within the meaning of the California Environmental Quality Act (CEQA), pursuant to Section 15378(b)(5) of the CEQA Guidelines, because it consists of an organizational or administrative activity of government which will not result in direct or indirect physical changes in the environment.

COUNTY EXECUTIVE OFFICER'S RECOMMENDATION: POLICY

*HEARING TIME: 10:38 AM - 11:27 AM (49 MIN.)*

**Received and filed staff presentation and conducted a public hearing.**

**Jeanne Sparks, Leonardo De Casaus, Karin Hauenstein, Linda Honikman, and Craig Minus addressed the Board.**

**A motion was made by Supervisor Capps, seconded by Supervisor Hartmann, that this matter be acted on as follows:**

**a) Received and filed and directed staff to publish a Request for Proposals (RFP);**

**b) i) and ii) Directed staff, as follows: (1) Return with additional information regarding applicability of Local Preference; (2) Address impact fees; (3) Consider concerns related to downtown employee parking; (4) Subject the project to the County's zero net policy (all electric project); and (5) Regarding tenant income levels, the preference is for low- to moderate-income tenants, while allowing above-moderate income levels as well; and**

**c) Approved.**

**The motion carried by the following vote:**

**Ayes:**     5 -   Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

**Teel Declaration
Page 229**

**BOARD OF SUPERVISORS**                    *Action Summary*                    December 16, 2025

3)    COUNTY EXECUTIVE OFFICE, BOARD OF DIRECTORS, FIRE                **25-01103**
      PROTECTION DISTRICT, BOARD OF DIRECTORS, FLOOD
      CONTROL AND WATER CONSERVATION DISTRICT, BOARD OF
      DIRECTORS, LAGUNA COUNTY SANITATION DISTRICT, BOARD
      OF DIRECTORS, WATER AGENCY
      HEARING - Consider recommendations regarding Fiscal Years (FYs) 2026-2031 Five-Year
      Forecast, as follows: (EST. TIME: 1 HR.)

      Acting concurrently as the Board of Supervisors; the Board of Directors, Fire Protection District;
      the Board of Directors, Flood Control and Water Conservation District; the Board of Directors,
      Laguna County Sanitation District; the Board of directors, Water Agency and other special districts
      under the supervision and control of the Board of Supervisors:

      a) Receive and file the Five-Year Forecast for FYs 2026-2027 through 2030-2031;

      b) Adopt the FY 2026-2027 Budget Development Policies;

      c) Review funding priorities for FY 2026-2027;

      d) Review Budget Balancing Framework and provide direction as appropriate; and

      e) Determine pursuant to California Environmental Quality Act Guidelines Section 15378 that the
      above activity is not a project under the California Environmental Quality Act.

      COUNTY EXECUTIVE OFFICERS RECOMMENDATION: POLICY

                    *HEARING TIME: 11:40 AM - 12:44 PM (1 HR. 4 MIN.)*

                    **Received and filed staff presentation and conducted a public hearing.**

                    **Gail Osherenko, Lawanda Lyons-Pruit, Jeanne Sparks, Maureen Earls, and
                    Robert Ornstein addressed the Board.**

                    **A motion was made by Supervisor Hartmann, seconded by Supervisor Lavagnino,
                    that this matter be acted on as follows:**

                    **Acting concurrently as the Board of Supervisors; the Board of Directors, Fire
                    Protection District; the Board of Directors, Flood Control and Water
                    Conservation District; the Board of Directors, Laguna County Sanitation
                    District; the Board of directors, Water Agency and other special districts under
                    the supervision and control of the Board of Supervisors:**

                    **a) Received and filed;**

                    **b) Adopted the Fiscal Year 2026-2027 Budget Development Policies; and**

                    **c) through e) Approved.**

                    **The motion carried by the following vote:**

                    **Ayes:**        5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor
                                            Nelson, and Supervisor Lavagnino

*County of Santa Barbara*                    *Page 48*

**Teel Declaration
Page 230**

**4)**   <u>COUNTY EXECUTIVE OFFICE</u>                                      **25-01087**

HEARING - Consider recommendations regarding Fiscal Year (FY) 2025-2026 First Quarter Budget Status Report, as follows: (EST. TIME: 20 MIN.)

a) Receive and file the FY 2025-2026 First Quarter Budget and Status Report as of September 30, 2025, showing the status of appropriations and financing for departmental budgets adopted by the Board of Supervisors; and

b) Determine that the above actions are not a project under the California Environmental Quality Act (CEQA), because pursuant to sections 15378(b)(4) and 15378(b)(5) the recommended actions consist of organizational, administrative, or fiscal activities of government that will not result in direct or indirect physical changes in the environment.

COUNTY EXECUTIVE OFFICER'S RECOMMENDATION: APPROVE

*HEARING TIME: 12:45 PM - 12:57 PM (12 MIN.)*

**Received and filed staff presentation and conducted a public hearing.**

**A motion was made by Supervisor Nelson, seconded by Supervisor Lee, that this matter be acted on as follows:**

**a) Received and filed; and**

**b) Approved.**

**The motion carried by the following vote:**

**Ayes:**        5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

**5)**   <u>PLANNING AND DEVELOPMENT DEPARTMENT</u>                          **25-01069**

HEARING - Consider recommendations regarding Ordinance Streamlining and Housing Accommodation Amendments, as follows: (EST. TIME: 1 HR.)

a) Make the required findings for approval, including California Environmental Quality Act (CEQA) findings, for the Ordinance Amendments, Case Nos. 25ORD-00006, 25ORD-00007, and 25ORD-00008;

b) Determine that the Ordinance Amendments, Case Nos. 25ORD-00006, 25ORD-00007, and 25ORD-00008, are exempt from CEQA pursuant to CEQA Guidelines Sections 15061(b)(3), 15168(c), and 15265;

**Teel Declaration
Page 231**

BOARD OF SUPERVISORS                Action Summary                December 16, 2025

c) Approve the Ordinance Streamlining and Housing Accommodation Amendments by taking the following actions:

i) Adopt an Ordinance amending the Zoning Regulations of the County Land Use and Development Code (Case No. 25ORD-00006), Section 35-1 of Chapter 35, Zoning, of the Santa Barbara County Code;

ii) Adopt an Ordinance amending the Zoning Regulations of the Article II Coastal Zoning Ordinance (Case No. 25ORD-00007), of Chapter 35, Zoning, of the Santa Barbara County Code; and

iii) Adopt an Ordinance amending the Zoning Regulations of the Montecito Land Use and Development Code (Case No. 25ORD-00008), Section 35-2 of Chapter 35, Zoning, of the Santa Barbara County Code;

d) Adopt a Resolution authorizing the Planning and Development Department to submit the Coastal Zoning Ordinance Streamlining and Housing Accommodation Amendments (Case No. 25ORD-00007) to the California Coastal Commission (CCC) for review and certification as an amendment to the Santa Barbara County Local Coastal Program; and

e) Direct the Planning and Development Department to transmit the adopted Resolution to the Executive Director of the CCC.

COUNTY EXECUTIVE OFFICER'S RECOMMENDATION: POLICY

*HEARING TIME: 1:38 PM - 3:18 PM (1 HR. 40 MIN.)*

**Received and filed staff presentation and conducted a public hearing.**

**Jeannie Sparks, and Karin Hauenstein addressed the Board.**

**A motion was made by Supervisor Nelson, seconded by Supervisor Hartmann, that this matter be continued to the January 27, 2026 Board of Supervisors meeting in Santa Maria.**

**The motion carried by the following vote:**

**Ayes:**    5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

**Teel Declaration
Page 232**

BOARD OF SUPERVISORS                    Action Summary                    December 16, 2025

**6)**        PLANNING AND DEVELOPMENT DEPARTMENT                                      **25-01067**

HEARING - Consider recommendations regarding the appeals of the Planning Commission Approval of the Sable Offshore Corporation's Change of Owner, Operator, and Guarantor for the Santa Ynez Unit (SYU), Pacific Offshore Pipeline Company (POPCO) Gas Plant, and Las Flores Pipeline System Final Development Plan (FDP) Permits, Third, Fourth, and First Districts, as flows: (EST. TIME: 1 HR. 15 MIN.)

a) Approve the appeals, Case Nos. 24APL-00025 and 24APL-00026;

b) Make the required findings for denial of the Change of Owner, Operator, and Guarantor for the respective SYU, POPCO Gas Plant, and Las Flores Pipeline System FDP Permits;

c) Determine that denial of the requests is exempt from the California Environmental Quality Act (CEQA) pursuant to CEQA Guidelines Section 15270(a); and

d) Deny the Change of Owner, Operator, and Guarantor for the respective SYU, POPCO Gas Plant, and Las Flores Pipeline System FDP Permits.

COUNTY EXECUTIVE OFFICER'S RECOMMENDATION: POLICY

*HEARING TIME: 3:18 PM - 4:42 PM (1 HR. 24 MIN.)*

**Received and filed staff presentation and conducted a public hearing.**

**Sarah Ebe, Jonathan Ullman, Seth Steiner, Nikki Talebi, Bill Hickman, Larry Bishop, Lawanda Lyons-Pruit, Tina Calderon, Thomas Becker, Paasha Mahdavi, Patrick Kennedy, Adam Maingot, Patrice Surmeier, Greg Orr, Jason Joyce, Karin Hauenstein, Jeannie Sparks, Joyce Howerton, Ellen Bougher-Harvey, Mike Stoker, and Ted Morton addressed the Board.**

**A motion was made by Supervisor Lavagnino, seconded by Supervisor Lee, that this matter be acted on as follows: Accept into the record the following documents: Public Comment letter from Shelley Smyers and a Public Comment letter from Brandon Sparks-Gillis.**

**The motion failed for lack of the required four-fifths vote, as follows:**

|  |  |  |
|---|---|---|
| **Ayes:** | 3 - | Supervisor Lee, Supervisor Capps, and Supervisor Lavagnino |
| **Noes:** | 1 - | Supervisor Nelson |
| **Recused:** | 1 - | Supervisor Hartmann |

**Teel Declaration**
**Page 233**

A motion was made by Supervisor Lavagnino, seconded by Supervisor Lee, that this matter be acted on as follows:

a) Approved the appeals, Case Nos. 24APL-00025 and 24APL-00026;

b) Made the required findings for denial of the Change of Owner, Operator, and Guarantor for the respective SYU, POPCO Gas Plant, and Las Flores Pipeline System FDP Permits;

c) Approved; and

d) Denied the Change of Owner, Operator, and Guarantor for the respective SYU, POPCO Gas Plant, and Las Flores Pipeline System FDP Permits.

The motion carried by the following vote:

| | | |
|---|---|---|
| **Ayes:** | 3 - | Supervisor Lee, Supervisor Capps, and Supervisor Lavagnino |
| **Noes:** | 1 - | Supervisor Nelson |
| **Recused:** | 1 - | Supervisor Hartmann |

**7)**      SUPERVISOR NELSON                                                    **25-01107**

HEARING - Consider recommendations regarding the introduction and intent to adopt an Ordinance adding Section 2-24.11 to the Santa Barbara County Code to change the election timing for the Treasurer-Tax Collector-Public Administrator, as follows: (EST. TIME: 15 MIN.)

a) Approve the introduction (first reading) of an Ordinance of the Santa Barbara County Board of Supervisors, State of California, adding Section 2-24.11 to the Santa Barbara County Code to move the election of the Treasurer-Tax Collector-Public Administrator to the presidential primary cycle;

b) Read the title and waive full reading of the Ordinance;

c) Set a hearing for January 13, 2026, to consider adoption (second reading) of the Ordinance; and

d) Determine that the above actions are organizational or administrative activities of the government that will not result in direct or indirect physical changes in the environment and are not a project under the California Environmental Quality Act (CEQA) pursuant to section 15378(b)(5) of the CEQA Guidelines.

*HEARING TIME: 2:58 PM - 3:17 PM (19 MIN.)*

**Received and filed staff presentation and conducted a public hearing.**

**No further action taken.**

**Teel Declaration
Page 234**

BOARD OF SUPERVISORS                    Action Summary                    December 16, 2025

## Adjourned at 4:42 PM

## Adjourned to

## Tuesday, January 13, 2026

## County Administration Building
## Board Hearing Room
## 105 East Anapamu Street , Fourth Floor
## Santa Barbara

## Challenges

*IF YOU CHALLENGE A DETERMINATION MADE ON A MATTER ON THIS AGENDA IN COURT, YOU MAY BE LIMITED TO RAISING ONLY THOSE ISSUES YOU OR SOMEONE ELSE RAISED AT THE PUBLIC HEARING DESCRIBED IN THIS NOTICE, OR IN WRITTEN CORRESPONDENCE TO THE BOARD OF SUPERVISORS AT, OR PRIOR TO, THE PUBLIC HEARING.*

## Announcements

*The meeting of Tuesday, December 16, 2025 will be telecast live on County of Santa Barbara TV Channel 20 at 9:00 AM, and will be rebroadcast on Thursday, December 18, 2025, at 5:00 PM and on Saturday, December 20, 2025, at 10:00 AM on CSBTV Channel 20.*

## http://www.countyofsb.org

*County of Santa Barbara*                    *Page 53*

**Teel Declaration**
**Page 235**

# EXHIBIT L

## Declaration of Julie Teel Simmonds



**U.S. Department
Of Transportation**

1200 New Jersey Ave., SE
Washington, DC 20590

**Pipeline and
Hazardous Materials
Safety Administration**

May 18, 2016

Mr. Bob Gorham
Program Manager/Supervising Pipeline Safety Engineer
Pipeline Safety Division
California State Fire Marshal
3500 Paramount Boulevard, Suite 210
Lakewood, CA 90712

Dear Mr. Gorham:

This letter serves to memorialize the understanding between the Pipeline and Hazardous Materials Safety Administration (PHMSA) and the California State Fire Marshal (CASFM) with respect to the transfer or regulatory oversight over Plains Pipeline, LP's (Plains) Lines 901 and 903 located in Santa Barbara County, California.

On May 19, 2015, Plains' Line 901 pipeline ruptured, releasing approximately 2,934 barrels of heavy crude oil into the environment (Failure). As a result, Line 901 and Line 903, which carries all of Line 901's crude oil throughput, were shut down.[1] Two days later, on May 21, 2015, PHMSA issued a Corrective Action Order (CAO) shutting down Line 901 and requiring immediate remedial actions. PHMSA has since amended the CAO twice,[2] requiring, among other actions, a shutdown of Line 903 between Gaviota and Pentland Station. Both lines remain shut down as of the date of this letter. PHMSA is currently conducting an investigation into the cause of the Failure.

Prior to the accident, Plains operated Lines 901 and 903 as interstate pipelines under Federal Energy Regulatory Commission (FERC) tariffs and were subject to PHMSA's regulatory, inspection and enforcement jurisdiction. After the Failure, Plains cancelled its FERC tariffs on Line 901 and Line 903. Specifically, it cancelled its FERC tariff on Line 901 on February 12, 2016, and Line 903 on April 29, 2016 (collectively, Transfer Dates). Effective as of the Transfer Dates, Lines 901 and 903 are now considered intrastate hazardous liquid pipelines subject to the regulatory and enforcement jurisdiction of CASFM, pursuant to state certification from PHMSA.

---

[1]  Lines 901 and 903 provide transportation service from Santa Barbara County to Pentland Station, Kern County.

[2]  The first amendment was issued on June 3, 2015, and the second was issued on November 12, 2015.

2 | P a g e
Mr. Bob Gorham
California State Fire Marshal

The post-accident transfer of regulatory authority from PHMSA to CASFM does not affect or otherwise impact PHMSA's ongoing investigation(s) of, and any enforcement action(s) related to, the Failure or to any other events involving the operation of Lines 901 and 903 occurring prior to the Transfer Dates. As a result, PHMSA will continue to assert its enforcement authority with respect to all actions and incidents occurring on Lines 901 and 903 prior to the Transfer Dates. CASFM, meanwhile, will exercise jurisdiction over any actions or events related to Lines 901 and 903 occurring after the Transfer Dates. CASFM will continue to implement and enforce the federal minimum pipeline safety regulations relating to Lines 901 and 903 beginning as of the Transfer Dates, and may adopt and enforce additional or more stringent standards for intrastate hazardous liquid pipelines under 49 U.S.C. § 60104(c). PHMSA and CASFM will cooperate and collaborate with each other, as necessary, on PHMSA's investigatory and enforcement activities relating to the Failure and on any other matters relating to Lines 901 and 903.

More specifically, PHMSA will be responsible for:

- Completing and finalizing the root-cause investigation of the Failure ;
- Issuing and finalizing any enforcement actions arising out of the investigation and any other events occurring prior to the Transfer Dates, including, but not limited to, the following types of actions: Notice of Probable Violation, Proposed Civil Penalty, Proposed Compliance Order, and/or Corrective Action Order (CAO), etc.;
- Completing the CAO issued to Plains on May 21, 2015, and any amendments thereto, and issuing any future CAOs related to the Failure;
- Collaborating with CASFM on any additional or modified safety requirements that may be needed in connection with any CAO that has been or may be imposed by PHMSA relating to Lines 901 and 903, including any potential re-start of the pipelines; and
- Transitioning full regulatory authority from PHMSA to CASFM once all PHMSA investigations and enforcement actions have been completed and closed.

CASFM will be responsible for:

- Including Lines 901 and 903 in CASFM's Annual Inspection Program (SB 295);
- Including Lines 901 and 903 in CASFM's Leak Detection Program (AB 864);
- Including Line 901 in the CASFM Higher Risk pipeline program, due to the release and absence of effective Cathodic Protection. This will require the pipeline to be tested annually for 5 years; and
- Exercising authority over Lines 901 and 903 under existing and future regulations established by CASFM.

If either pipeline is replaced rather than repaired, such work will be considered new construction, and the design, construction, operation, and maintenance would fall under the regulatory authority of the CASFM.

**3 | P a g e**
**Mr. Bob Gorham**
**California State Fire Marshal**

This Letter Agreement is subject to change based on any future events or newly-discovered facts that may impact any terms set forth herein. Please sign below and email me a PDF of the signed letter to zach.barrett@dot.gov. Thank you for your assistance and cooperation in this matter.

Sincerely,

Zach Barrett
Director for State Programs
Office of Pipeline Safety

ACKNOWLEDGED:

Bob Gorham
Program Manager/Supervising Pipeline Safety Engineer
Pipeline Safety Division
California State Fire Marshal

# EXHIBIT M

## Declaration of Julie Teel Simmonds

FILED
CLERK, U.S. DISTRICT COURT

10/14/2020

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ WH _____ DEPUTY

JS-6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, and the PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* DEPARTMENT OF FISH AND WILDLIFE, PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* CENTRAL COAST REGIONAL WATER QUALITY CONTROL BOARD, *ex rel.* CALIFORNIA DEPARTMENT OF PARKS AND RECREATION, *ex rel.* CALIFORNIA STATE LANDS COMMISSION, *ex rel.* CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION'S OFFICE OF STATE FIRE MARSHAL, and THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>      Plaintiffs,<br><br>             v.<br><br>PLAINS ALL AMERICAN PIPELINE, L.P. and PLAINS PIPELINE, L.P.,<br><br>      Defendants. | Civil Action No.<br>2:20-cv-02415-PSG-JEM<br><br>[PROPOSED]<br>**ORDER TO ENTER CONSENT DECREE**<br><br>**Date:** October 26, 2020<br>**Time:** 1:30 p.m.<br>**Location:** Telephonic<br>**Judge:** Hon. Philip S. Gutierrez |

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
[Proposed] Order to Enter Consent Decree

**Teel Declaration
Page 241**

# [~~PROPOSED~~] ORDER

For the reasons set forth in the United States' Motion to Enter Consent Decree and Memorandum of Law in Support thereof that was filed on August 19, 2020 and for good cause shown, the Consent Decree that was lodged on March 13, 2020 (Docket No. 6-1), is hereby ENTERED and shall constitute final judgment of the Court in this matter.

IT IS SO ORDERED.

DATED: 10/14/2020 _____

_____
THE HONORABLE PHILIP S. GUTIERREZ
UNITED STATES DISTRICT JUDGE

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
[~~Proposed~~] Order to Enter Consent Decree

-1-

**Teel Declaration
Page 242**

# EXHIBIT N

## Declaration of Julie Teel Simmonds

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SANTA BARBARA

SOUTH COUNTY REGION

COURTROOM SB-4                    HON. DONNA GECK, JUDGE

CENTER FOR BIOLOGICAL DIVERSITY     )
and WISHTOYO FOUNDATION,            )     **CERTIFIED COPY**
                                    )
         Petitioners/Plaintiffs,    )
                                    )  Case No. 25CV02244
    vs.                             )  Consolidated with
                                    )  Case No. 25CV02247
CALIFORNIA DEPARTMENT OF            )
FORESTRY AND FIRE PROTECTION, et    )
al.,                                )
                                    )
         Respondents/Defendants.    )
                                    )
    and                             )
                                    )
SABLE OFFSHORE CORP, et al.,        )
                                    )
         Real Parties in Interest.  )
_____     )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

WEDNESDAY, JANUARY 7, 2026

APPEARANCES:

For Petitioners Center for Biological Diversity
and Wishtoyo Foundation:

                    CENTER FOR BIOLOGICAL DIVERSITY
                    BY:  Talia Nimmer, Esq.
                         Julie Teel Simmons, Esq.
                    2011 Franklin Street, Suite 375
                    Oakland, California 94612

(APPEARANCES CONTINUED)

2

APPEARANCES:

For Petitioners Environmental Defense
Center, et al:

ENVIRONMENTAL DEFENSE CENTER
BY:   Jeremy M. Frankel, Esq.
          Linda Krop, Esq.
906 Garden Street
Santa Barbara, California 93101


For Respondents/Defendants California Department
of Forestry and Fire Protection, Office of
the State Fire Marshal:


CALIFORNIA ATTORNEY GENERAL'S OFFICE
By:   Michael S. Dorsi, Esq.
          Matthew Bullock, Esq.
55 Golden Gate Avenue, Suite 11000
San Francisco, California 94102

For Real Parties in Interest Sable Offshore
Corporation and Pacific Pipeline Company:


ALSTON & BIRD LLP
By:   Jeffrey D. Dintzer, Esq.
          Garrett B. Stanton, Esq.
350 South Grand Avenue, 51st Floor
Los Angeles, California 90071

                and

FAUVER, LARGE, ARCHBALD & SPRAY LLP
By:   Trevor D. Large, Esq.
820 State Street, 4th Floor
Santa Barbara, California 93101




Reported by:       MELINA HUSER, CSR No. 12028
                   Official Reporter Pro Tempore
                   West Coast Court Reporters, Inc.
                   300 Esplanade Drive, Suite 900
                   Oxnard, California 93036

**Teel Declaration
Page 245**

3

SANTA BARBARA, CALIFORNIA; WEDNESDAY, JANUARY 7, 2026

A.M. SESSION


THE COURT:  Good morning, everyone.  Welcome to Department 4.  We have two ex partes on calendar in the matter of Center for Biological Diversity versus California Department of Forestry and Sable Offshore Corporation, court files -- consolidated court files 25CV02244, consolidated with Case 25CV02247.

May I have appearances, please?

MR. DORSI:  Good morning, Your Honor.  Deputy Attorney General Michael Dorsi on behalf of Respondents California Department of Forestry and Fire Protection. I'm here with my colleague, Matt Bullock.

THE COURT:  All right.  Thank you.

MS. NIMMER:  Good morning, Your Honor.  Talia Nimmer an behalf of Petitioners, and I'm here with my colleague as well, Julie Teel Simmons.

THE COURT:  Good morning.

MR. FRANKEL:  Good morning, Your Honor.  Jeremy Frankel on behalf of Petitioners Environmental Defense Center, et al.

THE COURT:  All right.  Thank you.

MS. KROP:  Good morning, Your Honor.  Linda Krop on behalf of Petitioners Environmental Defense Center, et al.

THE COURT:  Good morning.

MR. DINTZER:  Good morning, Your Honor.

4

Jeffrey Dintzer on behalf of Real Party Sable Offshore and Pacific Pipeline.

MR. STANTON:  Good morning, Your Honor. Garrett Stanton on behalf of real parties in interest, Sable Offshore and Pacific Pipeline.

THE COURT:  Good morning.

MR. LARGE:  Good morning, Your Honor.  Trevor Large on behalf Real Party in Interest.

THE COURT:  All right.  Thank you.

I have read all moving papers.  I've read the opposition.  I've read the response to the oppositions.

Preliminarily, I have a couple of comments. First of all, I want to remind all counsel of your duty of candor to the Court.  Also, I'm not persuaded that either of the matters is appropriate for ex parte relief given the gravity of the matter here, the complexities involved, the jurisdictional issues, and I think that probably is the basis for believing the ex parte relief is not appropriate.  However, I will entertain argument from counsel if they want to be heard.

MS. NIMMER:  Thank you, Your Honor, yeah.  The Court does have --

THE REPORTER:  I'm sorry, Your Honor.  I should have introduced myself.  My name is Melina Huser.  My certification number is 12028, and I'll be reporting this matter.

THE COURT:  All right.  Thank you, Ms. Huser.

THE REPORTER:  And, Counsel, whoever is

5

speaking, I can't see your face, I don't know who you are.  Can you please identify --

MS. NIMMER:  Good morning.  This is Talia Nimmer.

The Court has discretion to order a status conference at any time, and the party may request a status conference at any time pursuant to California Rules of Court 3.723.  And here, recent developments necessitate a status conference.  For example, as you have mentioned, the pipeline and -- the Hazardous Material Safety Administration has issued an emergency special permit, has issued restart plan approvals, and has asserted jurisdiction over the pipelines.  So a status conference is needed to update the Court of what's been going on.  And this is grounds alone for a status conference --

THE COURT:  What's the last thing you said?

MS. NIMMER:  That would be grounds alone for a status conference.

But beyond that, a status conference is urgently needed because Sable indicated that it may restart the pipelines imminently, as soon as December 30th, 2025 --

THE COURT:  Which has come and gone.

MS. NIMMER:  Which has come and gone.  But we have not -- despite repeated requests, we have not confirmed whether Sable has restarted the pipelines or been able to confirm that Sable intends to or is in

6

compliance with the Court's July 29, 2025, preliminary injunction order.  And had Sable been forthcoming about this with Petitioners' counsels' repeated requests, this status conference may not have been needed altogether, but as it stands, the status conference is needed to assess the status of the pipelines and to assure the Court and the parties alike that Sable is in compliance with the Court's order.

With regard to the jurisdictional mootness issues that Sable raised, although Petitioners strongly disagree with those arguments, that is simply not before the Court today.  What -- all that Petitioners are requesting is a status conference to apprise the Court and public alike where things stand today and assure everyone that Sable will comply with this Court's existing and enforceable order.

THE COURT:  All right.  Thank you.

Do you wish to be heard, Counsel?

MR. DINTZER:  Yes.  Thank you very much, Your Honor.

As this Court is aware, this case is based upon an attack over the State Office of Fire Marshals' waivers over portions of the Los Flores Pipeline System.

Since this Court issued its injunction, the pipeline has been classified as an interstate pipeline, and, thus, is now under the jurisdiction of the Pipeline Hazardous Materials Safety Administration, which is a federal agency often referred to as PHMSA.

Teel Declaration
Page 249

7

In the complaint filed by EDC -- I think this is repeated in the complaint filed by CBD -- paragraph 128, and this is on page 29, the following allegation is made:  For interstate pipelines, PHMSA has exclusive jurisdiction over matters of pipeline safety. In fact, state authorities are expressly preempted from, quote, adopting or continuing to enforce safety standards for interstate pipeline facilities.  And there's a citation.

PHMSA has issued waivers and approved the full operation of the entire Los Flores Pipeline System. OFSM's [sic] jurisdiction has been revoked and is no longer -- OSFM no longer has a say in terms of restarting of the pipeline; thus, Sable and Pacific Pipeline no longer need the state waivers and this case is moot.  This Court no longer has jurisdiction over this matter and the preliminary injunction --

THE COURT:  Let me interrupt.

MR. DINTZER:  Yes, Your Honor.

THE COURT:  Isn't there an appeal currently pending in the ninth circuit?

MR. DINTZER:  Yes, Your Honor.  I'm getting to that right now.  Let me just finish up.

So this matter and the preliminary injunction, we believe, must be dissolved forthwith.  Jurisdiction over the existing federal waivers and permit to restart the remaining portions of the Los Flores Pipeline System is now in the ninth circuit, as the Court has

**Teel Declaration
Page 250**

8

articulated, where the petitioners -- these two petitioners before the Court availed themselves of jurisdiction and filed an emergency request to immediately stay, which was denied by the ninth circuit. And they set the matter on an ex parte schedule so the petitioners would have an opportunity to litigate the issue in a timely manner. Okay?

Thus, this Court's preliminary injunction is in conflict with the ninth circuit's order denying injunctive relief with respect to the lawful operation of the pipeline.

There is no room for delay. The Court's injunction must be resolved immediately to avoid the constitutional quandary that is presented. So we'd submit that if the Court is not going to entertain the ex parte application with respect to shortening time, that at least we have a hearing by the 23rd of January so that this matter can be resolved. We cannot have a federal court that is saying we are permitted to restart the pipeline and a state court saying exactly the opposite. That cannot exist in the same universe.

And I would point out that we do not believe there is any justification whatsoever for the petitioners, who have now availed themselves of jurisdiction in the ninth circuit, to continue to try and enforce a preliminary injunction in a state system. It is a constitutional issue. All right?

And so we'd request that the Court set this

9

promptly for hearing so we can have this matter resolved.  We've given them the chance to have their say about this issue, fair chance for the fire marshal to have his say about the issue, but this has to be resolved promptly.

We have submitted previously to this Court, and this Court is well aware of the -- in conjunction with the preliminary injunction motion that we filed declarations showing the harm to -- Sable, substantial financial harm to Sable that exists every single day that this injunction remains in place.

THE COURT:  All right.  What about Petitioner's argument that given the complexity and gravity of the matter that they need more time to respond if I were to set it on shortened notice?

MR. DINTZER:  Well, Your Honor, we filed our papers yesterday, effectively.  They've had them since Monday.  They've had our papers.  They've known what their position is.  They've known really what our position is for weeks now.  They filed their petition in the ninth circuit on the 24th of December, Christmas Eve.  So they've known about all of this.  This is not new.

They went into federal court knowing -- they pled it in their complaint -- that PHMSA has exclusive jurisdiction over this matter.  And when they did that, okay, it's an absolute concession, a pure concession that the federal court now has jurisdiction of this

10

matter.  This Court -- there is no way this Court can continue to hold on to an injunction when the case is about state waivers that are no longer relevant to our operation of the pipeline.

In fact, I would submit, Your Honor, you know, really, based on the record that you have before you today, the preliminary injunction should be revoked.

If they want to come back and -- today, frankly, if they want to come back and say, Hey, we have whatever, to this state court, they can do that.  The fact is they went to the ninth circuit which has jurisdiction.  They recognized that.  And the ninth circuit said, "We're not going to issue an injunction," which is in conflict with what this Court is presently sitting on.  We have a separation of constitutional functions here, and there's a supremacy issue here. It's a big one.  And there is no doubt now that this is a -- this is a federally regulated pipeline system. That is not in question.

And with all due respect, Your Honor, this Court no longer has jurisdiction to continue to enforce an injunction which has to do with state waivers that we no longer are relying upon.  We have the waivers, and we have authority from the federal government, okay, to restart our pipeline today, and we should not be -- to further delay in having to operate a pipeline, which is, you know -- which we have now waited for, you know, this process to play out.

11

And we've been patient.  We have not come back to this Court you know, willy-nilly.  We waited until the ninth circuit ruled on the motion to stay to see if there was going to be an inconsistency in the rulings.  Now there is clearly an inconsistency in the rulings, and we would submit the ninth circuit has supremacy in this matter, and they will have their full opportunity to have their hearing before the ninth circuit on an expedited basis, and the Court should revoke the injunction forthwith and let the ninth circuit deal with this matter.  We will --

THE COURT:  That's not what you put in your papers.

MR. DINTZER:  I understand.  That's why I wanted to give them a fair chance to be heard.

THE COURT:  Okay.  But what you said in your papers is you were not looking for affirmative relief in this ex parte; you were only addressing scheduling.

MR. DINTZER:  That is true, Your Honor.  And I'm going to -- I will stick with my papers today.  Okay.  I am not going to ask the Court to do anything beyond what we have filed.  Okay.  I'm just saying that -- I'm trying to impress upon the Court the urgency of this.

So my view is we filed our papers.  Effectively they have them Monday, which is the first day everybody came back.  Right?  And so we got them to them by 1 o'clock in the afternoon.  They've had them.

12

Mr. Dorsi has had them.  And they can file their opposition.  I think we proposed that the opposition papers be due on the ninth day.

I'm clearly well-vested in this issue.  They know it.  We will file our reply by the 14th, and we can go onto the Court's calendar on the 16th, which is a Friday, which I understand is the day the Court has -- hears law-and-motion matters, and we can have this issue resolved.

I think it's going to be a slam dunk because there's just no chance that they can continue to litigate this case in the ninth circuit and litigate this case in the state court.  They can't have concurrent jurisdiction.  That's not the case, and their own pleading says that.

THE COURT:  Okay.

MR. DINTZER:  So I just think that, you know, we -- this is costing us millions of dollars every day.  This is a big, big deal for this company, and we need to get this injunction lifted and get this case in compliance with what the ninth circuit -- which now has jurisdiction over this case to handle this matter.  All right?  And so we are very serious getting this resolved as promptly as possible.

THE COURT:  Understood.

All right.  Does anyone else wish to be heard?

MR. DORSI:  Just briefly.  I think your tentative views are good --

THE COURT:  Please state your name for the record.

MR. DORSI:  Deputy Attorney General Michael Dorsi on behalf of the respondent.  My apologies on that, Your Honor.

THE COURT:  That's okay.

MR. DORSI:  I think your initial approach makes some sense.  The issues are somewhat more complicated than the real party has indicated.

Just one piece of the state-versus-federal relationship that they have not explained is they have not -- the real parties have not sought an injunction in this case in federal court, nor could they do so because it is explicitly barred by the Anti-Injunction Act, the federal statute.  The fact that state courts and federal courts deal with overlapping issues occurs all the time.  What this Court should do here is a tricky question, and you should allow this case to be briefed on the ordinary briefing schedule.

The preemption question is not as clear-cut here.  The statement that PHMSA has asserted jurisdiction does not answer the issue.  The deference to federal agencies that used to be the law under Chevron versus NRDC was recently overruled in Loper Bright Enterprise versus Raimondo.  So there is no deference to the agency's interpretation based on ambiguity in the federal statute.

These are complicated issues, and you should

14

not require the attorney general and the Office of the State Fire Marshal, who tried to be deliberate and tried to take well-reasoned positions consistent with the other positions of the agencies of the State of California to do so on shortened time.  So we would support your tentative view.

THE COURT:  Thank you.

MR. DINTZER:  May I respond briefly?

THE COURT:  Yes, you may.

MR. DINTZER:  Thank you very much.

I don't believe that the fire marshal has any standing whatsoever here because this is an injunction against the fire marshal and against my client.  Okay.

They didn't file a complaint.  They haven't filed nothing except an answer to this complaint.  They have no standing whatsoever to be even objecting to the removal of the injunction.  It's an injunction against them.  So there's no -- and my client, obviously.

So Mr. Dorsi's comments that he needs time to evaluate the validity of our request for reconsideration, I think, is hollow.

THE COURT:  All right.  I couldn't hear you, go ahead.

MR. DORSI:  Deputy Attorney General Michael Dorsi.

You started this hearing by reminding us about our duty of candor, and part of the duty of candor of a state agency is tell the Court what it thinks about

15

questions of law.  And our thinking about the questions of law raised here is that they are complicated and that we would like our time to be able to figure out what we are going to say to this Court.  So short-circuiting it on the basis that we are a respondent, when we have a duty of candor, I think, makes no sense.

THE COURT:  All right.  Thank you.

MR. FRANKEL:  May I respond, Your Honor?

THE COURT:  You may.

MR. FRANKEL:  So just a couple things.  I think, you know, frankly we just heard a lot of misleading statements from counsel for Sable and a lot of conflating of the federal action and the state action.  So let me just begin by making it very clear that just because we challenged PHMSA's approvals, which are completely separate than those of the state fire marshal, does not in any way concede or recognize that PHMSA properly arrested jurisdiction from this agency and any of its following actions were in any way lawful or appropriate.  So that's number one.

Whether the agency has jurisdiction, whether this pipeline is interstate or intrastate, all of those questions are not answered yet, and they will be answered eventually by the ninth circuit, and there probably is going to be additional proceedings surrounding that.  So that is completely an open question.

Just because Sable is saying unilaterally that

16

this case is moot, that the fire marshal doesn't have jurisdiction, that doesn't make it so.  I think it's really important to remember that the state waivers, they're still in effect.  Sable has not conceded that they are not effective.  So if things go south for them in the ninth circuit, they're just going to fall back to the state waivers.  So there's no mootness with this case.  It's completely two separate proceedings.  And there's -- for the same reason, there's no constitutional quandary between what the federal court has done and what the state court has done with this injunction.

All the Court did in the ninth circuit when it denied the stay was say that for whatever reason -- there was really actually no explanation given.  It was just a one-sentence order -- that under those circumstances and the laws surrounding what PHMSA did, it sought -- you know, sought fit to allow expedited briefing instead of issue a stay.  It did not rule on any of the questions presented in this case before this Court and does not somehow conflict with this Court's injunction.

THE COURT:  Let me ask a question.  I'm going to interrupt and ask a question.

When is it anticipated that the ninth circuit will rule?

MR. FRANKEL:  So our final --

THE COURT:  The briefing schedule.

17

MR. FRANKEL:  The briefing schedule ends March 17th.

THE COURT:  Okay.

MR. FRANKEL:  We expect, because it's expedited, an opinion would issue promptly thereafter, potentially even before, when this motion for reconsideration is calendared for mid-April.

And then I just, you know, want to just finish by saying any amount of -- you know, any claims that this is exigent is just a fabrication.

I talked about this, you know, fabricated constitutional quandary, but there is nothing in the papers that Sable has submitted that says that they are going to be prejudiced by waiting until April 17th to have this motion heard.

If they truly were on the precipice of lawfully restarting, they still can, but they could have just filed a ten-day notice to lift the injunction.  That is part of the injunction order.  They didn't do that.  And it really belies all these claims they're making that they're suffering ongoing prejudice from having this injunction in place, and that remains in effect.  They have that remedy available to them in the interim until April.

So should they come to the point where they can lawfully restart, they can just do that.  There really is no exigency to rush this really, really consequential motion, which as you just heard, involves really

far-reaching ramifications, really complex jurisdictional questions. We really need to be afforded the opportunity of not four calendar days -- and you heard from Mr. Dorsi as well -- to really fully brief this issue for the Court's benefit as well.

So we would really respectfully request that the Court deny this application for the order shortening time and keep the motion calendared for April 17th.

Again, if developments change and they can lawfully restart, they can just file this ten-day notice to do so. So there is no prejudice to Sable.

And very lastly, going back to the status conference -- and this is related -- they have gone through clearly, you know, a lot of pain to not tell this Court or Petitioners what is going on at the facilities and whether they're in compliance with the Court's injunction. They won't give an answer about it.

We really would respectfully request that the Court ask them directly, because it also bears on whether they should be getting equitable relief here.

If they're not going to be candid with the Court, the Court should not be entertaining any type of equitable relief including this order shortening time.

THE COURT: Counsel, can you please address the status?

MR. DINTZER: Your Honor, first of all, I want to point out that there's no reason to believe that. They've put forward no evidence whatsoever that we're in

19

violation of this Court's --

THE COURT:  Can you please answer my question.

MR. DINTZER:  Yes, Your Honor.

The Los Flores Pipeline System has been operational, that is, active since May of 2025.  Sable and Pacific Pipeline continue to be in compliance with this Court's injunction on the record before the Court that we have before us today, anyway.  And we have every intention to continue to comply with this Court's injunction.

THE COURT:  Thank you.

MR. DINTZER:  Thank you.

MR. FRANKEL:  Your Honor, I think respectfully, that wasn't really an answer to the question and --

THE COURT:  It was quite evasive.

MR. FRANKEL:  Quite evasive.  And I think the real question is, Have they introduced oil into lines 324 or 325 since this injunction was entered?

MR. DINTZER:  The answer to that question is no.

THE COURT:  Okay.  Thank you.  Appreciate it.

MR. DINTZER:  I thought I was clear.  If there was an ambiguity in what I said, I apologize.

THE COURT:  That's okay.  It's not a problem.

Let me make sure.  Anybody else want to be heard?

MR. DINTZER:  Your Honor, if you'll give me just a moment to respond.

20

THE COURT:  Sure.  Go ahead.

MR. DINTZER:  Two quick points.  Number one, this matter is now in the ninth circuit.  They can litigate all of these issues in the ninth circuit.

And with respect to the ten-day notice, the ten-day notice was with respect to the stay.  We are not in that paradigm any longer.  We're now in the federal paradigm.  And we actually have federal waivers, and we have a permit to restart.  So we can -- if this -- as soon as this Court lifts its injunction, we can go forward with our restart plan.  That's the only thing that now is an impediment to us doing that.

So, you know, Your Honor, again, this is a matter of -- which needs to be addressed by this Court forthwith.

THE COURT:  I understand that's your position.

MR. DINTZER:  Thank you very much.

THE COURT:  Petitioners also need to be given a fair opportunity to address the issues, so I'm inclined, after hearing all of your arguments, to set it on shortened time.  Certainly not on your schedule.  It's just too fast.  But I can set it -- I think probably a reasonable compromise would be to set it at the end of February on perhaps February 27th at 10 o'clock.  And we can make oppositions due -- how about February -- Friday, February 13th, and then we can make replies due by Wednesday, February 18th.

MR. DINTZER:  That schedule is fine with --

21

THE COURT:  I think that's a reasonable compromise for everyone.

MR. FRANKEL:  We agree, Your Honor.  That is reasonable to us.

THE COURT:  All right.  Who would like to take the burden of preparing the order?

MR. DINTZER:  We'll prepare the order, Your Honor.

THE COURT:  Thank you for doing that.  Thank you.

All right.  Thanks, everyone.

(Proceedings concluded.)

**Teel Declaration
Page 264**

22

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SANTA BARBARA

SOUTH COUNTY REGION

CENTER FOR BIOLOGICAL DIVERSITY   )
and WISHTOYO FOUNDATION,          )
                                  )
          Petitioners/Plaintiffs, )
                                  ) Case No. 25CV02244
     vs.                          ) Consolidated with
                                  ) Case No. 25CV02247
CALIFORNIA DEPARTMENT OF          )
FORESTRY AND FIRE PROTECTION, et  )
al.,                              )
                                  )
          Respondents/Defendants. )
                                  )
     and                          )
                                  )
SABLE OFFSHORE CORP, et al.,      )
                                  )
          Real Parties in Interest. )
_____ )

          I, MELINA HUSER, CSR NO. 12028, Certified

Shorthand Reporter of the State of California, for the

County of Ventura, do hereby certify that pages 1

through 22, inclusive, are a full, true, and correct

transcript of the proceedings had in the above-entitled

case on January 7, 2025.


          Dated at Ventura, California, this 14th day of

January, 2026.

                              _____

                              Melina Huser, CSR No. 12028
                              Official Reporter Pro Tempore

**Teel Declaration
Page 265**

**1**

**1** 11:28
**10** 20:24
**11000** 2:11
**12028** 2:24 4:25
**128** 7:3
**13th** 20:26
**14th** 12:5
**16th** 12:6
**17th** 17:2,14 18:8
**18th** 20:27

**2**

**2011** 1:25
**2025** 5:23 6:1 19:5
**2026** 1:19 3:1
**23rd** 8:17
**24th** 9:21
**25CV02244** 1:8 3:9
**25CV02247** 1:9 3:9
**27th** 20:24
**29** 6:1 7:3

**3**

**3.723** 5:8
**30th** 5:23
**324** 19:18
**325** 19:18
**350** 2:16
**375** 1:25

**4**

**4** 3:5
**4th** 2:19

**5**

**51st** 2:16
**55** 2:11

**7**

**7** 1:19 3:1

**9**

**900** 2:25
**90071** 2:16
**906** 2:5
**93036** 2:26
**93101** 2:5,20
**94102** 2:11
**94612** 1:25

**A**

**A.M.** 3:2
**absolute** 9:27
**Act** 13:14
**action** 15:13,14
**actions** 15:19
**active** 19:5
**additional** 15:25
**address** 18:24 20:19
**addressed** 20:14
**addressing** 11:18
**Administration** 5:11 6:27
**adopting** 7:7
**affirmative** 11:17
**afforded** 18:2
**afternoon** 11:28
**agencies** 13:23 14:4
**agency** 6:28 14:28 15:18,21

**agency's** 13:26
**agree** 21:3
**ahead** 14:23 20:1
**alike** 6:7,14
**allegation** 7:4
**ALSTON** 2:14
**altogether** 6:4
**ambiguity** 13:27 19:23
**amount** 17:9
**Angeles** 2:16
**Anti-injunction** 13:14
**anticipated** 16:25
**apologies** 13:4
**apologize** 19:23
**appeal** 7:20
**appearances** 1:21,27 2:1 3:10
**application** 8:16 18:7
**apprise** 6:13
**approach** 13:7
**approvals** 5:12 15:15
**approved** 7:10
**April** 17:14,24 18:8
**ARCHBALD** 2:18
**argument** 4:19 9:13
**arguments** 6:11 20:20
**arrested** 15:18
**articulated** 8:1
**asserted** 5:13 13:21
**assess** 6:6
**assure** 6:6,14
**attack** 6:22
**attorney** 2:9 3:12 13:3 14:1,24
**authorities** 7:6
**authority** 10:24
**availed** 8:2,24

**Avenue** 2:11,16
**avoid** 8:13
**aware** 6:21 9:7

**B**

**back** 10:8,9 11:1,27 16:6 18:12
**Barbara** 1:2 2:5,20 3:1
**barred** 13:14
**based** 6:21 10:6 13:26
**basis** 4:18 11:9 15:5
**bears** 18:19
**begin** 15:14
**behalf** 3:12,17,21,25 4:1,4,8 13:4
**belies** 17:20
**believing** 4:18
**benefit** 18:5
**big** 10:17 12:19
**Biological** 1:6,22,23 3:6
**BIRD** 2:14
**briefed** 13:18
**briefing** 13:19 16:19,28 17:1
**briefly** 12:27 14:8
**Bright** 13:25
**Bullock** 2:10 3:14
**burden** 21:6

**C**

**calendar** 3:5 12:6 18:3
**calendared** 17:7 18:8
**California** 1:1,9,25 2:5, 7,9,11,16,20,26 3:1,7, 13 5:7 14:5
**candid** 18:21
**candor** 4:14 14:27 15:6

**case** 1:8,9 3:9 6:21 7:15 10:2 12:12,13,14,20,22 13:13,18 16:1,8,20

**CBD** 7:2

**Center** 1:6,22,23 2:2,3 3:6,22,26

**certification** 4:25

**challenged** 15:15

**chance** 9:2,3 11:15 12:11

**change** 18:9

**Chevron** 13:24

**Christmas** 9:21

**circuit** 7:21,28 8:4,25 9:21 10:11,13 11:3,6,8, 10 12:12,21 15:24 16:6, 13,25 20:3,4

**circuit's** 8:9

**circumstances** 16:17

**citation** 7:9

**claims** 17:9,20

**classified** 6:25

**clear** 15:14 19:22

**clear-cut** 13:20

**client** 14:13,18

**Coast** 2:25

**colleague** 3:14,18

**comments** 4:12 14:19

**company** 2:13 12:19

**complaint** 7:1,2 9:25 14:14,15

**completely** 15:16,26 16:8

**complex** 18:1

**complexities** 4:16

**complexity** 9:13

**compliance** 6:1,7 12:21 18:16 19:6

**complicated** 13:8,28 15:2

**comply** 6:15 19:9

**compromise** 20:23 21:2

**concede** 15:17

**conceded** 16:4

**concession** 9:27

**concluded** 21:12

**concurrent** 12:14

**conference** 5:6,7,9,14, 16,19,20 6:4,5,13 18:13

**confirm** 5:28

**confirmed** 5:27

**conflating** 15:13

**conflict** 8:9 10:14 16:21

**conjunction** 9:7

**consequential** 17:27

**consistent** 14:3

**consolidated** 1:8 3:8,9

**constitutional** 8:14,27 10:15 16:10 17:12

**continue** 8:25 10:2,21 12:11 19:6,9

**CONTINUED** 1:27

**continuing** 7:7

**CORP** 1:13

**Corporation** 2:13 3:8

**costing** 12:18

**counsel** 4:13,20,28 6:18 15:12 18:24

**counsels'** 6:3

**COUNTY** 1:2,3

**couple** 4:12 15:10

**court** 1:1 2:25 3:4,8,15, 19,23,27 4:6,9,14,22,27 5:5,8,14,17,24 6:7,12, 13,17,21,24 7:16,18,20, 28 8:2,15,19,20,28 9:6, 7,12,24,28 10:1,10,14, 21 11:2,9,12,16,21,23 12:7,13,16,25 13:1,6, 13,17 14:7,9,22,28

15:4,7,9 16:10,11,13, 21,23,28 17:3 18:7,15, 19,22,24 19:2,7,11,15, 21,24 20:1,10,14,16,18 21:1,5,9

**Court's** 6:1,8,15 8:8,12 12:6 16:21 18:5,17 19:1,7,9

**COURTROOM** 1:4

**courts** 13:15,16

**CSR** 2:24

---

**D**

**day** 9:10 11:26 12:3,7, 18

**days** 18:3

**deal** 11:10 12:19 13:16

**December** 5:23 9:21

**declarations** 9:9

**Defense** 2:2,3 3:21,25

**deference** 13:22,26

**delay** 8:12 10:26

**deliberate** 14:2

**denied** 8:4 16:14

**deny** 18:7

**denying** 8:9

**Department** 1:9 2:7 3:5,7,13

**Deputy** 3:11 13:3 14:24

**developments** 5:8 18:9

**Dintzer** 2:15 3:28 4:1 6:19 7:19,22 9:16 11:14,19 12:17 14:8,10 18:26 19:3,12,19,22,27 20:2,17,28 21:7

**directly** 18:19

**disagree** 6:11

**discretion** 5:5

**dissolved** 7:25

**Diversity** 1:6,22,23 3:6

**dollars** 12:18

**DONNA** 1:4

**Dorsi** 2:10 3:11,12 12:1,27 13:3,4,7 14:24, 25 18:4

**Dorsi's** 14:19

**doubt** 10:17

**Drive** 2:25

**due** 10:20 12:3 20:25, 26

**dunk** 12:10

**duty** 4:13 14:27 15:6

---

**E**

**EDC** 7:1

**effect** 16:4 17:22

**effective** 16:5

**effectively** 9:17 11:25

**emergency** 5:11 8:3

**end** 20:23

**ends** 17:1

**enforce** 7:7 8:26 10:21

**enforceable** 6:16

**entered** 19:18

**Enterprise** 13:25

**entertain** 4:19 8:15

**entertaining** 18:22

**entire** 7:11

**Environmental** 2:2,3 3:21,25

**equitable** 18:20,23

**Esplanade** 2:25

**Esq** 1:24 2:4,10,15,19

**et al** 1:13 2:2 3:22,26

**evaluate** 14:20

**evasive** 19:15,16

**Eve** 9:22

**eventually** 15:24

evidence 18:28

exclusive 7:5 9:25

exigency 17:27

exigent 17:10

exist 8:21

existing 6:16 7:26

exists 9:10

expect 17:4

expedited 11:9 16:18 17:5

explained 13:11

explanation 16:15

explicitly 13:14

expressly 7:6

**F**

fabricated 17:11

fabrication 17:10

face 5:1

facilities 7:8 18:16

fact 7:6 10:5,11 13:15

fair 9:3 11:15 20:19

fall 16:6

far-reaching 18:1

fast 20:22

FAUVER 2:18

February 20:24,25,26, 27

federal 6:28 7:26 8:19 9:24,28 10:24 13:13,15, 23,27 15:13 16:10 20:7, 8

federally 10:18

figure 15:3

file 12:1,5 14:14 18:10

filed 7:1,2 8:3 9:8,16,20 11:22,25 14:15 17:18

files 3:8

final 16:27

financial 9:10

fine 20:28

finish 7:23 17:8

fire 1:10 2:7,8 3:13 6:22 9:3 14:2,11,13 15:16 16:1

fit 16:18

Floor 2:16,19

Flores 6:23 7:11,27 19:4

Forestry 1:10 2:7 3:7, 13

forthcoming 6:2

forthwith 7:25 11:10 20:15

forward 18:28 20:11

Foundation 1:6,22

Francisco 2:11

Frankel 2:4 3:20,21 15:8,10 16:27 17:1,4 19:13,16 21:3

Franklin 1:25

frankly 10:9 15:11

Friday 12:7 20:26

full 7:10 11:7

fully 18:4

functions 10:16

**G**

Garden 2:5

Garrett 2:15 4:4

Gate 2:11

GECK 1:4

general 3:12 13:3 14:1, 24

GENERAL'S 2:9

give 11:15 18:17 19:27

Golden 2:11

good 3:4,11,16,19,20, 24,27,28 4:3,6,7 5:3 12:28

government 10:24

Grand 2:16

gravity 4:16 9:13

grounds 5:15,18

**H**

handle 12:22

harm 9:9,10

Hazardous 5:10 6:27

hear 14:22

heard 4:20 6:18 11:15 12:26 15:11 17:15,28 18:4 19:26

hearing 8:17 9:1 11:8 14:26 20:20

hears 12:8

Hey 10:9

hold 10:2

hollow 14:21

HON 1:4

Honor 3:11,16,20,24,28 4:3,7,21,23 6:20 7:19, 22 9:16 10:5,20 11:19 13:5 15:8 18:26 19:3, 13,27 20:13 21:3,8

Huser 2:24 4:24,27

**I**

identify 5:2

immediately 8:4,13

imminently 5:22

impediment 20:12

important 16:3

impress 11:23

inclined 20:19

including 18:23

inconsistency 11:4,5

initial 13:7

injunction 6:2,24 7:17, 24 8:8,13,26 9:8,11 10:2,7,13,22 11:10 12:20 13:12 14:12,17 16:12,22 17:18,19,22 18:17 19:7,10,18 20:10

injunctive 8:10

intends 5:28

intention 19:9

interest 1:14 2:12 4:4,8

interim 17:23

interpretation 13:26

interrupt 7:18 16:24

interstate 6:25 7:4,8 15:22

intrastate 15:22

introduced 4:24 19:17

involved 4:17

involves 17:28

issue 8:7,27 9:3,4 10:13,16 12:4,8 13:22 16:19 17:5 18:5

issued 5:11,12 6:24 7:10

issues 4:17 6:10 13:8, 16,28 20:4,19

**J**

January 1:19 3:1 8:17

Jeffrey 2:15 4:1

Jeremy 2:4 3:20

JUDGE 1:4

Julie 1:24 3:18

July 6:1

jurisdiction 5:13 6:26 7:5,12,16,25 8:3,25 9:26,28 10:12,21 12:14, 22 13:22 15:18,21 16:2

jurisdictional 4:17 6:9

18:2

**justification**  8:23

---

**K**

**knowing**  9:24

**Krop**  2:4 3:24,25

---

**L**

**Large**  2:18,19 4:7,8

**lastly**  18:12

**law**  13:23 15:1,2

**law-and-motion**  12:8

**lawful**  8:10 15:19

**lawfully**  17:16,26 18:10

**laws**  16:17

**lift**  17:18

**lifted**  12:20

**lifts**  20:10

**Linda**  2:4 3:24

**lines**  19:18

**litigate**  8:6 12:12 20:4

**LLP**  2:14,18

**longer**  7:13,15,16 10:3, 21,23 20:7

**Loper**  13:24

**Los**  2:16 6:23 7:11,27 19:4

**lot**  15:11,12 18:14

---

**M**

**made**  7:4

**make**  16:2 19:25 20:25, 26

**makes**  13:7 15:6

**making**  15:14 17:20

**manner**  8:7

**March**  17:2

**marshal**  2:8 9:3 14:2, 11,13 15:17 16:1

**Marshals'**  6:22

**Material**  5:11

**Materials**  6:27

**Matt**  3:14

**matter**  3:6 4:16,26 7:17,24 8:5,18 9:1,14, 26 10:1 11:7,11 12:22 20:3,14

**matters**  4:15 7:5 12:8

**Matthew**  2:10

**Melina**  2:24 4:24

**mentioned**  5:10

**Michael**  2:10 3:12 13:3 14:24

**mid-april**  17:7

**millions**  12:18

**misleading**  15:12

**moment**  19:28

**Monday**  9:18 11:26

**moot**  7:16 16:1

**mootness**  6:9 16:7

**morning**  3:4,11,16,19, 20,24,27,28 4:3,6,7 5:3

**motion**  9:8 11:3 17:6, 15,28 18:8

**moving**  4:10

---

**N**

**necessitate**  5:9

**needed**  5:14,21 6:4,5

**Nimmer**  1:24 3:16,17 4:21 5:3,4,18,25

**ninth**  7:21,28 8:4,9,25 9:21 10:11,12 11:3,6,8, 10 12:3,12,21 15:24 16:6,13,25 20:3,4

**notice**  9:15 17:18 18:10 20:5,6

**NRDC**  13:24

**number**  4:25 15:20 20:2

---

**O**

**Oakland**  1:25

**objecting**  14:16

**occurs**  13:16

**Office**  2:7,9 6:22 14:1

**Official**  2:24

**Offshore**  1:13 2:12 3:7 4:1,5

**OFSM's**  7:12

**oil**  19:17

**one-sentence**  16:16

**ongoing**  17:21

**open**  15:26

**operate**  10:26

**operation**  7:11 8:10 10:4

**operational**  19:5

**opinion**  17:5

**opportunity**  8:6 11:7 18:3 20:19

**opposite**  8:21

**opposition**  4:11 12:2

**oppositions**  4:11 20:25

**order**  5:5 6:2,8,16 8:9 16:16 17:19 18:7,23 21:6,7

**ordinary**  13:18

**OSFM**  7:13

**overlapping**  13:16

**overruled**  13:24

**Oxnard**  2:26

---

**P**

**Pacific**  2:13 4:2,5 7:14

19:6

**pain**  18:14

**papers**  4:10 9:17,18 11:13,17,20,25 12:3 17:13

**paradigm**  20:7,8

**paragraph**  7:3

**part**  14:27 17:19

**parte**  4:15,18 8:5,16 11:18

**partes**  3:5

**parties**  1:14 2:12 4:4 6:7 13:12

**party**  4:1,8 5:6 13:9

**patient**  11:1

**pending**  7:21

**permit**  5:12 7:26 20:9

**permitted**  8:19

**persuaded**  4:14

**petition**  9:20

**Petitioner's**  9:12

**petitioners**  1:22 2:2 3:17,21,25 6:10,12 8:1, 2,6,24 18:15 20:18

**Petitioners'**  6:3

**Petitioners/plaintiffs**  1:7

**PHMSA**  6:28 7:4,10 9:25 13:21 15:18 16:17

**PHMSA's**  15:15

**piece**  13:10

**pipeline**  2:13 4:2,5 5:10 6:23,25,26 7:5,8, 11,14,15,27 8:11,20 10:4,18,25,26 15:22 19:4,6

**pipelines**  5:13,22,27 6:6 7:4

**place**  9:11 17:22

**plan**  5:12 20:11

**play**  10:28

**pleading** 12:15

**pled** 9:25

**point** 8:22 17:25 18:27

**points** 20:2

**portions** 6:23 7:27

**position** 9:19,20 20:16

**positions** 14:3,4

**potentially** 17:6

**precipice** 17:16

**preempted** 7:6

**preemption** 13:20

**prejudice** 17:21 18:11

**prejudiced** 17:14

**Preliminarily** 4:12

**preliminary** 6:1 7:17, 24 8:8,26 9:8 10:7

**prepare** 21:7

**preparing** 21:6

**presented** 8:14 16:20

**presently** 10:14

**previously** 9:6

**Pro** 2:24

**problem** 19:24

**proceedings** 1:18 15:25 16:8 21:12

**process** 10:28

**promptly** 9:1,5 12:24 17:5

**properly** 15:18

**proposed** 12:2

**Protection** 1:10 2:7 3:13

**public** 6:14

**pure** 9:27

**pursuant** 5:7

**put** 11:12 18:28

**Q**

**quandary** 8:14 16:10 17:12

**question** 10:19 13:17, 20 15:27 16:23,24 19:2, 14,17,19

**questions** 15:1,23 16:20 18:2

**quick** 20:2

**quote** 7:7

**R**

**Raimondo** 13:25

**raised** 6:10 15:2

**ramifications** 18:1

**read** 4:10,11

**real** 1:14 2:12 4:1,4,8 13:9,12 19:17

**reason** 16:9,14 18:27

**reasonable** 20:23 21:1,4

**recent** 5:8

**recently** 13:24

**recognize** 15:17

**recognized** 10:12

**reconsideration** 14:21 17:7

**record** 10:6 13:2 19:7

**referred** 6:28

**regard** 6:9

**REGION** 1:3

**regulated** 10:18

**related** 18:13

**relationship** 13:11

**relevant** 10:3

**relief** 4:15,18 8:10 11:17 18:20,23

**relying** 10:23

**remaining** 7:27

**remains** 9:11 17:22

**remedy** 17:23

**remember** 16:3

**remind** 4:13

**reminding** 14:26

**removal** 14:17

**repeated** 5:26 6:3 7:2

**replies** 20:26

**reply** 12:5

**Reported** 2:24

**Reporter** 2:24 4:23,28

**REPORTER'S** 1:18

**Reporters** 2:25

**reporting** 4:25

**request** 5:6 8:3,28 14:20 18:6,18

**requesting** 6:13

**requests** 5:26 6:3

**require** 14:1

**resolved** 8:13,18 9:2,5 12:9,23

**respect** 8:10,16 10:20 20:5,6

**respectfully** 18:6,18 19:13

**respond** 9:14 14:8 15:8 19:28

**respondent** 13:4 15:5

**Respondents** 3:12

**Respondents/ defendants** 1:11 2:7

**response** 4:11

**restart** 5:12,22 7:26 8:19 10:25 17:26 18:10 20:9,11

**restarted** 5:27

**restarting** 7:14 17:17

**revoke** 11:9

**revoked** 7:12 10:7

**room** 8:12

**rule** 16:19,26

**ruled** 11:3

**Rules** 5:8

**rulings** 11:4,5

**rush** 17:27

**S**

**Sable** 1:13 2:12 3:7 4:1, 5 5:21,27,28 6:2,7,10, 15 7:14 9:9,10 15:12,28 16:4 17:13 18:11 19:5

**safety** 5:11 6:27 7:5,7

**San** 2:11

**Santa** 1:2 2:5,20 3:1

**SB-4** 1:4

**schedule** 8:5 13:19 16:28 17:1 20:21,28

**scheduling** 11:18

**sense** 13:8 15:6

**separate** 15:16 16:8

**separation** 10:15

**SESSION** 3:2

**set** 8:5,28 9:15 20:20, 22,23

**short-circuiting** 15:4

**shortened** 9:15 14:5 20:21

**shortening** 8:16 18:7, 23

**showing** 9:9

**sic** 7:12

**Simmons** 1:24 3:18

**simply** 6:11

**single** 9:10

**sitting** 10:15

**slam** 12:10

**sought** 13:12 16:18

**south** 1:3 2:16 16:5

**speaking** 5:1

**special** 5:12

**SPRAY** 2:18

**stand** 6:14

**standards** 7:8

**standing** 14:12,16

**stands** 6:5

**Stanton** 2:15 4:3,4

**started** 14:26

**state** 1:1 2:8,19 6:22 7:6,15 8:20,26 10:3,10, 22 12:13 13:1,15 14:2, 4,28 15:13,16 16:3,7,11

**state-versus-federal** 13:10

**statement** 13:21

**statements** 15:12

**status** 5:5,7,9,14,16,19, 20 6:4,5,6,13 18:12,25

**statute** 13:15,27

**stay** 8:4 11:3 16:14,19 20:6

**stick** 11:20

**Street** 1:25 2:5,19

**strongly** 6:10

**submit** 8:15 10:5 11:6

**submitted** 9:6 17:13

**substantial** 9:9

**suffering** 17:21

**Suite** 1:25 2:11,25

**SUPERIOR** 1:1

**support** 14:6

**supremacy** 10:16 11:6

**surrounding** 15:26 16:17

**system** 6:23 7:11,27 8:26 10:18 19:4

**T**

**Talia** 1:24 3:16 5:3

**talked** 17:11

**Teel** 1:24 3:18

**Tempore** 2:24

**ten-day** 17:18 18:10 20:5,6

**tentative** 12:28 14:6

**terms** 7:13

**thing** 5:17 20:11

**things** 6:14 15:10 16:5

**thinking** 15:1

**thinks** 14:28

**thought** 19:22

**time** 5:6,7 8:16 9:14 13:16 14:5,19 15:3 18:8,23 20:21

**timely** 8:7

**today** 6:12,14 10:7,8,25 11:20 19:8

**TRANSCRIPT** 1:18

**Trevor** 2:19 4:7

**tricky** 13:17

**true** 11:19

**type** 18:22

**U**

**understand** 11:14 12:7 20:16

**Understood** 12:25

**unilaterally** 15:28

**universe** 8:21

**update** 5:14

**urgency** 11:23

**urgently** 5:21

**V**

**validity** 14:20

**versus** 3:6 13:24,25

**view** 11:25 14:6

**views** 12:28

**violation** 19:1

**W**

**waited** 10:27 11:2

**waiting** 17:14

**waivers** 6:23 7:10,15, 26 10:3,22,23 16:3,7 20:8

**wanted** 11:15

**Wednesday** 1:19 3:1 20:27

**weeks** 9:20

**well-reasoned** 14:3

**well-vested** 12:4

**West** 2:25

**whatsoever** 8:23 14:12,16 18:28

**willy-nilly** 11:2

**Wishtoyo** 1:6,22

**Y**

**yesterday** 9:17

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
2/13/2026 8:49 PM
By: Narzralli Baksh , Deputy

Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 884-7100
*Attorneys for Petitioners/Plaintiffs Center for Biological Diversity and Wishtoyo Foundation*

Linda Krop (Bar No. 118773)
lkrop@environmentaldefensecenter.org
Jeremy M. Frankel (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
Tara C. Rengifo (Bar No. 307670)
trengifo@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152
*Attorneys for Petitioners/Plaintiffs Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## IN AND FOR THE COUNTY OF SANTA BARBARA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,<br><br>Petitioners/Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive,<br><br>Respondents/Defendants.<br><br>SABLE OFFSHORE CORP., a Delaware Corporation; PACIFIC PIPELINE COMPANY, a Delaware Corporation; and DOES 11 through 20, inclusive,<br><br>Real Parties in Interest. | Case No.: 25CV02244<br>[Consolidated with Case No. 25CV02247]<br><br>**PROOF OF SERVICE RE: PETITIONERS AND PLAINTIFFS' COMBINED OPPOSITION TO REAL PARTIES IN INTEREST'S NOTICE OF MOTION AND MOTION FOR RECONSIDERATION OF PRELIMINARY INJUNCTION**<br><br>Date:    February 27, 2026<br>Time:    10:00 a.m.<br>Dept.:    4<br>Judge:    Honorable Donna D. Geck<br><br>Action Filed: April 15, 2025 |

| | |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation, | Case No. 25CV02247 [Consolidated with Case No. 25CV02244] |

Petitioners/Plaintiffs,

v.

CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, an agency of the State of California; OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive,

Respondents/Defendants.

SABLE OFFSHORE CORP., a Delaware Corporation; and PACIFIC PIPELINE COMPANY, a Delaware Corporation,

Real Parties in Interest.

Proof of Service re: Petitioners' Combined Opposition to Motion for Reconsideration

I, Talia Nimmer, state:

I am over the age of 18 and not a party to the foregoing action. My business address is Center for Biological Diversity, 2100 Franklin St., Ste. 375, Oakland CA 94612. On February 13, 2026, I served a true and correct copy of:

1. **PETITIONERS' AND PLAINTIFFS' COMBINED OPPOSITION TO REAL PARTIES IN INTEREST'S NOTICE OF MOTION AND MOTION FOR RECONSIDERATION OF PRELIMINARY INJUNCTION;**

2. **DECLARATION OF JULIE TEEL SIMMONDS IN SUPPORT OF PETITIONERS' AND PLAINTIFFS' COMBINED OPPOSITION TO REAL PARTIES IN INTEREST'S NOTICE OF MOTION AND MOTION FOR RECONSIDERATION OF PRELIMINARY INJUNCTION;**

3. **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PETITIONERS' AND PLAINTIFFS' COMBINED OPPOSITION TO REAL PARTIES IN INTEREST'S NOTICE OF MOTION AND MOTION FOR RECONSIDERATION OF PRELIMINARY INJUNCTION; AND**

4. **[PROPOSED] ORDER RE: REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PETITIONERS' AND PLAINTIFFS' COMBINED OPPOSITION TO REAL PARTIES IN INTEREST'S NOTICE OF MOTION AND MOTION FOR RECONSIDERATION OF PRELIMINARY INJUNCTION**

[X] BY ELECTRONIC SERVICE: By electronically mailing a true and correct copy to the email addresses shown below pursuant to California Rule of Court Section 2.251(c)(3) and Local Rule 1012.

Michael S. Dorsi
Matthew Bullock
Myung Park
California Attorney General's Office
55 Golden Gate Ave, Ste 11000
San Francisco, CA 94102
Michael.Dorsi@doj.ca.gov
Matthew.Bullock@doj.ca.gov
Myung.Park@doj.ca.gov
*Attorney for Respondents/Defendants*

Jeffrey Dintzer
Garrett Stanton
ALSTON & BIRD
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071
Jeffrey.dintzer@alston.com

1

Proof of Service re: Petitioners' Combined Opposition to Motion for Reconsideration

Garrett.stanton@alston.com
*Attorneys for Real Parties in Interest*

DJ Moore
Benjamin Hanelin
Natalie Rogers
PAUL HASTINGS
1999 Avenue of the Stars, 27th Floor
Century City, CA 90067
djmoore@paulhastings.com
benjaminhanelin@paulhastings.com
natalierogers@paulhastings.com
*Attorneys for Real Parties in Interest*

Trevor D. Large
Victoria C. Diffenderfer
FAUVER LARGE ARCHBALD & SPRAY
820 State Street, 4th Floor
Santa Barbara, CA 93101
tlarge@flasllp.com
vdiffenderfer@flasllp.com
*Attorneys for Real Parties in Interest*

I declare under penalty of perjury under the law of California that the foregoing is true and correct. Executed on February 13, 2026, in Los Angeles, California.

Talia Nimmer

2

Proof of Service re: Petitioners' Combined Opposition to Motion for Reconsideration

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
2/18/2026 9:03 PM
By: Narzralli Baksh , Deputy

Jeffrey D. Dintzer (SBN: 139056)
Garrett B. Stanton (SBN: 324775)
**ALSTON & BIRD LLP**
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071
Tel: (213) 576-1000; Fax: (213) 576-1100
Jeffrey.Dintzer@alston.com
Garrett.Stanton@alston.com

Duncan Joseph Moore (SBN: 233955)
Benjamin J. Hanelin (SBN: 237595)
Natalie C. Rogers (SBN: 301254)
**PAUL HASTINGS LLP**
1999 Avenue of Stars, 27th Floor
Century City, CA 90067
Tel: (310) 620-5879; Fax: (310) 620-5899
djmoore@paulhastings.com
benjaminhanelin@paulhastings.com
natalierogers@paulhastings.com

Trevor D. Large (SBN: 214886)
Victoria C. Diffenderfer (SBN: 350018)
**FAUVER LARGE ARCHBALD & SPRAY**
820 State Street, 4th Floor
Santa Barbara, CA 93101
Tel: (805) 966-7000; Fax: (805) 966-7227
tlarge@flasllp.com
vdiffenderfer@flasllp.com

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SANTA BARBARA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION, | Case No.: 25CV02244 [Consolidated with 25CV02247] |
| Petitioners/Plaintiffs, | |
| v. | **REAL PARTIES IN INTEREST SABLE OFFSHORE CORP.'S AND PACIFIC PIPELINE COMPANY'S REPLY IN SUPPORT MOTION FOR RECONSIDERATION OF PRELIMINARY INJUNCTION** |
| CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10; inclusive, | |
| Respondents/Defendants. | Date:      February 27, 2026 Time:     10:00 a.m. Dept.:     4 |
| | Complaint Filed: April 15, 2025 |
| | [Assigned for Purposes to the Honorable Donna D. Geck, Dept. 4] |

---

**1**

REPLY IN SUPPORT OF MOTION FOR RECONSIDERATION

SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,

Real Parties in Interest

ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation,

Petitioners/Plaintiffs,

v.

CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, an agency of the State of California; OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10; inclusive,

Respondents/Defendants.

SABLE OFFSHORE CORP., a Delaware Corporation, and PACIFIC PIPELINE COMPANY, a Delaware Corporation.

Real Parties in Interest.

Case No.: 25CV02247

REPLY IN SUPPORT OF MOTION FOR RECONSIDERATION

## I.    INTRODUCTION

Petitioners and OSFM do not dispute the new facts and circumstances underlying Sable's Motion for Reconsideration of the Preliminary Injunction (the "Motion"): PHMSA has assumed exclusive jurisdiction over Lines CA-324 and CA-325, re-designated the Lines (as it was designated historically) as a portion of an interstate pipeline system, and authorized its restart. Instead, Petitioners and OSFM litigate the merits of PHMSA's jurisdiction, the terms of the Consent Decree, and the applicability of SB237 to preserve a Preliminary Injunction that is now untethered to Petitioners' claims for relief. This Court is not the appropriate venue, and the Motion is not the appropriate vehicle to resolve those issues.

Petitioners' allegations establish the basis on which this Court may issue preliminary injunctive relief. (*Griffin Dewatering Corp. v. Northern Ins. Co. of New York* (2009) 176 Cal. App. 4th 172, 179, 210 ("*Griffin Dewatering Corp.*"), citing *Lavely v. Nonemaker* (1931) 212 Cal. 380, 385 ["It is fundamental principle of pleading that 'a plaintiff must recover, if at all, upon the cause of action set out in the complaint, and not upon some other which may be developed by the proofs.'"].) Petitioners only seek injunctive relief related to legality of OSFM's State Waivers. (EDC's Compl., at Prayer for Relief, at 2; CBD's Compl., at Prayer for Relief, at 2.) Yet Sable never enjoyed the benefit of the State Waivers, as OSFM concluded Sable did not comply with their requirements (see OSFM's RJN, Ex. K ["OSFM is providing this initial notification of deficiency to Sable regarding the State Waiver requirements. . . .]), and Sable need not rely upon them now.

Therefore, the sole question before this Court is whether the Preliminary Injunction—which is wholly based on OSFM-issued State Waivers upon which Sable no longer relies—should be reconsidered and rescinded. For the reasons set forth in the Motion and below, the Court must now dissolve its Preliminary Injunction because it is based entirely on a finding that Petitioners had a likelihood of success on their claim that OSFM did not properly follow the *state* California Pipeline Safety Act's procedures in issuing the State Waivers; an issue that is no longer before this Court.

## II.    ARGUMENT

Petitioners' Complaints, which were filed on April 15, 2025, challenge OSFM's issuance of the State Waivers. Notably, Petitioners' Complaints seek injunctive relief purely with respect to

those State Waivers. (EDC's Compl., at Prayer for Relief, at 2 ["That the Court issue temporary, preliminary, and permanent injunctive relief preventing restart of [Lines CA-324 and CA-325] *under the State Waivers*"], italics added; CBD's Compl., at Prayer for Relief, at 2 ["For entry of temporary, preliminary, and permanent relief prohibiting Cal Fire and the Real Parties in Interest from conducting any further activity in furtherance of the Project *until Cal Fire complies with the requirements of CEQA and federal and state pipeline safety laws*."], italics added.) The Preliminary Injunction, which was entered on July 28, 2025, enjoins Sable from restarting Lines CA-324 and CA-325 of the Santa Ynez Pipeline System (formerly referred to as the "Las Flores Pipeline") until it gives 10 days' notice that it received all necessary approvals and permits (which at the time were under OSFM's purview). As Petitioners' Complaints center on OSFM's State Waivers, the July 28, 2025 Order granting the Preliminary Injunction only makes findings regarding the likelihood of success concerning the State Waivers.

However, the material facts and circumstances surrounding restart of Lines CA-324 and CA-325 have changed. PHMSA designated the Santa Ynez Pipeline System as an interstate pipeline under its exclusive pipeline safety jurisdiction on December 17, 2025, and approved Sable's Restart Plan on December 22, 2025. The Preliminary Injunction now stands to frustrate restart under a federal regulatory paradigm that was not previously contemplated and for which Petitioners do not seek any related relief. The Court should reject Petitioners' *ad hoc* arguments unmoored from their claims for relief and OSFM's efforts to enjoin itself from exercising authority it no longer possesses.

**A.     The Ninth Circuit has Exclusive Judicial Review over PHMSA Orders.**

The bases underlying Petitioners' Complaints and the Preliminary Injunction have fundamentally changed. Petitioners' Complaints challenge OSFM's issuance of the State Waivers pursuant to the regulatory authority it formerly had over Lines CA-324 and CA-325. Further, in issuing the Preliminary Injunction, the Court determined that Petitioners had only demonstrated a likelihood of success on the meris of its causes of action under the *state* California Pipeline Safety Act.

However, the California Pipeline Safety Act is no longer at issue. Sable has PHMSA's approval to restart Lines CA-324 and CA-325. Petitioners' Complaints do not challenge PHMSA's

---

**4**

REPLY IN SUPPORT OF MOTION FOR RECONSIDERATION

actions, and their Oppositions to the Motion are not the appropriate mechanism to seek such expanded relief. Stated plainly, Petitioners "cannot recover on a cause of action [preventing restart of Lines CA-324 and CA-325 under PHMSA's approvals and purview] not in the complaint." (*Griffin Dewatering Corp.*, *supra*, 176 Cal.App.4th at p. 179.) Nor can a Preliminary Injunction premised on inapplicable state law stand.

Petitioners' operative Complaints are in accord. "For *interstate* pipelines, PHMSA has exclusive jurisdiction over matters of pipeline safety[, and,] [i]n fact, state authorities are expressly preempted from adopt[ing] *or continu[ing] [to] [en]force for interstate pipeline facilities*. (49 U.S.C. § 60104(c).)" (EDC Compl., at ¶ 128, italics and emphasis added; see CBD Compl., at ¶ 58.) Sable now seeks to pursue the lawful restart of Lines CA-324 and CA-325 with PHMSA's approval and oversight, *and without relying upon OSFM's State Waivers or ever having received any benefit from the State Waivers*. (See OSFM's RJN, Ex. K.) In fact, Sable is actually *precluded* from relying upon the State Waivers. (Declaration of Jeffrey D. Dintzer ("Dintzer Decl."), Ex. 3 [PHMSA's Opposition to Emergency Stay Motion], p. 18 ["States cannot regulate interstate pipelines, 49 U.S.C. § 60104(c), so Sable **may not** rely on those waivers."] [emphasis added].)

To the extent Petitioners and OSFM challenge the scope of PHMSA's jurisdiction, whether Lines CA-324 and CA-325 are intrastate pipelines or segments of an interstate pipeline system, or the propriety of PHMSA's actions, only the Ninth Circuit can decide those issues. Congress vested the Ninth Circuit with exclusive authority to review PHMSA orders under 49 U.S.C. § 60119(a), which provides that a person "adversely affected" by an order issued by PHMSA under the federal Pipeline Safety Act may obtain judicial review only by filing a petition for review in the appropriate federal court of appeals within the proscribed statutory deadline. Petitioners and OSFM have done this. Both filed petitions for review in the Ninth Circuit challenging PHMSA's interstate designation and subsequent approvals.

The Ninth Circuit denied Petitioners' Emergency Motion for Stay Pending Appeal on December 31, 2025. (Large Decl., Exhibit D.) The resolution of the remaining merits must now be left to the Ninth Circuit and the Preliminary Injunction based on OSFM's State Waivers cannot stand to frustrate that parallel federal action or create inconsistent results.

Petitioners and OSFM argue that PHMSA's interstate designation and subsequent actions may be relitigated in any forum that happens to have a live dispute about related conduct. Not so. While parallel litigation about downstream consequences may generally proceed in different fora, Congress specifically precluded that here. "It can hardly be doubted that Congress, acting within its constitutional powers, may prescribe the procedures and conditions under which, and the courts in which, judicial review of administrative orders may be had." (*City of Tacoma v. Taxpayers of Tacoma* (1958) 357 U.S. 320, 336.) In *City of Tacoma*, the Supreme Court refused to permit litigation in other courts where Congress has created a "specific, complete and exclusive mode for judicial review" of agency orders. (*Ibid*.) That is exactly the situation present here. (See *Elgin v. Dep't of Treasury* (2012) 567 U.S. 1 [holding that statutory review scheme was exclusive where congressional intent to channel review was "fairly discernible"].) Petitioners' and OSFM's attempts to invalidate or nullify PHMSA's determination through collateral state litigation must be rejected. This Court cannot entertain a collateral merits challenge to PHMSA's orders under the guise of enforcing the Preliminary Injunction.

**B.      The Central District of California has Exclusive Review Jurisdiction over the Consent Decree.**

Petitioners and OSFM also advance several arguments on why certain provisions of the Consent Decree support keeping the Preliminary Injunction in place. But this Court is not the proper venue for resolving issues related to the Consent Decree, and the Preliminary Injunction is not the proper vehicle for enforcing its terms. Petitioners and OSFM conflate two distinct questions: (1) what obligations exist under the Consent Decree, and to what extent they apply; and (2) whether this Court can maintain the Preliminary Injunction despite conflicting federal action. Question one is not pled by Petitioners for the Court to consider and must be decided by the Central District of California. Only the latter question is presented here.

Paragraph 97 of the Consent Decree provides that the District Court for the Central District of California "shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of effectuating or enforcing compliance with the terms of the Consent Decree." (Sable's RJN & Dintzer Decl., Ex. 1, p. 3, ¶ 97.) Neither Petitioners nor OSFM have pointed to any provision

in the Consent Decree that would allow for a state court to exercise this exclusive enforcement jurisdiction. Moreover, and notwithstanding OSFM's blanket assertions of an identity of claims and privity between parties, the validity of OSFM's State Waivers in light of PHMSA's jurisdiction is not at issue *and Sable is not a party to the Consent Decree action pending in the Central District of California.* While Sable has assumed certain provisions of the Consent Decree by agreement (See OSFM's RJN, Ex. E), the terms of the Consent Decree, their applicability to Sable, and the parties' respective rights and obligations pursuant to those terms are appropriately litigated in the federal court with exclusive jurisdiction to effectuate and enforce the terms of the Consent Decree. OSFM argues this Court's "most conservative and prudent course" is to "hold Sable to its commitment" under the Consent Decree and "maintain its injunction until there is a final resolution in federal court, and then apply any preclusive effect of a federal court judgment in this case." (OSFM's Opp., at p 14.) But the scope of Sable's commitment under the Consent Decree is not for this Court to decide, and enforcing the Preliminary Injunction is not "conservative" but improper when it is premised on State Waivers upon which Sable may no longer rely.

Moreover, Petitioners confuse the Emergency Special Permit as a permit required to operate Lines CA-324 and CA-325. It is not. Under the Pipeline Safety Act, 49 CFR Part 195, *et seq.*, PHMSA administers comprehensive safety standards for oil pipelines including standards on design, construction, testing, operation, and maintenance. Pipelines regulated by PHMSA must meet the requirements of Part 195 but are not required to obtain operating permits. (See also 89 Fed. Reg. 99327, 99329 [Dec. 10, 2024 Proposed PHMSA NEPA Implementing Procedures] ["PHMSA does not site, permit, or authorize transportation infrastructure."].) Although 49 U.S.C. 60118(c) authorizes PHMSA to waive compliance with certain standards on an operator-by-operator basis (known as "special permits"), these are not permits to operate or construct a pipeline. Rather, they are intended to provide relief from otherwise applicable safety standards and flexibility in unique circumstances where the operator can show that it will implement alternative standards that achieve an equivalent or greater level of safety as required in Part 195. Sable is currently working with PHMSA on additional operating conditions consistent with the Consent Decree and has committed to following the conditions of the Emergency Special Permit during the interim period before a

regular permit is issued. (Dintzer Decl., Ex. 4.)

To the extent Petitioners or OSFM disagree, their disputes premised on PHMSA's jurisdiction are properly resolved by the Ninth Circuit and their disputes premised on the requirements of the Consent Decree are properly resolved by the Central District of California.

**C.     The Requirements of SB 237, to the Extent They Apply, Are Not at Issue.**

Petitioners argue that Sable will not suffer harm from the Preliminary Injunction remaining in place because SB 237 requires Sable to obtain additional Coastal Development Permits to restart Lines CA-324 and CA-325. (Petitioners' Opp., at p. 12.) The application of SB 237 to Sable and Lines CA-324 and CA-325 is another issue actively being litigated outside of this forum in the Superior Court of Kern County. (See OSFM's RJN, Exh. C.) That court recently denied the State of California's motion to change venue to Santa Barbara. (Sable's RJN & Dintzer Decl., Ex. 2.) PHMSA's approvals and jurisdiction also preempt SB 237, but questions around whether SB 237 applies, and to what extent, are not before this Court and may not form a basis for any preliminary injunctive relief. (See *Griffin Dewatering Corp.*, *supra*, 176 Cal.App.4th at p. 179.) The only issue for resolution here is whether the Preliminary Injunction can remain in place given the change in facts and circumstances. Because Sable is no longer relying upon the State Waivers underpinning Petitioners' Complaints and the basis for their injunctive relief, the Preliminary Injunction must be reconsidered and rescinded so as not frustrate PHMSA's jurisdiction and determinations.

**D.     Sable's Motion is Not Barred by Judicial Estoppel.**

OSFM also contends that Sable should be judicially estopped from pursuing reconsideration because Sable "assumed the role of Plains under the Consent Decree, accepting the obligation to obtain and comply with OSFM's State Waivers" and prior to PHMSA's assertion of jurisdiction, "notified this Court that there was no exigency because OSFM would have to approve a restart plan before Sable could transport oil through [Lines CA-324 and CA-325]." (OSFM Opp., at p. 17:15-22.)[1] OSFM further contends that Sable enjoyed a benefit of the State Waivers because it did not

---

[1] Rather, OSFM should be prevented from challenging PHMSA's jurisdiction as a basis to keep itself enjoined as a representative of OSFM plainly stated to the press when asked if OSFM would challenge PHMSA's assertion of regulatory authority: "We're not going to court. Anything like that would be up to the Governor's Office or the Department of Justice." (Dintzer Decl., Ex. 5.)

REPLY IN SUPPORT OF MOTION FOR RECONSIDERATION

contest a tentative ruling that "was a favorable result for OSFM and Sable." (*Id.*, at p. 17:22-25.) But OSFM ignores that it wasn't until December 2025, well after the Preliminary Injunction was entered, that PHMSA assumed exclusive jurisdiction over the Lines CA-324 and CA-325, re-designated them as segments of an interstate pipeline system, issued its Emergency Special Permit, and approved Sable's Restart Plan.

Additionally, OSFM fails to articulate how Sable could have derived any benefit from the State Waivers given OSFM's claim that Sable failed to comply with their conditions and could not restart Lines CA-324 and CA-325 as a result. (OSFM's RJN, Ex. K.) Specifically, OSFM informed Sable that "OSFM granted the State Waivers on the condition that Sable complies with the specific requirements contained therein[,]" but "Sable has not satisfied [a] condition in the State Waivers[,]" and thus, "[t]he above findings alone and the inconsistencies with the State Waiver requirements prevent restart under the law." (*Ibid.*) OSFM's reliance on *People ex rel. Sneddon v. Torch Energy Services, Inc.* (2002) 102 Cal.App.4th 181, is misplaced. Whereas the party in *Sneddon* accepted the benefits of a permit, it can hardly be said that OSFM's refusal to process Sable's Restart Plan or the Preliminary Injunction conferred any benefit onto Sable that would estop Sable from seeking reconsideration based on PHMSA's jurisdiction over restart.

### E.    Sable's Motion is Procedurally Proper.

Petitioners further argue that "to the extent Sable attempts to proceed under CCP section 1008(a)[], its Motion should be denied because it was not filed within ten days of the Court's order." (Petitioners' Opp., at p. 6:3-4.) Motions to reconsider are commonly brought under both Sections 1008 and 533. (See, e.g., *Global Protein Products, Inc. v. Le* (2019) 42 Cal.App.5th 352, 355 [reviewing a trial court order that considered both Sections 1008 and 533].) Sable's Motion was proper under both sections. Section 1008 allows for reconsideration of any order upon adduction of new evidence or change in law. (See Code Civ. Proc. § 1008(b).)[2] Section 533 empowers courts to

---

[2] Section 1008 provides two distinct procedural devices. Subdivision (a) carries a 10-day deadline, but subdivision (b) does not. Instead, 1008(b) allows litigants to request reconsideration of a previous order "upon new or different facts, circumstances, or law." (See also *Stephen v. Enterprise Rent-A-Car* (1991) 235 Cal.App.3d 806, 816 [explaining that "subdivision (b) applies to renewals based upon 'new' facts and imposes no time limitations on such motions"].)

modify or dissolve preliminary injunctions upon a showing of material change in facts or law, or in the interests of justice. (See Code Civ. Proc. § 533.) PHMSA's assumed jurisdiction, designation of Lines CA-324 and CA-325 as portions of an interstate pipeline system, approval of Sable's Restart Plan are new, material facts regardless of whether Petitioners or OSFM dispute their impact. (See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) [defining a "material fact" as one that might "affect [an] outcome … under the governing law"].) Section 533 or Section 1008 only require new or different facts, circumstances, or law; they do not require the moving party to prove the merits at the threshold. Thus, the material factual developments in this case make review under either Section 1008 or Section 533 proper.

## III.    CONCLUSION

For the foregoing reasons, Sable respectfully requests that this Court reconsider and rescind the Preliminary Injunction.

DATED:  February 18, 2026                    Respectfully submitted,

**ALSTON & BIRD, LLP**

By: _____
Jeffrey D. Dintzer

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP. and PACIFIC
PIPELINE COMPANY

---

**10**
REPLY IN SUPPORT OF MOTION FOR RECONSIDERATION

**PROOF OF SERVICE**

I, Kim Niz am a resident of the State of California, over the age of eighteen, and not a party to the within action.  My business address is Alston & Bird, 350 South Grand Avenue, 51st Floor Los Angeles, CA 90071.

On February 18, 2026, I served the within document: **REAL PARTIES IN INTEREST SABLE OFFSHORE CORP.'S AND PACIFIC PIPELINE COMPANY'S REPLY IN SUPPORT MOTION FOR RECONSIDERATION OF PRELIMINARY INJUNCTION**

By Mail:  By placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Santa Barbara, addressed as set forth below.

I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postage cancellation date or postage meter date is more than one day after the date of deposit for mailing in affidavit.

By Hand Delivery:  By personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

By Overnight Delivery:  I enclosed the document(s) in an envelope or package provided by an overnight delivery carrier and addressed to the persons at the address(es) set forth below.  I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

X   By Electronic Mail: I caused said document(s) to be transmitted to the email address(es) of the addressee(s) designated below.

**SEE ATTACHED SERVED LIST**

I declare under penalty of perjury under the laws of the State of California, that the above is true and correct.

Executed on February 18, 2026, at Los Angeles, California.

*/s/ Kim Niz*

_____
Kim Niz

# SERVICE LIST

| | |
|---|---|
| Julie Teel Simmonds, Esq.<br>David Pettit, Esq.<br>Talia Nimmer, Esq.<br>**CENTER FOR BIOLOGICAL DIVERSITY**<br>2011 Franklin Street, Suite 375<br>Oakland, CA 94612<br>Tel.: (510) 844-7100<br>Fax: (510) 844-7150<br>jteelsimmonds@biologicaldiversity.org<br>dpettit@biologicaldiversity.org<br>tnimmer@biologicaldiversity.org | *Attorneys for Petitioners: Center for Biological Diversity and Wishtoyo Foundation* |
| Duncan Joseph Moore<br>Benjamin J. Hanelin<br>Natalie C. Rogers<br>**PAUL HASTINGS**<br>1999 Avenue of Stars, 27th Floor<br>Century City, CA 90067<br>Tel: (310) 620-5879<br>Fax: (310) 620-5899<br>djmoore@paulhastings.com<br>benjaminhanelin@paulhastings.com<br>natalierogers@paulhastings.com | *Attorneys for Real Parties in Interest: Sable Offshore Corp. and Pacific Pipeline Company* |
| Trevor D. Large (SBN: 214886)<br>Victoria C. Diffenderfer (SBN: 350018)<br>**FAUVER LARGE ARCHBALD & SPRAY**<br>820 State Street, 4th Floor<br>Santa Barbara, CA 93101<br>Tel: (805) 966-7000<br>Fax: (805) 966-7227<br>tlarge@flasllp.com<br>vdiffenderfer@flasllp.com | *Attorneys for Real Parties in Interest: Sable Offshore Corp. and Pacific Pipeline Company* |
| Linda Krop, Esq.<br>Jeremy M. Frankel, Esq.<br>Tara C. Rengifo, Esq.<br>**ENVIRONMENTAL DEFENSE CENTER**<br>906 Garden Street<br>Santa Barbara, CA 93101<br>Tel: (805) 963-1622; (510) 844-7100<br>Fax: (805) 962-3152; (510) 844-7150<br>lkrop@environmentaldefensecenter.org<br>jfrankel@environmentaldefensecenter.org<br>trengifo@environmentaldefensecenter.org | *Attorneys for Petitioners: Environmental Defense Center, a California non-profit corporation; Get Oil Out!, a California non-profit corporation, Santa Barbara County Action Network, a California non-profit corporation, Sierra Club, a national non-profit corporation, and Santa Barbara Channelkeeper, a California non-profit corporation* |

| Michael S. Dorsi, Esq.<br>**CALIFORNIA ATTORNEY**<br>**GENERAL'S OFFICE**<br>55 Golden Gate Ave, Ste 11000<br>San Francisco, CA 94102<br>Tel.: (415) 510-3802<br>Michael.dorsi@doj.ca.gov | *Attorneys for*<br>*Respondents/Defendants: California*<br>*Department of Forestry and Fire*<br>*Protection, Office of the State Fire*<br>*Marshal, Daniel Berlant (in his*<br>*official capacity as State Fire*<br>*Marshal)* |

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
2/18/2026 9:03 PM
By: Narzralli Baksh , Deputy

Jeffrey D. Dintzer (SBN: 139056)
Garrett B. Stanton (SBN: 324775)
**ALSTON & BIRD LLP**
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071
Tel: (213) 576-1000; Fax: (213) 576-1100
Jeffrey.Dintzer@alston.com
Garrett.Stanton@alston.com

Duncan Joseph Moore (SBN: 233955)
Benjamin J. Hanelin (SBN: 237595)
Natalie C. Rogers (SBN: 301254)
**PAUL HASTINGS LLP**
1999 Avenue of Stars, 27th Floor
Century City, CA 90067
Tel: (310) 620-5879; Fax: (310) 620-5899
djmoore@paulhastings.com
benjaminhanelin@paulhastings.com
natalierogers@paulhastings.com

Trevor D. Large (SBN: 214886)
Victoria C. Diffenderfer (SBN: 350018)
**FAUVER LARGE ARCHBALD & SPRAY**
820 State Street, 4th Floor
Santa Barbara, CA 93101
Tel: (805) 966-7000; Fax: (805) 966-7227
tlarge@flasllp.com
vdiffenderfer@flasllp.com

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF SANTA BARBARA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,<br><br>      Petitioners/Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10; inclusive,<br><br>      Respondents/Defendants. | Case No.: 25CV02244<br>[Consolidated with 25CV02247]<br><br>**REAL PARTIES IN INTEREST SABLE OFFSHORE CORP.'S AND PACIFIC PIPELINE COMPANY'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT MOTION FOR RECONSIDERATION OF PRELIMINARY INJUNCTION; DECLARATION OF JEFFREY D. DINTZER**<br><br>Date: February 27, 2026<br>Time: 10:00 a.m.<br>Dept.: 4<br><br>Complaint Filed: April 15, 2025<br>[Assigned for Purposes to the Honorable Donna D. Geck, Dept. 4] |

1

SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,

Real Parties in Interest

ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation,

Petitioners/Plaintiffs,

v.

CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, an agency of the State of California; OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10; inclusive,

Respondents/Defendants.

SABLE OFFSHORE CORP., a Delaware Corporation, and PACIFIC PIPELINE COMPANY, a Delaware Corporation.

Real Parties in Interest.

Case No.: 25CV02247

2

## REQUEST FOR JUDICIAL NOTICE

Pursuant to Evidence Code sections 452 and 453, Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company (collectively, "Sable") hereby request that the Court take judicial notice of the following document in support of Sable's Motion for Writ of Reconsideration ("Motion").

1.      Attached as **Exhibit 1** to the concurrently filed Declaration of Jeffrey D. Dintzer is a true and correct copy of excerpts of the Consent Decree entered in *United States of America and People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*, Case No. 2:20-cv-02415 in the United States District Court for the Central District of California.

The basis for judicial notice of Exhibit 1 is that it constitutes an "official act" of a judicial departments of the United States within the meaning of Evidence Code section 452, subdivision (c). The Court may further take judicial notice of records of any court of record of the United States pursuant to Evidence Code section 452, subdivision (d). Exhibit 1 is relevant to the Motion because it supports Sable's position that the Central District of California retains jurisdiction to effectuate or enforce compliance with the terms of the Consent Decree.

2.      Attached as **Exhibit 2** to the concurrently filed Declaration of Jeffrey D. Dintzer is a true and correct copy of an order denying the State of California's Motion to Change Venue, dated February 3, 2026, by the Superior Court of Kern County in *Pacific Pipeline Company v. State of California*, Case No. BCV-25-103508.

The basis for judicial notice of Exhibit 2 is that it constitutes an "official act" of a judicial departments of a state of the United States within the meaning of Evidence Code section 452, subdivision (c). The Court may further take judicial notice of records of any court of record of the United States pursuant to Evidence Code section 452, subdivision (d). Exhibit 2 is relevant to the Motion because it supports Sable's position that the application of SB 237 to Sable and the Santa Ynez Pipeline System are currently being litigated in the Superior Court of Kern County, which denied the State of California's Motion to Change Venue to Santa Barbara.

/ / /

/ / /

/ / /

SABLE'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT MOTION FOR RECONSIDERATION; DECLARATION OF JEFFREY D. DINTZER

In accordance with Evidence Code section 453, Sable has given Petitioners and OSFM sufficient notice of this request to enable them to meet the request, and Sable has also furnished the Court with sufficient information to take judicial notice of **Exhibit 1** and **Exhibit 2**.

DATED:   February 18, 2026                     Respectfully Submitted,

**ALSTON & BIRD**
JEFFREY D. DINTZER
GARRETT B. STANTON

**FAUVER, LARGE, ARCHBALD & SPRAY LLP**
TREVOR D. LARGE

By: _____
                    Jeffrey D. Dintzer

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP.
PACIFIC PIPELINE COMPANY

SABLE'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT MOTION FOR RECONSIDERATION;
DECLARATION OF JEFFREY D. DINTZER

## DECLARATION OF JEFFREY D. DINTZER

I, Jeffrey D. Dintzer, declare as follows:

1.    I am an attorney duly licensed to practice law before all courts of the State of California. I am a partner at Alston & Bird LLP, counsel of record for Real Parties in Interest Sable Offshore Corp. ("Sable") and Pacific Pipeline Company ("PPC") (collectively, "Sable"). I make this declaration in support of Sable's Request for Judicial Notice. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently to them.

2.    I am familiar with the case files for these matters. The files for these matters are kept at my shared direction in a secure electronic format at the offices of Alston & Bird LLP.  Legal assistant Kim Niz and various associates maintain these files on a server at Alston & Bird.

3.    In preparing this declaration, others at my direction retrieved the true and correct copy of the documents described below and prepared them for inclusion in my declaration.

4.    Attached hereto as **Exhibit 1** is a true and correct copy of excerpts of the Consent Decree entered in *United States of America and People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*, Case No. 2:20-cv-02415 in the United States District Court for the Central District of California.

5.    On February 3, 2026, the Superior Court of Kern County denied the State of California's Motion to Change Venue in *Pacific Pipeline Company v. State of California*, Case No. BCV-25-103508. Attached hereto as **Exhibit 2** is true and correct copy of the Superior Court of Kern County's Order denying the State of California's Motion to Change Venue in *Pacific Pipeline Company v. State of California*, Case No. BCV-25-103508, dated February 3, 2026.

6.    On December 30, 2025, the Pipeline & Hazardous Materials Safety Administration ("PHMSA") filed its Opposition to Environmental Defense Center's Emergency Stay Motion in *Environmental Defense Center, et al. v. Pipeline & Hazardous Materials Safety Administration, et al.*, United States Court of Appeals for the Ninth Circuit, No. 25-809. Attached hereto as **Exhibit 3** is a true and correct copy of PHMSA's Opposition to Emergency Stay Motion in *Environmental Defense Center, et al. v. Pipeline & Hazardous Materials Safety Administration, et al.*, United States Court of Appeals for the Ninth Circuit, No. 25-809.

7.     On February 13, 2026, Sable's President, J. Caldwell Flores, sent a correspondence on behalf of Sable to PHMSA's Acting Associate Administrator, Linda Daughtery. Attached hereto as **Exhibit 4** is a true and correct copy of Mr. Flores's correspondence PHMSA's Acting Associate Administrator, Linda Daughtery, dated February 13, 2026.

8.     On December 23, 2025, the Santa Barbara Independent published an article entitled "*Sable Offshore Gets Green Light to Restart Pipeline from Feds*" quoting Jim Hosler, Assistant Deputy Director, Pipeline Safety and CUPA for the Office of State Fire Marshall. I obtained this document from the Santa Barbara Independent's website at: https://www.independent.com/2025/12/23/sable-offshore-gets-green-light-to-restart-pipeline-from-feds/. Attached hereto as **Exhibit 5** is a true and correct copy of the Santa Barbara Independent's article entitled "*Sable Offshore Gets Green Light to Restart Pipeline from Feds*" dated December 23, 2025.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 18th day of February, 2026, in Los Angeles, California.

_____
Jeffrey D. Dintzer

SABLE'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT MOTION FOR RECONSIDERATION; DECLARATION OF JEFFREY D. DINTZER

# EXHIBIT 1

BRUCE S. GELBER
Deputy Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
Washington, D.C. 20530
BRADLEY R. O'BRIEN (CA Bar Number: 189425)
Senior Attorney
ANGELA MO (CA Bar Number: 262113)
Trial Attorney
Environmental Enforcement Section
United States Department of Justice
301 Howard Street, Suite 1050
San Francisco, California 94105
Tel: (415) 744-6484;
Tel: (202) 514-1707
E-mail: brad.obrien@usdoj.gov
E-mail: angela.mo@usdoj.gov
Counsel for Plaintiff United States of America

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, and the PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* DEPARTMENT OF FISH AND WILDLIFE, PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* CENTRAL COAST REGIONAL WATER QUALITY CONTROL BOARD, *ex rel.* CALIFORNIA DEPARTMENT OF PARKS AND RECREATION, *ex rel.* CALIFORNIA STATE LANDS COMMISSION, *ex rel.* CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION'S OFFICE OF STATE FIRE MARSHAL, and THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, <br><br>       Plaintiffs, <br><br>       v. <br><br>PLAINS ALL AMERICAN PIPELINE, L.P. and PLAINS PIPELINE, L.P., <br><br>       Defendants. | Civil Action No. <br><br>2:20-cv-02415 <br><br>**CONSENT DECREE** |

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

XAVIER BECERRA
Attorney General of California
ERIC M. KATZ
Supervising Deputy Attorney General
MICHAEL ZARRO (CA Bar Number: 110171)
JESSICA BARCLAY-STROBEL (CA Bar Number: 280361)
Deputy Attorneys General
300 South Spring Street, Suite 1702
Los Angeles, California 90013
Tel: (213) 269-6635
E-mail: Jessica.BarclayStrobel@doj.ca.gov
*Counsel for Plaintiffs California Department of Fish and Wildlife, Central Coast Regional Water Quality Control Board, and California Department of Forestry and Fire Protection's Office of State Fire Marshal*

XAVIER BECERRA
Attorney General of California
CHRISTINA BULL ARNDT
Supervising Deputy Attorney General
NICOLE RINKE (CA Bar Number: 257510)
MITCHELL E. RISHE (CA Bar Number: 193503)
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, California 90013
Tel: (213) 269-6394
E-mail: Mitchell.Rishe@doj.ca.gov
*Counsel for Plaintiffs California Department of Parks and Recreation and California State Lands Commission*

MARGARET WU (CA Bar Number: 116588)
Deputy General Counsel
BARTON LOUNSBURY (CA Bar Number: 253895)
Senior Counsel
University of California
Office of the General Counsel
1111 Franklin Street, 8th Floor
Oakland, California 94607-5200
Tel: (510) 987-9800
E-mail: barton.lounsbury@ucop.edu
*Counsel for Plaintiff The Regents of the University of California*

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC   Document 363/15/20   Filed 05/14/26   Page 306 of 837   Page
Case 2:20-cv-02415-SVW-SSC   Document 6-1   Filed 03/15/20   Page 58 of 102   Page ID #:151
ID #:17349

Henry Weissmann
Daniel B. Levin
Colin Devine
Munger, Tolles & Olson LLP
350 S. Grand Ave, 50th Floor
Los Angeles, California 90071

Steven H. Goldberg
Nicole Granquist
Downey Brand LLP
621 Capitol Mall, 18th Floor
Sacramento, California  95814

94.    Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above.

95.    Notices submitted pursuant to this Section shall be deemed submitted upon mailing, or emailing unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XXI.    EFFECTIVE DATE

96.    The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court, or a motion to enter this Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.

## XXII.    RETENTION OF JURISDICTION

97.    The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of effectuating or enforcing compliance with the terms of this Consent Decree.

## XXIII.    MODIFICATION

98.    The terms of this Consent Decree, including any attached Appendices, may be modified only by a subsequent written agreement signed by the Parties.  Where the modification constitutes a material change to any term of this Consent Decree, it shall be effective only upon approval of the Court.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 54 -

# EXHIBIT 2



# SUPERIOR COURT OF CALIFORNIA
# COUNTY OF KERN

### Minute Order

Date:  February 3, 2026          Time:  8:30 AM          Location:  Division H

**Case Number:  BCV25103508**
**PACIFIC PIPELINE COMPANY, A DELAWARE CORPORATION**
          **Plaintiff/Petitioner**
          **v.**
**STATE OF CALIFORNIA**
          **Defendant/Respondent**

| | | | |
|---|---|---|---|
| Judicial Officer: | Bernard C. Barmann, Jr | Clerk: | Daisy Ayon Vallarta |
| Court Reporter: | Susan Wood | Finalized by: | Daisy Ayon Vallarta |

**Nature of Proceedings: Motion to change venue; filed by Defendant State of California**

Case called at: 09:17 AM

Appearances:

Attorney, Garrett Stanton is present on behalf of Plaintiff, PACIFIC PIPELINE COMPANY, A DELAWARE CORPORATION.

Attorney, Jeffrey Dintzer is present on behalf of Plaintiff, PACIFIC PIPELINE COMPANY, A DELAWARE CORPORATION.

Attorney, Brandon Sheldon Walker is appearing remotely on behalf of Defendant, STATE OF CALIFORNIA.

The Court appoints Susan Wood from the Pro Tempore list as the Official Court Reporter for today's proceedings.

Certified shorthand reporter provided their full name and license number pursuant to the Business and Professions Code 8016.

The Court announces a tentative decision.

Matter is argued and submitted by counsel.

The Court makes the following findings and orders:

Defendant's Motion to change venue is denied.

Discussion

(A) Whether venue is proper in Sant Barbara County

Defense arguments. Defendants argue that the current action alleges a dispute regarding the

potential application of SB 237 to the Las Flores Pipelines. The majority of the pipelines are in Santa Barbara County. And the specific issue is whether the Las Flores Pipelines can be considered "idled, inactive, or out of service for five years or more," which would require that a spike hydrostatic test be performed on the pipelines and a new coastal development permit be obtained before the transportation of oil through the pipelines can be resumed. (Complaint ¶¶ 39, 40, 53.) Accordingly, there are two distinct aspects of Pacific Pipeline's attack on SB 237, one related to the stress hydrostatic test requirement and the other related to the coastal development permit requirement.

Defendant argues this leaves the attack on SB 237 related to the coastal development permit requirement. A coastal development permit is only required for development within the Coastal Zone. (Pub. Resources Code § 30600, subd. (a).) The Coastal Zone is delineated on detailed maps adopted by the Commission, but in general it extends inland about 1,000 yards from the mean high tide line. (Pub. Resources Code, § 30103, subd. (a).) No part of Kern County is within the Coastal Zone.

Plaintiff's arguments

Pacific argues that California Code of Civil Procedure Section 392 establishes proper venue for actions concerning real property. Under Section 392, venue is proper "in the superior court [of] the county where the real property that is the subject of the action, or some part thereof, is situated." (See also 50 Cal. Forms of Pleading & Practice, Annotated (2021) § 571.17 [citing Goldtree v. McAllister (1890) 86 Cal. 93, 106] [explaining that, under the relevant section, venue is proper "in any county in which any part of real property is situated"].) Real property includes all that is "affixed to land." (Civ. Code § 658.) Property is affixed to land when that property is "imbedded in it, as in the case of walls; or permanently resting upon it, as in the case of buildings; or permanently attached to what is permanent, by means of cement, plaster, nails, bolts or screws." (Civ. Code § 660.)

Pacific argues that the State concedes, "it is reasonable to assume that much of the [Santa Ynez Pipeline System's segments] are attached to land." (Mot. at 15, n.7.) Recognizing that Section 392 "may be appropriately applied here," the State cannot escape that significant portions of the Santa Ynez Pipeline System, including Segment CA-325's delivery point, are situated in Kern County and affixed to the land here. On that basis alone, venue is proper.

Segment CA-325 in Kern County—which could be inoperable if SB 237 applied—and focusing on Santa Barbara County's issuance of Coastal Development Permits within the Coastal Zone. This fact suggests that venue would be proper in Kern County under CCP § 392 which states,
(a) Subject to the power of the court to transfer actions and proceedings as provided in this title, the superior court in the county where the real property that is the subject of the action, or some part thereof, is situated, is the proper court for the trial of the following actions:
(1) For the recovery of real property, or of an estate or interest therein, or for the determination in any form, of that right or interest, and for injuries to real property.
(2) For the foreclosure of all liens and mortgages on real property.
(b) In the court designated as the proper court in subdivision (a), the proper court location for trial of a proceeding for an unlawful detainer, as defined in Section 1161, is the location where the court tries that type of proceeding that is nearest or most accessible to where the real property that is the subject of the action, or some part thereof, is situated. Otherwise any location of the

superior court designated as the proper court in subdivision (a) is a proper court location for the trial. The court may specify by local rule the nearest or most accessible court location where the court tries that type of case.

CCP § 392

It appears that significant portions of the Santa Ynez Pipeline System, including Segment CA-325's delivery point, are situated in Kern County and affixed to the land here.

However, the State challenges this by arguing that Pacific ignores the actual location of the property that is the subject of the action, which is Pipeline CA-324 located in Santa Barbara County, and instead consider portions of a different pipeline, Pipeline CA-325 within Kern County, that may indirectly feel the effects of regulation over Pipeline CA-324.

The State further contends the only possible effect that SB 237 could have on property located within Kern County relates to SB 237's stress hydrostatic testing requirements, which are either already required by the State Waivers, or preempted in light of PHMSA's alleged assumption of jurisdiction over the pipelines. Again, that leaves only the claims regarding the coastal development permit requirements, which only apply to Pipeline CA-324. Pipeline CA-324 is a separate and distinct pipeline. It is the only pipeline that is properly the subject of this action. And it is wholly located in Santa Barbara County.

Merits argument

Pacific argues that the State's motion raises premature merits arguments. In their motion, the State argued that the claim regarding the stress hydrostatic test requirement, however, is moot and nonjusticiable because that same test is already required for the Las Flores Pipelines by the State waivers. (Complaint ¶¶ 29, 34-35 [consent decree requires compliance with approved State waivers]; Walker Dec. Exs. E [State waiver requiring a spike hydrostatic test], F [same].) A claim is moot, and non-justiciable, if the court cannot grant any effectual relief. (Wilson & Wilson v. City Council of Redwood City (2011) 191 Cal.App.4th 1559, 1574.) Here, even if the Court were to determine that the spike hydrostatic test requirement in SB 237 does not apply to the Las Flores Pipelines, that would be an academic exercise as the Court cannot relieve Pacific Pipeline of that same requirement in the State waivers.

Pacific contends mootness and justiciability are legal questions about the merits of a cause of action. They have no bearing on venue. (See County of San Bernardino v. Superior Court (1994) 30 Cal.App.4th 378 [explaining that courts cannot transfer venue based on substantive considerations but must adhere to the statutory scheme]; McCarthy v. Superior Court (1987) 191 Cal.App.3d 1023 [holding that trial judges cannot make rulings on the substance of a plaintiff's action while venue is in question].)

Pacific argues that the testing requirements under SB 237 impose different liabilities than those under the State Waivers. As one example, SB 237 violations of the Elder California Pipeline Safety Act of 1981 constitute a crime. (SB 237 Legislative Digest, Filed with Secretary of State September 19, 2025 at (2) [explaining that "[a]ny violation" of the provision at issue "would constitute a crime"].) Under SB 237, the Act now prohibits the restart of an existing oil pipeline that is six inches or larger that has been idle, inactive, or out of service for five years or more

without passing a hydrostatic testing program that meets the requirements established by the State Fire Marshal. Any violation of that provision would constitute a crime, potentially imposing more severe liabilities on Plaintiff than could be imposed under the State Waivers.

In their reply, the State argues that the mootness of Plaintiff's claims pertaining to Pipeline CA-325 can be considered at this time because they are glaring, defective, and beyond correction. Indeed, Plaintiff also argues that those same claims are moot because they are preempted by PHMSA's orders. Although the State and OSFM are challenging those orders, Plaintiff confirms that the claims regarding the portion of Pipeline CA-325 in Kern County are moot, one way or another.

The State further argues that Plaintiff argues that SB 237 imposes different liabilities than the State Waivers. (Response to Motion, p. 12.) But whether or not SB 237 adds or changes the nature of liability is irrelevant to a motion to change venue that is based on where the property, which is the subject of the action, is located. (Code of Civil Proc., § 392.) On one hand, Plaintiff must comply with the State Waivers before it can restart the pipelines. If, on the other hand, OSFM lacks jurisdiction or authority as Plaintiff now alleges, then the stress hydrostatic testing aspect of SB 237 would not apply, and venue is still proper only in Santa Barbara County.

All of these arguments assess the merits of the underlying claim which are not proper on motion to change venue. It appears that the State's argument summarily contends the only possible effect that SB 237 could have on property located within Kern County relates to SB 237's stress hydrostatic testing requirements. The State concludes that these are either already required by the State Waivers, or preempted in light of PHMSA's alleged assumption of jurisdiction over the pipelines. To reach this result, we are required to go to the substance of Plaintiff's claims, not whether venue is proper in Kern County.

(B) Whether (alternatively) this case should be transferred to the superior court for Santa Barbara County for the convenience of nonparty witnesses and the ends of justice

Defendant argues that both the Commission and OSFM are already participating in litigation involving the Las Flores Pipelines in the Superior Court for Santa Barbara County. (Sable Offshore Corp., et al. v. California Coastal Commission [Santa Barbara Super. Ct., Case No. 25CV00974]; Center for Biological Diversity, et al. v. California Department of Forestry and Fire Protection, et al. [Santa Barbara Super. Ct., Case No. 25CV02244]; Environmental Defense Center, et al. v. California Department of Forestry and Fire Protection, et al. [Santa Barbara Super. Ct., Case No. 25CV02247].) And although they are not named parties, they may also be required to participate in the additional litigation involving the Las Flores Pipelines pending in Santa Barbara County. (People of the State of California ex rel. Central Coast Regional Water Quality Board v. Sable Offshore Corp. [Santa Barbara Super. Ct., Case No. 25CV06285]; People of the State of California v. Sable Offshore Corporation [Santa Barbara Super. Ct., Case No. 25CR07677]. It would be inconvenient for the Commission or OSFM to also be required to participate as nonparty witnesses in litigation involving the Las Flores Pipelines in Kern County too.

Defendant contends additionally, most of the work for restarting the pipelines, and the potential impacts of doing so will be felt in Santa Barbara County. (See D. Venue, Cal. Prac. Guide Civ. Pro. Before Trial Ch. 3-D [ends of justice includes permitting view of the scene or making other

material evidence available].) Indeed, the oil spill that led to the idling of the Las Flores Pipelines occurred in Santa Barbara County.

Pacific argues that this case is not an environmental damages action requiring on-site fact-finding. It is a declaratory action on asking the court to interpret SB 237's terms and evaluate certain evidence regarding the pipeline's operational history, which does not depend on venue location in any particular county. Instead, the Court will be interpreting SB 237's terms ("idle," "inactive," etc.), considering the impact of PHMSA regulations on such interpretation, and evaluating certain evidence regarding the pipeline's operational history. These tasks do not depend on any judge's personal observation of Santa Barbara geography or conditions. The prior oil spill and coastal resources are part of the background context, but they are undisputed historical facts that can be presented through the record. A venue change to Santa Barbara would thus yield no improvement in access to proof or justice; it would only shift the forum away from a county with a concrete connection to the case and a significant interest in its outcome.

Here, Pacific's argument is persuasive. Pacific argues that a motion to transfer venue for the convenience of witnesses and the ends of justice is premature before an answer is filed. Pacific cites to Easton v. Superior Court (1970) 12 Cal.App.3d 243 where the Court states,
(1) The matter of convenience of witnesses was not properly before the court, because Schneider Bros. had not filed its answer. Only then could the court ascertain what the issues and the evidence relating to those issues would be. Before the answer is filed, the court cannot determine whether the witnesses whose convenience is involved have material testimony to offer (Cook v. Pendergast, 61 Cal. 72; Pearson v. Superior Court, 199 Cal.App. 2d 69, 75 [18 Cal.Rptr. 578]).
(2) "It is a long established rule that a motion for change of venue must satisfy two requirements: (1) It must be *246 shown the action is proper in the county to which the movant seeks transfer; and (2) it must be shown the county in which the action was filed was improper under any applicable theory (Citation)." (La Mirada Community Hospital v. Superior Court, 249 Cal.App.2d 39, 42 [57 Cal.Rptr. 42].) Neither requirement was satisfied here.
(Id. at 245–246)

Currently, no answer has been filed.

Conclusion

The motion is denied. Pacific's request for judicial notice is granted.

Defendant may file a responsive pleading within 30 days.

The Court deems the minute order to be the Order After Hearing.

The Counsel for Plaintiff(s) shall provide notice of the court's ruling.

# EXHIBIT 3

No. 25-8059

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

ENVIRONMENTAL DEFENSE CENTER, et al.,
*Petitioners*,

v.

PIPELINE & HAZARDOUS MATERIALS SAFETY ADMINISTRATION, et al.,
*Respondents*.

On Petition for Review of Actions by the Pipeline & Hazardous Materials Safety
Administration

**FEDERAL RESPONDENTS' OPPOSITION
TO EMERGENCY STAY MOTION**

| | |
|---|---|
| | ADAM R.F. GUSTAFSON |
| Of Counsel: | *Principal Deputy Assistant Attorney General* |
| | ROBERT N. STANDER |
| BENJAMIN FRED | *Deputy Assistant Attorney General* |
| TIMOTHY O'SHEA | AMBER BLAHA |
| KATHLEEN MAITLAND | REBECCA JAFFE |
| *Attorneys* | *Attorneys* |
| Pipeline and Hazardous Materials | Environment and Natural Resources Division |
| Safety Administration | U.S. Department of Justice |
| | Post Office Box 7415 |
| SAMUEL FULLER | Washington, D.C. 20044 |
| ERIN HENDRIXSON | (202) 598-0402 |
| *Attorneys* | rebecca.jaffe@usdoj.gov |
| U.S. Dept. of Transportation | |

## TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................................... ii

TABLE OF AUTHORITIES ................................................................................iv

GLOSSARY ...................................................................................................... viii

INTRODUCTION ...............................................................................................1

BACKGROUND .................................................................................................2

    A.    Statutory and regulatory background ....................................................2

        1.    Pipeline Safety Act ...................................................................2

        2.    National Environmental Policy Act ..........................................3

        3.    National Energy Emergency .....................................................4

    B.    Factual background .............................................................................5

        1.    Line 901 Spill .........................................................................5

        2.    Consent Decree .......................................................................6

        3.    Interstate Pipeline Determination ............................................7

        4.    Approval of Restart Plan..........................................................8

        5.    Emergency Special Permit........................................................9

        6.    This litigation .......................................................................12

STANDARD OF REVIEW ...............................................................................13

ARGUMENT ...................................................................................................13

I.    Petitioners are unlikely to succeed on the merits. .......................................13

    A.    PHMSA reasonably issued the emergency special permit.................14

ii

1.      PHMSA complied with the Pipeline Safety Act........................14

2.      PHMSA was not required to prepare NEPA
        analysis before issuing the permit...............................................19

    B.   PHMSA's approval of the restart plan was not subject to
         NEPA.......................................................................................................22

II.   Petitioners cannot establish irreparable harm...............................................24

III.  The public interest and the balance of the equities favor denying
      Petitioners' motion........................................................................................25

CONCLUSION.......................................................................................................25

CERTIFICATE OF COMPLIANCE.......................................................................27

iii

# TABLE OF AUTHORITIES

## Cases

*Alaska Wilderness League v. Jewell*,
   788 F.3d 1212 (9th Cir. 2015) ...............................................................23

*Baltimore Gas & Elec. Co. v. NRDC*,
   462 U.S. 87 (1983)...................................................................................16

*Bering Strait Citizens for Responsible Res. Dev. V. USACE*,
   524 F.3d 938 (9th Cir. 2008) ..................................................................16

*City of Davis v. Coleman*,
   521 F.2d 661 (9th Cir. 1975) ...................................................................20

*Ctr. For Biological Diversity v. Kempthorne*,
   588 F.3d 701 (9th Cir. 2009) ..................................................................14

*DOT v. Pub. Citizen*,
   541 U.S. 752 (2004)..................................................................................23

*Marsh v. Oregon Nat. Res. Council*,
   490 U.S. 360, (1989)................................................................................21

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*,
   463 U.S. 29 (1983)....................................................................................13

*National Wildlife Federation v. DOT*,
   960 F.3d 872 (6th Cir. 2020) ..................................................................23

*Nken v. Holder*,
   556 U.S. 418 (2009).......................................................................... 13, 24

*NRDC v. McCarthy*,
   993 F.3d 1243 (10th Cir. 2021) .........................................................................23

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
   605 U.S. 168 (2025) ........................................................... 4, 15, 20, 21

*Starbucks Corp. v. McKinney*,
   602 U.S. 339 (2024) ...........................................................................13

*Winter v. NRDC*,
   555 U.S. 7 (2008) ...............................................................................25

**Statutes**

5 U.S.C. § 706(2)(A) ..........................................................................13

42 U.S.C. § 4332 ........................................................................... 4, 19

42 U.S.C. § 4332(2)(C) ................................................................... 3, 22

42 U.S.C. § 4336(b)(2) ..........................................................................4

42 U.S.C. § 4336e(10)(A) ...................................................................22

42 U.S.C. § 4336e(10)(B)(viii) ...........................................................22

49 U.S.C. § 60102(a)(2) .........................................................................2

49 U.S.C. § 60104(c) ...................................................................... 3, 18

49 U.S.C. § 60105 ......................................................................................................3

49 U.S.C. § 60112(e) ...............................................................................................16

49 U.S.C. § 60118(c)(1)(A) .......................................................................................3

49 U.S.C. § 60118(c)(1)(B) .......................................................................................3

49 U.S.C. § 60118(c)(2)............................................................................................19

49 U.S.C. § 60118(c)(2)(A) .......................................................................... 3, 14, 18

49 U.S.C. § 60118(c)(2)(B) ................................................................................ 3, 25

49 U.S.C. § 60119(a) ...............................................................................................12

49 U.S.C. § 60119(a)(1)............................................................................................13

49 U.S.C. § 60119(a)(3)............................................................................................13

## Regulations

Pipeline Safety Enforcement and Regulatory Procedures, 49 C.F.R. pts. 190–199
........................................................................................................................2

49 C.F.R. § 190.233(b) ............................................................................................16

49 C.F.R. § 190.341(a)...............................................................................................3

49 C.F.R. § 190.341(g) .............................................................................................17

49 C.F.R. pt. 195 ...................................................................................................3, 8

49 C.F.R. § 195.304 ...............................................................................................15

49 C.F.R. § 195.452(b)(1)........................................................................................2

49 C.F.R. § 195.452(c)(i)(A) ....................................................................................2

49 C.F.R. § 195.452(h) .............................................................................................2

49 C.F.R. § 195.452(h)(2)........................................................................................24

49 C.F.R. § 195.452(h)(4)..........................................................................................2

49 C.F.R. § 195.452(h)(4)(i)....................................................................................16

49 C.F.R. § 195.452(h)(4)(i)(A) ...............................................................................2

49 C.F.R. § 195.452(h)(4)(iii)(I)...............................................................................3

49 C.F.R. § 195.452(h)(4)(iii)(H) ...................................................................... 10, 24

49 C.F.R. § 195.452(j)(3).........................................................................................16

## Other Authorities

*DOT's Procedures for Considering Environmental Impacts,* Order 5610.1D
   (July 1, 2025) ..................................................................................... 4, 19, 21

# GLOSSARY

DOT             Department of Transportation

NEPA            National Environmental Policy Act

OSFM            California Office of the State Fire Marshal

PHMSA           Pipeline & Hazardous Materials Safety Administration

## INTRODUCTION

The Pipeline and Hazardous Materials Safety Administration (PHMSA)

issued an emergency permit, based on a national energy emergency declared by the

President of the United States, to waive a regulatory requirement that applies to

two California oil pipelines. The pipelines (previously called Lines 901 and 903

and now called CA-324 and CA-325) had shut down after an oil spill in 2015. In

2020, the pipeline owner entered into a consent decree with PHMSA and other

agencies requiring it to obtain approval before restarting the pipelines and to obtain

a waiver from regulators for a certain type of corrosion protection that is not

suitable for these pipelines. Since then, Sable Offshore Corporation purchased the

pipelines. In December 2025, consistent with the consent decree, Sable applied to

PHMSA for approval of its restart plan and for a waiver. PHMSA approved the

restart plan and issued an emergency special permit waiving compliance with the

regulatory requirement and imposing conditions—many of which were more

stringent than PHMSA's regulations—to ensure pipeline integrity.

Petitioners moved to stay the permit and PHMSA's approval of the restart

plan. The Court should deny the motion. Petitioners have not shown a likelihood

of success on the merits because (1) PHMSA satisfied the Pipeline Safety Act's

requirements in issuing the permit, which included rigorous conditions to ensure

pipeline safety, and (2) PHMSA was not required to do additional environmental

1

analysis under the National Environmental Policy Act (NEPA) before issuing the permit or approving the restart plan. Nor can Petitioners establish irreparable harm because the permit conditions ensure public safety. And the current energy emergency, particularly inadequate oil supplies and high energy prices on the West Coast, weighs heavily against Petitioners' request.

## BACKGROUND

### A. Statutory and regulatory background

#### 1. Pipeline Safety Act

The Pipeline Safety Act directs PHMSA to "prescribe minimum safety standards for pipeline transportation and for pipeline facilities," 49 U.S.C. § 60102(a)(2), and PHMSA has done so, 49 C.F.R. pts. 190–199. For example, operators must establish "integrity management programs" that involve inspecting pipelines using "in-line inspection tools," which are devices with sensors that detect defects like corrosion or gouges. *Id.* § 195.452(b)(1), (c)(i)(A).

If operators discover anomalous conditions, they must evaluate them and remediate those that can reduce pipeline integrity. *Id.* § 195.452(h). Depending on the conditions' severity, operators have different time limits to repair them. *Id.* § 195.452(h)(4). For example, if operators discover metal loss greater than 80 percent of the pipeline wall, they must repair it immediately. *Id.* § 195.452(h)(4)(i)(A). By contrast, if they discover a groove greater than 12.5% of

2

the pipeline wall, they must remediate it within 180 days. *Id.*
§ 195.452(h)(4)(iii)(I).

PHMSA can waive compliance with any pipeline safety requirement on terms it "considers appropriate" if it "determines that the waiver is not inconsistent with pipeline safety." 49 U.S.C. § 60118(c)(1)(A). In non-emergency situations, PHMSA may issue waivers only after providing notice. *Id.* § 60118(c)(1)(B). In emergencies, PHMSA may waive compliance without notice if it determines that the waiver is in the public interest, is not inconsistent with pipeline safety, and is necessary to address "an actual or impending emergency involving pipeline transportation." *Id.* § 60118(c)(2)(A). Emergency waivers last no more than 60 days and may be renewed only after notice. *Id.* § 60118(c)(2)(B). PHMSA calls these waivers "special permits." 49 C.F.R. § 190.341(a).

Under the Pipeline Safety Act, states can regulate intrastate pipelines, 49 U.S.C. § 60105, but not interstate pipelines, *id.* § 60104(c). A pipeline is considered interstate if it originates on the Outer Continental Shelf. 49 C.F.R. pt. 195 App'x A ex. 7.

### 2. National Environmental Policy Act

NEPA directs federal agencies to provide a "detailed statement," called an environmental impact statement, for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Environmental

3

assessments are concise documents that agencies use to comply with NEPA when
an environmental impact statement is unnecessary. *Id.* § 4336(b)(2). "NEPA
imposes no substantive environmental obligations or restrictions." *Seven Cnty.*
*Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 173 (2025).

NEPA acknowledges that agencies may not be able to fully comply with its
procedures, requiring instead that agencies comply "to the fullest extent possible."
42 U.S.C. § 4332. Department of Transportation (DOT) procedures provide that
"[e]mergency circumstances may require immediate actions that preclude
following standard NEPA procedures." *DOT's Procedures for Considering*
*Environmental Impacts*, Order 5610.1D § 23 (July 1, 2025), available at
https://perma.cc/4NYP-4UQC. "Immediate emergency actions necessary to
protect the lives and safety of the public or protect valuable resources should never
be delayed in order to comply with NEPA." *Id.* Instead, agencies should prepare
environmental documentation "[w]hen time permits." *Id.*

### 3.    National Energy Emergency

In January 2025, President Donald Trump issued Executive Order 14156,
*Declaring a National Energy Emergency*. 90 Fed. Reg. 8433 (Jan. 20, 2025). The
President said that "[t]he United States' insufficient energy production,
transportation, refining, and generation constitutes an unusual and extraordinary
threat to our Nation's economy, national security, and foreign policy." *Id.* § 1.

4

The President directed agencies to "identify and use all lawful emergency or other authorities available to them to facilitate the supply, refining, and transportation of energy in and through the West Coast of the United States." *Id.* § 3(b).

## B.   Factual background

### 1.   Line 901 Spill

On May 19, 2015, the Line 901 pipeline, which Plains Pipeline LP owned and operated, ruptured and discharged crude oil in Santa Barbara, California. Appx-182. Two days later, PHMSA issued a corrective action order directing Plains to purge Line 901 and a portion of the adjoining Line 903 and to keep them shut down until Plains completed steps required by the corrective action order. Appx-182.

After investigating, PHMSA determined that Line 901 lacked adequate corrosion protection and failed because corrosion built up over time, thinning the pipe wall and causing a rupture. Appx-34. Pipeline corrosion can typically be prevented with "cathodic protection" methods, but Line 901's cathodic protection system was ineffective because of the Line's specific insulation and coating. Appx-34. In addition, PHMSA determined that Plains did not accurately identify the corrosion. Appx-34.

5

## 2.    Consent Decree

In 2020, PHMSA and other federal and state agencies entered into a consent decree with Plains to settle alleged violations of the Pipeline Safety Act and other claims related to the spill.  Appx-186–87, Appx-224.  The consent decree superseded the corrective action order.  Appx-208.  The consent decree designated the California Office of the State Fire Marshal (OSFM) (the state regulator for intrastate pipelines) to oversee certain compliance terms because Lines 901 and 903 were classified as intrastate at the time.

Under the consent decree, Lines 901 and 903 had to remain shut down until OSFM authorized Plains to restart the Lines.  Appx-273, Appx-276.  And Plains had to take certain steps before any restart could occur, including repairing the pipeline, taking actions to prevent and mitigate future failures, and obtaining a cathodic protection waiver.  Appx-257.  Because the insulation on Lines 901 and 903 can decrease effectiveness of cathodic protection, the consent decree directed Plains to get a waiver to manage corrosion risks through different methods, such as more frequent inspections and more stringent criteria for identifying and responding to potential anomalies in the pipeline wall.  Appx-39.

The consent decree also required Plains to obtain approval of its restart plan from OSFM.  Appx-273, Appx-276–77.  The restart plan had to include, inter alia,

incremental pressure increases, sufficient surveillance to ensure no leaks are present, and methods to address corrosion. Appx-273.

Under the consent decree, if Plains sold Lines 901 or 903, it had to obtain an agreement from the purchaser to be bound by the consent decree provisions that applied to the pipelines. Appx-230.

### 3. Interstate Pipeline Determination

In 2022, Pacific Pipeline Company purchased Lines 901 and 903 from Plains and then, in 2024, Sable purchased Pacific Pipeline. Appx-34. Sable agreed to be bound by the consent decree provisions that apply to Lines 901 and 903. Appx-168. Lines 901 and 903 were renamed CA-324 and CA-325.

In 2024, Sable also acquired three offshore drilling platforms and offshore subsea pipelines that transport oil from those platforms to CA-324 and CA-325, which further transport oil from the Las Flores Canyon processing facility to a terminal in Kern County, CA. Appx-143. Sable configured these assets as one system transporting oil from the Outer Continental Shelf to California. Appx-143. Below is a map showing this system:



Appx-68.

After conducting onsite inspections in December 2025, PHMSA determined that CA-324 and CA-325 are interstate pipelines because they transport oil from the Outer Continental Shelf into California.  Appx-137–39; *see also* 49 C.F.R. pt. 195 App'x A ex. 7.

### 4.    Approval of Restart Plan

Sable made extensive repairs and improvements to CA-324 and CA-325 to address the cause of the 2015 failure and prevent future recurrence.  For example, it conducted in-line inspections, analyzed all data indicating anomalies with 40

8

percent or more metal loss of the pipeline wall, and remediated 100 percent of the locations that had 40 percent or more metal loss, exceeding regulatory requirements. Appx-150. It installed 27 safety valves on CA-324 and CA-325 and implemented enhanced leak detection and emergency response measures. Appx-150. Sable also updated its control center, including the alarm configuration and alert notifications. Appx-150. In 2025, OSFM inspected Sable's operations, maintenance of the pipelines, and control room, and it did not document any unsatisfactory results or concerns. Appx-151.

In September 2025, Sable submitted to OSFM a plan for restarting CA-324 and CA-325, as specified in the consent decree. Appx-24. Then, after PHMSA assumed regulatory jurisdiction, Sable submitted the restart plan to PHMSA. PHMSA conducted field inspections to examine Sable's operations and maintenance procedures, corrosion-related records, pressure-test records, and start up procedures. Appx-141–42. PHMSA did not identify any concerns or unsatisfactory items. Appx-142.

On December 22, 2025, PHMSA approved Sable's restart plan. Appx-24.

### 5.	Emergency Special Permit

In December 2025, Sable applied to PHMSA for an emergency special permit to waive its obligation to comply with the requirement to remediate corrosion along longitudinal pipeline seams within 180 days of discovering the

9

corrosion. Appx-26, Appx-39 (citing 49 C.F.R. § 195.452(h)(4)(iii)(H)). Sable sought this waiver because the consent decree required it to apply for a waiver "for the limited effectiveness of cathodic protection." Appx-39.

Sable explained that the waiver was appropriate because longitudinal seam corrosion is not problematic for pipe manufactured after 1970, which the pipeline here contains. Appx-40. Sable planned to use pipeline inspection tools that would identify other types of corrosion (such as "blunt metal loss") that would be more applicable to this pipeline. Appx-40. The waiver would allow Sable to use tools and methods to differentiate between corrosion anomalies that do not actually pose risks and anomalies that do present risks to the pipeline's structural integrity. Appx-40. In addition, with the waiver, Sable would not have to dig down to inspect anomalies that posed no risk, thus reducing unnecessary excavations and environmental disturbance. Appx-42. Sable noted that OSFM had approved similar waivers before PHMSA assumed jurisdiction and that PHMSA had stated its non-objection to those waivers. Appx-26.

Sable requested an emergency special permit because of the national energy emergency. Appx-27. Sable noted that restarting the pipeline would provide energy security and reduce California's need to import oil. Appx-41. Sable planned to apply for a non-emergency special permit to replace the emergency special permit after it expired in 60 days. Appx-45.

10

On December 23, 2025, PHMSA approved Sable's emergency special permit application. Appx-3. PHMSA determined that Sable had an ongoing program to locate and remediate any safety risks and that Sable's compliance with the permit conditions would provide at least an equivalent level of safety as complying with the waived regulation. Appx-5.

PHMSA concluded that granting the permit was necessary to address the national energy emergency. Appx-6. PHMSA noted the Executive Order's finding about the threat posed to national security by "insufficient" energy transportation and the President's direction to "identify and use all lawful emergency or other authorities … to facilitate the supply, refining, and transportation of energy in and through the West Coast." Appx-6 (quoting E.O. 14156). PHMSA determined that the permit would enable CA-324 and CA-325 to "mitigate the risks of fuel shortages on the West Coast, and reduce United States dependency on imported oil." Appx-6. And expeditious action was required because "the United States' 'current inadequate development of domestic energy resources leaves us vulnerable to hostile foreign actors and poses and imminent and growing threat to the United States' prosperity and national security.'" Appx-6 (quoting E.O. 14156).

Because there is an emergency, PHMSA concluded that procedures for assessing environmental impacts in emergency circumstances applied and the need

11

for immediate action precluded preparing an environmental assessment. Appx-6.

PHMSA noted that the permit's scope was narrow, and that expected

environmental impacts "will not be significant." Appx-6–7. The permit waives

only a requirement to repair, within 180 days, corrosion along a longitudinal seam

weld, and the "conditions imposed by the special permit sufficiently address" any

potential risks and provide an equivalent level of safety. Appx-6–7. PHMSA

noted that it planned to prepare an environmental assessment as soon as

practicable. Appx-7.

PHMSA explained that the permit was in the public interest because it

would ensure uniform and continuous regulatory oversight by continuing the

waivers that OSFM had previously issued. Appx-5.

### 6.  This litigation

On December 24, 2025, Petitioners brought suit under 49 U.S.C. § 60119(a)

to challenge both the emergency special permit and PHMSA's approval of Sable's

restart plan.[1] ACMS 1.1. On December 26, 2025, Petitioners moved for an

emergency stay of PHMSA's orders. ACMS 8.1.

---

[1] Respondents reserve the right to challenge the Court's jurisdiction over these
actions, including the right to contend that PHMSA's approval of the restart plan is
not an agency action subject to judicial review.

## STANDARD OF REVIEW

To obtain a stay, Petitioners must show that: (1) they are likely to succeed on the merits, (2) they will be irreparably injured absent a stay, (3) the stay will not substantially injure the other parties, and (4) the public interest favors a stay. *Nken v. Holder*, 556 U.S. 418, 434 (2009). When the government opposes a stay, the last two factors merge. *Id.* at 435.

The Court applies the Administrative Procedure Act standards to review PHMSA orders issued under the Pipeline Safety Act. 49 U.S.C. § 60119(a)(1); (a)(3). Under the Administrative Procedure Act, the Court reviews whether an agency action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). This scope of review "is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983).

## ARGUMENT

### I.    Petitioners are unlikely to succeed on the merits.

To obtain a stay, Petitioners must "make a clear showing" that they are "likely to succeed on the merits." *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024) (cleaned up). They cannot meet this requirement.

PHMSA satisfied the Pipeline Safety Act's requirements for issuing an emergency special permit. And its issuance of the permit complied with NEPA.

13

Because of the emergency, PHMSA could not prepare a separate environmental assessment before issuing the permit, but it reasonably concluded that any impacts would not be significant.

Petitioners' only merits challenge to PHMSA's approval of the restart plan is that PHMSA failed to prepare a NEPA analysis. But PHMSA's approval of the restart plan was not subject to NEPA because it was not a major federal action and it was non-discretionary.

### A. PHMSA reasonably issued the emergency special permit.

#### 1. PHMSA complied with the Pipeline Safety Act.

PHMSA reasonably approved Sable's emergency special application. Congress authorized PHMSA to issue emergency special permits "on terms [PHMSA] considers appropriate" if PHMSA "determines" that the permit is consistent with pipeline safety, in the public interest, and necessary to address "an actual or impending emergency involving pipeline transportation." 49 U.S.C. § 60118(c)(2)(A). Each of these determinations warrants substantial deference. *Ctr. For Biological Diversity v. Kempthorne*, 588 F.3d 701, 707 (9th Cir. 2009) ("[D]eference is especially warranted when reviewing the agency's technical analysis and judgments." (cleaned up)). Neither Petitioners nor courts may second-guess the agency's judgment on issues of predictive, scientific judgment

14

and public policy. *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*, 605 U.S. 168, 183 (2025). And PHMSA satisfied all of the relevant criteria here.

First, the emergency special permit is consistent with pipeline safety. PHMSA waived only the requirement to remediate certain corrosion that poses little risk to CA-324 and CA-325, and PHMSA imposed extensive protective conditions that exceed the standards in its regulations.

For example, Condition 13 in the permit requires rigorous pressure testing. Appx-13. Before operating CA-324, Sable must conduct a "spike" pressure test at a minimum pressure that is at least 150 percent of CA-324's maximum operating pressure and then, immediately afterward, an 8-hour pressure test that is at least 125 percent of maximum operating pressure. Appx-13. By comparison, PHMSA's pressure-testing regulation requires pressure tests for only four hours at 125 percent of maximum operating pressure and then another four hours at 110 percent of maximum operating pressure. 49 C.F.R. § 195.304.

As another example, Condition 14 requires much more frequent in-line inspections than PHMSA's regulations. Condition 14 requires Sable to conduct in-line inspections to detect metal loss twice a year during the first two years of operations and then once a year. Appx-15. Sable must separately inspect for deformations on that same schedule. Appx-16. And Sable must use crack detection tools annually. Appx-15. By contrast, the comparable regulation

15

requires operators to inspect pipelines once every five years.  49 C.F.R. § 195.452(j)(3).  Condition 16 requires Sable to immediately repair certain conditions (such as crack-like anomalies that are equal to or greater than 50 percent of the pipe wall thickness) that the regulations do not require operators to immediately repair.  Appx-17; 49 C.F.R. § 195.452(h)(4)(i).

PHMSA reasonably determined that compliance with those conditions would, at a minimum, provide an "equivalent level of safety" as compliance with the waived regulation.  Appx-5.  Moreover, under the permit, PHMSA may order Sable to shut down CA-324 and CA-325 "at any time."  Appx-23.  By contrast, without the permit, PHMSA can order an immediate shut down only if it finds that the pipeline "will result in likely serious harm to life, property, or the environment."  49 U.S.C. § 60112(e); *see also* 49 C.F.R. § 190.233(b) (same).

Petitioners cite their own expert to speculate that the permit conditions are inadequate.  Mot. 11.  But when examining agencies' "scientific determination[s]," the Court "must generally be at its most deferential."  *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 103 (1983).  And "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts."  *Bering Strait Citizens for Responsible Res. Dev. V. USACE*, 524 F.3d 938, 957 (9th Cir. 2008) (cleaned up).  Moreover, aside from its general expertise in pipeline safety regulation, PHMSA has been intimately involved with

16

these pipelines since 2015. It has conducted numerous inspections, *e.g.*, Appx-224, including its recent December 2025 inspections, Appx-140. It has an extensive, expert understanding of the unique attributes of CA-324 and CA-325.

Second, the emergency special permit is in the public interest. It ensures uniform and continuous regulatory oversight over CA-324 and CA-325, continuing the many conditions that had previously applied through OSFM waivers. Appx-5. In addition, the permit reduces the need for unnecessary (and potentially destructive) excavations to investigate anomalies that do not pose risks to these pipelines. Appx-5.

Sable submitted a report to PHMSA showing how the public will benefit from restarting CA-324 and CA-325. Appx-75. For example, California has the highest retail gasoline and aviation fuel costs in the United States. Appx-80. Introducing Sable's production into California's refinery system could save $3.283 to $3.456 per barrel compared to imported oil. Appx-131.

Third, the permit is necessary to address an actual emergency involving pipeline transportation. Emergencies can be local, regional, or national in scope, and include significant fuel supply disruptions. 49 C.F.R. § 190.341(g). The President declared a national energy emergency and directed agencies to protect the country's national and economic security by using emergency authorities to facilitate the transportation of oil in the West Coast. E.O. 14156 § 3(b). The

17

President described the "active threat to the American people from high energy prices" and the challenges of insufficient energy transportation. *Id.* § 1.

Sable submitted a report identifying how the permit is necessary to implement the Executive Order. California's energy security would benefit from the addition of oil produced on Sable's offshore platforms and transported through CA-324 and CA-325. Appx-81. In addition, adding Sable's oil to the market would improve defense readiness for military forces stationed in California, Nevada, and Arizona that rely on California refineries for aviation, gasoline, and diesel fuels. Appx-81. And California would be less reliant on foreign imports. Appx-101.

Petitioners contend that there is no emergency "because the State Waivers exist," Mot. 8, but California issued those waivers before PHMSA assumed regulatory jurisdiction. States cannot regulate interstate pipelines, 49 U.S.C. § 60104(c), so Sable may not rely on those waivers.

Petitioners also argue that PHMSA failed to follow the required process for issuing non-emergency special permits, Mot. 9–11, but PHMSA issued an emergency special permit and, therefore, the process for non-emergency special permits did not apply, 49 U.S.C. § 60118(c)(2)(A).

18

## 2. PHMSA was not required to prepare NEPA analysis before issuing the permit.

PHMSA was not required to prepare NEPA analysis before issuing the emergency special permit. NEPA acknowledges that agencies may not be able to fully comply with its procedures, requiring instead that agencies comply "to the fullest extent possible." 42 U.S.C. § 4332. PHMSA's action here was consistent with DOT's NEPA procedures, which provide that "[e]mergency circumstances may require immediate actions that preclude following standard NEPA procedures." Order 5610.1D § 23. Delaying issuance of an emergency special permit to prepare a NEPA analysis would frustrate implementation of the emergency authority in the Pipeline Safety Act. 49 U.S.C. § 60118(c)(2). And in the Executive Order, the President directed agencies to "use all lawful emergency ... authorities available to them to facilitate the ... transportation of energy in and through the West Coast." E.O. 14156 § 3(b). That is what PHMSA did here.

Although it could not prepare an environmental assessment before issuing the permit, PHMSA did consider the proposed action's scope and concluded that it "is narrow." Appx-6. The permit does not authorize pipeline operations and therefore any environmental assessment would not consider all pipeline operations. Appx-6. The permit only waives the regulation requiring Sable to remediate corrosion along longitudinal pipeline seams within 180 days (while imposing other

19

protective conditions).  Appx-6–7.  So any environmental analysis would examine only whether waiving that requirement and imposing additional protections would have significant environmental impacts.  And PHMSA reasonably concluded that the permit would not have significant impacts because "[t]he full set of conditions imposed by the special permit sufficiently address the risk of a failure or release as a result of such corrosion and provide an equivalent level of safety."  Appx-7.  And PHMSA will prepare an environmental assessment as soon as practicable.  Appx-7.

The Court should defer to PHMSA's determination that any impacts will not be significant because "the central principle of judicial review in NEPA cases is deference."  *Seven Cnty.*, 605 U.S. at 179.  Petitioners insist that a 1975 case supplies the standard for determining significance under NEPA and that an action is significant if it "would materially degrade any aspect of environmental quality."  Mot. 12–13, 13 n.2 (quoting *City of Davis v. Coleman*, 521 F.2d 661, 674 (9th Cir. 1975)).  But Petitioners ignore *Seven County*, where the Supreme Court recently said that "an agency exercises substantial discretion" and "must make predictive and scientific judgments in assessing the relevant impacts (what are the likely impacts; do they rise to the level of 'significant'?)."  605 U.S. at 181.  "Black-letter administrative law instructs that when an agency makes those kinds of speculative assessments or predictive or scientific judgments, and decides what qualifies as significant ..., a reviewing court must be at its most deferential."  *Id.* at 182

20

(cleaned up). PHMSA is entitled to deference in determining "what qualifies as significant," *id.*, particularly in the pipeline safety regulation context, which "requires a high level of technical expertise," *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 377, (1989) (cleaned up).

DOT's NEPA procedures echo *Seven County*'s deferential approach. The procedures provide that "[w]hether an impact rises to the level of 'significant' is a matter of the [agency]'s expert judgment." Order 5610.1D § 6(c)(2). Petitioners cite DOT Order 5610.1C to argue that PHMSA had to prepare an environmental impact statement, Mot. 12, but Order 5610.1D, which was issued in 2025, superseded and cancelled Order 5610.1C. Order 5610.1D § 2(a).

Finally, "[e]ven if" PHMSA's NEPA analysis "falls short in some respects, that deficiency may not necessarily require a court to vacate the agency's ultimate approval ..., at least absent reason to believe that the agency might disapprove the project if it added more to the [NEPA analysis]." *Seven Cnty.*, 605 U.S. at 185. PHMSA already determined that the permit conditions were sufficiently protective, and that Sable remedied all the conditions that led to the 2015 spill. So there is no "reason to believe" that further environmental review would change its decision to issue the permit. *Id.*

**B.     PHMSA's approval of the restart plan was not subject to NEPA.**

PHMSA's approval of Sable's restart plan was not subject to NEPA because it was not a major federal action and because it was non-discretionary. NEPA applies only to "major Federal actions." 42 U.S.C. § 4332(2)(C). Major federal actions are actions subject to substantial federal control and responsibility, as determined by the agency conducting the actions. 42 U.S.C. § 4336e(10)(A). Major federal actions do not include "non-discretionary" activities "in accordance with an agency's statutory authority." 42 U.S.C. § 4336e(10)(B)(vii). No authority suggests PHMSA's approval of the restart plan was a major federal action under NEPA, and Petitioners point to none. To the contrary, it was a non-discretionary action as part of the consent decree implementation process.

There is no statutory or regulatory requirement for operators to obtain PHMSA's approval before starting (or restarting) pipeline operations. Here, PHMSA had to approve Sable's restart plan only because the consent decree required it to do so. Appx-273, Appx-276.

The consent decree mandates ten elements for the restart plan. Appx-273–75. The consent decree provides that, if the company seeks to restart the pipelines, it "shall develop and submit ... a written Restart Plan to the [regulator] for review and approval." Appx-273–75. And then, "[o]nce approved ..., the Restart Plan shall be incorporated by reference into this Consent Decree." Appx-273. The

22

consent decree does not provide any criteria for PHMSA to evaluate the restart

plan—other than ensuring the required elements are satisfied.

"Environmental analysis under NEPA is ... only required when it would

provide information that influences an agency's decision-making process.'" *DOT

v. Pub. Citizen*, 541 U.S. 752, 767 (2004).  Thus, "NEPA applies only where an

agency action is discretionary."  *NRDC v. McCarthy*, 993 F.3d 1243, 1251 (10th

Cir. 2021).  In *National Wildlife Federation v. DOT*, the Sixth Circuit held that

PHMSA's approval of pipeline operators' plans for addressing potential oil spills

was non-discretionary—and therefore not subject to NEPA—because PHMSA had

to approve the plans if they "satisfie[d] the enumerated criteria" in the statute.  960

F.3d 872, 879 (6th Cir. 2020).  If the plans met the required criteria, then PHMSA

could not deny approval based on environmental effects.  *Id.*; *see also Alaska

Wilderness League v. Jewell*, 788 F.3d 1212, 1225 (9th Cir. 2015).

To be sure, the consent decree does not mandate that PHMSA "shall

approve" any restart plan containing the required elements, but it also does not

give PHMSA authority to invent new requirements or deny approval based on

environmental impacts.  Appx-273.  Petitioners failed to show that PHMSA

violated NEPA in approving the restart plan.

23

## II.  Petitioners cannot establish irreparable harm.

Petitioners must also show that they "will be irreparably injured absent a stay." *Nken*, 556 U.S. at 434.  "[S]imply showing some possibility of irreparable injury fails to satisfy [this] factor." *Id*.  Petitioners cannot show irreparable harm.  First, PHMSA imposed conditions that are more stringent than its regulations.  Appx-10–23.  Second, PHMSA recently inspected CA-324 and CA-325 and did not identify any compliance or safety issues.  Appx-142.

Petitioners suggest that CA-324 and CA-325 are "defective," Mot. 10, but they ignore the extensive repair work that Sable (and Plains) performed on CA-324 and CA-325, Appx-150.  Sable remediated the corrosion that caused the 2015 failure and repaired all other anomalies that required remediation.  Appx-54.  In addition, Sable installed 27 safety valves and implemented enhanced leak detection and emergency response measures.  Appx-150.

Finally, the emergency special permit carries no prospect of irreparable harm, particularly in the near-term.  The permit waives the requirement to remediate corrosion along longitudinal seam welds within 180 days of discovering the corrosion.  Without the permit, Sable would have 180 days after conducting inspections to assess inspection data and identify corrosion and then another 180 days thereafter to remediate it.  49 C.F.R. §§ 195.452(h)(2), (h)(4)(iii)(H).  So, under the regulations, Sable would have 360 days after conducting an inspection to

remediate corrosion.  By contrast, under the permit, if Sable discovers corrosion, it must satisfy stronger risk-mitigation and repair requirements than the regulations would otherwise require.  There can be no near-term harm from PHMSA's waiver of a requirement that applies no sooner than 360 days from now, and when the permit expires well before then (60 days after issuance).  49 U.S.C. § 60118(c)(2)(B).  Nor can there be any harm from PHMSA's decision to require Sable to comply with requirements that are stricter than the regulations.

## III.    The public interest and the balance of the equities favor denying Petitioners' motion.

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Winter v. NRDC*, 555 U.S. 7, 24 (2008) (cleaned up).  The public interest and the balance of the equities favor denying Petitioners' motion because the President has declared an energy emergency partially based on "inadequate" oil supplies and infrastructure.  E.O. 14156 § 1.  There is an "active threat to the American people from high energy prices."  *Id.*  Safely introducing Sable's production into California's refinery system would reduce oil costs and enhance energy security, which would benefit the American people.  Appx-131.

## CONCLUSION

The Court should deny Petitioners' motion.

25

Respectfully submitted,

Of Counsel:

BENJAMIN FRED
TIMOTHY O'SHEA
KATHLEEN MAITLAND
*Attorneys*
Pipeline and Hazardous Materials Safety Administration

SAMUEL FULLER
ERIN HENDRIXSON
*Attorneys*
U.S. Dept. of Transportation

/s/ *Rebecca Jaffe*
ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*
ROBERT N. STANDER
*Deputy Assistant Attorney General*
AMBER BLAHA
REBECCA JAFFE
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice

*Counsel for Federal Respondents*

December 30, 2025
90-13-1-18076

**CERTIFICATE OF COMPLIANCE**

1.     This document complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) this document contains 5,090 words.

2.     This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

/s/ *Rebecca Jaffe*
REBECCA JAFFE
Counsel for Federal Respondents

27

# EXHIBIT 4



February 13, 2026

Linda Daugherty
Acting Associate Administrator for Pipeline Safety
Pipeline and Hazardous Materials Administration (PHMSA)
United States Department of Transportation
1200 New Jersey Ave, SE
Washington, DC 20590

*Via E-Mail*

Dear Ms. Daugherty,

Sable Offshore Corp. (Sable) is writing in regards to the December 23, 2025 Emergency Special Permit (ESP) issued by PHMSA.  The ESP is currently scheduled to expire on February 21, 2026.  Sable has also submitted an Application for Special Permit on January 22, 2026.  Sable understands that, based on the procedures in 49 C.F.R. § 190.341 (including publishing notice of the Application in the Federal Register and holding a public comment period), the ESP will expire before PHMSA makes a final determination on Sable's Application for Special Permit.

Notwithstanding the ESP's expiration, Sable will continue to comply with the conditions of the ESP until PHMSA makes a determination on the Application for Special Permit, and we respectfully request expedited consideration of the Application consistent with the National Energy Emergency Declaration in E.O 14156 and PHMSA's January 12, 2026 Notice of Limited Enforcement Discretion and Statement of Policy for Issuing Special Permits In Response to National Energy Emergency.

Should you have any questions, please do not hesitate to contact me.

Sincerely,

J. Caldwell Flores
President
Sable Offshore Corp.

Cc:
Timothy O'Shea
Keith Coyle

# EXHIBIT 5



## Sable Offshore Gets Green Light to Restart Pipeline from Feds

As of Tuesday Morning, No Officials with County of Santa Barbara or State of California Appeared to Know Whether Houston Oil Company Has Already Recommenced Production off Gaviota Coast

By **Nick Welsh**
Tue Dec 23, 2025 | 12:00pm

G Add independent.com on Google



*Exxon/Sable's Santa Ynez Unit includes platforms Harmony, Hondo, and Heritage. Restarting the unit would add to the largest source of pollution in Santa Barbara County. | Credit: Glenn Beltz*

Three days before Christmas, the federal agency responsible for pipeline safety, the Pipeline and Hazardous Materials Safety Administration (PHMSA), issued Sable Offshore a notably brief letter granting the company authorization to restart Sable's two onshore pipelines that have been at the heart of the prolonged and bitter regulatory battle putting the Houston-based oil company with a myriad of state oversight agencies.

At issue has been the safety and reliability of repairs the company made without permits of a badly corroded pipeline that sprung a major leak in May 2015 along the Gaviota Coast. That leak effectively shut down all oil production along the coast.

Monday's action by PHMSA comes on the heels of last Wednesday's decision by the same federal agency to take regulatory authority for restarting the pipeline away from the state agency — the Office of the State Fire Marshal — that since 2016 had been vested with safety oversight authority over the pipeline. In so doing, PHMSA had acted in response to a request from Sable Offshore, which owns and has repaired the corroded pipelines, to give the federal agency the last word on pipeline safety.

Sable's request came not long after the State Fire Marshal had put Sable on notice that the much-contested repair work the company had done so far was not up to the Fire Marshal's standards. According to the Fire Marshal, those repairs failed to comply with the margins of error that the Fire Marshal required. The company's restart application would go nowhere, the Fire Marshal explained, until those objections had been addressed. Sable objected and took its case to the federal agency, where, because of the Trump administration's aggressively pro-oil stance, the company might expect to elicit a more receptive and amenable response.

As of Tuesday morning, no officials with the County of Santa Barbara or the State of California appeared to know whether Sable has already recommenced production.

Sable executive Steve Rusch declined to say, stating only, "The only news is the news you're reading right now. All we're discussing is what you read this morning."

Jim Hosler of the State Fire Marshal's Office stated, "Really, we have no comment. We don't have anything. Was Sable pumping? I'm not aware of it. But they don't have to tell us anything anymore now," he said. When asked if his office challenged PHMSA's assertion of regulatory authority, Hosler replied, "We're not going to court. Anything like that would be up to the Governor's Office or the Department of Justice."

On Tuesday, State Senator Monique Limón responded to the news with the following statement: "This pipeline was shut down because it was spewing oil into the ocean and onto our beaches, killing wildlife, disrupting the fishing, tourism, and recreation jobs that are critical to our coastal economy and way of life. The pipeline should not be allowed to restart operations without proper safety review and oversight by the state. It is clear this reclassification is yet another attempt by this administration to circumvent state law, putting millions of Californians at risk. I am continuing to work with our state agencies and the Governor's Office to pursue options to ensure our laws are followed and that this pipeline will not cause yet another disaster in our community."

According to off-the-record sources, the Attorney General's office has been contacted and has expressed an eager interest in taking the case. Should Rob Bonta's office take the case, his attorneys would presumably argue that the consent decree entered into in 2020 detailing what steps must be undertaken to restart the pipeline and who was responsible for what has been violated. The consent decree stated explicitly that the Fire Marshal had to authorize any pipeline restart.

---

The document PHMSA released was exceptionally brief and provided no details or explanation of what safety thresholds Sable has met. Instead, it cited five documents PHMSA had reviewed. These included a contact list for the pipeline, two letters from Sable requesting the removal of certain unspecified pressure restrictions, another document detailing the startup procedures, and another detailing what's known as pipeline line-fill positioning plan assignments. In addition, the statement, signed by PHMSA Western Regional Director Dustin Hubbard, noted that PHMSA had conducted "a field inspection with Sable Offshore to discuss its process and safety procedures for the pipeline restart."

Based on this, Hubbard concluded, "PHMSA has reviewed these documents and hereby approves the submitted Restart plan. This approval is valid from the date of this letter." The letter was signed at 1:19 p.m. on December 22.

Linda Krop, lead attorney with the Environmental Defense Center contended the restart approval is illegal on its face because it flies in the face of the consent decree mandate that the Fire Marshal must make for any restart approval. She added that Sable still has to secure new easement rights on four miles of pipeline that traverse Gaviota State Park. Mostly, she is reaching out to other government agencies to encourage them to defend their rights in court. The most obvious of these would be Attorney General Bonta's office.

Among the county supervisors, however, it's not clear what their legal options are. The County Counsel's office has been instructed to investigate the matter, but aside from the county's recent vote refusing to approve the transfer to Sable of the property and transfer rights the company purchased from Exxon two years ago, there's little to work with. All parties

acknowledge that Sable can operate without that transfer taking place, but only if Exxon agrees to allow the company to operate under Exxon's existing permits. Doubtless there would be a daunting court fight. Right now, it appears doubtful that the supervisors have the votes needed to wage such a fight.

Among the bigger investors that have been bird-dogging Sable with a jaundiced eye, there's skepticism that the PHMSA approval really is the green light it might appear. Such news, they claim, should normally trigger a major jump in Sable's stock values. Right now, Sable is selling for little more than $10 a share. That's up from $8 the day before. But with news seemingly this dramatic, they have expressed surprise it's not much more. The investors, they have suggested, must know something.

*Editor's Note: Sable Offshore was granted authorization to restart its two onshore pipelines, not offshore pipelines as originally reported.*

## Related Posts



### Feds Subpoena Sable Offshore over Insider Information

By Nick Welsh | Tue Feb 03, 2026



### Santa Barbara Judge Keeps Sable Injunction in Place as Company Confirms No Oil in Pipelines

By Ella Heydenfeldt | Wed Jan 07, 2026



### Santa Barbara County Supervisors Weigh Legal Options to Stop or Slow Down Restart of Sable Offshore's Oil Pipeline

By Nick Welsh | Tue Jan 06, 2026

## Most Read    |    Recent News



## Goleta Farming Visionaries Jay and Kristen Ruskey Die in 'Tragic Accident'

By Matt Kettmann | Tue Feb 10, 2026



## Remembering the Ruskeys, California's Most Adventurous Farmers

By Matt Kettmann | Fri Feb 13, 2026



## Bankrupt California Friars Agree to $20 Million Settlement with Survivors

By Tyler Hayden | Thu Feb 12, 2026



## Jimmy's Oriental Gardens Nominated for National Register of Historic Places

By Ryan P. Cruz | Fri Feb 13, 2026



## Masked Disruption in UC Santa Barbara Lecture Sparks Investigation, Campus Debate

By Ella Heydenfeldt | Tue Feb 17, 2026

**Premier Events**







Wed, Feb 18    6:00 PM

Santa Barbara

### I.V. Unplugged with Jack Corliss

Thu, Feb 19    1:30 PM

Goleta

### Goleta Valley Library Film Club: Marty, 1955

Thu, Feb 19    6:00 PM

Santa Barbara

### Sips, Spins, Support

See Full Event Calendar

Wed Feb 18, 2026 | 23:43pm        https://www.independent.com/2025/12/23/sable-offshore-gets-green-light-to-restart-pipeline-from-feds/

.

**PROOF OF SERVICE**

I, Kim Niz, declare:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Alston & Bird LLP, 350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071.

On February 18, 2026, I served the document **REAL PARTIES IN INTEREST SABLE OFFSHORE CORP.'S AND PACIFIC PIPELINE COMPANY'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT MOTION FOR RECONSIDERATION OF PRELIMINARY INJUNCTION; DECLARATION OF JEFFREY D. DINTZER** on the interested parties in this action addressed as follows: **See Attached Service List**

☒     BY ELECTRONIC SERVICE on the date stated below, I caused the document(s) described above to be served electronically on the recipients designated on the Transaction Receipt pursuant to the parties' stipulation establishing the authorizing e-service of documents.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on February 18, 2026, at Los Angeles, California.

                        /s/ *Kim Niz*
                           Kim Niz

**SERVICE LIST**

| | |
|---|---|
| Julie Teel Simmonds, Esq.<br>David Pettit, Esq.<br>Talia Nimmer, Esq.<br>**CENTER FOR BIOLOGICAL DIVERSITY**<br>2011 Franklin Street, Suite 375<br>Oakland, CA 94612<br>Tel.: (510) 844-7100<br>Fax: (510) 844-7150<br>jteelsimmonds@biologicaldiversity.org<br>dpettit@biologicaldiversity.org<br>tnimmer@biologicaldiversity.org | *Attorneys for Petitioners: Center for Biological Diversity and Wishtoyo Foundation* |
| Duncan Joseph Moore<br>Benjamin J. Hanelin<br>Natalie C. Rogers<br>**PAUL HASTINGS**<br>1999 Avenue of Stars, 27th Floor<br>Century City, CA 90067<br>Tel: (310) 620-5879<br>Fax: (310) 620-5899<br>djmoore@paulhastings.com<br>benjaminhanelin@paulhastings.com<br>natalierogers@paulhastings.com | *Attorneys for Real Parties in Interest: Sable Offshore Corp. and Pacific Pipeline Company* |
| Trevor D. Large (SBN: 214886)<br>Victoria C. Diffenderfer (SBN: 350018)<br>**FAUVER LARGE ARCHBALD & SPRAY**<br>820 State Street, 4th Floor<br>Santa Barbara, CA 93101<br>Tel: (805) 966-7000<br>Fax: (805) 966-7227<br>tlarge@flasllp.com<br>vdiffenderfer@flasllp.com | *Attorneys for Real Parties in Interest: Sable Offshore Corp. and Pacific Pipeline Company* |
| Linda Krop, Esq.<br>Jeremy M. Frankel, Esq.<br>Tara C. Rengifo, Esq.<br>**ENVIRONMENTAL DEFENSE CENTER**<br>906 Garden Street<br>Santa Barbara, CA 93101<br>Tel: (805) 963-1622; (510) 844-7100<br>Fax: (805) 962-3152; (510) 844-7150<br>lkrop@environmentaldefensecenter.org<br>jfrankel@environmentaldefensecenter.org<br>trengifo@environmentaldefensecenter.org | *Attorneys for Petitioners: Environmental Defense Center, a California non-profit corporation; Get Oil Out!, a California non-profit corporation, Santa Barbara County Action Network, a California non-profit corporation, Sierra Club, a national non-profit corporation, and Santa Barbara Channelkeeper, a California non-profit corporation* |

Michael S. Dorsi, Esq.
**CALIFORNIA ATTORNEY GENERAL'S OFFICE**
55 Golden Gate Ave, Ste 11000
San Francisco, CA 94102
Tel.: (415) 510-3802
Michael.dorsi@doj.ca.gov

*Attorneys for Respondents/Defendants: California Department of Forestry and Fire Protection, Office of the State Fire Marshal, Daniel Berlant (in his official capacity as State Fire Marshal)*

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
2/23/2026 5:05 PM
By: Narzralli Baksh , Deputy

Jeffrey D. Dintzer (SBN: 139056)
Garrett B. Stanton (SBN: 324775)
**ALSTON & BIRD LLP**
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071
Tel: (213) 576-1000; Fax: (213) 576-1100
Jeffrey.Dintzer@alston.com
Garrett.Stanton@alston.com

Duncan Joseph Moore (SBN: 233955)
Benjamin J. Hanelin (SBN: 237595)
Natalie C. Rogers (SBN: 301254)
**PAUL HASTINGS LLP**
1999 Avenue of Stars, 27th Floor
Century City, CA 90067
Tel: (310) 620-5879; Fax: (310) 620-5899
djmoore@paulhastings.com
benjaminhanelin@paulhastings.com
natalierogers@paulhastings.com

Trevor D. Large (SBN: 214886)
Victoria C. Diffenderfer (SBN: 350018)
**FAUVER LARGE ARCHBALD & SPRAY**
820 State Street, 4th Floor
Santa Barbara, CA 93101
Tel: (805) 966-7000; Fax: (805) 966-7227
tlarge@flasllp.com
vdiffenderfer@flasllp.com

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF SANTA BARBARA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION, <br><br> Petitioners/Plaintiffs, <br><br> v. <br><br> CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10; inclusive, <br><br> Respondents/Defendants. | Case No.: 25CV02244 <br> [Consolidated with 25CV02247] <br><br> **SUPPLEMENTAL DECLARATION OF JEFFREY D. DINTZER IN SUPPORT OF REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S MOTION FOR RECONSIDERATION OF PRELIMINARY INJUNCTION** <br><br> Date:     February 27, 2026 <br> Time:     10:00 a.m. <br> Dept.:    4 <br><br><br> Complaint Filed: April 15, 2025 <br><br> [Assigned for Purposes to the Honorable Donna D. Geck, Dept. 4] |

1

SUPPLEMENTAL DECLARATION OF JEFFREY D. DINTZER

SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,

Real Parties in Interest

ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation,

Petitioners/Plaintiffs,

v.

CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, an agency of the State of California; OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10; inclusive,

Respondents/Defendants.

SABLE OFFSHORE CORP., a Delaware Corporation, and PACIFIC PIPELINE COMPANY, a Delaware Corporation.

Real Parties in Interest.

Case No.: 25CV02247

### <u>SUPPLEMENTAL DECLARATION OF JEFFREY D. DINTZER</u>

I, Jeffrey D. Dintzer, declare as follows:

1. I am an attorney duly licensed to practice law before all courts of the State of California and am a partner at Alston & Bird LLP, attorney of record for Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company (hereinafter collectively referred to as "Sable"). I make this declaration in support of Real Parties in Interest Sable Offshore Corp.'s and Pacific Pipeline Company's Motion for Reconsideration of Preliminary Injunction. I have personal knowledge of the facts set forth in this declaration and if called as a witness, could and would testify competently to them.

2. I am familiar with the case files for these matters. The files for these matters are kept at my shared direction in a secure electronic format at the offices of Alston & Bird LLP. Legal assistant Kim Niz and various associates maintain these files on a server at Alston & Bird.

3. In preparing this declaration, others at my direction retrieved the true and correct copy of the documents described below and prepared them for inclusion in my declaration.

4. On February 20, 2026, the State of California filed a Notice of Removal of Action for the action filed by Pacific Pipeline Company in the Superior Court of the State of California for the County of Kern, entitled *Pacific Pipeline Company v. State of California*, Case No. BCV-25-103508. A true and correct copy of the State of California's Notice of Removal of Action is attached hereto as **Exhibit A**.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 23rd day of February, 2026, in Los Angeles, California.



By: _____

Jeffrey D. Dintzer

# EXHIBIT A

ROB BONTA, State Bar No. 202668
Attorney General of California
BRANDON S. WALKER, State Bar No. 254581
Supervising Deputy Attorney General
JACK C. NICK, State Bar No. 160196
ISABELLA A. PANICUCCI, State Bar No. 318984
Deputy Attorneys General
  1300 I Street, Suite 125
  Sacramento, CA 95814
  Telephone:  (916) 210-7662
  Fax:  (916) 327-2319
  E-mail:  Isabella.Panicucci@doj.ca.gov
*Attorneys for Defendant*
*State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **PACIFIC PIPELINE COMPANY, a Delaware Corporation,**<br><br>Plaintiff,<br><br>v.<br><br>**STATE OF CALIFORNIA and DOES 1 through 25, inclusive,**<br><br>Defendant. | Case No.<br><br>(Kern County Superior Court Case No. BCV-25-103508)<br><br>**NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. SECTION 1441(a) (FEDERAL QUESTION)** |

**TO THE CLERK OF THE ABOVE-ENTITLED COURT:**

**PLEASE TAKE NOTICE** that Defendant State of California hereby removes to this Court the state court action described below.

1.   On September 29, 2025, an action was commenced in the Superior Court of the State of California for the County of Kern, entitled Pacific Pipeline Company, Plaintiff, vs. State of California and Does 1 through 25, Defendants, as case number BCV-25-103508. A true and correct copy of the complaint and summons are attached hereto as **Exhibit A.**

2.   On January 21, 2026, Plaintiff Pacific Pipeline Company filed a verified first amended complaint. The first amended complaint added a second cause of action alleging that

1

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 366 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 2 of 464
ID #:17409

under the federal Pipeline Safety Act, at 49 U.S.C. section 60104(c), state agencies are precluded from imposing any safety standards for California Pipelines 324 and 325. (First Amended Complaint, ¶ 68.) A true and correct copy of the first amended complaint, which was served on Defendant State of California on January 21, 2026, is attached hereto as **Exhibit B**.

3.     Defendant State of California has not yet filed a responsive pleading because the first amended complaint was served before a responsive pleading was due.

4.     True and correct copies of the remainder of the process, pleadings, and orders served upon Defendant State of California to date are attached hereto as **Exhibit C.**

5.     This action is a civil action of which this Court has original jurisdiction under 28 U.S.C. section 1331, and is one which may be removed to this Court by Defendant State of California pursuant to the provisions of 28 U.S.C. section 1441(a) in that the second cause of action in the first amended complaint seeks a judicial declaration that California Senate Bill 237's application to California Pipelines 324 and 325 is preempted by 49 U.S.C. section 60104(c). (First Amended Complaint, ¶ 73.)

6.     No other defendant has been served with the summons, complaint, or first amended complaint.

Dated:  February 20, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
BRANDON WALKER
Supervising Deputy Attorney General
JACK C. NICK
Deputy Attorney General

ISABELLA A. PANICUCCI
Deputy Attorney General
*Attorneys for Defendant
State of California*

SA2025306665
39639672

2

Notice of Removal of Action Under 28 U.S.C. Section 1441(a) (Federal Question)

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 367 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 3 of 464
ID #:17410

# Exhibit A

# OFFICE OF THE ATTORNEY GENERAL
## DEPARTMENT OF JUSTICE
### Civil Service of Process Cover Sheet
SAC   SF   OAK   LA   SD   FR



REC.CA DEPT OF JUSTICE
NOV 5 '25 PM 1:13

Data Stamp & Time

Service of Process Disclaimer:

To All Persons Attempting Service of Process Upon The Office Of The Attorney General:

Please be advised that staff assigned to receive documents delivered to the Attorney General's Office are not authorized to accept such documents as properly served. Further, staff are not authorized to receive documents on behalf of any individual. In receiving documents delivered by process servers and/or other members of the public, office personnel do not thereby waive any right of the State of California, the Attorney General's Office, any other entity of the State of California, or any individual to object to the validity of the service.

Please complete this form when delivering documents to the Attorney General's Office:

| Case Name: *Pacific Pipeline v State of California* | | |
|---|---|---|
| County: **Kern** | | Court No.: **BCV25103508** |
| Document(s) served: | ☒ Summons and Complaint/Cross Complaint/Amended Complaint <br> ☐ Notice to Attorney General's Office pursuant to Section _____ <br> ☐ Petition For Relief From Late Claim Filing (Gov. Code, § 946.6) <br> ☐ Pitchess Motion <br> ☐ Small Claims <br> ☐ Deposition Subpoena for Production of Business Records | ☐ Notice of Consumer or Employee and Objection and check for $15.00 <br> ☐ Writ of Mandate and Complaint for Declaratory Relief <br> ☐ Other (please list): _____ <br> _____ <br> _____ <br> _____ |
| Document(s) For (Specify State Agency): | **State of California** | |
| Process Server's Name: | | |
| Name of Company: (business name, address, and number) | | |
| Receptionist Signature: | | |

| FOR SERVICE DEPUTY'S USE ONLY | | | |
|---|---|---|---|
| Forwarded to: | | Date Forwarded: | |
| Name of Service Deputy, section, and telephone number: | | | |
| NOTES: | | | |

The attached document(s) appear(s) to be the responsibility of your section; if they are *not*, please return them to the Service Deputy named above, noting the section to which they are to be directed.                    (Rev. 7/2014).

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 369 of 837    Page
ID #:17412
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 5 of 464

**SUM-100**

# SUMMONS
## (CITACION JUDICIAL)

<table>
<tr><td></td><td>FOR COURT USE ONLY<br>(SOLO PARA USO DE LA CORTE)</td></tr>
</table>

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
STATE OF CALIFORNIA and DOES 1 through 25, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
PACIFIC PIPELINE COMPANY, a Delaware corporation,

**ELECTRONICALLY FILED**
Superior Court of California,
County of Kern
By: Vickie Fogerson, Deputy Clerk
11/05/2025

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* Superior Court of California
County of Kern, 1215 Truxtun Avenue, Bakersfield, CA 93301

CASE NUMBER:
*(Número del Caso):*
BCV25103508

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Jeffrey D. Dintzer, Alston & Bird, 350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071; (213) 576-1000 (See Attachment 1)

| DATE:<br>*(Fecha)* 11/05/2025 | Tara Leal | Clerk, by<br>*(Secretario)* /s/ **Vickie Fogerson** | , Deputy<br>*(Adjunto)* |
|---|---|---|---|

*(For proof of service of this summons, use* Proof of Service of Summons *(form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario* Proof of Service of Summons, *(POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☑ on behalf of *(specify):* STATE OF CALIFORNIA
   under: ☐ CCP 416.10 (corporation)    ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)    ☐ CCP 416.90 (authorized person)
   ☑ other *(specify):* 416.50 public entity
4. ☑ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courts.ca.gov*

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 370 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 6 of 464
ID #:17413

MC-025

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| PACIFIC PIPELINE COMPANY v. STATE OF CALIFORNIA | BCV25103508 |

**ATTACHMENT** *(Number):* 1

*(This Attachment may be used with any Judicial Council form.)*

Additional Plaintiff Attorney:

Benjamin J. Hanelin, SBN (237595)
Paul Hastings
1999 Avenue of the Stars
27th Floor
Century City, CA 90067
Telephone:  (310) 620-5879

*(If the item that this Attachment concerns is made under penalty of perjury, all statements in this Attachment are made under penalty of perjury.)*

Page __1__ of __1__

*(Add pages as required)*

Form Approved for Optional Use
Judicial Council of California
MC-025 [Rev. July 1, 2009]

**ATTACHMENT**
**to Judicial Council Form**

*www.courtinfo.ca.gov*

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 371 of 837    Page
ID #:17414
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 7 of 464

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
jeffrey.dintzer@alston.com
GARRETT B. STANTON, SBN 324775
garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071-1410
Telephone:    (213) 576-1000
Facsimile:    (213) 576-1100

**PAUL HASTINGS**
BENJAMIN J. HANELIN, SBN 237595
benjaminhanelin@paulhastings.com
NATALIE C. ROGERS, SBN 301254
natalierogers@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067
Telephone:    (310) 620-5879
Facsimile:    (310) 620-5899

Attorneys for Plaintiffs
PACIFIC PIPELINE COMPANY

FILED
KERN COUNTY
SUPERIOR COURT

SEP 29 2025

BY_____DEPUTY

## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF KERN

| | |
|---|---|
| PACIFIC PIPELINE COMPANY, a Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>STATE OF CALIFORNIA and DOES 1 through 25, inclusive,<br><br>Defendants. | Case No. BCV25103508<br><br>**VERIFIED COMPLAINT FOR DECLARATORY RELIEF**<br><br>(Code Civ. Proc. § 1060) |

- 1 -
VERIFIED COMPLAINT FOR DECLARATORY RELIEF

FILED BY FAX

Plaintiff Pacific Pipeline Company brings this Complaint for Declaratory Relief against Defendant the State of California. By this verified pleading, Plaintiff alleges as follows:

## INTRODUCTION

1. Pacific Pipeline Company owns the Las Flores Pipelines, which include Line CA-324 and Line CA-325 (collectively, the "Las Flores Pipelines"). Portions of the Las Flores Pipelines are located in Kern County, with other portions in San Luis Obispo and an unincorporated area of the County of Santa Barbara ("County") that sits in the Coastal Zone.

2. Sable Offshore Corp. ("Sable") owns the Santa Ynez Unit oil production infrastructure ("SYU Facilities") located both offshore of and onshore in the County's Gaviota Coast. Sable acquired the SYU Facilities and Pacific Pipeline Company, which owns the Las Flores Pipelines, in February 2024.

3. Since that time, Pacific Pipeline Company has worked with federal and state agencies toward resuming petroleum transportation from the SYU Facilities through the Las Flores Pipelines, including performing repair and maintenance work on the Las Flores Pipelines.

4. On September 13, 2025, the California Legislature adopted Senate Bill ("SB") 237.

5. Among other things, SB 237 adds Section 51014.1 of the Government Code, which provides that "[a]ny existing oil pipeline that is six inches or larger that has been idle, inactive, or out of service for five years or more, shall not be restarted without passing a spike hydrostatic testing program."

6. SB 237 also amends Section 30262 of the California Coastal Act to require a person to obtain a new coastal development permit ("CDP") for the "[r]epair, reactivation, and maintenance of an oil and gas facility, including an oil pipeline, that has been idled, inactive, or out of service for five years or more."

7. SB 237 does not define "idled, inactive, or out of service."

8. On September 19, 2025, Governor Gavin Newsom signed SB 237 into law.

- 2 -
VERIFIED COMPLAINT FOR DECLARATORY RELIEF

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 373 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 9 of 464
ID #:17416

9.    The State of California has taken the position that the Las Flores Pipelines have been idled, inactive, or out of service for five years or more. Pacific Pipeline Company disagrees. The Las Flores Pipelines are active. They are not idle and not out of service. In fact, the pipelines have retained their active status under state and federal law since 2015. More recently, Pacific Pipeline Company has been diligently performing necessary work on the Las Flores Pipelines to resume petroleum transportation. Under all relevant and applicable meanings of the words, the Las Flores Pipelines are not idle, inactive, or out of service.

10.    An actual and present controversy exists between Pacific Pipeline Company and Defendant concerning their respective rights and duties regarding the Las Flores Pipelines' status. Consequently, Pacific Pipeline Company seeks a judicial declaration from this Court that the Las Flores Pipelines are not idle, inactive, or out of service as those terms are used in SB 237.

## THE PARTIES

11.    Plaintiff Pacific Pipeline Company is a Delaware Corporation and does business in Kern County, California. Pacific Pipeline Company owns the Las Flores Pipelines.

12.    Pacific Pipeline Company is a "person interested under a statute" within the meaning of Code of Civil Procedure § 1060, because Pacific Pipeline Company's rights and obligations under SB 237 are directly at issue in this action.

13.    Defendant State of California is responsible for enacting and enforcing the laws of the State of California.

14.    Pacific Pipeline Company is unaware of the true names and/or capacities of Defendants DOES 1 through 25, inclusive, and therefore sues said Defendants by such fictitious names. Pacific Pipeline Company will amend this pleading to insert the true names and/or capacities of DOES 1 through 25, inclusive, when the same have been ascertained. Pacific Pipeline Company is informed and believe and thereon alleges that each such fictitiously named Defendant is, in some manner or for some reason, responsible for the actions or omissions alleged in this pleading, and each is subject to the relief being sought herein.

- 3 -
VERIFIED COMPLAINT FOR DECLARATORY RELIEF

## JURISDICTION AND VENUE

15. This Court has subject-matter jurisdiction over this action under California Constitution, article VI, section 10, and section 1060 of the Code of Civil Procedure.

16. Venue is proper in this Court pursuant to Code of Civil Procedure section 392 because portions of the Las Flores Pipelines at issue in this litigation are located in the County of Kern.

## FACTUAL AND LEGAL STATEMEMT

**A.     The SYU Facilities**

17. The Santa Ynez Unit consists of sixteen federal leases across approximately 76,000 acres of outer continental shelf and produces crude oil and natural gas from Platforms Hondo, Harmony, and Heritage, located in federal waters off the California Coast in the Santa Barbara Channel.

18. The oil and gas are transported through the subsea SYU Facilities to the onshore Las Flores Canyon Oil and Gas Plant and the Pacific Offshore Pipeline Company Gas Plant, both of which are located in Las Flores Canyon in unincorporated Santa Barbara County.

19. The onshore facilities in Las Flores Canyon separate oil, propane, butane, sulfur products, and fuel quality gas. The natural gas is dried, treated, compressed, and delivered to a local utility company. Oil is transferred through the Las Flores Pipelines to a refinery for final processing.

20. In February 1988, the California Coastal Commission ("Coastal Commission") reviewed and analyzed Sable's predecessor-in-interest's (Exxon Company U.S.A.) proposal for the construction, operation, and ongoing maintenance of the SYU Facilities, as part of a "Development and Production Plan" ("DPP") submitted to the federal Minerals Management Service in 1987.

21. The Coastal Commission issued two approvals for the SYU Facilities: (1) Consistency Certification No. CC-64-87, which confirmed pursuant to the federal Coastal Zone Management Act ("CZMA") that construction, operation, and maintenance of the SYU Facilities

-4-

VERIFIED COMPLAINT FOR DECLARATORY RELIEF

would be consistent with the Coastal Act, and (2) CDP No. E-88-1 (the "Offshore CDP"), which authorized the construction, operation, and maintenance of those portions of the SYU Facilities located in California state waters.

**B.     The Las Flores Pipelines**

22.     Line CA-325 is a thirty-inch diameter pipeline with a maximum permitted throughput capacity of 300,000-barrels of crude oil per day and transports crude oil approximately 113.5 miles north from the Gaviota Pump Station to the Sisquoc Pump Station, then east through the Los Padres National Forest and Cuyama Valley, ultimately delivering crude oil to the existing Pentland Delivery Point in the San Joaquin Valley in Kern County.

23.     Line CA-324 is a twenty-four-inch diameter pipeline with a maximum permitted throughput capacity of 150,000-barrels of crude oil per day. Line CA-324 transports crude oil approximately 10.9 miles from the Las Flores Pump Station in Las Flores Canyon, west along the Gaviota Coast, to the existing Gaviota Pump Station located approximately one mile east of Gaviota State Park in Santa Barbara County.

24.     In the mid-1980s, the California State Lands Commission, federal Bureau of Land Management, and Department of the Interior prepared a joint Environmental Impact Report and Environmental Impact Statement ("EIR/EIS") for the Celeron Pipeline Project, which includes analysis of the construction and long-term operation of Lines CA-324 and CA-325. The locations of Lines CA-324 and CA-325 were identified as an environmentally superior alignment to minimize impacts to environmental resources. The State Lands Commission certified the EIR/EIS in January 1985.

25.     After reviewing the EIR/EIS, the County Planning Commission made a final decision to approve the Celeron Pipeline Project and associated entitlements in February 1986. The County's approval was not challenged during the appeal period, and the Planning Commission's approval action became final and effective.

26.     Pursuant to the County of Santa Barbara's certified Local Coastal Program ("LCP"), the County issued CDP No. 86-CDP-189 for the Celeron Pipeline Project on July 27,

- 5 -

VERIFIED COMPLAINT FOR DECLARATORY RELIEF

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 376 of 837    Page
ID #:17419
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 12 of 464

1986. CDP No. 86-CDP-189 approved "[c]learing, grading and trenching activities for [the] Celeron Pipeline Project." On August 5, 1986, the County issued CDP No. 86-CDP-205 for the "[r]emainder of all construction activities for the Celeron Pipeline [P]roject." The CDPs were not appealed by any party and are, therefore, final, valid, and not subject to further appeal.

27.    Although the County has issued separate CDPs for major improvements, such as relocations and realignments of pipeline segments since the Las Flores Pipelines' CDPs were first issued, the County has not required new or amended CDPs for repair and maintenance work on the Las Flores Pipelines.

C.    **The Refugio Oil Spill and Resulting Repair Work**

28.    On May 19, 2015, a leak along CA-324 resulted in an oil spill. The Las Flores Pipelines have remained active, but petroleum has not flowed through them since that time. To maintain the Las Flores Pipelines in an active state, they were filled with nitrogen to prevent oxidation and internal corrosion, and the cathodic protection system is active and has been regularly inspected and maintained.

29.    On March 13, 2020, the prior owner and operator of the Las Flores Pipelines and SYU Facilities entered into a federal Consent Decree with the United States and the State of California on behalf of several federal and state regulatory agencies to resolve issues related to the oil spill. (See Consent Decree, *United States of America et al. v. Plains All American Pipeline, L.P. et al.*, Case No. 2:20-cv-02415 (C.D. Cal. Mar. 13, 2020).)

30.    Since that time, Pacific Pipeline Company (including its predecessor in interest, Plains Pipeline, L.P. ("Plains")), has maintained the pipelines as active and has undertaken substantial efforts to diligently repair the Las Flores Pipelines to ensure compliance with industry standards for active pipelines and resume petroleum transportation.

31.    For example, in April 2021, Plains secured approval from the Office of the State Fire Marshal ("OSFM") to retrofit the Pipelines with 16 safety valves as required by law, including seven valves in the Coastal Zone. In December 2021, Plains submitted applications to

-6-

VERIFIED COMPLAINT FOR DECLARATORY RELIEF

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 377 of 837   Page
ID #:17420
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 13 of 464

the County for approval to complete the safety valve installation work. Pacific Pipeline Company has since installed the safety valves in the Las Flores Pipelines.

32. In addition, multiple in-line inspections ("ILI") have been conducted on the Las Flores Pipelines:

    a. Two ILI runs have been performed on Line CA-324, one in February 2022 and another in December 2022;

    b. An ILI run was performed on a portion of on Line CA-325 in September 2023; and

    c. An ILI run was performed on the remainder of Line CA-325 in October 2023.

33. In May 2024, Pacific Pipeline Company separately began anomaly[1] repair and maintenance work on the pipelines per the Consent Decree and under the County's 1986 approvals and permits that authorized ongoing pipeline maintenance. On February 12 and March 21, 2025, in response to Pacific Pipeline Company's request to address claims from the Coastal Commission that the repair and maintenance work was not authorized, the County confirmed that no further permits were required for Pacific Pipeline Company's anomaly repair work. Pacific Pipeline Company has completed the anomaly repairs, as well as subsequent pipeline hydrotesting, under OSFM supervision.

34. In compliance with the Consent Decree, in April 2024, Pacific Pipeline Company submitted "State Waiver" applications to OSFM for Lines CA-324 and CA-325 to modify regulatory pipeline safety requirements based on the specifications applicable to the individual pipeline facilities. On December 17, 2024, OSFM granted both State Waivers and imposed over sixty separate conditions on Pacific Pipeline Company's operation of the Las Flores Pipelines, conditional on the Pipeline and Hazardous Materials Safety Administration ("PHMSA") expressing no objection to the State Waivers. On February 11, 2025, PHMSA notified OSFM that it had no objection to its issuance of the State Waivers.

---

[1] A pipeline anomaly refers to a pipeline segment with some deviation from its original configuration.

-7-

VERIFIED COMPLAINT FOR DECLARATORY RELIEF

35.     The Consent Decree separately requires Pacific Pipeline Company to submit and obtain OSFM's approval of a written "Restart Plan" before resuming petroleum transportation in either Line CA-324 or Line CA-325. Pacific Pipeline Company submitted a Restart Plan to OSFM for review on July 29, 2024. OSFM is currently reviewing Pacific Pipeline Company's Restart Plan and associated documentation, and in August and September 2025, OSFM performed multiple inspections of the Las Flores Pipelines in connection with its review of the Restart Plan.

36.     As of May 15, 2025, Sable resumed petroleum transportation from the SYU Facilities' offshore platforms to its storage facilities in Las Flores Canyon.

37.     At all times, Pacific Pipeline Company intended to resume petroleum transportation from Sable's storage facilities in Las Flores Canyon through the Las Flores Pipelines. Pacific Pipeline Company and its predecessors never abandoned the Las Flores Pipelines, rather they have been operated as active pipelines under the law and Pacific Pipeline Company has worked diligently to maintain their use under existing and valid CDPs.

**D.     Senate Bill 237**

38.     On September 13, 2025, the California Legislature passed SB 237. On September 19, 2025, Governor Newsom signed SB 237 into law.

39.     SB 237 adds Section 51014.1 of the Government Code, which states in part, "[a]ny existing oil pipeline that is six inches or larger that has been *idle, inactive, or out of service* for five years or more, shall not be restarted without passing a spike hydrostatic testing program." (Emphasis added).

40.     SB 237 also amends Section 30262 of the Coastal Act to provide, in relevant part:

> (2) Repair, reactivation, and maintenance of an oil and gas facility, including an oil pipeline, that has been idled, inactive, or out of service for five years or more shall be considered a new or expanded development requiring a new coastal development permit.
>
> (3) Development associated with the repair, reactivation, or maintenance of an oil pipeline that has been idled, inactive, or out of service for five years or more requires a new coastal development permit consistent with this section. (Pub. Res. Code §§ 30262(b)(2) and (3)).

- 8 -
VERIFIED COMPLAINT FOR DECLARATORY RELIEF

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 379 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 15 of 464
ID #:17422

41. State law does not define the terms "idled," "inactive," and "out of service." However, such terms are defined or described by PHMSA, the federal agency that administers the federal law pursuant to which the pipelines are regulated.

42. The Pipelines are subject to the federal Hazardous Liquid Pipeline Safety Act ("Pipeline Safety Act") administered by PHMSA. (49 U.S.C. §§ 60101 *et seq.*) The Pipeline Safety Act provides that state agencies may apply to and become certified by PHMSA to enforce equivalent or more stringent intrastate pipeline safety regulations (49 U.S.C. § 60105.) In California, the Legislature has vested OSFM with the "exclusive safety[,] regulatory and enforcement authority over intrastate hazardous liquid pipelines ..." (Gov. Code, § 51010.)

43. PHMSA recognizes two categories of pipeline status: (i) active and (ii) abandoned. (See 81 Fed. Reg. 54512 [federal "regulations consider pipelines to be either active and fully subject to all relevant parts of the safety regulations or abandoned."]; see also PHMSA Advisory Bulletin ADB 2016-0075 (Aug. 11, 2016).) Federal regulations for hazardous liquid pipelines define the term "abandoned" to mean "permanently removed from service." (See 49 C.F.R. 195.3.)

44. Federal regulations do not recognize "idle," "inactive," or "out of service" status at all. (See 81 Fed. Reg. 54512.) "If a pipeline is not properly abandoned and may be used in the future for transportation of hazardous liquid or gas, PHMSA regulations consider it as an active pipeline." (81 Fed. Reg. 54513.) "Owners and operators of pipelines that are not operating but contain hazardous liquids and gas must comply with all applicable safety requirements, including periodic maintenance, integrity management assessments, damage prevention programs, response planning, and public awareness programs." (*Ibid.*)

45. Pacific Pipeline Company is informed and believes, and on that basis alleges, that it is the position of the State of California that the Las Flores Pipelines have been "idled, inactive, or out of service for five years or more" and, therefore, repair, reactivation, maintenance, and development associated with such work is new or expanded development requiring a new CDP.

-9-

VERIFIED COMPLAINT FOR DECLARATORY RELIEF

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 380 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 16 of 464
ID #:17423

46.     The State, through the Coastal Commission and the Legislature, has previously made numerous statements and findings concerning its position on the Las Flores Pipelines' status.

47.     The Staff Report for the Coastal Commission's Cease and Desist Order CCC-25-CD-01, Restoration Order CCC-25-RO-01, and Administrative Civil Penalty Order CCC-25-AP3-01, characterizes the Pipelines as "offline and out-of-service" since the 2015 oil spill. (Staff Report, p. 3.) "[T]he pipelines remained in service until the 2015 oil spill, at which point they were placed out of service." (*Ibid.*) The Staff Report also characterizes the Pipelines as "inoperable," having "sat inactive for a decade." (*Id.*, p. 65.)

48.     Similarly, the Senate Rules Committee digest for SB 237 makes clear that SB 237 is intended to apply to the Las Flores Pipelines. (See Sen. Com. on Natural Resources, Analysis of Senate Bill No. 237 (2025-2026 Reg. Sess.) as amended on Sept. 10, 2025, attached hereto as Exhibit A.)

    a.  "This Bill [applies to] pipelines of a certain size that have been out of service for more than five years (which would notably include certain pipelines serving the Sable Corporation's Santa Ynez Unit)[.]" (Ex. A, p. 3.)

    b.  "Preventing oil spills from pipelines. On May 19, 2015 an offshore pipeline ruptured, spilling over 140,000 gallons of heavy crude oil along the Gaviota coast at Refugio Beach in Santa Barbara County. Sable announced they were restarting oil production in the Santa Ynez unit (in federal waters) on May 15, 2025, and restarting the use of those two pipelines. Sable has not replaced, but has rather made repairs to the pipelines. Some of the provisions of SB 237 are intended to address concerns surrounding the safety of restarting use of the repaired pipelines by requiring testing of the pipelines' durability." (Ex. A, p. 5.)

49.     Based on the State's authority under the Coastal Act and SB 237, Pacific Pipeline Company faces an immediate choice to either (i) resume petroleum transportation pursuant to its existing entitlements, permits, and approvals, including County-issued CDPs, but risk possible

- 10 -

VERIFIED COMPLAINT FOR DECLARATORY RELIEF

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 381 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 17 of 464
ID #:17424

enforcement action, fines, and other penalties by the State; or (ii) not resume petroleum transportation at all. State law provides no administrative procedure for addressing a dispute concerning the applicability of SB 237 to the Las Flores Pipelines.

50.    Given the absence of a process under the law for resolving this dispute, a judicial determination concerning the applicability of SB 237 to the Las Flores Pipelines is necessary.

## FIRST CAUSE OF ACTION

### Declaratory Relief (Code of Civ. Proc., § 1060)

51.    Pacific Pipeline Company realleges and incorporates by reference each of the above paragraphs as though fully set forth herein.

52.    Pacific Pipeline Company is a "person interested" under Code of Civil Procedure § 1060, because Pacific Pipeline Company owns and operates the Las Flores Pipelines pursuant to existing CDPs issued by the County and is the target of the amendments to the Government Code and Coastal Act enacted by SB 237.

53.    The Las Flores Pipelines have not been "idled, inactive, or out of service for five years or more" within the meaning of SB 237, because Pacific Pipeline Company has diligently undertaken repair and maintenance efforts since the 2015 spill under existing entitlements, permits, and approvals to resume petroleum transportation through the Las Flores Pipelines. The Las Flores Pipelines have not been "abandoned" under federal or state law applicable to oil and gas pipelines. Rather, the Las Flores Pipelines are deemed "active" under these laws by the agencies who administer them.

54.    Further, the Legislature did not make SB 237 retroactive. As such, SB 237 and its new rules for what is an idled, inactive, or out of service pipelines and what permitting standards may or may not be followed only applies prospectively. This means that SB 237 can only apply to pipelines that are eventually "idled, inactive, or out of service for five years or more" commencing on January 1, 2026. Thus, since the five-year idle, inactive, or out of service period must commence on January 1, 2026, the earliest a pipeline could be "idled, inactive, or out of service *for five years or more*" is January 1, 2031 (i.e., five years from SB 237's effective date).

- 11 -

55. Given statements the State, through the Coastal Commission and Legislature, has previously made concerning the Las Flores Pipelines' status as "idle," "inactive," and "out of service" for more than five years, an actual, present controversy exists between the parties concerning the applicability of SB 237 to the Las Flores Pipelines. This controversy is definite and concrete, touches the legal relations of parties with adverse legal interests, and is of sufficient immediacy and reality to warrant declaratory relief. (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 79–80.)

56. This action does not seek an advisory opinion or abstract interpretation of law. Pacific Pipeline Company must make immediate operational and financial decisions regarding whether to resume petroleum transportation under its existing CDPs at the risk of enforcement actions, penalties, or orders by the State. This presents a justiciable controversy under Code of Civil Procedure § 1060. (*Meyer v. Sprint Spectrum L.P.* (2009) 45 Cal.4th 634, 647.)

57. Declaratory relief is necessary and proper within the meaning of Code of Civil Procedure § 1061, because a judicial declaration will clarify the parties' rights and duties, guide Pacific Pipeline Company's conduct, and prevent multiplicity of actions.

58. Accordingly, Pacific Pipeline Company seeks a judicial declaration that the Las Flores Pipelines have not been "idled, inactive, or out of service for five years or more" under SB 237.

## PRAYER FOR RELIEF

WHEREFORE, Pacific Pipeline Company respectfully prays for judgment against the Defendant as follows:

1. For a judicial declaration that the Las Flores Pipelines have not been "idled, inactive, or out of service for five years or more" under Government Code Section 51014.1 and Public Resources Code Sections 30262 (b)(1) and (b)(2), as amended by SB 237;

2. For costs of suit incurred herein; and

3. For such other and further relief as the Court deems just and proper, including supplemental relief under Code of Civil Procedure § 1062.

- 12 -

VERIFIED COMPLAINT FOR DECLARATORY RELIEF

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 383 of 837   Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 19 of 464
ID #:17426

Respectfully submitted,

DATED:  September 29, 2025

ALSTON & BIRD LLP

By: _____

JEFFREY D. DINTZER

Attorney for Plaintiff
PACIFIC PIPELINE COMPANY

- 13 -
VERIFIED COMPLAINT FOR DECLARATORY RELIEF

## VERIFICATION

I, Steven P. Rusch, am Vice President of Regulatory and Environmental Affairs of Sable Offshore Corp., and I am an Authorized Representative of Pacific Pipeline Company. I am authorized to execute this verification on behalf of them. I have read the attached Verified Complaint for Declaratory Relief and am familiar with its contents. The Facts provided in the Complaint are true of my personal knowledge, except for those alleged on information and belief, and I believe those to be true.

DATED: September 29, 2025

Steven P. Rusch

- 14 -
VERIFIED COMPLAINT FOR DECLARATORY RELIEF

# EXHIBIT A

**SENATE RULES COMMITTEE**                                          SB 237
Office of Senate Floor Analyses
(916) 651-1520   Fax: (916) 327-4478

---

## UNFINISHED BUSINESS

---

Bill No:   SB 237
Author:    Grayson (D), Hurtado (D), McNerney (D), Richardson (D) and
           Wilson (D), et al.
Amended:   9/10/25
Vote:      21

---

SENATE JUDICIARY COMMITTEE: 12-0, 5/6/25
AYES: Umberg, Niello, Allen, Arreguín, Ashby, Caballero, Durazo, Laird, Stern,
   Wahab, Weber Pierson, Wiener
NO VOTE RECORDED: Valladares

SENATE FLOOR: 34-0, 5/15/25 (Consent)
AYES: Allen, Archuleta, Arreguín, Ashby, Becker, Blakespear, Cabaldon,
   Caballero, Choi, Cortese, Dahle, Durazo, Gonzalez, Grayson, Hurtado, Jones,
   Laird, Limón, McGuire, McNerney, Menjivar, Niello, Ochoa Bogh, Pérez,
   Richardson, Seyarto, Smallwood-Cuevas, Stern, Strickland, Umberg,
   Valladares, Wahab, Weber Pierson, Wiener
NO VOTE RECORDED: Alvarado-Gil, Cervantes, Grove, Padilla, Reyes, Rubio

ASSEMBLY FLOOR: 59-4 , 9/13/25 – Roll call not available.

---

**SUBJECT:**   Oil spill prevention: gasoline specifications: suspension: California
           Environmental Quality Act: exemptions: County of Kern:
           transportation fuels assessment: coastal resources

**SOURCE:**   Author

---

**DIGEST:**   This bill contains a number of provisions that seek to safely and
responsibly increase in-state oil production (such as through testing of previously-
idled pipelines, greater disclosure of financial assurances, and resolving ongoing
litigation in favor of easier approval of drilling permits in Kern County), while also
soliciting additional information to mitigate rising fuel costs (such as by relaxing
California gasoline standards) and assess medium- to long-term strategies in line
with recent work from the California Energy Commission (CEC).

Provided by LRI History LLC

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 387 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 23 of 464
ID #:17430

*Assembly Amendments* of 9/10/25 rewrote the bill entirely.

**ANALYSIS:**

Existing law:

1) Establishes the CEC tasks it with monitoring, analyzing, and making recommendations on statewide trends in the energy sector, including fuel supply and demand. (Public Resources Code §25200 et. seq.)

2) Establishes California Geologic Energy Management Division (CalGEM) for the purposes of overseeing the drilling, operation, maintenance, and removal of oil and gas wells. (Public Resources Code §3000 et. seq.)

3) Requires the Office of the State Fire Marshal (OSFM) to adopt hazardous liquid pipeline safety regulations that comply with federal law regarding hazardous liquid pipeline safety. (Government Code §51010 et. seq.)

4) Establishes the Office of Oil Spill Prevention and Response (OSPR) in the California Department of Fish and Wildlife as the state's principal regulator for oil spill prevention and response. (Government Code (GOV) §§8574.1 *et seq.*, GOV §§8670.1 *et seq.*, Public Resources Code §§8750 *et seq.*).

5) Institutes the California Environmental Quality Act (CEQA), which requires lead agencies with the principal responsibility for carrying out or approving a project to prepare a negative declaration (ND), mitigated negative declaration (MND), or environmental impact report (EIR) for the project, unless the project is exempt from CEQA. (Public Resources Code (PRC) §21000 et seq.). (CEQA Guidelines §15064(a)(1), (f)(1))

6) Establishes and defines a Program EIR (PEIR) in the CEQA guidelines as an EIR which may be prepared for a series of actions that can be characterized as one large project and are related either:
   a) Geographically;
   b) As logical parts in the chain of contemplated actions;
   c) In connection with issuance of rules, regulations, plans, or other general criteria to govern the conduct of a continuing program; or
   d) As individual activities carried out under the same authorizing statutory or regulatory authority and having generally similar environmental effects which can be mitigated in similar ways. (California Code of Regulations CEQA Guidelines § 15168)

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 388 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 24 of 464
ID #:17431

This bill:

1) Makes findings and declarations regarding, among other things, California's mid-transition phase of the energy transition.

2) Requires the OSPR to solicit feedback on and periodically update its worst case scenario spill volumes.

3) Requires the OSPR to list, among other things, all applications for certificates of financial responsibility, and to revise worst case scenario spill volumes, and operators' assurance of financial responsibility in case of a spill.

4) Requires pipelines of a certain size that have been out of service for more than five years (which would notably include certain pipelines serving the Sable Corporation's Santa Ynez Unit), to meet specific testing requirements.

5) Permits the Governor to, under certain circumstances and with specified considerations, suspend the requirement "summer blend" gasoline in order to protect against "extraordinary gasoline price increases," among other things.

6) Deems the Kern County Second Supplemental Recirculated Environmental Impact Report (SCH2013081079; the SSREIR), including all appendices (SSREIR, March 2025), until January 1, 2036, sufficient for full compliance with CEQA.

7) Directs CEC to, as part of the next Transportation Fuels Assessment, evaluate the cost and supply impacts of gasoline that is not "California reformulated gasoline blendstock for oxygenate blending" (CARBOB), and, among other things, potentially make various recommendations regarding how such non-CARBOB gasoline could benefit California.

8) Requires CEC to, on or before March 31, 2026, submit an assessment to the Legislature that evaluates certain information in the June 2025 letter to Governor Newsom from CEC Vice Chair Siva Gunda.

9) Requires oil produced offshore by new, expanded, or reactivated operations (of the same types of pipelines covered by #4 above) to be transported once

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 389 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 25 of 464
ID #:17432

onshore by pipelines using the best available technology, as defined, and certain projects require a new Coastal Development Permit.

## Background

*Declining domestic oil production may impact in-state oil pipelines.* California's reliance on crude oil has steadily declined since the 1980s; however, oil consumption recently increased from pandemic lows in 2020. Despite this rebound, California's in-state production of petroleum remains low and California largely relies on imports for its petroleum supplies. Several refineries maintain existing petroleum supplies by using pipelines to in-state oil fields. However, as supply from those fields decreases, the economic viability of those pipelines sharply declines. Some of the policies advanced by this bill (namely restoring the pipelines for offshore oil production in Sable's Santa Ynez Unit and the Kern County SSREIR being deemed approved) appear to address this problem by increasing in-state oil production.

a) *Tests for moving oil safely via pipelines.* To prevent accidents and spills, state and federal regulations require pipeline operators to conduct hydrostatic pressure tests to ensure the integrity of their pipelines.

b) *Financial assurances in the case of oil spills.* Because the threat of an oil spill is never zero, OSPR issues Certificate of Financial Responsibility to facilities, vessels, and pipelines that are required to have a California Oil Spill Contingency Plan, following submittal of an application and proof that the applicant has the financial resources to cover the cost of response for a "worst-case scenario" spill.

*Kern County oil and gas ordinance's iterative EIRs.* In 2013, Kern County began the process of amending its zoning ordinance addressing local permitting for oil and gas exploration, development and production. For the last ten years, the County has gone back and forth in litigation as plaintiffs challenged the ordinance and the drilling permitted under it. Courts have at different times and to various degrees sided with one side or the other, and the original EIR has been revisited in supplemental EIRs (SEIR). As of 2025, the most recent iteration of the EIR, the Second Supplemental Recirculated EIR (SSREIR), faces legal challenge.

*Energy Commission Recommendations for the mid transition.* On June 27, 2025, the Vice Chair of the energy commission submitted a letter to the Governor outlining the CEC's recommendation's on changes to state policy to ensure

**Provided by LRI History LLC**

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 390 of 837    Page
ID #:17433
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 26 of 464

"adequate transportation fuels supply during this pivotal time in our state's clean energy transition." The letter recommended pursuit of three concurrent strategies, briefly:

- c) Stabilize fuel supply through imports of refined fuels and maintaining in-state refining capacity;
- d) Provide sufficient confidence to industry to invest in maintaining reliable and safe infrastructure operations to meet demand; and
- e) Develop and execute a holistic transportation fuels transition strategy.

## Comments

*Purpose of Bill.* According to the author, "California faces an affordability crisis on a number of fronts, most notably when it comes to the cost of fuel. This affects all of us—both directly and indirectly—whether it be at the gas pump, where Californians pay some of the prices in the country, or in the form of higher prices for goods and services, which are also affected by the higher costs of energy to produce and deliver. As was noted in a June 27, 2025 report by California Energy Commission Vice-Chair, Siva Gunda, "If a lack of proactive management during this phase of the transition leads to rising energy prices and less reliable fuel supplies, that instability could erode support for continued decarbonization." SB 273 seeks to answers this call for proactive management."

*Preventing oil spills from pipelines.* On May 19, 2015 an offshore pipeline ruptured, spilling over 140,000 gallons of heavy crude oil along the Gaviota coast at Refugio Beach in Santa Barbara County. Sable announced they were restarting oil production in the Santa Ynez unit (in federal waters) on May 15, 2025, and restarting the use of those two pipelines. Sable has not replaced, but has rather made repairs to the pipelines. Some of the provisions of SB 237 are intended to address concerns surrounding the safety of restarting use of the repaired pipelines by requiring testing of the pipelines' durability.

*Updating financial assurances for oil spills.* There is no requirement that the regulations governing worst-case spills be regularly updated, and as such, they have not been. The marine facility reasonable "worst-case spill" volume calculations were established in regulation in 1993 using methods aligned with federal worst-case discharge calculations, and there have only been minor and infrequent updates since then. SB 237 would require more disclosure about and decadal updates of the certificates of financial responsibility.

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 391 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 27 of 464
ID #:17434

*Ending the Kern Oil and Gas Ordinance litigation, with some guardrails.* SB 237 'puts the lid' on any further revisions to or legal objections against Kern County's zoning ordinance focused on oil and gas (except purely typographical fixes). SB 237 also specifies that the zoning ordinance SSREIR is sufficient to meet the requirements of CEQA for compliant projects, meaning that no further, project-specific EIR's for a given oil well are required so long as the new wells fit in the four corners of the existing SSREIR. However, SB 237 could prevent appropriate mitigations measures or other environmental considerations from being applied to drilling projects that are atypical, use emerging technology or technology not considered the SSREIR, or are otherwise not considered in the SSREIR.

To help address some of these concerns, SB 237 adds some environmental guardrails to the application of the SSREIR, briefly:

a) It sets a cap for drilling in Kern County at 2,000 new oil wells, a 26% reduction in total planned wells per year compared to the original estimate in Kern County's oil and gas ordinance EIR. (However, this can be waived under certain CEC findings);

b) It contains a ten-year sunset on the provisions that specify that the SSREIR is sufficient, complete, and not subject to lawsuits for new drilling (However, the SSREIR itself would remain in effect after the sunset);

c) It specifies that CalGEM, rather than Kern County, must be the lead agency in a health protection zone, presumably making it harder to drill new wells in those zone (although not impossible).

*Maintaining capacity to stabilize fuel supply.* Several of this bill's provisions appear to follow recommendations in CEC Vice Chair Gunda's June letter, and would be expected to boost in-state production, which would be expected to support California's refinery capacity, which would be expected to help keep refineries operating in state.

*Using more tools in the toolbox to manage gas prices.* Parts of SB 237 contemplate changes to California's fuel blend to reduce fuel prices. Summer blend gasoline in California contributes less to smog, but is more expensive. California's unique gasoline blendstock, CARBOB, was formulated to help meet California's nation-leading air pollution challenges. However, it also means that fuel in neighboring states cannot be used in California. Both of these measures could be expected to reduce fuel prices, at the cost of increased air pollution. However, these do not address the long-term challenges the state faces in larger-scale decarbonization

Provided by LRI History LLC

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 392 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 28 of 464
ID #:17435

across all sectors of the economy.

*Navigating the mid-transition.* Whether through the intentional phase-down of fossil fuels in California, shifting global market dynamics, the costs associated with repair and maintenance, or a combination of all of the above and more, it is clearly becoming more and more difficult to profitably operate fossil fuel infrastructure in California. How do we embrace and deploy clean technologies while they are more expensive than the fossil fuel alternatives? How do we maintain the fossil fuel supply we need as it becomes less lucrative and less feasible to do so?

We are in a period described by academics as the "mid-transition". As described in a recent review:

> "Many aspects of transition will be felt, and shaped, directly by individuals because of our direct interactions with energy systems. Even rare missteps are likely to have significant and potentially system design relevant impacts on perception, political support, and implementation. Comparisons of the new system to the old system are likely to rest on experience of a world less affected by climate change, such that concerns about lower reliability, higher costs, and other challenges might be perceived as inherent to zero-carbon systems, versus energy systems facing consequences of climate change and longterm underinvestment."[1]

California's economy today relies on an immense volume of fossil fuels (by some accounts as much as 84% of our total energy today)[2]. In turn, extracting, transporting, refining, distributing, and using those fossil fuels relies on an immense network of infrastructure owned by a number of private companies and operated by tens of thousands of skilled workers. Those private companies rely on certainty about the profitability of their investments. What happens when—not if— it is no longer profitable to operate fossil fuel infrastructure in California? What— if not profit—would compel private companies to continue maintaining and operating their infrastructure? How can California keep its economy afloat and its people thriving in the crucial period between when fossil fuels stop being profitable, and when they stop being needed?

Pursuant to SBX1-2, the California Energy Commission produced a Transportation

---

[1] Grubert and Hastings-Simon, 2022. Designing the mid-transition: A review of medium-term challenges for coordinated decarbonization in the United States. WIRES Climate Change, Vol 13, Issue 3.
[2] California State Profile & Energy Estimates. U.S. Energy Information Administration. https://www.eia.gov/state/?sid=CA

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 393 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 29 of 464
ID #:17436

Fuels Assessment, which has begun to wrestle with some of these questions. One of several possible solutions under consideration is state ownership of refineries, in which, "The State of California would purchase and own refineries in the State to manage the supply and price of gasoline." However, doing so would be extremely costly and represent a significant departure from how this industry has operated in California to date. As the Legislature considers this bill and other proposals to assuage or mitigate the very real tensions of the mid-transition, it is worth also contemplating solutions on the longer time horizon as well.

There is no clear best way to transition the world's fourth largest economy off of fossil fuels. California is leading the way and charting a path to navigate this transition. This monumental task will have consequences, both expected and unforeseen. Nevertheless, the Legislature should evaluate the information and options available and take action before GHG emissions continue unabated, fossil fuel infrastructure falls into disrepair (with potentially catastrophic results), and communities surrounding this infrastructure continue to face air pollution and economic uncertainty alike.

Vice Chair Gunda's June letter described the importance of a holistic strategy for a managed transition away from fossil fuels, alongside more pressing and immediate matters. Boosting in-state production today, as SB 237 proposes to do, to keep critical infrastructure online is a reasonable response to less-than-ideal circumstances. But what lessons can be learned? What could California begin doing now to make the next refinery to announce its closure *less* disruptive to California's well-being, not more? What information is needed about California's refineries (both their operations and the financial liabilities associated with their site remediation) to better equip California to handle the next stage of this transition? Although SB 237 does not answer these questions, it helps get information that might. These continue to be questions the Legislature should consider, lest we find ourselves blindsided by the next nigh-inevitable refinery closure.

**FISCAL EFFECT:** Appropriation: No    Fiscal Com.:    Yes    Local: Yes

**SUPPORT:** (Verified 9/13/25)

350 Humboldt
Associated Builders and Contractors of California
Berry Petroleum Company, LLC
California Business Roundtable
California Independent Petroleum Association

Provided by LRI History LLC

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 394 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 30 of 464
ID #:17437

California Resources Corporation and Subsidiaries
California State Association of Electrical Workers
California State Pipe Trades Council
City of Bakersfield
Climate Action California
County of Kern

**OPPOSITION:** (Verified 9/13/25)

Asian Pacific Environmental Network Action
California Coastal Protection Network
California Environmental Justice Alliance Action
California Environmental Voters
Campaign for a Safe and Healthy California
Ceja Action
Center for Biological Diversity
Center on Race, Poverty & the Environment
Central California Environmental Justic Network
Central California Environmental Justice Network
Clean Water Action
Climate First: Replacing Oil & Gas
Communities for a Better Environment
Consumer Watchdog
Earthjustice
Leadership Council for Justice and Accountability
Natural Resources Defense Council
Natural Resources Defense Council
Physicians for Social Responsibility - Los Angeles
Sierra Club
Sierra Club California
The Climate Center

Prepared by:  Heather Walters / E.Q. / (916) 651-4108
9/13/25 11:10:30

**\*\*\*\* END \*\*\*\***

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 395 of 837    Page
ID #:17438
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 31 of 464

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, state bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| TELEPHONE NO.:          FAX NO *(Optional)*.: | |
| E-MAIL ADDRESS *(Optional)*: | |
| ATTORNEY FOR *(Name)* : | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF KERN**

STREET ADDRESS:

MAILING ADDRESS:

CITY AND ZIP CODE:

BRANCH NAME:

PLAINTIFF:

DEFENDANT:

| ADR STIPULATION AND ORDER FORM | CASE NUMBER: |
|---|---|

1.  Pursuant to California Rule of Court 3.221(a)(4), the parties and their attorneys stipulate that all claims in

    this action will be submitted to the following alternative dispute resolution (ADR) process:

    a.  ☐ Private Mediation.

    b.  ☐ Neutral Evaluation.

    c.  ☐ Binding Arbitration.

    d.  ☐ Referee/Special Master.

    e.  ☐ Settlement Conference with Private Neutral.

    f.  ☐ Non-binding Judicial Arbitration pursuant to CCP§1141.10 et seq., and applicable Rules of Court.

    g.  ☐ Discovery will remain open until 30 days before trial.

    h.  ☐ Other:

2.  It is also stipulated that

    a.                                                                 (name of individual neutral, not organization)

        has consented to and will serve as

    b.                                              (neutral function/process) and that the session will take place on

    c.                              (enter a FIRM date) and that all persons necessary to effect a settlement
        and having full authority to resolve the dispute will appear at such session.

---

KC ADR-101 (Mandatory) Rev. 07/2014         **ADR STIPULATION AND ORDER FORM**                    Page 1 of 2

CEB® | **Essential**
ceb.com | **Forms**

| PLAINTIFF: | CASE NUMBER: |
|---|---|
| DEFENDANT: | |

3. Date:

    a.   On behalf of Plaintiff/s

_____      _____
(TYPE OR PRINT NAME)      (SIGNATURE OF PLAINTIFF OR ATTORNEY)

_____      _____
(TYPE OR PRINT NAME)      (SIGNATURE OF PLAINTIFF OR ATTORNEY)

        ☐ Continued on *Attachment 3a* (form MC-025).

    b.   On behalf of Defendant/s

_____      _____
(TYPE OR PRINT NAME)      (SIGNATURE OF DEFENDANT OR ATTORNEY)

_____      _____
(TYPE OR PRINT NAME)      (SIGNATURE OF DEFENDANT OR ATTORNEY)

        ☐ Continued on *Attachment 3a* (form MC-025).

4.   ORDER:

    a.   ☐ The ADR process is to be completed by            :

    b.   ☐ The Case Management Conference currently set for       , at

                    ☐ a.m. ☐ p.m. in Department       :

        i.   ☐ Remains on calendar.

        ii.  ☐ Is hereby vacated.

    c.   ☐ Mediation Status Review.

    d.   ☐ Case Status Review re:

    e.   ☐ Final Case Management Conference is set for     , at     ☐ a.m.
        ☐ p.m. in Department

    f.   ☐ Judicial Arbitration Order Review Hearing will be set by notice upon assignment of
        arbitrator.

**IT SO ORDERED.**

Date:                 _____
                         JUDICIAL OFFICER

CEB® Essential Forms
ceb.com

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 397 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 33 of 464
ID #:17440

SUPERIOR COURT OF CALIFORNIA, COUNTY OF KERN
ALTERNATIVE DISPUTE RESOLUTION (ADR)
INFORMATION PACKET



Kern County Superior Court encourages, and under certain circumstances, may require parties to try ADR before trial.  Courts have also found ADR to be beneficial when used early in the case process. The courts, community organizations and private providers offer a variety of ADR processes to help people resolve disputes without a trial.  Below is information about the potential advantages and disadvantages of ADR, the most common types of ADR, and how to find a local arbitrator, mediator or neutral evaluator. You may find more information about these ADR processes at www.courts.ca.gov/programs/adr.

## Possible Advantages and Disadvantages of ADR

ADR may have a variety of advantages or disadvantages over a trial depending on the type of ADR process used as well as the particular type of case involved.

Possible Advantages:  Saves time; saves money; gives the parties more control over the dispute resolution process and outcome; helps to preserve and/or improve party relationships.

Possible Disadvantages:  May add additional time and costs to the litigation if ADR does not resolve the dispute; procedures such as discovery, jury trial, appeals, and other legal protections may be limited or unavailable.

## Most Common Types of ADR

Mediation:  A neutral person or "mediator" helps the parties communicate in an effective and constructive manner so the parties can try to resolve their dispute.  The mediator does not decide the outcome, but helps the parties to do so.  Mediation is generally confidential and may be particularly useful where ongoing relationships are involved, such as between family members, neighbors, employers/employees or business partners.

Settlement Conferences:  A judge or another neutral person assigned by the court helps the parties to understand the strengths and weaknesses of their case and to discuss settlement.  The judge or settlement conference neutral does not make a decision in the case but helps the parties to negotiate a settlement.  Settlement conferences may be particularly helpful when the parties have very different views about the likely outcome of a trial in their case.

Neutral Evaluation:  The parties briefly and informally present their facts and arguments to a neutral person who is often an expert in the subject matter of the dispute.  The neutral does not decide the outcome of the dispute, but helps the parties to do so by providing them with a non-binding opinion about the strengths, weaknesses and likely outcome of their case.  Depending on the neutral evaluation process, and with the parties' consent, the neutral may then help the parties try to negotiate a settlement.  Neutral evaluation may be appropriate when the parties desire a neutral's opinion about how the case might be resolved at trial; and, if the primary dispute is about the amount of damages or technical issues, the parties would like a neutral expert to resolve those disputes.

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 398 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 34 of 464
ID #:17441

Arbitration:  The parties present evidence and arguments to a neutral person or "arbitrator" who then decides the outcome of the dispute.  Arbitration is less formal than a trial, and the rules of evidence are generally more relaxed.  If the parties agree to *binding* arbitration, they waive their right to a jury trial and agree to accept the arbitrator's decision.  With *nonbinding* arbitration, any party may reject the arbitrator's decision and request a trial.  Arbitration may be appropriate when the parties want another person to decide the outcome of their dispute but would like to avoid the formality, time and expense of a trial, or desire an expert in the subject matter of their dispute to make a decision.

## Local Court ADR Programs
The Superior Court, County of Kern offers two types of ADR:  Arbitration in cases in which the amount in controversy as to each plaintiff is $50,000 or less; and DRPA mediation services on the day of the hearing, settlement conference or trial.

**Arbitration:**  The Superior Court of California, County of Kern does use Arbitrators in civil cases where the amount in controversy as to each individual plaintiff is $50,000 or less.  The Court may order the parties to Arbitration or the parties may agree to Arbitration any time before the first case management conference statement is filed. See Local Rule 3.14 at https://www.kern.courts.ca.gov/system/files/local_rules_of_court.pdf

**Dispute Resolution Program Act (DRPA):**  The Superior Court of California, County of Kern also offers mediation services in small claims and unlawful detainer, civil harassment, family law and probate matters.  The Court has contracted with the Better Business Bureau (BBB) under the Dispute Resolution Programs Act (DRPA) to provide these mediation services.  For more information about BBB Mediation Services go to https://www.bbb.org/local-bbb/bbb-serving-central-california-and-inland-empire-counties.

## ADR Coordinator:
Although complaints about arbitrators and mediators are rare, the Superior Court of California, County of Kern does provide a complaint procedure in our Local Rules, Rule 3.14.7.  If you have a complaint or a concern with any of this Court's ADR programs, or simply have a question about ADR, please contact the ADR Administrator at ADRAdministrator@kern.courts.ca.gov or 661-868-5695.

## Resources:
**California Department of Consumer Affairs:**  https://www.dca.ca.gov/consumers/mediation_guides.shtml
**Judicial Branch California Courts – ADR:** www.courts.ca.gov/selfhelp-adr.htm
**ADR Stipulation Form:** https://www.kern.courts.ca.gov/system/files/adr_stipulation_and_order_form.pdf



| | | FOR COURT USE ONLY |
|---|---|---|
| | SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF KERN<br>Bakersfield Metropolitan Justice<br>1215 Truxtun Ave<br>Bakersfield, CA 93301<br>Phone: (661) 610-6000 | FILED<br>SUPERIOR COURT OF<br>CALIFORNIA<br>COUNTY OF KERN<br><br>November 3, 2025<br><br>/s/ Alexandra Valles-Guerrero,<br>Deputy Clerk |
| PACIFIC PIPELINE COMPANY, A DELAWARE CORPORATION<br>v. STATE OF CALIFORNIA | | |
| Notice of Assignment to Judicial Officer for All Purposes, Notice of Order to Show Cause Re: California Rules of Court, Rule 3.110, and Notice of Case Management Conference | | Case Number:<br>BCV25103508 |

By order of the presiding judge, the above-entitled case is assigned to the Honorable Bernard C. Barmann, Jr for all purposes. It will be managed in Department/Division H until its conclusion. Peremptory challenges, if any, must be made within the times set out in Code of Civil Procedure §170.6.

To Plaintiff(s) and Plaintiff(s) Counsel:
You are required to serve this Notice of Assignment and Notice of Order to Show Cause date and Notice of Case Management Conference date with the Summons, Complaint [Local Rule 3.7(a), Alternative Dispute Resolution (ADR) Information Packet, and ADR Stipulation and Order Form (California Rules of Court, Rule 3.221).

You are ordered to appear on January 12, 2026 at 8:30 A.M. in Division H at 1215 Truxtun Ave, Bakersfield, CA 93301 to give any legal reason why sanctions shall not be imposed for failure to serve the complaint on all named defendants and file proof(s) of service with the court within sixty (60) days after the filing of the complaint pursuant to California Rules of Court, Rule 3.110. All appearances are mandatory, unless the court receives the required proof(s) of service five (5) court days prior to the hearing date, and then no appearance is necessary.

To each party and their respective attorney(s) of record:
Your attention is directed to the California Rules of Court and the Code of Civil Procedure provisions regarding mandatory expedited jury trial procedures, specifically to California Rules of Court Rules 3.1546, et seq., and Code of Civil Procedure section 630.20, et seq.

This case is set for Case Management Conference on March 25, 2026 at 8:30 A.M. in Division H located at 1215 Truxtun Ave, Bakersfield, CA 93301. Parties shall comply with and file case management statements at least fifteen (15) days prior to the conference in accordance with California Rules of Court, Rules 3.720 – 3.730.

To Cross Complainant(s) and Cross Complainant(s) Counsel:
If you are bringing cross complaint against new parties, you are, likewise, required to serve this Notice of Assignment pursuant to California Rules of Court, Rule 3.110, Notice of Order to Show Cause date and Notice of Case Management Conference date on the new cross defendants.

Tara Leal
Clerk of the Superior Court

Date: November 3, 2025

By:    /s/ Alexandra Valles-Guerrero
       Alexandra Valles-Guerrero, Deputy Clerk

PACIFIC PIPELINE COMPANY, A DELAWARE CORPORATION v. STATE OF CALIFORNIA
BCV25103508

The Clerk of the Superior Court's office has received a civil complaint from you for filing. Pursuant to the Trial Court Delay Reduction Act, your case has been assigned to the Honorable Bernard C. Barmann, Jr as monitoring judge.

Judge Bernard C. Barmann, Jr has instituted a direct calendaring system for all cases assigned to him/her as the monitoring judge.

All law and motion, case management and trial setting conferences, ex parte matters and trials will be scheduled before him/her in Division H at 1215 Truxtun Ave, Bakersfield, CA 93301.

Law & Motion and Ex-Parte hearing dates must be pre-cleared by contacting the Direct Calendaring Clerk at 661-610-6460. Tentative rulings are not provided in advance of the hearing.

At the time of filing the complaint, plaintiff's counsel will be given a Notice of Case Management Conference which sets a conference approximately one hundred eighty (180) days after filing of the complaint. This notice must be served with the summons and complaint on all defendants. Defendants must serve the notice on all cross-defendants named. The notice must also be served on interveners and lien claimants.

Pursuant to Local Rule 3.2.1. a party wishing to appear remotely in any civil proceeding other than an evidentiary hearing or trial, including conferences and law and motion hearings, is permitted to appear without advance notice to the court or other parties. By appearing remotely those persons will be deemed to have requested a remote appearance. Instructions for accessing Remote Court Hearings can be found on the court's website. Each judicial officer retains the discretion to require a party to appear in person at a conference, hearing, or proceeding, as authorized by Code of Civil Procedure section 367.75. Remote proceedings for evidentiary hearings or trials in all divisions shall be noticed and conducted as authorized by Code of Civil Procedure section 367.75 and California Rules of Court, rule 3.672.

The Court does not provide court reporters for civil matters. Parties wishing to have a matter reported must provide their own reporter. The court maintains a list of pre-approved official reporters pro tem. Your preferred reporter can be added to this list. Information regarding the court's list is on the court's website.

Another judge will hear settlement conferences in cases assigned to Judge Bernard C. Barmann, Jr. However, those cases that do not settle will be set for trial before him/her.

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 401 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 37 of 464
ID #:17444

PACIFIC PIPELINE COMPANY, A DELAWARE CORPORATION v. STATE OF CALIFORNIA

BCV25103508

Superior Court Of California County Of Kern Special Rules Relating To Case Management Conferences

At least fifteen (15) days prior to the case management conference, each party shall prepare, file and serve on each other party a case management conference statement providing the Court with the following information:

1. The "at-issue" status of the case including any new parties that may be contemplated;

2. A brief statement of the type of case and the general facts or contentions;

3. A description of the discovery done to date and that contemplated to be done;

4. Estimated time for trial and whether a jury is demanded;

5. Whether or not the case is entitled to priority in trial setting and if so, the legal authority thereof;

6. An evaluation of the case for alternative dispute resolution, including arbitration (judicial or binding), mediation or private judge handling;

7. If a person injury action, a description of the injuries sustained by each plaintiff and the elements of claimed damage;

8. A statement of any settlement negotiations undertaken thus far;

9. The name of the attorney primary responsible for the case on behalf of the party filing the statement.

More than one party may join in the filing of a single statement.

The case management conference shall be attended by the attorney primarily responsible for the case on behalf of each party or a member of his or her firm or counsel formally associated in the case. The attorney attending shall be thoroughly familiar with the case, and be able to engage in meaningful discussions with court and counsel, and to enter into agreements on behalf of his or her client on the following subjects:

1. The "at-issue" status of the case including the dismissal of the unnamed doe defendants or cross-defendants by agreement of all parties;

2. Discovery conducted and remaining to be done;

3. Amenability of the case to alternative dispute resolution including, but no limited to, arbitration (judicial or binding), mediation, and private judge handling.

4. Delineation of issues including stipulation of facts not in substantial controversy;

5. Settlement prospects;

6. Setting the matter for trial, pre-trial conferences, settlement conference or further case management conference;

7. Any other matters relevant to the processing of the case to a final resolution.

Any violation of these rules shall result in the imposition of substantial sanctions which may include monetary, issue, termination, or other appropriate sanctions.

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 402 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 38 of 464
ID #:17445

PACIFIC PIPELINE COMPANY, A DELAWARE CORPORATION v. STATE OF CALIFORNIA
BCV25103508

Certificate of Service

The undersigned, of said Kern County, certify:  That I am a Deputy Clerk of the Superior Court of the State of California, in and for the County of Kern, that I am a citizen of the United States, over 18 years of age, I reside in or am employed in the County of Kern, that I am not a party to the within action and that my business address is 1215 Truxtun Ave, Bakersfield, CA 93301, that I served the Notice of Assignment to Judicial Officer for All Purposes, Notice of Order to Show Cause Re: California Rules of Court, Rule 3.110, and Notice of Case Management Conference attached hereto on all interested parties and any respective counsel of record in the within action, following standard Court practices, by: (a) enclosing true copies thereof in a sealed envelope(s) with postage fully prepaid and depositing/placing for collection and delivery in the United States mail at Bakersfield, California; and/or (b) enclosing true copies thereof in a Kern County interoffice envelope(s) and placing for collection and delivery; and/or (c) electronically transmitting true copies thereof by electronic service or e-mail. Service address(es) are indicated on the attached service list.


Date of service:         November 3, 2025

Place of service:        Bakersfield, California

Sent from electronic service address: donotreply@kern.courts.ca.gov


I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

                                        Tara Leal
                                        Clerk of the Superior Court
Date:  November 3, 2025

                            By:    /s/ Alexandra Valles-Guerrero
                                        Alexandra Valles-Guerrero, Deputy Clerk

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 403 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 39 of 464
ID #:17446

PACIFIC PIPELINE COMPANY, A DELAWARE CORPORATION v. STATE OF CALIFORNIA
BCV25103508

Service List

Benjamin Hanelin
355 S Grand Ave Ste 100
Los Angeles, CA  90071
benjamin.hanelin@lw.com

Garrett Stanton
333 S Hope St Fl 16
Los Angeles, CA  90071
garrett.stanton@alston.com

Jeffrey Dintzer
333 S Hope St Ste 1600
Los Angeles, CA  90071
jeffrey.dintzer@alston.com

Natalie Rogers
12670 High Bluff Dr
San Diego, CA  92130
natalie.rogers@lw.com

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 404 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 40 of 464
ID #:17447



| | | FOR COURT USE ONLY |
|---|---|---|
| | SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF KERN<br>Bakersfield Metropolitan Justice<br>1215 Truxtun Ave<br>Bakersfield, CA 93301<br>Phone: (661) 610-6000 | FILED<br>SUPERIOR COURT OF<br>CALIFORNIA<br>COUNTY OF KERN<br><br>October 9, 2025<br><br>/s/ Alexandra Valles-Guerrero,<br>Deputy Clerk |
| PACIFIC PIPELINE COMPANY, A DELAWARE CORPORATION<br>v. STATE OF CALIFORNIA | | |
| Notice of Assignment to Judicial Officer for All Purposes, Notice of<br>Order to Show Cause Re: California Rules of Court, Rule 3.110, and<br>Notice of Case Management Conference | | Case Number:<br>BCV25103508 |

By order of the presiding judge, the above-entitled case is assigned to the Honorable Bernard C. Barmann, Jr for all purposes. It will be managed in Department/Division H until its conclusion. Peremptory challenges, if any, must be made within the times set out in Code of Civil Procedure §170.6.

To Plaintiff(s) and Plaintiff(s) Counsel:
You are required to serve this Notice of Assignment and Notice of Order to Show Cause date and Notice of Case Management Conference date with the Summons, Complaint [Local Rule 3.7(a), Alternative Dispute Resolution (ADR) Information Packet, and ADR Stipulation and Order Form (California Rules of Court, Rule 3.221).

You are ordered to appear on March 25, 2026 at 8:30 A.M. in Division H at 1215 Truxtun Ave, Bakersfield, CA 93301 to give any legal reason why sanctions shall not be imposed for failure to serve the complaint on all named defendants and file proof(s) of service with the court within sixty (60) days after the filing of the complaint pursuant to California Rules of Court, Rule 3.110. All appearances are mandatory, unless the court receives the required proof(s) of service five (5) court days prior to the hearing date, and then no appearance is necessary.

To each party and their respective attorney(s) of record:
Your attention is directed to the California Rules of Court and the Code of Civil Procedure provisions regarding mandatory expedited jury trial procedures, specifically to California Rules of Court Rules 3.1546, et seq., and Code of Civil Procedure section 630.20, et seq.

This case is set for Case Management Conference on January 12, 2026 at 8:30 A.M. in Division H located at 1215 Truxtun Ave, Bakersfield, CA 93301. Parties shall comply with and file case management statements at least fifteen (15) days prior to the conference in accordance with California Rules of Court, Rules 3.720 – 3.730.

To Cross Complainant(s) and Cross Complainant(s) Counsel:
If you are bringing cross complaint against new parties, you are, likewise, required to serve this Notice of Assignment pursuant to California Rules of Court, Rule 3.110, Notice of Order to Show Cause date and Notice of Case Management Conference date on the new cross defendants.

Tara Leal<br>Clerk of the Superior Court

Date: October 9, 2025

By:    /s/ Alexandra Valles-Guerrero
       Alexandra Valles-Guerrero, Deputy Clerk

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 405 of 837   Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 41 of 464
ID #:17448

PACIFIC PIPELINE COMPANY, A DELAWARE CORPORATION v. STATE OF CALIFORNIA

BCV25103508

The Clerk of the Superior Court's office has received a civil complaint from you for filing. Pursuant to the Trial Court Delay Reduction Act, your case has been assigned to the Honorable Bernard C. Barmann, Jr as monitoring judge.

Judge Bernard C. Barmann, Jr has instituted a direct calendaring system for all cases assigned to him/her as the monitoring judge.

All law and motion, case management and trial setting conferences, ex parte matters and trials will be scheduled before him/her in Division H at 1215 Truxtun Ave, Bakersfield, CA 93301.

Law & Motion and Ex-Parte hearing dates must be pre-cleared by contacting the Direct Calendaring Clerk at 661-610-6460. Tentative rulings are not provided in advance of the hearing.

At the time of filing the complaint, plaintiff's counsel will be given a Notice of Case Management Conference which sets a conference approximately one hundred eighty (180) days after filing of the complaint. This notice must be served with the summons and complaint on all defendants. Defendants must serve the notice on all cross-defendants named. The notice must also be served on interveners and lien claimants.

Pursuant to Local Rule 3.2.1. a party wishing to appear remotely in any civil proceeding other than an evidentiary hearing or trial, including conferences and law and motion hearings, is permitted to appear without advance notice to the court or other parties. By appearing remotely those persons will be deemed to have requested a remote appearance. Instructions for accessing Remote Court Hearings can be found on the court's website. Each judicial officer retains the discretion to require a party to appear in person at a conference, hearing, or proceeding, as authorized by Code of Civil Procedure section 367.75. Remote proceedings for evidentiary hearings or trials in all divisions shall be noticed and conducted as authorized by Code of Civil Procedure section 367.75 and California Rules of Court, rule 3.672.

The Court does not provide court reporters for civil matters. Parties wishing to have a matter reported must provide their own reporter. The court maintains a list of pre-approved official reporters pro tem. Your preferred reporter can be added to this list. Information regarding the court's list is on the court's website.

Another judge will hear settlement conferences in cases assigned to Judge Bernard C. Barmann, Jr. However, those cases that do not settle will be set for trial before him/her.

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 406 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 42 of 464
ID #:17449

PACIFIC PIPELINE COMPANY, A DELAWARE CORPORATION v. STATE OF CALIFORNIA

BCV25103508

Superior Court Of California County Of Kern Special Rules Relating To Case Management Conferences

At least fifteen (15) days prior to the case management conference, each party shall prepare, file and serve on each other party a case management conference statement providing the Court with the following information:

1. The "at-issue" status of the case including any new parties that may be contemplated;

2. A brief statement of the type of case and the general facts or contentions;

3. A description of the discovery done to date and that contemplated to be done;

4. Estimated time for trial and whether a jury is demanded;

5. Whether or not the case is entitled to priority in trial setting and if so, the legal authority thereof;

6. An evaluation of the case for alternative dispute resolution, including arbitration (judicial or binding), mediation or private judge handling;

7. If a person injury action, a description of the injuries sustained by each plaintiff and the elements of claimed damage;

8. A statement of any settlement negotiations undertaken thus far;

9. The name of the attorney primary responsible for the case on behalf of the party filing the statement.

More than one party may join in the filing of a single statement.

The case management conference shall be attended by the attorney primarily responsible for the case on behalf of each party or a member of his or her firm or counsel formally associated in the case. The attorney attending shall be thoroughly familiar with the case, and be able to engage in meaningful discussions with court and counsel, and to enter into agreements on behalf of his or her client on the following subjects:

1. The "at-issue" status of the case including the dismissal of the unnamed doe defendants or cross-defendants by agreement of all parties;

2. Discovery conducted and remaining to be done;

3. Amenability of the case to alternative dispute resolution including, but no limited to, arbitration (judicial or binding), mediation, and private judge handling.

4. Delineation of issues including stipulation of facts not in substantial controversy;

5. Settlement prospects;

6. Setting the matter for trial, pre-trial conferences, settlement conference or further case management conference;

7. Any other matters relevant to the processing of the case to a final resolution.

Any violation of these rules shall result in the imposition of substantial sanctions which may include monetary, issue, termination, or other appropriate sanctions.

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 407 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 43 of 464
ID #:17450

PACIFIC PIPELINE COMPANY, A DELAWARE CORPORATION v. STATE OF CALIFORNIA
BCV25103508

Certificate of Service

The undersigned, of said Kern County, certify:  That I am a Deputy Clerk of the Superior Court of the State of California, in and for the County of Kern, that I am a citizen of the United States, over 18 years of age, I reside in or am employed in the County of Kern, that I am not a party to the within action and that my business address is 1215 Truxtun Ave, Bakersfield, CA 93301, that I served the Notice of Assignment to Judicial Officer for All Purposes, Notice of Order to Show Cause Re: California Rules of Court, Rule 3.110, and Notice of Case Management Conference attached hereto on all interested parties and any respective counsel of record in the within action, following standard Court practices, by: (a) enclosing true copies thereof in a sealed envelope(s) with postage fully prepaid and depositing/placing for collection and delivery in the United States mail at Bakersfield, California; and/or (b) enclosing true copies thereof in a Kern County interoffice envelope(s) and placing for collection and delivery; and/or (c) electronically transmitting true copies thereof by electronic service or e-mail. Service address(es) are indicated on the attached service list.


Date of service:          October 9, 2025

Place of service:        Bakersfield, California

Sent from electronic service address: donotreply@kern.courts.ca.gov


I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

                                                        Tara Leal
                                                        Clerk of the Superior Court
Date:  October 9, 2025

                                            By:      /s/ Alexandra Valles-Guerrero
                                                        Alexandra Valles-Guerrero, Deputy Clerk

PACIFIC PIPELINE COMPANY, A DELAWARE CORPORATION v. STATE OF CALIFORNIA
BCV25103508

Service List

Benjamin Hanelin
355 S Grand Ave Ste 100
Los Angeles, CA  90071
benjamin.hanelin@lw.com

Garrett Stanton
333 S Hope St Fl 16
Los Angeles, CA  90071
garrett.stanton@alston.com

Jeffrey Dintzer
333 S Hope St Ste 1600
Los Angeles, CA  90071
jeffrey.dintzer@alston.com

Natalie Rogers
12670 High Bluff Dr
San Diego, CA  92130
natalie.rogers@lw.com

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 409 of 837   Page
ID #:17452
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 45 of 464

# Exhibit B

Case 2:26-cv-05242-SVW-SSC Document 36 Filed 05/14/26 Page 410 of 837 Page
ID #:17453
Case 1:26-cv-01486-KES-CDB Document 1 Filed 02/20/26 Page 46 of 464

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
jeffrey.dintzer@alston.com
GARRETT B. STANTON, SBN 324775
garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071-1410
Telephone:    (213) 576-1000
Facsimile:    (213) 576-1100

**PAUL HASTINGS LLP**
BENJAMIN J. HANELIN, SBN 237595
benjaminhanelin@paulhastings.com
NATALIE C. ROGERS, SBN 301254
natalierogers@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067
Telephone:    (310) 620-5879
Facsimile:    (310) 620-5899

Attorneys for Plaintiff
PACIFIC PIPELINE COMPANY

ELECTRONICALLY FILED
Superior Court of California,
County of Kern
By: Julia Barrera
Deputy Clerk
01/21/26 5:59 PM

### SUPERIOR COURT OF CALIFORNIA

### COUNTY OF KERN

| | |
|---|---|
| PACIFIC PIPELINE COMPANY, a Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>STATE OF CALIFORNIA and DOES 1 through 25, inclusive,<br><br>Defendants. | Case No. BCV-25-103508<br><br>**VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF**<br><br>(Code Civ. Proc. § 1060) |

- 1 -
VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 411 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 47 of 464
ID #:17454

Plaintiff Pacific Pipeline Company brings this First Amended Complaint for Declaratory Relief against Defendant the State of California. By this verified pleading, Plaintiff alleges as follows:

## INTRODUCTION

1.    Sable Offshore Corp. ("Sable") operates an interconnected pipeline facility known as the Santa Ynez Pipeline System, which includes both offshore and onshore components. Two onshore segments of this System are known as Segments CA-324 and CA-325, sometimes referred to as the Las Flores Pipeline, which are owned by Pacific Pipeline Company. Portions of Segments CA-325 are located in Kern County, San Luis Obispo County, and an unincorporated area of the County of Santa Barbara ("County"), including portions both inside and outside the Coastal Zone. Other onshore portions of the Santa Ynez Pipeline System, including Segment CA-324, are located in Santa Barbara County and within the Coastal Zone.

2.    Sable is the lessee and operator of federal offshore oil and gas leases in federal waters off the coast of California that form the Santa Ynez Unit. Offshore pipeline segments (the "Offshore Pipeline Segments") transport oil from this offshore field to intermediate onshore processing facilities at Las Flores Canyon (the "LFC Facilities"), and Segments CA-324 and CA-325 transport oil from the LFC Facilities to Gaviota and Pentland Stations and further downstream. Sable operates the Offshore Pipeline Segments, the LFC Facilities, and Segments CA-324 and CA-325 as part of the integrated Santa Ynez Pipeline System, which moves crude oil from offshore waters into and through California. Sable acquired the Santa Ynez Unit, the Offshore Pipeline Segments, the LFC Facilities and Pacific Pipeline Company in February 2024.

3.    Since that time, Sable and Pacific Pipeline Company have worked with federal and state agencies toward resuming petroleum transportation through the entirety of the Santa Ynez Pipeline System, including Segments CA-324 and CA-325. This has involved the performance of repair and maintenance work on all components of the Santa Ynez Pipeline System, including Segments CA-324 and CA-325.

- 2 -
VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

Case 2:26-cv-05242-SVW-SSC Document 36 Filed 05/14/26 Page 412 of 837 Page
Case 1:26-cv-01486-KES-CDB Document 1 Filed 02/20/26 Page 48 of 464
ID #:17455

4. On September 13, 2025, the California Legislature adopted Senate Bill ("SB") 237.

5. Among other things, SB 237 adds Section 51014.1 of the Government Code, which provides that "[a]ny existing oil pipeline that is six inches or larger that has been idle, inactive, or out of service for five years or more, shall not be restarted without passing a spike hydrostatic testing program."

6. SB 237 also amends Section 30262 of the California Coastal Act to require a person to obtain a new coastal development permit ("CDP") for the "[r]epair, reactivation, and maintenance of an oil and gas facility, including an oil pipeline, that has been idled, inactive, or out of service for five years or more."

7. SB 237 does not define "idled, inactive, or out of service."

8. On September 19, 2025, Governor Gavin Newsom signed SB 237 into law.

9. The State of California has taken the position that Segments CA-324 and CA-325 have been idled, inactive, or out of service for five years or more. Pacific Pipeline Company disagrees. The entire Santa Ynez Pipeline System—including Segments CA-324 and CA-325— is active. The Segments are not idle nor out of service. In fact, the entire Pipeline System has retained its active status under state and federal law since 2015. More recently, Pacific Pipeline Company and Sable have been diligently performing necessary work on Segments CA-324 and CA-325 to resume petroleum transportation through them. Under all relevant and applicable meanings of the words, the Santa Ynez Pipeline System, including Segments CA-324 and CA-325, is not idle, inactive, or out of service.

10. On December 17, 2025, the Pipeline and Hazardous Materials Safety Administration ("PHMSA") determined the Santa Ynez Pipeline System is an interstate pipeline under its exclusive pipeline safety jurisdiction. In making its determination, PHMSA confirmed the Santa Ynez Pipeline System is considered an "active" pipeline. Since assuming jurisdiction over the Santa Ynez Pipeline System, PHMSA approved Sable's Restart Plan for Segments CA-

- 3 -
VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 413 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 49 of 464
ID #:17456

324 and CA-325 on December 22, 2025 and issued Sable an Emergency Special Permit with respect to Segments CA-324 and CA-325 on December 23, 2025.

11.    An actual and present controversy exists between Pacific Pipeline Company and Defendant concerning their respective rights and duties regarding the Santa Ynez Pipeline System's status, and the applicability of SB 237 to Segments CA-324 and CA-325 in light of PHMSA's assumption of jurisdiction over the Santa Ynez Pipeline System. Consequently, Pacific Pipeline Company seeks a judicial declaration from this Court that: 1) the Santa Ynez Pipeline System, including Segments CA-324 and CA-325, is not idle, inactive, or out of service as those terms are used in SB 237; and 2) the application of SB 237 as to the Santa Ynez Pipeline System is preempted by federal law.

## THE PARTIES

12.    Plaintiff Pacific Pipeline Company is a Delaware Corporation and does business in Kern County, California. Pacific Pipeline Company owns Segments CA-324 and CA-325, which are critical portions of the Santa Ynez Pipeline System.

13.    Pacific Pipeline Company is a "person interested under a statute" within the meaning of Code of Civil Procedure § 1060, because Pacific Pipeline Company's rights and obligations under SB 237 are directly at issue in this action.

14.    Defendant State of California is responsible for enacting and enforcing the laws of the State of California.

15.    Pacific Pipeline Company is unaware of the true names and/or capacities of Defendants DOES 1 through 25, inclusive, and therefore sues said Defendants by such fictitious names. Pacific Pipeline Company will amend this pleading to insert the true names and/or capacities of DOES 1 through 25, inclusive, when the same have been ascertained. Pacific Pipeline Company is informed and believe and thereon alleges that each such fictitiously named Defendant is, in some manner or for some reason, responsible for the actions or omissions alleged in this pleading, and each is subject to the relief being sought herein.

- 4 -

VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 414 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 50 of 464
ID #:17457

## JURISDICTION AND VENUE

16.     This Court has subject-matter jurisdiction over this action under California Constitution, article VI, section 10, and section 1060 of the Code of Civil Procedure.

17.     Venue is proper in this Court pursuant to Code of Civil Procedure section 392 because significant portions of the Santa Ynez Pipeline System at issue in this litigation are located in Kern County and the Santa Ynez Pipeline System ultimately delivers crude oil to the Pentland Delivery Point in Kern County.

## FACTUAL AND LEGAL STATEMEMT

### A.     The Santa Ynez Unit

18.     The Santa Ynez Unit consists of sixteen federal leases across approximately 76,000 acres of outer continental shelf and produces crude oil and natural gas from Platforms Hondo, Harmony, and Heritage, located in federal waters off the California Coast in the Santa Barbara Channel.

19.     The oil and gas are transported through the Santa Ynez Pipeline System's Offshore Pipeline Segments to the onshore LFC Facilities, comprised principally of the Las Flores Canyon Oil and Gas Processing Facilities and the Pacific Offshore Pipeline Company-owned Gas Plant, both of which are located in Las Flores Canyon in unincorporated Santa Barbara County.

20.     The LFC Facilities separate oil, propane, butane, sulfur products, and fuel quality gas. The natural gas is dried, treated, compressed, and delivered to a local utility company. The partially processed crude oil continues through the Santa Ynez Pipeline System via Segments CA-324 and CA-325 to Pentland Station, where the oil enters third-party owned and operated infrastructure and is transported to a refinery for final processing.

21.     In February 1988, the California Coastal Commission ("Coastal Commission") reviewed and analyzed Sable's predecessor-in-interest's (Exxon Company U.S.A.) proposal for the construction, operation, and ongoing maintenance of the Santa Ynez Unit-related assets and

- 5 -

VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 415 of 837    Page
ID #:17458
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 51 of 464

the Offshore Pipeline Segments, as part of a "Development and Production Plan" ("DPP") submitted to the federal Minerals Management Service in 1987.

22.    The Coastal Commission issued three approvals for the Santa Ynez Unit-related assets and Offline Pipeline Segments: (1) Consistency Certification No. CC-7-83, which confirmed pursuant to the federal Coastal Zone Management Act ("CMZA") that a Development and Production Plan ("DPP") for the Santa Ynez Unit-related assets would be consistent with the Coastal Act, (2) Consistency Certification No. CC-64-87, which confirmed pursuant to the CZMA that construction, operation, and maintenance of the Santa Ynez-related assets and Offshore Pipeline Segments pursuant to a revised DPP would be consistent with the Coastal Act, and (3) CDP No. E-88-1 (the "Offshore CDP"), which authorized the construction, operation, and maintenance of those portions of the Offshore Pipeline Segments located in California state waters.

**B.    Segments CA-324 and CA-325 of the Santa Ynez Pipeline System**

23.    The Santa Ynez Pipeline System is made up of various segments. One segment is known as Segment CA-325. Segment CA-325 is a thirty-inch diameter pipeline with a maximum permitted throughput capacity of 300,000-barrels of crude oil per day and transports crude oil approximately 113.5 miles north from the Gaviota Pump Station to the Sisquoc Pump Station, then east through the Los Padres National Forest and Cuyama Valley, ultimately delivering crude oil to the existing Pentland Delivery Point in the San Joaquin Valley in Kern County.

24.    Another segment is Segment CA-324. Segment CA-324 is a twenty-four-inch diameter pipeline with a maximum permitted throughput capacity of 150,000-barrels of crude oil per day. Segment CA-324 transports crude oil approximately 10.9 miles from the Las Flores Pump Station in Las Flores Canyon, west along the Gaviota Coast, to the existing Gaviota Pump Station located approximately one mile east of Gaviota State Park in Santa Barbara County. The Offshore Pipeline Segments, as described above, comprise a third segment of the Santa Ynez Pipeline System and transport oil from the Santa Ynez Unit to the onshore LFC Facilities in Las Flores Canyon.

- 6 -

VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 416 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 52 of 464
ID #:17459

25.     In the mid-1980s, the California State Lands Commission, federal Bureau of Land Management, and Department of the Interior prepared a joint Environmental Impact Report and Environmental Impact Statement ("EIR/EIS") for the Celeron Pipeline Project, which includes analysis of the construction and long-term operation of what are now known as Segments CA-324 and CA-325. The locations of Segments CA-324 and CA-325 were identified as an environmentally superior alignment to minimize impacts to environmental resources. The State Lands Commission certified the EIR/EIS in January 1985.

26.     After reviewing the EIR/EIS, the County Planning Commission made a final decision to approve the Celeron Pipeline Project and associated entitlements in February 1986. The County's approval was not challenged during the appeal period, and the Planning Commission's approval action became final and effective.

27.     Pursuant to the County of Santa Barbara's certified Local Coastal Program ("LCP"), the County issued CDP No. 86-CDP-189 for the Celeron Pipeline Project on July 27, 1986. CDP No. 86-CDP-189 approved "[c]learing, grading and trenching activities for [the] Celeron Pipeline Project." On August 5, 1986, the County issued CDP No. 86-CDP-205 for the "[r]emainder of all construction activities for the Celeron Pipeline [P]roject." The CDPs were not appealed by any party and are, therefore, final, valid, and not subject to further appeal.

28.     Although the County has issued separate CDPs for major improvements, such as relocations and realignments of pipeline segments since Segments CA-324 and CA-325's CDPs were first issued, the County has not required new or amended CDPs for repair and maintenance work on Segments CA-324 and CA-325.

C.     The Refugio Oil Spill and Resulting Repair Work

29.     On May 19, 2015, a leak along Segment CA-324 resulted in an oil spill. Segments CA-324 and CA-325 remained active, but petroleum has not flowed through them since that time, even though petroleum began flowing through other portions of the Santa Ynez Pipeline System in May 2025. To maintain Segments CA-324 and CA-325 in an active state, they were

- 7 -
VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 417 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 53 of 464
ID #:17460

filled with nitrogen to prevent oxidation and internal corrosion, and the cathodic protection system is active and has been regularly inspected and maintained.

30. Since 2015, Pacific Pipeline Company (including its predecessor in interest, Plains Pipeline, L.P. ("Plains")), has maintained Segments CA-324 and CA-325 as active and has undertaken substantial efforts to diligently repair Segments CA-324 and CA-325 to ensure compliance with industry standards for active pipelines and resume petroleum transportation.

31. For example, in April 2021, Plains secured approval from the Office of the State Fire Marshal ("OSFM") to retrofit Segments CA-324 and CA-325 with 16 safety valves as required by law, including seven valves in the Coastal Zone. In December 2021, Plains submitted applications to the County for approval to complete the safety valve installation work. Pacific Pipeline Company has since installed the safety valves along Segments CA-324 and CA-325.

32. In addition, multiple in-line inspections ("ILI") have been conducted on Segments CA-324 and CA-325:

    a. Two ILI runs have been performed on Segment CA-324, one in February 2022 and another in December 2022;

    b. An ILI run was performed on a portion of on Segment CA-325 in September 2023; and

    c. An ILI run was performed on the remainder of Segment CA-325 in October 2023.

33. In May 2024, Pacific Pipeline Company and Sable separately began anomaly[1] repair and maintenance work on Segments CA-324 and CA-325 under the County's 1986 approvals and permits that authorized ongoing pipeline maintenance. On February 12 and March 21, 2025, in response to Pacific Pipeline Company's request to address claims from the Coastal Commission that the repair and maintenance work was not authorized, the County confirmed that no further permits were required for Pacific Pipeline Company's anomaly repair work. Pacific

---

[1] A pipeline anomaly refers to a pipeline segment with some deviation from its original configuration.

VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 418 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 54 of 464
ID #:17461

Pipeline Company has completed the anomaly repairs, as well as subsequent pipeline hydrotesting, under OSFM supervision.

34. Since 2016, Segments CA-324 and CA-325 had been considered an "intrastate" pipeline under the regulatory oversight of OSFM. In April 2024, Pacific Pipeline Company submitted "State Waiver" applications to OSFM for Segments CA-324 and CA-325 to modify regulatory pipeline safety requirements based on the specifications applicable to the individual pipeline facilities. On December 17, 2024, OSFM granted both State Waivers and imposed over sixty separate conditions on Pacific Pipeline Company's operation of Segments CA-324 and CA-325, conditional on the Pipeline and Hazardous Materials Safety Administration ("PHMSA") expressing no objection to the State Waivers. On February 11, 2025, PHMSA notified OSFM that it had no objection to its issuance of the State Waivers. On December 17, 2025, PHMSA designated the entire Santa Ynez Pipeline System (including Segments CA-324 and CA-325) as an interstate pipeline. As a result, OSFM no longer retains any regulatory oversight of Segments CA-324 and CA-325 and the State Waivers have been rendered moot.

35. Pacific Pipeline Company further submitted a Restart Plan to OSFM for review on July 29, 2024. In August and September 2025, OSFM performed multiple inspections of Segments CA-324 and CA-325 in connection with its review of the Restart Plan. As of December 17, 2025, PHMSA has assumed complete safety jurisdiction over the Santa Ynez Pipeline System, including Segments CA-324 and CA-325, including the processing and approval of Pacific Pipeline Company's Restart Plan.

36. As of May 15, 2025, Sable resumed petroleum transportation through the Santa Ynez Pipeline System's Offshore Pipeline Segments to its storage facilities in Las Flores Canyon.

37. At all times, Pacific Pipeline Company has intended to resume petroleum transportation from Sable's storage facilities in Las Flores Canyon through the remainder of the Santa Ynez Pipeline System, including Segments CA-324 and CA-325. Pacific Pipeline Company and its predecessors never abandoned Segments CA-324 and CA-325. Rather, these

- 9 -

segments have been operated as part of an active pipeline under the law and Pacific Pipeline Company has worked diligently to maintain their use under existing and valid CDPs.

**D.    Senate Bill 237**

38.    On September 13, 2025, the California Legislature passed SB 237. On September 19, 2025, Governor Newsom signed SB 237 into law.

39.    SB 237 adds Section 51014.1 of the Government Code, which states in part, "[a]ny existing oil pipeline that is six inches or larger that has been *idle, inactive, or out of service* for five years or more, shall not be restarted without passing a spike hydrostatic testing program." (Emphasis added).

40.    SB 237 also amends Section 30262 of the Coastal Act to provide, in relevant part:

> (2) Repair, reactivation, and maintenance of an oil and gas facility, including an oil pipeline, that has been idled, inactive, or out of service for five years or more shall be considered a new or expanded development requiring a new coastal development permit.
>
> (3) Development associated with the repair, reactivation, or maintenance of an oil pipeline that has been idled, inactive, or out of service for five years or more requires a new coastal development permit consistent with this section. (Pub. Res. Code §§ 30262(b)(2) and (3)).

41.    State law does not define the terms "idled," "inactive," and "out of service." However, such terms are defined or described by PHMSA, the federal agency that administers the federal law pursuant to which the Santa Ynez Pipeline System is regulated.

42.    The Santa Ynez Pipeline System is subject to the federal Hazardous Liquid Pipeline Safety Act ("Pipeline Safety Act") administered by PHMSA. (49 U.S.C. §§ 60101 *et seq.*) On December 17, 2025, PHMSA determined that the Santa Ynez Pipeline System is an interstate pipeline under PHMSA's exclusive jurisdiction. (See Dec. 17, 2025 Letter from PHMSA to Sable, attached hereto as Exhibit B.) In making its determination, PHMSA confirmed that PHMSA regulations consider the Santa Ynez Pipeline System to be an "active" pipeline. (Ex. B, p. 3, fn. 8.)

- 10 -

VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 420 of 837    Page
ID #:17463
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 56 of 464

43.     PHMSA recognizes two categories of pipeline status: (i) active and (ii) abandoned. (See 81 Fed. Reg. 54512 [federal "regulations consider pipelines to be either active and fully subject to all relevant parts of the safety regulations or abandoned."]; see also PHMSA Advisory Bulletin ADB 2016-0075 (Aug. 11, 2016).) Federal regulations for hazardous liquid pipelines define the term "abandoned" to mean "permanently removed from service." (See 49 C.F.R. 195.3.)

44.     Federal regulations do not recognize "idle," "inactive," or "out of service" status at all. (See 81 Fed. Reg. 54512.) "If a pipeline is not properly abandoned and may be used in the future for transportation of hazardous liquid or gas, PHMSA regulations consider it as an active pipeline." (81 Fed. Reg. 54513.) "Owners and operators of pipelines that are not operating but contain hazardous liquids and gas must comply with all applicable safety requirements, including periodic maintenance, integrity management assessments, damage prevention programs, response planning, and public awareness programs." (*Ibid.*)

45.     Pacific Pipeline Company is informed and believes, and on that basis alleges, that it is the position of the State of California that Segments CA-324 and CA-325 have been "idled, inactive, or out of service for five years or more" and, therefore, repair, reactivation, maintenance, and development associated with such work is new or expanded development requiring a new CDP.

46.     The State, through the Coastal Commission and the Legislature, has previously made numerous statements and findings concerning its position on the status of Segments CA-324 and CA-325.

47.     The Staff Report for the Coastal Commission's Cease and Desist Order CCC-25-CD-01, Restoration Order CCC-25-RO-01, and Administrative Civil Penalty Order CCC-25-AP3-01, characterizes Segments CA-324 and CA-325 as "offline and out-of-service" since the 2015 oil spill. (Staff Report, p. 3.) "[T]he pipelines remained in service until the 2015 oil spill, at which point they were placed out of service." (*Ibid.*) The Staff Report also characterizes the Segments as "inoperable," having "sat inactive for a decade." (*Id.*, p. 65.)

- 11 -
VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 421 of 837    Page
ID #:17464
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 57 of 464

48. Similarly, the Senate Rules Committee digest for SB 237 makes clear that SB 237 is intended to apply to the Santa Ynez Pipeline System. (See Sen. Com. on Natural Resources, Analysis of Senate Bill No. 237 (2025-2026 Reg. Sess.) as amended on Sept. 10, 2025, attached hereto as Exhibit A.)

    a. "This Bill [applies to] pipelines of a certain size that have been out of service for more than five years (which would notably include certain pipelines serving the Sable Corporation's Santa Ynez Unit)[.]" (Ex. A, p. 3.)

    b. "Preventing oil spills from pipelines. On May 19, 2015 an offshore pipeline ruptured, spilling over 140,000 gallons of heavy crude oil along the Gaviota coast at Refugio Beach in Santa Barbara County. Sable announced they were restarting oil production in the Santa Ynez unit (in federal waters) on May 15, 2025, and restarting the use of those two pipelines. Sable has not replaced, but has rather made repairs to the pipelines. Some of the provisions of SB 237 are intended to address concerns surrounding the safety of restarting use of the repaired pipelines by requiring testing of the pipelines' durability." (Ex. A, p. 5.)

49. Based on the State's asserted authority under the Coastal Act and SB 237, Pacific Pipeline Company faces an immediate choice to either (i) resume petroleum transportation pursuant to its existing entitlements, permits, and approvals, including County-issued CDPs and PHMSA approvals, but risk possible enforcement action, fines, and other penalties by the State; or (ii) not resume petroleum transportation at all. State law provides no administrative procedure for addressing a dispute concerning the applicability of SB 237 to the Santa Ynez Pipeline System.

50. Given the absence of a process under the law for resolving this dispute, a judicial determination concerning the applicability of SB 237 to the Santa Ynez Pipeline System, including Segments CA-324 and CA-325, is necessary.

- 12 -
VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 422 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 58 of 464
ID #:17465

**E.    PHMSA's Assumption of Jurisdiction**

51.    On December 17, 2025, PHMSA determined that the entirety of the Santa Ynez Pipeline System, including Segments CA-324 and CA-325, is an interstate pipeline subject to PHMSA's exclusive jurisdiction. This determination eliminated any jurisdiction of OSFM over Segments CA-324 and CA-325. In making its determination that the Santa Ynez Pipeline System is an interstate pipeline, PHMSA notified OSFM that the Pipeline System is "subject to the regulatory oversight of PHMSA." (Ex. B, p. 3.) PHMSA further confirmed that the Santa Ynez Pipeline System is considered an "active" pipeline under PHMSA regulations. (Ex. B, p. 3, fn. 8.)

52.    On December 22, 2025, PHMSA approved Sable's Restart Plan for Segments CA-324 and CA-325. (See Dec. 22, 2025 Letter from PHMSA to Sable, attached hereto as Exhibit C.)

53.    On December 23, 2025, PHMSA granted Sable an Emergency Special Permit for Segments CA-324 and CA-325. (See Dec. 23, 2025 Emergency Special Permit issued by PHMSA to Sable, attached hereto as Exhibit D.) The Emergency Special Permit takes the place of the OSFM-issued State Waivers and carried forward substantially the same conditions as issued in the State Waivers.

54.    No other PHMSA approvals or permits are necessary to flow oil through Segments CA-324 and CA-325.

55.    Given PHMSA's assumption of jurisdiction over the Santa Ynez Pipeline System as an interstate pipeline, OSFM is without jurisdiction to regulate Segments CA-324 and CA-325, or any other portion of the Santa Ynez Pipeline System. The requirements of the State Waivers have therefore been mooted and preempted by these federal actions. A judicial determination concerning whether the application of SB 237 as to the Santa Ynez Pipeline System is preempted by federal law is therefore necessary.

- 13 -

VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

## FIRST CAUSE OF ACTION

### Declaratory Relief (Code of Civ. Proc., § 1060)

56. Pacific Pipeline Company realleges and incorporates by reference each of the above paragraphs as though fully set forth herein.

57. Pacific Pipeline Company is a "person interested" under Code of Civil Procedure § 1060, because Pacific Pipeline Company owns and operates Segments CA-324 and CA-325 of the Santa Ynez Pipeline System, which are operated pursuant to existing CDPs issued by the County and are the target of the amendments to the Government Code and Coastal Act enacted by SB 237.

58. Segments CA-324 and CA-325 of the Santa Ynez Pipeline System have not been "idled, inactive, or out of service for five years or more" within the meaning of SB 237, because Pacific Pipeline Company has diligently undertaken repair and maintenance efforts since the 2015 spill under existing entitlements, permits, and approvals to resume petroleum transportation through Segments CA-324 and CA-325. Segments CA-324 and CA-325 have not been "abandoned" under federal or state law applicable to oil and gas pipelines. Rather, the Santa Ynez Pipeline System, including Segments CA-324 and CA-325, has been deemed "active" under these laws by the agencies who administer them.

59. Further, the Legislature did not make SB 237 retroactive. As such, SB 237 and its new rules for what is an idled, inactive, or out of service pipelines and what permitting standards may or may not be followed only applies prospectively. This means that SB 237 can only apply to pipelines that are eventually "idled, inactive, or out of service for five years or more" commencing on January 1, 2026. Thus, since the five-year idle, inactive, or out of service period must commence on January 1, 2026, the earliest a pipeline could be "idled, inactive, or out of service *for five years or more*" is January 1, 2031 (i.e., five years from SB 237's effective date).

60. Given statements the State, through the Coastal Commission and Legislature, has previously made concerning the status of Segments CA-324 and CA-325 as "idle," "inactive," and "out of service" for more than five years, an actual, present controversy exists between the

- 14 -
VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

parties concerning the applicability of SB 237 to the Santa Ynez Pipeline System, including Segments CA-324 and CA-325. This controversy is definite and concrete, touches the legal relations of parties with adverse legal interests, and is of sufficient immediacy and reality to warrant declaratory relief. (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 79–80.)

61. This action does not seek an advisory opinion or abstract interpretation of law. Pacific Pipeline Company must make immediate operational and financial decisions regarding whether to resume petroleum transportation under its existing CDPs at the risk of enforcement actions, penalties, or orders by the State. This presents a justiciable controversy under Code of Civil Procedure § 1060. (*Meyer v. Sprint Spectrum L.P.* (2009) 45 Cal.4th 634, 647.)

62. Declaratory relief is necessary and proper within the meaning of Code of Civil Procedure § 1061, because a judicial declaration will clarify the parties' rights and duties, guide Pacific Pipeline Company's conduct, and prevent multiplicity of actions.

63. Accordingly, Pacific Pipeline Company seeks a judicial declaration that the Santa Ynez Pipeline System, including Segments CA-324 and CA-325, have not been "idled, inactive, or out of service for five years or more" under SB 237.

## SECOND CAUSE OF ACTION

### Declaratory Relief (Code of Civ. Proc., § 1060)

64. Pacific Pipeline Company realleges and incorporates by reference each of the above paragraphs as if fully set forth herein.

65. Pacific Pipeline Company is a "person interested" under Code of Civil Procedure § 1060, because Pacific Pipeline Company owns and operates Segments CA-324 and CA-325 of the Santa Ynez Pipeline System pursuant to existing CDPs and is the target of the amendments to the Government Code and Coastal Act enacted by SB 237.

66. With PHMSA's assumption of jurisdiction and December 17, 2025 determination that the Santa Ynez Pipeline System is an interstate pipeline under its exclusive regulatory oversight, OSFM no longer retains any regulatory authority over Segments CA-324 and CA-325, including the resumption of petroleum transportation through the Segments.

- 15 -

VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 425 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 61 of 464
ID #:17468

67.     Moreover, with PHMSA's approval of Sable's Restart Plan on December 22, 2025 and issuance of the Emergency Special Permit (which overrides the State Waivers) on December 23, 2025, no other PHMSA approvals or permits are necessary to flow oil through Segments CA-324 and CA-325.

68.     Under the federal Pipeline Safety Act, at 49 U.S.C. § 60104(c), state agencies, such as OSFM or the Coastal Commission, are precluded from imposing any safety standards for interstate pipeline facilities, including the Santa Ynez Pipeline System.

69.     Moreover, under the federal pipeline safety regulations administered by PHMSA under 49 C.F.R. Part 195, Pacific Pipeline Company, as owner of Segments CA-324 and CA-325, is subject to several ongoing pipeline operation, maintenance, and repair requirements that are, in many cases, time-sensitive and not otherwise subject to advance permitting or approval requirements by PHMSA.

70.     Article VI, Clause 2 of the U.S. Constitution provides that "the Laws of the United States ... shall be the supreme Law of the Land," such that federal laws preempt state laws that purport to override or otherwise conflict with the implementation of federal laws.

71.     This action does not seek an advisory opinion or abstract interpretation of law. Segments CA-324 and CA-325 are now ready for resumed petroleum transportation pursuant to PHMSA's approvals and Pacific Pipeline Company must make immediate operational and financial decisions regarding whether to resume petroleum transportation through the Segments at the risk of enforcement actions, penalties, or orders by the State. This presents a justiciable controversy under Code of Civil Procedure § 1060. (*Meyer v. Sprint Spectrum L.P.* (2009) 45 Cal.4th 634, 647.)

72.     Declaratory relief is necessary and proper within the meaning of Code of Civil Procedure § 1061, because a judicial declaration will clarify the parties' rights and duties, guide Pacific Pipeline Company's conduct, and prevent multiplicity of actions.

73.     Accordingly, Pacific Pipeline Company seeks a judicial declaration that the application of SB 237 as to the Santa Ynez Pipeline System has been preempted by federal law.

VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 426 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 62 of 464
ID #:17469

## PRAYER FOR RELIEF

WHEREFORE, Pacific Pipeline Company respectfully prays for judgment against the Defendant as follows:

1.    For a judicial declaration that the Santa Ynez Pipeline System, including Segments CA-324 and CA-325, has not been "idled, inactive, or out of service for five years or more" under Government Code Section 51014.1 and Public Resources Code Sections 30262 (b)(1) and (b)(2), as amended by SB 237;

2.    For a judicial declaration that the application of SB 237 as to the Santa Ynez Pipeline System is preempted by federal law;

3.    For costs of suit incurred herein; and

4.    For such other and further relief as the Court deems just and proper, including supplemental relief under Code of Civil Procedure § 1062.

Respectfully submitted,

DATED: January 21, 2026                  ALSTON & BIRD LLP

By: _____
JEFFREY D. DINTZER
Attorney for Plaintiff
PACIFIC PIPELINE COMPANY

- 17 -
VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

## **VERIFICATION**

I, Steven P. Rusch, am Vice President of Regulatory and Environmental Affairs of Sable Offshore Corp., and I am an Authorized Representative of Pacific Pipeline Company. I am authorized to execute this verification on behalf of them. I have read the attached Verified Complaint for Declaratory Relief and am familiar with its contents. The Facts provided in the Complaint are true of my personal knowledge, except for those alleged on information and belief, and I believe those to be true.

DATED: January 21, 2026

_____
Steven P. Rusch

- 18 -
VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 428 of 837   Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 64 of 464
ID #:17471

# EXHIBIT A

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 429 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 65 of 464
ID #:17472

**SENATE RULES COMMITTEE**                                          SB 237
Office of Senate Floor Analyses
(916) 651-1520   Fax: (916) 327-4478

---

### UNFINISHED BUSINESS

---

Bill No:   SB 237
Author:    Grayson (D), Hurtado (D), McNerney (D), Richardson (D) and
           Wilson (D), et al.
Amended:   9/10/25
Vote:      21

---

SENATE JUDICIARY COMMITTEE: 12-0, 5/6/25
AYES: Umberg, Niello, Allen, Arreguín, Ashby, Caballero, Durazo, Laird, Stern,
   Wahab, Weber Pierson, Wiener
NO VOTE RECORDED: Valladares

SENATE FLOOR: 34-0, 5/15/25 (Consent)
AYES: Allen, Archuleta, Arreguín, Ashby, Becker, Blakespear, Cabaldon,
   Caballero, Choi, Cortese, Dahle, Durazo, Gonzalez, Grayson, Hurtado, Jones,
   Laird, Limón, McGuire, McNerney, Menjivar, Niello, Ochoa Bogh, Pérez,
   Richardson, Seyarto, Smallwood-Cuevas, Stern, Strickland, Umberg,
   Valladares, Wahab, Weber Pierson, Wiener
NO VOTE RECORDED: Alvarado-Gil, Cervantes, Grove, Padilla, Reyes, Rubio

ASSEMBLY FLOOR: 59-4 , 9/13/25 – Roll call not available.

---

**SUBJECT:**   Oil spill prevention: gasoline specifications: suspension: California
           Environmental Quality Act: exemptions: County of Kern:
           transportation fuels assessment: coastal resources

**SOURCE:**   Author

---

**DIGEST:**   This bill contains a number of provisions that seek to safely and
responsibly increase in-state oil production (such as through testing of previously-
idled pipelines, greater disclosure of financial assurances, and resolving ongoing
litigation in favor of easier approval of drilling permits in Kern County), while also
soliciting additional information to mitigate rising fuel costs (such as by relaxing
California gasoline standards) and assess medium- to long-term strategies in line
with recent work from the California Energy Commission (CEC).

Provided by LRI History LLC

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 430 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 66 of 464
ID #:17473

*Assembly Amendments* of 9/10/25 rewrote the bill entirely.

**ANALYSIS:**

Existing law:

1) Establishes the CEC tasks it with monitoring, analyzing, and making recommendations on statewide trends in the energy sector, including fuel supply and demand. (Public Resources Code §25200 et. seq.)

2) Establishes California Geologic Energy Management Division (CalGEM) for the purposes of overseeing the drilling, operation, maintenance, and removal of oil and gas wells. (Public Resources Code §3000 et. seq.)

3) Requires the Office of the State Fire Marshal (OSFM) to adopt hazardous liquid pipeline safety regulations that comply with federal law regarding hazardous liquid pipeline safety. (Government Code §51010 et. seq.)

4) Establishes the Office of Oil Spill Prevention and Response (OSPR) in the California Department of Fish and Wildlife as the state's principal regulator for oil spill prevention and response. (Government Code (GOV) §§8574.1 *et seq.,* GOV §§8670.1 *et seq.,* Public Resources Code §§8750 *et seq.*).

5) Institutes the California Environmental Quality Act (CEQA), which requires lead agencies with the principal responsibility for carrying out or approving a project to prepare a negative declaration (ND), mitigated negative declaration (MND), or environmental impact report (EIR) for the project, unless the project is exempt from CEQA. (Public Resources Code (PRC) §21000 et seq.). (CEQA Guidelines §15064(a)(1), (f)(1))

6) Establishes and defines a Program EIR (PEIR) in the CEQA guidelines as an EIR which may be prepared for a series of actions that can be characterized as one large project and are related either:
   a) Geographically;
   b) As logical parts in the chain of contemplated actions;
   c) In connection with issuance of rules, regulations, plans, or other general criteria to govern the conduct of a continuing program; or
   d) As individual activities carried out under the same authorizing statutory or regulatory authority and having generally similar environmental effects which can be mitigated in similar ways. (California Code of Regulations CEQA Guidelines § 15168)

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 431 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 67 of 464
ID #:17474

This bill:

1) Makes findings and declarations regarding, among other things, California's mid-transition phase of the energy transition.

2) Requires the OSPR to solicit feedback on and periodically update its worst case scenario spill volumes.

3) Requires the OSPR to list, among other things, all applications for certificates of financial responsibility, and to revise worst case scenario spill volumes, and operators' assurance of financial responsibility in case of a spill.

4) Requires pipelines of a certain size that have been out of service for more than five years (which would notably include certain pipelines serving the Sable Corporation's Santa Ynez Unit), to meet specific testing requirements.

5) Permits the Governor to, under certain circumstances and with specified considerations, suspend the requirement "summer blend" gasoline in order to protect against "extraordinary gasoline price increases," among other things.

6) Deems the Kern County Second Supplemental Recirculated Environmental Impact Report (SCH2013081079; the SSREIR), including all appendices (SSREIR, March 2025), until January 1, 2036, sufficient for full compliance with CEQA.

7) Directs CEC to, as part of the next Transportation Fuels Assessment, evaluate the cost and supply impacts of gasoline that is not "California reformulated gasoline blendstock for oxygenate blending" (CARBOB), and, among other things, potentially make various recommendations regarding how such non-CARBOB gasoline could benefit California.

8) Requires CEC to, on or before March 31, 2026, submit an assessment to the Legislature that evaluates certain information in the June 2025 letter to Governor Newsom from CEC Vice Chair Siva Gunda.

9) Requires oil produced offshore by new, expanded, or reactivated operations (of the same types of pipelines covered by #4 above) to be transported once

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 432 of 837    Page
ID #:17475
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 68 of 464

onshore by pipelines using the best available technology, as defined, and certain projects require a new Coastal Development Permit.

## Background

*Declining domestic oil production may impact in-state oil pipelines.* California's reliance on crude oil has steadily declined since the 1980s; however, oil consumption recently increased from pandemic lows in 2020. Despite this rebound, California's in-state production of petroleum remains low and California largely relies on imports for its petroleum supplies. Several refineries maintain existing petroleum supplies by using pipelines to in-state oil fields. However, as supply from those fields decreases, the economic viability of those pipelines sharply declines. Some of the policies advanced by this bill (namely restoring the pipelines for offshore oil production in Sable's Santa Ynez Unit and the Kern County SSREIR being deemed approved) appear to address this problem by increasing in-state oil production.

a) *Tests for moving oil safely via pipelines.* To prevent accidents and spills, state and federal regulations require pipeline operators to conduct hydrostatic pressure tests to ensure the integrity of their pipelines.

b) *Financial assurances in the case of oil spills.* Because the threat of an oil spill is never zero, OSPR issues Certificate of Financial Responsibility to facilities, vessels, and pipelines that are required to have a California Oil Spill Contingency Plan, following submittal of an application and proof that the applicant has the financial resources to cover the cost of response for a "worst-case scenario" spill.

*Kern County oil and gas ordinance's iterative EIRs.* In 2013, Kern County began the process of amending its zoning ordinance addressing local permitting for oil and gas exploration, development and production. For the last ten years, the County has gone back and forth in litigation as plaintiffs challenged the ordinance and the drilling permitted under it. Courts have at different times and to various degrees sided with one side or the other, and the original EIR has been revisited in supplemental EIRs (SEIR). As of 2025, the most recent iteration of the EIR, the Second Supplemental Recirculated EIR (SSREIR), faces legal challenge.

*Energy Commission Recommendations for the mid transition.* On June 27, 2025, the Vice Chair of the energy commission submitted a letter to the Governor outlining the CEC's recommendation's on changes to state policy to ensure

**Provided by LRI History LLC**

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 433 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 69 of 464
ID #:17476

"adequate transportation fuels supply during this pivotal time in our state's clean energy transition." The letter recommended pursuit of three concurrent strategies, briefly:

    c)  Stabilize fuel supply through imports of refined fuels and maintaining in-state refining capacity;

    d)  Provide sufficient confidence to industry to invest in maintaining reliable and safe infrastructure operations to meet demand; and

    e)  Develop and execute a holistic transportation fuels transition strategy.

## Comments

*Purpose of Bill.* According to the author, "California faces an affordability crisis on a number of fronts, most notably when it comes to the cost of fuel. This affects all of us—both directly and indirectly—whether it be at the gas pump, where Californians pay some of the prices in the country, or in the form of higher prices for goods and services, which are also affected by the higher costs of energy to produce and deliver. As was noted in a June 27, 2025 report by California Energy Commission Vice-Chair, Siva Gunda, "If a lack of proactive management during this phase of the transition leads to rising energy prices and less reliable fuel supplies, that instability could erode support for continued decarbonization." SB 273 seeks to answers this call for proactive management."

*Preventing oil spills from pipelines.* On May 19, 2015 an offshore pipeline ruptured, spilling over 140,000 gallons of heavy crude oil along the Gaviota coast at Refugio Beach in Santa Barbara County. Sable announced they were restarting oil production in the Santa Ynez unit (in federal waters) on May 15, 2025, and restarting the use of those two pipelines. Sable has not replaced, but has rather made repairs to the pipelines. Some of the provisions of SB 237 are intended to address concerns surrounding the safety of restarting use of the repaired pipelines by requiring testing of the pipelines' durability.

*Updating financial assurances for oil spills.* There is no requirement that the regulations governing worst-case spills be regularly updated, and as such, they have not been. The marine facility reasonable "worst-case spill" volume calculations were established in regulation in 1993 using methods aligned with federal worst-case discharge calculations, and there have only been minor and infrequent updates since then. SB 237 would require more disclosure about and decadal updates of the certificates of financial responsibility.

**Provided by LRI History LLC**

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 434 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 70 of 464
ID #:17477

*Ending the Kern Oil and Gas Ordinance litigation, with some guardrails.* SB 237 'puts the lid' on any further revisions to or legal objections against Kern County's zoning ordinance focused on oil and gas (except purely typographical fixes). SB 237 also specifies that the zoning ordinance SSREIR is sufficient to meet the requirements of CEQA for compliant projects, meaning that no further, project-specific EIR's for a given oil well are required so long as the new wells fit in the four corners of the existing SSREIR. However, SB 237 could prevent appropriate mitigations measures or other environmental considerations from being applied to drilling projects that are atypical, use emerging technology or technology not considered the SSREIR, or are otherwise not considered in the SSREIR.

To help address some of these concerns, SB 237 adds some environmental guardrails to the application of the SSREIR, briefly:

a) It sets a cap for drilling in Kern County at 2,000 new oil wells, a 26% reduction in total planned wells per year compared to the original estimate in Kern County's oil and gas ordinance EIR. (However, this can be waived under certain CEC findings);

b) It contains a ten-year sunset on the provisions that specify that the SSREIR is sufficient, complete, and not subject to lawsuits for new drilling (However, the SSREIR itself would remain in effect after the sunset);

c) It specifies that CalGEM, rather than Kern County, must be the lead agency in a health protection zone, presumably making it harder to drill new wells in those zone (although not impossible).

*Maintaining capacity to stabilize fuel supply.* Several of this bill's provisions appear to follow recommendations in CEC Vice Chair Gunda's June letter, and would be expected to boost in-state production, which would be expected to support California's refinery capacity, which would be expected to help keep refineries operating in state.

*Using more tools in the toolbox to manage gas prices.* Parts of SB 237 contemplate changes to California's fuel blend to reduce fuel prices. Summer blend gasoline in California contributes less to smog, but is more expensive. California's unique gasoline blendstock, CARBOB, was formulated to help meet California's nation-leading air pollution challenges. However, it also means that fuel in neighboring states cannot be used in California. Both of these measures could be expected to reduce fuel prices, at the cost of increased air pollution. However, these do not address the long-term challenges the state faces in larger-scale decarbonization

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 435 of 837    Page
ID #:17478
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 71 of 464

across all sectors of the economy.

*Navigating the mid-transition.* Whether through the intentional phase-down of fossil fuels in California, shifting global market dynamics, the costs associated with repair and maintenance, or a combination of all of the above and more, it is clearly becoming more and more difficult to profitably operate fossil fuel infrastructure in California. How do we embrace and deploy clean technologies while they are more expensive than the fossil fuel alternatives? How do we maintain the fossil fuel supply we need as it becomes less lucrative and less feasible to do so?

We are in a period described by academics as the "mid-transition". As described in a recent review:

> "Many aspects of transition will be felt, and shaped, directly by individuals because of our direct interactions with energy systems. Even rare missteps are likely to have significant and potentially system design relevant impacts on perception, political support, and implementation. Comparisons of the new system to the old system are likely to rest on experience of a world less affected by climate change, such that concerns about lower reliability, higher costs, and other challenges might be perceived as inherent to zero-carbon systems, versus energy systems facing consequences of climate change and longterm underinvestment."[1]

California's economy today relies on an immense volume of fossil fuels (by some accounts as much as 84% of our total energy today)[2]. In turn, extracting, transporting, refining, distributing, and using those fossil fuels relies on an immense network of infrastructure owned by a number of private companies and operated by tens of thousands of skilled workers. Those private companies rely on certainty about the profitability of their investments. What happens when—not if— it is no longer profitable to operate fossil fuel infrastructure in California? What— if not profit—would compel private companies to continue maintaining and operating their infrastructure? How can California keep its economy afloat and its people thriving in the crucial period between when fossil fuels stop being profitable, and when they stop being needed?

Pursuant to SBX1-2, the California Energy Commission produced a Transportation

---

[1] Grubert and Hastings-Simon, 2022. Designing the mid-transition: A review of medium-term challenges for coordinated decarbonization in the United States. WIRES Climate Change, Vol 13, Issue 3.
[2] California State Profile & Energy Estimates. U.S. Energy Information Administration. https://www.eia.gov/state/?sid=CA

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 436 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 72 of 464
ID #:17479

Fuels Assessment, which has begun to wrestle with some of these questions. One of several possible solutions under consideration is state ownership of refineries, in which, "The State of California would purchase and own refineries in the State to manage the supply and price of gasoline." However, doing so would be extremely costly and represent a significant departure from how this industry has operated in California to date. As the Legislature considers this bill and other proposals to assuage or mitigate the very real tensions of the mid-transition, it is worth also contemplating solutions on the longer time horizon as well.

There is no clear best way to transition the world's fourth largest economy off of fossil fuels. California is leading the way and charting a path to navigate this transition. This monumental task will have consequences, both expected and unforeseen. Nevertheless, the Legislature should evaluate the information and options available and take action before GHG emissions continue unabated, fossil fuel infrastructure falls into disrepair (with potentially catastrophic results), and communities surrounding this infrastructure continue to face air pollution and economic uncertainty alike.

Vice Chair Gunda's June letter described the importance of a holistic strategy for a managed transition away from fossil fuels, alongside more pressing and immediate matters. Boosting in-state production today, as SB 237 proposes to do, to keep critical infrastructure online is a reasonable response to less-than-ideal circumstances. But what lessons can be learned? What could California begin doing now to make the next refinery to announce its closure *less* disruptive to California's well-being, not more? What information is needed about California's refineries (both their operations and the financial liabilities associated with their site remediation) to better equip California to handle the next stage of this transition? Although SB 237 does not answer these questions, it helps get information that might. These continue to be questions the Legislature should consider, lest we find ourselves blindsided by the next nigh-inevitable refinery closure.

**FISCAL EFFECT:** Appropriation: No    Fiscal Com.:    Yes    Local: Yes

**SUPPORT:** (Verified 9/13/25)

350 Humboldt
Associated Builders and Contractors of California
Berry Petroleum Company, LLC
California Business Roundtable
California Independent Petroleum Association

**Provided by LRI History LLC**

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 437 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 73 of 464
ID #:17480

California Resources Corporation and Subsidiaries
California State Association of Electrical Workers
California State Pipe Trades Council
City of Bakersfield
Climate Action California
County of Kern

**OPPOSITION:** (Verified 9/13/25)

Asian Pacific Environmental Network Action
California Coastal Protection Network
California Environmental Justice Alliance Action
California Environmental Voters
Campaign for a Safe and Healthy California
Ceja Action
Center for Biological Diversity
Center on Race, Poverty & the Environment
Central California Environmental Justic Network
Central California Environmental Justice Network
Clean Water Action
Climate First: Replacing Oil & Gas
Communities for a Better Environment
Consumer Watchdog
Earthjustice
Leadership Council for Justice and Accountability
Natural Resources Defense Council
Natural Resources Defense Council
Physicians for Social Responsibility - Los Angeles
Sierra Club
Sierra Club California
The Climate Center


Prepared by:  Heather Walters / E.Q. / (916) 651-4108
9/13/25 11:10:30

**\*\*\*\* END \*\*\*\***

**Provided by LRI History LLC**

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 438 of 837   Page
ID #:17481
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 74 of 464

# EXHIBIT B

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 439 of 837   Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 75 of 464
ID #:17482



U.S. Department
of Transportation

1200 New Jersey Avenue SE
Washington, D.C. 20590

**Pipeline and Hazardous
Materials Safety
Administration**

December 17, 2025

<u>Via Electronic Mail to: cflores@sableoffshore.com</u>

J. Caldwell Flores
President and Chief Operating Officer
Sable Offshore Corp.
845 Texas Ave. Ste 2920
Houston, TX 77002

Re:  Determination of Interstate Classification

Dear Mr. Flores:

This responds to your letter of November 26, 2025 regarding the Las Flores Pipeline owned and
operated by Sable Offshore Corp. (Sable). Your letter notifies the Pipeline and Hazardous
Materials Safety Administration (PHMSA) that Sable has determined the pipeline to be an
interstate pipeline facility under the Pipeline Safety Act (PSA) and requests PHMSA transition
regulatory oversight from the California Office of the State Fire Marshal (OSFM) to PHMSA.

As noted in your letter, portions of the Las Flores Pipeline (previously known as Lines 901 and
903) have been considered intrastate since 2016 and subject to regulatory oversight by OSFM
pursuant to its certification with PHMSA under 49 U.S.C. § 60105(a). Prior to 2016, Lines 901
and 903 were considered interstate and regulated by PHMSA. The classification change in 2016
corresponded to the pipelines' previous owner cancelling tariffs with the Federal Energy
Regulatory Commission (FERC). In 2024, Sable acquired Lines 901 and 903 and other assets
comprising the Las Flores Pipeline, including offshore pipelines transporting crude oil from the
Outer Continental Shelf (OCS) and an onshore processing facility at Las Flores Canyon. Sable
operates the Las Flores Pipeline assets as a single pipeline system transporting crude oil from the
OCS to the Pentland Station terminal in Kern County, California.

Upon receipt of your letter, PHMSA initiated a review of the Las Flores Pipeline. This review
included an on-site inspection on December 9 through December 11, 2025. OSFM
representatives accompanied PHMSA on the inspection. PHMSA also reviewed Sable's written
procedures and records and conducted field observations of the Las Flores facility, the pump
stations at Gaviota and Sisquoc, the control room in Santa Maria, and the offshore Harmony
platform. In addition, PHMSA reviewed the 2025 program inspections conducted by OSFM. For

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 440 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 76 of 464
ID #:17483

2

the following reasons, PHMSA agrees with your determination that the Las Flores Pipeline is an interstate pipeline.

The PSA authorizes PHMSA to prescribe and enforce minimum safety standards for pipeline transportation and for pipeline facilities.[1] The PSA vests with PHMSA exclusive regulatory authority over interstate pipelines and preempts States from adopting or continuing in force safety standards for interstate pipelines.[2] With respect to intrastate pipelines, the PSA provides a State authority may regulate the intrastate pipelines within its borders upon submission to PHMSA of an annual certification.[3] Both the PSA and the Federal pipeline safety regulations define interstate and intrastate pipelines.[4] An interstate pipeline is a pipeline or part of a pipeline used to transport hazardous liquids in interstate or foreign commerce; an intrastate pipeline is a hazardous liquid pipeline that is not an interstate pipeline.

Determining whether a hazardous liquid pipeline is an interstate or intrastate pipeline requires a factual inquiry.[5] To assist in that determination, PHMSA adopted Appendix A to 49 CFR Part 195 providing a statement of agency policy and interpretation on the delineation between Federal and State jurisdiction.[6] In short, "if there is a tariff or concurrence filed with FERC governing the transportation of hazardous liquids over a pipeline facility . . . then [PHMSA] will, as a general rule, consider the facility to be an interstate pipeline facility within the meaning of the [PSA]." The absence of a FERC tariff generally means a pipeline is intrastate; however, in certain situations, PHMSA will consider a pipeline to be interstate despite the lack of a filing with FERC. Several examples of this are listed in Appendix A. As it relates to the Las Flores Pipeline, one example provides that a pipeline originating on the OCS will be considered an interstate pipeline even if the pipeline does not have a tariff with FERC.[7]

PHMSA's evaluation of the Las Flores Pipeline confirms that it transports crude oil from the OCS to an onshore processing facility at Las Flores Canyon and continues the transportation of crude oil from Las Flores Canyon to Pentland, California. Consistent with Appendix A, the Las

---

[1] 49 U.S.C. § 60101 et seq.

[2] 49 U.S.C. § 60104(c). See Olympic Pipe Line Co. v. City of Seattle, 437 F.3d 872, 878 (9th Cir. 2006) (discussing how the "PSA differentiates between the regulation of interstate and intrastate hazardous liquid pipelines.")

[3] 49 U.S.C. § 60105(a). OSFM has a certification with PHMSA to regulate intrastate hazardous liquid pipelines in California.

[4] 49 U.S.C. § 60101(a)(7), (a)(8)(B), (a)(10); 49 CFR § 195.2. See S. Pac. Pipe Lines Inc. v. DOT, 796 F.2d 539 (D.C. Cir. 1986) (finding PHMSA's definition of interstate and intrastate pipelines reasonable under the PSA).

[5] Transportation of Liquids by Pipeline, 46 Fed. Reg. 38,357, 38,359 (Jul. 27, 1981) (PHMSA's predecessor agency (hereafter PHMSA) explained that it had "reviewed examples of what it believes are the most frequent and likely configurations of liquid pipelines and pipeline facilities and considered various ways of cataloging or classifying them as either interstate or intrastate."); see also Shell Oil Co. v. City of Santa Monica, 830 F.2d 1052, 1064 (9th Cir. 1987) (noting that whether the pipeline was interstate or intrastate turned on a disputed issue of fact).

[6] Transportation of Hazardous Liquids by Pipeline; Regulation of Intrastate Pipelines, 50 Fed. Reg. 15,895, 15,897 (Apr. 23, 1985).

[7] 49 CFR Part 195, App. A. "Example 7. Pipeline Company P operates a pipeline that originates on the Outer Continental Shelf. P does not file any tariff for that line with FERC. [PHMSA] will consider the pipeline to be an interstate pipeline facility."

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 441 of 837    Page
ID #:17484
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 77 of 464

3

Flores Pipeline is an interstate pipeline.[8] As portions of the Las Flores Pipeline were previously considered to be intrastate and regulated by OSFM, PHMSA is notifying OSFM that the Las Flores Pipeline is subject to the regulatory oversight of PHMSA. Please direct further correspondence on this matter to Dustin Hubbard, Director, Western Region, Office of Pipeline Safety, PHMSA, at (720) 963-3183.

Sincerely,


Linda Daugherty
Acting Associate Administrator for Pipeline Safety


cc:     James Hosler, Chief, Pipeline Safety Division, OSFM
        Varun Shekhar, Shareholder, Babst Calland Clements & Zomnir, PC

---

[8] PHMSA regulations consider the Las Flores Pipeline to be an "active" pipeline. *See* Pipeline Safety: Clarification of Terms Relating to Pipeline Operational Status, 81 Fed. Reg. 54,512 (Aug. 12, 2016) ("The regulations consider pipelines to be either active and fully subject to all relevant parts of the safety regulations or abandoned.")

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 442 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 78 of 464
ID #:17485

# EXHIBIT C

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 443 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 79 of 464
ID #:17486



U.S. Department
of Transportation
**Pipeline and Hazardous**
**Materials Safety**
**Administration**

12300 W. Dakota Ave., Suite 340
Lakewood, CO  80228

**VIA ELECTRONIC MAIL TO: lyearwood@sableoffshore.com**

December 22, 2025

Mr. Lance Yearwood
Vice President
Pacific Pipeline Company / Sable Offshore Corp.
845 Texas Avenue, Suite 2920
Houston, Texas 77002

RE:     **Approval of Sable Offshore Corp.'s Restart Plan for the Las Flores Pipeline System Line**
        **CA-324 and Line CA-325**

Dear Mr. Yearwood:

From December 4 to December 12, 2025, the Pipeline and Hazardous Materials Safety Administration
(PHMSA) received several documents from Sable Offshore Corp. These documents included:

  1. Line CA-324 and Line CA-325 Fill Plan and Startup Procedures
  2. A letter requesting the removal of pressure restrictions for Line CA-324
  3. A letter requesting the removal of pressure restrictions for Line CA-325
  4. The Las Flores Pipeline Linefill Positioning Plan Assignments
  5. The Las Flores Pipeline Linefill Contact List

These documents addressed the Restart Plan for Line CA-324 and Line CA-325 (previously known as
Plains Line 901 and Line 903, respectively). In addition, PHMSA conducted a field inspection with Sable
Offshore Corp. to discuss its process and safety procedures for the pipeline restart.

PHMSA has reviewed these documents and hereby approves the submitted Restart Plan. This approval is
valid from the date of this letter.

Should you have any questions or concerns, please contact me at (720) 963-3160 or by email at
dustin.hubbard@dot.gov.

Sincerely,


Dustin Hubbard
Director, Western Region
Pipeline and Hazardous Materials Safety Administration

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 444 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 80 of 464
ID #:17487

cc:    Trent Fontenot, Sr. Vice President - Operations, tfontenot@sableoffshore.com
Jim Hosler, Assistant Deputy Director – Pipeline Safety and CUPA, CalFire,
jim.hosler@fire.ca.gov

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 445 of 837   Page
ID #:17488
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 81 of 464

# EXHIBIT D

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 446 of 837   Page
ID #:17489
Case 1:26-cv-01486-KES-CDB   Document 2   Filed 02/20/26   Page 82 of 464

# U.S. DEPARTMENT OF TRANSPORTATION

# PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION

# EMERGENCY SPECIAL PERMIT

## Special Permit Information:

| | |
|---|---|
| **Docket Number:** | 2025-1502 |
| **Requested By:** | Sable Offshore Corp. PPC |
| **Operator ID#:** | 40881 |
| **Date Requested:** | December 19, 2025 |
| **Issuance Date:** | December 23, 2025 |
| **Expiration Date:** | February 21, 2026 |
| **Code Section:** | 49 CFR § 195.452(h)(4)(iii)(H) |

## Grant of Special Permit:

By this order, subject to the terms and conditions set forth below, the Pipeline and Hazardous Materials Safety Administration (PHMSA) Office of Pipeline Safety (OPS)[1] grants this emergency special permit to Sable Offshore Corp. PPC (Sable) for 124.42 miles of 24- and 30-inch diameter hazardous liquid pipelines, Lines CA-324 and CA-325 (*special permit segments*), transporting crude oil from Las Flores Canyon to Pentland in Santa Barbara, San Luis Obispo, and Kern counties, California. This emergency special permit waives compliance from 49 CFR § 195.452(h)(4)(iii)(H), which requires corrosion of or along a longitudinal seam weld be scheduled for evaluation and remediation within 180 days of discovering the condition.

## I.   Purpose and Need

On December 19, 2025,[2] Sable requested an emergency special permit for relief from the requirement to evaluate and remediate corrosion occurring at longitudinal seam welds within 180 days. The *special permit segments* are under polyurethane foam and polyethylene tape wrap insulation, which can inhibit the effectiveness of cathodic protection and contribute to a risk of corrosion due to shielding effects. Sable proposed an alternative approach to safely manage this risk, which was previously reviewed and approved as part of two state waivers issued by the California Office of State Fire Marshal (OSFM) on December 17, 2024 to Sable for the *special permit segments*. PHMSA previously reviewed the state waivers pursuant to 49 U.S.C. § 60118(d).

---

[1] Throughout this special permit, the usage of "PHMSA" means the U.S. Department of Transportation (DOT), Pipeline and Hazardous Materials Safety Administration, Office of Pipeline Safety.

[2] Sable submitted supplemental information related to its application on December 23, 2025.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC                         Page 1 of 16
Emergency Special Permit – Corrosion Mitigation – California

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 447 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 83 of 464
ID #:17490

Sable sought this special permit to implement the terms of a Consent Decree entered in Civil Action No. 2:20-CV-02415 by the U.S. District Court for the Central District of California, which provides, among other requirements, that a "State Waiver" must be applied for and received from OSFM prior to restarting Lines CA-324 and CA-325. The *special permit segments* were previously considered intrastate at the time of entry of the Consent Decree and were regulated by OSFM pursuant to its state certification with PHMSA under 49 U.S.C. § 60105(a). However, the *special permit segments* are now considered interstate pursuant to Sable's designation on November 26, 2025, and PHMSA's concurrence on December 17, 2025. As a result, PHMSA has exclusive pipeline safety regulatory agency over Lines CA-324 and CA-325. The conditions ordered by OSFM in the two state waivers are now being re-issued by PHMSA as a special permit subject to Federal oversight and enforcement.

Sable requested PHMSA grant a special permit for the above reasons on an emergency basis pursuant to 49 U.S.C. § 60118(c)(2) and 49 CFR § 190.341(g). In its application, Sable stated that expedited review of its application was warranted in light of the national energy emergency declared by the President under the National Emergencies Act (50 U.S.C. § 1601 et seq.) in Executive Order 14156 (January 20, 2025). In Executive Order 14156, the President declared a national energy emergency based on a finding that "[t]he United States' insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy."[3]  The Executive Order directs agencies, such as PHMSA, to "identify and exercise any lawful emergency authorities available to them, as well as all other lawful authorities they may possess, to facilitate," among other activities, the "production, transportation, refining, and generation of domestic energy resources."[4]  The Executive Order further directs agencies to "identify and use all lawful emergency or other authorities available to them to facilitate the supply, refining, and transportation of energy in and through the West Coast of the United States . . . ."[5]

Sable's application stated that grant of this special permit on an emergency basis would facilitate the restart of Lines CA-324 and CA-325 to provide relief in response to the acute energy shortage conditions identified in Executive Order 14156 within California and in the West Coast region of the United States.[6]  Sable further noted that grant of this special permit on an emergency basis is appropriate to address the gap in coverage under the OSFM State Waivers created by redesignation of Lines CA-324 and CA-325 as interstate, given that the proposed special permit is substantially the same as that which was previously reviewed and approved by OSFM and PHMSA for issuance of the State Waivers.

This emergency special permit allows Sable to operate Lines CA-324 and CA-325 without being subject to the requirement to evaluate and remediate corrosion of or along a longitudinal seam weld within 180 days. On the condition that Sable comply with the terms and conditions set forth below, the emergency special permit waives compliance with 49 CFR § 195.452(h)(4)(iii)(H) for the *special permit segments*.

---

[3] Exec. Order 14156: Declaring a National Energy Emergency (Jan. 20, 2025), Sec. 1.

[4] Exec. Order 14156: Declaring a National Energy Emergency (Jan. 20, 2025), Sec. 2(a).  The order's definition of "energy" or "energy resources" includes "crude oil," and its definition of "transportation" includes "the physical movement of energy, including through, but not limited to, pipelines." Sec. 1(a); 1(c).

[5] Exec. Order 14156: Declaring a National Energy Emergency (Jan. 20, 2025), Sec. 3(b).

[6] For more information regarding these effects, see Attachments C, D, E, and F.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 2 of 16

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 448 of 837    Page
ID #:17491
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 84 of 464

## II. Special Permit Segments

This emergency special permit pertains to the specified pipeline segments which make up the Las Flores Pipeline called Line CA-324 and CA-325. Line CA-325 can be further divided into two segments: Lines CA-325A and CA-325B. The Las Flores Pipeline is part of the Santa Ynez Pipeline System (SYPS), an interstate pipeline facility that Sable operates from the Outer Continental Shelf off the coast of Santa Barbara to Kern County, California. A map of the special permit segments is available in Revised Attachment A.

**Special Permit Segments:**

| Special Permit Segment Name | Location | Mileage | California County or Counties |
|---|---|---|---|
| CA-324 | Las Flores Canyon Processing Facility to Gaviota Pump Station | 10.86 | Santa Barbara |
| CA-325A | Gaviota Pump Station to Sisquoc Pump Station | 38.72 | Santa Barbara |
| CA-325B | Sisquoc Pump Station to Pentland Station | 74.84 | Santa Barbara; San Luis Obispo; Kern |

## III. Conditions

PHMSA grants this emergency special permit subject to Sable implementing each of the following conditions. These conditions must be implemented and complied with in addition to all applicable requirements of 49 CFR Part 195 except for compliance with limitations on scheduling instances of corrosion on or near longitudinal seam welds for evaluation and remediation within 180 days of discovery in 49 CFR § 195.452(h)(4)(iii)(H), which would be waived.

**General Conditions:**

1) The *special permit segments* may only be used to transport crude oil.

2) Prior to transporting crude oil in the *special permit segments*, Sable must develop and implement procedures for the conditions and requirements described in this emergency special permit.

3) Sable shall not exceed maximum operating pressure (MOP) limits for the *special permit segments*, as follows:

   a) The MOP of Line CA-324 cannot exceed 1003 pounds per square inch gauge (psig).

   b) The MOP of Line CA-325A (the segment of Line CA-325 between Gaviota and Sisquoc stations) cannot exceed 1000 psig.

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 449 of 837   Page
ID #:17492
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 85 of 464

    c) The MOP of Line CA-325B (the segment of Line CA-325 between Sisquoc and Pentland stations) cannot exceed 1292 psig.

4)    Sable shall not exceed maximum operating temperature limits for crude oil transported in the *special permit segments*, as follows:

    a) The maximum operating temperature of the crude oil that is transported in Line CA-324 must not exceed 140 degrees Fahrenheit for more than 12 consecutive hours.

    b) The maximum operating temperature of the crude oil that is transported in Line CA-325A (the segment of Line CA-325 between Gaviota and Sisquoc stations) must not exceed 125 degrees Fahrenheit for more than 12 consecutive hours. Temperature transmitters must be installed on Line CA-325 at Gaviota station to monitor the temperature of Line CA-325A.

    c) The maximum operating temperature of the crude oil that is transported in Line CA-325B (the segment of Line CA-325 between Sisquoc and Pentland stations) must not exceed 110 degrees Fahrenheit for more than 12 consecutive hours. Temperature transmitters must be installed on Line CA-325 at Sisquoc station to monitor the temperature of Line CA-325B.

5)    This emergency special permit does not relieve Sable from complying with applicable requirements under 49 CFR Part 195, other than those waived in this emergency special permit.

6)    This emergency special permit does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).

7)    In-line inspections (ILIs) performed pursuant to this emergency special permit must include:

    a) Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion, defined as follows:

        i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.

        ii. General corrosion means uniform or gradually varying loss of wall thickness over an area.

    b) Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI).

    c) Use of a tool that is at least capable of reliably detecting and sizing crack or crack-like anomalies at a 90 percent POD and POI.

8)    Prior to placing CA-324 in operation, Sable must perform fracture toughness tests on the existing 24" pipe from CA-324 in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from the predominant existing 24" pipe, specifically API 5L X65 HF-ERW pipe with a nominal thickness of 0.344" that was manufactured by Nippon Steel Corp. in the 1980s. At least three (3) separate tests must be performed to obtain the fracture toughness values of the

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 4 of 16

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 450 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 86 of 464
ID #:17493

pipe body, heat affected zone (HAZ)[7], and the HF-ERW long seam weld on the pipe to represent the fracture toughness of CA-324 (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the HF-ERW long seam weld). The lowest fracture toughness value must be applied to conditions 11, 16, 17, and 21. Sable may use pipe samples taken opportunistically during ongoing maintenance and repair efforts on Line CA-324.[8]

9)  Prior to placing Line CA-325 (including CA-325A and CA-325B) in operation, Sable must perform fracture toughness tests on the existing 30" pipe from CA-325A/B in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from both of the two following predominant existing 30" pipe specifications:

   a)  API 5L X70 pipe with a nominal thickness of 0.281" that was manufactured by the various pipe mills in the 1980s.

   b)  API 5L X65 pipe with a nominal thickness of 0.344" that was manufactured by the various pipe mills in the 1980s.

At least three (3) separate tests must be performed from each pipe mill, for both of the two pipe specifications listed above, to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ), and the DSAW long seam weld on the pipe to represent the fracture toughness of CA-325A/B (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the DSAW long seam weld). The lowest fracture toughness value must be applied to conditions 11, 16, 17, and 21. Sable may use pipe samples taken opportunistically during ongoing maintenance and repair efforts on Line CA-325A/B.[9]

10)  All existing immediate and 180-day repair conditions must be evaluated and remediated pursuant to the Consent Decree repair criteria prior to restarting CA-325A/B.[10] Upon restart Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by PHMSA. Sable must utilize the Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results to identify, evaluate and remediate any immediate and 180-day repair conditions that are listed in this emergency special permit.

11)  Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines*. If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss

[7] The heat affected zone (HAZ), as used in this emergency special permit, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.

[8] Sable indicated in its application that it has already completed all of the testing required in this condition. Sable must submit all fracture toughness results to PHMSA prior to restarting Line CA-324.

[9] Sable indicated in its application that it has already completed the testing required in this condition. Sable must submit all fracture toughness results to PHMSA prior to restarting Line CA-325.

[10] Sable indicated in its application that it has already completed the repairs required in this sentence. Sable must submit all of the results to PHMSA prior to restarting CA-324 and CA-325.

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 451 of 837   Page
ID #:17494
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 87 of 464

anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

12) Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of CA-324 and CA-325A/B.

13) Pressure Testing:[11]

    a) Prior to placing CA-324 in operation, Sable must conduct a spike hydrostatic pressure test of CA-324 at a minimum pressure that is at least 1.5 times the maximum operating pressure (MOP) or 100% specified minimum yield strength (SMYS), for a minimum of 15 minutes after the spike test pressure is stabilized. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-324:

        i. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

        ii. All anomalies that have a predicted failure pressure less than or equal to 1.6 times MOP.

    b) Immediately following the spike hydrostatic pressure test specified in Condition 13(a), Sable must conduct an 8-hour hydrostatic pressure test of CA-324 at a minimum of 1.25 times the MOP.

    c) Prior to placing Line CA-325A (segment of Line 325 between Gaviota and Sisquoc stations) in operation, Sable must conduct a spike hydrostatic pressure test of CA-325A at a minimum pressure that is at least 1.39 times the MOP, for a minimum of 15 minutes after the spike test pressure is stabilized. Sable must ensure that the spike hydrostatic pressure at the highest elevation of each testable segment is at least 1.39 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-325A:

        i. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

        ii. All anomalies that have a predicted failure pressure less than or equal to 1.5 times MOP.

    d) Immediately following the spike hydrostatic pressure test specified in Condition 13(c), Sable must conduct an 8-hour hydrostatic pressure test of CA-325A at a minimum of 1.25 times the MOP.

    e) Prior to placing Line CA-325B (segment of Line 325 between Sisquoc and Pentland stations) in operation, Sable must conduct a hydrostatic pressure test of CA-325B at a minimum pressure of 1.25 times the MOP, for a minimum of 8 hours. Sable must ensure that the hydrostatic pressure at the highest elevation of each testable segment is at least 1.25 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the

---

[11] Sable indicated in its application that it has already completed all of the testing and repairs required in this Condition. Sable must submit the results to PHMSA prior to restart and confirm that no failures occurred during the required pressure testing.

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 452 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 88 of 464
ID #:17495

hydrostatic test on CA-325B:

    i. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

    ii. All anomalies that have a predicted failure pressure less than or equal to 1.4 times MOP.

f) Sable must obtain the Test ID for each hydrostatic pressure test from PHMSA (or OSFM if such testing was performed prior to November 26, 2025) and have the approved independent testing firm forward separately the certified test results to PHMSA or the OSFM, as applicable.

g) Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 CFR Part 195 Subpart E – Pressure Testing and monitored by an independent testing firm listed under PHMSA or OSFM (as applicable) approved hydrostatic testing companies.

h) Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported to PHMSA.[12]

i) Section(s) of the *special permit segments* that failed during the required hydrotesting must be repaired by removing and replacing the failed section. PHMSA reserves the right to revoke this emergency special permit if failure(s) raise the concern that the *special permit segments* cannot be safely operated.

14) In-Line Inspection (ILI) Assessment and Frequency:

a) Prior to performing in-line inspections of the *special permit segment*, Sable shall provide PHMSA with a written notification to PHMSA describing its assessment plan with the following information:

    i. Dates for integrity assessment

    ii. In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[13] to assess the integrity of the subject pipe segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications;

    iii. In-line inspection tool vendor(s)

    iv. Required tool specifications including operational specifications and anomaly sizing tolerances

    v. Tool validation methodology

    vi. Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications

---

[12] All submissions to PHMSA required by this emergency special permit shall be submitted through email to the OPS Western Region Director, Dustin Hubbard, email address: Dustin.Hubbard@dot.gov or his designee.

[13] Industry standards referenced in this emergency special permit must utilize the editions that are incorporated by reference in 49 CFR 195.3 unless another edition is explicitly specified in this emergency special permit.

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 453 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 89 of 464
ID #:17496

      vii.  Criteria used to identify locations for excavation and field verification

     viii.  Non-destructive examination

b) Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.

c) Metal Loss Tool(s):

      i.  Initial ILI tool runs – Each year, during the first two (2) years of operating the *special permit segments*, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU). Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months. If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.

      ii.  Subsequent ILI tool runs – After the first two (2) years of operating the *special permit segments*, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the *special permit segment* within 30 days after it was deemed to be unsuccessful. All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

d) Crack Detection Tools - Sable shall conduct at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15 months[14] or the ILI assessment must be assessed at more frequent intervals if condition 21 determined a shorter assessment interval.

      i.  These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.

      ii.  USCD Performance Specification Requirements

          1.  The USCD tools must have a probability of detection that is

---

[14] Sable may petition PHMSA to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to PHMSA approval.

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 454 of 837    Page
ID #:17497
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 90 of 464

≥ 90% for axial and circumferential cracks.

2. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.

3. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.

4. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks.

e) Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

f) Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the *special permit segment* in which the ILI tool velocity was outside of the specified tool velocity range.

g) All ILI tool runs must obtain the Test ID from PHMSA prior to run.

h) Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.

i) Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

j) Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals. Sable must document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[15] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different. If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

k) Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second

---

[15] A minimum of four (4) independent direct examination excavations must be used for unity plots.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC                                    Page 9 of 16
Emergency Special Permit – Corrosion Mitigation – California

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 455 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 91 of 464
ID #:17498

Edition, April 2013).

15)  Discovery of Condition: The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

16)  Immediate Repair Conditions:[16]

  a)  A crack or crack-like anomaly that meets any of the following criteria:

    i.  Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.

    ii.  Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.

  b)  Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.

  c)  Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[17]

17)  180-Day Repair Conditions:[18]

  a)  A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.

  b)  Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.

  c)  All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[19]

  d)  For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

18)  Corrosion Growth Rate Analysis (CGRA):

  a)  Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to

---

[16] The criteria specified in this emergency special permit is supplemental to, and does not relieve Sable from complying with, the requirements set forth in 49 CFR 195.452(h)(4)(i). All immediate repair conditions must be remediated with a permanent repair method.

[17] Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria. General corrosion means uniform or gradually varying loss of wall thickness over an area.

[18] The criteria specified in this emergency special permit is supplemental to, and does not relieve Sable from complying with, the requirements set forth in 49 CFR 195.452(h)(4)(iii), except for those associated with 49 CFR 195.452(h)(4)(iii)(H). All immediate repair conditions must be remediated with a permanent repair method.

[19] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth. If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify PHMSA, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 CFR § 195.452 until the indication is remediated or until otherwise authorized by PHMSA.

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 456 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 92 of 464
ID #:17499

prior ILI) and perform pipeline remediations needed to assure the integrity of the *special permit segments* is maintained.[20] The timing of remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.

b) The CGRA procedure must include ILI data matching methods[21] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.

c) Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.

d) When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates.[22]

e) All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

19) Pressure Reduction: If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in this emergency special permit, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

20) In Field Direct Examination of Pipe:

a) Direct examinations[23] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[24] PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.

b) Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition. However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:

i. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.

ii. Sable must increase the metal loss anomaly's depth by 20% when

---

[20] At a minimum, Sable must include signal matching between ILI data sets.

[21] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

[22] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

[23] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.

[24] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complemented by shear wave technology or inspection by phased array ultrasonic testing.

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 457 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 93 of 464
ID #:17500

they input it into the formula for calculating the number of wraps needed for repair method 5.

    iii. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs. If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

  c) Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

  d) Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy. Sable must recoat in accordance with their coating repair procedure.[25]

  e) All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

21)   Integrity Management:

  a) A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.

    i. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 CFR § 192.712(d)(1).

    ii. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 CFR § 192.712(d)(2).

  b) Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.

  c) When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

  d) Sable must send all field measurements to the ILI tool vendor within 90 days

---

[25] The coating procedure must be submitted to PHMSA prior to the effective date of this emergency special permit.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 12 of 16

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 458 of 837   Page
ID #:17501
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 94 of 464

of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

e) Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the *special permit segments*. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by PHMSA prior to being selected.

f) Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC) interference or direct current (DC) interference or shorting that could contribute to external corrosion is

g) occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

22) Data Requirements for Predicted Failure Analysis:

a) Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

b) The analyses performed in accordance with this emergency special permit must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in traceable, verifiable, and complete records.

23) Recordkeeping:

a) Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this emergency special permit shall be kept for the life of the *special permit segments* and must be submitted to PHMSA, in the manner requested (electronic, hardcopy, or other format) within 30 days.

b) Sable must maintain the following records:

i. Technical approach used for the analysis

ii. All data used and analyzed

iii. Pipe and longitudinal weld seam properties

iv. Procedures used to implement emergency special permit conditions

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 13 of 16

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 459 of 837    Page
ID #:17502
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 95 of 464

    v.      Evaluation methodology used

    vi.     Models used

    vii.    Direct in situ examination data

    viii.   All in-line inspection tool assessments information evaluated

    ix.     Pressure test data and results

    x.      All in-the-ditch assessments performed on the ***special permit segments***

    xi.     All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results

    xii.    All finite element analysis results

    xiii.   The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology

    xiv.   The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods

    xv.    Safety factors used for fatigue life and/or predicted failure pressure calculations

    xvi.   Reassessment time interval and safety factors

    xvii.  The date of the review

    xviii. Confirmation of the results by qualified technical subject matter expert(s)

    xix.   Approval by responsible Sable management personnel

    xx.    Records of additional preventive and mitigative (P&M) measures performed

    xxi.   Reports required by this emergency special permit.

24)    Reporting:

    a)  Any release on the ***special permit segments*** shall be reported to PHMSA at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery.[26]

    b)  An email notification shall be made at least three (3) days prior to a ***special permit segment*** being exposed for non-emergency purposes of field evaluation and repair to PHMSA. The email notification shall include, if applicable:

        i.  Tool type and run date

        ii.  Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)

---

[26] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state, or Federal regulations.

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 460 of 837    Page
ID #:17503
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 96 of 464

   iii. Dig sheets

   iv. Field contact information for Sable

   v. Time and location of the field evaluation and repair.

 c) Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run to PHMSA and include:

   i. Tool type

   ii. Run date

   iii. Summary of Conditions Report[27]

   iv. Final Vendor Report and Pipe Tally

 d) Sable shall provide a report to PHMSA by June 15th of every year for the duration of this special permit, including any renewals. The report shall be submitted to PHMSA. At a minimum, the annual report shall contain the following, if applicable:

   i. A Closure Report for the previous calendar (CY) which contains:

    1. Features that were remediated in previous CY, including documentation for in-the-ditch assessments and repairs

    2. Identify features that remain to be assessed

    3. Unity Plots for previous ILI runs

   ii. Fracture mechanics and pressure cycling analyses in accordance with Condition 21(a);

   iii. The third-party ILI expert reviews in accordance with condition 21(e).

   iv. AC and DC Interference surveys that are due in accordance with condition 21(f).

   v. A copy of the CGRA for prior year including:

    1. Mean corrosion growth rate for the *special permit segments*

    2. Distribution graph of the corrosion growth rate for the *special permit segments* (e.g. occurrences (#) vs. corrosion rate (mpy)

The above conditions are based on PHMSA's review and consideration of information provided by Sable, including information in their emergency special permit application which can be found at Docket No. PHMSA-2025-1502 in the Federal Docket Management System located at www.regulations.gov. PHMSA has determined the conditions listed above would be necessary to ensure this Emergency Special Permit is not inconsistent with pipeline safety.

---

[27] PHMSA may stipulate specific formatting or other information (e.g., condition type, anomaly details, remaining strength calculation method, failure pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 461 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 97 of 464
ID #:17504

## IV. Limitations:

This special permit is subject to the limitations set forth in 49 CFR § 190.341, as well as the following limitations:

1) This emergency special permit is limited to an initial term of sixty (60) days from the date of issuance. If Sable elects to seek renewal of this emergency special permit, it must submit a renewal request to PHMSA pursuant to 49 CFR § 190.341(g).

2) Should Sable fail to comply with any conditions of this emergency special permit or should PHMSA determine that this emergency special permit is no longer appropriate or is inconsistent with pipeline safety, PHMSA may revoke the emergency special permit and require Sable to comply with all appropriate regulatory requirements.

3) PHMSA may order the *special permit segments* to be shutdown at any time.

4) PHMSA may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for failure to comply with this emergency special permit. The terms and conditions of any compliance order shall take precedence over the terms of this emergency special permit.

5) In the event of conflict between the conditions of this emergency special permit and industry standards, the emergency special permit conditions shall prevail.

6) If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the emergency special permit, Sable must provide PHMSA written notice of the change within 60 days of the consummation date. In the event of such transfer, PHMSA reserves the right to revoke, suspend, or modify the emergency special permit.

AUTHORITY: 49 United States Code 60118 (c)(1) and 49 CFR § 1.97.

Issued in Washington, D.C., on December 23, 2025.

**LINDA GAIL DAUGHERTY**
Digitally signed by
LINDA GAIL DAUGHERTY
Date: 2025.12.23
15:48:57 -05'00'

Linda Daugherty
Acting Associate Administrator
  for Pipeline Safety

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 16 of 16

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 462 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 98 of 464
ID #:17505

**PROOF OF SERVICE**

I, **Kim Niz**, declare:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Alston & Bird LLP, 350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071.

On January 21, 2026, I served the document(s) **PACIFIC PIPELINE COMPANY'S VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF** on the interested parties stated below, by the following means of service:

Brandon Walker
Jack C. Nick
Isabella A. Panuccini
1300 I Street, Suite 125
Sacramento, CA 95814
Telephone: (916) 210-6395
Fax: (916) 327-2319
Brandon.Walker@doj.ca.gov
Jack.Nick@doj.ca.gov
Isabella.Panuccini@doj.ca.gov
Attorneys for Defendant State of California

☒   BY ELECTRONIC SERVICE on the date stated below, I caused the document(s) described above to be served electronically on the recipients designated on the Transaction Receipt pursuant to the parties' stipulation establishing the authorizing e-service of documents.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on January 21, 2026, at Los Angeles, California.

*/s/ Kim Niz*
_____
Kim Niz

VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 463 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 99 of 464
ID #:17506

# Exhibit C

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*
Jeffrey D. Dintzer, (SBN 139056), Alston & Bird LLP, 350 S. Grand Ave., 51st Floor, Los Angeles, CA 90071
Benjamin J. Hanelin, (SBN 237595), Paul Hastings, 1999 Avenue of the Stars, Century City, CA 90067

TELEPHONE NO.: (213) 576-1000 / (310) 620-5879     FAX NO.: (213) 576-1100 / (310) 620-5899
EMAIL ADDRESS: jeffrey.dintzer@alston.com; benjaminhanelin@paulhastings.com
ATTORNEY FOR *(Name):* Plaintiff Pacific Pipeline Company

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF KERN**
STREET ADDRESS: 1215 Truxtun Ave
MAILING ADDRESS: 1215 Truxtun Ave
CITY AND ZIP CODE: Bakersfield, CA 93301
BRANCH NAME: Metropolitan Division

CASE NAME:
Pacific Pipeline Company v. State of California

**FOR COURT USE ONLY**

**ELECTRONICALLY FILED**
Superior Court of California,
County of Kern
By: Marina Mercado, Deputy Clerk
**10/17/25 12:18 PM**

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| [x] **Unlimited** (Amount demanded exceeds $35,000)    [ ] **Limited** (Amount demanded is $35,000 or less) | [ ] Counter    [ ] Joinder<br>Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | BCV25103508<br>JUDGE: Barmann, Bernard C. Jr<br>DEPT.: H |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[x] Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [ ] is [x] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
a. [ ] Large number of separately represented parties
b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
c. [ ] Substantial amount of documentary evidence
d. [ ] Large number of witnesses
e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [ ] monetary b. [x] nonmonetary; declaratory or injunctive relief c. [ ] punitive
4. Number of causes of action *(specify):* one
5. This case [ ] is [x] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*
Date: October 17, 2025
Jeffrey D. Dintzer

_____     ▶     _____
(TYPE OR PRINT NAME)                          (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.    Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. January 1, 2024] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>www.courts.ca.gov |

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 465 of 837    Page
ID #:17508
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 101 of 464

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET                    CM-010

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
  Damage/Wrongful Death
Uninsured Motorist (46) *(if the*
  *case involves an uninsured*
  *motorist claim subject to*
  *arbitration, check this item*
  *instead of Auto)*
**Other PI/PD/WD (Personal Injury/**
**Property Damage/Wrongful Death) Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/
    Wrongful Death
Product Liability *(not asbestos or*
  *toxic/environmental)* (24)
Medical Malpractice (45)
  Medical Malpractice–
    Physicians & Surgeons
  Other Professional Health Care
    Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip
    and fall)
  Intentional Bodily Injury/PD/WD
    (e.g., assault, vandalism)
  Intentional Infliction of
    Emotional Distress
  Negligent Infliction of
    Emotional Distress
  Other PI/PD/WD
**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
  Practice (07)
Civil Rights (e.g., discrimination,
  false arrest) *(not civil*
  *harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice
    *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)
**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease
    Contract *(not unlawful detainer*
      *or wrongful eviction)*
  Contract/Warranty Breach–Seller
    Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/
    Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open
  book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally*
  *complex)* (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute
**Real Property**
Eminent Domain/Inverse
  Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent*
    *domain, landlord/tenant, or*
    *foreclosure)*
**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal*
  *drugs, check this item; otherwise,*
  *report as Commercial or Residential)*
**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court
    Case Matter
  Writ–Other Limited Court Case Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor Commissioner
  Appeals

**Provisionally Complex Civil Litigation (Cal.**
**Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
  *(arising from provisionally complex*
  *case type listed above)* (41)
**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of County)
  Confession of Judgment *(non-domestic*
    *relations)*
  Sister State Judgment
  Administrative Agency Award
    *(not unpaid taxes)*
  Petition/Certification of Entry of
    Judgment on Unpaid Taxes
  Other Enforcement of Judgment Case
**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-*
    *harassment)*
  Mechanics Lien
  Other Commercial Complaint
    Case *(non-tort/non-complex)*
  Other Civil Complaint
    *(non-tort/non-complex)*
**Miscellaneous Civil Petition**
Partnership and Corporate
  Governance (21)
Other Petition *(not specified above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief From Late Claim
  Other Civil Petition

CM-010 [Rev. January 1, 2024]                    **CIVIL CASE COVER SHEET**                    Page 2 of 2

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 466 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 102 of 464
ID #:17509

POS-010

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*<br>Jeffrey D. Dintzer (SBN 139056); Garrett B. Stanton (SBN 324775)<br>ALSTON & BIRD LLP<br>350 South Grand Avenue, Suite 5100 Los Angeles, CA 90071<br>TELEPHONE NO.: (213) 576-1000 | FAX NO. (213) 576-1100 | E-MAIL ADDRESS:<br>ATTORNEY FOR *(Name):* Plaintiffs: PACIFIC PIPELINE COMPANY | *FOR COURT USE ONLY*<br><br>**ELECTRONICALLY FILED**<br>Superior Court of California,<br>County of Kern<br>By: Karren Blanton<br>Deputy Clerk<br>**11/14/25 11:33 AM** |

| | |
|---|---|
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF KERN**<br>STREET ADDRESS: 1215 Truxtun Avenue<br>CITY AND ZIP CODE: Bakersfield, CA 93301<br>BRANCH NAME: BAKERSFIELD COURT | |
| PLAINTIFF/PETITIONER: PACIFIC PIPELINE COMPANY, a Delaware corporation<br>DEFENDANT/RESPONDENT: STATE OF CALIFORNIA | CASE NUMBER:<br>BCV25103508 |
| **PROOF OF SERVICE OF SUMMONS** | Ref. No. or File No.:<br>2513715CE |

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.

2. I served copies of:
   a. ☑ Summons
   b. ☑ Complaint
   c. ☑ Alternative Dispute Resolution (ADR) package
   d. ☐ Civil Case Cover Sheet
   e. ☐ Cross-Complaint
   f. ☑ other *(specify documents):* **NOTICE OF ASSIGNMENT TO JUDICIAL OFFICER FOR ALL PURPOSES, NOTICE OF ORDER TO SHOW CAUSE RE: CALIFORNIA RULES OF COURT, RULE 3.110, AND NOTICE OF CASE MANAGEMENT CONFERENCE FILED NOVEMBER 3, 2025; NOTICE OF ORDER TO SHOW CAUSE RE: CALIFORNIA RULES OF COURT, RULE 3.110, AND NOTICE OF CASE MANAGEMENT CONFERENCE FILED OCTOBER 9, 2025**

3. a. Party served *(specify name of party as shown on documents served):*
   **STATE OF CALIFORNIA**

   b. ☑ Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a):*
   **M. Brooks (Black, Female, 40yrs, 6'0", 180lbs, Brown eyes, Bald) #50 Badge, Authorized person to accept service of process**

4. Address where the party was served: **1300 "I" Street**
   **Sacramento, CA 95814**

5. I served the party *(check proper box)*
   a. ☑ **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date):* **11/5/2025** (2) at *(time):* **1:11 PM**

   b. ☐ **by substituted service.** On *(date):* at *(time):* I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3):*

   (1) ☐ **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him of her of the general nature of the papers.

   (2) ☐ **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.

   (3) ☐ **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him of her of the general nature of the papers.

   (4) ☐ I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., §415.20). I mailed the documents on *(date):* from *(city):* **or** ☐ a declaration of mailing is attached.

   (5) ☐ I attach a **declaration of diligence** stating actions taken first to attempt personal service.

Form Approved for Mandatory Use<br>Judicial Council of California<br>POS-010 [Rev. January 1, 2007]
**PROOF OF SERVICE OF SUMMONS**
Code of Civil Procedure, § 417.10<br>**POS010-1/2513715**

| Plaintiff: PACIFIC PIPELINE COMPANY, a Delaware corporation | CASE NUMBER: |
|---|---|
| Defendant: STATE OF CALIFORNIA | BCV25103508 |

c. ☐ **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

    (1) on *(date):*                                  (2) from *(city):*

    (3) ☐ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed* Notice and Acknowledgement of Receipt.) (Code Civ. Proc., § 415.30.)

    (4) ☐ to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

d. ☐ **by other means** *(specify means of service and authorizing code section):*

    ☐ Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:

    a. ☐ as an individual defendant.

    b. ☐ as the person sued under the fictitious name of *(specify):*

    c. ☐ as occupant.

    d. ☑ On behalf of *(specify):* **STATE OF CALIFORNIA**
       under the following Code of Civil Procedure section:

| | |
|---|---|
| ☐ 416.10 (corporation) | ☐ 415.95 (business organization, form unknown) |
| ☐ 416.20 (defunct corporation) | ☐ 416.60 (minor) |
| ☐ 416.30 (joint stock company/association) | ☐ 416.70 (ward or conservatee) |
| ☐ 416.40 (association or partnership) | ☐ 416.90 (authorized person) |
| ☑ 416.50 (public entity) | ☐ 415.46 (occupant) |
| | ☐ other: |

7. **Person who served papers**

    a. Name: **Brian Bernal - Ace Attorney Service, Inc.**

    b. Address: **800 S. Figueroa Street, Suite 900  Los Angeles, CA 90017**

    c. Telephone number: **(213) 623-3979**

    d. **The fee** for service was: **$ 135.72**

    e. I am:

        (1) ☐ not a registered California process server.

        (2) ☐ exempt from registration under Business and Professions Code section 22350(b).

        (3) ☑ registered California process server:
            (i) ☐ owner     ☑ employee     ☐ independent contractor.
            (ii) Registration No.: **2023-044**
            (iii) County: **SACRAMENTO**

8. ☑ I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

or

9. ☐ I am a California sheriff or marshal and I certify that the foregoing is true and correct.

Date: **11/6/2025**

**Brian Bernal**
(NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)

▶         (Signature - Per CC §1633.7)

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 468 of 837   Page
ID #:17511
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 104 of 464

ROB BONTA
Attorney General of California
BRANDON S. WALKER SBN. 254581
Supervising Deputy Attorney General
JACK C. NICK SBN. 160196
ISABELLA A. PANUCCINI SBN. 318984
Deputy Attorneys General
1300 I Street, Suite 125
Sacramento, CA 95814
Telephone: (916) 210-6395
Fax: (916) 327-2319
E-mail: Brandon.Walker@doj.ca.gov
*Attorneys for Defendant State of California*

**ELECTRONICALLY FILED**
Superior Court of California,
County of Kern
By: Marina Mercado
Deputy Clerk
**12/5/25 1:54 PM**

*Exempt from Filing Fees Pursuant
to Government Code § 6103*

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF KERN

METROPOLITAN DIVISION

| | |
|---|---|
| **Pacific Pipeline Company, A Delaware Corporation,**<br><br>Plaintiff,<br><br>v.<br><br>**State of California and DOES 1 through 25,**<br><br>Defendants. | Case No. BCV25103508<br><br>**NOTICE OF MOTION AND MOTION TO CHANGE VENUE**<br><br>Date: February 3, 2026<br>Time: 8:30 a.m.<br>Dept: H<br>Judge: Hon. Bernard C. Barmann, Jr.<br>Action Filed: September 29, 2025 |

1

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 469 of 837   Page
ID #:17512
Case 1:26-cv-01486-KES-CDB   Document 12   Filed 02/20/26   Page 105 of 464

## NOTICE OF MOTION AND MOTION TO CHANGE VENUE

TO ALL PARTIES AND ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on February 3, 2026, at 8:30 a.m., in Department H of the Superior Court of California for the County of Kern, Metropolitan Division, located at 1215 Truxtun Avenue, Bakersfield, California 93301, Defendant State of California will move and hereby does move this Court for an order transferring the above-referenced action to the Superior Court of California for the County of Santa Barbara.

This Motion to Change Venue (Motion) is made pursuant to Code of Civil Procedure sections 392, 396b, and 397, subdivisions (a) and (c). This Court is not the proper venue for this action and the convenience of witnesses and the ends of justice would be promoted by the change.

This action seeks declaratory relief in the form of a judicial declaration that the oil pipelines (Las Flores Pipelines) owned by Plaintiff Pacific Pipeline Company are not subject to the newly-enacted Senate Bill 237. However, the potentially justiciable claim in this case relates to portions of the Las Flores Pipelines within the Coastal Zone of California, which does not extend to Kern County. Accordingly, venue is not proper in this Court and the action should be transferred to Santa Barbara County, where the pipelines within the Coastal Zone are located and several other lawsuits involving the Las Flores Pipelines are already pending.

Alternatively, the only potential witnesses in this action are officials or staff members of the California Coastal Commission or the Office of the State Fire Marshal (OSFM). Both the Commission and OSFM are nonparties. (See Gov. Code, § 11043, subs. (c), (d).) These witnesses are already participating in multiple litigations involving the Las Flores Pipelines in Santa Barbara County and it is inconvenient and disruptive to their duties to require their participation in separate litigation involving the Las Flores Pipelines in Kern County as well. Moreover, most of the pipelines and all of the issues related to the Coastal Zone, including the potential impacts on the Coastal Zone from restarting the pipelines, are in Santa Barbara County. Accordingly, this case should be transferred to the Superior Court for Santa Barbara County for the additional and independent reason that transfer would be more consistent with the convenience of nonparty witnesses and the ends of justice.

2

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 470 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 106 of 464
ID #:17513

Defendant State of California bases this Motion on this notice of motion and motion, the accompanying memorandum of points and authorities, the concurrently-filed declaration of Brandon S. Walker, the pleadings and papers on file in this action, and any such other and further evidence as the Court may consider at the hearing on this Motion.

Dated:  December 5, 2025                             Respectfully submitted,

                                                    ROB BONTA
                                                    Attorney General of California
                                                    BRANDON S. WALKER
                                                    Supervising Deputy Attorney General
                                                    JACK C. NICK
                                                    Deputy Attorney General
                                                    ISABELLA A. PANICUCCI
                                                    Deputy Attorney General


                                                    /s/ Brandon S. Walker


                                                    BRANDON S. WALKER
                                                    Supervising Deputy Attorney General
                                                    *Attorneys for Defendant*
                                                    *State of California*

SA2025306665
39502728.docx

3

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 471 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 107 of 464
ID #:17514

## DECLARATION OF SERVICE BY E-MAIL

**Case Name:** Pacific Pipeline Company, A Delaware Corporation v. State of
California
**Case Number:** BCV25103508
**Party Represented:** State of California

**Declaration of Electronic Service**

1. I am at least 18 years of age and not a party to this matter.

2. I am employed in the Office of the Attorney General of the State of California. My
business address is 1300 I Street, Suite 125, Sacramento, CA 95814, County of
Sacramento.

3. My electronic service address is Valerie.Tamulevich@doj.ca.gov.

4. On December 5, 2025, I electronically served the following document[s]:

**NOTICE OF MOTION AND MOTION TO CHANGE VENUE**

5. I electronically served the aforementioned document[s] by emailing them to the
following individual[s]:

**PLEASE SEE ATTACHED SERVICE LIST**

I declare under penalty of perjury under the laws of the State of California and the United States
of America that the foregoing is true and correct, and that this declaration was executed on
December 5, 2025.

| Valerie A. Tamulevich | /s/ Valerie A. Tamulevich |
|:---:|:---:|
| Declarant | Signature |

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 472 of 837    Page
ID #:17515
Case 1:26-cv-01486-KES-CDB    Document 15    Filed 02/20/26    Page 108 of 464

## SERVICE LIST

Jeffrey Dintzer
Garrett B. Stanton
ALSTON & BIRD
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071
**E-mail Address:** jeffrey.dintzer@alston.com
**E-mail Address:** garrett.stanton@alston.com

Benjamin J. Hanelin
Natalie C. Rogers
PAUL HASTINGS LLP
1999 Avenue of the Stars, 27th Floor
Century City, CA 90067
**E-mail Address:** benjaminhanelin@paulhastings.com
**E-mail Address:** natalierogers@paulhastings.com

SA2025306665
39501664.docx

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 473 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 109 of 464
ID #:17516

ROB BONTA
Attorney General of California
BRANDON WALKER SBN. 254581
Supervising Deputy Attorney General
JACK C. NICK SBN. 160196
ISABELLA A. PANUCCINI SBN. 318984
Deputy Attorneys General
· 1300 I Street, Suite 125
Sacramento, CA 95814
Telephone: (916) 210-6395
Fax: (916) 327-2319
E-mail: Brandon.Walker@doj.ca.gov
*Attorneys for Defendant State of California*

**ELECTRONICALLY FILED**
Superior Court of California,
County of Kern
By: Marina Mercado
Deputy Clerk
**12/5/25 1:54 PM**

*Exempt from Filing Fees Pursuant to
Government Code § 6103*

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF KERN

METROPOLITAN DIVISION

| | |
|---|---|
| **Pacific Pipeline Company,** | Case No. BCV25103508 |
| Plaintiff, | |
| v. | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO CHANGE VENUE** |
| **State of California and Does 1 through 25,** | Date: February 3, 2026 |
| Defendants. | Time: 8:30 a.m. |
| | Dept: H |
| | Judge: Hon. Bernard C. Barmann, Jr. |
| | Action Filed: September 29, 2025 |

1

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 474 of 837   Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 110 of 464
ID #:17517

**TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................................. 5

STATEMENT OF FACTS ................................................................................................... 6

DISCUSSION ..................................................................................................................... 14

    I.    The Superior Court of Kern County Is the Wrong Court and the Proper
        Venue Is in Santa Barbara County. ................................................................. 14

    II.    Alternatively, this Case Should be Transferred to the Superior Court for
        Santa Barbara County for the Convenience of Nonparty Witnesses and the
        Ends of Justice. ............................................................................................... 17

CONCLUSION ................................................................................................................... 18

Memorandum of Points and Authorities in Support of Motion to Change Venue (BCV25103508)

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 475 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 111 of 464
ID #:17518

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Alexander v. Superior Court*
(2003) 114 Cal.App.4th 723 .......................................................................................... 14

*Brown v. Superior Court*
(1984) 37 Cal.3d 477 ..................................................................................................... 15

*Crestwood Behavioral Health, Inc. v. Superior Court*
(2021) 60 Cal.App.5th 1069 .......................................................................................... 14

*Dow AgroSciences LLC v. Superior Court*
(2017) 16 Cal.App.5th 1067 .......................................................................................... 15

*Freeman v. Dowling*
(1933) 219 Cal. 213 ....................................................................................................... 15

*General Steel & Wire Co. v. Stryco Mfg. Co.*
(1963) 213 Cal.App.2d 495 ........................................................................................... 15

*Hasrat v. Superior Court for Los Angeles County*
(1966) 241 Cal.App.2d 330 ........................................................................................... 14

*Housing Group v. United Nat. Ins. Co.*
(2001) 90 Cal.App.4th 1106 .......................................................................................... 15

*Massae v. Superior Court*
(1981) 118 Cal.App.3d 527 ...................................................................................... 15, 16

*Redevelopment Agency of the City of San Marcos v. Commission on State*
*Mandates*
(1996) 43 Cal.App.4th 1188 .......................................................................................... 17

*State of California v. Superior Court*
(1974) 12 Cal.3d 237 ............................................................................................... 15, 17

*Wilson & Wilson v. City Council of Redwood City*
(2011) 191 Cal.App.4th 1559 ........................................................................................ 16

**STATUTES**

California Coastal Act of 1976 .......................................................................................... 9

Civil Code
§ 658 ............................................................................................................................. 15
§ 660 ............................................................................................................................. 15

3

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 476 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 112 of 464
ID #:17519

**TABLE OF AUTHORITIES**
(continued)

Page

Code of Civil Procedure
§ 392 ................................................................................................................................ 16
§ 392, subd. (a)(1) ......................................................................................................... 15
§ 393 ................................................................................................................................ 15
§ 395 ................................................................................................................................ 15
§ 396b .............................................................................................................................. 14
§ 397, subd. (a) .............................................................................................................. 14
§ 397, subd. (c) .............................................................................................................. 17

Government Code
§ 11043, subd. (c) ...................................................................................................... 6, 18
§ 11043, subd. (d) ...................................................................................................... 6, 18
§ 51010 .............................................................................................................................. 7
§ 51010.5 ........................................................................................................................... 7
§ 51010.5, subd. (a) ......................................................................................................... 6
§ 51013.5 ........................................................................................................................... 7
§ 51014 .............................................................................................................................. 7
§ 51014.1 ..................................................................................................................... 7, 12

Public Resources Code
§ 30000 et seq. ................................................................................................................. 8
§ 30001 .............................................................................................................................. 8
§ 30001.5 ........................................................................................................................... 8
§ 30008 .............................................................................................................................. 8
§ 30100 .............................................................................................................................. 8
§ 30103 .............................................................................................................................. 8
§ 30103, subd. (a) ...................................................................................................... 6, 16
§ 30106 .............................................................................................................................. 8
§ 30107 .............................................................................................................................. 9
§ 30262 ..................................................................................................................... 7, 8, 9
§ 30600, subd. (a) ...................................................................................................... 8, 16

OTHER AUTHORITIES

81 Fed. Reg. 54513-54514 .......................................................................................... 13

D. Venue, Cal. Prac. Guide Civ. Pro. Before Trial Chapter 3-D ............................... 18

Senate Bill
No. 237 ..................................................................................................................... passim

Memorandum of Points and Authorities in Support of Motion to Change Venue (BCV25103508)

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 477 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 40   Filed 02/20/26   Page 113 of 464
ID #:17520

## INTRODUCTION

Defendant, the State of California (State), brings this motion for a change in venue because the potentially judiciable claim in this action relates to activities and portions of certain pipelines within the Coastal Zone. And the potential activities within the Coastal Zone are not within Kern County. Accordingly, by filing this action in the Superior Court for Kern County, Plaintiff Pacific Pipeline Company (Pacific Pipeline) filed it in the wrong court. The Court should order the action transferred to any proper county requested by the State, which is the Superior Court for Santa Barbara County.

Pacific Pipeline attacks the newly enacted, but not yet effective, Senate Bill (SB) 237 on the grounds that it may require a spike hydrostatic test of the pipelines and new coastal development permit before Pacific Pipeline can restart the transportation of oil through the Las Flores Pipelines. However, the Las Flores Pipelines are already subject to an existing legal requirement of a spike hydrostatic test before restarting based on requirements imposed by the Office of the State Fire Marshal (OSFM) under pre-SB 237 authority and a consent decree. Thus, the question of whether SB 237 requires a spike hydrostatic test for the Las Flores Pipelines is moot and non-justiciable. That leaves only a potential claim related to the coastal development permit.

A coastal development permit is only required for development within the Coastal Zone. Accordingly, only the portions of the Las Flores Pipelines that are within the Coastal Zone are potentially subject to SB 237's coastal development permit requirements. The Coastal Zone does not extend into Kern County. Contrary to Pacific Pipeline's conclusory allegation, no portion of the Las Flores Pipelines that is potentially affected by SB 237's coastal development permit requirement and this action is in Kern County. Accordingly, Pacific Pipeline filed this action in the wrong court.

The portions of the Las Flores Pipelines that may potentially be affected by this action are within the Coastal Zone in Santa Barbara County. The Superior Court for Santa Barabara County is the proper venue, and the case should be transferred there.

Additionally, the only potential witnesses in this action are officials or staff members of

5

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 478 of 837    Page
ID #:17521
Case 1:26-cv-01486-KES-CDB    Document 41    Filed 02/20/26    Page 114 of 464

the California Coastal Commission (Commission) or OSFM. As neither the Commission nor OSFM were named or served in this action, and there is no cause of action alleged against them, these are nonparty witnesses. (See Gov. Code, § 11043, subs. (c), (d).) These witnesses are already participating in multiple litigations involving the Las Flores Pipelines in Santa Barbara County and it is inconvenient and disruptive to their duties to require their participation in separate litigation involving the Las Flores Pipelines in Kern County as well. Moreover, most of the pipelines and all of the issues related to the Coastal Zone, including the potential impacts on the Coastal Zone from restarting the pipelines, are in Santa Barbara County. Accordingly, this case should be transferred to the Superior Court for Santa Barbara County for the additional and independent reason that transfer would be more consistent with the convenience of nonparty witnesses and the ends of justice.

## STATEMENT OF FACTS

As alleged, the Las Flores Pipelines are intended to transport crude oil produced from the Santa Ynez Unit to a refinery for final processing. (Complaint ¶¶ 17, 19.) The Las Flores Pipelines are comprised, in part, of Line CA-325 and Line CA-324. (Complaint ¶¶ 22-23.) The Las Flores Pipelines are intrastate pipelines. (See Gov. Code §, 51010.5, subd. (a).)

Line CA-324 connects the Las Flores Pump Station and the Gaviota Pump Station, all within Santa Barbara County. (Complaint ¶ 23.) All of Line CA-324 is within the Coastal Zone. (Complaint ¶ 26.)

A portion of Line CA-325 runs from the Gaviota Pump Station to the Sisquoc Pump Station. (Complaint ¶ 22.) This portion of CA-325 is entirely within Santa Barbara County. A segment of this portion of Line CA-325 within Santa Barbara County is also within the Coastal Zone. (Complaint ¶ 26.) The portion of CA-325 that extends out of Santa Barbara County is not within the Coastal Zone. (Pub. Resources Code, § 30103, subd. (a).)

The Las Flores Pipelines received its initial approvals, including necessary coastal development permits, in the 1980s. (Complaint ¶¶ 24-26.) "On May 19, 2015, a leak along Line CA-324 resulted in an oil spill." (Complaint ¶ 28.) Since 2015, no crude oil has flowed through the Las Flores Pipelines. (Complaint ¶ 28.) However, it has been the pipeline owners' intent to

6

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 479 of 837   Page
ID #:17522
Case 1:26-cv-01486-KES-CDB   Document 42   Filed 02/20/26   Page 115 of 464

resume use of the pipelines. (Complaint ¶¶ 35, 37.)

Pursuant to its sovereign authority to regulate intrastate oil pipelines and the Coastal Zone, the State of California enacted Senate Bill 237 (SB 237) on September 19, 2025. (Complaint ¶ 38.) SB 237 is not effective until January 1, 2026. (Complaint ¶ 54.) SB 237 is intended "to enact immediate measures to stabilize the transportation fuels market and to take future action to holistically address the mid-transition." (SB 237, § 1, subd. (i).) Among the immediate measures enacted are the addition of Government Code section 51014.1 and the amendment of Public Resources Code section 30262.

SB 237 adds Government Code section 51014.1 to the Elder California Pipeline Safety Act of 1981 (California Pipeline Safety Act), Government Code section 51010, et seq. The California Pipeline Safety Act gives exclusive safety regulatory and enforcement authority over intrastate oil pipelines to OSFM and sets testing requirements, among other items. (Gov. Code, §§ 51010, 51013.5, 51014.) The new section 51014.1 states:

> (a) Any existing oil pipeline that is six inches or larger that has been idle, inactive, or out of service for five years or more, shall not be restarted without passing a spike hydrostatic testing program.[1]
>
> (b) (1) (A) The hydrostatic spike test shall be at least 139 percent of the maximum operating pressure of the pipeline and shall not exceed 80 percent of the specific minimum yield strength, as determined appropriate by the State Fire Marshal.
>
> (B) Notwithstanding subparagraph (A), at the operator's request, the minimum hydrostatic spike test pressure may be lower than 100 percent of the specified minimum yield strength if the maximum operating pressure of the pipeline is correspondingly reduced.
>
> (i) Pursuant to this subparagraph the hydrostatic spike test shall be at least 139 percent of the reduced maximum operating pressure of the pipeline, as determined appropriate by the State Fire Marshal.
>
> (ii) The hydrostatic spike test shall be performed in segments to ensure every elevation point is tested.

---

[1] Unless specifically referenced and incorporated, definitions contained in the federal Hazardous Liquid Pipeline Safety Act are irrelevant to the definitions of terms used in the California Pipeline Safety Act. (See Gov. Code, § 51010.5.)

7

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 480 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 43   Filed 02/20/26   Page 116 of 464
ID #:17523

(2) If the specified minimum yield strength is unknown, the specified minimum yield strength shall be determined pursuant to Section 195.106(b) of Title 49 of the Code of Federal Regulations before performing the hydrostatic spike test.

(c) The hydrostatic spike test shall be no more than 15 minutes, and be immediately followed by a hydrostatic test, which shall be held for a minimum of eight hours and meet the requirements of the State Fire Marshal.

(d) The hydrostatic and hydrostatic spike test shall be performed in segments to ensure every elevation point is tested.

(e) All tests shall be performed by a qualified testing company that is compliant with this chapter, as determined by the State Fire Marshal.

(f) The Office of the State Fire Marshal shall promulgate regulations as necessary to implement this section.

(g) The requirements of this section shall become operative upon the effective date of this statute.

(h) The State Fire Marshal shall post on its public internet website information fully characterizing the parameters and results of each hydrostatic spike test performed, subject to any such information deemed confidential and proprietary, no less than 30 calendar days after each hydrostatic spike test is conducted pursuant to this section.

Public Resources Code section 30262 is part of the California Coastal Act of 1976 (Coastal Act), Public Resources Code 30000 et seq. The Coastal Act delineates the Coastal Zone and sets policies and requirements for development to protect the distinct and valuable natural resources within the Coastal Zone. (Pub. Resources Code, §§ 30001, 30001.5, 30008, 30103.) Pursuant to the Coastal Act, "any person . . . wishing to perform or undertake any development in the coastal zone . . . shall obtain a coastal development permit." (Pub. Resources Code, § 30600, subd. (a).) The Coastal Act provides its own definitions. (Pub. Resources Code, § 30100.)[2] "'Development' means . . . the placement or erection of any solid material or structure; . . . grading[;] . . . construction, reconstruction, demolition, or alteration of the size of any structure. . . ." (Pub. Resources Code, § 30106.) A structure includes any pipe. (*Ibid.*) An energy

---

[2] Definitions provided in the Federal Pipeline Safety Act are also irrelevant to the interpretation of the Coastal Act.

8

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 481 of 837   Page
ID #:17524
Case 1:26-cv-01486-KES-CDB   Document 4   Filed 02/20/26   Page 117 of 464

facility includes any transmitting facility for petroleum. (Pub. Resources Code, § 30107.) Public Resources Code section 30262 specifically discusses oil and gas development within the Coastal Zone. The relevant portions of amended Public Resources Code section 30262 state (with new language in bold):

> [(a)(5)](B) Once oil produced offshore California is onshore, it shall be transported to processing and refining facilities by **pipeline that uses the best available technology pursuant to Section 51013.1 of the Government Code.**
>
> [¶] . . . [¶]
>
> [(C)](iii) Subparagraphs (A) and (B) shall apply only to new or expanded oil extraction operations. "New extraction operations" means production of offshore oil from leases that did not exist or had never produced oil, as of January 1, 2003, or from platforms, drilling islands, subsea completions, or onshore drilling sites, that did not exist as of January 1, 2003. "Expanded oil extraction" means an increase in the geographic extent of existing leases or units, including lease boundary adjustments, an increase in the number of well heads, **reactivation of a facility idled, inactive, or out of service for more than five years, or an increase in oil extraction from the use of hydraulic fracturing, extended reach drilling, acidization, or other unconventional technologies,** on or after January 1, 2003.
>
> [¶] . . . [¶]
>
> (b) **(1)** Repair and maintenance of an existing oil and gas facility may be permitted in accordance with Section 30260 only if it does not result in expansion of capacity of the oil and gas facility, and if all applicable conditions of subdivision (a) are met.
>
> **(2) Repair, reactivation, and maintenance of an oil and gas facility, including an oil pipeline, that has been idled, inactive, or out of service for five years or more shall be considered a new or expanded development requiring a new coastal development permit consistent with this section.**
>
> **(3) Development associated with the repair, reactivation, or maintenance of an oil pipeline that has been idled, inactive, or out of service for five years or more requires a new coastal development permit consistent with this section.**
>
> **(4) The commission or local government with a certified local coastal program shall review and approve, modify, condition, or deny the permit based on the requirements of this section.**

Pacific Pipeline intends to resume petroleum transportation through the Las Flores Pipelines. (Complaint ¶¶ 3, 9, 37.) It alleges that, prior to the effective date of SB 237, Pacific

9

Pipeline undertook repairs and other development related to its intent to resume petroleum transportation through the pipelines. (Complaint ¶¶ 31, 33, 53.) The Complaint is silent on whether any additional repairs or development are required. The Complaint admits, pursuant to a Consent Decree, that a written Restart Plan must be approved by OSFM before resuming petroleum transportation through Lines CA-324 or -325. (Complaint ¶ 35.) Pacific Pipeline alleges that OSFM recently performed inspections of the pipelines but did not concluded its review of the Restart Plan. (Complaint ¶ 35.) It is unknown if and when OSFM will approve the Restart Plan and whether any additional repairs or related development will be required. The Complaint is silent as to any other reason why petroleum transportation through the Las Flores Pipelines will not, or cannot, occur before the effective date of SB 237.[3]

OSFM maintains a webpage dedicated to informing the public on the pathways for restarting Lines CA-324 and -325. (Declaration of Brandon S. Walker (Walker Dec.), Ex. A [https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa/pathways-for-restarting-pipelines [accessed on Dec. 3, 2025] [OSFM Website].) "Before restarting CA-324 and CA-325, pipeline operators must adhere to specific standards regulated by the OSFM, including strict compliance with all" of the following requirements: (1) coastal best available technology (CBAT); (2) the applicable consent decree; (3) the integrity management program; (4) issuance and compliance with State waivers; (5) performance of all deferred maintenances;[4] and (6) compliance with an approved startup plan. (Ibid.; see also Complaint ¶¶ 29, 31, 34, 35.) These requirements are discussed further below, but as will be seen, they often overlap or are interlaced with each other.

"In adhering to CBAT regulations, operators are required to submit a risk analysis to OSFM for approval." (Walker Dec., Ex. A.) OSFM approved a risk analysis for the pipelines in 2021. (Ibid.; Complaint ¶ 31.) Pacific Pipeline alleges that the safety valves identified in the approved risk analysis have been installed. (Complaint ¶ 31; compare with Walker Dec., Ex. B

---

[3] Pacific Pipeline's need of additional approvals contradicts its claim that immediate decisions are required. (See Complaint ¶ 56.) Pacific Pipeline and the Las Flores Pipelines are also subject to an injunction issued by the Superior Court for Santa Barbara County. (Walker Dec., Ex. I.)

[4] Although irrelevant to the interpretation of SB 237, it is noteworthy that the PHMSA allows the deferment of maintenance for idled pipelines, which Pacific Pipeline has utilized for the Las Flores Pipelines.

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 483 of 837    Page
ID #:17526
Case 1:26-cv-01486-KES-CDB    Document 46    Filed 02/20/26    Page 119 of 464

[OSFM's July 2024 denial of Sable's alternative risk analysis seeking to avoid installation of the valves due to problems getting local permits].) However, litigation ensued between Pacific Pipeline and the Commission regarding whether the installation of the safety valves and other work on the Las Flores Pipelines within the Coastal Zone require a new coastal development permit or was covered by the original permit. (Walker Dec., Ex. C [final ruling denying writ].) Recently the Superior Court for Santa Barbara County denied Pacific Pipeline's petition for writ of mandate, upholding the Commission's decision that the work was not covered by the original permit. (*Ibid.*)[5]

Lines CA-324 and -325 are subject to the obligations of a consent decree mandated by the United States District Court, Central District of California. (Walker Dec., Ex. D; Complaint ¶ 29.) The consent decree identifies California-specific requirements for Lines CA-324 and -325, including a State waiver; replacement, restart, or abandonment options; integrity management; valves; risk analysis; and leak detection. (Walker Dec., Exs. A and D, pp. 75-88 [consent decree].) Also, the consent decree refers to segments of the pipelines being "not in service" and sets requirements for their return to service. (Walker Dec., Ex. D, pp. 85, 94, 95.)

An integrity management program is established by the PHMSA, and further defined by the consent decree. (Walker Dec., Exs. A and D, pp. 77-79.) The integrity management program requires pipeline operators to implement measures and mitigate risks associated with pipeline integrity. (Walker Dec., Ex. A.) As part of the integrity management program, the OSFM mandates that active pipelines undergo an assessment test at least once every five years. (*Ibid.*) The assessment typically involves either a hydrostatic pressure test or an in-line inspection using a tool. (*Ibid.*; see also Walker Dec, Ex. D, pp. 79-80 [consent decree requiring additional in-line inspections]; Ex. E, pp. 4-5 [State waiver requiring additional spike hydrostatic and hydrostatic testing]; Ex. F p. 5 [same].) Because OSFM considers Lines CA-324 and -325 active but idle, OSFM will require that the pipelines undergo integrity assessment testing and implement relevant preventive and mitigative actions before restarting. (Walker Dec., Ex. A; see also Exs. E, F.)

---

[5] This may also render moot, or subject to collateral estoppel, aspects of Pacific Pipeline's attack on SB 237 related to a coastal development permit.

11

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 484 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 120 of 464
ID #:17527

Although it is alleged that some inspections and tests were performed (Complaint ¶¶ 32, 33), Pacific Pipeline does not allege that the performed inspections and tests satisfy what is required by the integrity management program, the consent decree, and the State waivers.

The consent decree requires the operator to apply for a State waiver through OSFM regarding the limited effectiveness of cathodic protection on the pipelines. (Complaint ¶ 34; Walker Dec., Ex. A; Ex. D, p. 75].) A State waiver modifies compliance with regulatory requirements if the operator demonstrates that alternative measures are consistent with pipeline safety. (Complaint ¶ 34; Walker Dec., Ex. A.) The Las Flores Pipelines received State waivers on December 17, 2024. (Complaint 34; Walker Dec., Ex. E [waiver for CA-324]; Ex. F [waiver for CA-325].) The State waivers require spike hydrostatic pressure tests and hydrostatic tests on the pipelines before they are placed back into operation. (Walker Dec., Ex. E, pp. 4-5; Ex. F, p.5.) Specifically, the State waiver for Line CA-324 requires:

> 12. Prior to placing the pipeline in operation, Sable must conduct a spike hydrostatic pressure test of the state waiver pipeline segments at a minimum pressure that is at least 1.5 times the MOP [maximum operating pressure] or 100% SMYS [specified minimum yield strength], for a minimum of 15 minutes after the spike test pressure is stabilized. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-324:
>
> a. All metal loss anomalies that have an ILI [in-line inspection] reported depth of 40% and greater wall loss.
>
> b. All anomalies that have a predicted failure pressure less than or equal to 1.6 times MOP.
>
> 13. Immediately following the spike hydrostatic pressure test, Sable must conduct an 8-hour hydrostatic pressure test of the state waiver pipeline segments at a minimum of 1.25 times the MOP. (Walker Dec., Ex. E, pp. 4-5.)

The requirements for spike hydrostatic pressure tests in the State waivers are consistent with the spike hydrostatic pressure tests required by SB 237. (Compare Walker Dec., Ex. E, pp. 4-5 and Ex. F, p.5 with Gov. Code § 51014.1.) Again, while Pacific Pipeline alleges that some testing has occurred, it does not allege that the testing already conducted satisfies the

12

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 485 of 837   Page
ID #:17528
Case 1:26-cv-01486-KES-CDB   Document 43   Filed 02/20/26   Page 121 of 464

requirements of the State waivers. (See Complaint ¶ 33.) Additionally, on October 22, 2025, OSFM sent a letter to the operator notifying it that there were deficiencies in the compliance with the State waivers. (Walker Dec., Ex. A.)

Consistent with OSFM's and PHMSA's programs (Walker Dec., Ex. A; Ex. G [https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa/out-of-service-deferral-program]; 81 Fed. Reg. 54513-54514), the pipeline operators were allowed to defer certain maintenance activities due to the pipelines' active yet idled status. All deferred maintenance must be completed before the pipelines can restart transporting oil. (Walker Dec., Ex. A.) The Complaint does not allege that all of the deferred maintenance has been completed.

The consent decree also requires the operator to obtain OSFM's approval of a restart plan. (Complaint ¶ 35; Walker Dec., Ex. C, pp. 91-95.) A restart plan was submitted for OSFM's review, but OSFM informed the operator that it cannot approve the restart plan until all other requirements are met, including those in the State waivers. (Complaint ¶ 35; Walker Dec., Ex. A.)

The Complaint acknowledges the existence, but not the effects, of a cease-and-desist order from the Commission that prohibited ongoing pipeline anomaly work. (Complaint ¶ 47; Walker Dec., Ex. H.) The Complaint fails to acknowledge that Pacific Pipeline has been subject to a preliminary injunction enforcing the cease-and-desist order since June 10, 2025. (Walker Dec., Ex. I.) Moreover, the Superior Court for Santa Barbara County recently upheld the cease-and-desist order after full briefing and oral argument. (Walker Dec., Ex. C.)

Additionally, there are several cases involving the Las Flores Pipelines already pending in the Superior Court for Santa Barbara County. Involving the Commission, there is a petition for writ of mandate and complaint for damages and injunctive relief, as well as a cross-complaint for declaratory and injunctive relief, in *Sable Offshore Corp., et al. v. California Coastal Commission* (Santa Barbara Super. Ct., Case No. 25CV00974). Involving OSFM, two petitions for writ of mandate are consolidated in *Center for Biological Diversity, et al. v. California Department of Forestry and Fire Protection, et al.* (Santa Barbara Super. Ct., Case No. 25CV02244) and *Environmental Defense Center, et al. v. California Department of Forestry and Fire Protection, et al.* (Santa Barbara Super. Ct., Case No. 25CV02247). There is a complaint for civil penalties

13

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 486 of 837   Page
ID #:17529
Case 1:26-cv-01486-KES-CDB   Document 49   Filed 02/20/26   Page 122 of 464

and injunctive relief for Water Code violations in *People of the State of California ex rel. Central Coast Regional Water Quality Board v. Sable Offshore Corp.* (Santa Barbara Super. Ct., Case No. 25CV06285). And the Santa Barbara County District Attorney filed a criminal complaint for knowingly discharging material into nearby creeks and waterways, obstructing streambeds, and discharging material harmful to wildlife in *People of the State of California v. Sable Offshore Corporation* (Santa Barbara Super. Ct., Case No. 25CR07677).

Although Pacific Pipeline did not name the Commission or OSFM as parties, did not serve either agency, and does not allege a cause of action against them, Pacific Pipeline alleges that the Commission made statements "concerning the Las Flores Pipelines' status as 'idle,' 'inactive,' and 'out of service' for more than five years. . . ." (Complaint ¶ 55.)

## DISCUSSION

### I. THE SUPERIOR COURT OF KERN COUNTY IS THE WRONG COURT AND THE PROPER VENUE IS IN SANTA BARBARA COUNTY.

The Legislature sets proper venue through statutes that "declare the public policy "of this state with respect to the proper court for an action. . . ." (*Alexander v. Superior Court* (2003) 114 Cal.App.4th 723, 731.) Allowing a party to disrupt this statutory scheme can "bring the administration of justice into disrepute" as it would allow a party to "have their cause heard where they believe it will be received most sympathetically." (*Ibid.*) That is why "[v]enue rules give defendants some control over the choice of forum so that the action is not litigated in a faraway county where it would be expensive and difficult to defend." (*Crestwood Behavioral Health, Inc. v. Superior Court* (2021) 60 Cal.App.5th 1069, 1077.)

When a defendant timely files a motion to change venue, "the court shall, if it appears that the action or proceeding was not commenced in the proper court, order the action or proceeding transferred to the proper court." (Code Civ. Proc., § 396b; see also Code of Civ. Proc. § 397, subd. (a).) "Venue is determined on the basis of the complaint as it stands at the time the motion to change is made, and the plaintiff is not permitted to make a subsequent election of theories by proposed amendments thereto [citation] or affidavits in opposition to the motion [citation]." (*Hasrat v. Superior Court for Los Angeles County* (1966) 241 Cal.App.2d 330, 337 cited by

14

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 487 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 123 of 464
ID #:17530

*Brown v. Superior Court* (1984) 37 Cal.3d 477, 482.) For the purposes of a motion to change venue, the allegations in a verified complaint may be controverted by declarations or affidavits of the moving party but must be based on admissible evidence. (See *General Steel & Wire Co. v. Stryco Mfg. Co.* (1963) 213 Cal.App.2d 495, 497.) The inclusion of a moot, non-justiciable claim in a complaint should not be the basis for determining the proper venue as the court has no jurisdiction over such claims. (See *Housing Group v. United Nat. Ins. Co.* (2001) 90 Cal.App.4th 1106, 1111; see also Code Civ. Proc. § 395 [the residence of an improperly joined defendant should not be considered in determining venue], *Freeman v. Dowling* (1933) 219 Cal. 213, 216-217 [sham or frivolous claims should not be used in considering venue and a defendant can seek a change of venue by demonstrating that other defendants are not necessary parties, that no cause of action is stated against them, and that no relief whatever may be awarded against them].)

Pacific Pipeline invokes the venue provision in Code of Civil Procedure section 392, subdivision (a)(1). (Complaint ¶ 16.)[6] Section 392, subdivision (a)(1), sets the proper court as the superior court in the county where the real property that is the subject of the action is located when a determination of a right or interest in the property is at issue.[7] Whether property is the subject of the action is determined by whether the main relief sought by the plaintiff pertains to real property. (*Dow AgroSciences LLC v. Superior Court* (2017) 16 Cal.App.5th 1067, 1078.) The question is "whether the *relief sought* amounts to 'the determination in any form, of [a] right or [interest in real property].'" (*Massae v. Superior Court* (1981) 118 Cal.App.3d 527, 539.) An action that "has a real and direct impact on a right or interest in the real property" at issue "is thus

---

[6] Although Pacific Pipeline brings this action against the State, the Complaint does not invoke Code of Civil Procedure section 393, which governs venue when the act of a public official is at issue. The Complaint does not identify any public official that has taken any alleged action that it seeks to challenge. In cases for declaratory relief, the State, as opposed to an agency or officer, is not a proper party as to which relief may be granted. (See *State of California v. Superior Court* (1974) 12 Cal.3d 237, 255.) This deficiency, along with others, will be the basis of a future demurrer if meeting and conferring does not result in an amended pleading.

[7] Civil Code section 658 defines real property as including "[t]hat which is affixed to land." Furthermore, "[a] thing is deemed to be affixed to land when it is imbedded in it . . . or permanently resting upon it . . . or permanently attached to what is permanent, by means of cement, plaster, nails, bolts or screws. . . ." (Civ. Code ¶ 660.) Without surveying the complete length of the pipelines, it seems reasonable to assume that much of the Las Flores Pipelines are affixed to land.

15

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 488 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 124 of 464
ID #:17531

'local' and should be tried in the county in which the real property is situated." (*Ibid.*) Although the venue rule in Code of Civil Procedure section 392 may be appropriately applied here, Kern County is not the proper venue because the "real property that is the subject of the action is located" in Santa Barbara County, not Kern County.

The current action alleges a dispute regarding the potential application of SB 237 to the Las Flores Pipelines.[8] The majority of the pipelines are in Santa Barbara County. And the specific issue is whether the Las Flores Pipelines can be considered "idled, inactive, or out of service for five years or more," which would require that a spike hydrostatic test be performed on the pipelines and a new coastal development permit be obtained before the transportation of oil through the pipelines can be resumed. (Complaint ¶¶ 39, 40, 53.) Accordingly, there are two distinct aspects of Pacific Pipeline's attack on SB 237, one related to the stress hydrostatic test requirement and the other related to the coastal development permit requirement.

The claim regarding the stress hydrostatic test requirement, however, is moot and non-justiciable because that same test is already required for the Las Flores Pipelines by the State waivers. (Complaint ¶¶ 29, 34-35 [consent decree requires compliance with approved State waivers]; Walker Dec. Exs. E [State waiver requiring a spike hydrostatic test], F [same].) A claim is moot, and non-justiciable, if the court cannot grant any effectual relief. (*Wilson & Wilson v. City Council of Redwood City* (2011) 191 Cal.App.4th 1559, 1574.) Here, even if the Court were to determine that the spike hydrostatic test requirement in SB 237 does not apply to the Las Flores Pipelines, that would be an academic exercise as the Court cannot relieve Pacific Pipeline of that same requirement in the State waivers.

That leaves the attack on SB 237 related to the coastal development permit requirement. A coastal development permit is only required for development within the Coastal Zone. (Pub. Resources Code § 30600, subd. (a).) The Coastal Zone is delineated on detailed maps adopted by the Commission, but in general it extends inland about 1,000 yards from the mean high tide line. (Pub. Resources Code, § 30103, subd. (a).) No part of Kern County is within the Coastal Zone.

---

[8] The Complaint lacks clarity. It does not present a facial attack on SB 237, nor does it properly allege an "as applied" attack based on an agency's action. Indeed, SB 237 is not even effective yet. This is another deficiency in the Complaint that will need to be addressed.

16

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 489 of 837   Page
ID #:17532
Case 1:26-cv-01486-KES-CDB   Document 12   Filed 02/20/26   Page 125 of 464

Accordingly, no potentially affected part of the Las Flores Pipelines is within Kern County. Thus, the Superior Court for Kern County is simply the wrong court for this action.

Rather, the potentially effected parts of the Las Flores Pipelines—those that are within the Coastal Zone—are all within Santa Barbara County. Accordingly, this matter should be transferred to the Superior Court for Santa Barbara County.

## II. ALTERNATIVELY, THIS CASE SHOULD BE TRANSFERRED TO THE SUPERIOR COURT FOR SANTA BARBARA COUNTY FOR THE CONVENIENCE OF NONPARTY WITNESSES AND THE ENDS OF JUSTICE.

Additionally, the Legislature has given courts the discretion to transfer a case to another county to promote the convenience of nonparty witnesses and the ends of justice. (Code Civ. Proc., § 397, subd. (c).) Transfer is appropriate on this additional and independent basis.

SB 237 is not yet effective, and so neither OSFM nor the Commission has taken any official action in interpreting or applying SB 237. But they are the State agencies that will be implementing the provisions of SB 237 that Pacific Pipeline is attacking. And Pacific Pipeline is also basing its attack on SB 237, in part, on statements allegedly made by the Commission. (Complaint ¶ 55.) Therefore, it appears that the only potential witnesses would be from OSFM or the Commission.

OSFM and the Commission are nonparties to this action. Even though an action for declaratory relief should name an agency or an officer instead of the State (*State* v. *Superior Court* (1974) 12 Cal.3d 237, 255) neither agency was named or served. There is no alleged cause of action against either of them. (Complaint ¶¶ 51-58.) Pacific Pipeline does not seek any remedy against them. (Complaint, Prayer for Relief ¶¶ 1-3.) Separate State agencies have a right to represent their positions separately. (See *Redevelopment Agency of the City of San Marcos* v. *Commission on State Mandates* (1996) 43 Cal.App.4th 1188 [Department of Finance interested party in case challenging decision of the Commission on State Mandates].) And recent amendments to the Government Code make clear that "[e]very state agency is a separate legal entity," so "[s]ervice of a summons, complaint, or subpoena on one state agency is not lawful service on any other state agency," and "[w]hen the Attorney General . . . defends an action in their independent capacity on behalf of the State of California . . ., the Attorney General acts in

17

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 490 of 837   Page
ID #:17533
Case 1:26-cv-01486-KES-CDB   Document 13   Filed 02/20/26   Page 126 of 464

the public interest of the State of California and its residents and not as the legal representative or attorney of any state entity, including entities within the executive, legislative, or judicial branches," which means that "[s]tate agencies are not parties to [the] action. . . ." (Gove. Code, § 11043, subds. (c), (d).)

Both the Commission and OSFM are already participating in litigation involving the Las Flores Pipelines in the Superior Court for Santa Barbara County. (*Sable Offshore Corp., et al. v. California Coastal Commission* [Santa Barbara Super. Ct., Case No. 25CV00974]; *Center for Biological Diversity, et al. v. California Department of Forestry and Fire Protection, et al.* [Santa Barbara Super. Ct., Case No. 25CV02244]; *Environmental Defense Center, et al. v. California Department of Forestry and Fire Protection, et al.* [Santa Barbara Super. Ct., Case No. 25CV02247].) And although they are not named parties, they may also be required to participate in the additional litigation involving the Las Flores Pipelines pending in Santa Barbara County. (*People of the State of California ex rel. Central Coast Regional Water Quality Board v. Sable Offshore Corp.* [Santa Barbara Super. Ct., Case No. 25CV06285]; *People of the State of California v. Sable Offshore Corporation* [Santa Barbara Super. Ct., Case No. 25CR07677]. It would be inconvenient for the Commission or OSFM to also be required to participate as nonparty witnesses in litigation involving the Las Flores Pipelines in Kern County too.

Additionally, most of the work for restarting the pipelines, and the potential impacts of doing so will be felt in Santa Barbara County. (See D. Venue, Cal. Prac. Guide Civ. Pro. Before Trial Ch. 3-D [ends of justice includes permitting view of the scene or making other material evidence available].) Indeed, the oil spill that led to the idling of the Las Flores Pipelines occurred in Santa Barbara County.

Thus, to promote the convenience of the nonparty witnesses and the ends of justice, this case should be transferred to the Superior Court for Santa Barbara County.

## CONCLUSION

The only potentially judiciable claim in the Complaint relates to the portions of the Las Flores Pipelines within the Coastal Zone, in Santa Barbara County. The Superior Court of Kern County is the wrong court and the action should be transferred to the Superior Court of Santa

18

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 491 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 127 of 464
ID #:17534

Barbara County. Additionally, the transfer to Santa Barbara County would promote the convenience of the nonparty witnesses and the ends of justice.

Dated:  December 5, 2025                        Respectfully submitted,

                                               ROB BONTA
                                               Attorney General of California
                                               BRANDON S. WALKER
                                               Supervising Deputy Attorney General
                                               JACK C. NICK
                                               Deputy Attorney General
                                               ISABELLA A. PANICUCCI
                                               Deputy Attorney General

                                               /s/ Brandon S. Walker

                                               BRANDON S. WALKER
                                               Supervising Deputy Attorney General
                                               *Attorneys for Defendant*
                                               *State of California*

SA2025306665

19

Memorandum of Points and Authorities in Support of Motion to Change Venue (BCV25103508)

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 492 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 128 of 464
ID #:17535

## DECLARATION OF SERVICE BY E-MAIL

**Case Name:**       Pacific Pipeline Company, A Delaware Corporation v. State of
                     California
**Case Number:**     BCV25103508
**Party Represented:** State of California

### Declaration of Electronic Service

1.  I am at least 18 years of age and not a party to this matter.

2.  I am employed in the Office of the Attorney General of the State of California.  My
    business address is 1300 I Street, Suite 125, Sacramento, CA 95814, County of
    Sacramento.

3.  My electronic service address is Valerie.Tamulevich@doj.ca.gov.

4.  On December 5, 2025, I electronically served the following document[s]:

    **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
    MOTION TO CHANGE VENUE**

5.  I electronically served the aforementioned document[s] by emailing them to the
    following individual[s]:

    **PLEASE SEE ATTACHED SERVICE LIST**

I declare under penalty of perjury under the laws of the State of California and the United States
of America that the foregoing is true and correct, and that this declaration was executed on
December 5, 2025.

| Valerie A. Tamulevich | /s/ Valerie A. Tamulevich |
|:---:|:---:|
| Declarant | Signature |

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 493 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 129 of 464
ID #:17536

## SERVICE LIST

Jeffrey Dintzer
Garrett B. Stanton
ALSTON & BIRD
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071
**E-mail Address**: jeffrey.dintzer@alston.com
**E-mail Address**: garrett.stanton@alston.com

Benjamin J. Hanelin
Natalie C. Rogers
PAUL HASTINGS LLP
1999 Avenue of the Stars, 27th Floor
Century City, CA 90067
**E-mail Address**: benjaminhanelin@paulhastings.com
**E-mail Address**: natalierogers@paulhastings.com

SA2025306665
39501664.docx

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 494 of 837   Page
ID #:17537
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 130 of 464

**ELECTRONICALLY FILED**
Superior Court of California,
County of Kern
By: Marina Mercado
Deputy Clerk
**12/5/25 1:54 PM**

ROB BONTA
Attorney General of California
BRANDON S. WALKER SBN. 254581
Supervising Deputy Attorney General
JACK C. NICK SBN. 160196
ISABELLA A. PANUCCINI SBN. 318984
Deputy Attorneys General
1300 I Street, Suite 125
Sacramento, CA 95814
Telephone: (916) 210-6395
Fax: (916) 327-2319
E-mail: Brandon.Walker@doj.ca.gov
*Attorneys for Defendant State of California*

*Exempt from Filing Fees Pursuant to
Government Code § 6103*

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF KERN

METROPOLITAN DIVISION

| | |
|---|---|
| **Pacific Pipeline Company, A Delaware Corporation,**<br><br>Plaintiff,<br><br>v.<br><br>**State of California and DOES 1 through 25,**<br><br>Defendants. | Case No. BCV25103508<br><br>**DECLARATION OF BRANDON S. WALKER IN SUPPORT OF MOTION TO CHANGE VENUE (Vol. 1 of 3)**<br><br>Date: February 3, 2026<br>Time: 8:30 a.m.<br>Dept: H<br>Judge: Hon. Bernard C. Barmann, Jr.<br><br>Action Filed: September 29, 2025 |

1

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 495 of 837   Page
ID #:17538
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 131 of 464

I, Brandon S. Walker, declare:

1.      I am a Supervising Deputy Attorney General employed by the State of California Department of Justice, Office of the Attorney General. I am one of the attorneys assigned to represent the State of California in this action. I have personal knowledge of the facts set forth below and could and would competently testify to them if called to do so.

**Volume 1**

2.      Attached as Exhibit A is a true and correct copy of a PDF printout of a website maintained by the Office of the State Fire Marshall (OSFM) describing the pathways for restarting CA-324 and CA-325 found at https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa/pathways-for-restarting-pipelines.

3.      Attached as Exhibit B is a true and correct copy of a redacted letter from the OSFM dated July 10, 2024.

4.      Attached as Exhibit C is a true and correct copy of the final ruling denying Pacific Pipeline's petition for writ of mandate in Santa Barbara Superior Court, Case No. 25CV00974.

**Volume 2**

5.      Attached as Exhibit D is a true and correct copy of the Consent Decree entered into by the parties in United States District Court, Central District of California, Case No. 2:20-cv-02415.

**Volume 3**

6.      Attached as Exhibit E is a true and correct copy of the State waiver issued by OSFM for Line CA-324.

7.      Attached as Exhibit F is a true and correct copy of the State waiver issued by OSFM for Line CA-325.

8.      Attached as Exhibit G is a true and correct copy of a PDF printout of a website maintained by OSFM describing the out-of-service deferral program found at https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa/out-of-service-deferral-program.

9.      Attached as Exhibit H is a true and correct copy of a cease and desist order issued by the California Coastal Commission for development activities associated with the return to service of CA-324 and CA-325.

2

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 496 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 19    Filed 02/20/26    Page 132 of 464
ID #:17539

10.    Attached as Exhibit I is a true and correct copy of the order granting application for preliminary injunction issued in Santa Barbara County Superior Court, Case No. 25CV00974.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed in Rocklin, California on December 5, 2025.

Brandon S.
Walker

Digitally signed by Brandon S. Walker
Date: 2025.12.05 11:02:37 -08'00'

Brandon S. Walker
Declarant

3

Case 2:26-cv-05242-SVW-SSC     Document 36     Filed 05/14/26     Page 497 of 837   Page
Case 1:26-cv-01486-KES-CDB      Document 1     Filed 02/20/26     Page 133 of 464
ID #:17540

# EXHIBIT "A"

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 498 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 134 of 464
ID #:17541



Emergency? Call 911    Translate    Settings



*Search safety information*

Home › What We Do › Pipeline Safety & CUPA › Pathways for Restarting Pipelines

SEARCH

# Pathways for Restarting CA-324 and CA-325

Revised: 10/23/2025

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 499 of 837    Page
ID #:17542
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 135 of 464

When they were in operation, lines CA-324and CA-325 (previously known as Lines 901 and 903), transported crude oil from the Santa Ynez Unit, which comprises an onshore oil and natural gas processing facility, three offshore platforms, and associated offshore pipelines.

These operations are subject to significant regulatory oversight, with the CAL FIRE - Office of the State Fire Marshal (OSFM) acting as the safety and enforcement regulatory authority over these pipelines. Platforms and offshore pipelines associated with CA-324 and CA-325 also fall under the jurisdiction of various other regulators, including the Pipeline and Hazardous Materials Safety Administration (PHMSA), State Lands Commission, and Bureau of Safety and Environmental Enforcement, among others. Those regulators maintain their own

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 500 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 43    Filed 02/20/26    Page 136 of 464
ID #:17543

requirements for restart of platforms and pipelines that may not fall directly under the OSFM jurisdiction.

Before restarting CA-324 and CA-325, pipeline operators must adhere to specific standards regulated by the OSFM, including strict compliance with **all** the listed requirements below.

## Regulatory Oversight of Crude Oil Pipelines in Santa Barbara County
## Pathways to Restarting Lines CA-324 & CA-325 FAQs
## Pathways for Restarting CA-324 and CA-325 Pipelines Infographic

**#1: Coastal Best Available Technology**                                    ✕

The Coastal Best Available Technology (CBAT) was enacted by the OSFM pursuant to legislative mandates imposed in response to the Refugio Beach pipeline spill in May 2015. It mandates the use of the best available technology for pipelines in environmentally sensitive coastal areas to minimize oil spills.

In adhering to CBAT regulations, operators are required to submit a risk analysis to the OSFM for approval. If an operator identifies the best available technology to mitigate the quantity of hazardous liquid spills in case of a release, it must specify these technologies and propose their retrofitting into the pipeline. Following the installation of these technologies, the OSFM will review the operator's records to confirm compliance with CBAT regulations.

In 2021, the OSFM approved a risk analysis and implementation plan for the lines, which included the installation of valves and incorporating other technologies into the pipelines. To proceed with implementing this technology, the operator needs permits for installing or upgrading specific safety valves in Santa Barbara County. The OSFM does not handle local

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 501 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 137 of 464
ID #:17544

permit issuance, and recommends stakeholders contact relevant agencies for updates on those processes as outlined in the approved plan.

In November 2023, the pipeline owner presented an alternative risk analysis to the OSFM for review and approval. The November 2023 risk analysis was withdrawn in March 2024.

On April 11, 2024, Pacific Pipeline Company submitted an alternative risk analysis and implementation plans to amend the current plan. The OSFM denied the April 2024 alternative risk analysis.

## **Coastal Best Available Technology (CBAT) Infographic**

References:

1. Coastal Best Available Technology, Office of State Fire Marshal, Retrieved from: https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa/coastal-best-available-technology
2. 901/903 Valve Upgrade, County of Santa Barbara Planning and Development, Retrieved from: https://www.countyofsb.org/880/901903-Valve-Upgrade ☐

**LINE 903 REDACTED RISK ANALYSIS (PDF)**

**LINE 901 REDACTED RISK ANALYSIS (PDF)**

**DENIAL LETTER – PACIFIC PIPELINE CBAT RISK ANALYSIS**

**REDACTED RISK ANALYSIS PACIFIC PIPELINE COMPANY**

**PACIFIC PIPELINE (SABLE) LETTER - EXTENSION NOTIFICATION**

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 502 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 138 of 464
ID #:17545

**#2: Consent Decree**

After the Refugio spill, CA-324 and CA-325 were subject to the obligations of a Consent Decree mandated by the United States District Court, Central District of California (Civil Action No. 2:20-cv-02415). This decree stipulates a series of prerequisites that must be met before any restart of these lines can be initiated. The operator is responsible for submitting reports and involving the OSFM in reviewing the subject pipelines' compliance with the requirements outlined in the Consent Decree. The California-specific provisions are found in Appendix B of the Consent Decree, and include:

- State Waiver

- Replacement, Restart, or Abandonment of the pipelines

- Integrity Management

- Valves

- Risk Analysis

- Leak Detection

The Appendix should be read in conjunction with the entire Consent Decree for a full understanding of the relevant requirements.

Reference:

1. Consent Decree Civil Action No. 2:20-cv-02415, United States District Court, Central District of California, Retrieved from: https://www.epa.gov/sites/default/files/2020-03/documents/plainsallamericanpipelinelp.pdf ☐

**#3: Integrity Management Program**

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 503 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 16    Filed 02/20/26    Page 139 of 464
ID #:17546

The Integrity Management Program established by the PHMSA on regulated pipelines is a framework designed to ensure the safe operation of pipelines. This program requires pipeline operators to implement measures to assess and mitigate risks associated with pipeline integrity, with the goal of preventing incidents such as ruptures, or failures.

As part of the integrity management program, the OSFM mandates that active pipelines undergo an Integrity Assessment test at least once every five years. These assessments typically involve either a hydrostatic pressure test or an In-Line inspection using a smart tool. The OSFM reviews and evaluates integrity assessment reports for each regulated pipeline. Since the pipelines in question are currently idle, both must undergo integrity assessment testing and implement relevant preventive and mitigative actions before restarting.

**<u>Integrity Management Program & Deferred Maintenance Infographic</u>**

Reference:

<u>Hazardous Liquid Integrity Management (HLIM)</u> ↗

**#4: State Waiver**                                                                                      ✕

A State Waiver is an order that modifies compliance with a regulatory requirement if an operator demonstrates that alternative measures are consistent with pipeline safety. The OSFM evaluates state waiver applications in consultation with the PHMSA to determine if the proposed alternative measures can provide an equal or greater level of safety than the required regulation and may grant a state waiver accordingly.

Certain provisions of the Consent Decree mandate that the pipeline operator applies for a State Waiver through OSFM regarding the limited effectiveness of cathodic protection on CA-324 and CA-325. The pipeline operator must

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 504 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 140 of 464
ID #:17547

obtain a State Waiver from the OSFM and a no-objection from PHMSA before restarting the respective pipelines.

## **State Waiver Infographic**

References:

1. Pipeline Safety: Ineffective Protection, Detection, and Mitigation of Corrosion Resulting from State Waiver information Poster Insulated Coatings on Buried Pipelines, Retrieved from: https://www.federalregister.gov/documents/2016/06/21/2016-14651/pipeline-safety-ineffective-protection-detection-and-mitigation-of-corrosion-resulting-from ☐

2. Special Permits and State Waivers Overview, United States Department of Transportation, Pipeline and Hazardous Materials Safety Administration, Retrieved from: https://www.phmsa.dot.gov/pipeline/special-permits-state-waivers/special-permits-and-state-waivers-overview ☐

3. State Waivers: #0001 (CA-325 A/B) and #0015 (CA-324)

**#5: Deferred Maintenances**                                                    ✕

The OSFM continues to oversee idle pipelines under 49 CFR Part 195 and the Elder Pipeline Act until a pipeline is formally abandoned, at which point it is removed from the OSFM's program. An idle pipeline remains temporarily inactive and is not involved in transporting hazardous materials. If the pipeline is purged of hydrocarbon substances, the operator may request to postpone specific maintenance tasks as outlined in PHMSA Advisory Bulletin 2016-0075. Both pipelines have deferred certain maintenance activities, and all the deferred maintenance must be completed before operations can resume.

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 505 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 141 of 464
ID #:17548

## Integrity Management Program & Deferred Maintenance Infographic

References:

1. Out-of-Service Deferral Program, Office of State Fire Marshal, Retrieved from: https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa/out-of-service-deferral-program
2. Pipeline Safety: Clarification of Terms Relating to Pipeline Operational Status, PHMSA Advisory Bulletin 2016-0075, Retrieved from: https://www.phmsa.dot.gov/regulations/federal-register-documents/2016-19494 ↗

**#6: Startup Plan**

×

A pipeline startup plan delineates the procedures and protocols for safely restarting the operation of a pipeline system. Prior to the potential restart of operations, the OSFM will review the startup plan and perform on-site inspections of the pipelines to verify compliance to the plan.

Appendix D of the Consent Decree specifies the minimum requirements for restarting CA-324 and CA-325. The restart plan typically represents the final step in resuming operations. After the pipeline operator fulfills all other necessary requirements, OSFM finalizes the specific requirements of the restart plan, ensuring they meet or exceed those mandated by the Consent Decree.

Sable has submitted restart plans to the Office of the State Fire Marshal for review. Evaluation will proceed once all compliance and safety requirements, including Coastal Best Available Technology standards, the Consent Decree, the Integrity Management Plan, the State Waiver, and approvals from other state, federal and local agencies, are met.

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 506 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 19    Filed 02/20/26    Page 142 of 464
ID #:17549

On October 22, 2025, State Fire Marshal Daniel Berlant sent a letter to Sable notifying the company of deficiencies in its compliance with the State Waiver, which prevents the approval of the restart plan until those requirements are met. OSFM continues to review the restart plan submitted by Sable in September and reserves its rights to provide additional direction or comment as part of that review.

## Startup Plan Infographic

References:

1. Sable's Restart Plan for CA-324.

2. Sable's Restart Plan for CA-325.
3. Sable's Fill Plan and Start-Up Procedures.

# OSFM's Commitment

The OSFM remains steadfast in its commitment to pipeline safety, serving the interests of both the State and local communities. Both CA-324 and CA-325 must fulfill **all** the aforementioned requirements before restarting operations. The pipeline operator must undergo a multi-stage review process to comply with these requirements and is expected to work with other agencies to meet their regulations, including any environmental review, before potentially restarting the subject pipelines.



QUICK LINKS

Defensible Space

GovMotus Fire Permits

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 507 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 143 of 464
ID #:17550

Fire Hazard Severity Zones

Recalls

Subscribe

2024 Strategic Plan

**DIVISIONS**

Code Development & Analysis

Community Wildfire Preparedness & Mitigation

Fire & Life Safety Division

Fire Engineering & Investigations

Pipeline Safety & CUPA

State Fire Training

**TRAINING RESOURCES**

Available Classes

State Fire Training Portal

Continuing Education (FSTEP)

Professional Certification (CFSTES)

Instructor Registration

Instructor Database

Back to Top    Accessibility    Conditions of Use    Privacy Policy    Site Map    Glossary of Terms

Copyright © 2025 State of California

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 508 of 837   Page
ID #:17551
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 144 of 464

# EXHIBIT "B"

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 509 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 145 of 464
ID #:17552

Docusign Envelope ID: 1B35BCAD9-C201-44B0-AFDE-8CBCF052206E

STATE OF CALIFORNIA - NATURAL RESOURCES AGENCY                                    Gavin Newsom, Governor



DEPARTMENT OF FORESTRY AND FIRE PROTECTION
OFFICE OF THE STATE FIRE MARSHAL
Pipeline Safety Division
3780 Kilroy Airport Way, Suite 500
Long Beach, CA 90806
(562) 497-0350
Website: www.fire.ca.gov



## CERTIFIED MAIL NO.: 7022-0410-0000-6648-0406

July 10, 2024

█████████████

Pacific Pipeline Company
845 Texas Avenue, Suite 2920
Houston, Texas 77002

SUBJECT:    REJECTION OF REVISED RISK ANALYSIS AND IMPLEMENTATION PLAN
            (OSFM #0001, CA-325 GAVIOTA TO EMIDIO)
            (OSFM #0015, CA-321 LAS FLORES CANYON TO GAVIOTA)

Dear ████████████:

CAL FIRE – Office of the State Fire Marshal (OSFM) acknowledges receipt of your letter
dated April 11, 2024, requesting approval for the acceptance of the amended risk
analysis and initial implementation plan concerning the best available technology for the
aforementioned pipelines. Thank you for the additional responses to OSFM's questions,
dated May 31, 2024.

Having thoroughly reviewed your risk analysis and supplementary response records, the
OSFM regrets to inform you that the April 11, 2024 risk analysis is determined to be
inadequate. The risk analysis is denied due to the following identified deficiencies:

1. The OSFM denies the proposal based on a comparison of the worst-case
   discharge volumes between the proposed risk analysis and the previously
   accepted risk analysis submitted by Plains All American Pipeline in April of 2021.
   According to Pacific Pipeline, the worst-case discharge volume in the previous
   plan was lower. Given the lower worst-case discharge volume in the previous
   plan, it indicates that the previous proposal offers a smaller release in the event
   of a worst-case spill, thus providing superior spill volume reduction and
   associated environmental benefits. Therefore, the current proposal is not
   considered as effective in mitigating potential environmental impacts compared to
   the previous plan.

2. Our office appreciates the efforts by Pacific Pipeline to reduce spill response
   times in the event of a failure. However, this is not a consideration for CBAT
   because at that point, product has already been released. The focus is on spill

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 510 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 146 of 464
ID #:17553

Docusign Envelope ID: BB36CAD5-C231-446F-8F9B-BCBC2F93206E



July 10, 2024
Page 2

volume reduction, not on spill containment and response.

3. Pacific Pipeline discusses the unavailability of construction permits as determinative of the issue of "availability" with regard to installation of valves. Our office does not perceive permitting issues at the local level as determinative of the availability of valves in general. It is also our understanding that Pacific Pipeline currently possesses the valves required for installation and that discussions around permitting issues between the County of Santa Barbara and Pacific Pipeline are being held to resolve the differences between parties. No other pipeline in the State has been denied construction permits for valves to comply with State law and reduce spill volumes and we see no difference here.

The previously approved risk analysis submitted by Plains All American Pipeline in April of 2021 remains in effect and represents best available technology. We look forward to working with you in implementing the approved risk analysis.

If you have any questions regarding this issue, please contact Andy Chau, Supervising Pipeline Safety Engineer, at (562) 305-0679.

Sincerely,

*James Hosler*

JAMES HOSLER
Assistant Deputy Director
Chief of Pipeline Safety and CUPA Programs

cc:    Andy Chau, Supervising Pipeline Safety Engineer, OSFM
       Huy Nguyen, Supervising Pipeline Safety Engineer, OSFM
       Brendan Feery, Supervising Pipeline Safety Engineer, OSFM
       Doug Allen, Supervising Pipeline Safety Engineer, OSFM
       Alin Podoreanu, Supervising Pipeline Safety Engineer, OSFM

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 511 of 837   Page
ID #:17554
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 147 of 464

# EXHIBIT "C"

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 512 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 5    Filed 02/20/26    Page 148 of 464
ID #:17555

# Civil Law and Motion Calendar
# 10/15/25
## 10 am

## <u>Sable Offshore Corp. and Pacific Pipeline Company v. California Coastal Commission</u> - Case No. 25CV00974

### HEARING

Petition of Petitioners Sable Offshore Corp. and Pacific Pipeline Co. for Writ of Mandate

### ATTORNEYS

*For Plaintiffs and Petitioners Sable Offshore Corp. and Pacific Pipeline Company*:
Jeffrey D. Dintzer, Garrett B. Stanton, Alston & Bird LLP; Trevor D. Large, Fauver, Large, Archbald & Spray LLP

*For Defendant and Respondent California Coastal Commission*: Rob Bonta, Norman N. Franklin, Wyatt E. Sloan-Tribe, Office of the California Attorney General

Emails: jeffrey.dintzer@alston.com; garrett.stanton@alston.com;
dan.seabolt@alston.com; Wyatt.Sloan-Tribe@doj.ca.gov;
Isabella.Langone@doj.ca.gov; Kevin.Kelly@doj.ca.gov;
Thomas.Kinzinger@doj.ca.gov; John.Natalizio@doj.ca.gov; tlarge@flasllp.com;

### RULING

**1. For the reasons set forth herein, the Court finds in favor of Respondent California Coastal Commission and against Petitioners Sable Offshore Corp. and Pacific Pipeline Company on Petitioners' first cause of action for issuance of a writ of mandate.**

**2. The Court does not now address the extent to which this ruling resolves or otherwise impacts other causes of action of the FAP or of the Commission's cross-complaint, which will be addressed in subsequent proceedings.**

**3. There is currently a motion to compel discovery now pending and set for hearing on 10/22/25 at 10 am. That matter is continued to 12/3/25, at 10 am.**

1

Document received by the CA 2nd District Court of Appeal.

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 513 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 149 of 464
ID #:17556

**4. There is currently a CMC set for 10/31/25; that CMC is vacated. The Court sets the next CMC for 12/3/25, at 10 am. CMCS's filed one week in advance.**

**5. There is currently a motion filed for leave to file a SAC that is set for 12/3/25 at 10am; the hearing will go forward. Briefing on the issue, if any, will be accomplished so the final brief is filed one week in advance.**

<u>Background</u>

This matter arises out of work done by Petitioners Sable Offshore Corp. (Sable OC) and Pacific Pipeline Company (PPC) (collectively, Sable or Petitioners) subject to the California Coastal Act of 1976 (Coastal Act, Pub. Resources Code, § 30000 et seq.). To address the issues raised in the petition, it is first useful to summarize the history of the underlying oil pipeline construction and maintenance. The summary is intended to provide sufficient background to address the issues before the Court and is not intended to be a complete recitation of the facts. Nonetheless, the Court has considered the complete record in this matter in making this ruling. Citations to the Administrative Record (AR) are in the form of "AR [page number(s)]" with leading zeros omitted.

(1)     Factual Background

(A)     The Oil Pipeline

PPC, a wholly-owned subsidiary of Sable OC, is the owner of the Las Flores Pipelines, which includes the pipeline segments CA-324 (Line 324) (previously known as Line 901) and CA-325 (Line 325) (previously known as Line 903) (collectively, the Las Flores Pipelines or Pipelines), portions of which are located within the coastal zone in an unincorporated area of the County of Santa Barbara (County). (First Amended Petition [FAP], ¶ 1; Answer to FAP [Answer], ¶ 1; AR 1-3.)

Line 324 is designed to transport crude oil from a pump station in Las Flores Canyon approximately 11 miles west along the coast to a pump station about a mile east of Gaviota State Park. (FAP, ¶ 26; Answer, ¶ 26; AR 3, 64.) Line 325 of the Pipelines is designed to transport crude oil from there to a location approximately 113.5 miles north, eventually reaching the Pentland Delivery Point in Kern County. (*Ibid.*)

The Pipelines were constructed in the 1980s and were referred to at the time as the "Celeron/ All American Pipeline Project." (AR 3832.) The Final Development Plan (FDP) Conditional Use Permit (CUP), dated March 3, 1986, was issued following

Document received by the CA 2nd District Court of Appeal.

2

005374

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 514 of 837   Page
ID #:17557
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 150 of 464

approval by the Santa Barbara County Planning Commission. (*Ibid.*) The project description in the CUP is:

"Celeron proposes to construct a 30-inch diameter, insulated welded steel pipeline designed to transport up to a maximum of 425,000 barrels per day (BPD) with an optimal throughput of 300,00 BPD, of Outer Continental Shelf and other locally produced crude oils. The pipeline would extend approximately 135 miles from Las Flores Canyon to the Emidio pump station in the southern San Joaquin Valley. Three pump stations would be constructed, one at Las Flores Canyon, one at Gaviota, and one near the Sisquoc River in northern Santa Barbara County. The pipeline would be buried to a minimum cover depth of three feet throughout its length according to Department of Transportation specifications, with increased cover depth in selected areas. [¶] The pipeline will require a 100-foot wide construction corridor and a 50-foot wide permanent easement. The proposed route parallels Highway 101 from Las Flores to Gaviota, turns north at Gaviota State Park west of Highway 101 and continues to the Sisquoc River. From the Sisquoc River the route follows Santa Maria then Suey Canyons north toward the Cuyama River. It crosses the river in the Western Cuyama Valley, and exits the County." (AR 3836.)

The final environmental impact report/environmental impact statement (EIR/EIS) regarding the project includes the following statement in its abstract:

"The Celeron and All American Pipeline Companies propose to construct a 1,200-mile pipeline that would transport Outer Continental Shelf and other locally produced crude oils from the Santa Barbara and Santa Maria Basins through Emidio station, CA, to McCamey, TX. The 122-mile Celeron segment would extend from Las Flores, CA to Emidio, CA, and the 1,084-mile All American segment would extend from Emidio, CA to McCamey, TX; both would transport heated crude oil. Getty Trading and Transportation Company (Getty) proposes to construct a 113-mile buried pipeline that would transport heated crude oil from Getty's existing marine terminal facility at Gaviota, CA, to Emidio station, CA. The Celeron/All American pipeline proposal and the Getty pipeline proposal are not dependent upon each other. Both projects could be approved or either project could be approved independently of the other.

"The Celeron/All American and Getty Pipeline Projects Environmental Impact Report/Environmental Impact Statement (EIR/EIS) addresses both applications to construct pipelines from the Santa Barbara coast to Emidio in Kern County. The EIR/EIS also addresses Celeron/All American's application for a pipeline from Emidio to McCamey, Texas.

"The EIR/EIS analyzes the environmental effects of the proposed pipelines; pump, heating, and delivery stations; and a tank farm through construction, operation, maintenance, and abandonment. This report analyzes the impacts of the

Document received by the CA 2nd District Court of Appeal.

005375

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 515 of 837    Page
ID #:17558
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 151 of 464

Celeron/All American and Getty Proposals and four routing alternatives that have been identified. These are the Santa Maria Canyon, Desert Plan Utility Corridor, Brenda, and McCamey to Freeport Alternatives. The Santa Maria Canyon Alternative crosses a portion of the Los Padres National Forest in Santa Barbara County; the Desert Plan Alternative is in the Mojave Desert in eastern California; the Brenda Alternative is in western Arizona near the Kofa National Wildlife Refuge; and the McCamey to Freeport Alternative. extends from West Texas to the Gulf Coast. These alternatives were identified to provide optional locations for the pipelines in sensitive areas. The No Project Alternative is also analyzed." (AR 3191-3192.)

Two coastal development permits (CDPs) were issued for the project. CDP 86-CDP-189 was issued on July 27, 1986. (AR 3891) The CDP is for the approved project: "Clearing, grading, and trenching activities for Celeron Pipeline Project as approved by 85-DP-66cz, in the area described below." (*Ibid.*) The area for this CDP is: "Gaviota State Park (survey station #1725+40) to Gaviota pump station." (*Ibid.*) CDP 86-CDP-205 was issued on August 5, 1986. (AR 3894.) The CDP is for the approved project: "Remainder of all construction activities for the Celeron Pipeline project as approved by 85-DP-66cz, in the area described below." (*Ibid.*) The area for this CDP is: "Gaviota State Park (survey station #1725+40) to Gaviota pump station." (*Ibid.*) Both CDPs state as special conditions: "The project description, pipeline route, conditions and plans required pursuant to those conditions described by the approved Final Development Plan 85-DP-66cz are incorporated herein by reference as terms of this permit. (AR 3891, 3894.)

The CDPs were not appealed or otherwise challenged after their issuance.

The FDP's Conditions of Approval include:

Under the heading "Authority to Impose Feasible Mitigations":

"This permit is premised upon findings that where feasible, all significant environmental effects of the project identified in the EIR/EIS (State Clearinghouse No. 83110902), which occur in Santa Barbara County, will be substantially mitigated by the permit conditions. Prior to approval of the Final Development Plan, County shall review any findings that identified certain mitigation measures as being in the primary jurisdiction of another agency but are also within County's jurisdiction. County shall thereupon determine either (1) that such mitigation has or is being implemented by such other agency or (2) that such other agency and County determine such mitigation to be infeasible. If County determines that no other agency is or may be implementing such feasible mitigation measures then County may impose those feasible measures within its jurisdiction to mitigate those environmental impacts in accordance with appropriate mitigation measures identified by the EIS/R." (AR 6714.)

Document received by the CA 2nd District Court of Appeal.

4

005376

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 516 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 19   Filed 02/20/26   Page 152 of 464
ID #:17559

Under the heading "Facility Throughput and Source Limits":
"All facilities constructed under this permit shall be used only for the shipment of a maximum volume of heated crude oil demonstrated to be within the design parameters of the pipeline facilities as built. The subject volumes will be outer continental shelf (OCS) and other locally produced onshore and offshore petroleum from the Santa Barbara and Santa Maria Basins. PPC shall obtain a new or modified permit, or authority to continue operation under the existing permit prior to undertaking any of the following activities which may, in the judgment of the County, result in significant changes to the impacts on the County. Such changes could include but not be limited to: 1) major pipeline or pump station modifications; 2) major changes in pipeline throughput; 3) introduction of production to the pipeline from sources other than those described above; and 4) introduction of a different product from any source." (AR 6710.)

Respondent California Coastal Commission (Commission) issue a CDP for offshore portion of the Pipelines in 1988, CDP E-88-1. (AR 61-62.)

In 2015, a corroded portion of Line 324 ruptured, causing an oil spill (2015 Refugio Oil Spill). (AR 3.) Following the 2015 Refugio Oil Spill, the Pipelines were placed out of service. (*Ibid.*)

In 2020, Sable's predecessor-in-interest entered into a Federal Consent Decree with the United States and the State of California to resolve issues related to the 2015 Refugio Oil Spill. (AR 6049-6150.) The Federal Consent Decree requires, among other things, that if Line 324 (former Line 901) is to restart, a written Restart Plan must first be approved by the California Office of the State Fire Marshal (OSFM). (AR 6144-6145.) No Restart Plan has yet been approved and restart of the Pipelines is not at issue in this litigation. (Sable Opening Brief, at p. 8, fn. 6.)

    (B)    Pipeline Activities

In 2024, Sable identified 121 sites on the onshore pipelines requiring Anomaly Repair Work. (AR 1750-1751.) A pipeline "anomaly" refers to a pipeline segment with some deviation from its original configuration. (AR 1750.)

According to Sable: "Sable detects anomalies by using a roving data gathering instrument located within the pipeline interior, typically referred to as an inspection 'pig,' which examines a pipeline's conditions as the pig travels through the Onshore Pipelines. Data collected from the inspection pig is used to identify the approximate location of anomalies from the surface so that excavation and repair activities can be planned. Sable generally must complete the following steps to repair any particular anomaly detected by the pig: (1) access the affected pipeline segment via existing roadways and rights-of-way, which in some locations requires

Document received by the CA 2nd District Court of Appeal.

005377

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 517 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 153 of 464
ID #:17560

placing metal plates over water courses; (2) excavate the anomaly site, including the dirt beneath the affected pipeline segment, which in some locations may require dewatering and associated discharge; (3) expose the pipeline segment by removing insulation and sandblasting; (4) evaluate whether a 'Composite Repair' or 'Cut-Out Repair' is required, (5) conduct the Composite or Cut-Out Repair as appropriate, sandblast the repaired pipeline segment, and apply an epoxy coating, pipe tape, and rockguard wrap; (6) backfill the anomaly site, and (7) conduct final site cleanup including erosion control and revegetation work (collectively, the 'Anomaly Repair Work'). Anomaly Repair Work is short-term and temporary (often lasting less than a week) within the Onshore Pipelines' operational right-of-way. It requires the use of heavy equipment and may involve the removal of vegetation." (AR 1751, fns. omitted.)

According to Sable, Sable completed the Anomaly Repair Work at 48 of these anomaly sites before it received communications from the Commission. (AR 1751.)

On September 20, 2024, Commission Enforcement Analyst Jo Ginsberg sent an email to Errin Briggs, Deputy Director, Energy Minerals & Compliance of the County stating:

"We have learned that Sable Offshore Corporation (Sable) is undertaking development in the coastal zone related to Lines 324/325 (formerly known as Lines 901/903) without any Coastal Act authorization, which is a violation of the County's LCP, and we hereby request the County to take enforcement action. At the same time, we are also aware of both the recent litigation and settlement between the County and Sable, and we assume that, as a result of that settlement, the County will not take the requested action. However, we do believe the work requires Coastal Act authorization. Thus, the Commission will assume enforcement jurisdiction based on the understanding that you are declining this request unless you indicate otherwise by close of business on Sept. 23, 2024." (AR 300-301.)

Later on September 20, the Briggs replied: "Received. We will review this and get back to you ASAP." (AR 300.)

On September 27, 2024, Ginsberg, on behalf of the Commission, sent by email its Notice of Violation (NOV) No. V-9-24-0152 (2024 NOV) to Steve Rusch, Vice President Environmental & Regulatory Affairs of Sable, stating in part:

"As you have recently discussed with Cassidy Teufel and Wesley Horn of our staff, it has come to our attention that unpermitted activities are currently taking place in the Coastal Zone, including excavation and other activities at various locations along the existing Lines 324/325 (formerly known as Lines 901/903) now owned by [Sable] associated with a proposed restart of the Santa Ynez Unit. These activities

Document received by the CA 2nd District Court of Appeal.

6

Case 2:26-cv-05242-SVW-SSC  Document 36  Filed 05/14/26  Page 518 of 837  Page
Case 1:26-cv-01486-KES-CDB  Document 1  Filed 02/20/26  Page 154 of 464
ID #:17561

constitute violations of the Coastal Act and Santa Barbara County's Local Coastal Program ('LCP'). (AR 208-209, fn. omitted.)

"It has been confirmed that Sable is currently performing various unpermitted construction activities in the Coastal Zone associated with upgrades to Lines 324/325 in connection with Sable's proposed restart of that pipeline. As part of that proposed restart, Sable is currently undertaking work including a pipeline upgrade project to address pipeline corrosion in locations within the Coastal Zone and to install new safety valves in portions of the pipeline in the Coastal Zone. These activities constitute development and are not exempt from coastal development permit ('CDP') requirements." (AR 209, fn. omitted.)

"Please note that in certain cases when unpermitted development takes place, but Commission staff believe that some version of the work could have been found to be consistent with the applicable standard of review and authorized accordingly, staff recommends that the party undertaking the development submit a CDP application to the regulating authority (in this case, Santa Barbara County), seeking after-the-fact ('ATF') authorization for the previously undertaken unpermitted development within the County's LCP jurisdiction. In other cases, when staff has determined that the unpermitted development is not something for which staff would recommend approval due its inconsistency with the Coastal Act/certified LCP, staff advises the alleged violator to seek resolution through removal, mitigation, restoration, and/or payment of penalties, etc., and not to seek a CDP to authorize such development.

"In this case, we are uncertain at this time whether Santa Barbara County would be able to approve a CDP application from Sable that was seeking ATF authorization for the unpermitted construction activities that have already taken place, as well as authorization going forward for continued construction or other development activities related to the pipeline, such as the installation of safety valves. More information regarding the project would be necessary to come to any such conclusion at this time; however, since such an application might be found approvable by the County, we recommend that you submit a CDP application to the County as soon as possible. Please note that should the County grant approval of such a CDP application, those portions of the project that are located within the Coastal Commission's appeals jurisdiction would be appealable to the Commission and those portions of the project, if any, that are located within the Commission's original jurisdiction would require a CDP from the Commission." (AR 211.)

The Commission followed up with a letter to Sable, dated October 4, 2024 (October 4 Letter), from Kate Huckelbridge, Executive Director, which asked for confirmation that the activity referred to in the 2024 NOV fully ceased and for additional information. (AR 214-217.) According to Sable, at the time of their receipt of the October 4 Letter, Sable completed the Anomaly Repair Work at 48 of the identified

Document received by the CA 2nd District Court of Appeal.

7

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 519 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 155 of 464
ID #:17562

anomaly sites. (AR 1751.) At that time, 45 anomaly sites were open (Open Sites) where excavation and other steps had been undertaken, but the Anomaly Repair Work had not been completed. (*Ibid.*)

On November 12, 2024, the Commission's Executive Director issued an Executive Director Cease and Desist Order (EDCDO). (AR 13311-13320.) This EDCDO orders Sable to cease and desist from conducting any further unpermitted development and to immediately take steps to avoid irreparable injury to the properties at issue, including, safely securing and stabilizing the Open Sites. (AR 13312-13313.)

On November 21, 2024, Cassidy Teufel, Deputy Director of the Commission, sent an email to Rusch of Sable stating that any work on the offshore portions of the Pipelines would also require a CDP from the Commission. (AR 247-249.)

On November 22, 2024, SCS Engineers, on behalf of Sable, sent a request to Briggs for Zoning Clearances to conduct certain Anomaly Repair Work on Line 324. (AR 6866-6868.) The request identifies that Sable had previously commenced Anomaly Repair Work and had received the 2024 NOV and the EDCDO. (AR 6867.) Sable sought both after-the-fact Zoning Clearances for the Anomaly Repair Work previously undertaken and Zoning Clearances to complete the Anomaly Repair Work in the future. (*Ibid.*)

The Commission received reports that Sable was conducting work on the offshore portions of the Pipelines beginning on November 29, 2024. (AR 4, 6-7, 8.)

On December 6, 2024, SCS Engineers, on behalf of Sable, sent a second request for Zoning Clearances. (AR 7916-7917.) "Sable is submitting two Zoning Clearance applications for this anomaly repair work: (i) an application for the anomaly repair work that is not located in proximity to environmentally sensitive habitat areas, and (ii) an application associated with 6 anomaly repairs for locations that are potentially located in proximity to areas of sensitive habitat." (AR 7916.)

"Through its inspection pig activities, Sable identified one hundred and twenty-one (121) anomalies where Anomaly Repair Work was required within unincorporated Santa Barbara County and within the Coastal Zone. Sable completed the Anomaly Repair Work at forty-eight (48) of these anomaly sites before receiving the 2024 [Notice of Violation (NOV)] and October 4 Letter. Forty-five (45) anomaly sites were open (i.e., excavation and other steps had been undertaken, but the Anomaly Repair Work had not been completed) at the time Sable received the 2024 NOV and October 4 Letter. At that time, twenty-eight (28) remaining anomaly sites had been identified for future Anomaly Repair Work that had not yet commenced." (AR 1751, fns. omitted.)

On February 10, 2025, the Commission's ECDCO expired by operation of law. (See Pub. Resources Code, § 30809, subd. (e).)

Document received by the CA 2nd District Court of Appeal.

8

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 520 of 837    Page
ID #:17563
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 156 of 464

On February 11, 2025, Ginsberg, on behalf of the Commission, sent by email a second NOV, V-9-25-001 (2025 NOV). (AR 219-226.) The 2025 NOV identified the violation as: "Unpermitted offshore development including, but not necessarily limited to, deploying sand/cement bags on the seafloor and positioning them to provide support to Sable's out-of-service offshore oil and water pipelines as part of an effort to restart SYU oil production operations and bring the pipelines back into use." (AR 219.)

On February 12, 2025, Briggs of the County sent a letter to Sable in response to the November 22, 2024 and December 6, 2024, Zoning Clearance applications, stating in part:

"On November 22, 2024 and December 6, 2024, Santa Barbara County Planning and Development received four Zoning Clearance applications for pipeline 'anomaly repair work' to Lines 324 and 325a. These applications stated that they sought to permit anomaly repair work in the enclosed descriptions of work for case numbers 24ZCl-00090, 24ZCl-00091, 24ZCl-00095, and 24ZCl-00096. Sable's position is that the Zoning Clearance process meets the requirements of the County's Local Coastal Program because it is a means for the County to determine if the activities fall within an existing Coastal Development Permit or if a new Coastal Development Permit is required.

"The County conducted a detailed review of pipeline permitting history and the Coastal Zoning Ordinance. Planning and Development concludes that this pipeline anomaly repair work is authorized by the existing permits (Final Development Plan, Major Conditional Use Permit, and associated Coastal Development Permits) and was analyzed in the prior Environmental Impact Report/Environmental Impact Statement (EIR/EIS). The County previously exercised its authority under its Local Coastal Program and delegated Coastal Act authority in approving the permits and the requested anomaly repair work is within the scope of those approved permits. (Pub. Resources Code§ 30519.) The County's assessment is consistent with the type of reviews conducted by the County, both inside and outside the Coastal Zone, on a regular basis to determine whether proposed development activities fall within the scope of existing permits. Planning and Development will be returning the Zoning Clearance applications to Sable without taking action on them. Alternatively, Sable can choose to withdraw the applications.

"This conclusion is related to the requested pipeline anomaly repair work in case numbers 24ZCl-00090, 24ZCl-00091, 24ZCl-00095, and 24ZCl-00096 and the information supplied with those applications and does not speak to permitting or jurisdiction on any other past or future work on or changes to the Pipeline and associated equipment.

9

Document received by the CA 2nd District Court of Appeal.

005381

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 521 of 837    Page
ID #:17564
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 157 of 464

"This is not a: 1) permit exemption; 2) Director determination on the meaning or applicability of the provisions of the Coastal Zoning Ordinance; 3) decision on an application for a Coastal Development Permit; or 4) any other ground set forth in Article II Section 35-182. Rather, this letter confirms that the requested anomaly repair work was contemplated, analyzed, and approved in the existing Final Development Plan, Major Conditional Use Permit, associated Coastal Development Permits and certified EIR/EIS. Thus, no further application to or action by the County is required. This conclusion is not appealable to the Planning Commission, Board of Supervisors, or Coastal Commission and it does not require a Notice of Final Action. (Article II §§ 35-182; 35-181.4.)" (AR 543-544.)

On February 14, 2025, Sable sent a letter to the Commission addressing the 2024 NOV and the October 4 Letter. (AR 282-299.) Among other things, the February 14 letter points to the County's February 12 letter as confirming Sable's position that the Anomaly Repair Work does not require any further authorization under the Coastal Act or the County's LCP. (AR 295.)

On February 16, 2025, the Commission Executive Director sent a response to Sable, stating in part:

"My staff have reviewed your February 14, 2025 letter, in which, at page 4, you cite Santa Barbara County (the 'County') as concluding that 'no further authorization under the Coastal Act or LCP is required for Sable to proceed' with the work you generally describe as 'anomaly repair work' along Las Flores Pipelines CA-324 and CA-325 ('Pipeline'). Your letter suggests that Sable intends to proceed with this work, and we have received evidence suggesting that Sable may already be doing so, despite several conversations with Commission staff, Notice of Violation letters, and a previous Executive Director Cease and Desist Order ('EDCDO') directing Sable to seek Coastal Act authorization for the work already completed and to cease further work until it, too, is authorized by a new coastal development permit ('CDP'), as described in greater detail below. Although your letter argues that the work has been pre-authorized, based on the information we have received to date, I do not agree." (AR 13523.)

The February 16 letter further states:

"I am therefore informing you that if Sable does not immediately cease all unpermitted development activities, as described above, and comply with the requirement in the next paragraph, it may receive an Executive Director Cease and Desist Order ('EDCDO'), the violation of which may subject Sable to additional fines and penalties. [¶] In order to avoid issuance of an EDCDO, you must confirm, in writing, by Monday, February 17, 2025, no later than 4pm, that Sable will cease all development of the sort described in this notice unless and until it either: (a) demonstrates, to my satisfaction and receives my written confirmation, that it

Document received by the CA 2nd District Court of Appeal.

10

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 522 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 158 of 464
ID #:17565

already possesses the necessary Coastal Act authorization for the work, which Sable has not yet demonstrated; or (b) obtains a new, final, operative CDP or other valid Coastal Act authorization specifically covering the work at issue and complies with the terms of any final, validly issued CDPs." (AR 13526.)

On February 17, 2025, the Commission, by Enforcement Counsel Stephanie Cook, sent a letter to the County expressing surprise and disappointment with the February 14 letter sent to Sable. (AR 1078.) The letter states that the Commission received notice that Sable was refusing to halt its operations. (*Ibid.*) The letter asks the County to initiate enforcement proceedings. (*Ibid.*) The letter concludes by stating that unless the Commission hears from the County by noon on February 18, the Commission will "assume that the County has declined to act and conclude that, in any event, the County has not taken action in a timely manner. And as such, we may issue our EDCDO." (AR 1079.)

On February 18, 2025, the Commission's Executive Director issued a second EDCDO (ED-25-CD-01), violation numbers V-9-25-0013 and V-9-24-0152. (AR 233-246.) This EDCDO included a notice of intent to commence cease and desist order, restoration order, and administrative order proceedings. (*Ibid.*)

After receiving the County's letter, Sable resumed onshore Anomaly Repair Work. (AR 1748; Sable Opening Brief, at pp. 4-5.)

(C)     Legal and Administrative Proceedings

On February 18, 2025, Sable filed its initial petition in this matter asserting four causes of action: (1) damages for inverse condemnation; (2) declaratory relief for impairment of vested rights; (3) declaratory relief for inverse condemnation; and (4) declaratory relief re Public Resources Code section 30803.

On March 10, 2025, submitted a Statement of Defense to the Commission. (AR 1740-10165.)

The Commission set the matter for a formal administrative adjudication and, on March 28, 2025 issued its staff report and recommendation. (AR 117-205.)

On April 10, 2025, the Commission held a public hearing on its proposed enforcement orders against Sable. (AR 12973-13227.) At this hearing, Sable presented its defense. (*Ibid.*) At the conclusion of the hearing, following deliberation among the Commissioners, the Commission voted to issue three orders (collectively, the April 10 Orders): Cease and Desist Order No. CCC-25-CD-01 (CDO); Restoration Order No. CCC-25-RO-01 (RO); and Administrative Penalty No. CCC-25-AP3-01 (AP). (AR 12497-12522.) The AP provided an administrative penalty of $18,022,500. (AR 12501.)

11

Document received by the CA 2nd District Court of Appeal.

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 523 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 16    Filed 02/20/26    Page 159 of 464
ID #:17566

Also on April 10, 2025, the Commission filed a demurrer to Sable's original complaint in this Court.

On April 16, 2025, Sable filed its FAP. The FAP asserts six causes of action: (1) for writ of traditional mandamus, or alternatively for administrative mandamus; (2) for declaratory relief; (3) for inverse condemnation; (4) for declaratory relief for impairment of vested rights; (5) for declaratory relief for inverse condemnation; and (6) for declaratory relief under Public Resources Code section 30803. The first cause of action seeks issuance of a writ of mandate to set aside the NOVs, EDCDOs, and April 10 orders.

Also on April 16, 2025, the Commission filed a cross-complaint against Sable asserting two causes of action: (1) equitable relief to restrain violation of a cease and desist order; and (2) for declaratory relief.

On May 15, 2025, the Commission filed its first amended cross-complaint (FACC) asserting five causes of action: (1) equitable relief to restrain violation of a cease and desist order; (2) equitable relief to restrain violation of a restoration order; (3) equitable relief to restrain violation of an administrative civil penalty order; (4) for declaratory relief for Sable's violation of CDO CCC-25-CD-01; and (5) for declaratory relief for Sable's violation of RO CCC-25-RO-01.

On May 16, 2025, the Commission made a motion to bifurcate and separately try the writ of mandate claims before the non-writ claims. Also on May 16, the Commission filed its demurrer to the FAP.

On June 16, 2025, Sable filed its demurrer to the FACC.

On June 18, 2025, the Court sustained, without leave to amend, the Commission's demurrer to the sixth cause of action of the FAP and otherwise overruled the demurrer.

On July 23, 2025, the Court overruled Sable's demurrer to the FACC. The Court also granted the Commission's motion to bifurcate. The Court set a briefing schedule for resolution of the writ claims on the administrative record.

The parties have lodged the administrative record with the Court. The parties have filed their respective briefs.

## Analysis

(1)     Requests for Judicial Notice

12

Document received by the CA 2nd District Court of Appeal.

005384

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 524 of 837   Page
ID #:17567
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 160 of 464

In support of the petition, Sable requests that the Court take judicial notice of selected provisions of the Coastal Zoning Ordinance of the County. This request for judicial notice is granted. (See Evid. Code, § 452, subds. (b), (c).)

In support of the petition in reply, Sable also requests that the Court take judicial notice of "the dictionary definition of 'act.' " (Reply Request for Judicial Notice [RRJN], at p. 2.) The Court will take judicial notice of the fact that definition of "act" in exhibit 2 the RRJN appears at the website for merriam-webster.com. (See Evid. Code, § 452, subd. (h).) "When interpreting a statute, Courts 'appropriately refer to the dictionary definition' to ascertain the ordinary, usual meaning of a word." (*California Public Records Research, Inc. v. County of Stanislaus* (2016) 246 Cal.App.4th 1432, 1445.) The Court may therefore appropriately consider that dictionary definitions in determining statutory meaning (as discussed below). However, judicial notice does not extend to determining that this specific definition of "act" applies in the relevant a statutory context.

(2)     Standards of Review

"Any aggrieved person shall have a right to judicial review of any decision or action of the commission by filing a petition for a writ of mandate in accordance with Section 1094.5 of the Code of Civil Procedure ...." (Pub. Resources Code, § 30801.)

"Administrative mandamus [citation] provides for judicial review of an agency decision resulting from a proceeding in which '(1) by law a hearing is required to be given, (2) evidence is required to be taken, and (3) the determination of the facts is the responsibility of the administrative agency.' [Citations.]" (*Save Oxnard Shores v. California Coastal Com.* (1986) 179 Cal.App.3d 140, 148.)

Both parties agree that, notwithstanding that Sable's first cause of action is stated in the alternative of a traditional writ of mandate under Code of Civil Procedure section 1085, the appropriate procedure and standards are for an administrative writ of mandate under section 1094.5. (Sable Notice of Motion, at p. 2; Sable Opening Brief, at p. 8; Commission Opposition Brief, at p. 8.)

"The inquiry in such a case shall extend to the questions whether the Respondent has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the Respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (Code Civ. Proc., § 1094.5, subd. (b).)

" ' "The general rule" ' in [writ of administrative mandate] actions is that judicial review ' "is conducted solely on the record of the proceeding before the administrative agency. [Citation.]" [Citation.]' [Citation.] A reviewing Court may

13

Document received by the CA 2nd District Court of Appeal.

005385

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 525 of 837   Page
ID #:17568
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 161 of 464

receive additional evidence only if that evidence 'in the exercise of reasonable diligence, could not have been produced or … was improperly excluded at the hearing before' the administrative agency. [Citations.] Thus, in reviewing the Commission's decision, Courts are 'confined to the record before the Commission unless' the Petitioner shows it 'could not have produced' the new evidence 'in the exercise of reasonable diligence or unless relevant evidence was improperly excluded at the administrative hearing.' [Citation.]" (*Sierra Club v. California Coastal Com.* (2005) 35 Cal.4th 839, 863.)

The administrative record is reviewed " 'to determine whether the Commission's findings are supported by substantial evidence.' [Citation.]" (*Reddell v. California Coastal Com.* (2009) 180 Cal.App.4th 956, 962 (*Reddell*).) " ' "Courts may reverse an agency's decision only if, based on the evidence before the agency, a reasonable person could not reach the conclusion reached by the agency." ' [Citation.]" (*Ibid.*, italics omitted.)

"It is presumed that an administrative agency regularly performed its duty, and the burden is on the party challenging the agency's actions to prove an abuse of discretion." (*Save Laurel Way v. City of Redwood City* (2017) 14 Cal.App.5th 1005, 1011.)

(3)    Arguments

Sable argues that the Commission abused its discretion in issuing the April 10 Orders because the County authorized Sable's onshore repair work. In support of this argument Sable argues that the existing onshore CDPs encompass the onshore work, that the County's determination is entitled to deference, and that the Commission lacks statutory authority to issue the CDO. Sable further argues that the OSFM compelled and approved Sable's installation of safety valves. Sable further argues that the offshore repair work was fully authorized.

The Commission disagrees and disputes each of Sable's arguments. Instead, the Commission argues that it was authorized to issue the April 10 Orders and that Sable engaged in unauthorized development in violation of the Coastal Act.

(4)    Coastal Act Requirements

Except as to emergencies not at issue here, "and in addition to obtaining any other permit required by law from any local government or from any state, regional, or local agency, any person, as defined in Section 21066, wishing to perform or undertake any development in the coastal zone, other than a facility subject to Section 25500, shall obtain a coastal development permit." (Pub. Resources Code, § 30600, subd. (a).)

Document received by the CA 2nd District Court of Appeal.

14

005386

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 526 of 837   Page
ID #:17569
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 162 of 464

" 'Development' means, on land, in or under water, the placement or erection of any solid material or structure; discharge or disposal of any dredged material or of any gaseous, liquid, solid, or thermal waste; grading, removing, dredging, mining, or extraction of any materials; change in the density or intensity of use of land, including, but not limited to, subdivision pursuant to the Subdivision Map Act (commencing with Section 66410 of the Government Code), and any other division of land, including lot splits, except where the land division is brought about in connection with the purchase of such land by a public agency for public recreational use; change in the intensity of use of water, or of access thereto; construction, reconstruction, demolition, or alteration of the size of any structure, including any facility of any private, public, or municipal utility; and the removal or harvesting of major vegetation other than for agricultural purposes, kelp harvesting, and timber operations which are in accordance with a timber harvesting plan submitted pursuant to the provisions of the Z'berg-Nejedly Forest Practice Act of 1973 (commencing with Section 4511). [¶] As used in this section, 'structure' includes, but is not limited to, any building, road, pipe, flume, conduit, siphon, aqueduct, telephone line, and electrical power transmission and distribution line." (Pub. Resources Code, § 30106.)

There is no essential dispute that Sable's Anomaly Repair Work constitutes "development" within the meaning of the Coastal Act. The Anomaly Repair Work involves grading and other activities within the definition of "development." There is therefore no essential dispute that performing such work requires a CDP. Sable argues both that the CDPs obtained in 1986 authorize the development activities under the Coastal Act and that the Commission does not have authority to issue the CDO based upon the development activities.

(5)   Commission Authority

"The Coastal Act 'was enacted by the Legislature as a comprehensive scheme to govern land use planning for the entire coastal zone of California. The Legislature found that "the California coastal zone is a distinct and valuable natural resource of vital and enduring interest to all the people"; that "the permanent protection of the state's natural and scenic resources is a paramount concern"; that "it is necessary to protect the ecological balance of the coastal zone" and that "existing developed uses, and future developments that are carefully planned and developed consistent with the policies of this division, are essential to the economic and social well-being of the people of this state...." ([Pub. Resources Code,] § 30001, subds. (a) and (d).)' [Citation.] The Coastal Act is to be 'liberally construed to accomplish its purposes and objectives.' (Pub. Resources Code, § 30009.) Under it, with exceptions not applicable here, any person wishing to perform or undertake any development in the coastal zone must obtain a coastal development permit 'in addition to obtaining any other permit required by law from any local government or from any state, regional, or local agency....' (Id., § 30600, subd. (a).)" (Pacific Palisades Bowl Mobile

Document received by the CA 2nd District Court of Appeal.

15

005387

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 527 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 10    Filed 02/20/26    Page 163 of 464
ID #:17570

*Estates, LLC v. City of Los Angeles* (2012) 55 Cal.4th 783, 793–794 (*Pacific Palisades*).)

"The Coastal Act expressly recognizes the need to 'rely heavily' on local government '[t]o achieve maximum responsiveness to local conditions, accountability, and public accessibility....' (Pub. Resources Code, § 30004, subd. (a).) As relevant here, it requires local governments to develop local coastal programs, comprised of a land use plan and a set of implementing ordinances designed to promote the act's objectives of protecting the coastline and its resources and of maximizing public access. (*Id.,* §§ 30001.5, 30500–30526; [citation].) Once the California Coastal Commission certifies a local government's program, and all implementing actions become effective, the commission delegates authority over coastal development permits to the local government. (Pub. Resources Code, §§ 30519, subd. (a), 30600.5, subds. (a), (b), (c).) Moreover, '[p]rior to certification of its local coastal program, a local government may, with respect to any development within its area of jurisdiction, ... establish procedures for the filing, processing, review, modification, approval, or denial of a coastal development permit.' (*Id.,* § 30600, subd. (b)(1).) An action taken under a locally issued permit is appealable to the commission. (*Id.,* § 30603.) Thus, '[u]nder the Coastal Act's legislative scheme, ... the [local coastal program] and the development permits issued by local agencies pursuant to the Coastal Act are not solely a matter of local law, but embody state policy.' [Citation.] 'In fact, a fundamental purpose of the Coastal Act is to ensure that state policies prevail over the concerns of local government.' [Citation.]" (*Pacific Palisades, supra,* 55 Cal.4th at p. 794.)

The County established a LCP at the time of the issuance of the 1986 CDPs. There is no essential dispute that the initial construction of the Pipelines were within the scope of the CDPs as issued.

Sable argues that the Commission has no authority to issue the CDO as to the onshore work because the County issued the applicable CDP and the County determined that the work was within the scope of the CDP. The Commission argues that it has authority to issue the EDCDOs and CDO because the County failed and refused to act to enforce the Coastal Act.

"If the executive director determines that any person or governmental agency has undertaken, or is threatening to undertake, any activity that (1) may require a permit from the commission without securing a permit or (2) may be inconsistent with any permit previously issued by the commission, the executive director may issue an order directing that person or governmental agency to cease and desist. The order may be also issued to enforce any requirements of a certified local coastal program ..., or any requirements of this division which are subject to the jurisdiction of the certified program or plan, under any of the following circumstances: [¶] ... [¶] (2) The commission requests and the local government ...

16

Document received by the CA 2nd District Court of Appeal.

005388

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 528 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 164 of 464
ID #:17571

declines to act, or does not take action in a timely manner, regarding an alleged violation which could cause significant damage to coastal resources. [¶] (3) The local government ... is a party to the violation." (Pub. Resources Code, § 30809, subd. (a)(2), (3).)

"If the commission, after public hearing, determines that any person or governmental agency has undertaken, or is threatening to undertake, any activity that (1) requires a permit from the commission without securing a permit or (2) is inconsistent with any permit previously issued by the commission, the commission may issue an order directing that person or governmental agency to cease and desist. The order may also be issued to enforce any requirements of a certified local coastal program ..., or any requirements of this division which are subject to the jurisdiction of the certified program or plan, under any of the following circumstances: [¶] ... [¶] (2) The commission requests and the local government ... declines to act, or does not take action in a timely manner, regarding an alleged violation which could cause significant damage to coastal resources. [¶] (3) The local government ... is a party to the violation." (Pub. Resources Code, § 30810, subd. (a)(2), (3).)

The Commission twice requested that the County take enforcement to stop Sable's construction activity. (AR 300-301, 1078-1079.) The County has taken no enforcement action. Instead, in its February 12 letter to Sable, the County staff took the position that no further application to or action by the County is required for Sable to do the Anomaly Repair Work. (AR 543-544.) The Commission points to the County's February 12 letter as inaction to authorize its own action under sections 30809 and 30810. Sable points to the County's February 12 letter as action by the County precluding Commission action under sections 30809 and 30810.

To resolve this dispute, it is necessary for the Court to interpret the language in sections 30809 and 30810 of "the local government ... declines to act." (Note: For ease of writing, the Court will refer only to section 30810. Because the language is identical and there is no apparent reason for interpreting this language different as between section 30809 and 30810, the same analysis applies to section 30809.)

"We will follow the Act's plain meaning unless doing so would lead to absurd results the Legislature did not intend. [Citation.] If we cannot determine that meaning from the statutory language, we will defer to the Commission's interpretation of the Act so long as it is not clearly erroneous. [Citation.] We may also examine legislative history [citation] and 'consider the impact of an interpretation on public policy' [citation]. But we can neither insert words into the Act that the Legislature omitted nor omit words the Legislature inserted [citation]; our job is not to rewrite statutes to conform to an assumed intent that does not appear from their language [citation]." (*Wall v. California Coastal Commission* (2021) 72 Cal.App.5th 943, 953.)

17

Document received by the CA 2nd District Court of Appeal.

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 529 of 837    Page
ID #:17572
Case 1:26-cv-01486-KES-CDB    Document 12    Filed 02/20/26    Page 165 of 464

However, "[w]e give no deference to the Coastal Commission's determination in deciding whether its action exceeds the authority delegated to it by the Legislature." (*City of Malibu v. California Coastal Com.* (2012) 206 Cal.App.4th 549, 560.)

Sable argues, citing a definition of "act" as "to give a decision," that the County did act. This interpretation is not, however, consistent with the overall use of language in the statute.

"Pursuant to established principles, our first task in construing a statute is to ascertain the intent of the Legislature so as to effectuate the purpose of the law. In determining such intent, a Court must look first to the words of the statute themselves, giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose. A construction making some words surplusage is to be avoided. The words of the statute must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible. [Citations.] Where uncertainty exists consideration should be given to the consequences that will flow from a particular interpretation. [Citation.] Both the legislative history of the statute and the wider historical circumstances of its enactment may be considered in ascertaining the legislative intent." (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386–1387.)

The language of section 30810, subdivision (a)(2) is "The commission requests and the local government … declines to act, or does not take action in a timely manner, regarding an alleged violation which could cause significant damage to coastal resources." The phrase "declines to act" exists in conjunction with the "commission requests" and both are modified by "regarding an alleged violation which could cause significant damage." The phrase "declines to act" thus more naturally reads as a negative response to the Commission's request for action. That is precisely what occurred here—the County, or at least a staff member acting for the County, declined to take enforcement action as requested by the Commission, instead finding that no further action was necessary.

The ostensible purpose of section 30810, subdivision (a) is to allow the Commission to act to stop significant damage to coastal resources, even where there is a LCP in place, where the local government does not act. It is reasonable to assume that if a local government is not acting to stop such potential damage after a request by the Commission, one reason why the local government does not act is because it disagrees with the Commission as to the need or wisdom to act. The statutory language and overall statutory purpose, however, is to protect coastal resources. Thus, under subdivision (a), if the Commission sees a violation and the local government does not, the Commission may issue a CDO.

18

Document received by the CA 2nd District Court of Appeal.

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 530 of 837    Page
ID #:17573
Case 1:26-cv-01486-KES-CDB    Document 13    Filed 02/20/26    Page 166 of 464

Sable's alternative interpretation is inconsistent with the statutory scheme. As Sable points out, the action by County here is not subject to appeal, within the County or to the Commission. (AR 9358.) Consequently, under this interpretation, if the County's determination that no further authorization is required is legally wrong, the Commission has no authority to act to prevent the violation. The Commission's apparent only avenue would be to seek a writ in civil Court to make the County act differently. That consequence is plainly contrary to the statutory language to allow the Commission to act on its own to protect coastal resources when the local government does not. It is, for the same reason, also inconsistent with subdivision (a)(3) that allows the Commission to issue a CDO, notwithstanding a LCP, where the local government itself is a party to the violation.

The Court finds that, under the facts presented in the AR here, the Commission had authority to issue the April 10 Orders.

(6)    Scope of 1986 CDPs

Sable's next principal argument is that the Anomaly Repair Work was authorized by the 1986 CDPs issued by the County. The County's February 12 letter addresses this issue by stating: "The County conducted a detailed review of pipeline permitting history and the Coastal Zoning Ordinance. Planning and Development concludes that this pipeline anomaly repair work is authorized by the existing permits (Final Development Plan, Major Conditional Use Permit, and associated Coastal Development Permits) and was analyzed in the prior Environmental Impact Report/Environmental Impact Statement (EIR/EIS)." (AR 543.)

This argument was rejected by the Commission in reaching its determination to issue the April 10 Orders. (See AR 6.)

The CDPs by their express terms authorize "[c]learing, grading and trenching activities for Celeron Pipeline Project as approved by 85-DP-66cz" and "[r]emainder of all construction activities for Celeron Pipeline Project as approved by 85-DP-66cz." (AR 3891, 3894.) There is no essential dispute between the parties that the CDPs authorize not only the initial construction of the Pipelines but maintenance activities consistent with the continuing operation of the Pipelines. The parties do not point to anything in the AR to suggest that additional CDPs were required or expected for maintenance activities during the time of the continuous operation of the Pipelines. This is understanding is consistent with the EIR/EIS analysis which very generally addresses maintenance.

The circumstances at the time of the April 10 Orders, however, were markedly different from those contemplated by the CDPs as issued. One significant difference is that in 2015 there was an oil spill that shut down the operation of the Pipelines. The Anomaly Repair Work did not commence until 2024, with approximately nine

Document received by the CA 2nd District Court of Appeal.

19

005391

years of hiatus. (AR 1748-1750.) Another significant difference is that the work in 2024 was significantly more intense than prior maintenance activities. The work done by Sable involved work at 121 sites done during a single year, rather than limited work done throughout nearly a decade.

The definition of "development" under Public Resources Code section 30106 includes "construction" and "reconstruction" of any "structure." "Structure" is further defined to include a "pipe." Because the definition of "development" expressly includes both "construction" and "reconstruction," under ordinary principles of statutory construction, these terms are interpreted to mean different things. Thus, a permit that allows for "construction" would not in the ordinary sense also allow for "reconstruction." And, indeed, the CDPs expressly permit "construction" without mention of "reconstruction." The dictionary definition of "reconstruct" is sensible, including: "to construct again: as **a** (1): to build again: rebuild <~*ing* destroyed railroads> (2): to make over: repair <~*ed* the highways that needed it>." (Webster's 3d New Internat. Dict. (1986) p. 1897.) So "reconstruction" (the action of reconstructing (*id.*, p. 1898)) includes concepts of both rebuilding and repair.

By including "reconstruction" as separate from "construction," it is reasonable to conclude that at some point the extent of maintenance of a project would move from construction to reconstruction, where reconstruction would be a development requiring a CDP separate from the CDP authorizing construction. Whether specific to that part of the definition of "development" or more generally, these concepts provide an analytical framework to distinguish among permitted development as authorized by a CDP and unpermitted further development requiring a separate CDP.

As a starting point, it is useful to note that the EIR/ EIS projected a 30-year life of the project, although the actual life would depend on the availability of crude oil. (AR 2580.) This projected end of life is close to when the 2015 Refugio Oil Spill occurred. In that timeframe, work needed to keep the Pipeline operational would be expected to intensify and thus be more akin to "reconstruction" than mere maintenance. This is consistent with the record of what happened. According to Commission staff, the work done by Sable far exceeds the simple repair and maintenance as described by Sable:

"Sable has excavated and reinforced or replaced the line at more than 130 separate locations along its roughly 14-mile length in the Coastal Zone, in some extended stretches, leaving behind barely any in its original condition. In addition, the type of work being done, which includes permanent removal of the insulating layer on the outside of the line, which was a critical feature of the original design." (AR 13000-13001.) "Based on information from Sable, it has excavated over 3.7 acres across its worksites in the Coastal Zone and an estimated 72,000 cubic yards of soil." (AR

Document received by the CA 2nd District Court of Appeal.

20

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 532 of 837    Page
ID #:17575
Case 1:26-cv-01486-KES-CDB    Document 15    Filed 02/20/26    Page 168 of 464

13001.) "Considering the additional area of habitat removal and disturbance for access roads and staging areas and stockpile areas for the worksites, the cumulative impact of the work is significantly greater." (AR 13002.)

This last point is also meaningful. Even it is assumed that the same repair and maintenance work that was actually done by Sable (or at the time of the CDO contemplated by Sable) would have ultimately have been required during continuous operation of the Pipelines, such work would have been accomplished under the CDP authorization over the course of approximately nine years. Doing all of that work in the space of a few months has a cumulative effect of a substantially increased intensity of use of the land that is more consistent with "reconstruction" than maintenance "construction."

While there are some factual disputes regarding the scope and nature of the work performed by Sable (and, as of the time of the CDO, to have been performed by Sable), the Commission determined the extent of this work to exceed the scope of "construction" as authorized by the existing CDPs. This is a different conclusion than apparently reached by the County. This disagreement raises an issue about the extent to which deference is owed to either decision. (See *Reddell, supra,* 180 Cal.App.4th 956, 968, quoting *Divers' Environmental Conservation Organization v. State Water Resources Control Bd.* (2006) 145 Cal.App.4th 246, 252, 51 Cal.Rptr.3d 497 [" '... we must also defer to an administrative agency's interpretation of a statute or regulation involving its area of expertise, unless the interpretation flies in the face of the clear language and purpose of the interpreted provision' "].)

As between the County's position and the Commission's position, the Commission's position is more persuasive. The issue presented to each agency is the same. The Commission, in addition to its position as a state-wide agency responsible for Coastal Act issues, adopted its position by action of its Commissioners with a detailed staff report incorporated by reference. (AR 12493-12494.) The County's February 12 letter is conclusory in its analysis, reflects the position of staff rather than a decisional body of the County, and contains express qualifications as to the limitations of it as a County decision. (AR 543-544.) Under these circumstances, to whatever extent deference is to be paid to these determinations, the Commission's determination is entitled to greater deference.

As a consequence, applying these concepts to the instant situation, the scope of the activity is more consistent with "reconstruction" than with "construction." The Court finds that there is substantial evidence to support the Commission's conclusion that the work is beyond the scope of the 1986 CDPs. To whatever extent this is a legal determination, the Court agrees with the Commission's characterization of such work as beyond the scope of the 1986 CDPs.

Document received by the CA 2nd District Court of Appeal.

21

005393

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 533 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 16   Filed 02/20/26   Page 169 of 464
ID #:17576

While the above discussion is focused on the Anomaly Repair Work, the same analysis and conclusion applies to both the installation of safety valves and the offshore repair work, as discussed below.

The Court concludes that Sable has not shown that the Commission was in error in determining that the prior CDPs did not authorize the work subject to the April 10 Orders. Put differently, under the standards applicable to administrative writs, Sable has not shown that its work was authorized under the Coastal Act.

(7)   OSFM Approval of Safety Valve Installation

Sable also argues that because the OSFM compelled and approved Sable's installation of safety valves, that specific work is permitted by the existing CDPs. It is significant to note that the OSFM required operators to retrofit existing pipelines with "best available technology" (BAT), i.e., an automatic shutoff system, by April 1, 2023. (Cal. Code Regs., tit. 19, § 2108, subd. (c).) The work subject to the April 10 Orders occurred in 2024 as part of the extensive work performed by Sable. For the same reasons discussed above, whether or not specific work could under different conditions been considered as within the scope of the existing CDPs, the Commission did not err in determining that the extensive work conducted by Sable was beyond the scope of the 1986 CDPs and hence unpermitted.

(8)   Offshore Work

Sable further argues that the Offshore Repair Work was fully authorized by the prior CDP. This argument is subject to the same analysis as discussed above. The offshore portion of the Pipelines was constructed under a CDP issued by the Commission (rather than the County) in 1988. (AR 61-62.) The Offshore Repair Work included within the unpermitted work identified in the April 10 Orders include the deployment and positioning of sand and concrete bags to provide structural support below section from which the seafloor had scoured or eroded. (AR 6.) As with the onshore work, there is a factual dispute between the parties as to the characterization of the work, among other things, as being within the scope of the 1988 CDPs. For the same reasons discussed above, whether or not specific work could under different conditions have been considered as within the scope of the existing CDPs, the Commission did not err in determining that the extensive work conducted by Sable was beyond the scope of the 1988 CDP and hence unpermitted.

(9)   Conclusion

As the above discussion demonstrates, the issue before the Court is not whether the specific work conducted by Sable was or is ultimately necessary or appropriate for pipeline safety. The issue before the Court is whether the Commission abused its

22

Document received by the CA 2nd District Court of Appeal.

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 534 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 170 of 464
ID #:17577

discretion in issuing the April 10 Orders under the standards for review by petition for administrative writ of mandate.

Based on the foregoing analysis and a review of all of the arguments of the parties and the AR, the Court finds the Commission's factual findings are supported by substantial evidence and that Sable has not met its burden to show an abuse of discretion by the Commission in issuing the April 10 Orders.

Accordingly, the petition for administrative mandate as set forth in the first cause of action of Sable's FAP will be denied.

Thomas P. Anderle, Judge

Document received by the CA 2nd District Court of Appeal.

23

005395

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 535 of 837   Page
ID #:17578
Case 1:26-cv-01486-KES-CDB   Document 18   Filed 02/20/26   Page 171 of 464

ROB BONTA
Attorney General of California
BRANDON S. WALKER SBN. 254581
Supervising Deputy Attorney General
JACK C. NICK SBN. 160196
ISABELLA A. PANUCCINI SBN. 318984
Deputy Attorneys General
 1300 I Street, Suite 125
Sacramento, CA 95814
Telephone: (916) 210-6395
Fax: (916) 327-2319
E-mail: Brandon.Walker@doj.ca.gov
*Attorneys for Defendant State of California*

**ELECTRONICALLY FILED**
Superior Court of California,
County of Kern
By: Marina Mercado
Deputy Clerk
**12/5/25 1:54 PM**

*Exempt from Filing Fees Pursuant to
Government Code § 6103*

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF KERN

METROPOLITAN DIVISION

| | |
|---|---|
| **Pacific Pipeline Company, A Delaware Corporation,**<br><br>Plaintiff,<br><br>v.<br><br>**State of California and DOES 1 through 25,**<br><br>Defendants. | Case No. BCV25103508<br><br>**DECLARATION OF BRANDON S. WALKER IN SUPPORT OF MOTION TO CHANGE VENUE (Vol. 2 of 3)**<br><br>Date:    February 3, 2026<br>Time:    8:30 a.m.<br>Dept:    H<br>Judge:   Hon. Bernard C. Barmann, Jr.<br><br>Action Filed: September 29, 2025 |

1

Case 2:26-cv-05242-SVW-SSC     Document 36     Filed 05/14/26     Page 536 of 837   Page
Case 1:26-cv-01486-KES-CDB     Document 1     Filed 02/20/26     Page 172 of 464
ID #:17579

# EXHIBIT "D"

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 537 of 837    Page
ID #:17590
Case 1:26-cv-01486-KES-CDB    Document 9-3    Filed 02/20/26    Page 173 of 464
Case 2:20-cv-02415    Document 6-1    Filed 03/13/20    Page 1 of 102    Page ID #:94

BRUCE S. GELBER
Deputy Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
Washington, D.C. 20530
BRADLEY R. O'BRIEN (CA Bar Number: 189425)
Senior Attorney
ANGELA MO (CA Bar Number: 262113)
Trial Attorney
Environmental Enforcement Section
United States Department of Justice
301 Howard Street, Suite 1050
San Francisco, California 94105
Tel: (415) 744-6484;
Tel: (202) 514-1707
E-mail: brad.obrien@usdoj.gov
E-mail: angela.mo@usdoj.gov
Counsel for Plaintiff United States of America

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, and the PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* DEPARTMENT OF FISH AND WILDLIFE, PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* CENTRAL COAST REGIONAL WATER QUALITY CONTROL BOARD, *ex rel.* CALIFORNIA DEPARTMENT OF PARKS AND RECREATION, *ex rel.* CALIFORNIA STATE LANDS COMMISSION, *ex rel.* CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION'S OFFICE OF STATE FIRE MARSHAL, and THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>Plaintiffs,<br><br>v.<br><br>PLAINS ALL AMERICAN PIPELINE, L.P. and PLAINS PIPELINE, L.P.,<br><br>Defendants. | Civil Action No.<br><br>2:20-cv-02415<br><br>**CONSENT DECREE** |

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 538 of 837    Page
ID #:17591
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 174 of 464
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 2 of 102   Page ID #:95

XAVIER BECERRA
Attorney General of California
ERIC M. KATZ
Supervising Deputy Attorney General
MICHAEL ZARRO (CA Bar Number: 110171)
JESSICA BARCLAY-STROBEL (CA Bar Number: 280361)
Deputy Attorneys General
300 South Spring Street, Suite 1702
Los Angeles, California 90013
Tel: (213) 269-6635
E-mail: Jessica.BarclayStrobel@doj.ca.gov
*Counsel for Plaintiffs California Department of Fish and Wildlife, Central Coast
Regional Water Quality Control Board, and California Department of Forestry
and Fire Protection's Office of State Fire Marshal*

XAVIER BECERRA
Attorney General of California
CHRISTINA BULL ARNDT
Supervising Deputy Attorney General
NICOLE RINKE (CA Bar Number: 257510)
MITCHELL E. RISHE (CA Bar Number: 193503)
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, California 90013
Tel: (213) 269-6394
E-mail: Mitchell.Rishe@doj.ca.gov
*Counsel for Plaintiffs California Department of Parks and Recreation and
California State Lands Commission*

MARGARET WU (CA Bar Number: 116588)
Deputy General Counsel
BARTON LOUNSBURY (CA Bar Number: 253895)
Senior Counsel
University of California
Office of the General Counsel
1111 Franklin Street, 8th Floor
Oakland, California 94607-5200
Tel: (510) 987-9800
E-mail: barton.lounsbury@ucop.edu
*Counsel for Plaintiff The Regents of the University of California*

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 539 of 837   Page
ID #:17592
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 175 of 464
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 3 of 102   Page ID #:96

# TABLE OF CONTENTS

I.      BACKGROUND ........................................................................... - 5 -

II.     JURISDICTION AND VENUE ................................................... - 6 -

III.    APPLICABILITY ........................................................................ - 7 -

IV.     DEFINITIONS ............................................................................. - 7 -

V.      CIVIL PENALTIES .................................................................... - 13 -

VI.     NATURAL RESOURCE DAMAGES ........................................ - 17 -

VII.    TRUSTEES' MANAGEMENT AND APPLICABILITY
        OF JOINT NRD FUNDS ............................................................ - 21 -

VIII.   TRUSTEES' MANAGEMENT OF RECREATIONAL
        USE FUNDS ................................................................................ - 22 -

IX.     INJUNCTIVE RELIEF ................................................................ - 23 -

X.      CORRECTIVE ACTION ORDER .............................................. - 27 -

XI.     STIPULATED PENALTIES ........................................................ - 27 -

XII.    FORCE MAJEURE ...................................................................... - 35 -

XIII.   DISPUTE RESOLUTION ........................................................... - 37 -

XIV.    REPORTING ................................................................................ - 39 -

XV.     CERTIFICATION ........................................................................ - 40 -

XVI.    INFORMATION COLLECTION AND RETENTION .................. - 40 -

XVII.   EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS ........... - 43 -

XVIII.  TRANSFER AND ACQUISITION OF ASSETS ......................... - 49 -

XIX.    COSTS .......................................................................................... - 50 -

XX.     NOTICES ...................................................................................... - 51 -

XXI.    EFFECTIVE DATE ..................................................................... - 54 -

XXII.   RETENTION OF JURISDICTION .............................................. - 54 -

XXIII.  MODIFICATION .......................................................................... - 54 -

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 540 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 1-3    Filed 02/20/26    Page 176 of 464
Case 2:20-cv-02415    Document 6-1    Filed 03/13/20    Page 4 of 102    Page ID #:97

XXIV.    TERMINATION ....................................................................- 55 -

XXV.    PUBLIC PARTICIPATION.......................................................- 56 -

XXVI.    SIGNATORIES/SERVICE ......................................................- 56 -

XXVII.    INTEGRATION..................................................................- 57 -

XXVIII.  FINAL JUDGMENT.............................................................- 57 -

XXIX.    26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION ...............- 57 -

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- ii -

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 541 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 177 of 464
ID #:17594
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 5 of 102   Page ID #:98

A.   WHEREAS, on or about May 19, 2015, a hazardous liquid pipeline known as the Line 901 pipeline ("Line 901") owned and operated by Plains Pipeline, L.P., a wholly owned subsidiary of Plains All American Pipeline, L.P., (jointly, "Plains" or "Defendants"), failed and discharged approximately 2,934 barrels of heavy crude-oil ("Refugio Incident") in Santa Barbara County, California.  A portion of the oil reached the Pacific Ocean and coastal areas such as Refugio State Beach.  The Refugio Incident adversely impacted Natural Resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States and the State of California ("California" or the "State").

B.   WHEREAS, cleanup actions began immediately after the Refugio Incident at the direction of a Unified Command established by the United States Coast Guard ("USCG") and the State of California Department of Fish and Wildlife ("CDFW"), Office of Spill Prevention and Response ("OSPR").  The Unified Command was comprised of the United States, State agencies, the County of Santa Barbara, and Plains.

C.   WHEREAS, on May 21, 2015, the United States Department of Transportation's Pipeline and Hazardous Materials Safety Administration ("PHMSA") issued Plains a Corrective Action Order ("Original CAO"), CPF No. 5-2015-5011H, which was subsequently amended on June 3, 2015 ("CAO Amendment No. 1"), November 12, 2015 ("CAO Amendment No. 2"), and June 16, 2016 ("CAO Amendment No. 3"), (collectively, "the PHMSA CAO").  The PHMSA CAO directed Plains, among other things, to purge Line 901 and a portion of the adjoining Line 903 pipeline ("Line 903"), between Plains' Gaviota and Pentland pump stations, and to keep Line 901 and the purged sections of Line 903 shut down until the actions required by the PHMSA CAO were satisfactorily completed.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 1 -

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 542 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 5    Filed 02/20/26    Page 178 of 464
ID #:17595
Case 2:20-cv-02415    Document 6-1    Filed 03/13/20    Page 6 of 102    Page ID #:99

D.    WHEREAS, on May 19, 2016, PHMSA issued a Failure Investigation Report, which included PHMSA's findings of the "proximate or direct" causes and the "contributing" causes of the Refugio Incident.

E.    WHEREAS, Defendants reimbursed Plaintiffs' costs incurred for cleanup, and Plaintiffs have no known unreimbursed claims for cleanup costs arising from the Refugio Incident.

F.    WHEREAS, CDFW incurred certain additional costs arising from the administration and civil enforcement of pollution laws, including attorneys' fees that have been reimbursed by Plains.

G.    WHEREAS, Plains represents that it has implemented and will continue to utilize an electronic tracking tool and software for maintenance activities, including those activities related to mainline valves. The software tracks which maintenance activities are performed, who performs the activity, when prior notifications of maintenance activities by field personnel are received, when problems requiring maintenance are first discovered, and when maintenance problems are corrected. Plains maintains a separate software program to track the training and qualifications of all maintenance personnel.

H.    WHEREAS, Plains represents that, following the Refugio Incident and pursuant to PHMSA's CAO, Plains performed a comprehensive review of its Emergency Response Plan and Training Program, and revised and updated its Response Plan for Onshore Oil Pipelines for Line 901 and Line 903 ("Bakersfield District Response Zone Plan") to reflect modifications resulting from the review and the incorporation of lessons learned. As part of the revision, Plains identified the locations of culverts along the pipelines' rights-of-way and provided containment and recovery techniques for responding to spills that may occur near those culverts. Plains provided drafts of the updated Bakersfield District Response Zone Plan to PHMSA, incorporated comments provided by PHMSA, and received approval of the revised plan from PHMSA on September 26, 2017.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 2 -

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 543 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 596   Filed 02/20/26   Page 179 of 464
ID #:17596
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 7 of 102   Page ID #:100

I.   WHEREAS, Plains represents that it also created a more detailed Geographic Information System ("GIS") based online Tactical Response Plan for its onshore oil pipelines in Southern California, including Line 2000 and the operational portion of Line 903, that, among other things, identifies culverts along the pipelines' rights-of-way, potential receptors and the equipment, supplies and resources that would be necessary to respond to a spill occurring at any given location along those pipelines, identifies the sources and locations for obtaining those resources, and, in some instances, establishes stored inventories of those resources in specific locations. Plains represents that it intends to keep its Tactical Response Plan updated and available for use in drills and spill response, and that it will make the Tactical Response Plan available to the Plaintiffs upon reasonable request and as needed in connection with a drill or response to a spill.

J.   WHEREAS, Plains represents that Plains personnel responding to incidents that trigger the standup of an incident command structure ("ICS") have been provided ICS training appropriate to their responsibilities.

K.   WHEREAS, the relevant Natural Resources trustees ("Trustees") for the Refugio Incident are the United States Department of the Interior ("DOI"); United States Department of Commerce, on behalf of the National Oceanic and Atmospheric Administration ("NOAA"); CDFW; California Department of Parks and Recreation ("CDPR"); California State Lands Commission ("CSLC"); and The Regents of the University of California ("UC").

L.   WHEREAS, pursuant to Section 1006 of the Oil Pollution Act ("OPA"), 33 U.S.C. 2701, *et seq.*, the United States and the State Trustees allege that oil from the Refugio Incident caused injuries to Natural Resources, including birds, marine mammals, shoreline and subtidal habitats, and also had an impact upon human uses of Natural Resources and other public resources. The Federal Trustees are designated pursuant to the National Contingency Plan,

*United States of America and the People of the State of California v.
Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 3 -

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 544 of 837    Page
ID #:17597
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 180 of 464
Case 2:20-cv-02415    Document 6-1    Filed 03/13/20    Page 8 of 102    Page ID #:101

40 C.F.R. § 300.600 and Executive Order 12777. CDFW and CDPR are designated state trustees pursuant to the National Contingency Plan, 40 C.F.R. § 300.605, and the Governor's Designation of State Natural Resource Trustees pursuant to Section 1006(b)(3) of OPA and the Comprehensive Environmental Response, Compensation and Liability Act of 1980. In addition, CDFW has state natural resource trustee authority pursuant to California Fish and Game Code §§ 711.7 and 1802 and the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act (California Government Code § 8670.1 *et seq.*). CDPR and UC have jurisdiction over natural resources within the state park system and the UC Natural Reserve System, respectively, which are held in trust for the people of the State of California. CSLC is a state trustee pursuant to its jurisdiction under Public Resources Code § 6301 and Civil Code § 670.

M.    WHEREAS, after the Refugio Incident, the Trustees and Defendants entered into a cooperative Natural Resource Damage Assessment process pursuant to 15 C.F.R. § 990.14, whereby the Trustees and Defendants jointly and independently planned and conducted a number of injury assessment activities. These activities included gathering and analyzing data and other information that the Trustees used to determine and quantify resource injuries and damages. As a result of this process and other activities, the Trustees identified several categories of injured and damaged Natural Resources, including birds, marine mammals, and shoreline and subtidal habitats, as well as effects to human use/recreation resulting from impacts on these Natural Resources, and determined the cost to restore, rehabilitate, replace, or acquire the equivalent of injured Natural Resources. By entering this Consent Decree, Defendants do not admit or agree that the Trustees' NRD findings and determinations are accurate.

N.    WHEREAS, due to the specific facts surrounding the Refugio Incident, including the timing, degree, and nature of the spill and the affected

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 4 -

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 545 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 181 of 464
ID #:17598
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 9 of 102   Page ID #:102

environment, the Trustees will not seek additional damages, costs, or expenses for Natural Resources resulting from the Refugio Incident.

O.     WHEREAS, Plains agrees to reimburse costs incurred by the Trustees in connection with the NRDA through November 15, 2018, and will not reimburse costs incurred by the Trustees in connection with the NRDA after that date.

P.     WHEREAS, by entering into this Consent Decree, Plains does not admit the allegations in the Complaint filed in this action, or any liability to the Plaintiffs.

Q.     WHEREAS, on January 28, 2019, PHMSA initiated a regularly-scheduled "Integrated Inspection" of a portion of Defendants' Regulated Pipelines, as described below, and other pipeline facilities and records, pursuant to 49 U.S.C. § 60117.

R.     WHEREAS, the Parties agree that settlement of this matter without further litigation is in the public interest and that the entry of this Consent Decree is the most appropriate means of resolving this action.

S.     WHEREAS, the Parties agree and the Court by entering this Consent Decree finds, that this Consent Decree: (1) has been negotiated by the Parties at arm's-length and in good faith; (2) will avoid prolonged litigation between the Parties; (3) is fair and reasonable; and (4) furthers the objectives of the federal and state environmental protections, and the federal and state pipeline safety laws.

## I.     BACKGROUND

The United States, on behalf of PHMSA, the United States Environmental Protection Agency ("EPA"), DOI, NOAA, and USCG; and the People of the State of California *Ex Relatione* CDFW, CDPR, CSLC, UC, the California Central Coast Regional Water Quality Control Board ("RWQCB"), and the California Department of Forestry and Fire Protection's - Office of the State Fire

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 5 -

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 546 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 19   Filed 02/20/26   Page 182 of 464
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 10 of 102   Page ID #:103

Marshal ("OSFM"), filed a Complaint in this matter pursuant to the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq.*, and associated regulations and orders; OPA, 33 U.S.C. §§ 2701 *et seq.*, and associated regulations and orders; the federal Pipeline Safety Laws, 49 U.S.C. §§ 60101 *et seq.*, and associated regulations and orders; the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act, California Government Code §§ 8670.1 *et seq.* and associated regulations; California Fish and Game Code §§ 2014, 5650, 5650.1, 12016, 13013; California Water Code §§ 13350, 13385; and the Elder California Pipeline Safety Act of 1981, California Government Code §§ 51010 *et seq.* The Complaint against Plains, *inter alia*, asserts allegations of violations, and seeks penalties, injunctive relief, and Natural Resource Damages.

NOW, THEREFORE, before the trial of any claims and without adjudication or admission of any issue of fact or law and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## II.    JURISDICTION AND VENUE

1.    This Court has jurisdiction over the subject matter of the United States' claims in this action pursuant to Section 311(b)(7)(E) and (n) of the CWA, 33 U.S.C. § 1321(b)(7)(E) and (n), Section 1017(b) of OPA, 33 U.S.C. § 2717(b); Sections 60120 and 60122 of the Pipeline Safety Laws, 49 U.S.C. §§ 60120 and 60122; and 28 U.S.C. §§ 1331, 1345, and 1355. This Court has supplemental jurisdiction over the State law claims pursuant to 28 U.S.C. § 1367. To the extent the OPA presentment requirement described in 33 U.S.C. § 2713 applies, the United States and the State Agencies have satisfied the requirement.

2.    Venue is proper in this District pursuant to Section 311(b)(7)(E) of the CWA, 33 U.S.C. § 1321(b)(7)(E), Section 1017(b) of OPA, 33 U.S.C. § 2717(b); Section 60120 of the Pipeline Safety Laws, 49 U.S.C. § 60120; and 28 U.S.C. §§ 1391 and 1395(a), because Plains

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 6 -

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 547 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 6-1   Filed 02/20/26   Page 183 of 464
ID #:17590
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 11 of 102   Page ID #:104

does business in this District and the alleged claims occurred in this District.

3. For purposes of this Consent Decree or any action to enforce this Consent Decree, Defendants consent to the Court's jurisdiction over this Consent Decree for such action and Defendants consent to venue in this judicial district. For purposes of this Consent Decree and without admission of liability, Defendants agree that the Complaint states claims upon which relief may be granted.

### III.   APPLICABILITY

4. Subject to the terms herein, the obligations of this Consent Decree apply to and are binding upon the Parties and any successors, assigns, as well as any other entities or persons otherwise bound by law to comply with this Consent Decree.

5. Defendants shall provide a copy of this Consent Decree to all officers, employees, and agents whose duties might reasonably include ensuring compliance with any provision of this Consent Decree, as well as to any contractor retained for the purpose of performing work required under this Consent Decree. Defendants shall condition any such contract upon performance of the work in conformity with the terms of this Consent Decree by specifying that contractors are obligated to perform work in compliance with this Consent Decree.

6. In any action to enforce this Consent Decree, Defendants shall not raise as a defense the failure by any of their officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

### IV.   DEFINITIONS

7. Terms used in this Consent Decree that are defined in the CWA, OPA, Pipeline Safety Laws, the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act, and the Elder California Pipeline Safety Act of 1981 shall

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 548 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 91   Filed 02/20/26   Page 184 of 464
ID #:17591
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 12 of 102   Page ID #:105

have the meanings assigned to them in these statutes and their regulations, unless otherwise provided in this Consent Decree.  Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

"Appendix A" is the set of maps that generally depict Lines 901, 903, and 2000;

"Appendix B" is the Injunctive Relief that Plains is required to perform under this Consent Decree;

"Appendix C" is intentionally left blank;

"Appendix D" is the list of remaining corrective actions from the PHMSA CAO that Plains is still required to implement under this Consent Decree.  For the terms of the PHMSA CAO, *see* https://primis.phmsa.dot.gov/comm/reports/enforce/CaseDetail_cpf_520155011H .html?nocache=4888#_TP_1_tab_1;

"CDFW" shall mean the California Department of Fish and Wildlife and any of its successor departments or agencies;

"CDPR" shall mean the California Department of Parks and Recreation and any of its successor departments or agencies;

"Complaint" shall mean the Complaint filed by the Plaintiffs in this action;

"Consent Decree" shall mean this Consent Decree and all Appendices attached hereto;

"Control Room Management Plan" shall mean Plains' Control Room Management Plan, dated October 2019, and delivered to PHMSA electronically on October 21, 2019, from counsel for Defendants;

"Control Center General Procedures" shall mean Plains' Control Center General Procedures, dated October 2019, and delivered to PHMSA electronically on October 21, 2019, from counsel for Defendants;

"CSLC" shall mean the California State Lands Commission and any of its successor departments or agencies;

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 8 -

Case 2:26-cv-05242-SVW-SSC Document 36 Filed 05/14/26 Page 549 of 837 Page
Case 1:26-cv-01486-KES-CDB Document 92 Filed 02/20/26 Page 185 of 464
ID #:17592
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 13 of 102 Page ID #:106

"Day" shall mean a calendar day unless expressly stated to be a working day. In computing any period of time under this Consent Decree, the rules set forth in Rule 6 of the Federal Rules of Civil Procedure shall apply;

"Defendants" shall mean Plains All American Pipeline, L.P. and Plains Pipeline, L.P.;

"Delivery Lines" as stated in Appendix B shall mean any pipeline that generally operates to move oil from a delivery meter on a pipeline or facility to another pipeline or facility in close proximity;

"DOI" shall mean the United States Department of the Interior, including its bureaus and agencies, and any of its successor departments or agencies;

"Elder California Pipeline Safety Act" shall mean the Elder California Pipeline Safety Act of 1981, California Government Code §§ 51010 *et seq.*;

"EPA" shall mean the United States Environmental Protection Agency and any of its successor departments or agencies;

"Effective Date" shall have the definition provided in Section XXI (Effective Date);

"Federal Trustees" shall mean DOI and NOAA in their capacities as Natural Resource Trustees;

"Integrity Management Plan" or "IMP" shall mean Plains' Integrity Management Plan, dated September 2019, as delivered to PHMSA by letter dated November 19, 2019, from counsel for Defendants;

"Line 901" is Defendants' 24-inch diameter crude-oil pipeline that extends approximately 10.7 miles in length from the Los Flores Pump Station to the Gaviota Pump Station, in Santa Barbara County, California, as generally depicted in Appendix A;

"Line 903" is Defendants' 30-inch diameter crude-oil pipeline that extends approximately 129 miles in length from the Gaviota Pump Station in Santa Barbara County, California to the Emidio Pump Station in Kern County,

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 9 -

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 550 of 837   Page ID #:17593
Case 1:26-cv-01486-KES-CDB   Document 3   Filed 02/20/26   Page 186 of 464
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 14 of 102   Page ID #:107

California, with intermediate stations at Sisquoc Mile Post 38.5 and Pentland Mile Post 114.57, as generally depicted in Appendix A;

"Line 2000" is Defendants' 20-inch diameter pipeline that extends approximately 130 miles in length and transports crude-oil produced in the outer continental shelf and the San Joaquin Valley.  Line 2000 runs from Bakersfield, California, over the Tehachapi Mountains and through the Grapevine I-5 corridor and extends to delivery locations in the Los Angeles metropolitan area, as generally depicted in Appendix A;

"Mainline pipeline" as stated in Appendix B shall mean the principal pipeline or the parallel pipeline in a given pipeline system, excluding connected lateral lines or branch lines that are used locally to deliver product either into the mainline pipeline from, or out of the mainline pipeline to, a nearby facility or a third-party line;

"Natural Resource" and "Natural Resources" shall mean land, fish, mammals, birds, wildlife, biota, air, water, ground water, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States and/or the State or any subdivision thereof, and shall also mean the services provided by such resources to other resources or to humans;

"Natural Resource Damages" or "NRD" shall mean all damages, including restoration or rehabilitation costs, recoverable by the United States or State Trustees for injuries to, destruction of, loss of, or loss of use of, natural resources including any services such natural resources provide, including the reasonable costs of assessing the damage, as described in 33 U.S.C. § 2702(b)(2)(A), resulting from the Refugio Incident;

"Natural Resource Damage Assessment" or "NRDA" shall mean the process of collecting, compiling, and analyzing information, statistics, or data through prescribed methodologies to determine damages for injuries to Natural

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 10 -

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 551 of 837    Page
ID #:17594
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 187 of 464
Case 2:20-cv-02415    Document 6-1    Filed 03/13/20    Page 15 of 102    Page ID #:108

Resources, as described in 15 C.F.R. Part 990, resulting from the Refugio Incident;

"NRD Payment" shall mean the payment Defendants are required to pay for the Natural Resource Damages as described in Section VI (Natural Resource Damages);

"Natural Resource Trustees" or "Trustees" are those federal and state agencies or officials designated or authorized pursuant to the CWA, OPA, and/or applicable state laws to act as Trustees for the Natural Resources belonging to, managed by, controlled by, or appertaining to the United States or the State. Participating Trustees in the Natural Resource Damage Assessment and in this Consent Decree are DOI, NOAA, CDFW, CDPR, CSLC, and UC;

"NOAA" shall mean the National Oceanic and Atmospheric Administration and any of its successor departments or agencies;

"Oil Spill Liability Trust Fund" or "OSLTF" shall mean, *inter alia*, the fund established pursuant to 26 U.S.C. § 9509, including the claim-reimbursement provisions set forth in 33 U.S.C. § 2712;

"OSFM" shall mean the California Department of Forestry and Fire Protection's - Office of the State Fire Marshal and any of its successor departments or agencies;

"Paragraph" shall mean a portion of this Consent Decree identified by an Arabic numeral;

"Parties" shall mean the Plaintiffs and Defendants, collectively;

"PHMSA" shall mean the United States Department of Transportation, Pipeline and Hazardous Materials Safety Administration and any of its successor departments or agencies;

"PHMSA Corrective Action Order" or "PHMSA CAO" shall mean the Original CAO issued on May 21, 2015, by PHMSA, which was subsequently amended on June 3, 2015, November 12, 2015, and June 16, 2016;

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 11 -

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 552 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 15   Filed 02/20/26   Page 188 of 464
ID #:17595
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 16 of 102   Page ID #:109

"Pipeline Safety Laws" shall mean 49 U.S.C. §§ 60101 *et seq.*, and regulations promulgated thereunder, including 49 C.F.R. Parts 190-199;

"Plaintiffs" shall mean the United States and the State Agencies;

"Refugio Incident" shall mean the release of approximately 2,934 barrels of crude-oil from Plains' Line 901 Pipeline, in Santa Barbara County, California on or about May 19, 2015;

"Regulated Pipeline" shall mean any pipeline operated by Plains subject to regulation under 49 C.F.R. Subchapter D, 19 California Code of Regulations Div. 1 Ch. 14, or the pipeline safety regulations of any other state certified by PHMSA pursuant to 49 U.S.C. § 60105, but excludes facilities other than pipelines;

"Requests for Information" or "RFI" shall mean PHMSA's RFIs dated August 19, 2015, August 21, 2015, and September 1, 2016. RFIs shall also refer to PHMSA's subpoenas issued to Plains dated July 27, 2016 and June 2, 2017;

"Restore" or "Restoration" shall mean any action or combination of actions to restore, rehabilitate, replace or acquire the equivalent of any Natural Resource and its services, including Natural Resource-based recreational opportunities that were injured, lost, or destroyed as a result of the Refugio Incident;

"RWQCB" shall mean the California Central Coast Regional Water Quality Control Board and any of its successor departments or agencies;

"Section" shall mean a portion of this Consent Decree identified by a Roman numeral;

"Segment" as stated in Appendix B shall mean any contiguous portion of a pipeline system for which a single hydrostatic test or ILI may be performed, as determined by Defendants;

"State Agencies" shall mean the People of the State of California, *Ex Relatione* CDFW, CDPR, CSLC, OSFM, RWQCB, and UC. The State Agencies do not include any entity or political subdivision of the State of California other than those agencies herein designated the "State Agencies";

Case 2:26-cv-05242-SVW-SSC  Document 36  Filed 05/14/26  Page 553 of 837  Page
Case 1:26-cv-01486-KES-CDB  Document 36  ID #:17596  Filed 02/20/26  Page 189 of 464
Case 2:20-cv-02415  Document 6-1  Filed 03/13/20  Page 17 of 102  Page ID #:110

"State Trustees" shall mean CDFW, CDPR, CSLC, and UC in their capacities as Natural Resource Trustees;

"United States" shall mean the United States of America, on behalf of PHMSA, EPA, DOI, NOAA, and USCG;

"UC" shall mean The Regents of the University of California and any of its successor departments or agencies; and

"USCG" shall mean the United States Coast Guard and any of its successor departments or agencies.

## V.  CIVIL PENALTIES

A.  Within thirty (30) Days after the Effective Date, Defendants shall pay to the United States, CDFW, and RWQCB a total civil penalty of twenty-four million dollars ($24,000,000), together with interest accruing from the date on which the Consent Decree is lodged with the Court, at a rate specified in 28 U.S.C. § 1961 (the "Penalty Payment"). The Penalty Payment shall be allocated as follows:

8.  Penalty Payment to the United States (PHMSA). For violations of the Pipeline Safety Laws alleged in the United States' Complaint, Defendants shall pay to the United States a civil penalty of fourteen million five hundred thousand dollars ($14,500,000), together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made as follows:

 a.  Thirteen million two hundred fifty thousand dollars ($13,250,000) attributed to Plains' alleged Pipeline Safety Law violations; and

 b.  One million two hundred fifty thousand dollars ($1,250,000) attributed to Plains' alleged non-compliance with the RFIs.

 c.  Payment shall be made by FedWire Electronic Funds Transfer ("EFT") to the United States Department of Justice in accordance with written instructions to be provided to Defendants by the

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 13 -

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 554 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 190 of 464
ID #:17597
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 18 of 102   Page ID #:111

Financial Litigation Unit ("FLU") of the United States Attorney's Office for the Central District of California Western Division after the Effective Date. The payment instructions provided by the FLU will include a Consolidated Debt Collection System ("CDCS") number, which Defendants shall use to identify all payments required to be made in accordance with this Consent Decree. The FLU will provide the payment instructions to:

> Megan Prout
> Senior Vice President
> Commercial Law and Litigation
> Plains All American Pipeline, L.P.
> 333 Clay Street, Suite 1600
> Houston, TX 77002

on behalf of Defendants. Defendants may change the individual to receive payment instructions on their behalf by providing written notice of such change to the United States in accordance with Section XX (Notices).

d.       At the time of payment, Defendants shall send a copy of the EFT authorization form and the EFT transaction record, together with a transmittal letter, which shall state the payment is for the civil penalty owed pursuant to this Consent Decree in the *United States of America and the People of the State of California v. Plains All American Pipeline, L.P., et al.*, and shall reference the Civil Action Number assigned to this case, CDCS Number, and DOJ case number 90-5-1-1-11340, to the United States in accordance with Section XX (Notices).

9.       Penalty Payment to the United States (EPA) shared with CDFW and RWQCB. The Penalty Payment shall be allocated as follows:

a.       As a CWA penalty for violations of 33 U.S.C. § 1321(b) and

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 14 -

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 555 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 18   Filed 02/20/26   Page 191 of 464
ID #:17598
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 19 of 102   Page ID #:112

the California statutes alleged in the Complaint other than California Government Code § 8670.66(b), Defendants shall pay a civil penalty of nine million four hundred fifty thousand dollars ($9,450,000), together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made as follows:

1)     To CDFW, one million twenty-five thousand dollars ($1,025,000), together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made by check payable to California Department of Fish and Wildlife. The check shall be sent by overnight or certified mail to:

> California Department of Fish and Wildlife
> Office of Spill Prevention and Response
> Attn: Katherine Verrue-Slater, Senior Counsel
> P.O. Box 160362
> Sacramento, California 95816-0362

The check shall reference the "Refugio Oil Spill." CDFW shall deposit the money as follows: one million dollars ($1,000,000) into the Environmental Enhancement Fund pursuant to California Government Code § 8670.70; and twenty-five thousand dollars ($25,000) into the Fish and Wildlife Pollution Account pursuant to California Fish and Game Code §§ 12017 and 13011.

2)     To RWQCB, two million five hundred thousand dollars ($2,500,000), together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made by check payable to the "State Water Pollution Cleanup and Abatement Account" and sent to:

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 15 -

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 556 of 837   Page
ID #:17599
Case 1:26-cv-01486-KES-CDB   Document 19   Filed 02/20/26   Page 192 of 464
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 20 of 102   Page ID #:113

State Water Resources Control Board
Division of Administrative Services, ATTN: Civil
Liability Payment
P.O. Box 1888
Sacramento, California 95812-1888

The check shall reference the "Refugio Oil Spill."

3)      To the United States, five million nine hundred twenty-five thousand dollars ($5,925,000), together with a proportionate share of the interest accrued on the Penalty Payment, by EFT to the United States Department of Justice, in accordance with instructions to be provided to Defendants by the FLU of the United States Attorney's Office for the Central District of California Western Division.  Such monies are to be deposited in the OSLTF.  The Penalty Payment shall reference the Civil Action Number assigned to this case, DOJ case number 90-5-1-1-11340, and USCG reference numbers FPNs A15017 and A15018, and shall specify that the payment is made for CWA civil penalties to be deposited into the OSLTF pursuant to 33 U.S.C. § 1321(s), Section 4304 of Pub. L. No. 101-380, and 26 U.S.C. § 9509(b)(8).  Any funds received after 11:00 a.m. Eastern Standard Time shall be credited on the next business day.  Defendants shall simultaneously provide notice of payment in writing, together with a copy of any transmittal documentation to EPA and the United States in accordance with Section XX (Notices) of this Consent Decree, and to EPA by email to acctsreceivable.CINWD@epa.gov and to EPA and the National Pollution Funds Center at the following addresses:

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 557 of 837   Page
ID #:17600
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 193 of 464
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 21 of 102   Page ID #:114

U.S. Environmental Protection Agency
Cincinnati Finance Office
26 Martin Luther King Drive
Cincinnati, Ohio 45268

and

Patricia V. Kingcade
Attorney Advisor
National Pollution Funds Center
U.S. Coast Guard
2703 Martin Luther King Jr. Avenue SE
Washington, D.C. 20593-7605

10.    Penalty Payment to be Paid to CDFW. For alleged violations of California Government Code § 8670.25.5, Defendants shall pay a civil penalty pursuant to California Government Code § 8670.66(b) of fifty thousand dollars ($50,000) together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made by check payable to California Department of Fish and Wildlife. The check shall be sent by overnight or certified mail to:

California Department of Fish and Wildlife
Office of Spill Prevention and Response
Attn: Katherine Verrue-Slater, Senior Counsel
P.O. Box 160362
Sacramento, California 95816-0362

The check shall reference the "Refugio Oil Spill." CDFW shall deposit the money into the Environmental Enhancement Fund pursuant to California Government Code § 8670.70.

11.    Defendants shall not deduct or capitalize any penalties paid under this Section or under Section XI (Stipulated Penalties) in calculating their federal or state income taxes.

## VI.    NATURAL RESOURCE DAMAGES

12.    Within thirty (30) Days after the Effective Date, Defendants shall pay an NRD Payment of twenty-two million three hundred twenty-five thousand

*United States of America and the People of the State of California v.
Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 17 -

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 558 of 837   Page ID #:17601
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 194 of 464
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 22 of 102   Page ID #:115

dollars ($22,325,000) together with interest accruing from November 16, 2018, at a rate specified in 28 U.S.C. § 1961. The NRD Payment shall be allocated as follows:

    a.    To DOI, eighteen million four hundred twenty-two thousand dollars ($18,422,000) together with a proportionate share of the interest accrued on the NRD Payment. Such payment shall be used by the Trustees for the purposes set forth in Section VII (Trustees' Management and Applicability of Joint NRD Funds). Defendants shall make such payment by EFT to the United States Department of Justice in accordance with instructions that the FLU of the United States Attorney's Office for the Central District of California Western Division shall provide to Defendants following the Effective Date of this Consent Decree by this Court. At the time of payment, Defendants shall simultaneously send written notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree and to:

> Department of the Interior
> Natural Resource Damage Assessment and
>     Restoration Program
> Attention: Restoration Fund Manager
> 1849 "C" Street, N.W. Mail Stop 4449
> Washington, D.C. 20240

The EFT and transmittal documentation shall reflect that the payment is being made to the Department of the Interior Natural Resources Damage Assessment and Restoration Fund ("Restoration Fund"), Account Number 14X5198. DOI will maintain these funds as a segregated subaccount named REFUGIO BEACH OIL SPILL NRD Subaccount within the Restoration Fund.

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 18 -

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 559 of 837    Page ID #:17602
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 195 of 464
Case 2:20-cv-02415    Document 6-1    Filed 03/13/20    Page 23 of 102    Page ID #:116

b.    To CDPR, two million eighty-four thousand dollars ($2,084,000) together with a proportionate share of the interest accrued on the NRD Payment, for deposit into the State Park Contingent Fund.  Payment shall be made by check payable to the California Department of Parks and Recreation.  At the time of payment, Defendants shall simultaneously send written notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree.  The check shall be sent by overnight or certified mail to:

> The California Department of Parks and
>         Recreation
> Attn:  Laura Reimche, Senior Counsel
> 1416 Ninth Street, Room 1404-6
> Sacramento, California 95814

The check shall reference the "Refugio Beach Oil Spill" and reflect that it is a payment to the State Parks Contingent Fund.  CDPR shall use such monies to fund appropriate projects within State Parks' properties from Gaviota to El Capitan State Park to compensate for recreation losses resulting from the Refugio Incident.  CDPR shall manage such monies in accordance with Section VIII (Trustees' Management of Recreational Use Funds).

c.    To the National Fish and Wildlife Foundation ("NFWF"), one million seven hundred ninety-three thousand dollars ($1,793,000) together with a proportionate share of the interest accrued on the NRD Payment, on behalf of the State Trustees for deposit into the California South Coast Shoreline Parks and Outdoor Recreational Use Account established by NFWF.  Payment shall be made by check payable to the National Fish and Wildlife Foundation.  At the time of payment, Defendants shall simultaneously send written

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 560 of 837    Page
ID #:17603
Case 1:26-cv-01486-KES-CDB    Document 43    Filed 02/20/26    Page 196 of 464
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 24 of 102   Page ID #:117

notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree. The check shall be sent by overnight or certified mail to:

> California Department of Fish and Game
> Office of Spill Prevention and Response
> Attn: Katherine Verrue-Slater, Senior Counsel
> P.O. Box 160362
> Sacramento, California 95816-0362

The check shall reference the "Refugio Beach Oil Spill" and reflect that it is a payment to the California South Coast Shoreline Parks and Outdoor Recreational Use Account. The California South Coast Shoreline Parks and Outdoor Recreational Use Account shall be managed in accordance with the South Coast Shoreline Parks and Outdoor Recreational Use Account Memorandum of Agreement among the State Trustees and NFWF and shall be used by the Trustees for the purposes set forth in Section VIII (Trustees' Management of Recreational Use Funds).

d.    To UC, twenty-six thousand dollars ($26,000) together with a proportionate share of the interest accrued on the NRD Payment, for deposit into Natural Reserve System Account. Payment shall be made by check payable to The Regents of the University of California. At the time of payment, Defendants shall simultaneously send written notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree. The check shall be sent by overnight or certified mail to:

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 561 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 197 of 464
ID #:17694
Case 2:20-cv-02415    Document 6-1    Filed 03/13/20    Page 25 of 102    Page ID #:118

The Regents of the University of California
Attn: Michael Kisgen, Associate Director
Natural Reserve System
University of California, Office of the President
1111 Franklin Street, 6th Floor
Oakland, California 94607-5200

The check shall reference the "Refugio Beach Oil Spill" and reflect that it is a payment to the Natural Reserve System Account. The University of California Natural Reserve System will administer the monies to fund projects selected by the University of California in coordination with the Trustees. The projects shall address the research, education, and outreach missions of the University of California. UC shall manage such monies in accordance with Section VIII (Trustees' Management of Recreational Use Funds).

13.    The NRD Payment is in addition to the NRDA costs incurred by the Trustees through November 15, 2018, which have been separately reimbursed by Defendants. To date, Plains has paid approximately ten million dollars ($10,000,000) for NRDA costs incurred by the Trustees through November 15, 2018.

## VII.    TRUSTEES' MANAGEMENT AND APPLICABILITY OF JOINT NRD FUNDS

14.    DOI shall, in accordance with law, manage and invest funds in the REFUGIO BEACH OIL SPILL NRD Subaccount, paid pursuant to Paragraph 12, and any return on investments or interest accrued on the REFUGIO BEACH OIL SPILL NRD Subaccount for use by the Natural Resource Trustees in connection with Restoration of Natural Resources affected by the Refugio Incident. DOI shall not make any charge against the REFUGIO BEACH OIL SPILL NRD Subaccount for any investment or management services provided.

15.    DOI shall hold all funds in the REFUGIO BEACH OIL SPILL NRD

*United States of America and the People of the State of California v.
Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 21 -

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 562 of 837    Page
ID #:17605
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 198 of 464
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 26 of 102   Page ID #:119

Subaccount, including return on investments or accrued interest, subject to the provisions of this Consent Decree.

16.     The Natural Resource Trustees commit to the expenditure of the funds set forth in Paragraph 12 for the design, implementation, permitting (as necessary), monitoring, and oversight of Restoration projects and for the costs of complying with the requirements of the law to conduct a Restoration planning and implementation process.  The Natural Resource Trustees will use the funds to Restore, rehabilitate, replace or acquire the equivalent of any Natural Resource and its services, including lost human use of such services, injured, lost, or destroyed as a result of the Refugio Incident and for the administration and oversight of these Restoration projects.

17.     The specific projects or categories of projects will be contained in a Restoration Plan prepared and implemented jointly by the Trustees, for which public notice, opportunity for public input, and consideration of public comment will be provided.  Plains shall have no responsibility nor liability for implementation of the Restoration Plan or projects relating to the Refugio Incident, including any future project costs other than the payments set forth in Section VII herein.  The Trustees jointly retain the ultimate authority and responsibility to use the funds in the REFUGIO BEACH OIL SPILL NRD Subaccount to Restore Natural Resources in accordance with applicable law, this Consent Decree, and any memorandum or other agreement among them.

## VIII.    TRUSTEES' MANAGEMENT OF RECREATIONAL USE FUNDS

18.     CDPR shall allocate the monies paid pursuant to Paragraph 12 for projects providing human use benefits and for the oversight of those projects in accordance with a Restoration Plan prepared and implemented jointly by the Trustees, this Consent Decree, and in accordance with applicable law and any Trustee memorandum or other agreement among them.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 22 -

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 563 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 199 of 464
ID #:17606
Case 2:20-cv-02415    Document 6-1    Filed 03/13/20    Page 27 of 102    Page ID #:120

19.    The State Trustees shall allocate the funds in the Recreational Use Account held by NFWF for projects providing human use benefits and for the oversight of those projects in accordance with a Restoration Plan prepared and implemented jointly by the Trustees, this Consent Decree, and in accordance with applicable law and any Trustee memorandum or other agreement among them.

20.    UC shall allocate the monies paid pursuant to Paragraph 12 for research, education, and outreach projects in accordance with a Restoration Plan prepared and implemented jointly by the Trustees, this Consent Decree, and in accordance with applicable law and any Trustee memorandum or other agreement among them.

## IX.    INJUNCTIVE RELIEF

21.    Plains agrees to implement the injunctive relief set forth in Appendix B to this Consent Decree for Plains' Regulated Pipelines.

22.    Material Changes to Plains' IMP.

a.    Plains' Integrity Management Plan shall serve as the baseline IMP for purposes of this Consent Decree.  Plains agrees that it will not make any material changes to the following parts of the IMP throughout the term of this Consent Decree without following the process set forth in this Paragraph:

1)    Procedure for the Assessment of In-Line Inspection ("ILI") Results;

2)    Section 9.5, "Continual Evaluation and Assessment of Pipeline Integrity;"

3)    White Papers 32-200.09-S001, "Reassessment Interval Determination on Pipelines with Possible Shielded Coatings," and 32-200.09-S002, "Reassessment Interval Determination on Pipelines with Possible Corrosion Under Insulation;"

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 23 -

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 564 of 837    Page
ID #:17607
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 200 of 464
Case 2:20-cv-02415    Document 6-1    Filed 03/13/20    Page 28 of 102    Page ID #:121

4)      Section 11.3, "Conducting Preventive and Mitigative Evaluation Meetings;"

5)      Section 11.4, "Documentation of P&M Evaluation Meetings;" and

6)      Section 11.6, "Implementation of P&M Recommendations."

For purposes of this Paragraph, the term "material change" refers to any substantive modification in the IMP Procedures that could affect the outcome or effect of a particular procedure or requirement.

b.      At least thirty (30) Days prior to making a material change to the above sections of the IMP, Defendants shall provide written notice to PHMSA that includes a copy of the proposed change(s). In the event PHMSA provides a written objection to Defendants' notice prior to the effective date of the material change and they cannot informally resolve the matter, Defendants shall have the right to submit the issue to Dispute Resolution (Section XIII).

c.      In the event Plains cannot reasonably provide the thirty (30) Day notice of material modification to the IMP described in Subparagraph 22.b due to an unanticipated emergency, Plains shall provide written notice to PHMSA within seven (7) Days of the material change, stating the basis for the abbreviated notice. In the event PHMSA provides a written objection to Defendants' modification, Defendants shall have the right to submit the issue to Dispute Resolution (Section XIII).

d.      In the event PHMSA provides a written objection to a material modification of Defendants' IMP, PHMSA and Defendants shall have sixty (60) Days for informal consultation. The parties may mutually agree to extend the period by no more than thirty (30)

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 24 -

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 565 of 837   Page
ID #:17608
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 201 of 464
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 29 of 102   Page ID #:122

Days.  Following the notice period specified in Subparagraphs 22.b and 22.c, Defendants may implement the modification until the dispute is resolved.  If the dispute is not resolved as a result of the informal consultation, PHMSA or Defendants may invoke Dispute Resolution pursuant to Section XIII.  Stipulated penalties shall not accrue during the informal consultation period described in this Paragraph.

23.   Material Changes in Control Room Management Plan and Control Center General Procedures.

a.   Plains' Control Room Management Plan and Control Center General Procedures (collectively, "Control Center Plan and Procedures") shall serve as the baseline Control Center Plan and Procedures for purposes of this Consent Decree.  Plains agrees that it will not make any material changes to sections 6.5.5, 6.6.8, 8, 9.6.4, 9.6.9, 9.6.13, and 9.6.14 of its Control Room Management Plan and procedures 100-2, 100-8, 100-9, 200-1, 300-1, 300-3, 300-5, 400-0, and 500-12 of its Control Center General Procedures throughout the term of this Consent Decree without following the process set forth in this Paragraph.  For purposes of this Paragraph, the term "material change" refers to any substantive modification in the Control Center Plan and Procedures that could affect the outcome or effect of a particular procedure or requirement.

b.   At least thirty (30) Days prior to making a material modification to the above sections of  its Control Room Management Plan and Control Center General Procedures, Defendants shall provide written notice to PHMSA that includes a copy of the proposed change(s).  In the event PHMSA provides a written objection to Defendants' notice prior to the effective date of

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 25 -

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 566 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 19    Filed 02/20/26    Page 202 of 464    ID #:17609
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 30 of 102   Page ID #:123

the material change(s), Defendants shall have the right to submit the issue to Dispute Resolution (Section XII).

c.    In the event Plains cannot reasonably provide the thirty (30) Day notice of material modification to the Control Room Management Plan and Control Center General Procedures described in Subparagraph 23.b due to an unanticipated emergency, Plains shall provide written notice to PHMSA within seven (7) Days of the material modification, stating the basis for the abbreviated notice.  In the event PHMSA provides a written objection to Defendants' modification, Defendants shall have the right to submit the issue to Dispute Resolution (Section XIII).

d.    In the event PHMSA provides a written objection to a material modification of Defendants' Control Room Management Plan and Control Center General Procedures, PHMSA and Defendants shall have sixty (60) Days for informal consultation. The parties may mutually agree to extend the period by no more than thirty (30) Days.  Following the notice period specified in Subparagraphs 23.b and 23.c, Defendants may implement the modification until the dispute is resolved.  If the dispute is not resolved as a result of the informal consultation, PHMSA or Defendants may invoke Dispute Resolution pursuant to Section XIII. Stipulated penalties shall not accrue during the informal consultation period described in this Paragraph.

24.    Where any compliance obligation under this Consent Decree requires Defendants to obtain a federal, state, or local permit or approval, Defendants shall submit timely applications and take all other actions reasonably necessary to obtain all such permits or approvals.  Defendants may seek relief under the provisions of Section XII (Force Majeure) for any delay in the performance of any such

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 26 -

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 567 of 837   Page
ID #:17610
Case 1:26-cv-01486-KES-CDB   Document 10   Filed 02/20/26   Page 203 of 464
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 31 of 102   Page ID #:124

obligation resulting from a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation, if Defendants have submitted timely applications and have taken all other actions reasonably necessary to obtain all such permits or approvals.

## X.   CORRECTIVE ACTION ORDER

25.   Upon the Effective Date of this Consent Decree, the PHMSA CAO shall close and be of no further force or effect.  All outstanding terms and obligations under the PHMSA CAO as of the Effective Date and which Plains is still required to implement under this Consent Decree are set forth in Appendix D.

## XI.   STIPULATED PENALTIES

26.   Unless excused under Section XII (Force Majeure), Defendants shall be liable for stipulated penalties for violations of this Consent Decree as specified below.  A violation includes failing to perform any obligation required by the terms of this Consent Decree according to all applicable requirements of this Consent Decree and within the specified time schedules established by or approved under this Consent Decree.

27.   <u>Late Payment of Civil Penalties and NRD Payment.</u>

a.   If Defendants fail to pay any portion of the Penalty Payment to the United States required under Section V (Civil Penalties) when due, Defendants shall pay to the United States a stipulated penalty of ten thousand dollars ($10,000) per Day for each Day payment is late.

b.   If Defendants fail to pay any portion of the Penalty Payment to the CDFW and/or RWQCB as required under Section V (Civil Penalties) when due, Defendants shall pay to the CDFW and/or RWQCB a stipulated penalty of ten thousand dollars ($10,000) each, as applicable, per Day for each Day payment is late.

c.   If Defendants fail to pay any portion of the NRD Payments

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 27 -

Case 2:26-cv-05242-SVW-SSC Document 36 Filed 05/14/26 Page 568 of 837 Page
Case 1:26-cv-01486-KES-CDB Document 11 Filed 02/20/26 Page 204 of 464
ID #:17611
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 32 of 102 Page ID #:125

required under Section VI (Natural Resource Damages) when due, Defendants shall pay a stipulated penalty of five thousand dollars ($5,000) to the United States, and five thousand dollars ($5,000) to the State Trustees, per Day for each Day payment is late.

28. Stipulated Penalties for Non-Performance of Injunctive Relief. Unless excused under Section XII (Force Majeure), the stipulated penalties described in this Paragraph shall accrue per violation per Day for Defendants' failure to perform the following injunctive relief required under Section IX (Injunctive Relief) when due:

a. For failure to timely submit to OSFM the applications for State waivers as specified in paragraphs 1.A, 1.B, 1.C, and 1.D of Appendix B;

b. For failure to implement the Integrity Management provisions as specified in paragraphs 4.A.1.a, e, f, g, h, and 4.A.2 of Appendix B;

c. For failure to timely submit to OSFM the EFRD analyses as specified in paragraphs 5.A-5.B of Appendix B;

d. For failure to timely submit to OSFM the risk analysis as specified in paragraph 6.A of Appendix B;

e. For failure to timely submit to PHMSA the modified Section 9.5 of Plains' IMP, as specified in paragraph 9.A.3 of Appendix B;

f. For failure to timely submit to PHMSA the modified P&M Recommendation forms, as specified in paragraph 9.B of Appendix B;

g. For failure to timely conduct EFRD analyses for all Regulated Pipelines for which Plains has not previously conducted an EFRD analysis, as specified in paragraph 10.A of Appendix B;

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 28 -

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 569 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 42    Filed 02/20/26    Page 205 of 464
ID #:17612
Case 2:20-cv-02415    Document 6-1    Filed 03/13/20    Page 33 of 102    Page ID #:126

h.    For failure to timely have in place revised valve maintenance procedures, as specified in paragraph 10.B of Appendix B;

i.    For failure to timely create a list of rupture detection methods utilized, as specified in paragraph 11.A of Appendix B;

j.    For failure to timely conduct annual training for controllers on attributes and benefits of various methods of leak detection, including Analog High/Low Threshold, Alarm Deadband, Creep Deviation, and Analog Rate of Change, as specified in paragraph 11.B of Appendix B;

k.    For failure to timely submit to PHMSA the computational pipeline monitoring ("CPM") systems analysis, as specified in paragraph 11.C of Appendix B;

l.    For failure to timely submit to PHMSA the selection of leak detection method procedure, as specified in paragraph 11.D of Appendix B;

m.    For failure to hold or document periodic (at least annual) meetings regarding potential improvements to leak detection, as provided in paragraph 11.E of Appendix B;

n.    For failure to timely have in place a procedure for tracking when instrumentation has been impeded, as provided in paragraph 11.F of Appendix B;

o.    For failure to complete, prior to resuming operations on Lines 901 or 903, the items identified in paragraph 12.A.1-4 of Appendix B;

p.    For failure to timely submit to OSFM confirmation that all alarm descriptors are accurate, as specified in paragraph 12.B of Appendix B;

q.    For failure to timely conduct the surveys and update the

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 29 -

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 570 of 837   Page
Case 1:26-cv-01486-KES-CDB    Document 13    Filed 02/20/26    Page 206 of 464
ID #:17613
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 34 of 102   Page ID #:127

emergency response plans, as specified in paragraph 13.B.1 of Appendix B;

r.      For failure to timely provide emergency response training to employees, as specified in paragraph 13.B.2 of Appendix B;

s.      For failure to timely provide control room supervisor training, as specified in paragraph 13.B.4 of Appendix B;

t.      For failure to timely submit to PHMSA and/or OSFM, and/or OSPR, as applicable, notice of drills, as specified in paragraph 13.B.5 of Appendix B, provided that the penalty under this subsection shall not exceed one Day per drill;

u.      For failure to timely submit to PHMSA the third-party Safety Management System report, as specified in paragraph 14.A.1 of Appendix B;

v.      For failure to timely review and revise the drug and alcohol misuse plans, as specified in paragraph 15 of Appendix B;

w.      For failure to timely submit to PHMSA notice of any material modification to the IMP, as required by Paragraph 22; and

x.      For failure to timely submit to PHMSA notice of any material modification to the Control Room Management Plan or Control Center General Procedures, as required by Paragraph 23;

y.      The penalties stipulated in this Section shall accrue as follows:

| Penalty Per Violation | Per Day Period of Noncompliance |
|---|---|
| $2,000 penalty per Day | 1st to 30th Day |
| $4,000 penalty per Day | 31st to 60th Day |
| $5,500 penalty per Day | 61st Day and beyond |

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 571 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 14   Filed 02/20/26   Page 207 of 464
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 35 of 102   Page ID #:128

29.   <u>Stipulated Penalties for Non-Compliance with Corrective Action Order Terms.</u>  Unless excused under Section XII (Force Majeure), the stipulated penalties described in this Paragraph shall accrue per violation per Day for Defendants' failure to perform the following injunctive relief required under Section X (Corrective Action Order) when due:

a.    For operation of Line 901 in violation of paragraph 1.a of Appendix D;

b.    For failure to timely submit to OSFM a Line 901 Restart Plan, as specified by paragraph 1.b of Appendix D;

c.    For failure to comply with the operating pressure restriction, including requirements for removal of the pressure restriction, for Line 901 specified by paragraphs 1.c and 1.d of Appendix D;

d.    For operation of Line 903, in violation of paragraph 1.e of Appendix D;

e.    For failure to timely submit to OSFM a Line 903 Restart Plan, as specified by paragraph 1.f of Appendix D;

f.    For failure to comply with the operating pressure restriction, including requirements for removal of the pressure restriction, for Line 903 specified by paragraphs 1.g and 1.h of Appendix D;

g.    For failure to timely submit to OSFM any notification specified by paragraph 1.i of Appendix D; and

h.    For failure to submit to OSFM a final Appendix D Documentation Report, as specified by paragraph 1.j of Appendix D.

i.    The penalties stipulated in this Section shall accrue as follows:

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 31 -

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 572 of 837    Page ID #:17615
Case 1:26-cv-01486-KES-CDB    Document 15    Filed 02/20/26    Page 208 of 464
Case 2:20-cv-02415    Document 6-1    Filed 03/13/20    Page 36 of 102    Page ID #:129

| Penalty Per Violation | Per Day Period of Noncompliance |
|---|---|
| $2,000 penalty per Day | 1st to 30th Day |
| $4,000 penalty per Day | 31st to 60th Day |
| $5,500 penalty per Day | 61st Day and beyond |

30.    Defendants shall pay stipulated penalties due pursuant to this Section within thirty (30) Days of a written demand.

31.    For stipulated penalties accrued pursuant to Subparagraphs 27.a, 28.e, 28.f, 28.g, 28.h, 28.i, 28.j, 28.k, 28.l, 28.m, 28.n, 28.s, 28.t, 28.u, 28.v, 28.w, or 28.x of this Consent Decree, the United States shall have the right to issue a written demand for stipulated penalties, and Defendants must pay to the United States the full amount of any stipulated penalties due and will not be liable to the State Agencies for any such stipulated penalties.

32.    For stipulated penalties accrued pursuant to Subparagraph 27.b of this Consent Decree, only CDFW and RWQCB shall have the right to issue a written demand for stipulated penalties and Defendants must pay to the CDFW and RWQCB the full amount of any stipulated penalties due and will not be liable to United States for any such stipulated penalties.

33.    For stipulated penalties accrued pursuant to Subparagraphs 28.a, 28.b, 28.c, 28.d, 28.o, 28.p, or Paragraph 29 of this Consent Decree, only OSFM shall have the right to issue a written demand for stipulated penalties, and Defendants must pay to OSFM the full amount of any stipulated penalties due and will not be liable to United States for any such stipulated penalties.

34.    For stipulated penalties accrued pursuant to Paragraphs 28.q, 28.r, 28.t, or Paragraph 30 of this Consent Decree, the United States, CDFW, OSFM, or all, may demand stipulated penalties by sending a joint or individual written demand to Defendants, with a copy simultaneously sent to the other Plaintiff(s).

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 32 -

Case 2:26-cv-05242-SVW-SSC  Document 36  Filed 05/14/26  Page 573 of 837  Page
Case 1:26-cv-01486-KES-CDB  Document 16  Filed 02/20/26  Page 209 of 464
Case 2:20-cv-02415  Document 6-1  Filed 03/13/20  Page 37 of 102  Page ID #:130

a.  Where only one or two of the Plaintiffs referenced in Paragraph 35 demand stipulated penalties under Paragraph 35, a copy of the demand will simultaneously be sent to the remaining Plaintiff(s) and they will have forty-five (45) Days to join in the demand.

b.  Where multiple Plaintiffs referenced in Paragraph 35 demand stipulated penalties for the same violation, Defendants shall pay fifty (50) percent to each of the demanding Plaintiffs (when two Plaintiffs join in the demand); one third to each demanding Plaintiff (when all three Plaintiffs join in the demand); or as allocated by the United States, CDFW, and OSFM.

c.  Where only one Plaintiff referenced in Paragraph 35 demands stipulated penalties, and the other Plaintiffs do not join in the demand within forty-five (45) Days of receiving the demand, Defendants shall pay one hundred (100) percent to the Plaintiff making the demand.

d.  If a Plaintiff joins in the demand within forty-five (45) Days but subsequently elects to waive or reduce stipulated penalties, in accordance with Paragraphs 38 or 39 for that violation, Defendants shall not be liable for such portion of the stipulated penalties waived or reduced by such Plaintiff and shall be liable for any stipulated penalties due to the other Plaintiffs joining such demand pursuant to the allocation set forth in Subparagraph 34(b).

35.  For stipulated penalties arising from a failure to perform obligations pursuant to Subparagraph 27.c, the United States and the State Trustees may demand stipulated penalties by sending a joint written demand to Defendants.

36.  For all payments made pursuant to this Section, Defendants must follow the payment instructions set forth in Section V (Civil Penalties).  Any

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 33 -

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 574 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 210 of 464
ID #:17617
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 38 of 102   Page ID #:131

transmittal correspondence shall state that payment is for stipulated penalties and shall identify the date of the written demand to which the payment corresponds.

37.   Stipulated penalties under this Section shall begin to accrue on the Day after the performance is due or on the day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed, or until the violation ceases.  Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

38.   The United States may, in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due to the United States under this Consent Decree.

39.   The applicable State Agencies may, in the unreviewable exercise of their discretion, reduce or waive stipulated penalties otherwise due to the applicable State Agencies under this Consent Decree.

40.   Stipulated penalties shall continue to accrue as provided in Paragraphs 27 through 29, during any Dispute Resolution, but need not be paid until the following:

    a.   If the dispute is resolved by agreement or by a decision of the United States or the State Agencies, as applicable, that is not appealed to the Court, Defendants shall pay accrued penalties determined to be owing to the United States or the State Agencies, as applicable, together with interest, within thirty (30) Days of the effective date of the agreement or the receipt of the United States' or the State Agencies' decision.

    b.   If the dispute is appealed to the Court and the Plaintiffs prevail in whole or in part, Defendants shall pay all accrued penalties determined by the Court to be owing, together with interest, within sixty (60) Days of receiving the Court's decision or order, except as provided in Subparagraph c, below.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 575 of 837   Page
ID #:17618
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 211 of 464
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 39 of 102   Page ID #:132

c.    If any Party appeals the Court's decision and a Plaintiff prevails in whole or in part, Defendants shall pay all accrued penalties determined to be owing, together with interest, within fifteen (15) Days of receiving the final appellate court decision.

41.    If Defendants fail to pay stipulated penalties according to the terms of this Consent Decree, Defendants shall be liable for interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due. Nothing in this Paragraph shall be construed to limit the United States or the State Agencies from seeking any remedy otherwise provided by law for Defendants' failure to pay any stipulated penalties.

42.    The payment of stipulated penalties, if any, shall not alter in any way Defendants' obligation to complete the performance of the requirements of this Consent Decree.

43.    Subject to the provisions of Section XVII (Effect of Settlement/Reservation of Rights) of this Consent Decree, the stipulated penalties provided for in this Consent Decree shall be in addition to any other rights, remedies, or sanctions available to the United States or the State Agencies (including, but not limited to, statutory penalties, additional injunctive relief, mitigation or offsets measures, and/or contempt) for Defendants' violation of this Consent Decree or applicable laws.

## XII.   FORCE MAJEURE

44.    "Force Majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Defendants, of any entity controlled by Defendants, or of Defendants' contractors that delays or prevents the performance of any obligation under this Consent Decree despite Defendants' best efforts to fulfill the obligation. The requirement that Defendants exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential Force Majeure event and best efforts to address the effects of any

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 35 -

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 576 of 837   Page
Case 1:26-cv-01486-KES-CDB    Document 19    Filed 02/20/26    Page 212 of 464
ID #:17619
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 40 of 102   Page ID #:133

potential Force Majeure event (a) as it is occurring and (b) following the potential Force Majeure, such that the delay and any adverse effects of the delay are minimized. "Force Majeure" does not include Defendants' financial inability to perform any obligation under this Consent Decree.

45. If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a Force Majeure event, Defendants shall provide notice orally or by electronic transmission to the relevant Plaintiff(s), within five (5) Days of when Defendants first knew that the event might cause a delay. Within ten (10) Days thereafter, Defendants shall provide in writing to such Plaintiffs an explanation and description of the reasons for the delay; the anticipated duration of the delay; the actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Defendants' rationale for attributing such delay to a Force Majeure event if it intends to assert such a claim; and a statement as to whether, in the opinion of Defendants, such event may cause or contribute to an endangerment to public health, welfare or the environment. Defendants shall provide with any notice the documentation that Defendants are relying on to support the claim that the delay was attributable to a Force Majeure event. Failure to comply with the above requirements shall preclude Defendants from asserting any claim of Force Majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure. Defendants shall be deemed to know of any circumstance of which Defendants, any entity controlled by Defendants, or Defendants' contractors knew or should have known.

46. If Plaintiffs agree that the delay or anticipated delay is attributable to a Force Majeure event, the time for performance of the obligations under this Consent Decree that are affected by the Force Majeure event will be extended by

*United States of America and the People of the State of California v.
Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 36 -

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 577 of 837   Page
ID #:17620
Case 1:26-cv-01486-KES-CDB   Document 40   Filed 02/20/26   Page 213 of 464
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 41 of 102   Page ID #:134

Plaintiffs for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the Force Majeure event shall not, of itself, extend the time for performance of any other obligation. Plaintiffs will notify Defendants in writing of the length of the extension, if any, for performance of the obligations affected by the Force Majeure event.

47. If Plaintiffs do not agree that the delay or anticipated delay has been or will be caused by a Force Majeure event, Plaintiffs will notify Defendants in writing of their decision.

48. If Defendants elect to invoke the Dispute Resolution procedures set forth in Section XIII (Dispute Resolution), in response to Plaintiffs' determination in Paragraph 47 above, it shall do so no later than thirty (30) Days after receipt of Plaintiffs' notice. In any such proceeding, Defendants shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a Force Majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Defendants complied with the requirements of Paragraphs 44 and 45. If Defendants carry this burden, the delay at issue shall be deemed not to be a violation by Defendants of the affected obligation of this Consent Decree identified to Plaintiffs and the Court.

## XIII. DISPUTE RESOLUTION

49. Unless otherwise expressly provided for in this Consent Decree, the Dispute Resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree. Defendants' failure to seek resolution of a dispute under this Section shall preclude Defendants from raising any such issue as a defense to an action by Plaintiffs to enforce any obligation of Defendants arising under this Consent

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 37 -

Case 2:26-cv-05242-SVW-SSC Document 36 Filed 05/14/26 Page 578 of 837 Page
Case 1:26-cv-01486-KES-CDB Document 41 Filed 02/20/26 Page 214 of 464
ID #:17621
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 42 of 102 Page ID #:135

Decree.

50. Informal Dispute Resolution. Any dispute subject to Dispute Resolution under this Consent Decree shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when Defendants send the relevant Plaintiff(s) a written Notice of Dispute. Such Notice of Dispute shall state clearly the matter in dispute. The period of informal negotiations shall not exceed thirty (30) Days from the date the dispute arises, unless that period is modified by written agreement. If the parties cannot resolve a dispute by informal negotiations, then the position advanced by Plaintiffs shall be considered binding unless, within forty-five (45) Days after the conclusion of the informal negotiation period, Defendants invoke formal Dispute Resolution procedures as set forth below.

51. Formal Dispute Resolution. Defendants shall invoke formal Dispute Resolution procedures, within the time period provided in the preceding Paragraph, by serving on Plaintiffs a written Statement of Position regarding the matter in dispute. The Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting Defendants' position and any supporting documentation relied upon by Defendants.

52. Plaintiffs shall serve their Statement of Position within forty-five (45) Days of receipt of Defendants' Statement of Position. Plaintiffs' Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by Plaintiffs. Plaintiffs' Statement of Position shall be binding on Defendants, unless Defendants file a motion for judicial review of the dispute in accordance with the following Paragraph.

53. Defendants may seek judicial review of the dispute by filing with the Court and serving on the relevant Plaintiff(s), in accordance with Section XX (Notices), a motion requesting judicial resolution of the dispute. The motion

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC  Document 36  Filed 05/14/26  Page 579 of 837  Page
Case 1:26-cv-01486-KES-CDB  Document 42  Filed 02/20/26  Page 215 of 464
ID #:17622
Case 2:20-cv-02415  Document 6-1  Filed 03/13/20  Page 43 of 102  Page ID #:136

must be filed within thirty (30) Days of receipt of Plaintiffs' Statement of Position pursuant to the preceding Paragraph. The motion shall contain a written statement of Defendants' position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of this Consent Decree.

54. Plaintiffs shall respond to Defendants' motion within the time period allowed by the Local Rules of this Court or by a schedule set by the Court. Defendants may file a reply memorandum to the extent permitted by the Local Rules.

55. Except as otherwise provided in this Consent Decree, in any dispute brought under Paragraph 51, Defendants shall bear the burden of demonstrating that its position complies with this Consent Decree, based on the Statements of Position, and under applicable standards of review.

56. The invocation of Dispute Resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of Defendants under this Consent Decree, unless and until final resolution of the dispute so provides. Stipulated penalties with respect to the disputed matter shall continue to accrue until the final resolution of the dispute. Payment shall be stayed pending resolution of the dispute. If Defendants do not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section XI (Stipulated Penalties).

## XIV. REPORTING

57. After the Effective Date, by March 31 and September 30 of the following years until termination of this Consent Decree per Section XXIV (Termination), Defendants shall submit to the Plaintiffs in accordance with Section XX (Notices) bi-annual reports that shall describe the status of Defendants' compliance with the Consent Decree, including implementation of

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 580 of 837    Page ID #:17623
Case 1:26-cv-01486-KES-CDB    Document 43    Filed 02/20/26    Page 216 of 464 Page ID #:137
Case 2:20-cv-02415    Document 6-1    Filed 03/13/20    Page 44 of 102    Page ID #:137

the injunctive relief requirements set forth in Appendices B and D. The report will be organized to show the measures taken to comply with each of the requirements set forth in Appendices B and D, whether the measures were taken timely, the status of any permitting action that may affect compliance with the Consent Decree, and whether the measures taken have achieved compliance with the requirement.

## XV. CERTIFICATION

58. Each report submitted by Defendants under Section XIV (Reporting) shall be signed by either the Chief Executive Officer, the President, an Executive Vice President, a Senior Vice President, or General Counsel who is an authorized representative of Defendants, and must contain the following statement:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on any personal knowledge and my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

## XVI. INFORMATION COLLECTION AND RETENTION

59. Plaintiffs and their representatives shall have the right of entry into any facility covered by this Consent Decree, at all reasonable times and upon reasonable notice, upon presentation of credentials, to:

    a.    monitor the progress of activities required under this Consent Decree;

    b.    verify any data or information submitted to the Plaintiffs in accordance with the terms of this Consent Decree;

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 581 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 44    Filed 02/20/26    Page 217 of 464
ID #:17624
Case 2:20-cv-02415    Document 6-1    Filed 03/13/20    Page 45 of 102    Page ID #:138

c.    obtain documentary evidence, including photographs and similar data; and

d.    assess Defendants' compliance with this Consent Decree.

60.    Until one (1) year after the termination of this Consent Decree, Defendants shall retain, and shall instruct their contractors and agents to preserve or deliver to Plains, all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) in their or their contractors' or agents' possession or control, or that come into their or their contractors' or agents' possession or control, and that relate in any manner to Defendants' performance of their obligations under this Consent Decree.  At any time during this information-retention period, upon request by the Plaintiffs, Defendants shall provide copies of any documents, records, or other information required to be maintained under this Paragraph.

61.    This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States or the State Agencies pursuant to applicable federal or state laws, regulations, or permits, nor does it limit or affect any duty or obligation of Defendants to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

62.    For any documents, records, or other information required to be submitted to Plaintiffs pursuant to this Consent Decree, Plains may assert a claim of business confidentiality or other protections applicable to the release of information by Plaintiffs, covering part or all of the information required to be submitted to Plaintiffs pursuant to this Consent Decree in accordance with, as applicable, 49 C.F.R. Part 7, 49 C.F.R. Part 190, and 40 C.F.R Part 2.  Plains must mark the claim of confidentiality in writing on each page, and include a statement specifying the grounds for each claim of confidentiality.

63.    The federal agency Plaintiffs are subject to applicable laws

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 41 -

Case 2:26-cv-05242-SVW-SSC Document 36 Filed 05/14/26 Page 582 of 837 Page ID #:17625
Case 1:26-cv-01486-KES-CDB Document 45 Filed 02/20/26 Page 218 of 464
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 46 of 102 Page ID #:139

governing the disclosure of information under the Freedom of Information Act ("FOIA") (5 U.S.C. § 552 *et seq.*). If a federal agency Plaintiff receives a request pursuant to FOIA for records produced pursuant to the Consent Decree, that Plaintiff will, to the extent permitted by law, treat those records as exempt from disclosure, and give Defendants a reasonable opportunity to identify portions of documents Defendants have claimed as confidential and that may be subject to the request, and to specify the grounds for each claim of confidentiality. In accordance with applicable regulations, if the federal agency Plaintiff determines that the records are not exempt from disclosure, the Plaintiff shall provide notice of the determination to Defendants prior to making any record available to the public.

64. For documents provided to PHMSA under this Consent Decree, Defendants need not provide redacted copies when the documents are produced. Within fourteen (14) Days of notification from PHMSA of a FOIA request, or such other time as agreed upon, Defendants will provide a copy of the relevant records with confidential information redacted along with explanations of the asserted grounds for confidentiality.

65. State Agency Plaintiffs are subject to the California Public Records Act ("CPRA") (California Government Code §§ 6250 *et seq.*). If a State Agency Plaintiff receives a request pursuant to the CPRA for records produced pursuant to the Consent Decree, that Plaintiff will, to the maximum extent permitted by law, treat those records as exempt from disclosure, and give Defendants a reasonable opportunity to submit redacted copies of the requested records. If the Plaintiff determines that the records are not exempt from disclosure, the Plaintiff shall provide notice of the determination to Defendants prior to making any record available to the public.

66. The requirements of this Paragraph apply to Defendants' production of documents to PHMSA only. Defendants shall produce all documents required

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

- 42 -

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 583 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 46    Filed 02/20/26    Page 219 of 464
Case 2:20-cv-02415  Document 6-1  Filed 03/13/20  Page 47 of 102  Page ID #:140

to be produced in connection with this Consent Decree in, at Defendants' option, either native format via electronic media or secure file transfer protocol ("FTP"). Any encryption or access restriction shall be on a container level only, *i.e.*, only the electronic media or the top-level folder containing the documents shall be encrypted and Plaintiffs shall have unrestricted access to the files/folders within the electronic media or the top-level folder without need for additional decryption or access codes. Regardless of production method or encryption, individual documents shall be produced in a manner that allows the Plaintiffs to view, print, copy, save, download, and share each document within Plaintiffs' own environment without restriction, tracking or monitoring by Defendants, or automatically generated changes to the document (*e.g.*, without entering access codes prior to each download, and without automatically generated watermarks stating the download date and time).

67. At the conclusion of the information-retention period, Defendants shall provide ninety (90) Days' notice to Plaintiffs of Defendants' resumption of internal document destruction policies for documents, records, or other information subject to the requirements of Paragraph 60.

68. [*Intentionally left blank.*]

**XVII.    EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS**

69. This Consent Decree resolves the civil claims of the United States and the State Agencies for the matters alleged in the Complaint filed in this action for the Refugio Incident.

70. Subject to the reservations of rights specified in Paragraph 71, this Consent Decree also resolves all civil and administrative penalty claims that could be brought by PHMSA, for violations of the Pipeline Safety Laws specified below that occurred on any of Defendants' Regulated Pipelines prior to January 28, 2019, the date that PHMSA's ongoing "Integrated Inspection" of a portion of Defendants' Regulated Pipelines and other pipeline facilities began. The specific

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 43 -

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 584 of 837   Page ID #:17627
Case 1:26-cv-01486-KES-CDB   Document 41   Filed 02/20/26   Page 220 of 464
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 48 of 102   Page ID #:141

Pipeline Safety Laws subject to this Paragraph are the following (including other regulations expressly incorporated therein):

      a.     49 C.F.R. Part 194 Subpart B – Response Plans;

      b.     49 C.F.R. Part 195 Subpart B – Reporting;

      c.     49 C.F.R. Part 195 Subpart E – Pressure Testing;

      d.     49 C.F.R. Part 195 Subpart F – Operation and Maintenance, sections 195.402, 195.403, 195.404, 195.406, 195.408, 195.412, 195.420, 195.422, 195.428, 195.436, 195.442, 195.444, 195.446, 195.452;

      e.     49 C.F.R. Part 195 Subpart G – Qualification of Pipeline Personnel, as it relates to valve maintenance;

      f.     49 C.F.R. Part 195 Subpart H – Corrosion Control;

      g.     49 C.F.R. Part 199 – Drug and Alcohol Testing; and

      h.     All recordkeeping, documentation, and document production requirements in the provisions listed in subsections 70.a-70.g, and 49 C.F.R. section 190.203 and Part 195.

71.    The United States, on behalf of PHMSA, reserves all legal and equitable remedies to address violations of the Pipeline Safety Laws described in Paragraph 70 that occur on or after January 28, 2019, including violations that may have begun prior to such date and continued subsequent to January 28, 2019. A separate violation of the Pipeline Safety Laws occurs for each day that the violation continues, pursuant to 49 U.S.C. § 60122(a).

72.    This Consent Decree also resolves all civil and administrative penalty claims that could be brought by OSFM against Defendants for violations of the Pipeline Safety Laws and the Elder California Pipeline Safety Act as specified below relating to Line 901, Line 903, or Line 2000 that occurred prior to January 28, 2019. OSFM reserves all legal and equitable remedies to address violations of the specified Pipeline Safety Laws that occur on or after

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 585 of 837   Page
ID #:17628
Case 1:26-cv-01486-KES-CDB   Document 4   Filed 02/20/26   Page 221 of 464
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 49 of 102   Page ID #:142

January 28, 2019, including violations that may have begun prior to such date and continued subsequent to January 28, 2019. The specific Pipeline Safety Laws and Elder California Pipeline Safety Act subject to this Paragraph are:

a. The Pipeline Safety Laws specified in Paragraph 70; and

b. California Government Code §§ 51012.3, 51013, 51013.5, 51014, 51015, 51015.4, 51015.5 (for Line 901 and Line 903 only), and 51018.

73. For any reportable pipeline accident, as defined in 49 C.F.R. § 195.50, occurring on or after January 28, 2019, on any of Defendants' Regulated Pipelines, Paragraphs 70 and 72 shall not limit the right of PHMSA and OSFM to sue or pursue administrative or other remedies for violations (including penalties) under the Pipeline Safety Laws and the Elder California Pipeline Safety Act for such accident. Nothing in Paragraphs 70 through 72 shall be construed to limit the legal and equitable remedies of the United States or State Agencies, other than PHMSA and OSFM.

74. The United States and the State Agencies reserve all legal and equitable remedies available to enforce the provisions of this Consent Decree. This Consent Decree shall not be construed to limit the rights of the United States or the State Agencies to obtain penalties, injunctive relief, or other administrative or judicial remedies under the CWA, OPA, Pipeline Safety Laws, or under other federal or state laws, regulations, or permit conditions, except as specified in Paragraphs 69, 70, and 72.

75. The United States reserves all legal and equitable remedies to address any imminent and substantial endangerment or threat to the public health or welfare or the environment arising at, or posed by, Defendants' operations, whether related to the violations addressed in this Consent Decree or otherwise. PHMSA further reserves the right to issue to Defendants corrective action orders pursuant to 49 C.F.R § 190.233; emergency orders pursuant to 49 C.F.R.

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 586 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 49   Filed 02/20/26   Page 222 of 464
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 50 of 102   Page ID #:143

§ 190.236; and safety orders pursuant to 49 C.F.R. § 190.239. The State Agencies reserve all legal and equitable remedies under California Government Code §§ 8670.57, 8670.69.4, 51013.5, 51015.5, 51018.6, 51018.7 and 51018.8, California Water Code §§ 13301, 13304, 13340, and 13386, and California Health & Safety Code § 13107.5 to address (1) conditions threatening to cause or creating a substantial risk of an unauthorized discharge of oil into waters of the State of California, (2) a discharge of waste threatening to cause a condition of pollution or nuisance, or (3) a discharge which poses a substantial probability of harm to persons, property or natural resources.

76. This Consent Decree also shall not be construed to in any way limit or waive the claims set forth in the case entitled *California State Lands Commission, et al. v. Plains Pipeline, L.P., et al.,* Case No. 18CV02504 (Cal. Sup. Court) and Case No. B295632 (Cal. Ct. App.).

77. In any subsequent administrative or judicial proceeding initiated by the United States or the State Agencies for injunctive relief, civil penalties, other appropriate relief relating to Defendants' violations alleged in Plaintiffs' Complaint, Defendants shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, *res judicata*, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States or the State Agencies in the subsequent proceeding should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraphs 69, 70, and 72.

78. This Consent Decree is not a permit, or a modification of any permit, under any federal, state, or local laws, or regulations. Defendants are responsible for achieving and maintaining full compliance with all applicable federal, state, and local laws, regulations, and permits; and Defendants' compliance with this Consent Decree shall be no defense to any action

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC  Document 36  Filed 05/14/26  Page 587 of 837  Page
ID #:17630
Case 1:26-cv-01486-KES-CDB  Document 6-1  Filed 02/20/26  Page 223 of 464
Case 2:20-cv-02415  Document 6-1  Filed 03/13/20  Page 51 of 102  Page ID #:144

commenced pursuant to any such laws, regulations, or permits, except as set forth herein. The United States and the State Agencies do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that Defendants' compliance with any aspect of this Consent Decree will result in compliance with provisions of the CWA, OPA, Pipeline Safety Laws, or with any other provisions of federal, state, or local laws, regulations, or permits.

79. This Consent Decree does not limit or affect the rights of Defendants or of the United States or the State Agencies against any third-parties, not party to this Consent Decree, nor does it limit the rights of third-parties, not party to this Consent Decree, against Defendants, except as otherwise provided by law.

80. This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third-party not party to this Consent Decree.

81. Plaintiffs will not submit any claim for restitution for Natural Resource Damages in *The People of the State of California v. Plains All American Pipeline, L.P.,* Case No. 1495091 (Cal. Sup. Court).

82. By entering into this settlement, Defendants do not admit the Pipeline Safety Laws violations alleged in the Complaint or described in this Consent Decree by the United States on behalf of PHMSA; therefore, any allegations of violations of these Pipeline Safety Laws do not constitute a finding of violation and may not be used in any civil proceeding of any kind as evidence or proof of any fact, fault or liability, or as evidence of the violation of any law, rule, regulation, order, or requirement, except in a proceeding to enforce the provisions of this Consent Decree. However, the allegations of violations set forth in the Complaint may be: (1) considered by PHMSA to constitute prior offenses in any future PHMSA enforcement action brought by the agency against Plains, and (2) used for statistical purposes to identify violations that PHMSA deems as causal to an incident or to increase the consequences of an incident. Notwithstanding the forgoing, alleged violations subject to Paragraph 70 shall not

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 47 -

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 588 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 31   Filed 02/20/26   Page 224 of 464
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 52 of 102   Page ID #:145

be considered by PHMSA to constitute prior offenses in any future PHMSA enforcement action brought by the agency against Plains.

83.    By entering into this settlement, Defendants do not admit the allegations of California Water Code §§ 13350 and 13385 violations set forth in the Complaint; therefore, any allegations of violations of these statutes do not constitute a finding of violation and may not be used in any civil proceeding of any kind as evidence or proof of any fact, fault or liability, or as evidence of the violation of any law, rule, regulation, order, or requirement, except in a proceeding to enforce the provisions of this Consent Decree.  However, the allegations of California Water Code §§ 13350 and 13385 violations set forth in the Complaint may be considered by the State Water Resources Control Board or Regional Water Quality Control Boards to constitute prior offenses in any future enforcement action brought by any of these agencies against Plains.

84.    Subject to the terms of this Consent Decree, no provision contained herein affects or relieves Plains of their responsibilities to comply with all applicable requirements of the CWA, OPA, the Pipeline Safety Laws, federal or state laws, and the regulations and orders issued thereunder.  Subject to the terms of this Consent Decree, nothing herein shall limit or reduce the Plaintiffs' right of access, entry, inspection, and information-gathering or their authority to bring enforcement actions against Defendants pursuant to the CWA, OPA, the Pipeline Safety Laws, federal or state laws, the regulations and orders issued thereunder, or any other applicable provision of federal or state law.

85.    Defendants hereby covenant not to sue Plaintiffs for any claims related to the Refugio Incident, or response activities in connection with the Incident, pursuant to the CWA, OPA, the Pipeline Safety Laws, federal or state laws, or any other law or regulation for acts or omissions through the date on which this Consent Decree is lodged with the Court.

86.    Defendants covenant not to sue and agree not to assert any direct or

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 48 -

Case 2:26-cv-05242-SVW-SSC  Document 36  Filed 05/14/26  Page 589 of 837  Page
Case 1:26-cv-01486-KES-CDB  Document 12  ID #:17632  Filed 02/20/26  Page 225 of 464
Case 2:20-cv-02415  Document 6-1  Filed 03/13/20  Page 53 of 102  Page ID #:146

indirect claim for reimbursement related to the Refugio Incident from the OSLTF or pursuant to any other provision of law.

87.  The United States reserves the right to seek reimbursement from Defendants for claims relating to the Refugio Incident paid after the date on which the Consent Decree is lodged with the Court from the OSLTF pursuant to 33 U.S.C. § 2712.

## XVIII.  TRANSFER AND ACQUISITION OF ASSETS

88.  In the event Defendants sell or transfer ownership of or operating responsibility for Lines 901, 903, or 2000, or any lines built to replace Lines 901 or 903, Defendants will obtain from the transferee an agreement to be bound by those provisions of this Consent Decree and Appendices B and D that are specifically applicable to the asset(s) acquired, unless Defendants have already completed the required action or unless OSFM agrees to relieve the transferee of the obligations of any otherwise applicable provision.  Those provisions of Appendix B are:

> a.  For existing but non-operational segments of Lines 901 and 903, paragraphs 1.A, 1.B, 1.E, 2.B, 2.C., 4, 5, 6, 7.A, 12.A of Appendix B;

> b.  For the operational segment of Line 903 from Pentland to Emidio, paragraphs 1.C, 1.E, 4, 5, 6, 7.A of Appendix B;

> c.  For any lines built to replace Lines 901 or 903, paragraphs 2.A.1, 5, 7.B, 12.A of Appendix B; and

> d.  For Line 2000, paragraphs 1.D, 1.E, 4, 5, 6, 7.A, 12.B. of Appendix B.

89.  In the event Defendants sell or transfer ownership of or operating responsibility for Lines 901, 903, or 2000, or any lines built to replace Lines 901 or 903, Defendants shall provide a copy of this Consent Decree to the prospective transferee at least fourteen (14) Days prior to such transfer.  Defendants shall

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 49 -

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 590 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 13   Filed 02/20/26   Page 226 of 464
ID #:17633
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 54 of 102   Page ID #:147

provide written notice of any such transfer to OSFM within ten (10) Days after the date Defendants publicly disclose the transaction or the date the transaction is closed, whichever is earlier.  Prior to the transfer, Defendants may notify OSFM that Defendants have completed certain required actions of this Consent Decree, or request that OSFM relieve the transferee of certain obligations of otherwise applicable provisions, such that the transferee will not be bound by those requirements.  Defendants shall provide to Plaintiffs documentation demonstrating the transferee's agreement to be bound by the relevant provisions of the Consent Decree.  Defendants shall provide to the transferee copies of those portions of relevant emergency response plans that relate to the transferred asset.

90.     In the event of the sale or transfer pursuant to an arm's-length transaction of Defendants' Regulated Pipelines other than Lines 901, 903, or 2000, or any lines built to replace Lines 901 or 903, to an independent third-party transferee, the transferee shall not be subject to the requirements of this Consent Decree.  Defendants shall provide a copy of this Consent Decree to the transferee at least fourteen (14) Days prior to such transfer.  Defendants shall provide written notice of any such transfer, including documentation demonstrating that the Consent Decree was provided to the transferee, to PHMSA within ten (10) Days after the date Defendants publicly disclose the transaction or the date the transaction is closed, whichever is earlier.  Defendants' obligations under this Consent Decree with respect to all non-transferred assets shall not be affected.

91.     For all Regulated Pipeline assets that Defendants assume operating responsibility for after the Effective Date, Plains is obligated to apply Article II (Company Wide Provisions) of Appendix B of this Consent Decree to the newly acquired assets.

## XIX. COSTS

92.     Except as otherwise stated in this Consent Decree, the Parties shall bear their own costs related to this action and this Consent Decree, including

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 50 -

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 591 of 837   Page
ID #:17634
Case 1:26-cv-01486-KES-CDB   Document 6-1   Filed 02/20/26   Page 227 of 464
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 55 of 102   Page ID #:148

attorneys' fees; provided, however, the United States and the State Agencies shall be entitled to collect the costs (including attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any stipulated penalties due but not paid by Defendants.

## XX.   NOTICES

93.    Unless otherwise specified in this Consent Decree, whenever notifications, submissions, reports, or communications are required by this Consent Decree, they shall be made in writing, sent electronically by email provided by the Parties, and addressed to all Parties as follows:

| | |
|---|---|
| As to the United States by email: | eescdcopy.enrd@usdoj.gov<br>Re: DJ # 90-5-1-1-11340 |
| As to the United States by mail: | EES Case Management Unit<br>Environment and Natural Resources<br>Division<br>U.S. Department of Justice<br>P.O. Box 7611<br>Washington, D.C.  20044-7611<br>Re: DJ # 90-5-1-1-1130 |
| As to PHMSA: | James M. Pates<br>Assistant Chief Counsel<br>for Pipeline Safety<br>U.S. Department of Transportation<br>Pipeline and Hazardous Materials<br>Safety Administration<br>1200 New Jersey Ave. SE. E-26<br>Washington, DC. 20590 |
| As to EPA: | Andrew Helmlinger<br>Attorney Advisor<br>U.S. EPA Region IX<br>75 Hawthorne Street (ORC-3)<br>San Francisco, California 94104 |

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 51 -

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 592 of 837   Page
ID #:17635
Case 1:26-cv-01486-KES-CDB   Document 35   Filed 02/20/26   Page 228 of 464
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 56 of 102   Page ID #:149

As to DOI:                          Clare Cragan
                                    U.S. Department of the Interior
                                    Office of the Solicitor
                                    755 Parfet St., Suite 151
                                    Lakewood, Colorado 80215

As to NOAA:                         National Oceanic and Atmospheric
                                        Administration
                                    Office of General Counsel
                                    Natural Resources Section
                                    ATTN: Christopher J. Plaisted
                                    501 W. Ocean Blvd, Suite 4470
                                    Long Beach, California 90802

As to USCG:                         Patricia V. Kingcade
                                    Attorney Advisor
                                    National Pollution Funds Center,
                                        US Coast Guard
                                    2703 Martin Luther King Jr. Ave SE
                                    Washington, DC 20593-7605

As to the State Agencies:           Michael Zarro
                                    Deputy Attorney General
                                    Office of the Attorney General
                                    Natural Resources Law Section
                                    300 S. Spring St., Suite 11220
                                    Los Angeles, California 90013

As to CDFW:                         California Department of Fish
                                        and Wildlife
                                    Office of Spill Prevention and Response
                                    Attn: Katherine Verrue-Slater
                                    Senior Counsel
                                    P.O. Box 160362
                                    Sacramento, California 95816-0362

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

- 52 -

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 593 of 837    Page
ID #:17636
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 229 of 464
Case 2:20-cv-02415    Document 6-1    Filed 03/13/20    Page 57 of 102    Page ID #:150

As to CDPR:                    California Department of Parks and
                                  Recreation
                               Attn: Laura A. Reimche, Senior Counsel
                               1416 Ninth Street, Room 1404-6
                               Sacramento, California 95814

As to CSLC:                    California State Lands Commission
                               Attn: Patrick Huber, Legal Division
                               100 Howe Avenue, Suite 100-South
                               Sacramento, California 95825

As to OSFM:                    California Department of Forestry and
                                  Fire Protection
                               Legal Services Office
                               Attn: Joshua Cleaver, Staff Counsel
                               P.O. Box 944246
                               Sacramento, California 94244-2460

As to RWQCB:                   California Central Coast Regional Water
                               Quality Control Board
                               Attn: Naomi Rubin, Attorney III
                               801 K Street
                               Sacramento, California 95814

As to UC:                      Barton Lounsbury, Senior Counsel
                               University of California
                               Office of the General Counsel
                               1111 Franklin Street, 8th Floor
                               Oakland, California  94607

As to Defendants:              Megan Prout
                               Senior Vice President
                               Commercial Law and Litigation
                               333 Clay Street, Suite 1600
                               Houston, Texas  77002

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 53 -

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 594 of 837   Page ID #:17637
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 230 of 464
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 58 of 102   Page ID #:151

Henry Weissmann
Daniel B. Levin
Colin Devine
Munger, Tolles & Olson LLP
350 S. Grand Ave, 50th Floor
Los Angeles, California 90071

Steven H. Goldberg
Nicole Granquist
Downey Brand LLP
621 Capitol Mall, 18th Floor
Sacramento, California 95814

94.   Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above.

95.   Notices submitted pursuant to this Section shall be deemed submitted upon mailing, or emailing unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XXI.   EFFECTIVE DATE

96.   The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court, or a motion to enter this Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.

## XXII.   RETENTION OF JURISDICTION

97.   The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of effectuating or enforcing compliance with the terms of this Consent Decree.

## XXIII.   MODIFICATION

98.   The terms of this Consent Decree, including any attached Appendices, may be modified only by a subsequent written agreement signed by the Parties. Where the modification constitutes a material change to any term of this Consent Decree, it shall be effective only upon approval of the Court.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 595 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 38   Filed 02/20/26   Page 231 of 464
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 59 of 102   Page ID #:152

99.   Any disputes concerning modification of this Consent Decree shall be resolved pursuant to Section XIII (Dispute Resolution), provided, however, that, instead of the burden of proof provided by Paragraph 55, the Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XXIV.   TERMINATION

100.   After Defendants have:  (a) operated under this Consent Decree for five (5) years and three (3) months from the Effective Date; and (b) complied with the requirements of this Consent Decree, including payment of all penalties and accrued stipulated penalties required by this Consent Decree, Defendants may serve on Plaintiffs a Request for Termination, stating that Defendants have satisfied these requirements, together with all necessary supporting documentation.  Plaintiffs shall respond within ninety (90) Days to Defendants' Request for Termination.  If Plaintiffs agree that the requirements for termination have been satisfied, the Parties shall submit for the Court's approval a joint stipulation terminating the Consent Decree.

101.   Following receipt by Plaintiffs of Defendants' Request for Termination, Plaintiffs shall respond within ninety (90) Days regarding any disagreement that the Consent Decree may be terminated and state the reason for such disagreement.  The Parties shall confer informally concerning the Request for Termination and any disagreement that the Parties may have as to whether Defendants have complied with the requirements for termination of this Consent Decree.  If Plaintiffs agree that the requirements for termination have been satisfied, the Parties shall submit for the Court's approval a joint stipulation terminating the Consent Decree.

102.   If Plaintiffs do not agree that the requirements for termination have been satisfied, Defendants may invoke Dispute Resolution under Section XIII (Dispute Resolution).  However, Defendants shall not seek Dispute Resolution of

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 596 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 39   Filed 02/20/26   Page 232 of 464
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 60 of 102   Page ID #:153

any dispute regarding termination until sixty (60) Days after receipt of the Plaintiffs' response to Defendants' Request for Termination.

## XXV.   PUBLIC PARTICIPATION

103.   This Consent Decree shall be lodged with the Court for a period of not fewer than thirty (30) Days for public notice and comment in accordance with 28 C.F.R. § 50.7. The Parties agree and acknowledge that the final approval by Plaintiffs and entry of this Consent Decree are subject to notice of lodging of the Consent Decree and a public comment period. Plaintiffs reserve the right to withdraw or withhold consent if the comments disclose facts or considerations that indicate that this Consent Decree is inappropriate, improper, or inadequate.

104.   Defendants consent to entry of this Consent Decree without further notice and agree not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge any provision of the Consent Decree, unless Plaintiffs have notified Defendants in writing that Plaintiffs no longer support entry of the Consent Decree.

## XXVI.   SIGNATORIES/SERVICE

105.   Each undersigned representative of Defendants, the State of California Attorney General's Office, CDFW, CDPR, CSLC, OSFM, RWQCB, UC, the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice, PHMSA, and EPA certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to the terms of this Consent Decree.

106.   This Consent Decree may be signed in counterparts, and such counterpart signature pages shall be given full force and effect. For purposes of this Consent Decree, a signature page that is transmitted electronically (*e.g.*, by emailed PDF) shall have the same effect as an original.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 597 of 837   Page ID #:17640
Case 1:26-cv-01486-KES-CDB   Document 40   Filed 02/20/26   Page 233 of 464
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 61 of 102   Page ID #:154

## XXVII.  INTEGRATION

107.   This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Consent Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein.  The Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Consent Decree.

## XXVIII.   FINAL JUDGMENT

108.   Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the Parties.

## XXIX.   26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION

109.   For purposes of the identification requirement of Section 162(f)(2)(A)(ii) of the Internal Revenue Code, 26 U.S.C. § 162(f)(2)(A)(ii), performance of Section III (Applicability), Paragraph 5; Section VI (Natural Resource Damages), Paragraph 12; Section IX (Injunctive Relief), Subparagraphs 22.a, 22.b, 22.c, 23.a, 23.b, 23.c, Paragraph 24, and related Appendix B; Section XIV (Reporting), Paragraph 57; Section XV (Certification), Paragraph 58; and Section XVI (Information Collection and Retention), Paragraphs 59, 60, and 66 is restitution or required to come into compliance with law to the extent it applies to federal agencies.

Dated and entered this _____ day of _____, 20__.


_____
UNITED STATES DISTRICT JUDGE


*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 598 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 41    Filed 02/20/26    Page 234 of 464
ID #:17641
Case 2:20-cv-02415    Document 6-1    Filed 03/13/20    Page 62 of 102    Page ID #:155

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE UNITED STATES OF AMERICA:

3/12/2020

Date

BRUCE S. GELBER
Deputy Assistant Attorney General
Environment and Natural Resources
    Division U.S. Department of Justice

3/13/2020

Date

BRADLEY R. O'BRIEN
ANGELA MO
Environmental Enforcement Section
Environment and Natural Resources

Division

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 58 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P and Plains Pipeline, L.P.*

FOR THE UNITED STATES DEPARTMENT OF TRANSPORTATION, PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION:

3 May 2020
_____
Date

_____
PAUL ROBERTI
Chief Counsel
U.S. Department of Transportation
Pipeline and Hazardous Materials Safety
Administration
1200 New Jersey Avenue, SE
Washington, DC 20590

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 59 -

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 600 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 43   Filed 02/20/26   Page 236 of 464
ID #:17643
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 64 of 102   Page ID #:157

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:

3-2-20

Date

SUSAN PARKER BODINE
Assistant Administrator
Office of Enforcement and Compliance
Assurance

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 60 -

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 601 of 837   Page
Case 1:26-cv-01486-KES-CDB    Document 11    Filed 02/20/26    Page 237 of 464
ID #:17644
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 65 of 102   Page ID #:158

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:

2\26\2010
_____
Date

AMY C. MILLER
Region 9 Director
Enforcement and Compliance Assurance
     Division
U.S. EPA Region 9
Mail Code ENF-1
75 Hawthorne Street
San Francisco, CA 94105

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 61 -

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 602 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 45   Filed 02/20/26   Page 238 of 464
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 66 of 102   Page ID #:159
ID #:17645

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA DEPARTMENT OF FISH and WILDLIFE:

2/4/2020
Date

THOMAS M. CULLEN, JR.
Administrator
Office of Spill Prevention and Response

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 62 -

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 603 of 837   Page
ID #:17646
Case 1:26-cv-01486-KES-CDB   Document 6-1   Filed 02/20/26   Page 239 of 464
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 67 of 102   Page ID #:160

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA DEPARTMENT OF PARKS AND RECREATION:

_____3/7/20_____
Date

_____Lisa Ann L. Mangat_____
LISA ANN L. MANGAT
Director
California Department of Parks
and Recreation

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 604 of 837   Page
ID #:17647
Case 1:26-cv-01486-KES-CDB   Document 41   Filed 02/20/26   Page 240 of 464
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 68 of 102   Page ID #:161

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA STATE LANDS COMMISSION:

2/28/2020
Date

JENNIFER LUCCHESI
Executive Officer
California State Lands Commission

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION'S - OFFICE OF THE STATE FIRE MARSHAL:

3/4/2020
Date

THOMAS W. PORTER
Director
California Department of Forestry and
Fire Protection

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 65 -

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 606 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 19   Filed 02/20/26   Page 242 of 464
ID #:17649
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 70 of 102   Page ID #:163

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD, CENTRAL COAST REGION:

March 2, 2020
_____
Date

_____
JOHN ROBERTSON
Executive Officer
Central Coast Regional Water
Quality Control Board

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 66 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE REGENTS OF THE UNIVERSITY OF CALIFORNIA:

3/3/20
Date

BARTON LOUNSBURY
Senior Counsel
Office of the General Counsel

Date

PEGGY FIEDLER
Executive Director
UC Natural Reserve System

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 67 -

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 608 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 31   Filed 02/20/26   Page 244 of 464
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 72 of 102   Page ID #:165

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE REGENTS OF THE UNIVERSITY OF CALIFORNIA:

_____
Date

BARTON LOUNSBURY
Senior Counsel
Office of the General Counsel

*3 March 2020*
Date

PEGGY FIEDLER
Executive Director
UC Natural Reserve System

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 67A -

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 609 of 837    Page
ID #:17652
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 245 of 464
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 73 of 102   Page ID #:166

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR PLAINS ALL AMERICAN PIPELINE, L.P.

2/25/2020
Date

HARRY PEFANIS
President

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 68 -

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 610 of 837   Page
ID #:17653
Case 1:26-cv-01486-KES-CDB   Document 53   Filed 02/20/26   Page 246 of 464
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 74 of 102   Page ID #:167

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR PLAINS PIPELINE, L.P.

2/25/2020

Date

HARRY PEFANIS

President

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

- 69 -

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 611 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 54   Filed 02/20/26   Page 247 of 464
ID #:17654
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 75 of 102   Page ID #:168

# APPENDIX A

# *(Set of maps that generally depict Lines 901, 903, and 2000)*

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 612 of 837    Page
ID #:17655
Case 1:26-cv-01486-KES-CDB    Document 35    Filed 02/20/26    Page 248 of 464
Case 2:20-cv-02415    Document 6-1    Filed 03/13/20    Page 76 of 102    Page ID #:169

Sources: Esri, HERE, Garmin, Intermap, increment P Corp., GEBCO, USGS, FAO, NPS, NRCAN, GeoBase, IGN, Kadaster NL, Ordnance Survey, Esri Japan, METI, Esri China (Hong Kong), (c) OpenStreetMap contributors, and the GIS User Community

*Appendix A – Line 901*

Owner:

PLAINS
ALL AMERICAN
PIPELINE, L.P.

Scale:  1:100,000

Sheet No:  1/1

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 613 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 9    Filed 02/20/26    Page 249 of 464
ID #:17656
Case 2:20-cv-02415    Document 6-1    Filed 03/13/20    Page 77 of 102    Page ID #:170

Appendix A – Line 903

| | |
|---|---|
| Scale: 1:700,000 | Owner: PLAINS ALL AMERICAN PIPELINE, L.P. |
| Sheet No: 1/1 | |

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 614 of 837   Page
ID #:17657
Case 1:26-cv-01486-KES-CDB   Document 6-1   Filed 02/20/26   Page 250 of 464
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 78 of 102   Page ID #:171

Sources: Esri, HERE, Garmin, Intermap, increment P Corp., GEBCO, USGS, FAO, NPS, NRCAN, GeoBase, IGN, Kadaster NL, Ordnance Survey, Esri Japan, METI, Esri China (Hong Kong), (c) OpenStreetMap contributors, and the GIS User Community

*Appendix A – Line 2000*

Owner:

PLAINS
ALL AMERICAN
PIPELINE, L.P.

Scale:  1:966,574

Sheet No:  1/1

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 615 of 837   Page
ID #:17658
Case 1:26-cv-01486-KES-CDB   Document 8   Filed 02/20/26   Page 251 of 464
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 79 of 102   Page ID #:172

# APPENDIX B

# *(PHMSA Injunctive Relief)*

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*

-74-

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 616 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 59    Filed 02/20/26    Page 252 of 464
Case 2:20-cv-02415    Document 6-1    Filed 03/13/20    Page 80 of 102    Page ID #:173

## APPENDIX B

### ARTICLE I – CALIFORNIA-SPECIFIC PROVISIONS

1. **State Waivers for Lines 901, 903, and 2000 (not to include any replacement lines):**

   A.    Prior to restarting Line 901, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 901. Plains must receive a State Waiver from the OSFM prior to restarting Line 901.

   B.    Prior to restarting non-operational segments of Line 903, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 903. Plains must receive a State Waiver from the OSFM prior to restarting Line 903.

   C.    Within 90 days of entry of the Consent Decree (CD), Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 903. The State Waiver shall apply to the currently operational segment of Line 903 from Pentland to Emidio.

   D.    Within 90 days of entry of the CD, Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 2000.

   E.    To the extent that a State Waiver directly incorporates terms identified in section 4 (Integrity Management) below, as being applicable to Lines 901, 903, or 2000, Plains shall not contest the inclusion of those terms in the relevant State Waiver. Plains reserves its rights to contest on any grounds any additional terms that the OSFM may require as part of each State Waiver if one is received. Nothing in this CD shall be construed to limit the authority of the OSFM to require additional terms or conditions in the State Waiver. Further, nothing in the State Waiver shall be construed to limit the applicability of the terms set forth in the CD.

2. **Replacement, Restart, or Abandonment of Lines 901 and 903:**

   A.    Plains shall replace the existing Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland with non-insulated pipe, if Plains is able to timely obtain: (1) agreements from shippers to transport sufficient quantities of product to make the cost of replacing the segments economically viable; (2) the Federal, State, and Local permits that may be required; and (3) whatever additional rights are needed, including rights-of-way that may be needed from landowners. Obtaining required commercial commitments, permits, rights-of-way, and any other rights necessary for replacement is the sole responsibility of Plains.

1

-75-

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 617 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 60   Filed 02/20/26   Page 253 of 464
ID #:17660
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 81 of 102   Page ID #:174

1.    On any replacement segments of Lines 901 or 903, Plains shall, prior to commencing operation of such segment(s):

    a.    Test for potential AC/DC interference.  Where potential AC/DC interference exists, proper mitigation of interference shall be designed and installed during construction of replacement lines.

    b.    Conduct a close interval survey (CIS) and AC/DC interference survey.

    c.    Based on the CIS and AC/DC interference surveys, place additional cathodic-protection test stations at locations where the surveys demonstrate potential cathodic-protection deficiencies, following review and consultation with the OSFM regarding proposed test station locations.

B.    As an alternative to replacement of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may restart the existing pipelines in accordance with the CD (including Appendix D) and applicable law.

C.    As an alternative to replacement or restart of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may abandon all or any segments in accordance with all applicable laws and regulations.

3.    **Third-Party Analysis of Line 2000 ILI Data**

A.    Plains shall select, subject to OSFM's approval, a third-party consultant to review and analyze ILI data for Line 2000 and provide a report to the OSFM on its findings.

B.    The consultant shall:

    1.    Review all ILI results and reports that Plains has received from ILI vendors for Line 2000;

    2.    Review Plains' processes and procedures for analyzing ILI data, and Plains' analysis of Line 2000 ILI results, and suggest potential improvements, if any, to Plains' current processes or procedures for analyzing ILI data;

    3.    Analyze Plains' implementation of its ILI assessment procedures for Line 2000.

    4.    Evaluate ILI vendor specifications to ensure that proper criteria and technology considerations are taken in to account in selecting the specific inspection tool(s) used in the future, with consideration given to best available technology for reliably detecting corrosion, general corrosion, selective seam-weld corrosion, and seam anomalies;

2

-76-

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 618 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 91   Filed 02/20/26   Page 254 of 464
ID #:17661
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 82 of 102   Page ID #:175

5.   Consider disclosed industry standards and regulations, including, but not limited to: 49 CFR § 195.452, the California Elder Pipeline Safety Act, ASME B31.4 (Pipeline Transportation Systems for Liquids and Slurries), ASME B31G (Manual for Determining Strength of Corroded Pipelines) or RSTRENG, API 1160 (Managing System Integrity for Hazardous Liquid Pipelines), API 1163 (In-Line Inspection Systems Qualification), ANSI/ASNT ILI-PQ (In-Line Inspection Personnel Qualification and Certification), NACE SP0169 (Control of External Corrosion on Underground or Submerged Metallic Piping Systems), and the PRCI Pipeline Repair Manual;

6.   Comply with additional requirements specified in the scope of work.

C.   The third-party consultant shall prepare a written report reflecting its findings, conclusions, and any recommendations for improvement found in conducting the analysis.

1.   The consultant may recommend improvements to Plains' ILI analysis process and procedures to improve the quality and integration of ILI data into its IMP going forward. Plains shall give due consideration to the results of the analysis and recommendations of the consultant but will maintain discretion over whether and how to implement any recommendations.

2.   The report shall include a list of documents and data reviewed in conducting the analysis, which shall be provided to the OSFM, if requested.

3.   Within 150 days of entry of the CD, the consultant shall provide a draft report to the OSFM and Plains for comment at the same time. Plains and the OSFM may provide comments to the consultant on the report within 21 days of receipt of the draft.

4.   Within 45 days after receiving comments (if any) from Plains and the OSFM, the consultant shall provide a final report to PHMSA, the OSFM and Plains.

4.   **Integrity Management**

A.   For any operating segments of Lines 901, 903, and 2000 (not to include any replacement lines):

1.   Plains shall implement the following measures and amend its IMP, as needed, to include the requirements of this section for the applicable lines:

a.   In addition to other dig criteria specified by regulation or in its IMP, Plains shall remediate all internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall

3

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 619 of 837    Page
ID #:17662
Case 1:26-cv-01486-KES-CDB    Document 2    Filed 02/20/26    Page 255 of 464
Case 2:20-cv-02415    Document 6-1    Filed 03/13/20    Page 83 of 102    Page ID #:176

loss, within one year of discovery. If Plains is unable to remediate such anomalies within one year of discovery, Plains shall notify OSFM and temporarily reduce the operating pressure and/or take further remedial action in accordance with 49 C.F.R. § 195.452 until the anomaly is remediated (or until otherwise authorized by OSFM).

b.    Analyze a sample of additional anomalies of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten, unless fewer than ten anomalies are reported within that range, in which case Plains would examine the number of anomalies called.

c.    When sizing anomalies, apply interaction/clustering criteria of 6t by 6t for applicable ILI tools;

d.    Require its ILI tool vendor to include in the vendor's inspection report all metal loss anomalies of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance;

e.    Any time a shrink sleeve is exposed during an anomaly investigation, remove the shrink sleeve, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy;

f.    Send all field measurements to the tool vendor within 90 days of completing all digs for any ILI, provided that available data must be submitted prior to the next ILI run, and conduct annual meetings with the tool vendor to discuss tool performance;

g.    For any use of magnetic flux leakage (MFL) tools, require its ILI tool vendor to manually grade any metal loss anomalies initially identified by the ILI tool as greater than or equal to 20% of wall loss (i.e., have human eyes on the raw data and not simply rely on a computer algorithm), and require that the vendor's ILI report note any differences between what the computer algorithm reported and the vendor's manual grade;

h.    Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, re-run the ILI tool to cover the area of failure;

i.    Integrate and analyze available data in its P&M process, including:

      i.    Assessment data from ILI tool runs;

      ii.    Dig and repair data;

4

-78-

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 620 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 256 of 464
ID #:17663
Case 2:20-cv-02415    Document 6-1    Filed 03/13/20    Page 84 of 102    Page ID #:177

iii.   Corrosion data, such as survey results, chemical treatments, and cleaning-pig results;

iv.   Operational data, such as pressure and flow data;

v.   Emergency response data, such as tactical response plans and results of recent drills on the pipeline, including locations of conduits to water, as identified in emergency response plans;

vi.   Evaluation of the capability of the leak detection system, which shall include identification of each leak detection segment between block valves, consideration of length and size of the pipeline, type of product carried, proximity to high consequence areas, swiftness of leak detection (the time period required for a leak to be operationally isolated and/or the pipeline to be shut down), type and location of valves, valve closure time, EFRD analysis results, the location of nearest response personnel, leak history, and risk assessment results;

vii.   Other pipeline characteristics, such as length, diameter, presence in HCAs and Environmentally and Ecologically Sensitive Areas (as defined in regulations promulgated pursuant to California Government Code § 8574.7(d), including 14 CCR 817.04(k)(3)(A)), maximum operating pressure, normal operating pressure, coating type, elevation data, water crossings, proximity to water bodies, casings, geohazard threats, maximum flow rate, and maximum rupture volume.

2.   ILI Measures

a.   Initial ILI Runs. Each year during the first two years after entry of the CD, Plains shall conduct at least two ILIs using: (1) a high-resolution MFL tool; and (2) a UT tool with an inertial measurement unit (IMU). Plains shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. If a UT tool run is unsuccessful, Plains shall identify the limitations that prevented the UT tool run from being successful, consider changes to increase the likelihood of a successful UT tool run, and use best efforts to rerun the UT tool within six months (subject to tool availability).

i.   All ILI assessments in the first two years shall include a sizing tool and a tool capable of identifying dents.

5

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 621 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 4    Filed 02/20/26    Page 257 of 464
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 85 of 102   Page ID #:178

ii.    In each of the first two years, Plains shall run the second ILI tool as soon as practicable after running the first ILI tool, but no later than 90 days after completion of the first ILI tool run. If one of the two tool runs is unsuccessful, Plains shall re-run the tool that was unsuccessful (but need not re-run the tool that was successful) even if the re-run of the unsuccessful tool run would occur more than 90 days from the successful tool run.

b.    <u>Subsequent ILI Runs</u>. After the first two years, Plains shall run at least one MFL or one UT tool every year, using a different ILI tool type (MFL or UT) in each alternating year. Alternatively, Plains may run a UT tool each year. If, however, any UT tool run is unsuccessful, Plains shall document the reasons why the UT tool was unsuccessful, consider changes to increase the likelihood of a successful UT tool run, and may use MFL technology to complete that year's ILI, but must run a UT tool the following year.

c.    <u>All ILI Runs</u>. Plains shall provide ILI results and reports to the OSFM within 30 days from its availability to Plains.

5.    **Valves**

A.    Within one year after entry of the CD for any operating segments of Lines 901, 903, and 2000, and for any new pipeline segments replacing those lines, Plains shall conduct EFRD analyses, which shall include consideration of:

1.    Swiftness of leak detection and pipeline shutdown capabilities, type of commodity carried, rate of potential leakage, volume that can be released, topography or pipeline profile, potential for ignition (for spilled commodity), proximity to power sources, location of nearest response personnel, specific terrain between the pipeline and the HCA, and benefits expected by reducing the spill size.

2.    Valve placement and method of valve actuation for all valves (not including valves used for instrumentation purposes, such as on tubing on transmitter calibration manifolds).

B.    Plains shall submit the EFRD analyses to OSFM within one year of entry of the CD.

C.    Where practical, Plains shall confirm that check valves that are necessary for the safe operation of the pipeline are in good working order at intervals required by other valve maintenance activities and associated procedures.

6

-80-

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 622 of 837   Page
ID #:17665
Case 1:26-cv-01486-KES-CDB   Document 5   Filed 02/20/26   Page 258 of 464
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 86 of 102   Page ID #:179

6. **Risk Analysis**

    A.    For any operating segments of Lines 901, 903, or 2000 (not to include any replacement lines):

        1.    Plains shall submit a risk analysis under proposed regulation 19 CCR § 2111(c) to OSFM (dated January 17, 2019 and publicly noticed in the California Regulatory Notice Register on February 15, 2019), or the final version of such regulation as it may be made effective in the future, regardless of whether or not those lines would otherwise be subject to the proposed regulations.

            a.    The information in the risk analysis shall be limited to the information listed in proposed regulation 19 CCR § 2111(c).

            b.    Plains' responsibility under this subsection is limited to providing the risk analysis to OSFM; Plains will maintain discretion over whether and how to implement the results of the analysis. The OSFM may review and comment on the risk analysis submitted by Plains consistent with provisions found in the proposed regulations, 19 CCR 2100 et seq.

            c.    The risk analysis shall be due within one year from entry of the CD.

7. **Leak Detection**

    A.    For any operating segments of Lines 901, 903, or 2000 (not to include any replacement lines), Plains shall confirm in writing to the OSFM within 30 days of entry of the CD that it has installed a Computational Pipeline Monitoring (CPM) Real Time Transient Model (RTTM) that is compliant with API 1130.

    B.    Within 12 months after initiating operation of any replacement lines for Lines 901 or 903, Plains shall verify and certify to the OSFM that all Pipeline and Instrumentation Drawings (P&IDs) reflect correct "as-built" information.

8. **Non-waiver**

    A.    Nothing in this CD shall excuse Plains from otherwise complying with the AB 864 regulations when they are promulgated.

## ARTICLE II – COMPANY-WIDE PROVISIONS ON REGULATED PIPELINES

9. **Integrity Management**

    A.    New Procedures for Interim Reviews and Assessments

7

-81-

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 623 of 837    Page
ID #:17666
Case 1:26-cv-01486-KES-CDB    Document 6    Filed 02/20/26    Page 259 of 464
Case 2:20-cv-02415    Document 6-1    Filed 03/13/20    Page 87 of 102    Page ID #:180

1.    Plains shall modify Section 9.5 of its Integrity Management Plan ("Continual Evaluation and Assessment of Pipeline Integrity") to provide for an annual, but not to exceed 15 months, Interim Review of each pipeline segment it operates to determine whether, since the last assessment (whether it was an Interim Assessment or a full periodic assessment under Section 6), conditions have changed or new information has been obtained that could significantly impact already-identified threats or create new threats for that segment. If so, Plains shall evaluate whether it should implement any P&M measure(s) to address that threat prior to the next regularly-scheduled assessment. Section 9.5 shall list all the categories of potential threats to be considered as part of the Interim Review and the types of conditions, information and data that will be included in the information analysis conducted under 49 CFR § 195.452(g).

2.    Plains shall modify Section 9.5 of its IMP to provide new forms for P&M measures or actions to be taken as a result of an Interim Review. Section 9.5 shall provide that Plains' Integrity Engineer may recommend any P&M measures that may be appropriate, including any P&M measures that could be recommended following a full assessment performed under Section 6 of its IMP.

3.    Plains shall submit its proposed modifications of Section 9.5 to PHMSA no later than 60 days after entry of the CD. If PHMSA does not object or request any modification within 60 days, Plains shall proceed to implement the revised procedures in Section 9.5, which shall be completed within 18 months from entry of the CD.

B.    Documentation for P&M Recommendations

1.    Within 90 days from entry of the CD, Plains shall revise Part B of its P&M Recommendation form (F11-2), to expand the scope and content of comments in the "Basis of Recommendation" field to provide a narrative explanation that reflects, at a minimum:

a.    What drew the engineer's attention and caused him or her to make the recommendation (such as an anomaly, pattern, trend or potential correlation observed in the data, a particular event or occurrence, a particular change in the operation or configuration of the line or in its surrounding environment, "lessons learned" from another event or occurrence, a corporate goal or initiative, etc.);

b.    The specific risk (likelihood or consequence of failure, or both) or concern that the recommended measure is intended to investigate or address; and

8

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 624 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 1-7    Filed 02/20/26    Page 260 of 464
ID #:17667
Case 2:20-cv-02415    Document 6-1    Filed 03/13/20    Page 88 of 102    Page ID #:181

c.   The goal or intended outcome that the recommended P&M measure is intended to achieve with regard to that specific risk or concern.

2.   In the new forms for the Interim Review procedure described in Paragraph A above, Plains shall likewise provide a narrative explanation of the bases for any recommended P&M measures.

3.   In Part B of its Preventive and Mitigative Evaluation Recommendation Form (F11-2), Plains shall continue to identify the anticipated completion date for the P&M measure in the column titled "Deadline Date."

C.   Tracking of P&M Measures

Plains shall document P&M measures recommended but not implemented.  Plains shall document implemented P&M measures through to completion, whether undertaken pursuant to an Interim Review under Section 9.5 or a full assessment under Section 6, such that these actions will be properly documented under 49 CFR § 195.452(l).

10.   **Valves and O&M**

A.   Within two years after entry of the CD, Plains shall conduct EFRD analyses for all Regulated Pipelines for which it has not previously completed an EFRD analysis.

B.   Within two years of entry of the CD, Plains shall develop and implement procedures to:

1.   If a valve fails to respond properly on first actuation command, document the failure and review historical records for that valve to identify any systemic issues.

2.   Adjust Plains' surge analyses and Emergency Response Plans, if necessary, to account for identified systemic issues associated with valve closure times.

3.   Timely communicate to the Control Room the status of valve maintenance activity for those valves on Regulated Pipelines that are capable of being operated by the Control Room.

4.   Verify that personnel assigned to operator-qualification tasks for valve maintenance are qualified to perform those tasks.

C.   Plains shall make all repairs necessary to keep valves in good working order within one year of discovery that the valve is not operating as intended, or, if not possible, Plains shall provide timely notification (including justification) to PHMSA or OSFM as applicable.

9

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 625 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 68    Filed 02/20/26    Page 261 of 464
Case 2:20-cv-02415    Document 6-1    Filed 03/13/20    Page 89 of 102    Page ID #:182

D.    For all field personnel who perform maintenance on facilities, equipment, or devices, Plains shall provide training:

1.    Within two years of entry of the CD, that addresses the importance of complying with Plains' policy requiring notification of Control Room personnel before beginning maintenance activities on any such facility, equipment, or device that could change the status of any pump, valve, CPM device, SCADA device, pressure or flow metering or rate that is monitored by the Control Room. Plains shall include in the training a requirement that employees shall notify the Control Room before entering a facility to perform maintenance, or, if not possible, immediately after entering.

E.    Plains shall improve existing valve maintenance recordkeeping to include confirmation whether the valve has been actually operated during maintenance.

11.    **Leak Detection**

A.    Within 90 days after entry of the CD, Plains shall create and maintain a list of its regulated mainline pipelines, excluding gathering lines and Delivery Lines, to indicate which of the following three rupture-detection methods, if any, are used on each line: (1) Rate of Change Combination alarm; (2) low discharge pressure alarm; or (3) 5-minute computational pipeline monitoring (CPM) alarm.

1.    Within one year after entry of the CD, for any regulated mainline pipeline identified in the list created pursuant to this paragraph that does not utilize at least one of the three rupture detection methods, Plains shall implement at least one.

B.    For the term of the CD, Plains shall conduct annual training for controllers on attributes and benefits of various methods of leak detection, including Analog High/Low Threshold, Alarm Deadband, Creep Deviation, and Analog Rate of Change.

C.    Within 18 months of entry of the CD, for its CPM systems, Plains shall analyze and evaluate the use of accumulated deviation rolling time periods longer than 24 hours.

1.    Plains shall document its analysis and provide it to PHMSA for comment, but Plains shall maintain discretion over what actions to take, if any, and how to implement the results of its analysis.

D.    Within six months of entry of the CD, Plains shall have in place a written procedure for Selection of Leak Detection Method for its Regulated Pipelines.

1.    Plains shall provide the Selection of Leak Detection Method procedure to PHMSA for comment, but Plains shall maintain discretion over and be

10

-84-

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 626 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 9    Filed 02/20/26    Page 262 of 464
ID #:17669
Case 2:20-cv-02415    Document 6-1    Filed 03/13/20    Page 90 of 102    Page ID #:183

responsible for the final content and implementation of the Selection of Leak Detection Method procedure.

E.  Plains will hold periodic (at least annual) meetings to solicit feedback from Control Room and operations maintenance personnel regarding potential improvements to leak detection. The results of the meetings will be documented and shared with appropriate personnel. The recommendations will be evaluated and documented.

F.  Instrumentation and Display

1.  To minimize and prevent false operating conditions from being displayed, Plains shall, per API 1175 (Pipeline Leak Detection – Program Management (1st Edition, December 2015)), within three years from entry of the CD or such earlier time as required by regulations:

a.  Provide a procedure by which operations maintenance personnel and/or Control Room personnel identify and record when instrumentation has been impeded on an unplanned basis and is no longer providing accurate and updated values on pressure, flow, or temperature due to scheduled or planned maintenance activities.

b.  Track these conditions through to resolution, including instrumentation relocation when necessary.

12.  **Control Room Management**

A.  For Lines 901 and 903, prior to resuming operations on segments currently not in service or commencing operations on any replacement for those lines, Plains shall:

1.  Complete point-to-point verification reviews for all components of its SCADA system, including displays, alarm setpoint values, and alarm log descriptors;

2.  Update its piping and instrumentation diagrams, software, manuals, and operating procedures to accurately reflect the existing field configuration;

3.  Confirm that all Lo-Lo and Hi-Hi SCADA alarms are configured and programmed as critical safety related alarms for pressures and flows, and that alert notifications are correct and accurate; and

4.  Update the names of all facilities, equipment, devices, measurement points and locations in console displays, the Control Room Management Plan and Control Center General Procedures, shift reports, and form templates to reflect current operating conditions (updating or removing out-of-date names).

11

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 627 of 837   Page
ID #:17670
Case 1:26-cv-01486-KES-CDB   Document 6-1   Filed 02/20/26   Page 263 of 464
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 91 of 102   Page ID #:184

B.    For Line 2000, within six months after entry of the CD, Plains shall confirm to the OSFM that all Alarm Descriptors on the control console are accurate.

C.    Plains shall implement the Control Room Management Plan measures and Control Center General Procedures measures referenced in paragraph 23(a) of the CD.

13.    **Emergency Response and Oil Spill Response Plans**

A.    California-Specific Provisions:

1.    Plains shall review and update its Bakersfield District Response Zone Plan periodically, as required by applicable regulations, including 14 CCR 816.05. Plains' review shall include the portions of its Response Plan that address identification of culverts along the pipelines' rights-of-way, potential receptors, access to potential spill sites, and procedures to assure protection of the environment from oil spills. To the extent that Plains has a Tactical Response Plan, Plains shall make it available to the Governments upon reasonable request and as needed in connection with a drill or response to a spill.

B.    Company-Wide Provisions

1.    Plains shall, at least once before two years from the date of entry of the CD, and at least one additional time prior to termination of the CD, survey its rights-of-way for all regulated mainline pipelines of at least 24" diameter, by foot or air patrol, to identify all culverts and shall ensure the emergency response plans covering those pipelines (a) reflect the locations of all culverts identified, and (b) address potential containment and recovery techniques for spills that may occur near identified culverts.

2.    Within 180 days of entry of the CD (or within 180 days of a new employee being hired, or an existing employee being assigned to relevant duties) Plains shall provide or confirm that it has provided all employees who may reasonably be involved in spill response with NIMS ICS training at the 100 and 200 levels. Within 180 days of entry of the CD, Plains shall also provide or confirm that it has provided ICS training at the 300 and 400 level to any employee who may reasonably be expected to coordinate with the Incident Management Team during a spill response. Plains shall provide refresher training to employees within two years after initial training and shall maintain certification of such training and make such documents available to Plaintiffs upon request.

3.    Going forward from the date of the CD, Plains shall include in its contracts with all Oil Spill Response Organizations (OSROs) a requirement that the OSROs' employees and contract employees receive training at the same level specified for Plains employees, based on their responsibilities, prior to participating in any incident response on behalf of

12

-86-

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 628 of 837    Page
ID #:17671
Case 1:26-cv-01486-KES-CDB    Document 11    Filed 02/20/26    Page 264 of 464
Case 2:20-cv-02415    Document 6-1    Filed 03/13/20    Page 92 of 102    Page ID #:185

Plains. Plains shall require its OSRO contractors and subcontractors to register with a third-party online compliance verification system and shall use that online verification system to spot-check the NIMS ICS Training histories for randomly-selected OSRO personnel who participate in Plains' table-top drills. Plains' spot-check shall include a reasonable number of OSRO personnel participating in the drills to help ensure that all OSRO personnel participating in incident response are trained at the ICS levels specified herein.

4. Within 180 days of entry of the CD, Plains shall provide or confirm that it has provided all Control Room supervisors with training regarding the Control Room's emergency response responsibilities and procedures. Plains shall provide this training annually thereafter. Plains shall maintain auditable documentation that supervisors have received such training and shall make such documentation available to PHMSA upon request.

5. Plains shall notify PHMSA (and, for California Lines, California OSPR and OSFM) of company-sponsored and organized drills in accordance with applicable regulations, including table tops (either with or without equipment deployment). Plains shall provide PHMSA (and, for California Lines, California OSPR and OSFM) with after-action reports for each table-top drill involving equipment deployment within 90 days of completion of the drill. Plains shall include lessons learned in such after-action reports and shall consider such lessons learned for incorporation into future drills or exercises.

6. For the term of the CD, a representative of Plains' Control Room management team shall participate in any after-action or "hot wash" activity designed to identify areas of improvement following a release, and shall share, in documented form, the information obtained with relevant Control Room personnel.

14. **Safety Management System (SMS)**

A. Plains shall continue to implement its SMS, which is based on recommended practices in American Petroleum Institute (API) RP 1173 (Pipeline Safety Management Systems (1st Edition, July 2015)).

1. Prior to the termination of the CD, Plains shall hire a third party to assess the conformance of its SMS to API RP 1173. Plains shall direct the third party to transmit a copy of the final report to PHMSA. Plains' responsibility under this paragraph shall be limited to engaging the third party to prepare the report and providing the report to PHMSA. Any nonconformance identified by the third party shall not be a violation of the CD.

13

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 629 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 12   Filed 02/20/26   Page 265 of 464
ID #:17672
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 93 of 102   Page ID #:186

B.      Plains shall participate in the API Pipeline SMS Group to exchange ideas, information, and lessons learned about implementation of API RP 1173.

15.    **Drug and Alcohol Program**

A.      Within one year of entry of the CD, Plains shall review and revise its drug and alcohol misuse plans to comply with post-accident and random drug and alcohol testing required by 49 C.F.R. §§ 199.105(b), (c), and 49 C.F.R. § 199.225(a). This shall include a review of all covered positions among Control Room personnel and field personnel for inclusion in the plans for post-accident testing. Covered positions shall include any person with authority to shut down a pipeline, including Control Room shift supervisors. Plains shall ensure adequate implementation and documentation for all post-accident drug/alcohol tests as required by 49 C.F.R. § 199.117(a)(5) and 49 C.F.R. §§ 199.227(b)(4), (c)(1)(v) and in accordance with its procedures. Should Plains determine that it is not possible to administer a post-accident drug/alcohol test on a covered employee whose performance of a covered function either contributed to the accident or could not be completely discounted as a contributing factor within the time specified in the regulations, Plains shall document why the test was not administered within such time.

14

# APPENDIX C

# *(Intentionally left blank)*

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 631 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 14    Filed 02/20/26    Page 267 of 464
ID #:17674
Case 2:20-cv-02415    Document 6-1    Filed 03/13/20    Page 95 of 102    Page ID #:188

# APPENDIX D

## (Remaining Corrective Actions from the PHMSA CAO)

*United States of America and the People of the State of California v.
Plains All American Pipeline, L.P. and Plains Pipeline, L.P.
Consent Decree*

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 632 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 15   Filed 02/20/26   Page 268 of 464
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 96 of 102   Page ID #:189

# APPENDIX D

1.    All outstanding corrective actions in PHMSA's closed Corrective Action Order (CAO), CPF No. 5-2015-5011H, as amended, are hereby merged into this Consent Decree, as outlined below, and subject to the sole regulatory oversight of the OSFM.

   a. **Line 901 Shutdown.** Plains shall not operate Line 901 until authorized to do so by the OSFM.

   b. **Restart Plan for Line 901.** If Plains seeks to restart Line 901, Plains shall develop and submit, at least 60 days in advance of a scheduled restart, a written Restart Plan for Line 901 to the OSFM for review and approval. Once approved by the OSFM, the Restart Plan shall be incorporated by reference into this Consent Decree. The Restart Plan shall include:

      1)    Documentation of the completion of all mandated actions, and a management of change plan to ensure that all procedural modifications are incorporated into Plains' operations and maintenance procedures manual;

      2)    Provisions for adequate patrolling of Line 901 during the restart process and shall include incremental pressure increases during start-up, with each increment to be held for at least two hours;

      3)    Sufficient surveillance of the pipeline during each pressure increment to ensure that no leaks are present when operation of the line resumes;

      4)    A specific day-light restart that includes advance communications with local emergency response officials;

      5)    Master Control Room enhancements, including:

         a) Implementation of advanced leak-detection

- 1 -

-91-

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 633 of 837   Page
ID #:17676
Case 1:26-cv-01486-KES-CDB   Document 6   Filed 02/20/26   Page 269 of 464
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 97 of 102   Page ID #:190

capabilities that include mass balance and line pack calculations (the total volume of liquid present in a pipeline section). The leak-detection improvements shall include:

1. Revised alarm threshold adjustments;

2. Additional required instrumentation; installation of additional safety valves as a result of Plains' EFRD evaluation;

b) Review and update of the alarm set-point values of pressures and flows to account for hydraulics and the interaction of topography, pipeline status (running and shutdown), sensor location, and historical pressure and flow values by configuration, in order to provide a basic level of leak detection when the pipeline is down and not running. Dynamic alarm limits based on pipeline status shall be used if hydraulically required;

c) Implementation of modifications to the existing alarm priority/severity system to incorporate low and high pressure and flow values in major or safety-related alarm (SRA) categories;

d) Implementation of emergency shutdown programming associated with Line 901 that can be executed by the Shift Supervisor or Controller;

e) Development and implementation of training associated with the emergency shutdown programming described above; and

f) Provision of additional controller training that

- 2 -

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 634 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 17   Filed 02/20/26   Page 270 of 464
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 98 of 102   Page ID #:191

incorporates awareness of abnormal operations and reduced-pressure operational characteristics, including alarm set-point revisions for conditions similar to the Refugio Incident.

6)   Elimination and documentation of actions taken to prevent inappropriate uncommanded Valve 460 (Sisquoc Conoco) status and position changes;

7)   Installation of additional safety valves as a result of Plains' EFRD evaluation;

8)   Installation of additional pressure sensors as a result of Plains' surge study;

9)   Initiation of a UT ILI within seven days after steady-state operation is achieved in accordance with an ILI schedule approved by the OSFM. The tool run shall be initiated during daylight hours. If the tool run does not collect a complete data set, the UT tool shall be promptly re-run. A report from the ILI tool vendor shall be completed within 30 days of running the tool. Plains shall complete its review and analysis of the ILI report within 15 days of receiving the report. Provisions shall be made to address any immediate repairs that result from an initial data analysis of the UT ILI run; and

10)   **Corrosion Prevention.** Plains shall include a long-term plan to address corrosion under insulation (CUI) on Line 901 that meets the requirements of 49 C.F.R. Part 195, Subpart H, in any Restart Plan. Plains may address the inadequate corrosion prevention through any method approved by the OSFM, including but not limited to the provisions contained in CAO Amendment No. 3, Section 2(a)-(c).

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 635 of 837    Page
ID #:17678
Case 1:26-cv-01486-KES-CDB    Document 6-1    Filed 02/20/26    Page 271 of 464
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 99 of 102   Page ID #:192

c. **Return to Service of Line 901.** After the OSFM approves the Restart Plan, Plains may return Line 901 to service but the operating pressure shall not exceed eighty percent (80%) of the actual operating pressure in effect immediately prior to the Refugio Incident on May 19, 2015.

d. **Removal of Pressure Restriction of Line 901.** The OSFM may allow the removal or modification of the pressure restriction upon a written request from Plains demonstrating that restoring the pipeline to its pre-Refugio Incident operating pressure is justified, based on a reliable engineering analysis showing that the pressure increase is safe, considering all known defects, anomalies, and operating parameters of the pipeline. The OSFM may allow the temporary removal or modification of the pressure restriction upon a written request from Plains demonstrating that temporary Preventive and Mitigative (P&M) measures will be implemented prior to and during the temporary removal or modification of the pressure restriction. The OSFM's determination shall be based on consideration of the Refugio Incident's cause and Plains' evidence that P&M measures provide for the safe operation of Line 901 during the temporary removal or modification of the pressure restriction.

e. **Line 903 Shutdown.** After purging Line 903, Plains shall not operate Line 903 between Gaviota and Pentland stations until authorized to do so by the OSFM.

f. **Restart Plan for Line 903.** If Plains seeks to restart the Gaviota-to-Pentland segment of Line 903, Plains shall develop and submit, at least 60 days in advance of a scheduled restart, a written Restart Plan for the Gaviota-to-Pentland segment of Line

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 636 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 19    Filed 02/20/26    Page 272 of 464
Case 2:20-cv-02415    Document 6-1    Filed 03/13/20    Page 100 of 102    Page ID #:193

903 to the OSFM for review and approval. Once approved by the OSFM, the Restart Plan shall be incorporated by reference into this Consent Decree. In addition to all the requirements set forth in the above subparagraphs 1.b.1)-11), excluding subparagraph 1.b.6), the Restart Plan shall include:

    1)    Provisions for adequate patrolling during the restart process and the inclusion of incremental pressure increases during start-up, with each increment to be held for at least two hours;

    2)    Sufficient surveillance of the pipeline during each pressure increment to ensure that no leaks are present when operation of the line resumes; and

    3)    Provisions for a daylight restart and advance communications with local emergency response officials.

g. **Line 903 Return to Service.** After the OSFM approves the Restart Plan for the Gaviota-to-Pentland segment of Line 903, Plains may return that segment to service, but the operating pressure shall not exceed eighty percent (80%) of the highest pressure sustained for a continuous 8-hour period between April 19, 2015, and May 19, 2015, for Line 903 (Gaviota-to-Sisquoc and Sisquoc-to-Pentland segments).

h. **Removal of Pressure Restriction for Line 903.** After a return to service, Plains may request the OSFM to remove the pressure restriction for the Gaviota-to-Pentland segment of Line 903.

    1)    The OSFM may allow removal or modification of the pressure restriction upon a written request from Plains demonstrating that restoring the pipeline to its pre-Refugio Incident operating pressure is justified, based on a reliable

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 637 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 6-1   Filed 02/20/26   Page 273 of 464
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 101 of 102   Page ID #:194
ID #:17690

engineering analysis showing that the pressure increase is safe, considering all known defects, anomalies, and operating parameters of the pipeline.

2)    The OSFM may allow the temporary removal or modification of the pressure restriction upon a written request from Plains demonstrating that temporary P&M measures will be implemented prior to and during the temporary removal or modification of the pressure restriction. The OSFM's determination shall be based on consideration of the Refugio Incident's cause and Plains' evidence that P&M measures provide for the safe operation of Line 903 during the temporary removal or modification of the pressure restriction. Requests for removal of the pressure restriction may be submitted by pipeline segment.

i. **Notifications.** Plains shall provide notification to the OSFM within five business days of any of the following events: any investigation and remediation field actions for identified anomalies (i.e., digs and repairs), ILI tool runs, and/or startup dates.

j. **Reporting Requirements for Lines 901 and 903.** If and when Plains has concluded all items in this Appendix D, Plains shall submit a final Appendix D Documentation Report to the OSFM for review and approval.

1)    The OSFM may approve the Appendix D Documentation Report incrementally without approving it in its entirety.

2)    Once approved by the OSFM, the Appendix D Documentation Report shall be incorporated by reference into this Consent Decree.

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 638 of 837   Page
ID #:17691
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 274 of 464
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 102 of 102   Page ID #:195

3)    The Appendix D Documentation Report shall include but not be limited to:

A.   Table of Contents;

B.   [*intentionally left blank.*]

C.   [*intentionally left blank.*]

D.   Summary of all tests, inspections, assessments, evaluations, and analysis to the extent required under this Appendix D;

E.   [*intentionally left blank.*]

F.   [*intentionally left blank.*]

G.   Lessons learned while fulfilling the requirements of this Appendix D.

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 639 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 275 of 464
ID #:17692

ROB BONTA
Attorney General of California
BRANDON S. WALKER SBN. 254581
Supervising Deputy Attorney General
JACK C. NICK SBN. 160196
ISABELLA A. PANUCCINI SBN. 318984
Deputy Attorneys General
  1300 I Street, Suite 125
  Sacramento, CA 95814
  Telephone: (916) 210-6395
  Fax: (916) 327-2319
  E-mail: Brandon.Walker@doj.ca.gov
*Attorneys for Defendant State of California*

ELECTRONICALLY FILED
Superior Court of California,
County of Kern
By: Marina Mercado
Deputy Clerk
**12/5/25 1:54 PM**

*Exempt from Filing Fees Pursuant to
Government Code § 6103*

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF KERN

METROPOLITAN DIVISION

| | |
|---|---|
| **Pacific Pipeline Company, A Delaware Corporation,** | Case No. BCV25103508 |
| Plaintiff, | **DECLARATION OF BRANDON S. WALKER IN SUPPORT OF MOTION TO CHANGE VENUE (Vol. 3 of 3)** |
| v. | Date:       February 3, 2026 |
| **State of California and DOES 1 through 25,** | Time:       8:30 a.m. |
| Defendants. | Dept:       H |
| | Judge:      Hon. Bernard C. Barmann, Jr. |
| | Action Filed: September 29, 2025 |

1

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 640 of 837   Page
ID #:17693
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 276 of 464

# EXHIBIT "E"

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 641 of 837   Page
Docusign Envelope ID: 8711857A-ED70-4886-86B2-BCE5F180BFD7   ID #:17694
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 277 of 464

STATE OF CALIFORNIA—NATURAL RESOURCES AGENCY                    Gavin Newsom, Governor



**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**OFFICE OF THE STATE FIRE MARSHAL**
P.O. Box 944246
Sacramento, California 94244-2460
(916) 568-3800
Website: www.fire.ca.gov



## CERTIFIED MAIL No: 9589-0710-5270-1475-5353-08

December 17, 2024

Lance Yearwood
Vice President
Sable Offshore Corp
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**SUBJECT:   LETTER OF DECISION ON THE STATE WAIVER REQUEST FOR
LIMITED EFECTIVENESS OF CATHODIC PROTECTION ON
THERMALLY INSULATED PIPELINE AND CORROSION OF OR ALONG
A LONGITUDINAL SEAM WELD (CA-324)**

Operator:     Sable Offshore Corp
OPID# 40851
845 Texas Avenue, # 2920
Houston, Texas 77002

Pipeline:     OSFM Line ID 0015 - 10.86 miles (Las Flores Canyon to Gaviota) of Sable
Offshore Corp CA-324 (OSFM Line ID 0015) located in Santa Barbara
County, California as described in the request of state waiver dated April 24,
2024

Dear Mr. Yearwood:

The Office of the State Fire Marshal (OSFM) received Sable Offshore Corp's (*Sable*) state
waiver request (*Application*) on April 24, 2024, in accordance with the terms of the
Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and
the People of the State of California, DOJ Case REF. NO. 90-5-1-1-1130 (Appendix B,
Article 1.1.D).

In addition, Sable requested a regulatory relief from Title 49 Code of Federal Regulations
(49 C.F.R.), § 195.452(h)(4)(iii)(H) *Corrosion of or along a longitudinal seam weld* for
Sable CA-324.

*"The Department of Forestry and Fire Protection serves and safeguards the people and protects the property and resources of California."*

Lance Yearwood
December 17, 2024
Page 2

Sable explained that its goal is to appropriately manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection due to the shielding effects of the polyurethane foam and the polyethylene tape wrap. Sable described the measures it has taken to address this risk and implemented and proposed a number of additional measures designed to mitigate the risk of corrosion under insulation that may result from potential ineffective cathodic protection (CP).

Sable provided the OSFM with its proposed measures to mitigate the risk of corrosion under insulation. Sable also provided the OSFM information from the completed in-line inspections and additional data requested by our office. The OSFM Pipeline Safety Engineers have reviewed the materials provided and have been in communication with the United States Department of Transportation (USDOT), Pipeline and Hazardous Materials Safety Administration (PHMSA) Engineering and Research Division to incorporate PHMSA's recommended conditions into the state waiver.

The OSFM has regulatory jurisdiction over the safety standards and practices of intrastate hazardous liquid pipeline transportation within California. As a Pipeline Safety Program that is certified under 49 USC § 60105, the OSFM may grant a state waiver with a pipeline safety regulation adopted by the state of California. Title 49 C.F.R., Part 195 was adopted by reference as it relates to hazardous liquid pipelines within Title 19 California Code of Regulations (19 CCR), Section 2000.

This state waiver applies to Sable's Line CA-324 (OSFM Line ID 0015) which consists of a 10.86 mile long, 24-inch outside diameter pipeline segment with the origin and termination points as described in the application. The pipeline is located in Santa Barbara, California and shall be referred herein as *CA-324*.

The state waiver shall not become effective until (1) PHMSA issues an Order approving the waiver or stating it has no objection to the waiver or (2) PHMSA takes no action on the waiver within sixty (60) days after receiving the Letter of Decision from the OSFM.

The state waiver is limited to a term of no more than ten (10) years from the date it becomes effective, which shall be considered as the date of issuance. The OSFM may terminate the state waiver under conditions detailed below.

**Applicable Regulations**

The OSFM hereby grants this state waiver for CA-324, provided that Sable complies with the specific requirements in this state waiver and any additional conditions outlined by PHMSA. The pipeline must be operated and maintained in accordance with the CD, these state waiver conditions and 49 C.F.R. Part 195, with the exception of 49 C.F.R. §195.452(h)(4)(iii)(H). In the event of a conflict between the state waiver conditions and the applicable requirements under 49 C.F.R. Part 195, the state waiver conditions control.

Lance Yearwood
December 17, 2024
Page 3

Should additional federal or State statutory or regulatory requirements come into effect
following the implementation of this state waiver, CA-324 shall be subject to those
requirements except where they are in conflict with the State Waiver or the safe operation
of the pipeline.

## General Conditions

1. The pipeline can only be used to transport crude oil as stated in the application.
2. The maximum operating pressure (MOP) of CA-324 cannot exceed 1003
   pounds per square inch gauge (psig).
3. The maximum operating temperature of the crude oil that transports in CA-324
   must not exceed 140 Fahrenheit for more than 12 consecutive hours.
4. Prior to startup, Sable must develop and implement procedures for the
   conditions and requirements described in the state waiver.
5. This state waiver does not relieve Sable from other requirements under 49
   C.F.R. Part 195 or the Elder California Pipeline Safety Act of 1981 other than
   contained herein.
6. This state waiver does not relieve Sable from any requirements imposed by the
   Consent Decree (United States District Court Central District of California Civil
   Action No. 2:20-cv-02415).
7. In-line inspection must include:
   a. Use of a tool that is at least capable of reliably detecting and identifying
      cluster corrosion and general corrosion. Definition of cluster and general
      corrosion is as follows:
      i. Cluster means two or more adjacent metal loss features in the wall of
         the pipe or weld that may interact based on interaction criteria.
      ii. General corrosion means uniform or gradually varying loss of wall
          thickness over an area.
   b. Use of a tool that is at least capable of reliably detecting and sizing corrosion
      at a 90 percent probability of detection (POD) and probability of identification
      (POI).
   c. Use of a tool that is at least capable of reliably detecting and sizing cracks or
      crack-like anomalies at a 90 percent POD and POI.
8. Prior to placing CA-324 in operation, Sable must perform fracture toughness
   tests on the existing 24" pipe from CA-324 in accordance with ASTM E1820-23B
   Standard Test Method for Measurement of Fracture Toughness. All of the test
   specimens must be from the predominant existing 24" pipe, specifically API 5L
   X65 HF-ERW pipe with a nominal thickness of 0.344" that was manufactured by

Docusign Envelope ID: 871F8E7A-ED76-4881-88B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 4

Nippon Steel Corp. in the 1980s. At least three (3) separate tests must be performed to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ)[1], and the HF-ERW long seam weld on the pipe to represent the fracture toughness of its CA-324 (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the HF-ERW long seam weld). The lowest fracture toughness value must be applied to conditions 10, 30, 33, and 48. Sable may use pipe samples taken opportunistically during ongoing pipeline maintenance and repair efforts.[2]

9. All immediate and 180-day repair conditions that are listed in this state waiver must be evaluated and remediated prior to restarting CA-324. Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by OSFM. Sable must utilize the most recent Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results when identifying these repair conditions.

10. Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines*. If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

11. Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of its CA-324.

## Pressure Testing

12. Prior to placing the pipeline in operation, Sable must conduct a spike hydrostatic pressure test of the state waiver pipeline segments at a minimum pressure that is at least 1.5 times the MOP or 100% SMYS, for a minimum of 15 minutes after

---

[1] The heat affected zone (HAZ), as used in the state waiver, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.

[2] Sable must submit all fracture toughness results to the OSFM prior to restarting the pipeline.

Docusign Envelope ID: 871-19E7A-5D79-4884-88B3-BCECF190FFD7

Lance Yearwood
December 17, 2024
Page 5

the spike test pressure is stabilized. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-324:
   a. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.
   b. All anomalies that have a predicted failure pressure less than or equal to 1.6 times MOP.

13. Immediately following the spike hydrostatic pressure test, Sable must conduct an 8-hour hydrostatic pressure test of the state waiver pipeline segments at a minimum of 1.25 times the MOP.

14. Sable must obtain the Test ID from the OSFM for each hydrostatic pressure test and have the approved independent testing firm forward separately the certified test results to the OSFM.

15. Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 C.F.R., Part 195 Subpart E – Pressure Testing and monitored by an independent testing firm listed under the OSFM approved hydrostatic testing companies.

16. Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported[3] to the OSFM via email at PipelineNotification@fire.ca.gov
   Subject: OSFM State Waiver - Hydrotest Failure

17. Section(s) of the state waiver pipeline segments that failed during the required hydrotesting must be repaired by removing and replacing the failed section. The OSFM reserves the right to revoke the state waiver if failure(s) raise the concern that the pipeline cannot be safely operated.

## In-Line Inspection (ILI) Assessment and Frequency

18. At least 90 days prior to performing in-line inspections of the state waiver segment, Sable shall provide the OSFM with a written notification to PipelineNotification@fire.ca.gov describing its assessment plan with the following information:
   a) Dates for integrity assessment
   b) In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[4] to assess the integrity of the subject pipe

---

[3] In addition to the OSFM reporting, Sable shall follow all additional state reporting requirements.
[4] Industry standards that are referenced in this state waiver must utilize the editions that are incorporated by referenced in Title 49 Part 195.3 unless another edition was explicitly specified.

Lance Yearwood
December 17, 2024
Page 6

      segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications

    c) In-line inspection tool vendor(s)

    d) Required tool specifications including operational specifications and anomaly sizing tolerances

    e) Tool validation methodology

    f) Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications

    g) Criteria used to identify locations for excavation and field verification

    h) Non-destructive examination

19. Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.

20. Metal Loss Tool(s)

    a. Initial ILI tool runs – Each year, during the first two (2) years of operating CA-324, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU). Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months. If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.

    b. Subsequent ILI tool runs – After the first two (2) years of operating CA-324, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the pipeline within 30 days after it was deemed to be unsuccessful. All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

21. Crack Detection Tools - Sable shall conduct at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15

Docusign Envelope ID: 8711 8FF4 ED7B4489 86B3 ECE0FDBFFD7

Lance Yearwood
December 17, 2024
Page 7

months[5] or ILI assessment must be assessed at more frequent intervals if condition 48 determined a shorter assessment interval.

   a. These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.

   b. USCD Performance Specification Requirements

      i. The USCD tools must have a probability of detection that is ≥ 90% for axial and circumferential cracks.

      ii. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.

      iii. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.

      iv. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks.

22. Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

23. Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the pipeline segment in which the ILI tool velocity was outside of the specified tool velocity range.

24. All ILI tool runs must obtain the Test ID from the OSFM prior to run.

25. Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.

26. Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

27. Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals. Sable must

---

[5] Sable may petition the OSFM to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to OSFM and PHMSA approval.

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 648 of 837   Page
ID #:17691
Docusign Envelope ID: 871A3E7A-E074-4880-85E3-5CE5E1B0FFD   Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 284 of 464

Lance Yearwood
December 17, 2024
Page 8

document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[6] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different. If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

28. Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013).

## Discovery of Condition

29. The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

## Immediate Repair Conditions[7]

30. A crack or crack-like anomaly that meets any of the following criteria:
    a. Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.
    b. Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.
31. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.
32. Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the

---

[6] A minimum of four (4) independent direct examination excavations must be used for unity plots.

[7] The criteria outlined in the state waiver is supplemental to the requirements set forth in §195.452(h)(4)(i) *Immediate repair conditions* and does not relieve Sable from complying with §195.452(h)(4)(i). All immediate repair conditions must be remediated with a permanent repair method.

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 649 of 837   Page
ID #:17692
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 285 of 464

Docusign Envelope ID: 87116E7A-5D76-4481-89B3-BCF0D190FFD7

Lance Yearwood
December 17, 2024
Page 9

remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[8]

## 180-Day Repair Conditions[9]

33. A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.
34. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.
35. All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[10]
36. For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

## Corrosion Growth Rate Analysis (CGRA)

37. Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to prior ILI) and perform pipeline remediations needed to assure the integrity of the pipeline is maintained.[11] The timing of pipeline remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.
38. The CGRA procedure must include ILI data matching methods[12] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.

---

[8] Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria. General corrosion means uniform or gradually varying loss of wall thickness over an area.

[9] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(iii) 180-day conditions* and does not relieve Sable from complying with §195.452(h)(4)(iii). All 180-day repair conditions must be remediated with a permanent repair method.

[10] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth. If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify the OSFM, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 C.F.R. §195.452 until the indication is remediated or until otherwise authorized by OSFM.

[11] At a minimum, Sable must include signal matching between ILI data sets.

[12] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

Docusign Envelope ID: 87.28-7A-D1-486-KE5-6CEDB-OFFD

Lance Yearwood
December 17, 2024
Page 10

39. Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.

40. When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates[13].

41. All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

## Pressure Reduction

42. If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in the state waiver, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

## In Field Direct Examination of Pipe

43. Direct examinations[14] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[15] PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.

44. Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition. However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:

   a. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.

---

[13] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

[14] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.

[15] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complimented by shear wave technology or inspection by phased array ultrasonic testing.

Docusign Envelope ID: 8711365A-FD7D-4880-86B3-BCE5F1805FD7

Lance Yearwood
December 17, 2024
Page 11

       b.  Sable must increase the metal loss anomaly's depth by 20% when they input it into the formula for calculating the number of wraps needed for repair method 5.

       c.  After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs. If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

45. Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

46. Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy. Sable must recoat in accordance with their coating repair procedure.[16]

47. All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

## Integrity Management

48. A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.

       a.  Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 C.F.R. §192.712(d)(1).

       b.  Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 C.F.R. §192.712(d)(2).

49. Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.

50. When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

---

[16] The coating procedure must be submitted to the OSFM prior to the prior to the effective date of the state waiver.

Docusign Envelope ID: 871285E7A-ED76-4886-8883-8CE5D180FFD1

Lance Yearwood
December 17, 2024
Page 12

51. Sable must send all field measurements to the ILI tool vendor within 90 days of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

52. Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the pipeline. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by the OSFM prior to being selected.

53. Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC) interference or direct current (DC) interference or shorting that could contribute to external corrosion is occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

## Data Requirements for Predicted Failure Analysis

54. Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

55. The analyses performed in accordance with this state waiver must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in *traceable, verifiable, and complete* records.

## Recordkeeping

56. Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this state waiver shall be kept for the life of the pipeline and must be submitted to the OSFM, in the manner requested (electronic, hardcopy, or other format) within 30 days.

57. Sable must maintain the following records:
   a. Technical approach used for the analysis
   b. All data used and analyzed
   c. Pipe and longitudinal weld seam properties
   d. Procedures used to implement state waiver conditions

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 653 of 837   Page
Docusign Envelope ID: 87118E7A-ED76-4884-86B3-BCE5F189FFD7   ID #:17696
Case 1:26-cv-01486-RES-CDB   Document 16   Filed 02/20/26   Page 289 of 464

Lance Yearwood
December 17, 2024
Page 13

e.  Evaluation methodology used
f.  Models used
g.  Direct in situ examination data
h.  All in-line inspection tool assessments information evaluated
i.  Pressure test data and results
j.  All in-the-ditch assessments performed on the pipeline segments
k.  All measurement tool, assessment, and evaluation accuracy specifications
    and tolerances used in technical and operations results
l.  All finite element analysis results
m. The number of pressure cycles to failure, the equivalent number of annual
    pressure cycles, and the pressure cycle counting methodology
n.  The predicted fatigue life and predicted failure pressure from the required
    fatigue life models and fracture mechanics evaluation methods
o.  Safety factors used for fatigue life and/or predicted failure pressure
    calculations
p.  Reassessment time interval and safety factors
q.  The date of the review
r.  Confirmation of the results by qualified technical subject matter expert(s)
s.  Approval by responsible Sable management personnel
t.  Records of additional preventive and mitigative (P&M) measures performed
u.  Reports required by this State Waiver.

## Reporting

58. Any release on the pipeline shall be reported to the OSFM at the earliest
    practicable moment following discovery but no later than 24 hours from the time
    of discovery via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State
    Waiver – Accident Notification.*[17]
59. An email notification shall be made at least three (3) days prior to the pipeline
    being exposed for non-emergency purposes of field evaluation and repair via
    email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver –
    Pipeline Repair CA-324.* The email notification shall include, if applicable:
    a.  Tool type and run date
    b.  Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)
    c.  Dig sheets
    d.  Field contact information for Sable
    e.  Time and location of the field evaluation and repair.
60. Sable shall provide a Summary of Conditions Report within 210 days of the last
    date of an ILI run via email at PipelineNotification@fire.ca.gov, *Subject: OSFM
    State Waiver – Summary of Conditions CA-324* and include:

---

[17] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state
or federal regulations.

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 654 of 837    Page
Docusign Envelope ID: 8711E7A-ED76-4891-86B3-8CE95190FFD7    ID #:17697
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 290 of 464

Lance Yearwood
December 17, 2024
Page 14

     a. Tool type
     b. Run date
     c. Summary of Conditions Report[18]
     d. Final Vendor Report and Pipe Tally

61. Sable shall provide a report to the OSFM by June 15th of every year for the duration of the state waiver. The report shall be addressed to the OSFM Assistant Deputy Director, Chief of Pipeline Safety via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Annual Report CA-324.* At a minimum, the annual report shall contain the following, if applicable:
     a. A Closure Report for the previous calendar (CY) which contains:
          i. Features that were remediated in previous CY
               1. Provide documentation for the in-the-ditch assessments and repairs
          ii. Identify features that remain to be assessed
          iii. Unity Plots for previous ILI runs
     b. Fracture mechanics and pressure cycling analyses in accordance with Condition 48
     c. The third-party ILI expert reviews in accordance with Condition 52
     d. AC and DC Interference surveys that are due in accordance with Condition 53
     e. A copy of the CGRA for prior year including:
          i. Mean corrosion growth rate for the pipeline
          ii. Distribution graph of the corrosion growth rate for the pipeline (e.g. occurrences (#) vs. corrosion rate (mpy)

## Limitations

62. This state waiver is limited to a term of no more than (10) years from the date of issuance. If Sable elects to seek renewal of this state waiver, it must submit a renewal request to the OSFM at least 180 days prior to the expiration date, including a justification for continuation of the waiver.
63. Should Sable fail to comply with any conditions of this state waiver or should the OSFM determine that this state waiver is no longer appropriate or is inconsistent with pipeline safety, the OSFM may revoke the state waiver and require Sable to comply with all appropriate regulatory requirements.
64. The OSFM may order the pipeline shutdown at any time.
65. The OSFM may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for

---

[18] The OSFM may stipulate specific formatting or other information (e.g. Condition Type, Anomaly Details, Remaining Strength Calculation Method, Failure Pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 655 of 837   Page
Docusign Envelope ID: 871 D57A4D794486C840B8C49B1F7D7   ID #:17698
Case 1:26-cv-01486-RES-SDB   Document 1   Filed 02/20/26   Page 291 of 464

Lance Yearwood
December 17, 2024
Page 15

failure to comply with this state waiver. The terms and conditions of any compliance order shall take precedence over the terms of the state waiver.

66. In the event of conflict between the state waiver conditions and industry standards, the state waiver conditions shall prevail.

67. If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the state waiver, Sable must provide the OSFM written notice of the change within 30 days of the consummation date. In the event of such transfer, the OSFM reserves the right to revoke, suspend, or modify the state waiver.

Should you have any questions, please contact Alin Podoreanu, Supervising Pipeline Safety Engineer at (916) 212-8891.

Sincerely,

JAMES HOSLER
Assistant Deputy Director
Chief of Pipeline Safety and CUPA Programs

Enclosure(s): (1) Pacific Pipeline Company State Waiver Application for CA-324

cc: Doug Allen, Supervising Pipeline Safety Engineer, OSFM
Andy Chau, Supervising Pipeline Safety Engineer, OSFM
Brendan Feery, Supervising Pipeline Safety Engineer, OSFM
Huy Nguyen, Supervising Pipeline Safety Engineer, OSFM
Alin Podoreanu, Supervising Pipeline Safety Engineer, OSFM
Tuan Tran, Pipeline Safety Engineer, OSFM
Josh Cleaver, Staff Counsel, CAL FIRE
Max Kieba, Engineering and Research Division, PHMSA
Joshua Johnson, Engineering and Research Division, PHMSA

Case 2:26-cv-05242-SVW-SSC Document 36 Filed 05/14/26 Page 656 of 837 Page
Case 1:26-cv-01486-KES-CDB Document 1 Filed 02/20/26 Page 292 of 464
ID #:17699

# EXHIBIT "F"

STATE OF CALIFORNIA—NATURAL RESOURCES AGENCY                              Gavin Newsom, Governor

 **DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**OFFICE OF THE STATE FIRE MARSHAL**
P.O. Box 944246
Sacramento, California 94244-2460
(916) 568-3800
Website: www.fire.ca.gov



## CERTIFIED MAIL No: 9589-0710-5270-1475-5353-15

December 17, 2024

Lance Yearwood
Vice President
Sable Offshore Corp
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**SUBJECT:   LETTER OF DECISION ON THE STATE WAIVER REQUEST FOR
LIMITED EFECTIVENESS OF CATHODIC PROTECTION ON
THERMALLY INSULATED PIPELINE AND CORROSION OF OR ALONG
A LONGITUDINAL SEAM WELD (CA-325A/B)**

Operator:   Sable Offshore Corp
OPID# 40851
845 Texas Avenue, Suite 2920
Houston, Texas 77002

Pipeline:   OSFM Line ID 0001 - 113.56 miles (Gaviota to Sisquoc to Pentland) of
Sable Offshore Corp CA-325A/B (OSFM Line ID 0001) located in Santa
Barbara County, San Luis Obispo County, and Kern County, California as
described in the request of state waiver dated April 24, 2024

Dear Mr. Yearwood:

The Office of the State Fire Marshal (OSFM) received Sable Offshore Corp's (*Sable*) state
waiver request (*Application*) on April 24, 2024, in accordance with the terms of the
Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and
the People of the State of California, DOJ Case REF. NO. 90-5-1-1-1130 (Appendix B,
Article 1.1.D).

In addition, Sable requested a regulatory relief from Title 49 Code of Federal Regulations
(49 C.F.R.), § 195.452(h)(4)(iii)(H) *Corrosion of or along a longitudinal seam weld* for
Sable CA-325 A/B.

Sable explained that its goal is to appropriately manage the risk of corrosion under
insulation that may occur as a result of inadequate cathodic protection due to the

*"The Department of Forestry and Fire Protection serves and safeguards the people and protects the property and resources of California."*

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 658 of 837   Page
Docusign Envelope ID: 165BFFF3-211E-476F-82D0-8AFB95600F3B   ID #:17701
Case 1:26-cv-01486-RES-CDB   Document 1   Filed 02/20/26   Page 294 of 464

Lance Yearwood
December 17, 2024
Page 2

shielding effects of the polyurethane foam and the polyethylene tape wrap. Sable described the measures it has taken to address this risk and implemented and proposed a number of additional measures designed to mitigate the risk of corrosion under insulation that may result from potential ineffective cathodic protection (CP).

Sable provided the OSFM with its proposed measures to mitigate the risk of corrosion under insulation. Sable also provided the OSFM information from the completed in-line inspections and additional data requested by our office. The OSFM Pipeline Safety Engineers have reviewed the materials provided and have been in communication with the United States Department of Transportation (USDOT), Pipeline and Hazardous Materials Safety Administration (PHMSA) Engineering and Research Division to incorporate PHMSA's recommended conditions into the state waiver.

The OSFM has regulatory jurisdiction over the safety standards and practices of intrastate hazardous liquid pipeline transportation within California. As a Pipeline Safety Program that is certified under 49 USC § 60105, the OSFM may grant a state waiver with a pipeline safety regulation adopted by the state of California. Title 49 C.F.R., Part 195 was adopted by reference as it relates to hazardous liquid pipelines within Title 19 California Code of Regulations (19 CCR), Section 2000.

This state waiver applies to Sable's Line CA-325A/B (OSFM Line ID 0001) which consists of a 113.56 mile long, 30-inch outside diameter pipeline segment with the origin and termination points as described in the application. The pipeline is located in Santa Barbara County, San Luis Obispo County, and Kern County, California and shall be referred herein as CA-325A/B. CA-325A/B consists of two shorter pipeline segments, CA-325A and CA-325B. The pipeline segment CA-325A, located completely in Santa Barbara County, starts in Gaviota and ends at Sisquoc. CA-325A is approximately 38.72 miles long. The other pipeline segment, CA-325B, which is directly downstream of CA-325A, begins at Sisquoc and terminates in Pentland. CA-325B is approximately 74.84 miles long and traverses Santa Barbara County, San Luis Obispo County, and Kern County, California. The state waiver shall not become effective until (1) PHMSA issues an Order approving the waiver or stating it has no objection to the waiver or (2) PHMSA takes no action on the waiver within sixty (60) days after receiving the Letter of Decision from the OSFM.

The state waiver is limited to a term of no more than ten (10) years from the date it becomes effective, which shall be considered as the date of issuance. The OSFM may terminate the state waiver under conditions detailed below.

**Applicable Regulations**

The OSFM hereby grants this state waiver for CA-325 A/B, provided that Sable complies with the specific requirements in this state waiver and any additional conditions outlined by PHMSA. The pipeline must be operated and maintained in accordance with the CD, these

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 659 of 837   Page
Docusign Envelope ID: 166BE5F3-211E-47G5-8D10-BAFB05600F3B   ID #:17702
Case 1:26-cv-01486-KES-CDB   Document 2   Filed 02/20/26   Page 295 of 464

Lance Yearwood
December 17, 2024
Page 3

state waiver conditions and 49 C.F.R. Part 195, with the exception of 49 C.F.R. §195.452(h)(4)(iii)(H). In event of a conflict between the state waiver conditions and the applicable requirements under 49 C.F.R. Part 195, the state waiver conditions control. Should additional federal or State statutory or regulatory requirements come into effect following the implementation of this state waiver, CA-325 A/B shall be subject to those requirements except where they are in conflict with the State Waiver or the safe operation of the pipeline.

## General Conditions

1. The pipeline can only be used to transport crude oil as stated in the application.
2. The maximum operating pressure (MOP) cannot exceed:
   a. 1000 pounds per square inch gauge (psig) for CA-325A.
   b. 1292 psig for CA-325B.
3. The maximum operating temperature of the crude oil must not exceed:
   a. 125 Fahrenheit for more than 12 consecutive hours for CA-325A. Temperature transmitters must be installed on CA-325A at Gaviota station to monitor the temperature of CA-325A/B at this facility.
   b. 110 Fahrenheit for more than 12 consecutive hours for CA-325B. Temperature transmitters must be installed on CA-325A/B at Sisquoc station to monitor the temperature of CA-325A/B at this facility.
4. Prior to startup, Sable must develop and implement procedures for the conditions and requirements described in the state waiver.
5. This state waiver does not relieve Sable from other requirements under 49 C.F.R. Part 195 or the Elder California Pipeline Safety Act of 1981 other than contained herein.
6. This state waiver does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).
7. In-line inspection must include:
   a. Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion. Definition of cluster and general corrosion is as follows:
      i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.
      ii. General corrosion means uniform or gradually varying loss of wall thickness over an area.
   b. Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI)
   c. Use of a tool that is at least capable of reliably detecting and sizing crack or crack-like anomalies at a 90 percent POD and POI

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 660 of 837   Page
Docusign Envelope ID: 166BEFF3-201E-4780F-8D10-BAFB95600F3B   ID #:17703
Case 1:26-cv-01486-RES-CDB   Document 1   Filed 02/20/26   Page 296 of 464

Lance Yearwood
December 17, 2024
Page 4

8. Prior to placing CA-325A/B in operation, Sable must perform fracture toughness tests on the existing 30" pipe from CA-325A/B in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from both of the two following predominant existing 30" pipe specifications:
   a. API 5L X70 pipe with a nominal thickness of 0.281" that was manufactured by the various pipe mills in the 1980s.
   b. API 5L X65 pipe with a nominal thickness of 0.344" that was manufactured by the various pipe mills in the 1980s.
   At least three (3) separate tests must be performed from each pipe mill, for both of the two pipe specifications listed above, to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ)[1], and the DSAW long seam weld on the pipe to represent the fracture toughness of CA-325A/B (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the DSAW long seam weld). The lowest fracture toughness value must be applied to conditions 10, 31, 34, and 49. Sable may use pipe samples taken opportunistically during ongoing pipeline maintenance and repair efforts.[2]

9. All immediate and 180-day repair conditions that are listed in this state waiver must be evaluated and remediated prior to restarting CA-325A/B. Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by the OSFM. Sable must utilize the most recent Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results when identifying these repair conditions.

10. Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines.* If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

11. Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of its CA-325A/B.

---

[1] The heat affected zone (HAZ), as used in the state waiver, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.

[2] Sable must submit all fracture toughness results to the OSFM prior to restarting the pipeline.

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 661 of 837   Page
Docusign Envelope ID: 166BEFF3-211F-476F-8D10-BAFB95600F3B   ID #:17704
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 297 of 464

Lance Yearwood
December 17, 2024
Page 5

## Pressure Testing

12. Prior to placing the pipeline in operation, Sable must conduct a spike hydrostatic pressure test of the state waiver pipeline segment *CA-325A* at a minimum pressure that is at least 1.39 times the MOP, for a minimum of 15 minutes after the spike test pressure is stabilized. Sable must ensure that the spike hydrostatic pressure at the highest elevation of each testable segment is at least 1.39 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-325A:
    a. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.
    b. All anomalies that have a predicted failure pressure less than or equal to 1.5 times MOP.
13. Immediately following the spike hydrostatic pressure test, Sable must conduct an 8-hour hydrostatic pressure test of the state waiver pipeline segment *CA-325A* at a minimum of 1.25 times the MOP.
14. Prior to placing the pipeline in operation, Sable must conduct a hydrostatic pressure test of the state waiver pipeline segment *CA-325B* at a minimum pressure of 1.25 times the MOP, for a minimum of 8 hours. Sable must ensure that the hydrostatic pressure at the highest elevation of each testable segment is at least 1.25 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the hydrostatic test on CA-325B:
    a. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.
    b. All anomalies that have a predicted failure pressure less than or equal to 1.4 times MOP.
15. Sable must obtain the Test ID from the OSFM for each hydrostatic pressure test segment and have the approved independent testing firm forward the certified test results to the OSFM.
16. Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 C.F.R., Part 195 E – Pressure Testing and monitored by an independent testing firm listed under the OSFM approved hydrostatic testing companies.
17. Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported[3] to the OSFM via email at PipelineNotification@fire.ca.gov
    Subject: OSFM State Waiver - Hydrotest Failure.
18. Section(s) of the state waiver pipeline segments that failed during the required hydrotesting must be repaired by removing and replacing the failed section. The OSFM reserves the right to revoke the state waiver if failure(s) raise the concern that the pipeline cannot be safely operated.

---

[3] In addition to the OSFM reporting, Sable shall follow all additional state reporting requirements.

Docusign Envelope ID: 166BEFF3-2116-4766-8210-BAFB95800F3B

Lance Yearwood
December 17, 2024
Page 6

### In-Line Inspection (ILI) Assessment and Frequency

19. At least 90 days prior to performing in-line inspections of the state waiver segment, Sable shall provide the OSFM with a written notification to PipelineNotification@fire.ca.gov describing its assessment plan with the following information:
    a) Dates for integrity assessment
    b) In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[4] to assess the integrity of the subject pipe segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications
    c) In-line inspection tool vendor(s)
    d) Required tool specifications including operational specifications and anomaly sizing tolerances
    e) Tool validation methodology
    f) Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications
    g) Criteria used to identify locations for excavation and field verification
    h) Non-destructive examination
20. Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.
21. Metal Loss Tool(s)
    a. Initial ILI tool runs – Each year, during the first two (2) years of operating CA-325 A/B, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU). Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months. If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.
    b. Subsequent ILI tool runs – After the first two (2) years of operating CA-325 A/B, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If,

---

[4] Industry standards that are referenced in this state waiver must utilize the editions that are incorporated by referenced in Title 49 Part 195.3 unless another edition was explicitly specified.

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 663 of 837   Page
ID #:17706
Docusign Envelope ID: 466B2EF3-2116-47B5-B04C-B3FB9D5BDF3B   Case 1:26-cv-01466-KES-CDB   Document 16   Filed 02/20/26   Page 299 of 464

Lance Yearwood
December 17, 2024
Page 7

             any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the pipeline within 30 days after it was deemed to be unsuccessful. All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

22. Crack Detection Tools - Sable must run at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15 months[5] or the ILI assessment must be assessed at more frequent intervals if Condition 49 determined a shorter assessment interval.

    a. These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.

    b. USCD Performance Specification Requirements

        i. The USCD tools must have a probability of detection that is ≥ 90% for axial and circumferential cracks.

        ii. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.

        iii. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.

        iv. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks.

23. Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

24. Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the pipeline segment in which the ILI tool velocity was outside of the specified tool velocity range.

25. All ILI tool runs must obtain the Test ID from the OSFM prior to run.

26. Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.

27. Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

---

[5] Sable may petition the OSFM to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to the OSFM and PHMSA approval.

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 664 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 300 of 464
ID #:17707
Docusign Envelope ID: 186BEFF3-211E-476E-8D10-BAFB95600F3B

Lance Yearwood
December 17, 2024
Page 8

28. Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals. Sable must document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[6] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different. If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

29. Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013).

## Discovery of Condition

30. The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

## Immediate Repair Conditions[7]

31. A crack or crack-like anomaly that meets any of the following criteria:
    a. Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.
    b. Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.

32. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.

33. Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[8]

---

[6] A minimum of four (4) independent direct examination excavations must be used for unity plots.

[7] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(i) Immediate repair conditions* and does not relieve Sable from complying with §195.452(h)(4)(i). All immediate repair conditions must be remediated with a permanent repair method.

[8] Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria. General corrosion means uniform or gradually varying loss of wall thickness over an area.

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 665 of 837    Page
Docusign Envelope ID: 166B5FF3-2115-478E-8D4C-BAFB95600F3B    ID #:17708
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 301 of 464

Lance Yearwood
December 17, 2024
Page 9

## 180-Day Repair Conditions[9]

34. A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.
35. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.
36. All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[10]
37. For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

## Corrosion Growth Rate Analysis (CGRA)

38. Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to prior ILI) and perform pipeline remediations needed to assure the integrity of the pipeline is maintained.[11] The timing of pipeline remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.
39. The CGRA procedure must include ILI data matching methods[12] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.
40. Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.
41. When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates[13].

---

[9] The criteria outlined in the state waiver is supplemental to the requirements set forth in §195.452(h)(4)(iii) 180-day conditions and does not relieve Sable from complying with §195.452(h)(4)(iii). All 180-day repair conditions must be remediated with a permanent repair method.

[10] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth. If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify OSFM, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 C.F.R. §195.452 until the indication is remediated or until otherwise authorized by the OSFM.

[11] At a minimum, Sable must include signal matching between ILI data sets.

[12] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

[13] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

Lance Yearwood
December 17, 2024
Page 10

42. All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

## Pressure Reduction

43. If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in the state waiver, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

## In Field Direct Examination of Pipe

44. Direct examinations[14] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[15] PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.

45. Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition. However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:

   a. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.

   b. Sable must increase the metal loss anomaly's depth by 20% when they input it into the formula for calculating the number of wraps needed for repair method 5.

   c. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs. If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

46. Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

---

[14] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.
[15] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complimented by shear wave technology or inspection by phased array ultrasonic testing.

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 667 of 837   Page
Docusign Envelope ID: 166BEEF3-211F-476F-88D4-BAF095800F3B   ID #:17710
Case 1:26-cv-01486-KES-CDB   Document 10   Filed 02/20/26   Page 303 of 464

Lance Yearwood
December 17, 2024
Page 11

47. Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy. Sable must recoat in accordance with their coating repair procedure.[16]

48. All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

## Integrity Management

49. A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.
    a. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 C.F.R. §192.712(d)(1).
    b. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 C.F.R. §192.712(d)(2).

50. Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.

51. When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

52. Sable must send all field measurements to the ILI tool vendor within 90 days of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

53. Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the pipeline. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by the OSFM prior to being selected.

54. Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC)

---

[16] The coating procedure must be submitted to the OSFM prior to the prior to the effective date of the state waiver.

Lance Yearwood
December 17, 2024
Page 12

interference or direct current (DC) interference or shorting that could contribute
to external corrosion is occurring. The expert must recommend the frequency
of subsequent interference surveys. All evaluations must be approved and
signed by the NACE-certified expert.

## Data Requirements for Predicted Failure Analysis

55. Unless the defect dimensions have been verified using a direct examination
measurements, Sable must explicitly analyze uncertainties in reported
assessment results including but not limited to tool tolerance, detection
threshold, probability of detection, probability of identification, sizing accuracy,
conservative anomaly, interaction criteria, location accuracy, anomaly findings,
and unity chart plots or equivalent for determining uncertainties and verifying tool
performance, in identifying and characterizing the type and dimensions of
anomalies or defects used in the analyses.
56. The analyses performed in accordance with this state waiver must utilize pipe
and material properties of the pipe body and longitudinal weld seam that are
documented in *traceable, verifiable, and complete* records.

## Recordkeeping

57. Procedures, records of investigations, data, analyses, and other actions made in
accordance with the requirements of this state waiver shall be kept for the life of
the pipeline and must be submitted to the OSFM, in the manner requested
(electronic, hardcopy, or other format) within 30 days.
58. Sable must maintain the following records:
    a. Technical approach used for the analysis
    b. All data used and analyzed
    c. Pipe and longitudinal weld seam properties
    d. Procedures used to implement state waiver conditions
    e. Evaluation methodology used
    f. Models used
    g. Direct in situ examination data
    h. All in-line inspection tool assessments information evaluated
    i. Pressure test data and results
    j. All in-the-ditch assessments performed on the pipeline segments
    k. All measurement tool, assessment, and evaluation accuracy specifications
       and tolerances used in technical and operations results
    l. All finite element analysis results
    m. The number of pressure cycles to failure, the equivalent number of annual
       pressure cycles, and the pressure cycle counting methodology

Docusign Envelope ID: 466BEFF3-2115-4765-8D10-BAFB95680F3B

Lance Yearwood
December 17, 2024
Page 13

    n. The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods

    o. Safety factors used for fatigue life and/or predicted failure pressure calculations

    p. Reassessment time interval and safety factors

    q. The date of the review

    r. Confirmation of the results by qualified technical subject matter expert(s)

    s. Approval by responsible Sable management personnel

    t. Records of additional preventive and mitigative (P&M) measures performed

    u. Reports required by this State Waiver.

## Reporting

59. Any release on the pipeline shall be reported to the OSFM at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Accident Notification.*[17]

60. An email notification shall be made at least three (3) days prior to the pipeline being exposed for non-emergency purposes of field evaluation and repair via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Pipeline Repair CA-325 A/B.* The email notification shall include, if applicable:

    d. Tool type and run date

    e. Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)

    f. Dig sheets

    g. Field contact information for Sable

    h. Time and location of the field evaluation and repair.

61. Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Summary of Conditions CA-325 A/B* and include:

    i. Tool type

    j. Run date

    k. Summary of Conditions Report[18]

    l. Final Vendor Report and Pipe Tally

62. Sable shall provide a report to the OSFM by June 15th of every year for the duration of the state waiver. The report shall be addressed to the OSFM Assistant Deputy Director, Chief of Pipeline Safety via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Annual Report*

---

[17] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state or federal regulations.

[18] The OSFM may stipulate specific formatting or other information (e.g. Condition Type, Anomaly Details, Remaining Strength Calculation Method, Failure Pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

Docusign Envelope ID: 188BEFF3-2101-478E-8A1C-BAFB95690F3B

Lance Yearwood
December 17, 2024
Page 14

> *CA-325 A/B.* At a minimum, the annual report shall contain the following, if
> applicable:
> a. A Closure Report for the previous calendar (CY) which contains:
>  i. Features that were remediated in previous CY
>   1. Provide documentation for the in-the-ditch assessments and
>    repairs
>  ii. Identify features that remain to be assessed
>  iii. Unity Plots for previous ILI runs
> b. Fracture mechanics and pressure cycling analyses in accordance with
>  Condition 49
> c. The third-party ILI expert reviews in accordance with Condition 53
> d. AC and DC Interference surveys that are due in accordance with Condition
>  54
> e. A copy of the CGRA for prior year including:
>  i. Mean corrosion growth rate for the pipeline
>  ii. Distribution graph of the corrosion growth rate for the pipeline (e.g.
>   occurrences (#) vs. corrosion rate (mpy)

## Limitations

63. This state waiver is limited to a term of no more than ten (10) years from the date
of issuance. If Sable elects to seek renewal of this state waiver, it must submit a
renewal request to the OSFM at least 180 days prior to the expiration date,
including a justification for continuation of the waiver.
64. Should Sable fail to comply with any conditions of this state waiver or should the
OSFM determine that this state waiver is no longer appropriate or is inconsistent
with pipeline safety, the OSFM may revoke the state waiver and require Sable to
comply with all appropriate regulatory requirements.
65. The OSFM may order the pipeline shutdown at any time.
66. The OSFM may issue a compliance order or may initiate proceedings to
determine the nature and extent of the violations and appropriate civil penalty for
failure to comply with this state waiver. The terms and conditions of any
compliance order shall take precedence over the terms of the state waiver.
67. In the event of conflict between the state waiver conditions and industry
standards, the state waiver conditions shall prevail.
68. If Sable sells, merges, transfers or otherwise disposes of all or part of the assets
covered by the state waiver, Sable must provide the OSFM written notice of the
change within 30 days of the consummation date. In the event of such transfer,
the OSFM reserves the right to revoke, suspend, or modify the state waiver.

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 671 of 837   Page
ID #:17714
Docusign Envelope ID: 168BEF53-2115-4765-ADA0-BAF30560F3B   Case 1:26-cv-51456-KES-CDB   Document 1   Filed 02/20/26   Page 307 of 464

Lance Yearwood
December 17, 2024
Page 15

Should you have any questions, please contact Alin Podoreanu, Supervising Pipeline
Safety Engineer at (916) 212-8891.

Sincerely,

JAMES HOSLER
Assistant Deputy Director
Chief of Pipeline a Safety and CUPA Programs

Enclosure(s): (1) Pacific Pipeline Company State Waiver Application for CA-325 A/B

cc:     Doug Allen, Supervising Pipeline Safety Engineer, OSFM
        Andy Chau, Supervising Pipeline Safety Engineer, OSFM
        Brendan Feery, Supervising Pipeline Safety Engineer, OSFM
        Huy Nguyen, Supervising Pipeline Safety Engineer, OSFM
        Alin Podoreanu, Supervising Pipeline Safety Engineer, OSFM
        Tuan Tran, Pipeline Safety Engineer, OSFM
        Josh Cleaver, Staff Counsel, CAL FIRE
        Max Kieba, Engineering and Research Division, PHMSA
        Joshua Johnson, Engineering and Research Division, PHMSA

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 672 of 837   Page
ID #:17715
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 308 of 464

# EXHIBIT "G"

Emergency? Call 911   Translate   Settings



*Search safety information*

Home › What We Do › Pipeline Safety & CUPA › Out-of-Service Deferral Program

SEARCH

# Out-of-Service Deferral Program

In order to clarify the regulatory requirements that may vary depending on the operational status of a pipeline, the Pipeline and Hazardous Materials Safety Administration (PHMSA) issued Advisory Bulletin (ADB)-2016-0075 to all operators of Hazardous Liquid and Carbon Dioxide pipelines. ADB-2016-0075 advises operators who wish to defer certain activities for purged pipelines to coordinate the deferral in advance with regulatory agencies, such as CAL FIRE - Office of the State Fire Marshal (OSFM) for intrastate pipelines. According to the bulletin, purged pipelines present different risks, and different regulatory treatments may be appropriate. The OSFM will consider each deferral request and approve deferral activities that are deemed impractical for purged pipelines.

It is important to note that PHMSA is currently in the process of rulemaking to establish a defined operational status called "idled" for pipelines that are temporarily taken out of service. This rulemaking also aims to set forth operations and maintenance requirements for idled pipelines and establish inspection requirements for idled pipelines that are subsequently turned to service. The ongoing rulemaking process, with a Regulatory Identification Number (RIN) of 2137-AF52, indicates PHMSA's commitment to add regulatory framework for idled pipelines. Meanwhile, the OSFM follows the guidelines provided in ADB-2016-0075 when reviewing deferred maintenance requests for purged pipelines submitted by operators.

ASK CAL FIRE

Let's Chat

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 674 of 837   Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 310 of 464
ID #:17717

# Procedures

### Step 1: Deferral Request

The operator is required to submit a deferral request to the Assistant Deputy Director of the Pipeline Safety Division at the OSFM. The request should be sent via email to the Pipeline Notification address: pipelinenotification@fire.ca.gov.

The deferral request must provide the following information about the pipeline:

- OSFM Pipeline Identification Number.

- Commodity contained in the pipeline at the time of the application.

- Length of the purged pipeline segment, along with a map showing the beginning and end locations of the purged pipeline.

- Procedure for purging the hazardous liquid from the pipeline.

- Activities for which the operator is requesting a deferral, including specific regulatory sections.

- Supporting documents demonstrating how the line is isolated from the active pipeline system (e.g., pictures with GPS locations for both ends of the subject pipelines).

- Explanation of why each deferred activity is impractical for the subject pipeline.

### Step 2: Field Inspection(s) and/or Records Review

Upon receiving the deferral request, the OSFM may request the operator to provide a schedule of any field activities related to the subject pipeline. The OSFM may also conduct field inspections to verify that the pipeline has been purged and cleaned in accordance with the provided procedure.

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 675 of 837   Page
ID #:17718
Case 1:26-cv-01486-KES-CDB    Document 18    Filed 02/20/26    Page 311 of 464

At the conclusion of the field activities, the operator must submit the following supporting documents to the OSFM:

- Records demonstrating that the subject pipeline has been purged.

- Pictures and GPS locations of each isolation point.

## Step 3: Acknowledgment

Each deferral request is evaluated based on the criteria outlined in PHMSA-2016-0075:

- Proper purging of the hazardous liquid from the pipeline.

The OSFM will send a letter acknowledging each deferral request upon review.

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 676 of 837    Page
Case 1:26-cv-01486-KES-CDB    ID #:17719   Filed 02/20/26    Page 312 of 464
Document 1



## Information Bulletin

- Pipeline Status Terminology
- PHMSA-2016-0075 Advisory Bulletin
- National Pipeline Mapping System ⬀

## Program Contact

The OSFM is available to discuss the Out-of-Service Deferral Program with any operator in a virtual meeting.

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 677 of 837    Page
ID #:17720
Case 1:26-cv-01486-KES-CDB    Document 4    Filed 02/20/26    Page 313 of 464

*Virtual Meeting Contact:*

Andy Chau
Supervising Pipeline Safety Engineer
andy.chau@fire.ca.gov
(562) 305-0679



**QUICK LINKS**

Defensible Space

GovMotus Fire Permits

Fire Hazard Severity Zones

Recalls

Subscribe

2024 Strategic Plan

**DIVISIONS**

Code Development & Analysis

Community Wildfire Preparedness & Mitigation

Fire & Life Safety Division

Fire Engineering & Investigations

Pipeline Safety & CUPA

State Fire Training

**TRAINING RESOURCES**

Available Classes

State Fire Training Portal

Continuing Education (FSTEP)

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 678 of 837   Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 314 of 464
ID #:17721

Professional Certification (CFSTES)

Instructor Registration

Instructor Database

Back to Top    Accessibility    Conditions of Use    Privacy Policy    Site Map    Glossary of Terms

Copyright © 2025 State of California

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 679 of 837   Page
ID #:17722
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 315 of 464

# EXHIBIT "H"

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 680 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 43   Filed 02/20/26   Page 316 of 464
ID #:17723

Sable Offshore Corp.
Cease and Desist Order, Restoration Order and Administrative Penalty
CCC-25-CD-01, CCC-25-RO-01 & CCC-25-AP3-01
Page 1 of 26

## CEASE AND DESIST ORDER CCC-25-CD-01,
## RESTORATION ORDER CCC-25-RO-01,
## ADMINISTRATIVE CIVIL PENALTY CCC-25-AP3-01

**1.0   CEASE AND DESIST ORDER CCC-25-CD-01**

Pursuant to its authority under California Public Resource Code ("PRC") Section 30810, the California Coastal Commission ("the Commission") hereby orders and authorizes Sable Offshore Corporation ("Sable"); its successors in interest, heirs, officers, managers, assigns, employees, agents, and contractors; and any other persons or entities acting in concert with any of the foregoing (hereinafter collectively referred to as "Sable") to take all actions required by this Cease and Desist Order, in compliance with its terms, including by complying with the following:

1.1   Cease and desist from engaging in or undertaking any development, as that term is defined in the Coastal Act (PRC Section 30106) and the Santa Barbara County Local Coastal Program (at Section 35-58), that requires a coastal development permit on any of the property and/or locations defined in Section 4.3, below, as the Santa Ynez Unit unless confirmed by the Executive Director of the Coastal Commission to have received the requisite Coastal Act authorization or to be exempt, including but not limited to the following development undertaken or planned at A) locations onshore: excavation; removal of major vegetation; fill of wetlands; grading and widening of roads; installation of metal plates over water courses; dewatering and discharge of water; removal, replacement, and reinforcement of pipeline and pipeline infrastructure; and other development associated with the return to service of Las Flores Pipelines CA-324 and CA-325 and; B) at locations offshore: placement of sand and cement bags on the seafloor below and adjacent to Sable's out-of-service offshore oil and water pipelines; as part of an effort to restart the Santa Ynez Unit oil production operations and bring the pipelines back into use.

1.2   Fully and completely comply with the terms and conditions set forth herein, including the terms and conditions of Cease and Desist Order No. CCC-25-CD-01, Restoration Order No. CCC-25-RO-01, and Administrative Penalty No. CCC-25-AP3-01 (collectively, "Orders"). These Orders provide authorization under the Coastal Act for the development required herein, including any restoration activities described below, so long as such development is undertaken in accordance with the terms and conditions of these Orders.

1.3.A  Within 30 days of the effective date of these Orders, submit complete coastal development permit ("CDP") applications or a single consolidated CDP application (as provided for in the Coastal Act in PRC Section 30601.3) for: (a) after the fact ("ATF") authorization for all unpermitted development as defined in Section 4.2, below, conducted at both onshore and offshore locations; as well as

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 681 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 44   Filed 02/20/26   Page 317 of 464
ID #:17724

Sable Offshore Corp.
April 10, 2025
Page 2 of 26

(b) prospective authorization for any proposed development activities that have not yet been completed but that are contemplated in Sable's current plans. Sable shall not withdraw or impede final action in any way on this CDP application(s). Sable shall comply with the terms and conditions of any CDP approved pursuant to the application(s) submitted under these Orders by the deadlines required in the CDP(s).

1.3.B   A complete CDP application shall include, at a minimum,

For onshore development:

- Site plans for each anomaly repair location depicting, but not limited to: topographic contours, grading (cut, fill, export), sensitive resources (Environmentally Sensitive Habitat Area ("ESHA"), wetlands), applicable Best Management Practices ("BMPs"), equipment staging, stockpiles, details specific to work to be performed at each site (wrap, pipeline cut and replacement), cross sections and diagrams of the work to be performed, and surveys of property lines/easements/right-of-ways;
- Grading totals (cut, fill, export) for each site and all of the types of work (anomaly excavation, road creation/widening/maintenance, crossings of wetlands or watercourses, etc.) plus the combined total grading for all of the work (both that already occurred and future proposed development);
- Specific details on the amount and type of vegetation clearing and trimming (area, amount of limbing, plant species and alliances, per the Manual of California Vegetation);
- List of all construction and erosion control BMPs;
- Geology and soils report;
- Site-specific biological survey reports prepared by a qualified biologist;
- A site survey of all ESHA buffers of 100 feet from location of ESHA;
- Site-specific delineation of single parameter wetlands;
- Measures to avoid, minimize and mitigate for adverse impacts to ESHA, wetlands and sensitive plant and animal species;
- Site-specific cultural resources surveys and measures to avoid and minimize potential adverse impacts on cultural resources (including outreach and coordination with Tribes that may have cultural connections to the restoration area and use of tribal monitors during ground disturbance activities);
- Project schedule (with a breakdown of the hours of construction, number of days and time of year that construction took place or is proposed to take place at each location);
- Evidence that permits or authorization from other agencies have been granted or applied for;
- CEQA determination.

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 682 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 45   Filed 02/20/26   Page 318 of 464
ID #:17725

Sable Offshore Corp.
April 10, 2025
Page **3** of **26**

For offshore development:

- Site plans for each span remediation location depicting, but not limited to: bathymetric contours, fill placement areas, results of marine habitat surveys (such as sandy bottom, rocky, reef, kelp), applicable BMPs including material staging/stockpiles/hazardous materials and spill response, details specific to work to be performed at each site (such as number of bags, slopes), cross sections and diagrams of the work performed;
- Information on the vessels and ROVs that were used for the work and information on how the vessels and ROVs were maintained to prevent the release of any fuel or oils;
- Information on where the vessels were moored and how they transited to and from the site;
- Information on any commercial and recreational fishing in the area that could have been affected by project activities and any advance coordination that occurred with fishing communities;
- Information on the specific type of cement mix used and information demonstrating how it will be safe for use in the marine environment over the life of the development;
- In the event that anchors are needed, identify contingency anchor areas away from sensitive marine habitat and species;
- Marine resources survey including survey of the seafloor and information on marine species in the area of the development. This should also include a quantification of the totals of each type of benthic habitat impacted by the development as well as the methodology used for the survey;
- Analysis of alternatives to the proposed cement bags, and measures to avoid or minimize quantity of fill and potential adverse impacts from the fill (e.g. use different materials other than concrete that may have less of an environmentally impact (i.e., 100% sand, use of "T bar" support, change in orientation/slope of the bags to minimize their impact on the seafloor);
- Site-specific cultural resources surveys of the development area and measures to avoid and minimize potential adverse impacts on cultural resources;
- Project schedule with hours of construction, total number of days, and time of year work occurred;
- Evidence that permits or authorization from other agencies have been granted or applied for;
- CEQA determination

Sable shall provide complete responses to any request for information made by the appropriate permitting agency within 10 days of the date of such request, unless additional time is provided by the Executive Director pursuant to Section 14, below.

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 683 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 46   Filed 02/20/26   Page 319 of 464
ID #:17726

Sable Offshore Corp.
April 10, 2025
Page **4** of **26**

1.3.C Sable shall submit the application(s) required by Section 1.3.A in one of the following manners: (a) as one, consolidated permit application, submitted to the Commission pursuant to PRC section 30601.3; or (b) if the County agrees to process an application for the work within its LCP permitting jurisdiction, Sable may submit an application for the work in that area to the County, and a separate application for the work in the Commission's permitting jurisdiction to the Commission. To maximize the likelihood of compliance with these Orders and to rectify this matter in the most efficient manner possible, thereby limiting the costs to the state and increasing the potential for accelerated restoration and reduced impacts on resources, if Sable elects to proceed with option (a), above (consolidated CDP application), the Administrative Penalty outlined in Section 3, below, will be reduced according to the provisions of that section. The Executive Director may extend the deadline for submittal of the CDP application pursuant to Section 14, below.

1.3.D In the event the appropriate permitting agency denies the CDP application in whole or in part, Sable shall submit, for the review and approval of the Executive Director of the Commission, a Removal Plan that provides for the removal of that development that was already completed but for which after-the-fact authorization was denied. Sable shall submit this Removal Plan within 30 days of final action on said denial and shall commence implementation of this Removal Plan within 30 days of Executive Director approval thereof and shall complete all removal and activities within 30 days of commencement, unless an extension is granted by the Executive Director for good cause pursuant to Section 14, below. If the Executive Director determines that any removal activities negatively impacted resources protected under the Coastal Act, Respondent shall submit an amendment to the Restoration Plan required pursuant to Section 6, below, to restore any resources impacted.

1.3 Obtain and comply with the terms and conditions of all other mandatory approvals or permits for the work required herein that are issued by other government agencies having jurisdiction over that work, consistent with these Orders, and comply with the terms and conditions of such approvals/permits.

1.4 Any questions of intent or interpretation of any condition in the CDP issued pursuant to the terms of these Orders will be resolved by the Executive Director of the Commission after consultation with Sable.

## 2.0   RESTORATION ORDER CCC-25-RO-01

Pursuant to its authority under PRC Section 30811, the Commission hereby orders and authorizes Sable to undertake all the restorative actions set forth in Section 6.0, below.

## 3.0   ADMINISTRATIVE PENALTY CCC-25-AP3-01

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 684 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 47   Filed 02/20/26   Page 320 of 464
ID #:17727

Sable Offshore Corp.
April 10, 2025
Page **5** of **26**

3.1.   Pursuant to its authority under PRC Section 30821.3, the Commission hereby
       imposes on Sable an administrative penalty of $14,987,250

3.2    To maximize the likelihood of compliance with these Orders and to rectify this
       matter in the most efficient manner possible, thereby limiting the costs to the
       state and increasing the potential for accelerated restoration and reduced
       impacts on resources, if Sable elects to proceed with option (a) as described in
       Section1.3.C, above (consolidated CDP application), the Administrative Penalty
       will be reduced by 10% of the total amount (i.e., $1,498,725).  If, however, at any
       point prior to the Commission staff filing the CDP application as complete, Sable
       takes any steps that would interfere with the processing of the CDP application,
       including any attempt to delay or avoid submittal of the CDP application, the
       penalty amount shall not be reduced, and Sable shall be required to pay any
       remaining penalty amount to bring the full payment up to $14,987,250.

3.3    Within 180 days of the effective date of this Administrative Penalty, Sable shall
       pay the full penalty (or reduced penalty pursuant to Section 3.2, above). The
       monetary penalty shall be made out to and deposited in the Violation
       Remediation Account administered by the California State Coastal Conservancy
       (see PRC Section 30821.3(k) and 30823). The monetary penalty shall be
       submitted to the Commission's San Francisco office, at the address provided in
       Section 7.0, to the attention of Stephanie Cook of the Commission, payable to
       the account designated under the Coastal Act, and include a reference to these
       Orders by number.

## 4.0   DEFINITIONS COMMON TO ALL ORDERS

4.1    Orders: Cease and Desist Order No. CCC-25-CD-01, Restoration Order
       No. CCC-25-RO-01, and Administrative Civil Penalty CCC-25-AP3-01 are
       collectively referred to herein as "the" or "these Orders."

4.2    Unpermitted Development: The phrase "Unpermitted Development" as
       used herein means all "development" as that term is defined in PRC
       Section 30106 that Sable has undertaken in the Coastal Zone that
       required authorization pursuant to the Coastal Act but for which no such
       authorization was obtained, including, but not limited to, excavation with
       heavy equipment; removal of major vegetation; grading and widening of
       roads; installation of metal plates and other fill material within wetlands;
       dewatering and discharge of water; pipeline removal, replacement, and
       reinforcement; installation of shutoff valves; and other development
       associated with the Las Flores Pipelines CA-324 and CA-325; as well as
       offshore development including, but not necessarily limited to, placing
       sand and cement bags on the seafloor below and adjacent to out-of-
       service offshore oil and water pipelines; all without the requisite Coastal

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 685 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 48   Filed 02/20/26   Page 321 of 464
ID #:17728

Sable Offshore Corp.
April 10, 2025
Page 6 of 26

> Act authorization, as part of an effort to restart Santa Ynez Unit oil production operations and bring the pipelines back into use.

> 4.3  Santa Ynez Unit: The Santa Ynez Unit consists of three offshore platforms (Hondo, Harmony, and Heritage), Las Flores Canyon processing facility, Pacific Offshore Pipeline Company (POPCO) Gas Plant, associated electrical transmission facilities and lines, oil, natural gas and produced water transport pipelines, including pipelines CA-325 and CA-325 and associated rights-of-way (ROW) and easements.

> 4.4  Restoration Area: All areas within, along, or around the Santa Ynez Unit, as defined above, and any other areas impacted in connection with work on any portion of the Santa Ynez Unit, upon which Unpermitted Development occurred. This identifies the location where the unpermitted development was undertaken.

## 5.0  ENTITIES AND PERSONS SUBJECT TO THIS CEASE AND DESIST ORDER, RESTORATION ORDER, AND ADMINISTRATIVE PENALTY ACTION

Sable Offshore Corp.; its successors in interest, assigns, lessees, officers, managers, employees, agents, and contractors; and any other persons or entities acting in concert with or on behalf of any of the foregoing are jointly and severally subject to all requirements of these Orders.

## 6.0  RESTORATION PLAN

Within 60 days of issuance of these Orders, Sable shall submit, for the review and approval of the Commission's Executive Director a Revegetation Plan; a Temporary Erosion Control Plan, a Remedial Grading Plan, a Cultural Resources Plan, and a Monitoring Plan (hereinafter collectively referred to as "the Restoration Plan"). The Restoration Plan shall set forth the measures that Sable shall undertake to implement erosion control measures, undertake remedial grading, revegetate the Restoration Area to address permanent and temporal losses of habitat and other resources affected by the Unpermitted Development, implement cultural resource protections and monitoring, and monitor the restoration to ensure the success of restoration activities.

6.1  General Provisions of the Restoration Plan:

6.1.A  The Restoration Plan shall include an initial assessment of all Unpermitted Development and a site-specific biological assessment for all of the areas in which Unpermitted Development occurred. This will form the basis of the Restoration Area as defined in Section 4.4.  These initial site assessments shall include, at a minimum, a plan that (a) delineates all areas where the development listed in Section 4.2 was undertaken, (b) details the nature of the

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 686 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 49   Filed 02/20/26   Page 322 of 464
ID #:17729

Sable Offshore Corp.
April 10, 2025
Page **7** of **26**

work undertaken, and (c) identifies the coastal resources, specifically: on the ground environmentally sensitive habitat areas ("ESHA"), including but not limited to riparian, oak woodland, chaparral, coastal sage scrub, and/or native grasslands, as shown on a biological resources survey, (d) a single-parameter wetlands delineation, (e) an evaluation of protected plant and animal species in those areas that could have been affected by the Unpermitted Development, and the timing and duration of all Unpermitted Development, including as such development relates to the timing of bird and other animals' nesting and breeding seasons, including but not limited to those species identified under the California Endangered Species Act or federal Endangered Species Act such as the southern California steelhead, southwestern pond turtle, tidewater goby, and California red-legged frog. For Unpermitted Development that occurred offshore, Sable shall also include in this initial assessment: the physical and chemical composition of the materials used to form the concrete bags, a survey of the seafloor identifying the type of substrate(s) within the area of the Unpermitted Development (i.e., sandy bottom or rock reef/bedrock) and a quantification of the total of each type of substrate impacted by the Unpermitted Development, a survey identifying the marine species in the area of the Unpermitted Development, and location of any anchor points that were used. Based on this initial assessment, Sable shall identify areas where the work may have adversely affected coastal resources protected under the Coastal Act and/or the Santa Barbara County Local Coastal Program, and where restoration is needed to address temporal and permanent losses of habitat. The Executive Director will make the final determination of the size and scale of location of, and impacts caused by, the Unpermitted Development. These areas will be known as the Restoration Area.

6.1.A.1   Within 15 days of the effective date of these Orders and prior to the submittal of the Restoration Plan, Sable shall submit, for the Executive Director's review and approval, a description of the qualifications of the proposed Specialist(s), including a description of their educational background, training, and experience related to the preparation and implementation of the Restoration Plan described herein. To meet the requirements to be a qualified Specialist specifically for the restoration component of the Restoration Plan, one must have experience successfully completing restoration projects of a similar scale and scope involving restoration of ESHA in the Gaviota region of Santa Barbara County. A qualified Specialist must also have experience in wildlife surveys, including those species identified under the California Endangered Species Act or federal Endangered Species Act that may be present in or near the Restoration Area (see also Section 6.3.A, below). In addition, to meet the requirements for the development and implementation of plans related to the remedial grading, and erosion activities required herein, a qualified Specialist must have experience successfully designing plans for and implementing these plans for

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 687 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 323 of 464
ID #:17730

Sable Offshore Corp.
April 10, 2025
Page **8** of **26**

restoration of wetlands, restorative grading, erosion control, and hydrology.

6.1.A.2    The Restoration Plan shall include a survey map from a licensed surveyor, with input from the Specialist(s), drawn to scale, that shows the specific parameters, locations and extents of: 1) the boundaries of the Restoration Area and associated areas affected by the Unpermitted Development; 2) the physical items placed or allowed to come to rest on or in the Restoration Area; 3) the areas from which native vegetation and wetlands were removed or impacted; 4) the current topography of all landscape features within the Restoration Area and the topography of all landscape features within 100 feet of the Restoration Area; 5) the locations of all erosion control measures to be installed pursuant to Section 6.7, below; 6) the locations of all species, individually delineated and labeled, to be planted pursuant to Section 6.9, below; 8) the specific locations and directions from which photographs will be taken for the annual monitoring reports; and 9) the locations where remedial grading will take place. Pursuant to Section 6.8, below.

6.1.A.3    The Restoration Plan shall provide that, prior to the initiation of any restoration activities, the boundaries of the Restoration Area shall be physically delineated in the field using temporary non-plastic measures such as fencing or colored wooden stakes. The Restoration Plan shall further provide that all delineation materials shall be removed when no longer needed, and verification of such removal shall be provided in the annual monitoring report corresponding to the reporting period during which the removal occurred. No more than one week prior to commencement of ground disturbance in a particular work area at all restoration sites, a qualified biologist shall survey the ground-disturbance area for any sensitive, protected and/or endangered species, which may include, but be not limited to, California red-legged frog (*Rana draytonii*), southerwestern pond turtle (*Actinemys pallida*), tidewater goby (Eucyclogobius newberryi) and southern California steelhead (*Oncorhynchus mykiss irideus*), and if any such animals are present within the Restoration Area, shall coordinate with the California Department of Fish and Wildlife ("CDFW") staff to determine if work should be delayed until the species is no longer present or if it can be relocated to nearby suitable habitats an appropriate distance away from the work area.

6.1.A.4    The Restoration Plan shall include a specific schedule/timeline of activities for each of the Restoration Plan components; the procedures to be used, and identification of the parties who will be conducting the restoration activities. The schedule/timeline of activities in the Restoration Plan shall be in accordance with the deadlines in these Orders and shall be in

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 688 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 31   Filed 02/20/26   Page 324 of 464
ID #:17731

Sable Offshore Corp.
April 10, 2025
Page **9** of **26**

accordance with the ideal planting seasons. In addition, the schedule/timeline of activities shall incorporate the following restrictions:

6.1.A.4.1    The Restoration Plan shall include a detailed explanation of how Sable will proactively address potential impacts to raptors and protected bird species and other protected animals, from restoration activities. This explanation shall be based on a nesting bird/habitat survey of areas within 500 feet of all work to be conducted.  In the event that Sable is unable to obtain access to neighboring properties for surveying, survey areas shall be limited to on or along the Sable easements to which impact from the Unpermitted Development occurred. The survey shall be attached to and incorporated into the Restoration Plan. Both the biologist and the methods for the survey must be approved by the Executive Director.

6.1.A.4.2    All in-creek or stream work for temporary erosion control and remedial grading activities under the approved Restoration Plan shall occur during the dry season from May 1 through October 31. This period may be extended for a limited period of time if the situation warrants such a limited extension, if approved by the Executive Director. Restoration activities restricted to this period include any work within the bed to the bank or the outer edge of riparian vegetation, whichever is the greater distance.

6.1.A.4.3    If during the rainy season (Nov 1-April 30) season, in-creek or stream work is necessary and such work is authorized by the Executive Director to occur during this time, Sable shall implement the following best management practices (BMPs), and include such measures in the Restoration Plan:

6.1.A.4.3.1    In addition to other measures that may be required by CDFW and the Regional Water Quality Control Board (RWQCB), all in-water construction work shall, at a minimum, be done with a qualified biological monitor with expertise in the identification of threatened, endangered and/or sensitive species on-site at all times during all in-water restoration work. Should the biological monitor identify any sensitive species that could be adversely affected by restoration activities, restoration work shall be halted and Sable shall contact the appropriate resource agency (USFWS or CDFW) to determine an appropriate course of action.

6.1.A.4.3.2    Any materials or structures temporarily placed within the creek or stream where protected species, such as those noted above, are or may be present, shall be designed, constructed, and maintained such that it does not constitute a barrier to upstream or downstream movement of the species.  Additionally, Sable shall

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 689 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 12   Filed 02/20/26   Page 325 of 464
ID #:17732

Sable Offshore Corp.
April 10, 2025
Page **10** of **26**

include: 1) measures to avoid capture of fish and wildlife in pumps or other equipment that contain mechanisms; 2) measures to maintain acceptable noise levels (e.g. using low-noise equipment, placing sandbags or another noise reduction device around pumps); and 3) measures to prevent sediment and debris from entering the creek channel or adjacent areas. Dust control measures shall be provided. Any and all debris resulting from construction activities shall be removed immediately. Any debris inadvertently discharged into coastal waters shall be recovered immediately and disposed of consistent with the requirements of this order.

6.1.A.4.3.3   Equipment shall avoid contact with water to the extent feasible. If that is infeasible, there shall be protocols for ensuring that all equipment that may come into contact with surface or subsurface water in the creek or stream channel is cleaned prior to contact, in order to prevent introduction of invasive species or substances that could impact the water quality of or native habitat in the creek or stream.

6.1.A.4.3.4   Water in the creek or stream shall either be diverted from work areas or barriers, such as coffer dams, shall be installed to prevent water from entering the work area.

6.1.A.4.3.5   Any fueling, maintenance and washing of construction equipment shall occur within upland areas outside of ESHA/wetlands and within designated staging areas. Mechanized heavy equipment or other vehicles shall not be refueled, maintained or washed within 100 feet of coastal waters.

6.1.A.4.3.6   Fuels, lubricants, and solvents shall not be allowed to enter coastal waters. Hazardous materials management equipment including oil containment booms and absorbent pads shall be available immediately on-hand at the project site, and a registered first-response, professional hazardous materials clean-up/remediation service shall be locally available on call. Any accidental spill shall be rapidly contained and cleaned up.

6.1.A.5 Each component of the Restoration Plan shall include a narrative report, specific to that component, describing the restoration activities to take place, the procedures to be used, and identification of the parties who will be conducting such activities. Along with a narrative report of each component of the Restoration Plan to be completed, Sable shall also submit photographs depicting the work, taken from the designated photo points. The photographic report shall show implementation of each

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 690 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 33   Filed 02/20/26   Page 326 of 464
ID #:17733

Sable Offshore Corp.
April 10, 2025
Page **11** of **26**

component of the Restoration Plan, demonstrating progress before, during, and after completion of each component of the work.

6.1.A.6 The Restoration Plan shall provide appropriate contact information for each landowner where restoration activities would be carried out to facilitate coordination with Commission staff regarding the scope of proposed work. Commission staff will use that information to make all reasonable efforts to reach out to and consider input provided by such landowners prior to approval of the Restoration Plan.

6.2 The Restoration Plan shall include a detailed description of all equipment to be used. Non-mechanized hand tools shall be used for invasive, non-native plant removal. The Restoration Plan shall state that any equipment utilized to implement the Restoration Plan shall not adversely impact resources protected under the Coastal Act, including, but not limited to: public access, geological stability, erosion, integrity of landforms, water quality, sensitive species, and the existing and restored native vegetation. If circumstances require the use of mechanized equipment, Sable shall submit a supplemental plan, for the review and approval of the Executive Director, that describes the proposed use of such equipment, including routes the equipment will take and locations of such use, and shall detail the following in the supplemental plan:

6.2.A Limitations on the hours of operations for all equipment and measures that addresses, at a minimum: 1) potential impacts from equipment use, including disturbance of areas where revegetation will occur and the responses thereto; 2) potential spills of fuel or other hazardous releases that may result from the use of mechanized equipment and the responses thereto; and 3) any potential water quality impacts.

6.2.B Designated areas for staging of any mechanized equipment and other materials, including receptacles and temporary stockpiles of materials, provided that equipment shall be covered, enclosed on all sides, located as far away as possible from drain inlets and any waterway, a minimum of 100 feet from any sensitive habitat, and not stored in contact with the soil or sandy beach, and not stored in areas reserved for public parking.

6.2.C Designated and confined areas for fueling, maintaining and washing machinery and equipment shall be specifically designed to control runoff. Thinners or solvents shall not be discharged into sanitary or storm sewer systems. The discharge of hazardous materials into any receiving waters is prohibited.

6.2.D Prior to commencement of work under the approved Restoration Plan, Sable shall submit to the Executive Director written evidence that all necessary approvals have been obtained. If an agency requires a change to the Restoration

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 691 of 837   Page
ID #:17734
Case 1:26-cv-01486-KES-CDB   Document 14   Filed 02/20/26   Page 327 of 464

Sable Offshore Corp.
April 10, 2025
Page 12 of 26

Plan as submitted and/or approved, Sable shall submit proposed revisions for Executive Director review and approval.

6.3   Wildlife Protection

6.3.A   Sable shall retain the services of a qualified biologist (hereinafter, "biologist") with appropriate qualifications acceptable to the Executive Director, to monitor the site during restoration activities and conduct surveys of sensitive species and to monitor all restoration activities. Sable shall submit the contact information and qualifications of all monitors with a description of their duties and their on-site schedule to the Executive Director for review and approval pursuant to Section 6.1.A.1, above. Should a biological monitor identify any sensitive species that could be adversely affected by restoration activities, such work shall be halted, and Sable shall contact the appropriate resource agency (USFWS or CDFW) to determine an appropriate course of action. For the purpose of these Orders, "sensitive species" shall be taken to mean any special-status wildlife species. Special-status species are species listed as: Endangered, Threatened, or Rare under the federal or state Endangered Species Acts; Candidate Species, California Fully Protected Species, and, pursuant to CEQA Guidelines Section 15380(d), all other species tracked by the California Natural Diversity Database (CNDDB), which are considered by the CDFW to be those species of greatest conservation concern (e.g. S1-S3 and G1-G3 Listed Species), and locally important species including, but not limited to: raptors, Steelhead trout, California red-legged frog, Tidewater goby, and Western pond turtle.

6.3.B   To avoid impacts to nesting birds, restoration activities shall be scheduled outside of the avian breeding and nesting season (February 1 through September 15). No restoration activities shall occur within 300 feet of roosting or foraging birds. If the Executive Director determines that restoration activities may occur during the breeding and nesting season, then restoration activities shall be done with the following protective measures:

6.3.C   If restoration activities must occur during bird nesting season (February 1 through September 15), a qualified biologist with experience conducting bird surveys shall survey for active nests of any federally or state listed threatened or endangered species, species of special concern, fully protected species, species with global rarity rankings of G1-G3 and/or state rarity rankings of S1-S3, or any species of raptor or wading birds, within 7 days prior to commencement of restoration activities, and once a week thereafter during construction, to detect any such activity within 500 feet of the project area.

6.3.D   If an active nest(s) of any of the above species is located within 300 feet of construction activities (500 feet for raptors), the qualified biologist shall halt construction activities to enable Respondent to employ BMPs to ensure that construction activities do not disturb or disrupt nesting activities.

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 692 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 15   Filed 02/20/26   Page 328 of 464
ID #:17735

Sable Offshore Corp.
April 10, 2025
Page **13** of **26**

6.3.E  Results of nesting bird surveys, ambient noise studies, and any follow-up
construction avoidance measures shall be documented in monthly reports by the
qualified biologist and submitted to the Commission Executive Director
throughout the bird breeding season.

6.4    Prior to commencement of work under the approved Restoration Plan, Sable
shall submit to the Executive Director written evidence that all other necessary
government approvals have been obtained. If an agency requires a change to
the approved Restoration Plan, Sable shall submit proposed revisions for the
Executive Director's review and approval under Section 7.0 (Submittal of
Documents). These Orders provide Coastal Act authorization for all development
required herein.

6.5    These Orders require the following deadlines that shall be reflected in the
Restoration Plan:

6.5.A  Within 15 days of the effective date of these Orders, Sable shall submit the
qualifications of the proposed Specialist(s) for the Executive Director's review
and approval.

6.5.B  Within 60 days of the approval of the Specialist(s) by the Executive Director,
Sable shall submit the proposed Restoration Plan to the Commission's Executive
Director for their review and written approval.

6.5.C  Within 30 days of the approval of the Restoration Plan by the Executive Director,
Sable shall commence implementation of the Restoration Plan through
commencing the restoration activities and installing temporary erosion control
measures. Sable shall implement each phase of the Restoration Plan according
to the deadlines set forth in each section, as described more fully, below.

6.5.D  Within 15 days of the completion of each element of the Restoration Plan (i.e.,
Erosion Control Plan, Remedial Grading Plan, etc.), Sable shall submit a
narrative report pursuant to Section 6.1.A.5, prepared by the Specialist(s), for the
review and approval of the Executive Director, documenting all restoration work
performed pursuant to the plan, which shall include a summary of dates on which
work was performed and accompanying photographs documenting
implementation of the respective components of the Restoration Plan.

6.5.E  If timing in which the Executive Director approves the Restoration Plan creates a
situation that causes work to occur during avian nesting season, breeding
season for protected species, or outside of the ideal planting season as
determined by the Specialist, Sable shall request an extension of deadlines
pursuant to Section 14.0 and the Executive Director may, for good cause, extend
this deadline to provide for a more successful restoration and to protect such
species.

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 693 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 36   Filed 02/20/26   Page 329 of 464
ID #:17736

Sable Offshore Corp.
April 10, 2025
Page **14** of **26**

6.6     Sable shall actively monitor for trash and/or other debris and promptly remove
        any such debris or trash from the Restoration Area, as necessary, to ensure the
        ongoing success of the restoration activities.

6.7     <u>TEMPORARY EROSION CONTROL PLAN</u>

6.7.A   Sable shall submit, as part of the Restoration Plan, a Temporary Erosion Control
        Plan, prepared by a qualified Specialist approved pursuant to Section 6.1.A.1, to
        stabilize the soil and prevent erosion, to address ground disturbance during any
        restoration activities, and to stabilize the soil and prevent erosion during the
        establishment of any vegetation planted pursuant to Section 6.9, below.

6.7.B   The Temporary Erosion Control Plan shall include: 1) a narrative report
        describing all temporary run- off and erosion control measures to be used
        including replacement and/or re-compaction of any excavated materials, and
        restorative grading to be done during and after restoration activities; and 2) a site
        plan identifying and delineating the locations of all temporary erosion control
        measures that will be installed pursuant to this plan, including seeding of
        location-appropriate plant species to assist in erosion control and 3) specify that
        the remedial grading and installation of erosion control features shall take place
        only during the dry season (May 1 through October 31).

6.7.C   The Temporary Erosion Control Plan shall indicate that all erosion control
        measures are required to be installed and fully functional in the Restoration Area
        prior to, or concurrent with, the initial restoration activities required by these
        Orders and maintained at all times of the year throughout the remedial grading,
        revegetation, and monitoring process, to minimize erosion across the site, and
        consistent with the deadlines established herein for the removal of the temporary
        erosion control measures.

6.7.D   All temporary construction related erosion control materials shall be comprised of
        bio-degradable materials, including the material used to encase fiber rolls and
        other erosion control devices. To minimize wildlife entanglement and plastic
        debris pollution, the use of temporary rolled erosion and sediment control
        products with plastic netting (such as polypropylene, nylon, polyethylene,
        polyester, or other synthetic fibers used in fiber rolls, erosion control blankets,
        and mulch control netting) is prohibited. Any erosion-control associated netting
        shall be made of natural fibers and constructed in a loose-weave design with
        movable joints between the horizontal and vertical twines.

6.7.E   The erosion control measures shall remain in place and be maintained at all
        times of the year until the plantings have become established, or in the case of
        erosion control measures for winter rainstorms, until such time period established
        by the approved Restoration Plan, and then all such measures shall be removed
        and properly disposed of by Sable. Verification of such removal shall be provided

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 694 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 330 of 464
ID #:17737

Sable Offshore Corp.
April 10, 2025
Page **15** of **26**

in the monitoring or completion report for the monitoring report period during which the removal occurred.

6.7.F   The Temporary Erosion Control Plan shall include the following deadlines:

6.7.F.1   Within 15 days of the approval of the Restoration Plan by the Executive Director, Sable shall commence the implementation of the Temporary Erosion Control Plan.

6.7.F.2   Within 15 days of commencing installation activities under the Temporary Erosion Control Plan, Sable shall conclude installation.

6.7.F.3   Within 15 days of the completion of the installation of erosion control measures under the Temporary Erosion Control Plan, Sable shall submit evidence for the Executive Director's review and approval in the form of a narrative report. The Temporary Erosion Control Plan Report shall also show the devices installed, the type of devices installed, and document their impact, if any.

6.8   REMEDIAL GRADING PLAN

6.8.A   The Restoration Plan shall include a Remedial Grading Plan prepared by a qualified Specialist approved pursuant to Section 6.1.A.1 above, that will describe all measures necessary to return the Restoration Area to the original, pre-violation topography if it is determined by the Executive Director, based upon the information received pursuant to Section 6.1.A, that such remedial grading is necessary to restore the pre-violation topography.

6.8.B   The Remedial Grading Plan shall include a narrative description that demonstrates how the proposed remedial grading will restore the Restoration Areas to the pre-violation topography.  If fill materials are to be used, the narrative shall discuss which fill materials will be used, the origin of the fill materials, how the fill materials are compatible for use within the Restoration Area, how much of each type of material will be used, and the differences and similarities between the fill materials and existing materials located in the corresponding portions of the Restoration Area.

6.8.C   If historic data or topographical maps are not available for this location, Sable shall propose an approximation of the topography which existed in the area prior to the Unpermitted Development based on undisturbed slopes in the area, for the review and approval of the Executive Director. If an approximation is used, the Specialist shall submit in writing that the proposed approximation is the most accurate depiction of what the topography looked like prior to the occurrence of the Unpermitted Development. If it is determined by the Specialist that a different topography will result in a more successful restoration and will benefit coastal

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 695 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 31   Filed 02/20/26   Page 331 of 464
ID #:17738

Sable Offshore Corp.
April 10, 2025
Page **16** of **26**

resources, the Specialist may propose a different topography to meet these goals.

6.8.D   The Remedial Grading Plan shall include sections showing original and finished grades, and a quantitative breakdown of grading amounts (cut/fill/export), drawn to scale with contours that clearly illustrate, as accurately as possible, the pre-violation topography and the current, unpermitted topography. The Remedial Grading Plan shall demonstrate how the proposed remedial grading will restore impacted areas to their original, pre-violation topography. The Remedial Grading Plan shall identify the source and date for all of the data used to produce this information.

6.8.E   The Remedial Grading Plan shall state that remedial grading activities undertaken pursuant to the Restoration Plan shall not disturb areas outside of the Restoration Area. Prior to initiation of any activities resulting in physical alteration of the areas affected by the Unpermitted Development, the disturbance boundary shall be physically delineated in the field using temporary non-plastic measures such as fencing or colored wooden stakes.

6.8.F   The Remedial Grading Plan shall include the following deadlines:

6.8.F.1   Within 15 days of completing Temporary Erosion Control Plan, Sable shall begin implementation of the Remedial Grading Plan.

6.8.F.2   Within 45 days of commencing implementation of the remedial grading activities, Sable shall complete implementation of the Remedial Grading Plan.

6.8.F.3   Within 15 days of the completion of the implementation of the Remedial Grading Plan Sable shall submit evidence, for the Executive Director's review and approval, in the form of a narrative report as described in 6.1.A.5, showing that the remedial grading has been completed pursuant to the approved Restoration Plan.

6.9   REVEGETATION PLAN

6.9.A   The Restoration Plan shall include a Revegetation Plan prepared by a qualified Specialist, approved pursuant to Section 6.1.A.1 above, that will describe the measures necessary to revegetate the Restoration Areas such that these areas meet the goals, standards and objectives of these Orders.

6.9.B   The Revegetation Plan shall include a detailed description of the methods that shall be utilized to restore the Restoration Area that is determined, pursuant to Section 6.1.A, to have been adversely impacted by the Unpermitted Development. The Revegetation Plan shall include detailed descriptions, including graphic representations, narrative reports, and photographic evidence,

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 696 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 19   Filed 02/20/26   Page 332 of 464
ID #:17739

Sable Offshore Corp.
April 10, 2025
Page **17** of **26**

as necessary. The Revegetation Plan shall demonstrate that the Restoration Area and additional areas to account for the temporal and permanent losses of habitat caused by the Unpermitted Development will be revegetated using plant species endemic to and appropriate for the locations where Unpermitted Development occurred.

6.9.C   The Revegetation Plan shall identify the natural habitat type(s) that are the reference site(s)/model(s) for the restoration and shall describe the desired relative abundance of particular species in each vegetation community. The reference site(s) shall be natural areas with the least amount of disturbance and located as close as possible to the Restoration Area, so long as the habitat type is similar to that impacted by the Unpermitted Development. If an undisturbed reference site does not exist, an otherwise representative area may be proposed, accounting for vegetation and topography changes due to disturbance, and in conjunction with published descriptions of local habitat using relevant, peer-reviewed literature. Alternatively, if an undisturbed reference site or otherwise representative area are not available or suitable for the proposed restoration, the peer-reviewed literature along with membership rules per the Manual of California Vegetation (Sawyer,Keeler-Wolf and Evens 2009; available online at https://vegetation.cnps.org) for the appropriate habitat alliance-level, may be used to determine the desired relative abundance of native vegetation and particular species in each vegetation community.  The Revegetation Plan shall be based on one or more reference sites specific to the habitat type(s) upon which the Unpermitted Development occurred. The Revegetation Plan shall explicitly lay out the restoration goals, standards and objectives for the restoration based on the respective model(s).

6.9.D   The Revegetation Plan shall be based on these Reference Sites, which, along with information from the scientific literature, shall be used to identify the plant species that are native to the site and will be planted in the areas determined by the Executive Director pursuant to Section 6.1.A, above, to be adversely impacted in the Restoration Area. The Revegetation Plan shall explicitly state the restoration goals, standards and objectives for the revegetation effort, with the goal of achieving the revegetation performance standards in the allotted period, which may include, but are not limited to, diversity and native plant cover requirements and require the control of invasive plants. Based on these goals, the Revegetation Plan shall identify the species that are to be planted (plant "palette") and provide a rationale for and description of the size and number of container plants, seed mix, the rate and method of seed application, the method of planting, irrigation requirements and irrigation schedule. The Revegetation Plan shall indicate that plant propagules and seeds must come from local, native stock. If plants, cuttings, or seeds are obtained from a nursery, the nursery must certify that they are of local origin and are not cultivars. The Revegetation Plan shall provide specifications for preparation of nursery stock. Technical details of planting methods (e.g., spacing, mycorrhizal inoculation, etc.) shall be included.

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 697 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 40    Filed 02/20/26    Page 333 of 464
ID #:17740

Sable Offshore Corp.
April 10, 2025
Page **18** of **26**

shall not employ non-native plant species, which could supplant native plant species in the Restoration Area.

6.9.E  The Revegetation Plan shall include a schedule for installation of plants, removal of non-native plants, and completion of revegetation within the Restoration Area and any other area revegetated to account for the temporal and permanent losses of habitat caused by the Unpermitted Development. The Specialist shall recommend removal of non-natives outside the Restoration Area if they determine that such non-natives could impact or limit the success of the native plantings within the Restoration Area.

6.9.F  The revegetation schedule shall include specific time periods and deadlines, including identifiable interim goals for planting, other revegetation activities, and additional non-native species removal work spread out over the time period established in this section.

6.9.G  Sable is responsible for ensuring the ongoing survival of the plantings, shall undertake measures necessary to ensure the success of such plantings, and shall replace any dead or dying plants with native plants approved through this Revegetation Plan.

6.9.H  The Revegetation Plan shall describe the proposed use of artificial inputs, such as irrigation, fertilizer, or herbicides, including the full range of amounts of the inputs that may be utilized. The minimum amount necessary to support the establishment of the plantings for successful restoration shall be utilized.

6.9.I  The Revegetation Plan shall include the following deadlines:

6.9.I.1  Within 15 days of completing implementation of the Remedial Grading Plan, Sable shall begin implementation of the Revegetation Plan. The schedule/timeline of activities in the Restoration Plan shall be in accordance with the deadlines in these Orders and shall be in accordance with the ideal planting seasons.

6.9.I.2  Within 45 days of commencing implementation of activities under the Revegetation Plan, Sable shall complete implementation of all planting activities under the Revegetation Plan.

6.9.I.3  Within 15 days of the completion of all revegetation activities, Sable shall submit evidence, for the Executive Director's review and approval, in the form of a narrative report as described in Section 6.1.A.5, demonstrating that the revegetation has been completed pursuant to these Orders and the approved Restoration Plan.

6.10  CULTURAL RESOURES SURVEY AND PLAN

Case 2:26-cv-05242-SVW-SSC  Document 36  Filed 05/14/26  Page 698 of 837  Page
Case 1:26-cv-01486-KES-CDB  Document 41  Filed 02/20/26  Page 334 of 464
ID #:17741

Sable Offshore Corp.
April 10, 2025
Page **19** of **26**

6.10.A Sable shall submit, for review and approval of the Executive Director, a Cultural
Resources Survey and Cultural Materials Plan prepared by a qualified
professional, defined in Section 6.1.A.1 below as the "Archeological Specialist",
which shall assess the extent to which the restoration activities required by these
Orders have any potential to uncover or otherwise disturb cultural resources.
Prior to the preparation of the Cultural Resources Survey and Cultural Materials
Plan, Sable shall submit the qualifications of the proposed Archeological
Specialist for the Executive Director's review and approval, including a
description of the archeologist's background, training, and experience.

After the Executive Director has approved the Restoration Plan, but before the
first commencement of activities required by the Restoration Plan, Sable shall
convene an on-site pre-meeting with the Archeological Specialist, the Native
American Most Likely Descendant(s) (MLD) and Native American Monitor(s), as
defined in Section 6.10.D, below, to ensure that all parties understand the
procedures to be followed pursuant to these Orders and the approved Cultural
Resources Survey and Cultural Materials Plan

In order to protect cultural resources on any location where restoration activities
will occur pursuant to these Orders, the Cultural Resources Survey and Cultural
Materials Plan shall incorporate the following measures and procedures, and
Sable shall implement such measures and procedures.

6.10.B In preparing Cultural Resources Survey and Cultural Materials Plan, the
Archeological Specialist, as defined in Section 6.10.C, below, shall consult with
the Native American Monitor(s), as defined in Section 6.10.D, below.

6.10.C The Archeologist Specialist shall be a professional archeologist who has
experience in cultural and archeological fieldwork, preferably in Santa Barbara
County. The archeologist must be selected in consultation with the Executive
Director consistent with the standards of the Native American Heritage
Commission ("NAHC"). The Cultural Resources Survey and Cultural Materials
Plan shall identify the Archaeological Specialist and include a description of
his/her education, training, and experience. Native American Monitors

6.10.D The Native American Monitor(s) shall be the monitor(s) who will monitor work to
be conducted pursuant to these Orders, according to the provisions of the
Cultural Resources Survey and Cultural Materials Plan. The Native American
monitors shall be selected by the appropriate tribe as designated by the NAHC.

6.10.E The Cultural Resources Survey and Cultural Materials Plan shall require that the
Archeological Specialist shall document any cultural materials, including but not
limited to, human remains and grave-related artifacts, traditional cultural sites,
religious or spiritual site, village sites, or other artifacts, ("Cultural Materials")

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 699 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 42   Filed 02/20/26   Page 335 of 464
ID #:17742

Sable Offshore Corp.
April 10, 2025
Page **20** of **26**

encountered during the course of work conducted pursuant to these Orders, and such documentation shall be included in a report to the Executive Director within 15 days of identification.

6.10.F During all ground disturbance and subsurface activity that occurs on the Restoration Area or any location where restoration activities may occur pursuant to the requirements of these Orders that have any potential to uncover or otherwise disturb cultural deposits, the Native American Monitors may be present on the Restoration Area.

6.10.G Sable shall fund sufficient Native American Monitors to assure that all remedial grading or other restoration activities that have any potential to uncover or otherwise disturb cultural deposits are monitored at all times. More than one Monitor at the Restoration Area may be necessary during times with multiple soil disturbance locations. In instances where more than one Monitor is necessary and less than all Native American Monitors necessary respond to request to monitor particular areas within 7 days, Sable shall halt work until Native American Monitors are available.

6.10.H Prior to the disposal of any materials from the restoration activities, the Archeological Specialist shall identify, as best as possible, soil that may contain cultural materials and, if determined by the Archeological Specialist and the MLD and Native American Monitors to be necessary, screen it for evidence of such materials. Any cultural materials, including cultural midden materials, human remains, and archeological features, shall be documented and reburied, or transported offsite in coordination with guidance from the Archeological Specialist and Native American Monitors. If human remains are encountered during soil screening, Sable shall comply with all applicable State and Federal laws, including but not limited to, contacting the County Coroner, NAHC, and the MLDs

6.10.I All identification of soil, soil screening, and restoration activities conducted pursuant to these Orders shall be monitored by the Native American Monitors. In addition, the Native American Monitors shall be provided access to the site to inspect the Restoration Area prior to removal and/or restoration. Sable shall not restrict the Native American Monitors from communicating with Commission staff. If human remains are encountered during inspection of the Restoration Area, Sable shall comply with all applicable State and Federal laws including, but not limited to, immediately stopping working and contacting the County Coroner, NAHC, and the MLD

6.10.J If any Cultural Materials are discovered, all restoration activities in that particular area shall cease. The Archaeological Specialist shall submit a proposal to the Executive Director for his review and approval on how Sable will address such discovery, consistent with the Cultural Resources Survey and Cultural Materials Plan. Restoration activity may proceed only at such time as the Executive

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 700 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 43    Filed 02/20/26    Page 336 of 464
ID #:17743

Sable Offshore Corp.
April 10, 2025
Page **21** of **26**

Director has determined that Sable has complied with all obligations of the Cultural Resources Survey and Cultural Materials Plan.

6.10.K        Should human remains be discovered on-site during the course of the restoration activities, immediately after such discovery, the on-site archaeologist and Native American monitor(s) shall notify the County Coroner within 24 hours of such discovery, and all restoration activities shall be temporarily halted until the remains can be identified. An "exclusion zone" may be established around the discovery area. If the County coroner determines that the human remains are those of a Native American, the coroner shall contact the NAHC within 24 hours, pursuant to Health and Safety Code Section 7050.5. The NAHC shall deem the Native American most likely descendant (MLD) to be invited to participate in the identification process pursuant to Public Resources Code Section 5097.98. Sable shall comply with the requirements of Section 5097.98 and work with the MLD person(s) to preserve the remains in place, move the remains elsewhere onsite, relinquish the remains to the descendants for treatment, or determine other culturally appropriate treatment. Within five (5) calendar days of notification to NAHC, Sable shall notify the Executive Director of the discovery of human remains and identify any changes to the proposed Cultural Resources Survey and Cultural Materials Plan that may be needed related to the inadvertent discovery. The Executive Director will maintain confidentiality regarding the presence of human remains on the site. If such discovery requires changes to the Restoration Plan, Sable shall submit, within 30 days of notifying the Executive Director, and amendment to the plan for the Executive Director's review and approval.

## 6.11    MONITORING PLAN

6.11.A The Restoration Plan shall include a Monitoring Plan prepared by a qualified Specialist, approved pursuant to Section 6.1.A.1 above, that will provide for monitoring the Restoration Area over a period of, at a minimum, 5 years from the completion and full implementation of the Restoration Plan to ensure successful restoration.

6.11.B  The Monitoring Plan shall describe the monitoring and maintenance methodology, including sampling procedures, sampling frequency, goals, standards, objectives, and contingency plans to address potential problems with restoration activities or unsuccessful restoration of the Restoration Area.

6.11.C  The Monitoring Plan shall include an initial site survey showing the Restoration Area, the areas and types of revegetation mapped to the appropriate alliance-level, and specific photo points that will be used for the annual reports and site visits described below.

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 701 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1-4   Filed 02/20/26   Page 337 of 464
ID #:17744

Sable Offshore Corp.
April 10, 2025
Page 22 of 26

6.11.D The Monitoring Plan shall specify the number of site visits (at a minimum on a quarterly basis) that the Specialist shall conduct annually for the duration of the monitoring period for the purpose of inspecting and maintaining, at a minimum, the following: all erosion control measures; non-native species eradication; trash and debris removal; and the health and abundance of original and/or replacement plantings planted pursuant to these Orders and consistent with the Revegetation Plan. It is Sable's obligation to ensure a successful restoration that will meet the established goals, standards, and objectives, which may necessitate more site visits than required herein.

6.11.E Sable shall submit no later than December 31 of the first year of monitoring and subsequently on an annual basis and during the same one-month period of each year for at least 5 years from the completion of the revegetation phase of the Restoration Plan, for the review and approval of the Executive Director, a monitoring report prepared by the Specialist that evaluates compliance with the approved Restoration Plan. These reports shall also include photographs taken during the periodic site inspections demonstrating the success of the restoration. The locations from which the photographs are taken shall not change over the course of the monitoring period.

6.11.F If periodic inspections or the annual monitoring reports indicate that the restoration project or a portion thereof is not in conformance with the Restoration Plan or these Orders or has failed to meet the goals and/or performance standards specified in the Restoration Plan, Sable shall implement approved contingency plans.

6.11.G At the end of the five-year monitoring period, Sable shall submit, for the review and approval of the Executive Director, a final detailed report prepared by the Specialist that documents the successful implementation of the Restoration Plan. If the Executive Director determines from this final report that the restoration has in part, or in whole, been unsuccessful and/or did not meet the final success criteria, based on the requirements of the respective plan, Sable shall submit a Revised Restoration Plan, and the monitoring program shall be revised accordingly.

6.11.H The Revised Restoration Plan shall be prepared by the Specialist, approved by the Executive Director, and shall specify measures to correct those restoration activities that have failed or are not in conformance with the original, approved Restoration Plan. The Executive Director will then determine whether the Revised Restoration Plan must be processed as a new Restoration Order, or a CDP. After the Revised Restoration Plan has been approved, these measures, and any subsequent measures necessary to carry out the original, approved Restoration Plan, shall be undertaken by Sable as required by the Executive Director until the goals of the original, approved Restoration Plan have been met. Following Sable's full implementation of the Revised Restoration Plan, the

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 702 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 45    Filed 02/20/26    Page 338 of 464
ID #:17745

Sable Offshore Corp.
April 10, 2025
Page 23 of 26

duration of the monitoring period shall be extended for a period of time equal to that during which the project remained out of compliance, but in no case less than two annual reporting periods.

6.11.I  The Monitoring Plan shall include the following deadlines:

6.11.I.1  As part of the Restoration Plan, within 60 days of the effective date of these Orders, Sable shall submit, for review and approval of the Executive Director, the Monitoring Plan.

6.11.I.2  The monitoring period shall begin immediately upon the full implementation of the Restoration Plan and shall extend for a period of, at a minimum, 5 years.

6.11.I.3  Sable shall submit no later than December 31 of the first year of monitoring and subsequently on an annual basis and during the same one-month period of each year for at least 5 years from the completion of the revegetation phase of the Restoration Plan, for the review and approval of the Executive Director, a monitoring report.

6.11.I.4  At the end of the five-year monitoring, Sable shall submit, for the review and approval of the Executive Director, a final detailed report prepared by the Specialist that documents the successful implementation of the Restoration Plan.

## ADDITIONAL PROVISIONS COMMON TO THESE ORDERS

## 7.0    SUBMITTAL OF DOCUMENTS

All plans, reports, photographs, documents and funds submitted to the Commission pursuant to these Orders shall be sent to both of the following addresses, with the original sent to the San Francisco office, and additionally sent via electronic mail to:

With a copy sent to:

California Coastal Commission
Attn: Stephanie Cook
455 Market Street, Suite 300
San Francisco, CA 94105
Stephanie.Cook@coastal.ca.gov

California Coastal Commission
Attn: Wesley Horn
89 S. California Street, STE 200
Ventura, CA 93001
Wesley.Horn@coastal.ca.gov

## 8.0    FINDINGS

This Cease and Desist Order, Restoration Order, and Administrative Penalty Assessment are issued on the basis of the findings adopted by the Commission, as set forth in the document entitled "Staff Report: Recommendations and

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 703 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 46   Filed 02/20/26   Page 339 of 464
ID #:17746

Sable Offshore Corp.
April 10, 2025
Page **24** of **26**

Findings for Cease and Desist Order, Restoration Order, and Administrative Civil Penalties." The Commission has ordered and authorized the activities required in these Orders and has determined them to be consistent with the resource protection policies set forth in Chapter 3 of the Coastal Act if carried out in compliance with the terms of these Orders.

## 9.0   EFFECTIVE DATE AND TERMS OF THESE ORDERS

The effective date of these Orders is the date the Commission votes to approve these Orders. These Orders shall remain in effect permanently unless and until rescinded by the Commission.

## 10.0   COMMISSION JURISDICTION

The Commission has jurisdiction to issue the Cease and Desist Order pursuant to PRC Section 30810, jurisdiction to issue the Restoration Order pursuant to PRC Section 30811, and jurisdiction to impose the Administrative Civil Penalties pursuant to PRC Section 30821.3.

## 11.0   SITE ACCESS

11.1   Sable shall provide Commission staff and staff of any agency having jurisdiction over the work being performed under these Orders with access to all portions of the Restoration Area and any area needed for Commission staff to safely access the Restoration area  Nothing in these Orders is intended to limit in any way the right of entry or inspection that any agency may otherwise have by operation of any law. The Commission staff and other relevant agency staff may enter and move freely about the following areas: (1) any areas on which the development as defined in Section 4.2, above, occurred, (2) any areas where work is to be performed pursuant to these Orders or pursuant to any plans adopted pursuant to these Orders, (3) any areas necessary in order to view the areas where work is being performed pursuant to the requirements of these Orders, (4) any areas where evidence of compliance with these Orders may lie for purposes including but not limited to, inspecting records, logs and contracts; and overseeing, inspecting, documenting, and reviewing the progress of Sable in carrying out the terms of these Orders.

11.2   Sable shall provide Commission staff with documentation of their right to enter and take action as required pursuant to these Orders on any property not owned by Sable.

## 12.0   APPEAL

Pursuant to PRC Section 30803 (b), any person or entity against whom this Cease and Desist Order under Section 1.0 is issued may file a petition with the

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 704 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 340 of 464
ID #:17747

Sable Offshore Corp.
April 10, 2025
Page **25** of **26**

Superior Court for a stay of this Cease and Desist Order. Pursuant to Section 30803(a), any person may maintain an action for declaratory and equitable relief to restrain any violation of this division, including violations of a cease and desist or restoration order issued pursuant to this division.

## 13.0   GOVERNMENT LIABILITY

Neither the State of California, nor the Commission, nor its employees shall be liable for injuries or damages to persons or property resulting from acts or omissions by Sable in carrying out activities pursuant to these Orders; nor shall the State of California, the Commission or its employees be held as a party to any contract entered into by Sable or their agents in carrying out activities pursuant to these Orders.

## 14.0   DEADLINES

The Executive Director may extend deadlines specified herein. Any extension request must be made in writing and received by Commission staff ten (10) days prior to expiration of the subject deadline. Any such request shall be sent to the address listed in Section 7.0, above

## 15.0   SUCCESSORS AND ASSIGNS

These Orders shall bind Sable and all its successors in interest, newly created LLCs, partnerships, and corporations, heirs, and assigns.

## 16.0   REVISION OF DELIVERABLES

The Executive Director may require revisions to deliverables under these Orders, as necessary to satisfy the requirements in these Orders, and Sable shall revise any such deliverable consistent with the Executive Director's specifications and resubmit them for review and approval by the Executive Director by the deadline established by the modification request from the Executive Director.

## 17.0   MODIFICATION AND AMENDMENTS

Except as provided in Section 14 of these Orders, or for ministerial corrections, these Orders may be amended or modified only in accordance with the standards and procedures set forth in Section 13188(b) and 13197 of Title 14 of the California Code of Regulations.

## 18.0   SEVERABILITY

Should any provision of these Orders be found invalid, void, or unenforceable, such illegality or unenforceability shall not invalidate the whole, but these Orders shall be construed as if the provision(s) containing the illegal or unenforceable part were not a part hereof.

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 705 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 48   Filed 02/20/26   Page 341 of 464
ID #:17748

Sable Offshore Corp.
April 10, 2025
Page 26 of 26

### 19.0   GOVERNMENT JURISDICTION

These Orders shall be interpreted, construed, governed, and enforced under and pursuant to the laws of the State of California.

### 20.0   COMPLIANCE OBLIGATION

Strict compliance with this Cease and Desist Order, Restoration Order, and Administrative Penalty by all parties subject hereto is required. Failure to resolve violations addressed herein or comply with any term or condition of this Cease and Desist Order, Restoration Order, and Administrative Penalty, including any deadline contained herein, will constitute a violation of these Orders and may result in the imposition of civil penalties under PRC Section 30821.6 of up to six thousand dollars ($6,000) per day for each day in which each violation persists. In addition, failure to comply with any terms or conditions of these Orders may result in the Commission seeking judicial relief and additional penalties as authorized under Chapter 9 of the Coastal Act, including PRC Sections 30820, 30821.3(d), and 30822

### 21.0   NO LIMITATION OF AUTHORITY

Except as expressly provided herein, nothing in these Orders shall limit or restrict the exercise of the Commission's enforcement authority pursuant to Chapter 9 of the Coastal Act (PRC Sections 30800 to 30824), including the authority to require and enforce compliance with these Orders and the authority to take enforcement action for Coastal Act violations beyond those that are specified in Section 4.2 of these Orders.


Executed in _____ on behalf of the California Coastal Commission:


_____                    _____
Dr. Kate Huckelbridge                                          Date
Executive Director
California Coastal Commission

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 706 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 342 of 464
ID #:17749

# EXHIBIT "I"

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 707 of 837   Page
ID #:17750
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 343 of 464

Pursuant to CRC 2.259 this document has been electronically filed by the
Superior Court of California, County of Santa Barbara, on 5/29/2025

TC

ROB BONTA
Attorney General of California
NORMA N. FRANKLIN
Supervising Deputy Attorney General
WYATT E. SLOANE-TRIBE (State Bar No. 260319)
JOHN M. NATALIZIO (State Bar No. 311482)
Deputy Attorneys General
  300 South Spring Street, Suite 1702
  Los Angeles, CA 90013-1230
  Telephone: (213) 269-6380
  Fax: (916) 731-2121
  E-mail: Wyatt.Sloan-Tribe@doj.ca.gov
*Attorneys for Cross-Complainant, Respondent, and
Defendant California Coastal Commission*

**FILED**
SUPERIOR COURT of CALIFORNIA
COUNTY of SANTA BARBARA
**06/10/2025**
Darrel E. Parker, Executive Officer
BY  Chavez, Terri
                                        Deputy Clerk

*Fee exempt per Govt. Code § 6103*

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SANTA BARBARA

ANACAPA DIVISION

| | |
|---|---|
| SABLE OFFSHORE CORP., a Delaware corporation; PACIFIC PIPELINE COMPANY, a Delaware corporation, and DOES 1 through 25, inclusive,<br><br>        Plaintiffs, Petitioners, and Cross-Defendants,<br><br>        v.<br><br>CALIFORNIA COASTAL COMMISSION, a state agency; and DOES 1 through 25, inclusive,<br><br>        Cross-Complainant, Respondent, and Defendant. | Case No. 25CV00974<br><br>[~~PROPOSED~~] ORDER GRANTING APPLICATION FOR PRELIMINARY INJUNCTION<br><br>Date:     May 28, 2025<br>Time:    10:00 a.m.<br>Dept:    3<br>Judge:  The Honorable Thomas Pearce Anderle<br>Trial Date: Not set.<br>Action Filed: February 18, 2025 |

1

Cross-Complainant, Respondent, and Defendant California Coastal Commission ("Commission") came before this Court on May 28, 2025 for its Application for Preliminary Injunction.

The Court, having considered the Application, the Memorandum of Points and Authorities in support thereof, the Request for Judicial Notice, and all supporting declarations filed therewith, the Opposition and Reply briefs, the supplemental materials presented by Sable Offshore Corp. and Pacific Pipeline Company (collectively, "Sable"), and oral argument at the hearing, finds that good cause exists to **GRANT** the Commission's Application.

## PRELIMINARY INJUNCTION

Pending a final judgment on the merits of this case, or an order of this Court dissolving the instant injunction, Sable its employees and agents, and any other persons acting with Sable or on its behalf, are hereby restrained and enjoined from conducting any further development in violation the duly-ordered cease and desist order issued by the Commission on April 10, 2025. The Court incorporates by reference into this order its ruling issued on May 28, 2025, attached hereto as exhibit "A". The activities that shall be restrained include, but are not limited to, the following:

1.      Any "development" as that term is defined in the California Coastal Act (Pub. Resources Code § 30106) and the Santa Barbara County Local Coastal Program (LCP) that has not been specifically identified and authorized by a new, final action pursuant to the Coastal Act and/or the LCP.

2.      Development undertaken or planned at locations onshore, including: excavation; removal of major vegetation; fill of wetlands; grading and widening of roads; installation of metal plates over water courses; dewatering and discharge of water; removal, replacement, and reinforcement of pipeline and pipeline infrastructure; and other development associated with the return to service of Las Flores Pipelines CA-324 and CA-325.

\\\

\\\

\\\

2

3.        Development undertaken or planned at locations offshore, including: placement of sand and cement bags on the seafloor below and adjacent to Sable's offshore oil and water pipelines.

**IT IS SO ORDERED.**

DATED:    **06/10/2025**

Hon. Thomas P. Anderle

[Proposed] Order Granting Application for Preliminary Injunction (25CV00974)

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 710 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 53   Filed 02/20/26   Page 346 of 464
ID #:17753

**ELECTRONICALLY FILED**
Superior Court of California,
County of Kern
By: Marina Mercado
Deputy Clerk
**12/5/25 1:54 PM**

ROB BONTA
Attorney General of California
BRANDON WALKER SBN. 254581
Supervising Deputy Attorney General
JACK C. NICK SBN. 160196
ISABELLA A. PANUCCINI SBN. 318984
Deputy Attorneys General
1300 I Street, Suite 125
Sacramento, CA 95814
Telephone: (916) 210-6395
Fax: (916) 327-2319
E-mail: Brandon.Walker@doj.ca.gov
*Attorneys for Defendant State of California*

*Exempt from Filing Fees Pursuant to
Government Code § 6103*

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF KERN

METROPOLITAN DIVISION

| | |
|---|---|
| **Pacific Pipeline Company, A Delaware Corporation,**<br><br>Plaintiff,<br><br>v.<br><br>**State of California and DOES 1 through 25,**<br><br>Defendants. | Case No. BCV25103508<br><br>**DECLARATION OF SERVICE BY E-MAIL**<br><br>Date: February 3, 2026<br>Time: 8:30 a.m.<br>Dept: H<br>Judge: Hon. Bernard C. Barmann, Jr.<br><br>Action Filed: September 29, 2025 |

1

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 711 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 54   Filed 02/20/26   Page 347 of 464
ID #:17754

**Declaration of Electronic Service**

I am at least 18 years of age and not a party to this matter.

I am employed in the Office of the Attorney General of the State of California. My business address is 1300 I Street, Suite 125, Sacramento, CA 95814, County of Sacramento.

My electronic service address is Valerie.Tamulevich@doj.ca.gov.

On <u>December 5, 2025</u>, I electronically served the following document[s]:

    a.  **DECLARATION OF BRANDON S. WALKER IN SUPPORT OF MOTION TO CHANGE VENUE (Vol. 1 of 3)**

    b.  **DECLARATION OF BRANDON S. WALKER IN SUPPORT OF MOTION TO CHANGE VENUE (Vol. 2 of 3)**

    c.  **DECLARATION OF BRANDON S. WALKER IN SUPPORT OF MOTION TO CHANGE VENUE (Vol. 3 of 3)**

I electronically served the aforementioned document[s] by emailing them to the following individual[s]:

Jeffrey Dintzer
Garrett B. Stanton
ALSTON & BIRD
**E-mail Address**: jeffrey.dintzer@alston.com
**E-mail Address**: garrett.stanton@alston.com

Benjamin J. Hanelin
Natalie C. Rogers
PAUL HASTINGS LLP
**E-mail Address**: benjaminhanelin@paulhastings.com
**E-mail Address**: natalierogers@paulhastings.com

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct, and that this declaration was executed on <u>December 5, 2025</u>.

| Valerie A. Tamulevich | /s/ *Valerie A. Tamulevich* |
|---|---|
| Declarant | Signature |

2

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 712 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 348 of 464
ID #:17755

Superior Court of California,
County of Kern
By: Marina Mercado
Deputy Clerk
01/21/2026

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
jeffrey.dintzer@alston.com
GARRETT B. STANTON, SBN 324775
garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071-1410
Telephone:    (213) 576-1000
Facsimile:    (213) 576-1100

**PAUL HASTINGS LLP**
BENJAMIN J. HANELIN, SBN 237595
benjaminhanelin@paulhastings.com
NATALIE C. ROGERS, SBN 301254
natalierogers@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067
Telephone:    (310) 620-5879
Facsimile:    (310) 620-5899

Attorneys for Plaintiffs
PACIFIC PIPELINE COMPANY

**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF KERN**

**METROPOLITAN DIVISION**

| PACIFIC PIPELINE COMPANY, | Case No. BCV25103508 |
| Plaintiffs, | **PACIFIC PIPELINE COMPANY'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO CHANGE VENUE** |
| v. | |
| STATE OF CALIFORNIA and DOES 1 through 25, | Date:      February 3, 2026 |
| | Time:      8:30 a.m. |
| Defendants. | Dept.      H |
| | Judge:     Hon. Bernard C. Barmann, Jr. |
| | Action Filed: September 29, 2025 |

- 1 -
RESPONSE IN OPPOSITION TO MOTION TO CHANGE VENUE

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 713 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 349 of 464
ID #:17756

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 5

STATEMENT OF FACTS ............................................................................................... 6

LEGAL STANDARD ...................................................................................................... 9

ARGUMENT .................................................................................................................... 9

     I.     Kern County is the Proper Venue Because Large Portions of the Pipeline
           System are Situated in Kern County. ....................................................................... 10

     II.    The State Raises Premature Merits Arguments, Which Also Fail. ...................... 11

     III.   A Motion to Transfer Venue for the Convenience of Witnesses and the
           Ends of Justice is Premature Before an Answer is Filed. ..................................... 13

CONCLUSION ................................................................................................................ 14

RESPONSE IN OPPOSITION TO MOTION TO CHANGE VENUE

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 714 of 837   Page
ID #:17757
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 350 of 464

# TABLE OF AUTHORITIES

**Page(s)**

STATE CASES

*Anmaco, Inc. v. Bohlken*
    (1993) 13 Cal.App.4th 891 ......6

*Battaglia Enterprises, Inc. v. Superior Court*
    (2013) 215 Cal.App.4th 309 ......9

*Brown v. Superior Court*
    (1984) 37 Cal.3d 477 ......9

*Cholakian & Assocs. v. Superior Court*
    (2015) 236 Cal. App. 4th 361 ......13

*County of San Bernardino v. Superior Court*
    (1994) 30 Cal.App.4th 378 ......11

*Easton v. Superior Court,*
    (1970) 12 Cal. App. 3d 243 ......9, 13

*Foreman & Clark Corp. v. Fallon,*
    (1971) 3 Cal.3d at 875 ......6

*Freedman v. Imperial Cattle Co.*
    (1952) 112 Cal. App. 2d 593 ......9, 11

*Freeman v. Dowling*
    (1933) 219 Cal. 213 ......11

*Goldtree v. McAllister*
    (1890) 86 Cal. 93 ......10

*Haines v. Lamb*
    (1962) 206 Cal.App.2d 322 ......9

*Housing Group v. United Nat. Ins. Co.*
    (2001) 90 Cal. App.4th 1106 ......11

*McCarthy v. Superior Court*
    (1987) 191 Cal.App.3d 1023 ......11

*Meyer v. State Board of Equalization*
    (1954) 42 Cal.2d 376 ......6

*Mills v. Brown*
    (1928) 205 Cal. 38 ......11

- 3 -

RESPONSE IN OPPOSITION TO MOTION TO CHANGE VENUE

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 715 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 351 of 464
ID #:17758

*Pearson v. Superior Court,*
(1962) 199 Cal. App. 2d 69 ......................................................................................13

*Richardson v. Rose*
(1961) 197 Cal.App.2d 318 ......................................................................................12

*State Compensation Ins. Fund v. Superior Court*
(2010) 184 Cal.App.4th 1124 ....................................................................................5

*Sylmar Air Conditioning v. Pueblo Contracting Services, Inc.*
(2004) 122 Cal.App.4th 1049 ....................................................................................5

*Ward Mfg. Co. v. Miley*
(1955) 131 Cal.App.2d 603 ......................................................................................11

*White v. Kaiser-Frazer Corp.*
(1950) 100 Cal.App.2d 754 ........................................................................................9

**FEDERAL STATUTES**

49 U.S.C. § 60118(c)(2)(A) ........................................................................................8

**STATE STATUTES**

Cal. Code Civ. Proc. § 392 ......................................................................................10

Cal. Code Civ. Proc. § 397(c) ..................................................................................13

Cal. Code Civ. Proc. § 472, subd. (a) ........................................................................5

Cal. Pub. Res. Code § 30262 ....................................................................................8

Civ. Code § 658 ......................................................................................................10

Civ. Code § 660 ......................................................................................................10

Elder California Pipeline Safety Act of 1981 ..........................................................12

§ 51014.1 of the Government Code ............................................................................7

**SUPPLEMENTAL SOURCES**

50 Cal. Forms of Pleading & Practice, Annotated (2021) § 571.17 ........................10

RESPONSE IN OPPOSITION TO MOTION TO CHANGE VENUE

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 716 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 19   Filed 02/20/26   Page 352 of 464
ID #:17759

## INTRODUCTION

Defendant State of California's (the "State") Motion to Change Venue (the "Motion") attempts to piecemeal the Santa Ynez Pipeline System—an active pipeline with significant portions located in Kern County—in a manner inconsistent with both the operation of an integrated pipeline and the plain language of SB 237. The Santa Ynez Pipeline System (or the "Pipeline System") has been continually repaired and maintained, and crude oil has been flowing through portions of the Pipeline System since May 2025. Moreover, the entire Santa Ynez Pipeline System is now an interstate pipeline under the jurisdiction of the federal Pipeline and Hazardous Materials Safety Administration ("PHMSA").[1] Since assuming jurisdiction, PHMSA confirmed the Pipeline System's active status on December 17, 2025, approved Plaintiff's Restart Plan for Segments CA-324 and CA-325 of the Pipeline System on December 22, 2025, and issued an Emergency Special Permit for those Segments on December 23, 2025. (RJN, Exs. A through C.) The Santa Ynez Pipeline System is therefore an active pipeline ready to resume transportation of crude oil throughout the entirety of the System pursuant to PHMSA's approvals.

The State relies on self-serving attorney declarations to argue venue should be transferred to Santa Barbara County because certain portions of the Santa Ynez Pipeline System run through there, and certain approvals under SB 237, if required, would need to be issued by the Coastal Commission. Even if the State's extraneous facts were properly considered on a motion to change venue (they are not), the State's Motion fails on its merits. Plaintiff Pacific Pipeline Company filed its action in Kern County for a very simple reason: the Santa Ynez Pipeline System operates in and will ultimately deliver crude oil to Kern County. This case challenges SB 237's application to

---

[1] Concurrently with this Response, Pacific Pipeline Company filed its Verified First Amended Complaint ("FAC") pursuant to California Code of Civil Procedure Section 472, subdivision (a) to plead additional facts and a separate cause of action related to PHMSA's assumption of jurisdiction and actions taken with respect to the Santa Ynez Pipeline System in December of 2025. "Because there is but one complaint in a civil action, the filing of an amended complaint moots a motion directed to a prior complaint." (See *Sylmar Air Conditioning v. Pueblo Contracting Services, Inc.* (2004) 122 Cal.App.4th 1049, 1054; *State Compensation Ins. Fund v. Superior Court* (2010) 184 Cal.App.4th 1124, 1131.) The State's Motion is therefore mooted by the FAC. To the extent the Court determines the Motion or any portion thereof remains live, Pacific Pipeline Company responds to the Motion as set forth herein.

RESPONSE IN OPPOSITION TO MOTION TO CHANGE VENUE

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 717 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 10   Filed 02/20/26   Page 353 of 464
ID #:17760

an integrated pipeline system that extends over 135 miles into Kern County and terminates there; it cannot be reduced to its segments in Santa Barbara as the State contends. Moreover, the State's arguments on mootness and justiciability go to the substance of Plaintiff's claims, not whether venue is proper in Kern County. Deciding venue on those bases would be improper. And finally, the State's argument on convenience of witnesses and interests of justice is unsupported by evidence and prohibited at this early stage. Throughout its Motion, the State misapplies the law and prematurely litigates the substance of what it unilaterally ascertains to be the sole "potentially judiciable claim" in this case. Its Motion should be denied.

### STATEMENT OF FACTS

Sable Offshore Corp. ("Sable") is the lessee and operator of federal offshore oil and gas leases in federal waters off the coast of California that form the Santa Ynez Unit. (FAC ¶ 2.)[2] Sable operates the interconnected Santa Ynez Pipeline System, which consists of offshore pipeline infrastructure, onshore processing and storage facilities, and two onshore pipeline segments that have been referred to as Lines CA-324 and CA-325 and as the Las Flores Pipeline (collectively, "Segments CA-324 and CA-325"). (*Ibid.*) In February 2024, Sable acquired the Santa Ynez Unit oil production infrastructure (the "SYU Facilities") and Pacific Pipeline Company, which owns Segments CA-324 and CA-325. (*Ibid.*)

Portions of the Santa Ynez Pipeline System are located in Kern County, San Luis Obispo County, and an unincorporated area of Santa Barbara County. (FAC ¶ 1.) Since the acquisition in February 2024, Pacific Pipeline Company has worked with federal and state agencies toward resuming petroleum production from the SYU Facilities through the Santa Ynez Pipeline System, including performing repair and maintenance work on Segments CA-324 and CA-325. (FAC ¶ 3.)

---

[2] The FAC supersedes the original Complaint, which "ceases to perform any function as a pleading" upon filing of an amended complaint. (See *Foreman & Clark Corp. v. Fallon* (1975) 3 Cal.3d 875, 884, quoting *Meyer v. State Board of Equalization* (1954) 42 Cal.2d 376, 384.) The FAC now furnishes "the sole basis for the cause of action, and the original complaint ceases to have any effect either as a pleading or a basis for judgment." (*Anmaco, Inc. v. Bohlken* (1993) 13 Cal.App.4th 891, 901.) All citations herein are therefore to the FAC, which is the operative complaint in this action.

- 6 -

RESPONSE IN OPPOSITION TO MOTION TO CHANGE VENUE

The SYU Facilities consist of sixteen federal leases across approximately 76,000 acres of outer continental shelf and produce crude oil and natural gas from platforms located in federal waters off the California Coast in the Santa Barbara Channel. (FAC ¶ 18.) Oil and gas is transported through the Santa Ynez Pipeline System's offshore pipeline infrastructure to the Pipeline System's onshore processing facilities in Las Flores Canyon, and then Segments CA-324 and CA-325 transport oil from Las Flores Canyon to the Gaviota and Pentland Stations further downstream. (FAC ¶¶ 2, 18, 19, 20.) The Gaviota Pump Station, the end point of Segment CA-324, is located in Santa Barbara County. (FAC ¶ 24.) The Pentland Delivery Point, the end point of Segment CA-325, is located in the San Joaquin Valley in Kern County. (FAC ¶ 23.)

In the late 1980s, Segments CA-324 and CA-325 received their initial approvals and development permits. (FAC ¶¶ 25-27.) In May 2015, a leak and oil spill occurred along Segment CA-324 in Santa Barbara County. (FAC ¶ 29.) Segments CA-324 and CA-325 remained active after this leak – these segments were filled with nitrogen to prevent oxidation and internal corrosion, and the cathodic protection system remains active, regularly inspected, and maintained. (*Id.*) In May 2024, Pacific Pipeline Company began anomaly repairs to Segments CA-324 and CA-325, which were completed under OSFM supervision. (FAC ¶ 34.)

As of May 2025, Sable resumed petroleum transportation from the SYU Facilities' offshore platforms through the Santa Ynez Pipeline System to storage facilities in Las Flores Canyon. (FAC ¶ 36.) Since the pause in production related to the spill, Pacific Pipeline Company and its predecessors always intended to resume petroleum transportation through Segments CA-324 and CA-325. (FAC ¶ 37.) Pacific Pipeline Company and its predecessors never abandoned Segments CA-324 and CA-325 and continued to maintain and repair the Segments. (*Ibid.*)

In September 2025, the California Legislature passed, and Governor Newsom signed into law, SB 237. (FAC ¶ 38.) SB 237 went into effect on January 1, 2026, and is not retroactive. (FAC ¶ 59.) Among other things, SB 237 adds Section 51014.1 of the Government Code, which states in part: "[a]ny existing oil pipeline that is six inches or larger that has been idle, inactive, or out of service for five years or more, shall not be restarted without passing a spike hydrostatic testing

-7-
RESPONSE IN OPPOSITION TO MOTION TO CHANGE VENUE

program." (FAC ¶ 39.) SB 237 separately amends Section 30262 of the Coastal Act to provide requirements for coastal development permits ("CDPs") for pipelines that have been "idled, inactive, or out of service" for five years or more. (FAC ¶ 40.) While state law does not define "idle," "inactive," and "out of service," analogous terms are defined or described by PHMSA. (FAC ¶ 41.)

On December 17, 2025, PHMSA determined that the entirety of the Santa Ynez Pipeline System, including Segments CA-324 and CA-325, is an interstate pipeline subject to PHMSA's exclusive jurisdiction. (FAC ¶ 51.) This determination eliminated any jurisdiction OSFM had over Segments CA-324 and CA-325. (RJN, Ex. A, p. 2.) In making its determination that the Santa Ynez Pipeline System is an interstate pipeline, PHMSA notified OSFM that Segments CA-324 and CA-325 are "subject to the regulatory oversight of PHMSA." (*Ibid.*, pp. 2–3.) On December 22, 2025, PHMSA approved Plaintiff's Restart Plan for Segments CA-324 and CA-325 (the "Restart Approval"). (RJN, Ex. B.) On December 23, 2025, PHMSA granted Plaintiff an "emergency special permit" for Segments CA-324 and CA-325 pursuant to 49 U.S.C. Section 60118(c)(2)(A) (the "Emergency Special Permit"). (RJN, Ex. 3, p. 2.) With the Restart Approval and the Emergency Special Permit, no other PHMSA approvals or permits are necessary to flow oil through the entirety of the Santa Ynez Pipeline System, including Segments CA-324 and CA-325. Given PHMSA's assertion of jurisdiction over the entirety of the Santa Ynez Pipeline System as an interstate pipeline, OSFM is without jurisdiction to regulate Segments CA-324 and CA-325, or any other portion of the Pipeline System. (FAC ¶ 55.)

Pacific Pipeline Company brought this declaratory action to determine its rights and obligations under SB 237. In particular, Pacific Pipeline Company seeks a declaration regarding: 1) whether the requirements associated with idle, inactive, or out of service pipelines apply to the Santa Ynez Pipeline System, including Segments CA-324 and CA-325; and 2) whether the application of SB 237 as to the Santa Ynez Pipeline System is preempted by federal law. The duties and obligations arising under SB 237, if they are not preempted by federal law, would impact Pacific Pipeline Company's ability and timeline to resume petroleum transportation across the

- 8 -

RESPONSE IN OPPOSITION TO MOTION TO CHANGE VENUE

entire Pipeline System. As such, SB 237 impacts all counties associated with the Santa Ynez Pipeline System, including Kern County, where crude oil is ultimately delivered.

## LEGAL STANDARD

Venue is determined from "the complaint on file at the time the motion to change venue is made." (*Brown v. Superior Court* (1984) 37 Cal.3d 477, 482.) The trial court is therefore confined to the complaint's allegations, together with only those facts "which were judicially noticed," when evaluating a venue motion. (*Haines v. Lamb* (1962) 206 Cal.App.2d 322, 325.) In determining a motion for a change in venue, "the court must accept as true the material allegations of the complaint which are not controverted." *(Freedman v. Imperial Cattle Co.* (1952) 112 Cal. App. 2d 593).

A plaintiff's choice of venue is presumptively correct, and the defendant bears the burden of demonstrating that venue is improper in the selected forum. (See *Battaglia Enterprises, Inc. v. Superior Court* (2013) 215 Cal.App.4th 309, 313–314; *Easton v. Superior Court* (1970) 12 Cal. App. 3d 243, 247.) And, absent narrow, inapplicable circumstances, "upon a motion for change of venue, the court should not try disputed issues of fact going to the merits of the cause, upon the conflicting affidavits, in order to determine whether or not a cause of action does in reality exist." (*White v. Kaiser-Frazer Corp.* (1950) 100 Cal.App.2d 754, 758.)

## ARGUMENT

Venue is clearly proper in Kern County, where significant portions of the Santa Ynez Pipeline System, including Segment CA-325's delivery point, are situated. The State improperly advances arguments on the substance of Plaintiff's claims, which are not properly adjudicated on a motion to transfer venue. Finally, the State's argument regarding a change in venue for the convenience of witnesses and to serve the ends of justice is premature at this early stage. The State's Motion should be denied.

//

//

-9-

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 721 of 837   Page
ID #:17764
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 357 of 464

I.    **Kern County is the Proper Venue Because Large Portions of the Pipeline System are Situated in Kern County.**

First, the State asserts that venue is improper in Kern County because "no portion of the [Santa Ynez Pipeline System] that is potentially affected by SB 237's coastal permit requirement … is in Kern County." (Mot. at 5.)

Not so. California Code of Civil Procedure Section 392 establishes proper venue for actions concerning real property. Under Section 392, venue is proper "in the superior court [of] the county where the real property that is the subject of the action, or some part thereof, is situated." (See also 50 Cal. Forms of Pleading & Practice, Annotated (2021) § 571.17 [citing *Goldtree v. McAllister* (1890) 86 Cal. 93, 106] [explaining that, under the relevant section, venue is proper "in any county in which any part of real property is situated"].) Real property includes all that is "affixed to land." (Civ. Code § 658.) Property is affixed to land when that property is "imbedded in it, as in the case of walls; or permanently resting upon it, as in the case of buildings; or permanently attached to what is permanent, by means of cement, plaster, nails, bolts or screws." (Civ. Code § 660.)

As the State concedes, "it is reasonable to assume that much of the [Santa Ynez Pipeline System's segments] are attached to land." (Mot. at 15, n.7.) Recognizing that Section 392 "may be appropriately applied here," the State cannot escape that significant portions of the Santa Ynez Pipeline System, including Segment CA-325's delivery point, are situated in Kern County and affixed to the land here. On that basis alone, venue is proper.

So instead, the State breaks the Santa Ynez Pipeline System into pieces, ignoring the stretch of Segment CA-325 in Kern County—which could be inoperable if SB 237 applied—and focusing on Santa Barbara County's issuance of Coastal Development Permits within the Coastal Zone. But the repair and maintenance that could be covered by such a Coastal Development Permit does not exist in a silo and would instead impact the operation of the integrated Pipeline System as a whole. The plain text of SB 237 accounts for this reality and purports to regulate pipelines system-wide, turning on whether "an existing oil pipeline" has been "idle, inactive, or out of service" for the relevant period instead of treating pipelines as severable pieces. (FAC ¶ 6.) The Complaint and

- 10 -

RESPONSE IN OPPOSITION TO MOTION TO CHANGE VENUE

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 722 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 15   Filed 02/20/26   Page 358 of 464
ID #:17765

FAC follow the singular language of the statute, asserting that SB 237 does not apply because the Santa Ynez Pipeline System, as an integrated system, has retained its active status since at least 2015. (See FAC ¶ 9.) The State's effort to rewrite the statute to isolate Segments CA-324 and CA-325 as a Santa Barbara-exclusive "subject" of this action should be rejected.

## II. The State Raises Premature Merits Arguments, Which Also Fail.

The State argues that a challenge to SB 237's stress hydrostatic testing requirements is moot and nonjusticiable because the same test may already be required under certain State Waivers.[3] Mootness and justiciability are legal questions about the merits of a cause of action. They have no bearing on venue. (See *County of San Bernardino v. Superior Court* (1994) 30 Cal.App.4th 378 [explaining that courts cannot transfer venue based on substantive considerations but must adhere to the statutory scheme]; *McCarthy v. Superior Court* (1987) 191 Cal.App.3d 1023 [holding that trial judges cannot make rulings on the substance of a plaintiff's action while venue is in question].)

California law is clear: "[u]pon a motion for change of venue, the court should not try disputed issues of fact going to the merits of the cause, upon the conflicting affidavits, in order to determine whether or not a cause of action does in reality exist against the resident defendant." (*Freedman v. Imperial Cattle Co.* (1952) 112 Cal.App.2d 593, 596; see also *Ward Mfg. Co. v. Miley* (1955) 131 Cal.App.2d 603, 608 [explaining that it is "not the function of the trial judge to consider the merits of plaintiff's plea" when deciding whether venue is appropriate].) Further, when considering a defendant's motion to change venue, the defendant's "statement of a legal

---

[3] In support of its argument, Defendant cites irrelevant case law concerning fraudulent joinder and sham litigation. (See *Housing Group v. United Nat. Ins. Co.* (2001) 90 Cal. App.4th 1106, 1111-1112; *Freeman v. Dowling* (1933) 219 Cal. 213, 216.) The line of cases invoked by Defendant requires the complaint to have been filed in bad faith, "so glaringly and vitally defective as to be beyond correction by amendment." (*Mills v. Brown* (1928) 205 Cal. 38, 41.) However, for all the reasons enumerated in the Complaint and the FAC, this action has not been brought in bad faith. There is a clear case in controversy before this Court, as Plaintiff seeks a declaration that SB 237 is inapplicable to the Las Flores Pipeline, which has been active since long before the law's effective date (January 1, 2026). Plaintiff's FAC further demonstrates that SB 237 is preempted as to the Las Flores Pipeline, which is now under the exclusive jurisdiction of PHMSA.

- 11 -

RESPONSE IN OPPOSITION TO MOTION TO CHANGE VENUE

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 723 of 837    Page
ID #:17766
Case 1:26-cv-01486-KES-CDB    Document 16    Filed 02/20/26    Page 359 of 464

conclusion in support of a motion is ineffective, and provides no sufficient support for an order granting the motion." (*Richardson v. Rose* (1961) 197 Cal.App.2d 318, 320.)

Even if mootness were properly considered on a motion to transfer venue, the State's argument fails on the merits. Here, the testing requirements under SB 237 impose different liabilities than those under the State Waivers. As one example, SB 237 violations of the Elder California Pipeline Safety Act of 1981 constitute a crime. (SB 237 Legislative Digest, Filed with Secretary of State September 19, 2025 at (2) [explaining that "[a]ny violation" of the provision at issue "would constitute a crime"].) Under SB 237, the Act now prohibits the restart of an existing oil pipeline that is six inches or larger that has been idle, inactive, or out of service for five years or more without passing a hydrostatic testing program that meets the requirements established by the State Fire Marshal. Any violation of that provision would constitute a crime, potentially imposing more severe liabilities on Plaintiff than could be imposed under the State Waivers.

Moreover, as demonstrated by the exhibits attached to Plaintiff's Request for Judicial Notice, the requirements of the State Waivers have now been mooted with PHMSA's assumption of jurisdiction over the Santa Ynez Pipeline System. Segments CA-324 and CA-325 are portions of the Santa Ynez Pipeline System, which had been considered intrastate since 2016 and thus subject to OSFM's regulatory oversight. (RJN, Ex. A, p. 1.) However, on December 17, 2025, PHMSA determined that the entire Santa Ynez Pipeline System (including Segments CA-324 and CA-325) is an "interstate pipeline" that is subject to PHMSA's exclusive jurisdiction and notified OSFM that the Santa Ynez Pipeline System is "subject to the regulatory oversight by PHMSA." (*Id.*, pp. 2–3.) Since assuming federal jurisdiction over the Pipeline System, PHMSA granted all remaining approvals necessary to resume petroleum transportation through Segments CA-324 and CA-325, including approval of the Restart Plan (which is now under PHMSA's jurisdiction, not OSFM's) and issuance of the Emergency Special Permit. (RJN, Exs. B and C.) The Emergency Special Permit is the federal equivalent and takes the place of the State Waivers. (See RJN, Ex. C, p. 2.)

- 12 -
RESPONSE IN OPPOSITION TO MOTION TO CHANGE VENUE

Because SB 237 imposes additional obligations and liabilities on Plaintiff's operation of the Santa Ynez Pipeline System, declaratory judgment from the Court would provide relief regarding Plaintiff's rights and duties and is therefore not moot.

### III.    A Motion to Transfer Venue for the Convenience of Witnesses and the Ends of Justice is Premature Before an Answer is Filed.

Finally, the State requests to transfer venue under CCP § 397(c), arguing Santa Barbara County would serve the interests of justice and be more convenient for nonparty witnesses. (Mot. at 17-18.) This is premature because "a motion to transfer venue on such ground cannot be made before an answer is filed." (*Easton*, 12 Cal. App. 3d at 245 ["The matter of convenience of witnesses was not properly before the court, because [defendant] had not filed its answer. Only then could the court ascertain what the issues and the evidence relating to those issues would be. Before the answer is filed, the court cannot determine whether the witnesses whose convenience is involved have material testimony to offer..."]; *Cholakian & Assocs. v. Superior Court* (2015) 236 Cal. App. 4th 361, 372; *Pearson v. Superior Court* (1962) 199 Cal. App. 2d 69, 74 (1962) ["A motion for change of venue on the ground of the convenience of witnesses will not be entertained when the defendant has not filed an answer..."]).

In support of its argument, the State broadly claims that "the only potential witnesses in this action are officials or staff members" of the Coastal Commission or OSFM. (Mot. at 17.) However, Plaintiff's Complaint did not identify any witnesses from the Coastal Commission or OSFM. The State's argument about potential or hypothetical witnesses is therefore purely speculative and is not grounds for a change in venue. Moreover, there is no evidence to suggest that Santa Barbara would somehow be a more convenient venue for Coastal Commission or OSFM witnesses, who are expected to be primarily located in Sacramento and San Francisco where the agencies' main offices are located—locations that are closer to Kern County.

The State also argues that the "ends of justice" favor transfer, because "most of the work for restarting the pipelines, and the potential impacts of doing so, will be felt in Santa Barbara County." (Mot. at 18.) In support, the State points to authority indicating that permitting view of

- 13 -
RESPONSE IN OPPOSITION TO MOTION TO CHANGE VENUE

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 725 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 9    Filed 02/20/26    Page 361 of 464
ID #:17768

the scene or making material evidence available promotes the ends of justice. However, this case is not an environmental damages action requiring on-site fact-finding. It is a declaratory action on asking the court to interpret SB 237's terms and evaluate certain evidence regarding the pipeline's operational history, which does not depend on venue location in any particular county. Instead, the Court will be interpreting SB 237's terms ("idle," "inactive," etc.), considering the impact of PHMSA regulations on such interpretation, and evaluating certain evidence regarding the pipeline's operational history. These tasks do not depend on any judge's personal observation of Santa Barbara geography or conditions. The prior oil spill and coastal resources are part of the background context, but they are undisputed historical facts that can be presented through the record. A venue change to Santa Barbara would thus yield no improvement in access to proof or justice; it would only shift the forum away from a county with a concrete connection to the case and a significant interest in its outcome.

## CONCLUSION

The State ignores the key purpose of the dispute: declaring Plaintiff's rights and duties under the inapplicable and now preempted SB 237 as to an active pipeline system that operates throughout Santa Barbara, San Luis Obispo, and Kern Counties, a major delivery point located in the county where this action was filed. Plaintiff's operation of the pipeline system will bring oil to the state's refineries, create jobs in Kern County, and bolster in-state oil production. The pipeline system's impact will be felt in Kern, even if portions of the system operate in other counties as well. Venue is proper in Kern County because impermissible hurdles to the operation of the pipeline apply to the pipeline as a whole, including where delivery is intended to occur. Kern County has a concrete connection to this case and a significant interest in its outcome, and as such, venue here is appropriate.

//

//

//

- 14 -
RESPONSE IN OPPOSITION TO MOTION TO CHANGE VENUE

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 726 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 362 of 464
ID #:17769

Respectfully submitted,

DATED:  January 21, 2026

**ALSTON & BIRD LLP**

By: _____

JEFFREY D. DINTZER

Attorney for Plaintiff
PACIFIC PIPELINE COMPANY

- 15 -

RESPONSE IN OPPOSITION TO MOTION TO CHANGE VENUE

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 727 of 837   Page
Case 1:26-cv-01486-KES-CDB    Document 10    Filed 02/20/26    Page 363 of 464
ID #:17770

**PROOF OF SERVICE**

I, **Kim Niz**, declare:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Alston & Bird LLP, 350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071.

On January 21, 2026, I served the document(s) **PACIFIC PIPELINE COMPANY'S RESPONSE IN OPPOSITION TO DEFEDANT'S MOTION TO CHANGE VENUE** on the interested parties stated below, by the following means of service:

Brandon Walker
Jack C. Nick
Isabella A. Panuccini
1300 I Street, Suite 125
Sacramento, CA 95814
Telephone: (916) 210-6395
Fax: (916) 327-2319
Brandon.Walker@doj.ca.gov
Jack.Nick@doj.ca.gov
Isabella.Panuccini@doj.ca.gov
Attorneys for Defendant State of California

☒ BY ELECTRONIC SERVICE on the date stated below, I caused the document(s) described above to be served electronically on the recipients designated on the Transaction Receipt pursuant to the parties' stipulation establishing the authorizing e-service of documents.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on January 21, 2026, at Los Angeles, California.

/s/ Kim Niz
Kim Niz

RESPONSE IN OPPOSITION TO MOTION TO CHANGE VENUE

ELECTRONICALLY FILED
Superior Court of California,
County of Kern
By: Marina Mercado
Deputy Clerk
01/21/26 7:37 PM

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
jeffrey.dintzer@alston.com
GARRETT B. STANTON, SBN 324775
garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071-1410
Telephone:     (213) 576-1000
Facsimile:     (213) 576-1100

**PAUL HASTINGS LLP**
BENJAMIN J. HANELIN, SBN 237595
benjaminhanelin@paulhastings.com
NATALIE C. ROGERS, SBN 301254
natalierogers@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067
Telephone:     (310) 620-5879
Facsimile:     (310) 620-5899

Attorneys for Plaintiff
PACIFIC PIPELINE COMPANY

### SUPERIOR COURT OF CALIFORNIA

### COUNTY OF KERN

### METROPOLITAN DIVISION

| | |
|---|---|
| PACIFIC PIPELINE COMPANY,<br><br>Plaintiffs,<br><br>v.<br><br>STATE OF CALIFORNIA and DOES 1 through 25,<br><br>Defendants. | Case No. BCV25103508<br><br>**PACIFIC PIPELINE COMPANY'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO CHANGE VENUE; DECLARATION OF GARRETT B. STANTON**<br><br>*[Filed concurrently with Response in Opposition to Defendant's Motion to Change Venue]*<br><br>Date:        February 3, 2026<br>Time:        8:30 a.m.<br>Dept.        H<br>Judge:       Hon. Bernard C. Barmann, Jr.<br><br>Action Filed: September 29, 2025 |

- 1 -

REQUEST FOR JUDICIAL NOTICE; DECLARATION OF GARRETT B. STANTON

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 729 of 837    Page
ID #:17772
Case 1:26-cv-01486-KES-CDB    Document 12    Filed 02/20/26    Page 365 of 464

## REQUEST FOR JUDICIAL NOTICE

Pursuant to Evidence Code sections 452 and 453, Plaintiff Pacific Pipeline Company hereby requests that the Court take judicial notice of the following document in support of Plaintiff's Response in Opposition to Defendant's Motion to Change Venue (the "Response").

1.      Attached hereto as **Exhibit A** is a true and correct copy of the December 17, 2025 letter from the Pipeline and Hazardous Materials Safety Administration ("PHMSA") issued to Sable Offshore Corporation ("Sable").

2.      Attached hereto as **Exhibit B** is a true and correct copy of the December 22, 2025 PHMSA approval of Sable's Restart Plan.

3.      Attached hereto as **Exhibit C** is a true and correct copy of the December 23, 2025 Emergency Special Permit granted by PHMSA to Sable.

Exhibits A through C constitute "official acts" of an executive department of the United States within the meaning of Evidence Code section 452, subdivision (c). Exhibits A through C are necessary to respond to Defendant State of California's (the "State") argument that a challenge to SB 237's stress hydrostatic testing requirements is moot and nonjusticiable because the same test is already required under certain State Waivers issued by the California Office of the State Fire Marshal ("OSFM").

Exhibits A through C are relevant to Plaintiff's Response because they demonstrate the Santa Ynez Pipeline System (including Segments CA-324 and CA-325) is now an interstate pipeline subject to PHMSA's jurisdiction, the requirements of the State Waivers issued by OSFM are now moot and preempted, and the Santa Ynez Pipeline System is now ready to resume transportation of crude oil through its entirety pursuant to PHMSA's approvals. More specifically, Exhibit A demonstrates that OSFM no longer retains any regulatory oversight over Segments CA-324 and CA-325 and was notified by PHMSA on December 17, 2025 that the Santa Ynez Pipeline System is now subject to PHMSA's jurisdiction. Exhibit B demonstrates that on December 22, 2025, PHMSA approved Sable's Restart Plan for Segments CA-324 and CA-325. Exhibit C

- 2 -

REQUEST FOR JUDICIAL NOTICE; DECLARATION OF GARRETT B. STANTON

demonstrates that on December 23, 2025, PHMSA granted Sable an Emergency Special Permit for Segments CA-325 and CA-325.

Evidence Code section 452, subdivision (c) "enables courts in California to take notice of a wide variety of official acts . . . [and] an expansive reading must be provided to certain of its phrases[;] included in 'executive' acts are those performed by administrative agencies." (*Scott v. JPMorgan Chase Bank, N.A.* (2013) 214 Cal.App.4th 743, 752-52, citing Simons, California Evidence Manual (2013) Judicial Notice § 7:11, p. 558.) The Court may therefore properly take judicial notice of Exhibits A through C pursuant to Evidence Code section 452, subdivision (c).

In accordance with Evidence Code section 453, Plaintiff has given the State sufficient notice of this request to enable it to meet the request, and Plaintiff has also furnished the Court with sufficient information to take judicial notice of Exhibits A through C.

Respectfully submitted,

DATED: January 21, 2025

**ALSTON & BIRD LLP**

By: _____
JEFFREY D. DINTZER
Attorney for Plaintiff
PACIFIC PIPELINE COMPANY

- 3 -

REQUEST FOR JUDICIAL NOTICE; DECLARATION OF GARRETT B. STANTON

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 731 of 837   Page
Case 1:26-cv-01486-KES-CDB    Document 14    Filed 02/20/26    Page 367 of 464
ID #:17774

## DECLARATION OF GARRETT B. STANTON

I, Garrett B. Stanton, declare as follows:

1.    I am an attorney duly licensed to practice law before all courts of the State of California. I am a senior associate at Alston & Bird LLP, counsel of record for Plaintiff Pacific Pipeline Company. I make this declaration in support of Plaintiff's Request for Judicial Notice. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently to them.

2.    I am familiar with the case files for this matter. The files for this matter are maintained by various attorneys, legal assistants, and other firm employees in a secure electronic format at the offices of Alston & Bird LLP.

3.    Attached as **Exhibit A** is a true and correct copy of a letter, dated December 17, 2025, issued by PHMSA to Sable. I received a copy of this letter from Plaintiff, whereupon I stored it on Alston & Bird LLP's secure electronic file management system. In preparing this declaration, I retrieved the true and correct copy of the document described as **Exhibit A** from Alston & Bird LLP's secure electronic file management system and prepared it for inclusion in my declaration.

4.    Attached as **Exhibit B** is a true and correct copy of a letter, dated December 22, 2025, issued by PHMSA to Sable. I received a copy of this letter from Plaintiff, whereupon I stored it on Alston & Bird LLP's secure electronic file management system. In preparing this declaration, I retrieved the true and correct copy of the document described as **Exhibit B** from Alston & Bird LLP's secure electronic file management system and prepared it for inclusion in my declaration.

/ / /

/ / /

/ / /

/ / /

- 4 -
REQUEST FOR JUDICIAL NOTICE; DECLARATION OF GARRETT B. STANTON

5.      Attached as **Exhibit C** is a true and correct copy of an Emergency Special Permit dated December 23, 2025, issued by PHMSA to Sable. I received a copy of this Emergency Special Permit from Plaintiff, whereupon I stored it on Alston & Bird LLP's secure electronic file management system. In preparing this declaration, I retrieved the true and correct copy of the document described as **Exhibit C** from Alston & Bird LLP's secure electronic file management system and prepared it for inclusion in my declaration.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 21st day of January, 2026, in Bakersfield, California.


GARRETT B. STANTON
Attorney for Plaintiff
PACIFIC PIPELINE COMPANY

REQUEST FOR JUDICIAL NOTICE; DECLARATION OF GARRETT B. STANTON

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 733 of 837   Page
Case 1:26-cv-01486-KES-CDB      Document 1     Filed 02/20/26     Page 369 of 464
ID #:17776

# EXHIBIT A

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 734 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 17    Filed 02/20/26    Page 370 of 464
ID #:17777



U.S. Department
of Transportation

1200 New Jersey Avenue SE
Washington, D.C. 20590

**Pipeline and Hazardous
Materials Safety
Administration**

December 17, 2025

Via Electronic Mail to: cflores@sableoffshore.com

J. Caldwell Flores
President and Chief Operating Officer
Sable Offshore Corp.
845 Texas Ave. Ste 2920
Houston, TX 77002

Re:  Determination of Interstate Classification

Dear Mr. Flores:

This responds to your letter of November 26, 2025 regarding the Las Flores Pipeline owned and
operated by Sable Offshore Corp. (Sable). Your letter notifies the Pipeline and Hazardous
Materials Safety Administration (PHMSA) that Sable has determined the pipeline to be an
interstate pipeline facility under the Pipeline Safety Act (PSA) and requests PHMSA transition
regulatory oversight from the California Office of the State Fire Marshal (OSFM) to PHMSA.

As noted in your letter, portions of the Las Flores Pipeline (previously known as Lines 901 and
903) have been considered intrastate since 2016 and subject to regulatory oversight by OSFM
pursuant to its certification with PHMSA under 49 U.S.C. § 60105(a). Prior to 2016, Lines 901
and 903 were considered interstate and regulated by PHMSA. The classification change in 2016
corresponded to the pipelines' previous owner cancelling tariffs with the Federal Energy
Regulatory Commission (FERC). In 2024, Sable acquired Lines 901 and 903 and other assets
comprising the Las Flores Pipeline, including offshore pipelines transporting crude oil from the
Outer Continental Shelf (OCS) and an onshore processing facility at Las Flores Canyon. Sable
operates the Las Flores Pipeline assets as a single pipeline system transporting crude oil from the
OCS to the Pentland Station terminal in Kern County, California.

Upon receipt of your letter, PHMSA initiated a review of the Las Flores Pipeline. This review
included an on-site inspection on December 9 through December 11, 2025. OSFM
representatives accompanied PHMSA on the inspection. PHMSA also reviewed Sable's written
procedures and records and conducted field observations of the Las Flores facility, the pump
stations at Gaviota and Sisquoc, the control room in Santa Maria, and the offshore Harmony
platform. In addition, PHMSA reviewed the 2025 program inspections conducted by OSFM. For

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 735 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 18    Filed 02/20/26    Page 371 of 464

2

the following reasons, PHMSA agrees with your determination that the Las Flores Pipeline is an interstate pipeline.

The PSA authorizes PHMSA to prescribe and enforce minimum safety standards for pipeline transportation and for pipeline facilities.[1] The PSA vests with PHMSA exclusive regulatory authority over interstate pipelines and preempts States from adopting or continuing in force safety standards for interstate pipelines.[2] With respect to intrastate pipelines, the PSA provides a State authority may regulate the intrastate pipelines within its borders upon submission to PHMSA of an annual certification.[3] Both the PSA and the Federal pipeline safety regulations define interstate and intrastate pipelines.[4] An interstate pipeline is a pipeline or part of a pipeline used to transport hazardous liquids in interstate or foreign commerce; an intrastate pipeline is a hazardous liquid pipeline that is not an interstate pipeline.

Determining whether a hazardous liquid pipeline is an interstate or intrastate pipeline requires a factual inquiry.[5] To assist in that determination, PHMSA adopted Appendix A to 49 CFR Part 195 providing a statement of agency policy and interpretation on the delineation between Federal and State jurisdiction.[6] In short, "if there is a tariff or concurrence filed with FERC governing the transportation of hazardous liquids over a pipeline facility . . . then [PHMSA] will, as a general rule, consider the facility to be an interstate pipeline facility within the meaning of the [PSA]." The absence of a FERC tariff generally means a pipeline is intrastate; however, in certain situations, PHMSA will consider a pipeline to be interstate despite the lack of a filing with FERC. Several examples of this are listed in Appendix A. As it relates to the Las Flores Pipeline, one example provides that a pipeline originating on the OCS will be considered an interstate pipeline even if the pipeline does not have a tariff with FERC.[7]

PHMSA's evaluation of the Las Flores Pipeline confirms that it transports crude oil from the OCS to an onshore processing facility at Las Flores Canyon and continues the transportation of crude oil from Las Flores Canyon to Pentland, California. Consistent with Appendix A, the Las

---

[1] 49 U.S.C. § 60101 et seq.

[2] 49 U.S.C. § 60104(c). *See* Olympic Pipe Line Co. v. City of Seattle, 437 F.3d 872, 878 (9th Cir. 2006) (discussing how the "PSA differentiates between the regulation of interstate and intrastate hazardous liquid pipelines.")

[3] 49 U.S.C. § 60105(a). OSFM has a certification with PHMSA to regulate intrastate hazardous liquid pipelines in California.

[4] 49 U.S.C. § 60101(a)(7), (a)(8)(B), (a)(10); 49 CFR § 195.2. *See* S. Pac. Pipe Lines Inc. v. DOT, 796 F.2d 539 (D.C. Cir. 1986) (finding PHMSA's definition of interstate and intrastate pipelines reasonable under the PSA).

[5] Transportation of Liquids by Pipeline, 46 Fed. Reg. 38,357, 38,359 (Jul. 27, 1981) (PHMSA's predecessor agency (hereafter PHMSA) explained that it had "reviewed examples of what it believes are the most frequent and likely configurations of liquid pipelines and pipeline facilities and considered various ways of cataloging or classifying them as either interstate or intrastate."); *see also* Shell Oil Co. v. City of Santa Monica, 830 F.2d 1052, 1064 (9th Cir. 1987) (noting that whether the pipeline was interstate or intrastate turned on a disputed issue of fact).

[6] Transportation of Hazardous Liquids by Pipeline; Regulation of Intrastate Pipelines, 50 Fed. Reg. 15,895, 15,897 (Apr. 23, 1985).

[7] 49 CFR Part 195, App. A. "Example 7. Pipeline Company P operates a pipeline that originates on the Outer Continental Shelf. P does not file any tariff for that line with FERC. [PHMSA] will consider the pipeline to be an interstate pipeline facility."

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 736 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 19    Filed 02/20/26    Page 372 of 464
ID #:17779

3

Flores Pipeline is an interstate pipeline.[8] As portions of the Las Flores Pipeline were previously considered to be intrastate and regulated by OSFM, PHMSA is notifying OSFM that the Las Flores Pipeline is subject to the regulatory oversight of PHMSA. Please direct further correspondence on this matter to Dustin Hubbard, Director, Western Region, Office of Pipeline Safety, PHMSA, at (720) 963-3183.

Sincerely,

Linda Daugherty
Acting Associate Administrator for Pipeline Safety

cc:    James Hosler, Chief, Pipeline Safety Division, OSFM
       Varun Shekhar, Shareholder, Babst Calland Clements & Zomnir, PC

---

[8] PHMSA regulations consider the Las Flores Pipeline to be an "active" pipeline. *See* Pipeline Safety: Clarification of Terms Relating to Pipeline Operational Status, 81 Fed. Reg. 54,512 (Aug. 12, 2016) ("The regulations consider pipelines to be either active and fully subject to all relevant parts of the safety regulations or abandoned.")

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 737 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 373 of 464
ID #:17790

# EXHIBIT B

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 738 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 374 of 464
ID #:17791



U.S. Department
of Transportation
**Pipeline and Hazardous**
**Materials Safety**
**Administration**

12300 W. Dakota Ave., Suite 340
Lakewood, CO  80228

**VIA ELECTRONIC MAIL TO: lyearwood@sableoffshore.com**

December 22, 2025

Mr. Lance Yearwood
Vice President
Pacific Pipeline Company / Sable Offshore Corp.
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**RE:     Approval of Sable Offshore Corp.'s Restart Plan for the Las Flores Pipeline System Line**
**CA-324 and Line CA-325**

Dear Mr. Yearwood:

From December 4 to December 12, 2025, the Pipeline and Hazardous Materials Safety Administration
(PHMSA) received several documents from Sable Offshore Corp. These documents included:

1. Line CA-324 and Line CA-325 Fill Plan and Startup Procedures
2. A letter requesting the removal of pressure restrictions for Line CA-324
3. A letter requesting the removal of pressure restrictions for Line CA-325
4. The Las Flores Pipeline Linefill Positioning Plan Assignments
5. The Las Flores Pipeline Linefill Contact List

These documents addressed the Restart Plan for Line CA-324 and Line CA-325 (previously known as
Plains Line 901 and Line 903, respectively). In addition, PHMSA conducted a field inspection with Sable
Offshore Corp. to discuss its process and safety procedures for the pipeline restart.

PHMSA has reviewed these documents and hereby approves the submitted Restart Plan. This approval is
valid from the date of this letter.

Should you have any questions or concerns, please contact me at (720) 963-3160 or by email at
dustin.hubbard@dot.gov.

Sincerely,

Dustin Hubbard
Director, Western Region
Pipeline and Hazardous Materials Safety Administration

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 739 of 837   Page
ID #:17792
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 375 of 464

cc:    Trent Fontenot, Sr. Vice President - Operations, tfontenot@sableoffshore.com
       Jim Hosler, Assistant Deputy Director – Pipeline Safety and CUPA, CalFire,
       jim.hosler@fire.ca.gov

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 740 of 837   Page
ID #:17793
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 376 of 464

# EXHIBIT C

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 740 of 837   Page
ID #:17793
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 376 of 464

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 741 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 14   Filed 02/20/26   Page 377 of 464
ID #:17794

# U.S. DEPARTMENT OF TRANSPORTATION
# PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION
# EMERGENCY SPECIAL PERMIT

## Special Permit Information:

| | |
|---|---|
| **Docket Number:** | 2025-1502 |
| **Requested By:** | Sable Offshore Corp. PPC |
| **Operator ID#:** | 40881 |
| **Date Requested:** | December 19, 2025 |
| **Issuance Date:** | December 23, 2025 |
| **Expiration Date:** | February 21, 2026 |
| **Code Section:** | 49 CFR § 195.452(h)(4)(iii)(H) |

## Grant of Special Permit:

By this order, subject to the terms and conditions set forth below, the Pipeline and Hazardous Materials Safety Administration (PHMSA) Office of Pipeline Safety (OPS)[1] grants this emergency special permit to Sable Offshore Corp. PPC (Sable) for 124.42 miles of 24- and 30-inch diameter hazardous liquid pipelines, Lines CA-324 and CA-325 (*special permit segments*), transporting crude oil from Las Flores Canyon to Pentland in Santa Barbara, San Luis Obispo, and Kern counties, California. This emergency special permit waives compliance from 49 CFR § 195.452(h)(4)(iii)(H), which requires corrosion of or along a longitudinal seam weld be scheduled for evaluation and remediation within 180 days of discovering the condition.

## I.   Purpose and Need

On December 19, 2025,[2] Sable requested an emergency special permit for relief from the requirement to evaluate and remediate corrosion occurring at longitudinal seam welds within 180 days. The *special permit segments* are under polyurethane foam and polyethylene tape wrap insulation, which can inhibit the effectiveness of cathodic protection and contribute to a risk of corrosion due to shielding effects. Sable proposed an alternative approach to safely manage this risk, which was previously reviewed and approved as part of two state waivers issued by the California Office of State Fire Marshal (OSFM) on December 17, 2024 to Sable for the *special permit segments*. PHMSA previously reviewed the state waivers pursuant to 49 U.S.C. § 60118(d).

---

[1] Throughout this special permit, the usage of "PHMSA" means the U.S. Department of Transportation (DOT), Pipeline and Hazardous Materials Safety Administration, Office of Pipeline Safety.
[2] Sable submitted supplemental information related to its application on December 23, 2025.

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 742 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 95   Filed 02/20/26   Page 378 of 464
ID #:17795

Sable sought this special permit to implement the terms of a Consent Decree entered in Civil Action No. 2:20-CV-02415 by the U.S. District Court for the Central District of California, which provides, among other requirements, that a "State Waiver" must be applied for and received from OSFM prior to restarting Lines CA-324 and CA-325. The *special permit segments* were previously considered intrastate at the time of entry of the Consent Decree and were regulated by OSFM pursuant to its state certification with PHMSA under 49 U.S.C. § 60105(a). However, the *special permit segments* are now considered interstate pursuant to Sable's designation on November 26, 2025, and PHMSA's concurrence on December 17, 2025. As a result, PHMSA has exclusive pipeline safety regulatory agency over Lines CA-324 and CA-325. The conditions ordered by OSFM in the two state waivers are now being re-issued by PHMSA as a special permit subject to Federal oversight and enforcement.

Sable requested PHMSA grant a special permit for the above reasons on an emergency basis pursuant to 49 U.S.C. § 60118(c)(2) and 49 CFR § 190.341(g). In its application, Sable stated that expedited review of its application was warranted in light of the national energy emergency declared by the President under the National Emergencies Act (50 U.S.C. § 1601 et seq.) in Executive Order 14156 (January 20, 2025). In Executive Order 14156, the President declared a national energy emergency based on a finding that "[t]he United States' insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy."[3] The Executive Order directs agencies, such as PHMSA, to "identify and exercise any lawful emergency authorities available to them, as well as all other lawful authorities they may possess, to facilitate," among other activities, the "production, transportation, refining, and generation of domestic energy resources."[4] The Executive Order further directs agencies to "identify and use all lawful emergency or other authorities available to them to facilitate the supply, refining, and transportation of energy in and through the West Coast of the United States . . . ."[5]

Sable's application stated that grant of this special permit on an emergency basis would facilitate the restart of Lines CA-324 and CA-325 to provide relief in response to the acute energy shortage conditions identified in Executive Order 14156 within California and in the West Coast region of the United States.[6] Sable further noted that grant of this special permit on an emergency basis is appropriate to address the gap in coverage under the OSFM State Waivers created by redesignation of Lines CA-324 and CA-325 as interstate, given that the proposed special permit is substantially the same as that which was previously reviewed and approved by OSFM and PHMSA for issuance of the State Waivers.

This emergency special permit allows Sable to operate Lines CA-324 and CA-325 without being subject to the requirement to evaluate and remediate corrosion of or along a longitudinal seam weld within 180 days. On the condition that Sable comply with the terms and conditions set forth below, the emergency special permit waives compliance with 49 CFR § 195.452(h)(4)(iii)(H) for the *special permit segments*.

---

[3] Exec. Order 14156: Declaring a National Energy Emergency (Jan. 20, 2025), Sec. 1.

[4] Exec. Order 14156: Declaring a National Energy Emergency (Jan. 20, 2025), Sec. 2(a). The order's definition of "energy" or "energy resources" includes "crude oil," and its definition of "transportation" includes "the physical movement of energy, including through, but not limited to, pipelines." Sec. 1(a); 1(c).

[5] Exec. Order 14156: Declaring a National Energy Emergency (Jan. 20, 2025), Sec. 3(b).

[6] For more information regarding these effects, see Attachments C, D, E, and F.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 2 of 16

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 743 of 837    Page
ID #:17796
Case 1:26-cv-01486-KES-CDB    Document 16    Filed 02/20/26    Page 379 of 464

## II. Special Permit Segments

This emergency special permit pertains to the specified pipeline segments which make up the Las Flores Pipeline called Line CA-324 and CA-325. Line CA-325 can be further divided into two segments: Lines CA-325A and CA-325B. The Las Flores Pipeline is part of the Santa Ynez Pipeline System (SYPS), an interstate pipeline facility that Sable operates from the Outer Continental Shelf off the coast of Santa Barbara to Kern County, California. A map of the special permit segments is available in Revised Attachment A.

**Special Permit Segments:**

| Special Permit Segment Name | Location | Mileage | California County or Counties |
|---|---|---|---|
| CA-324 | Las Flores Canyon Processing Facility to Gaviota Pump Station | 10.86 | Santa Barbara |
| CA-325A | Gaviota Pump Station to Sisquoc Pump Station | 38.72 | Santa Barbara |
| CA-325B | Sisquoc Pump Station to Pentland Station | 74.84 | Santa Barbara; San Luis Obispo; Kern |

## III. Conditions

PHMSA grants this emergency special permit subject to Sable implementing each of the following conditions. These conditions must be implemented and complied with in addition to all applicable requirements of 49 CFR Part 195 except for compliance with limitations on scheduling instances of corrosion on or near longitudinal seam welds for evaluation and remediation within 180 days of discovery in 49 CFR § 195.452(h)(4)(iii)(H), which would be waived.

**General Conditions:**

1) The *special permit segments* may only be used to transport crude oil.

2) Prior to transporting crude oil in the *special permit segments*, Sable must develop and implement procedures for the conditions and requirements described in this emergency special permit.

3) Sable shall not exceed maximum operating pressure (MOP) limits for the *special permit segments*, as follows:

   a) The MOP of Line CA-324 cannot exceed 1003 pounds per square inch gauge (psig).

   b) The MOP of Line CA-325A (the segment of Line CA-325 between Gaviota and Sisquoc stations) cannot exceed 1000 psig.

Docket Number PHMSA-2025-1502 -- Sable Offshore Corp. PPC
Emergency Special Permit -- Corrosion Mitigation -- California

Page 3 of 16

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 744 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 380 of 464
ID #:17797

    c) The MOP of Line CA-325B (the segment of Line CA-325 between Sisquoc and Pentland stations) cannot exceed 1292 psig.

4) Sable shall not exceed maximum operating temperature limits for crude oil transported in the *special permit segments,* as follows:

    a) The maximum operating temperature of the crude oil that is transported in Line CA-324 must not exceed 140 degrees Fahrenheit for more than 12 consecutive hours.

    b) The maximum operating temperature of the crude oil that is transported in Line CA-325A (the segment of Line CA-325 between Gaviota and Sisquoc stations) must not exceed 125 degrees Fahrenheit for more than 12 consecutive hours. Temperature transmitters must be installed on Line CA-325 at Gaviota station to monitor the temperature of Line CA-325A.

    c) The maximum operating temperature of the crude oil that is transported in Line CA-325B (the segment of Line CA-325 between Sisquoc and Pentland stations) must not exceed 110 degrees Fahrenheit for more than 12 consecutive hours. Temperature transmitters must be installed on Line CA-325 at Sisquoc station to monitor the temperature of Line CA-325B.

5) This emergency special permit does not relieve Sable from complying with applicable requirements under 49 CFR Part 195, other than those waived in this emergency special permit.

6) This emergency special permit does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).

7) In-line inspections (ILIs) performed pursuant to this emergency special permit must include:

    a) Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion, defined as follows:

        i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.

        ii. General corrosion means uniform or gradually varying loss of wall thickness over an area.

    b) Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI).

    c) Use of a tool that is at least capable of reliably detecting and sizing crack or crack-like anomalies at a 90 percent POD and POI.

8) Prior to placing CA-324 in operation, Sable must perform fracture toughness tests on the existing 24" pipe from CA-324 in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from the predominant existing 24" pipe, specifically API 5L X65 HF-ERW pipe with a nominal thickness of 0.344" that was manufactured by Nippon Steel Corp. in the 1980s. At least three (3) separate tests must be performed to obtain the fracture toughness values of the

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 745 of 837   Page
ID #:17798
Case 1:26-cv-01486-KES-CDB   Document 18   Filed 02/20/26   Page 381 of 464

pipe body, heat affected zone (HAZ)[7], and the HF-ERW long seam weld on the pipe to represent the fracture toughness of CA-324 (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the HF-ERW long seam weld). The lowest fracture toughness value must be applied to conditions 11, 16, 17, and 21. Sable may use pipe samples taken opportunistically during ongoing maintenance and repair efforts on Line CA-324.[8]

9)   Prior to placing Line CA-325 (including CA-325A and CA-325B) in operation, Sable must perform fracture toughness tests on the existing 30" pipe from CA-325A/B in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from both of the two following predominant existing 30" pipe specifications:

   a)   API 5L X70 pipe with a nominal thickness of 0.281" that was manufactured by the various pipe mills in the 1980s.

   b)   API 5L X65 pipe with a nominal thickness of 0.344" that was manufactured by the various pipe mills in the 1980s.

At least three (3) separate tests must be performed from each pipe mill, for both of the two pipe specifications listed above, to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ), and the DSAW long seam weld on the pipe to represent the fracture toughness of CA-325A/B (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the DSAW long seam weld). The lowest fracture toughness value must be applied to conditions 11, 16, 17, and 21. Sable may use pipe samples taken opportunistically during ongoing maintenance and repair efforts on Line CA-325A/B.[9]

10)   All existing immediate and 180-day repair conditions must be evaluated and remediated pursuant to the Consent Decree repair criteria prior to restarting CA-325A/B.[10] Upon restart Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by PHMSA. Sable must utilize the Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results to identify, evaluate and remediate any immediate and 180-day repair conditions that are listed in this emergency special permit.

11)   Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines*. If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss

---

[7] The heat affected zone (HAZ), as used in this emergency special permit, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.

[8] Sable indicated in its application that it has already completed all of the testing required in this condition. Sable must submit all fracture toughness results to PHMSA prior to restarting Line CA-324.

[9] Sable indicated in its application that it has already completed the testing required in this condition. Sable must submit all fracture toughness results to PHMSA prior to restarting Line CA-325.

[10] Sable indicated in its application that it has already completed the repairs required in this sentence. Sable must submit all of the results to PHMSA prior to restarting CA-324 and CA-325.

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 746 of 837    Page
ID #:17799
Case 1:26-cv-01486-KES-CDB    Document 9    Filed 02/20/26    Page 382 of 464

anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

12) Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of CA-324 and CA-325A/B.

13) Pressure Testing:[11]

    a) Prior to placing CA-324 in operation, Sable must conduct a spike hydrostatic pressure test of CA-324 at a minimum pressure that is at least 1.5 times the maximum operating pressure (MOP) or 100% specified minimum yield strength (SMYS), for a minimum of 15 minutes after the spike test pressure is stabilized. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-324:

        i. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

        ii. All anomalies that have a predicted failure pressure less than or equal to 1.6 times MOP.

    b) Immediately following the spike hydrostatic pressure test specified in Condition 13(a), Sable must conduct an 8-hour hydrostatic pressure test of CA-324 at a minimum of 1.25 times the MOP.

    c) Prior to placing Line CA-325A (segment of Line 325 between Gaviota and Sisquoc stations) in operation, Sable must conduct a spike hydrostatic pressure test of CA-325A at a minimum pressure that is at least 1.39 times the MOP, for a minimum of 15 minutes after the spike test pressure is stabilized. Sable must ensure that the spike hydrostatic pressure at the highest elevation of each testable segment is at least 1.39 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-325A:

        i. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

        ii. All anomalies that have a predicted failure pressure less than or equal to 1.5 times MOP.

    d) Immediately following the spike hydrostatic pressure test specified in Condition 13(c), Sable must conduct an 8-hour hydrostatic pressure test of CA-325A at a minimum of 1.25 times the MOP.

    e) Prior to placing Line CA-325B (segment of Line 325 between Sisquoc and Pentland stations) in operation, Sable must conduct a hydrostatic pressure test of CA-325B at a minimum pressure of 1.25 times the MOP, for a minimum of 8 hours. Sable must ensure that the hydrostatic pressure at the highest elevation of each testable segment is at least 1.25 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the

---

[11] Sable indicated in its application that it has already completed all of the testing and repairs required in this Condition. Sable must submit the results to PHMSA prior to restart and confirm that no failures occurred during the required pressure testing.

Case 2:26-cv-05242-SVW-SSC     Document 36     Filed 05/14/26     Page 747 of 837     Page
Case 1:26-cv-01486-KES-CDB     Document 90     Filed 02/20/26     Page 383 of 464
ID #:17790

hydrostatic test on CA-325B:

    i. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

    ii. All anomalies that have a predicted failure pressure less than or equal to 1.4 times MOP.

f) Sable must obtain the Test ID for each hydrostatic pressure test from PHMSA (or OSFM if such testing was performed prior to November 26, 2025) and have the approved independent testing firm forward separately the certified test results to PHMSA or the OSFM, as applicable.

g) Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 CFR Part 195 Subpart E – Pressure Testing and monitored by an independent testing firm listed under PHMSA or OSFM (as applicable) approved hydrostatic testing companies.

h) Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported to PHMSA.[12]

i) Section(s) of the *special permit segments* that failed during the required hydrotesting must be repaired by removing and replacing the failed section. PHMSA reserves the right to revoke this emergency special permit if failure(s) raise the concern that the *special permit segments* cannot be safely operated.

14) In-Line Inspection (ILI) Assessment and Frequency:

a) Prior to performing in-line inspections of the *special permit segment*, Sable shall provide PHMSA with a written notification to PHMSA describing its assessment plan with the following information:

    i. Dates for integrity assessment

    ii. In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[13] to assess the integrity of the subject pipe segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications;

    iii. In-line inspection tool vendor(s)

    iv. Required tool specifications including operational specifications and anomaly sizing tolerances

    v. Tool validation methodology

    vi. Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications

---

[12] All submissions to PHMSA required by this emergency special permit shall be submitted through email to the OPS Western Region Director, Dustin Hubbard, email address: Dustin.Hubbard@dot.gov or his designee.

[13] Industry standards referenced in this emergency special permit must utilize the editions that are incorporated by reference in 49 CFR 195.3 unless another edition is explicitly specified in this emergency special permit.

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 748 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 91   Filed 02/20/26   Page 384 of 464
ID #:17791

          vii.  Criteria used to identify locations for excavation and field verification

          viii.  Non-destructive examination

b) Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.

c) Metal Loss Tool(s):

    i.  Initial ILI tool runs – Each year, during the first two (2) years of operating the *special permit segments*, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU). Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months. If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.

    ii.  Subsequent ILI tool runs – After the first two (2) years of operating the *special permit segments*, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the *special permit segment* within 30 days after it was deemed to be unsuccessful. All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

d) Crack Detection Tools - Sable shall conduct at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15 months[14] or the ILI assessment must be assessed at more frequent intervals if condition 21 determined a shorter assessment interval.

    i.  These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.

    ii.  USCD Performance Specification Requirements

        1.  The USCD tools must have a probability of detection that is

---

[14] Sable may petition PHMSA to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to PHMSA approval.

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 749 of 837   Page
ID #:17792
Case 1:26-cv-01486-KES-CDB   Document 42   Filed 02/20/26   Page 385 of 464

≥ 90% for axial and circumferential cracks.

2. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.

3. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.

4. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks.

e) Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

f) Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the *special permit segment* in which the ILI tool velocity was outside of the specified tool velocity range.

g) All ILI tool runs must obtain the Test ID from PHMSA prior to run.

h) Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.

i) Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

j) Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals. Sable must document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[15] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different. If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

k) Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second

---

[15] A minimum of four (4) independent direct examination excavations must be used for unity plots.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 9 of 16

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 750 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 386 of 464
ID #:17793

Edition, April 2013).

15) Discovery of Condition: The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

16) Immediate Repair Conditions:[16]

    a) A crack or crack-like anomaly that meets any of the following criteria:

        i. Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.

        ii. Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.

    b) Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.

    c) Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[17]

17) 180-Day Repair Conditions:[18]

    a) A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.

    b) Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.

    c) All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[19]

    d) For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

18) Corrosion Growth Rate Analysis (CGRA):

    a) Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to

---

[16] The criteria specified in this emergency special permit is supplemental to, and does not relieve Sable from complying with, the requirements set forth in 49 CFR 195.452(h)(4)(i). All immediate repair conditions must be remediated with a permanent repair method.

[17] Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria. General corrosion means uniform or gradually varying loss of wall thickness over an area.

[18] The criteria specified in this emergency special permit is supplemental to, and does not relieve Sable from complying with, the requirements set forth in 49 CFR 195.452(h)(4)(iii), except for those associated with 49 CFR 195.452(h)(4)(iii)(H). All immediate repair conditions must be remediated with a permanent repair method.

[19] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth. If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify PHMSA, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 CFR § 195.452 until the indication is remediated or until otherwise authorized by PHMSA.

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 751 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 9-4   Filed 02/20/26   Page 387 of 464
ID #:17794

prior ILI) and perform pipeline remediations needed to assure the integrity of the *special permit segments* is maintained.[20] The timing of remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.

b) The CGRA procedure must include ILI data matching methods[21] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.

c) Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.

d) When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates.[22]

e) All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

19) Pressure Reduction: If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in this emergency special permit, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

20) In Field Direct Examination of Pipe:

a) Direct examinations[23] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[24] PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.

b) Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition. However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:

   i. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.

   ii. Sable must increase the metal loss anomaly's depth by 20% when

---

[20] At a minimum, Sable must include signal matching between ILI data sets.

[21] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

[22] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

[23] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.

[24] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complemented by shear wave technology or inspection by phased array ultrasonic testing.

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 752 of 837    Page
ID #:17795
Case 1:26-cv-01486-KES-CDB    Document 95    Filed 02/20/26    Page 388 of 464

they input it into the formula for calculating the number of wraps needed for repair method 5.

 iii. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs. If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

c) Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

d) Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy. Sable must recoat in accordance with their coating repair procedure.[25]

e) All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

21) Integrity Management:

a) A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.

 i. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 CFR § 192.712(d)(1).

 ii. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 CFR § 192.712(d)(2).

b) Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.

c) When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

d) Sable must send all field measurements to the ILI tool vendor within 90 days

---

[25] The coating procedure must be submitted to PHMSA prior to the effective date of this emergency special permit.

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 753 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 96   Filed 02/20/26   Page 389 of 464
ID #:17796

of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

e) Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the *special permit segments*. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by PHMSA prior to being selected.

f) Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC) interference or direct current (DC) interference or shorting that could contribute to external corrosion is

g) occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

22) Data Requirements for Predicted Failure Analysis:

a) Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

b) The analyses performed in accordance with this emergency special permit must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in traceable, verifiable, and complete records.

23) Recordkeeping:

a) Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this emergency special permit shall be kept for the life of the *special permit segments* and must be submitted to PHMSA, in the manner requested (electronic, hardcopy, or other format) within 30 days.

b) Sable must maintain the following records:

    i.    Technical approach used for the analysis

    ii.    All data used and analyzed

    iii.    Pipe and longitudinal weld seam properties

    iv.    Procedures used to implement emergency special permit conditions

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 13 of 16

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 754 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 390 of 464
ID #:17797

    v.    Evaluation methodology used

    vi.    Models used

    vii.    Direct in situ examination data

    viii.    All in-line inspection tool assessments information evaluated

    ix.    Pressure test data and results

    x.    All in-the-ditch assessments performed on the *special permit segments*

    xi.    All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results

    xii.    All finite element analysis results

    xiii.    The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology

    xiv.    The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods

    xv.    Safety factors used for fatigue life and/or predicted failure pressure calculations

    xvi.    Reassessment time interval and safety factors

    xvii.    The date of the review

    xviii.    Confirmation of the results by qualified technical subject matter expert(s)

    xix.    Approval by responsible Sable management personnel

    xx.    Records of additional preventive and mitigative (P&M) measures performed

    xxi.    Reports required by this emergency special permit.

24)    Reporting:

    a)    Any release on the *special permit segments* shall be reported to PHMSA at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery.[26]

    b)    An email notification shall be made at least three (3) days prior to a *special permit segment* being exposed for non-emergency purposes of field evaluation and repair to PHMSA. The email notification shall include, if applicable:

        i.  Tool type and run date

        ii.  Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)

---

[26] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state, or Federal regulations.

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 755 of 837   Page
Case 1:26-cv-01486-KES-CDB    Document 18    Filed 02/20/26    Page 391 of 464
ID #:17798

      iii. Dig sheets

      iv. Field contact information for Sable

      v. Time and location of the field evaluation and repair.

c) Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run to PHMSA and include:

      i. Tool type

      ii. Run date

      iii. Summary of Conditions Report[27]

      iv. Final Vendor Report and Pipe Tally

d) Sable shall provide a report to PHMSA by June 15th of every year for the duration of this special permit, including any renewals. The report shall be submitted to PHMSA. At a minimum, the annual report shall contain the following, if applicable:

      i. A Closure Report for the previous calendar (CY) which contains:

            1. Features that were remediated in previous CY, including documentation for in-the-ditch assessments and repairs

            2. Identify features that remain to be assessed

            3. Unity Plots for previous ILI runs

      ii. Fracture mechanics and pressure cycling analyses in accordance with Condition 21(a);

      iii. The third-party ILI expert reviews in accordance with condition 21(e).

      iv. AC and DC Interference surveys that are due in accordance with condition 21(f).

      v. A copy of the CGRA for prior year including:

            1. Mean corrosion growth rate for the *special permit segments*

            2. Distribution graph of the corrosion growth rate for the *special permit segments* (e.g. occurrences (#) vs. corrosion rate (mpy)

The above conditions are based on PHMSA's review and consideration of information provided by Sable, including information in their emergency special permit application which can be found at Docket No. PHMSA-2025-1502 in the Federal Docket Management System located at www.regulations.gov. PHMSA has determined the conditions listed above would be necessary to ensure this Emergency Special Permit is not inconsistent with pipeline safety.

---

[27] PHMSA may stipulate specific formatting or other information (e.g., condition type, anomaly details, remaining strength calculation method, failure pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 15 of 16

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 756 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 9    Filed 02/20/26    Page 392 of 464
ID #:17799

## IV.  Limitations:

This special permit is subject to the limitations set forth in 49 CFR § 190.341, as well as the following limitations:

1) This emergency special permit is limited to an initial term of sixty (60) days from the date of issuance. If Sable elects to seek renewal of this emergency special permit, it must submit a renewal request to PHMSA pursuant to 49 CFR § 190.341(g).

2) Should Sable fail to comply with any conditions of this emergency special permit or should PHMSA determine that this emergency special permit is no longer appropriate or is inconsistent with pipeline safety, PHMSA may revoke the emergency special permit and require Sable to comply with all appropriate regulatory requirements.

3) PHMSA may order the *special permit segments* to be shutdown at any time.

4) PHMSA may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for failure to comply with this emergency special permit. The terms and conditions of any compliance order shall take precedence over the terms of this emergency special permit.

5) In the event of conflict between the conditions of this emergency special permit and industry standards, the emergency special permit conditions shall prevail.

6) If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the emergency special permit, Sable must provide PHMSA written notice of the change within 60 days of the consummation date. In the event of such transfer, PHMSA reserves the right to revoke, suspend, or modify the emergency special permit.

AUTHORITY:  49 United States Code 60118 (c)(1) and 49 CFR § 1.97.

Issued in Washington, D.C., on <u>December 23, 2025</u>.

**LINDA GAIL DAUGHERTY**
Digitally signed by
LINDA GAIL DAUGHERTY
Date: 2025.12.23
15:48:57 -05'00'

Linda Daugherty
Acting Associate Administrator
  for Pipeline Safety

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 16 of 16

Case 2:26-cv-05242-SVW-SSC     Document 36     Filed 05/14/26     Page 757 of 837   Page
ID #:17800
Case 1:26-cv-01486-KES-CDB     Document 1     Filed 02/20/26     Page 393 of 464

**PROOF OF SERVICE**

I, **Kim Niz**, declare:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Alston & Bird LLP, 350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071.

On January 21, 2026, I served the document(s) **PACIFIC PIPELINE COMPANY'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO CHANGE VENUE; DECLARATION OF GARRETT B. STANTON** on the interested parties stated below, by the following means of service:

Brandon Walker
Jack C. Nick
Isabella A. Panuccini
1300 I Street, Suite 125
Sacramento, CA 95814
Telephone: (916) 210-6395
Fax: (916) 327-2319
Brandon.Walker@doj.ca.gov
Jack.Nick@doj.ca.gov
Isabella.Panuccini@doj.ca.gov
Attorneys for Defendant State of California

☒ BY ELECTRONIC SERVICE on the date stated below, I caused the document(s) described above to be served electronically on the recipients designated on the Transaction Receipt pursuant to the parties' stipulation establishing the authorizing e-service of documents.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on January 21, 2026, at Los Angeles, California.

_/s/ Kim Niz_
Kim Niz

- 6 -

REQUEST FOR JUDICIAL NOTICE; DECLARATION OF GARRETT B. STANTON

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 758 of 837   Page
ID #:17801
Case 1:26-cv-01486-KES-CDB    Document 41    Filed 02/20/26    Page 394 of 464

ELECTRONICALLY FILED
Superior Court of California,
County of Kern
By: Marina Mercado
Deputy Clerk
01/27/26 3:49 PM

ROB BONTA
Attorney General of California
BRANDON S. WALKER SBN. 254581
Supervising Deputy Attorney General
JACK C. NICK SBN. 160196
ISABELLA A. PANICUCCI SBN. 318984
Deputy Attorneys General
  1300 I Street, Suite 125
  Sacramento, CA 95814
  Telephone: (916) 210-6395
  Fax: (916) 327-2319
  E-mail: Brandon.Walker@doj.ca.gov
*Attorneys for Defendant State of California*

NO FEE PURSUANT TO
GOVERNMENT CODE § 6103

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF KERN

METROPOLITAN DIVISION

| | |
|---|---|
| **Pacific Pipeline Company, A Delaware Corporation,** | Case No. BCV25103508 |
| Plaintiff, | **STATE OF CALIFORNIA'S REPLY TO PACIFIC PIPELINE'S RESPONSE IN OPPOSITION TO MOTION TO CHANGE VENUE** |
| v. | |
| **State of California and DOES 1 through 25,** | Date: February 3, 2026 |
| | Time: 8:30 a.m. |
| Defendant. | Dept: H |
| | Judge: Hon. Bernard C. Barmann, Jr. |
| | Action Filed: September 29, 2025 |

**INTRODUCTION**

Defendant, the State of California (State), filed a motion to change venue because (1) the only property that could properly be a subject of the action (Pipeline CA-324) is located wholly in Santa Barbara County and (2) the potential nonparty witnesses from the Office of State Fire Marshal (OSFM) and the Coastal Commission (Commission) are already engaged in litigation related to Pipelines CA-324 and CA-325 in Santa Barbara County. Plaintiff Pacific Pipeline Company (Plaintiff) filed a response to the motion and a First Amended Complaint, which it erroneously argues moots this motion, but in truth the amended complaint merely confirms and

1

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 759 of 837   Page
ID #:17802
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 395 of 464

reinforces the reasons why venue is not proper in Kern County and supports transferring this case to Santa Barbara County.

**DISCUSSION**

**I.   THE FIRST AMENDED COMPLAINT DOES NOT MOOT THE MOTION AND CONFIRMS WHY KERN COUNTY IS AN IMPROPER VENUE.**

The filing of the First Amended Complaint does not moot the pending motion to change venue. "Venue is determined based on the complaint on file at the time the motion to change venue is made." (*Brown v. Superior Court* (1984) 37 Cal.3d 477, 482.) This rule is specifically intended to prevent a plaintiff from manipulating venue by filing strategic amendments after a defendant has already moved to transfer the case. (See *Haurat v. Superior Court for Los Angeles County* (1966) 241 Cal.App.2d 330, 337.) However, where an amended complaint makes material changes that present a new question for a change of venue, that new question can be considered by the court. (*South v. Wishard* (1954) 123 Cal.App.2d 642, 653-654.) Additionally, "admissions in an original complaint that has been superseded by an amended pleading remain within the court's cognizance." (*Berg & Berg Enterprises, LLC v. Boyle* (2009) 178 Cal.App.4th 1020, 1043 fn. 25.)

Plaintiff's citations to *Sylmar Air Conditioning v. Pueblo Contracting Services, Inc.* (2004) 122 Cal.App.4th 1049, 1054 and *State Compensation Ins. Fund v. Superior Court (SCIF)* (2010) 184 Cal.App.4th 1124, 1131 are misplaced. *Sylmar* addresses the effects of an amended complaint on a demurrer (*Sylmar, supra,* 122 Cal.App.4th at p. 1054), and *SCIF* addresses the effects of an amended complaint on a motion for summary adjudication (*SCIF, supra,* 184 Cal.App.4th at p. 1131). Neither case applies to a motion to change venue and as explained above, the amended complaint does not moot such a motion. (*Brown, supra,* 37 Cal.3d at p. 482.)

Plaintiff's First Amended Complaint now alleges that the federal Pipeline and Hazardous Materials Safety Administration (PHMSA) asserts jurisdiction over Pipelines CA-324 and CA-325 pursuant to the federal Hazardous Liquid Pipeline Safety Act, which Plaintiff alleges divests OSFM of its regulatory jurisdiction pursuant to the Elder California Pipeline Safety Act of 1981.[1]

---

[1] Although Plaintiff seeks a declaration that OSFM's regulatory authority is preempted, Plaintiff has not named OSFM as a defendant. In comparison to its express allegations that OSFM's
(continued...)

2

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 760 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 396 of 464
ID #:17803

(First Amended Complaint ¶¶ 10-11, 34, 51-55, 66.) The question of whether OSFM's authority is preempted is currently pending before the Ninth Circuit Court of Appeals and has also been raised by Plaintiff in the case involving OSFM pending in Santa Barbara County Superior Court, via a motion that is currently scheduled to be heard on February 27, 2026.[2] (Supplemental Declaration of Brandon S. Walker, Exs. J and K.) This issue will be resolved well before this Court will have an opportunity to address it.

Additionally, if OSFM's authority is preempted, as Plaintiff alleges and which the State and OSFM dispute, then this an alternative basis for finding that any claims or issues related to SB 237's effect on property located in Kern County are moot and demonstrate that Kern County is the wrong venue. The complaint only contains allegations related to two state agencies, OSFM and the Commission, which are both nonparties. Of those two state agencies, only OSFM has jurisdiction over the portion of the pipelines in Kern County. Thus, if OSFM were to be deprived of jurisdiction, Plaintiff's claims relating to the portions of Pipeline CA-325 in Kern County would be mooted, and the only remaining issue would possibly be whether SB 237 requires Plaintiff to obtain a coastal development permit prior to resuming oil transport through the pipeline located within the Coastal Zone, i.e., Pipeline CA-324. The Coastal Zone is solely within Santa Barbara County and does not extend into Kern County.

Accordingly, the First Amended Complaint further supports the motion to change venue.

## II. VENUE IS PROPER IN SANTA BARABARA COUNTY, WHERE THE PROPERTY THAT IS THE SUBJECT OF THE ACTION IS LOCATED.

The venue statute at issue, Code of Civil Procedure section 392, places venue in the county where the real property that is the subject of the action is located. For the reasons stated above, the only pipeline that could properly be the subject of this action is that which is subject to SB 237's requirement to obtain a coastal development permit, i.e., Pipeline CA-324, which is located

authority is preempted, the First Amended Complaint does not allege that the Commission's authority pursuant to the Coastal Act is preempted. (See also, Response to Motion at p. 8:18-20 [only discussing preemption of OSFM's authority].)

[2] PHMSA's assertion of jurisdiction and the dispute over preemption also demonstrates that claims regarding an attempt by OSFM to enforce SB 237 on Pipelines CA-324 and CA-325 are currently speculative and unripe.

3

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 761 of 837   Page
ID #:17804
Case 1:26-cv-01486-KES-CDB   Document 14   Filed 02/20/26   Page 397 of 464

exclusively in Santa Barabara County. Plaintiff attempts to avoid this result by asking the court to ignore the actual location of the property that is the subject of the action, which is Pipeline CA-324 located in Santa Barbara County, and instead consider portions of a different pipeline, Pipeline CA-325 within Kern County, that may indirectly feel the effects of regulation over Pipeline CA-324. It is irrelevant, however, that some indirect effects may be felt downstream in a separate pipeline in a different county outside of the Coastal Zone. That is not where the property that is the subject of the action is located. Accordingly, proper venue is in Santa Barbara County.

Additionally, a court can properly disregard moot claims added to manipulate venue under the doctrine of improper joinder. (See *Housing Group v. United Nat. Ins. Co.* (2001) 90 Cal.App.4th 1106, 1111; see also Code Civ. Proc., § 395 [the residence of an improperly joined defendant should not be considered in determining venue]; *Freeman v. Dowling* (1933) 219 Cal. 213, 216-217 [sham or frivolous claims should not be used in considering venue and a defendant can seek a change of venue by demonstrating that other defendants are not necessary parties, that no cause of action is stated against them, and that no relief whatever may be awarded against them]; *Alexander v. Superior Court* (2003) 114 Cal.App.4th 723, 731 [manipulating the venue provisions can "bring the administration of justice into disrepute"].) Plaintiff admits that such arguments may be considered when the complaint is "so glaringly and vitally defective as to be beyond correction by amendment. (*Mills v. Brown* (1928) 205 Cal. 38, 41.)" (Response to Motion, p. 11, fn. 3.) The mootness of Plaintiff's claims pertaining to Pipeline CA-325 can be considered at this time because they are glaring, defective, and beyond correction. Indeed, Plaintiff also argues that those same claims are moot because they are preempted by PHMSA's orders. Although the State and OSFM are challenging those orders, Plaintiff confirms that the claims regarding the portion of Pipeline CA-325 in Kern County are moot, one way or another.

Plaintiff does not dispute that the State Waivers already require it to perform the same stress hydrostatic testing required by SB 237, which moots its claims regarding the portion of Pipeline CA-325 in Kern County. (Declaration of Brandon S. Walker (Walker Dec.), Exs. E and F.) Instead, Plaintiff argues that SB 237 imposes different liabilities than the State Waivers. (Response to Motion, p. 12.) But whether or not SB 237 adds or changes the nature of liability is

4

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 762 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 398 of 464
ID #:17805

irrelevant to a motion to change venue that is based on where the property, which is the subject of the action, is located. (Code of Civil Proc., § 392.) On one hand, Plaintiff must comply with the State Waivers before it can restart the pipelines. If, on the other hand, OSFM lacks jurisdiction or authority as Plaintiff now alleges, then the stress hydrostatic testing aspect of SB 237 would not apply, and venue is still proper only in Santa Barbara County.[3]

Put simply, the only possible effect that SB 237 could have on property located within Kern County relates to SB 237's stress hydrostatic testing requirements, which are either already required by the State Waivers, or preempted in light of PHMSA's alleged assumption of jurisdiction over the pipelines. Again, that leaves only the claims regarding the coastal development permit requirements, which only apply to Pipeline CA-324. Pipeline CA-324 is a separate and distinct pipeline. It is the only pipeline that is properly the subject of this action. And it is wholly located in Santa Barabara County.

Plaintiff's argument that the pipelines are part of a larger integrated pipeline system that cannot be considered individually is belied by their own allegations and the regulatory history of these pipelines.[4] As admitted in the original complaint, oil is brought to onshore facilities from the Santa Ynez Unit through separate offshore pipelines. (Complaint ¶¶ 17-19.) At those onshore facilities, the oil is separated from propane, butane, sulfur products, and fuel quality gas. (Complaint ¶ 19.) The natural gas is treated, compressed, and delivered to a local utility company. (Complaint ¶ 19.) Currently, the offshore pipeline has allegedly been used since May 2025 and the transported oil is being stored in storage tanks at the onshore processing facility. (Complaint ¶ 36; compare with Complaint ¶ 28 [no oil transported through Pipelines CA-324 and CA-325 since 2015].) Thus, there is a clear physical and practical distinction and break between the offshore and submerged pipelines and Pipeline CA-324. Similarly, there are admitted distinctions between Pipelines CA-324 and CA-325. (Compare ¶¶ 22 and 23 [different diameters and permitted throughputs].) This is further confirmed by the admitted fact that the two onshore pipelines are

[3] Even if OSFM's regulatory jurisdiction is otherwise preempted, the pipelines are still subject to the requirements of the Consent Decree. (Walker Dec., Ex. D.)

[4] Even if Pipeline CA-324 were considered part of a larger, integrated system, the Coastal Act would still apply to the portions of that system within the Coastal Zone, which are wholly within Santa Barbara County.

5

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 763 of 837   Page
ID #:17806
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 399 of 464

regularly treated separately by regulatory agencies and Plaintiff. (Complaint ¶¶ 22, 32 [testing performed on the pipelines separately], 34 [separate State Waivers issued for the two pipelines]; see also Walker Dec., Exs. D [consent decree deals with Lines CA-324 and CA-325 separately, applying different requirements for each pipeline], E [State Waiver for Line CA-324, not CA-325], F [State Waiver for Line CA-325, not CA-324].) The unremarkable fact that CA-324 at some point interacts with and attaches to other facilities (as all pipelines must), does not negate that it is a separate and distinct pipeline for regulatory purposes.

As a separate and distinct pipeline, and the only pipeline that could properly be the subject of this action, Pipeline CA-324's physical location in Santa Barbara County is determinative of proper venue pursuant to Code of Civil Procedure section 392. (Compare with Code of Civil Proc., §393 [proper venue is where the effect of an agency's action is felt].)[5] Section 392 does not extend venue to counties where the property is not located based merely on a potential indirect, downstream effect on other property, and Plaintiff cites no authority suggesting otherwise.

III. **THE STATE APPROPRIATELY RAISED ADDITIONAL CONSIDERATIONS.**

The State was required to bring its motion to change venue before, or at the same time as, answering. (Code of Civil Procedure § 396b, subd. (a).) In consideration of that motion, it was appropriate to bring to the Court's attention the various other cases currently pending in Santa Barabara County pertaining to Pipelines CA-324 and CA-325, some of which involve OSFM and the Commission and raise issues that relate to or overlap with those alleged in this case. Plaintiff does not dispute, or even address, the State's lengthy list of existing litigation in Santa Barbara County Superior Court.

Even without a specific witness list, it is clear that if witnesses will be called, they will be nonparties from OSFM and/or the Commission. And if the preemption allegations in the First Amended Complaint are accepted, the group of potential witnesses, if any, would be narrowed even further to just the nonparty Commission. The Commission does not have permitting or

---

[5] As stated in the moving papers, Plaintiff brought this action against the State and invokes Code of Civil Procedure section 392. It did not identify any public official that has taken an alleged action or invoke Code of Civil Procedure section 393.

State's Reply to Pacific Pipeline's Response to Motion to Change Venue (BCV25103508)

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 764 of 837   Page
ID #:17807
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 400 of 464

regulatory authority, an office, or personnel in Kern County at all and is already engaged in litigation involving Pipeline CA-324 in Santa Barabara County. Giving the Court this fuller picture is appropriate. Additionally, courts generally disfavor a multiplicity of motions to change venue. (*Connell v. Bowes* (1942) 49 Cal.App.2d 542, 544; *South v. Wishard* (1954) 123 Cal.App.2d 642, 653-654.)

## CONCLUSION

Proper venue is in Santa Barabara County because that is where the only property that is properly the subject of this action is located. Accordingly, the motion to change venue should be granted.

Dated:  January 27, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
BRANDON S. WALKER
Supervising Deputy Attorney General
JACK C. NICK
Deputy Attorney General
ISABELLA A. PANICUCCI
Deputy Attorney General


/s/ Brandon S. Walker


BRANDON S. WALKER
Supervising Deputy Attorney General
*Attorneys for Defendant
State of California*

SA2025306665
39603840.docx

State's Reply to Pacific Pipeline's Response to Motion to Change Venue (BCV25103508)

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 765 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 401 of 464
ID #:17808

## DECLARATION OF SERVICE BY E-MAIL

**Case Name:**        Pacific Pipeline Company, A Delaware Corporation v. State of
California
**Case Number:**     BCV25103508
**Party Represented:**  State of California

**Declaration of Electronic Service**

1.  I am at least 18 years of age and not a party to this matter.

2.  I am employed in the Office of the Attorney General of the State of California. My
    business address is 1300 I Street, Suite 125, Sacramento, CA 95814, County of
    Sacramento.

3.  My electronic service address is Valerie.Tamulevich@doj.ca.gov.

4.  On January 27, 2026, I electronically served the following document[s]:

    **STATE OF CALIFORNIA'S REPLY TO PACIFIC PIPELINE'S RESPONSE IN
    OPPOSITION TO MOTION TO CHANGE VENUE**

5.  I electronically served the aforementioned document[s] by emailing them to the
    following individual[s]:

    **PLEASE SEE ATTACHED SERVICE LIST**

I declare under penalty of perjury under the laws of the State of California and the United States
of America that the foregoing is true and correct, and that this declaration was executed on
January 27, 2026.

| Valerie A. Tamulevich | /s/ Valerie A. Tamulevich |
|:---:|:---:|
| Declarant | Signature |

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 766 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 402 of 464
ID #:17809

## <u>SERVICE LIST</u>

Jeffrey Dintzer
Garrett B. Stanton
ALSTON & BIRD
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071
**E-mail Address**: jeffrey.dintzer@alston.com
**E-mail Address**: garrett.stanton@alston.com

Benjamin J. Hanelin
Natalie C. Rogers
PAUL HASTINGS LLP
1999 Avenue of the Stars, 27th Floor
Century City, CA 90067
**E-mail Address**: benjaminhanelin@paulhastings.com
**E-mail Address**: natalierogers@paulhastings.com

SA2025306665
39603832.docx

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 767 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 403 of 464
ID #:17810

ELECTRONICALLY FILED
Superior Court of California,
County of Kern
By: Marina Mercado
Deputy Clerk
01/27/26 3:49 PM

ROB BONTA
Attorney General of California
BRANDON S. WALKER SBN. 254581
Supervising Deputy Attorney General
JACK C. NICK SBN. 160196
ISABELLA A. PANICUCCI SBN. 318984
Deputy Attorneys General
 1300 I Street, Suite 125
 Sacramento, CA 95814
 Telephone: (916) 210-6395
 Fax: (916) 327-2319
 E-mail: Brandon.Walker@doj.ca.gov
*Attorneys for Defendant State of California*

NO FEE PURSUANT TO
GOVERNMENT CODE § 6103

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF KERN

METROPOLITAN DIVISION

| | |
|---|---|
| **Pacific Pipeline Company, A Delaware Corporation,**<br><br>Plaintiff,<br><br>v.<br><br>**State of California and DOES 1 through 25,**<br><br>Defendant. | Case No. BCV25103508<br><br>**SUPPLEMENTAL DECLARATION OF BRANDON S. WALKER IN SUPPORT OF STATE OF CALIFORNIA'S REPLY TO PACIFIC PIPELINE'S RESPONSE IN OPPOSITION TO MOTION TO CHANGE VENUE**<br><br>Date:          February 3, 2026<br>Time:          8:30 a.m.<br>Dept:          H<br>Judge:        Hon. Bernard C. Barmann, Jr.<br><br>Action Filed: September 29, 2025 |

Supp. Dec. of Brandon S. Walker ISO Reply to Response in Opp. to Motion to Change Venue (BCV25103508)

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 768 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 11   Filed 02/20/26   Page 404 of 464
ID #:17811

I, Brandon S. Walker, declare:

1.    I am a Supervising Deputy Attorney General employed by the State of California Department of Justice, Office of the Attorney General. I am one of the attorneys assigned to represent the State of California in this action. I have personal knowledge of the facts set forth below and could and would competently testify to them if called to do so.

2.    Attached as Exhibit J is a true and correct copy of the petition for review filed in the Ninth Circuit Court of Appeals by the State of California, by and through the Attorney General's Office and the Office of the State Fire Marshal that challenges three orders by the federal Pipeline and Hazardous Materials Safety Administration.

3.    Attached as Exhibit K is a true and correct copy of the motion for reconsideration of preliminary injunction filed by Pacific Pipeline Company in Santa Barabara County Superior Court.

Dated:  January 27, 2026

**Brandon S. Walker**
<br>Digitally signed by Brandon S. Walker
<br>Date: 2026.01.27 09:30:13 -08'00'

_____
<br>Brandon S. Walker
<br>Declarant

SA2025306665
39600921.docx

Supp. Dec. of Brandon S. Walker ISO Reply to Response in Opp. to Motion to Change Venue (BCV25103508)

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 769 of 837   Page
ID #:17812
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 405 of 464

# Exhibit J

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 770 of 837   Page
Case: 26-508, 01/23/2026, DktEntry: 1.1, Page 1 of 30
ID #:17843
Case 1:26-cv-01486-KES-CDB   Document 43   Filed 02/20/26   Page 406 of 464

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

STATE OF CALIFORNIA,

*Petitioner*,

V.

PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION, PAUL ROBERTI, IN HIS OFFICIAL CAPACITY AS ADMINISTRATOR OF THE PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION, UNITED STATES DEPARTMENT OF TRANSPORTATION, AND SEAN DUFFY, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF TRANSPORTATION,

*Respondents*,

## PETITION FOR REVIEW

ROB BONTA
*Attorney General of California*
ANNADEL A. ALMENDRAS
DEBORAH M. SMITH
  *Senior Assistant Attorneys General*
MYUNG J. PARK
VANESSA MORRISON
  *Supervising Deputy Attorneys General*

MATTHEW BULLOCK
MICHAEL S. DORSI
MITCHELL RISHE
RAFAEL J. HURTADO
REBECCA HUNTER
  *Deputy Attorneys General*
STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 510-3802
Fax: (415) 703-1107
Michael.Dorsi@doj.ca.gov
Mitchell.Rishe@doj.ca.gov
  *Attorneys for State of California*

January 23, 2026

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 771 of 837   Page
Case: 26-508   01/23/2026   DktEntry: 1.1   Page 2 of 30
Case 1:26-cv-01488-KES-CDB   Document 1   Filed 02/20/26   Page 407 of 464

## PETITION FOR REVIEW

Pursuant to 49 U.S.C. Section 60119(a)(1), Federal Rule of Appellate Procedure 15, and Ninth Circuit Rule 15-1, the State of California, by and through Attorney General Rob Bonta and Office of the State Fire Marshal (OSFM), a unit of the California Department of Forestry and Fire Protection, petitions this Court for review of orders issued by the Pipeline and Hazardous Materials Safety Administration (PHMSA), an agency within the United States Department of Transportation.

This Petition challenges three unlawful orders by PHMSA.

First, on December 17, 2025, PHMSA issued an order (the "Federalization Order") purporting to assume exclusive federal jurisdiction over the Las Flores Pipelines—a pair of onshore pipelines designated CA-324 and CA-325 that, in sequence, originate at Las Flores Canyon in Santa Barbara County, California, and terminate at the Pentland Station terminal, in Kern County, California. The assertion of federal jurisdiction is erroneous, and, if allowed to stand, would displace OSFM from its role in regulating pipeline safety for the Las Flores Pipelines. PHMSA's December 17, 2025, Federalization Order is attached to this Petition as Exhibit 1.

Second, on December 22, 2025, PHMSA issued an order approving a Restart Plan (the "Restart Approval Order") for the Las Flores Pipelines, allowing

2

them to return to service without completion of OSFM's requirements imposed pursuant to the consent decree—to which PHMSA and OSFM are signatories—after the catastrophic 2015 oil spill on these lines near Refugio State Beach, in Santa Barbara County, California. *See United States, et al. v. Plains All American Pipeline, L.P., et al.*, Case No. 2:20-cv-02415, ECF Nos. 6, 6-1, and 33 (C.D. Cal. 2020). The Restart Approval Order, if permitted to become effective, would allow the Las Flores Pipelines to operate (a) despite the failure to finish required repairs and remediation on the pipelines to address the lack of corrosion protection, which PHMSA determined to be the root cause of the Refugio Oil Spill, and (b) without complying with OSFM's alternative conditions, outlined in the OSFM State Waivers.[1] Pursuant to 49 USC § 60118(d), PHMSA did not object to granting of these waivers by OSFM for the CA-324 and CA-325 pipelines. A copy of PHMSA's Restart Approval Order is attached to this Petition as Exhibit 2.

Third, on December 23, 2025, PHMSA issued an order granting an "Emergency Special Permit" (the "Emergency Special Permit") to the Las Flores Pipelines' owner, Sable Offshore Corp., pursuant to 49 U.S.C. Section

---

[1] A State Waiver is an order that allows a state to impose additional safety requirements on a pipeline facility where continued operation would violate State or federal pipeline safety laws. Every State Waiver must be submitted to PHMSA for review; if PHMSA does not object to the terms of the order, it will issue. The State Waivers issued to Sable are available on CAL FIRE's web page Pathways for Restarting CA-324 and CA-325, https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa/pathways-for-restarting-pipelines.

3

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 773 of 837   Page
Case 26-508  01/23/2026  DktEntry: 1.1, Page 4 of 30
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 409 of 464

60118(c)(2)(A), waiving compliance with federal pipeline safety regulations. The Emergency Special Permit bypassed federal procedures for approval of a special permit and lacks any legal or factual basis. PHMSA's Emergency Special Permit is attached to this Petition as Exhibit 3.

Pursuant to 49 U.S.C. Section 60119(a), orders issued by PHMSA under the Pipeline Safety Act ("PSA") may be challenged by filing a Petition for Review directly in the federal court of appeals where the petitioner resides, and the petition must be filed within 89 days of the issuance of PHMSA's order. Accordingly, Petitioner has timely and properly sought review of PHMSA's orders directly in this Court.

Judicial review of PHMSA orders is conducted under the standards of Section 706 of the Administrative Procedure Act. 49 U.S.C. § 60119(a)(3). As the basis for this Petition for Review, Petitioner alleges that PHMSA's actions and orders were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A) & (D).

Petitioner prays for an order setting aside PHMSA's orders dated December 17, 22, and 23, 2025.

4

Respectfully submitted this 23rd day of January, 2026.

ROB BONTA
*Attorney General of California*

*/s/ Michael S. Dorsi*
MICHAEL S. DORSI
*Deputy Attorney General*
455 Golden Gate Ave, Suite 11000
San Francisco, CA 94102
Tel: (415) 510-3802
Email: Michael.Dorsi@doj.ca.gov
*Attorneys for State of California*

## STATEMENT OF RELATED CASES

The following related case is pending: *Environmental Defense Center, et al. v. Pipeline and Hazardous Materials Safety Administration*, Ninth Circuit Court of Appeals Case No. 25-8059.

5

# Exhibit 1

Exhibit 1
to Petition for Review



U.S. Department
of Transportation

1200 New Jersey Avenue SE
Washington, D.C. 20590

**Pipeline and Hazardous
Materials Safety
Administration**

December 17, 2025

Via Electronic Mail to: cflores@sableoffshore.com

J. Caldwell Flores
President and Chief Operating Officer
Sable Offshore Corp.
845 Texas Ave. Ste 2920
Houston, TX 77002

Re: Determination of Interstate Classification

Dear Mr. Flores:

This responds to your letter of November 26, 2025 regarding the Las Flores Pipeline owned and
operated by Sable Offshore Corp. (Sable). Your letter notifies the Pipeline and Hazardous
Materials Safety Administration (PHMSA) that Sable has determined the pipeline to be an
interstate pipeline facility under the Pipeline Safety Act (PSA) and requests PHMSA transition
regulatory oversight from the California Office of the State Fire Marshal (OSFM) to PHMSA.

As noted in your letter, portions of the Las Flores Pipeline (previously known as Lines 901 and
903) have been considered intrastate since 2016 and subject to regulatory oversight by OSFM
pursuant to its certification with PHMSA under 49 U.S.C. § 60105(a). Prior to 2016, Lines 901
and 903 were considered interstate and regulated by PHMSA. The classification change in 2016
corresponded to the pipelines' previous owner cancelling tariffs with the Federal Energy
Regulatory Commission (FERC). In 2024, Sable acquired Lines 901 and 903 and other assets
comprising the Las Flores Pipeline, including offshore pipelines transporting crude oil from the
Outer Continental Shelf (OCS) and an onshore processing facility at Las Flores Canyon. Sable
operates the Las Flores Pipeline assets as a single pipeline system transporting crude oil from the
OCS to the Pentland Station terminal in Kern County, California.

Upon receipt of your letter, PHMSA initiated a review of the Las Flores Pipeline. This review
included an on-site inspection on December 9 through December 11, 2025. OSFM
representatives accompanied PHMSA on the inspection. PHMSA also reviewed Sable's written
procedures and records and conducted field observations of the Las Flores facility, the pump
stations at Gaviota and Sisquoc, the control room in Santa Maria, and the offshore Harmony
platform. In addition, PHMSA reviewed the 2025 program inspections conducted by OSFM. For

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 777 of 837   Page
Case 1:26-cv-01488-KES-CDB   Document 1   Filed 02/20/26   Page 413 of 464

2

the following reasons, PHMSA agrees with your determination that the Las Flores Pipeline is an interstate pipeline.

The PSA authorizes PHMSA to prescribe and enforce minimum safety standards for pipeline transportation and for pipeline facilities.[1] The PSA vests with PHMSA exclusive regulatory authority over interstate pipelines and preempts States from adopting or continuing in force safety standards for interstate pipelines.[2] With respect to intrastate pipelines, the PSA provides a State authority may regulate the intrastate pipelines within its borders upon submission to PHMSA of an annual certification.[3] Both the PSA and the Federal pipeline safety regulations define interstate and intrastate pipelines.[4] An interstate pipeline is a pipeline or part of a pipeline used to transport hazardous liquids in interstate or foreign commerce; an intrastate pipeline is a hazardous liquid pipeline that is not an interstate pipeline.

Determining whether a hazardous liquid pipeline is an interstate or intrastate pipeline requires a factual inquiry.[5] To assist in that determination, PHMSA adopted Appendix A to 49 CFR Part 195 providing a statement of agency policy and interpretation on the delineation between Federal and State jurisdiction.[6] In short, "if there is a tariff or concurrence filed with FERC governing the transportation of hazardous liquids over a pipeline facility . . . then [PHMSA] will, as a general rule, consider the facility to be an interstate pipeline facility within the meaning of the [PSA]." The absence of a FERC tariff generally means a pipeline is intrastate; however, in certain situations, PHMSA will consider a pipeline to be interstate despite the lack of a filing with FERC. Several examples of this are listed in Appendix A. As it relates to the Las Flores Pipeline, one example provides that a pipeline originating on the OCS will be considered an interstate pipeline even if the pipeline does not have a tariff with FERC.[7]

PHMSA's evaluation of the Las Flores Pipeline confirms that it transports crude oil from the OCS to an onshore processing facility at Las Flores Canyon and continues the transportation of crude oil from Las Flores Canyon to Pentland, California. Consistent with Appendix A, the Las

---

[1] 49 U.S.C. § 60101 et seq.

[2] 49 U.S.C. § 60104(c). See Olympic Pipe Line Co. v. City of Seattle, 437 F.3d 872, 878 (9th Cir. 2006) (discussing how the "PSA differentiates between the regulation of interstate and intrastate hazardous liquid pipelines.")

[3] 49 U.S.C. § 60105(a). OSFM has a certification with PHMSA to regulate intrastate hazardous liquid pipelines in California.

[4] 49 U.S.C. § 60101(a)(7), (a)(8)(B), (a)(10); 49 CFR § 195.2. See S. Pac. Pipe Lines Inc. v. DOT, 796 F.2d 539 (D.C. Cir. 1986) (finding PHMSA's definition of interstate and intrastate pipelines reasonable under the PSA).

[5] Transportation of Liquids by Pipeline, 46 Fed. Reg. 38,357, 38,359 (Jul. 27, 1981) (PHMSA's predecessor agency (hereafter PHMSA) explained that it had "reviewed examples of what it believes are the most frequent and likely configurations of liquid pipelines and pipeline facilities and considered various ways of cataloging or classifying them as either interstate or intrastate."); see also Shell Oil Co. v. City of Santa Monica, 830 F.2d 1052, 1064 (9th Cir. 1987) (noting that whether the pipeline was interstate or intrastate turned on a disputed issue of fact).

[6] Transportation of Hazardous Liquids by Pipeline; Regulation of Intrastate Pipelines, 50 Fed. Reg. 15,895, 15,897 (Apr. 23, 1985).

[7] 49 CFR Part 195, App. A. "Example 7. Pipeline Company P operates a pipeline that originates on the Outer Continental Shelf. P does not file any tariff for that line with FERC. [PHMSA] will consider the pipeline to be an interstate pipeline facility."

3

Flores Pipeline is an interstate pipeline.[8] As portions of the Las Flores Pipeline were previously considered to be intrastate and regulated by OSFM, PHMSA is notifying OSFM that the Las Flores Pipeline is subject to the regulatory oversight of PHMSA. Please direct further correspondence on this matter to Dustin Hubbard, Director, Western Region, Office of Pipeline Safety, PHMSA, at (720) 963-3183.

Sincerely,

LINDA GAIL DAUGHERTY
Digitally signed by LINDA GAIL DAUGHERTY
Date: 2025.12.17 07:56:56 -05'00'

Linda Daugherty
Acting Associate Administrator for Pipeline Safety

cc:    James Hosler, Chief, Pipeline Safety Division, OSFM
       Varun Shekhar, Shareholder, Babst Calland Clements & Zomnir, PC

---

[8] PHMSA regulations consider the Las Flores Pipeline to be an "active" pipeline. *See* Pipeline Safety: Clarification of Terms Relating to Pipeline Operational Status, 81 Fed. Reg. 54,512 (Aug. 12, 2016) ("The regulations consider pipelines to be either active and fully subject to all relevant parts of the safety regulations or abandoned.")

# Exhibit 2

Exhibit 2
to Petition for Review



U.S. Department
of Transportation
**Pipeline and Hazardous**
**Materials Safety**
**Administration**

12300 W. Dakota Ave., Suite 340
Lakewood, CO 80228

<u>**VIA ELECTRONIC MAIL TO: lyearwood@sableoffshore.com**</u>

December 22, 2025

Mr. Lance Yearwood
Vice President
Pacific Pipeline Company / Sable Offshore Corp.
845 Texas Avenue, Suite 2920
Houston, Texas 77002

> **RE:**   **Approval of Sable Offshore Corp.'s Restart Plan for the Las Flores Pipeline System Line
> CA-324 and Line CA-325**

Dear Mr. Yearwood:

From December 4 to December 12, 2025, the Pipeline and Hazardous Materials Safety Administration
(PHMSA) received several documents from Sable Offshore Corp. These documents included:

> 1. Line CA-324 and Line CA-325 Fill Plan and Startup Procedures
> 2. A letter requesting the removal of pressure restrictions for Line CA-324
> 3. A letter requesting the removal of pressure restrictions for Line CA-325
> 4. The Las Flores Pipeline Linefill Positioning Plan Assignments
> 5. The Las Flores Pipeline Linefill Contact List

These documents addressed the Restart Plan for Line CA-324 and Line CA-325 (previously known as
Plains Line 901 and Line 903, respectively). In addition, PHMSA conducted a field inspection with Sable
Offshore Corp. to discuss its process and safety procedures for the pipeline restart.

PHMSA has reviewed these documents and hereby approves the submitted Restart Plan. This approval is
valid from the date of this letter.

Should you have any questions or concerns, please contact me at (720) 963-3160 or by email at
dustin.hubbard@dot.gov.

Sincerely,

# DUSTIN B HUBBARD
Digitally signed by DUSTIN B HUBBARD
Date: 2025.12.22 13:19:33 -07'00'

Dustin Hubbard
Director, Western Region
Pipeline and Hazardous Materials Safety Administration

Case 2:26-cv-05242-SVW-CSO, Document 86-1, Filed 05/14/26, Page 781 of 837 Page
Case, 26-508, 04/23/2026, DktEntry: 1.1, Page 12 of 30
ID #:17824
Case 1:26-cv-01486-KES-CDB Document 4 Filed 02/20/26 Page 417 of 464

cc:    Trent Fontenot, Sr. Vice President - Operations, tfontenot@sableoffshore.com
Jim Hosler, Assistant Deputy Director – Pipeline Safety and CUPA, CalFire,
jim.hosler@fire.ca.gov

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 782 of 837    Page
Case: 26-508, 01/23/2026, DktEntry: 1.1, Page 13 of 30
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 418 of 464

# Exhibit 3

Exhibit 3
to Petition for Review

# U.S. DEPARTMENT OF TRANSPORTATION
# PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION
# EMERGENCY SPECIAL PERMIT

## Special Permit Information:

| | |
|---|---|
| **Docket Number:** | 2025-1502 |
| **Requested By:** | Sable Offshore Corp. PPC |
| **Operator ID#:** | 40881 |
| **Date Requested:** | December 19, 2025 |
| **Issuance Date:** | December 23, 2025 |
| **Expiration Date:** | February 21, 2026 |
| **Code Section:** | 49 CFR § 195.452(h)(4)(iii)(H) |

## Grant of Special Permit:

By this order, subject to the terms and conditions set forth below, the Pipeline and Hazardous Materials Safety Administration (PHMSA) Office of Pipeline Safety (OPS)[1] grants this emergency special permit to Sable Offshore Corp. PPC (Sable) for 124.42 miles of 24- and 30-inch diameter hazardous liquid pipelines, Lines CA-324 and CA-325 (*special permit segments*), transporting crude oil from Las Flores Canyon to Pentland in Santa Barbara, San Luis Obispo, and Kern counties, California. This emergency special permit waives compliance from 49 CFR § 195.452(h)(4)(iii)(H), which requires corrosion of or along a longitudinal seam weld be scheduled for evaluation and remediation within 180 days of discovering the condition.

## I. Purpose and Need

On December 19, 2025,[2] Sable requested an emergency special permit for relief from the requirement to evaluate and remediate corrosion occurring at longitudinal seam welds within 180 days. The *special permit segments* are under polyurethane foam and polyethylene tape wrap insulation, which can inhibit the effectiveness of cathodic protection and contribute to a risk of corrosion due to shielding effects. Sable proposed an alternative approach to safely manage this risk, which was previously reviewed and approved as part of two state waivers issued by the California Office of State Fire Marshal (OSFM) on December 17, 2024 to Sable for the *special permit segments*. PHMSA previously reviewed the state waivers pursuant to 49 U.S.C. § 60118(d).

---

[1] Throughout this special permit, the usage of "PHMSA" means the U.S. Department of Transportation (DOT), Pipeline and Hazardous Materials Safety Administration, Office of Pipeline Safety.

[2] Sable submitted supplemental information related to its application on December 23, 2025.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC                                    Page 1 of 16
Emergency Special Permit – Corrosion Mitigation – California

Sable sought this special permit to implement the terms of a Consent Decree entered in Civil Action No. 2:20-CV-02415 by the U.S. District Court for the Central District of California, which provides, among other requirements, that a "State Waiver" must be applied for and received from OSFM prior to restarting Lines CA-324 and CA-325. The *special permit segments* were previously considered intrastate at the time of entry of the Consent Decree and were regulated by OSFM pursuant to its state certification with PHMSA under 49 U.S.C. § 60105(a). However, the *special permit segments* are now considered interstate pursuant to Sable's designation on November 26, 2025, and PHMSA's concurrence on December 17, 2025. As a result, PHMSA has exclusive pipeline safety regulatory agency over Lines CA-324 and CA-325. The conditions ordered by OSFM in the two state waivers are now being re-issued by PHMSA as a special permit subject to Federal oversight and enforcement.

Sable requested PHMSA grant a special permit for the above reasons on an emergency basis pursuant to 49 U.S.C. § 60118(c)(2) and 49 CFR § 190.341(g). In its application, Sable stated that expedited review of its application was warranted in light of the national energy emergency declared by the President under the National Emergencies Act (50 U.S.C. § 1601 et seq.) in Executive Order 14156 (January 20, 2025). In Executive Order 14156, the President declared a national energy emergency based on a finding that "[t]he United States' insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy."[3] The Executive Order directs agencies, such as PHMSA, to "identify and exercise any lawful emergency authorities available to them, as well as all other lawful authorities they may possess, to facilitate," among other activities, the "production, transportation, refining, and generation of domestic energy resources."[4] The Executive Order further directs agencies to "identify and use all lawful emergency or other authorities available to them to facilitate the supply, refining, and transportation of energy in and through the West Coast of the United States . . . ."[5]

Sable's application stated that grant of this special permit on an emergency basis would facilitate the restart of Lines CA-324 and CA-325 to provide relief in response to the acute energy shortage conditions identified in Executive Order 14156 within California and in the West Coast region of the United States.[6] Sable further noted that grant of this special permit on an emergency basis is appropriate to address the gap in coverage under the OSFM State Waivers created by redesignation of Lines CA-324 and CA-325 as interstate, given that the proposed special permit is substantially the same as that which was previously reviewed and approved by OSFM and PHMSA for issuance of the State Waivers.

This emergency special permit allows Sable to operate Lines CA-324 and CA-325 without being subject to the requirement to evaluate and remediate corrosion of or along a longitudinal seam weld within 180 days. On the condition that Sable comply with the terms and conditions set forth below, the emergency special permit waives compliance with 49 CFR § 195.452(h)(4)(iii)(H) for the *special permit segments*.

---

[3] Exec. Order 14156: Declaring a National Energy Emergency (Jan. 20, 2025), Sec. 1.
[4] Exec. Order 14156: Declaring a National Energy Emergency (Jan. 20, 2025), Sec. 2(a). The order's definition of "energy" or "energy resources" includes "crude oil," and its definition of "transportation" includes "the physical movement of energy, including through, but not limited to, pipelines." Sec. 1(a); 1(c).
[5] Exec. Order 14156: Declaring a National Energy Emergency (Jan. 20, 2025), Sec. 3(b).
[6] For more information regarding these effects, see Attachments C, D, E, and F.

## II. Special Permit Segments

This emergency special permit pertains to the specified pipeline segments which make up the Las Flores Pipeline called Line CA-324 and CA-325. Line CA-325 can be further divided into two segments: Lines CA-325A and CA-325B. The Las Flores Pipeline is part of the Santa Ynez Pipeline System (SYPS), an interstate pipeline facility that Sable operates from the Outer Continental Shelf off the coast of Santa Barbara to Kern County, California. A map of the special permit segments is available in Revised Attachment A.

<u>Special Permit Segments:</u>

| Special Permit Segment Name | Location | Mileage | California County or Counties |
|---|---|---|---|
| CA-324 | Las Flores Canyon Processing Facility to Gaviota Pump Station | 10.86 | Santa Barbara |
| CA-325A | Gaviota Pump Station to Sisquoc Pump Station | 38.72 | Santa Barbara |
| CA-325B | Sisquoc Pump Station to Pentland Station | 74.84 | Santa Barbara; San Luis Obispo; Kern |

## III. Conditions

PHMSA grants this emergency special permit subject to Sable implementing each of the following conditions. These conditions must be implemented and complied with in addition to all applicable requirements of 49 CFR Part 195 except for compliance with limitations on scheduling instances of corrosion on or near longitudinal seam welds for evaluation and remediation within 180 days of discovery in 49 CFR § 195.452(h)(4)(iii)(H), which would be waived.

<u>General Conditions:</u>

1) The *special permit segments* may only be used to transport crude oil.

2) Prior to transporting crude oil in the *special permit segments*, Sable must develop and implement procedures for the conditions and requirements described in this emergency special permit.

3) Sable shall not exceed maximum operating pressure (MOP) limits for the *special permit segments*, as follows:

   a) The MOP of Line CA-324 cannot exceed 1003 pounds per square inch gauge (psig).

   b) The MOP of Line CA-325A (the segment of Line CA-325 between Gaviota and Sisquoc stations) cannot exceed 1000 psig.

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 786 of 837    Page
Case 1:26-cv-01486-KES-CRB    Document 36    Filed 02/20/26    Page 422 of 464
ID #:17829

c) The MOP of Line CA-325B (the segment of Line CA-325 between Sisquoc and Pentland stations) cannot exceed 1292 psig.

4) Sable shall not exceed maximum operating temperature limits for crude oil transported in the *special permit segments*, as follows:

    a) The maximum operating temperature of the crude oil that is transported in Line CA-324 must not exceed 140 degrees Fahrenheit for more than 12 consecutive hours.

    b) The maximum operating temperature of the crude oil that is transported in Line CA-325A (the segment of Line CA-325 between Gaviota and Sisquoc stations) must not exceed 125 degrees Fahrenheit for more than 12 consecutive hours. Temperature transmitters must be installed on Line CA-325 at Gaviota station to monitor the temperature of Line CA-325A.

    c) The maximum operating temperature of the crude oil that is transported in Line CA-325B (the segment of Line CA-325 between Sisquoc and Pentland stations) must not exceed 110 degrees Fahrenheit for more than 12 consecutive hours. Temperature transmitters must be installed on Line CA-325 at Sisquoc station to monitor the temperature of Line CA-325B.

5) This emergency special permit does not relieve Sable from complying with applicable requirements under 49 CFR Part 195, other than those waived in this emergency special permit.

6) This emergency special permit does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).

7) In-line inspections (ILIs) performed pursuant to this emergency special permit must include:

    a) Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion, defined as follows:

        i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.

        ii. General corrosion means uniform or gradually varying loss of wall thickness over an area.

    b) Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI).

    c) Use of a tool that is at least capable of reliably detecting and sizing crack or crack-like anomalies at a 90 percent POD and POI.

8) Prior to placing CA-324 in operation, Sable must perform fracture toughness tests on the existing 24" pipe from CA-324 in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from the predominant existing 24" pipe, specifically API 5L X65 HF-ERW pipe with a nominal thickness of 0.344" that was manufactured by Nippon Steel Corp. in the 1980s. At least three (3) separate tests must be performed to obtain the fracture toughness values of the

pipe body, heat affected zone (HAZ)[7], and the HF-ERW long seam weld on the pipe to represent the fracture toughness of CA-324 (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the HF-ERW long seam weld). The lowest fracture toughness value must be applied to conditions 11, 16, 17, and 21. Sable may use pipe samples taken opportunistically during ongoing maintenance and repair efforts on Line CA-324.[8]

9) Prior to placing Line CA-325 (including CA-325A and CA-325B) in operation, Sable must perform fracture toughness tests on the existing 30" pipe from CA-325A/B in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from both of the two following predominant existing 30" pipe specifications:

   a) API 5L X70 pipe with a nominal thickness of 0.281" that was manufactured by the various pipe mills in the 1980s.

   b) API 5L X65 pipe with a nominal thickness of 0.344" that was manufactured by the various pipe mills in the 1980s.

At least three (3) separate tests must be performed from each pipe mill, for both of the two pipe specifications listed above, to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ), and the DSAW long seam weld on the pipe to represent the fracture toughness of CA-325A/B (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the DSAW long seam weld). The lowest fracture toughness value must be applied to conditions 11, 16, 17, and 21. Sable may use pipe samples taken opportunistically during ongoing maintenance and repair efforts on Line CA-325A/B.[9]

10) All existing immediate and 180-day repair conditions must be evaluated and remediated pursuant to the Consent Decree repair criteria prior to restarting CA-325A/B.[10] Upon restart Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by PHMSA. Sable must utilize the Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results to identify, evaluate and remediate any immediate and 180-day repair conditions that are listed in this emergency special permit.

11) Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines*. If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss

---

[7] The heat affected zone (HAZ), as used in this emergency special permit, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.

[8] Sable indicated in its application that it has already completed all of the testing required in this condition. Sable must submit all fracture toughness results to PHMSA prior to restarting Line CA-324.

[9] Sable indicated in its application that it has already completed the testing required in this condition. Sable must submit all fracture toughness results to PHMSA prior to restarting Line CA-325.

[10] Sable indicated in its application that it has already completed the repairs required in this sentence. Sable must submit all of the results to PHMSA prior to restarting CA-324 and CA-325.

anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

12) Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of CA-324 and CA-325A/B.

13) Pressure Testing:[11]

a) Prior to placing CA-324 in operation, Sable must conduct a spike hydrostatic pressure test of CA-324 at a minimum pressure that is at least 1.5 times the maximum operating pressure (MOP) or 100% specified minimum yield strength (SMYS), for a minimum of 15 minutes after the spike test pressure is stabilized. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-324:

   i. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

   ii. All anomalies that have a predicted failure pressure less than or equal to 1.6 times MOP.

b) Immediately following the spike hydrostatic pressure test specified in Condition 13(a), Sable must conduct an 8-hour hydrostatic pressure test of CA-324 at a minimum of 1.25 times the MOP.

c) Prior to placing Line CA-325A (segment of Line 325 between Gaviota and Sisquoc stations) in operation, Sable must conduct a spike hydrostatic pressure test of CA-325A at a minimum pressure that is at least 1.39 times the MOP, for a minimum of 15 minutes after the spike test pressure is stabilized. Sable must ensure that the spike hydrostatic pressure at the highest elevation of each testable segment is at least 1.39 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-325A:

   i. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

   ii. All anomalies that have a predicted failure pressure less than or equal to 1.5 times MOP.

d) Immediately following the spike hydrostatic pressure test specified in Condition 13(c), Sable must conduct an 8-hour hydrostatic pressure test of CA-325A at a minimum of 1.25 times the MOP.

e) Prior to placing Line CA-325B (segment of Line 325 between Sisquoc and Pentland stations) in operation, Sable must conduct a hydrostatic pressure test of CA-325B at a minimum pressure of 1.25 times the MOP, for a minimum of 8 hours. Sable must ensure that the hydrostatic pressure at the highest elevation of each testable segment is at least 1.25 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the

---

[11] Sable indicated in its application that it has already completed all of the testing and repairs required in this Condition. Sable must submit the results to PHMSA prior to restart and confirm that no failures occurred during the required pressure testing.

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 789 of 837   Page
ID #:17892
Case 1:26-cv-00486-SB   Document 31/23/2026   Entry Filed 2/20220 6 of 30 Page 425 of 464

hydrostatic test on CA-325B:

    i.  All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

    ii.  All anomalies that have a predicted failure pressure less than or equal to 1.4 times MOP.

f)  Sable must obtain the Test ID for each hydrostatic pressure test from PHMSA (or OSFM if such testing was performed prior to November 26, 2025) and have the approved independent testing firm forward separately the certified test results to PHMSA or the OSFM, as applicable.

g)  Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 CFR Part 195 Subpart E – Pressure Testing and monitored by an independent testing firm listed under PHMSA or OSFM (as applicable) approved hydrostatic testing companies.

h)  Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported to PHMSA.[12]

i)  Section(s) of the *special permit segments* that failed during the required hydrotesting must be repaired by removing and replacing the failed section. PHMSA reserves the right to revoke this emergency special permit if failure(s) raise the concern that the *special permit segments* cannot be safely operated.

14)  In-Line Inspection (ILI) Assessment and Frequency:

a)  Prior to performing in-line inspections of the *special permit segment*, Sable shall provide PHMSA with a written notification to PHMSA describing its assessment plan with the following information:

    i.  Dates for integrity assessment

    ii.  In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[13] to assess the integrity of the subject pipe segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications;

    iii.  In-line inspection tool vendor(s)

    iv.  Required tool specifications including operational specifications and anomaly sizing tolerances

    v.  Tool validation methodology

    vi.  Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications

---

[12] All submissions to PHMSA required by this emergency special permit shall be submitted through email to the OPS Western Region Director, Dustin Hubbard, email address: Dustin.Hubbard@dot.gov or his designee.

[13] Industry standards referenced in this emergency special permit must utilize the editions that are incorporated by reference in 49 CFR 195.3 unless another edition is explicitly specified in this emergency special permit.

vii. Criteria used to identify locations for excavation and field verification

viii. Non-destructive examination

b) Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.

c) Metal Loss Tool(s):

    i. Initial ILI tool runs – Each year, during the first two (2) years of operating the *special permit segments*, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU). Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months. If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.

    ii. Subsequent ILI tool runs – After the first two (2) years of operating the *special permit segments*, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the *special permit segment* within 30 days after it was deemed to be unsuccessful. All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

d) Crack Detection Tools - Sable shall conduct at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15 months[14] or the ILI assessment must be assessed at more frequent intervals if condition 21 determined a shorter assessment interval.

    i. These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.

    ii. USCD Performance Specification Requirements

        1. The USCD tools must have a probability of detection that is

---

[14] Sable may petition PHMSA to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to PHMSA approval.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 8 of 16

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 791 of 837   Page
Case: 26-508  01/23/2026, DktEntry: 1.1, Page 22 of 30
Case 1:26-cv-01486-KES-CDB    Document 1-4    Filed 02/20/26    Page 427 of 464

$\geq 90\%$ for axial and circumferential cracks.

2. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.

3. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.

4. The depth sizing accuracy for cracks must be $\pm 0.8$ mm for axial cracks and $\pm 1$ mm for circumferential cracks.

e) Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

f) Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the *special permit segment* in which the ILI tool velocity was outside of the specified tool velocity range.

g) All ILI tool runs must obtain the Test ID from PHMSA prior to run.

h) Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.

i) Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

j) Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals. Sable must document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[15] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different. If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

k) Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second

---

[15] A minimum of four (4) independent direct examination excavations must be used for unity plots.

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 792 of 837   Page
Case: 26-508   01/23/2026   DktEntry: 1.1   Page 23 of 30
Case 1:26-cv-01486-KES-CDB    Document 15    Filed 02/20/26    Page 428 of 464

Edition, April 2013).

15) Discovery of Condition: The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

16) Immediate Repair Conditions:[16]

    a) A crack or crack-like anomaly that meets any of the following criteria:

        i. Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.

        ii. Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.

    b) Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.

    c) Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[17]

17) 180-Day Repair Conditions:[18]

    a) A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.

    b) Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.

    c) All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[19]

    d) For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

18) Corrosion Growth Rate Analysis (CGRA):

    a) Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to

---

[16] The criteria specified in this emergency special permit is supplemental to, and does not relieve Sable from complying with, the requirements set forth in 49 CFR 195.452(h)(4)(i). All immediate repair conditions must be remediated with a permanent repair method.

[17] Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria. General corrosion means uniform or gradually varying loss of wall thickness over an area.

[18] The criteria specified in this emergency special permit is supplemental to, and does not relieve Sable from complying with, the requirements set forth in 49 CFR 195.452(h)(4)(iii), except for those associated with 49 CFR 195.452(h)(4)(iii)(H). All immediate repair conditions must be remediated with a permanent repair method.

[19] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth. If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify PHMSA, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 CFR § 195.452 until the indication is remediated or until otherwise authorized by PHMSA.

prior ILI) and perform pipeline remediations needed to assure the integrity of the *special permit segments* is maintained.[20] The timing of remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.

b) The CGRA procedure must include ILI data matching methods[21] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.

c) Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.

d) When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates,[22]

e) All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

19) Pressure Reduction: If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in this emergency special permit, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

20) In Field Direct Examination of Pipe:

a) Direct examinations[23] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[24] PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.

b) Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition. However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:

   i. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.

   ii. Sable must increase the metal loss anomaly's depth by 20% when

---

[20] At a minimum, Sable must include signal matching between ILI data sets.

[21] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

[22] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

[23] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.

[24] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complemented by shear wave technology or inspection by phased array ultrasonic testing.

they input it into the formula for calculating the number of wraps needed for repair method 5.

   iii. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs. If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

c) Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

d) Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy. Sable must recoat in accordance with their coating repair procedure.[25]

e) All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

21) Integrity Management:

a) A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.

   i. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 CFR § 192.712(d)(1).

   ii. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 CFR § 192.712(d)(2).

b) Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.

c) When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

d) Sable must send all field measurements to the ILI tool vendor within 90 days

---

[25] The coating procedure must be submitted to PHMSA prior to the effective date of this emergency special permit.

of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

e) Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the *special permit segments*. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by PHMSA prior to being selected.

f) Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC) interference or direct current (DC) interference or shorting that could contribute to external corrosion is

g) occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

22) Data Requirements for Predicted Failure Analysis:

a) Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

b) The analyses performed in accordance with this emergency special permit must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in traceable, verifiable, and complete records.

23) Recordkeeping:

a) Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this emergency special permit shall be kept for the life of the *special permit segments* and must be submitted to PHMSA, in the manner requested (electronic, hardcopy, or other format) within 30 days.

b) Sable must maintain the following records:

   i.    Technical approach used for the analysis

   ii.   All data used and analyzed

   iii.  Pipe and longitudinal weld seam properties

   iv.   Procedures used to implement emergency special permit conditions

Case 2:26-cv-05242-SVW-SSC  Document 36  Filed 05/14/26  Page 796 of 837  Page
ID #:17839
Case 1:26-cv-01486-KES-SUB  Document 1/28/2026  Filed 02/30/267  Page 432 of 464

    v.    Evaluation methodology used

    vi.    Models used

    vii.    Direct in situ examination data

    viii.    All in-line inspection tool assessments information evaluated

    ix.    Pressure test data and results

    x.    All in-the-ditch assessments performed on the *special permit segments*

    xi.    All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results

    xii.    All finite element analysis results

    xiii.    The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology

    xiv.    The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods

    xv.    Safety factors used for fatigue life and/or predicted failure pressure calculations

    xvi.    Reassessment time interval and safety factors

    xvii.    The date of the review

    xviii.    Confirmation of the results by qualified technical subject matter expert(s)

    xix.    Approval by responsible Sable management personnel

    xx.    Records of additional preventive and mitigative (P&M) measures performed

    xxi.    Reports required by this emergency special permit.

24) Reporting:

    a)    Any release on the *special permit segments* shall be reported to PHMSA at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery.[26]

    b)    An email notification shall be made at least three (3) days prior to a *special permit segment* being exposed for non-emergency purposes of field evaluation and repair to PHMSA. The email notification shall include, if applicable:

        i.    Tool type and run date

        ii.    Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)

---

[26] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state, or Federal regulations.

iii. Dig sheets

iv. Field contact information for Sable

v. Time and location of the field evaluation and repair.

c) Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run to PHMSA and include:

   i. Tool type

   ii. Run date

   iii. Summary of Conditions Report[27]

   iv. Final Vendor Report and Pipe Tally

d) Sable shall provide a report to PHMSA by June 15th of every year for the duration of this special permit, including any renewals. The report shall be submitted to PHMSA. At a minimum, the annual report shall contain the following, if applicable:

   i. A Closure Report for the previous calendar (CY) which contains:

      1. Features that were remediated in previous CY, including documentation for in-the-ditch assessments and repairs

      2. Identify features that remain to be assessed

      3. Unity Plots for previous ILI runs

   ii. Fracture mechanics and pressure cycling analyses in accordance with Condition 21(a);

   iii. The third-party ILI expert reviews in accordance with condition 21(e).

   iv. AC and DC Interference surveys that are due in accordance with condition 21(f).

   v. A copy of the CGRA for prior year including:

      1. Mean corrosion growth rate for the *special permit segments*

      2. Distribution graph of the corrosion growth rate for the *special permit segments* (e.g. occurrences (#) vs. corrosion rate (mpy)

The above conditions are based on PHMSA's review and consideration of information provided by Sable, including information in their emergency special permit application which can be found at Docket No. PHMSA-2025-1502 in the Federal Docket Management System located at www.regulations.gov. PHMSA has determined the conditions listed above would be necessary to ensure this Emergency Special Permit is not inconsistent with pipeline safety.

---

[27] PHMSA may stipulate specific formatting or other information (e.g., condition type, anomaly details, remaining strength calculation method, failure pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 15 of 16

## IV. Limitations:

This special permit is subject to the limitations set forth in 49 CFR § 190.341, as well as the following limitations:

1) This emergency special permit is limited to an initial term of sixty (60) days from the date of issuance. If Sable elects to seek renewal of this emergency special permit, it must submit a renewal request to PHMSA pursuant to 49 CFR § 190.341(g).

2) Should Sable fail to comply with any conditions of this emergency special permit or should PHMSA determine that this emergency special permit is no longer appropriate or is inconsistent with pipeline safety, PHMSA may revoke the emergency special permit and require Sable to comply with all appropriate regulatory requirements.

3) PHMSA may order the *special permit segments* to be shutdown at any time.

4) PHMSA may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for failure to comply with this emergency special permit. The terms and conditions of any compliance order shall take precedence over the terms of this emergency special permit.

5) In the event of conflict between the conditions of this emergency special permit and industry standards, the emergency special permit conditions shall prevail.

6) If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the emergency special permit, Sable must provide PHMSA written notice of the change within 60 days of the consummation date. In the event of such transfer, PHMSA reserves the right to revoke, suspend, or modify the emergency special permit.

AUTHORITY: 49 United States Code 60118 (c)(1) and 49 CFR § 1.97.

Issued in Washington, D.C., on December 23, 2025.

**LINDA GAIL DAUGHERTY**
Digitally signed by
LINDA GAIL DAUGHERTY
Date: 2025.12.23
15:48:57 -05'00'

Linda Daugherty
Acting Associate Administrator
  for Pipeline Safety

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 16 of 16

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 799 of 837   Page
Case: 26-508  01/23/2026  DktEntry: 1.1  Page 30 of 30
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 435 of 464

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of January, 2026, the foregoing Petition for Review and exhibits were served on Respondents by sending a copy via certified mail, return receipt requested, to each of the following addresses:

Paul J. Roberti, Administrator
U.S. Department of Transportation,
Pipeline and Hazardous Materials Safety Administration
1200 New Jersey Avenue, SE
Washington, D.C. 20590

Office of Chief Counsel
U.S. Department of Transportation,
Pipeline and Hazardous Materials Safety Administration
1200 New Jersey Avenue, SE
Washington, D.C. 20590

Sean Duffy, Secretary of Transportation
U.S. Department of Transportation,
Pipeline and Hazardous Materials Safety Administration
1200 New Jersey Avenue, SE
Washington, D.C. 20590

Pamela Bondi
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue, N.W. Washington,
D.C. 20530- 0001

Dated: January 23, 2026

/s/ Michael S. Dorsi
MICHAEL S. DORSI

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 800 of 837   Page
ID #:17843
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 436 of 464

# Exhibit K

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
1/5/2026 6:59 PM
By: Narzralli Baksh , Deputy

Jeffrey D. Dintzer (SBN: 139056)
Garrett B. Stanton (SBN: 324775)
**ALSTON & BIRD, LLP**
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071
Tel: (213) 576-1000; Fax: (213) 576-1100
Jeffrey.Dintzer@alston.com
Garrett.Stanton@alston.com

Duncan Joseph Moore (SBN: 233955)
Benjamin J. Hanelin (SBN: 237595)
Natalie C. Rogers (SBN: 301254)
**PAUL HASTINGS LLP**
1999 Avenue of Stars, 27th Floor
Century City, CA 90067
Tel: (310) 620-5879; Fax: (310) 620-5899
djmoore@paulhastings.com
benjaminhanelin@paulhastings.com
natalierogers@paulhastings.com

Trevor D. Large (SBN: 214886)
Victoria C. Diffenderfer (SBN: 350018)
**FAUVER LARGE ARCHBALD & SPRAY**
820 State Street, 4th Floor
Santa Barbara, CA 93101
Tel: (805) 966-7000; Fax: (805) 966-7227
tlarge@flasllp.com
vdiffenderfer@flasllp.com

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SANTA BARBARA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,<br><br>Petitioners/Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10; inclusive,<br><br>Respondents/Defendants. | Case No.: 25CV02244<br>[Consolidated with 25CV02247]<br><br>**REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S NOTICE OF MOTION AND MOTION FOR RECONSIDERATION OF PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>[Filed concurrently with Declarations of J. Caldwell Flores and Trevor D. Large; [Proposed] Order Immediately Rescinding Preliminary Injunction] |

1

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 802 of 837   Page
ID #:17845
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 438 of 464

Date:    April 17, 2026
Time:    10:00 a.m.
Dept.:   4

Complaint Filed: April 15, 2025

[Assigned for Purposes to the Honorable Donna D. Geck, Dept. 4]

SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,

Real Parties in Interest

ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation,

Petitioners/Plaintiffs,

v.

CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, an agency of the State of California; OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10; inclusive,

Respondents/Defendants.

SABLE OFFSHORE CORP., a Delaware Corporation, and PACIFIC PIPELINE COMPANY, a Delaware Corporation.

Real Parties in Interest.

Case No.: 25CV02247

2

REAL PARTIES IN INTERESTS NOTICE OF MOTION AND MOTION FOR RECONSIDERATION

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 803 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 439 of 464
ID #:17846

**TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on Friday, April 17, 2026 at 10:00 a.m., in Department 4 of the Superior Court of California for the County of Santa Barbara, located at 1100 Anacapa Street, Santa Barbara, California, before the Honorable Donna D. Geck, Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company (collectively referred to herein as "Sable") will, and hereby do, move the Court pursuant to Code of Civil Procedure section 1008 and Code of Civil Procedure section 533 for an order rescinding the July 29, 2025 Order re: Preliminary Injunction in the above-referenced matters (the "Preliminary Injunction").

This motion is made pursuant to California Code of Civil Procedure section 1008, on the grounds that new and different facts and circumstances exist that warrant reconsidering and rescinding the Preliminary Injunction, including that the Las Flores Pipeline is now an interstate pipeline under the exclusive federal jurisdiction of the Pipeline and Hazardous Materials Safety Administration ("PHMSA"), PHMSA has issued all necessary approvals for the restart of the Las Flores Pipeline, and ***Petitioners in these consolidated actions are separately pursuing relief in the United States Court of Appeals for the Ninth Circuit directed at challenging PHMSA's actions***. Given this federal posture and given that the California Office of the State Fire Marshal ("OSFM") no longer has jurisdiction over the Las Flores Pipeline, the Preliminary Injunction is now moot and must be rescinded. In addition, Sable will continue to suffer significant and irreparable harm if the Preliminary Injunction is not immediately rescinded, based on the following specific facts and legal authority:

1.      On July 29, 2025, the Court issued the Preliminary Injunction. Based on the Court's finding that Petitioners had a likelihood of success on their state law claims under the California Pipeline Safety Act, the Court enjoined the restart of the Las Flores Pipeline "until 10 court days following the filing and service of notice by or on behalf of real parties in interest . . . that Sable has received all necessary approvals and permits for restarting the Las Flores Pipeline and that Sable intends to commence such restart." (July 29, 2025 Order at p. 18.)

---

3

REAL PARTIES IN INTERESTS NOTICE OF MOTION AND MOTION FOR RECONSIDERATION

2.      Lines CA-324 and CA-325 (formerly known as Lines 901 and 903) are portions of the Las Flores Pipeline, which also includes offshore pipelines transporting crude oil from the Outer Continental Shelf and an onshore processing facility at Las Flores Canyon. Lines CA-324 and CA-325 had been considered intrastate since 2016 and thus subject to oversight by the OSFM. At the time the Court entered the Preliminary Injunction, Lines CA-324 and CA-325 were still designated as intrastate, and subject to OSFM's regulatory oversight.

3.      On December 17, 2025, PHMSA determined that the entirety of the Las Flores Pipeline is an interstate pipeline subject to PHMSA's exclusive jurisdiction. This determination eliminated any jurisdiction of OSFM over Lines CA-324 and CA-325. (See Declaration of J. Caldwell Flores in Support of Motion for Reconsideration ["Flores Decl.], Exhibit A, p. 2.) In making its determination that *the Las Flores Pipeline is an interstate pipeline,* PHMSA notified "OSFM that the Las Flores Pipeline is subject to the regulatory oversight of PHMSA." (*Id.*, pp. 2–3 [emphasis added].)

4.      On December 22, 2025, PHMSA approved Sable's Restart Plan for Lines CA-324 and CA-325 (the "Restart Approval"). (See Flores Decl., Exhibit B.)

5.      On December 23, PHMSA granted Sable a "emergency special permit" for the operation of Lines CA-324 and CA-325 pursuant to 49 U.S.C. Section 60118(c)(2)(A) (the "Emergency Special Permit"). (See Flores Decl., Exhibit C, p. 6.)

6.      Given PHMSA's assertion of jurisdiction over the Las Flores Pipeline as an interstate pipeline, OSFM is without jurisdiction to regulate Lines CA-324 and CA-325, or any other portion of the Las Flores Pipeline.

7.      On December 24, 2025, Petitioners in these consolidated actions, recognizing that approval to flow oil through the pipeline is now under federal jurisdiction, filed an Emergency Motion for Stay Pending Appeal and a Petition for Review in the United States Court of Appeals for the Ninth Circuit, seeking a stay, pending appeal, of the issuance of the Restart Approval and Emergency Special Permit issued by PHMSA. (*Environmental Defense Center, et al. v. U.S. Department of Transportation, et al.* (9th Cir.) Case No. 25-8059 (the "Ninth Circuit Action"),

4

REAL PARTIES IN INTERESTS NOTICE OF MOTION AND MOTION FOR RECONSIDERATION

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 805 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 441 of 464
ID #:17848

Declaration of Trevor D. Large in Support of Ex Parte Application for Order Shortening Time ["Large Decl.", Exhibit D] [Emergency Motion for Stay Pending Appeal].)

8.     On December 25, 2025, Sable filed an Emergency Motion to Intervene in the Ninth Circuit Action. (Large Decl., Exhibit D.)

9.     On December 31, 2025, the United States Court of Appeals for the Ninth Circuit granted Sable's Emergency Motion to Intervene, denied Petitioners' Emergency Motion for Stay Pending Appeal, and set an expedited briefing schedule in the Ninth Circuit Action. (Large Decl., Exhibit D.)

10.     On January 5, 2026 at 9:56 a.m., Trevor D. Large, counsel for Sable, sent an email to counsel for Petitioners and Respondents providing notice of Sable's Ex Parte Application for Order Shortening Time for the Court to hear this Motion for Reconsideration, and providing counsel with the date, time, department, and requested briefing schedule. (Large Decl., ¶¶ 6-7.)

This motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the Declaration of J. Caldwell Flores in Support of Sable's Motion For Reconsideration, the Declaration of Trevor D. Large in Support of Sable's Ex Parte Application for Order Shortening Time, their exhibits, the concurrently lodged [Proposed] Order Rescinding Preliminary Injunction, the record on file with the Court in this matter, and upon such further evidence and argument as may be presented to the court at or before the hearing.

DATED: January 5, 2026

Respectfully submitted,
ALSTON & BIRD

By: _____ for

Jeffrey D. Dintzer

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP. and
PACIFIC PIPELINE COMPANY

5

REAL PARTIES IN INTERESTS NOTICE OF MOTION AND MOTION FOR RECONSIDERATION

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 806 of 837   Page
ID #:17849
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 442 of 464

**<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>**

**I.     INTRODUCTION**

Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company (collectively referred to herein as "Sable") move the Court to reconsider and rescind the July 29, 2025 Order re: Preliminary Injunction (the "Preliminary Injunction") because new facts and circumstances render the Preliminary Injunction moot. First, the Las Flores Pipeline has been designated as an interstate pipeline under exclusive federal jurisdiction, and the California Office of the State Fire Marshal ("OSFM") no longer has any regulatory authority. Second, the federal Pipeline and Hazardous Materials Safety Administration ("PHMSA") has issued approvals authorizing the flow of oil through the Las Flores Pipeline. Third, Petitioners in these consolidated actions have now sought relief in the Court of Appeals for the Ninth Circuit challenging PHMSA's actions. Thus, the basis for the Court's Preliminary Injunction—which was grounded in OSFM's regulatory authority over the Las Flores Pipeline under the California Pipeline Safety Act—is now moot. In addition, the Preliminary Injunction should be dissolved to avoid the risk of collateral disputes and inconsistent directives across forums. As such, Sable respectfully requests that the Court rescind the Preliminary Injunction.

**II.    FACTUAL BACKGROUND**

On July 29, 2025, the Court issued the Preliminary Injunction. Based on the Court's finding that Petitioners had a likelihood of success on their state law claims under the California Pipeline Safety Act, the Court enjoined the restart of Lines CA-324 and CA-325 "until 10 court days following the filing and service of notice by or on behalf of real parties in interest . . . that Sable has received all necessary approvals and permits for restarting the Las Flores Pipeline and that Sable intends to commence such restart." (See July 29, 2025 Preliminary Injunction at 18.)

Lines CA-324 and CA-325 are portions of the Las Flores Pipeline,[1] and had been

---

[1] Lines CA-324 and CA-325 (formerly known as Lines 901 and 903) are portions of the Las Flores Pipeline, which also includes offshore pipelines transporting crude oil from the Outer Continental Shelf and an onshore processing facility at Las Flores Canyon.

6

REAL PARTIES IN INTERESTS NOTICE OF MOTION AND MOTION FOR RECONSIDERATION

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 807 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 443 of 464
ID #:17850

considered intrastate since 2016 and thus subject to OSFM's regulatory oversight. (Declaration of J. Caldwell Flores ["Flores Decl."], Ex. A, p. 1.) However, on December 17, 2025, PHMSA determined that "the Las Flores Pipeline is an interstate pipeline" subject to PHMSA's exclusive jurisdiction and notified "OSFM that the Las Flores Pipeline is subject to the regulatory oversight by PHMSA." (*Id.*, pp. 2–3.)

On December 22, 2025, PHMSA approved the Restart Plan for Lines CA-324 and CA-325. (See Flores Decl. Ex. B.) In approving the Restart Plan for Lines CA-324 and CA-325, PHMSA reviewed Sable's Fill Plan and Startup Procedures, Linefill Positioning Plan Assignments, Line Fill Contact List, and letters requesting removal of pressure restrictions for the Las Flores Pipeline. (*Ibid.*) PHMSA also conducted field inspections with Sable to discuss process and safety procedures for Restart. (*Ibid.*) PHMSA's letter confirms that its "approval is valid from the date of [PHMSA's] letter." (*Ibid.*)

On December 23, 2025, PHMSA issued an Emergency Special Permit for Lines CA-324 and CA-325.[2] (See Flores Decl., Ex. C, p. 6.) Special permits are the federal equivalent of state waivers, like those states waivers that were the subject of Petitioners' now moot challenge against OSFM. This Emergency Special Permit takes the place of the State Waivers OSFM previously issued. The OSFM State Waiver is no longer necessary because the Las Flores Pipeline is now designated as an interstate pipeline. (Flores Decl., Ex. C, p. 6.)

In issuing the Emergency Special Permit, PHMSA "confirm[ed] that the special permit conditions ensure that [Sable] has an ongoing program to locate and remediate safety threats" and that "compliance with [permit] conditions . . . would provide an equivalent level of safety as compliance with [federal regulations]." (Flores Decl., Ex. C, p. 6.) "The full set of conditions imposed by the special permit sufficiently address the risk of a failure or release as a result of [] corrosion and provide an equivalent level of safety as compliance with [federal regulations],

///

---

[2] A special permit is an order that waives or modifies compliance with a regulatory requirement if the pipeline operator requesting it demonstrates the need and PHMSA determines that granting a special permit would be consistent with pipeline safety. (49 U.S.C. § 60118(c).)

REAL PARTIES IN INTERESTS NOTICE OF MOTION AND MOTION FOR RECONSIDERATION

demonstrating the expected environmental impacts of the action will not be significant." (*Id.*, p. 4.)

PHMSA further found that "[g]ranting this special permit is necessary to address the emergency declared by the President in Executive Order 14156"[3] because "the special permit would enable and facilitate the [Las Flores Pipeline] to meet regional energy demands, reduce refinery feedstock prices, mitigate the risks of fuel shortages on the West Coast, and reduce United States dependency on imported oil and the associated energy security risks of such imports." (Flores Decl., Ex. C, p. 7.)

On December 24, 2025, recognizing that approval to flow oil through the pipeline is now under federal jurisdiction, Petitioners filed an Emergency Motion for Stay Pending Appeal and a Petition for Review in the United States Court of Appeals for the Ninth Circuit, seeking a stay, pending appeal, of the issuance of PHMSA's Restart Approval and Emergency Special Permit. (See Declaration of Trevor D. Large in Support of Ex Parte Application for Order Shortening Time ["Large Decl."], Ex. D.) On December 25, 2025, Sable filed an Emergency Motion to Intervene. (Large Decl., Ex. D.) On December 31, 2025, the Ninth Circuit granted Sable's Emergency Motion to Intervene, denied Petitioners' Emergency Motion for Stay Pending Appeal, and set an expedited briefing schedule in the Ninth Circuit Action. (Large Decl., Ex. D.)

## III.   LEGAL STANDARD

Code of Civil Procedure section 1008 authorizes the Court to reconsider a prior ruling if it finds there are new or different facts, circumstances, or law than those before the Court at the time of the original ruling. Once the Court determines the existence of new or different facts, circumstances, or law, it can either modify or affirm its prior decision. (*Corns v. Miller* (1986) 181 Cal.App.3d 195, 202.) Section 1008, subd. (a) provides: "When an application for an order has been made to a judge, or to a court, and refused in whole … any party affected by the order may, within 10 days after service upon the party of written notice of entry of the order and based upon

---

[3] Executive Order 14156, issued January 20, 2025, declares a national energy emergency and vests federal agencies, including PHMSA, with authority to facilitate the identification, leasing, siting, production, transportation, refining, and generation of domestic energy resources.

REAL PARTIES IN INTERESTS NOTICE OF MOTION AND MOTION FOR RECONSIDERATION

new or different facts, circumstances, or law, make application to the same judge or court that made the order, to reconsider the matter and modify, amend, or revoke the prior order." The party making the application shall state by affidavit (i) what application was made before, (ii) when and to what judge, (iii) what order or decisions were made, and (iv) what new or different facts, circumstances, or law are claimed to be shown. (Code Civ. Proc. § 1008, subd. (a).) To be entitled to reconsideration, a party must show new or different facts and a satisfactory explanation for failing to produce such evidence earlier. (*Kalivas v. Barry Controls Corp.* (1996) 49 Cal.App.4th 1152, 1160-61.)

Section 533 additionally allows the court to dissolve a preliminary injunction upon a showing that "there has been a material change in the facts upon which the injunction or temporary restraining order was granted, that the law upon which the injunction or temporary restraining order was granted has changed, or that the ends of justice would be served by the modification or dissolution of the injunction or temporary restraining order." (Code Civ. Proc., § 533.)

## IV. ARGUMENT

### A. This Motion is Timely

A motion for reconsideration must be filed within 10 days after the introduction of new or different facts, circumstances, or law. (Code Civ. Proc § 1008, subd. (a).) Here, PHMSA determined the Las Flores Pipeline is an interstate pipeline subject to PHMSA's exclusive regulatory oversight and issued approvals for which Petitioners sought review in the Court of Appeals for the Ninth Circuit. The Court of Appeals for the Ninth Circuit issued an order on December 31, 2025 denying Petitioners' Emergency Motion for Stay Pending Appeal and setting an expedited briefing schedule on Petitioners' Petition for Review. This motion follows within 10 days of those new or different facts. No entry of an order has been issued. Thus, this motion is timely.

### B. Material New Facts and Circumstances Warrant Reconsidering and Rescinding the Preliminary Injunction

New facts and circumstances warrant reconsideration of the Preliminary Injunction. The

REAL PARTIES IN INTERESTS NOTICE OF MOTION AND MOTION FOR RECONSIDERATION

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 810 of 837   Page
ID #:17853
Case 1:26-cv-01486-KES-CDB   Document 53   Filed 02/20/26   Page 446 of 464

Preliminary Injunction enjoins Sable from restarting Lines CA-324 and CA-325 of the Las Flores Pipeline until it gives 10 days' notice that it received all necessary approvals and permits from OSFM. (July 29, 2025 Order at 18.) With PHMSA's designation of the Las Flores Pipeline as an interstate pipeline under its exclusive federal jurisdiction, OSFM no longer has regulatory authority over Lines CA-324 and CA-325, or any portion of the Las Flores Pipeline. The basis for this Court's Preliminary Injunction is therefore now moot, no legal justification exists to continue the Preliminary Injunction, and Sable will be irreparably harmed if the Court does not rescind the Preliminary Injunction. (Previously filed Declaration of Steve Rusch in Support of Opposition to Application for Preliminary Injunction, filed July 8, 2025, ¶¶ 66–72.)

On December 17, 2025, PHMSA designated the Las Flores Pipeline as interstate and subject to PHMSA's exclusive jurisdiction. (Flores Decl., Ex. A, p. 3.) PHMSA's determination eliminates OSFM's jurisdiction over the Las Flores Pipeline, which only exercises jurisdiction over *intrastate* pipelines. (*Ibid.*) Given PHMSA's determination that "***the Las Flores Pipeline is an interstate pipeline,***" PHMSA notified "OSFM that the Las Flores Pipeline is subject to the regulatory oversight of PHMSA." (*Ibid.*)

Since assuming federal jurisdiction over the Las Flores Pipeline, PHMSA has asserted regulatory oversight over the Las Flores Pipeline. PHMSA approved Sable's Restart Plan for Lines CA-324 and CA-325 on December 22, 2025 and issued an Emergency Special Permit on December 23, 2025. (Flores Dec., Exs. B and C.) These approvals are in lieu of and render moot the OSFM-issued State Waivers that are the subject of Petitioners' lawsuit and the Preliminary Injunction. PHMSA specifically confirmed that "[t]he conditions ordered by OSFM in the two state waivers are now being re-issued by PHMSA as a special permit subject to Federal oversight and enforcement." (See Flores Dec., Ex. C, p. 6.)

Given the Las Flores Pipeline has now been designated an interstate pipeline under the exclusive jurisdiction of PHMSA, the Court's Preliminary Injunction frustrates Sable's prompt compliance with "the accomplishment of a federal objective" and "make[s] it impossible . . . to comply with both state and federal law." (*Geier v. Am. Honda Motor Co.* (2000) 529 U.S. 861,

10

REAL PARTIES IN INTERESTS NOTICE OF MOTION AND MOTION FOR RECONSIDERATION

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 811 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 447 of 464
ID #:17854

873-84.) The Supremacy Clause of the United States provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the Supreme law of the land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." (U.S. Cons. Art. VI, cl. 2; *Fisher v. City of Berkeley* (1984) 37 Cal.3d 644, 655 [noting that California courts are "duty-bound" to follow federal law].)

The Preliminary Injunction is also preempted. Conflict preemption arises when "it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." (*Silkwood v. Kerr-McGee Corp.* (1983) 464 U.S. 238, 248.) Where, as here, "compliance with both federal and state regulations is a physical impossibility," state law must immediately yield. (*Florida Lime & Avocado Growers, Inc. v. Paul* (1963) 373 U.S. 132, 142.) Preemption may be based on an Executive Order, such as the President's Executive Order 14156 issued on January 20, 2025, which is specifically referenced in PHMSA's findings supporting Sable's Emergency Special Permit. (See *Old Dominion Branch No. 496, National Ass'n of Letter Carriers, AFL-CIO v. Austin* (1974) 418 U.S. 264, 273.)

Moreover, given that PHMSA's approvals are now the subject of an appeal pending before the Ninth Circuit, the operation of the Preliminary Injunction increases the risk of collateral disputes and inconsistent directives across forums while the parties litigate parallel issues in federal proceedings. Recognizing the federal posture, Petitioners sought review of PHMSA's actions in the Court of Appeals for the Ninth Circuit by filing a Petition for Review and Emergency Motion for Stay Pending Appeal on December 24, 2025. (See Large Dec., Ex. D.) On December 31, 2025, the Court of Appeals for the Ninth Circuit granted Sable's Motion to Intervene, denied Petitioners' Emergency Motion for Stay Pending Appeal, and set an expedited briefing schedule on Petitioners' Petition for Review. (See Large Dec., Ex. D.) The parties are now actively litigating these issues in federal court on an abbreviated schedule.

///

REAL PARTIES IN INTERESTS NOTICE OF MOTION AND MOTION FOR RECONSIDERATION

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 812 of 837   Page
ID #:17855
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 448 of 464

The designation of the Las Flores Pipeline as an interstate pipeline under the exclusive jurisdiction of PHMSA, PHMSA's approval of Sable's Restart Plan and issuance of the Emergency Special Permit, and the pendency of the Ninth Circuit action all constitute material new facts and circumstances that warrant reconsidering and rescinding the Preliminary Injunction pursuant to Code of Civil Procedure sections 1008 and 533.

## V.     CONCLUSION

For the foregoing reasons, Sable respectfully requests that this Court reconsider and rescind the Preliminary Injunction.

DATED: January 5, 2025                     Respectfully submitted,

                                           ALSTON & BIRD, LLP

By: _____ **for**
                                           Jeffrey D. Dintzer

                                           Attorneys for Real Parties in Interest
                                           SABLE OFFSHORE CORP. and PACIFIC
                                           PIPELINE COMPANY

REAL PARTIES IN INTERESTS NOTICE OF MOTION AND MOTION FOR RECONSIDERATION

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 813 of 837   Page
ID #:17856
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 449 of 464

**PROOF OF SERVICE**

I am a resident of the State of California, over the age of eighteen, and not a party to the within action. My business address is 820 State Street, 4th Floor, Santa Barbara, CA 93101. On January 5, 2026, I served the within document:

**REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S NOTICE OF MOTION AND MOTION FOR RECONSIDERATION; MEMORANDUM OF POINTS AND AUTHORITIES**

By Mail: By placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Santa Barbara, addressed as set forth below.

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postage cancellation date or postage meter date is more than one day after the date of deposit for mailing in affidavit.

By Hand Delivery: By personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

By Overnight Delivery: I enclosed the document(s) in an envelope or package provided by an overnight delivery carrier and addressed to the persons at the address(es) set forth below. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

X   By Electronic Mail: I caused said document(s) to be transmitted to the email address(es) of the addressee(s) designated below.

**SEE ATTACHED SERVED LIST**

I declare under penalty of perjury under the laws of the State of California, that the above is true and correct.

Executed on January 5, 2026, at Santa Barbara, California.

*Marina L Ratliff*
Marina L. Ratliff

13
**PROOF OF SERVICE**

LEGAL02/47827721v3

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 814 of 837    Page
ID #:17857
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 450 of 464

**SERVICE LIST**

| | |
|---|---|
| Jeffrey D. Dintzer<br>Garrett B. Stanton<br>**ALSTON & BIRD, LLP**<br>350 South Grand Avenue, 51st Floor<br>Los Angeles, CA 90071<br>Tel: (213) 576-1000<br>Fax: (213) 576-1100<br>Jeffrey.Dintzer@alston.com<br>Garrett.Stanton@alston.com | *Attorneys for Real Parties in Interest:*<br>*Sable Offshore Corp. and Pacific*<br>*Pipeline Company* |
| Julie Teel Simmonds, Esq.<br>David Pettit, Esq.<br>Talia Nimmer, Esq.<br>Center for Biological Diversity<br>2011 Franklin Street, Suite 375<br>Oakland, CA 94612<br>Tel.: (510) 844-7100<br>Fax: (510) 844-7150<br>jteelsimmonds@biologicaldiversity.org<br>dpettit@biologicaldiversity.org<br>tnimmer@biologicaldiversity.org | *Attorneys for Petitioners: Center for*<br>*Biological Diversity and Wishtoyo*<br>*Foundation* |
| Duncan Joseph Moore<br>Benjamin J. Hanelin<br>Natalie C. Rogers<br>**PAUL HASTINGS**<br>1999 Avenue of Stars, 27th Floor<br>Century City, CA 90067<br>Tel: (310) 620-5879<br>Fax: (310) 620-5899<br>djmoore@paulhastings.com<br>benjaminhanelin@paulhastings.com<br>natalierogers@paulhastings.com | *Attorneys for Real Parties in Interest:*<br>*Sable Offshore Corp. and Pacific*<br>*Pipeline Company* |
| Trevor D. Large (SBN: 214886)<br>Victoria C. Diffenderfer (SBN: 350018)<br>**FAUVER LARGE ARCHBALD &**<br>**SPRAY**<br>820 State Street, 4th Floor<br>Santa Barbara, CA 93101<br>Tel: (805) 966-7000<br>Fax: (805) 966-7227<br>tlarge@flasllp.com<br>vdiffenderfer@flasllp.com | *Attorneys for Real Parties in Interest:*<br>*Sable Offshore Corp. and Pacific*<br>*Pipeline Company* |

14
**PROOF OF SERVICE**

LEGAL02/47827721v3

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 815 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 451 of 464
ID #:17858

| Linda Krop, Esq.<br>Jeremy M. Frankel, Esq.<br>Tara C. Rengifo, Esq.<br>ENVIRONMENTAL DEFENSE<br>CENTER<br>906 Garden Street<br>Santa Barbara, CA 93101<br>Tel: (805) 963-1622; (510) 844-7100<br>Fax: (805) 962-3152; (510) 844-7150<br>lkrop@environmentaldefensecenter.org<br>jfrankel@environmentaldefensecenter.org<br>trengifo@environmentaldefensecenter.org | *Attorneys for Petitioners:*<br>*Environmental Defense Center, a*<br>*California non-profit corporation; Get*<br>*Oil Out!, a California non-profit*<br>*corporation, Santa Barbara County*<br>*Action Network, a California non-*<br>*profit corporation, Sierra Club, a*<br>*national non-profit corporation, and*<br>*Santa Barbara Channelkeeper, a*<br>*California non-profit corporation* |
|---|---|
| Michael S. Dorsi, Esq.<br>California Attorney General's Office<br>55 Golden Gate Ave, Ste 11000<br>San Francisco, CA 94102<br>Tel.: (415) 510-3802<br>Michael.dorsi@doj.ca.gov | *Attorneys for*<br>*Respondents/Defendants: California*<br>*Department of Forestry and Fire*<br>*Protection, Office of the State Fire*<br>*Marshal, Daniel Berlant (in his*<br>*official capacity as State Fire*<br>*Marshal)* |

15
**PROOF OF SERVICE**

LEGAL02/47827721v3

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 816 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 452 of 464
ID #:17859

## DECLARATION OF SERVICE BY E-MAIL

| | |
|---|---|
| **Case Name:** | Pacific Pipeline Company, A Delaware Corporation v. State of California |
| **Case Number:** | BCV25103508 |
| **Party Represented:** | State of California |

**Declaration of Electronic Service**

1.  I am at least 18 years of age and not a party to this matter.

2.  I am employed in the Office of the Attorney General of the State of California. My business address is 1300 I Street, Suite 125, Sacramento, CA 95814, County of Sacramento.

3.  My electronic service address is Valerie.Tamulevich@doj.ca.gov.

4.  On January 27, 2026, I electronically served the following document[s]:

**SUPPLEMENTAL DECLARATION OF BRANDON S. WALKER IN SUPPORT OF STATE OF CALIFORNIA'S REPLY TO PACIFIC PIPELINE'S RESPONSE IN OPPOSITION TO MOTION TO CHANGE VENUE**

5.  I electronically served the aforementioned document[s] by emailing them to the following individual[s]:

**PLEASE SEE ATTACHED SERVICE LIST**

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct, and that this declaration was executed on January 27, 2026.

| | |
|---|---|
| Valerie A. Tamulevich | /s/ Valerie A. Tamulevich |
| Declarant | Signature |

Case 2:26-cv-05242-SVW-SSC     Document 36     Filed 05/14/26     Page 817 of 837   Page
ID #:17860
Case 1:26-cv-01486-KES-CDB     Document 1     Filed 02/20/26     Page 453 of 464

## SERVICE LIST

Jeffrey Dintzer
Garrett B. Stanton
ALSTON & BIRD
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071
**E-mail Address**: jeffrey.dintzer@alston.com
**E-mail Address**: garrett.stanton@alston.com

Benjamin J. Hanelin
Natalie C. Rogers
PAUL HASTINGS LLP
1999 Avenue of the Stars, 27th Floor
Century City, CA 90067
**E-mail Address**: benjaminhanelin@paulhastings.com
**E-mail Address**: natalierogers@paulhastings.com

SA2025306665
39601922.docx

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 818 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 454 of 464
ID #:17861

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
jeffrey.dintzer@alston.com
GARRETT B. STANTON, SBN 324775
garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071-1410
Telephone:    (213) 576-1000
Facsimile:    (213) 576-1100

**PAUL HASTINGS LLP**
BENJAMIN J. HANELIN, SBN 237595
benjaminhanelin@paulhastings.com
NATALIE C. ROGERS, SBN 301254
natalierogers@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067
Telephone:    (310) 620-5879
Facsimile:    (310) 620-5899

Attorneys for Plaintiff
PACIFIC PIPELINE COMPANY

**ELECTRONICALLY FILED**
Superior Court of California,
County of Kern
By: Gricelda Evans
Deputy Clerk
**02/9/26 5:49 PM**

### SUPERIOR COURT OF CALIFORNIA

### COUNTY OF KERN

### METROPOLITAN DIVISION

| | |
|---|---|
| PACIFIC PIPELINE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>STATE OF CALIFORNIA and DOES 1 through 25,<br><br>Defendants. | Case No. BCV-25-103508<br><br>**PACIFIC PIPELINE COMPANY'S CORRECTED NOTICE OF RULING REGARDING STATE OF CALIFORNIA'S MOTION TO CHANGE VENUE**<br><br>Date:         February 3, 2026<br>Time:        8:30 a.m.<br>Dept.        H<br>Judge:      Hon. Bernard C. Barmann, Jr.<br><br>Action Filed: September 29, 2025 |

- 1 -

NOTICE OF RULING REGARDING MOTION TO CHANGE VENUE

**TO THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on February 3, 2026, the Court held a hearing concerning Defendant State of California's ("Defendant") Motion to Change Venue ("Motion"). During that hearing, Plaintiff Pacific Pipeline Company ("Plaintiff") was ordered to give notice of the Court's rulings, which follow:

1. Defendant's Motion is denied;

2. Plaintiff's Request for Judicial Notice is granted; and

3. Defendant may file a responsive pleading within 30 days of the Court's February 3, 2026 Ruling.

Attached as **Exhibit A** and incorporated by reference is a true and correct copy of the Court's February 3, 2026, Minute Order, which reflects the foregoing rulings.

Dated:  February 9, 2026

Respectfully submitted,

**ALSTON & BIRD**
JEFFREY D. DINTZER
GARRETT B. STANTON

**PAUL HASTINGS LLP**
BENJAMIN J. HANELIN
NATALIE C. ROGERS

By: _____
Jeffrey D. Dintzer

Attorneys for Plaintiff PACIFIC PIPELINE COMPANY

- 2 -

NOTICE OF RULING REGARDING MOTION TO CHANGE VENUE

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 820 of 837   Page
ID #:17863
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 456 of 464

# EXHIBIT A

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 821 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 1-4    Filed 02/20/26    Page 457 of 464
ID #:17864



# SUPERIOR COURT OF CALIFORNIA
# COUNTY OF KERN

### Minute Order

| | | |
|---|---|---|
| Date: February 3, 2026 | Time: 8:30 AM | Location: Division H |

**Case Number: BCV25103508**
**PACIFIC PIPELINE COMPANY, A DELAWARE CORPORATION**
        **Plaintiff/Petitioner**
        v.
**STATE OF CALIFORNIA**
        **Defendant/Respondent**

| | | |
|---|---|---|
| Judicial Officer: Bernard C. Barmann, Jr | Clerk: | Daisy Ayon Vallarta |
| Court Reporter: Susan Wood | Finalized by: | Daisy Ayon Vallarta |

**Nature of Proceedings: Motion to change venue; filed by Defendant State of California**

Case called at: 09:17 AM

Appearances:

Attorney, Garrett Stanton is present on behalf of Plaintiff, PACIFIC PIPELINE COMPANY, A DELAWARE CORPORATION.

Attorney, Jeffrey Dintzer is present on behalf of Plaintiff, PACIFIC PIPELINE COMPANY, A DELAWARE CORPORATION.

Attorney, Brandon Sheldon Walker is appearing remotely on behalf of Defendant, STATE OF CALIFORNIA.

The Court appoints Susan Wood from the Pro Tempore list as the Official Court Reporter for today's proceedings.

Certified shorthand reporter provided their full name and license number pursuant to the Business and Professions Code 8016.

The Court announces a tentative decision.

Matter is argued and submitted by counsel.

The Court makes the following findings and orders:

Defendant's Motion to change venue is denied.

Discussion

(A) Whether venue is proper in Sant Barbara County

Defense arguments. Defendants argue that the current action alleges a dispute regarding the

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 822 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 458 of 464
ID #:17865

potential application of SB 237 to the Las Flores Pipelines. The majority of the pipelines are in Santa Barbara County. And the specific issue is whether the Las Flores Pipelines can be considered "idled, inactive, or out of service for five years or more," which would require that a spike hydrostatic test be performed on the pipelines and a new coastal development permit be obtained before the transportation of oil through the pipelines can be resumed. (Complaint ¶¶ 39, 40, 53.) Accordingly, there are two distinct aspects of Pacific Pipeline's attack on SB 237, one related to the stress hydrostatic test requirement and the other related to the coastal development permit requirement.

Defendant argues this leaves the attack on SB 237 related to the coastal development permit requirement. A coastal development permit is only required for development within the Coastal Zone. (Pub. Resources Code § 30600, subd. (a).) The Coastal Zone is delineated on detailed maps adopted by the Commission, but in general it extends inland about 1,000 yards from the mean high tide line. (Pub. Resources Code, § 30103, subd. (a).) No part of Kern County is within the Coastal Zone.

Plaintiff's arguments

Pacific argues that California Code of Civil Procedure Section 392 establishes proper venue for actions concerning real property. Under Section 392, venue is proper "in the superior court [of] the county where the real property that is the subject of the action, or some part thereof, is situated." (See also 50 Cal. Forms of Pleading & Practice, Annotated (2021) § 571.17 [citing Goldtree v. McAllister (1890) 86 Cal. 93, 106] [explaining that, under the relevant section, venue is proper "in any county in which any part of real property is situated"].) Real property includes all that is "affixed to land." (Civ. Code § 658.) Property is affixed to land when that property is "imbedded in it, as in the case of walls; or permanently resting upon it, as in the case of buildings; or permanently attached to what is permanent, by means of cement, plaster, nails, bolts or screws." (Civ. Code § 660.)

Pacific argues that the State concedes, "it is reasonable to assume that much of the [Santa Ynez Pipeline System's segments] are attached to land." (Mot. at 15, n.7.) Recognizing that Section 392 "may be appropriately applied here," the State cannot escape that significant portions of the Santa Ynez Pipeline System, including Segment CA-325's delivery point, are situated in Kern County and affixed to the land here. On that basis alone, venue is proper.

Segment CA-325 in Kern County—which could be inoperable if SB 237 applied—and focusing on Santa Barbara County's issuance of Coastal Development Permits within the Coastal Zone. This fact suggests that venue would be proper in Kern County under CCP § 392 which states,
(a) Subject to the power of the court to transfer actions and proceedings as provided in this title, the superior court in the county where the real property that is the subject of the action, or some part thereof, is situated, is the proper court for the trial of the following actions:
(1) For the recovery of real property, or of an estate or interest therein, or for the determination in any form, of that right or interest, and for injuries to real property.
(2) For the foreclosure of all liens and mortgages on real property.
(b) In the court designated as the proper court in subdivision (a), the proper court location for trial of a proceeding for an unlawful detainer, as defined in Section 1161, is the location where the court tries that type of proceeding that is nearest or most accessible to where the real property that is the subject of the action, or some part thereof, is situated. Otherwise any location of the

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 823 of 837   Page
ID #:17866
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 459 of 464

superior court designated as the proper court in subdivision (a) is a proper court location for the trial. The court may specify by local rule the nearest or most accessible court location where the court tries that type of case.

CCP § 392

It appears that significant portions of the Santa Ynez Pipeline System, including Segment CA-325's delivery point, are situated in Kern County and affixed to the land here.

However, the State challenges this by arguing that Pacific ignores the actual location of the property that is the subject of the action, which is Pipeline CA-324 located in Santa Barbara County, and instead consider portions of a different pipeline, Pipeline CA-325 within Kern County, that may indirectly feel the effects of regulation over Pipeline CA-324.

The State further contends the only possible effect that SB 237 could have on property located within Kern County relates to SB 237's stress hydrostatic testing requirements, which are either already required by the State Waivers, or preempted in light of PHMSA's alleged assumption of jurisdiction over the pipelines. Again, that leaves only the claims regarding the coastal development permit requirements, which only apply to Pipeline CA-324. Pipeline CA-324 is a separate and distinct pipeline. It is the only pipeline that is properly the subject of this action. And it is wholly located in Santa Barbara County.

Merits argument

Pacific argues that the State's motion raises premature merits arguments. In their motion, the State argued that the claim regarding the stress hydrostatic test requirement, however, is moot and nonjusticiable because that same test is already required for the Las Flores Pipelines by the State waivers. (Complaint ¶¶ 29, 34-35 [consent decree requires compliance with approved State waivers]; Walker Dec. Exs. E [State waiver requiring a spike hydrostatic test], F [same].) A claim is moot, and non-justiciable, if the court cannot grant any effectual relief. (Wilson & Wilson v. City Council of Redwood City (2011) 191 Cal.App.4th 1559, 1574.) Here, even if the Court were to determine that the spike hydrostatic test requirement in SB 237 does not apply to the Las Flores Pipelines, that would be an academic exercise as the Court cannot relieve Pacific Pipeline of that same requirement in the State waivers.

Pacific contends mootness and justiciability are legal questions about the merits of a cause of action. They have no bearing on venue. (See County of San Bernardino v. Superior Court (1994) 30 Cal.App.4th 378 [explaining that courts cannot transfer venue based on substantive considerations but must adhere to the statutory scheme]; McCarthy v. Superior Court (1987) 191 Cal.App.3d 1023 [holding that trial judges cannot make rulings on the substance of a plaintiff's action while venue is in question].)

Pacific argues that the testing requirements under SB 237 impose different liabilities than those under the State Waivers. As one example, SB 237 violations of the Elder California Pipeline Safety Act of 1981 constitute a crime. (SB 237 Legislative Digest, Filed with Secretary of State September 19, 2025 at (2) [explaining that "[a]ny violation" of the provision at issue "would constitute a crime"].) Under SB 237, the Act now prohibits the restart of an existing oil pipeline that is six inches or larger that has been idle, inactive, or out of service for five years or more

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 824 of 837    Page
ID #:17867
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 460 of 464

without passing a hydrostatic testing program that meets the requirements established by the State Fire Marshal. Any violation of that provision would constitute a crime, potentially imposing more severe liabilities on Plaintiff than could be imposed under the State Waivers.

In their reply, the State argues that the mootness of Plaintiff's claims pertaining to Pipeline CA-325 can be considered at this time because they are glaring, defective, and beyond correction. Indeed, Plaintiff also argues that those same claims are moot because they are preempted by PHMSA's orders. Although the State and OSFM are challenging those orders, Plaintiff confirms that the claims regarding the portion of Pipeline CA-325 in Kern County are moot, one way or another.

The State further argues that Plaintiff argues that SB 237 imposes different liabilities than the State Waivers. (Response to Motion, p. 12.) But whether or not SB 237 adds or changes the nature of liability is irrelevant to a motion to change venue that is based on where the property, which is the subject of the action, is located. (Code of Civil Proc., § 392.) On one hand, Plaintiff must comply with the State Waivers before it can restart the pipelines. If, on the other hand, OSFM lacks jurisdiction or authority as Plaintiff now alleges, then the stress hydrostatic testing aspect of SB 237 would not apply, and venue is still proper only in Santa Barbara County.

All of these arguments assess the merits of the underlying claim which are not proper on motion to change venue. It appears that the State's argument summarily contends the only possible effect that SB 237 could have on property located within Kern County relates to SB 237's stress hydrostatic testing requirements. The State concludes that these are either already required by the State Waivers, or preempted in light of PHMSA's alleged assumption of jurisdiction over the pipelines. To reach this result, we are required to go to the substance of Plaintiff's claims, not whether venue is proper in Kern County.

(B) Whether (alternatively) this case should be transferred to the superior court for Santa Barbara County for the convenience of nonparty witnesses and the ends of justice

Defendant argues that both the Commission and OSFM are already participating in litigation involving the Las Flores Pipelines in the Superior Court for Santa Barbara County. (Sable Offshore Corp., et al. v. California Coastal Commission [Santa Barbara Super. Ct., Case No. 25CV00974]; Center for Biological Diversity, et al. v. California Department of Forestry and Fire Protection, et al. [Santa Barbara Super. Ct., Case No. 25CV02244]; Environmental Defense Center, et al. v. California Department of Forestry and Fire Protection, et al. [Santa Barbara Super. Ct., Case No. 25CV02247].) And although they are not named parties, they may also be required to participate in the additional litigation involving the Las Flores Pipelines pending in Santa Barbara County. (People of the State of California ex rel. Central Coast Regional Water Quality Board v. Sable Offshore Corp. [Santa Barbara Super. Ct., Case No. 25CV06285]; People of the State of California v. Sable Offshore Corporation [Santa Barbara Super. Ct., Case No. 25CR07677]. It would be inconvenient for the Commission or OSFM to also be required to participate as nonparty witnesses in litigation involving the Las Flores Pipelines in Kern County too.

Defendant contends additionally, most of the work for restarting the pipelines, and the potential impacts of doing so will be felt in Santa Barbara County. (See D. Venue, Cal. Prac. Guide Civ. Pro. Before Trial Ch. 3-D [ends of justice includes permitting view of the scene or making other

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 825 of 837    Page
Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 461 of 464
ID #:17868

material evidence available].) Indeed, the oil spill that led to the idling of the Las Flores
Pipelines occurred in Santa Barbara County.

Pacific argues that this case is not an environmental damages action requiring on-site fact-
finding. It is a declaratory action on asking the court to interpret SB 237's terms and evaluate
certain evidence regarding the pipeline's operational history, which does not depend on venue
location in any particular county. Instead, the Court will be interpreting SB 237's terms ("idle,"
"inactive," etc.), considering the impact of PHMSA regulations on such interpretation, and
evaluating certain evidence regarding the pipeline's operational history. These tasks do not
depend on any judge's personal observation of Santa Barbara geography or conditions. The prior
oil spill and coastal resources are part of the background context, but they are undisputed
historical facts that can be presented through the record. A venue change to Santa Barbara would
thus yield no improvement in access to proof or justice; it would only shift the forum away from
a county with a concrete connection to the case and a significant interest in its outcome.

Here, Pacific's argument is persuasive. Pacific argues that a motion to transfer venue for the
convenience of witnesses and the ends of justice is premature before an answer is filed. Pacific
cites to Easton v. Superior Court (1970) 12 Cal.App.3d 243 where the Court states,
(1) The matter of convenience of witnesses was not properly before the court, because Schneider
Bros. had not filed its answer. Only then could the court ascertain what the issues and the
evidence relating to those issues would be. Before the answer is filed, the court cannot determine
whether the witnesses whose convenience is involved have material testimony to offer (Cook v.
Pendergast, 61 Cal. 72; Pearson v. Superior Court, 199 Cal.App. 2d 69, 75 [18 Cal.Rptr. 578]).
(2) "It is a long established rule that a motion for change of venue must satisfy two requirements:
(1) It must be *246 shown the action is proper in the county to which the movant seeks transfer;
and (2) it must be shown the county in which the action was filed was improper under any
applicable theory (Citation)." (La Mirada Community Hospital v. Superior Court, 249
Cal.App.2d 39, 42 [57 Cal.Rptr. 42].) Neither requirement was satisfied here.
(Id. at 245–246)

Currently, no answer has been filed.

Conclusion

The motion is denied. Pacific's request for judicial notice is granted.

Defendant may file a responsive pleading within 30 days.

The Court deems the minute order to be the Order After Hearing.

The Counsel for Plaintiff(s) shall provide notice of the court's ruling.

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 826 of 837   Page
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 462 of 464
ID #:17869

## PROOF OF SERVICE

I, Kim Niz, declare:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Alston & Bird LLP, 350 South Grand Avenue, 51st Floor, Los Angeles, California 90071.

On February 9, 2026, I served the document **PACIFIC PIPELINE COMPANY'S CORRECTED NOTICE OF RULING REGARDING STATE OF CALIFORNIA'S MOTION TO CHANGE VENUE** on the interested parties in this action addressed as follows:

**See Attached Service List**

I.    ☒    BY ELECTRONIC SERVICE on the date stated below, I caused the document(s) described above to be served electronically on the recipients designated on the Transaction Receipt pursuant to the parties' stipulation establishing the authorizing e-service of documents.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on February 9, 2026, at Los Angeles, California.

/s/ *Kim Niz*

_____

Kim Niz

NOTICE OF RULING REGARDING MOTION TO CHANGE VENUE

Case 2:26-cv-05242-SVW-SSC Document 36 Filed 05/14/26 Page 827 of 837 Page
ID #:1787
Case 1:26-cv-01486-KES-CDB Document 10 Filed 02/20/26 Page 463 of 464

**Pacific Pipeline Company v. State of California, et al.**
**Case No. BCV-25-103508**
**Service List**

Brandon Walker
Jack C. Nick
Isabella A. Panuccini
1300 I Street, Suite 125
Sacramento, CA 95814
Telephone: (916) 210-6395
Fax: (916) 327-2319
Brandon.Walker@doj.ca.gov
Jack.Nick@doj.ca.gov
Isabella.Panuccini@doj.ca.gov

*Attorneys for Defendant*
State of California

PAUL HASTINGS LLP
BENJAMIN J. HANELIN, SBN 237595
benjaminhanelin@paulhastings.com
NATALIE C. ROGERS, SBN 301254
natalierogers@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067
Telephone: (310) 620-5879
Facsimile: (310) 620-5899

*Attorneys for Plaintiff*
PACIFIC PIPELINE COMPANY

NOTICE OF RULING REGARDING MOTION TO CHANGE VENUE

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 828 of 837   Page
ID #:17871
Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 464 of 464

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**

Pacific Pipeline Company

**(b)** County of Residence of First Listed Plaintiff    Houston, TX (Harris C.)
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

See attachment

**DEFENDANTS**

State of California; Does 1-25

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

See attachment

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question *(U.S. Government Not a Party)*

☐ 2 U.S. Government Defendant

☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*     Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>☐ 365 Personal Injury - Product Liability<br>☐ 367 Health Care Pharmaceutical Personal Injury Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**INTELLECTUAL PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 835 Patent - Abbreviated New Drug Application<br>☐ 840 Trademark<br>☐ 880 Defend Trade Secrets Act of 2016 | ☐ 375 False Claims Act<br>☐ 376 Qui Tam (31 USC 3729(a))<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit (15 USC 1681 or 1692)<br>☐ 485 Telephone Consumer Protection Act<br>☐ 490 Cable Sat TV<br>☐ 850 Securities/Commodities Exchange<br>☒ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | **SOCIAL SECURITY** |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing Accommodations<br>☐ 445 Amer. w Disabilities - Employment<br>☐ 446 Amer. w Disabilities - Other<br>☐ 448 Education | **Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee - Conditions of Confinement | ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor Management Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement Income Security Act | ☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | ☐ 891 Agricultural Acts<br>☐ 893 Environmental Matters<br>☐ 895 Freedom of Information Act<br>☐ 896 Arbitration<br>☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>☐ 950 Constitutionality of State Statutes |
| | | | **IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 465 Other Immigration Actions | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

☐ 1 Original Proceeding    ☒ 2 Removed from State Court    ☐ 3 Remanded from Appellate Court    ☐ 4 Reinstated or Reopened    ☐ 5 Transferred from Another District *(specify)*    ☐ 6 Multidistrict Litigation - Transfer    ☐ 8 Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Pipeline Safety Act, 49 U.S.C. § 60104(c)

Brief description of cause:
Declaratory relief related to alleged federal preemption of state law and supplemental declaratory relief claim seeking interpretation of state law

**VII. REQUESTED IN COMPLAINT:**

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes  ☒ No

**VIII. RELATED CASE(S) IF ANY**

*(See instructions):*    JUDGE Judge Philip S. Gutierrez    DOCKET NUMBER 2:20-cv-02415; Ninth Cir. 26-508

DATE
February 20, 2026

SIGNATURE OF ATTORNEY OF RECORD
Isabella A. Panicucci

**FOR OFFICE USE ONLY**

RECEIPT #    AMOUNT    APPLYING IFP    JUDGE    MAG. JUDGE

JS 44 Reverse (Rev. 04/21)

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 830 of 837    Page ID #:17873
Case 1:26-cv-01486-KES-CDB    Document 31-1    Filed 02/20/26    Page 2 of 4

**INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44**

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)  Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)  County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the  defendant  is the location of the tract of land involved.)

**(c)  Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section  (see attachment) .

**II.  Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an  in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an  in this box.
Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.  Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.  Nature of Suit.** Place an  in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.  Origin.** Place an  in one of the seven boxes.
Original Proceedings.  (1) Cases which originate in the United States district courts.
Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation  Transfer.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation  Direct File.  (8) Check this box when a multidistrict case is filed in the same district as the  Master  MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.  Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.  Requested in Complaint.** Class Action. Place an  in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.  Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 831 of 837   Page
ID #:17874
Case 1:26-cv-01486-KES-CDB    Document 1-1    Filed 02/20/26    Page 3 of 4

# CIVIL COVER SHEET ATTACHMENT

I.(c) Attorneys (*Firm Name, Address, and Telephone Number*)

      ALSTON & BIRD LLP
      JEFFREY D. DINTZER, SBN 139056
      jeffrey.dintzer@alston.com
      GARRETT B. STANTON, SBN 324775
      garrett.stanton@alston.com
      350 South Grand Avenue, 51st Floor
      Los Angeles, CA 90071-1410
      Telephone: (213) 576-1000
      Facsimile: (213) 576-1100

      PAUL HASTINGS LLP
      BENJAMIN J. HANELIN, SBN 237595
      benjaminhanelin@paulhastings.com
      NATALIE C. ROGERS, SBN 301254
      natalierogers@paulhastings.com
      1999 Avenue of the Stars, 27th Floor
      Century City, California, 90067
      Telephone: (310) 620-5879
      Facsimile: (310) 620-5899

      *Attorneys for Plaintiff*
      *Pacific Pipeline Company*

      [*Continued on next page*]

1

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 832 of 837   Page
ID #:17875
Case 1:26-cv-01486-KES-CDB    Document 1-1    Filed 02/20/26    Page 4 of 4

OFFICE OF THE ATTORNEY GENERAL
BRANDON S. WALKER (State Bar No. 254581)
Supervising Deputy Attorney General
Brandon.Walker@doj.ca.gov
1300 I Street, Suite 125
Sacramento, CA 95814
Telephone:  (916) 210-6395
Fax:  (916) 327-2319
JACK C. NICK (State Bar No. 160196)
Deputy Attorney General
Jack.Nick@doj.ca.gov
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1230
Telephone:  (213) 269-6173
ISABELLA A. PANICUCCI (State Bar No. 318984)
Deputy Attorney General
Isabella.Panicucci@doj.ca.gov
1300 I Street, Suite 125
Sacramento, CA 95814
Telephone:  (916) 210-7662
Fax:  (916) 327-2319

*Attorneys for Defendant*
*State of California*

# CERTIFICATE OF SERVICE

Case Name:    **Pacific Pipeline Company, A Delaware Corporation v. State of California**

No.    **BCV25103508**

I hereby certify that on <u>February 20, 2026</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. SECTION 1441(a) (FEDERAL QUESTION)**

**CIVIL CASE COVER SHEET**

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar at which member's direction this service is made. I am 18 years of age or older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service with postage thereon fully prepaid that same day in the ordinary course of business.

I further certify that some of the participants in the case are not registered CM/ECF users. On <u>February 20, 2026</u>, I have caused to be mailed in the Office of the Attorney General's internal mail system, the foregoing document(s) by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within three (3) calendar days to the following non-CM/ECF participants:

Jeffrey Dintzer
Garrett B. Stanton
ALSTON & BIRD
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071
E-mail Address: jeffrey.dintzer@alston.com
E-mail Address:
garrett.stanton@alston.com

Benjamin J. Hanelin
Natalie C. Rogers
PAUL HASTINGS LLP
1999 Avenue of the Stars, 27th Floor
Century City, CA 90067
E-mail Address:
benjaminhanelin@paulhastings.com
E-mail Address:
natalierogers@paulhastings.com

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>February 20, 2026</u>, at Sacramento, California.

_____
Antinia Brown
Declarant

_____
Signature

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 834 of 837   Page
ID #:17877
Case 1:26-cv-01486-KES-CDB    Document 1-2    Filed 02/20/26    Page 2 of 2

SA2025306665
39659363

Case 2:26-cv-05242-SVW-SSC   Document 36   Filed 05/14/26   Page 834 of 837   Page
ID #:17877
Case 1:26-cv-01486-KES-CDB    Document 1-2    Filed 02/20/26    Page 2 of 2

**PROOF OF SERVICE**

I, Kim Niz, declare:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Alston & Bird LLP, 350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071.

On February 23, 2026, I served the document **SUPPLEMENTAL DECLARATION OF JEFFREY D. DINTZER IN SUPPORT OF REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S MOTION FOR RECONSIDERATION OF PRELIMINARY INJUNCTION** on the interested parties in this action addressed as follows: **See Attached Service List**

1.  ☒  BY ELECTRONIC SERVICE on the date stated below, I caused the document(s) described above to be served electronically on the recipients designated on the Transaction Receipt pursuant to the parties' stipulation establishing the authorizing e-service of documents.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on February 23, 2026, at Los Angeles, California.

_____
/s/ *Kim Niz*
Kim Niz

**SERVICE LIST**

| | |
|---|---|
| Julie Teel Simmonds, Esq.<br>David Pettit, Esq.<br>Talia Nimmer, Esq.<br>**CENTER FOR BIOLOGICAL DIVERSITY**<br>2011 Franklin Street, Suite 375<br>Oakland, CA 94612<br>Tel.: (510) 844-7100<br>Fax: (510) 844-7150<br>jteelsimmonds@biologicaldiversity.org<br>dpettit@biologicaldiversity.org<br>tnimmer@biologicaldiversity.org | *Attorneys for Petitioners: Center for Biological Diversity and Wishtoyo Foundation* |
| Duncan Joseph Moore<br>Benjamin J. Hanelin<br>Natalie C. Rogers<br>**PAUL HASTINGS**<br>1999 Avenue of Stars, 27th Floor<br>Century City, CA 90067<br>Tel: (310) 620-5879<br>Fax: (310) 620-5899<br>djmoore@paulhastings.com<br>benjaminhanelin@paulhastings.com<br>natalierogers@paulhastings.com | *Attorneys for Real Parties in Interest: Sable Offshore Corp. and Pacific Pipeline Company* |
| Trevor D. Large (SBN: 214886)<br>Victoria C. Diffenderfer (SBN: 350018)<br>**FAUVER LARGE ARCHBALD & SPRAY**<br>820 State Street, 4th Floor<br>Santa Barbara, CA 93101<br>Tel: (805) 966-7000<br>Fax: (805) 966-7227<br>tlarge@flasllp.com<br>vdiffenderfer@flasllp.com | *Attorneys for Real Parties in Interest: Sable Offshore Corp. and Pacific Pipeline Company* |
| Linda Krop, Esq.<br>Jeremy M. Frankel, Esq.<br>Tara C. Rengifo, Esq.<br>**ENVIRONMENTAL DEFENSE CENTER**<br>906 Garden Street<br>Santa Barbara, CA 93101<br>Tel: (805) 963-1622; (510) 844-7100<br>Fax: (805) 962-3152; (510) 844-7150<br>lkrop@environmentaldefensecenter.org<br>jfrankel@environmentaldefensecenter.org<br>trengifo@environmentaldefensecenter.org | *Attorneys for Petitioners: Environmental Defense Center, a California non-profit corporation; Get Oil Out!, a California non-profit corporation, Santa Barbara County Action Network, a California non-profit corporation, Sierra Club, a national non-profit corporation, and Santa Barbara Channelkeeper, a California non-profit corporation* |

| | |
|---|---|
| Michael S. Dorsi, Esq.<br>**CALIFORNIA ATTORNEY GENERAL'S OFFICE**<br>55 Golden Gate Ave, Ste 11000<br>San Francisco, CA 94102<br>Tel.: (415) 510-3802<br>Michael.dorsi@doj.ca.gov | *Attorneys for Respondents/Defendants: California Department of Forestry and Fire Protection, Office of the State Fire Marshal, Daniel Berlant (in his official capacity as State Fire Marshal)* |