# EXHIBIT OO

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
2/26/2026 2:34 PM
By: Terri Chavez , Deputy

Jeffrey D. Dintzer (SBN: 139056)
Garrett B. Stanton (SBN: 324775)
**ALSTON & BIRD, LLP**
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071
Tel: (213) 576-1000; Fax: (213) 576-1100
Jeffrey.Dintzer@alston.com
Garrett.Stanton@alston.com

Duncan Joseph Moore (SBN: 233955)
Benjamin J. Hanelin (SBN: 237595)
Natalie C. Rogers (SBN: 301254)
**PAUL HASTINGS LLP**
1999 Avenue of Stars, 27th Floor
Century City, CA 90067
Tel: (310) 620-5879; Fax: (310) 620-5899
djmoore@paulhastings.com
benjaminhanelin@paulhastings.com
natalierogers@paulhastings.com

Trevor D. Large (SBN: 214886)
Victoria C. Diffenderfer (SBN: 350018)
**FAUVER LARGE ARCHBALD & SPRAY**
820 State Street, 4th Floor
Santa Barbara, CA 93101
Tel: (805) 966-7000; Fax: (805) 966-7227
tlarge@flasllp.com
vdiffenderfer@flasllp.com

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF SANTA BARBARA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,<br><br>Petitioners/Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10; inclusive,<br><br>Respondents/Defendants. | Case No.: 25CV02244<br>[Consolidated with 25CV02247]<br><br>**SECOND SUPPLEMENTAL DECLARATION OF JEFFREY D. DINTZER IN SUPPORT OF REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S MOTION FOR RECONSIDERATION OF PRELIMINARY INJUNCTION**<br><br>Date:     February 27, 2026<br>Time:    10:00 a.m.<br>Dept.:    4<br><br>Complaint Filed: April 15, 2025<br><br>[Assigned for Purposes to the Honorable Donna D. Geck, Dept. 4] |

1

SUPPLEMENTAL DECLARATION OF JEFFREY D. DINTZER

SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,

Real Parties in Interest

ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation,

Petitioners/Plaintiffs,

v.

CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, an agency of the State of California; OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10; inclusive,

Respondents/Defendants.

SABLE OFFSHORE CORP., a Delaware Corporation, and PACIFIC PIPELINE COMPANY, a Delaware Corporation.

Real Parties in Interest.

Case No.: 25CV02247

2

SUPPLEMENTAL DECLARATION OF JEFFREY D. DINTZER

**SUPPLEMENTAL DECLARATION OF JEFFREY D. DINTZER**

I, Jeffrey D. Dintzer, declare as follows:

1. I am an attorney duly licensed to practice law before all courts of the State of California and am a partner at Alston & Bird LLP, attorneys of record for Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company (hereinafter collectively referred to as "Sable"). I make this declaration in support of Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company's Motion for Reconsideration of Preliminary Injunction. I have personal knowledge of the facts set forth in this declaration and if called as a witness, could and would testify competently to them.

2. I am familiar with the case files for these matters. The files for these matters are kept at my shared direction in a secure electronic format at the offices of Alston & Bird LLP. Legal assistant Kim Niz and various associates maintain these files on a server at Alston & Bird.

3. In preparing this declaration, others at my direction retrieved the true and correct copy of the documents described below and prepared them for inclusion in my declaration.

4. On February 26, 2026, Sable sent a letter to Daniel Berlandt, State Fire Marshal, relinquishing, surrendering, and abandoning the State Waivers issued by the Office of the State Fire Marshal on December 17, 2024 with respect to Segments CA-324 and CA-325 of the Santa Ynez Pipeline System (previously referred to as Las Flores Pipeline Lines CA-324 and CA-325). A true and correct copy of Sable's February 26, 2026 letter is attached hereto as **Exhibit A**.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 26th day of February, 2026, in Los Angeles, California.

By: _____
Jeffrey D. Dintzer

1
SUPPLEMENTAL DECLARATION OF JEFFREY D. DINTZER

# EXHIBIT A



1(310) 620-5779
djmoore@paulhastings.com

February 26, 2026

Daniel Berlant, State Fire Marshal

California Department of Forestry and Fire Protection
715 P Street
Sacramento, CA 94244
calfire.statefiremarshal@fire.ca.gov

      Re:  Sable – Relinquishment of State Waivers

Dear Fire Marshal Berlant:

As you know, our firm has represented Sable Offshore Corp. and Pacific Pipeline Company (collectively, Sable) in matters before the Office of the State Fire Marshal (OSFM) regarding Segments CA-324 (OSFM Line ID 0015) and CA-325 (OSFM Line ID 0001) of the Santa Ynez Pipeline System (previously referred to as Las Flores Pipeline Lines CA-324 and CA-325A/B).  On behalf of Sable, I am writing to you with regard to the "State Waivers" issued by OSFM on December 17, 2024, with respect to Segments CA-324 and CA-325.

Although Sable has complied with the terms of the State Waivers, Sable has not exercised any rights or privileges under the State Waivers since they were issued.  On December 17, 2025, the federal Pipeline & Hazardous Materials Safety Administration (PHMSA) notified Sable that it concurred in Sable's determination that the Santa Ynez Pipeline System—including Segments CA-324 and CA-325—is an interstate pipeline facility under the Pipeline Safety Act, and that the Santa Ynez Pipeline System is therefore "subject to the regulatory oversight of PHMSA" rather than that of OSFM.[1]  On December 23, 2025, PHMSA issued an emergency special permit with respect to Segments CA-324 and CA-325, which included conditions that are "substantially the same" as those included in OSFM's State Waivers, and reconfirmed that "PHMSA has exclusive pipeline safety regulatory authority" over Segments CA-324 and CA-325.[2]  PHMSA has since confirmed again that the "California [OSFM] issued [the State W]aivers before PHMSA assumed regulatory jurisdiction," and because "States cannot regulate interstate pipelines … Sable may not rely on [OSFM's State W]aivers."[3]

Because Segments CA-324 and CA-325 are now subject to PHMSA's exclusive jurisdiction under the federal Pipeline Safety Act, Sable has determined it is appropriate to relinquish its rights under OSFM's previously issued State Waivers.  Therefore, by this letter and effective immediately, Sable hereby relinquishes, surrenders and abandons the State Waivers.

//

---

[1] PHMSA, Letter to J. Caldwell Flores, "Determination of Interstate Classification" (Dec. 17, 2025).
[2] PHMSA, Docket No. PHMSA-2025-1502, Emergency Special Permit (Dec. 23, 2025).
[3] *Environmental Defense Center v. Pipeline & Hazardous Materials Safety Administration*, 9th Cir. Case No. 25-8059, Federal Respondents' Opposition to Emergency Stay Motion (Dec. 30, 2025), p. 18.



February 26, 2026
Page 2


Please do not hesitate to contact me with any questions.

Sincerely,

Duncan Joseph Moore
of PAUL HASTINGS LLP

CC:
James Hosler, Assistant Deputy Director, OSFM
Linda Gail Daugherty, Acting Associate Administrator for Pipeline Safety, PHMSA
Josh Cleaver, Staff Counsel, OSFM
J. Caldwell Flores, President, Sable Offshore Corp.
Anthony Duenner, General Counsel, Sable Offshore Corp.


LEGAL_US_W # 185921873.7

**PROOF OF SERVICE**

I, Kim Niz, declare:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Alston & Bird LLP, 350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071.

On February 26, 2026, I served the document **SECOND SUPPLEMENTAL DECLARATION OF JEFFREY D. DINTZER IN SUPPORT OF REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S MOTION FOR RECONSIDERATION OF PRELIMINARY INJUNCTION** on the interested parties in this action addressed as follows: **See Attached Service List**

1.    ☒    BY ELECTRONIC SERVICE on the date stated below, I caused the document(s) described above to be served electronically on the recipients designated on the Transaction Receipt pursuant to the parties' stipulation establishing the authorizing e-service of documents.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on February 26, 2026, at Los Angeles, California.

/s/ *Kim Niz*
Kim Niz

**SERVICE LIST**

| | |
|---|---|
| Julie Teel Simmonds, Esq.<br>David Pettit, Esq.<br>Talia Nimmer, Esq.<br>**CENTER FOR BIOLOGICAL DIVERSITY**<br>2011 Franklin Street, Suite 375<br>Oakland, CA 94612<br>Tel.: (510) 844-7100<br>Fax: (510) 844-7150<br>jteelsimmonds@biologicaldiversity.org<br>dpettit@biologicaldiversity.org<br>tnimmer@biologicaldiversity.org | *Attorneys for Petitioners: Center for Biological Diversity and Wishtoyo Foundation* |
| Duncan Joseph Moore<br>Benjamin J. Hanelin<br>Natalie C. Rogers<br>**PAUL HASTINGS**<br>1999 Avenue of Stars, 27th Floor<br>Century City, CA 90067<br>Tel: (310) 620-5879<br>Fax: (310) 620-5899<br>djmoore@paulhastings.com<br>benjaminhanelin@paulhastings.com<br>natalierogers@paulhastings.com | *Attorneys for Real Parties in Interest: Sable Offshore Corp. and Pacific Pipeline Company* |
| Trevor D. Large (SBN: 214886)<br>Victoria C. Diffenderfer (SBN: 350018)<br>**FAUVER LARGE ARCHBALD & SPRAY**<br>820 State Street, 4th Floor<br>Santa Barbara, CA 93101<br>Tel: (805) 966-7000<br>Fax: (805) 966-7227<br>tlarge@flasllp.com<br>vdiffenderfer@flasllp.com | *Attorneys for Real Parties in Interest: Sable Offshore Corp. and Pacific Pipeline Company* |
| Linda Krop, Esq.<br>Jeremy M. Frankel, Esq.<br>Tara C. Rengifo, Esq.<br>**ENVIRONMENTAL DEFENSE CENTER**<br>906 Garden Street<br>Santa Barbara, CA 93101<br>Tel: (805) 963-1622; (510) 844-7100<br>Fax: (805) 962-3152; (510) 844-7150<br>lkrop@environmentaldefensecenter.org<br>jfrankel@environmentaldefensecenter.org<br>trengifo@environmentaldefensecenter.org | *Attorneys for Petitioners: Environmental Defense Center, a California non-profit corporation; Get Oil Out!, a California non-profit corporation, Santa Barbara County Action Network, a California non-profit corporation, Sierra Club, a national non-profit corporation, and Santa Barbara Channelkeeper, a California non-profit corporation* |

Michael S. Dorsi, Esq.
**CALIFORNIA ATTORNEY GENERAL'S OFFICE**
55 Golden Gate Ave, Ste 11000
San Francisco, CA 94102
Tel.: (415) 510-3802
Michael.dorsi@doj.ca.gov

*Attorneys for Respondents/Defendants: California Department of Forestry and Fire Protection, Office of the State Fire Marshal, Daniel Berlant (in his official capacity as State Fire Marshal)*

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF SANTA BARBARA**

Dated and Entered:    02/27/2026                          Time:    10:00 AM
Judicial Officer:      Donna D Geck
Deputy Clerk:          Preston Frye                        Dept:    SB Dept 4
Bailiff/Court Officer: Eduardo Munoz                       Case No: 25CV02244
Court Reporter:        Elizabeth Mooy

---

**Center for Biological Diversity et al vs California Department of Forestry and Fire Protection et al**

Parties Present:
Dintzer, Jeffrey D          Attorney for Real Parties Interest
Dorsi, Michael S            Attorney for Respondents
Krop, Linda J               Attorney for Petitioners Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, Santa Barbara Channelkeeper and Environmental Defense Center
Large, Trevor               Attorney for Real Parties Interest
Stanton, Garrett B          Attorney for Real Parties Interest
Pettit, David               Attorney for Petitioners Center for Biological Diversity and Wishtoyo Foundation
Frankel, Jeremy             Attorney for Petitioners Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, Santa Barbara Channelkeeper and Environmental Defense Center

---

**NATURE OF PROCEEDINGS*:*  Case Management Conference**

The matter was called with appearances as stated above.

Mr. Dintzer, Ms. Krop, and Mr. Dorsi presented oral argument regarding the Court's Tentative Ruling.

At the conclusion of oral argument, the Court adopted its Tentative Ruling as follows:

**TENTATIVE RULING**:

For the reasons set forth herein, the motion of real parties in interest Sable Offshore Corp. and Pacific Pipeline Company for reconsideration and to dissolve or modify the preliminary injunction issued in this case is denied.

---

These are two consolidated cases involving the same underlying incidents and activity.

Documents filed by petitioners and plaintiffs Center for Biological Diversity and Wishtoyo Foundation (case No. 25CV02244) will be identified by the prefix, and these parties will be collectively referred to as, "CBD"; documents filed by petitioners and plaintiffs Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper (case No. 25CV02247) will be identified by the prefix, and these parties collectively referred to as, "EDC." Petitioners and plaintiffs will collectively be referred to as "petitioners"; respondents and defendants will be collectively referred to as "respondents"; a petition and complaint will be referred to simply as a "petition."

---

SC-2411 (Revised July 1, 2013)                    **MINUTE ORDER**

Respondents Department of Forestry and Fire Protection, by and through the Office of the State Fire Marshal, an agency of the State of California, and Daniel Berlant, in his official capacity as State Fire Marshal will be collectively referred to as "OSFM." Real parties in interest Sable Offshore Corp., and Pacific Pipeline Company will be collectively referred to as "Sable."

**Background:**

As alleged in the petitioners' respective petitions:

These actions involve two oil pipelines connected to three offshore platforms known as the Santa Ynez Unit. (CBD Petition, ¶¶ 33, 34; EDC Petition, ¶ 38, 39.) The two oil pipelines at issue (collectively, the Las Flores Pipelines) consist of Las Flores Pipeline CA-324 (Line 324) and Las Flores Pipeline CA-325 (Line 325). (CBD Petition, ¶¶ 39, 40; EDC Petition, ¶ 41.) Prior to 2015, when owned by Plains Pipeline, L.P., a wholly owned subsidiary of Plains All American Pipeline (collectively, Plains), Line 324 was known as Line 901 and Line 325 was known as Line 903. (CBD Petition, ¶ 49; EDC Petition, ¶ 41, 68.)

The Las Flores Pipelines were constructed and operated following approval by Santa Barbara County in 1986. (CBD Petition, ¶ 35; EDC Petition, ¶ 54.) This approval relied upon an environmental impact report (EIR) drafted in 1984 and finalized in 1985. (CBD Petition, ¶ 35; EDC Petition, ¶ 54 & fn. 1.)

In 2015, Line 324 (formerly Line 901) ruptured causing a serious oil spill (Refugio Oil Spill). (CBD Petition, ¶¶ 50-51; EDC Petition, ¶¶ 69-70.) The Las Flores Pipelines were consequently shut down at that time. (CBD Petition, ¶ 52; EDC Petition, ¶ 82.)

In March 2020, the United States and the State of California sued Plains based upon damages from the Refugio Oil Spill in *United States v. Plains All American Pipeline*, United States District Court for the Central District of California, case No. 2:20-cv-02415 (the Federal Action). (CBD Petition, ¶ 59; EDC Petition, ¶ 85.) The Federal Action was settled by a consent decree (Federal Consent Decree) entered by the court. (CBD Petition, ¶¶ 59-62; EDC Petition, ¶¶ 85-88 & fn. 3 [the Federal Consent Decree].)

The Federal Consent Decree required the operator to "remediate all internal or external metal loss anomalies that have an ILI reported depth of 40 [percent] or greater wall loss, within one year of discovery." (CBD Petition, ¶ 60.) The Federal Consent Decree also expressly required that prior to any restart, the operator
"shall apply for a State Waiver through [OSFM] for the limited effectiveness of cathodic protection" and that it "must receive a State Waiver from [OSFM] prior to restarting." (CBD Petition, ¶ 61.) The Federal Consent Decree stated that OSFM has the discretion to require additional terms and conditions if it grants any request for a State Waiver. (CBD Petition, ¶ 62.)

In 2024, Sable acquired the Santa Ynez Unit and the Las Flores Pipelines. (CBD Petition, ¶ 64-65; EDC Petition, ¶ 99.)

In April 2024, Sable submitted State Waiver applications to OSFM for Lines 324 and 325. (EDC Petition, ¶ 110 & exhibit B.)

On September 24, 2024, CBD set a letter to OSFM stating that the OSFM had a duty to conduct an analysis and provide opportunities for meaningful public participation under the California Environmental Quality Act (CEQA, Pub. Resources Code, § 21000 et seq.). (CBD Petition, ¶ 68.)

On September 27, 2024, EDC sent a letter to OSFM renewing their March 2024 request for a public process. (EDC Petition, ¶ 112.) EDC also stated that operating the Las Flores Pipeline System without effective cathodic protection was neither anticipated nor reviewed in the 1985 EIR or any project approval, and the potential impacts of doing so have never been fully considered. (*Id*. & exhibit C.) OSFM never responded to the letter. (EDC Petition, ¶ 112.)

On December 17, 2024, OSFM issued State Waivers for Lines 324 and 325 with conditions. (EDC Petition, ¶ 115; CBD Petition, ¶ 71.) OSFM did not offer any sort of public process in advance of its decision. (EDC Petition, ¶ 115.)

On February 11, 2025, the United States Department of Transportation Pipeline and Hazardous Materials Safety Administration (PHMSA) sent a letter to OSFM indicating that it would not object to the OSFM's issuance of the State Waivers. (EDC Petition, ¶ 117.)

On April 15, 2025, CBD filed their verified petition (case No. 25CV02244) seeking writ and injunctive relief asserting three causes of action: (1) violation of federal pipeline safety laws (49 U.S.C. § 60118); (2) violation of state pipeline safety laws (Gov. Code, § 51011); and (3) violations of CEQA.

Also on April 15, 2025, EDC filed their verified petition (case No. 25CV02247) seeking writ, injunctive, and declaratory relief asserting eight causes of action: (1) violation of the federal Pipeline Safety Act (FPSA, 49 U.S.C. § 60118(d))—failure to provide a public process; (2) violation of the FPSA (49 U.S.C. § 60118(d))—failure to provide a statement of reasons; (3) declaratory relief—state waiver procedures required under the FPSA (49 U.S.C. § 60118(d)); (4) abuse of discretion under the FPSA (49 U.S.C. § 60118(d)); (5) violation of the Elder California Pipeline Safety Act of 1981 (CPSA, Gov. Code, § 51011, subd. (c)); (6) abuse of discretion under the CPSA (Gov. Code, § 51011, subd. (b)); (7) declaratory relief—standards and procedures required under the CPSA (Gov. Code, § 51011, subds. (b), (c)); and (8) CEQA—failure to prepare a subsequent EIR (Pub. Resources Code, § 21166).

On June 3, 2025, the court heard petitioners' ex parte applications for an administrative stay, or for an OSC re preliminary injunction and temporary restraining order (TRO). The court granted the petitioners' requests for a TRO and set a hearing on the OSCs for July 18, 2025.

On July 8, 2025, Sable filed demurrers and motions to strike as to the CBD Petition and EDC Petition, all noticed for hearing on September 19, 2025.

On July 18, 2025, the court granted in part petitioners' applications for issuance of preliminary injunctions.

On July 29, 2025, the court entered its written orders granting preliminary injunctions. The orders provide:

"The applications of petitioners in case numbers 25CV02244 and 25CV02247 for issuance of preliminary injunctions are, respectively, granted in part. The applications are granted to enjoin, pending the

disposition of these proceedings or further order of the court, the restart of the Las Flores Pipelines, as herein defined, until 10 court days following the filing and service of notice by or on behalf of real parties in interest Sable Offshore Corp., and Pacific Pipeline Company (collectively, Sable) that Sable has received all necessary approvals and permits for restarting the Las Flores Pipelines and that Sable intends to commence such restart. "Restart" shall have the same meaning as in the Federal Consent Decree identified herein. To be effective to commence the 10-court-day period, such notice shall be signed by an officer of Sable under penalty of perjury under the laws of the State of California and shall identify each such approval or permit, the agency giving such approval or permit, and the date such approval or permit was given by the agency; the notice need not identify or provide information for any approval or permit given or received prior to June 3, 2025. The 10-court-day time period shall be extended based upon the manner of service of the notice as provided in Code of Civil Procedure sections 1013 and 1010.6, and shall be calculated from the later of the date of filing or the date of service. The temporary restraining order remains in place until a written order of the court is entered on this preliminary injunction." (Order, filed July 29, 2025, exhibit A.)

On August 27, 2025, petitioners filed their motions to bifurcate "procedural" from "substantive" claims.

On September 8, 2025, Sable withdrew their demurrers and motions to strike. On September 17, 2025, Sable filed their answers to the petitions, admitting and denying allegations in the petitions and asserting 25 (in answer to the CBD Petition) and 19 (in answer to the EDC Petition) affirmative defenses.

On September 19, 2025, the court denied the motions to bifurcate.

On December 2, 2025, on the stipulation of the parties, the court entered its order consolidating both cases with case No. 25CV02244 as the lead case.

On January 5, 2026, Sable filed their motion for reconsideration of the preliminary injunction. As discussed below, the basis for this motion is the assertion of jurisdiction over the Las Flores Pipelines by the federal Pipeline and Hazardous Materials Safety Administration (PHMSA).

On January 7, 2026, the court heard Sable's ex parte application for reconsideration or alternatively to advance the hearing on the motion for reconsideration. The court set this hearing of February 27 on the motion for reconsideration.

On February 13, 2026, petitioners jointly filed opposition. OSFM filed separate opposition.

On February 18, 2026, Sable filed their reply.

On February 23, 2026, Sable filed a supplemental declaration.

**Analysis:**

(1)    Requests for Judicial Notice

In opposition to Sable's motion, petitioners request that the court take judicial notice of the following documents: (Petitioners' Opposition Request for Judicial Notice [Petitioners RJN], exhibit A) excerpts of the Consent Decree entered into by Sable's predecessor, Plains All American Pipeline, the Office of the

State Fire Marshal (OSFM), and the Pipeline and Hazardous Materials Safety Administration (PHMSA) (among other parties); (exhibit B) the California Natural Resources Agency's (CNRA) December 31, 2025 updated Summary of State Regulation of Crude Oil Pipelines in Santa Barbara County; (exhibit C) an October 22, 2025 letter from the OSFM to Sable regarding unmet State Waiver conditions; (exhibit D) a November 26, 2025 letter from Sable to PHMSA requesting that the pipelines be redesignated as interstate; (exhibit E) a December 19, 2025 application letter from Sable to PHMSA for an Emergency Special Permit; (exhibit F) petitioners' December 24, 2025 Petition for Review filed in the Ninth Circuit Court of Appeals challenging PHMSA's approval of Sable's Restart Plan and issuance of an Emergency Special Permit for the Las Flores Pipeline System; (exhibit G) the Ninth Circuit Court of Appeals' denial of Petitioners' Emergency Motion and Order expediting briefing in the case; (exhibit H) the State of California's January 23, 2026 Petition in the Ninth Circuit Court of Appeals; (exhibit I) the January 30, 2026 Motion to Consolidate Petitioners' and the State of California's Petitions, filed in the Ninth Circuit Court of Appeals; (exhibit J) the Ninth Circuit Court of Appeals' February 5, 2026 Order granting the Motion to Consolidate; (exhibit K) the Santa Barbara County Board of Supervisors' December 23, 2025 Action Letter; (exhibit L) the May 18, 2016 letter from PHMSA to OSFM memorializing the understanding between the two agencies with respect to the regulatory oversight of the pipelines; (exhibit M) the United States District Court, Central District of California's October 14, 2020 Order to Enter Consent Decree; and (exhibit N) the certified transcript from the Court's January 7, 2026 hearing on the parties' ex parte motions.

The court will grant judicial notice as to these documents, all of which constitute court records, official documents, or official filings of government agencies. (See Evid. Code, § 452, subds. (b), (c), (d), (h).) Judicial notice does not extend to the truth of factual matters set forth in such documents. (*Steed v. Department of Consumer Affairs* (2012) 204 Cal.App.4th 112, 120; *Fremont Indemnity Co. v. Fremont General Corp.* (2007) 148 Cal.App.4th 97, 113.)

Also in opposition to the motion, OSFM requests that the court take judicial notice of the following documents: (OSFM Request for Judicial Notice [OSFM RJN], exhibit A) the Petition for Review filed by California on January 23, 2026; (exhibit A-1) PHMSA Preemption Letter, dated December 17, 2025; (exhibit A-2) PHMSA Restart Plan Approval, dated December 22, 2025; (exhibit A-3) PHMSA Special Permit, dated December 23, 2025; (exhibit B) Complaint, *Pacific Pipeline Company v. California* (Kern County), filed September 29, 2025, with exhibits omitted; (exhibit C) Amended Complaint, *Pacific Pipeline Company v. California* (Kern County), filed January 21, 2026, with exhibits omitted; (exhibit D) selected pages from the Consent Decree, filed March 13, 2020; (exhibit E) Sable Assumption Agreement, dated February 19, 2024; (exhibit F) selected pages from Preliminary Injunction Order, entered on July 29, 2025; (exhibit G) selected pages from Answer by Sable Offshore Corp and Pacific Pipeline Company, filed on September 17, 2025; (exhibit H) letter from PHMSA to OSFM re Intrastate Designation, dated May 18, 2016; (exhibit I) selected pages from State Waiver for CA-324; (exhibit J) selected pages from State Waiver for CA-325; (exhibit K) OSFM letter to Sable re Tool Tolerance, dated October 22, 2025; (exhibit L) Sable letter to OSFM re Tool Tolerance, dated October 23, 2025; (exhibit M) Sable letter to PHMSA re Interstate Designation, dated November 26, 2025; (exhibit N) Order on Consent Decree, entered October 14, 2020; (exhibit O) selected pages from Santa Barbara County Air District permit; (exhibit P) Appendix to 49 CFR Part 195, Appendix A; (exhibit Q) Sable 8-K Form (Securities and Exchange Com.), dated September 29, 2025; and (exhibit R) selected pages from Sable Exhibit 99.2 to SEC filings.

The court will grant judicial notice as to these documents, all of which constitute court records, official documents, or official filings of government agencies. (See Evid. Code, § 452, subds. (b), (c), (d), (h).) As before, judicial notice does not extend to the truth of factual matters set forth in such documents.

In reply, Sable requests that the court take judicial notice of: (Sable Reply Request for Judicial Notice [Sable Reply RJN], exhibit 1) excerpts of the Consent Decree entered in *United States of America and People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*, case No. 2:20-cv-02415 in the United States District Court for the Central District of California; and (2) an order denying the State of California's Motion to Change Venue, dated February 3, 2026, by the Superior Court of Kern County in *Pacific Pipeline Company v. State of California*, Case No. BCV-25-103508.

The court will grant judicial notice as to these documents, which are court records. (See Evid. Code, § 452, subd. (d).) As before, judicial notice does not extend to the truth of factual matters set forth in such documents.

(2)     Standards for Sable's Motion

Sable frames its motion as a motion for "reconsideration" pursuant to Code of Civil Procedure sections 1008 and 533. (Notice, at p. 3.) Reconsideration of rulings on motions generally is governed by section 1008:

"When an application for an order has been made to a judge, or to a court, and refused in whole or in part, or granted, or granted conditionally, or on terms, any party affected by the order may, within 10 days after service upon the party of written notice of entry of the order and based upon new or different facts, circumstances, or law, make application to the same judge or court that made the order, to reconsider the matter and modify, amend, or revoke the prior order. The party making the application shall state by affidavit what application was made before, when and to what judge, what order or decisions were made, and what new or different facts, circumstances, or law are claimed to be shown." (Code Civ. Proc., § 1008, subd. (a).)

Sable asserts that this motion is timely under section 1008 because it was made within 10 days of the new or different facts and no notice of entry was served on them. Petitioners argue it is untimely under section 1008 because it has been more than five months since the court entered its order. Here, there is no evidence that there has been service of notice of entry of the order, which starts the 10-day period running. The motion is therefore timely under section 1008. (See *Novak v. Fay* (2015) 236 Cal.App.4th 329, 335–336 [service of notice of entry is applicable start date].) In any event, however, there is no time limit in making a motion to modify or dissolve an injunction under section 533:

"In any action, the court may on notice modify or dissolve an injunction or temporary restraining order upon a showing that there has been a material change in the facts upon which the injunction or temporary restraining order was granted, that the law upon which the injunction or temporary restraining order was granted has changed, or that the ends of justice would be served by the modification or dissolution of the injunction or temporary restraining order." (Code Civ. Proc., § 533.)

SC-2411 (Revised July 1, 2013)                    **MINUTE ORDER**

In either case, the party seeking modification or dissolution of an injunction bears the burden to show that changed circumstances justifies modification or dissolution of the order. (*Loeffler v. Medina* (2009) 174 Cal.App.4th 1495, 1504.)

(3)     Prior Ruling on Preliminary Injunction and Subsequent Events

The court need not here repeat the background and analysis set forth in the court's July 2025 ruling granting plaintiffs' applications for preliminary injunction, which ruling is incorporated by this reference. However, it is useful to highlight past events reflected in the court's record in order to evaluate Sable's motion for reconsideration.

In ruling on plaintiffs' applications for preliminary injunction, the court did not find that plaintiffs had made a sufficient evidentiary showing of a likelihood of success on the merits of plaintiffs' causes of action except as related to the State Fire Marshal's findings under the Elder California Pipeline Safety Act of 1981 (CPSA, Gov. Code, § 51010 et seq.).

In opposing the issuance of the preliminary injunction, Sable and OSFM argued that much, if not all, of plaintiffs' claims of harm were premature because those claims depended upon the restart of the Las Flores Pipelines and that multiple approvals were necessary before such restart. As argued by Sable in that opposition:

"Petitioners' alleged harm from restart of the Pipelines [citations] is purely speculative due to the additional approval Sable must obtain before the Pipelines are operational. [Citation.] As Petitioners acknowledge, and as required by the Consent Decree, OSFM must approve a Restart Plan before Sable can restart the Pipelines. [Citations.] When reviewing Sable's Restart Plan, OSFM will necessarily consider the safety of operations and integrity of the pipelines to minimize potential safety risks." (Sable Opposition re Preliminary Injunction, filed July 8, 2025, at p. 19.)

Accepting this argument in part, the court granted the preliminary injunction narrowly. As the court stated in its July 18 ruling:

"As the evidence and arguments of the petitioners most strongly demonstrate, the principal harm to be avoided is the restart of the Las Flores Pipelines without compliance with all applicable law. Because such a restart requires additional approvals, this harm may be avoided in the present by having adequate notice that a restart has been approved and so providing petitioners with a reasonable opportunity to address compliance issues of such a restart based upon such future approvals. By the same token, Sable would not be materially harmed by being restrained from restarting the Las Flores Pipelines without first providing such adequate notice. The OSFM would not be restrained or constrained in the interim to address all such matters within its regulatory purview.

"Accordingly, the court will narrowly grant the motions for preliminary injunctions to enjoin the restart of the Las Flores Pipelines, as herein defined, until 10 court days following Sable's filing and service of notice that Sable has received all necessary approvals and permits for restarting the Las Flores Pipelines and that Sable intends to commence such restart. 'Restart' shall have the same meaning as in the Federal Consent Decree. Such notice shall be signed by an officer of Sable under penalty of perjury under the laws of the State of California and shall identify each such approval or permit, the agency giving such approval or permit, and the date such approval or permit was given by the agency; the notice need not

identify or provide information for any approval or permit given or received prior to June 3, 2025 (the date of the court's grant of the TRO in these matters). The 10-court-day time period shall be extended based upon the manner of service of the notice as provided in Code of Civil Procedure sections 1013 and 1010.6, and shall be calculated from the later of the date of filing and the date of service.

"Under these terms of the preliminary injunction, absent further order of the court, Sable may restart the Las Flores Pipelines 10 court days following the giving of notice of receiving all necessary approvals and permits. Sable is not prevented by this injunction from taking steps towards restarting the Las Flores Pipelines short of actual restart. The OSFM is not impeded by the injunction from taking steps it finds appropriate in its regulatory capacity, including any steps OSFM may find desirable following this order. The conditions of the injunction do not allow restart without prior notice. This notice requirement and intervening waiting period provides reasonable time and opportunity for the petitioners and for the OSFM to take any requisite procedural step they may find appropriate before restart is to occur. The ruling is without prejudice to petitioners to seek additional, further, or other relief from the court, if any is warranted, before such restart. The court would be in a position to assess the evidence and arguments of the parties as they then exist, including, presumably, the fact and effects of actions taken as a result of obtaining the remaining necessary approvals and permits." (Minute Order, filed July 18, 2025, at pp. 13-14.)

Sable has not filed and served a notice under the existing terms of the preliminary injunction to restart the Las Flores Pipelines.

Subsequent to the court's grant of the preliminary injunction, the PHMSA has asserted that the Las Flores Pipelines constitute an interstate pipeline subject to PHMSA's exclusive jurisdiction. (Flores decl., ¶ 3 & exhibit A.) The PHMSA further issued their own approvals and an emergency special permit. (Flores decl., ¶¶ 4-7 & exhibits B, C.) These approvals are the subject of proceedings in the Ninth Circuit Court of Appeals, which has not issued a final ruling. (OSFM RJN, exhibit A; Simmonds decl., ¶¶ 7-11 & exhibits F-J.)

(4)     Reconsideration

Sable argues that because the PHMSA has asserted exclusive jurisdiction over the Las Flores Pipelines, the preliminary injunction issued by this court has been preempted. Acknowledging that preemption issues are being resolved in other jurisdictions, including the Ninth Circuit Court of Appeals, OSFM and Petitioners argue that, at least until there is binding authority otherwise, this court is bound by the terms of the Federal Consent Degree and the preliminary injunction remains on a firm foundation.

The Federal Consent Decree provides, among other things, that "Plains must receive a State Waiver from the OSFM prior to restarting Line 901." (Federal Consent Decree, appen. B, art. I, § 1(A).) While Sable now argues that it is not a party to the proceedings in which the Federal Consent Decree was entered, Sable's authority to operate the Las Flores Pipelines derives from rights obtained by Plains, for which Plains was, and remains, subject to conditions including conditions set forth in the Federal Consent Decree. Sable has not demonstrated any right to operate the Las Flores Pipelines separate from the rights derived from Plains and subject to the Federal Consent Decree. (See, e.g., Federal Consent Decree, art. III, § 4 [obligations binding on successors and assigns].)

The arguments raised by Sable thus question the continuing authority of the Federal Consent Decree.

"In a stipulated judgment, or consent decree, litigants voluntarily terminate a lawsuit by assenting to specified terms, which the court agrees to enforce as a judgment. [Citations.] As the high court has recognized, stipulated judgments bear the earmarks both of judgments entered after litigation and contracts derived through mutual agreement: '[C]onsent decrees "have attributes both of contracts and of judicial decrees"; a dual character that has resulted in different treatment for different purposes.' As in [*Firefighters v. City of Cleveland* (1986) 478 U.S. 501 [106 S.Ct. 3063, 92 L.Ed.2d 405]*, the issue before us is 'not whether we can label a consent decree as a "contract" or a "judgment," for we can do both.' [Citation.]" (*California State Auto. Assn. Inter-Ins. Bureau v. Superior Court* (1990) 50 Cal.3d 658, 663–664.)

For purposes of this discussion, it is sufficient to observe that by the Federal Consent Decree, the Las Flores Pipelines may not be restarted (as defined therein) without obtaining a State Waiver from the OSFM. Thus, the Federal Consent Decree by its terms requires authorization from the OSFM, whether that authorization is couched in regulatory, contract, or collateral estoppel terms. The court is not persuaded on this record that administrative actions taken by PHMSA necessarily eliminates OSFM participation in the restart process.

As pertinent to the preliminary injunction ruling, Petitioners' actions challenge whether OSFM meets OSFM's statutory and regulatory obligations in providing the authorization directed by the Federal Consent Decree. The court's grant of the preliminary injunction is narrow precisely so that all parties will have the opportunity to put this matter in a procedural posture specific to the circumstances existing when Sable is, by its own reckoning, fully authorized and ready to restart the Las Flores Pipelines. At that time the court can resolve, to the extent necessary, the restart issues presented by the parties without being sidetracked by speculative harms (such as those highlighted previously by Sable) and with the benefit of any then-existing legal developments from the federal courts.

After considering all of the arguments, facts, and circumstances presented in Sable's motion for reconsideration, the court does not find the evidence of subsequent events involving PHMSA and federal appellate proceedings are sufficient to reconsider its ruling on the preliminary injunction or to modify or dissolve the preliminary injunction. The motion will therefore be denied.

---

The Court continued the Case Management Conference as indicated below.
Notice was waived by all parties.


*Future Scheduled Hearings:*
June 26, 2026 8:30 AM Case Management Conference
Geck, Donna D- SB Dept 4
ANGELA BRAUN, EXECUTIVE OFFICER                    Minutes Prepared by:

_____Preston Frye_____ , Deputy


SC-2411 (Revised July 1, 2013)                    **MINUTE ORDER**

Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 884-7100
*Attorneys for Petitioners/Plaintiffs Center for Biological Diversity and Wishtoyo Foundation*

Linda Krop (Bar No. 118773)
lkrop@environmentaldefensecenter.org
Jeremy M. Frankel (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
Tara C. Rengifo (Bar No. 307670)
trengifo@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152
*Attorneys for Petitioners/Plaintiffs Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper*

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
2/27/2026 1:47 PM
By: Sarah Sisto , Deputy

### SUPERIOR COURT OF THE STATE OF CALIFORNIA
### IN AND FOR THE COUNTY OF SANTA BARBARA

CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,

                    Petitioners/Plaintiffs,

    v.

CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive,

                    Respondents/Defendants.

SABLE OFFSHORE CORP., a Delaware Corporation; PACIFIC PIPELINE COMPANY, a Delaware Corporation; and DOES 11 through 20, inclusive,

                    Real Parties in Interest.

Case No. 25CV02244
[Consolidated with Case No. 25CV02247]

**NOTICE OF ENTRY OF ORDERS RE PRELIMINARY INJUNCTION**

Trial Date: None Yet Scheduled

Actions Filed: April 15, 2025

---

Notice of Entry of Orders re Preliminary Injunction

ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation,

                     Petitioners/Plaintiffs,

    v.

CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, an agency of the State of California; OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive,

                  Respondents/Defendants.

SABLE OFFSHORE CORP., a Delaware Corporation; and PACIFIC PIPELINE COMPANY, a Delaware Corporation,

              Real Parties in Interest.

**TO ALL PARTIES AND ATTORNEYS OF RECORD:**

Please take notice that on July 29, 2025, the Court entered the following orders in these consolidated matters, (1) Order Re: Preliminary Injunction and Undertaking (Case No. 25CV02244); and (2) Order Re: Preliminary Injunction and Undertaking (Case No. 25CV02247).

Copies of these orders are attached to this notice.

DATED: February 27, 2026

Respectfully Submitted,

s/ Julie Teel Simmonds
Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 844-7100 / Fax: (510) 844-7150
*Attorneys for Petitioners/Plaintiffs Center for Biological Diversity and Wishtoyo Foundation*

1

Pursuant to CRC 2.250, this document has been electronically filed by the Superior Court of California, County of Santa Barbara on 7/25/2025

**FILED**
SUPERIOR COURT of CALIFORNIA
COUNTY of SANTA BARBARA
**07/29/2025**
Darrel E. Parker, Executive Officer
BY  Chavez, Terri
Deputy Clerk

Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 844-7100 / Fax: (510) 844-7150

*Attorneys for Petitioners Center for Biological Diversity and Wishtoyo Foundation*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## IN AND FOR THE COUNTY OF SANTA BARBARA

CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,

              Petitioners/Plaintiffs,

    v.

CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive,

              Respondents/Defendants.

_____

SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,

              Real Parties in Interest.

Case No.: 25CV02244

[~~PROPOSED~~] ORDER RE: PRELIMINARY INJUNCTION AND UNDERTAKING

Hearing: July 18, 2025
Time:    10:00 a.m.
Dept.:    4
Judge:   Hon. Donna D. Geck

Action Filed: April 15, 2025
Trial: None Set

1
[Proposed] Order Re: Preliminary Injunction and Undertaking

**TO RESPONDENTS AND REAL PARTIES IN INTEREST IN THE ABOVE-CAPTIONED ACTION:**

The application of Petitioners Center for Biological Diversity and Wishtoyo Foundation ("Petitioners") for a preliminary injunction was heard on July 18, 2025, at 10:00 A.M. in Department 4 of the above-captioned Court. Appearing as attorneys were Talia Nimmer for Petitioners; Michael Dorsi for Respondents California Department of Fire and Forestry and State Fire Marshal Daniel Berlant (collectively, "Respondents"); and Jeffrey Dintzer, Garret Stanton, and Trevor Large for Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company (collectively, "Sable").

At the hearing, the Court adopted its tentative ruling to grant, in part, Petitioners' application. The order of the Court is set forth in its tentative — and now final — ruling, attached hereto as **Exhibit A.**

**IT IS SO ORDERED.**

DATED: _____, 2025

07/29/2025

_____
JUDGE OF THE SUPERIOR COURT
**Donna D. Geck**

---

2
[Proposed] Order Re: Preliminary Injunction and Undertaking

# **<u>EXHIBIT A</u>**

 

NOTICE: Effective September 1, 2025, the cost of e-filing will increase from $6.45 to $10.00 per envelope. For more information click <u>here</u>.

Notice: The court is aware of fraudulent messages and scams being sent to the public. For more information please click <u>here</u>.

# Center for Biological Diversity et al vs California Dept of Forestry and Fire Protection et al

## Case Number

25CV02244

## Case Type

Civil Law & Motion

## Hearing Date / Time

Fri, 07/18/2025 - 10:00

## Nature of Proceedings

CMC; OSC Preliminary Injunction; Motion to Compel; Motion to Strike

## Tentative Ruling

(1)    The applications of petitioners in case numbers 25CV02244 and 25CV02247 for issuance of preliminary injunctions are, respectively, granted in part. The applications are granted to enjoin, pending the disposition of these proceedings or further order of the court, the restart of the Las Flores Pipelines, as herein defined, until 10 court days following the filing and service of notice by or on behalf of real parties in interest Sable Offshore Corp., and Pacific Pipeline Company (collectively, Sable) that Sable has received all necessary approvals and permits for restarting the Las Flores Pipelines and that Sable intends to commence such restart. "Restart" shall have the same meaning as in the Federal Consent Decree identified herein. To be effective to commence the 10-court-day period, such notice shall be signed by an officer of Sable under penalty of perjury under the laws of the State of California and shall identify each such approval or permit, the agency giving such approval or permit, and the date such approval or permit was given by the agency; the notice need not identify or provide information for any approval or permit given or received prior to June 3, 2025. The 10-court-day time period shall be extended based upon the manner of service of the notice as provided in Code of Civil Procedure sections 1013 and 1010.6, and shall be calculated from the later of the date of filing or the date of service. The temporary restraining order remains in place until a written order of the court is entered on this preliminary injunction.

(2)    On or before July 25, 2025, petitioners in each case shall lodge with the court an order for signature and filing.

(3)    The court fixes the undertaking required by Code of Civil Procedure section 529 in the amount of $1,000.00, to be filed in each case by the respective petitioners. Petitioners shall file such undertaking on or before July 25, 2025.

(4)    For the reasons set forth herein, the motion of Sable (case No. 25CV02244) to compel the deposition of Richard B. Kuprewicz, the motion of Sable (case No. 25CV02244) to strike the declaration of Kuprewicz filed in support of petitioners' applications for preliminary injunctions, the motion of Sable (case No. 25CV02247) to compel the deposition of Kuprewicz, and the motion of Sable (case No. 25CV02247) to strike the declaration of Kuprewicz filed in support of petitioners' applications for preliminary injunctions are all denied.

(1)    OSC re Preliminary Injunction

These are two related cases involving the same underlying incidents and activity. Pursuant to the parties' stipulation, the responding parties and real parties in interest have filed the same brief addressing both cases in each of these cases and the respective petitioners have filed reply papers in each of their respective cases. The court therefore will address the orders to show cause re issuance of preliminary injunctions (OSCs) together.

Documents filed by petitioners and plaintiffs Center for Biological Diversity and Wishtoyo Foundation (case No. 25CV02244) will be identified by the prefix, and these parties will be collectively referred to as, "CBD"; documents filed by petitioners and plaintiffs Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper (case No. 25CV02247) will be identified by the prefix, and these parties collectively referred to as, "EDC." Petitioners and plaintiffs will collectively be referred to as "petitioners"; respondents and defendants will be collectively referred to as "respondents"; a petition and complaint will be referred to simply as a "petition." Respondents Department of Forestry and Fire Protection, by and through the Office of the State Fire Marshal, an agency of the State of California, and Daniel Berlant, in his official capacity as State Fire Marshal will be collectively referred to as "OSFM." Real parties in interest Sable Offshore Corp., and Pacific Pipeline Company will be collectively referred to as "Sable."

**Background:**

The parties have submitted voluminous evidence in support of, and in opposition to, these OSCs. The court has reviewed all of the papers presented by the parties, and has relied only upon admissible evidence in making this ruling. The discussion herein is not intended to be exhaustive, but to provide context for the court's analysis and ruling.

These actions involve two oil pipelines connected to three offshore platforms known as the Santa Ynez Unit. (CBD Petition, ¶¶ 33, 34; EDC Petition, ¶ 38, 39.) The two oil pipelines at issue (collectively, the Las Flores Pipelines) consist of Las Flores Pipeline CA-324 (Line 324) and Las Flores Pipeline CA-325 (Line 325). (CBD Petition, ¶¶ 39, 40; EDC Petition, ¶ 41.) Prior to 2015, when owned by Plains Pipeline, L.P., a wholly owned subsidiary of Plains All American Pipeline (collectively, Plains), Line 324 was known as Line 901 and Line 325 was known as Line 903. (CBD Petition, ¶ 49; EDC Petition, ¶ 41, 68.)

The Las Flores Pipelines were constructed and operated following approval by Santa Barbara County in 1986. (CBD Petition, ¶ 35; EDC Petition, ¶ 54.) This approval relied upon an environmental impact report (EIR) drafted in 1984 and finalized in 1985. (CBD Petition, ¶ 35; EDC Petition, ¶ 54 & fn. 1.)

In 2015, Line 324 (formerly Line 901) ruptured causing a serious oil spill (Refugio Oil Spill). (CBD Petition, ¶¶ 50-51; EDC Petition, ¶¶ 69-70.) The Las Flores Pipelines were consequently shut down at that time. (CBD Petition, ¶ 52; EDC Petition, ¶ 82.)

In March 2020, the United States and the State of California sued Plains based upon damages from the Refugio Oil Spill in *United States v. Plains All American Pipeline*, United States District Court for the Central District of California, case No. 2:20-cv-02415 (the Federal Action). (CBD Petition, ¶ 59; EDC Petition, ¶ 85.) The Federal Action was settled by a consent decree (Federal Consent Decree) entered by the court. (Rusch decl., ¶ 33 & exhibit N [the Federal Consent Decree].)

The Federal Consent Decree includes the following provisions:

"1.     State Waivers for Lines 901, 903, and 2000 (not to include any replacement lines):

"A.     Prior to restarting Line 901, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 901. Plains must receive a State Waiver from the OSFM prior to restarting Line 901.

"B.     Prior to restarting non-operational segments of Line 903, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic

protection on Line 903. Plains must receive a State Waiver from the OSFM prior

to restarting Line 903.

"C.     Within 90 days of entry of the Consent Decree (CD), Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 903. The State Waiver shall apply to the currently operational segment of Line 903 from Pentland to Emidio.

"D.     Within 90 days of entry of the CD, Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 2000.

"E.     To the extent that a State Waiver directly incorporates terms identified in section 4 (Integrity Management) below, as being applicable to Lines 901, 903, or 2000, Plains shall not contest the inclusion of those terms in the relevant State Waiver. Plains reserves its rights to contest on any grounds any additional terms that the OSFM may require as part of each State Waiver if one is received. Nothing in this CD shall be construed to limit the authority of the OSFM to require additional terms or conditions in the State Waiver. Further, nothing in the State Waiver shall be construed to limit the applicability of the terms set forth in the CD.

"2.     Replacement, Restart, or Abandonment of Lines 901 and 903:

"A.     Plains shall replace the existing Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland with non-insulated pipe, if Plains is able to timely obtain: (1) agreements from shippers to transport sufficient quantities of product to make the cost of replacing the segments economically viable; (2) the Federal, State, and Local permits that may be required; and (3) whatever additional rights are needed, including rights-of-way that may be needed from landowners. Obtaining required commercial commitments, permits, rights-of-way, and any other rights necessary for replacement is the sole responsibility of

Plains.

"1.     On any replacement segments of Lines 901 or 903, Plains shall, prior to commencing operation of such segment(s):

"a.     Test for potential AC/DC interference. Where potential AC/DC interference exists, proper mitigation of interference shall be designed and installed during construction of replacement lines.

"b.     Conduct a close interval survey (CIS) and AC/DC interference survey.

"c.     Based on the CIS and AC/DC interference surveys, place additional cathodic-protection test stations at locations where the surveys demonstrate potential cathodic-protection deficiencies, following review and consultation with the OSFM regarding proposed test station locations.

"B.     As an alternative to replacement of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may restart the existing pipelines in accordance with the CD (including Appendix D) and applicable law.

"C.      As an alternative to replacement or restart of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may abandon all or any segments in accordance with all applicable laws and regulations." (Federal Consent Decree, appen. B, art. I, §§ 1, 2.)

In 2024, Sable acquired the Santa Ynez Unit and the Las Flores Pipelines. (CBD Petition, ¶ 64-65; EDC Petition, ¶ 99.)

In April 2024, Sable submitted State Waiver applications to OSFM for Lines 324 and 325. (EDC Petition, ¶ 110 & exhibit B.)

In May 2024, Sable began conducting repair and maintenance activities to the Las Flores Pipelines. (Rusch decl., ¶ 5.) According to Sable, these activities were completed pursuant to previously granted coastal development permits, approvals, and EIR. (*Ibid*.)

On September 24, 2024, CBD set a letter to OSFM stating that the OSFM had a duty to conduct an analysis and provide opportunities for meaningful public participation under the California Environmental Quality Act (CEQA, Pub. Resources Code, § 21000 et seq.). (CBD Petition, ¶ 68.)

On September 27, 2024, EDC sent a letter to OSFM renewing their March 2024 request for a public process. (EDC Petition, ¶ 112.) EDC also stated that operating the Las Flores Pipeline System without effective cathodic protection was neither anticipated nor reviewed in the 1985 EIR or any project approval, and the potential impacts of doing so have never been fully considered. (*Id*. & exhibit C.) OSFM never responded to the letter. (EDC Petition, ¶ 112.)

On December 17, 2024, OSFM issued State Waivers for Lines 324 and 325 with conditions. (Rusch decl., ¶ 7 & exhibits B, C.) OSFM did not offer any sort of public process in advance of its decision. (EDC Petition, ¶ 115.)

On February 11, 2025, the United States Department of Transportation Pipeline and Hazardous Materials Safety Administration (PHMSA) sent a letter to OSFM indicating that it would not object to the OSFM's issuance of the State Waivers. (Rusch decl., ¶ 9 & exhibit E.)

On April 2, 2025, OSFM issued letters noting its receipt of PHMSA's decision stating that it has no objection to granting the State Waivers. (Rusch decl., ¶ 10 & exhibits F, G.)

On April 15, 2025, CBD filed their verified petition (case No. 25CV02244) seeking writ and injunctive relief asserting three causes of action: (1) violation of federal pipeline safety laws (49 U.S.C. § 60118); (2) violation of state pipeline safety laws (Gov. Code, § 51011); and (3) violations of CEQA.

Also on April 15, 2025, EDC filed their verified petition (case No. 25CV02247) seeking writ, injunctive, and declaratory relief asserting eight causes of action: (1) violation of the federal Pipeline Safety Act (FPSA, 49 U.S.C. § 60118(d))—failure to provide a public process; (2) violation of the FPSA (49 U.S.C. § 60118(d))—failure to provide a statement of reasons; (3) declaratory relief—state waiver procedures required under the FPSA (49 U.S.C. § 60118(d)); (4) abuse of discretion under the FPSA (49 U.S.C. § 60118(d)); (5) violation of the Elder California Pipeline Safety Act of 1981 (CPSA, Gov. Code, § 51011, subd. (c)); (6) abuse of discretion under the CPSA (Gov. Code, § 51011, subd. (b)); (7) declaratory relief—standards and procedures required under the CPSA (Gov. Code, § 51011, subds. (b), (c)); and (8) CEQA—failure to prepare a subsequent EIR (Pub. Resources Code, § 21166).

On June 3, 2025, the court heard petitioners' ex parte applications for an administrative stay, or for an OSC re preliminary injunction and temporary restraining order (TRO). The court granted the petitioners' requests for a TRO and set a hearing on the OSCs for this date.

The applications for issuance of a preliminary injunction are opposed by OSFM and by Sable.

**Analysis:**

Notwithstanding the issuance of the TRO, the burden is on petitioners, as the parties seeking injunctive relief, to show all elements necessary to support issuance of a preliminary injunction. (*O'Connell v. Superior Court* (2006) 141 Cal.App.4th 1452, 1481.) A preliminary injunction is available "[w]hen it appears by the complaint or affidavits that the commission or continuance of some act during the litigation would produce waste, or great or irreparable injury, to a party to the action." (Code Civ. Proc., § 526, subd. (a)(2).)

"The trial courts consider two interrelated questions in deciding whether to issue a preliminary injunction: 1) are the plaintiffs likely to suffer greater injury from a denial of the injunction than the defendants are likely to suffer from its grant; and 2) is there a reasonable probability that the plaintiffs will prevail on the merits. [Citations.] '[By] balancing the respective equities of the parties, [the court] concludes that, pending a trial on the merits, the defendant should or that he should not be restrained from exercising the right claimed by him.' [Citations.]" (*Robbins v. Superior Court* (1985) 38 Cal.3d 199, 206.)

(A)    Likelihood of Success on the Merits

Petitioners raise multiple claims in their petitions that separately could support issuance of an injunction. It is therefore necessary to address these claims in turn.

(i)    CEQA

Petitioners each assert a claim under CEQA based upon OSFM's issuance of the State Waivers without preparing environmental documentation, without providing public notice, and without providing an opportunity for public comment. (CBD Petition, ¶¶ 128-129; EDC Petition, ¶ 224.)

"[CEQA] and the regulations implementing it (Cal. Code Regs., tit. 14, § 15000 et seq.) embody California's strong public policy of protecting the environment. 'The basic purposes of CEQA are to: [¶] (1) Inform governmental decision makers and the public about the potential, significant environmental effects of proposed activities. [¶] (2) Identify ways that environmental damage can be avoided or significantly reduced. [¶] (3) Prevent significant, avoidable damage to the environment by requiring changes in projects through the use of alternatives or mitigation measures when the governmental agency finds the changes to be feasible. [¶] (4) Disclose to the public the reasons why a governmental agency approved the project in the manner the agency chose if significant environmental effects are involved.' [Citation.]" (*Tomlinson v. County of Alameda* (2012) 54 Cal.4th 281, 285–286 (*Tomlinson*).)

"To achieve these goals, CEQA and the implementing regulations provide for a three-step process. In the first step, the public agency must determine whether the proposed development is a 'project,' that is, 'an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment' undertaken, supported, or approved by a public agency. (§ 21065.)" (*Tomlinson, supra,* 54 Cal.4th at p. 286.)

"The second step of the process is required if the proposed activity is a 'project.' The public agency must then decide whether it is exempt from compliance with CEQA under either a statutory exemption (§ 21080) or a categorical exemption set forth in the regulations (§ 21084, subd. (a); Cal. Code Regs., tit. 14, § 15300). A categorically exempt project is not subject to CEQA, and no further environmental review is required. [Citations.] If the project is not exempt, the agency must determine whether the project may have a significant effect on the environment. If the agency decides the project will not have such an effect, it must 'adopt a negative declaration to that effect.' [Citations.] Otherwise, the agency must proceed to the third step, which entails preparation of an environmental impact report before approval of the project. (§§ 21100, subd. (a), 21151, subd. (a).)" (*Tomlinson*, *supra*, 54 Cal.4th at p. 286.)

CBD asserts that restarting the Las Flores Pipelines by issuance of the State Waivers is a "project" under CEQA requiring environmental review. (CBD Application, at pp. 21-23.) OSFM and Sable argue that the issuance of the State Waivers is not a "project" or is otherwise not subject to CEQA.

" 'Project' means an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and which is any of the following: [¶] … [¶] (c) An activity that involves the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies." (Pub. Resources Code, § 21065.)

"The term 'project' refers to the activity which is being approved and which may be subject to several discretionary approvals by governmental agencies. The term 'project' does not mean each separate governmental approval." (Cal. Code Regs., tit. 14, § 15378, subd. (c).)

Under this definition, the issuance of the State Waivers does not appear to constitute a "project" separately subject to CEQA review. The State Waivers would at most constitute a separate governmental approval for the underlying activity, which is the restart of the Las Flores Pipelines. The court concludes that the issuance of the State Waivers does not itself cause a change or authorize a change in the environment. (See *Simons v. City of Los Angeles* (1976) 63 Cal.App.3d 455, 466.)

If the State Waivers were considered more broadly, i.e., as a proxy for the restart of the Las Flores Pipelines, the resolution under CEQA is not clear. OSFM and Sable argue that, in such instance, the categorical existing facilities exemption applies.

"Class 1 consists of the operation, repair, maintenance, permitting, leasing, licensing, or minor alteration of existing public or private structures, facilities, mechanical equipment, or topographical features, involving negligible or no expansion of existing or former use. The types of 'existing facilities' itemized below are not intended to be all-inclusive of the types of projects which might fall within Class 1." (Cal. Code Regs., tit. 14, § 15301; see also Pub. Resources Code, § 21084; Cal. Code Regs., tit. 14, § 15300.)

"Examples include but are not limited to: [¶] ... [¶] (d) Restoration or rehabilitation of deteriorated or damaged structures, facilities, or mechanical equipment to meet current standards of public health and safety, unless it is determined that the damage was substantial and resulted from an environmental hazard such as earthquake, landslide, or flood." (Cal. Code Regs., tit. 14, § 15301, subd. (d).)

An issue now before the California Supreme Court is whether "negligible" in this exemption pertains to a negligible change in use or to a change that presents a negligible risk of environmental harm. (*Sunflower Alliance v. Department of Conservation* (2024) 105 Cal.App.5th 771, review granted Dec. 18, 2024, S287414 (*Sunflower*).) Under broader circumstances, this issue may bear upon the application of the exemption. But as the issue is presented here, such analysis is premature because the State Waivers are not themselves directly or indirectly causing change to the environment.

EDC, in particular, focuses its argument on the need for updated environmental review:

"When an environmental impact report has been prepared for a project pursuant to this division, no subsequent or supplemental environmental impact report shall be required by the lead agency or by any responsible agency, unless one or more of the following events occurs:

"(a)    Substantial changes are proposed in the project which will require major revisions of the environmental impact report.

"(b)    Substantial changes occur with respect to the circumstances under which the project is being undertaken which will require major revisions in the environmental impact report.

"(c)    New information, which was not known and could not have been known at the time the environmental impact report was certified as complete, becomes available." (Pub. Resources Code, § 21166.)

"When an EIR has been certified or a negative declaration adopted for a project, no subsequent EIR shall be prepared for that project unless the lead agency determines, on the basis of substantial evidence in the light of the whole record, one or more of the following:

"(1)    Substantial changes are proposed in the project which will require major revisions of the previous EIR or negative declaration due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects;

"(2)    Substantial changes occur with respect to the circumstances under which the project is undertaken which will require major revisions of the previous EIR or negative declaration due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects; or

"(3)    New information of substantial importance, which was not known and could not have been known with the exercise of reasonable diligence at the time the previous EIR was certified as complete or the negative declaration was adopted, shows any of the following:

"(A)    The project will have one or more significant effects not discussed in the previous EIR or negative declaration;

"(B)    Significant effects previously examined will be substantially more severe than shown in the previous EIR;

"(C)    Mitigation measures or alternatives previously found not to be feasible would in fact be feasible and would substantially reduce one or more significant effects of the project, but the project proponents decline to adopt the mitigation measure or alternative; or

"(D)    Mitigation measures or alternatives which are considerably different from those analyzed in the previous EIR would substantially reduce one or more significant effects on the environment, but the project proponents decline to adopt the mitigation measure or alternative."

(Cal. Code Regs., tit. 14, § 15162, subd. (a).)

EDC argues that a subsequent EIR is required because: (1) operating the pipeline system without an effective cathodic protection system throughout the entire length of the pipeline constitutes a change in the project that increases the risk and severity of impacts, requiring major revisions to the 1985 EIR; (2) the failure of the pipeline system's cathodic protection system and resulting corrosion constitutes a change in circumstances; (3) it was only after the 2015 oil spill that the pipeline system was discovered to lack effective cathodic protection, which constitutes new information showing that the risk of an oil spill is substantially more severe than previously determined.

The petitioners rely largely upon the declaration and reports of expert Richard Kuprewicz for evidence regarding pipeline safety. The testimony of Kuprewicz is the subject of other motions also pending before the court (discussed below) based in part upon Kuprewicz's present unavailability to be subject to a deposition. For purposes of these motions, the court will consider Kuprewicz's evidence with Kuprewicz's unavailability going to the weight of the evidence in the context of these applications for preliminary injunctions.

"After an initial EIR is certified, CEQA establishes a presumption against additional environmental review. An agency has jurisdiction to prepare a subsequent or supplemental EIR only if the agency grants a 'discretionary' approval on the project [citation, fn.], and certain statutorily enumerated new circumstances occur." (*San Diego Navy Broadway Complex Coalition v. City of San Diego* (2010) 185 Cal.App.4th 924, 928.)

The 1985 EIR addressed the potential for an oil spill from pipeline operation. (Dorsi decl., exhibit 5.) There is a dispute among the parties as to whether the 2015 spill and the failure of effective cathodic protection demonstrate new information requiring more or different analysis than present the 1985 EIR. However, this analysis, like the discussion above, is an analysis of a "project," and in particular the restart of pipeline operations as compared with the State Waivers at issue here.

The court concludes that, in the present administrative posture, petitioners are not likely to succeed on the merits of showing a violation of CEQA. Nonetheless, the court finds that petitioners have shown some likelihood of success on the merits which may be weighed against the relative harms and equities to support issuance of a preliminary injunction.

(ii)     Federal Claims

In addition to violations of CEQA, petitioners assert violations of the FPSA in failing to provide a public process and failing to provide a statement of reasons.

"General requirements.--A person owning or operating a pipeline facility shall--

"(1)    comply with applicable safety standards prescribed under this chapter, except as provided in this section or in section 60126;

"(2)    prepare and carry out a plan for inspection and maintenance required under section 60108(a) and (b) of this title;

"(3)    allow access to or copying of records, make reports and provide information, and allow entry or inspection required under subsections (a) through (e) of section 60117 of this title; and

"(4)    conduct a risk analysis, and adopt and implement an integrity management program, for pipeline facilities as required under section 60109(c)." (49 U.S.C. § 60118(a).)

"Waivers by Secretary.--

(1)    Nonemergency waivers.--

"(A)    In general.--On application of an owner or operator of a pipeline facility, the Secretary by order may waive compliance with any part of an applicable standard prescribed under this chapter with respect to such facility on terms the Secretary considers appropriate if the Secretary determines that the waiver is not inconsistent with pipeline safety.

"(B) Hearing.--The Secretary may act on a waiver under this paragraph only after notice and an opportunity for a hearing."

(49 U.S.C. § 60118(c)(1).)

"Statement of reasons.--The Secretary shall state in an order issued under this subsection the reasons for granting the waiver." (49 U.S.C. § 60118(c)(3).)

"Waivers by State authorities.--If a certification under section 60105 of this title or an agreement under section 60106 of this title is in effect, the State authority may waive compliance with a safety standard to which the certification or agreement applies in the same way and to the same extent the Secretary may waive compliance under subsection (c) of this section. However, the authority must give the Secretary written notice of the waiver at least 60 days before its effective date. If the Secretary makes a written objection before the effective date of the waiver, the waiver is stayed. After notifying the authority of the objection, the Secretary shall provide a prompt opportunity for a hearing. The Secretary shall make the final decision on granting the waiver." (49 U.S.C. § 60118(d).)

Petitioners argue that, because "the State authority may waive compliance with a safety standard to which the certification or agreement applies in the same way and to the same extent the Secretary may waive compliance under subsection (c)" and because the Secretary may act on a waiver only after notice and an opportunity for a hearing and by stating reasons, petitioners may set aside the State Waivers until the OSFM complies with section 60118.

OSFM and Sable argue that petitioners may not seek such remedies under federal law for violation of these non-discretionary procedural requirements, citing *City and County of San Francisco v. U.S. Dept. of Transp.* (9th Cir. 2015) 796 F.3d 993 (*San Francisco*). In *San Francisco*, the litigation was initiated following an explosion of a natural gas transmission pipeline. (*Id.* at p. 995.) Fearing a recurrence, the City and County of San Francisco sued under the FPSA's citizen suit provision alleging that the PHMSA failed to comply with the FPSA. (*Ibid.*) The city sought declaratory and injunctive relief to compel the FPSA to comply with its duties under the FPSA. (*Id.* at pp. 997-998.) The District Court dismissed the suit with leave to amend, finding that the citizen suit provision (49 U.S.C. § 60121) was " 'not an appropriate vehicle for seeking mandamus relief regarding defendants' performance of their regulatory obligations.' " (*Id.* at p. 998.) The city amended its complaint to include claims under the Administrative Procedures Act, arguing that the PHMSA approval of the state agency's certification was arbitrary and capricious, and a failure to act, in violation of title 5, United States Code section 706. (*Ibid.*) The District Court dismissed these claims as well. (*Ibid.*)

On appeal in *San Francisco*, the Ninth Circuit affirmed. (*San Francisco*, *supra*, 796 F.3d at p. 1004.) "The Pipeline Safety Act, by its plain language, allows only a very limited private right of action. It permits injunctive citizen suits against the United States or other entities 'for a violation of this chapter or a regulation prescribed or order issued under this chapter.' [Citation.] In other words, private citizen suits are authorized for substantive statutory or regulatory violations. By its terms, the provision does not authorize a mandamus-type action to compel the Agency to perform non-discretionary regulatory duties." (*Id*. at pp. 998–999.)

The OSFM also argues that the notice and hearing requirements of section 60121 appear in the FPSA as procedural protections for the benefit of the applicant seeking the waiver and not for the more general purpose of public participation. This latter point is consistent with the corresponding regulations: "Hearing means an informal conference or a proceeding for oral presentation. Unless otherwise specifically prescribed in this part, the use of 'hearing' is not intended to require a hearing on the record in accordance with section 554 of title 5, U.S.C." (49 C.F.R. § 190.3 (2025).)

Considering these regulations and the reasoning of *San Francisco*, there is a reasonable basis to find that federal law does not require a hearing with generalized public participation and hence to find no violation of the procedural aspects of the FPSA. Despite this lack of requirement, petitioners, nonetheless, actually submitted evidence to the OSFM. (CDB Petition, ¶¶ 68-74; EDC Petition, ¶ 116.) A reasonable inference is that the petitioners have had an opportunity to present evidence to OSFM regardless of whether there is a public participation requirement.

The court finds that petitioners have not shown a likelihood of success on the merits as to claims based on federal law, but again petitioners have shown some likelihood of success on the merits which may be weighed against the relative harms and equities to support issuance of a preliminary injunction.

       (iii)    State Claims

Corresponding to their FPSA claims, petitioners also assert violations of the CPSA.

"It is the intent of the Legislature, in enacting this chapter, that the State Fire Marshal shall exercise exclusive safety regulatory and enforcement authority over intrastate hazardous liquid pipelines and, to the extent authorized by agreement between the State Fire Marshal and the United States Secretary of Transportation, may act as agent for the United States Secretary of Transportation to implement the federal Hazardous Liquid Pipeline Safety Act of 1979 (49 U.S.C. Sec. 60101 et seq.) and federal pipeline safety regulations as to those portions of interstate pipelines located within this state, as necessary to obtain annual federal certification." (Gov. Code, § 51010.)

"The State Fire Marshal shall adopt hazardous liquid pipeline safety regulations in compliance with the federal law relating to hazardous liquid pipeline safety, including, but not limited to, compliance orders, penalties, and inspection and maintenance provisions, and including amendments to those laws and regulations that may be hereafter enacted and adopted." (Gov. Code, § 51011, subd. (a).)

"The State Fire Marshal may exempt the application of regulations adopted pursuant to this section to any pipeline, or portion thereof, when it is determined that the risk to public safety is slight and the probability of injury or damage remote." (Gov. Code, § 51011, subd. (b).)

"Notification of exemptions shall be written, and shall include a discussion of those factors that the State Fire Marshal considers significant to the granting of the exemption." (Gov. Code, § 51011, subd. (c).)

"Title 49 of the Code of Federal Regulations, Part 195 is hereby adopted by reference as it relates to hazardous liquid pipelines." (Cal. Code Regs., tit. 19, § 2000.)

While federal procedural law may not separately provide for mandate remedies, California procedural law generally provides for writs of mandate to command California officials to comply with the law. (See Code Civ. Proc., §§ 1085, 1094.5.)

Reviewing the State Waivers, the court concludes that the State Waivers do not contain a discussion of factors that the OSFM considered significant in granting the exemption beyond conclusions.

"Administrative agency findings are generally permitted considerable latitude with regard to their precision, formality, and matters reasonably implied therein. [Citation.] However, findings by implication cannot be substituted for specific findings when they are required by law." (*Southern Pacific Transportation Co. v. State Bd. of Equalization* (1987) 191 Cal.App.3d 938, 954.)

Given the specific findings required by section 51011, subdivision (b), it appears that the statutorily-required discussion of subdivision (c) must in some appropriate way at least connect the factors stated (and their significance) to the findings that the risk to public safety is slight and the probability of injury or damage remote. The court finds that petitioners have established a reasonable probability of success on the merits on this claim.

> (B)  Greater Harms

Petitioners argue that they, and the portion of the public they represent, would suffer the greater harm by the erroneous denial of a preliminary injunction. In particular, petitioners argue that the potential harm to natural resources and the failure to consider impacts of the project or to allow public input outweigh any delay for Sable. Sable argues that such harm is purely speculative and that it, and the general public, would suffer economic harms delaying or preventing the domestic oil production from Sable's use of the pipelines by the erroneous issuance of a preliminary injunction. The OSFM argues that erroneous issuance of an injunction against public officers in performing their duties is a form of irreparable injury.

As discussed below, because the petitions focus on deficiencies in the State Waivers as issued by OSFM and because additional approvals are required before the pipelines subject to the State Waivers may be restarted, the court finds that no party has made a strong showing that it would suffer greater harm by the erroneous grant or denial of the preliminary injunction.

> (C)  Balance of Equities

In arguing that CEQA is inapplicable, Sable and OSFM make the point that the State Waivers constitute but one approval of several necessary to restart the Las Flores Pipelines. This argument is carried forward into their analysis of the relative harms: "Petitioners' alleged harm from restart of the Pipelines [citations] is purely speculative due to the additional approval Sable must obtain before the Pipelines are operational. [Citation.] As Petitioners acknowledge, and as required by the Consent Decree, OSFM must approve a Restart Plan before Sable can restart the Pipelines. [Citations.] When reviewing Sable's Restart Plan, OSFM will necessarily consider the safety of operations and integrity of the pipelines to minimize potential safety risks." (Sable Opposition, at p. 19.)

The principal harms argued both by petitioners and by Sable are based upon what would or would not happen when the Las Flores Pipelines are restarted. The evidence presented by all parties, however, shows that the restart of the Las Flores Pipelines is dependent upon approvals that have not yet been given. The respective potential harms are thus premature in this analysis. As the OSFM argues, there are potential harms in premature and potentially unnecessary judicial interference with the activities of regulators.

As the evidence and arguments of the petitioners most strongly demonstrate, the principal harm to be avoided is the restart of the Las Flores Pipelines without compliance with all applicable law. Because such a restart requires additional approvals, this harm may be avoided in the present by having adequate notice that a restart has been approved and so providing petitioners with a reasonable opportunity to address compliance issues of such a restart based upon such future approvals. By the same token, Sable would not be materially harmed by being restrained from restarting the Las Flores Pipelines without first providing such adequate notice. The OSFM would not be restrained or constrained in the interim to address all such matters within its regulatory purview.

Accordingly, the court will narrowly grant the motions for preliminary injunctions to enjoin the restart of the Las Flores Pipelines, as herein defined, until 10 court days following Sable's filing and service of notice that Sable has received all necessary approvals and permits for restarting the Las Flores Pipelines and that Sable intends to commence such restart. "Restart" shall have the same meaning as in the Federal Consent Decree. Such notice shall be signed by an officer of Sable under penalty of perjury under the laws of the State of California and shall identify each such approval or permit, the agency giving such approval or permit, and the date such approval or permit was given by the agency; the notice need not identify or provide information for any approval or permit given or received prior to June 3, 2025 (the date of the court's grant of the TRO in these matters). The 10-court-day time period shall be extended based upon the manner of service of the notice as provided in Code of Civil Procedure sections 1013 and 1010.6, and shall be calculated from the later of the date of filing and the date of service.

Under these terms of the preliminary injunction, absent further order of the court, Sable may restart the Las Flores Pipelines 10 court days following the giving of notice of receiving all necessary approvals and permits. Sable is not prevented by this injunction from taking steps towards restarting the Las Flores Pipelines short of actual restart. The OSFM is not impeded by the injunction from taking steps it finds appropriate in its regulatory capacity, including any steps OSFM may find desirable following this order. The conditions of the injunction do not allow restart without prior notice. This notice requirement and intervening waiting period provides reasonable time and opportunity for the petitioners and for the OSFM to take any requisite procedural step they may find appropriate before restart is to occur. The ruling is without prejudice to petitioners to seek additional, further, or other relief from the court, if any is warranted, before such restart. The court would be in a position to assess the evidence and arguments of the parties as they then exist, including, presumably, the fact and effects of actions taken as a result of obtaining the remaining necessary approvals and permits.

(D)    Bond

"On granting an injunction, the court or judge must require an undertaking on the part of the applicant to the effect that the applicant will pay to the party enjoined any damages, not exceeding an amount to be specified, the party may sustain by reason of the injunction, if the court finally decides that the applicant was not entitled to the injunction." (Code Civ. Proc., § 529, subd. (a).)

In view of the nature of the injunction issued, the potential damages caused by a wrongful injunction are minimal. The court fixes the amount of the undertaking required by section 529 at $1,000.00, to be filed by CBD and EDU, respectively in each case, on or before July 25, 2025.

(2)    Motions re Richard B. Kuprewicz

In addition to the applications for issuance of preliminary injunctions, the parties have filed motions related to petitioners' expert witness Richard B. Kuprewicz: (1) motion of Sable (case No. 25CV02244) to compel the deposition of Kuprewicz; (2) the motion of Sable (case No. 25CV02244) to strike the declaration of Kuprewicz filed in support of petitioners' applications for preliminary injunctions; (3) motion of Sable (case No. 25CV02247) to compel the deposition of Kuprewicz; and (4) the motion of Sable (case No. 25CV02247) to strike the declaration of Kuprewicz filed in support of petitioners' applications for preliminary injunctions. There are also motions now set for hearing in October in each case to quash Sable's deposition subpoena and notice of deposition, and to stay the deposition of Kuprewicz.

Case 2:26-cv-05242-SVW-SSC Document 37 Filed 05/14/26 Page 45 of 424 Page ID #:17925

As discussed briefly above, the court has considered, but does not rely upon, the substance of the declaration of Kuprewicz to reach its conclusions in this ruling. The motions to strike the declaration will be denied. The motions to compel the deposition of Kuprewicz are denied as moot. To the extent these ruling moot the pending motions to quash, the court expects the parties to advise the court of that fact.

Based upon the court's ruling on the merits of the applications for preliminary injunction, it is not necessary at this time to determine what role, if any, the testimony of Kuprewicz may have in further proceedings. The court expects that petitioners will fully consider the issues raised by Sable in these motions in any further filings with the court.

## JUDGES

### JUDGE DONNA GECK

Dept. 4 SB-Anacapa

1100 Anacapa Street P.O. Box 21107

Santa Barbara, CA 93121-1107

US

Pursuant to CRC 2.259 this document has been electronically filed by the Superior Court of California, County of Santa Barbara, on 7/25/2025

**FILED**
SUPERIOR COURT of CALIFORNIA
COUNTY of SANTA BARBARA
**07/29/2025**
Darrel E. Parker, Executive Officer
BY___Chavez, Terri_____
Deputy Clerk

LINDA KROP (Bar No. 118773)
lkrop@environmentaldefensecenter.org
JEREMY M. FRANKEL (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
TARA C. RENGIFO (Bar No. 307670)
trengifo@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152

*Attorneys for Petitioners/Plaintiffs*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## IN AND FOR THE COUNTY OF SANTA BARBARA

ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation,

                Petitioners and Plaintiffs,

    vs.

CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, by and through the OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive,

                Respondents and Defendants,

    and

SABLE OFFSHORE CORP., a Delaware corporation; and PACIFIC PIPELINE COMPANY, a Delaware Corporation,

                Real Parties in Interest.

Case No.: 25CV02247

[~~PROPOSED~~] ORDER FOR PRELIMINARY INJUNCTION AND UNDERTAKING

Dept.:    4
Judge:   Hon. Donna D. Geck

Action Filed: April 15, 2025
Trial: None Set

---

1

**TO RESPONDENTS AND REAL PARTIES IN INTEREST IN THE ABOVE-CAPTIONED ACTION:**

The application of Petitioners and Plaintiffs Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper (collectively, "Petitioners") for a preliminary injunction was heard on July 18, 2025, at 10:00 A.M. in Department 4 of the above-captioned Court. Appearing as attorneys were Linda Krop and Jeremy Frankel for Petitioners; Michael Dorsi for Respondents California Department of Fire and Forestry and State Fire Marshal Daniel Berlant (collectively, "Respondents"); and Jeffrey Dintzer, Garret Stanton, and Trevor Large for Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company (collectively, "Sable").

At the hearing, the Court adopted its tentative ruling to grant, in part, Petitioners' application. The order of the Court is set forth in its tentative — and now final — ruling, attached hereto as **Exhibit A.**

**IT IS SO ORDERED.**

DATED: _____, 2025

07/29/2025

*[signature]*

JUDGE OF THE SUPERIOR COURT
**Donna D. Geck**

# EXHIBIT A

Case 2:26-cv-05242-SVW-SSC Document 37 Filed 05/14/26 Page 49 of 424 Page ID #:17929

 

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF SANTA BARBARA**

We're currently experiencing a technical issue with the Jury eResponse login link: Click here for more information

Notice: The court is aware of fraudulent messages and scams being sent to the public. For more information please click here.

# Environmental Defense Center et al vs California Dept of Forestry and Fire Protection

## Case Number

25CV02247

## Case Type

Civil Law & Motion

## Hearing Date / Time

Fri, 07/18/2025 - 10:00

## Nature of Proceedings

OSC; Motion to Compel; Motion to Strike

## Tentative Ruling

(1)     The applications of petitioners in case numbers 25CV02244 and 25CV02247 for issuance of preliminary injunctions are, respectively, granted in part. The applications are granted to enjoin, pending the disposition of these proceedings or further order of the court, the restart of the Las Flores Pipelines, as herein defined, until 10 court days following the filing and service of notice by or on behalf of real parties in interest Sable Offshore Corp., and Pacific Pipeline Company (collectively, Sable) that Sable has received all necessary approvals and permits for restarting the Las Flores Pipelines and that Sable intends to commence such restart. "Restart" shall have the same meaning as in the Federal Consent Decree identified herein. To be effective to commence the 10-court-day period, such notice shall be signed by an officer of Sable under penalty of perjury under the laws of the State of California and shall identify each such approval or permit, the agency giving such approval or permit, and the date such approval or permit was given by the agency; the notice need not identify or provide information for any approval or permit given or received prior to June 3, 2025. The 10-court-day time period shall be extended based upon the manner of service of the notice as provided in Code of Civil Procedure sections 1013 and 1010.6, and shall be calculated from the later of the date of filing or the date of service. The temporary restraining order remains in place until a written order of the court is entered on this preliminary injunction.

(2)     On or before July 25, 2025, petitioners in each case shall lodge with the court an order for signature and filing.

(3)     The court fixes the undertaking required by Code of Civil Procedure section 529 in the amount of $1,000.00, to be filed in each case by the respective petitioners. Petitioners shall file such undertaking on or before July 25, 2025.

(4)     For the reasons set forth herein, the motion of Sable (case No. 25CV02244) to compel the deposition of Richard B. Kuprewicz, the motion of Sable (case No. 25CV02244) to strike the declaration of Kuprewicz filed in support of petitioners' applications for preliminary injunctions, the motion of Sable (case No. 25CV02247) to compel the deposition of Kuprewicz, and the motion of Sable (case No. 25CV02247) to strike the declaration of Kuprewicz filed in support of petitioners' applications for preliminary injunctions are all denied.

(1)     OSC re Preliminary Injunction

These are two related cases involving the same underlying incidents and activity. Pursuant to the parties' stipulation, the responding parties and real parties in interest have filed the same brief addressing both cases in each of these cases and the respective petitioners have filed reply papers in each of their respective cases. The court therefore will address the orders to show cause re issuance of preliminary injunctions (OSCs) together.

Documents filed by petitioners and plaintiffs Center for Biological Diversity and Wishtoyo Foundation (case No. 25CV02244) will be identified by the prefix, and these parties will be collectively referred to as, "CBD"; documents filed by petitioners and plaintiffs Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper (case No. 25CV02247) will be identified by the prefix, and these parties collectively referred to as, "EDC." Petitioners and plaintiffs will collectively be referred to as "petitioners"; respondents and defendants will be collectively referred to as "respondents"; a petition and complaint will be referred to simply as a "petition." Respondents Department of Forestry and Fire Protection, by and through the Office of the State Fire Marshal, an agency of the State of California, and Daniel Berlant, in his official capacity as State Fire Marshal will be collectively referred to as "OSFM." Real parties in interest Sable Offshore Corp., and Pacific Pipeline Company will be collectively referred to as "Sable."

## Background:

The parties have submitted voluminous evidence in support of, and in opposition to, these OSCs. The court has reviewed all of the papers presented by the parties, and has relied only upon admissible evidence in making this ruling. The discussion herein is not intended to be exhaustive, but to provide context for the court's analysis and ruling.

These actions involve two oil pipelines connected to three offshore platforms known as the Santa Ynez Unit. (CBD Petition, ¶¶ 33, 34; EDC Petition, ¶ 38, 39.) The two oil pipelines at issue (collectively, the Las Flores Pipelines) consist of Las Flores Pipeline CA-324 (Line 324) and Las Flores Pipeline CA-325 (Line 325). (CBD Petition, ¶¶ 39, 40; EDC Petition, ¶ 41.) Prior to 2015, when owned by Plains Pipeline, L.P., a wholly owned subsidiary of Plains All American Pipeline (collectively, Plains), Line 324 was known as Line 901 and Line 325 was known as Line 903. (CBD Petition, ¶ 49; EDC Petition, ¶ 41, 68.)

The Las Flores Pipelines were constructed and operated following approval by Santa Barbara County in 1986. (CBD Petition, ¶ 35; EDC Petition, ¶ 54.) This approval relied upon an environmental impact report (EIR) drafted in 1984 and finalized in 1985. (CBD Petition, ¶ 35; EDC Petition, ¶ 54 & fn. 1.)

In 2015, Line 324 (formerly Line 901) ruptured causing a serious oil spill (Refugio Oil Spill). (CBD Petition, ¶¶ 50-51; EDC Petition, ¶¶ 69-70.) The Las Flores Pipelines were consequently shut down at that time. (CBD Petition, ¶ 52; EDC Petition, ¶ 82.)

In March 2020, the United States and the State of California sued Plains based upon damages from the Refugio Oil Spill in *United States v. Plains All American Pipeline*, United States District Court for the Central District of California, case No. 2:20-cv-02415 (the Federal Action). (CBD Petition, ¶ 59; EDC Petition, ¶ 85.) The Federal Action was settled by a consent decree (Federal Consent Decree) entered by the court. (Rusch decl., ¶ 33 & exhibit N [the Federal Consent Decree].)

The Federal Consent Decree includes the following provisions:

"1.     State Waivers for Lines 901, 903, and 2000 (not to include any replacement lines):

"A.     Prior to restarting Line 901, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 901. Plains must receive a State Waiver from the OSFM prior to restarting Line 901.

"B.     Prior to restarting non-operational segments of Line 903, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 903. Plains must receive a State Waiver from the OSFM prior to restarting Line 903.

"C.     Within 90 days of entry of the Consent Decree (CD), Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 903. The State Waiver shall apply to the currently operational segment of Line 903 from Pentland to Emidio.

"D.     Within 90 days of entry of the CD, Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 2000.

Case 2:26-cv-05242-SVW-SSC Document 37 Filed 05/14/26 Page 53 of 424 Page ID #:17933

"E.     To the extent that a State Waiver directly incorporates terms identified in section 4 (Integrity Management) below, as being applicable to Lines 901, 903, or 2000, Plains shall not contest the inclusion of those terms in the relevant State Waiver. Plains reserves its rights to contest on any grounds any additional terms that the OSFM may require as part of each State Waiver if one is received. Nothing in this CD shall be construed to limit the authority of the OSFM to require additional terms or conditions in the State Waiver. Further, nothing in the State Waiver shall be construed to limit the applicability of the terms set forth in the CD.

"2.     Replacement, Restart, or Abandonment of Lines 901 and 903:

"A.     Plains shall replace the existing Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland with non-insulated pipe, if Plains is able to timely obtain: (1) agreements from shippers to transport sufficient quantities of product to make the cost of replacing the segments economically viable; (2) the Federal, State, and Local permits that may be required; and (3) whatever additional rights are needed, including rights-of-way that may be needed from landowners. Obtaining required commercial commitments, permits, rights-of-way, and any other rights necessary for replacement is the sole responsibility of Plains.

"1.     On any replacement segments of Lines 901 or 903, Plains shall, prior to commencing operation of such segment(s):

"a.     Test for potential AC/DC interference. Where potential AC/DC interference exists, proper mitigation of interference shall be designed and installed during construction of replacement lines.

"b.     Conduct a close interval survey (CIS) and AC/DC interference survey.

"c.     Based on the CIS and AC/DC interference surveys, place additional cathodic-protection test stations at locations where the surveys demonstrate potential cathodic-protection deficiencies, following review and consultation with the OSFM regarding proposed test station locations.

"B.     As an alternative to replacement of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may restart the existing pipelines in accordance with the CD (including Appendix D) and applicable law.

"C.      As an alternative to replacement or restart of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may abandon all or any segments in accordance with all applicable laws and regulations." (Federal Consent Decree, appen. B, art. I, §§ 1, 2.)

In 2024, Sable acquired the Santa Ynez Unit and the Las Flores Pipelines. (CBD Petition, ¶ 64-65; EDC Petition, ¶ 99.)

In April 2024, Sable submitted State Waiver applications to OSFM for Lines 324 and 325. (EDC Petition, ¶ 110 & exhibit B.)

In May 2024, Sable began conducting repair and maintenance activities to the Las Flores Pipelines. (Rusch decl., ¶ 5.) According to Sable, these activities were completed pursuant to previously granted coastal development permits, approvals, and EIR. (*Ibid*.)

On September 24, 2024, CBD set a letter to OSFM stating that the OSFM had a duty to conduct an analysis and provide opportunities for meaningful public participation under the California Environmental Quality Act (CEQA, Pub. Resources Code, § 21000 et seq.). (CBD Petition, ¶ 68.)

On September 27, 2024, EDC sent a letter to OSFM renewing their March 2024 request for a public process. (EDC Petition, ¶ 112.) EDC also stated that operating the Las Flores Pipeline System without effective cathodic protection was neither anticipated nor reviewed in the 1985 EIR or any project approval, and the potential impacts of doing so have never been fully considered. (*Id*. & exhibit C.) OSFM never responded to the letter. (EDC Petition, ¶ 112.)

On December 17, 2024, OSFM issued State Waivers for Lines 324 and 325 with conditions. (Rusch decl., ¶ 7 & exhibits B, C.) OSFM did not offer any sort of public process in advance of its decision. (EDC Petition, ¶ 115.)

On February 11, 2025, the United States Department of Transportation Pipeline and Hazardous Materials Safety Administration (PHMSA) sent a letter to OSFM indicating that it would not object to the OSFM's issuance of the State Waivers. (Rusch decl., ¶ 9 & exhibit E.)

On April 2, 2025, OSFM issued letters noting its receipt of PHMSA's decision stating that it has no objection to granting the State Waivers. (Rusch decl., ¶ 10 & exhibits F, G.)

On April 15, 2025, CBD filed their verified petition (case No. 25CV02244) seeking writ and injunctive relief asserting three causes of action: (1) violation of federal pipeline safety laws (49 U.S.C. § 60118); (2) violation of state pipeline safety laws (Gov. Code, § 51011); and (3) violations of CEQA.

Also on April 15, 2025, EDC filed their verified petition (case No. 25CV02247) seeking writ, injunctive, and declaratory relief asserting eight causes of action: (1) violation of the federal Pipeline Safety Act (FPSA, 49 U.S.C. § 60118(d))—failure to provide a public process; (2) violation of the FPSA (49 U.S.C. § 60118(d))—failure to provide a statement of reasons; (3) declaratory relief—state waiver procedures required under the FPSA (49 U.S.C. § 60118(d)); (4) abuse of discretion under the FPSA (49 U.S.C. § 60118(d)); (5) violation of the Elder California Pipeline Safety Act of 1981 (CPSA, Gov. Code, § 51011, subd. (c)); (6) abuse of discretion under the CPSA (Gov. Code, § 51011, subd. (b)); (7) declaratory relief—standards and procedures required under the CPSA (Gov. Code, § 51011, subds. (b), (c)); and (8) CEQA—failure to prepare a subsequent EIR (Pub. Resources Code, § 21166).

On June 3, 2025, the court heard petitioners' ex parte applications for an administrative stay, or for an OSC re preliminary injunction and temporary restraining order (TRO). The court granted the petitioners' requests for a TRO and set a hearing on the OSCs for this date.

The applications for issuance of a preliminary injunction are opposed by OSFM and by Sable.

**Analysis:**

Notwithstanding the issuance of the TRO, the burden is on petitioners, as the parties seeking injunctive relief, to show all elements necessary to support issuance of a preliminary injunction. (*O'Connell v. Superior Court* (2006) 141 Cal.App.4th 1452, 1481.) A preliminary injunction is available "[w]hen it appears by the complaint or affidavits that the commission or continuance of some act during the litigation would produce waste, or great or irreparable injury, to a party to the action." (Code Civ. Proc., § 526, subd. (a)(2).)

"The trial courts consider two interrelated questions in deciding whether to issue a preliminary injunction: 1) are the plaintiffs likely to suffer greater injury from a denial of the injunction than the defendants are likely to suffer from its grant; and 2) is there a reasonable probability that the plaintiffs will prevail on the merits. [Citations.] '[By] balancing the respective equities of the parties, [the court] concludes that, pending a trial on the merits, the defendant should or that he should not be restrained from exercising the right claimed by him.' [Citations.]" (*Robbins v. Superior Court* (1985) 38 Cal.3d 199, 206.)

(A)    Likelihood of Success on the Merits

Petitioners raise multiple claims in their petitions that separately could support issuance of an injunction. It is therefore necessary to address these claims in turn.

(i)    CEQA

Petitioners each assert a claim under CEQA based upon OSFM's issuance of the State Waivers without preparing environmental documentation, without providing public notice, and without providing an opportunity for public comment. (CBD Petition, ¶¶ 128-129; EDC Petition, ¶ 224.)

"[CEQA] and the regulations implementing it (Cal. Code Regs., tit. 14, § 15000 et seq.) embody California's strong public policy of protecting the environment. 'The basic purposes of CEQA are to: [¶] (1) Inform governmental decision makers and the public about the potential, significant environmental effects of proposed activities. [¶] (2) Identify ways that environmental damage can be avoided or significantly reduced. [¶] (3) Prevent significant, avoidable damage to the environment by requiring changes in projects through the use of alternatives or mitigation measures when the governmental agency finds the changes to be feasible. [¶] (4) Disclose to the public the reasons why a governmental agency approved the project in the manner the agency chose if significant environmental effects are involved.' [Citation.]" (*Tomlinson v. County of Alameda* (2012) 54 Cal.4th 281, 285–286 (*Tomlinson*).)

"To achieve these goals, CEQA and the implementing regulations provide for a three-step process. In the first step, the public agency must determine whether the proposed development is a 'project,' that is, 'an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment' undertaken, supported, or approved by a public agency. (§ 21065.)" (*Tomlinson*, *supra*, 54 Cal.4th at p. 286.)

"The second step of the process is required if the proposed activity is a 'project.' The public agency must then decide whether it is exempt from compliance with CEQA under either a statutory exemption (§ 21080) or a categorical exemption set forth in the regulations (§ 21084, subd. (a); Cal. Code Regs., tit. 14, § 15300). A categorically exempt project is not subject to CEQA, and no further environmental review is required. [Citations.] If the project is not exempt, the agency must determine whether the project may have a significant effect on the environment. If the agency decides the project will not have such an effect, it must 'adopt a negative declaration to that effect.' [Citations.] Otherwise, the agency must proceed to the third step, which entails preparation of an environmental impact report before approval of the project. (§§ 21100, subd. (a), 21151, subd. (a).)" (*Tomlinson*, *supra*, 54 Cal.4th at p. 286.)

CBD asserts that restarting the Las Flores Pipelines by issuance of the State Waivers is a "project" under CEQA requiring environmental review. (CBD Application, at pp. 21-23.) OSFM and Sable argue that the issuance of the State Waivers is not a "project" or is otherwise not subject to CEQA.

" 'Project' means an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and which is any of the following: [¶] … [¶] (c) An activity that involves the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies." (Pub. Resources Code, § 21065.)

"The term 'project' refers to the activity which is being approved and which may be subject to several discretionary approvals by governmental agencies. The term 'project' does not mean each separate governmental approval." (Cal. Code Regs., tit. 14, § 15378, subd. (c).)

Under this definition, the issuance of the State Waivers does not appear to constitute a "project" separately subject to CEQA review. The State Waivers would at most constitute a separate governmental approval for the underlying activity, which is the restart of the Las Flores Pipelines. The court concludes that the issuance of the State Waivers does not itself cause a change or authorize a change in the environment. (See *Simons v. City of Los Angeles* (1976) 63 Cal.App.3d 455, 466.)

If the State Waivers were considered more broadly, i.e., as a proxy for the restart of the Las Flores Pipelines, the resolution under CEQA is not clear. OSFM and Sable argue that, in such instance, the categorical existing facilities exemption applies.

Case 2:26-cv-05242-SVW-SSC Document 37 Filed 05/14/26 Page 58 of 424 Page ID #:17938

"Class 1 consists of the operation, repair, maintenance, permitting, leasing, licensing, or minor alteration of existing public or private structures, facilities, mechanical equipment, or topographical features, involving negligible or no expansion of existing or former use. The types of 'existing facilities' itemized below are not intended to be all-inclusive of the types of projects which might fall within Class 1." (Cal. Code Regs., tit. 14, § 15301; see also Pub. Resources Code, § 21084; Cal. Code Regs., tit. 14, § 15300.)

"Examples include but are not limited to: [¶] … [¶] (d) Restoration or rehabilitation of deteriorated or damaged structures, facilities, or mechanical equipment to meet current standards of public health and safety, unless it is determined that the damage was substantial and resulted from an environmental hazard such as earthquake, landslide, or flood." (Cal. Code Regs., tit. 14, § 15301, subd. (d).)

An issue now before the California Supreme Court is whether "negligible" in this exemption pertains to a negligible change in use or to a change that presents a negligible risk of environmental harm. (*Sunflower Alliance v. Department of Conservation* (2024) 105 Cal.App.5th 771, review granted Dec. 18, 2024, S287414 (*Sunflower*).) Under broader circumstances, this issue may bear upon the application of the exemption. But as the issue is presented here, such analysis is premature because the State Waivers are not themselves directly or indirectly causing change to the environment.

EDC, in particular, focuses its argument on the need for updated environmental review:

"When an environmental impact report has been prepared for a project pursuant to this division, no subsequent or supplemental environmental impact report shall be required by the lead agency or by any responsible agency, unless one or more of the following events occurs:

"(a)    Substantial changes are proposed in the project which will require major revisions of the environmental impact report.

"(b)    Substantial changes occur with respect to the circumstances under which the project is being undertaken which will require major revisions in the environmental impact report.

"(c)    New information, which was not known and could not have been known at the time the environmental impact report was certified as complete, becomes available." (Pub. Resources Code, § 21166.)

"When an EIR has been certified or a negative declaration adopted for a project, no subsequent EIR shall be prepared for that project unless the lead agency determines, on the basis of substantial evidence in the light of the whole record, one or more of the following:

"(1)    Substantial changes are proposed in the project which will require major revisions of the previous EIR or negative declaration due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects;

"(2)    Substantial changes occur with respect to the circumstances under which the project is undertaken which will require major revisions of the previous EIR or negative declaration due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects; or

"(3)    New information of substantial importance, which was not known and could not have been known with the exercise of reasonable diligence at the time the previous EIR was certified as complete or the negative declaration was adopted, shows any of the following:

"(A)    The project will have one or more significant effects not discussed in the previous EIR or negative declaration;

"(B)    Significant effects previously examined will be substantially more severe than shown in the previous EIR;

"(C)    Mitigation measures or alternatives previously found not to be feasible would in fact be feasible and would substantially reduce one or more significant effects of the project, but the project proponents decline to adopt the mitigation measure or alternative; or

"(D)    Mitigation measures or alternatives which are considerably different from those analyzed in the previous EIR would substantially reduce one or more significant effects on the environment, but the project proponents decline to adopt the mitigation measure or alternative."

(Cal. Code Regs., tit. 14, § 15162, subd. (a).)

EDC argues that a subsequent EIR is required because: (1) operating the pipeline system without an effective cathodic protection system throughout the entire length of the pipeline constitutes a change in the project that increases the risk and severity of impacts, requiring major revisions to the 1985 EIR; (2) the failure of the pipeline system's cathodic protection system and resulting corrosion constitutes a change in circumstances; (3) it was only after the 2015 oil spill that the pipeline system was discovered to lack effective cathodic protection, which constitutes new information showing that the risk of an oil spill is substantially more severe than previously determined.

The petitioners rely largely upon the declaration and reports of expert Richard Kuprewicz for evidence regarding pipeline safety. The testimony of Kuprewicz is the subject of other motions also pending before the court (discussed below) based in part upon Kuprewicz's present unavailability to be subject to a deposition. For purposes of these motions, the court will consider Kuprewicz's evidence with Kuprewicz's unavailability going to the weight of the evidence in the context of these applications for preliminary injunctions.

"After an initial EIR is certified, CEQA establishes a presumption against additional environmental review. An agency has jurisdiction to prepare a subsequent or supplemental EIR only if the agency grants a 'discretionary' approval on the project [citation, fn.], and certain statutorily enumerated new circumstances occur." (*San Diego Navy Broadway Complex Coalition v. City of San Diego* (2010) 185 Cal.App.4th 924, 928.)

The 1985 EIR addressed the potential for an oil spill from pipeline operation. (Dorsi decl., exhibit 5.) There is a dispute among the parties as to whether the 2015 spill and the failure of effective cathodic protection demonstrate new information requiring more or different analysis than present the 1985 EIR. However, this analysis, like the discussion above, is an analysis of a "project," and in particular the restart of pipeline operations as compared with the State Waivers at issue here.

The court concludes that, in the present administrative posture, petitioners are not likely to succeed on the merits of showing a violation of CEQA. Nonetheless, the court finds that petitioners have shown some likelihood of success on the merits which may be weighed against the relative harms and equities to support issuance of a preliminary injunction.

> (ii)     Federal Claims

In addition to violations of CEQA, petitioners assert violations of the FPSA in failing to provide a public process and failing to provide a statement of reasons.

"General requirements.--A person owning or operating a pipeline facility shall--

"(1)    comply with applicable safety standards prescribed under this chapter, except as provided in this section or in section 60126;

"(2)    prepare and carry out a plan for inspection and maintenance required under section 60108(a) and (b) of this title;

"(3)    allow access to or copying of records, make reports and provide information, and allow entry or inspection required under subsections (a) through (e) of section 60117 of this title; and

"(4)    conduct a risk analysis, and adopt and implement an integrity management program, for pipeline facilities as required under section 60109(c)." (49 U.S.C. § 60118(a).)

"Waivers by Secretary.--

(1)    Nonemergency waivers.--

"(A)    In general.--On application of an owner or operator of a pipeline facility, the Secretary by order may waive compliance with any part of an applicable standard prescribed under this chapter with respect to such facility on terms the Secretary considers appropriate if the Secretary determines that the waiver is not inconsistent with pipeline safety.

"(B) Hearing.--The Secretary may act on a waiver under this paragraph only after notice and an opportunity for a hearing."

(49 U.S.C. § 60118(c)(1).)

"Statement of reasons.--The Secretary shall state in an order issued under this subsection the reasons for granting the waiver." (49 U.S.C. § 60118(c)(3).)

"Waivers by State authorities.--If a certification under section 60105 of this title or an agreement under section 60106 of this title is in effect, the State authority may waive compliance with a safety standard to which the certification or agreement applies in the same way and to the same extent the Secretary may waive compliance under subsection (c) of this section. However, the authority must give the Secretary written notice of the waiver at least 60 days before its effective date. If the Secretary makes a written objection before the effective date of the waiver, the waiver is stayed. After notifying the authority of the objection, the Secretary shall provide a prompt opportunity for a hearing. The Secretary shall make the final decision on granting the waiver." (49 U.S.C. § 60118(d).)

Petitioners argue that, because "the State authority may waive compliance with a safety standard to which the certification or agreement applies in the same way and to the same extent the Secretary may waive compliance under subsection (c)" and because the Secretary may act on a waiver only after notice and an opportunity for a hearing and by stating reasons, petitioners may set aside the State Waivers until the OSFM complies with section 60118.

OSFM and Sable argue that petitioners may not seek such remedies under federal law for violation of these non-discretionary procedural requirements, citing *City and County of San Francisco v. U.S. Dept. of Transp.* (9th Cir. 2015) 796 F.3d 993 (*San Francisco*). In *San Francisco*, the litigation was initiated following an explosion of a natural gas transmission pipeline. (*Id.* at p. 995.) Fearing a recurrence, the City and County of San Francisco sued under the FPSA's citizen suit provision alleging that the PHMSA failed to comply with the FPSA. (*Ibid.*) The city sought declaratory and injunctive relief to compel the FPSA to comply with its duties under the FPSA. (*Id.* at pp. 997-998.) The District Court dismissed the suit with leave to amend, finding that the citizen suit provision (49 U.S.C. § 60121) was " 'not an appropriate vehicle for seeking mandamus relief regarding defendants' performance of their regulatory obligations.' " (*Id.* at p. 998.) The city amended its complaint to include claims under the Administrative Procedures Act, arguing that the PHMSA approval of the state agency's certification was arbitrary and capricious, and a failure to act, in violation of title 5, United States Code section 706. (*Ibid.*) The District Court dismissed these claims as well. (*Ibid.*)

On appeal in *San Francisco*, the Ninth Circuit affirmed. (*San Francisco*, *supra*, 796 F.3d at p. 1004.) "The Pipeline Safety Act, by its plain language, allows only a very limited private right of action. It permits injunctive citizen suits against the United States or other entities 'for a violation of this chapter or a regulation prescribed or order issued under this chapter.' [Citation.] In other words, private citizen suits are authorized for substantive statutory or regulatory violations. By its terms, the provision does not authorize a mandamus-type action to compel the Agency to perform non-discretionary regulatory duties." (*Id*. at pp. 998–999.)

The OSFM also argues that the notice and hearing requirements of section 60121 appear in the FPSA as procedural protections for the benefit of the applicant seeking the waiver and not for the more general purpose of public participation. This latter point is consistent with the corresponding regulations: "Hearing means an informal conference or a proceeding for oral presentation. Unless otherwise specifically prescribed in this part, the use of 'hearing' is not intended to require a hearing on the record in accordance with section 554 of title 5, U.S.C." (49 C.F.R. § 190.3 (2025).)

Considering these regulations and the reasoning of *San Francisco*, there is a reasonable basis to find that federal law does not require a hearing with generalized public participation and hence to find no violation of the procedural aspects of the FPSA. Despite this lack of requirement, petitioners, nonetheless, actually submitted evidence to the OSFM. (CDB Petition, ¶¶ 68-74; EDC Petition, ¶ 116.) A reasonable inference is that the petitioners have had an opportunity to present evidence to OSFM regardless of whether there is a public participation requirement.

The court finds that petitioners have not shown a likelihood of success on the merits as to claims based on federal law, but again petitioners have shown some likelihood of success on the merits which may be weighed against the relative harms and equities to support issuance of a preliminary injunction.

> (iii)   State Claims

Corresponding to their FPSA claims, petitioners also assert violations of the CPSA.

"It is the intent of the Legislature, in enacting this chapter, that the State Fire Marshal shall exercise exclusive safety regulatory and enforcement authority over intrastate hazardous liquid pipelines and, to the extent authorized by agreement between the State Fire Marshal and the United States Secretary of Transportation, may act as agent for the United States Secretary of Transportation to implement the federal Hazardous Liquid Pipeline Safety Act of 1979 (49 U.S.C. Sec. 60101 et seq.) and federal pipeline safety regulations as to those portions of interstate pipelines located within this state, as necessary to obtain annual federal certification." (Gov. Code, § 51010.)

"The State Fire Marshal shall adopt hazardous liquid pipeline safety regulations in compliance with the federal law relating to hazardous liquid pipeline safety, including, but not limited to, compliance orders, penalties, and inspection and maintenance provisions, and including amendments to those laws and regulations that may be hereafter enacted and adopted." (Gov. Code, § 51011, subd. (a).)

"The State Fire Marshal may exempt the application of regulations adopted pursuant to this section to any pipeline, or portion thereof, when it is determined that the risk to public safety is slight and the probability of injury or damage remote." (Gov. Code, § 51011, subd. (b).)

"Notification of exemptions shall be written, and shall include a discussion of those factors that the State Fire Marshal considers significant to the granting of the exemption." (Gov. Code, § 51011, subd. (c).)

"Title 49 of the Code of Federal Regulations, Part 195 is hereby adopted by reference as it relates to hazardous liquid pipelines." (Cal. Code Regs., tit. 19, § 2000.)

While federal procedural law may not separately provide for mandate remedies, California procedural law generally provides for writs of mandate to command California officials to comply with the law. (See Code Civ. Proc., §§ 1085, 1094.5.)

Reviewing the State Waivers, the court concludes that the State Waivers do not contain a discussion of factors that the OSFM considered significant in granting the exemption beyond conclusions.

"Administrative agency findings are generally permitted considerable latitude with regard to their precision, formality, and matters reasonably implied therein. [Citation.] However, findings by implication cannot be substituted for specific findings when they are required by law." (*Southern Pacific Transportation Co. v. State Bd. of Equalization* (1987) 191 Cal.App.3d 938, 954.)

Given the specific findings required by section 51011, subdivision (b), it appears that the statutorily-required discussion of subdivision (c) must in some appropriate way at least connect the factors stated (and their significance) to the findings that the risk to public safety is slight and the probability of injury or damage remote. The court finds that petitioners have established a reasonable probability of success on the merits on this claim.

### (B)    Greater Harms

Petitioners argue that they, and the portion of the public they represent, would suffer the greater harm by the erroneous denial of a preliminary injunction. In particular, petitioners argue that the potential harm to natural resources and the failure to consider impacts of the project or to allow public input outweigh any delay for Sable. Sable argues that such harm is purely speculative and that it, and the general public, would suffer economic harms delaying or preventing the domestic oil production from Sable's use of the pipelines by the erroneous issuance of a preliminary injunction. The OSFM argues that erroneous issuance of an injunction against public officers in performing their duties is a form of irreparable injury.

As discussed below, because the petitions focus on deficiencies in the State Waivers as issued by OSFM and because additional approvals are required before the pipelines subject to the State Waivers may be restarted, the court finds that no party has made a strong showing that it would suffer greater harm by the erroneous grant or denial of the preliminary injunction.

### (C)    Balance of Equities

In arguing that CEQA is inapplicable, Sable and OSFM make the point that the State Waivers constitute but one approval of several necessary to restart the Las Flores Pipelines. This argument is carried forward into their analysis of the relative harms: "Petitioners' alleged harm from restart of the Pipelines [citations] is purely speculative due to the additional approval Sable must obtain before the Pipelines are operational. [Citation.] As Petitioners acknowledge, and as required by the Consent Decree, OSFM must approve a Restart Plan before Sable can restart the Pipelines. [Citations.] When reviewing Sable's Restart Plan, OSFM will necessarily consider the safety of operations and integrity of the pipelines to minimize potential safety risks." (Sable Opposition, at p. 19.)

Case 2:26-cv-05242-SVW-SSC Document 37 Filed 05/14/26 Page 66 of 424 Page ID #:17946

The principal harms argued both by petitioners and by Sable are based upon what would or would not happen when the Las Flores Pipelines are restarted. The evidence presented by all parties, however, shows that the restart of the Las Flores Pipelines is dependent upon approvals that have not yet been given. The respective potential harms are thus premature in this analysis. As the OSFM argues, there are potential harms in premature and potentially unnecessary judicial interference with the activities of regulators.

As the evidence and arguments of the petitioners most strongly demonstrate, the principal harm to be avoided is the restart of the Las Flores Pipelines without compliance with all applicable law. Because such a restart requires additional approvals, this harm may be avoided in the present by having adequate notice that a restart has been approved and so providing petitioners with a reasonable opportunity to address compliance issues of such a restart based upon such future approvals. By the same token, Sable would not be materially harmed by being restrained from restarting the Las Flores Pipelines without first providing such adequate notice. The OSFM would not be restrained or constrained in the interim to address all such matters within its regulatory purview.

Accordingly, the court will narrowly grant the motions for preliminary injunctions to enjoin the restart of the Las Flores Pipelines, as herein defined, until 10 court days following Sable's filing and service of notice that Sable has received all necessary approvals and permits for restarting the Las Flores Pipelines and that Sable intends to commence such restart. "Restart" shall have the same meaning as in the Federal Consent Decree. Such notice shall be signed by an officer of Sable under penalty of perjury under the laws of the State of California and shall identify each such approval or permit, the agency giving such approval or permit, and the date such approval or permit was given by the agency; the notice need not identify or provide information for any approval or permit given or received prior to June 3, 2025 (the date of the court's grant of the TRO in these matters). The 10-court-day time period shall be extended based upon the manner of service of the notice as provided in Code of Civil Procedure sections 1013 and 1010.6, and shall be calculated from the later of the date of filing and the date of service.

Under these terms of the preliminary injunction, absent further order of the court, Sable may restart the Las Flores Pipelines 10 court days following the giving of notice of receiving all necessary approvals and permits. Sable is not prevented by this injunction from taking steps towards restarting the Las Flores Pipelines short of actual restart. The OSFM is not impeded by the injunction from taking steps it finds appropriate in its regulatory capacity, including any steps OSFM may find desirable following this order. The conditions of the injunction do not allow restart without prior notice. This notice requirement and intervening waiting period provides reasonable time and opportunity for the petitioners and for the OSFM to take any requisite procedural step they may find appropriate before restart is to occur. The ruling is without prejudice to petitioners to seek additional, further, or other relief from the court, if any is warranted, before such restart. The court would be in a position to assess the evidence and arguments of the parties as they then exist, including, presumably, the fact and effects of actions taken as a result of obtaining the remaining necessary approvals and permits.

(D)    Bond

"On granting an injunction, the court or judge must require an undertaking on the part of the applicant to the effect that the applicant will pay to the party enjoined any damages, not exceeding an amount to be specified, the party may sustain by reason of the injunction, if the court finally decides that the applicant was not entitled to the injunction." (Code Civ. Proc., § 529, subd. (a).)

In view of the nature of the injunction issued, the potential damages caused by a wrongful injunction are minimal. The court fixes the amount of the undertaking required by section 529 at $1,000.00, to be filed by CBD and EDU, respectively in each case, on or before July 25, 2025.

(2)    Motions re Richard B. Kuprewicz

In addition to the applications for issuance of preliminary injunctions, the parties have filed motions related to petitioners' expert witness Richard B. Kuprewicz: (1) motion of Sable (case No. 25CV02244) to compel the deposition of Kuprewicz; (2) the motion of Sable (case No. 25CV02244) to strike the declaration of Kuprewicz filed in support of petitioners' applications for preliminary injunctions; (3) motion of Sable (case No. 25CV02247) to compel the deposition of Kuprewicz; and (4) the motion of Sable (case No. 25CV02247) to strike the declaration of Kuprewicz filed in support of petitioners' applications for preliminary injunctions. There are also motions now set for hearing in October in each case to quash Sable's deposition subpoena and notice of deposition, and to stay the deposition of Kuprewicz.

Case 2:26-cv-05242-SVW-SSC Document 37 Filed 05/14/26 Page 68 of 424 Page ID #:17948

As discussed briefly above, the court has considered, but does not rely upon, the substance of the declaration of Kuprewicz to reach its conclusions in this ruling. The motions to strike the declaration will be denied. The motions to compel the deposition of Kuprewicz are denied as moot. To the extent these ruling moot the pending motions to quash, the court expects the parties to advise the court of that fact.

Based upon the court's ruling on the merits of the applications for preliminary injunction, it is not necessary at this time to determine what role, if any, the testimony of Kuprewicz may have in further proceedings. The court expects that petitioners will fully consider the issues raised by Sable in these motions in any further filings with the court.

## JUDGES

### JUDGE DONNA GECK

Dept. 4 SB-Anacapa

1100 Anacapa Street P.O. Box 21107

Santa Barbara, CA 93121-1107

US

I, Julie Teel Simmonds, state:

I am over the age of 18 and not a party to the foregoing action. My business address is Center for Biological Diversity, 2100 Franklin St., Ste. 375, Oakland CA 94612. On February 27, 2026, I served a true and correct copy of the foregoing NOTICE OF ENTRY OF ORDERS RE PRELIMINARY INJUNCTION,

[X] BY ELECTRONIC SERVICE: By electronically mailing a true and correct copy to the email addresses shown below pursuant to California Rule of Court Section 2.251(c)(3) and Local Rule 1012.

Michael S. Dorsi
Matthew Bullock
Myung Park
California Attorney General's Office
55 Golden Gate Ave, Ste 11000
San Francisco, CA 94102
Michael.Dorsi@doj.ca.gov
Matthew.Bullock@doj.ca.gov
Myung.Park@doj.ca.gov
*Attorney for Respondents/Defendants*

Jeffrey Dintzer
Garrett Stanton
ALSTON & BIRD
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071
Jeffrey.dintzer@alston.com
Garrett.stanton@alston.com
*Attorneys for Real Parties in Interest*

DJ Moore
Benjamin Hanelin
Natalie Rogers
PAUL HASTINGS
1999 Avenue of the Stars, 27th Floor
Century City, CA 90067
djmoore@paulhastings.com
benjaminhanelin@paulhastings.com
natalierogers@paulhastings.com
*Attorneys for Real Parties in Interest*

Trevor D. Large
Victoria C. Diffenderfer

PROOF OF SERVICE

FAUVER LARGE ARCHBALD & SPRAY
820 State Street, 4th Floor
Santa Barbara, CA 93101
tlarge@flasllp.com
vdiffenderfer@flasllp.com
*Attorneys for Real Parties in Interest*

I declare under penalty of perjury under the law of California that the foregoing is true and correct. Executed on February 27, 2026 in Boulder, Colorado.

_____
Julie Teel Simmonds

PROOF OF SERVICE

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Angela Braun, Executive Officer
3/16/2026 12:08
By: Narzralli Baksh , Deputy

Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 844-7100
*Attorneys for Petitioners Center for Biological Diversity and Wishtoyo Foundation*

Linda Krop (Bar No. 118773)
lkrop@environmentaldefensecenter.org
Jeremy M. Frankel (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Tel: (805) 963-1622
*Attorneys for Petitioners Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper*

# SUPERIOR COURT OF THE STATE OF CALIFORNIA
## IN AND FOR THE COUNTY OF SANTA BARBARA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,<br><br>Petitioners/Plaintiffs,<br>v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive,<br><br>Respondents/Defendants.<br><br>SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,<br>Real Parties in Interest. | Case No.: 25CV02244<br>[Consolidated with Case No. 25CV02247]<br><br>**PETITIONERS' COMBINED EX PARTE APPLICATION FOR ENFORCEMENT OF PRELIMINARY INJUNCTION AND FOR AN ORDER TO SHOW CAUSE WHY REAL PARTIES IN INTEREST SHOULD NOT BE FOUND IN CONTEMPT OF COURT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>[Filed concurrently with Declaration of Jeremy Frankel; [Proposed] Order Directing Shut-Off; and [Proposed] Order to Show Cause]<br><br>Date:        March 17, 2026<br>Time:        8:30 a.m.<br>Dept.:       4<br>Judge:      Honorable Donna D. Geck<br><br>Action Filed: April 15, 202 |

## **EX PARTE APPLICATION**

TO THE HONORABLE COURT, ALL PARTIES, AND ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on March 17, 2025, at 8:30 a.m. or as soon thereafter as the matter may be heard in Department 4 of the Superior Court of Santa Barbara, located at 1100 Anacapa Street, Santa Barbara, California 93121, Petitioners Center for Biological Diversity, Wishtoyo Foundation, Environmental Defense Center, Get Out Oil!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper (Petitioners) will apply *ex parte* for an order directing Sable Offshore Corp. and Pacific Pipeline Company (collectively, "Sable") to immediately shut off and cease operation of pipelines CA-324 and CA-325 (the "Pipelines"), which is necessary to enforce the Court's July 29, 2025 Orders re: Preliminary Injunction (the "PI Orders") and uphold the integrity of the judicial process. The PI Orders, which Sable appears to be willfully violating, enjoin Sable from restarting the Pipelines until 10 court days following Sable's filing and service of notice that Sable has received all necessary approvals and permits to restart of the Pipelines and that Sable intends to commence such restart. Additionally, Petitioners will apply *ex parte* for an Order to Show Cause why Sable should not be found in contempt of Court for violating the PI Orders.

Good cause and exigency exist because Sable has restarted the Pipelines without first complying with the terms of this Court's PI Orders. In doing so, Sable has failed to give Petitioners the required notice and opportunity to seek further relief from this Court, including an opportunity to dispute the accuracy of the Sable's contention that it has obtained all necessary approvals to restart the Pipelines, as well as to extend the duration of the Preliminary Injunction to prevent harm to Petitioners and the public from the restart of the defective pipelines. Every day that the Pipelines operate without the required environmental review, public input, and informed decisionmaking or compliance with pipeline safety standards puts the community and environment at grave risk of unassessed environmental impacts and another devastating oil spill.

Pursuant to California Rule of Court 3.1202(b), Petitioners have made no previous application for similar relief. (Frankel Decl., ¶ 8.) Further, pursuant to California Rules of Court 3.1203 and 3.1204(a), California Code of Civil Procedure section 527(c), and Local Rule 1009, notice of this Application and when it would be presented was provided to Respondents/Defendants and Real Parties

Petitioners' Combined *Ex Parte* Application for Enforcement of Preliminary Injunction and OSC re: Contempt

in Interest via email on March 16, 2026 before 10 a.m.. (*See* Frankel Decl., Exh. D.) Real Parties' counsel informed Petitioners that they intend to appear and oppose the Ex Parte Application. (*Id*.) Pursuant to California Rule of Court 3.1202(a), contact information for counsel for Respondents/Defendants and potential counsel Real Parties in Interest is provided below:

Michael S. Dorsi
California Attorney General's Office
55 Golden Gate Ave, Ste 11000
San Francisco, CA 94102
Michael.Dorsi@doj.ca.gov
*Attorney for Respondents/Defendants*

Jeffrey Dintzer
Matthew C. Wickersham
Garrett Stanton
ALSTON & BIRD
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071
Jeffrey.Dintzer@alston.com
Matt.wickersham@alston.com
Garrett.stanton@alston.com
*Attorneys for Real Parties in Interest*

DJ Moore
Benjamin Hanelin
Natalie Rogers
PAUL HASTINGS
1999 Avenue of the Stars, 27th Floor
Century City, CA 90067
djmoore@paulhastings.com
benjaminhanelin@paulhastings.com
natalierogers@paulhastings.com
*Attorneys for Real Parties in Interest*

Trevor D. Large
Victoria C. Diffenderfer
FAUVER LARGE ARCHBALD & SPRAY
820 State Street, 4th Floor
Santa Barbara, CA 93101
tlarge@flasllp.com
vdiffenderfer@flasllp.com
*Attorneys for Real Parties in Interest*

This *Ex Parte* Application is made pursuant to California Code of Civil Procedure sections 128,

3

525, 1209, and 1218 and California Rule of Court 3.1150. The application is based on the records on file in these cases, including the July 29, 2025 Orders Re: Preliminary Injunction; the attached Memorandum of Points and Authorities; the accompanying Declaration of Jeremy Frankel; and such further evidence and argument that the Court may consider at or before the hearing on this Application.

Dated: March 16, 2026

Respectfully submitted,

/s/ Jeremy Frankel
Linda Krop
Jeremy Frankel
ENVIRONMENTAL DEFENSE CENTER
906 Garden St.,
Santa Barbara, CA 93101
Tel. (805) 963-1622

*Attorneys for Petitioners Environmental Defense Center, Get Out Oil!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper*

/s/ Talia Nimmer
Julie Teel Simmonds
David Pettit
Talia Nimmer
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 844-7100

*Attorneys for Petitioners Center for Biological Diversity and Wishtoyo Foundation*

4

Petitioners' Combined *Ex Parte* Application for Enforcement of Preliminary Injunction and OSC re: Contempt

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. <u>INTRODUCTION</u>

For over two years, Sable Offshore Corp. and Pacific Pipeline Company (collectively, "Sable") have routinely disregarded all manner of state laws and agency directives as they rush to restart pipelines CA-324 and CA-325 (the "Pipelines"), resulting in monetary penalties, multiple lawsuits, and felony criminal charges. Now, Sable has added another notch to its belt of lawlessness: willfully violating this Court's July 29, 2025, Orders for Preliminary Injunction (the "PI Orders.")

The PI Orders require that, prior to restarting the Pipelines, and once "Sable receive[s] all necessary approvals and permits," Sable must provide 10 days' notice to the Court and Petitioners of its intent to restart the Pipelines. Despite that relatively modest requirement, Sable has proceeded with restart without such notice, utterly disregarding the Court's PI Orders and upending all norms of judicial process.

Petitioners respectfully request that the Court enforce its PI Orders by issuing an appurtenant order that requires Sable to immediately shut down and cease operating the Pipelines until it has obtained all necessary approvals to restart and provided 10 court days' notice of restart, as required by the PI Orders. Additionally, Petitioners request that the Court issue an Order to Show Cause why Sable should not be found in contempt of the PI Orders at the earliest possible juncture. These requested orders are necessary to protect the public and Petitioners from undue harm and to maintain the integrity of the judicial process.

## II. <u>FACTUAL AND PROCEDURAL BACKGROUND</u>

### A. **Petitioners' Lawsuits and the PI Orders**

Petitioners' consolidated actions challenge the restart of the Pipelines, one of which caused one of the worst oil disasters in California history in 2015 (the "Restart Project"). (*See, e.g.,* Center for Biological Diversity et al. Petition and Complaint, ¶ 10 [construing the challenged project as "restart [of] the Santa Ynez Unit oil and gas operations and transport of oil though the Las Flores Pipeline[s]"]). As was discovered after the spill, the Pipelines each suffer from a critical design defect that leaves them vulnerable to pervasive corrosion and, consequently, another catastrophic rupture.

The Restart Project is overseen, among other agencies, by Respondent Office of the State Fire

5

Marshal (OSFM) and is subject to a federal Consent Decree that requires Sable to obtain from OSFM several approvals and entitlements, including State Waivers and the approval of Restart Plans. (*See* February 27, 2026 Minute Order, p. 9 [recognizing that "the Federal Consent Decree by its terms requires authorization from the OSFM"]). Petitioners contend in their respective Petitions that the Restart Project is subject to various federal and state laws that OSFM failed to comply with, including the federal Pipeline Safety Act, 49 U.S.C. section 60101 *et seq.*, the California Elder Pipeline Safety Act, Government Code section 51010 *et seq.*, and the California Environmental Quality Act, Public Resources Code section 21000 *et seq.*

On June 3, 2025, the Court granted Petitioners' request for a Temporary Restraining Order, ordering OSFM and Sable to maintain the status quo until Petitioners' request for a Preliminary Injunction could be heard. Thereafter, on July 29, 2025, the Court granted, in part, Petitioners' requests for a Preliminary Injunction, ordering that:

> The applications are granted to enjoin, pending the disposition of these proceedings or further order of the court, the restart of the Las Flores Pipelines, as herein defined, until 10 court days following the filing and service of notice by or on behalf of real parties in interest Sable Offshore Corp., and Pacific Pipeline Company (collectively, Sable) that Sable has received all necessary approvals and permits for restarting the Las Flores Pipelines and that Sable intends to commence such restart.

(Declaration of Jeremy Frankel, Exhs. A and B, p. 1 [hereinafter "Frankel Decl"].) Importantly, the Court also observed that:

> This notice requirement and intervening waiting period provides reasonable time and opportunity for the petitioners and for the OSFM to take any requisite procedural step they may find appropriate before restart is to occur. The ruling is without prejudice to petitioners to seek additional, further, or other relief form the court, if any is warranted, before such restart. The court would be in a position to assess the evidence and arguments of the parties as they then exist . . . .

(Frankel Decl., Exhs. A and B, p. 19.)

**B.    Relevant Events Following the PI Orders, Legal Impediments to Restart, and Sable's Attempts to Circumvent State Authority**

Following the Court's PI Orders, on September 11, 2025, Sable submitted to OSFM updated Restart Plans for approval. (<u>Granted</u> Request for Judicial Notice in Support of Petitioners' Opposition to Sable's Motion for Reconsideration, Exh. C [hereinafter "Granted RJN"].) On October 22, 2025, OSFM

responded in a letter stating that Sable must conduct additional, critical repairs of the corroded Pipelines before OSFM could lawfully approve Sable's Restart Plans. (*Id.*) Such repairs, said OSFM, were explicitly required by the State Waivers, and "the inconsistencies with the State Waiver requirements prevent restart under the law." (*Id.*) The letter additionally noted that OSFM continues to review Sable's submitted Restart Plans. (*Id.*)

Meanwhile, on September 19, 2025, Senate Bill (SB) 237 was enacted, which, among other things, requires that "[r]epair, reactivation, and maintenance of an oil and gas facility, including an oil pipeline, that has been idled, inactive, or out of service for five years or more shall be considered a new or expanded development requiring a new coastal development permit" ("CDP") from the California Coastal Commission. (*See* 2025 Cal. Legis. Serv. Ch. 118 (S.B. 237); Pub. Res. Code § 30262(b)(2) [as codified].) SB 237 went into effect on January 1, 2026. (*See* 2025 Cal. Legis. Serv. Ch. 118 (S.B. 237).) To date, Sable has not applied for a new CDP to restart the Pipelines.

In addition to the above impediments, Sable needs a new easement from the California State Parks Department ("State Parks") to operate CA-325 in Gaviota State Park. (Granted RJN, Exh. B at p. 10.) To date, Sable has not acquired the new easement it needs from State Parks to restart the Pipelines. It also needs to obtain County operating permits for the Pipelines, which it likewise, to date, has failed to obtain. (Granted RJN, Exh. K.)

In an attempt to circumvent California oversight of the Pipelines, Sable sent a letter to the Pipeline and Hazardous Materials Safety Administration (PHMSA) on November 26, 2025, requesting that it concur with Sable's unliteral determination that the Pipelines are "interstate" rather than "intrastate," as PHMSA previously acknowledged. (*See* Declaration of J. Caldwell Flores in Support of Sable's Motion for Reconsideration, Exh. A.) On December 17, 2025, PHMSA sent Sable a letter concurring in Sable's determination and, on that basis, purported to wrest jurisdiction of the Pipelines from OSFM. (*Id.*) PHMSA then issued Sable an Emergency Special Permit to operate without effective cathodic protection and approved Sable's Restart Plans. (*Id.* at Exh. C.)

Citing PHMSA's actions, Sable then applied *ex parte* to this Court on January 6, 2026 for an Order Shortening Time to file a Motion for Reconsideration of the PI Orders. The Court denied Sable's request and set a hearing on Sable's motion for February 27, 2026. Sable's motion argued, *inter alia*,

Petitioners' Combined *Ex Parte* Application for Enforcement of Preliminary Injunction and OSC re: Contempt

that OSFM no longer had jurisdiction over the Pipelines, and thus Petitioners' claims were moot.

At the February 27, 2026 hearing, the Court denied Sable's Motion for Reconsideration. It observed that "the Federal Consent Decree by its terms requires authorization from OSFM" in order to restart the Pipelines. (February 27, 2026 Minute, p. 9.) It also reiterated why the 10-day notice in the PI Orders was critical to these proceedings:

> The court's grant of the preliminary injunction is narrow precisely so that all parties will have the opportunity to put this matter in a procedural posture specific to the circumstances existing when Sable is . . . fully authorized and ready to restart [the Pipelines]. At that time, the court can resolve, to the extent necessary, the restart issues presented by the parties without being sidetracked by speculative harms . . . and with the benefit of any then-existing legal developments from the federal courts.

(*Id.*)

Despite the Court's denial of Sable's Motion for Reconsideration little more than two weeks ago, Sable has now restarted the Pipelines without having obtained all necessary approvals and without providing the 10-days' notice required by the PI Orders. (Frankel Decl., Exh. C.)

III.    LAW AND ARGUMENT

A.    Sable has Unequivocally Restarted the Pipelines in Violation of the PI Orders.

On March 16, 2026, Sable "announced that on March 14, 2026, [it] resumed transportation of hydrocarbons (oil) produced at the Santa Ynez Unit ("SYU") through . . . [the Pipelines]," in utter disregard for the PI Orders. (Frankel Decl., Exh. C.)

As the Court can verify in the record of this action, Sable has restarted the Pipelines without filing and serving any notice beforehand of its intent to do so — an unequivocal violation of the PI Orders. (*See* Frankel Decl., ¶ 6.) In disregarding this requirement of the PI Orders, Sable deprived Petitioners of the opportunity contemplated in the PI Orders "to take any requisite procedural step they may find appropriate before restart is to occur" and "seek additional, further, or other relief form the court, if any is warranted, before such restart." (Frankel Decl., Exhs. A and B, p. 19.)

Beyond failing to provide the requisite notice, Sable also violated the PI Orders because it restarted the Pipelines without having "all necessary approvals and permits" to do so, including:

- Approval to restart from OSFM, as required by the governing Consent Decree (*see* Granted RJN, Exh. A; February 27, 2026 Minute, p. 9 ["[T]he Federal Consent Decree by its terms

8

requires authorization from OSFM" in order to restart the Pipelines.]);

- An easement from State Parks to operate through Gaviota State Park (*see* Granted RJN, Exh. B at p. 10);

- A CDP to restart the Pipelines pursuant to Public Resources Code section 30262(b)(2); and

- Operating permits from Santa Barbara County (*see* Granted RJN, Exh. K).

So long as Sable is operating the Pipelines without complying with the terms of the PI Orders, it is in continual violation of the PI Orders.

**B.       The Court Should Enforce its PI Orders by Issuing an Appurtenant Order Directing Sable to Immediately Shut Down and Cease Operating the Pipelines.**

Courts have broad authority to enforce injunctions they issue. (*See* Code Civ. Proc. § 525 [Injunctions "may be enforced as an order of the court."].) Indeed, it is well settled that "[e]very court has power to compel obedience to its judgments and orders . . .  and a court of equity retains inherent jurisdiction to oversee and enforce execution of its decrees." (*City of Los Angeles v. Silver* (1979) 98 Cal.App.3d 745, 752 [citing Code Civ. Proc. § 128(4)].) Thus, courts have authority to both enforce injunctions they impose and to take further remedial actions to ensure that the terms of their injunctions are complied with. (*Id.; see also, e.g., Venice Canals Resident Home Owners Assn. v. Superior Court* (1977) 72 Cal.App.3d 675, 679 ["The court may make discretionary orders with reasonable conditions . . . and even make subsequent limitations and modifications of prior orders in order to achieve justice." [citation omitted]].)

Because Sable's conduct poses an immediate and exigent threat to the public, the environment, and to law and order, Petitioners request that the Court exercise its inherent authority to issue, on an *ex parte* basis, an order directing Sable to immediately shut down and cease operating the Pipelines until it has all necessary approvals to restart and provides 10 days' notice of its intent to do so, as required by the PI Orders (the "Shut Down Order").

Resumption of these fundamentally flawed pipelines poses an imminent hazard to life, property, and the environment each and every day they are in operation. As Petitioners have explained at length before, the risk of operating the Pipelines without effective protection from corrosion, as Sable is doing, has never been evaluated. However, at least one analysis found that restarting the Pipelines could result

in an oil spill *once a year* and a rupture *once every four years*. (Case No. 25CV02244 Petition at ¶ 6; Case No. 25CV02247 June 2, 2025 Declaration of Linda Krop, Exh. E.) Moreover, as recently as October 22, 2025, OSFM determined that the pipelines should *not* be restarted until further repairs are made. (Granted RJN, Exh. C.)

We have already seen first-hand the devastation that the Pipelines can wreak on coastal resources. However, the Pipelines — which span 120 miles — also threaten major rivers and groundwater supply sources, renowned parks and ecological reserves, and a number of endangered and special-status species. (Case No. 25CV02244 Petition at ¶¶ 45-47; Case No. 25CV02244 June 2, 2025 Declaration of Kara Clasuer, Exhs. 1-6.) They also run directly under a populated suburban neighborhood in Buellton, California, complete with schools, parks, and dozens of homes. (Case No. 25CV02244 Petition at ¶ 48; Case No. 25CV02244 June 2, 2025 Declaration of Kara Clasuer, Exh. 6.).

What's more, the premature operation of the Pipelines also substantially impacts Petitioners' rights to a fair hearing and process. For one, Sable has deprived Petitioners of the opportunity contemplated in the PI Orders "to take any requisite procedural step they may find appropriate before restart is to occur" and seek additional, further, or other relief form the court, if any is warranted, before such restart." (Frankel Decl., Exhs. A and B, p. 19.) Further, by allowing the Pipelines to restart before Petitioners have an opportunity to present their arguments to the Court, any CEQA and pipeline safety review ultimately ordered by this Court may "become nothing more than post hoc rationalizations to support action already taken." (*Tulare Lake Canal Co. v. Stratford Pub. Utility Dist.* (2023) 92 Cal.App.5th 380, 416 [quoting *Laurel Heights Improvement Assn. v. Regents of Univ. of California* (1988) 47 Cal.3d 376, 392].) Thus, the PI Orders must be immediately enforced to preserve Petitioners' rights and ensure Sable's compliance with all applicable requirements.

Finally, Sable's blatant disregard of the PI Orders makes a mockery of the judicial process and undermines this Court's authority, warranting immediate enforcement measures from the Court to deter continued violation. (*Conn v. Superior Court* (1987) 196 Cal.App.3d 774, 785 ["the court has the inherent power to control the proceedings before it and to make orders which prevent the frustration, abuse, or disregard of the court's processes"].)

For these reasons, an order directing Sable to shut down and cease operating the Pipelines is both

necessary and appropriate on an *ex parte* basis.

**C.      The Court Should Issue an Order to Show Cause Directing Sable to Show Why It is Not in Contempt of the PI Orders and Any Appurtenant Order.**

Courts may find parties in contempt of court for "[d]isobedience of any lawful judgment, order, or process of the court." (Code Civ. Proc. § 1209(a)(5).) If a court finds a person or entity guilty of contempt, it may impose a fine, the person or entity representative may be imprisoned for five days, and the person or entity may be ordered to pay reasonable attorney's fees and costs. (Code Civ. Proc. § 1218(a).) In addition, "if the contempt consists of the omission to perform an act which is yet in the power of the person to perform, he or she may be imprisoned until he or she has performed it." (Code Civ. Proc. § 1219.)

An applicant seeking contempt must set forth facts showing "(1) the making of the order; (2) knowledge of the order; (3) ability of the respondent to render compliance; and (4) willful disobedience of the order." (*Moore v. Superior Court* (2020) 57 Cal.App.5th 441, 456 [citation omitted].) All are present here.

As to (1) and (2), that the PI Orders were issued and known to Sable is beyond dispute. Sable's counsel attended the hearing at which the PI Orders were entered, were later provided notice of the orders, and recently filed a Motion for Reconsideration directly challenging the PI Orders. (Frankel Decl, ¶¶ 3-5; ; *see* January 5, 2026, Motion for Reconsideration; *see also* February 27, 2026, Notice of Entry of Order.)

As to (3) and (4), Sable is the sole owner of the Pipelines and an active participant in this litigation with the ability to provide this Court with notice at any time. Sable was fully capable of providing the requisite notice and *not* restarting the Pipelines until it had done so. Yet, as discussed, Sable utterly disregarded this requirement in express violation of the PI Orders.

Thus, it is abundantly clear that Sable is in violation of the Court's PI Orders and Petitioners respectfully request that the Court issue an order directing Sable to show cause why Sable should not be found in contempt at the earliest possible juncture. In light of the flagrant nature of Sable's violation, Petitioners request that the Court impose the maximum penalties authorized by statute to ensure future compliance with the PI Orders. (Code Civ. Proc. § 1218(a).)

Additionally, should the Court issue, as requested, the Shut Down Order, Petitioners ask that the Order to Show Cause encompass that appurtenant order. If issued at the *ex parte* hearing, the Shut Down Order would be an appropriate use of the Court's inherent authority to enforce the PI Orders, immediately known to Sable, and capable of being complied with for the reasons above. (*See Moore v. Superior Court* (2020) 57 Cal.App.5th 441, 456 [citation omitted].)

If Sable is found in contempt of the Shut Down Order, Petitioners likewise request that the Court impose the maximum penalty authorized by statute to ensure future compliance with the PI Orders, including, if necessary, imprisonment pending compliance. (Code Civ. Proc. § 1219; *see Katenkamp v. Superior Court* (1940) 16 Cal.2d 696, 700 [Any injunction against a corporation binds both the corporate entity and "all persons who act for the corporation in the transaction of its business and have knowledge of the decree."].)

## IV.    CONCLUSION

For the foregoing reasons, Petitioners respectfully request that the Court enforce its PI Orders by issuing the Shut Down Order. Additionally, Petitioners respectfully request that the Court issue an Order to Show Cause directing Sable to show why it is not in contempt of the PI Orders and Shut Down Order at the earliest possible juncture.

Petitioners' Combined *Ex Parte* Application for Enforcement of Preliminary Injunction and OSC re: Contempt

Dated: March 16, 2026     Respectfully submitted,


/s/ Jeremy Frankel
Linda Krop
Jeremy Frankel
ENVIRONMENTAL DEFENSE CENTER
906 Garden St.,
Santa Barbara, CA 93101
Tel. (805) 963-1622

*Attorneys for Petitioners Environmental Defense Center, Get Out Oil!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper*

/s/ Talia Nimmer
Julie Teel Simmonds
David Pettit
Talia Nimmer
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 844-7100

*Attorneys for Petitioners Center for Biological Diversity and Wishtoyo Foundation*

13

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Angela Braun, Executive Officer
3/16/2026 12:08
By: Narzralli Baksh , Deputy

Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 844-7100
*Attorneys for Petitioners Center for Biological Diversity and Wishtoyo Foundation*

Linda Krop (Bar No. 118773)
lkrop@environmentaldefensecenter.org
Jeremy M. Frankel (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Tel: (805) 963-1622
*Attorneys for Petitioners Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## IN AND FOR THE COUNTY OF SANTA BARBARA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,<br><br>Petitioners/Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive,<br><br>Respondents/Defendants.<br><br>_____<br><br>SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,<br><br>Real Parties in Interest. | Case No.: 25CV02244<br>[Consolidated with Case No. 25CV02247]<br><br>**DECLARATION OF JEREMY FRANKEL IN SUPPORT OF PETITIONERS' *EX PARTE* APPLICATION**<br><br>[Filed concurrently with Petitioners' Ex Parte Application, [Proposed] Order Directing Shut Off, [Proposed] Order to Show Cause]<br><br>Date:    March 17, 2026<br>Time:    8:30 a.m.<br>Dept.:    4<br>Judge:    Honorable Donna D. Geck<br><br>Action Filed: April 15, 2025 |

1

DECLARATION OF JEREMY FRANKEL ISO PETITIONERS' COMBINED EX PARTE APPLICATION

I, Jeremy Frankel, hereby declare as follows:

1.      I am an attorney at law admitted to practice before the courts of the State of California and am an attorney of record for Petitioners Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper. I have personal knowledge of the facts set forth herein, which are known by me to be true and correct, and if called as a witness, I could and would competently testify to them. I submit this declaration in support of Petitioners' concurrently-filed *Ex Parte* Application for enforcement of the Court's July 29, 2025, order for Preliminary Injunction and Order to Show Cause why Sable Offshore Corp. and Pacific Pipeline Company (collectively, "Sable") are not in contempt of Court.

2.      On June 3, 2025, Petitioners applied *ex parte* for a Temporary Restraining Order to prevent the restart of pipelines CA-324 and CA-325 (the "Pipelines") and an Order to Show Cause why a preliminary injunction should not issue. The Court granted Petitioners' requests and set a hearing on the Orders to Show Cause for July 18, 2025.

3.      On July 18, 2025, at a hearing in which counsel for Sable and one or more Sable officers were present, the Court granted, in part, Petitioners' requests for preliminary injunctions.

4.      On July 29, 2025, the Court entered its written orders granting the preliminary injunctions. True and correct copies of the Court's orders, which I obtained from the Court's website, are attached hereto as **Exhibits A and B**.

5.      On February 27, 2026, Petitioners electronically provided notice to Sable of the Court's preliminary injunction orders.

6.      On March 16, 2026, Sable announced on its website that it had restarted the Pipelines on March 14, 2026. A true and correct copy of the announcement, which I obtained from https://sableoffshore.com/news/news-details/2026/Sable-Resumes-Oil-Flow-as-Ordered-by-the-Federal-DPA-with-Expected-Gross-Oil-Rate-of-50000-Bblsd-and-Expects-First-Sales-by-April-1-2026/default.aspx, is attached hereto as **Exhibit C.** Petitioners did not receive any notice from Sable of its intent to restart the Pipelines.

7.      On March 16, 2026, before 10:00 a.m., I emailed all listed counsel for Real Parties and Respondents with notice that Petitioners' *Ex Parte* Application will be heard on March 17, 2026, at 8:30

DECLARATION OF JEREMY FRANKEL ISO PETITIONERS' COMBINED EX PARTE APPLICATION

a.m. in Department 4 of Santa Barbara Superior Court. Real Parties' counsel informed Petitioners that they intend to appear and oppose the Ex Parte Application. A true and correct copy of the email correspondence is attached hereto as **Exhibit D**.

8. Petitioners have made no previous ex parte applications for similar relief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 16th day of March, 2026.

/s/ *Jeremy Frankel*
Jeremy Frankel (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Tel. (805) 963-1622
*Attorney for Petitioners Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper*

3

DECLARATION OF JEREMY FRANKEL ISO PETITIONERS' COMBINED EX PARTE APPLICATION

# EXHIBIT A

Pursuant to CRC 2.259 this document has been electronically filed by the Superior Court of California, County of Santa Barbara on 7/25/2025

Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 844-7100 / Fax: (510) 844-7150

*Attorneys for Petitioners Center for Biological Diversity and Wishtoyo Foundation*

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**IN AND FOR THE COUNTY OF SANTA BARBARA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION, <br><br> Petitioners/Plaintiffs, <br><br> v. <br><br> CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive, <br><br> Respondents/Defendants. <br> ――――――――――――――――――――― <br> SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive, <br><br> Real Parties in Interest. | Case No.: 25CV02244 <br><br> [~~PROPOSED~~] ORDER RE: PRELIMINARY INJUNCTION AND UNDERTAKING <br><br> Hearing: July 18, 2025 <br> Time: 10:00 a.m. <br> Dept.: 4 <br> Judge: Hon. Donna D. Geck <br><br> Action Filed: April 15, 2025 <br> Trial: None Set |

FILED
SUPERIOR COURT of CALIFORNIA
COUNTY of SANTA BARBARA
07/29/2025
Darrel E. Parker, Executive Officer
BY Chavez, Terri
Deputy Clerk

**TO RESPONDENTS AND REAL PARTIES IN INTEREST IN THE ABOVE-CAPTIONED ACTION:**

The application of Petitioners Center for Biological Diversity and Wishtoyo Foundation ("Petitioners") for a preliminary injunction was heard on July 18, 2025, at 10:00 A.M. in Department 4 of the above-captioned Court. Appearing as attorneys were Talia Nimmer for Petitioners; Michael Dorsi for Respondents California Department of Fire and Forestry and State Fire Marshal Daniel Berlant (collectively, "Respondents"); and Jeffrey Dintzer, Garret Stanton, and Trevor Large for Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company (collectively, "Sable").

At the hearing, the Court adopted its tentative ruling to grant, in part, Petitioners' application. The order of the Court is set forth in its tentative — and now final — ruling, attached hereto as **Exhibit A.**

**IT IS SO ORDERED.**

DATED: _____, 2025

**07/29/2025**

_[signature]_

JUDGE OF THE SUPERIOR COURT
**Donna D. Geck**

# **<u>EXHIBIT A</u>**

Pursuant to CRC 2.259 this document has been electronically filed by the Superior Court of California, County of Santa Barbara, on 7/25/2025

**F I L E D**
SUPERIOR COURT of CALIFORNIA
COUNTY of SANTA BARBARA
**07/29/2025**
Darrel E. Parker, Executive Officer
BY  Chavez, Terri
Deputy Clerk

LINDA KROP (Bar No. 118773)
lkrop@environmentaldefensecenter.org
JEREMY M. FRANKEL (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
TARA C. RENGIFO (Bar No. 307670)
trengifo@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152

*Attorneys for Petitioners/Plaintiffs*

**SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF SANTA BARBARA**

| | |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation, | Case No.: 25CV02247 |
| Petitioners and Plaintiffs, | [~~PROPOSED~~] **ORDER FOR PRELIMINARY INJUNCTION AND UNDERTAKING** |
| vs. | Dept.:    4 |
| | Judge:   Hon. Donna D. Geck |
| CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, by and through the OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive, | Action Filed: April 15, 2025 |
| | Trial: None Set |
| Respondents and Defendants, | |
| and | |
| SABLE OFFSHORE CORP., a Delaware corporation; and PACIFIC PIPELINE COMPANY, a Delaware Corporation, | |
| Real Parties in Interest. | |

[Proposed] Order for Preliminary Injunction and Undertaking

**TO RESPONDENTS AND REAL PARTIES IN INTEREST IN THE ABOVE-CAPTIONED ACTION:**

The application of Petitioners and Plaintiffs Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper (collectively, "Petitioners") for a preliminary injunction was heard on July 18, 2025, at 10:00 A.M. in Department 4 of the above-captioned Court. Appearing as attorneys were Linda Krop and Jeremy Frankel for Petitioners; Michael Dorsi for Respondents California Department of Fire and Forestry and State Fire Marshal Daniel Berlant (collectively, "Respondents"); and Jeffrey Dintzer, Garret Stanton, and Trevor Large for Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company (collectively, "Sable").

At the hearing, the Court adopted its tentative ruling to grant, in part, Petitioners' application. The order of the Court is set forth in its tentative — and now final — ruling, attached hereto as **Exhibit A.**

**IT IS SO ORDERED.**

DATED: _____, 2025

07/29/2025

_Donna D. Geck_ _____

JUDGE OF THE SUPERIOR COURT
**Donna D. Geck**

2
[Proposed] Order for Preliminary Injunction and Undertaking

# **EXHIBIT A**

 **SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF SANTA BARBARA**



We're currently experiencing a technical issue with the Jury eResponse login link:
Click here for more information

Notice: The court is aware of fraudulent messages and scams being sent to the
public. For more information please click here.

# Environmental Defense Center et al vs California Dept of Forestry and Fire Protection

## Case Number

25CV02247

## Case Type

Civil Law & Motion

## Hearing Date / Time

Fri, 07/18/2025 - 10:00

## Nature of Proceedings

OSC; Motion to Compel; Motion to Strike

## Tentative Ruling

(1)     The applications of petitioners in case numbers 25CV02244 and 25CV02247 for issuance of preliminary injunctions are, respectively, granted in part. The applications are granted to enjoin, pending the disposition of these proceedings or further order of the court, the restart of the Las Flores Pipelines, as herein defined, until 10 court days following the filing and service of notice by or on behalf of real parties in interest Sable Offshore Corp., and Pacific Pipeline Company (collectively, Sable) that Sable has received all necessary approvals and permits for restarting the Las Flores Pipelines and that Sable intends to commence such restart. "Restart" shall have the same meaning as in the Federal Consent Decree identified herein. To be effective to commence the 10-court-day period, such notice shall be signed by an officer of Sable under penalty of perjury under the laws of the State of California and shall identify each such approval or permit, the agency giving such approval or permit, and the date such approval or permit was given by the agency; the notice need not identify or provide information for any approval or permit given or received prior to June 3, 2025. The 10-court-day time period shall be extended based upon the manner of service of the notice as provided in Code of Civil Procedure sections 1013 and 1010.6, and shall be calculated from the later of the date of filing or the date of service. The temporary restraining order remains in place until a written order of the court is entered on this preliminary injunction.

(2)     On or before July 25, 2025, petitioners in each case shall lodge with the court an order for signature and filing.

(3)     The court fixes the undertaking required by Code of Civil Procedure section 529 in the amount of $1,000.00, to be filed in each case by the respective petitioners. Petitioners shall file such undertaking on or before July 25, 2025.

(4)     For the reasons set forth herein, the motion of Sable (case No. 25CV02244) to compel the deposition of Richard B. Kuprewicz, the motion of Sable (case No. 25CV02244) to strike the declaration of Kuprewicz filed in support of petitioners' applications for preliminary injunctions, the motion of Sable (case No. 25CV02247) to compel the deposition of Kuprewicz, and the motion of Sable (case No. 25CV02247) to strike the declaration of Kuprewicz filed in support of petitioners' applications for preliminary injunctions are all denied.

(1)     OSC re Preliminary Injunction

These are two related cases involving the same underlying incidents and activity. Pursuant to the parties' stipulation, the responding parties and real parties in interest have filed the same brief addressing both cases in each of these cases and the respective petitioners have filed reply papers in each of their respective cases. The court therefore will address the orders to show cause re issuance of preliminary injunctions (OSCs) together.

Documents filed by petitioners and plaintiffs Center for Biological Diversity and Wishtoyo Foundation (case No. 25CV02244) will be identified by the prefix, and these parties will be collectively referred to as, "CBD"; documents filed by petitioners and plaintiffs Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper (case No. 25CV02247) will be identified by the prefix, and these parties collectively referred to as, "EDC." Petitioners and plaintiffs will collectively be referred to as "petitioners"; respondents and defendants will be collectively referred to as "respondents"; a petition and complaint will be referred to simply as a "petition." Respondents Department of Forestry and Fire Protection, by and through the Office of the State Fire Marshal, an agency of the State of California, and Daniel Berlant, in his official capacity as State Fire Marshal will be collectively referred to as "OSFM." Real parties in interest Sable Offshore Corp., and Pacific Pipeline Company will be collectively referred to as "Sable."

**Background:**

The parties have submitted voluminous evidence in support of, and in opposition to, these OSCs. The court has reviewed all of the papers presented by the parties, and has relied only upon admissible evidence in making this ruling. The discussion herein is not intended to be exhaustive, but to provide context for the court's analysis and ruling.

These actions involve two oil pipelines connected to three offshore platforms known as the Santa Ynez Unit. (CBD Petition, ¶¶ 33, 34; EDC Petition, ¶ 38, 39.) The two oil pipelines at issue (collectively, the Las Flores Pipelines) consist of Las Flores Pipeline CA-324 (Line 324) and Las Flores Pipeline CA-325 (Line 325). (CBD Petition, ¶¶ 39, 40; EDC Petition, ¶ 41.) Prior to 2015, when owned by Plains Pipeline, L.P., a wholly owned subsidiary of Plains All American Pipeline (collectively, Plains), Line 324 was known as Line 901 and Line 325 was known as Line 903. (CBD Petition, ¶ 49; EDC Petition, ¶ 41, 68.)

The Las Flores Pipelines were constructed and operated following approval by Santa Barbara County in 1986. (CBD Petition, ¶ 35; EDC Petition, ¶ 54.) This approval relied upon an environmental impact report (EIR) drafted in 1984 and finalized in 1985. (CBD Petition, ¶ 35; EDC Petition, ¶ 54 & fn. 1.)

In 2015, Line 324 (formerly Line 901) ruptured causing a serious oil spill (Refugio Oil Spill). (CBD Petition, ¶¶ 50-51; EDC Petition, ¶¶ 69-70.) The Las Flores Pipelines were consequently shut down at that time. (CBD Petition, ¶ 52; EDC Petition, ¶ 82.)

In March 2020, the United States and the State of California sued Plains based upon damages from the Refugio Oil Spill in *United States v. Plains All American Pipeline*, United States District Court for the Central District of California, case No. 2:20-cv-02415 (the Federal Action). (CBD Petition, ¶ 59; EDC Petition, ¶ 85.) The Federal Action was settled by a consent decree (Federal Consent Decree) entered by the court. (Rusch decl., ¶ 33 & exhibit N [the Federal Consent Decree].)

The Federal Consent Decree includes the following provisions:

"1.     State Waivers for Lines 901, 903, and 2000 (not to include any replacement lines):

"A.     Prior to restarting Line 901, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 901. Plains must receive a State Waiver from the OSFM prior to restarting Line 901.

"B.     Prior to restarting non-operational segments of Line 903, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 903. Plains must receive a State Waiver from the OSFM prior to restarting Line 903.

"C.     Within 90 days of entry of the Consent Decree (CD), Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 903. The State Waiver shall apply to the currently operational segment of Line 903 from Pentland to Emidio.

"D.     Within 90 days of entry of the CD, Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 2000.

"E.      To the extent that a State Waiver directly incorporates terms identified in section 4 (Integrity Management) below, as being applicable to Lines 901, 903, or 2000, Plains shall not contest the inclusion of those terms in the relevant State Waiver. Plains reserves its rights to contest on any grounds any additional terms that the OSFM may require as part of each State Waiver if one is received. Nothing in this CD shall be construed to limit the authority of the OSFM to require additional terms or conditions in the State Waiver. Further, nothing in the State Waiver shall be construed to limit the applicability of the terms set forth in the CD.

"2.      Replacement, Restart, or Abandonment of Lines 901 and 903:

"A.      Plains shall replace the existing Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland with non-insulated pipe, if Plains is able to timely obtain: (1) agreements from shippers to transport sufficient quantities of product to make the cost of replacing the segments economically viable; (2) the Federal, State, and Local permits that may be required; and (3) whatever additional rights are needed, including rights-of-way that may be needed from landowners. Obtaining required commercial commitments, permits, rights-of-way, and any other rights necessary for replacement is the sole responsibility of Plains.

"1.      On any replacement segments of Lines 901 or 903, Plains shall, prior to commencing operation of such segment(s):

"a.      Test for potential AC/DC interference. Where potential AC/DC interference exists, proper mitigation of interference shall be designed and installed during construction of replacement lines.

"b.      Conduct a close interval survey (CIS) and AC/DC interference survey.

"c.      Based on the CIS and AC/DC interference surveys, place additional cathodic-protection test stations at locations where the surveys demonstrate potential cathodic-protection deficiencies, following review and consultation with the OSFM regarding proposed test station locations.

"B.      As an alternative to replacement of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may restart the existing pipelines in accordance with the CD (including Appendix D) and applicable law.

"C.    As an alternative to replacement or restart of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may abandon all or any segments in accordance with all applicable laws and regulations." (Federal Consent Decree, appen. B, art. I, §§ 1, 2.)

In 2024, Sable acquired the Santa Ynez Unit and the Las Flores Pipelines. (CBD Petition, ¶ 64-65; EDC Petition, ¶ 99.)

In April 2024, Sable submitted State Waiver applications to OSFM for Lines 324 and 325. (EDC Petition, ¶ 110 & exhibit B.)

In May 2024, Sable began conducting repair and maintenance activities to the Las Flores Pipelines. (Rusch decl., ¶ 5.) According to Sable, these activities were completed pursuant to previously granted coastal development permits, approvals, and EIR. (*Ibid*.)

On September 24, 2024, CBD set a letter to OSFM stating that the OSFM had a duty to conduct an analysis and provide opportunities for meaningful public participation under the California Environmental Quality Act (CEQA, Pub. Resources Code, § 21000 et seq.). (CBD Petition, ¶ 68.)

On September 27, 2024, EDC sent a letter to OSFM renewing their March 2024 request for a public process. (EDC Petition, ¶ 112.) EDC also stated that operating the Las Flores Pipeline System without effective cathodic protection was neither anticipated nor reviewed in the 1985 EIR or any project approval, and the potential impacts of doing so have never been fully considered. (*Id*. & exhibit C.) OSFM never responded to the letter. (EDC Petition, ¶ 112.)

On December 17, 2024, OSFM issued State Waivers for Lines 324 and 325 with conditions. (Rusch decl., ¶ 7 & exhibits B, C.) OSFM did not offer any sort of public process in advance of its decision. (EDC Petition, ¶ 115.)

On February 11, 2025, the United States Department of Transportation Pipeline and Hazardous Materials Safety Administration (PHMSA) sent a letter to OSFM indicating that it would not object to the OSFM's issuance of the State Waivers. (Rusch decl., ¶ 9 & exhibit E.)

On April 2, 2025, OSFM issued letters noting its receipt of PHMSA's decision stating that it has no objection to granting the State Waivers. (Rusch decl., ¶ 10 & exhibits F, G.)

On April 15, 2025, CBD filed their verified petition (case No. 25CV02244) seeking writ and injunctive relief asserting three causes of action: (1) violation of federal pipeline safety laws (49 U.S.C. § 60118); (2) violation of state pipeline safety laws (Gov. Code, § 51011); and (3) violations of CEQA.

Also on April 15, 2025, EDC filed their verified petition (case No. 25CV02247) seeking writ, injunctive, and declaratory relief asserting eight causes of action: (1) violation of the federal Pipeline Safety Act (FPSA, 49 U.S.C. § 60118(d))—failure to provide a public process; (2) violation of the FPSA (49 U.S.C. § 60118(d))—failure to provide a statement of reasons; (3) declaratory relief—state waiver procedures required under the FPSA (49 U.S.C. § 60118(d)); (4) abuse of discretion under the FPSA (49 U.S.C. § 60118(d)); (5) violation of the Elder California Pipeline Safety Act of 1981 (CPSA, Gov. Code, § 51011, subd. (c)); (6) abuse of discretion under the CPSA (Gov. Code, § 51011, subd. (b)); (7) declaratory relief—standards and procedures required under the CPSA (Gov. Code, § 51011, subds. (b), (c)); and (8) CEQA—failure to prepare a subsequent EIR (Pub. Resources Code, § 21166).

On June 3, 2025, the court heard petitioners' ex parte applications for an administrative stay, or for an OSC re preliminary injunction and temporary restraining order (TRO). The court granted the petitioners' requests for a TRO and set a hearing on the OSCs for this date.

The applications for issuance of a preliminary injunction are opposed by OSFM and by Sable.

**Analysis:**

Notwithstanding the issuance of the TRO, the burden is on petitioners, as the parties seeking injunctive relief, to show all elements necessary to support issuance of a preliminary injunction. (*O'Connell v. Superior Court* (2006) 141 Cal.App.4th 1452, 1481.) A preliminary injunction is available "[w]hen it appears by the complaint or affidavits that the commission or continuance of some act during the litigation would produce waste, or great or irreparable injury, to a party to the action." (Code Civ. Proc., § 526, subd. (a)(2).)

"The trial courts consider two interrelated questions in deciding whether to issue a preliminary injunction: 1) are the plaintiffs likely to suffer greater injury from a denial of the injunction than the defendants are likely to suffer from its grant; and 2) is there a reasonable probability that the plaintiffs will prevail on the merits. [Citations.] '[By] balancing the respective equities of the parties, [the court] concludes that, pending a trial on the merits, the defendant should or that he should not be restrained from exercising the right claimed by him.' [Citations.]" (*Robbins v. Superior Court* (1985) 38 Cal.3d 199, 206.)

(A)    Likelihood of Success on the Merits

Petitioners raise multiple claims in their petitions that separately could support issuance of an injunction. It is therefore necessary to address these claims in turn.

(i)    CEQA

Petitioners each assert a claim under CEQA based upon OSFM's issuance of the State Waivers without preparing environmental documentation, without providing public notice, and without providing an opportunity for public comment. (CBD Petition, ¶¶ 128-129; EDC Petition, ¶ 224.)

"[CEQA] and the regulations implementing it (Cal. Code Regs., tit. 14, § 15000 et seq.) embody California's strong public policy of protecting the environment. 'The basic purposes of CEQA are to: [¶] (1) Inform governmental decision makers and the public about the potential, significant environmental effects of proposed activities. [¶] (2) Identify ways that environmental damage can be avoided or significantly reduced. [¶] (3) Prevent significant, avoidable damage to the environment by requiring changes in projects through the use of alternatives or mitigation measures when the governmental agency finds the changes to be feasible. [¶] (4) Disclose to the public the reasons why a governmental agency approved the project in the manner the agency chose if significant environmental effects are involved.' [Citation.]" (*Tomlinson v. County of Alameda* (2012) 54 Cal.4th 281, 285–286 (*Tomlinson*).)

"To achieve these goals, CEQA and the implementing regulations provide for a three-step process. In the first step, the public agency must determine whether the proposed development is a 'project,' that is, 'an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment' undertaken, supported, or approved by a public agency. (§ 21065.)" (*Tomlinson, supra*, 54 Cal.4th at p. 286.)

"The second step of the process is required if the proposed activity is a 'project.' The public agency must then decide whether it is exempt from compliance with CEQA under either a statutory exemption (§ 21080) or a categorical exemption set forth in the regulations (§ 21084, subd. (a); Cal. Code Regs., tit. 14, § 15300). A categorically exempt project is not subject to CEQA, and no further environmental review is required. [Citations.] If the project is not exempt, the agency must determine whether the project may have a significant effect on the environment. If the agency decides the project will not have such an effect, it must 'adopt a negative declaration to that effect.' [Citations.] Otherwise, the agency must proceed to the third step, which entails preparation of an environmental impact report before approval of the project. (§§ 21100, subd. (a), 21151, subd. (a).)" (*Tomlinson, supra*, 54 Cal.4th at p. 286.)

CBD asserts that restarting the Las Flores Pipelines by issuance of the State Waivers is a "project" under CEQA requiring environmental review. (CBD Application, at pp. 21-23.) OSFM and Sable argue that the issuance of the State Waivers is not a "project" or is otherwise not subject to CEQA.

" 'Project' means an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and which is any of the following: [¶] … [¶] (c) An activity that involves the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies." (Pub. Resources Code, § 21065.)

"The term 'project' refers to the activity which is being approved and which may be subject to several discretionary approvals by governmental agencies. The term 'project' does not mean each separate governmental approval." (Cal. Code Regs., tit. 14, § 15378, subd. (c).)

Under this definition, the issuance of the State Waivers does not appear to constitute a "project" separately subject to CEQA review. The State Waivers would at most constitute a separate governmental approval for the underlying activity, which is the restart of the Las Flores Pipelines. The court concludes that the issuance of the State Waivers does not itself cause a change or authorize a change in the environment. (See *Simons v. City of Los Angeles* (1976) 63 Cal.App.3d 455, 466.)

If the State Waivers were considered more broadly, i.e., as a proxy for the restart of the Las Flores Pipelines, the resolution under CEQA is not clear. OSFM and Sable argue that, in such instance, the categorical existing facilities exemption applies.

Case 2:26-cv-05242-SVW-SSC   Document 37   Filed 05/14/26   Page 103 of 424   Page
ID #:17983

"Class 1 consists of the operation, repair, maintenance, permitting, leasing, licensing, or minor alteration of existing public or private structures, facilities, mechanical equipment, or topographical features, involving negligible or no expansion of existing or former use. The types of 'existing facilities' itemized below are not intended to be all-inclusive of the types of projects which might fall within Class 1." (Cal. Code Regs., tit. 14, § 15301; see also Pub. Resources Code, § 21084; Cal. Code Regs., tit. 14, § 15300.)

"Examples include but are not limited to: [¶] … [¶] (d) Restoration or rehabilitation of deteriorated or damaged structures, facilities, or mechanical equipment to meet current standards of public health and safety, unless it is determined that the damage was substantial and resulted from an environmental hazard such as earthquake, landslide, or flood." (Cal. Code Regs., tit. 14, § 15301, subd. (d).)

An issue now before the California Supreme Court is whether "negligible" in this exemption pertains to a negligible change in use or to a change that presents a negligible risk of environmental harm. (*Sunflower Alliance v. Department of Conservation* (2024) 105 Cal.App.5th 771, review granted Dec. 18, 2024, S287414 (*Sunflower*).) Under broader circumstances, this issue may bear upon the application of the exemption. But as the issue is presented here, such analysis is premature because the State Waivers are not themselves directly or indirectly causing change to the environment.

EDC, in particular, focuses its argument on the need for updated environmental review:

"When an environmental impact report has been prepared for a project pursuant to this division, no subsequent or supplemental environmental impact report shall be required by the lead agency or by any responsible agency, unless one or more of the following events occurs:

"(a)     Substantial changes are proposed in the project which will require major revisions of the environmental impact report.

"(b)     Substantial changes occur with respect to the circumstances under which the project is being undertaken which will require major revisions in the environmental impact report.

"(c)     New information, which was not known and could not have been known at the time the environmental impact report was certified as complete, becomes available." (Pub. Resources Code, § 21166.)

Case 2:26-cv-05242-SVW-SSC    Document 37    Filed 05/14/26    Page 104 of 424    Page ID #:17984

"When an EIR has been certified or a negative declaration adopted for a project, no subsequent EIR shall be prepared for that project unless the lead agency determines, on the basis of substantial evidence in the light of the whole record, one or more of the following:

"(1)    Substantial changes are proposed in the project which will require major revisions of the previous EIR or negative declaration due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects;

"(2)    Substantial changes occur with respect to the circumstances under which the project is undertaken which will require major revisions of the previous EIR or negative declaration due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects; or

"(3)    New information of substantial importance, which was not known and could not have been known with the exercise of reasonable diligence at the time the previous EIR was certified as complete or the negative declaration was adopted, shows any of the following:

"(A)    The project will have one or more significant effects not discussed in the previous EIR or negative declaration;

"(B)    Significant effects previously examined will be substantially more severe than shown in the previous EIR;

"(C)    Mitigation measures or alternatives previously found not to be feasible would in fact be feasible and would substantially reduce one or more significant effects of the project, but the project proponents decline to adopt the mitigation measure or alternative; or

"(D)    Mitigation measures or alternatives which are considerably different from those analyzed in the previous EIR would substantially reduce one or more significant effects on the environment, but the project proponents decline to adopt the mitigation measure or alternative."

(Cal. Code Regs., tit. 14, § 15162, subd. (a).)

EDC argues that a subsequent EIR is required because: (1) operating the pipeline system without an effective cathodic protection system throughout the entire length of the pipeline constitutes a change in the project that increases the risk and severity of impacts, requiring major revisions to the 1985 EIR; (2) the failure of the pipeline system's cathodic protection system and resulting corrosion constitutes a change in circumstances; (3) it was only after the 2015 oil spill that the pipeline system was discovered to lack effective cathodic protection, which constitutes new information showing that the risk of an oil spill is substantially more severe than previously determined.

The petitioners rely largely upon the declaration and reports of expert Richard Kuprewicz for evidence regarding pipeline safety. The testimony of Kuprewicz is the subject of other motions also pending before the court (discussed below) based in part upon Kuprewicz's present unavailability to be subject to a deposition. For purposes of these motions, the court will consider Kuprewicz's evidence with Kuprewicz's unavailability going to the weight of the evidence in the context of these applications for preliminary injunctions.

"After an initial EIR is certified, CEQA establishes a presumption against additional environmental review. An agency has jurisdiction to prepare a subsequent or supplemental EIR only if the agency grants a 'discretionary' approval on the project [citation, fn.], and certain statutorily enumerated new circumstances occur." (*San Diego Navy Broadway Complex Coalition v. City of San Diego* (2010) 185 Cal.App.4th 924, 928.)

The 1985 EIR addressed the potential for an oil spill from pipeline operation. (Dorsi decl., exhibit 5.) There is a dispute among the parties as to whether the 2015 spill and the failure of effective cathodic protection demonstrate new information requiring more or different analysis than present the 1985 EIR. However, this analysis, like the discussion above, is an analysis of a "project," and in particular the restart of pipeline operations as compared with the State Waivers at issue here.

The court concludes that, in the present administrative posture, petitioners are not likely to succeed on the merits of showing a violation of CEQA. Nonetheless, the court finds that petitioners have shown some likelihood of success on the merits which may be weighed against the relative harms and equities to support issuance of a preliminary injunction.

(ii)    Federal Claims

In addition to violations of CEQA, petitioners assert violations of the FPSA in failing to provide a public process and failing to provide a statement of reasons.

Case 2:26-cv-05242-SVW-SSC   Document 37   Filed 05/14/26   Page 106 of 424   Page ID #:17986

"General requirements.--A person owning or operating a pipeline facility shall--

"(1)    comply with applicable safety standards prescribed under this chapter, except as provided in this section or in section 60126;

"(2)    prepare and carry out a plan for inspection and maintenance required under section 60108(a) and (b) of this title;

"(3)    allow access to or copying of records, make reports and provide information, and allow entry or inspection required under subsections (a) through (e) of section 60117 of this title; and

"(4)    conduct a risk analysis, and adopt and implement an integrity management program, for pipeline facilities as required under section 60109(c)." (49 U.S.C. § 60118(a).)

"Waivers by Secretary.--

(1)    Nonemergency waivers.--

"(A)    In general.--On application of an owner or operator of a pipeline facility, the Secretary by order may waive compliance with any part of an applicable standard prescribed under this chapter with respect to such facility on terms the Secretary considers appropriate if the Secretary determines that the waiver is not inconsistent with pipeline safety.

"(B) Hearing.--The Secretary may act on a waiver under this paragraph only after notice and an opportunity for a hearing."

(49 U.S.C. § 60118(c)(1).)

"Statement of reasons.--The Secretary shall state in an order issued under this subsection the reasons for granting the waiver." (49 U.S.C. § 60118(c)(3).)

"Waivers by State authorities.--If a certification under section 60105 of this title or an agreement under section 60106 of this title is in effect, the State authority may waive compliance with a safety standard to which the certification or agreement applies in the same way and to the same extent the Secretary may waive compliance under subsection (c) of this section. However, the authority must give the Secretary written notice of the waiver at least 60 days before its effective date. If the Secretary makes a written objection before the effective date of the waiver, the waiver is stayed. After notifying the authority of the objection, the Secretary shall provide a prompt opportunity for a hearing. The Secretary shall make the final decision on granting the waiver." (49 U.S.C. § 60118(d).)

Petitioners argue that, because "the State authority may waive compliance with a safety standard to which the certification or agreement applies in the same way and to the same extent the Secretary may waive compliance under subsection (c)" and because the Secretary may act on a waiver only after notice and an opportunity for a hearing and by stating reasons, petitioners may set aside the State Waivers until the OSFM complies with section 60118.

OSFM and Sable argue that petitioners may not seek such remedies under federal law for violation of these non-discretionary procedural requirements, citing *City and County of San Francisco v. U.S. Dept. of Transp.* (9th Cir. 2015) 796 F.3d 993 (*San Francisco*). In *San Francisco*, the litigation was initiated following an explosion of a natural gas transmission pipeline. (*Id.* at p. 995.) Fearing a recurrence, the City and County of San Francisco sued under the FPSA's citizen suit provision alleging that the PHMSA failed to comply with the FPSA. (*Ibid.*) The city sought declaratory and injunctive relief to compel the FPSA to comply with its duties under the FPSA. (*Id.* at pp. 997-998.) The District Court dismissed the suit with leave to amend, finding that the citizen suit provision (49 U.S.C. § 60121) was " 'not an appropriate vehicle for seeking mandamus relief regarding defendants' performance of their regulatory obligations.' " (*Id.* at p. 998.) The city amended its complaint to include claims under the Administrative Procedures Act, arguing that the PHMSA approval of the state agency's certification was arbitrary and capricious, and a failure to act, in violation of title 5, United States Code section 706. (*Ibid.*) The District Court dismissed these claims as well. (*Ibid.*)

Case 2:26-cv-05242-SVW-SSC   Document 37   Filed 05/14/26   Page 108 of 424   Page ID #:17988

On appeal in *San Francisco*, the Ninth Circuit affirmed. (*San Francisco*, *supra*, 796 F.3d at p. 1004.) "The Pipeline Safety Act, by its plain language, allows only a very limited private right of action. It permits injunctive citizen suits against the United States or other entities 'for a violation of this chapter or a regulation prescribed or order issued under this chapter.' [Citation.] In other words, private citizen suits are authorized for substantive statutory or regulatory violations. By its terms, the provision does not authorize a mandamus-type action to compel the Agency to perform non-discretionary regulatory duties." (*Id*. at pp. 998–999.)

The OSFM also argues that the notice and hearing requirements of section 60121 appear in the FPSA as procedural protections for the benefit of the applicant seeking the waiver and not for the more general purpose of public participation. This latter point is consistent with the corresponding regulations: "Hearing means an informal conference or a proceeding for oral presentation. Unless otherwise specifically prescribed in this part, the use of 'hearing' is not intended to require a hearing on the record in accordance with section 554 of title 5, U.S.C." (49 C.F.R. § 190.3 (2025).)

Considering these regulations and the reasoning of *San Francisco*, there is a reasonable basis to find that federal law does not require a hearing with generalized public participation and hence to find no violation of the procedural aspects of the FPSA. Despite this lack of requirement, petitioners, nonetheless, actually submitted evidence to the OSFM. (CDB Petition, ¶¶ 68-74; EDC Petition, ¶ 116.) A reasonable inference is that the petitioners have had an opportunity to present evidence to OSFM regardless of whether there is a public participation requirement.

The court finds that petitioners have not shown a likelihood of success on the merits as to claims based on federal law, but again petitioners have shown some likelihood of success on the merits which may be weighed against the relative harms and equities to support issuance of a preliminary injunction.

> (iii)    State Claims

Corresponding to their FPSA claims, petitioners also assert violations of the CPSA.

"It is the intent of the Legislature, in enacting this chapter, that the State Fire Marshal shall exercise exclusive safety regulatory and enforcement authority over intrastate hazardous liquid pipelines and, to the extent authorized by agreement between the State Fire Marshal and the United States Secretary of Transportation, may act as agent for the United States Secretary of Transportation to implement the federal Hazardous Liquid Pipeline Safety Act of 1979 (49 U.S.C. Sec. 60101 et seq.) and federal pipeline safety regulations as to those portions of interstate pipelines located within this state, as necessary to obtain annual federal certification." (Gov. Code, § 51010.)

"The State Fire Marshal shall adopt hazardous liquid pipeline safety regulations in compliance with the federal law relating to hazardous liquid pipeline safety, including, but not limited to, compliance orders, penalties, and inspection and maintenance provisions, and including amendments to those laws and regulations that may be hereafter enacted and adopted." (Gov. Code, § 51011, subd. (a).)

"The State Fire Marshal may exempt the application of regulations adopted pursuant to this section to any pipeline, or portion thereof, when it is determined that the risk to public safety is slight and the probability of injury or damage remote." (Gov. Code, § 51011, subd. (b).)

"Notification of exemptions shall be written, and shall include a discussion of those factors that the State Fire Marshal considers significant to the granting of the exemption." (Gov. Code, § 51011, subd. (c).)

"Title 49 of the Code of Federal Regulations, Part 195 is hereby adopted by reference as it relates to hazardous liquid pipelines." (Cal. Code Regs., tit. 19, § 2000.)

While federal procedural law may not separately provide for mandate remedies, California procedural law generally provides for writs of mandate to command California officials to comply with the law. (See Code Civ. Proc., §§ 1085, 1094.5.)

Reviewing the State Waivers, the court concludes that the State Waivers do not contain a discussion of factors that the OSFM considered significant in granting the exemption beyond conclusions.

"Administrative agency findings are generally permitted considerable latitude with regard to their precision, formality, and matters reasonably implied therein. [Citation.] However, findings by implication cannot be substituted for specific findings when they are required by law." (*Southern Pacific Transportation Co. v. State Bd. of Equalization* (1987) 191 Cal.App.3d 938, 954.)

Given the specific findings required by section 51011, subdivision (b), it appears that the statutorily-required discussion of subdivision (c) must in some appropriate way at least connect the factors stated (and their significance) to the findings that the risk to public safety is slight and the probability of injury or damage remote. The court finds that petitioners have established a reasonable probability of success on the merits on this claim.

(B)    Greater Harms

Petitioners argue that they, and the portion of the public they represent, would suffer the greater harm by the erroneous denial of a preliminary injunction. In particular, petitioners argue that the potential harm to natural resources and the failure to consider impacts of the project or to allow public input outweigh any delay for Sable. Sable argues that such harm is purely speculative and that it, and the general public, would suffer economic harms delaying or preventing the domestic oil production from Sable's use of the pipelines by the erroneous issuance of a preliminary injunction. The OSFM argues that erroneous issuance of an injunction against public officers in performing their duties is a form of irreparable injury.

As discussed below, because the petitions focus on deficiencies in the State Waivers as issued by OSFM and because additional approvals are required before the pipelines subject to the State Waivers may be restarted, the court finds that no party has made a strong showing that it would suffer greater harm by the erroneous grant or denial of the preliminary injunction.

(C)    Balance of Equities

In arguing that CEQA is inapplicable, Sable and OSFM make the point that the State Waivers constitute but one approval of several necessary to restart the Las Flores Pipelines. This argument is carried forward into their analysis of the relative harms: "Petitioners' alleged harm from restart of the Pipelines [citations] is purely speculative due to the additional approval Sable must obtain before the Pipelines are operational. [Citation.] As Petitioners acknowledge, and as required by the Consent Decree, OSFM must approve a Restart Plan before Sable can restart the Pipelines. [Citations.] When reviewing Sable's Restart Plan, OSFM will necessarily consider the safety of operations and integrity of the pipelines to minimize potential safety risks." (Sable Opposition, at p. 19.)

Case 2:26-cv-05242-SVW-SSC   Document 37   Filed 05/14/26   Page 111 of 424   Page
ID #:17991

The principal harms argued both by petitioners and by Sable are based upon what would or would not happen when the Las Flores Pipelines are restarted. The evidence presented by all parties, however, shows that the restart of the Las Flores Pipelines is dependent upon approvals that have not yet been given. The respective potential harms are thus premature in this analysis. As the OSFM argues, there are potential harms in premature and potentially unnecessary judicial interference with the activities of regulators.

As the evidence and arguments of the petitioners most strongly demonstrate, the principal harm to be avoided is the restart of the Las Flores Pipelines without compliance with all applicable law. Because such a restart requires additional approvals, this harm may be avoided in the present by having adequate notice that a restart has been approved and so providing petitioners with a reasonable opportunity to address compliance issues of such a restart based upon such future approvals. By the same token, Sable would not be materially harmed by being restrained from restarting the Las Flores Pipelines without first providing such adequate notice. The OSFM would not be restrained or constrained in the interim to address all such matters within its regulatory purview.

Accordingly, the court will narrowly grant the motions for preliminary injunctions to enjoin the restart of the Las Flores Pipelines, as herein defined, until 10 court days following Sable's filing and service of notice that Sable has received all necessary approvals and permits for restarting the Las Flores Pipelines and that Sable intends to commence such restart. "Restart" shall have the same meaning as in the Federal Consent Decree. Such notice shall be signed by an officer of Sable under penalty of perjury under the laws of the State of California and shall identify each such approval or permit, the agency giving such approval or permit, and the date such approval or permit was given by the agency; the notice need not identify or provide information for any approval or permit given or received prior to June 3, 2025 (the date of the court's grant of the TRO in these matters). The 10-court-day time period shall be extended based upon the manner of service of the notice as provided in Code of Civil Procedure sections 1013 and 1010.6, and shall be calculated from the later of the date of filing and the date of service.

Case 2:26-cv-05242-SVW-SSC   Document 37   Filed 05/14/26   Page 112 of 424   Page ID #:17992

Under these terms of the preliminary injunction, absent further order of the court, Sable may restart the Las Flores Pipelines 10 court days following the giving of notice of receiving all necessary approvals and permits. Sable is not prevented by this injunction from taking steps towards restarting the Las Flores Pipelines short of actual restart. The OSFM is not impeded by the injunction from taking steps it finds appropriate in its regulatory capacity, including any steps OSFM may find desirable following this order. The conditions of the injunction do not allow restart without prior notice. This notice requirement and intervening waiting period provides reasonable time and opportunity for the petitioners and for the OSFM to take any requisite procedural step they may find appropriate before restart is to occur. The ruling is without prejudice to petitioners to seek additional, further, or other relief from the court, if any is warranted, before such restart. The court would be in a position to assess the evidence and arguments of the parties as they then exist, including, presumably, the fact and effects of actions taken as a result of obtaining the remaining necessary approvals and permits.

(D)    Bond

"On granting an injunction, the court or judge must require an undertaking on the part of the applicant to the effect that the applicant will pay to the party enjoined any damages, not exceeding an amount to be specified, the party may sustain by reason of the injunction, if the court finally decides that the applicant was not entitled to the injunction." (Code Civ. Proc., § 529, subd. (a).)

In view of the nature of the injunction issued, the potential damages caused by a wrongful injunction are minimal. The court fixes the amount of the undertaking required by section 529 at $1,000.00, to be filed by CBD and EDU, respectively in each case, on or before July 25, 2025.

(2)    Motions re Richard B. Kuprewicz

In addition to the applications for issuance of preliminary injunctions, the parties have filed motions related to petitioners' expert witness Richard B. Kuprewicz: (1) motion of Sable (case No. 25CV02244) to compel the deposition of Kuprewicz; (2) the motion of Sable (case No. 25CV02244) to strike the declaration of Kuprewicz filed in support of petitioners' applications for preliminary injunctions; (3) motion of Sable (case No. 25CV02247) to compel the deposition of Kuprewicz; and (4) the motion of Sable (case No. 25CV02247) to strike the declaration of Kuprewicz filed in support of petitioners' applications for preliminary injunctions. There are also motions now set for hearing in October in each case to quash Sable's deposition subpoena and notice of deposition, and to stay the deposition of Kuprewicz.

Case 2:26-cv-05242-SVW-SSC Document 37 Filed 05/14/26 Page 113 of 424 Page ID #:17993

As discussed briefly above, the court has considered, but does not rely upon, the substance of the declaration of Kuprewicz to reach its conclusions in this ruling. The motions to strike the declaration will be denied. The motions to compel the deposition of Kuprewicz are denied as moot. To the extent these ruling moot the pending motions to quash, the court expects the parties to advise the court of that fact.

Based upon the court's ruling on the merits of the applications for preliminary injunction, it is not necessary at this time to determine what role, if any, the testimony of Kuprewicz may have in further proceedings. The court expects that petitioners will fully consider the issues raised by Sable in these motions in any further filings with the court.

## JUDGES

### JUDGE DONNA GECK

Dept. 4 SB-Anacapa

1100 Anacapa Street P.O. Box 21107

Santa Barbara, CA 93121-1107

US

# **EXHIBIT B**



SUPERIOR COURT OF CALIFORNIA
**COUNTY OF SANTA BARBARA**

NOTICE: Effective September 1, 2025, the cost of e-filing will increase from $6.45 to $10.00 per envelope. For more information click <u>here</u>.

Notice: The court is aware of fraudulent messages and scams being sent to the public. For more information please click <u>here</u>.

# Center for Biological Diversity et al vs California Dept of Forestry and Fire Protection et al

## Case Number

25CV02244

## Case Type

Civil Law & Motion

## Hearing Date / Time

Fri, 07/18/2025 - 10:00

## Nature of Proceedings

CMC; OSC Preliminary Injunction; Motion to Compel; Motion to Strike

## Tentative Ruling

(1)     The applications of petitioners in case numbers 25CV02244 and 25CV02247 for issuance of preliminary injunctions are, respectively, granted in part. The applications are granted to enjoin, pending the disposition of these proceedings or further order of the court, the restart of the Las Flores Pipelines, as herein defined, until 10 court days following the filing and service of notice by or on behalf of real parties in interest Sable Offshore Corp., and Pacific Pipeline Company (collectively, Sable) that Sable has received all necessary approvals and permits for restarting the Las Flores Pipelines and that Sable intends to commence such restart. "Restart" shall have the same meaning as in the Federal Consent Decree identified herein. To be effective to commence the 10-court-day period, such notice shall be signed by an officer of Sable under penalty of perjury under the laws of the State of California and shall identify each such approval or permit, the agency giving such approval or permit, and the date such approval or permit was given by the agency; the notice need not identify or provide information for any approval or permit given or received prior to June 3, 2025. The 10-court-day time period shall be extended based upon the manner of service of the notice as provided in Code of Civil Procedure sections 1013 and 1010.6, and shall be calculated from the later of the date of filing or the date of service. The temporary restraining order remains in place until a written order of the court is entered on this preliminary injunction.

(2)     On or before July 25, 2025, petitioners in each case shall lodge with the court an order for signature and filing.

(3)     The court fixes the undertaking required by Code of Civil Procedure section 529 in the amount of $1,000.00, to be filed in each case by the respective petitioners. Petitioners shall file such undertaking on or before July 25, 2025.

(4)     For the reasons set forth herein, the motion of Sable (case No. 25CV02244) to compel the deposition of Richard B. Kuprewicz, the motion of Sable (case No. 25CV02244) to strike the declaration of Kuprewicz filed in support of petitioners' applications for preliminary injunctions, the motion of Sable (case No. 25CV02247) to compel the deposition of Kuprewicz, and the motion of Sable (case No. 25CV02247) to strike the declaration of Kuprewicz filed in support of petitioners' applications for preliminary injunctions are all denied.

(1)     OSC re Preliminary Injunction

These are two related cases involving the same underlying incidents and activity. Pursuant to the parties' stipulation, the responding parties and real parties in interest have filed the same brief addressing both cases in each of these cases and the respective petitioners have filed reply papers in each of their respective cases. The court therefore will address the orders to show cause re issuance of preliminary injunctions (OSCs) together.

Documents filed by petitioners and plaintiffs Center for Biological Diversity and Wishtoyo Foundation (case No. 25CV02244) will be identified by the prefix, and these parties will be collectively referred to as, "CBD"; documents filed by petitioners and plaintiffs Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper (case No. 25CV02247) will be identified by the prefix, and these parties collectively referred to as, "EDC." Petitioners and plaintiffs will collectively be referred to as "petitioners"; respondents and defendants will be collectively referred to as "respondents"; a petition and complaint will be referred to simply as a "petition." Respondents Department of Forestry and Fire Protection, by and through the Office of the State Fire Marshal, an agency of the State of California, and Daniel Berlant, in his official capacity as State Fire Marshal will be collectively referred to as "OSFM." Real parties in interest Sable Offshore Corp., and Pacific Pipeline Company will be collectively referred to as "Sable."

**Background:**

The parties have submitted voluminous evidence in support of, and in opposition to, these OSCs. The court has reviewed all of the papers presented by the parties, and has relied only upon admissible evidence in making this ruling. The discussion herein is not intended to be exhaustive, but to provide context for the court's analysis and ruling.

These actions involve two oil pipelines connected to three offshore platforms known as the Santa Ynez Unit. (CBD Petition, ¶¶ 33, 34; EDC Petition, ¶ 38, 39.) The two oil pipelines at issue (collectively, the Las Flores Pipelines) consist of Las Flores Pipeline CA-324 (Line 324) and Las Flores Pipeline CA-325 (Line 325). (CBD Petition, ¶¶ 39, 40; EDC Petition, ¶ 41.) Prior to 2015, when owned by Plains Pipeline, L.P., a wholly owned subsidiary of Plains All American Pipeline (collectively, Plains), Line 324 was known as Line 901 and Line 325 was known as Line 903. (CBD Petition, ¶ 49; EDC Petition, ¶ 41, 68.)

7/22/25, 1:50 PM
Case 2:26-cv-05242-SVW-SSC   Document 37   Filed 05/14/26   Page 118 of 424   Page
25cv02244 | Superior Court of California, County of Santa Barbara
ID #:17998

The Las Flores Pipelines were constructed and operated following approval by Santa Barbara County in 1986. (CBD Petition, ¶ 35; EDC Petition, ¶ 54.) This approval relied upon an environmental impact report (EIR) drafted in 1984 and finalized in 1985. (CBD Petition, ¶ 35; EDC Petition, ¶ 54 & fn. 1.)

In 2015, Line 324 (formerly Line 901) ruptured causing a serious oil spill (Refugio Oil Spill). (CBD Petition, ¶¶ 50-51; EDC Petition, ¶¶ 69-70.) The Las Flores Pipelines were consequently shut down at that time. (CBD Petition, ¶ 52; EDC Petition, ¶ 82.)

In March 2020, the United States and the State of California sued Plains based upon damages from the Refugio Oil Spill in *United States v. Plains All American Pipeline*, United States District Court for the Central District of California, case No. 2:20-cv-02415 (the Federal Action). (CBD Petition, ¶ 59; EDC Petition, ¶ 85.) The Federal Action was settled by a consent decree (Federal Consent Decree) entered by the court. (Rusch decl., ¶ 33 & exhibit N [the Federal Consent Decree].)

The Federal Consent Decree includes the following provisions:

"1.      State Waivers for Lines 901, 903, and 2000 (not to include any replacement lines):

"A.      Prior to restarting Line 901, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 901. Plains must receive a State Waiver from the OSFM prior to restarting Line 901.

"B.      Prior to restarting non-operational segments of Line 903, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic

protection on Line 903. Plains must receive a State Waiver from the OSFM prior

to restarting Line 903.

"C.      Within 90 days of entry of the Consent Decree (CD), Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 903. The State Waiver shall apply to the currently operational segment of Line 903 from Pentland to Emidio.

"D.      Within 90 days of entry of the CD, Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 2000.

"E.     To the extent that a State Waiver directly incorporates terms identified in section 4 (Integrity Management) below, as being applicable to Lines 901, 903, or 2000, Plains shall not contest the inclusion of those terms in the relevant State Waiver. Plains reserves its rights to contest on any grounds any additional terms that the OSFM may require as part of each State Waiver if one is received. Nothing in this CD shall be construed to limit the authority of the OSFM to require additional terms or conditions in the State Waiver. Further, nothing in the State Waiver shall be construed to limit the applicability of the terms set forth in the CD.

"2.     Replacement, Restart, or Abandonment of Lines 901 and 903:

"A.     Plains shall replace the existing Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland with non-insulated pipe, if Plains is able to timely obtain: (1) agreements from shippers to transport sufficient quantities of product to make the cost of replacing the segments economically viable; (2) the Federal, State, and Local permits that may be required; and (3) whatever additional rights are needed, including rights-of-way that may be needed from landowners. Obtaining required commercial commitments, permits, rights-of-way, and any other rights necessary for replacement is the sole responsibility of

Plains.

"1.     On any replacement segments of Lines 901 or 903, Plains shall, prior to commencing operation of such segment(s):

"a.     Test for potential AC/DC interference. Where potential AC/DC interference exists, proper mitigation of interference shall be designed and installed during construction of replacement lines.

"b.     Conduct a close interval survey (CIS) and AC/DC interference survey.

"c.     Based on the CIS and AC/DC interference surveys, place additional cathodic-protection test stations at locations where the surveys demonstrate potential cathodic-protection deficiencies, following review and consultation with the OSFM regarding proposed test station locations.

"B.     As an alternative to replacement of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may restart the existing pipelines in accordance with the CD (including Appendix D) and applicable law.

"C.     As an alternative to replacement or restart of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may abandon all or any segments in accordance with all applicable laws and regulations." (Federal Consent Decree, appen. B, art. I, §§ 1, 2.)

In 2024, Sable acquired the Santa Ynez Unit and the Las Flores Pipelines. (CBD Petition, ¶ 64-65; EDC Petition, ¶ 99.)

In April 2024, Sable submitted State Waiver applications to OSFM for Lines 324 and 325. (EDC Petition, ¶ 110 & exhibit B.)

In May 2024, Sable began conducting repair and maintenance activities to the Las Flores Pipelines. (Rusch decl., ¶ 5.) According to Sable, these activities were completed pursuant to previously granted coastal development permits, approvals, and EIR. (*Ibid*.)

On September 24, 2024, CBD set a letter to OSFM stating that the OSFM had a duty to conduct an analysis and provide opportunities for meaningful public participation under the California Environmental Quality Act (CEQA, Pub. Resources Code, § 21000 et seq.). (CBD Petition, ¶ 68.)

On September 27, 2024, EDC sent a letter to OSFM renewing their March 2024 request for a public process. (EDC Petition, ¶ 112.) EDC also stated that operating the Las Flores Pipeline System without effective cathodic protection was neither anticipated nor reviewed in the 1985 EIR or any project approval, and the potential impacts of doing so have never been fully considered. (*Id*. & exhibit C.) OSFM never responded to the letter. (EDC Petition, ¶ 112.)

On December 17, 2024, OSFM issued State Waivers for Lines 324 and 325 with conditions. (Rusch decl., ¶ 7 & exhibits B, C.) OSFM did not offer any sort of public process in advance of its decision. (EDC Petition, ¶ 115.)

On February 11, 2025, the United States Department of Transportation Pipeline and Hazardous Materials Safety Administration (PHMSA) sent a letter to OSFM indicating that it would not object to the OSFM's issuance of the State Waivers. (Rusch decl., ¶ 9 & exhibit E.)

On April 2, 2025, OSFM issued letters noting its receipt of PHMSA's decision stating that it has no objection to granting the State Waivers. (Rusch decl., ¶ 10 & exhibits F, G.)

On April 15, 2025, CBD filed their verified petition (case No. 25CV02244) seeking writ and injunctive relief asserting three causes of action: (1) violation of federal pipeline safety laws (49 U.S.C. § 60118); (2) violation of state pipeline safety laws (Gov. Code, § 51011); and (3) violations of CEQA.

Also on April 15, 2025, EDC filed their verified petition (case No. 25CV02247) seeking writ, injunctive, and declaratory relief asserting eight causes of action: (1) violation of the federal Pipeline Safety Act (FPSA, 49 U.S.C. § 60118(d))—failure to provide a public process; (2) violation of the FPSA (49 U.S.C. § 60118(d))—failure to provide a statement of reasons; (3) declaratory relief—state waiver procedures required under the FPSA (49 U.S.C. § 60118(d)); (4) abuse of discretion under the FPSA (49 U.S.C. § 60118(d)); (5) violation of the Elder California Pipeline Safety Act of 1981 (CPSA, Gov. Code, § 51011, subd. (c)); (6) abuse of discretion under the CPSA (Gov. Code, § 51011, subd. (b)); (7) declaratory relief—standards and procedures required under the CPSA (Gov. Code, § 51011, subds. (b), (c)); and (8) CEQA—failure to prepare a subsequent EIR (Pub. Resources Code, § 21166).

On June 3, 2025, the court heard petitioners' ex parte applications for an administrative stay, or for an OSC re preliminary injunction and temporary restraining order (TRO). The court granted the petitioners' requests for a TRO and set a hearing on the OSCs for this date.

The applications for issuance of a preliminary injunction are opposed by OSFM and by Sable.

**Analysis:**

Notwithstanding the issuance of the TRO, the burden is on petitioners, as the parties seeking injunctive relief, to show all elements necessary to support issuance of a preliminary injunction. (*O'Connell v. Superior Court* (2006) 141 Cal.App.4th 1452, 1481.) A preliminary injunction is available "[w]hen it appears by the complaint or affidavits that the commission or continuance of some act during the litigation would produce waste, or great or irreparable injury, to a party to the action." (Code Civ. Proc., § 526, subd. (a)(2).)

"The trial courts consider two interrelated questions in deciding whether to issue a preliminary injunction: 1) are the plaintiffs likely to suffer greater injury from a denial of the injunction than the defendants are likely to suffer from its grant; and 2) is there a reasonable probability that the plaintiffs will prevail on the merits. [Citations.] '[By] balancing the respective equities of the parties, [the court] concludes that, pending a trial on the merits, the defendant should or that he should not be restrained from exercising the right claimed by him.' [Citations.]" (*Robbins v. Superior Court* (1985) 38 Cal.3d 199, 206.)

(A)    Likelihood of Success on the Merits

Petitioners raise multiple claims in their petitions that separately could support issuance of an injunction. It is therefore necessary to address these claims in turn.

(i)    CEQA

Petitioners each assert a claim under CEQA based upon OSFM's issuance of the State Waivers without preparing environmental documentation, without providing public notice, and without providing an opportunity for public comment. (CBD Petition, ¶¶ 128-129; EDC Petition, ¶ 224.)

"[CEQA] and the regulations implementing it (Cal. Code Regs., tit. 14, § 15000 et seq.) embody California's strong public policy of protecting the environment. 'The basic purposes of CEQA are to: [¶] (1) Inform governmental decision makers and the public about the potential, significant environmental effects of proposed activities. [¶] (2) Identify ways that environmental damage can be avoided or significantly reduced. [¶] (3) Prevent significant, avoidable damage to the environment by requiring changes in projects through the use of alternatives or mitigation measures when the governmental agency finds the changes to be feasible. [¶] (4) Disclose to the public the reasons why a governmental agency approved the project in the manner the agency chose if significant environmental effects are involved.' [Citation.]" (*Tomlinson v. County of Alameda* (2012) 54 Cal.4th 281, 285–286 (*Tomlinson*).)

"To achieve these goals, CEQA and the implementing regulations provide for a three-step process. In the first step, the public agency must determine whether the proposed development is a 'project,' that is, 'an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment' undertaken, supported, or approved by a public agency. (§ 21065.)" (*Tomlinson, supra*, 54 Cal.4th at p. 286.)

"The second step of the process is required if the proposed activity is a 'project.' The public agency must then decide whether it is exempt from compliance with CEQA under either a statutory exemption (§ 21080) or a categorical exemption set forth in the regulations (§ 21084, subd. (a); Cal. Code Regs., tit. 14, § 15300). A categorically exempt project is not subject to CEQA, and no further environmental review is required. [Citations.] If the project is not exempt, the agency must determine whether the project may have a significant effect on the environment. If the agency decides the project will not have such an effect, it must 'adopt a negative declaration to that effect.' [Citations.] Otherwise, the agency must proceed to the third step, which entails preparation of an environmental impact report before approval of the project. (§§ 21100, subd. (a), 21151, subd. (a).)" (*Tomlinson*, *supra*, 54 Cal.4th at p. 286.)

CBD asserts that restarting the Las Flores Pipelines by issuance of the State Waivers is a "project" under CEQA requiring environmental review. (CBD Application, at pp. 21-23.) OSFM and Sable argue that the issuance of the State Waivers is not a "project" or is otherwise not subject to CEQA.

" 'Project' means an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and which is any of the following: [¶] … [¶] (c) An activity that involves the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies." (Pub. Resources Code, § 21065.)

"The term 'project' refers to the activity which is being approved and which may be subject to several discretionary approvals by governmental agencies. The term 'project' does not mean each separate governmental approval." (Cal. Code Regs., tit. 14, § 15378, subd. (c).)

Under this definition, the issuance of the State Waivers does not appear to constitute a "project" separately subject to CEQA review. The State Waivers would at most constitute a separate governmental approval for the underlying activity, which is the restart of the Las Flores Pipelines. The court concludes that the issuance of the State Waivers does not itself cause a change or authorize a change in the environment. (See *Simons v. City of Los Angeles* (1976) 63 Cal.App.3d 455, 466.)

If the State Waivers were considered more broadly, i.e., as a proxy for the restart of the Las Flores Pipelines, the resolution under CEQA is not clear. OSFM and Sable argue that, in such instance, the categorical existing facilities exemption applies.

"Class 1 consists of the operation, repair, maintenance, permitting, leasing, licensing, or minor alteration of existing public or private structures, facilities, mechanical equipment, or topographical features, involving negligible or no expansion of existing or former use. The types of 'existing facilities' itemized below are not intended to be all-inclusive of the types of projects which might fall within Class 1." (Cal. Code Regs., tit. 14, § 15301; see also Pub. Resources Code, § 21084; Cal. Code Regs., tit. 14, § 15300.)

"Examples include but are not limited to: [¶] ... [¶] (d) Restoration or rehabilitation of deteriorated or damaged structures, facilities, or mechanical equipment to meet current standards of public health and safety, unless it is determined that the damage was substantial and resulted from an environmental hazard such as earthquake, landslide, or flood." (Cal. Code Regs., tit. 14, § 15301, subd. (d).)

An issue now before the California Supreme Court is whether "negligible" in this exemption pertains to a negligible change in use or to a change that presents a negligible risk of environmental harm. (*Sunflower Alliance v. Department of Conservation* (2024) 105 Cal.App.5th 771, review granted Dec. 18, 2024, S287414 (*Sunflower*).) Under broader circumstances, this issue may bear upon the application of the exemption. But as the issue is presented here, such analysis is premature because the State Waivers are not themselves directly or indirectly causing change to the environment.

EDC, in particular, focuses its argument on the need for updated environmental review:

"When an environmental impact report has been prepared for a project pursuant to this division, no subsequent or supplemental environmental impact report shall be required by the lead agency or by any responsible agency, unless one or more of the following events occurs:

"(a)    Substantial changes are proposed in the project which will require major revisions of the environmental impact report.

"(b)    Substantial changes occur with respect to the circumstances under which the project is being undertaken which will require major revisions in the environmental impact report.

"(c)    New information, which was not known and could not have been known at the time the environmental impact report was certified as complete, becomes available." (Pub. Resources Code, § 21166.)

"When an EIR has been certified or a negative declaration adopted for a project, no subsequent EIR shall be prepared for that project unless the lead agency determines, on the basis of substantial evidence in the light of the whole record, one or more of the following:

"(1)    Substantial changes are proposed in the project which will require major revisions of the previous EIR or negative declaration due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects;

"(2)    Substantial changes occur with respect to the circumstances under which the project is undertaken which will require major revisions of the previous EIR or negative declaration due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects; or

"(3)    New information of substantial importance, which was not known and could not have been known with the exercise of reasonable diligence at the time the previous EIR was certified as complete or the negative declaration was adopted, shows any of the following:

"(A)    The project will have one or more significant effects not discussed in the previous EIR or negative declaration;

"(B)    Significant effects previously examined will be substantially more severe than shown in the previous EIR;

"(C)    Mitigation measures or alternatives previously found not to be feasible would in fact be feasible and would substantially reduce one or more significant effects of the project, but the project proponents decline to adopt the mitigation measure or alternative; or

"(D)    Mitigation measures or alternatives which are considerably different from those analyzed in the previous EIR would substantially reduce one or more significant effects on the environment, but the project proponents decline to adopt the mitigation measure or alternative."

(Cal. Code Regs., tit. 14, § 15162, subd. (a).)

EDC argues that a subsequent EIR is required because: (1) operating the pipeline system without an effective cathodic protection system throughout the entire length of the pipeline constitutes a change in the project that increases the risk and severity of impacts, requiring major revisions to the 1985 EIR; (2) the failure of the pipeline system's cathodic protection system and resulting corrosion constitutes a change in circumstances; (3) it was only after the 2015 oil spill that the pipeline system was discovered to lack effective cathodic protection, which constitutes new information showing that the risk of an oil spill is substantially more severe than previously determined.

The petitioners rely largely upon the declaration and reports of expert Richard Kuprewicz for evidence regarding pipeline safety. The testimony of Kuprewicz is the subject of other motions also pending before the court (discussed below) based in part upon Kuprewicz's present unavailability to be subject to a deposition. For purposes of these motions, the court will consider Kuprewicz's evidence with Kuprewicz's unavailability going to the weight of the evidence in the context of these applications for preliminary injunctions.

"After an initial EIR is certified, CEQA establishes a presumption against additional environmental review. An agency has jurisdiction to prepare a subsequent or supplemental EIR only if the agency grants a 'discretionary' approval on the project [citation, fn.], and certain statutorily enumerated new circumstances occur." (*San Diego Navy Broadway Complex Coalition v. City of San Diego* (2010) 185 Cal.App.4th 924, 928.)

The 1985 EIR addressed the potential for an oil spill from pipeline operation. (Dorsi decl., exhibit 5.) There is a dispute among the parties as to whether the 2015 spill and the failure of effective cathodic protection demonstrate new information requiring more or different analysis than present the 1985 EIR. However, this analysis, like the discussion above, is an analysis of a "project," and in particular the restart of pipeline operations as compared with the State Waivers at issue here.

The court concludes that, in the present administrative posture, petitioners are not likely to succeed on the merits of showing a violation of CEQA. Nonetheless, the court finds that petitioners have shown some likelihood of success on the merits which may be weighed against the relative harms and equities to support issuance of a preliminary injunction.

> (ii) Federal Claims

In addition to violations of CEQA, petitioners assert violations of the FPSA in failing to provide a public process and failing to provide a statement of reasons.

"General requirements.--A person owning or operating a pipeline facility shall--

"(1)     comply with applicable safety standards prescribed under this chapter, except as provided in this section or in section 60126;

"(2)     prepare and carry out a plan for inspection and maintenance required under section 60108(a) and (b) of this title;

"(3)     allow access to or copying of records, make reports and provide information, and allow entry or inspection required under subsections (a) through (e) of section 60117 of this title; and

"(4)     conduct a risk analysis, and adopt and implement an integrity management program, for pipeline facilities as required under section 60109(c)." (49 U.S.C. § 60118(a).)

"Waivers by Secretary.--

(1)     Nonemergency waivers.--

"(A)     In general.--On application of an owner or operator of a pipeline facility, the Secretary by order may waive compliance with any part of an applicable standard prescribed under this chapter with respect to such facility on terms the Secretary considers appropriate if the Secretary determines that the waiver is not inconsistent with pipeline safety.

"(B) Hearing.--The Secretary may act on a waiver under this paragraph only after notice and an opportunity for a hearing."

(49 U.S.C. § 60118(c)(1).)

"Statement of reasons.--The Secretary shall state in an order issued under this subsection the reasons for granting the waiver." (49 U.S.C. § 60118(c)(3).)

"Waivers by State authorities.--If a certification under section 60105 of this title or an agreement under section 60106 of this title is in effect, the State authority may waive compliance with a safety standard to which the certification or agreement applies in the same way and to the same extent the Secretary may waive compliance under subsection (c) of this section. However, the authority must give the Secretary written notice of the waiver at least 60 days before its effective date. If the Secretary makes a written objection before the effective date of the waiver, the waiver is stayed. After notifying the authority of the objection, the Secretary shall provide a prompt opportunity for a hearing. The Secretary shall make the final decision on granting the waiver." (49 U.S.C. § 60118(d).)

Petitioners argue that, because "the State authority may waive compliance with a safety standard to which the certification or agreement applies in the same way and to the same extent the Secretary may waive compliance under subsection (c)" and because the Secretary may act on a waiver only after notice and an opportunity for a hearing and by stating reasons, petitioners may set aside the State Waivers until the OSFM complies with section 60118.

OSFM and Sable argue that petitioners may not seek such remedies under federal law for violation of these non-discretionary procedural requirements, citing *City and County of San Francisco v. U.S. Dept. of Transp.* (9th Cir. 2015) 796 F.3d 993 (*San Francisco*). In *San Francisco*, the litigation was initiated following an explosion of a natural gas transmission pipeline. (*Id.* at p. 995.) Fearing a recurrence, the City and County of San Francisco sued under the FPSA's citizen suit provision alleging that the PHMSA failed to comply with the FPSA. (*Ibid.*) The city sought declaratory and injunctive relief to compel the FPSA to comply with its duties under the FPSA. (*Id.* at pp. 997-998.) The District Court dismissed the suit with leave to amend, finding that the citizen suit provision (49 U.S.C. § 60121) was " 'not an appropriate vehicle for seeking mandamus relief regarding defendants' performance of their regulatory obligations.' " (*Id.* at p. 998.) The city amended its complaint to include claims under the Administrative Procedures Act, arguing that the PHMSA approval of the state agency's certification was arbitrary and capricious, and a failure to act, in violation of title 5, United States Code section 706. (*Ibid.*) The District Court dismissed these claims as well. (*Ibid.*)

7/22/25, 1:53 PM

Case 2:26-cv-05242-SVW-SSC    25CV02244 | Superior Court of California, County of Santa Barbara    Document 37    Filed 05/14/26    Page 129 of 424    Page ID #:18009

On appeal in *San Francisco*, the Ninth Circuit affirmed. (*San Francisco*, *supra*, 796 F.3d at p. 1004.) "The Pipeline Safety Act, by its plain language, allows only a very limited private right of action. It permits injunctive citizen suits against the United States or other entities 'for a violation of this chapter or a regulation prescribed or order issued under this chapter.' [Citation.] In other words, private citizen suits are authorized for substantive statutory or regulatory violations. By its terms, the provision does not authorize a mandamus-type action to compel the Agency to perform non-discretionary regulatory duties." (*Id*. at pp. 998–999.)

The OSFM also argues that the notice and hearing requirements of section 60121 appear in the FPSA as procedural protections for the benefit of the applicant seeking the waiver and not for the more general purpose of public participation. This latter point is consistent with the corresponding regulations: "Hearing means an informal conference or a proceeding for oral presentation. Unless otherwise specifically prescribed in this part, the use of 'hearing' is not intended to require a hearing on the record in accordance with section 554 of title 5, U.S.C." (49 C.F.R. § 190.3 (2025).)

Considering these regulations and the reasoning of *San Francisco*, there is a reasonable basis to find that federal law does not require a hearing with generalized public participation and hence to find no violation of the procedural aspects of the FPSA. Despite this lack of requirement, petitioners, nonetheless, actually submitted evidence to the OSFM. (CDB Petition, ¶¶ 68-74; EDC Petition, ¶ 116.) A reasonable inference is that the petitioners have had an opportunity to present evidence to OSFM regardless of whether there is a public participation requirement.

The court finds that petitioners have not shown a likelihood of success on the merits as to claims based on federal law, but again petitioners have shown some likelihood of success on the merits which may be weighed against the relative harms and equities to support issuance of a preliminary injunction.

       (iii)    State Claims

Corresponding to their FPSA claims, petitioners also assert violations of the CPSA.

"It is the intent of the Legislature, in enacting this chapter, that the State Fire Marshal shall exercise exclusive safety regulatory and enforcement authority over intrastate hazardous liquid pipelines and, to the extent authorized by agreement between the State Fire Marshal and the United States Secretary of Transportation, may act as agent for the United States Secretary of Transportation to implement the federal Hazardous Liquid Pipeline Safety Act of 1979 (49 U.S.C. Sec. 60101 et seq.) and federal pipeline safety regulations as to those portions of interstate pipelines located within this state, as necessary to obtain annual federal certification." (Gov. Code, § 51010.)

"The State Fire Marshal shall adopt hazardous liquid pipeline safety regulations in compliance with the federal law relating to hazardous liquid pipeline safety, including, but not limited to, compliance orders, penalties, and inspection and maintenance provisions, and including amendments to those laws and regulations that may be hereafter enacted and adopted." (Gov. Code, § 51011, subd. (a).)

"The State Fire Marshal may exempt the application of regulations adopted pursuant to this section to any pipeline, or portion thereof, when it is determined that the risk to public safety is slight and the probability of injury or damage remote." (Gov. Code, § 51011, subd. (b).)

"Notification of exemptions shall be written, and shall include a discussion of those factors that the State Fire Marshal considers significant to the granting of the exemption." (Gov. Code, § 51011, subd. (c).)

"Title 49 of the Code of Federal Regulations, Part 195 is hereby adopted by reference as it relates to hazardous liquid pipelines." (Cal. Code Regs., tit. 19, § 2000.)

While federal procedural law may not separately provide for mandate remedies, California procedural law generally provides for writs of mandate to command California officials to comply with the law. (See Code Civ. Proc., §§ 1085, 1094.5.)

Reviewing the State Waivers, the court concludes that the State Waivers do not contain a discussion of factors that the OSFM considered significant in granting the exemption beyond conclusions.

"Administrative agency findings are generally permitted considerable latitude with regard to their precision, formality, and matters reasonably implied therein. [Citation.] However, findings by implication cannot be substituted for specific findings when they are required by law." (*Southern Pacific Transportation Co. v. State Bd. of Equalization* (1987) 191 Cal.App.3d 938, 954.)

Given the specific findings required by section 51011, subdivision (b), it appears that the statutorily-required discussion of subdivision (c) must in some appropriate way at least connect the factors stated (and their significance) to the findings that the risk to public safety is slight and the probability of injury or damage remote. The court finds that petitioners have established a reasonable probability of success on the merits on this claim.

(B)     Greater Harms

Petitioners argue that they, and the portion of the public they represent, would suffer the greater harm by the erroneous denial of a preliminary injunction. In particular, petitioners argue that the potential harm to natural resources and the failure to consider impacts of the project or to allow public input outweigh any delay for Sable. Sable argues that such harm is purely speculative and that it, and the general public, would suffer economic harms delaying or preventing the domestic oil production from Sable's use of the pipelines by the erroneous issuance of a preliminary injunction. The OSFM argues that erroneous issuance of an injunction against public officers in performing their duties is a form of irreparable injury.

As discussed below, because the petitions focus on deficiencies in the State Waivers as issued by OSFM and because additional approvals are required before the pipelines subject to the State Waivers may be restarted, the court finds that no party has made a strong showing that it would suffer greater harm by the erroneous grant or denial of the preliminary injunction.

(C)     Balance of Equities

In arguing that CEQA is inapplicable, Sable and OSFM make the point that the State Waivers constitute but one approval of several necessary to restart the Las Flores Pipelines. This argument is carried forward into their analysis of the relative harms: "Petitioners' alleged harm from restart of the Pipelines [citations] is purely speculative due to the additional approval Sable must obtain before the Pipelines are operational. [Citation.] As Petitioners acknowledge, and as required by the Consent Decree, OSFM must approve a Restart Plan before Sable can restart the Pipelines. [Citations.] When reviewing Sable's Restart Plan, OSFM will necessarily consider the safety of operations and integrity of the pipelines to minimize potential safety risks." (Sable Opposition, at p. 19.)

The principal harms argued both by petitioners and by Sable are based upon what would or would not happen when the Las Flores Pipelines are restarted. The evidence presented by all parties, however, shows that the restart of the Las Flores Pipelines is dependent upon approvals that have not yet been given. The respective potential harms are thus premature in this analysis. As the OSFM argues, there are potential harms in premature and potentially unnecessary judicial interference with the activities of regulators.

As the evidence and arguments of the petitioners most strongly demonstrate, the principal harm to be avoided is the restart of the Las Flores Pipelines without compliance with all applicable law. Because such a restart requires additional approvals, this harm may be avoided in the present by having adequate notice that a restart has been approved and so providing petitioners with a reasonable opportunity to address compliance issues of such a restart based upon such future approvals. By the same token, Sable would not be materially harmed by being restrained from restarting the Las Flores Pipelines without first providing such adequate notice. The OSFM would not be restrained or constrained in the interim to address all such matters within its regulatory purview.

Accordingly, the court will narrowly grant the motions for preliminary injunctions to enjoin the restart of the Las Flores Pipelines, as herein defined, until 10 court days following Sable's filing and service of notice that Sable has received all necessary approvals and permits for restarting the Las Flores Pipelines and that Sable intends to commence such restart. "Restart" shall have the same meaning as in the Federal Consent Decree. Such notice shall be signed by an officer of Sable under penalty of perjury under the laws of the State of California and shall identify each such approval or permit, the agency giving such approval or permit, and the date such approval or permit was given by the agency; the notice need not identify or provide information for any approval or permit given or received prior to June 3, 2025 (the date of the court's grant of the TRO in these matters). The 10-court-day time period shall be extended based upon the manner of service of the notice as provided in Code of Civil Procedure sections 1013 and 1010.6, and shall be calculated from the later of the date of filing and the date of service.

Under these terms of the preliminary injunction, absent further order of the court, Sable may restart the Las Flores Pipelines 10 court days following the giving of notice of receiving all necessary approvals and permits. Sable is not prevented by this injunction from taking steps towards restarting the Las Flores Pipelines short of actual restart. The OSFM is not impeded by the injunction from taking steps it finds appropriate in its regulatory capacity, including any steps OSFM may find desirable following this order. The conditions of the injunction do not allow restart without prior notice. This notice requirement and intervening waiting period provides reasonable time and opportunity for the petitioners and for the OSFM to take any requisite procedural step they may find appropriate before restart is to occur. The ruling is without prejudice to petitioners to seek additional, further, or other relief from the court, if any is warranted, before such restart. The court would be in a position to assess the evidence and arguments of the parties as they then exist, including, presumably, the fact and effects of actions taken as a result of obtaining the remaining necessary approvals and permits.

(D)     Bond

"On granting an injunction, the court or judge must require an undertaking on the part of the applicant to the effect that the applicant will pay to the party enjoined any damages, not exceeding an amount to be specified, the party may sustain by reason of the injunction, if the court finally decides that the applicant was not entitled to the injunction." (Code Civ. Proc., § 529, subd. (a).)

In view of the nature of the injunction issued, the potential damages caused by a wrongful injunction are minimal. The court fixes the amount of the undertaking required by section 529 at $1,000.00, to be filed by CBD and EDU, respectively in each case, on or before July 25, 2025.

(2)     Motions re Richard B. Kuprewicz

In addition to the applications for issuance of preliminary injunctions, the parties have filed motions related to petitioners' expert witness Richard B. Kuprewicz: (1) motion of Sable (case No. 25CV02244) to compel the deposition of Kuprewicz; (2) the motion of Sable (case No. 25CV02244) to strike the declaration of Kuprewicz filed in support of petitioners' applications for preliminary injunctions; (3) motion of Sable (case No. 25CV02247) to compel the deposition of Kuprewicz; and (4) the motion of Sable (case No. 25CV02247) to strike the declaration of Kuprewicz filed in support of petitioners' applications for preliminary injunctions. There are also motions now set for hearing in October in each case to quash Sable's deposition subpoena and notice of deposition, and to stay the deposition of Kuprewicz.

As discussed briefly above, the court has considered, but does not rely upon, the substance of the declaration of Kuprewicz to reach its conclusions in this ruling. The motions to strike the declaration will be denied. The motions to compel the deposition of Kuprewicz are denied as moot. To the extent these ruling moot the pending motions to quash, the court expects the parties to advise the court of that fact.

Based upon the court's ruling on the merits of the applications for preliminary injunction, it is not necessary at this time to determine what role, if any, the testimony of Kuprewicz may have in further proceedings. The court expects that petitioners will fully consider the issues raised by Sable in these motions in any further filings with the court.

## JUDGES

### JUDGE DONNA GECK

Dept. 4 SB-Anacapa

1100 Anacapa Street P.O. Box 21107

Santa Barbara, CA 93121-1107

US

# EXHIBIT C



About Us ⌄   **News**   **Events & Presentations**   Stock Info ⌄   Financials ⌄   Governance ⌄

Resources ⌄   **Careers**

## News Details

**VIEW ALL NEWS →**

# Sable Resumes Oil Flow As Ordered By The Federal DPA With Expected Gross Oil Rate Of 50,000

Skip to main content



**News    Events & Presentations**

**Careers**

On March 13, 2026, President of the United States, Donald J. Trump, signed an Executive Order to, among other things, delegate certain authorities under the Defense Production Act of 1950 ("DPA") to the United States Secretary of Energy. Subsequently on March 13, 2026, the United States Secretary of Energy, Chris Wright, issued an order to Sable invoking the DPA (the "DPA Order") to immediately prioritize and allocate pipeline transportation services for hydrocarbons from the SYU through the SYPS in order to address the energy scarcity and supply disruption risks caused by California policies that have left the region and U.S. military forces dependent on foreign oil. Sable immediately complied with this federal DPA Order and began shipping hydrocarbons from LFC to Pentland Station on March 14, 2026 with federal safety regulators present in observance.

As stated in the DPA Order, all federally produced barrels from the SYU must flow through the SYPS, up to the existing pipeline capacity of 200,000 Bbls/d. Sable completed its onshore anomaly repair program and hydrotested all segments of the SYPS consistent with applicable requirements as of May 2025.

Prior to resuming hydrocarbon transportation from LFC to Sable's sales point at Pentland Station, Sable had approximately 540,000 barrels of processed crude oil in storage at LFC, representing more than the line fill volume for the SYPS between LFC and Pentland Station. Sable is fully staffed and will continue to implement the conditions of the Emergency Special Permit previously issued by the United States Department of Transportation, Pipeline and Hazardous Materials Safety Administration.

Sable is currently producing hydrocarbons from its Platform Harmony at the SYU and our wells continue to perform as expected. Production ramp-up is anticipated to proceed with full production resumption at Platforms Harmony and Heritage this month, in March 2026, and Platform Hondo in June 2026. The Company plans to commence first sales by April 1, 2026 at an expected gross oil rate of 50,000 Bbls/d.

Also on March 13, 2026, Sable and Pacific Pipeline Company ("PPC") sued California Department of Parks and Recreation ("State Parks") in a lawsuit styled Sable Offshore Corp. and Pacific Pipeline Company, Plaintiffs v. Armando Quitero, in his official capacity as Director of the California Department of Parks and Recreation, Defendant, Case, No. 2:26-cv-02739 in the United States District Court for the Central District of California. The lawsuit requests declaratory relief to confirm Sable and PPC's rights (and their ability to fulfill their obligations) under the DPA Order. Subsequently, on March 14, 2026, State Parks sent a letter to Sable contesting Sable's rights under the DPA Order.

Skip to main content



**News    Events & Presentations**

**Careers**

**Forward-Looking Statements**

The information in this press release include "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. When used in this press release, the words "could," "should," "will," "may," "believe," "anticipate," "intend," "estimate," "expect," "project," "continue," "plan," "forecast," "predict," "potential," "future," "outlook," and "target," the negative of such terms and other similar expressions are intended to identify forward- looking statements, although not all forward-looking statements will contain such identifying words. These statements are based on the current beliefs and expectations of Sable's management and are subject to significant risks and uncertainties. Actual results may differ materially from those described in the forward-looking statements. Factors that could cause Sable's actual results to differ materially from those described in the forward-looking statements include: the ability to recommence full production of the SYU assets; our ability to recommence sales of oil, the cost and time required therefor, and production levels once recommenced; availability of future financing; our financial performance; global economic conditions and inflation; increased operating costs; lack of availability of drilling and production equipment, supplies, services and qualified personnel; geographical concentration of operations; environmental and weather risks; regulatory changes and uncertainties; litigation, complaints and/or adverse publicity; privacy and data protection laws, privacy or data breaches, or loss of data; our ability to comply with laws and regulations applicable to our business; and other one-time events and other factors that can be found in Sable's Annual Report on Form 10-K for the year ended December 31, 2025, which is filed with the Securities and Exchange Commission and are available on Sable's website (www.sableoffshore.com) and on the Securities and Exchange Commission's website (www.sec.gov). Except as required by applicable law, Sable undertakes no obligation to publicly release the result of any revisions to these forward-looking statements to reflect the impact of events or circumstances that may arise after the date of this press release.

**Disclaimers**

The Santa Ynez Unit restarted production in May 2025. Sable has not sold commercial quantities of hydrocarbons since the acquisition of the Santa Ynez Unit. The Santa Ynez Unit was shut in during June of 2015 when the only onshore pipeline transporting hydrocarbons produced from the Santa Ynez Unit to market ceased transportation.

Skip to main content



**News    Events & Presentations**

**Careers**

Skip to main content



**News**     **Events & Presentations**

**Careers**

Enter your Email Address                                                            **SIGN UP**

☐ News                              ☐ Quarterly Reports
☐ Annual Reports                    ☐ SEC Filings
☐ End of Day Stock Quote            ☐ Events & Presentations

Unsubscribe

Terms of Service    |    Privacy Policy

# Exhibit D

| | |
|---|---|
| **From:** | Dintzer, Jeffrey |
| **To:** | Jeremy Frankel; Stanton, Garrett; Hanelin, Benjamin J.; Moore, DJ; Rogers, Natalie C.; Trevor D. Large; Victoria Diffenderfer; "Michael S Dorsi"; Myung J. Park; Matthew Bullock |
| **Cc:** | Linda Krop; Julie Teel Simmonds; David Pettit; Talia Nimmer |
| **Subject:** | RE: CBD v OSFM; EDC v OSFM - Ex Parte Notice |
| **Date:** | Monday, March 16, 2026 10:08:38 AM |
| **Attachments:** | image002.png |
| | image003.png |
| | image004.png |
| | image005.png |

Sable and Pacific Pipeline will appear and oppose this ex-parte application.  Jeffrey.

Jeffrey Dintzer
ALSTON & BIRD

350 S. Grand Avenue, 51st Floor
Los Angeles, CA 90071
Office:  213-576-1063
Cell: 213-393-8664

**From:** Jeremy Frankel <jfrankel@environmentaldefensecenter.org>
**Sent:** Monday, March 16, 2026 9:44 AM
**To:** Dintzer, Jeffrey <Jeffrey.Dintzer@alston.com>; Stanton, Garrett <Garrett.Stanton@alston.com>; Hanelin, Benjamin J. <benjaminhanelin@paulhastings.com>; Moore, DJ <djmoore@paulhastings.com>; Rogers, Natalie C. <natalierogers@paulhastings.com>; Trevor D. Large <tlarge@flasllp.com>; Victoria Diffenderfer <vdiffenderfer@FLASllp.com>; 'Michael S Dorsi' <Michael.Dorsi@doj.ca.gov>; Myung J. Park <Myung.Park@doj.ca.gov>; Matthew Bullock <Matthew.Bullock@doj.ca.gov>
**Cc:** Linda Krop <lkrop@environmentaldefensecenter.org>; Julie Teel Simmonds <jteelsimmonds@biologicaldiversity.org>; David Pettit <dpettit@biologicaldiversity.org>; Talia Nimmer <tnimmer@biologicaldiversity.org>
**Subject:** CBD v OSFM; EDC v OSFM - Ex Parte Notice

**EXTERNAL SENDER – Proceed with caution**

Counsel,
PLEASE TAKE NOTICE that Petitioners in both 25CV02244 and 25CV02247 will appear and apply *ex parte* on Tuesday, **March 17, 2026 at 8:30 a.m. in Department 4 of the California Superior Court for the County of Santa Barbara, Anacapa Division, located at 1100 Anacapa Street, Santa Barbara, CA 93121-1107** to request that the Court issue (1) an order directing Real Parties Sable Offshore Corp. and Pacific Pipeline Company (collectively, "Sable") to immediately shut down and cease operation of pipelines CA-324 and CA-325 and (2) an order directing Sable to

show cause why it is not in contempt of the Court's July 29, 2025 Orders for Preliminary Injunction.

Please contact counsel for Petitioners by no later than 11:30 a.m. if you intend to oppose or object to Petitioners' *ex parte* application.

Thanks,



**JEREMY FRANKEL (he/him/his)**
STAFF ATTORNEY
906 Garden Street
Santa Barbara, CA 93101
805.963.1622 x100
www.EnvironmentalDefenseCenter.org

  

We recognize that EDC sits on occupied, unceded, stolen lands of the Chumash Peoples, on Shmuwich Territory, who have called this area home for time immemorial. We commit today to make space to elevate indigenous voices and support our local Chumash and indigenous communities in our work to protect our environment.

CONFIDENTIALITY NOTE: The information contained in this communication may be confidential, is intended only for the use of the recipient named above, and may be legally privileged. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please re-send this communication to the sender and delete the original message and any copy of it from your computer system. Thank you.

NOTICE: This e-mail message and all attachments may contain legally privileged and confidential information intended solely for the use of the addressee. If you are not the intended recipient, you are hereby notified that you may not read, copy, distribute or otherwise use this message or its attachments. If you have received this message in error, please notify the sender by email and delete all copies of the message immediately.

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Angela Braun, Executive Officer
3/16/2026 12:37
By: Narzralli Baksh , Deputy

Jeffrey D. Dintzer (SBN: 139056)
Garrett B. Stanton (SBN: 324775)
**ALSTON & BIRD, LLP**
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071
Tel: (213) 576-1000; Fax: (213) 576-1100
Jeffrey.Dintzer@alston.com
Garrett.Stanton@alston.com

Duncan Joseph Moore (SBN: 233955)
Benjamin J. Hanelin (SBN: 237595)
Natalie C. Rogers (SBN: 301254)
**PAUL HASTINGS LLP**
1999 Avenue of Stars, 27th Floor
Century City, CA 90067
Tel: (310) 620-5879; Fax: (310) 620-5899
djmoore@paulhastings.com
benjaminhanelin@paulhastings.com
natalierogers@paulhastings.com

Trevor D. Large (SBN: 214886)
Victoria C. Diffenderfer (SBN: 350018)
**FAUVER LARGE ARCHBALD & SPRAY**
820 State Street, 4th Floor
Santa Barbara, CA 93101
Tel: (805) 966-7000; Fax: (805) 966-7227
tlarge@flasllp.com
vdiffenderfer@flasllp.com

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF SANTA BARBARA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION, <br><br> Petitioners/Plaintiffs, <br><br> v. <br><br> CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10; inclusive, <br><br> Respondents/Defendants. | Case No.: 25CV02244 [Consolidated with 25CV02247] <br><br> **REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER AND REQUEST FOR IMMEDIATE RECISSION OF PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES** <br><br> [Filed concurrently with Request for Judicial Notice; Declaration of Jeffrey D. Dintzer; [Proposed] Order Immediately Rescinding Preliminary Injunction] |

REAL PARTIES IN INTERESTS *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER AND REQUEST FOR IMMEDIATE RECISSION OF PRELIMINARY INJUNCTION

|  |  |
|---|---|
|  | Date:       March 17, 2026<br>Time:      8:30 a.m.<br>Dept.:      4 |
|  | Complaint Filed: April 15, 2025 |
|  | [Assigned for Purposes to the Honorable Donna D. Geck, Dept. 4] |
| SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,<br><br>      Real Parties in Interest |  |
| ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation,<br><br>      Petitioners/Plaintiffs,<br><br>      v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, an agency of the State of California; OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10; inclusive,<br><br>      Respondents/Defendants.<br><br>SABLE OFFSHORE CORP., a Delaware Corporation, and PACIFIC PIPELINE COMPANY, a Delaware Corporation.<br><br>      Real Parties in Interest. | Case No.: 25CV02247 |

2

REAL PARTIES IN INTERESTS *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER AND REQUEST FOR IMMEDIATE RECISSION OF PRELIMINARY INJUNCTION

**TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on March 17, 2026 at 8:30 a.m., in Department 4 of the Superior Court of California for the County of Santa Barbara, located at 1100 Anacapa Street, Santa Barbara, California, before the Honorable Donna D. Geck, Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company (collectively referred to herein as "Sable") will, and hereby do, notify the Court *ex parte* of the President of the United States's Executive Order issued on March 13, 2026, entitled "Adjusting Certain Delegations Under the Defense Production Act[,]" and the Defense Production Act Order also issued on March 13, 2026, ordering Sable to immediately transport hydrocarbons through the Santa Ynez Pipeline System, including Segments CA-324 and CA-325, which make it impossible for Sable to comply with the July 29, 2025 Order re: Preliminary Injunction in the above-referenced matters (the "Preliminary Injunction"). Under controlling federal and state law, which this Court remains duty-bound to follow, the Court must immediately rescind the Preliminary Injunction and yield to the federal government's Defense Production Act Order.

This Notice is made pursuant to Rule 3.1200, et seq., of the California Rules of Court, Code of Civil Procedure § 533, the United States Constitution, Article VI, Clause 2 (the Supremacy Clause), the Defense Production Act, 50 U.S.C Sections 4501 et seq., the Executive Order issued on March 13, 2026, entitled "Adjusting Certain Delegations Under the Defense Production Act[,]" and the Defense Production Act Order.

On March 13, 2026, the President of the United States amended "Executive Order 13603 of March 16, 2012 (National Defense Resources Preparedness)" which "delegates certain authorities of the President under the Defense Production Act (50 U.S.C. 4501 *et seq.*), to specified executive department and agency (agency) heads." (Declaration of Jeffrey D. Dintzer ("Dintzer Decl."), Exhibit F (the "Executive Order").) The President's Executive Order further "clarifies section 2(a) of Executive Order 14156 of January 20, 2025 (Declaring a National Energy Emergency)" and provides, "Section 203 of Executive Order 13603 is hereby amended by striking the phrase 'Secretary of Commerce' and inserting, in lieu thereof, 'Secretary of Commerce and the

REAL PARTIES IN INTERESTS *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER AND REQUEST FOR IMMEDIATE RECISSION OF PRELIMINARY INJUNCTION

Secretary of Energy, each of whom may exercise such delegated authority independently of the other'." (*Ibid.*)

Upon this delegation of authority and on behalf of the President of the United States, the Secretary of Energy commanded Sable to commence the flow of crude oil through the Santa Ynez Pipeline System pursuant to the Defense Production Act, 50 U.S.C Sections 4501 et seq. (Dintzer Decl., Exhibit A (the "DPA Order").) The DPA Order directs Sable "to immediately prioritize and allocate pipeline transportation services for hydrocarbons from the SYU [Santa Ynez Unit] through the SYPS [Santa Ynez Pipeline System]" and "immediately commence performance under contracts or orders for services… for hydrocarbon transportation capacity in the SYPS[.]" (*Id.*, Ex. A at p. 3.) The DPA Order further requires Sable to "comply with this order immediately and maintain such compliance until such time as the conditions necessitating the issuance of this order abate or until Sable is directed otherwise." (*Ibid.*) The DPA Order finds the "[a]n affordable and reliable domestic supply of energy is a fundamental requirement for the national and economic security of any nation" and these "problems are most pronounced in our Nation's West Coast, 'where dangerous State and local policies jeopardize our Nation's core national defense and security needs, and devastate the prosperity of not only local residents but the entire United States population.'" (*Id.*, Ex. A at p. 1.) The DPA Order further finds that the Santa Ynez Pipeline System is a "critical energy resource on the West Coast" but "cannot be used to address the shortages identified in EO 14156 and the resulting vulnerabilities, including adversarial dependence" because "California agencies have deployed an array of state measures [] to block pipeline operations." (*Id.*, Ex. A at p. 2.)

On March 14, 2026, Sable "resumed the transportation of hydrocarbons (oil) produced at the Santa Ynez Unit ('SYU') through the federally regulated and approved to operate Santa Ynez Pipeline System ('SYPS') from Las Flores Canyon ('LFC') to Pentland Station at the direction of the United States Secretary of Energy, Chris Wright." (*Id.*, Exhibit G [March 16, 2026 Press Release].)

Prior to issuance of the Executive Order and DPA Order, on March 3, 2025, the Office of

REAL PARTIES IN INTERESTS *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER AND REQUEST FOR IMMEDIATE RECISSION OF PRELIMINARY INJUNCTION

Attorney General published a "Memorandum Opinion for the General Counsel [for the] Department of Energy" that details, in part, that (1) "[t]he DPA authorizes the President to regulate private entities in ways that may be inconsistent with state law[; (2) a]n order issued under that authority could preempt state law either expressly or by conflict[; and (3) the DPA Order] may displace certain provisions of the Consent Decree [], including those vesting authority over resumption of transportation with the California Office of the State Fire Marshal." (Dintzer Decl., Exhibit B, at p. 22 (the "Memorandum Opinion").) This Court's Preliminary Injunction directly contravenes the DPA Order and is now *invalid* and unenforceable as a matter of law.

The Preliminary Injunction is further untenable given the ongoing conflict in the Middle East, where the Strait of Hormuz has been compromised and California gas prices are surging due to the State's high dependency on foreign oil. Moreover, Sable must comply with the DPA Order or risk facing civil or criminal penalties (including possible debarment), rendering Sable's compliance with the Preliminary Injunction impossible.

Further, on February 26, 2026, Sable relinquished, surrendered, and abandoned the Office of the State Fire Marshal-issued State Waivers that Petitioners challenge. (Dintzer Decl., Exhibit E). As Sable has abandoned the State Waivers underpinning the Preliminary Injunction, the State Waivers have no force or effect, and the Preliminary Injunction cannot stand.

If this Court attempts to enforce a Preliminary Injunction in direct defiance of the DPA Order, the Court would violate well-established legal principles it is required to follow, and Sable would suffer significant and irreparable harm based on the following specific facts and legal authority:

1. On July 29, 2025, the Court issued the Preliminary Injunction based on Petitioners' lawsuits challenging OSFM's issuance of State Waivers. Based on the Court's finding that Petitioners had a likelihood of success on their state law claims under the California Pipeline Safety Act, the Court enjoined the restart of Lines CA-324 and CA-325 of the Santa Ynez Pipeline System "until 10 court days following the filing and service of notice by or on behalf of real parties in interest . . . that Sable has received all necessary approvals and permits for restarting the [] Pipeline

REAL PARTIES IN INTERESTS *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER AND REQUEST FOR IMMEDIATE RECISSION OF PRELIMINARY INJUNCTION

and that Sable intends to commence such restart." (July 29, 2025 Order at p. 18.)

2. On March 13, 2026, the President of the United States amended the Executive Order, which "delegates certain authorities of the President under the Defense Production Act (50 U.S.C. 4501 *et seq.*), to specified executive department and agency (agency) heads." (Dintzer Decl., Exhibit F.) Upon a delegation of authority and on behalf of the President, the Secretary of Energy commanded Sable to commence the flow of crude oil through the Santa Ynez Pipeline System pursuant to the DPA. (Dintzer Decl., Exhibit A.) Sable is required by federal law to comply with the DPA Order or risks facing civil and criminal penalties. (See 50 U.S.C § 4556; *id.*, § 4513.)

3. On March 14, 2026, Sable resumed the transportation of hydrocarbons (oil) produced at the SYU through the federally regulated Santa Ynez Pipeline System at the direction of the Secretary of Energy. (See Dintzer Decl., Exhibit G [March 16, 2026 Press Release].)

4. The Preliminary Injunction directly contravenes the DPA Order as seeks to prevent Sable's ability to transport crude oil through the Santa Ynez Pipeline System, including Segments CA-324 and CA-325.

5. The conflict between the DPA Order and the Preliminary Injunction plainly creates a situation where "compliance with both federal and state regulations is a physical impossibility," and the Preliminary Injunction must yield. (*Florida Lime & Avocado Growers, Inc. v. Paul* (1963) 373 U.S. 132, 142; see U.S. Cons. Art. VI, cl. 2; see also *Fisher v. City of Berkeley* (1984) 37 Cal.3d 644, 655 [noting that California courts are "duty-bound" to follow federal law]; Exhibit C). Sable can no longer legally comply with this Court's Preliminary Injunction, and federal and California Supreme Court authority command this Court to rescind the Preliminary Injunction forthwith.

6. In addition to the mandates of the DPA Order, on February 26, 2026, counsel for Sable sent a letter to OSFM, relinquishing, surrendering, and abandoning the State Waivers. (See Dintzer Decl., Exhibit E.) As Sable has disclaimed all rights and benefits the State Waivers may have conferred and the Preliminary Injunction is based on the State Waivers, the Preliminary Injunction must be dissolved as there is no longer a justiciable controversy between the parties.

REAL PARTIES IN INTERESTS *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER AND REQUEST FOR IMMEDIATE RECISSION OF PRELIMINARY INJUNCTION

7.      In accordance with California Rule of Court 3.1203, counsel for Sable provided notice of the nature of the relief to be requested and the date, time, and place the Application will be made to counsel for Petitioners and OSFM on March 14, 2026, by email at 2:57 p.m.. (Dintzer Decl., ¶¶ 4-5, Exhibit C.) Counsel for Petitioners indicated in a response email that they intend to appear and oppose the application. (*Id*, ¶¶ 4-5, Exhibit C.) Counsel for the OSFM also indicated in a response email that it intended to appear and oppose the application. (*Id*, ¶¶ 4, 6, Exhibit D.)

8.      No prior application has been made with respect to this matter.

9.      Pursuant to Rule 3.1202, subdivision (a) of the California Rules of Court ("CRC"), the contact information for known counsel in this matter is as follows:

Jeffrey D. Dintzer
jeffrey.dintzer@alston.com
Garrett B. Stanton
garrett.stanton@alston.com
 **ALSTON & BIRD LLP**
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071-1410
(213) 576-1000

Trevor D. Large (SBN: 214886)
tlarge@flasllp.com
Victoria C. Diffenderfer (SBN: 350018)
vdiffenderfer@flasllp.com
**FAUVER LARGE ARCHBALD & SPRAY**
820 State Street, 4th Floor
Santa Barbara, CA 93101
Tel: (805) 966-7000; Fax: (805) 966-7227

DJ Moore
djmoore@paulhastings.com
Benjamin J. Hanelin
benjaminhanelin@paulhastings.com
Natalie C. Rogers
natalierogers@paulhastings.com
**PAUL HASTINGS LLP**
1999 Avenue of the Stars, 27th Floor
Century City, CA 90067
(310) 620-5700

Linda Krop
lkrop@environmentaldefensecenter.org

7

REAL PARTIES IN INTERESTS *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER AND
REQUEST FOR IMMEDIATE RECISSION OF PRELIMINARY INJUNCTION

Jeremy M. Frankel
jfrankel@environmentaldefensecenter.org
Tara C. Rengifo
trengifo@environmentaldefensecenter.org
**ENVIRONMENTAL DEFENSE CENTER**
906 Garden Street
Santa Barbara, CA 93101
(805) 963-1622, Ext. 100

Julie Teel Simmonds
jteelsimmonds@biologicaldiversity.org
David Pettit
dpettit@biologicaldiversity.org
Talia Nimmer
tnimmer@biologicaldiversity.org
**CENTER FOR BIOLOGICAL DIVERSITY**
2100 Franklin St., Ste. 375
Oakland, CA 94612
(510) 844-7100

Michael S. Dorsi
Michael.Dorsi@doj.ca.gov
**CALIFORNIA ATTORNEY GENERAL'S OFFICE**
455 Golden Gate Ave, Ste 11000
San Francisco, CA 94102
(415) 510-4400

This Notice is based upon the attached Memorandum of Points and Authorities, the Request for Judicial Notice, the Declaration of Jeffrey D. Dintzer and attached exhibits, the record on file with the Court in this matter, and upon such further evidence and argument as may be presented to the court at the time of the hearing on the Notice.

DATED: March 16, 2026

Respectfully submitted,
**ALSTON & BIRD**

By: _____

Jeffrey D. Dintzer
Garrett B. Stanton
Attorneys for Real Parties in Interest
**SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY**

8

REAL PARTIES IN INTERESTS *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER AND REQUEST FOR IMMEDIATE RECISSION OF PRELIMINARY INJUNCTION

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.      INTRODUCTION AND FACTUAL BACKGROUND**

On March 13, 2026, the President of the United States amended "Executive Order 13603 of March 16, 2012 (National Defense Resources Preparedness)" which "delegates certain authorities of the President under the Defense Production Act (50 U.S.C. 4501 *et seq.*), to specified executive department and agency (agency) heads." (Declaration of Jeffrey D. Dintzer ("Dintzer Decl."), Exhibit F (the "Executive Order").) The President's Executive Order further "clarifies section 2(a) of Executive Order 14156 of January 20, 2025 (Declaring a National Energy Emergency)" and provides, "Section 203 of Executive Order 13603 is hereby amended by striking the phrase 'Secretary of Commerce' and inserting, in lieu thereof, 'Secretary of Commerce and the Secretary of Energy, each of whom may exercise such delegated authority independently of the other'." (*Ibid.*) Upon this delegation of authority and on behalf of the President of the United States, the Secretary of Energy commanded Sable to commence the flow of crude oil through the Santa Ynez Pipeline System pursuant to the Defense Production Act, 50 U.S.C Sections 4501 et seq. (Dintzer Decl., Exhibit A (the "DPA Order").) Specifically, the DPA Order directs Sable "to immediately prioritize and allocate pipeline transportation services for hydrocarbons from the SYU [Santa Ynez Unit] through the SYPS [Santa Ynez Pipeline System]" and "immediately commence performance under contracts or orders for services… for hydrocarbon transportation capacity in the SYPS[.]" (*Id.*, Ex. A at p. 3.) The DPA Order further requires Sable to "comply with this order immediately and maintain such compliance until such time as the conditions necessitating the issuance of this order abate or until Sable is directed otherwise." (*Ibid.*)

On March 14, 2026, Sable "resumed the transportation of hydrocarbons (oil) produced at the Santa Ynez Unit ("SYU") through the federally regulated and approved to operate Santa Ynez Pipeline System ("SYPS") from Las Flores Canyon ("LFC") to Pentland Station at the direction of the United States Secretary of Energy, Chris Wright." (*Id.*, Exhibit G [March 16, 2026 Press Release].) In anticipation of the DPA Order, the Assistant Attorney General made clear that upon the issuance of the DPA Order, "Sable would be immune from any penalties, including those

1

imposed under a Consent Decree for any act or failure to act resulting directly or indirectly from compliance with a DPA order." (See Dintzer Decl., Ex. B at p. 21 [Memorandum of Opinion].)[1]

Now, this Court's Preliminary Injunction directly conflicts with the DPA Order as it enjoins Sable from resuming petroleum transportation through Lines CA-324 and CA-325 of the Santa Ynez Pipeline System until 10 court days following Sable's filing and service of notice that Sable received all necessary approvals and permits from the Office of the State Fire Marshal ("OSFM"). (See July 29, 2025 Preliminary Injunction at p. 18.)

The Preliminary Injunction creates a situation in which "compliance with both federal law [(the DPA Order)] and state regulations [(the Preliminary Injunction)] is a physical impossibility." (*Florida Lime & Avocado Growers, Inc. v. Paul* (1963) 373 U.S. 132, 142.)[2] Because the DPA Order was issued pursuant to federal law and under powers conferred by Congress, the DPA Order is supreme and vanquishes the enforceability of this Court's Preliminary Injunction. (See *ibid.*; U.S. Cons. Art. VI, cl. 2; *In re Neagle*, 135 U.S. 1, 62 ["While [the federal government is limited in the number of its powers, so far as its sovereignty extends[,] it is supreme."]; see also *Fisher v. City of Berkeley* (1984) 37 Cal.3d 644, 655 [noting that California courts are "duty-bound" to follow federal law]; Dintzer Decl., Ex. B.) The Preliminary Injunction is no longer valid and cannot be kept in place in the face of the DPA Order issued during an ongoing conflict in the Middle East. Maintaining the Preliminary Injunction affects significant and consequential national security concerns as the Strait of Hormuz has been compromised and California gas prices are surging due to the State's high dependency on foreign oil from the Middle East. Thus, the Preliminary Injunction directly harms the country's national security interests and as this Court is "duty-

---

[1] Under California law, "in the absence of controlling authority, an Attorney General opinion may be persuasive because we presume the Legislature is aware of the opinion and would have amended the statute if it disagreed." (*Life Care Centers of America v. Cal. Optima* (2005) 133 Cal.App.4th 1169, 1178; *ARC Students for Liberty Campaign v. Los Rios Community College* (2010) 732 F.Supp.2d 1051, 1057 (citing *City of Irvine v. S. Cal. Ass'n of Gov'ts* (2009) 175 Cal.App.4th 506, 521 ["Under California law, the Attorney General's opinions are not binding, yet are 'entitled to great weight and, in the absence of contrary controlling authority, persuasive.'"].)

[2] Federal preemption of OSFM's regulatory authority over the Santa Ynez Pipeline System is not a matter of first impression for this Court. The DPA Order only further confirms that OSFM no longer retains any regulatory authority over the Santa Ynez Pipeline System.

REAL PARTIES IN INTERESTS *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER AND REQUEST FOR IMMEDIATE RECISSION OF PRELIMINARY INJUNCTION

bound," this Court must now immediately dissolve and yield to the superior DPA Order as a matter of law. *(Florida Lime & Avocado Growers, Inc., supra*, 373 U.S. at p. 142.)

## II.    LEGAL STANDARD

"Courts have inherent equity, supervisory, and administrative powers as well as inherent power to control litigation before them." (*Cottle v. Superior Court* (1992) 3 Cal.App.4th 1367, 1377.) Nevertheless, this Court is "duty-bound" to follow federal law and well-established legal principles, including federalism and preemption. (See *Fisher*, *supra*, 37 Cal.3d at 655 [noting that California courts are "duty-bound" to follow federal law].) Code of Civil Procedure section 533 allows the court to dissolve a preliminary injunction upon a showing that "there has been a material change in the facts upon which the injunction or temporary restraining order was granted, that the law upon which the injunction or temporary restraining order was granted has changed, or that the ends of justice would be served by the modification or dissolution of the injunction or temporary restraining order." (Code Civ. Proc., § 533.)

## III.    ARGUMENT

### A.    The DPA Order Renders Sable's Compliance with this Court's Preliminary Injunction Impossible.

Sable will be in violation of federal law and Presidential authority if it attempts to comply with this Court's Preliminary Injunction. Thus, the DPA Order renders Sable's compliance with the Preliminary Injunction impossible. The Preliminary Injunction must yield to the DPA Order.

Congress enacted the DPA to help ensure the "ability of the domestic industrial base to supply materials and services for the national defense and to prepare for and respond to military conflicts, natural or man-caused disasters, or acts of terrorism within the United States." (50 U.S.C. § 4502(a)(1).) When enacting the DPA, Congress found "the development of domestic productive capacity" critical for ensuring the national defense, 50 U.S.C. § 4502(a)(3), and similarly found it necessary "to assure the availability of domestic energy supplies." (*Id.*, § 4502(a)(5).) The DPA thus vests "the President with an array of authorities," all designed "to maintain and enhance the domestic industrial base." (50 U.S.C. § 4502(a)(4).) The President, by and through his Secretary

REAL PARTIES IN INTERESTS *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER AND REQUEST FOR IMMEDIATE RECISSION OF PRELIMINARY INJUNCTION

of Energy, may use those authorities "whether or not an 'emergency' situation exists." (Dintzer Decl., Ex. B at p. 11 [citing *Legal Authorities Available to the President to Respond to a Severe Energy Supply Interruption or Other Substantial Reduction in Available Petroleum Products*, 6 Op. O.L.C. 644, 662 (1982) ("*Energy Supply Interruption*")].) Thus, the DPA confers "broad and flexible" authority on the President to regulate private parties and preempt contrary state law to shape domestic industry in the interest of national defense. (*Ibid.* [quoting H.R. Rep. No. 81-2759, at 4 (1950)].) And "because the President may regulate and direct private conduct when exercising such authority, he may also necessarily displace contrary state law." (Dintzer Decl., Ex. B at p. 11; see *ibid.* ["[L]est there be any doubt, the DPA makes explicit that orders issued pursuant to the Act displace state-law liability. It provides that'[n]o person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to this chapter.' [50 U.S.C.] § 4557."].)

Under the DPA, the President is authorized "to allocate materials, services, and facilities in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate to promote the national defense." (50 U.S.C. § 4511(a)(2).) The President may use this section "to facilitate petroleum transportation," such as "by requiring pipelines, marine terminals, and other facilities to perform oil transport contracts necessary or appropriate to promote the national defense." (Dintzer Decl., Ex. B at p. 15, citing *Energy Supply Interruption*, *supra,* 6 Op. O.L.C. at p. 665) Moreover, the "sweeping language [of 50 U.S.C. § 4511(a)(2)] allows the President to preempt contrary state law by ordering Sable to produce the recoverable oil located on the SYU and transport such production to the California refinery complex using the Santa Ynez Pipeline System." (Dintzer Decl., Ex. B at pp. 16-17; *see, e.g.*, *Johnson v. Tyson Foods, Inc.* 580 F. Supp. 3d 382, 389 (N.D. Tex. 2022 [holding that the President's allocation authority under the DPA allowed him to require meat facilities to remain open during the COVID-19 pandemic and preempt state tort law]; *Reed v. Tyson Foods, Inc.*, No. 21-cv-01155, 2021 WL 5107725, at *6 (W.D. Tenn. Nov. 3, 2021) ["Because the purpose of the DPA cannot otherwise be accomplished while allowing states to implement their own, potentially inconsistent policy decisions for meat and poultry

---

REAL PARTIES IN INTERESTS *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER AND REQUEST FOR IMMEDIATE RECISSION OF PRELIMINARY INJUNCTION

processor operations during the COVID-19 pandemic, the state law must yield."].)

Additionally, "[t]he President's prioritization authority under section 4511(a)(1) also allows him to preempt state law." (Dintzer Decl., Ex. B at p. 18.) "Section 4511(a)(1) authorizes the President 'to require that performance under contracts or orders' that 'he deems necessary or appropriate to promote the national defense shall take priority over performance under any other contract or order.'" (*Ibid.*) The DPA Order, issued by and through the Secretary of Energy on behalf of the President of the United States, preempts those laws that impair or delay prioritized contract performance as required by the DPA Order. (See *id.*, Ex. C at pp. 18-19, citing *E. Air Lines, Inc. v. McDonnell Douglas Corp.* (5th Cir. 1976) 532 F.2d 957, 993 ["Congress intended to accord the Executive Branch great flexibility in molding its priorities policies to the frequently unanticipated exigencies of national defense."].; see also Ex. F.) State law rendering the DPA Order's prioritization impossible is now preempted. (See *id.*, Ex. B at p. 19.)

Furthermore, to "assure the availability of domestic energy supplies," the DPA grants the President the ability to take actions and issue orders to "maximize domestic energy supplies." (50 U.S.C. § 4511(c).) The President, by and through the Secretary of Energy, may exempt Sable from compliance with laws and the Preliminary Injunction threatening the ability to "maximize domestic energy supplies." (*Id.*, § 4511(c)(1); see Dintzer Decl., Ex. F.) The President's preemptive powers, exercised by and through the Secretary of Energy, exist "even in the absence of a national-defense finding." (Dintzer Decl., Ex. B at p. 19, citing *Energy Supply Interruption*, *supra*, 6 Op. O.L.C. at p. 668.)

Here, the DPA Order directs Sable "to immediately prioritize and allocate pipeline transportation services for hydrocarbons from the SYU [Santa Ynez Unit] through the SYPS [Santa Ynez Pipeline System]" and "immediately commence performance under contracts or orders for services… for hydrocarbon transportation capacity in the SYPS[.]" (*Id.*, Ex. A at p. 3.) The DPA Order further requires Sable to "comply with this order immediately and maintain such compliance until such time as the conditions necessitating the issuance of this order abate or until Sable is directed otherwise." (*Ibid.*) The DPA Order finds the "[a]n affordable and reliable domestic

5

supply of energy is a fundamental requirement for the national and economic security of any nation" and these "problems are most pronounced in our Nation's West Coast, 'where dangerous State and local policies jeopardize our Nation's core national defense and security needs, and devastate the prosperity of not only local residents but the entire United States population.'" (*Id.*, Ex. A at p. 1.) The DPA Order further finds that the Santa Ynez Pipeline System is a "critical energy resource on the West Coast" but "cannot be used to address the shortages identified in EO 14156 and the resulting vulnerabilities, including adversarial dependence" because "California agencies have deployed an array of state measures [] to block pipeline operations." (*Id.*, Ex. A at p. 2.) On March 14, 2026, Sable "resumed the transportation of hydrocarbons (oil) produced at the Santa Ynez Unit [] through the federally regulated and approved to operate Santa Ynez Pipeline System [] from Las Flores Canyon [] to Pentland Station at the direction of the United States Secretary of Energy, Chris Wright." (*Id.*, Exhibit G [March 16, 2026 Press Release].)

As it stands, this Court's Preliminary Injunction directly conflicts with a federal order from the President of the United States, made by and through the Secretary of Energy, making it void and unenforceable. If Sable does not comply with the DPA Order, it risks severe penalties, including criminal penalties. (See, e.g., 50 U.S.C. § 4513 ["Any person who … willfully fails to perform any act required, by the provisions of this subchapter or any rule, regulation, or order thereunder, shall, upon conviction, be fined not more than $10,000 or imprisoned for not more than one year, or both."].) As the DPA Order was issued to address concerns arising from the ongoing conflict in the Middle East and California's high dependency on oil from the region (which is causing gas prices to surge, directly affecting California consumers and harming the Country's national security interests as our local military rely upon the availability of petroleum to conduct their operations), the Preliminary Injunction now stands in the way of significant and consequential national security concerns, and this Court cannot keep it in place. Moreover, Sable has relinquished, surrendered, and abandoned the State Waivers underlying the Preliminary Injunction, and is no longer relying upon them. (Dintzer Decl., Ex. E.)

/ / /

REAL PARTIES IN INTERESTS *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER AND REQUEST FOR IMMEDIATE RECISSION OF PRELIMINARY INJUNCTION

**1. The DPA Order Preempts the Preliminary Injunction.**

The instant case implicates this country's oldest and most well-established principles of law. The Supremacy Clause of the United States provides that federal law "shall be the Supreme law of the land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." (U.S. Cons. Art. VI, cl. 2; *Fisher*, *supra*, 37 Cal.3d at p. 655.) Conflict preemption arises when "it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." (*Silkwood v. Kerr-McGee Corp.* (1983) 464 U.S. 238, 248.) And conflict preemption may be based on the DPA Order issued on March 13, 2026. (See *Old Dominion Branch No. 496, National Ass'n of Letter Carriers, AFL-CIO v. Austin* (1974) 418 U.S. 264, 273; *Alario v. Knudsen* (D. Mont. 2023) 704 F.Supp.3d 1061, 1085 [finding conflict preemption where a state law conflicted with an executive order issued under the DPA's "ability … to regulate" a private entity].)

California courts have recognized that state court injunctions cannot stand in the face of conflicting federal law. ***The California Supreme Court has held that, where a "state court order granting [ ] injunctive relief … would stand as a direct obstacle to the accomplishment" of a federal objective, that injunction is invalid.*** (*County of Butte v. Department of Water Resources* (2022) 13 Cal.5th 612, 634; see also *County of San Diego v. San Diego NORML* (2008) 165 Cal.App.4th 798, 821 ["[o]bstacle preemption will invalidate a state law when, under the circumstances of a particular case, the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress"].)

In another analogous case, the President of the United States issued an executive order under the Defense Production Act directing divestment of a private entity, TikTok. (See *Alario v. Knudsen*, *supra*, 704 F.Supp.3d at p. 1061.) Simultaneously, the Montana state legislature enacted a law purporting to regulate TikTok by banning its use. Even though there was no direct conflict, as there is here, the *Alario* court found that the executive order preempted the state law and held that the state law could not go into effect. (See *Alario v. Knudsen*, *supra*, 704 F.Supp.3d at p.

REAL PARTIES IN INTERESTS *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER AND REQUEST FOR IMMEDIATE RECISSION OF PRELIMINARY INJUNCTION

1061.) Sable is required by the DPA Order to transport hydrocarbons through the Santa Ynez Pipeline System, including Segments CA-324 and CA-325. Because the Court's Preliminary Injunction directly conflicts with the DPA Order, "the accomplishment of [the] federal objective" set out in the DPA Order makes it "impossible . . . to comply with both state and federal law." (*Geier v. Am. Honda Motor Co.* (2000) 529 U.S. 861, 873-84.) It is physically impossible for Sable to comply with both the DPA Order and the Preliminary Injunction. (See *Florida Lime & Avocado Growers, Inc.*, *supra*, 373 U.S. at p. 142 [state law must concede to federal law].)

By preempting the Preliminary Injunction, the DPA Order has invalidated the Preliminary Injunction. (See *County of San Diego*, *supra*, 165 Cal.App.4th at p. 821 ["[o]bstacle preemption will ***invalidate*** a state law when, under the circumstances of a particular case, the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress"] [emphasis suppled].)

### 2.    Sable Must Comply with the DPA Order.

Sable must comply with the DPA Order. If Sable does not comply, it risks severe penalties, including criminal penalties. (See 50 U.S.C. § 4513.) Failure to comply with a DPA Order also may result in suspension or debarment from federal contracting, which would irreparably harm Sable as a federal lease holder. As a result, the DPA grants immunity to any person "for damages or penalties for any act or failure to act resulting directly or indirectly from compliance" with a DPA Order. (50 U.S.C. § 4557.) "And under the DPA, the President possesses broad discretion to determine when to invoke that immunity, *see* 50 U.S.C. § 4511(a), (c), for it is the President who possesses the institutional competence to make such judgments on behalf of the Nation, *see id.* § 4502(a)(4); *see also Holder v. Humanitarian L. Project*, 561 U.S. 1, 33 (2010) (emphasizing the need to defer to the 'evaluation of the facts by the Executive' in the national-security context)." (Dintzer Decl., Ex. B at p. 13.) Any contempt sanction for otherwise lawful acts taken to comply with the DPA Order would be a "penalty" barred by 50 U.S.C. § 4557. In fact, "Section 4557 is an express preemption provision, even though it does not appear to operate directly on state law."

REAL PARTIES IN INTERESTS *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER AND REQUEST FOR IMMEDIATE RECISSION OF PRELIMINARY INJUNCTION

(Dintzer Decl., Ex. B at p. 12 [citing *Murphy v. Nat'l Collegiate Athletic Ass'n* (2018) 584 U.S. 453, 478.)

Likewise, the DPA Order displaces any provisions of the Consent Decree that may prevent resumption of petroleum transportation through Lines CA-324 and CA-325 because Section 4557 "immunize[s] Sable from needing to satisfy these provisions of the Consent Decree" in its efforts to comply with the DPA Order. (*Id.*, Ex. B at pp. 20-21.) Under Section 4557, Sable is "immune from any penalties – including those imposed under the Consent Decree – for 'any act or failure to act resulting directly or indirectly from compliance with' [the] DPA Order." (Dintzer Decl., Ex. B at p. 21; see 50 U.S.C. § 4557; Consent Decree at 27 [including a "stipulated penalties" provision for violations of its requirements].) Further, the issuance of the DPA Order "constitute[s] an 'event' arising from causes beyond the control of Sable [ – *a force majeure under the Consent Decree* (see Consent Decree at 35) –], and complying with the [DPA Order] might delay or prevent the performance of Sable's obligations under the Consent Decree." (Dintzer Decl., Ex. B at pp. 21-22.) Therefore, the Consent Decree cannot prevent compliance with the DPA Order, and its provisions preventing Sable's resumption of petroleum transportation through Lines CA-324 and CA-325 are untenable as a matter of federal law.

Taken together, the DPA "confers on private entities . . . a federal right to engage in certain conduct" – conduct required by the DPA Order – "subject only to certain (federal) constraints," not constraints imposed by state law. (*Murphy*, *supra*, 584 U.S. at pp. 478-79.) Thus, the plain text of the statute is clear: by providing Sable with immunity from any damages or penalties that might result from compliance with the DPA Order, the DPA renders the Preliminary Injunction unenforceable. (See *Hercules, Inc. v. United States* (1996) 516 U.S. 417, 429 [explaining that the Defense Production Act "plainly provides immunity . . . [b]y expressly providing a defense to liability"].) This grant of immunity reflects Congress's unambiguous intent to shield private entities like Sable from any liability that could result from a conflict between competing legal obligations.

/ / /

REAL PARTIES IN INTERESTS *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER AND REQUEST FOR IMMEDIATE RECISSION OF PRELIMINARY INJUNCTION

### 3. Sable has Relinquished the State Waivers.

The Preliminary Injunction is premised on OSFM's alleged failure to follow certain state law procedures in issuing the State Waivers. But Sable has relinquished the State Waivers.

Courts decide only justiciable or live controversies, i.e., those involving an actual dispute based on concrete facts. (*County of San Diego*, *supra*, 165 Cal.App.4th at p. 813.) Accordingly, a writ will not issue "to enforce an abstract or moot right." (*Slater v. City Council of City of Los Angeles* (1965) 238 Cal.App.2d 864, 868.) A matter is moot if the court cannot grant the plaintiff any effectual relief. (*Giles v. Horn* (2002) 100 Cal.App.4th 206, 227; see also *Ogunsalu v. Superior Court* (2017) 12 Cal.App.5th 107 [petition dismissed because subsequent events rendered effective relief impossible]; *Coalition for a Sustainable Future in Yucaipa v. City of Yucaipa* (2011) 198 Cal.App.4th 939 [petition dismissed because applicant abandoned development project and city rescinded project approvals].)

Here, on February 26, 2026, counsel for Sable sent a letter to OSFM, relinquishing, surrendering, and abandoning the State Waivers. (See Dintzer Decl., Ex. E.) Because Sable has disclaimed all rights and benefits the State Waivers may have conferred, there is no longer a justiciable controversy between the parties.

## IV.    CONCLUSION

Sable must comply with the DPA Order or face civil or criminal penalties. The Preliminary Injunction stands in direct conflict with the DPA Order and is therefore preempted, unenforceable, and void.  This Court must rescind the Preliminary Injunction forthwith.

DATED:  March 16, 2026                    Respectfully submitted,

**ALSTON & BIRD, LLP**

By: _____
Jeffrey D. Dintzer
Garrett B. Stanton
Attorneys for Real Parties in Interest
**SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY**

10

REAL PARTIES IN INTERESTS *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER AND REQUEST FOR IMMEDIATE RECISSION OF PRELIMINARY INJUNCTION

**PROOF OF SERVICE**

I, **Kim Niz**, declare:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Alston & Bird LLP, 350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071.

On March 16, 2026, I served the document(s) **REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S NOTICE OF EX PARTE AND EX PARTE NOTICE OF DEFENSE PRODUCTION ACT ORDER; MEMORANDUM OF POINTS AND AUTHORITIES** on the interested parties stated below, by the following means of service:

**See Attached Service List**

(BY U.S. MAIL)  I am personally and readily familiar with the business practice of Alston & Bird LLP for collection and processing of correspondence for mailing with the United States Parcel Service, and I caused such envelope(s) with postage thereon fully prepaid to be placed in the United States Postal Service at Los Angeles, California.

(BY FACSIMILE)  I am personally and readily familiar with the business practice of Alston & Bird LLP for collection and processing of document(s) to be transmitted by facsimile and I caused such document(s) on this date to be transmitted by facsimile to the offices of addressee(s) at the numbers listed below.

(BY OVERNIGHT MAIL)  I am personally and readily familiar with the business practice of Alston & Bird LLP for collection and processing of correspondence for overnight delivery, and I caused such document(s) described herein to be deposited for delivery to a facility regularly maintained by Federal Express for overnight delivery.

☒　BY ELECTRONIC SERVICE on the date stated below, I caused the document(s) described above to be served electronically on the recipients designated on the Transaction Receipt pursuant to the parties' stipulation establishing the authorizing e-service of documents.

I declare under penalty of perjury under the laws of the State of California, that the above is true and correct.

Executed on March 16, 2026, at Los Angeles, California.

_/s/ Kim Niz_____
Kim Niz

**SERVICE LIST**

| | |
|---|---|
| Julie Teel Simmonds, Esq.<br>David Pettit, Esq.<br>Talia Nimmer, Esq.<br>Center for Biological Diversity<br>2011 Franklin Street, Suite 375<br>Oakland, CA 94612<br>Tel.: (510) 844-7100<br>Fax: (510) 844-7150<br>jteelsimmonds@biologicaldiversity.org<br>dpettit@biologicaldiversity.org<br>tnimmer@biologicaldiversity.org | *Attorneys for Petitioners: Center for Biological Diversity and Wishtoyo Foundation* |
| Duncan Joseph Moore<br>Benjamin J. Hanelin<br>Natalie C. Rogers<br>**PAUL HASTINGS**<br>1999 Avenue of Stars, 27th Floor<br>Century City, CA 90067<br>Tel: (310) 620-5879<br>Fax: (310) 620-5899<br>djmoore@paulhastings.com<br>benjaminhanelin@paulhastings.com<br>natalierogers@paulhastings.com | *Attorneys for Real Parties in Interest: Sable Offshore Corp. and Pacific Pipeline Company* |
| Trevor D. Large (SBN: 214886)<br>Victoria C. Diffenderfer (SBN: 350018)<br>**FAUVER LARGE ARCHBALD & SPRAY**<br>820 State Street, 4th Floor<br>Santa Barbara, CA 93101<br>Tel: (805) 966-7000<br>Fax: (805) 966-7227<br>tlarge@flasllp.com<br>vdiffenderfer@flasllp.com | *Attorneys for Real Parties in Interest: Sable Offshore Corp. and Pacific Pipeline Company* |
| Linda Krop, Esq.<br>Jeremy M. Frankel, Esq.<br>Tara C. Rengifo, Esq.<br>ENVIRONMENTAL DEFENSE CENTER<br>906 Garden Street<br>Santa Barbara, CA 93101<br>Tel: (805) 963-1622; (510) 844-7100<br>Fax: (805) 962-3152; (510) 844-7150<br>lkrop@environmentaldefensecenter.org<br>jfrankel@environmentaldefensecenter.org<br>trengifo@environmentaldefensecenter.org | *Attorneys for Petitioners: Environmental Defense Center, a California non-profit corporation; Get Oil Out!, a California non-profit corporation, Santa Barbara County Action Network, a California non-profit corporation, Sierra Club, a national non-profit corporation, and Santa Barbara Channelkeeper, a California non-profit corporation* |
| Michael S. Dorsi, Esq.<br>California Attorney General's Office<br>55 Golden Gate Ave, Ste 11000<br>San Francisco, CA 94102 | *Attorneys for Respondents/Defendants: California Department of Forestry and Fire* |

**12**
**PROOF OF SERVICE**

| Tel.: (415) 510-3802<br>Michael.dorsi@doj.ca.gov | *Protection, Office of the State Fire Marshal, Daniel Berlant (in his official capacity as State Fire Marshal)* |
|---|---|

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Angela Braun, Executive Officer
3/16/2026 12:37
By: Narzralli Baksh , Deputy

Jeffrey D. Dintzer (SBN: 139056)
Garrett B. Stanton (SBN: 324775)
**ALSTON & BIRD, LLP**
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071
Tel: (213) 576-1000; Fax: (213) 576-1100
Jeffrey.Dintzer@alston.com
Garrett.Stanton@alston.com

Duncan Joseph Moore (SBN: 233955)
Benjamin J. Hanelin (SBN: 237595)
Natalie C. Rogers (SBN: 301254)
**PAUL HASTINGS**
1999 Avenue of Stars, 27th Floor
Century City, CA 90067
Tel: (310) 620-5879; Fax: (310) 620-5899
djmoore@paulhastings.com
benjaminhanelin@paulhastings.com
natalierogers@paulhastings.com

Trevor D. Large (SBN: 214886)
Victoria C. Diffenderfer (SBN: 350018)
**FAUVER LARGE ARCHBALD & SPRAY**
820 State Street, 4th Floor
Santa Barbara, CA 93101
Tel: (805) 966-7000; Fax: (805) 966-7227
tlarge@flasllp.com
vdiffenderfer@flasllp.com

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF SANTA BARBARA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,<br><br>Petitioners/Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10; inclusive,<br><br>Respondents/Defendants. | Case No.: 25CV02244<br>[Consolidated with 25CV02247]<br><br>**REAL PARTIES IN INTEREST SABLE OFFSHORE CORP.'S AND PACIFIC PIPELINE COMPANY'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT of NOTICE OF EX PARTE AND EX PARTE NOTICE OF DEFENSE PRODUCTION ACT ORDER; DECLARATION OF JEFFREY D. DINTZER**<br><br>Date:    March 17, 2026<br>Time:    8:30 a.m.<br>Dept.:    4<br><br>[Filed concurrently with Notice of Ex Parte and Ex Parte Notice of Defense Production Act Order; Memorandum and Points of Authorities; [Proposed] Order Immediately |

1

SABLE'S REQUEST FOR JUDICIAL NOTICE; DECLARATION OF JEFFREY D. DINTZER

Rescinding Preliminary Injunction]

Complaint Filed: April 15, 2025

[Assigned for Purposes to the Honorable Donna D. Geck, Dept. 4]

SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,

    Real Parties in Interest

ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation,

    Petitioners/Plaintiffs,

    v.

CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, an agency of the State of California; OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10; inclusive,

    Respondents/Defendants.

SABLE OFFSHORE CORP., a Delaware Corporation, and PACIFIC PIPELINE COMPANY, a Delaware Corporation.

    Real Parties in Interest.

Case No.: 25CV02247

2

**<u>REQUEST FOR JUDICIAL NOTICE</u>**

Pursuant to Evidence Code sections 452 and 453, Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company (collectively, "Sable") hereby request that the Court take judicial notice of the following document in support of Sable's Notice of *Ex Parte* and *Ex Parte* Notice of Defense Production Act Order ("*Ex Parte* Notice").

1.      Attached as **<u>Exhibit A</u>** to the concurrently filed Declaration of Jeffrey D. Dintzer is a true and correct copy of the Defense Production Act Order ("DPA Order") issued by the Secretary of Energy upon the delegation from and on behalf of the President of the United States on March 13, 2026. The DPA Order commanded Sable to commence the flow of oil through the Santa Ynez Pipeline System, including Segments CA-324 and CA-325, pursuant to the Defense Production Act (50 U.S.C §§ 4501 *et seq*.).

The basis for judicial notice of **<u>Exhibit A</u>** is that it constitutes an "official act" of the executive department of the United States within the meaning of Evidence Code section 452, subdivision (c). **<u>Exhibit A</u>** is relevant to the *Ex Parte* Notice because it orders Sable to commence the flow of oil through the Santa Ynez Pipeline System, including Segments CA-324 and CA-325, pursuant to the Defense Production Act (50 U.S.C §§ 4501 *et seq*.), which directly conflicts with the Court's Preliminary Injunction.

2.      Attached as **<u>Exhibit F</u>** to the concurrently filed Declaration of Jeffrey D. Dintzer is a true and correct copy of the President of the United States's Executive Order entitled "Adjusting Certain Delegations Under the Defense Production Act" issued on March 13, 2026. The Executive Order, in relevant part, amends Section 203 of Executive Order 13603 to strike the phrase "Secretary of Commerce" and inserts, in lieu thereof, "Secretary of Commerce and Secretary of Energy, each of whom may exercise delegated authority independently of the other".

The basis for judicial notice of **<u>Exhibit F</u>** is that it constitutes an "official act" of the executive department of the United States within the meaning of Evidence Code section 452, subdivision (c). **<u>Exhibit F</u>** is relevant to the *Ex Parte* Notice because it delegates authority under the Defense Production Act to the Secretary of Energy, which has ordered Sable under that authority to commence the flow of oil through the Santa Ynez Pipeline System, including Segments CA-324 and CA-325,

SABLE'S REQUEST FOR JUDICIAL NOTICE; DECLARATION OF JEFFREY D. DINTZER

pursuant to the Defense Production Act (50 U.S.C §§ 4501 *et seq.*), which directly conflicts with the Court's Preliminary Injunction.

In accordance with Evidence Code section 453, Sable has given Petitioners and OSFM sufficient notice of this request to enable them to meet the request, and Sable has also furnished the Court with sufficient information to take judicial notice of **Exhibit A** and **Exhibit F**.

DATED:   March 16, 2026                      Respectfully Submitted,

**ALSTON & BIRD**
JEFFREY D. DINTZER
GARRETT B. STANTON

**FAUVER, LARGE, ARCHBALD & SPRAY LLP**
TREVOR D. LARGE

By: _____
Jeffrey D. Dintzer

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP.
PACIFIC PIPELINE COMPANY

SABLE'S REQUEST FOR JUDICIAL NOTICE; DECLARATION OF JEFFREY D. DINTZER

## <u>DECLARATION OF JEFFREY D. DINTZER</u>

I, Jeffrey D. Dintzer, declare as follows:

1. I am an attorney duly licensed to practice law before all courts of the State of California and am a partner at Alston & Bird LLP, attorneys of record for Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company (hereinafter collectively referred to as "Sable"). I make this declaration in support of Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company's Notice of Ex Parte and Ex Parte Notice of Defense Production Act Order. I have personal knowledge of the facts set forth in this declaration and if called as a witness, could and would testify competently to them.

On March 13, 2026, the United States Secretary of Energy, at the direction of the President of the United States, commanded Sable to commence the flow of oil through the Santa Ynez Pipeline System, including Segments CA-324 and CA-325, pursuant to the Defense Production Act (50 U.S.C §§ 4501 *et seq.*). The DPA Order directs Sable "to immediately prioritize and allocate pipeline transportation services for hydrocarbons from the SYU [Santa Ynez Unit] through the SYPS [Santa Ynez Pipeline System]" and "immediately commence performance under contracts or orders for services… for hydrocarbon transportation capacity in the SYPS[.]" (*Id.*, Ex. A at p. 3.) The DPA Order further requires Sable to "comply with this order immediately and maintain such compliance until such time as the conditions necessitating the issuance of this order abate or until Sable is directed otherwise." (*Ibid.*) The DPA Order finds the "[a]n affordable and reliable domestic supply of energy is a fundamental requirement for the national and economic security of any nation" and these "problems are most pronounced in our Nation's West Coast, 'where dangerous State and local policies jeopardize our Nation's core national defense and security needs, and devastate the prosperity of not only local residents but the entire United States population.'" (*Id.*, Ex. A at p. 1.) The DPA Order further finds that the Santa Ynez Pipeline System is a "critical energy resource on the West Coast" but "cannot be used to address the shortages identified in EO 14156 and the resulting vulnerabilities, including adversarial dependence" because "California agencies have deployed an array of state measures [] to block pipeline operations." (*Id.*, Ex. A at p. 2.) Upon receipt of the DPA Order, I electronically stored it in my computer in a segregated file where it has been securely maintained. In

SABLE'S REQUEST FOR JUDICIAL NOTICE; DECLARATION OF JEFFREY D. DINTZER

preparing this declaration, I retrieved the DPA Order and provided a copy to my legal counsel at Alston & Bird. Attached hereto as **Exhibit A** is a true and correct copy of the DPA Order, which I have reviewed before signing this declaration.

2.     On March 3, 2026, the Department of Justice Office of Legal Counsel published a "Memorandum Opinion For The General Counsel Department Of Energy" detailing the preemptive effect of the Defense Production Act Order on State Law. Upon the Department of Justice Office of Legal Counsel's issuance of "Memorandum Opinion For The General Counsel Department Of Energy[,]" I stored downloaded it and it in a secure electronic file management system at the offices of Alston & Bird LLP, which is maintained by various attorneys, legal assistants, and other employees at the firm. A true and correct copy of the Department of Justice Office of Legal Counsel's "Memorandum Opinion For The General Counsel Department Of Energy[,]" dated March 3, 2026, is attached hereto as **Exhibit B.**

3.     On March 14, 2026 at 2:57 p.m., Trevor Large, co-counsel for Real Parties in Interest, sent an email to Linda Krop, Jeremy Frankel, and Tara Regnifo, counsel for Petitioners, and Michael Dorsi, counsel for Respondents. The email informed Petitioners and Respondents that Sable would be filing for *ex parte* notice of the Defense Production Act Order.

4.     On March 15, 2026 at 9:06 a.m., counsel for Petitioners responded and stated that they intend to appear and oppose Sable's Application. A true and correct copy of Sable's email and Petitioners' response is attached as **Exhibit C**.

5.     On March 16, 2026 at 10:20 a.m., counsel for Respondents responded and stated that they intend to appear and oppose the *ex parte* application. A true and correct copy of Sable's email and Respondents' response is attached as **Exhibit D**.

6.     On February 26, 2026, Sable sent a letter to Daniel Berlandt, State Fire Marshal, relinquishing, surrendering, and abandoning the State Waivers issued by the Office of the State Fire Marshal on December 17, 2024 with respect to Segments CA-324 and CA-325 of the Santa Ynez Pipeline System (previously referred to as Las Flores Pipeline Lines CA-324 and CA-325). A true and correct copy of Sable's February 26, 2026 letter is attached hereto as **Exhibit E.**

7.     On March 13, 2026, the President of the United States issued an Executive Order

SABLE'S REQUEST FOR JUDICIAL NOTICE; DECLARATION OF JEFFREY D. DINTZER

entitled "Adjusting Certain Delegations Under the Defense Production Act" that "amends Executive Order 13603" which "delegates certain authorities of the President under the Defense Production Act (50 U.S.C. 4501 et seq.)…." As the Executive Order states, "Section 203 of Executive Order 13603 is hereby amended by striking the phrase 'Secretary of Commerce' and inserting, in lieu thereof, 'Secretary of Commerce and the Secretary of Energy, each of whom may exercise such delegated authority independently of the other'." I accessed the Executive Order from the White House's official website, and it is available at: https://www.whitehouse.gov/presidential-actions/2026/03/adjusting-certain-delegations-under-the-defense-production-act/. Upon the President of the United States's publishing of the Executive Order entitled "Adjusting Certain Delegations Under the Defense Production Act" I stored downloaded it and it in a secure electronic file management system at the offices of Alston & Bird LLP, which is maintained by various attorneys, legal assistants, and other employees at the firm. A true and correct copy of the President of the United States's Executive Order entitled "Adjusting Certain Delegations Under the Defense Production Act[,]" dated March 13, 2026, and available at: https://www.whitehouse.gov/presidential-actions/2026/03/adjusting-certain-delegations-under-the-defense-production-act/ is attached hereto as **Exhibit F**.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

5

SABLE'S REQUEST FOR JUDICIAL NOTICE; DECLARATION OF JEFFREY D. DINTZER

8.      On March 16, 2026, Sable published a press-release detailing that Sable has "resumed the transportation of hydrocarbons (oil) produced at the Santa Ynez Unit ("SYU") through the federally regulated and approved to operate Santa Ynez Pipeline System ("SYPS") from Las Flores Canyon ("LFC") to Pentland Station at the direction of the United States Secretary of Energy, Chris Wright." I accessed the March 16, 2026 Press Release from Sable's official website, and it is available at: https://sableoffshore.com/news/news-details/2026/Sable-Resumes-Oil-Flow-as-Ordered-by-the-Federal-DPA-with-Expected-Gross-Oil-Rate-of-50000-Bblsd-and-Expects-First-Sales-by-April-1-2026/default.aspx. A true and correct copy of Sable's Press Release, dated March 16, 2026, and available at: https://sableoffshore.com/news/news-details/2026/Sable-Resumes-Oil-Flow-as-Ordered-by-the-Federal-DPA-with-Expected-Gross-Oil-Rate-of-50000-Bblsd-and-Expects-First-Sales-by-April-1-2026/default.aspx is attached hereto as **Exhibit G**.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on March 16, 2026, in Los Angeles, California.

By: _____

Jeffrey D. Dintzer

---

6

SABLE'S REQUEST FOR JUDICIAL NOTICE; DECLARATION OF JEFFREY D. DINTZER

# EXHIBIT A

# PIPELINE CAPACITY PRIORITIZATION AND ALLOCATION ORDER

## I.     AUTHORITY

The Department of Energy (DOE) is authorized to issue orders pursuant to Executive Order 13603 section 201, which delegates to the Secretary of Energy the authority of the President conferred by the Defense Production Act of 1950 (DPA), sections 101(a) & (c).  By delegation, section 101(a) authorizes the Secretary to require acceptance and priority performance of contracts or orders and to allocate materials, services, and facilities, as deemed necessary or appropriate to promote the national defense with respect to all forms of energy.  Section 101(c)[1] authorizes the Secretary to require the allocation of, or the priority performance of contracts or orders relating to, materials, equipment, and services to maximize domestic energy supplies where those supplies of materials, services, and facilities are scarce, critical, and essential to maintain or expand exploration, production, refining, or transportation.

## II.     COVERED ENTITIES

Sable Offshore Corp. and Pacific Pipeline Company (collectively "Sable")
Attn: Lance Yearwood
845 Texas Avenue
Suite 2800
Houston, TX 77002
(713) 579-8118

## III.     NEED FOR PRIORITY PERFORMANCE AND ALLOCATION

In Executive Order 14156, President Trump declared a national emergency, determining that the "United States' insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy."[2]  Further, President Trump found, "[i]n an effort to harm the American people, hostile state and non-state foreign actors have targeted our domestic energy infrastructure, weaponized our reliance on foreign energy, and abused their ability to cause dramatic swings within international commodity markets.  An affordable and reliable domestic supply of energy is a fundamental requirement for the national and economic security of any nation."[3]  The President determined that problems are most pronounced in our Nation's West Coast, "where dangerous State and local policies jeopardize our Nation's core national defense and security needs, and devastate the prosperity of not only local residents but the entire United States population."[4]

Sable is the lessee, owner, and operator of the Santa Ynez Unit (SYU), an offshore oil and gas unit located in Federal waters off the coast of California.[5]  Sable and the Department of the Interior are

---

[1] Pub. L. No. 81-774 (50 U.S.C. §§ 4511(a), 4511(c)).

[2] Executive Order No. 14156, 90 Fed. Reg. 8433 (Jan. 20, 2025) (Declaring a National Energy Emergency), https://www.federalregister.gov/documents/2025/01/29/2025-02003/declaring-a-national-energy-emergency.

[3] *Id.*

[4] *Id.*

[5] Sable Offshore Corp. (2025). Form 10-K. U.S. Securities and Exchange Commission, at 1-2, available at: https://d18rn0p25nwr6d.cloudfront.net/CIK-0001831481/652c5f0a-582e-42c9-b069-e47f9af7bc7f.pdf ("the 'Santa Ynez Unit' or 'SYU' refers to the 16 federal leases, three offshore production platforms (Hondo, Harmony, and

1

currently updating a previously approved Development and Production Plan, which would allow for continuous production to address energy vulnerabilities on the West Coast.[6]  The SYU is a critical energy resource on the West Coast.  It is one of the largest known offshore oilfields in the United States.[7]  This resource cannot be used to address the shortages identified in EO 14156 and the resulting vulnerabilities, including adversarial dependence, without reliable transport of SYU's production through the Santa Ynez Pipeline System (SYPS) to market on mainland California.

For most of SYU's production history, oil and gas were produced through pipeline infrastructure connecting offshore platforms to onshore facilities in Las Flores Canyon, California.[8]  From there, crude oil was transported via onshore pipeline to a California refinery complex via the Las Flores Pipeline System.[9]  This interstate pipeline system running from the SYU to the Pentland Station terminal in Pentland, California is known as the SYPS, which Sable owns and operates.[10]  According to Sable, the State of California is impeding it from resuming transportation of SYU production through the SYPS.  As Sable reports, "California agencies have deployed an array of state measures—including SB 237, the state waiver process, novel interpretations of state agency jurisdiction and authority, excessive delay in granting a long-term easement through a state park for an existing pipeline, and the Restart Plan requirements under [a] Consent Decree—to block pipeline operations."[11]

---

Heritage), and associated ancillary facilities located in federal waters offshore California") (hereinafter "Sable 10-K").

[6] *See* Letter for Jonathan Brightbill, General Counsel, Department of Energy, from James Noe, Partner, Holland & Knight, *Re: Sable Offshore Corp.—Request for Action Under the Defense Production Act* at 1-2 (Dec. 12, 2025) (hereinafter "Sable Request").

[7] U.S. Energy Information Administration, *Top 100 U.S. Oil and Gas Fields*, at 5 (Mar. 2015), https://www.eia.gov/naturalgas/crudeoilreserves/top100/pdf/top100.pdf.

[8] Sable Request at 2.

[9] *Id.*

[10] *Id. See also*, Letter for Linda Daugherty, Acting Associate Administrator for Pipeline Safety, Pipeline and Hazardous Materials Safety Administration (PHMSA), from J. Caldwell Flores, President and Chief Operating Officer, Pacific Pipeline Company / Sable Offshore Corp., *RE: Application for Emergency Special Permit Sable Offshore Corp.* at 1 (Dec. 19, 2025) ("As part of this Application, Sable requests that PHMSA issue an Emergency Special Permit covering two pipeline segments (Lines CA-324 and CA-325) that together, constitute the Las Flores Pipeline, which is part of an interstate pipeline facility that Sable operates from the Outer Continental Shelf (OCS) off the coast of Santa Barbara, California to Kern County, California, known as the Santa Ynez Pipeline System (SYPS)."); Letter for J. Caldwell Flores, President and Chief Operating Officer, Sable Offshore Corp., *RE: Determination of Interstate Classification* at 2 (Dec. 17, 2025) ("PHMSA agrees with your determination that the Las Flores Pipeline is an interstate pipeline."); Sable 10-K at 1-2 ("the 'Santa Ynez Pipeline System' (or 'SYPS') refers to the interstate pipeline connecting the Santa Ynez Unit to the Pentland Station terminal, inclusive of 'Pipeline Segment 324' and 'Pipeline Segment 325', or collectively referred to as 'Pipeline Segments 324 and 325' (formerly known as '901/903 Assets' and as defined in the Sable-[Exxon Mobil Corporation] Purchase Agreement), the Las Flores Canyon ('LFC') onshore processing, storage, and related pipeline assets, and the offshore pipeline connecting the Santa Ynez Unit to LFC. The SYU Assets include the Santa Ynez Unit and the Santa Ynez Pipeline System.").

[11] Sable Request at 6.

IV.        ORDER

In light of my findings and determinations in accordance with Title I of the DPA that the actions directed below are necessary or appropriate to promote the national defense and to maximize domestic energy supplies where those supplies of materials, services, and facilities are scarce, critical, and essential to maintain or expand exploration, production, refining, or transportation and maintenance or expansion of exploration, production, refining, transportation cannot reasonably be accomplished without exercising the authority in this Order, it is directed that:

A. Pursuant to sections 101(a) and (c) of the DPA, Sable is directed to immediately prioritize and allocate pipeline transportation services for hydrocarbons from the SYU through the SYPS, including transportation service activities at the onshore facilities in Las Flores Canyon, California, to the Pentland Station terminal in Pentland, California.

B. Sable is directed to immediately commence performance under contracts or orders for services, including contracts or orders hereinafter entered into or sought, for hydrocarbon transportation capacity in the SYPS from the point of production in the SYU through the SYPS, including transportation service activities at the onshore facilities in Las Flores Canyon, California, to the Pentland Station terminal in Pentland, California, at which point hydrocarbons move through the Plains All American Line 2000 for transport to refineries.

C. Such contracts for hydrocarbon transportation services from the point of production in the SYU through the SYPS, including transportation service activities at the onshore facilities in Las Flores Canyon, California, to the Pentland Station terminal in Pentland, California, shall take priority over other non-SYPS hydrocarbon transportation contracts or orders for such services from the SYU that are entered, hereinafter are entered, or could as an alternative to the SYPS be entered into for hydrocarbon transportation services from the point of production in the SYU.  For purposes of assuring such priority, Sable is directed to accept and perform such contracts or order up to and so long as the SYPS has capacity to transport.

D. Any person contracting for or ordering, or who hereinafter does contract for or order hydrocarbon transportation services from Sable from the point of production in the SYU is directed to prefer and utilize such capacity in the SYPS from the point of production in the SYU through the SYPS, including transportation service activities at the onshore facilities in Las Flores Canyon, California, to the Pentland Station terminal in Pentland, California, in preference to other such non-pipeline contracts or orders by other persons capable of hydrocarbon transportation service, including but not limited to by truck, vessel, or alternative pipeline, up to the capacity of the SYPS.

E. Sable, and any person seeking hydrocarbon transportation services from the SYU through the SYPS, including transportation service activities at the onshore facilities in Las Flores Canyon, California, to the Pentland Station terminal in Pentland, California, are authorized to enter into such orders and contracts as those parties negotiate, as appropriate.

F. Sable is directed to provide a monthly report to DOE via askcr@hq.doe.gov on the use of this priority and allocation order, including the volumes of hydrocarbons transported or contracted for under this Order during the previous month.

G. Sable is ordered to comply with this order immediately and to maintain such compliance until such time as the conditions necessitating the issuance of this order abate or until Sable is directed otherwise.

3

Issued in Washington, D.C. on this 13th day of March 2026

_____

Chris Wright
Secretary of Energy

# EXHIBIT B

(Slip Opinion)

# Preemptive Effect of Defense Production Act
# Order on State Law

Presidential orders issued as an exercise of congressionally delegated authority or the
President's constitutional powers have the force of federal law under the Supremacy
Clause and may preempt state law.

An order issued pursuant to the Defense Production Act may preempt state laws expressly
or by conflict.

An order issued pursuant to the Defense Production Act may displace sanctions for non-
compliance with a contrary consent decree, even if that consent decree rests on federal-
law claims.

March 3, 2026

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
DEPARTMENT OF ENERGY

Sable Offshore Corp. ("Sable") is the lessee and operator of the Santa
Ynez Unit ("SYU"), an offshore oil and gas unit located in federal waters
off the coast of California. Sable and the Department of the Interior are
updating a previously approved Development and Production Plan, which
would allow for continuous production on the SYU to address energy
vulnerabilities on the West Coast. But, according to Sable, the State of
California has impeded it from operating the SYU and transporting pro-
duction through the Santa Ynez Pipeline System.

You have asked whether an order issued under the Defense Production
Act of 1950 ("DPA" or "Act"), Pub. L. No. 81-774, 64 Stat. 798 (codified
as amended at 50 U.S.C. § 4501 *et seq.*), to Sable by the President or his
delegee would preempt the California laws currently impeding Sable from
resuming production and operating the associated pipeline infrastructure.
We conclude that it would. An order issued as an exercise of congression-
ally delegated authority or the President's constitutional powers has the
force of federal law under the Supremacy Clause and may preempt contra-
ry state law. Because the DPA authorizes the President to order certain
actions that may otherwise be prohibited by state law, an order issued
pursuant to the DPA could preempt those laws expressly or by conflict.
That is true regardless of the form of the President's order, although we
refer in this memorandum to executive orders for simplicity. *See Legal
Effectiveness of a Presidential Directive, as Compared to an Executive*

1

50 Op. O.L.C. __ (Mar. 3, 2026)

*Order*, 24 Op. O.L.C. 29, 29 (2000) ("[T]here is no substantive difference in the legal effectiveness of an executive order and a presidential directive that is styled other than as an executive order.").[1]

## I.

## A.

On January 20, 2025, President Trump declared a national emergency related to the Nation's energy supply and infrastructure. *See generally* Exec. Order No. 14156. The President determined that the Nation's "insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy." *Id.* § 1. "These numerous problems," the President emphasized, "are most pronounced in our Nation's Northeast and West Coast, where dangerous State and local policies jeopardize our Nation's core national defense and security needs." *Id.*

The President directed the heads of executive departments and agencies to wield "any lawful emergency authorities available to them" to bolster the "production, transportation, refining, and generation of domestic energy resources." *Id.* § 2(a). "If an agency assesses that use of either Federal eminent domain authorities or authorities afforded under the Defense Production Act are necessary to achieve this objective, the agency shall submit recommendations for a course of action to the

---

[1] President Obama delegated Title I authority under the DPA to the Secretary of Energy for all energy-related matters. *See* Exec. Order No. 13603 (2012). For convenience, we refer in this memorandum to determinations made, and orders given, by the President, even though that authority has been lawfully delegated to the Secretary. We note that an executive order issued by President Trump provides that if an agency seeks to invoke the DPA, it "shall submit recommendations for a course of action to the President." Exec. Order No. 14156 § 2(a) (2025). This language does not, however, impliedly limit the scope of the power delegated by the President to the Secretary. The provisions of each executive order are not "in irreconcilable conflict," nor is President Trump's order "clearly intended as a substitute" for President Obama's delegation. *Carcieri v. Salazar*, 555 U.S. 379, 395 (2009) (cleaned up). Instead, President Trump's order provides only that the Secretary should submit a recommendation to the President before wielding delegated authority. *See* Exec. Order No. 14156 § 2(a). The Secretary could, for instance, recommend that the Secretary himself—rather than the President—issue a DPA order. And nothing in President Trump's executive order requires the President's affirmative approval of a recommendation before the Secretary acts. *See generally id.*

2

*Preemptive Effect of DPA Order*

President . . . ." *Id.* (internal citation omitted). The President also instructed agencies to expedite the completion of energy infrastructure, including by "facilitat[ing] the supply, refining, and transportation of energy in and through the West Coast of the United States." *Id.* § 3(b).

## B.

The SYU—which Sable leases and operates—is a critical energy resource on the West Coast. Located in federal waters in the Pacific Ocean, it is the largest known offshore oilfield in the United States. *See* Letter for Jonathan Brightbill, General Counsel, Department of Energy, from James W. Noe, Partner, Holland & Knight LLP, *Re: Sable Offshore Corp.—Request for Action Under the Defense Production Act* at 1 (Dec. 12, 2025) ("Sable Letter").[2] It has an estimated 904 million barrels in place, and from 1981 to 2014, it produced more than 670 million barrels of oil. *Id.*

For most of the SYU's production history, oil and gas were produced through pipeline infrastructure connecting offshore platforms to onshore facilities in Las Flores Canyon, California. *Id.* at 2. From there, crude oil was transported via onshore pipeline to a California refinery complex via the Las Flores Pipeline System. *Id.* This network of on- and offshore pipelines is known as the Santa Ynez Pipeline System. *Id.* Currently, Sable and the Department of the Interior are updating a previously approved Development and Production Plan to address West Coast energy vulnerabilities. *Id.* at 1–2.

But according to Sable, the State of California is impeding it from resuming transportation of SYU production through the Santa Ynez Pipeline System. Sable reports that "California agencies have deployed an array of state measures—including SB 237, the state waiver process, novel interpretations of state agency jurisdiction and authority, excessive delay in granting a long-term easement through a state park for an existing pipeline, and the Restart Plan requirements under [a] Consent Decree—to block pipeline operations." *Id.* at 6.

---

[2] For purposes of this advice, we accept the veracity of the factual statements set forth in Sable's letter, although we are not presently in a position to verify their accuracy.

3

50 Op. O.L.C. __ (Mar. 3, 2026)

Sable has thus requested the Secretary of Energy ("Secretary") to make necessary findings under the DPA and issue an order "requiring Sable to operate the Santa Ynez Unit and the Santa Ynez Pipeline System to maximize domestic energy production." *Id.* at 9. In Sable's view, such an order would conflict with—and therefore preempt—California state law. *Id.* at 6.

## II.

Preemption doctrine derives from the constitutional hierarchy established by the Supremacy Clause. That clause provides that "the Laws of the United States," as well as the Constitution and treaties, "shall be the supreme Law of the Land," notwithstanding "any Thing in the Constitution or Laws of any State to the Contrary." U.S. Const. art. VI, cl. 2. The Supremacy Clause thus enshrines two principles into our legal system: It places federal law above state law in the constitutional hierarchy, and it establishes a choice-of-law rule that federal law must prevail whenever it conflicts with state law. The Supreme Court has "identified three different types of preemption—conflict, express, and field—but all of them work in the same way." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 477 (2018) (cleaned up). Federal law typically "imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." *Id.* At times, federal law "might appear to operate directly on the States," such as in the form of an express preemption provision, but such provisions operate "just like any other federal law with preemptive effect" by conferring on private entities "a federal right to engage in certain conduct subject only to certain (federal) constraints." *Id.* at 478–79.

We first explain that an executive order may preempt state law when the President is empowered by the Constitution or statute to regulate private parties or where state law would otherwise conflict with a lawful exercise of the President's official powers. We then describe the two primary ways in which executive orders might displace state law—expressly or by conflict.

4

*Preemptive Effect of DPA Order*

## A.

The Constitution vests the entire executive power in a single President, whose "duties are of 'unrivaled gravity and breadth.'" *Trump v. United States*, 144 S. Ct. 2312, 2327 (2024) (quoting *Trump v. Vance*, 140 S. Ct. 2412, 2425 (2020)). The President's authority to wield these powers "necessarily stems either from an act of Congress or from the Constitution itself." *Id.* (cleaned up) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)). The Constitution that the President must defend, and the federal laws that he must execute, are "the supreme Law[s] of the Land." U.S. Const. art. VI, cl. 2; *see also id.* art. II, § 1, cl. 8; *id.* art. II, § 3. Of course, "the President alone and unaided could not execute the laws. He must execute them by the assistance of subordinates." *Myers v. United States*, 272 U.S. 52, 117 (1926).

The power of executive agencies—literally, the Chief Executive's agents—to preempt state law is well understood. Congress may authorize executive agencies to promulgate regulations that "have the force and effect of law." *Chrysler Corp. v. Brown*, 441 U.S. 281, 295 (1979) (citation and internal quotation marks omitted). "This doctrine is so well established that agency regulations implementing federal statutes have been held to pre-empt state law under the Supremacy Clause." *Id.* at 295–96. Put simply, when agencies issue regulations implementing federal statutes, those regulations are fully clothed in "the Laws of the United States" for purposes of preemption and therefore can displace contrary state law. U.S. Const. art. VI, cl. 2. To be sure, an agency's power to preempt state law is not unlimited. "[A] federal agency may pre-empt state law only when and if it is acting within the scope of its congressionally delegated authority, for an agency literally has no power to act, let alone pre-empt the validly enacted legislation of a sovereign State, unless and until Congress confers power upon it." *New York v. FERC*, 535 U.S. 1, 18 (2002) (cleaned up). But within the confines of delegated authority, executive preemption of state law is an unremarkable feature of our governmental structure.

This logic applies *a fortiori* to the President, who is the head of the Executive Branch and wields independent constitutional powers that agencies lack on their own. Regardless of whether the President derives his authority from statute or directly from the Constitution, he wields a piece

5

50 Op. O.L.C. __ (Mar. 3, 2026)

of federal sovereignty itself, so long as he acts within the bounds of his authority. States thus lack the power to impede the exercise of the President's official powers, as to do so would be to interfere with the United States itself. *See, e.g.*, *Tarble's Case*, 80 U.S. (13 Wall.) 397, 403–04 (1872) (holding that this rule applies "whether that authority be exercised by a Federal officer or be exercised by a Federal tribunal"); *see also In re Neagle*, 135 U.S. 1, 75 (1890) (holding that California murder law could not be applied to prosecute a federal officer "for an act which he was authorized to do by the law of the United States"). The Constitution's command that federal law prevails over contrary state law thus necessarily entails that valid presidential action preempts and displaces conflicting state law. *See In re Neagle*, 135 U.S. at 62 ("While [the federal government] is limited in the number of its powers, so far as its sovereignty extends[,] it is supreme."); *see, e.g.*, *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 416 (2003) (concluding that executive agreements, which do not require congressional approval, "are fit to preempt state law, just as treaties are").

Presidential preemption is most likely to arise when "the President acts pursuant to an express or implied authorization of Congress." *Youngstown Sheet & Tube Co.*, 343 U.S. at 635 (Jackson, J., concurring). In such circumstances, the President's authority to regulate "is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Id.* That is, when Congress authorizes the President to act, the President may do so in a way that shunts aside conflicting state enactments, provided he acts within the scope of the congressional authorization or his independent constitutional authority.

Like regulations issued by agencies, executive orders authorized by the Constitution or a federal statute may preempt state law. As the Supreme Court has explained, executive orders "may create rights protected against inconsistent state laws through the Supremacy Clause," especially when such orders are issued pursuant to "congressional authorization." *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 273 n.5 (1974) (citing *Youngstown Sheet & Tube Co.*, 343 U.S. at 635–37 (Jackson, J., concurring)). Our Office, too, has long recognized an executive order "can of course have the force and effect of law," "particularly" if it "rests on specific statutory authority." Memorandum for Phyllis Coven, Deputy Associate Attorney General, Office of the

6

*Preemptive Effect of DPA Order*

Associate Attorney General, from Daniel L. Koffsky, Acting Assistant Attorney General, Office of Legal Counsel, *Re:* Matter of Chu *and* Matter of Tsun at 17 n.15 (July 1, 1993). Thus, when an executive order is authorized by the Constitution or a federal statute (or both), "it can be enforced by the government against private parties and may preempt conflicting state law." Kevin M. Stack, *The Statutory President*, 90 Iowa L. Rev. 539, 551 (2005) (footnotes omitted); *see also, e.g.*, *League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 171 (D.D.C. 2025).

Importantly, Congress need not mention preemption by name when authorizing the President to displace state law. Rather, Congress may authorize the President to preempt state law simply by conferring upon him regulatory power. *See, e.g.*, *Letter Carriers*, 418 U.S. at 273 n.5. When determining whether Congress has delegated such authority to the Executive Branch, courts simply "interpret the statute," "without any presumption one way or the other" about preemption. *FERC*, 535 U.S. at 18. "In other words, we must interpret the statute to determine whether Congress has given [the Executive Branch] the power to act," using ordinary principles of statutory interpretation. *Id.* As with any statute authorizing the Executive Branch to regulate pursuant to flexible statutory terms, courts must identify "the best reading of [the] statute" and "effectuate the will of Congress" as expressed by the text. *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2263 (2024).

In sum, executive orders may preempt state law when the President's regulatory power stems from either congressional authorization or the Constitution itself.

## B.

Executive orders, like statutes, may preempt state law in one of two ways: expressly or by implication.

Start with express preemption, which operates "through express language" in a presidential order or statute declaring certain state laws preempted. *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376 (2015); *see, e.g.*, *Preemption of State and Local Requirements Under a PREP Act Declaration*, 45 Op. O.L.C. __, at *4–10 (Jan. 19, 2021). In some prior cases, the Court would begin its preemption analysis "with the assumption

50 Op. O.L.C. __ (Mar. 3, 2026)

that the historic police powers of the States are not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress," especially when Congress "legislated in a field traditionally occupied by the States." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) (cleaned up). Today, however, at least when a "statute contains an express pre-emption clause," the Court does "not invoke any presumption against preemption but instead focus[es] on the plain wording of the clause." *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016) (cleaned up).[3] Of course, the existence of an express preemption clause "does not immediately end the inquiry" into a federal law's preemptive effect. *Altria Grp.*, 555 U.S. at 76. "[T]he question of the substance and scope of [the] displacement of state law still remains." *Id.* Determining the scope of an express preemption provision turns on "the plain wording of the clause." *Chamber of Com. of the U.S. v. Whiting*, 563 U.S. 582, 594 (2011) (citation omitted).

Although express preemption clauses often "appear to operate directly on the States," their preemptive effect in truth operates by conferring on private parties "a federal right to engage in certain conduct subject only to certain (federal) constraints." *Murphy*, 584 U.S. at 478–79. Federal law regulating medical devices intended for human use, for example, expressly preempts state law by declaring that no state may establish "any requirement . . . which is different from, or in addition to, any requirement applicable under this chapter to the device." 21 U.S.C. § 360k(a). This provision appears to operate directly on states, but it actually confers on medical-device manufacturers a federal right to be free from requirements other than those imposed by the federal government.

Implied preemption operates in much the same way. "This mechanism is shown most clearly in cases involving 'conflict preemption.'" *Murphy*, 584 U.S. at 478. When federal law confers a right or imposes a restriction on regulated parties, "state law is pre-empted to the extent that it actually conflicts with federal law." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990). Thus, "when a regulated party cannot comply with both federal

---

[3] *See also, e.g.*, *Carson v. Monsanto Co.*, 72 F.4th 1261, 1267 (11th Cir. 2023) (en banc); *Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1101 (9th Cir. 2024). *But see AbbVie, Inc. v. Fitch*, 152 F.4th 635, 645 (5th Cir. 2025) (per curiam) (continuing to apply the presumption); *Nwauzor v. GEO Grp., Inc.*, 127 F.4th 750, 767–68 (9th Cir. 2025) (same).

8

*Preemptive Effect of DPA Order*

and state directives, the Supremacy Clause tells us the state law must yield." *Martin v. United States*, 145 S. Ct. 1689, 1700 (2025); *see also Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1672 (2019). The Supreme Court has found conflict preemption where, for example, it was impossible for a pharmaceutical company to "comply with both its state-law duty to strengthen the warnings" on the label for one of its drugs "and its federal-law duty not to alter" the label for that same drug. *Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 480 (2013).

There are other forms of implied preemption, which we need not dwell on here. Field preemption, for instance, "occurs when federal law occupies a 'field' of regulation 'so comprehensively that it has left no room for supplementary state legislation.'" *Murphy*, 584 U.S. at 479 (quoting *R.J. Reynolds Tobacco Co. v. Durham County*, 479 U.S. 130, 140 (1986)). And obstacle preemption contemplates the displacement of state law "where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives" of federal law. *Arizona v. United States*, 567 U.S. 387, 399 (2012) (citation and internal quotation marks omitted). But we need not address those theories today; when an executive order expressly or by conflict preempts state law, resort to these other theories of implied preemption is unnecessary.

### III.

The President may expressly or by conflict preempt certain state laws by issuing an order under the DPA. We first situate the DPA within the broader context of national-defense laws, explaining why it authorizes the President to preempt state law. We then identify the particular provisions that would most likely allow the President to preempt state law in the circumstances presented here.

### A.

"It is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation." *Haig v. Agee*, 453 U.S. 280, 307 (1981) (quoting *Aptheker v. Sec'y of State*, 378 U.S. 500, 509 (1964)). "Recognizing this fact, the Framers listed 'providing for the common defence' as a motivating purpose for the Constitution," *Wayte v. United States*, 470 U.S. 598, 612 (1985) (cleaned up), conferring on the federal

9

50 Op. O.L.C. __ (Mar. 3, 2026)

government a "complete delegation of authority" to ensure the Nation's safety, *Torres v. Tex. Dep't of Pub. Safety*, 142 S. Ct. 2455, 2463 (2022). This power is not "limited to the 'context of an actual war.'" *Id.* at 2465 (citation omitted). It also includes the authority to act prophylactically—the government may act to secure the national defense well before the country's safety is in peril. *Cf. Dennis v. United States*, 341 U.S. 494, 509 (1951) ("Obviously, the words cannot mean that before the Government may act, it must wait until the putsch is about to be executed, the plans have been laid and the signal is awaited." (emphasis omitted)). Because national defense is vested exclusively in the federal government, "the structure of the Constitution prevents States from frustrating national objectives in this field." *Torres*, 142 S. Ct. at 2464. Even legitimate state interests generally must yield to the common defense of the Nation, for the Constitution "is not a suicide pact." *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 160 (1963).

In providing for the common defense, Congress and the President have "time and again, as exigencies arose," taken actions that have displaced ordinary state laws, such as those pertaining to property or torts. *Bank Markazi v. Peterson*, 578 U.S. 212, 235 (2016). Following World War II, for example, the Renegotiation Act allowed the federal government "to recover excess profits" on wartime contracts—even with respect to contracts between two private parties rather than only those "made directly with the Government." *Lichter v. United States*, 334 U.S. 742, 788–89 (1948). The Court upheld "the right of the Government to recover excess profits on" such contracts, *id.* at 789, emphasizing the wartime exigencies that necessitated the legislation, *see id.* at 754–72. The Court subsequently sustained President Carter's decision to nullify attachments and liens on Iranian assets in the United States and to direct that those assets be transferred to Iran. *See Dames & Moore v. Regan*, 453 U.S. 654, 660, 674 (1981). In doing so, the Supreme Court emphasized that the International Emergency Economic Powers Act ("IEEPA"), Pub. L. No. 95-223, 91 Stat. 1626, "delegate[d] broad authority to the President to act in times of national emergency with respect to property of a foreign country." 453 U.S. at 677. And because IEEPA authorized the actions taken, the Court upheld the nullification of the attachments and the transfer of the assets, traditional property rules notwithstanding. *Id.* at 674.

10

*Preemptive Effect of DPA Order*

Modelled on "the First and Second War Powers Acts of 1941 and 1942, which gave the [E]xecutive [B]ranch broad authority to regulate industry during World War II," the DPA is yet another example of Congress delegating to the President powers to regulate domestic policy for the national defense. Alexandra G. Neenan, Cong. Rsch. Serv., R43767, *The Defense Production Act of 1950: History, Authorities, and Considerations for Congress* at 2 (updated Oct. 6, 2023), https://www.congress.gov/crs-product/R43767 [https://perma.cc/S6L9-UUJE]. The DPA differs from those earlier statutes, however, in one key respect: Although its predecessor statutes conferred sweeping authority upon the President during wartime, the DPA "is not an 'emergency' statute." *Legal Authorities Available to the President to Respond to a Severe Energy Supply Interruption or Other Substantial Reduction in Available Petroleum Products*, 6 Op. O.L.C. 644, 662 (1982) ("*Energy Supply Interruption*"). Instead, it includes power to act prophylactically. Congress recognized that "the security of the United States is dependent on the ability of the domestic industrial base to supply materials and services for the national defense." 50 U.S.C. § 4502(a)(1). The Act thus vests "the President with an array of authorities," all designed "to maintain and enhance the domestic industrial base." *Id.* § 4502(a)(4). The President may use those authorities "whether or not an 'emergency' situation exists." *Energy Supply Interruption*, 6 Op. O.L.C. at 662.

The DPA confers "broad and flexible" authority on the President to regulate private parties and preempt contrary state law. *Id.* (quoting H.R. Rep. No. 81-2759, at 4 (1950)). In general terms, section 4511 authorizes the President to control the distribution of materials, services, and facilities, and to require entities to prioritize the performance of some contracts over others, as "necessary or appropriate to promote the national defense" or "to maximize domestic energy supplies." 50 U.S.C. § 4511(a), (c). And because the President may regulate and direct private conduct when exercising such authority, he may also necessarily displace contrary state law.

And lest there be any doubt, the DPA makes explicit that orders issued pursuant to the Act displace state-law liability. It provides that "[n]o person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to this chapter." *Id.* § 4557. Such immunity

11

50 Op. O.L.C. __ (Mar. 3, 2026)

from liability exists even when the related DPA rule, regulation, or order is subsequently "declared by judicial or other competent authority to be invalid." *Id.* Section 4557 is an express preemption provision, even though it does not appear to operate directly on state law. *See Murphy*, 584 U.S. at 478. "It confers on private entities . . . a federal right to engage in certain conduct"—conduct required by a DPA order—"subject only to certain (federal) constraints," not constraints imposed by state law. *Id.* at 478–79.

The provisions in section 4511 authorizing the President to issue regulatory (and thus preemptive) orders are united by a central principle: necessity. At a high level, section 4511(a) allows the President to require the prioritized performance of certain contracts or to allocate materials and other resources as he considers "necessary or appropriate to promote the national defense." 50 U.S.C. § 4511(a)(1)–(2). Section 4511(c) similarly allows the President to require the priority performance of certain contracts or allocate materials and resources "in order to maximize domestic energy supplies." *Id.* § 4511(c)(1). Ensuring the availability of such energy supplies, the DPA makes clear, is "necessary and appropriate" to secure "national defense preparedness." *Id.* § 4502(a)(5).

Necessity has long functioned as a defense to private liability under state law. When an otherwise tortious action—like trespass or conversion—is necessary to avoid "public disaster," the actor will not be held liable under tort law. *See* Restatement (Second) of Torts § 196 (1965) (trespass); *id.* § 262 (conversion); *see also id.* § 892D (describing the emergency doctrine). Necessity similarly excuses contractual nonperformance when supervening events make performance impracticable or frustrate the contract's purpose. *See* Restatement (Second) of Contracts § 261 (1981) (discharge by supervening impracticability); *id.* § 265 (discharge by supervening frustration). And force majeure clauses typically "relieve a party from its contractual duties when its performance has been prevented by a force beyond its control." *JN Contemp. Art LLC v. Phillips Auctioneers LLC*, 29 F.4th 118, 123 (2d Cir. 2022) (citation omitted). Necessity even may excuse liability for criminal conduct: "Every American jurisdiction, without exception, has adopted the necessity defense in its criminal jurisprudence." Shaun P. Martin, *The Radical Necessity Defense*, 73 U. Cin. L. Rev. 1527, 1535 (2005).

*Preemptive Effect of DPA Order*

The DPA operates on parallel logic to preempt state private law. When compliance with a presidential DPA order would otherwise violate state law—whether by causing tortious injury or breaching contractual obligations—the Act displaces that liability in the name of national defense. *See* 50 U.S.C. § 4557. Indeed, the DPA expressly contemplates reprioritizing contractual commitments for national-defense interests, notwithstanding that doing so may cause a party to breach its obligations under state contract law. *See id.* § 4511(a)(1), (c).

The DPA's displacement of state regulatory law follows from the same principle. State regulation often accomplishes *ex ante* what private law accomplishes *ex post*—the mitigation of social costs. *See* Susan Rose Ackerman, *Regulation and the Law of Torts*, 81 Am. Econ. Rev. 54, 54 (1991). The means are different, but the purpose is the same. For example, a state licensing regime and common-law negligence each address the risk of substandard professional conduct. Environmental regulations and common-law nuisance claims each address pollution and its harmful effects. *Cf.* Samuel Issacharoff, *Regulating After the Fact*, 56 DePaul L. Rev. 375, 380 (2007) ("The key is that both ex ante and ex post review are essential parts of the regulatory model—sometimes operating in tandem, sometimes as substitutes." (emphasis omitted)). The DPA contemplates the preemption of *ex ante* regulations much as it contemplates the preemption of *ex post* private-law remedies, all in the name of necessity. After all, although the interests protected by state regulation are doubtlessly important, "[f]ew interests can be more compelling than a nation's need to ensure its own security." *Wayte*, 470 U.S. at 611.

"Necessity" is not, of course, a constitutional prerequisite for Congress to confer on the President preemptive authority. But the Act functions as the Nation's necessity defense to state law. And under the DPA, the President possesses broad discretion to determine when to invoke that immunity, *see* 50 U.S.C. § 4511(a), (c), for it is the President who possesses the institutional competence to make such judgments on behalf of the Nation, *see id.* § 4502(a)(4); *see also Holder v. Humanitarian L. Project*, 561 U.S. 1, 33 (2010) (emphasizing the need to defer to the "evaluation of the facts by the Executive" in the national-security context).

13

50 Op. O.L.C. __ (Mar. 3, 2026)

Moreover, such a finding of necessity is likely immune from judicial review under the Administrative Procedure Act ("APA") and other statutes, even if the Secretary makes the determination by exercising delegated presidential power.[4] Under the APA, "agency action is not subject to judicial review to the extent that such action is committed to agency discretion by law." *Lincoln v. Vigil*, 508 U.S. 182, 190–91 (1993) (citation and internal quotation marks omitted). Review of an agency determination "is not to be had in those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Id.* at 191 (citation and internal quotation marks omitted). Section 4511(a) clearly commits action to the discretion of the President or his delegee, allowing the decisionmaker to allocate materials "to such extent as *he shall deem* necessary or appropriate." 50 U.S.C. § 4511(a)(2) (emphasis added); *see also id.* § 4511(a)(1). In *Webster v. Doe*, the Supreme Court construed similar language to preclude APA review. 486 U.S. 592 (1988). The provision at issue allowed "termination of [a Central Intelligence] Agency employee whenever the Director 'shall *deem* such termination necessary or advisable in the interests of the United States,' not simply when the dismissal *is* necessary or advisable to those interests." *Id.* at 600 (emphases in original). The Court concluded that this provision "foreclose[d] the application of any meaningful judicial standard of review." *Id.* So too here, especially given the national-security context, where the Executive Branch traditionally wields broad and often-unreviewable discretion. *See Dep't of the Navy v. Egan*, 484 U.S. 518, 527, 529–30 (1988); *Lee v. Garland*, 120 F.4th 880, 886 (D.C. Cir. 2024).

## B.

As we have emphasized, the DPA immunizes entities from liability "for damages or penalties" stemming from "any act or failure to act resulting directly or indirectly from compliance" with an order issued under the Act. 50 U.S.C. § 4557. Three provisions of 50 U.S.C. § 4511 authorize the President to direct that Sable resume production of the SYU and

---

[4] The APA does not apply to the President, although "the President's actions may still be reviewed for constitutionality." *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992).

14

*Preemptive Effect of DPA Order*

operate the associated pipeline infrastructure. An order issued under one of these provisions could preempt state law either expressly or by conflict. We address these provisions in the order best suited to our analysis: We start with the President's allocation authority under section 4511(a)(2); we then discuss his prioritization authority under section 4511(a)(1); and we conclude with his energy-production authority under section 4511(c).

## 1.

We consider first the President's allocation authority under section 4511(a)(2). That provision authorizes the President "to allocate materials, services, and facilities in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate to promote the national defense." 50 U.S.C. § 4511(a)(2). The term "materials" encompasses "any raw materials (including minerals, metals, and advanced processed materials), commodities, articles, components (including critical components), products, and items of supply," as well as "any technical information or services ancillary to the use of any such materials, commodities, articles, components, products, or items." *Id.* § 4552(13). The term "services" includes "any effort that is needed for or incidental to": (A) "the development, production, processing, distribution, delivery, or use of an industrial resource or a critical technology item"; (B) "the construction of facilities"; (C) "the movement of individuals and property by all modes of civil transportation"; or (D) "other national defense programs and activities." *Id.* § 4552(16).[5] And the "term 'facilities' includes all types of buildings, structures, or other improvements to real property . . . , and services relating to the use of any such building, structure, or other improvement." *Id.* § 4552(8). In the light of these broad definitions, we have previously opined that this section could "be used to facilitate petroleum transportation," such as "by requiring pipelines, marine terminals, and other facilities to perform oil transport contracts necessary or appropriate to promote the national defense." *Energy Supply Interruption*, 6 Op. O.L.C. at 665.

---

[5] Moreover, the phrase "industrial resources" as used in the Act means "materials, services, processes, or manufacturing equipment (including the processes, technologies, and ancillary services for the use of such equipment) needed to establish or maintain an efficient and modern national defense industrial base." 50 U.S.C. § 4552(12).

15

50 Op. O.L.C. __ (Mar. 3, 2026)

The President could expressly preempt California law through an order issued under this section. Section 4511(a)(2) authorizes the President to allocate materials, services, and facilities "in such manner" and "to such extent as he shall deem necessary or appropriate to promote the national defense." 50 U.S.C. § 4511(a)(2). This sweeping language allows the President to preempt contrary state law by ordering Sable to produce the recoverable oil located on the SYU and transport such production to the California refinery complex using the Santa Ynez Pipeline System. That conclusion follows directly from the capacious definitions of "materials," "services," and "facilities." *See id.* § 4552(8), (13), (16). The production and transportation of such oil—a "material"—is plainly a "service" within the meaning of the Act. *See id.* § 4552(13), (16). The Santa Ynez Pipeline System is, in our view, a facility within the meaning of the DPA, because it is an "improvement[] to real property," and operation of the pipeline system is a service "relating to the use" of that improvement. *Id.* § 4552(8). A DPA order could thus declare on its face that particular California environmental regulations, permitting requirements, or other restrictions are preempted with respect to Sable's production on the SYU and operation of the Santa Ynez Pipeline System. Indeed, if the President were to find that Sable being noncompliant with particular state laws is "necessary" to promote the national defense, *id.* § 4511(a)(2), he could instruct Sable to disregard state laws that would otherwise frustrate its obligations under the order.

One might suggest that the word "allocate" in section 4511(a)(2) allows the President only to *distribute* resources, not to compel their production. But that reading ignores critical statutory language. Section 4511(a)(2) authorizes the President to allocate not just materials but also "services"—which the Act defines to include "any effort that is needed for or incidental to" the "development" or "production" of "an industrial resource." *Id.* § 4552(16). The President's power to allocate services thus includes the power to allocate productive capacity itself. Moreover, section 4511(a)(2) grants the President discretion to allocate services "in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate," *id.* § 4511(a)(2), making clear that the President may determine how and to what degree to allocate productive capacity. That discretion necessarily entails the authority to compel production, not just to allocate materials that already exist. *See, e.g.*,

16

*Preemptive Effect of DPA Order*

*Johnson v. Tyson Foods, Inc.*, 580 F. Supp. 3d 382, 389 (N.D. Tex. 2022) (holding that the President's allocation authority under the DPA allowed him to require meat facilities to remain open during the COVID-19 pandemic and preempt state tort law); *see also Reed v. Tyson Foods, Inc.*, No. 21-cv-01155, 2021 WL 5107725, at *6 (W.D. Tenn. Nov. 3, 2021) ("Because the purpose of the DPA cannot otherwise be accomplished while allowing states to implement their own, potentially inconsistent policy decisions for meat and poultry processor operations during the COVID-19 pandemic, the state law must yield." (cleaned up)). Indeed, an allocation order can "require[] a person to take or refrain from taking certain actions," including with respect to production of a resource. 15 C.F.R. § 700.33(b).

Our reading is also consistent with the DPA's context and history. The Act was modeled on the War Powers Acts, which conferred on the President sweeping authority to regulate industry during wartime. *See* Neenan, *supra*, at 2. And a critical component of wartime authority is ensuring adequate productive capacity. The DPA supplies comparable authority but before the outbreak of any conflict. When enacting the DPA, Congress found "the development of domestic productive capacity" critical for ensuring the national defense, 50 U.S.C. § 4502(a)(3), and similarly found it necessary "to assure the availability of domestic energy supplies," *id.* § 4502(a)(5). These congressional findings would mean little if the President could only shuffle existing inventory rather than direct facilities to produce energy.[6]

We emphasize that the precise preemptive scope of a presidential order would depend upon the language employed in relation to the obligations imposed by state law. We cannot opine on the preemptive reach of an order not yet drafted. Moreover, because "hypothetical or potential conflict is insufficient" to preempt state law by conflict, the wording

---

[6] The President's authority to compel production is even more pronounced under section 4511(c), which allows the President to use the allocation power "in order to maximize domestic energy supplies." 50 U.S.C. § 4511(c)(1). We discuss section 4511(c) in greater detail below, but the word "allocate" must be "given more precise content by the neighboring words with which it is associated," *Fischer v. United States*, 144 S. Ct. 2176, 2183 (2024) (citation omitted), and "identical words and phrases within the same statute should normally be given the same meaning," *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007).

17

50 Op. O.L.C. __ (Mar. 3, 2026)

of any DPA order will affect the scope of conflict preemption. *Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982).[7] According to Sable, "California agencies have deployed an array of state measures . . . to block pipeline operations," including "[enforcement of California] SB 237, the state waiver process, novel interpretations of state agency jurisdiction and authority, [and] excessive delay in granting a long-term easement through a state park for an existing pipeline." Sable Letter at 6. If such state measures make it impossible for Sable immediately to resume production and distribution of oil located on the SYU, they would be displaced as a matter of conflict preemption if a presidential order directed Sable to resume production immediately. Such an order would "irreconcilably conflict" with the terms of California state law. *Merck Sharp & Dohme Corp.*, 139 S. Ct. at 1679 (cleaned up).

**2.**

The President's prioritization authority under section 4511(a)(1) also allows him to preempt state law. Section 4511(a)(1) authorizes the President "to require that performance under contracts or orders" that "he deems necessary or appropriate to promote the national defense shall take priority over performance under any other contract or order." 50 U.S.C. § 4511(a)(1). Recall that "[i]n executing a contract under the DPA, a contractor is not liable for actions taken to comply with" a presidential order issued pursuant to the Act. Neenan, *supra*, at 6. Moreover, the President can also "prioritize the performance of contracts between two private parties." *Id.*

The President could issue an order under section 4511(a)(1) to expressly preempt certain state laws that, in the President's judgment, would impair or delay prioritized contract performance. *See E. Air Lines, Inc. v.*

---

[7] The DPA immunizes entities from liability for any act "resulting directly *or indirectly* from compliance" with an order issued under the Act. 50 U.S.C. § 4557 (emphasis added). It is thus possible that a DPA order might preempt state law to the extent that an entity's compliance with that order would result—even indirectly—in a breach of state law. Section 4557's immunity for acts resulting indirectly from compliance with a DPA order suggests that Congress anticipated that DPA orders might engender conflict with other legal obligations, even where dual compliance remains technically possible. But it is not necessary for us in answering your question to decide whether the DPA in effect lowers the standard for conflict preemption, so we do not decide it here.

18

*Preemptive Effect of DPA Order*

*McDonnell Douglas Corp.*, 532 F.2d 957, 993 (5th Cir. 1976) ("Congress intended to accord the Executive Branch great flexibility in molding its priorities policies to the frequently unanticipated exigencies of national defense."). The President could, for instance, instruct that Sable's contracts for oil production and transportation take priority over Sable's other contractual obligations and expressly preempt California environmental regulations insofar as they would impede that prioritized performance. By naming the preempted state laws on the face of the order, the President would eliminate any doubt about which legal requirements must give way to defense needs under the terms of the order.

An order issued under section 4511(a)(1) might also displace state contract law—which is often judge-made rather than statutory—by conflict. If the President requires that performance of certain contracts be prioritized over performance under any other contract or purchase order, state law rendering that prioritization impossible would be preempted. *Cf.* Memorandum for the Files, from Henry C. Whitaker, Principal Deputy Assistant Attorney General, Office of Legal Counsel, *Use of the Defense Production Act and the International Emergency Economic Powers Act to Regulate Industry During the Early Stages of the COVID-19 Pandemic* at 5–6 (Jan. 18, 2021). As we have explained, conflict preemption is a demanding standard; if Sable could prioritize the designated contracts while also complying with state law, state law would not necessarily be preempted. *But cf.* 50 U.S.C. § 4557 (shielding entities from liability for any act "resulting directly or indirectly from compliance" with a DPA order). But if state law would render Sable incapable of prioritizing the designated contracts, that state law would be displaced.

### 3.

Finally, section 4511(c) allows the President to preempt state law by wielding the allocation and prioritization powers "to maximize domestic energy supplies"—even in the absence of a national-defense finding. *See Energy Supply Interruption*, 6 Op. O.L.C. at 668 (citation omitted).[8]

---

[8] When updating our 1982 advice about the DPA in 2021, we wrote that "the powers granted in" section 4511 are "limited by" section 4511(b). Memorandum for Stuart F. Delery, Deputy Counsel to the President, Executive Office of the President, from Martin S. Lederman, Deputy Assistant Attorney General, Office of Legal

50 Op. O.L.C. __ (Mar. 3, 2026)

Section 4511(c) allows the President, upon making certain other findings, to "require the allocation of, or the priority performance under contracts or orders . . . relating to, materials, equipment, and services in order to maximize domestic energy supplies." 50 U.S.C. § 4511(c)(1). The words "materials" and "services" have the same capacious meanings as described above. *See id.* § 4552(13), (16).

The preemption analysis under section 4511(c) parallels that of the two provisions described above. In a directive requiring Sable to resume production and distribution of oil from the SYU, the President could exempt Sable from compliance with particular state laws, especially if the President were to find that compliance with such laws would threaten the ability to "maximize domestic energy supplies." *Id.* § 4511(c)(1). At minimum, an executive order would displace conflicting California law under traditional conflict-preemption principles, with the scope of preemption turning on the order's specific terms.

## IV.

State law, we have been advised, is not currently the only impediment to Sable's ability to resume production and transportation of oil. A consent decree entered in *United States v. Plains All American Pipeline L.P.*, No. 20-cv-02415 (C.D. Cal. Oct. 14, 2020), Dkt. 33 ("Consent Decree"), "currently vests authority over resumption of transportation through the onshore portions of the Santa Ynez Pipeline System with the California Office of the State Fire Marshal." Sable Letter at 9. We have been advised that Sable assumed by contract certain obligations under the Consent Decree.[*] Assuming for the sake of our analysis that provisions of the Consent Decree could be enforced against Sable, you have asked whether

---

Counsel, *Re: Preliminary Review of Possible Legal Authorities Related to the Cyberattack Targeting the Colonial Pipeline* at 10 (May 12, 2021). But section 4511(c)(1) applies "[n]otwithstanding any other provision of this chapter." 50 U.S.C. § 4511(c)(1). To the extent that our more recent advice inadvertently suggested that section 4511(b) would limit the President's authority under section 4511(c), we take this opportunity to disclaim that suggestion.

[*] Editor's note: As originally issued on March 3, 2026, this opinion mistakenly referred to Sable as a party to the Consent Decree. We have since confirmed that, although Sable assumed by contract certain obligations under the Consent Decree, it was not and is not party to the Consent Decree.

*Preemptive Effect of DPA Order*

an executive order under the DPA would displace these provisions of the Consent Decree, even though there are both federal- and state-law claims at issue in that case. For three reasons, we think it would.

*First*, section 4557 would likely immunize Sable from needing to satisfy these provisions of the Consent Decree if acting to comply with a DPA order. The Consent Decree includes a "stipulated penalties" provision for violations of its requirements. *See* Consent Decree at 27. But section 4557 provides that "[n]o person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to this chapter." 50 U.S.C. § 4557. Thus, Sable would be immune from any penalties—including those imposed under the Consent Decree—for "any act or failure to act resulting directly or indirectly from compliance with" a DPA order. *Id.*

Section 4557 would also immunize Sable from liability for contempt under such circumstances. *See* Consent Decree at 39 (leaving "contempt" open as a sanction for violations). Civil contempt sanctions are "penalties designed to compel future compliance" with a consent decree. *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994); *see also Lackey v. Stinnie*, 145 S. Ct. 659, 671 (2025) ("Violation of a consent decree is enforceable by a citation for contempt."). Civil contempt sanctions can take the form of monetary fines or sentences of imprisonment. *See Hicks ex rel. Feiock v. Feiock*, 485 U.S. 624, 631–32 (1988). Monetary fines to compel future compliance with the Consent Decree here, of course, may not be imposed for any act or omission resulting from compliance with a DPA order. *See* 50 U.S.C. § 4557. So too for sentences of imprisonment imposed for the same reason. The word "penalty" meant "a punishment imposed or incurred for a violation of law or rule." *The American College Dictionary* 895 (1948 ed.); *see also Webster's New Collegiate Dictionary* 621 (2d ed. 1956) ("*Webster's*"); *The Oxford Universal Dictionary* 1462 (3d ed. 1955). Nor was the word "liable" limited to monetary liability. *See, e.g.*, *Webster's* at 484 ("Bound or obliged by law or submission to other forces; answerable"). And limiting the word "penalties" to only monetary fines would be incongruous with the rest of section 4557 and the DPA more broadly, which ensure that the President can displace impediments to productive capacity when necessary. Indeed,

21

50 Op. O.L.C. __ (Mar. 3, 2026)

it would be anomalous to think that section 4557 forbids the imposition of monetary fines but not the harsher penalty of imprisonment.

*Second*, a DPA order could constitute a force majeure under the Consent Decree. In particular, the Consent Decree defines a force majeure "as any event arising from causes beyond the control of Defendants . . . that delays or prevents the performance of any obligation under this Consent Decree despite Defendants' best efforts to fulfill the obligation." Consent Decree at 35. The issuance of a DPA order would likely constitute an "event" arising from causes beyond the control of Sable, and complying with the order might delay or prevent the performance of Sable's obligations under the Consent Decree.

*Third*, the issuance of a DPA order might also constitute changed circumstances sufficient to require modification of the Consent Decree. A consent decree "must" be modified if one of its obligations "has become impermissible under federal law." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 388 (1992). And as we have explained, a DPA order has the force of federal law. If a DPA order requires Sable to take an action that is prohibited by the Consent Decree, the Consent Decree likely must be modified.

\* \* \* \* \*

The DPA authorizes the President to regulate private entities in ways that may be inconsistent with state law. An order issued under that authority could preempt state law either expressly or by conflict. And it may displace certain provisions of the Consent Decree described above, including those vesting authority over resumption of transportation with the California Office of the State Fire Marshal.

T. ELLIOT GAISER
*Assistant Attorney General*
*Office of Legal Counsel*

# EXHIBIT C

| | |
|---|---|
| **From:** | Jeremy Frankel |
| **To:** | Trevor D. Large; "Michael S Dorsi"; Julie Teel Simmonds; Dintzer, Jeffrey; Stanton, Garrett; Hanelin, Benjamin J.; Moore, DJ; Rogers, Natalie C.; Victoria Diffenderfer; Myung J. Park; Matthew Bullock |
| **Cc:** | Linda Krop; David Pettit; Talia Nimmer; Andrew Nettesheim; Matthew Bullock; Myung J. Park; Annadel Almendras |
| **Subject:** | RE: CBD v OSFM; EDC v OSFM - Ex Parte Notice - UPDATE |
| **Date:** | Sunday, March 15, 2026 9:05:59 AM |
| **Attachments:** | image003.png |
| | image004.png |
| | image005.png |
| | image006.png |
| | image007.png |

**EXTERNAL SENDER – Proceed with caution**

Trevor,

Petitioners in both 25CV02244 and 25CV02247 intend to oppose.

Thanks,



**JEREMY FRANKEL (he/him/his)**
STAFF ATTORNEY
906 Garden Street
Santa Barbara, CA 93101
805.963.1622 x100
www.EnvironmentalDefenseCenter.org

  

We recognize that EDC sits on occupied, unceded, stolen lands of the Chumash Peoples, on Shmuwich Territory, who have called this area home for time immemorial. We commit today to make space to elevate indigenous voices and support our local Chumash and indigenous communities in our work to protect our environment.

CONFIDENTIALITY NOTE: The information contained in this communication may be confidential, is intended only for the use of the recipient named above, and may be legally privileged. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please re-send this communication to the sender and delete the original message and any copy of it from your computer system. Thank you.

**From:** Trevor D. Large <TLarge@flasllp.com>
**Sent:** Saturday, March 14, 2026 2:57 PM
**To:** 'Michael S Dorsi' <Michael.Dorsi@doj.ca.gov>; Jeremy Frankel <jfrankel@environmentaldefensecenter.org>; Julie Teel Simmonds <jteelsimmonds@biologicaldiversity.org>; Dintzer, Jeffrey <jeffrey.dintzer@alston.com>; Stanton, Garrett <garrett.stanton@alston.com>; Hanelin, Benjamin J. <benjaminhanelin@paulhastings.com>; Moore, DJ <djmoore@paulhastings.com>; Rogers, Natalie C. <natalierogers@paulhastings.com>;

Victoria Diffenderfer <vdiffenderfer@FLASllp.com>; Myung J. Park <Myung.Park@doj.ca.gov>; Matthew Bullock <Matthew.Bullock@doj.ca.gov>

**Cc:** Linda Krop <lkrop@environmentaldefensecenter.org>; David Pettit <dpettit@biologicaldiversity.org>; Talia Nimmer <tnimmer@biologicaldiversity.org>; Andrew Nettesheim <anettesheim@FLASllp.com>; Matthew Bullock <Matthew.Bullock@doj.ca.gov>; Myung J. Park <Myung.Park@doj.ca.gov>; Annadel Almendras <Annadel.Almendras@doj.ca.gov>

**Subject:** CBD v OSFM; EDC v OSFM - Ex Parte Notice - UPDATE

Counsel, this is an update on my prior notice communication:

 PLEASE TAKE NOTICE that Real Parties in Interest Sable Offshore Corporation ("Sable") and Pacific Pipeline Company ("PPC" and collectively "Real Parties") will appear and apply *ex parte* on Tuesday**, March 17, 2026 at 8:30 a.m. in Department 4 of the California Superior Court for the County of Santa Barbara, Anacapa Division, located at 1100 Anacapa Street, Santa Barbara, CA 93121-1107** to alert this Court to the Federal DPA and request this Court reconsider and rescind the Court's existing Preliminary Injunction due the DPA Order.  Please contact counsel for Real Parties by no later than 11:30 a.m. Monday, March 16, if you intend to oppose or object to Real Parties' *ex parte* application.

 Thank you for your courtesy and attention to this matter.

Trevor

**Trevor D. Large, Partner**

 Fauver · Large · Archbald · Spray

820 State Street, Fourth Floor
Santa Barbara, CA 93101
805.966.7716 (Direct)
805.966.7000 (Main)
TLarge@FLASllp.com

---

**From:** Trevor D. Large <tlarge@flasllp.com>
**Sent:** Friday, March 13, 2026 2:03 PM
**To:** 'Michael S Dorsi' <Michael.Dorsi@doj.ca.gov>; Jeremy Frankel <jfrankel@environmentaldefensecenter.org>; Julie Teel Simmonds <jteelsimmonds@biologicaldiversity.org>; Dintzer, Jeffrey <jeffrey.dintzer@alston.com>; Stanton, Garrett <garrett.stanton@alston.com>; Hanelin, Benjamin J. <benjaminhanelin@paulhastings.com>; Moore, DJ <djmoore@paulhastings.com>; Rogers, Natalie C. <natalierogers@paulhastings.com>; Victoria Diffenderfer <vdiffenderfer@FLASllp.com>; Myung J. Park <Myung.Park@doj.ca.gov>; Matthew Bullock <Matthew.Bullock@doj.ca.gov>
**Cc:** Linda Krop <lkrop@environmentaldefensecenter.org>; David Pettit <dpettit@biologicaldiversity.org>; Talia Nimmer <tnimmer@biologicaldiversity.org>; Andrew Nettesheim <anettesheim@FLASllp.com>; Matthew Bullock <Matthew.Bullock@doj.ca.gov>; Myung J. Park <Myung.Park@doj.ca.gov>; Annadel Almendras <Annadel.Almendras@doj.ca.gov>
**Subject:** RE: CBD v OSFM; EDC v OSFM - Ex Parte Notice

Counsel, please be advised that we have taken the Ex Parte hearing, referenced below, off calendar for Monday morning.  I apologize for any inconvenience and will let you know if there are any further updates.

Trevor

**Trevor D. Large, Partner**

 FAUVER · LARGE · ARCHBALD · SPRAY

820 State Street, Fourth Floor
Santa Barbara, CA 93101
805.966.7716 (Direct)
805.966.7000 (Main)
TLarge@FLASllp.com

---

**From:** Michael S Dorsi <Michael.Dorsi@doj.ca.gov>
**Sent:** Friday, March 13, 2026 11:28 AM
**To:** Jeremy Frankel <jfrankel@environmentaldefensecenter.org>; Trevor D. Large <tlarge@flasllp.com>; Julie Teel Simmonds <jteelsimmonds@biologicaldiversity.org>; Dintzer, Jeffrey <jeffrey.dintzer@alston.com>; Stanton, Garrett <garrett.stanton@alston.com>; Hanelin, Benjamin J. <benjaminhanelin@paulhastings.com>; Moore, DJ <djmoore@paulhastings.com>; Rogers, Natalie C. <natalierogers@paulhastings.com>; Victoria Diffenderfer <vdiffenderfer@FLASllp.com>; Myung J. Park <Myung.Park@doj.ca.gov>; Matthew Bullock <Matthew.Bullock@doj.ca.gov>
**Cc:** Linda Krop <lkrop@environmentaldefensecenter.org>; David Pettit <dpettit@biologicaldiversity.org>; Talia Nimmer <tnimmer@biologicaldiversity.org>; Andrew Nettesheim <anettesheim@FLASllp.com>; Matthew Bullock <Matthew.Bullock@doj.ca.gov>; Myung J. Park <Myung.Park@doj.ca.gov>; Annadel Almendras <Annadel.Almendras@doj.ca.gov>
**Subject:** RE: CBD v OSFM; EDC v OSFM - Ex Parte Notice

Counsel:

Respondents OSFM, et al. cannot commit to our final position supporting or opposing a motion without seeing the basis for the motion, including the moving papers.

However, we can say that our ordinary preference is against resolving key issues by ex parte application; the proper process is a noticed motion.

Due to the vagueness of the notice provided and to maintain all rights, we provide notice of our intent to oppose and object.

Best,

Michael S. Dorsi
Deputy Attorney General
Natural Resources Law Section
California Attorney General's Office
(415) 510-3802

---

**From:** Jeremy Frankel <jfrankel@environmentaldefensecenter.org>
**Sent:** Friday, March 13, 2026 10:10 AM
**To:** Trevor D. Large <tlarge@flasllp.com>; Julie Teel Simmonds <jteelsimmonds@biologicaldiversity.org>; Dintzer, Jeffrey <jeffrey.dintzer@alston.com>; Stanton, Garrett <garrett.stanton@alston.com>; Hanelin, Benjamin J. <benjaminhanelin@paulhastings.com>; Moore, DJ <djmoore@paulhastings.com>; Rogers, Natalie C. <natalierogers@paulhastings.com>; Victoria Diffenderfer <vdiffenderfer@FLASllp.com>; Michael S Dorsi <Michael.Dorsi@doj.ca.gov>; Myung J. Park <Myung.Park@doj.ca.gov>; Matthew Bullock <Matthew.Bullock@doj.ca.gov>
**Cc:** Linda Krop <lkrop@environmentaldefensecenter.org>; David Pettit <dpettit@biologicaldiversity.org>; Talia Nimmer <tnimmer@biologicaldiversity.org>; Andrew Nettesheim <anettesheim@FLASllp.com>
**Subject:** RE: CBD v OSFM; EDC v OSFM - Ex Parte Notice

> **EXTERNAL EMAIL:** This message was sent from outside DOJ. Please do not click links or open attachments that appear suspicious.

Hi Trevor,

Petitioners in both 25CV02244 and 25CV02247 intend to oppose.

Thanks,



**JEREMY FRANKEL (he/him/his)**
STAFF ATTORNEY
906 Garden Street
Santa Barbara, CA 93101
805.963.1622 x100
www.EnvironmentalDefenseCenter.org



We recognize that EDC sits on occupied, unceded, stolen lands of the Chumash Peoples, on Shmuwich Territory, who have called this area home for time immemorial. We commit today to make space to elevate indigenous voices and support our local Chumash and indigenous communities in our work to protect our environment.

CONFIDENTIALITY NOTE: The information contained in this communication may be confidential, is intended

only for the use of the recipient named above, and may be legally privileged. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please re-send this communication to the sender and delete the original message and any copy of it from your computer system. Thank you.

---

**From:** Trevor D. Large <tlarge@flasllp.com>
**Sent:** Friday, March 13, 2026 9:54 AM
**To:** Julie Teel Simmonds <jteelsimmonds@biologicaldiversity.org>; Dintzer, Jeffrey <jeffrey.dintzer@alston.com>; Stanton, Garrett <garrett.stanton@alston.com>; Hanelin, Benjamin J. <benjaminhanelin@paulhastings.com>; Moore, DJ <djmoore@paulhastings.com>; Rogers, Natalie C. <natalierogers@paulhastings.com>; Victoria Diffenderfer <vdiffenderfer@FLASllp.com>; Michael S Dorsi <michael.dorsi@doj.ca.gov>; Myung J. Park <myung.park@doj.ca.gov>; Matthew Bullock <matthew.bullock@doj.ca.gov>
**Cc:** Linda Krop <lkrop@environmentaldefensecenter.org>; Jeremy Frankel <jfrankel@environmentaldefensecenter.org>; David Pettit <dpettit@biologicaldiversity.org>; Talia Nimmer <tnimmer@biologicaldiversity.org>; Andrew Nettesheim <anettesheim@FLASllp.com>
**Subject:** CBD v OSFM; EDC v OSFM - Ex Parte Notice

Counsel,

PLEASE TAKE NOTICE that Real Parties in Interest Sable Offshore Corporation ("Sable") and Pacific Pipeline Company ("PPC" and collectively "Real Parties") will appear and apply *ex parte* on **Monday, March 16, 2026 at 8:30 a.m. in Department 4 of the California Superior Court for the County of Santa Barbara, Anacapa Division, located at 1100 Anacapa Street, Santa Barbara, CA 93121-1107** to request this Court to reconsider and rescind the Court's existing Preliminary Injunction.

Please contact counsel for Real Parties by no later than 11:30 a.m. today if you intend to oppose or object to Real Parties' *ex parte* application.

Thank you for your courtesy and attention to this matter.

Trevor

**Trevor D. Large, Partner**

 **Fauver · Large · Archbald · Spray**

820 State Street, Fourth Floor
Santa Barbara, CA 93101
805.966.7716 (Direct)

805.966.7000 (Main)

TLarge@FLASllp.com

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**WARNING:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

# EXHIBIT D

| | |
|---|---|
| **From:** | Michael S Dorsi |
| **To:** | Jeremy Frankel; Trevor D. Large; Julie Teel Simmonds; Dintzer, Jeffrey; Stanton, Garrett; Hanelin, Benjamin J.; Moore, DJ; Rogers, Natalie C.; Victoria Diffenderfer; Myung J. Park; Matthew Bullock |
| **Cc:** | Linda Krop; David Pettit; Talia Nimmer; Andrew Nettesheim; Matthew Bullock; Myung J. Park; Annadel Almendras |
| **Subject:** | RE: CBD v OSFM; EDC v OSFM - Ex Parte Notice - UPDATE |
| **Date:** | Monday, March 16, 2026 10:20:24 AM |
| **Attachments:** | image002.png |
| | image003.png |
| | image004.png |
| | image005.png |
| | image006.png |

**EXTERNAL SENDER – Proceed with caution**

Respondents intend to oppose Real Parties' application.

Michael S. Dorsi
Deputy Attorney General
Natural Resources Law Section
California Attorney General's Office
(415) 510-3802

---

**From:** Jeremy Frankel <jfrankel@environmentaldefensecenter.org>
**Sent:** Sunday, March 15, 2026 9:05 AM
**To:** Trevor D. Large <TLarge@flasllp.com>; Michael S Dorsi <Michael.Dorsi@doj.ca.gov>; Julie Teel Simmonds <jteelsimmonds@biologicaldiversity.org>; Dintzer, Jeffrey <jeffrey.dintzer@alston.com>; Stanton, Garrett <garrett.stanton@alston.com>; Hanelin, Benjamin J. <benjaminhanelin@paulhastings.com>; Moore, DJ <djmoore@paulhastings.com>; Rogers, Natalie C. <natalierogers@paulhastings.com>; Victoria Diffenderfer <vdiffenderfer@FLASllp.com>; Myung J. Park <Myung.Park@doj.ca.gov>; Matthew Bullock <Matthew.Bullock@doj.ca.gov>
**Cc:** Linda Krop <lkrop@environmentaldefensecenter.org>; David Pettit <dpettit@biologicaldiversity.org>; Talia Nimmer <tnimmer@biologicaldiversity.org>; Andrew Nettesheim <anettesheim@FLASllp.com>; Matthew Bullock <Matthew.Bullock@doj.ca.gov>; Myung J. Park <Myung.Park@doj.ca.gov>; Annadel Almendras <Annadel.Almendras@doj.ca.gov>
**Subject:** RE: CBD v OSFM; EDC v OSFM - Ex Parte Notice - UPDATE

**EXTERNAL EMAIL:** This message was sent from outside DOJ. Please do not click links or open attachments that appear suspicious.

Trevor,

Petitioners in both 25CV02244 and 25CV02247 intend to oppose.

Thanks,



**JEREMY FRANKEL (he/him/his)**
STAFF ATTORNEY
906 Garden Street
Santa Barbara, CA 93101
805.963.1622 x100
www.EnvironmentalDefenseCenter.org

  

We recognize that EDC sits on occupied, unceded, stolen lands of the Chumash Peoples, on Shmuwich Territory, who have called this area home for time immemorial. We commit today to make space to elevate indigenous voices and support our local Chumash and indigenous communities in our work to protect our environment.

CONFIDENTIALITY NOTE: The information contained in this communication may be confidential, is intended only for the use of the recipient named above, and may be legally privileged. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please re-send this communication to the sender and delete the original message and any copy of it from your computer system. Thank you.

---

**From:** Trevor D. Large <TLarge@flasllp.com>
**Sent:** Saturday, March 14, 2026 2:57 PM
**To:** 'Michael S Dorsi' <Michael.Dorsi@doj.ca.gov>; Jeremy Frankel <jfrankel@environmentaldefensecenter.org>; Julie Teel Simmonds <jteelsimmonds@biologicaldiversity.org>; Dintzer, Jeffrey <jeffrey.dintzer@alston.com>; Stanton, Garrett <garrett.stanton@alston.com>; Hanelin, Benjamin J. <benjaminhanelin@paulhastings.com>; Moore, DJ <djmoore@paulhastings.com>; Rogers, Natalie C. <natalierogers@paulhastings.com>; Victoria Diffenderfer <vdiffenderfer@FLASllp.com>; Myung J. Park <Myung.Park@doj.ca.gov>; Matthew Bullock <Matthew.Bullock@doj.ca.gov>
**Cc:** Linda Krop <lkrop@environmentaldefensecenter.org>; David Pettit <dpettit@biologicaldiversity.org>; Talia Nimmer <tnimmer@biologicaldiversity.org>; Andrew Nettesheim <anettesheim@FLASllp.com>; Matthew Bullock <Matthew.Bullock@doj.ca.gov>; Myung J. Park <Myung.Park@doj.ca.gov>; Annadel Almendras <Annadel.Almendras@doj.ca.gov>
**Subject:** CBD v OSFM; EDC v OSFM - Ex Parte Notice - UPDATE

Counsel, this is an update on my prior notice communication:
 PLEASE TAKE NOTICE that Real Parties in Interest Sable Offshore Corporation ("Sable") and Pacific Pipeline Company ("PPC" and collectively "Real Parties") will appear and apply *ex parte* on Tuesday, **March 17, 2026 at 8:30 a.m. in Department 4 of the California Superior Court for the County of Santa Barbara, Anacapa Division, located at 1100 Anacapa Street, Santa Barbara, CA 93121-1107** to alert this Court to the Federal DPA and request this Court reconsider and rescind the Court's existing Preliminary Injunction due the DPA Order.
 Please contact counsel for Real Parties by no later than 11:30 a.m. Monday, March 16, if you intend to oppose or object to Real Parties' *ex parte* application.
 Thank you for your courtesy and attention to this matter.

Trevor

**Trevor D. Large, Partner**

 Fauver · Large · Archbald · Spray

820 State Street, Fourth Floor
Santa Barbara, CA 93101
805.966.7716 (Direct)
805.966.7000 (Main)
TLarge@FLASllp.com

---

**From:** Trevor D. Large <tlarge@flasllp.com>
**Sent:** Friday, March 13, 2026 2:03 PM
**To:** 'Michael S Dorsi' <Michael.Dorsi@doj.ca.gov>; Jeremy Frankel <jfrankel@environmentaldefensecenter.org>; Julie Teel Simmonds <jteelsimmonds@biologicaldiversity.org>; Dintzer, Jeffrey <jeffrey.dintzer@alston.com>; Stanton, Garrett <garrett.stanton@alston.com>; Hanelin, Benjamin J. <benjaminhanelin@paulhastings.com>; Moore, DJ <djmoore@paulhastings.com>; Rogers, Natalie C. <natalierogers@paulhastings.com>; Victoria Diffenderfer <vdiffenderfer@FLASllp.com>; Myung J. Park <Myung.Park@doj.ca.gov>; Matthew Bullock <Matthew.Bullock@doj.ca.gov>
**Cc:** Linda Krop <lkrop@environmentaldefensecenter.org>; David Pettit <dpettit@biologicaldiversity.org>; Talia Nimmer <tnimmer@biologicaldiversity.org>; Andrew Nettesheim <anettesheim@FLASllp.com>; Matthew Bullock <Matthew.Bullock@doj.ca.gov>; Myung J. Park <Myung.Park@doj.ca.gov>; Annadel Almendras <Annadel.Almendras@doj.ca.gov>
**Subject:** RE: CBD v OSFM; EDC v OSFM - Ex Parte Notice

Counsel, please be advised that we have taken the Ex Parte hearing, referenced below, off calendar for Monday morning.  I apologize for any inconvenience and will let you know if there are any further updates.

Trevor

**Trevor D. Large, Partner**

 Fauver · Large · Archbald · Spray

820 State Street, Fourth Floor
Santa Barbara, CA 93101
805.966.7716 (Direct)
805.966.7000 (Main)
TLarge@FLASllp.com

---

**From:** Michael S Dorsi <Michael.Dorsi@doj.ca.gov>

**Sent:** Friday, March 13, 2026 11:28 AM
**To:** Jeremy Frankel <jfrankel@environmentaldefensecenter.org>; Trevor D. Large <tlarge@flasllp.com>; Julie Teel Simmonds <jteelsimmonds@biologicaldiversity.org>; Dintzer, Jeffrey <jeffrey.dintzer@alston.com>; Stanton, Garrett <garrett.stanton@alston.com>; Hanelin, Benjamin J. <benjaminhanelin@paulhastings.com>; Moore, DJ <djmoore@paulhastings.com>; Rogers, Natalie C. <natalierogers@paulhastings.com>; Victoria Diffenderfer <vdiffenderfer@FLASllp.com>; Myung J. Park <Myung.Park@doj.ca.gov>; Matthew Bullock <Matthew.Bullock@doj.ca.gov>
**Cc:** Linda Krop <lkrop@environmentaldefensecenter.org>; David Pettit <dpettit@biologicaldiversity.org>; Talia Nimmer <tnimmer@biologicaldiversity.org>; Andrew Nettesheim <anettesheim@FLASllp.com>; Matthew Bullock <Matthew.Bullock@doj.ca.gov>; Myung J. Park <Myung.Park@doj.ca.gov>; Annadel Almendras <Annadel.Almendras@doj.ca.gov>
**Subject:** RE: CBD v OSFM; EDC v OSFM - Ex Parte Notice

Counsel:

Respondents OSFM, et al. cannot commit to our final position supporting or opposing a motion without seeing the basis for the motion, including the moving papers.

However, we can say that our ordinary preference is against resolving key issues by ex parte application; the proper process is a noticed motion.

Due to the vagueness of the notice provided and to maintain all rights, we provide notice of our intent to oppose and object.

Best,


Michael S. Dorsi
Deputy Attorney General
Natural Resources Law Section
California Attorney General's Office
(415) 510-3802

---

**From:** Jeremy Frankel <jfrankel@environmentaldefensecenter.org>
**Sent:** Friday, March 13, 2026 10:10 AM
**To:** Trevor D. Large <tlarge@flasllp.com>; Julie Teel Simmonds <jteelsimmonds@biologicaldiversity.org>; Dintzer, Jeffrey <jeffrey.dintzer@alston.com>; Stanton, Garrett <garrett.stanton@alston.com>; Hanelin, Benjamin J. <benjaminhanelin@paulhastings.com>; Moore, DJ <djmoore@paulhastings.com>; Rogers, Natalie C. <natalierogers@paulhastings.com>; Victoria Diffenderfer <vdiffenderfer@FLASllp.com>; Michael S Dorsi <Michael.Dorsi@doj.ca.gov>; Myung J. Park <Myung.Park@doj.ca.gov>; Matthew Bullock <Matthew.Bullock@doj.ca.gov>
**Cc:** Linda Krop <lkrop@environmentaldefensecenter.org>; David Pettit

<dpettit@biologicaldiversity.org>; Talia Nimmer <tnimmer@biologicaldiversity.org>; Andrew Nettesheim <anettesheim@FLASllp.com>
**Subject:** RE: CBD v OSFM; EDC v OSFM - Ex Parte Notice

> **EXTERNAL EMAIL:** This message was sent from outside DOJ. Please do not click links or open attachments that appear suspicious.

Hi Trevor,

Petitioners in both 25CV02244 and 25CV02247 intend to oppose.

Thanks,



**JEREMY FRANKEL (he/him/his)**
STAFF ATTORNEY
906 Garden Street
Santa Barbara, CA 93101
805.963.1622 x100
www.EnvironmentalDefenseCenter.org



We recognize that EDC sits on occupied, unceded, stolen lands of the Chumash Peoples, on Shmuwich Territory, who have called this area home for time immemorial. We commit today to make space to elevate indigenous voices and support our local Chumash and indigenous communities in our work to protect our environment.

CONFIDENTIALITY NOTE: The information contained in this communication may be confidential, is intended only for the use of the recipient named above, and may be legally privileged. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please re-send this communication to the sender and delete the original message and any copy of it from your computer system. Thank you.

---

**From:** Trevor D. Large <tlarge@flasllp.com>
**Sent:** Friday, March 13, 2026 9:54 AM
**To:** Julie Teel Simmonds <jteelsimmonds@biologicaldiversity.org>; Dintzer, Jeffrey <jeffrey.dintzer@alston.com>; Stanton, Garrett <garrett.stanton@alston.com>; Hanelin, Benjamin J. <benjaminhanelin@paulhastings.com>; Moore, DJ <djmoore@paulhastings.com>; Rogers, Natalie C. <natalierogers@paulhastings.com>; Victoria Diffenderfer <vdiffenderfer@FLASllp.com>; Michael S Dorsi <michael.dorsi@doj.ca.gov>; Myung J. Park <myung.park@doj.ca.gov>; Matthew Bullock <matthew.bullock@doj.ca.gov>
**Cc:** Linda Krop <lkrop@environmentaldefensecenter.org>; Jeremy Frankel <jfrankel@environmentaldefensecenter.org>; David Pettit <dpettit@biologicaldiversity.org>; Talia Nimmer <tnimmer@biologicaldiversity.org>; Andrew Nettesheim <anettesheim@FLASllp.com>
**Subject:** CBD v OSFM; EDC v OSFM - Ex Parte Notice

Counsel,

PLEASE TAKE NOTICE that Real Parties in Interest Sable Offshore Corporation ("Sable") and Pacific Pipeline Company ("PPC" and collectively "Real Parties") will appear and apply *ex parte* on **Monday, March 16, 2026 at 8:30 a.m. in Department 4 of the California Superior Court for the County of Santa Barbara, Anacapa Division, located at 1100 Anacapa Street, Santa Barbara, CA 93121-1107** to request this Court to reconsider and rescind the Court's existing Preliminary Injunction.

Please contact counsel for Real Parties by no later than 11:30 a.m. today if you intend to oppose or object to Real Parties' *ex parte* application.

Thank you for your courtesy and attention to this matter.

Trevor

**Trevor D. Large, Partner**

 FAUVER · LARGE · ARCHBALD · SPRAY

820 State Street, Fourth Floor
Santa Barbara, CA 93101
805.966.7716 (Direct)
805.966.7000 (Main)
TLarge@FLASllp.com

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**WARNING:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

# EXHIBIT E



1(310) 620-5779
djmoore@paulhastings.com

February 26, 2026

Daniel Berlant, State Fire Marshal

California Department of Forestry and Fire Protection
715 P Street
Sacramento, CA 94244
calfire.statefiremarshal@fire.ca.gov

Re: Sable – Relinquishment of State Waivers

Dear Fire Marshal Berlant:

As you know, our firm has represented Sable Offshore Corp. and Pacific Pipeline Company (collectively, Sable) in matters before the Office of the State Fire Marshal (OSFM) regarding Segments CA-324 (OSFM Line ID 0015) and CA-325 (OSFM Line ID 0001) of the Santa Ynez Pipeline System (previously referred to as Las Flores Pipeline Lines CA-324 and CA-325A/B). On behalf of Sable, I am writing to you with regard to the "State Waivers" issued by OSFM on December 17, 2024, with respect to Segments CA-324 and CA-325.

Although Sable has complied with the terms of the State Waivers, Sable has not exercised any rights or privileges under the State Waivers since they were issued. On December 17, 2025, the federal Pipeline & Hazardous Materials Safety Administration (PHMSA) notified Sable that it concurred in Sable's determination that the Santa Ynez Pipeline System—including Segments CA-324 and CA-325—is an interstate pipeline facility under the Pipeline Safety Act, and that the Santa Ynez Pipeline System is therefore "subject to the regulatory oversight of PHMSA" rather than that of OSFM.[1] On December 23, 2025, PHMSA issued an emergency special permit with respect to Segments CA-324 and CA-325, which included conditions that are "substantially the same" as those included in OSFM's State Waivers, and reconfirmed that "PHMSA has exclusive pipeline safety regulatory authority" over Segments CA-324 and CA-325.[2] PHMSA has since confirmed again that the "California [OSFM] issued [the State W]aivers before PHMSA assumed regulatory jurisdiction," and because "States cannot regulate interstate pipelines … Sable may not rely on [OSFM's State W]aivers."[3]

Because Segments CA-324 and CA-325 are now subject to PHMSA's exclusive jurisdiction under the federal Pipeline Safety Act, Sable has determined it is appropriate to relinquish its rights under OSFM's previously issued State Waivers. Therefore, by this letter and effective immediately, Sable hereby relinquishes, surrenders and abandons the State Waivers.

//

---

[1] PHMSA, Letter to J. Caldwell Flores, "Determination of Interstate Classification" (Dec. 17, 2025).
[2] PHMSA, Docket No. PHMSA-2025-1502, Emergency Special Permit (Dec. 23, 2025).
[3] *Environmental Defense Center v. Pipeline & Hazardous Materials Safety Administration*, 9th Cir. Case No. 25-8059, Federal Respondents' Opposition to Emergency Stay Motion (Dec. 30, 2025), p. 18.



February 26, 2026
Page 2

Please do not hesitate to contact me with any questions.

Sincerely,

Duncan Joseph Moore
of PAUL HASTINGS LLP

CC:
James Hosler, Assistant Deputy Director, OSFM
Linda Gail Daugherty, Acting Associate Administrator for Pipeline Safety, PHMSA
Josh Cleaver, Staff Counsel, OSFM
J. Caldwell Flores, President, Sable Offshore Corp.
Anthony Duenner, General Counsel, Sable Offshore Corp.

LEGAL_US_W # 185921873.7

# EXHIBIT F

## PRESIDENTIAL ACTIONS

### ADJUSTING CERTAIN DELEGATIONS UNDER THE DEFENSE PRODUCTION ACT

Executive Orders

March 13, 2026

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

Section 1.  Purpose.  This order amends Executive Order 13603 of March 16, 2012 (National Defense Resources Preparedness).  Executive Order 13603 delegates certain authorities of the President under the Defense Production Act (50 U.S.C. 4501 *et seq.*), to specified executive department and agency (agency) heads.  This order also clarifies section 2(a) of Executive Order 14156 of January 20, 2025 (Declaring a National Energy Emergency).

Sec. 2.  Amendment to Executive Order 13603.  Section 203 of Executive Order 13603 is hereby amended by striking the phrase "Secretary of Commerce" and inserting, in lieu thereof, "Secretary of Commerce and the Secretary of Energy, each of whom may exercise such delegated authority independently of the other".

Sec. 3.  Clarifying Section 2(a) of Executive Order 14156.  For the avoidance of doubt, an agency head need only recommend action to the President under section 2(a) of Executive Order 14156 when the authority to take the recommended action is vested in the President alone and has not been delegated.  Section 2(a) of Executive Order 14156 does not require an agency head to make a recommendation to the President when the agency head has authority to take the action by virtue of a delegation pursuant to Executive Order 13603 or other Presidential delegation.

Sec. 4.  General Provisions.  (a)  Nothing in this order shall be construed to impair or otherwise affect:

(i)  the authority granted by law to an executive department or agency, or the head thereof; or

(ii)  the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b)  This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c)  This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

(d)  The costs for publication of this order shall be borne by the Department of Energy.

DONALD J. TRUMP

THE WHITE HOUSE,

March 13, 2026.

Related

Immediate Measures to Increase American Mineral Production

Presidential Actions, Executive Orders    |    March 20, 2025
Modifying the Scope of the Reciprocal Tariff with Respect to Certain Agricultural Products

Presidential Actions, Executive Orders    |    November 14, 2025
Promoting the National Defense by Ensuring an Adequate Supply of Elemental Phosphorus and Glyphosate-Based Herbicides

Presidential Actions, Executive Orders    |    February 18, 2026
Addressing Threats to the United States by the Government of Iran

Presidential Actions, Executive Orders    |    February 6, 2026
Ending Certain Tariff Actions

Presidential Actions, Executive Orders    |    February 20, 2026

1    2    3    ...    86  NEXT PAGE

 

GET THE FACTS →

ABOUT

Administration

Contact

Internships

Stay Informed

Privacy Policy

MEDIA

News

Gallery

Video Library

Media Offenders

White House Wire

INITIATIVES

Freedom 250

Investments

Working Families Tax Cuts

AI.Gov

DOGE

SUBSCRIBE TO THE WH NEWSLETTER

Your email                                                          SIGN UP

Click here or text 45470 to receive updates



# EXHIBIT G



About Us ⌄    News    Events & Presentations    Stock Info ⌄    Financials ⌄    Governance ⌄

Resources ⌄    Careers

## News Details

VIEW ALL NEWS →

# Sable Resumes Oil Flow As Ordered By The Federal DPA With Expected Gross Oil Rate Of 50,000 Bbls/D And Expects First Sales By April 1, 2026

**03/16/2026**

HOUSTON--(BUSINESS WIRE)-- Sable Offshore Corp. ("Sable," or the "Company") (NYSE: SOC) today announced that on March 14, 2026, the Company resumed the transportation of hydrocarbons (oil) produced at the Santa Ynez Unit ("SYU") through the federally regulated and approved to operate Santa Ynez Pipeline System ("SYPS") from Las Flores Canyon ("LFC") to Pentland Station at the direction of the United States Secretary of Energy, Chris Wright.

On March 13, 2026, President of the United States, Donald J. Trump, signed an Executive Order to, among other things, delegate certain authorities under the Defense Production Act of 1950 ("DPA") to the United States Secretary of Energy. Subsequently on March 13, 2026, the United States Secretary of Energy, Chris Wright, issued an order to Sable invoking the DPA (the "DPA Order") to immediately prioritize and allocate pipeline transportation services for hydrocarbons from the SYU through the SYPS in order to address the energy scarcity and supply disruption risks caused by California policies that have left the region and U.S. military forces dependent on foreign oil. Sable immediately complied with this federal DPA Order and began shipping hydrocarbons from LFC to Pentland Station on March 14, 2026 with federal safety regulators present in observance.

As stated in the DPA Order, all federally produced barrels from the SYU must flow through the SYPS, up to the existing pipeline capacity of 200,000 Bbls/d. Sable completed its onshore anomaly repair program and hydrotested all segments of the SYPS consistent with applicable requirements as of May 2025.

Prior to resuming hydrocarbon transportation from LFC to Sable's sales point at Pentland Station, Sable had approximately 540,000 barrels of processed crude oil in storage at LFC, representing more than the line fill volume for the SYPS between LFC and Pentland Station. Sable is fully staffed and will continue to implement the conditions of the Emergency Special Permit previously issued by the United States Department of Transportation, Pipeline and Hazardous Materials Safety Administration.

Skip to main content



**News    Events & Presentations**

**Careers**

---

"Sable Offshore is putting California consumers first by increasing domestic supply of crude oil into the California market by approximately 17% and we look forward to continuing to execute as so ordered by the Defense Production Act executed on March 13, 2026," said Jim Flores, Sable's Chairman and Chief Executive Officer. Flores continued, "We look forward to working closely with the Department of Energy in fully complying with the DPA and working with the Trump administration to take all necessary steps to deliver the energy necessary for the security and defense of the country."

**About Sable**

Sable Offshore Corp. is an independent oil and gas company, headquartered in Houston, Texas, focused on responsibly developing the Santa Ynez Unit in federal waters offshore California. The Sable team has extensive experience safely operating in California.

**Forward-Looking Statements**

The information in this press release include "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. When used in this press release, the words "could," "should," "will," "may," "believe," "anticipate," "intend," "estimate," "expect," "project," "continue," "plan," "forecast," "predict," "potential," "future," "outlook," and "target," the negative of such terms and other similar expressions are intended to identify forward- looking statements, although not all forward-looking statements will contain such identifying words. These statements are based on the current beliefs and expectations of Sable's management and are subject to significant risks and uncertainties. Actual results may differ materially from those described in the forward-looking statements. Factors that could cause Sable's actual results to differ materially from those described in the forward-looking statements include: the ability to recommence full production of the SYU assets; our ability to recommence sales of oil, the cost and time required therefor, and production levels once recommenced; availability of future financing; our financial performance; global economic conditions and inflation; increased operating costs; lack of availability of drilling and production equipment, supplies, services and qualified personnel; geographical concentration of operations; environmental and weather risks; regulatory changes and uncertainties; litigation, complaints and/or adverse publicity; privacy and data protection laws, privacy or data breaches, or loss of data; our ability to comply with laws and regulations applicable to our business; and other one-time events and other factors that can be found in Sable's Annual Report on Form 10-K for the year ended December 31, 2025, which is filed with the Securities and Exchange Commission and are available on Sable's website (www.sableoffshore.com) and on the Securities and Exchange Commission's website (www.sec.gov). Except as required by applicable law, Sable undertakes no obligation to publicly release the result of any revisions to these forward-looking statements to reflect the impact of events or circumstances that may arise after the date of this press release.

**Disclaimers**

The Santa Ynez Unit restarted production in May 2025. Sable has not sold commercial quantities of hydrocarbons since the acquisition of the Santa Ynez Unit. The Santa Ynez Unit was shut in during June of 2015 when the only onshore pipeline transporting hydrocarbons produced from the Santa Ynez Unit to market ceased transportation.

  Investor Contact:
Harrison Breaud
Vice President, Finance & Investor Relations
IR@sableoffshore.com
713-579-8111

Source: Sable Offshore Corp.

**VIEW ALL NEWS ⟶**

Skip to main content



**News    Events & Presentations**

**Careers**

SEC FILINGS

INFORMATION REQUEST FORM

## Investor Email Alerts

Enter your Email Address                SIGN UP

☐  News                    ☐  Quarterly Reports
☐  Annual Reports          ☐  SEC Filings
☐  End of Day Stock Quote  ☐  Events & Presentations

Unsubscribe

SABLE
OFFSHORE

Terms of Service   |   Privacy Policy

**PROOF OF SERVICE**

I, **Kim Niz**, declare:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Alston & Bird LLP, 350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071.

On March 16, 2026, I served the document(s) **Declaration of Jeffrey D. Dintzer in support of Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company's Notice of Ex Parte and Ex Parte Notice of Defense Production Act Order** on the interested parties stated below, by the following means of service:

**See Attached Service List**

☐ (BY U.S. MAIL)  I am personally and readily familiar with the business practice of Alston & Bird LLP for collection and processing of correspondence for mailing with the United States Parcel Service, and I caused such envelope(s) with postage thereon fully prepaid to be placed in the United States Postal Service at Los Angeles, California.

☐ (BY FACSIMILE)  I am personally and readily familiar with the business practice of Alston & Bird LLP for collection and processing of document(s) to be transmitted by facsimile and I caused such document(s) on this date to be transmitted by facsimile to the offices of addressee(s) at the numbers listed below.

☐ (BY OVERNIGHT MAIL)  I am personally and readily familiar with the business practice of Alston & Bird LLP for collection and processing of correspondence for overnight delivery, and I caused such document(s) described herein to be deposited for delivery to a facility regularly maintained by Federal Express for overnight delivery.

☒ BY ELECTRONIC SERVICE on the date stated below, I caused the document(s) described above to be served electronically on the recipients designated on the Transaction Receipt pursuant to the parties' stipulation establishing the authorizing e-service of documents.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on March 16, 2026, at Los Angeles, California.

*/s/Kim Niz*
Kim Niz

**SERVICE LIST**

| | |
|---|---|
| Jeffrey D. Dintzer<br>Garrett B. Stanton<br>**ALSTON & BIRD, LLP**<br>350 South Grand Avenue, 51st Floor<br>Los Angeles, CA 90071<br>Tel: (213) 576-1000<br>Fax: (213) 576-1100<br>Jeffrey.Dintzer@alston.com<br>Garrett.Stanton@alston.com | *Attorneys for Real Parties in Interest: Sable Offshore Corp. and Pacific Pipeline Company* |
| Julie Teel Simmonds, Esq.<br>David Pettit, Esq.<br>Talia Nimmer, Esq.<br>Center for Biological Diversity<br>2011 Franklin Street, Suite 375<br>Oakland, CA 94612<br>Tel.: (510) 844-7100<br>Fax: (510) 844-7150<br>jteelsimmonds@biologicaldiversity.org<br>dpettit@biologicaldiversity.org<br>tnimmer@biologicaldiversity.org | *Attorneys for Petitioners: Center for Biological Diversity and Wishtoyo Foundation* |
| Duncan Joseph Moore<br>Benjamin J. Hanelin<br>Natalie C. Rogers<br>**PAUL HASTINGS**<br>1999 Avenue of Stars, 27th Floor<br>Century City, CA 90067<br>Tel: (310) 620-5879<br>Fax: (310) 620-5899<br>djmoore@paulhastings.com<br>benjaminhanelin@paulhastings.com<br>natalierogers@paulhastings.com | *Attorneys for Real Parties in Interest: Sable Offshore Corp. and Pacific Pipeline Company* |
| Linda Krop, Esq.<br>Jeremy M. Frankel, Esq.<br>Tara C. Rengifo, Esq.<br>ENVIRONMENTAL DEFENSE CENTER<br>906 Garden Street<br>Santa Barbara, CA 93101<br>Tel: (805) 963-1622; (510) 844-7100<br>Fax: (805) 962-3152; (510) 844-7150<br>lkrop@environmentaldefensecenter.org<br>jfrankel@environmentaldefensecenter.org<br>trengifo@environmentaldefensecenter.org | *Attorneys for Petitioners: Environmental Defense Center, a California non-profit corporation; Get Oil Out!, a California non-profit corporation, Santa Barbara County Action Network, a California non-profit corporation, Sierra Club, a national non-profit corporation, and Santa Barbara Channelkeeper, a California non-profit corporation* |
| Michael S. Dorsi, Esq.<br>California Attorney General's Office<br>55 Golden Gate Ave, Ste 11000<br>San Francisco, CA 94102 | *Attorneys for Respondents/Defendants: California Department of Forestry and Fire Protection, Office of the State Fire* |

| Tel.: (415) 510-3802<br>Michael.dorsi@doj.ca.gov | *Marshal, Daniel Berlant (in his official capacity as State Fire Marshal)* |
|---|---|

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
jeffrey.dintzer@alston.com
GARRETT B. STANTON, SBN 324775
garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071-1410
Telephone:    (213) 576-1000
Facsimile:    (213) 576-1100

**PAUL HASTINGS LLP**
DUNCAN JOSEPH MOORE, SBN 233955
djmoore@paulhastings.com
BENJAMIN J. HANELIN, SBN 237595
benjaminhanelin@paulhastings.com
NATALIE C. ROGERS, SBN 301254
natalierogers@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067
Telephone:    (310) 620-5879
Facsimile:    (310) 620-5899

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP.; PACIFIC PIPELINE COMPANY

*Additional Counsel Listed on Signature Page*

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Angela Braun, Executive Officer
3/16/2026 7:44 PM
By: Gabriel Moreno , Deputy

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF SANTA BARBARA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,<br><br>Petitioners/Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10; inclusive,<br><br>Respondents/Defendants. | Case No. 25CV02247<br>[Coordinated with Case No. 25CV02244]<br><br>Assigned for all purposes to:<br>Hon. Donna D. Geck<br><br>**SABLE OFFSHORE CORP.'S AND PACIFIC PIPELINE COMPANY'S OPPOSITION TO PETITIONERS' COMBINED EX PARTE APPLICATION FOR AN ORDER TO SHOW CAUSE WHY REAL PARTIES IN INTEREST SHOULD NOT BE FOUND IN CONTEMPT OF COURT**<br><br>[*Filed concurrently with Declaration of Garrett B. Stanton*]<br><br>Date:        March 17, 2026<br>Time:        8:30 AM<br>Dept.:        4<br><br>Complaint Filed:        April 15, 2025<br>Trial Date:        None set |

1

OPPOSITION TO PETITIONERS' COMBINED EX PARTE APPLICATION

SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,

Real Parties in Interest

ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation,

Petitioners/Plaintiffs,

v.

CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, an agency of the State of California; OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10; inclusive,

Respondents/Defendants.

SABLE OFFSHORE CORP., a Delaware Corporation, and PACIFIC PIPELINE COMPANY, a Delaware Corporation.

Real Parties in Interest.

OPPOSITION TO PETITIONERS' COMBINED EX PARTE APPLICATION

**REAL PARTIES' OPPOSITION TO PETITIONERS' *EX PARTE* APPLICATION**

On January 7, 2026, this Court reminded "all counsel of [their] duty of candor to the Court." (Declaration of Garrett B. Stanton ("Stanton Decl."), Exhibit A [January 7, 2026 Hearing Transcript].) The duty of candor requires that counsel "***shall not*** [] knowingly make a false statement of fact or law to a tribunal [or] *fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client*…." (Cal. Prof. Rules of Conduct, Rule 3.3, emphasis and italics added; see *Levine v. Berschneider* (2020) 56 Cal. App. 5th 916, 921 [holding the duty of candor is broad; it "is not simply an obligation to answer honestly when asked a direct question by the trial court. It includes an affirmative duty to inform the court when a material statement of fact or law has become false or misleading in light of subsequent events."].) Yet, in their *Ex Parte* Application for an Order to Show Cause Why Real Parties in Interest Should Not Be Found In Contempt of Court ("*Ex Parte*"), Petitioners deliberately conceal from the Court that Sable Offshore Corp. and Pacific Pipeline Company (collectively "Real Parties" or "Sable") are required by a federal Defense Production Act Order ("DPA Order") to commence restart of the Santa Ynez Pipeline System, including Segments CA-324 and CA-325, along with the authorities addressing the DPA Order's preemptive effect over the Preliminary Injunction and relief sought in the *Ex Parte*. In fact, Petitioners' *Ex Parte* does not even include the words "Defense Production Act," "DPA," or "DPA Order." Nor does Petitioners' *Ex Parte* include any discussion of the DPA Order's preemptive effect, much less state the word "preemption" or any variation of it in their moving papers. Petitioners' attempt to circumvent the existence and effect of the DPA Order and failure to address it cannot be overlooked.

Petitioners' concealment to the Court of the DPA Order and controlling legal authorities is neither inadvertent nor a harmless mistake; it is a calculated strategy employed by Petitioners in hopes that they may obtain an order shutting off the Santa Ynez Pipeline System without first providing the Court with the controlling facts and legal authorities governing that decision. Petitioners cannot claim ignorance to the DPA Order or the DPA Order's legal effect as it pertains to the Preliminary Injunction because, on March 13, 2026, CBD's counsel, Talia Nimmer, told the media that the President "is misusing this Cold-War-era law [the Defense Production Act]…." (Stanton Decl., Exhibit B [March 13, 2026 CalMatters Article].) Likewise, EDC's counsel, Jeremy Frankel, also addressed the DPA Order to

the media, stating that President "is using a war that he started to increase profits for his friends in the oil business." (Stanton Decl., Exhibit C [March 15, 2026 CalCoastNews.com Article].) Thus, there is no doubt that Petitioners' counsel were well aware of the DPA Order and that the DPA Order forestalls the enforcement of and further invalidates the Preliminary Injunction. Nor may Petitioners claim ignorance of the Attorney General's "Memorandum Opinion for the General Counsel [for the] Department of Energy" issued on March 3, 2026, that details, in part, that (1) "[t]he DPA authorizes the President to regulate private entities in ways that may be inconsistent with state law[; (2) a]n order issued under that authority could preempt state law either expressly or by conflict[; and (3) the DPA Order] may displace certain provisions of the Consent Decree [], including those vesting authority over resumption of transportation with the California Office of the State Fire Marshal." (Declaration of Jeffrey D. Dintzer In Support of Sable Offshore Corp.'s and Pacific Pipeline Company's Ex Parte Notice of Defense Production Act Order ("Dintzer Decl.") Exhibit B [Memorandum of Opinion], at p. 22.) Nevertheless, Petitioners deliberately chose not to inform the Court of these facts and authorities and instead ask the Court to issue an order that violates the DPA Order.

In light of the Petitioners' disregard for their duty of candor, this Court should not consider the *Ex Parte*. If the Court should still consider the *Ex Parte*, it must be denied because Petitioners cannot demonstrate any good cause or legal basis for the relief they now seek. In lieu of establishing good cause, Petitioners knowingly obfuscate the facts and controlling law to request that this Court issue an order overriding the DPA Order without even discussing it. Moreover, the *Ex Parte* must be denied as Sable is immune from any penalties resulting in a violation of the Preliminary Injunction, and this Court remains "duty-bound" to follow federal law and yield to the superior DPA Order. (U.S. Const. art. VI, Cl. 2; 50 U.S.C. § 4511(a), (c); 50 U.S.C. § 4557; *Martin v. United States* (2025) 145 S. Ct. 1689, 1700 ["when a regulated party cannot comply with both federal and state directives, the Supremacy Clause tells us the state law must yield."]; *Merck Sharp & Dohme Corp. v. Albrecht* (2019) 139 S. Ct. 1668, 1672 [holding laws that "irreconcilably conflict" with supreme law are displaced as a matter of conflict preemption]; *Murphy v. Nat'l Collegiate Athletic Ass'n* (2018) 584 U.S. 453, 477-79 [holding the preemptive effect of an express preemption clause is conferred on private parties "a federal right to engage in certain conduct subject only to certain (federal) constraints."]; *Markazi v. Peterson* (2016)

578 U.S. 212, 235 [holding Congress and the President have "time and again, as exigencies arose," taken actions that have displaced ordinary state law, such as those pertaining to property or torts]; *Holder v. Humanitarian L. Project* (2010) U.S. 1, 33 [emphasizing the need to defer to the "evaluation of facts by the Executive" in the national-security context]; *Geier v. Am. Honda Motor Co.* (2000) 529 U.S. 861, 873-84 [recognizing federal preemption when "the accomplishment of [the] federal objective" makes it "impossible . . . to comply with both state and federal law."]; *Haig v. Agee* (1981) 453 U.S. 280, 307 [finding that "[i]t is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation."]; *Chrysler Corp. v. Brown* (1979) 441 U.S. 281, 295-96 [finding Congress may authorize executive agencies to promulgate regulations that "have the force and effect of law" and that "[t]his doctrine is so well established that agency regulations implementing federal statutes have been held to pre-empt state law under the Supremacy Clause."]; *Florida Lime & Avocado Growers, Inc. v. Paul* (1963) 373 U.S. 132, 142 [state law must concede to federal law]; *Youngstown Sheet & Tube Co. v. Sawyer* (1952) 343 U.S. 579, 585, 635-37 [finding presidential preemption arises when "the President acts pursuant to an express or implied authorization of Congress."]; *Tarble's Case* (1872) 80 U.S. (13 Wall.) 397, 403-04 [holding states lack the ability to impede on the President's official powers "whether that authority be exercised by a Federal officer or be exercised by a Federal tribunal"]; *County of Butte v. Department of Water Resources* (2022) 13 Cal.5th 612, 634 ["state court order granting [ ] injunctive relief … would stand as a direct obstacle to the accomplishment" of a federal objective, that injunction is invalid]; *County of San Diego v. San Diego NORML* (2008) 165 Cal.App.4th 798, 821 ["[o]bstacle preemption will invalidate a state law when, under the circumstances of a particular case, the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress"]; *Energy Supply Interruption or Other Substantial Reduction in Available Petroleum Products* (1982) 6 Op. O.L.C. 644, 662 [allowing President to use authorities vested to him in the Defense Production Act "whether or not an 'emergency' situation exists."].) In further response to the arguments raised in Petitioners' *Ex Parte* and to avoid duplicative filings, Sable directs the Court to the arguments raised in its Memorandum of Points and Authorities filed with its *Ex Parte* Notice of Defense Production Act.

For the foregoing reasons, Petitioners' *Ex Parte* application should be denied, and the Court

should dissolve the Preliminary Injunction as it must yield to the DPA Order as a matter of law.

DATED: March 16, 2026          Respectfully submitted,

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER
GARRETT B. STANTON

**PAUL HASTINGS LLP**
DUNCAN JOSEPH MOORE

**FAUVER, LARGE, ARCHBALD & SPRAY LLP**
TREVOR D. LARGE

_____
          Jeffrey D. Dintzer

Attorneys for Real Parties in Interest
**SABLE OFFSHORE CORP.**
**PACIFIC PIPELINE COMPANY**

OPPOSITION TO PETITIONERS' COMBINED EX PARTE APPLICATION

**PROOF OF SERVICE**

I, Garrett Stanton, declare:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Alston & Bird LLP, 350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071.

On March 16, 2026, I served the document(s) **SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S OPPOSITION TO PETITIONERS' COMBINED EX PARTE APPLICATION FOR AN ORDER TO SHOW CAUSE WHY REAL PARTIES IN INTEREST SHOULD NOT BE FOUND IN CONTEMPT OF COURT** on the interested parties stated below, by the following means of service:

**See Attached Service List**

☒   BY ELECTRONIC SERVICE on the date stated below, I caused the document(s) described above to be served electronically on the recipients designated on the Transaction Receipt pursuant to the parties' stipulation establishing the authorizing e-service of documents.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on March 16, 2026, at Los Angeles, California.

_____
/s/ Garrett Stanton
Garrett Stanton

**SERVICE LIST**

| | |
|---|---|
| Julie Teel Simmons, Esq.<br>David Pettit, Esq.<br>Talia Nimmer, Esq.<br>Center for Biological Diversity<br>2011 Franklin Street, Suite 375<br>Oakland, CA 94612 | ATTORNEYS FOR PETITIONERS<br>CENTER FOR BIOLOGICAL DIVERSITY and<br>WISHTOYO FOUNDATION<br><br>Tel.:   (510) 844-7100<br>Fax:   (510) 844-7150<br>Email: jteelsimmonds@biologicaldiversity.org<br>dpettit@biologicaldiversity.org<br>         tnimmer@biologicaldiversity.org |
| Linda Krop, Esq.<br>Jeremy M. Frankel, Esq.<br>Tara C. Regnifo, Esq.<br>ENVIRONMENTAL DEFENSE CENTER<br>906 Garden Street<br>Santa Barbara, CA 93101<br>Phone: (805) 963-1622; Fax: (805) 962-3152 | ATTORNEYS FOR PETITIONERS<br>ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation<br><br>Tel.:   (510) 844-7100<br>Fax:   (510) 844-7150<br>Email: lkrop@environmentaldefensecenter.org<br>         jfrankel@environmentaldefensecenter.org<br>         trengifo@environmentaldefensecenter.org |
| Michael S. Dorsi, Esq.<br>California Attorney General's Office<br>55 Golden Gate Ave, Ste 11000,<br>San Francisco, CA 94102 | ATTORNEYS FOR RESPONDENTS/<br>DEFENDANTS<br>California Department of Forestry and Fire Protection, Office of the State Fire Marshal; Daniel Berlant, in his official capacity as State Fire Marshal<br><br>Tel.:   (415) 510-3802<br>Email: Michael.dorsi@doj.ca.gov |
| Duncan Joseph Moore, Esq.<br>Benjamin J. Hanelin, Esq.<br>Natalie C. Rogers, Esq.<br>PAUL HASTINGS LLP<br>1999 Avenue of the Stars, 27th Floor<br>Century City, California, 90067 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp.; Pacific Pipeline Company<br><br>Tel.:   (310) 620-5879<br>Email: djmoore@paulhastings.com<br>         benjaminhanelin@paulhastings.com<br>         natalierogers@paulhastings.com |
| Trevor D. Large, Esq.<br>FAUVER, LARGE, ARCHBALD & SPRAY LLP<br>820 State Street, 4th Floor<br>Santa Barbara, CA 93101 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp.; Pacific Pipeline Company<br><br>Tel.:   (805) 966-7000<br>Email: TLarge@FLASllp.com |

Jeffrey D. Dintzer (SBN: 139056)
Garrett B. Stanton (SBN: 324775)
**ALSTON & BIRD, LLP**
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071
Tel: (213) 576-1000; Fax: (213) 576-1100
Jeffrey.Dintzer@alston.com
Garrett.Stanton@alston.com

Duncan Joseph Moore (SBN: 233955)
Benjamin J. Hanelin (SBN: 237595)
Natalie C. Rogers (SBN: 301254)
**PAUL HASTINGS LLP**
1999 Avenue of Stars, 27th Floor
Century City, CA 90067
Tel: (310) 620-5879; Fax: (310) 620-5899
djmoore@paulhastings.com
benjaminhanelin@paulhastings.com
natalierogers@paulhastings.com

Trevor D. Large (SBN: 214886)
Victoria C. Diffenderfer (SBN: 350018)
**FAUVER LARGE ARCHBALD & SPRAY**
820 State Street, 4th Floor
Santa Barbara, CA 93101
Tel: (805) 966-7000; Fax: (805) 966-7227
tlarge@flasllp.com
vdiffenderfer@flasllp.com

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Angela Braun, Executive Officer
3/16/2026 7:44 PM
By: Gabriel Moreno , Deputy

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF SANTA BARBARA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION, <br><br> Petitioners/Plaintiffs, <br><br> v. <br><br> CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10; inclusive, <br><br> Respondents/Defendants. | Case No.: 25CV02244 <br> [Consolidated with 25CV02247] <br><br> **DECLARATION OF GARRETT B. STANTON IN SUPPORT OF REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S OPPOSITION TO PETITIONERS' COMBINED EX PARTE APPLICATION FOR AN ORDER TO SHOW CAUSE WHY REAL PARTIES IN INTEREST SHOULD NOT BE FOUND IN CONTEMPT OF COURT** <br><br> [*Filed concurrently with Real Parties In Interests Sable Offshore Corp.'s and Pacific Pipeline Company's Opposition to Ex Parte Application*] <br><br> Date:    March 17, 2026 |

1

DECLARATION OF GARRETT B. STANTON

Time:    8:30 a.m.
Dept.:    4

Complaint Filed: April 15, 2025

[Assigned for Purposes to the Honorable Donna D. Geck, Dept. 4]

SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,

Real Parties in Interest

ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation,

Petitioners/Plaintiffs,

v.

CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, an agency of the State of California; OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10; inclusive,

Respondents/Defendants.

SABLE OFFSHORE CORP., a Delaware Corporation, and PACIFIC PIPELINE COMPANY, a Delaware Corporation.

Real Parties in Interest.

Case No.: 25CV02247

2

DECLARATION OF GARRETT B. STANTON

## **<u>DECLARATION OF GARRETT B. STANTON</u>**

I, Garrett B. Stanton, declare as follows:

1.      I am an attorney duly licensed to practice law before all courts of the State of California and am a senior associate at Alston & Bird LLP, attorneys of record for Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company (hereinafter collectively referred to as "Sable"). I make this declaration in support of Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company's Opposition to Petitioners' Combined *Ex Parte* Application For Enforcement Of Preliminary Injunction And For An Order to Show Cause Why Real Parties In Interest Should Not Be Found In Contempt Of Court. I have personal knowledge of the facts set forth in this declaration and if called as a witness, could and would testify competently to them.

2.      I am familiar with the case files for these matters. The files for these matters are kept at my shared direction in a secure electronic format at the offices of Alston & Bird LLP. Legal assistant Kim Niz and various associates maintain these files on a server at Alston & Bird.

3.      In preparing this declaration, others at my direction retrieved the true and correct copy of the documents described below and prepared them for inclusion in my declaration.

4.      On January 7, 2026, the Court held a hearing regarding the parties' competing ex parte applications. A court reporter was present at the haring on January 7, 2026, and the court reporter transcribed the proceedings. During the January 7, 2026 hearing, the Court "remind[ed] all counsel of [their] duty of candor to the Court." A true and correct copy of the Certified Hearing Transcript regarding the January 7, 2026 Hearing is attached hereto as **<u>Exhibit A</u>**.

5.      On March 13, 2026, Center for Biological Diversity's counsel, Talia Nimmer, provided the media with a statement concerning the United States Secretary of Energy's issuance of the Defense Production Act Order ("DPA Order") requiring Sable to commence the flow of oil through the Santa Ynez Pipeline System, including Segments CA-324 and CA-325. In an article entitled, "*Citing Iran crisis, Trump orders Santa Barbara oil pipeline restart. California will fight it*[,]" Counsel publicly stated that "Trump is misusing this Cold War-era law just to help a Texas oil company skirt vital state laws that protect our coastline, and Californians will pay the price." I accessed the article entitled, "*Citing Iran crisis, Trump orders Santa Barbara oil pipeline restart. California will fight it*" from

DECLARATION OF GARRETT B. STANTON

CalMatters.Org, and it is available at: https://calmatters.org/environment/2026/03/trump-emergency-sable-santa-barbara/. I downloaded the article and stored it in a secure electronic file management system at the offices of Alston & Bird LLP, which is maintained by various attorneys, legal assistants, and other employees at the firm. A true and correct copy of the article entitled, "*Citing Iran crisis, Trump orders Santa Barbara oil pipeline restart. California will fight it*" dated March 13, 2026, and available at: https://calmatters.org/environment/2026/03/trump-emergency-sable-santa-barbara/ is attached hereto as **Exhibit B**.

6.    On March 15, 2026, Environmental Defense Center's counsel, Jeremy Frankel, was quoted by the media concerning the DPA Order. In an article entitled, "*Trump orders oil production to restart off Santa Barbara County*[,]" Counsel is quoted as stating "[t]his oil isn't going to bring the price of oil down, not by one cent….Trump is using a war that he started to increase profits for his friends in the oil business." I accessed the article entitled, "*Trump orders oil production to restart off Santa Barbara County*" from CalCoastNews.Com, and it is available at: https://calcoastnews.com/2026/03/trump-orders-oil-production-to-restart-off-santa-barbara-county/. I downloaded the article and stored it in a secure electronic file management system at the offices of Alston & Bird LLP, which is maintained by various attorneys, legal assistants, and other employees at the firm. A true and correct copy of the article entitled, "*Trump orders oil production to restart off Santa Barbara County*" dated March 15, 2026, and available at: https://calcoastnews.com/2026/03/trump-orders-oil-production-to-restart-off-santa-barbara-county/ is attached hereto as **Exhibit C**.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 16th day of March, 2026, in Los Angeles, California.

By: _____
    Garrett B. Stanton

DECLARATION OF GARRETT B. STANTON

# EXHIBIT A

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SANTA BARBARA

SOUTH COUNTY REGION

COURTROOM SB-4          HON. DONNA GECK, JUDGE


CENTER FOR BIOLOGICAL DIVERSITY   )
and WISHTOYO FOUNDATION,          )
                                  )
     Petitioners/Plaintiffs,   )
                               ) Case No. 25CV02244
   vs.                         ) Consolidated with
                               ) Case No. 25CV02247
CALIFORNIA DEPARTMENT OF          )
FORESTRY AND FIRE PROTECTION, et  )
al.,                              )
                                  )
     Respondents/Defendants.   )
                               )
   and                         )
                               )
SABLE OFFSHORE CORP, et al.,     )
                                 )
     Real Parties in Interest. )
_____   )


REPORTER'S TRANSCRIPT OF PROCEEDINGS

WEDNESDAY, JANUARY 7, 2026


APPEARANCES:

For Petitioners Center for Biological Diversity
and Wishtoyo Foundation:

          CENTER FOR BIOLOGICAL DIVERSITY
          BY:  Talia Nimmer, Esq.
            Julie Teel Simmons, Esq.
          2011 Franklin Street, Suite 375
          Oakland, California 94612


(APPEARANCES CONTINUED)

2

APPEARANCES:

For Petitioners Environmental Defense Center, et al:

      ENVIRONMENTAL DEFENSE CENTER
      BY:  Jeremy M. Frankel, Esq.
         Linda Krop, Esq.
      906 Garden Street
      Santa Barbara, California 93101


For Respondents/Defendants California Department of Forestry and Fire Protection, Office of the State Fire Marshal:


      CALIFORNIA ATTORNEY GENERAL'S OFFICE
      By:  Michael S. Dorsi, Esq.
         Matthew Bullock, Esq.
      55 Golden Gate Avenue, Suite 11000
      San Francisco, California 94102

For Real Parties in Interest Sable Offshore Corporation and Pacific Pipeline Company:


      ALSTON & BIRD LLP
      By:  Jeffrey D. Dintzer, Esq.
         Garrett B. Stanton, Esq.
      350 South Grand Avenue, 51st Floor
      Los Angeles, California 90071

        and

      FAUVER, LARGE, ARCHBALD & SPRAY LLP
      By:  Trevor D. Large, Esq.
      820 State Street, 4th Floor
      Santa Barbara, California 93101


Reported by:    MELINA HUSER, CSR No. 12028
      Official Reporter Pro Tempore
      West Coast Court Reporters, Inc.
      300 Esplanade Drive, Suite 900
      Oxnard, California 93036

3

SANTA BARBARA, CALIFORNIA; WEDNESDAY, JANUARY 7, 2026

A.M. SESSION

THE COURT: Good morning, everyone. Welcome to Department 4. We have two ex partes on calendar in the matter of Center for Biological Diversity versus California Department of Forestry and Sable Offshore Corporation, court files -- consolidated court files 25CV02244, consolidated with Case 25CV02247.

May I have appearances, please?

MR. DORSI: Good morning, Your Honor. Deputy Attorney General Michael Dorsi on behalf of Respondents California Department of Forestry and Fire Protection. I'm here with my colleague, Matt Bullock.

THE COURT: All right. Thank you.

MS. NIMMER: Good morning, Your Honor. Talia Nimmer an behalf of Petitioners, and I'm here with my colleague as well, Julie Teel Simmons.

THE COURT: Good morning.

MR. FRANKEL: Good morning, Your Honor. Jeremy Frankel on behalf of Petitioners Environmental Defense Center, et al.

THE COURT: All right. Thank you.

MS. KROP: Good morning, Your Honor. Linda Krop on behalf of Petitioners Environmental Defense Center, et al.

THE COURT: Good morning.

MR. DINTZER: Good morning, Your Honor.

4

Jeffrey Dintzer on behalf of Real Party Sable Offshore and Pacific Pipeline.

MR. STANTON:  Good morning, Your Honor. Garrett Stanton on behalf of real parties in interest, Sable Offshore and Pacific Pipeline.

THE COURT:  Good morning.

MR. LARGE:  Good morning, Your Honor.  Trevor Large on behalf Real Party in Interest.

THE COURT:  All right.  Thank you.

I have read all moving papers.  I've read the opposition.  I've read the response to the oppositions.

Preliminarily, I have a couple of comments. First of all, I want to remind all counsel of your duty of candor to the Court.  Also, I'm not persuaded that either of the matters is appropriate for ex parte relief given the gravity of the matter here, the complexities involved, the jurisdictional issues, and I think that probably is the basis for believing the ex parte relief is not appropriate.  However, I will entertain argument from counsel if they want to be heard.

MS. NIMMER:  Thank you, Your Honor, yeah.  The Court does have --

THE REPORTER:  I'm sorry, Your Honor.  I should have introduced myself.  My name is Melina Huser.  My certification number is 12028, and I'll be reporting this matter.

THE COURT:  All right.  Thank you, Ms. Huser.

THE REPORTER:  And, Counsel, whoever is

speaking, I can't see your face, I don't know who you are.  Can you please identify --

MS. NIMMER:  Good morning.  This is Talia Nimmer.

The Court has discretion to order a status conference at any time, and the party may request a status conference at any time pursuant to California Rules of Court 3.723.  And here, recent developments necessitate a status conference.  For example, as you have mentioned, the pipeline and -- the Hazardous Material Safety Administration has issued an emergency special permit, has issued restart plan approvals, and has asserted jurisdiction over the pipelines.  So a status conference is needed to update the Court of what's been going on.  And this is grounds alone for a status conference --

THE COURT:  What's the last thing you said?

MS. NIMMER:  That would be grounds alone for a status conference.

But beyond that, a status conference is urgently needed because Sable indicated that it may restart the pipelines imminently, as soon as December 30th, 2025 --

THE COURT:  Which has come and gone.

MS. NIMMER:  Which has come and gone.  But we have not -- despite repeated requests, we have not confirmed whether Sable has restarted the pipelines or been able to confirm that Sable intends to or is in

6

compliance with the Court's July 29, 2025, preliminary injunction order.  And had Sable been forthcoming about this with Petitioners' counsels' repeated requests, this status conference may not have been needed altogether, but as it stands, the status conference is needed to assess the status of the pipelines and to assure the Court and the parties alike that Sable is in compliance with the Court's order.

With regard to the jurisdictional mootness issues that Sable raised, although Petitioners strongly disagree with those arguments, that is simply not before the Court today.  What -- all that Petitioners are requesting is a status conference to apprise the Court and public alike where things stand today and assure everyone that Sable will comply with this Court's existing and enforceable order.

THE COURT:  All right.  Thank you.

Do you wish to be heard, Counsel?

MR. DINTZER:  Yes.  Thank you very much, Your Honor.

As this Court is aware, this case is based upon an attack over the State Office of Fire Marshals' waivers over portions of the Los Flores Pipeline System.

Since this Court issued its injunction, the pipeline has been classified as an interstate pipeline, and, thus, is now under the jurisdiction of the Pipeline Hazardous Materials Safety Administration, which is a federal agency often referred to as PHMSA.

7

In the complaint filed by EDC -- I think this is repeated in the complaint filed by CBD -- paragraph 128, and this is on page 29, the following allegation is made:  For interstate pipelines, PHMSA has exclusive jurisdiction over matters of pipeline safety.  In fact, state authorities are expressly preempted from, quote, adopting or continuing to enforce safety standards for interstate pipeline facilities.  And there's a citation.

PHMSA has issued waivers and approved the full operation of the entire Los Flores Pipeline System.  OFSM's [sic] jurisdiction has been revoked and is no longer -- OSFM no longer has a say in terms of restarting of the pipeline; thus, Sable and Pacific Pipeline no longer need the state waivers and this case is moot.  This Court no longer has jurisdiction over this matter and the preliminary injunction --

THE COURT:  Let me interrupt.

MR. DINTZER:  Yes, Your Honor.

THE COURT:  Isn't there an appeal currently pending in the ninth circuit?

MR. DINTZER:  Yes, Your Honor.  I'm getting to that right now.  Let me just finish up.

So this matter and the preliminary injunction, we believe, must be dissolved forthwith.  Jurisdiction over the existing federal waivers and permit to restart the remaining portions of the Los Flores Pipeline System is now in the ninth circuit, as the Court has

8

articulated, where the petitioners -- these two petitioners before the Court availed themselves of jurisdiction and filed an emergency request to immediately stay, which was denied by the ninth circuit. And they set the matter on an ex parte schedule so the petitioners would have an opportunity to litigate the issue in a timely manner.  Okay?

Thus, this Court's preliminary injunction is in conflict with the ninth circuit's order denying injunctive relief with respect to the lawful operation of the pipeline.

There is no room for delay.  The Court's injunction must be resolved immediately to avoid the constitutional quandary that is presented.  So we'd submit that if the Court is not going to entertain the ex parte application with respect to shortening time, that at least we have a hearing by the 23rd of January so that this matter can be resolved.  We cannot have a federal court that is saying we are permitted to restart the pipeline and a state court saying exactly the opposite.  That cannot exist in the same universe.

And I would point out that we do not believe there is any justification whatsoever for the petitioners, who have now availed themselves of jurisdiction in the ninth circuit, to continue to try and enforce a preliminary injunction in a state system. It is a constitutional issue.  All right?

And so we'd request that the Court set this

9

promptly for hearing so we can have this matter resolved. We've given them the chance to have their say about this issue, fair chance for the fire marshal to have his say about the issue, but this has to be resolved promptly.

We have submitted previously to this Court, and this Court is well aware of the -- in conjunction with the preliminary injunction motion that we filed declarations showing the harm to -- Sable, substantial financial harm to Sable that exists every single day that this injunction remains in place.

THE COURT: All right. What about Petitioner's argument that given the complexity and gravity of the matter that they need more time to respond if I were to set it on shortened notice?

MR. DINTZER: Well, Your Honor, we filed our papers yesterday, effectively. They've had them since Monday. They've had our papers. They've known what their position is. They've known really what our position is for weeks now. They filed their petition in the ninth circuit on the 24th of December, Christmas Eve. So they've known about all of this. This is not new.

They went into federal court knowing -- they pled it in their complaint -- that PHMSA has exclusive jurisdiction over this matter. And when they did that, okay, it's an absolute concession, a pure concession that the federal court now has jurisdiction of this

10

matter.  This Court -- there is no way this Court can continue to hold on to an injunction when the case is about state waivers that are no longer relevant to our operation of the pipeline.

In fact, I would submit, Your Honor, you know, really, based on the record that you have before you today, the preliminary injunction should be revoked.

If they want to come back and -- today, frankly, if they want to come back and say, Hey, we have whatever, to this state court, they can do that.  The fact is they went to the ninth circuit which has jurisdiction.  They recognized that.  And the ninth circuit said, "We're not going to issue an injunction," which is in conflict with what this Court is presently sitting on.  We have a separation of constitutional functions here, and there's a supremacy issue here. It's a big one.  And there is no doubt now that this is a -- this is a federally regulated pipeline system. That is not in question.

And with all due respect, Your Honor, this Court no longer has jurisdiction to continue to enforce an injunction which has to do with state waivers that we no longer are relying upon.  We have the waivers, and we have authority from the federal government, okay, to restart our pipeline today, and we should not be -- to further delay in having to operate a pipeline, which is, you know -- which we have now waited for, you know, this process to play out.

And we've been patient.  We have not come back to this Court you know, willy-nilly.  We waited until the ninth circuit ruled on the motion to stay to see if there was going to be an inconsistency in the rulings.  Now there is clearly an inconsistency in the rulings, and we would submit the ninth circuit has supremacy in this matter, and they will have their full opportunity to have their hearing before the ninth circuit on an expedited basis, and the Court should revoke the injunction forthwith and let the ninth circuit deal with this matter.  We will --

THE COURT:  That's not what you put in your papers.

MR. DINTZER:  I understand.  That's why I wanted to give them a fair chance to be heard.

THE COURT:  Okay.  But what you said in your papers is you were not looking for affirmative relief in this ex parte; you were only addressing scheduling.

MR. DINTZER:  That is true, Your Honor.  And I'm going to -- I will stick with my papers today.  Okay.  I am not going to ask the Court to do anything beyond what we have filed.  Okay.  I'm just saying that -- I'm trying to impress upon the Court the urgency of this.

So my view is we filed our papers.  Effectively they have them Monday, which is the first day everybody came back.  Right?  And so we got them to them by 1 o'clock in the afternoon.  They've had them.

12

Mr. Dorsi has had them.  And they can file their opposition.  I think we proposed that the opposition papers be due on the ninth day.

I'm clearly well-vested in this issue.  They know it.  We will file our reply by the 14th, and we can go onto the Court's calendar on the 16th, which is a Friday, which I understand is the day the Court has -- hears law-and-motion matters, and we can have this issue resolved.

I think it's going to be a slam dunk because there's just no chance that they can continue to litigate this case in the ninth circuit and litigate this case in the state court.  They can't have concurrent jurisdiction.  That's not the case, and their own pleading says that.

THE COURT:  Okay.

MR. DINTZER:  So I just think that, you know, we -- this is costing us millions of dollars every day. This is a big, big deal for this company, and we need to get this injunction lifted and get this case in compliance with what the ninth circuit -- which now has jurisdiction over this case to handle this matter.  All right?  And so we are very serious getting this resolved as promptly as possible.

THE COURT:  Understood.

All right.  Does anyone else wish to be heard?

MR. DORSI:  Just briefly.  I think your tentative views are good --

13

THE COURT:  Please state your name for the record.

MR. DORSI:  Deputy Attorney General Michael Dorsi on behalf of the respondent.  My apologies on that, Your Honor.

THE COURT:  That's okay.

MR. DORSI:  I think your initial approach makes some sense.  The issues are somewhat more complicated than the real party has indicated.

Just one piece of the state-versus-federal relationship that they have not explained is they have not -- the real parties have not sought an injunction in this case in federal court, nor could they do so because it is explicitly barred by the Anti-Injunction Act, the federal statute.  The fact that state courts and federal courts deal with overlapping issues occurs all the time.  What this Court should do here is a tricky question, and you should allow this case to be briefed on the ordinary briefing schedule.

The preemption question is not as clear-cut here.  The statement that PHMSA has asserted jurisdiction does not answer the issue.  The deference to federal agencies that used to be the law under Chevron versus NRDC was recently overruled in Loper Bright Enterprise versus Raimondo.  So there is no deference to the agency's interpretation based on ambiguity in the federal statute.

These are complicated issues, and you should

14

not require the attorney general and the Office of the State Fire Marshal, who tried to be deliberate and tried to take well-reasoned positions consistent with the other positions of the agencies of the State of California to do so on shortened time.  So we would support your tentative view.

THE COURT:  Thank you.

MR. DINTZER:  May I respond briefly?

THE COURT:  Yes, you may.

MR. DINTZER:  Thank you very much.

I don't believe that the fire marshal has any standing whatsoever here because this is an injunction against the fire marshal and against my client.  Okay.

They didn't file a complaint.  They haven't filed nothing except an answer to this complaint.  They have no standing whatsoever to be even objecting to the removal of the injunction.  It's an injunction against them.  So there's no -- and my client, obviously.

So Mr. Dorsi's comments that he needs time to evaluate the validity of our request for reconsideration, I think, is hollow.

THE COURT:  All right.  I couldn't hear you, go ahead.

MR. DORSI:  Deputy Attorney General Michael Dorsi.

You started this hearing by reminding us about our duty of candor, and part of the duty of candor of a state agency is tell the Court what it thinks about

15

questions of law.  And our thinking about the questions of law raised here is that they are complicated and that we would like our time to be able to figure out what we are going to say to this Court.  So short-circuiting it on the basis that we are a respondent, when we have a duty of candor, I think, makes no sense.

THE COURT:  All right.  Thank you.

MR. FRANKEL:  May I respond, Your Honor?

THE COURT:  You may.

MR. FRANKEL:  So just a couple things.  I think, you know, frankly we just heard a lot of misleading statements from counsel for Sable and a lot of conflating of the federal action and the state action.  So let me just begin by making it very clear that just because we challenged PHMSA's approvals, which are completely separate than those of the state fire marshal, does not in any way concede or recognize that PHMSA properly arrested jurisdiction from this agency and any of its following actions were in any way lawful or appropriate.  So that's number one.

Whether the agency has jurisdiction, whether this pipeline is interstate or intrastate, all of those questions are not answered yet, and they will be answered eventually by the ninth circuit, and there probably is going to be additional proceedings surrounding that.  So that is completely an open question.

Just because Sable is saying unilaterally that

this case is moot, that the fire marshal doesn't have jurisdiction, that doesn't make it so.  I think it's really important to remember that the state waivers, they're still in effect.  Sable has not conceded that they are not effective.  So if things go south for them in the ninth circuit, they're just going to fall back to the state waivers.  So there's no mootness with this case.  It's completely two separate proceedings.  And there's -- for the same reason, there's no constitutional quandary between what the federal court has done and what the state court has done with this injunction.

All the Court did in the ninth circuit when it denied the stay was say that for whatever reason -- there was really actually no explanation given.  It was just a one-sentence order -- that under those circumstances and the laws surrounding what PHMSA did, it sought -- you know, sought fit to allow expedited briefing instead of issue a stay.  It did not rule on any of the questions presented in this case before this Court and does not somehow conflict with this Court's injunction.

THE COURT:  Let me ask a question.  I'm going to interrupt and ask a question.

When is it anticipated that the ninth circuit will rule?

MR. FRANKEL:  So our final --

THE COURT:  The briefing schedule.

17

MR. FRANKEL: The briefing schedule ends March 17th.

THE COURT: Okay.

MR. FRANKEL: We expect, because it's expedited, an opinion would issue promptly thereafter, potentially even before, when this motion for reconsideration is calendared for mid-April.

And then I just, you know, want to just finish by saying any amount of -- you know, any claims that this is exigent is just a fabrication.

I talked about this, you know, fabricated constitutional quandary, but there is nothing in the papers that Sable has submitted that says that they are going to be prejudiced by waiting until April 17th to have this motion heard.

If they truly were on the precipice of lawfully restarting, they still can, but they could have just filed a ten-day notice to lift the injunction. That is part of the injunction order. They didn't do that. And it really belies all these claims they're making that they're suffering ongoing prejudice from having this injunction in place, and that remains in effect. They have that remedy available to them in the interim until April.

So should they come to the point where they can lawfully restart, they can just do that. There really is no exigency to rush this really, really consequential motion, which as you just heard, involves really

18

far-reaching ramifications, really complex jurisdictional questions. We really need to be afforded the opportunity of not four calendar days -- and you heard from Mr. Dorsi as well -- to really fully brief this issue for the Court's benefit as well.

So we would really respectfully request that the Court deny this application for the order shortening time and keep the motion calendared for April 17th.

Again, if developments change and they can lawfully restart, they can just file this ten-day notice to do so. So there is no prejudice to Sable.

And very lastly, going back to the status conference -- and this is related -- they have gone through clearly, you know, a lot of pain to not tell this Court or Petitioners what is going on at the facilities and whether they're in compliance with the Court's injunction. They won't give an answer about it.

We really would respectfully request that the Court ask them directly, because it also bears on whether they should be getting equitable relief here.

If they're not going to be candid with the Court, the Court should not be entertaining any type of equitable relief including this order shortening time.

THE COURT: Counsel, can you please address the status?

MR. DINTZER: Your Honor, first of all, I want to point out that there's no reason to believe that. They've put forward no evidence whatsoever that we're in

violation of this Court's --

THE COURT: Can you please answer my question.

MR. DINTZER: Yes, Your Honor.

The Los Flores Pipeline System has been operational, that is, active since May of 2025. Sable and Pacific Pipeline continue to be in compliance with this Court's injunction on the record before the Court that we have before us today, anyway. And we have every intention to continue to comply with this Court's injunction.

THE COURT: Thank you.

MR. DINTZER: Thank you.

MR. FRANKEL: Your Honor, I think respectfully, that wasn't really an answer to the question and --

THE COURT: It was quite evasive.

MR. FRANKEL: Quite evasive. And I think the real question is, Have they introduced oil into lines 324 or 325 since this injunction was entered?

MR. DINTZER: The answer to that question is no.

THE COURT: Okay. Thank you. Appreciate it.

MR. DINTZER: I thought I was clear. If there was an ambiguity in what I said, I apologize.

THE COURT: That's okay. It's not a problem.

Let me make sure. Anybody else want to be heard?

MR. DINTZER: Your Honor, if you'll give me just a moment to respond.

20

THE COURT: Sure. Go ahead.

MR. DINTZER: Two quick points. Number one, this matter is now in the ninth circuit. They can litigate all of these issues in the ninth circuit.

And with respect to the ten-day notice, the ten-day notice was with respect to the stay. We are not in that paradigm any longer. We're now in the federal paradigm. And we actually have federal waivers, and we have a permit to restart. So we can -- if this -- as soon as this Court lifts its injunction, we can go forward with our restart plan. That's the only thing that now is an impediment to us doing that.

So, you know, Your Honor, again, this is a matter of -- which needs to be addressed by this Court forthwith.

THE COURT: I understand that's your position.

MR. DINTZER: Thank you very much.

THE COURT: Petitioners also need to be given a fair opportunity to address the issues, so I'm inclined, after hearing all of your arguments, to set it on shortened time. Certainly not on your schedule. It's just too fast. But I can set it -- I think probably a reasonable compromise would be to set it at the end of February on perhaps February 27th at 10 o'clock. And we can make oppositions due -- how about February -- Friday, February 13th, and then we can make replies due by Wednesday, February 18th.

MR. DINTZER: That schedule is fine with --

21

THE COURT:  I think that's a reasonable compromise for everyone.

MR. FRANKEL:  We agree, Your Honor.  That is reasonable to us.

THE COURT:  All right.  Who would like to take the burden of preparing the order?

MR. DINTZER:  We'll prepare the order, Your Honor.

THE COURT:  Thank you for doing that.  Thank you.

All right.  Thanks, everyone.

(Proceedings concluded.)

22

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SANTA BARBARA

SOUTH COUNTY REGION

CENTER FOR BIOLOGICAL DIVERSITY )
and WISHTOYO FOUNDATION, )
)
Petitioners/Plaintiffs, )
) Case No. 25CV02244
vs. ) Consolidated with
) Case No. 25CV02247
CALIFORNIA DEPARTMENT OF )
FORESTRY AND FIRE PROTECTION, et )
al., )
)
Respondents/Defendants. )
)
and )
)
SABLE OFFSHORE CORP, et al., )
)
Real Parties in Interest. )
_____ )

I, MELINA HUSER, CSR NO. 12028, Certified

Shorthand Reporter of the State of California, for the

County of Ventura, do hereby certify that pages 1

through 22, inclusive, are a full, true, and correct

transcript of the proceedings had in the above-entitled

case on January 7, 2025.


Dated at Ventura, California, this 14th day of

January, 2026.



_____

Melina Huser, CSR No. 12028
Official Reporter Pro Tempore

# EXHIBIT B



**Donate**

Track Your Legislator   Politics   Immigration   Housing   Education   Economy   Environment   California Voice

**ENVIRONMENT**

# Citing Iran crisis, Trump orders Santa Barbara oil pipeline restart. California will fight it



**BY ALEJANDRO LAZO**
**MARCH 13, 2026**

Republish

An offshore oil platform in the Santa Barbara Channel. Photo by Marli Miller, Universal Images Group via Getty Images

**IN SUMMARY**

- The Trump administration ordered the restart of a Santa Barbara oil pipeline shut since the 2015 Refugio spill, invoking emergency powers under the Defense Production Act.
- California officials say the move defies court orders and state oversight. Gov. Gavin Newsom said the state will sue.
- The order escalates a fight over whether federal authority can override California regulators blocking Sable Offshore's plan to restart the pipeline.

The Trump administration invoked emergency powers under the Defense Production Act Friday, ordering the restart of the Santa Ynez offshore oil platform and pipeline along the Santa Barbara County coast that was shuttered after a spill released thousands of barrels of crude into the Pacific 11 years ago.

The move, which comes in response to skyrocketing fuel prices in the wake of the Iran conflict, brought an immediate threat to sue by Gov. Gavin Newsom.

The order also marks the most aggressive federal intervention yet in a yearslong dispute. On one side is the Trump administration and Sable Offshore Corp., a Houston-based startup that has been trying to restart the pipeline. On the other are California officials and environmental groups who oppose the effort.

Sable, which bought the system from ExxonMobil in 2024, has told investors that production could increase from about 30,000 barrels of oil equivalent per day to more than 50,000 if the system restarts, sending oil to refineries in Los Angeles, Bakersfield and the Bay Area. The company did not immediately respond to a request for comment Friday evening.

The ruptured pipeline released crude oil onto beaches north of Goleta in May 2015, **killing hundreds of birds and marine mammals** and triggering one of the worst California coastal oil spills in decades.

Sable was blocked from restarting operations by court orders requiring approval from California regulators — a requirement the Trump administration has tried to override.

On Friday, Energy Secretary Chris Wright said in a statement that the Trump Administration "remains committed to putting all Americans and their energy security first. Today's order will strengthen America's oil supply and restore a pipeline system vital to our national security and defense, ensuring that West Coast military installations have the reliable energy critical to military readiness."

Newsom said, however, that California will sue the Trump administration over the move.

"Donald Trump started a war, admitted it would spike gas prices nationwide, and told Americans it was a small price to pay," Newsom said. "Now he's using this crisis of his own making to attempt what he's wanted to do for years: open California's coast for his oil industry friends so they can poison our beaches."

"The Trump administration and Sable are defying multiple court orders, and we will see them back in court," Newsom said.

The Energy Department did not immediately provide CalMatters with a copy of the order. A **March 3 legal opinion** from the Justice Department concluded that a federal order under the Defense Production Act of 1950 could preempt state law in the Sable case. It also said such an order could override a 2020 federal consent decree stemming from the 2015 Refugio spill that requires approval from the California State Fire Marshal before the pipeline can restart.

Earlier Friday, the White House **issued an executive order** expanding and clarifying the energy secretary's authority to act under the Defense Production Act.

Environmental groups challenging the legality of Sable's plans condemned the move.

"This is a revolting power grab by an extremist president," said Talia Nimmer, an attorney at the Center for Biological Diversity, which has challenged the pipeline restart in state and federal court. "Trump is misusing this Cold War-era law just to help a Texas oil company skirt vital state laws that protect our coastline, and Californians will pay the price."

Nimmer said forcing the pipelines to restart would not lower gasoline prices but would expose coastal wildlife to the risk of another spill. Allowing the federal government to override state law so an oil company can restart the pipelines, she said, would set a dangerous precedent. The Trump administration has long sought to expand offshore oil leasing along the West Coast, which has drawn fierce opposition in California.

In December, federal officials sought to shift authority over the pipeline from California regulators to Washington when the Pipeline and Hazardous Materials Safety Administration ruled that the infrastructure qualifies as an interstate pipeline. It issued an emergency permit approving a restart plan.

Environmental groups and the state of California challenged that move and are awaiting a ruling in the 9th U.S. Circuit Court of Appeals.

A representative for Attorney General Rob Bonta could not immediately be reached for comment on Friday. After the Justice Department released its memo outlining the legal basis for the move, Bonta spokesperson Christine Lee said the state was reviewing that development.

"The Trump Administration's desire to put oil and gas interests over our communities and a clean environment continues unabated," Lee said, on Tuesday. "We are reviewing this development and cannot comment on legal strategy."

Last month, a Santa Barbara County Superior Court judge **ordered the pipeline to remain shut down**, ruling that the Trump administration's earlier intervention was not enough to override an injunction requiring Sable to obtain state approvals before restarting.

**READ NEXT**



### Santa Barbara judge rules against company that turned to Trump for help restarting pipeline

FEBRUARY 26, 2026



### Oil company fined record $18 million for defying state orders to stop work on pipeline

APRIL 10, 2025



### Gavin Newsom warms to Big Oil in climate reversal

AUGUST 18, 2025

© 2026 CalMatters

# EXHIBIT C



Home    Uncovered SLO    Daily Briefs    Discovered    Sales and Deals    Opinion    Eye on the Coast    Login
Share Your Opinion    Subscribe    Advertise    Search    Tips    Newsletter

Sponsored Links

# Trump orders oil production to restart off Santa Barbara County

**March 15, 2026**



By KAREN VELIE

President Donald Trump on Friday directed Sable Offshore to resume oil production off the coast of Santa Barbara under the Defense Production Act. Sable Offshore has been unable to produce oil because of ongoing disagreements over permitting its Santa Ynez pipeline.

Sable is slated to produce approxamatly 50,000 barrels of oil per day, "a 15% increase to California's in-state oil production, that can replace nearly 1.5 million barrels of foreign crude each month," according to the Department of Energy.

It is estimated that more than 60 percent of the oil refined in California is shipped in from overseas, including oil that travels through the Strait of Hormuz.

"The Trump Administration remains committed to putting all Americans and their energy security first," U.S. Secretary of Energy Chris Wright said in a statement. "Unfortunately, some state leaders have not adhered to those same principles, with potentially disastrous consequences not just for their residents, but also our national security.

"Today's order will strengthen America's oil supply and restore a pipeline system vital to our national security and defense, ensuring that the West Coast military installations have the reliable energy critical to military readiness."

Congressman Salud Carbajal hit back saying that Trump is using the war in Iran to override the will of California and Santa Barbara County residents.

"The reality is that restarting the Sable project would produce nowhere near enough oil to lower the skyrocketing gas prices families are facing," Carbajal said. "His reckless war is causing immense damage, and jamming the Sable project through is a hollow solution."

For more than six months, state and federal regulators have battled over the reopening of the Santa Ynez pipeline, which is needed to transport the oil. While the State Fire Marshal argues Sable had not yet completed all of the repairs necessary to restart the pipeline, federal regulators claim they have jurisdictional control.

The Defense Production Act grants the president powers to ensure the nation's defense by expanding and expediting the supply of materials and services from the domestic industrial base.

In 2015, a pipe owned by Plains All American Pipeline ruptured near Refugio State Beach in Santa Barbara County, causing more than 100,000 gallons of oil to spill. About 21,000

Sponsored Links

## Search Cal Coast News.Com

Sponsored Links

## Recent And Most Commented

- Recent topics
- Most viewed
- Most commented

gallons flowed into a culvert and then into a ditch that drained into the ocean.

The spill spread over 9 miles of mostly sandy beaches and led to the closure of the three offshore drilling platforms and the pipeline, which are now owned by Sable.

In May 2025, Sable resumed oil production in federal waters offshore of Santa Barbara County. It started extracting oil from one of three platforms that had been closed since the 2015 spill.

The resumption of offshore oil production began just a month after the California Coastal Commission fined Sable $18 million and ordered a halt to their work for not obtaining necessary permits. The company disputes the Coastal Commission's finding, arguing it has all the required permits for its operations.

Environmental groups, including the Center for Biological Diversity, have criticized the offshore oil production restart, citing risks to sensitive habits and species.

Before the Iran War started, Sabel argued that restarting oil production off the coast of Santa Barbara was in the national interest – an argument environmental groups claim is fear mongering.

"This oil isn't going to bring the price of oil down, not by one cent," said Jeremy Frankel, an attorney with the Environmental Defense Center. "Trump is using a war that he started to increase profits for his friends in the oil business."

***Because we believe the public needs the facts, the truth, CalCoastNews has not put up a paywall because it limits readership. However, we are seeking qualification as a paper of record, which will allow us to publish public notices, this requires 5,000 paid subscribers.***

***Your subscription will help us to continue investigating and reporting the news.***

## Support CalCoastNews, subscribe today, click here.





**Born to Bond: The Zodiac Signs Who Thrive in Deep Relationships**

InspireDot



**Adam Lambert, 43, Takes Off Makeup, Leaves Us With No Words**

Buzz Day



**Idle Game, Big Action!**

Hero Wars

Subjects: **offshore oil    President Donald Trump    Santa Barbara**

Related:

More oil production to restart offshore of Santa Barbara County

Oil production to restart offshore of Santa Barbara County

<- Previous article

**Inmate died at San Luis Obispo County Jail**

Next article ->

**Why won't anybody talk to me?**

•
•

 SUBSCRIBE

## Popular Today

- Teen hits, kills toddler in stroller in Santa Maria
- Arrests, violations and medical issues amid St. Fratty's Day in SLO, photos
- Inmate died at San Luis Obispo County Jail
- State investigating apparent voter petition fraud tied to SLO County
- Trump orders oil production to restart off Santa Barbara County
- Gas prices in SLO County rise higher, find lowest costs
- Hazmat crews respond to incident at blood bank in San Luis Obispo
- Delivery truck slams into tree in downtown San Luis Obispo
- Why won't anybody talk to me?
- Morro Bay City Council approves purchase of elementary school property

## CCN Team

Editor Bill Loving

Reporter Karen Velie, (805) 234-1703

Reporter Josh Friedman

Founder Daniel Blackburn

Reporter Ben Di Gugliemo

Be part of the news. Send pics, videos and tips to CCN.

Tip Your Team tips@calcoastnews.com

Advertise ads@calcoastnews.com

Moderator moderator@calcoastnews.com

Site Issues admin@calcoastnews.com

•

## Connect with us!



- Subscribe

Tip your team

## Subscribers

- Register
- Log in
- Entries feed

Oil production restarted offshore of Santa Barbara County 10 years after spill

California Coastal Commission's $18 million fine over oil pipeline

Santa Barbara County denies proposal to restart offshore oil production

Central Coast oil platform sets new record

The comments below represent the opinion of the writer and do not represent the views or policies of CalCoastNews.com.  Please address the Policies, events and arguments, not the person. Constructive debate is good; mockery, taunting, and name calling is not.    Comment Guidelines

Copyright © 2008-2023 **Cal Coast News**. Trademarks property of their respective owners. All posts and Comments © the original authors.

Login

Please login to comment

## 10 COMMENTS

**L.B. Jefferies**

03/16/2026 12:08 pm

I am very curious to see what the anti-windmill people are going to say. All the environmental and aesthetic arguments apply to oil rigs far more than to offshore wind. If they're opposed then I will respect that at least they're honest anti-growth anti-development NIMBYs. If they're mute or supportive, I think that gives the game away, it's just MAGA culture war Idiocracy.

 -6

**Jorge Estrada**

03/16/2026 11:10 am

Some things should be on a need-to-know basis, telling the whole world what, where and when may be asking for trouble. Not to be sinical, it does seem like media wants to be the first to tell.

 1

**Flipside**

03/16/2026 10:47 am

Lets see if this makes sense… We receive no oil from Iran, very little from the middle east but are restarting oil wells on the west coast under the Defense Act because trump had a "feeling" Iran was going to attack.

Makes complete sense.

 6

> **kayaknut**
>
> Reply to  Flipside    03/16/2026 2:07 pm
>
> Here is a crazy idea, use CA oil to resupply the US strategic oil reserves or sell it to countries that do need it.
>
>  4

**CaliGirl2**

03/16/2026 10:40 am

Salud Carbajal on 3/11/26 in Op-Ed published by CCN: "we have an affordability crisis on the central coast. Watch me on my affordability tour talk to people about more government handouts" (inflationary solutions). Also Salud Carbajal on 3/16/26: "increasing the supply of locally produced oil

by 10-15% won't lower prices in any Significant Way, it's a hollow solution" (increased supply is a deflationary solution, with the added benefit of bringing $100k jobs BACK to the central coast which is profitable for everyone from the schools that benefit from tax revenue to the service industry that benefits from discretionary spending). Go back to Econ101, Salud!

1.5 million barrels a month = 18 million barrels a year @ $90 a barrel = $1.62Billion added to local economy. Yes, I voted for this!

 12

### slocorruptionhater
Reply to  CaliGirl2   03/16/2026 10:44 am

You voted for war. That's what you voted for.

 -15

#### NorCounty
Reply to  slocorruptionhater   03/16/2026 11:56 am

Bet you have a Ukrainian flag topsheet and comforter.

 5

#### kayaknut
Reply to  slocorruptionhater   03/16/2026 2:10 pm

BTW we have been at war with Iran for at least 50 years, not sure you rememeber when they help US citizens hostage after stroming the US Embassy

 7

### Mopar
03/16/2026 9:57 am

Trump is helping California save itself despite what the installed politicians here say.

Carbajal works for the people that are trying to destroy our state.

 13

### Rambunctious
03/16/2026 6:15 am

Good….

 34

**PROOF OF SERVICE**

I, Garrett Stanton, declare:

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is Alston & Bird LLP, 350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071.

On March 16, 2026, I served the document **DECLARATION OF GARRETT B. STANTON IN SUPPORT OF REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S OPPOSITION TO PETITIONERS' COMBINED EX PARTE APPLICATION FOR AN ORDER TO SHOW CAUSE WHY REAL PARTIES IN INTEREST SHOULD NOT BE FOUND IN CONTEMPT OF COURT** on the interested parties in this action addressed as follows:  **See Attached Service List**

1.  ☒   BY ELECTRONIC SERVICE on the date stated below, I caused the document(s) described above to be served electronically on the recipients designated on the Transaction Receipt pursuant to the parties' stipulation establishing the authorizing e-service of documents.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on March 16, 2026, at Los Angeles, California.

/s/ *Garrett Stanton*

Garrett Stanton

**SERVICE LIST**

| Julie Teel Simmonds, Esq.<br>David Pettit, Esq.<br>Talia Nimmer, Esq.<br>**CENTER FOR BIOLOGICAL DIVERSITY**<br>2011 Franklin Street, Suite 375<br>Oakland, CA 94612<br>Tel.: (510) 844-7100<br>Fax: (510) 844-7150<br>jteelsimmonds@biologicaldiversity.org<br>dpettit@biologicaldiversity.org<br>tnimmer@biologicaldiversity.org | *Attorneys for Petitioners: Center for Biological Diversity and Wishtoyo Foundation* |
|---|---|
| Duncan Joseph Moore<br>Benjamin J. Hanelin<br>Natalie C. Rogers<br>**PAUL HASTINGS**<br>1999 Avenue of Stars, 27th Floor<br>Century City, CA 90067<br>Tel: (310) 620-5879<br>Fax: (310) 620-5899<br>djmoore@paulhastings.com<br>benjaminhanelin@paulhastings.com<br>natalierogers@paulhastings.com | *Attorneys for Real Parties in Interest: Sable Offshore Corp. and Pacific Pipeline Company* |
| Trevor D. Large (SBN: 214886)<br>Victoria C. Diffenderfer (SBN: 350018)<br>**FAUVER LARGE ARCHBALD & SPRAY**<br>820 State Street, 4th Floor<br>Santa Barbara, CA 93101<br>Tel: (805) 966-7000<br>Fax: (805) 966-7227<br>tlarge@flasllp.com<br>vdiffenderfer@flasllp.com | *Attorneys for Real Parties in Interest: Sable Offshore Corp. and Pacific Pipeline Company* |
| Linda Krop, Esq.<br>Jeremy M. Frankel, Esq.<br>Tara C. Rengifo, Esq.<br>**ENVIRONMENTAL DEFENSE CENTER**<br>906 Garden Street<br>Santa Barbara, CA 93101<br>Tel: (805) 963-1622; (510) 844-7100<br>Fax: (805) 962-3152; (510) 844-7150<br>lkrop@environmentaldefensecenter.org<br>jfrankel@environmentaldefensecenter.org<br>trengifo@environmentaldefensecenter.org | *Attorneys for Petitioners: Environmental Defense Center, a California non-profit corporation; Get Oil Out!, a California non-profit corporation, Santa Barbara County Action Network, a California non-profit corporation, Sierra Club, a national non-profit corporation, and Santa Barbara Channelkeeper, a California non-profit corporation* |

| Michael S. Dorsi, Esq. **CALIFORNIA ATTORNEY GENERAL'S OFFICE** 55 Golden Gate Ave, Ste 11000 San Francisco, CA 94102 Tel.: (415) 510-3802 Michael.dorsi@doj.ca.gov | *Attorneys for Respondents/Defendants: California Department of Forestry and Fire Protection, Office of the State Fire Marshal, Daniel Berlant (in his official capacity as State Fire Marshal)* |
|---|---|

Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 884-7100
*Attorneys for Petitioners/Plaintiffs Center for Biological Diversity and Wishtoyo Foundation*

Linda Krop (Bar No. 118773)
lkrop@environmentaldefensecenter.org
Jeremy M. Frankel (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
Tara C. Rengifo (Bar No. 307670)
trengifo@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152
*Attorneys for Petitioners/Plaintiffs Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper*

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Angela Braun, Executive Officer
3/16/2026 9:00 PM
By: Gabriel Moreno , Deputy

**SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF SANTA BARBARA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,<br><br>Petitioners/Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive,<br><br>Respondents/Defendants.<br><hr>SABLE OFFSHORE CORP., a Delaware Corporation; PACIFIC PIPELINE COMPANY, a Delaware Corporation; and DOES 11 through 20, inclusive,<br><br>Real Parties in Interest. | Case No.: 25CV02244<br>[Consolidated with Case No. 25CV02247]<br><br>**PETITIONERS AND PLAINTIFFS' COMBINED OPPOSITION TO REAL PARTIES IN INTEREST'S EX PARTE APPLICATION FOR REQUEST FOR IMMEDIATE RESCISSION OF PRELIMINARY INJUNCTION**<br><br>Date:     March 17, 2026<br>Time:     8:30 a.m.<br>Dept.:     4<br>Judge:   Honorable Donna D. Geck<br><br>Action Filed: April 15, 2025 |

Petitioners and Plaintiffs' Combined Opposition to Real Parties in Interest's Ex Parte Application

ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation,

Petitioners/Plaintiffs,

v.

CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, an agency of the State of California; OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive,

Respondents/Defendants.

SABLE OFFSHORE CORP., a Delaware Corporation; and PACIFIC PIPELINE COMPANY, a Delaware Corporation,

Real Parties in Interest.

Case No.: 25CV02247
[Consolidated with Case No. 25CV02244]

## I.     **<u>INTRODUCTION</u>**

Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company (together, "Sable") apply to this Court *ex parte*, for a second time, for an order rescinding the Court's July 29, 2025 Orders for Preliminary Injunction (the "PI Orders") based on a theory of preemption (the "Application"). This time, it cites an order issued by the Department of Energy under the Defense Production Act (the "DPA Order"). As with Sable's prior application, this one likewise asks the Court to resolve, on an *ex parte* basis, complex jurisdictional issues with far-reaching ramifications for this case and others. The Court should deny Sable's Application for at least three reasons.

First, as with Sable's prior *ex parte* application which this Court rejected, Sable has again failed to show exigent circumstances warrant the extraordinary relief it is requesting. Most notably, and as recognized by this Court little more than two weeks ago, the PI Orders are not the sole impediment to Sable. A *federal* Consent Decree requires that Sable obtain authorization from the Office of the State Fire Marshal (OSFM) prior to restarting, which it does not yet have. (*See* February 27, 2026, Minute Order, p. 9.) Moreover, the sole declaration that Sable submitted in support of the Application does not explain why it would suffer any irreparable harm should its requested relief not be granted.

Second, the DPA Order, which is invalid on its face, does not preempt the PI Orders or render it impossible for Sable to comply with them. Even assuming the order is valid — which it is not — Sable has failed to sufficiently demonstrate that Congress intended the DPA to confer on the President or his delegees the power to preempt outstanding state law requirement, that Sable does not remain fully capable of complying with the PI Orders' notice requirement, or that restarting pipelines CA-324 and CA-325 (the "Pipelines") was necessary to comply with the DPA Orders.

Lastly, Sable's theory that this case has been rendered moot be virtue of its purported relinquishment of the State Waivers defies controlling case law, which Sable failed to cite. The pertinent question is whether Sable has *abandoned* restart of the Pipelines entirely. Because it has not, and because it still needs authorizations for the project from OSFM, the Court can still grant Petitioners effective relief as to how OSFM must carry out those authorizations.

Accordingly, the Court must deny Sable's Application.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

### A.  Petitioners' Lawsuits and the PI Orders

Petitioners' consolidated actions challenge the restart of the Pipelines, one of which caused one of the worst oil disasters in California history in 2015 (the "Restart Project"). (*See, e.g.,* Center for Biological Diversity et al. Petition and Complaint, ¶ 10 [construing the challenged project as "restart [of] the Santa Ynez Unit oil and gas operations and transport of oil though the Las Flores Pipeline[s]"].) As was discovered after the spill, the Pipelines each suffer from a critical design defect that leaves them vulnerable to pervasive corrosion and, consequently, another catastrophic rupture.

The Restart Project is overseen, among other agencies, by OSFM and is subject to a federal Consent Decree that requires Sable to obtain from OSFM several approvals and entitlements, including State Waivers and the approval of Restart Plans. (*See* February 27, 2026 Minute Order, p. 9 [recognizing that "the Federal Consent Decree by its terms requires authorization from the OSFM"]). Petitioners contend in their respective Petitions that the Restart Project is subject to various federal and state laws with which OSFM failed to comply.

On June 3, 2025, the Court granted Petitioners' request for a Temporary Restraining Order, ordering OSFM and Sable to maintain the status quo until Petitioners' request for a Preliminary Injunction could be heard. Thereafter, on July 29, 2025, the Court granted, in part, Petitioners' requests for a Preliminary Injunction.

### B.  Relevant Events Following the PI Orders

On September 11, 2025, Sable submitted to OSFM updated Restart Plans for approval. (Granted Request for Judicial Notice in Support of Petitioners' Opposition to Sable's Motion for Reconsideration, Exh. C [hereinafter "Granted RJN"].) On October 22, 2025, OSFM responded in a letter stating that Sable must conduct additional, critical repairs of the corroded Pipelines before OSFM could lawfully approve Sable's Restart Plans. (*Id.*) Such repairs, said OSFM, were explicitly required by the State Waivers, and "the inconsistencies with the State Waiver requirements prevent restart under the law." (*Id.*) The letter additionally noted that OSFM continues to review Sable's submitted Restart Plans. (*Id.*)

In an attempt to circumvent California oversight of the Pipelines, Sable sent a letter to the Pipeline and Hazardous Materials Safety Administration (PHMSA) on November 26, 2025, requesting that it concur with Sable's unliteral determination that the Pipelines are "interstate" rather than "intrastate," as PHMSA previously acknowledged. (*See* Declaration of J. Caldwell Flores in Support of Sable's Motion for Reconsideration, Exh. A.) On December 17, 2025, PHMSA sent Sable a letter concurring in Sable's determination and, on that basis, purported to wrest jurisdiction of the Pipelines from OSFM. (*Id.*) PHMSA then issued Sable an Emergency Special Permit to operate without effective cathodic protection and approved Sable's Restart Plans. (*Id.* at Exh. C.)

Citing PHMSA's actions, Sable then applied *ex parte* to this Court on January 6, 2026 for an Order Shortening Time to file a Motion for Reconsideration of the PI Orders. The Court denied Sable's request and set a hearing on Sable's motion for February 27, 2026. Sable's motion argued, *inter alia*, that OSFM no longer had jurisdiction over the Pipelines, and thus Petitioners' claims were moot.

At the February 27, 2026, hearing, the Court denied Sable's Motion for Reconsideration, finding that "the Federal Consent Decree by its terms requires authorization from OSFM" in order to restart the Pipelines. (February 27, 2026, Minute Order, p. 9.) Despite the Court's denial of Sable's Motion for Reconsideration little more than two weeks ago, Sable has now restarted the Pipelines in violation of the PI Orders. (Dinzter Decl., Exh. G.)

Notably, the Consent Decree, which served as the basis of the Court's February 27 decision, remains in effect. Without waiting for this Court to decide whether to rescind its PI Orders, Sable now claims it is authorized to restart the Pipelines by the DPA Order, which purportedly directs Sable, *inter alia*, "to immediately prioritize and allocate pipeline transportation services for hydrocarbons from the [Santa Ynez Unit] through the [Pipelines]." (Dintzer Decl., Exh. A.)

## III.    **LEGAL STANDARD**

Code of Civil Procedure section 533 provides that a court may modify an injunction or temporary restraining order "upon a showing that there has been a material change in the facts upon which the injunction or temporary restraining order was granted, that the law upon which the injunction or temporary restraining order was granted has changed, or that the ends of justice would be served by the modification." "[T]he burden is on the restrained party to show by a preponderance of the evidence

that one of the circumstances set forth in Code of Civil Procedure section 533 is present and justifies" modification of the order. (*Loeffler v. Medina* (2009) 174 Cal.App.4th 1495, 1504.)

**IV.    ARGUMENT**

    **A.    Sable is Not Entitled to Ex Parte Relief**

To obtain *ex parte* relief, "[a]n applicant *must* make an affirmative factual showing in a declaration . . . of irreparable harm, immediate danger, or any other statutory basis for granting relief *ex parte*." (Cal. Rules of Court, rule 3.1202(c) (emphasis added).)

In support of its Application, Sable summarily concludes that it "would suffer significant and irreparable harm" should the Court enforce its PI Orders, alleging that it can no longer comply with the orders because they "contravene[]" the DPA Order. (App. at pp. 5-6.) Sable entirely neglects to justify why such issues cannot be resolved by a standard-noticed motion, nor does it provide any evidence that it would suffer "irreparable harm" or "immediate danger" if its requested relief is not granted. (Cal. Rules of Court, rule 3.1202(c).) The only declaration that Sable submits in support of its Application does not event purport to make a factual showing to this effect. (*See* Dintzer Decl.) Such relief is inappropriate here because — contrary to Sable's implications otherwise — there are no exigent circumstances that warrant it.

Indeed, there is no urgency necessitating relief on an *ex parte* basis. Sable still does not have all of the necessary approvals to lawfully resume operations of the Pipelines. Namely, it has not complied with a binding *federal* Consent Decree, which is not preempted by the DPA Order and which requires that Sable obtain certain authorizations from OSFM before restarting. (*See* February 27, 2026 Minute Order, p. 9.)  In addition, while Sable claims noncompliance with the DPA Order would mean it would "risk facing civil or criminal penalties (including possible debarment)," (App. at p. 5), there is zero indication in its papers that there is any reasonable threat of such consequences. Instead, the DPA Order appears to be a collaborative effort by Sable and the federal government to aid the company in its goal of resuming operations of the Pipelines.[1] Moreover, as fully explained below, Sable has not

---

[1] The DPA Order's reference to Sable's December 12, 2025 letter to the Department of Energy requesting action under the DPA (Dintzer Decl., Exh. A, p. 2, fn. 6) indicates that the Order was made explicitly at Sable's request, negating Sable's contention that the DPA Order was an "'event' arising from causes beyond the control of Sable." (Ex Parte App. At p. 9.)

demonstrated that it cannot comply with both the PI Orders and the DPA Order. Thus, there is no basis for a showing of "irreparable harm" or "immediate danger" here.

Notably, Sable has already once attempted, on an *ex parte* basis, to request that this Court rescind the PI Orders on preemption grounds. The Court appropriately denied that request, finding a standard-noticed motion the appropriate route. Again here, Sable has not made the "affirmative factual showing" necessary to warrant *ex parte* relief. (Cal. Rules of Court, rule 3.1202(c)). Accordingly, the Court must deny Sable's Application.

**B.      The PI Orders Are Not Preempted by the DPA Order.**

1.   The DPA Order is Facially Invalid

As an initial matter, the DPA Order patently fails to comply with the DPA. First, a DPA Order purporting to "allocate" materials or services, as here, "must include . . . [s]pecific start and end calendar dates for each required allocation action." (10 C.F.R. § 217.54.) The DPA Order does not have a termination date. (*See* Dintzer Decl., Exh. A.)

Second, the DPA and its implementing regulations require that specific findings to be made in support of an order, including that the services or materials at issue are "scarce, critical, and essential." (50 U.S.C. § 4511(c)(2)(A); *see also* 10 C.F.R. § 217.52.) The DPA Order does not include any of the requisite findings.

Third, insofar as the DPA Order purports to require Sable to commence immediate performance under any contracts, or to require Sable to open a failed pipeline it has no authority to operate, the DPA does not authorize any such order and has never before been construed to do so.

The DPA allows the president or his delegees to "allocate" services "in such manner, upon such conditions, and to such extent as he shall deem necessary." (50 U.S.C. § 4511(a)(2).) The phrasing of this provision plainly refers to the distribution of resources — i.e., the dedication of services to one thing rather than another. (*See* 10 C.F.R. § 217.20 [Allocation means "[t]he control of the distribution of materials, services or facilities for a purpose deemed necessary or appropriate to promote the national defense."].) In other words, the DPA provides for the "allocation" — i.e., distribution — of existing services, not the immediate commencement of new services. The DPA Order, however, does not purport to "allocate" transportation services, but to improperly compel their provision.

Petitioners and Plaintiffs' Combined Opposition to Real Parties in Interest's Ex Parte Application

The DPA's separate prioritization authority permits the government to require contracts it favors to be prioritized over *other* contracts. (50 U.S.C. § 4511(a)(1).) In other words, it allows the government to enable those contracts to jump to the front of the queue. The prioritization authority does not confer onto the federal government the power to compel immediate performance.

Because Sable's Application assumes the validity of the DPA order, it must be denied.

### 2. Congress Has Not Expressed Any Intent that the DPA Should Preempt State Law

Preemption of state law "fundamentally is a question of congressional intent." (*English v. Gen. Elec. Co.* (1990) 496 U.S. 72, 78-79.) Thus, when assessing whether an executive branch action has preemptive effects, courts must consider whether Congress conferred on the agency the authority to displace state law. (*La. Pub. Serv. Comm'n v. FCC* (1986) 476 U.S. 355, 374; *see also New York v. FERC* (2002) 535 U.S. 1, 18 ["[A]n agency literally has no power to act, let alone pre-empt" state regulation "unless and until Congress confers power upon it"].) After all, to hold that an agency's action has preemptive effect would give the agency the "power to override Congress." (*La. Pub. Serv. Comm'n*, *supra*, 476 U.S. at 375.)

Here, Sable fails to demonstrate that Congress intended the DPA to confer on the President or his delegees the power to preempt outstanding state law requirements like those at issue, including a Coastal Development Permit from the California Coastal Commission, approval of Restart Plans from OSFM, and an easement form the California Department of Parks and Recreation to enter Gaviota State Park.[2] (*See* Pub. Res. Code § 30262(b)(2); *see also* Granted RJN, Exh. B at pp. 10-11.) Nor, more importantly, does the DPA indicate an intend to override a judicial order — especially, as here, one that flows from a federal Consent Decree. Rather, the DPA merely allows the President to require that performance under contracts or orders which he deems necessary or appropriate to promote the national defense to take priority over performance under any other contract or order to allocate materials, services, and facilities in such manner he deems necessary or appropriate to promote the national defense. (50 U.S. Code § 4511(a).) Nowhere does the DPA include authorizing contracts to override the many other impediments that exist to executing them. Congress simply never intended to

---

[2] Were it otherwise, Congress would have essentially silently authorized the executive branch to seize property contravening constitutional protections against takings and anticommandeering.

order the immediate performance of contracts in disregard of state law and orders, rendering Sable's preemption argument unavailing.

        3.   <u>Sable Remains Fully Capable of Complying with the Injunction and Has Not Demonstrated that Restart Was Necessary to Comply with the DPA Order</u>

Although the DPA Order never actually itself purports to preempt any state law, Sable argues that "it is physically impossible for Sable to comply with both the DPA Order and the Preliminary Injunction." (App. at p. 8.) Impossibility preemption, however, is a "demanding defense", which Sable's preemption argument fails to satisfy. (*Wyeth v. Levine* (2009) 555 U.S. 555, 573.)

First, nothing in the Preliminary Injunction prevents Sable from prioritizing, allocating, and commencing the restart of the Pipelines by working on and obtaining all necessary state approvals as quickly as possible and giving 10 court days' notice thereafter. (Dintzer Decl., Exh. A, p. 3 [Sable is directed "to immediately prioritize and allocate pipeline transportation services" and "immediately commence performance under contracts or orders for services."]) Although Sable has expressed frustration with the process (*id*. at p. 2), much of that frustration is Sable's own doing for failing to even apply for a Coastal Development Permit from the California Coastal Commission and make the repairs required by OSFM. (*See* Granted RJN, Exhs. B-C.) Sable's largely self-inflicted frustration with the regulatory process does not somehow render compliance with both the DPA Order and Preliminary Injunction notice requirement an impossibility.

Second, Sable has not demonstrated anywhere in its papers which, if any, contracts it needed to prioritize and commence performance of which compelled restarting the Pipelines. Absent such evidence, Sable's contention that it was required to restart the Pipelines in defiance of the Preliminary Injunction in order to comply with the DPA Order is no more than an unsubstantiated excuse. The Court should not "see[k] out conflicts between state and federal regulation where none clearly exists." (*English*, *supra*, 496 U.S. at 90 [quoting *Huron Portland Cement Co. v. Detroit* (1960) 362 U.S. 440, 446.)

        4.   <u>The DPA Does Not Shield Sable From Liability For Violating State Law and Orders Nor Impact the Application of an Existing Preliminary Injunctions</u>

Finally, Sable argues that the DPA somehow excuses it from liability for blatantly and admittedly violating the terms of this Court's Preliminary Injunction pursuant to 50 U.S.C. section 4557.

Petitioners and Plaintiffs' Combined Opposition to Real Parties in Interest's Ex Parte Application

(Ex Parte App. at pp. 8-9.) However, when considering the context and longstanding interpretation of the DPA, it is apparent that this provision (referred to as "section 707") provides immunity from *contract* damages or penalties that parallel the risk created by 50 U.S. Code section 4511(a) (referred to as "section 101") rather than immunity from *any* consequence that might flow from violating *state law and judicial orders*.[3] (*See In re Agent Orange Product Liab. Litig.* (E.D.N.Y. 1984) 597 F. Supp. 740, 845 [Section 707 "was enacted as the quid pro quo to section 101," and so, logically, the protection it affords "should correspond to the risk imposed, viz, the possible need for the contractor to break its contracts with third parties or the increased risk to employees or users posed by speeded-up production"] *see also Hercules v. United States* (Fed. Cir. 1994) 24 F.3d 188, 203–04 [a*ffirmed on other grounds*, (1996) 516 U.S. 417] [the protection afforded by section 707 extends no further than the risk imposed by section 101(a)]; *see also United States v. Vertac Chem. Corp.* (8th Cir. 1995) 46 F.3d 803, 811–12 (section 707 does not shield company from CERCLA liability arising out of its performance of government contracts).)

Even if the provision swept more broadly, by its plain text, it immunizes Sable only from "damages" or "penalties." (50 U.S.C. § 4557.) The obligation to comply with state law—and an injunction ordering the same is neither one of these. Thus, nothing in Sable's liability argument prevents an existing Preliminary Injunction from remaining binding and enforceable. Sable's attempt to rid itself of this Court's precautionary measure or escape liability for its flagrant disregard thereof fails.

**C.      Sable's Relinquishment of the State Waivers Does Not Render This Action Moot.**

Lastly, Sable contends, again, that this case is moot because it has purportedly relinquished the State Waivers it received from OSFM. Sable is incorrect.

Courts impose a very high bar for mootness. A case is moot only when the court's ruling "can have no practical impact or provide the parties effectual relief." (*Woodward Park Homeowners Assn. v. Garreks, Inc.* (2000) 77 Cal.App.4th 880, 888 [CEQA challenge not moot even though project was built and operating because "directing the preparation of an EIR . .  could result in modification of the project to mitigate adverse impacts"]).

Simply because a project approval has been rescinded — or in this case, relinquished — does not

---

[3] For this reason too, Sable's argument that the DPA shields Sable from liability for violating the federal Consent Decree also fails. (Ex Parte App. at p. 9.)

in itself render a case moot. (*See Citizens for Open Government v. City of Lodi* (2006) 144 Cal.App.4th 865, 873; *see also Friends of the Eel River v. North Coast Railroad Authority* (2014) 178 Cal.Rptr.3d 752, 767 [*rev'd on other grounds*, 3 Cal.5th 677 (2017)].) The pertinent inquiry in such circumstances is whether the project applicant has *abandoned* the project; if not, it may still be possible, as here, for the court to grant effective relief to Petitioners. (*City of Lodi*, 144 Cal.App.4th at 873; *Friends of the Eel River*, 178 Cal.Rptr.3d at 767.)

*City of Lodi* is instructive. There, two non-profit groups filed separate petitions for writ of mandate against the City of Lodi challenging its certification of an EIR and approval of a use permit for construction of commercial retail space for a developer. (*City of Lodi*, 144 Cal.App.4th at 868.) The trial court partially granted one of the petitions for writ of mandate on two of its claims, and thus set aside the approvals for the project. (*See id.* at 872-73.) The trial denied in whole the other petition for writ of mandate for failure to exhaust administrative remedies. (*Id.* at 872).

The non-profit whose petition was denied in whole appealed. (*Id.* at 869.) On appeal, the City claimed that the petition was moot, arguing that "a trial court ruling in this case could no longer have any practical impact or provide effectual relief because the trial court has already set aside the project approvals as a result of a partial grant of the of the [companion] petition." (*Id.* at 872). The appellate court disagreed. (*Id.*) It noted that the trial court had only granted partial relief, and "[t]here is no evidence before this court that the City and [the developer] have *abandoned* [the project]." (*Id.* at 873 (emphasis added).) If the trial court were to find petitioners' claims addressing additional issues with the EIR meritorious, it could order the City to address those deficiencies while it reconsiders the project, and thus "[e]ffective relief would still be possible in this case." (*Id.*)

*Friends of the Eel River v. North Coast Railroad Authority* is perhaps even more on point. ((2014) 178 Cal.Rptr.3d 752, [*rev'd on other grounds*, 3 Cal.5th 677 (2017)].) There, environmental groups filed petitions for writ of mandate challenging a state agency's certification of an EIR under CEQA and approval of the resumption of railroad service on a line that "has a history of safety and maintenance issues." (*Id.* at 760.) As relevant here, both the certification of the EIR and approval of resumed operations was issued via a resolution adopted the agency. (*Id.* at 764.)

As petitioners' case was pending, the state agency rescinded the resolution. (*Id.* at 765.) Shortly

thereafter, the agency filed a motion to dismiss the writ petitions as moot, citing the rescission. (*Id.* at 766.) The trial court denied the motion, concluding that the petitions had not been mooted by the subsequent rescission because the project applicant had not abandoned the project. (*Id.*)

On appeal, the state agency raised the same mootness argument. It claimed that "this case is moot because the petitions for writ of mandate challenged the sufficiency of the EIR certified by resolution in 2011, and [the agency] has since rescinded that resolution." (*Id.* at 766.) "[B]ecause the railroad line is operating," they suggested, "and because no further approval is needed for those operations, this court lacks the ability to issue an order affecting railroad operations or the environmental review of those operations." (*Id.*) The appellate court disagreed. It explained that "[t]hough the resolution approving the EIR has been rescinded, there is no evidence the project it approved has been *abandoned*." (*Id.*) Thus, it reasoned, if the agency's other claims on appeal were meritless, the court "would surely be empowered to grant the petitioners relief." (*Id.* at 767.)

So, as long as a project has not been abandoned, *City of Lodi* and *Friends of the Eel River* instruct that a case may present a live controversy notwithstanding the lapse of an underlying approval. And that is precisely the case here.

Sable has, quite obviously, *not* abandoned the restart project challenged in this matter and is instead pursuing it at all costs. And while Sable may prefer otherwise, it still needs approvals from OSFM in order to pursue the project, as expressly set forth in the controlling federal Consent Decree, and as this Court recognized little more than two weeks ago. (February 27, 2026 Minute, p. 9. ["[T]he Federal Consent Decree by its terms requires authorization from OSFM."].) Because Petitioners' challenge here asks for declaratory relief regarding what procedures OSFM must follow in issuing those approvals, as well as related injunctive relief, it can still afford effective relief to Petitioners notwithstanding Sable's purported relinquishment of the State Waivers.

Accordingly, Petitioners' lawsuits are not moot. And, in any event, equity requires that Sable bring its mootness challenge by way of noticed motion, which, among other things, would afford Petitioners an opportunity to amend their petitions, if necessary.

## V.    CONCLUSION

For the above reasons, Petitioners respectfully request that this Court deny Sable's Application.

Dated: March 16, 2026                    Respectfully submitted,


                                         /s/ *Jeremy Frankel*
                                         Linda Krop
                                         Jeremy M. Frankel
                                         Tara C. Rengifo
                                         ENVIRONMENTAL DEFENSE CENTER
                                         906 Garden St.,
                                         Santa Barbara, CA 93101
                                         Tel. (805) 963-1622

                                         *Attorneys for Petitioners Environmental Defense Center,*
                                         *Get Out Oil!, Santa Barbara County Action Network,*
                                         *Sierra Club, and Santa Barbara Channelkeeper*

                                         /s/ *Talia Nimmer*
                                         Julie Teel Simmonds
                                         David Pettit
                                         Talia Nimmer
                                         CENTER FOR BIOLOGICAL DIVERSITY
                                         2100 Franklin St., Ste. 375
                                         Oakland, CA 94612
                                         Tel. (510) 844-7100

                                         *Attorneys for Petitioners Center for*
                                         *Biological Diversity and Wishtoyo Foundation*

---

13

Petitioners and Plaintiffs' Combined Opposition to Real Parties in Interest's Ex Parte Application

**PROOF OF SERVICE**

I, Talia Nimmer, declare:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to this action.

On March 16, 2026, I served the above document(s) described as **PETITIONERS AND PLAINTIFFS' COMBINED OPPOSITION TO REAL PARTIES IN INTEREST'S EX PARTE APPLICATION FOR IMMEDIATE RESCISSION OF PRELIMINARY INJUNCTION** on the interested parties in this action, stated below, by the following means of service:

**See Attached Service List**

☒    **By e-mail or electronic transmission.** On the date above, I caused a copy of the document(s) described above to be served electronically on the recipients designated in the attached Service List.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on March 16, 2026, at Los Angeles, California.

_____
Talia Nimmer

**SERVICE LIST**

| | |
|---|---|
| Michael S. Dorsi<br>Michael.Dorsi@doj.ca.gov<br>Myung Park<br>Myung.Park@doj.ca.gov<br>Matthew Bullock<br>Matthew.Bullock@doj.ca.gov<br>California Attorney General's Office<br>55 Golden Gate Avenue, Suite 11000<br>San Francisco, CA 94102 | ATTORNEYS FOR<br>RESPONDENTS/DEFENDANTS<br>California Department of Forestry and Fire Protection, Office of the State Fire Marshal; and Daniel Berlant, in his official capacity as State Fire Marshal |
| Duncan Joseph Moore<br>djmoore@paulhastings.com<br>Benjamin J. Hanelin<br>benjaminhanelin@paulhastings.com<br>Natalie C. Rogers<br>natalierogers@paulhastings.com<br>PAUL HASTINGS, LLP<br>1999 Avenue of the Stars, 27th Floor<br>Century City, CA 90067 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp. and Pacific Pipeline Company |
| Jeffrey D. Dintzer<br>Jeffrey.dintzer@alston.com<br>Matthew C. Wickersham<br>Matt.wickersham@alston.com<br>Garrett B. Stanton<br>Garrett.stanton@alston.com<br>ALSTON & BIRD LLP<br>350 South Grand Avenue, 51st Floor<br>Los Angeles, CA 90071 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp. and Pacific Pipeline Company |
| Trevor D. Large<br>tlarge@flasllp.com<br>Victoria C. Diffenderfer<br>vdiffenderfer@flasllp.com<br>FAUVER LARGE ARCHBALD & SPRAY<br>820 State Street, 4th Floor<br>Santa Barbara, CA 93101 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp. and Pacific Pipeline Company |

ROB BONTA
Attorney General of California
MYUNG J. PARK
Supervising Deputy Attorney General
MATTHEW BULLOCK (SBN 243377)
MICHAEL S. DORSI (SBN 281865)
Deputy Attorney General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3802
  Fax:  (415) 703-5480
  E-mail:  Michael.Dorsi@doj.ca.gov
*Attorneys for Respondents and Defendants
Department of Forestry and Fire Protection, by and
through the Office of the State Fire Marshal, an
agency of the State of California; Daniel Berlant, in
his official capacity as State Fire Marshal*

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Angela Braun, Executive Officer
3/16/2026 9:44 PM
By: Gabriel Moreno , Deputy

EXEMPT FROM FILING FEES
PURSUANT TO GOVERNMENT
CODE SECTION 6103

SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF SANTA BARBARA

| | |
|---|---|
| **CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,**<br><br>               **Petitioner and Plaintiff,**<br><br>v.<br><br>**CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, by and through the OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive,**<br><br>            **Respondents and Defendants,**<br><br>**SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,**<br><br>            **Real Parties in Interest.**<br><br>\*\*\*<br><br>**ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL** | Case No. 25CV02244<br>Consolidated with Case No. 25CV02247<br><br>**RESPONDENTS CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, ET AL.'S BRIEF IN RESPONSE TO EX PARTE APPLICATIONS**<br><br>Date:      March 16, 2026<br>Time:     8:30 a.m.<br>Dept:     4<br>Judge:    Hon. Donna Geck<br><br>Trial Date:  Not Set<br>Action Filed: April 15, 2025 |

1

**OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation,**

**Petitioners and Plaintiffs,**

**v.**

**CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, an agency of the State of California; OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive,**

**Respondents and Defendants,**

**SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,**

**Real Parties in Interest.**

**TABLE OF CONTENTS**

**Page**

Introduction ............................................................................................................... 4

Background ................................................................................................................. 5

I.      Prior Lax Safety Measures and Insufficient Enforcement Resulted in the Refugio Oil Spill ................................................................................................. 5

II.     PHMSA Transferred Jurisdiction to OSFM, and a Federal Court Entered a Binding Consent Decree ............................................................................... 5

III.    OSFM Issued State Waivers to Sable But Sable Did Not Comply ................. 7

IV.     Sable Sought and Obtained Letters from PHMSA Purporting to Preempt OSFM's Regulation of the Lines 324 and 325 ....................................... 7

V.      Sable Sought—and Failed to Obtain—This Court's Blessing to the Restart Lines 324 and 325 .................................................................................. 7

VI.     The Energy Secretary's Order Under the Defense Production Act ......................... 8

Legal Standards ........................................................................................................... 9

Interest of Respondents .............................................................................................. 9

Argument ................................................................................................................... 9

I.      Sable's Violation Prior to Moving to Amend The Injunction Should Result in Disentitlement ................................................................................ 9

II.     Sable Cannot Lawfully Transport Crude Oil Through the Las Flores Pipelines .................................................................................................... 10

        A.      Sable's Transportation of Crude Oil Violates Federal Pipeline Safety Law .................................................................................... 10

                1.      Sable Needs a Waiver, and Has Neither a State Waiver nor an Equivalent Federal Special Permit ........................................... 11

                2.      Moving Forward, Federal Law Requires Sable Obtain a Waiver from OSFM, not PHMSA ................................................. 12

        B.      Sable's Transportation of Crude Oil Violates California Law ................. 13

        C.      Sable's Transportation of Crude Oil Violates State Parks' Property Rights ........................................................................................ 13

III.    The Defense Production Act Offers Only Limited Immunity and Does Not Displace Existing State Law ............................................................... 14

        A.      The Defense Production Act Shields Sable Only From Contract Liability ....................................................................................... 14

        B.      The Defense Production Act Does Not Authorize Bringing New Resources Online, Only the Distribution of Existing Resources .............. 16

        C.      The Defense Production Act Does Not Displace Cooperative Federalism ..................................................................................... 16

IV.     The Defense Production Act Order is Inconsistent with the Statute and Federal Regulations .................................................................................... 17

V.      This Case is Not Moot ........................................................................... 17

Conclusion ................................................................................................................ 18

## INTRODUCTION

Real Parties in Interest Sable Offshore Corp and Pacific Pipeline Company (Sable) seek to dissolve the preliminary injunction in this case on the basis that the Defense Production Act vests the President and, by delegation, the Secretary of Energy, with unbounded power to preempt state laws. Petitioners Environmental Defense Center and Center for Biological Diversity (Petitioners) seek an order requiring Sable to come into compliance with the existing preliminary injunction in this case, and for an order to show cause re: contempt. On the law, Petitioners are correct and Sable is wrong. The Court should grant relief to Petitioners and deny Sable's Application.

***

Sable unilaterally decided that it is not subject to the authority of this Court. Sable is aware that this Court enjoined it from pumping oil without providing 10 days' notice. It recently asked this Court to reconsider that injunction, and the Court declined. Then last Friday, Sable again gave notice that it would seek reconsideration of the injunction. But Sable as quickly withdrew that notice and instead just began pumping oil, in open violation of the Court's injunction. This bears repeating: it appears that Sable was going to ask to lift the injunction, but then thought better of it and simply began pumping in a blatant violation of the Court's order. With its delayed motion today, Sable is now telling the Court: *agree with us and let us pump, or we will ignore you and continue pumping*. The Court should not countenance Sable's disregard for the Court by reconsidering the injunction Sable is openly flaunting. Sable's ex parte motion should be denied.

In the end, Sable asserts that a stroke of the Energy Secretary's pen can absolve it from complying with all applicable laws—state and federal—and binding injunctions, including this Court's preliminary injunction. As explained below, Sable is incorrect. An order under the Defense Production Act has no such effect. But more important, this Court should make one thing clear immediately while it considers the federal order and the new issues Sable has raised: Sable *must* comply with this Court's injunction unless or until *this Court* says otherwise. Sable's unilateral decision that it no longer needs to comply, and its self-help remedy of restarting the pipelines immediately, cannot be squared with the rule of law. This Court should not countenance it, and it should swiftly compel compliance with its orders by granting Petitioners' application.

4

# BACKGROUND

## I. PRIOR LAX SAFETY MEASURES AND INSUFFICIENT ENFORCEMENT RESULTED IN THE REFUGIO OIL SPILL

On May 19, 2015, crude oil pipeline CA-324, then designated Line 901, ruptured, releasing over 2,900 barrels of crude oil into the environment along the Santa Barbara coast. That pipeline and a connecting onshore pipeline (then called Line 903, now CA-325, collectively the Las Flores Pipelines), were taken out of service pending investigation and remediation. Investigations determined that the Pipelines' system designed to prevent corrosion used a defective design that could not be remediated. PHMSA's Failure Investigation Report ("Failure Report") determined that the proximate cause of the spill was external corrosion that thinned Line 324's wall to an extent where it ruptured—only *11 percent* of Line 324's wall thickness remained at the point of failure at the time of the rupture.

Federal regulations require pipelines with metal exposed to the soil to be protected by a "cathodic protection system" that counteracts the corrosive electrical charge caused by that exposure. (49 C.F.R. § 195.563.) However, the cathodic protection used to protect underground pipelines from corrosion is not effective when these underground pipelines are wrapped with insulation, as Line 324 was—and remains today.

Neither Plains, then operator of the Las Flores Pipelines, nor PHMSA, then regulator of the Pipelines, ensured that the necessary steps would be taken to address the ongoing corrosion of the Pipelines. The resulting Refugio Oil Spill marred and closed Santa Barbara's landmark beaches, killed hundreds of birds and mammals, impacted nearshore fish species, and closed fisheries entirely. The spill also impacted a wide variety of coastal habitats and species protected under federal and state laws.

## II. PHMSA TRANSFERRED JURISDICTION TO OSFM, AND A FEDERAL COURT ENTERED A BINDING CONSENT DECREE

The federal Pipeline Safety Act vests regulatory jurisdiction over interstate pipelines with PHMSA, while intrastate pipelines are subject to regulation by States. (49 U.S.C. §§ 60101, 60104(c), 60105(a) [no federal jurisdiction over intrastate pipelines for States with certifications].) At the time of the 2015 oil spill, PHMSA asserted regulatory authority over the

5

Las Flores Pipelines based on Plains' tariffs filed with FERC. In early 2016, then-operator Plains Pipeline, L.P. cancelled its tariffs with FERC. On May 18, 2016, PHMSA re-designated the Lines 324 and 325 as intrastate, with the California Office of State Fire Marshal (OSFM) as the safety regulator. (Granted RJN,[1] Exh. H [May 18, 2016 Letter].)

After the Refugio Oil Spill, state and federal agencies engaged in efforts that culminated in the agreed-upon Consent Decree, filed in 2020 in the federal District Court. (Granted RJN, Exh. D.) Plains agreed to pay millions for the natural resource damages caused by the spill, which was in addition to what it had already paid to federal and state agencies, and did not include the untold millions Plains had directly expended to address natural resource damage harm. The Consent Decree also resolved claims by agencies including PHMSA and OSFM. To obtain approval by the District Court, the United States and California presented OSFM as the agency that would be responsible for oversight of the Las Flores Pipelines. This was consistent with the transfer of jurisdiction after Plains' cancellation of the FERC tariff, and avoided having to explain why the District Court should trust PHMSA after PHMSA failed to prevent the Refugio Oil Spill.

Specifically, the Consent Decree required that, "Prior to restarting Line 901 [Line 324], Plains shall apply for a State Waiver [i.e., state approval] through the OSFM for the limited effectiveness of cathodic protection on Line 901 [Line 324]. Plains must receive a State Waiver from the OSFM prior to restarting Line 901 [Line 324]."[2] (Granted RJN, Exh. D, at p. 80.)[3] This was consistent with the federal Pipeline Safety Act, which allows state regulators to adopt and enforce safety standards in addition to or more stringent than PHMSA's standards. The Consent Decree also assigns OSFM the power to approve a restart plan. (*Id.* at 96.)

The federal District Court signed the Consent Decree on October 14, 2020, reducing it to a judgment that binds all parties. (Granted RJN. Exh. N.)

---

[1] This brief cites to many of the same documents attached to Respondents' Request for Judicial Notice filed on February 13, 2026. This Court granted that Request for Judicial Notice in full. To avoid duplicative filings, this brief refers to documents attached to the prior Request for Judicial Notice as exhibits to the "Granted RJN."

[2] Because the conditions are repeated for CA-324 and CA-325, to avoid duplication, this memorandum cites conditions in the Consent Decree and State Waivers only for line CA-324 (formerly 901). All cited conditions are the same for line CA-325 (formerly 903).

[3] Page citations to the Consent Decree refer to the blue page numbers at the top of the page, imposed by the ECF filing system, not the page numbers at the bottom.

6

**III.   OSFM ISSUED STATE WAIVERS TO SABLE BUT SABLE DID NOT COMPLY**

On February 14, 2024, Sable Offshore Corp acquired a 100% interest in Pacific Pipeline Company, which now owns and operates the Las Flores Pipelines. As a condition of this acquisition, Sable agreed to be bound by the Consent Decree. (Granted RJN, Exh. E [Assumption Agreement].) Sable applied for State Waivers, which OSFM issued. Neither Sable nor PHMSA objected to the terms of the State Waivers, and PHMSA provided its notices of non-objection.

In fall 2025, "OSFM identified a requirement of the State Waivers that has not yet been met and that Sable must complete prior to any potential restart." (Granted RJN, Exh. K [OSFM Letter to Sable dated October 22, 2025].) Sable responded the next day, disagreeing with OSFM's view of the rules but not disputing OSFM's factual statements. (Granted RJN, Exh. L [Sable Letter].) Sable has not, in any forum, indicated that it took additional actions in the five months since then in response to the deficiencies identified by OSFM.

**IV.   SABLE SOUGHT AND OBTAINED LETTERS FROM PHMSA PURPORTING TO PREEMPT OSFM'S REGULATION OF THE LINES 324 AND 325**

A month after OSFM informed Sable of its failure to comply with the State Waivers, Sable sent a letter to PHMSA requesting that PHMSA assume jurisdiction over CA-324 and CA-325. RJN, Exh. M (Nov. 26, 2025 letter to PHMSA). Sable asked PHMSA to decree that the lines are actually *inter*state lines because the onshore processing facility is connected by other pipelines to federal waters offshore. PHMSA gave Sable what it asked for with limited analysis. (Granted RJN, Exhs. A-1 to A-3.) In its third order, PMHSA issued an Emergency Special Permit.[4] That Permit expired on its own terms on February 21, 2026. (Granted RJN, Exh. A-3, at p. 1.)

**V.   SABLE SOUGHT—AND FAILED TO OBTAIN—THIS COURT'S BLESSING TO THE RESTART LINES 324 AND 325**

On December 24, 2025, non-governmental organizations Environmental Defense Center (EDC), et al. filed a Petition for Review in the Ninth Circuit, challenging PHMSA's December 22 Restart Plan approval and December 23 Permit.[5] On January 23, 2026, California, by and through the Attorney General and OSFM, also filed a Petition for Review in the Ninth Circuit, challenging

---

[4] "Special Permit" is PHMSA's name for the federal analogue to OSFM's State Waivers.
[5] 49 U.S.C. § 60119 provides that petitions for review of PHMSA orders shall be filed in federal appellate courts, not federal district courts.

7

PHMSA's December 17, 22, and 23 orders. Briefing is underway in the Ninth Circuit.

Sable, in turn, raised federal preemption in a Motion for Reconsideration in this Court, seeking termination of the preliminary injunction. Sable relied on PHMSA's December 2025 orders as the basis for its Motion for Reconsideration. This Court denied Sable's motion on Friday, February 27, 2026, keeping its preliminary injunction in place.

## VI.    THE ENERGY SECRETARY'S ORDER UNDER THE DEFENSE PRODUCTION ACT

On December 12, 2025, Sable sent a letter to the United States requesting that it issue an order under the Defense Production Act. (See 50 Op. O.L.C. __ at 3 (Mar. 3, 2026) [OLC Opinion], attached to Dintzer Decl. as Exhibit B.) On March 3, 2026, the United States Department of Justice issued a memorandum opinion specific to the United States' authority to assist Sable in restarting its shuttered pipeline. In it, the United States Office of Legal Counsel concluded that the President could issue an order under the Defense Production Act directing Sable to commence operating the Las Flores Pipelines free from all manner of constraints, whether it be state environmental and property laws, or even the Consent Decree. On March 13, 2026, the President issued an Executive Order delegating certain of his authority under the Defense Production Act to the Secretary of Energy.[6] Purportedly pursuant to that delegation, the same day the Secretary of Energy issued a "Pipeline Capacity Prioritization and Allocation Order" which provides, among other things, that "Sable is directed to immediately commence performance under contracts or orders for service … for hydrocarbon transportation capacity" through, among facilities, Lines 324 and 325. (Dintzer Decl., Exh. A.) On March 16, 2026, Sable issued a press release stating that it has commenced transporting crude oil through Lines 324 and 325 as of Saturday, March 14, 2026. (Dintzer Decl., Exh. G.) In response, California agencies moved to enforce the Consent Decree in the federal District Court, see ECF 43, *United States, et al. v. Plains All American Pipeline, et al*, C.D. Cal. Case No. 2:20-cv-2415, and Petitioners moved to enforce the injunction here.

---

[6] https://www.whitehouse.gov/presidential-actions/2026/03/adjusting-certain-delegations-under-the-defense-production-act/

8

**LEGAL STANDARDS**

Under Code of Civil Procedure section 533, a party must show a "material change in the facts . . , that the law . . . has changed, or that the ends of justice would be served" by the dissolution of a preliminary injunction. In applying Section 533, when "the restrained party later seeks to terminate the restraining order, the burden is on the restrained party to show by a preponderance of the evidence that one of the circumstances set forth in Code of Civil Procedure section 533 is present and justifies a termination of the restraining order." (*Loeffler v. Medina* (2009) 174 Cal.App.4th 1495, 1504, citations omitted.)

Preliminary injunctions issue and terminate based on weighing the likelihood of success on the merits, the immediate harm to the plaintiff in the absence of an injunction, and the harm the defendant would suffer from imposition of an injunction. (*IT Corp. v. County of Imperial* (1983) 35 Cal.3d 63, 69–70.) Sable asserts preemption. "The burden of proving preemption is on the party claiming it applies, and courts are reluctant to infer preemption." (*Calaveras Telephone Co. v. Public Utilities Com.* (2022) 87 Cal.App.5th 793, 809.)

**INTEREST OF RESPONDENTS**

Respondents ask that this Court deny Sable's Motion because it is in error, and it would confer relief based on an assertion of preemption that would displace California law. A state has a cognizable interest in the enforcement of its laws. (*Missouri v. Holland* (1920) 252 U.S. 416, 431.) Sable's Motion is adverse to Respondents' interests because Sable seeks preemption of California law. Established California law protects a party's right to oppose relief that is adverse to that party's interests, even against co-defendants. (See *Bean v. City of Thousand Oaks* (2025) 114 Cal.App.5th 775, 780; *Apple, Inc. v. Franchise Tax Board* (2011) 199 Cal.App.4th 1, 16.)

**ARGUMENT**

I. **SABLE'S VIOLATION PRIOR TO MOVING TO AMEND THE INJUNCTION SHOULD RESULT IN DISENTITLEMENT**

Sable has been less than forthcoming about whether it was in compliance with orders of this Court. (See, e.g., Respondents' Response to Real Parties in Interest's Ex Parte Application for Order Shortening Time, filed Jan. 6, 2026, p. 4.) Now, Sable is transporting oil in open violation

of the Court's preliminary injunction. Despite Sable's open disregard for the Court's injunction, Sable seeks equitable relief from that same injunction. Sable wants the Court to let it pump, but has made clear it will only respect the Court's decision if the Court sides with Sable; otherwise, it will continue disregarding the authority of the Court. The ordinary rule is that a party cannot "ask the aid and assistance of a court in hearing his demands while he stands in an attitude of contempt to legal orders and processes of the courts of this state." (*MacPherson v. MacPherson* (1939) 13 Cal.2d 271, 277; *Alioto Fish Co. v. Alioto* (1994) 27 Cal.App.4th 1669, 1683, quoting 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 172, p. 184.) Before considering equitable relief for Sable—even if the Court thought that Sable's positions had merit—this Court should require an affirmation from Sable that it will immediately come into compliance with the Court's order and abide by the Court's ultimate ruling—whether Sable agrees with that determination or not.

Sable's protestations about the Defense Production Act are no response. Under federal law, a party may not defend a contempt on the basis that the injunction was unlawful—the party must comply while challenging the injunction. (*Walker v. City of Birmingham* (1967) 388 U.S. 307, 320 [parties "could not by-pass orderly judicial review of the injunction before disobeying it."].) It would have been entirely consistent with the federal law for Sable to seek to lift the injunctions against it prior to violating them. That Sable did do so weighs strongly in favor of granting Petitioners' Ex Parte Application.

## II.  SABLE CANNOT LAWFULLY TRANSPORT CRUDE OIL THROUGH THE LAS FLORES PIPELINES

A party suffers no injury by being enjoined from carrying out an unlawful act. (See *Disney Enters., Inc. v. VidAngel, Inc.* (9th Cir. 2017) 869 F.3d 848, 867 [acknowledging "long-settled principle that harm caused by illegal conduct does not merit significant equitable protection."].) Because Sable is seeking relief from this court to enable unlawful conduct, Sable has not offered a viable basis for relief from the preliminary injunction.

### A.  Sable's Transportation of Crude Oil Violates Federal Pipeline Safety Law

When the District Court entered the Consent Decree, the parties and the Court relied on three shared understandings: (1) the Las Flores Pipelines are intrastate pipelines subject to state

regulation, (2) the Las Flores Pipelines lack effective cathodic protection and therefore federal regulations prevent operation of the Pipelines absent a waiver, and (3) federal law authorizes OSFM, not any federal agency, to waive compliance with those regulations. 49 U.S.C. § 60105.

**1.    Sable Needs a Waiver, and Has Neither a State Waiver nor an Equivalent Federal Special Permit**

The Las Flores Pipelines are buried pipelines that transport crude oil at high temperature. (Granted RJN, Exhs. I, J [OSFM State Waivers], A-3 [PHMSA Special Permit].) These Pipelines are required by federal law to operate with a functional cathodic protection (*i.e.*, anti-corrosion) system. (49 CFR §§ 195.452(h)(4)(iii)(H), 195.563.) After the Las Flores Pipelines failed and caused the Refugio Oil Spill, PMSA, OSFM, Plains, and all other parties acknowledged that the Las Flores Pipelines were not compliant with federal regulations and, because of their design, could not comply with federal regulations.

Because Sable cannot comply with federal regulations, it had three options. As explained in the Consent Decree, Sable could have (1) abandoned the Pipelines, (2) replaced the Pipelines, or (3) obtained permission to operate the Pipelines out of compliance with federal regulations. (Granted RJN, Exh. D, at p. 80.) Sable chose the third option. To do so, even if the Consent Decree did not exist, federal law would compel Sable to obtain State Waivers from OSFM because they concern intrastate pipelines. If, on the other hand, exclusive federal jurisdiction over the Pipelines were appropriately asserted—and it has not been—then Sable could obtain a Special Permit from PHMSA.[7] Right now, Sable has neither. Sable never completed the requirements of the State Waivers, and recently abandoned them. (Dintzer Decl., Exh. E.) And even assuming PHMSA had authority to issue the permission required, Sable does not have PHMSA's permission either. While Sable received an Emergency Special Permit from PHMSA on December 23, 2025, that permit was limited by statute to 60 days, and expired on its own terms on February 21, 2026.[8] Accordingly, Sable's operation of the Las Flores Pipelines violates this

---

[7] State Waiver and Special Permit are the terms used by OSFM and PHMSA, respectively, for the same thing: permission to operate a pipeline even if out of compliance with federal regulations. Here of course, the Pipeline Safety Act and the Consent Decree vests OSFM with the sole authority to issue the required permission.

[8] That permit was also invalid, but because it expired, the Court need not reach this issue.

11

Consent Decree *and* federal regulations. This Court should not grant Sable relief to enable Sable to violate federal law.

On this point, preemption does not help Sable. Even if Sable were correct and California was preempted from regulating, Sable needs California to *enable* it to restart the Las Flores Pipelines under federal law. Preemption does not excuse the federal-law need for a state waiver because the Defense Production Act does not displace federal law. (See *United States v. Vertac Chem. Corp.* (8th Cir. 1995) 46 F.3d 803, 812 [holding that DPA did not displace CERCLA].)

### 2.    Moving Forward, Federal Law Requires Sable Obtain a Waiver from OSFM, not PHMSA

Putting aside the fact that the Consent Decree vests that authority in OSFM, in the abstract whether permission comes from a state or federal authority is governed by the Pipeline Safety Act. Specifically, when a state authority has complied with the requirements of the Pipeline Safety Act, only the state agency, not PHMSA, has the power to issue waivers for intrastate pipelines in that state. 49 U.S.C. § 60105 ("the Secretary of Transportation may not prescribe or enforce safety standards and practices for an intrastate pipeline facility or intrastate pipeline transportation to the extent that the safety standards and practices are regulated by a State authority . . . .").

California acknowledges that Sable and PHMSA contend that the Las Flores Pipelines are "interstate" and therefore PHMSA has jurisdiction. Because PHMSA took this position in an order, California's challenge was made at the Ninth Circuit Court of Appeals. (49 U.S.C. § 60119.) And the question of interstate vs intrastate status is presently before the Ninth Circuit in the consolidated petitions for review challenging PHMSA's December 2025 orders. For purposes of this case, this Court should maintain the status quo, at least until the Ninth Circuit rules, that the Las Flores Pipelines are intrastate pipelines. More, in this Court, Sable introduced this argument in its previous Motion for Reconsideration. Sable has not meaningfully re-argued this point, and the Court should not revisit an issue not directly raised in this Motion.[9]

---

[9] To the extent that this Court wishes to consider the question of interstate vs intrastate jurisdiction, it should consider the arguments in Parts II.B (Claim Preclusion) and II.D (Statutory Interpretation) in Respondents' Opposition to Sable's first motion for reconsideration, filed on February 13, 2026.

**B.    Sable's Transportation of Crude Oil Violates California Law**

The California Elder Pipeline Safety Act, Gov. Code 51010, et seq., incorporates the same rules as the federal Pipeline Safety Act with regard to cathodic protection (i.e., anti-corrosion systems). Violation of federal law in this area is also violation of state law. This Court should not grant Sable relief to enable violations of state law.

**C.    Sable's Transportation of Crude Oil Violates State Parks' Property Rights**

California law prohibits trespass on government property. (Civ. Code, § 829.) A landowner has the right to the land and "everything permanently situated beneath it." (*Id.*, see also Civ. Code, § 659.) This includes the subsurface transportation of crude oil across state land without an easement. (*Ibid.*, see also *Civic W. Corp. v. Zila Indus., Inc.* (1977) 66 Cal.App.3d 1, 16 ["The essence of [a] cause of action for trespass is an 'unauthorized entry' onto the land of another.]".)

CA-325 passes through Gaviota State Park, property of the California Department of Parks and Recreation. When it operated the Lines 324 and 325, Plains had an easement. The easement, entered into in 1986, was for a duration of 30 years. (Declaration of Dena Bellman, Exh. C.) That easement expired in 2016, while the Pipelines were out of service. Without an easement, Sable has no right to cross Gaviota State Park. And State Parks recently informed Sable that, under present circumstances, it is not providing that permission. (*Ibid.*)

Neither the United States nor Sable can compel California State Parks to dedicate the state's resources, including its real property, to Sable's crude oil to transportation—nor can the United States coerce California to enter into an easement agreement with Sable. (See *Printz v. United States* (1997) 521 U.S. 898, 925 [federal government cannot commandeer state agencies].) If Sable wanted to lawfully transport crude oil through Gaviota State Park, it was required to obtain an easement from State Parks. Nor can the federal government authorize a private party's access to Gaviota State Park without complying with the requirements imposed by the takings clause and federal statutes. *Cedar Point Nursery v. Hassid* (2021) 594 U.S. 139, 140 (2021), *United States v. Carmack* (1946) 329 U.S. 230, 243-246.)

In addition to a violation of California's constitutionally-protected property rights, Sable transporting oil through Gaviota State Park without an easement violates this Court's preliminary

13

injunction. The injunction requires Sable to refrain from restart "until 10 court days following Sable's filing and service of notice that Sable has received all necessary approvals and permits for restarting the Las Flores Pipelines and that Sable intends to commence such restart." (Granted RJN, Exh. F.) An easement from state parks is an approval or permit that Sable needed. And even if Sable were correct that the Defense Production Act preempts state regulatory law, Sable offers no basis to believe that the Secretary of Energy did or could authorize a trespass.

III. **THE DEFENSE PRODUCTION ACT OFFERS ONLY LIMITED IMMUNITY AND DOES NOT DISPLACE EXISTING STATE LAW**

A. **The Defense Production Act Shields Sable Only From Contract Liability**

Sable relies on a maximalist view that the Defense Production Act that grants nearly unlimited power to preempt state law based on a provision that prevents the imposition of liability "for damages or penalties" resulting from compliance with the Defense Production Act. Sable failed to inform this Court that two federal appeals courts have concluded that this provision protects parties only from liability for breach of contracts, not for torts or violations of regulatory commands. (See *United States v. Vertac Chem. Corp.* (8th Cir. 1995) 46 F.3d 803, 812, citing *Hercules, Inc. v. United States* (Fed.Cir.1994) 24 F.3d 188, 203–04.) In its brief at the Supreme Court, the United States defended the Federal Circuit's holding in *Hercules*, explaining that "the language and statutory context of Section 707 show that it protects contractors from claims arising out of a DPA order's displacement of work for other customers, not from tort liability to parties who claim to have been injured . . . ." (Brief for Respondent United States, *Hercules, Inc. v. United States*, No. 94-818 (516 U.S. 417), 1995 WL 495540, at *34.) Based in Respondents' research, this was the position of the United States until March 3, 2026. Sable is asking this Court to take sweeping action, contrary to precedent, based on a self-serving memorandum that, less than two weeks ago, reversed long-standing policy of the United States.

The OLC Opinion, 50 Op., O.L.C. ___, should not be treated as contrary precedent. Courts do not defer to the federal Executive Branch's conclusions about preemption. (*PLIVA, Inc. v. Mensing* (2011) 564 U.S. 604, 613 fn. 3, citing *Wyeth v. Levine* (2009) 555 U.S. 555, 576.)

The OLC Opinion is also wrong. The Opinion argues that "DPA's displacement of state

regulatory law follows from the same principle" as the liability shield because "[s]tate regulation often accomplishes *ex ante* what private law accomplishes *ex post*." (Dintzer Decl., Exh. B, at p. 13.) This is not how statutory authorization works. Statutes confer only the powers they identify, not powers that are unmentioned. (*West Virginia v. EPA* (2022) 597 U.S. 697, 723.)

The recent decision by the United States Supreme Court invalidating tariffs imposed under the International Emergency Economic Powers Act (IEEPA) is instructive. There, the United States contended that imposing tariffs fell within "regulat[ing] . . . importation" under the IEEPA because a tariff has the effect of altering the volume of imports, functionally similar to quotas and other import restrictions. (Opening Brief for the United States, at p. 37, *Learning Res., Inc. v. Trump*, 146 S. Ct. 628 (2026) (No. 24-1287), 2025 WL 2772085, at *37 (United States arguing that "there is no substantive difference between directly specifying the quantities of a foreign product to be sold and exploiting price-demand curves (via tariffs) to achieve the same end.")). The Supreme Court rejected this argument.[10] (*Learning Res., Inc. v. Trump* (2026) 146 S. Ct. 628, 646.) The Court explained that Congress uses different terms to confer different powers, and courts do not infer that Congress conferred a power based on some *functionally equivalent but different* power. (*Id.* at p. 643.) Although the OLC Opinion post-dates *Learning Resources* by 11 days, it does not mention *Learning Resources*, and is inconsistent with the Supreme Court's majority opinion. Indeed, the OLC Opinion doubles down on the sweeping view of unilateral executive power that the Supreme Court had just rejected. The OLC Opinion adopts a view that when Congress confers a power on the Executive, the Executive can exercise other powers that have a functionally similar result. (Dintzer Decl., Exh. B, at pp. 12–13.) But *Learning Resources* rejects this logic, and this Court should too. As the Supreme Court held in *Learning Resources*, Congress conferring power to regulate does not confer power to tax. And under the Defense Production Act, Congress conferring power to preempt *damages liability* via a DPA order does not confer power for the Executive Branch to unilaterally excuse compliance with state law.

---

[10] Although the Court split into three groups, this holding is in Part II.B, which six of the nine justices joined. (*Learning Resources*, *supra*, 146 S. Ct. at p. 634.)

15

**B.    The Defense Production Act Does Not Authorize Bringing New Resources Online, Only the Distribution of Existing Resources**

When Congress enacted the Defense Production Act in 1950, Congress included the power to "requisition" materials—that is, to make materials that do not yet exist and provide them to the government. (Alexandra G. Neenan, Cong. Rsch. Serv., R43767, *The Defense Production Act of 1950: History, Authorities, and Considerations for Congress* at 2 (updated Oct. 6, 2023), https://www.congress.gov/crs-product/R43767.) In the 1950 version of the Act, the requisition provision was Title II of the Act. If any authority in the Act supported what Sable alleges here, that provision would be the only provision that fits. But in 1953, shortly after President Truman's controversial seizure of the steel mills, Congress amended the Defense Production Act to terminate Titles II and IV. (P.L. 83-95, 67 Stat. 129. P.L. 83-95 [terminating Titles II and VI, effective June 30, 1953, and Titles IV and V, effective April 30, 1953].) Sable is attempting to rely on a power that Congress decided to remove from the relevant statute.

**C.    The Defense Production Act Does Not Displace Cooperative Federalism**

An order by the Executive Branch cannot create federal preemption when Congress preserved a state's sovereign authority. (*See Youngstown Co. v. Sawyer* (1952) 343 U.S. 579, 637 (1952) ["When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb . . . ."]; *see also Barclays Bank PLC v. Franchise Tax Bd. of California* (1994) 512 U.S. 298, 330 [executive pronouncements of policy cannot invalidate "congressionally-condoned" state policy], *Chamber of Commerce of U.S. v. Reich* (D.C. Cir. 1996) 74 F.3d 1322, 1332 [holding that when an executive action conflicts with a statute , the statute controls].) "The case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there is between them." (*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.* (1989) 489 U.S. 141, 166–67, cleaned up.) Here, Congress not only stood by and tolerated state power; it expressly preserved state jurisdiction over intrastate pipelines. (49 U.S.C. §§ 60101(a)(8)(B), (a)(10), 60104(c).) In the regulation of intrastate pipelines, Congress disabled the federal government from regulating. The

16

Secretary of Energy cannot override this with a vaguely-worded order under a different statute.

## IV. THE DEFENSE PRODUCTION ACT ORDER IS INCONSISTENT WITH THE STATUTE AND FEDERAL REGULATIONS

The Defense Production Act authorizes prioritization and allocation—that is, to perform some orders before others or to allocate already-available goods to some orders before others. (See 50 U.S.C. § 4511(a), (c).) An allocation order is "an official action to control the distribution of materials, services, or facilities," not an order to produce something that would not otherwise exist. (10 C.F.R. § 217.20.) Similarly, a prioritization changes which order is filled first. (10 C.F.R. § 217.31.) This purported DPA Order does not do this. It purports to bring a new resource online. That is not what the Defense Production Act authorizes.

Sable fails to identify the allocations, prioritizations, or contracts it is required to undertake. That should suffice to conclude that Sable has not carried its burden.

The DPA Order also fails to comply with relevant regulations. An agency action that is inconsistent with federal regulations—including the agency's own regulations—is unlawful. (*Nat'l Ass'n of Home Builders v. Norton* (9th Cir. 2003) 340 F.3d 835, 841, 852 ["Having chosen to promulgate the *DPS Policy,* the FWS must follow that policy."]; *see also Morton v. Ruiz* (1974) 415 U.S. 199, 235.) The DPA Order gives a general preference but does not provide the procurement information required by the Department of Energy's regulations. For example, orders under the Defense Production Act must contain start and end dates. (10 C.F.R. §§ 271.51(f), 217.54(b).) Orders must contain detailed descriptions of what is to be prioritized or allocated. (10 C.F.R. §§ 271.51(f), 217.54(a).) Priority orders must use priority ratings (DO or DX). (10 C.F.R. §§ 271.31.) The DPA Order does not satisfy any of these conditions.

## V. THIS CASE IS NOT MOOT

Sable also seeks to terminate the injunction based on mootness. Unlike Sable's argument under the Defense Production Act, Sable offers no argument that mootness creates urgency. The Court should reject the ex parte application for mootness and require a noticed motion.

Sable is also wrong about mootness. Under California law, a CEQA or related writ challenge does not become moot unless there is evidence that the planned course of action has

17

been abandoned. (*Citizens for Open Gov. v. City of Lodi* (2006) 144 Cal.App.4th 865, 873 [rescinded project approval did not moot case where there was no evidence that respondents intended to abandon project); see also Pub. Res. Code, § 21167(a).) The events in the appeals of *Friends of the Eel River v. North Coast Railroad Authority* (2017) 3 Cal.5th 677, 701, are instructive. There, the respondent and real party in interest asserted preemption of state regulation of railroads, and the respondent rescinded its project approval and certification. The respondent (local agency) and real party (private railroad) then sought dismissal based on mootness. The trial court denied their mootness motion but entered a defense judgment based on preemption. The petitioners appealed, and the Court of Appeal affirmed, finding that the case was not moot but preemption applied. (*Ibid*.) The California Supreme Court then reversed on the merits, instructing the respondent that CEQA was not preempted. This case is similar, and this Court is within its power to maintain an injunction, at least until a noticed motion addressing mootness can be heard.

## CONCLUSION

This Court should not dissolve or modify its injunction on account of Sable's allegation of preemption prior to resolution by a federal court. Sable is wrong on the law and bound by the Consent Decree. This Court should deny Sable's Motion.

Dated:  March 16, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
MYUNG PARK
Supervising Deputy Attorney General

MICHAEL S. DORSI
Deputy Attorney General
*Attorneys for Respondents and Defendants*
*Dep't of Forestry and Fire Protection, et al.*

LA2025400847
44961031

18

<u>**DECLARATION OF SERVICE BY E-MAIL**</u>

**Case Name:**          Center for Biological Diversity v. CalFire/OSFM
**Case Number:**       25CV02244
**Party Represented:** Department of Forestry and Fire Protection, by and through the Office of the State Fire Marshal, an agency of the State of California; Daniel Berlant, in his official capacity as State Fire Marshal

**Declaration of Electronic Service**

1. I am at least 18 years of age and not a party to this matter.

2. I am employed in the Office of the Attorney General of the State of California. My business address is 300 S. Spring Street, Suite 1702, Los Angeles, CA 90013, County of Los Angeles.

3. My electronic service address is <u>Valerie.Thompson@doj.ca.gov</u>.

4. On <u>March 16, 2026</u>, I electronically served the following documents:

   a. **RESPONDENTS CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, ET AL.'S BRIEF IN RESPONSE TO EX PARTE APPLICATIONS**

   b. **DECLARATION OF DENA BELLMAN IN SUPPORT OF RESPONDENTS CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, ET AL.**

5. I electronically served the aforementioned documents by emailing them to the following individuals:

   SEE ATTACHED SERVICE LIST

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct, and that this declaration was executed on <u>March 16, 2026</u>.

Valerie Thompson                                      /s/ *Valerie Thompson*
_____                _____
Declarant                                                    Signature

Page **1** of **2**

**Case Name:**     Center for Biological Diversity v. CalFire/OSFM
**Case Number:**   25CV02244

# SERVICE LIST

| | |
|---|---|
| Linda Krop<br>Jeremy M. Frankel<br>Tara C. Rengifo<br>ENVIRONMENTAL DEFENSE CENTER<br>lkrop@environmentaldefensecenter.org<br>jfrankel@environmentaldefensecenter.org<br>trengifo@environmentaldefensecenter.org<br>***Attorneys for Petitioners Environmental Defense Center*** | Julie Teel Simmonds<br>David Pettit<br>Talia Nimmer<br>CENTER FOR BIOLOGICAL DIVERSITY<br>**Email Addresses:**<br>jteelsimmonds@biologicaldiversity.org<br>dpettit@biologicaldiversity.org<br>tnimmer@biologicaldiversity.org ***Attorneys for Petitioners Center for Biological Diversity*** |
| Duncan Joseph Moore<br>Benjamin J. Hanelin<br>Natalie C. Rogers<br>PAUL HASTINGS, LLP<br>**Email Addresses:**<br>djmoore@paulhastings.com<br>benjaminhanelin@paulhastings.com<br>natalierogers@paulhastings.com<br>***Attorneys for Real Parties in Interest Sable Offshore Corp Pacific Pipeline Company*** | Brooke Bolender<br>Jeffrey Dintzer<br>ALSTON & BIRD, LLP<br>**Email Addresses:**<br>Brooke.Bolender@alston.com<br>jeffrey.dintzer@alston.com<br>***Attorneys for Real Parties in Interest Sable Offshore Corp Pacific Pipeline Company*** |
| Trevor D. Large<br>FAUVER, LARGE, ARCHIBALD & SPRAY, LLP<br>**Email Address:** TLarge@FLASllp.com<br>***Attorney for Real Parties in Interest Sable Offshore Corp Pacific Pipeline Company*** | INTENTIONALLY LEFT BLANK |

Docusign Envelope ID: C1D5CE6E-7CB0-4668-8C3E-E73147DD5058

ROB BONTA
Attorney General of California
MYUNG J. PARK
Supervising Deputy Attorney General
MATTHEW BULLOCK (SBN 243377)
MICHAEL S. DORSI (SBN 281865)
Deputy Attorney General
    455 Golden Gate Avenue, Suite 11000
    San Francisco, CA  94102-7004
    Telephone:  (415) 510-3802
    Fax:  (415) 703-5480
    E-mail:  Michael.Dorsi@doj.ca.gov
*Attorneys for Respondents and Defendants*
*Department of Forestry and Fire Protection, by and*
*through the Office of the State Fire Marshal, an*
*agency of the State of California; Daniel Berlant, in*
*his official capacity as State Fire Marshal*

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Angela Braun, Executive Officer
3/16/2026 9:44 PM
By: Gabriel Moreno , Deputy

EXEMPT FROM FILING FEES
PURSUANT TO GOVERNMENT
CODE SECTION 6103

SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF SANTA BARBARA

| | |
|---|---|
| **CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,**<br><br>                    **Petitioner and Plaintiff,**<br><br>v.<br><br>**CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, by and through the OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive,**<br><br>                    **Respondents and Defendants,**<br><br>**SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,**<br><br>                    **Real Parties in Interest.**<br><br>***<br><br>**ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL** | Case No. 25CV02244<br>Consolidated with Case No. 25CV02247<br><br>**DECLARATION OF DENA BELLMAN IN SUPPORT OF RESPONDENTS CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, ET AL.**<br><br>Date:          March 17, 2026<br>Time:          8:30 a.m.<br>Dept:          4<br>Judge:        Hon. Donna Geck<br><br>Trial Date:  Not Set<br>Action Filed: April 15, 2025 |

1

**OUT!**, a California non-profit corporation; **SANTA BARBARA COUNTY ACTION NETWORK**, a California non-profit corporation; **SIERRA CLUB**, a national non-profit corporation; and **SANTA BARBARA CHANNELKEEPER**, a California non-profit corporation,

              **Petitioners and Plaintiffs,**

              **v.**

**CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION**, an agency of the State of California; **OFFICE OF THE STATE FIRE MARSHAL**, an agency of the State of California; **DANIEL BERLANT**, in his official capacity as State Fire Marshal; and **DOES 1 to 10**, inclusive,

           **Respondents and Defendants,**

**SABLE OFFSHORE CORP.**, a Delaware Corporation, **PACIFIC PIPELINE COMPANY**, a Delaware Corporation, and **DOES 11 through 20**, inclusive,

           **Real Parties in Interest.**

2

Declaration of Dena Bellman (California State Parks)  (25CV02244)

I, Dena Bellman, declare:

1.    I am the Superintendent of the Channel Coast District of California State Parks.

2.    I have personal knowledge of the facts asserted in this Declaration, and if called as a witness, I could and would competently testify to these facts.

3.    To transport crude oil through a state park by underground pipeline requires an easement.

4.    Transporting crude oil by pipeline through a state park without an easement is a trespass.

5.    The pipeline designated CA-325, formerly line 903, which is a part of the Las Flores Pipelines, passes through Gaviota State Park in Santa Barbara County, California.

6.    In 1986, the owner of the Las Flores Pipelines, obtained an easement to transport crude oil through Gaviota State Park. This easement had a term of 30 years.  A true and correct copy of this easement, which I am familiar with through my oversight of Gaviota State Park, is attached to this Declaration as Exhibit A.

7.    The easement obtained in 1986 expired according to its terms in 2016.

8.    I understand that in 2016, the owner of the Las Flores Pipelines was Plains Pipeline, LP, a wholly-owned subsidiary of Plains All American Pipeline, LP, and that the owner now is Pacific Pipeline Company, a wholly owned subsidiary of Sable Offshore Corp.

9.    Sable has not acquired a new easement for the existing pipeline, and no other party currently has a right to operate the pipeline through Gaviota State Park.

10.    California State Parks has in the past granted right of entry permits in order to permit certain access to the offline pipeline designated CA-325 for general maintenance and monitoring A true and correct copy of the most recent right of entry permit, which I am familiar with through my oversight of Gaviota State Park, is attached hereto as Exhibit B.

11.    On March 14, 2026, California State Parks sent a letter to Sable denying Sable's easement request, and demanding that Sable immediately remove the pipeline according to the expired easement. State Parks, however, stated that it was prepared to withdraw its letter if Sable confirmed in writing no later than 12 PM Pacific Time on Monday, March 16, 2026, that it had

3

Declaration of Dena Bellman (California State Parks)  (25CV02244)

Docusign Envelope ID: C1D5CE6F-7SB0-4668-8C3E-E72147DD5058

not restarted the pipeline traveling through Gaviota State Park and that it would not restart the pipeline until and unless it obtained all required state approvals and a new easement from State Parks, or it obtained final judicial decision that any state approvals or easements were not needed. A true and correct copy of California State Parks' letter dated March 14, 2026 is attached hereto as Exhibit C.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 16th Day of March, 2026.

DocuSigned by:

*Dena Bellman*

—1FD96B85B9674A1

DENA BELLMAN
SUPERINTENDENT, CHANNEL COAST
DISTRICT, CALIFORNIA STATE PARKS

LA2025400847

4

Declaration of Dena Bellman (California State Parks)  (25CV02244)

# Exhibit A

DEC 4 1987

EAS87-019

STATE OF CALIFORNIA

DEPARTMENT OF PARKS AND RECREATION

PIPELINE EASEMENT

CELERON PIPELINE COMPANY OF CALIFORNIA

GAVIOTA STATE PARK

STATE OF CALIFORNIA, acting by and through the Department of Parks and Recreation, hereinafter called "STATE", and pursuant to Public Resources Code Section 5012 and in accordance with Section 5400 et seq., grants to CELERON PIPELINE COMPANY OF CALIFORNIA, hereinafter called "COMPANY", an easement to construct, operate, maintain, and remove an underground pipeline together with its appurtenances for the transportation of hydrocarbon substances over, under, and across that portion of Gaviota State Park described in Exhibit "A", attached hereto and made a part hereof.

THIS EASEMENT IS SUBJECT TO THE FOLLOWING TERMS AND CONDITIONS:

1.    This easement is for a term of thirty (30) years, beginning July 28, 1986 and ending on July 27, 2016.

2.    As consideration for the granting of this easement, COMPANY agrees to pay STATE $477,998.50, calculated as follows:

---

---

---

301-0???



1047899

DO NOT RECORD!

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)
88 34768

| Encumbrance | $/Rod | Rods | $ |
|---|---|---|---|
| Coastal Area | 350 | 457.76 | 160,216.00 |
| Inland Area | 250 | 871.13 | 217,782.50 |
| | | | $377,998.50 |

Mitigation of impacts to natural resources
and public recreation use                        100,000.00

TOTAL                                            $477,998.50


Mitigation of impacts to natural resources and public recreation use are based on the project described in the Environmental Impact Report and Environmental Impact Statement, dated January 1985 and filed under State Clearing House Number 83110902.  Impacts above and beyond those within said Gaviota State Park will be the subject of additional compensation to State.

This payment shall be made in a single lump sum payment within 60 days of the date of this easement.

Discrepancies between pipeline lengths actually installed and calculated lengths will be paid for additionally or reimbursed from one party to the other within 90 days of the completion of the construction of the pipeline, using the formula set forth above.

3.    COMPANY acknowledges that this easement is expressly limited to the lands described in said Exhibit "A", and use of other STATE owned land is not conferred or implied, excepting the access road described in Paragraph 13 herein.

---

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)
85 34769

2

301-0269

4.   This easement is subject to all valid contracts, leases, licenses, encumbrances, and claims which may affect said property, and the use of the word "Grant" herein shall not be construed as a covenant against the existence of any thereof.

5.   COMPANY, in the exercise of the privileges herein granted, shall at all times be in compliance with all applicable laws, rules, and regulations.

6.   (a)  In the exercise of this easement, COMPANY shall conduct archeological work under provisions of Exhibit "B", attached hereto and made a part hereof.

(b)  COMPANY agrees that construction monitors, as required under Santa Barbara County Final Development Plan C-1, will oversee all construction activities within said Park.  Said Plan C-1 is attached hereto as Exhibit "C" and made a part hereof.

(c)  COMPANY agrees that all areas disturbed during construction activities and during the term of this easement will be restored and revegetated as required under the approved Gaviota State Park Restoration and Revegetation Plan, attached hereto as Exhibit "D" and made a part hereof.

7.   COMPANY hereby waives all claims and recourse against the State of California, its officers, agents, and employees for loss or damage to persons or property arising from, growing out of, or in any way connected with or incident to this easement.  COMPANY agrees to indemnify, save harmless, and defend the State of California, its officers, agents, and employees against

3

301-0263

any and all claims, demands, or causes of action that may be brought against the State of California, its officers, agents, and employees arising out of or in any way connected with or incident to this easement, except those arising out of the sole negligence of STATE.

8.    Upon any termination of this easement, COMPANY shall remove at the option of STATE all improvements for which this easement is issued and shall restore and revegetate said easement in a manner satisfactory to STATE.  In the event COMPANY fails to do so, STATE at its option may do so, and COMPANY agrees and warrants that upon receipt of written demand from STATE, COMPANY will pay to STATE the cost incurred by STATE for said removal and restoration.

9.    It is mutually agreed that COMPANY, at its option, may extend the term of this easement for an additional period not to exceed ten (10) years, subject to the following provisions:

(a)  COMPANY must give STATE, during year twenty-nine (29) of this easement, a written request for the extension of this easement.  Said request shall set forth the length of the proposed extension.

(b)  Consideration for said extension, payable by COMPANY in a lump sum prior to the expiration of the original term of this easement, shall be the fair market value of the property rights involved.  If STATE and COMPANY fail to reach agreement as to said fair market value, the dispute shall be resolved under the provisions of paragraph 24 herein.

---

---

3

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 0-72)
84 32915

4

SJ-0263

(c) Excepting those terms and conditions superseded by provisions A and B of this clause, and those terms and conditions changed by mutual consent of STATE and COMPANY, the terms and conditions of this easement shall remain in full force and effect.

10. COMPANY can at any time by providing thirty (30) days written notice to STATE of its intent to terminate this easement, do so.

11. In the event that COMPANY shall at any time be in default in respect to any liquidated monetary payment due hereunder STATE may at its option declare this easement forfeited and terminated, provided, however, before any forfeiture shall be declared hereunder, STATE shall cause to be given to COMPANY a written notice specifying the particulars wherein COMPANY is in default and demanding performance in accordance with the terms of this easement. If within thirty (30) days after such notice is given, COMPANY shall fully comply therewith, no forfeiture by reason of breach shall be declared hereunder; but, in the event of the failure of COMPANY to comply with such notice, STATE may then declare and effect a forfeiture by reason of the default therein specified.

COMPANY is prohibited from assigning, mortgaging, hypothecating, or transferring this easement or any interest therein without the prior written consent of STATE, which consent will not be unreasonably withheld.

12. In the event of a spill or leak of said pipeline contents into or over said Park, COMPANY shall immediately notify STATE'S Regional Director for

---

3

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV 8-72)
84 32915

5

翌 0763

the Gaviota District or his authorized representative. Information to be reported shall include, but not be limited to:

The name and company of the person reporting, an information telephone number that can be contacted for further information, the time and date of the spill, the location of the spill, the discharger, the substance spilled, the estimated quantity spilled, the cause of the spill, and the action taken. Thereafter, a written report shall be filed with the STATE identifying the source, cause, size of spill, and the action taken.

13. COMPANY shall during the herein term maintain in full force and effect, with respect to this easement, a policy or policies of public liability insurance in the amount of Five Hundred Thousand Dollars ($500,000) each occurrence for bodily injury and property damage combined ($500,000 combined single limit). The policy or policies shall be underwritten to the satisfaction of STATE, in a form satisfactory to STATE, and a complete and signed copy of a Certificate of Insurance thereof shall be submitted to STATE concurrently with the signed copy of this easement. Certificates of Insurance shall contain the following special endorsement:

"The State of California, California State Park and Recreation Commission, Department of Parks and Recreation, their officers, employees, and agents, are hereby declared to be additional insureds under the terms of this policy, both as to the activities of the Company and as to the activities of the State, the State Park and Recreation Commission, the Department of Parks and Recreation, their officers, employees, and agents, as related to the activities contemplated in this easement."

6

301-0263

"This insurance policy will not be reduced or canceled without fifteen (15) days' prior written notice to the Department of Parks and Recreation.

"The State of California is not liable for the payment of any premiums or assessments on this policy."

This cancellation provision shall not be construed in derogation of the duty of the COMPANY to furnish insurance during the entire term of the easement.

In the event COMPANY fails to keep in effect at all times insurance coverage as herein provided, STATE may, in addition to any other remedies it may have, terminate this easement and all privileges COMPANY may have hereunder.

14.  The road to be used by COMPANY for ingress, egress, and access by COMPANY to this easement shall be reasonably designated and redesignated by STATE.  COMPANY shall not call upon STATE, nor shall STATE have any responsibility to perform any maintenance work or to make any repairs or improvements on said road.  If COMPANY feels more maintenance or repair work is needed than is actually performed by STATE, COMPANY may perform such repairs or maintenance at COMPANY'S own expense.  COMPANY shall immediately repair any damage caused by COMPANY, or its invitees, to the road surface.

15.  In its use of this easement, COMPANY shall comply with all STATE requirements, including, but not limited to, parking control and the uses

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)

contemplated herein.  Employee camping by COMPANY employees during construction in said Park shall not be permitted.

16.  COMPANY shall coordinate all construction activities herein authorized within said Park with STATE'S Superintendent of the Gaviota District to assure the safety of said Park visitors and also to minimize the inconvenience to said Park visitors and possible detrimental effect on said Park operations or resources.

17.  If STATE grants other pipeline easements within this easement, each such easement shall require that the grantee pay COMPANY'S cost for inspectors to protect COMPANY'S pipeline, require grantee to indemnify COMPANY, and to have a plan that gives time and dates for revegetation and cathodic protection in accordance with industry standards.  STATE shall not be liable to COMPANY for failure to require said grantees to provide these protections unless COMPANY gives written notice to STATE, prior to such grant, of the provisions of this paragraph.  Also, in no event shall STATE have any liability for failure to require these protections if the pipeline is installed pursuant to a court order in an action in eminent domain.

18.  During construction, COMPANY shall provide or cause to be provided: (1) adequate signing for its work, including all of its excavations, within said Park warning the public of dangerous conditions, and (2) adequate lighting to warn against open excavations or other dangerous conditions created during said construction.  All trenches and excavations for the pipeline or other construction work shall be made in such a manner as to permit the visiting public uninterrupted access across the route of said construction.

301· 0263

19. COMPANY shall, during construction work under this easement, provide for the safe passage of handicapped visitors along service roads and trails providing access throughout said Park for the visiting public.

20. No tree or plants outside this easement within said park shall be cut, injured, or disturbed as a result of the herein construction by COMPANY without prior approval of said Superintendent. Any tree or slash so cut or removed shall be disposed of in a manner satisfactory to STATE. Any trees or plants removed within said Park shall be replaced at no cost to STATE with trees and plants acceptable to STATE in accordance with provisions under Paragraph 6(c) above.

21. To secure the full and complete performance of COMPANY'S obligation hereunder to the good faith satisfaction of STATE, and until the termination herein provided, COMPANY shall furnish evidence for STATE of its financial net worth in excess of $10,000,000 or as an alternative, COMPANY may provide a bond in the amount of One Million Dollars ($1,000,000). Said bond shall be in the form shown on Exhibit "E", attached hereto and made a part hereof.

22. If, in the judgment of said Superintendent, the herein construction becomes hazardous to said Park or said Park visitors, the said Superintendent shall immediately request COMPANY to cease that specific construction task and COMPANY shall not proceed with that specific construction task until the hazardous problem is resolved in a manner acceptable to said Superintendent.

23. In the event of a rupture of the pipeline and consequent spill of pollutants within the said Park, COMPANY, at no cost to STATE, shall

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)

9

immediately employ a professional expert acceptable to STATE for the purpose of determining monetary loss to STATE and the public in connection with the spill or pollutants. Upon approval by STATE and COMPANY of the monetary determination of loss, COMPANY shall submit said amount to STATE. If STATE and COMPANY fail to reach agreement, the dispute shall be resolved under provisions of paragraph 24 herein.

24. If a monetary dispute arises under paragraphs 9, 23, or 25 of this easement, it shall be resolved by two persons skilled in appraisal of the type of valuation sought by STATE. STATE shall appoint one appraiser and COMPANY the other appraiser. STATE and COMPANY shall be bound by the determination made by the two appraisers. If the two appraisers do not come to an agreement upon the appraised damages and/or values, a third appraiser shall be appointed by the first two appraisers so that a decision can be made by the majority.

25. In the event a spill of pollutants results in the permanent loss of usability of part or all of said Park, COMPANY, upon request by STATE, shall hire a professional real property appraiser acceptable to STATE for the purpose of determining fee value of the land no longer usable and the cost to replace said with land of equal value and utility. Upon review and approval of the appraisal by STATE and COMPANY, COMPANY will proceed to obtain land of equal value to provide STATE a dollar amount equal to the value of the land no longer usable. STATE and COMPANY will then exchange properties. If STATE and COMPANY cannot agree to the exchange, the dispute shall be resolved under provisions of paragraph 24 above.

---

---

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)
65 34769

10

301-0268

26. Notices to COMPANY shall be addressed to:

Area Manager
Celeron Pipeline Company of California
6840 District Boulevard
Bakersfield, CA  93313

27. Notices to STATE shall be addressed to:

District Superintendent
Gaviota District
Department of Parks and Recreation
#10 Refugio Beach Road
Goleta, CA  93117

IN WITNESS WHEREOF, the parties hereto have executed this Grant of easement this _____day of _____, 19___.

CELERON PIPELINE COMPANY          STATE OF CALIFORNIA
OF CALIFORNIA                     DEPT. OF PARKS AND RECREATION


By _____        _____
        Ronald L. Hinn

Title _____President_____    Chief Deputy Director
                                  _____

Date ____August 6, 1987____       ____5-26-87____


APPROVED:


DEPARTMENT OF GENERAL SERVICES

By_____
   PAUL V. SAVONA, Chief
   Office of Real Estate
   and Design Services

Date:  NOV 23 1987

B-1132Q

11

STATE OF CALIFORNIA

OSB-023-SZ

Centerline description of a fifty (50) foot wide right of way in, through and across that certain parcel of land situated in the County of Santa Barbara, State of California more particularly referred to as "Gaviota State Park." Said land is depicted in Record of Survey Map recorded in Book 85, page 29, Sheets 1 to 5 inclusive, in the Office of the County Recorder of Santa Barbara County.

The limits of said centerline running parallel with and lying 25 feet either side of a centerline described as follows:

BEGINNING at a point in the East property line of the parcel referenced above. Said POINT OF BEGINNING bears North 0° 25' East a distance of 152.7 feet from a 2" Iron Pipe with brass cap tagged L.S. 2602 and depicted as monument 40A on Record of Survey Map recorded in Book 85, Page 9, Sheets 1 to 5 inclusive.

1) THENCE North 71° 38' West for a distance of 547.9 feet;

2) THENCE North 65° 09' West for a distance of 46.0 feet;

3) THENCE North 54" 19' West for a distance of 40.0 feet;

4) THENCE North 43° 30' West for a distance of 40.0 feet;

5) THENCE North 32° 41' West for a distance of 108.5 feet;

6) THENCE North 22° 12' West for a distance of 40.0 feet;

7) THENCE North 11° 43' West for a distance of 575.3 feet;

8) THENCE North 19° 28' West for a distance of 40.0 feet;

9) THENCE North 27° 13' West for a distance of 116.5 feet;

10) THENCE North 36° 58' West for a distance of 40.0 feet;

11) THENCE North 46° 42' West for a distance of 40.0 feet;

12) THENCE North 56° 27' West for a distance of 33.5 feet;

13) THENCE North 68° 37' West for a distance of 40.0 feet;

14) THENCE North 80° 47' West for a distance of 40.0 feet;

15) THENCE South 87° 03' West for a distance of 45.8 feet;

16) THENCE South 78° 34' West for a distance of 40.0 feet;

17) THENCE South 70° 05' West for a distance of 40.0 feet;

18) THENCE South 61° 36' West for a distance of 75.5 feet;

19) THENCE South 72° 53' West for a distance of 40.0 feet;

21) THENCE North 85° 09' West for a distance of 40.0 feet;

22) THENCE North 74° 29' West for a distance of 40.0 feet;

23) THENCE North 63° 48' West for a distance of 208.8 feet to a point of curvature;

24) THENCE along a curve to the right with a radius of 44.5 feet and a central angle of 51° 30' for a distance of 40.0 feet;

25) THENCE North 12° 19' West for a distance of 808.0 feet to a point of curvature;



-1-

EXHIBIT-A

301-0263

26) THENCE along a curve to the left with a radius of 47.6 feet a central angle
of 56° 22' for a distance of 80.0 feet;

27) THENCE South 71° 20' West for a distance of 105.5 feet to a point in the East
Right of Way for State Highway 101.  Said point bears North 20° 49' West a
distance of 1580.6 feet from State Highway Right of Way Monument designated
+24.93/121.  THENCE continuing South 71° 20' West for a distance of 177.1 feet to
the Westerly Right of Way for State Highway 101.  Said point bears North 27° 03'
West a distance of 1590.4 feet from monument +24.93/121 described above.

28) THENCE South 71° 20' West for a distance of 43.5 feet;

29) THENCE South 65° 13' West for a distance of 121.3 feet;

30) THENCE South 41° 19' West for a distance of 149.5 feet;

31) THENCE South 29° 36' West for a distance of 991.4 feet;

32) THENCE South 40° 41' West for a distance of 40.0 feet;

33) THENCE South 51° 46' West for a distance of 305.6 feet;

34) THENCE South 62° 01' West for a distance of 40.0 feet;

35) THENCE South 72° 16' West for a distance of 40.0 feet;

36) THENCE South 82° 32' West for a distance of 40.0 feet;

37) THENCE North 87° 13' West for a distance of 261.4 feet;

38) THENCE South 81° 05' West for a distance of 236.7 feet;

39) THENCE South 70° 18' West for a distance of 40.0 feet;

40) THENCE South 59° 32' West for a distance of 40.0 feet;

41) THENCE South 48° 45' West for a distance of 40.0 feet;

42) THENCE South 38° 00' West for a distance of 281.4 feet;

43) THENCE South 49° 01' West for a distance of 40.0 feet;

44) THENCE South 60° 03' West for a distance of 157.1 feet;

45) THENCE South 70° 33' West for a distance of 107.0 feet to a point of curvature;

46) THENCE along a curve to the right having a radius of 32.1 feet and a central
angle of 71° 52' for a distance of 40.2 feet;

47) THENCE North 37° 35' West for a distance of 383.3 feet;

48) THENCE North 48° 49' West for a distance of 40.0 feet;

49) THENCE North 60° 14' West for a distance of 40.0 feet;

50) THENCE North 71° 13' West for a distance of 734.2 feet;

51) THENCE North 79° 07' West for a distance of 485.2 feet;

52) THENCE North 70° 38' West for a distance of 40.0 feet;

53) THENCE North 62° 08' West for a distance of 40.0 feet;

54) THENCE North 53° 38' West for a distance of 82.2 feet to the POINT OF TERMINATION
in the West property line of the above described tract of land.  Said POINT OF
TERMINATION bears South 07° 36' East a distance of 2280.9 feet from a standard
P&R bronze disc index number 3 as per Record of Survey mentioned above:

55) THENCE re-entering Gaviota State Park along the West property line.  Said POINT
OF BEGINNING bears South 07° 36' East a distance of 25.6 feet from a standard P&R
bronze disc mentioned above.  THENCE along a curve to the right having a radius
of 35.3 feet and a central angle of 69° 02' for a distance of 42.5 feet;

-2-

EXHIBIT-A    301-0209

56) THENCE No.../ 27° C    West for a distance of 113.4 feet to :   line of curvature;

57) THENCE along a curve to the right having a radius of 60.1 feet and a central angle of 83° 16' for a distance of 87.5 feet;

58) THENCE North 56° 11' East for a distance of 195.0 feet;

59) THENCE North 58° 08' East for a distance of 248.1 feet;

60) THENCE North 63° 34" East for a distance of 218.5 feet;

61) THENCE North 64° 21' East for a distance of 201.7 feet;

62) THENCE North 56° 54' East for a distance of 21.4 feet;

63) THENCE North 44° 55' East for a distance of 40.0 feet;

64) THENCE North 32" 57' East for a distance of 40.0 feet;

65) THENCE North 20° 58' East for a distance of 40.0 feet;

66) THENCE North 08° 59' East for a distance of 40.0 feet;

67) THENCE North 02° 59' West for a distance of 40.0 feet;

68) THENCE North 14° 58' West for a distance of 612.9 feet;

69) THENCE North 25° 52' West for a distance of 40.0 feet;

70) THENCE North 36° 46' West for a distance of 40.0 feet;

71) THENCE North 47° 39' West for a distance of 342.0 feet;

72) THENCE North 45° 52' West for a distance of 286.0 feet;

73) THENCE North 35° 30' West for a distance of 40.0 feet;

74) THENCE North 25° 08' West for a distance of 40.0 feet;

75) THENCE North 14° 47' West for a distance of 40.0 feet;

76) THENCE North 04° 25' West for a distance of 40.0 feet;

77) THENCE North 05° 57' East for a distance of 613.4 feet;

78) THENCE North 05° 51' West for a distance of 40.0 feet;

79) THENCE North 17° 39' West for a distance of 40.0 feet;

80) THENCE North 29° 27' West for a distance of 40.0 feet;

81) THENCE North 41° 16' West for a distance of 40.0 feet;

82) THENCE North 53° 02' West for a distance of 149.4 feet;

83) THENCE North 42° 33' West for a distance of 40.0 feet;

84) THENCE North 32° 04' West for a distance of 40.0 feet;

85) THENCE North 21° 35' West for a distance of 40.0 feet;

86) THENCE North 11° 06' West for a distance of 415.3 feet;

87) THENCE North 19° 10' West for a distance of 271.6 feet;

88) THENCE North 11° 59' West for a distance of 113.1 feet;

-3-

3

EXHIBIT-A

301-0268

89) THENCE ...h 24° , West for a distance of 341.9 feet;

90) THENCE North 12° 56' West for a distance of 40.0 feet;

91) THENCE North 01° 33' West for a distance of 40.0 feet;

92) THENCE North 09° 51' East for a distance of 346.1 feet;

93) THENCE North 18° 57' East for a distance of 40.0 feet;

94) THENCE North 26° 49' East for a distance of 40.0 feet;

95) THENCE North 37° 09' East for a distance of 213.5 feet;

96) THENCE North 26° 49' East for a distance of 40.0 feet;

97) THENCE North 16° 28' East for a distance of 372.3 feet;

98) THENCE North 28° 03' East for a distance of 40.0 feet;

99) THENCE North 39° 39' East for a distance of 660.1 feet;

100) THENCE North 29° 57' East for a distance of 40.0 feet;

101) THENCE North 20° 16' East for a distance of 40.0 feet;

102) THENCE North 10° 34' East for a distance of 40.0 feet;

103) THENCE North 00° 52' East for a distance of 96.6 feet;

104) THENCE North 12° 24' East for a distance of 40.0 feet;

105) THENCE North 23° 56' East for a distance of 40.0 feet;

106) THENCE North 35° 28' East for a distance of 40.0 feet;

107) THENCE North 47° 00' East for a distance of 264.6 feet;

108) THENCE North 39° 36' East for a distance of 40.0 feet;

109) THENCE North 32° 12' East for a distance of 365.5 feet;

110) THENCE North 33° 15' East for a distance of 787.1 feet;

111) THENCE North 25° 53' East for a distance of 180.5 feet;

112) THENCE North 34° 22' East for a distance of 366.8 feet;

113) THENCE North 33° 21' East for a distance of 210.2 feet;

114) THENCE North 39° 14' East for a distance of 153.5 feet;

115) THENCE North 31° 35' East for a distance of 33.7 feet;

116) THENCE North 42° 25' East for a distance of 40.0 feet;

117) THENCE North 53° 15' East for a distance of 40.0 feet;

118) THENCE North 64° 05' East for a distance of 40.0 feet;

119) THENCE North 74° 55' East for a distance of 40.0 feet;

120) THENCE North 85° 45' East for a distance of 74.0 feet;

121) THENCE North 84° 50' East for a distance of 357.5 feet;

122) THENCE North 73° 09' East for a distance of 40.0 feet;

123) THENCE North 61° 28' East for a distance of 268.1 feet;

3

-4-

# EXHIBIT-A

301-D268

124) THENCE North 70° ' East for a distance of 40.0 feet;

125) THENCE North 80° 01' East for a distance of 40.0 feet;

126) THENCE North 89° 18' East for a distance of 254.7 feet;

127) THENCE North 78° 17' East for a distance of 40.0 feet;

128) THENCE North 67° 16' East for a distance of 40.0 feet;

129) THENCE North 56° 15' East for a distance of 40.0 feet;

130) THENCE North 45° 13' East for a distance of 40.0 feet;

131) THENCE North 34° 12' East for a distance of 189.0 feet;

132) THENCE North 45° 19' East for a distance of 40.0 feet;

133) THENCE North 56° 25' East for a distance of 142.6 feet;

134) THENCE North 45° 49' East for a distance of 40.0 feet;

135) THENCE North 35° 12' East for a distance of 40.0 feet;

136) THENCE North 24° 36' East for a distance of 40.0 feet;

137) THENCE North 14° 00' East for a distance of 40.0 feet;

138) THENCE North 03° 23' East for a distance of 80.0 feet;

139) THENCE North 11° 40' East for a distance of 40.0 feet;

140) THENCE North 19° 57' East for a distance of 234.0 feet to the POINT OF TERMINATION in the Northerly property line of the above described tract of land.  Said POINT OF TERMINATION bears North 68° 27' West a distance of 119.9 feet from Caltrans monument +00"A"/180.0 as shown on Caltrans Map for State Highway 1 Map P.M. 0.0-SB1.

Said centerline contains 21,452.7 lineal feet or 1300.2 rods in length, more or less.

The bearings calculated to establish the location of the above centerline was obtained from monuments "Surprise" and "Orford."

# EXHIBIT-A

3

191-0263



89-049246

| | |
|---|---|
| Rec Fee | 13.0( |
| Check | 13.0( |

Recorded
Official Records
County of
Santa Barbara
Kenneth A Pettit
Recorder
10:28am 27-Jul-89

RO    5

Recording Requested By:

RECORDING REQUESTED BY
WHEN RECORDED MAIL TO:
ALL AMERICAN PIPELINE COMPANY
5800 MING AVENUE, SUITE 300
BAKERSFIELD, CALIFORNIA 93309
ATTN: RIGHT-OF-WAY DEPARTMENT

When Recorded Mail To:

DOCUMENTARY TRANSFER TAX $ ....... — O —
........COMPUTED ON FULL VALUE OF PROPERTY CONVEYED
........OR COMPUTED ON FULL VALUE LESS LIENS AND
ENCUMBRANCES REMAINING AT TIME OF SALE.

*All American Pipeline Co. By* _____
Signature of Declarant or Agent determining tax. Firm Name

Space Above for Recorder's Use

AGREEMENT AND GRANT OF EASEMENT    Grantee: All American Pipeline Company
~~Celeron Pipeline Company of California~~

TR89 100-E

Project: Underground Communication and Electrical Supply Systems

Park Unit:  Gaviota State Park

THIS AGREEMENT made and entered into by and between the STATE OF CALIFORNIA, acting through the Department of Parks and Recreation, hereinafter called State, and ~~CELERON PIPELINE COMPANY OF CALIFORNIA~~ ALL AMERICAN PIPELINE COMPANY, a ~~Delaware~~ Texas Corporation, hereinafter called Grantee.

State pursuant to the provisions of Section 5012 of the Public Resources Code of the State of California, and for valuable consideration, receipt of which is hereby acknowledged, hereby grants unto Grantee, its successors and assigns forever, an easement for the use, construction, reconstruction, placement, replacement, repair, inspection, operation and maintenance of an underground communication and electrical supply systems consisting of underground conduits, cables, and vaults including aboveground enclosures, markers, and concrete pads and all incidental appurtenant fixtures and/or equipment in, under, across and along that certain real property conveyed to the State of California by deed recorded October 10, 1967, in

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV 8-72)

S 34769


1047903

301-0207

Book 2207, Page 1050 as Document Number 29404, Official Records of Santa Barbara, being in the unincorporated area, County of Santa Barbara, State of California, and more particularly described as follows:

A strip of land 10 feet in width, lying 7 feet to the Westerly and 3 feet to the Easterly of the following described line:

Beginning at a point which bears North 20° 49' West, 1644.3 feet from a State Highway R.O.W. monument designated 05-SB-101 + 24.93/121 thence South 61° 14' East 13.3 feet; thence South 18° 40' East, 28.9 feet to point of termination on the North boundary of Celeron's existing East-West 50-foot wide pipeline easement recorded April 7, 1988 as Document No. 88-020459 Official Records, County of Santa Barbara.

PROVIDED, this Grant of Easement is subject to the following terms and conditions:

1.  This Grant is subject to existing contracts, leases, licenses, easements, encumbrances, and claims which may affect said property, and the use of the word "Grant" herein shall not be construed as a covenant against the existence of any thereof.

2.  Grantee waives all claims against State, its officers, agents, and employees, for loss or damage caused by, arising out of, or in any way connected with the exercise of this Easement, and Grantee agrees to save harmless, indemnify, and defend State, its officers, agents, and employees, from any and all loss, damage, or liability which may be suffered or incurred by State, its officers, agents, and employees caused by, arising out of, or in any way connected with exercise by Grantee of the rights hereby granted, except those arising out of the sole negligence of State.

---

COURT PAPER
STATE OF CALIFORNIA
STD 113 (REV 8-72)

85 34769

2

3.   State reserves the right to use said real property in any manner, provided such use does not unreasonably intefere with Grantee's rights hereunder.

4.   State expressly reserves the right to require Grantee, at the expense of Grantee, to remove and relocate all improvements placed by Grantee within the easement, upon determination by State that the same interfere with future development of State's property.  Within 180 days after State's written notice and demand for removal and relocation of the improvements, Grantee shall remove and relocate the improvements to a feasible location on the property of State, as designated by State, and State shall furnish Grantee with a good and sufficient similar easement in such new location, on the same terms and conditions as herein stated, and Grantee thereupon shall reconvey to State the Easement herein provided.

5.   This Easement shall terminate in the event Grantee fails for a continuous period of one (1) year to use the Easement for the purposes herein granted.  Upon such termination, Grantee shall forthwith upon service of written demand, deliver to State a quitclaim deed, to its right, title, and interest hereunder, and shall, on State request, without cost to State, and within 90 days from written demand by State, remove all property placed by or for Grantee upon said property and restore said premises as nearly as possible to the same condition they were in prior to the execution of this Easement. In the event Grantee should fail to restore the premises in accordance with such request, State may do so at the risk of Grantee, and all costs of such removal and restoration shall be paid by Grantee upon demand.

- - -

COURT PAPER
STATE OF CALIFORNIA
STD 113 (REV 8-72)

86 34769

3    301-0267

6.   In making any excavation on said property of State, Grantee shall make the same in such manner as will cause the least injury to the surface of the ground around such excavation, and shall replace the earth so removed by it and restore the surface of the ground and any improvement thereon to as near the same condition as they were prior to such excavation as is practicable.

7.   Grantee is further given the right of reasonable ingress to and egress from the Easement hereby granted, provided, however, that existing roads and trails shall be utilized for such purpose whenever reasonably possible and further provided that if such road or trail is not available, Grantee shall secure the consent of the State as to the route or routes to be followed for the purpose of such ingress and egress.  Such right of ingress and egress shall at all times be exercised in a manner which will cause the least damage to the property of the State.

JUN 20 1989

Date

STATE OF CALIFORNIA
DEPARTMENT OF PARKS AND RECREATION

By _____

Y-1600Q

APPROVED
Department of General Services

By _____
Senior Land Agent
Office of Real Estate and Design Services

GRANTEE:
~~CELERON PIPELINE COMPANY OF~~ 1/mw
~~CALIFORNIA~~
ALL AMERICAN PIPELINE COMPANY

By _Larry m. weel_

4          301-0267

STATE OF CALIFORNIA        )
                           )  ss.
COUNTY OF *Sacramento*     )

On this _____*26th*_____ day of _____*June*_____, in the year of 1989, before me, a Notary Public in and for the STATE OF CALIFORNIA, duly commissioned and sworn, personally appeared *Henry G. Agonia*_____, known to me to be the _____ **DIRECTOR OF PARKS AND RECREATION OF THE STATE OF CALIFORNIA** and acknowledged to me that (s)he executed the within instrument in the name of and on behalf of the STATE OF CALIFORNIA.

IN WITNESS WHEREOF, I have hereunder set my hand and affixed my official seal in said County, the day and year first above written.



_____*Susan P. Harrington*_____
Notary Public

STATE OF CALIFORNIA        )
                           )  ss.
COUNTY OF _*Kern*_         )

On _____*June 9, 1989*_____, before me, the undersigned, a Notary Public in and for said State, personally appeared **HARRY M. WEED**, personally known to me or proved to me on the basis of satisfactory evidence to be the person who executed the within instrument as the **VICE PRESIDENT - OPERATIONS** of **ALL AMERICAN PIPELINE COMPANY**, a Texas corporation, the corporation that executed the within instrument, and acknowledged to me that such corporation executed the within instrument pursuant to its by-laws or a resolution of its board of directors.

WITNESS my hand and official seal.

_____*Freda Dianna Bagby*_____
Notary Public

OFFICIAL SEAL
FREDA DIANNA BAGBY
NOTARY PUBLIC - CALIFORNIA
KERN COUNTY
My comm. expires AUG 25, 1992

*331-02-7*

# Exhibit B

| | |
|---|---|
| **RIGHT OF ENTRY PERMIT** | Agency:  Department of Parks and Recreation<br><br>Project:  **Pacific Pipeline 2025-26**<br>Gaviota State Park |

This Right of Entry Permit (Permit) is made and entered into this 27 day of July 2025, between the State of California, acting by and through its Department of Parks and Recreation, hereinafter called State, and **Pacific Pipeline Company,** hereinafter called Permittee; State and Permittee may hereinafter be referred to as a Party, or collectively the Parties.

## RECITALS

- **Whereas**, the State owns, operates, and maintains the State Park known as Gaviota State Park (S.P.), in the County of Santa Barbara, State of California; and

- **Whereas**, Permittee has applied to State for permission to access Gaviota S.P. for purposes of carrying out Permittee's **pipeline maintenance and access for existing Line 325 (formerly known as Line 903) that is currently subject to closure orders** (the Project). This Permit is needed because the original easement facilitating Permittee's access to Line 325 in Gaviota S.P. has expired. **Activities related to any new or future projects, including restarting Line 325 or constructing a new pipeline, are not included in the Project and are not covered by this Right of Entry. Instead, the parties are negotiating separate agreements regarding Permittee's activities with respect to restarting Line 325, including any preliminary work required by any regulatory oversight agencies to be completed prior to restart.**

- **Whereas**, the State desires to accommodate Permittee's application for permission to enter Gaviota S.P. for purposes of the Project, as provided herein and as, and to the extent, such Project has been previously described, permitted, approved, and conditioned by Permittee's original environmental document entitled **Celeron/All American and Getty Pipeline (CEQA SCH #1983110902-2).** The environmental document is attached hereto as Exhibit "A" and the original easement is attached hereto as Exhibit "D" are both herein incorporated by reference. This Permit shall further be limited as the Project may be conditioned by any other regulatory agency having jurisdiction, if applicable.

## TERMS AND CONDITIONS

Now therefore, the State by this Permit hereby grants to the Permittee permission to enter upon State's property, conditioned upon the agreement of the Parties that this Permit does not create or vest in Permittee any interest in the real property herein described or depicted, that the Permit is revocable and non-transferable, and that the Permit is further subject to the following terms and conditions:

1.  **Project Description:**  By this Permit, the State hereby grants to the Permittee permission to enter onto those lands depicted Gaviota SP and/or described on Exhibit "B" (the Property), attached hereto and herein incorporated by this reference, solely for the purpose of the Project, the limits of which are described in Exhibit A and Exhibit D for the purpose of **pipeline maintenance and access for existing Line 325 that is currently subject to closure orders** (the Project), **and detailed below:**

    a)  **This permit is subject to all valid contracts, leases, licenses, encumbrances, and claims which may affect said property, and the use of the word "Grant" herein shall not be construed as a covenant against the existence of any thereof.**
    b)  **Permittee, in the exercises of the privileges herein granted, shall at all times be in compliance with all applicable laws, rules, and regulations.**
    c)  **Permittee agrees that all areas disturbed due to Project activities during the term of the permit will be restored and revegetated as required by State.**
    d)  **Any roads to be used by Permittee for ingress, egress, and access by the Permittee to the pipeline shall be reasonably designated and redesignated by State prior to Permittee's use. State shall not have any responsibility to perform maintenance or make repairs or improvements to the roads for Permittee's use. Permittee shall be**

responsible for any desired improvements to the roads. Any improvement project shall conform to State standards and be subject to the approval of the State Parks District Superintendent. If Permittee damages any road it shall immediately repair the damage in accordance with State standards.

    e)  In its use of this permit, Permittee shall comply with all State requirements, including, but not limited to, parking control and the uses contemplated herein. Employee camping by Permittee in said park shall not be permitted.

    f)  Permittee shall coordinate all maintenance activities herein authorized within said park with State's District Superintendent or designee to assure the safety of park visitors and possible detrimental effects on park operations or resources.

    g)  No trees, plants, rocks, animals, or soils outside the pipeline footprint shall be cut or injured or disturbed by or on behalf of Permittee.

2.    **Permit Subject to Laws and Regulatory Agency Permits:** This Permit is expressly conditioned upon Permittee's obtaining any and all regulatory permits or approvals required by the relevant regulatory agencies for the Project and Permittee's use of the Property, and upon Permittee's compliance with all applicable municipal, state and federal laws, rules and regulations, including all State Park regulations. Permittee shall, at Permittee's sole cost and expense, comply with the Project Description, and requirements and mitigations contained in the Environmental Document.

Prior to commencement of any work, Permittee shall obtain all such legally required permits or approvals and submit to the State full and complete copies of all permits and approvals, including documentation related to or referenced in such permits and approvals, along with the corresponding agency contact and telephone numbers, and related California Environmental Quality Act (CEQA) and/or National Environmental Policy Act (NEPA) documentation as applicable.



3.    **Term of Permit:** This Permit shall only be for the period beginning on **July 27, 2025**, and ending on, **July 26, 2026** or as may be reasonably extended by written mutual agreement of the Parties.



4.    **Consideration:** Permittee agrees to pay State the sum of **$ 48,046.85** as consideration for the rights granted by this Permit. Please refer to Exhibit "C" for calculation of fee.

5.    **Permit Subject to Existing Claims:** This Permit is subject to existing contracts, permits, licenses, encumbrances, and claims which may affect the Property.

6.    **Waiver of Claims and Indemnity:** Permittee waives all claims against State, its officers, agents and/or employees, for loss, injury, death, or damage caused by, arising out of, or in any way connected with the condition or use of the Property, the issuance, exercise, use or implementation of this Permit, and/or the rights herein granted. Permittee further agrees to protect, save, hold harmless, indemnify and defend State, its officers, agents and/or employees from any and all loss, damage, claims, demands, costs and liability which may be suffered or incurred by State, its officers, agents and/or employees from any cause whatsoever, arising out of, or in any way connected with this Permit, exercise by Permittee of the rights herein granted, Permittee's use of the Property and/or the Project for which this Permit is granted, except those arising out of the sole active negligence or willful misconduct of State. Permittee will further cause such indemnification and waiver of claims in favor of State to be inserted in each contract that Permittee executes for the provision of services in connection with the Project for which this Permit is granted.

7.    **Contractors:** Permittee shall incorporate the terms, conditions and requirements contained herein when contracting out all or any portion of the work permitted hereunder. Permittee shall be responsible for ensuring contractor/subcontractor compliance with the terms and conditions contained herein. Failure of Permittee's contractors to abide by State's terms and conditions shall constitute default by Permittee (see "20. Default" paragraph below) allowing State to terminate this Permit and seek all legal remedies.

8.    **Insurance Requirements:** As a condition of this Permit and in connection with Permittee's indemnification and waiver of claims contained herein, Permittee shall maintain, and cause its contractors to maintain, a policy or policies of insurance as follows:

**General Provisions Applying to All Policies**

A.    **Coverage Term** – Coverage needs to be in force for the complete term of the contract. If insurance expires during the term of the contract, a new certificate must be received by the State at least ten (10) days prior to the expiration of this insurance. Any new insurance must still comply with the original terms of the contract.

B.    **Policy Cancellation or Termination & Notice of Non-Renewal** – Contractor is responsible to notify the State within five business days before the effective date of any cancellation, non-renewal, or material change that affects required insurance coverage. In the event Contractor fails to keep in effect at all times the specified insurance coverage, the State may, in addition to any other remedies it may have, terminate this Contract upon the occurrence of such event, subject to the provisions of this Contract.

C.    **Deductible** – Contractor is responsible for any deductible or self-insured retention contained within their insurance program.

D.    **Primary Clause** – Any required insurance contained in this contract shall be primary, and not excess or contributory, to any other insurance carried by the State.

E.    **Insurance Carrier Required Rating** – All insurance companies must carry a rating acceptable to the Office of Risk and Insurance Management.  If the Contractor is self-insured for a portion or all of its insurance, review of financial information including a letter of credit may be required.

F.    **Endorsements** – Any required endorsements requested by the State must be physically attached to all requested certificates of insurance and not substituted by referring to such coverage on the certificate of insurance.

G.    **Inadequate Insurance** – Inadequate or lack of insurance does not negate the contractor obligations under the contract.

H.    **Satisfying an SIR** - All insurance required by this contract must allow the State to pay and/or act as the contractor's agent in satisfying any self-insured retention (SIR).  The choice to pay and/or act as the contractor's agent in satisfying any SIR is at the State's discretion.

I.    **Available Coverages/Limits** - All coverage and limits available to the contractor shall also be available and applicable to the State.

J.    **Subcontractors** - In the case of Contractor utilization of subcontractors to complete the contracted scope of work, contractor shall include all subcontractors as insureds under Contractor and insurance or supply evidence of insurance to The State equal to policies, coverages and limits required of Contractor.

**COMMERCIAL GENERAL LIABILITY**:
Commercial General Liability Insurance covering bodily injury and property damage in a form and with coverage that are satisfactory to the State.  This insurance shall include personal and advertising injury liability, products and completed operations, and liability assumed under an insured contract.  Coverage shall be written on an occurrence basis in an amount of not less than $1,000,000 per occurrence.  Annual aggregate limit shall not be less than $2,000,000. **The State of California, its officers, agents, and employees are to be covered as additional insureds with respect to liability arising out of work or operations.**

**AUTOMOBILE LIABILITY INSURANCE**:
Automobile Liability Insurance covering all owned, non-owned, and hired vehicles with a combined single limit of not less than $1,000,000 for bodily injury and property damage. **The State of California, its officers, agents, and employees are to be covered as additional insureds with respect to liability arising out of work or operations.**

**WORKERS COMPENSATION AND EMPLOYERS LIABILITY**:
Workers' Compensation insurance as required by the State of California, with Statutory Limits, and Employer's Liability Insurance with limit of no less than $1,000,000 per accident for bodily injury or disease. **The Workers' Compensation policy shall be endorsed with a waiver of subrogation in favor of the State of California.**

9.    **Reservation of Rights:**  State reserves the right to use the Property in any manner, provided such use does not unreasonably interfere with Permittee's rights herein.

10.    **Access Limits and Conditions:**  Access to the Property shall be limited to the access designated by State.

- **Access to Gaviota State Park shall be for access to and maintenance of existing Line 325 pipeline as outlined in the original environmental document, the original easement and amendment. See Exhibits A and D.**
- **Activities related to any new or future projects, including restarting Line 325 or constructing a new pipeline, are not covered by this Right of Entry.**

11. **Notice of Work:** Any required notices to State shall be sent to the State authorities in charge of Gaviota State Park named below.  At least two full business days (which do not include state holidays) prior to any entry upon the Property for any of the purposes hereinabove set forth, Permittee shall provide the State contact[s] named below with written notice of Permittee's intent to enter the Property.  Permittee shall also notify the State contact[s] listed below in writing at least two full business days (which do not include state holidays) prior to any change in the Project schedule or cessation or completion of work.  Should State personnel need to contact Permittee, State shall notify Permittee's contact person listed below:

**STATE:**

Contact: Katharine Wilson
         District Planning Chief
         Katharine.Wilson@Parks.Ca.Gov

District:   Channel Coast
Address:  911 San Pedro Street
          Ventura, CA

Telephone: (805) 804-2060

**PERMITTEE'S CONTACT:**

Contact: Stephen T. Laperouse
         Vice President Land
         slaperouse@sableoffshore.com

Address: 845 Texas Avenue, Suite 2920
         Houston, Texas 77002

Telephone: (337) 316-3034

12. **Limits of Work:**  In no event shall this Permit authorize work in excess or contrary to the terms and conditions of any regulatory agency permit or approval.  Under no circumstances, whether or not authorized by any regulatory agency, other permit or any person or entity other than State, shall work exceed that which is authorized by this Permit.

13. **Public Safety:** Permittee shall erect orange plastic temporary construction fencing and appropriate signage prior to commencement of work to prevent public access to the construction zone.  Permittee shall remove such fencing within two (2) days after the completion of work.  Permittee shall take, and shall cause its contractors or subcontractors to take, any and all necessary and reasonable steps to protect the public from harm in connection with the Project or implementation of this Permit.

14. **Compliance with Project Requirements, Monitoring and Mitigation Measures (if applicable):** Resource monitoring and mitigation measures identified by environmental document shall be completed in accordance with and to the satisfaction of the District Superintendent or designee.

Permittee's activities conducted under this Permit shall comply with all State and Federal environmental laws, including, but not limited to, the Endangered Species Act, CEQA, and Section 5024 of the Public Resources Code.

Any of Permittee's archaeological consultants working within the boundaries of the Property shall obtain a permit from the California State Parks Archaeology, History & Museums Division prior to commencing any archaeological or cultural investigations of the Property.

Permittee shall immediately advise State's contact person if any new site conditions are found during the course of permitted work.  State will advise Permittee if any new historical resources (including archaeological sites), special status species, threatened/endangered species protocols, or other resource issues are identified within the Project site.  Permittee shall abide by District Superintendent or designee's instructions to protect the resource(s) during the permitted work or risk revocation of the Permit.

Permittee shall make all excavation activities on the Property available to the State Archaeologist for observation and monitoring.  During excavation, the State archaeological monitor may observe and report to the State on all excavation activities.  State archaeological monitor shall be empowered to stop any construction activities as necessary to protect significant cultural resources from being disturbed.

In the event that previously unknown cultural resources, including, but not limited to, dark soil containing shell, bone, flaked stone, groundstone, or deposits of historic trash are encountered during Project construction by anyone, work will be suspended at that specific location, and the Permittee's work will be redirected to other tasks, until after a State-qualified archaeologist has evaluated the find and implemented appropriate treatment measures and disposition of artifacts, as appropriate, in compliance with all applicable laws and department resource directives.

If human remains are discovered during the Project, work will be immediately suspended at that specific location and the District Superintendent or designee shall be notified by Permittee.  The specific protocol, guidelines and channels of communication outlined by the California Native

American Heritage Commission (NAHC), and/or contained in Health and Safety Code Section 7050.5 and Public Resources Code Sections 5097.9 et seq., will be followed.  Those statutes will guide the potential Native American involvement in the event of discovery of human remains.

Permittee shall provide a written work schedule to State so that the State archaeological monitor can arrange to be on site on the necessary days.  Permittee shall provide reasonable advance notice of and invite the District Superintendent or designee to any preconstruction meetings with the prime contractor or subcontractors.

15. **Restoration of Property:**  Permittee shall complete the restoration, repair, and revegetation of the Property in consultation with, and to the satisfaction of, the State Environmental Scientist within one (1) year after completion of the Project or the expiration or termination of this Permit, whichever comes first.  This obligation shall survive the expiration or termination of this Permit.

16. **Right to Halt Work:**  The State reserves the right to halt work and demand mitigation measures at any time, with or without prior notice to Permittee, in the event the State determines that any provision contained herein has been violated, or in the event that cessation of work is necessary to prevent, avoid, mitigate or remediate any threat to the health and safety of the public or state park personnel, or to the natural or cultural resources of the state park.

17. **Use Restrictions:**  The use of the Property by Permittee, including its guests, invitees, employees, contractors and agents, shall be restricted to the daytime hours between sunrise and sunset on a day-by-day basis, unless otherwise approved in advance in writing by State. No person shall use or occupy the Property overnight.

    Activities on the Property shall be conducted only in a manner which will not interfere with the orderly operation of the state park.  Permittee shall not engage in any disorderly conduct and shall not maintain, possess, store or allow any contraband on the Property. Contraband includes, but is not limited to: any illegal alcoholic beverages, drugs, firearms, explosives and weapons.

    Roads and trails where motorized vehicles are normally prohibited may be used for vehicle access by Permittee, its employees, agents or contractors for patrol, maintenance or repair purposes only, and only to the extent specified by State, and shall be otherwise subject to all other conditions and/or restrictions of this Permit and any applicable laws, state park regulations and state park policies.

    Permittee shall not use or allow the Property to be used, either in whole or in part, for any purpose other than as set forth in this Permit, without the prior written consent of the State.

18. **State's Right to Enter:**  At all times during the term of this Permit and any extension thereof, there shall be and is hereby expressly reserved to State and to any of its agencies, contractors, agents, employees, representatives, invitees or licensees, the right at any and all times, and any and all places, to temporarily enter upon said Property to survey, inspect, or perform any other lawful State purposes.

    Permittee shall not interfere with State's right to enter.

19. **Protection of Property:**  Permittee shall protect the Property, including all improvements and all natural and cultural features thereon, at all times at Permittee's sole cost and expense, and Permittee shall strictly adhere to the following restrictions:

    (a)    Permittee shall not place or dump garbage, trash or refuse anywhere upon or within the Property, except in self-contained trash receptacles that are maintained to State's satisfaction by Permittee.

    (b)    Permittee shall not commit or create, or suffer to be committed or created, any waste, hazardous condition or nuisance in, on, under, above or adjacent to the Property.

    (c)    Permittee shall not cut, prune or remove any vegetation upon the Property, except as specifically identified in the Project description and herein permitted or subsequently approved in writing by the District Superintendent.

    (d)    Permittee shall not disturb, move or remove any rocks or boulders upon the Property, except as specifically identified in the Project description and herein permitted or subsequently approved in writing by the District Superintendent.

    (e)    Permittee shall not grade or regrade, or alter in any way, the ground surface of the Property, except as specifically identified in the Project description and herein permitted, or subsequently approved in writing by the District Superintendent.

(f) Permittee shall not bait, poison, trap, hunt, pursue, catch, kill or engage in any other activity which results in the taking, maiming or injury of wildlife upon the Property, except as specifically identified in the Project description and herein permitted or subsequently approved in writing by the District Superintendent.

(g) Permittee shall not use, create, store, possess or dispose of hazardous substances (as defined in the California Hazardous Substances Act) on the Property except as specifically identified in the Project description and herein permitted, or subsequently approved in writing by the District Superintendent.

(h) Permittee shall exercise due diligence to protect the Property against damage or destruction by fire, vandalism and any other causes.

20. **Default:** In the event of a default or breach by Permittee of any of the terms or conditions set forth in this Permit, State may at any time thereafter, without limiting State in the exercise of any right of remedy at law or in equity which State may have by reason of such default or breach:

(a) Maintain this Permit in full force and effect and recover the consideration, if any, and other monetary charges as they become due, without terminating Permittee's right to use of the Property, regardless of whether Permittee has abandoned the Property; or

(b) Immediately terminate this Permit upon giving written notice to Permittee, whereupon Permittee shall immediately surrender possession of the Property to State and remove all of Permittee's equipment and other personal property from the Property. In such event, State shall be entitled to recover from Permittee all damages incurred or suffered by State by reason of Permittee's default, including, but not limited to, the following:

(i) any amount necessary to compensate State for all the detriment proximately caused by Permittee's failure to perform its obligations under this Permit, including, but not limited to, compensation for the cost of restoration, repair and revegetation of the Property, which shall be done at State's sole discretion and compensation for the detriment which in the ordinary course of events would be likely to result from the default; plus

(ii) at State's election, such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by applicable law.

21. **State's Right to Cure Permittee's Default:** At any time after Permittee is in default or in material breach of this Permit, State may, but shall not be required to, cure such default or breach at Permittee's cost. If State at any time, by reason of such default or breach, pays any sum or does any act that requires the payment of any sum, the sum paid by State shall be due immediately from Permittee to State at the time the sum is paid. The sum due from Permittee to State shall bear the maximum interest allowed by California law from the date the sum was paid by State until the date on which Permittee reimburses State.

22. **Revocation of Permit:** The State shall have the absolute right to revoke this Permit for any reason upon ten (10) days written notice to Permittee. Written notice to Permittee may be accomplished by electronic or facsimile transmission, and the notice period set forth in this paragraph shall begin on the date of the electronic or facsimile transmission, or, if sent by mail, on the date of delivery. If Permittee is in breach of the Permit or owes money to the State pursuant to this Permit, any prepaid monies paid by Permittee to State shall be held and applied by the State as an offset toward damages and/or amounts owed. Nothing stated herein shall limit the State's exercise of its legal and equitable remedies.

23. **Recovery of Legal Fees:** In any action brought to enforce or interpret any provisions of this Permit or to restrain the breach of any agreement contained herein, or for the recovery of possession of the Property, or to protect any rights given to the State against Permittee, and in any actions or proceedings under Title 11 of the United States Code, if the State shall prevail in such action on trial or appeal, the Permittee shall pay to the State such amount in attorney's fees in said action as the court shall determine to be reasonable, which shall be fixed by the court as part of the costs of said action.

24. **Voluntary Execution and Independence of Counsel:** By their respective signatures below, each Party hereto affirms that they have read and understood this Permit and have received independent counsel and advice from their attorneys with respect to the advisability of executing this Permit.

25. **Reliance on Investigations:** Permittee declares that it has made such investigation of the facts pertaining to this Permit, the Property and all the matters pertaining thereto as it deems necessary, and on that basis accepts the terms and conditions contained in this Permit. Permittee

acknowledges that State has made, and makes, no representations or warranties as to the condition of the Property, and Permittee expressly agrees to accept the Property in its as-is condition for use as herein permitted.

26. **Entire Agreement:**  The Parties further declare and represent that no inducement, promise or agreement not herein expressed has been made to them and this Permit contains the entire agreement of the Parties, and that the terms of this agreement are contractual and not a mere recital.

27. **Warranty of Authority:**  The undersigned represents that they have the authority to, and do, bind the person or entity on whose behalf and for whom they are signing this Permit and the attendant documents provided for herein, and this Permit and said additional documents are, accordingly, binding on said person or entity.

28. **Assignment:**  This Permit shall not be assigned, mortgaged, hypothecated, or transferred by Permittee, whether voluntarily or involuntarily or by operation of law, nor shall Permittee let, sublet or grant any license or permit with respect to the use and occupancy of the Property or any portion thereof, without the prior written consent of State.

29. **Choice of Law:**  This Permit will be governed and construed by the laws of the State of California.


**STATE OF CALIFORNIA**
Department of Parks and Recreation

**PACIFIC PIPELINE COMPANY**


Signature: _____

Signature: _____


Date:_____

Date:_____ July 25, 2025 _____


Name: **Dena Bellman**
Title:    District Superintendent
            Channel Coast District

Name: **J. Caldwell Flores**
Title:    President

acknowledges that State has made, and makes, no representations or warranties as to the condition of the Property, and Permittee expressly agrees to accept the Property in its as-is condition for use as herein permitted.

26. **Entire Agreement:** The Parties further declare and represent that no inducement, promise or agreement not herein expressed has been made to them and this Permit contains the entire agreement of the Parties, and that the terms of this agreement are contractual and not a mere recital.

27. **Warranty of Authority:** The undersigned represents that they have the authority to, and do, bind the person or entity on whose behalf and for whom they are signing this Permit and the attendant documents provided for herein, and this Permit and said additional documents are, accordingly, binding on said person or entity.

28. **Assignment:** This Permit shall not be assigned, mortgaged, hypothecated, or transferred by Permittee, whether voluntarily or involuntarily or by operation of law, nor shall Permittee let, sublet or grant any license or permit with respect to the use and occupancy of the Property or any portion thereof, without the prior written consent of State.

29. **Choice of Law:** This Permit will be governed and construed by the laws of the State of California.


**STATE OF CALIFORNIA**
Department of Parks and Recreation

Signature: _____

Date: ___7/25/2025___

Name: **Dena Bellman**
Title:  District Superintendent
        Channel Coast District


**PACIFIC PIPELINE COMPANY**

Signature: _____

Date: _____

Name: **J. Caldwell Flores**
Title:  President

# Exhibit C

| | |
|---|---|
| State of California • Natural Resources Agency | Gavin Newsom, *Governor* |
| **DEPARTMENT OF PARKS AND RECREATION** | Armando M. Quintero, *Director* |
| **Legal Office • Post Office Box 924896 • Sacramento, CA 94296-000** | |

March 14, 2026                                    ***Sent via Electronic Mail Only***
                                                      ***slaperouse@sableoffshore.com***

Stephen T. Laperouse
Vice President Land
Sable Offshore
845 Texas Avenue, Suite 2920
Houston, TX 77002

Dear Mr. Laperouse:

This letter is to notify Sable Offshore and Pacific Pipeline Company ("Sable") that California Department of Parks and Recreation ("State Parks") is denying Sable's easement request, and demanding Sable immediately remove the pipeline according to section 8 of the Expired Easement.

Section 8 of the temporary pipeline easement granted to Sable's predecessor, Celeron Pipeline Company, which expired in 2016 ("Expired Easement"), attached hereto, authorizes State Parks to demand Sable to remove the pipeline and restore the property to its original condition after the end of the term. This letter demands immediate removal of the pipeline on State Parks' property pursuant to section 8 of the Expired Easement. State Parks has determined that due to Sable's excessive drain on state resources and incompatibility of their project with the park unit, State Parks will not be granting Sable an easement to continue to use Gaviota State Park for its oil pipeline operations. Additionally, although, State Parks has discussed the possibility of an easement with Sable, all prior permissions and discussions have been premised on the requirement that Sable comply with all applicable state laws and obtain all applicable state approvals, and Sable has now indicated that it has begun or imminently intends to begin restarting operations without adhering to those requirements or obtaining permission to use the State of California's land.

Consequently, State Parks is immediately ceasing any easement negotiations and related CEQA process.

If Sable does not formally respond within 10 days with plans for removal of the pipeline segment within Gaviota State Park, State Parks will pursue legal action to defend the State's property rights, and State Parks reserves the right to take all appropriate legal action in the interim.  State Parks is prepared to withdraw this letter, however, if Sable confirms in writing to State Parks no later than 12 PM Pacific Time on Monday, March

Docusign Envelope ID: 9F9AF68A-9C3E-498A-BC3C-5495CBB5978C

Stephen Laperouse
March 14, 2026
Page 2

16, 2026, that it has not restarted Line 325 traveling through Gaviota State Park and that it will not restart that pipeline until and unless it obtains all required state approvals and a new easement from State Parks or obtains a final judicial decision (inclusive of appeals) that any state approvals or easements are not needed.

*Background*

State Parks stewards Gaviota State Park, which consists of 2,712 acres of oak woodland and chaparral backcountry, beach and campground property, and natural sulfur hot springs in varied ecologically diverse habitats. It also contains significant known archeological, tribal, and historic resources, including the Las Cruces Adobe.

In 1986, Sable's predecessor received a 30-year pipeline easement from State Parks. Sable's pipeline runs four miles through Gaviota State Park, but has been offline since the May 2015 Refugio oil spill. The federal pipeline safety oversight agency determined the cause of the spill was in part the result of "ineffective protection against external corrosion of the pipeline." (Plains Pipeline, LP – Failure Investigation Report, Santa Barbara County, California Crude Oil Release – May 19, 2015, PHMSA (May 2016).) As a result of the spill, various state and federal agencies entered into a Consent Decree with Sable's predecessor as a settlement to a lawsuit containing a variety of claims. State Parks, as a resource trustee, is party to that Consent Decree which requires, among other things, that Sable comply with existing laws in its effort to restart its pipeline.[1]

Sable's 30-year easement for its pipeline expired in 2016, after the Refugio spill. Section 5 of the Expired Easement required Sable, "in the exercise of the privileges [therein] granted, [to] at all times be in compliance with all applicable laws, rules, and regulations." Section 8 of the Expired Easement stated that "[u]pon termination of this easement, COMPANY shall remove at option of STATE all improvements for which this easement is issued and shall restore and revegetate said easement in a manner satisfactory to STATE. In the event COMPANY fails to do so, STATE at its option may do so, and COMPANY agrees and warrants that upon receipt of written demand from STATE, COMPANY will pay to STATE the cost incurred by STATE for said removal and restoration."

---

[1] Section 78 of the Consent Decree states: "This Consent Decree is not a permit, or a modification of any permit, under any federal, state, or local laws, or regulations. Defendants are responsible for achieving and maintaining full compliance with all applicable federal, state, and local laws, regulations, and permits; and Defendants' compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, and permits, except as set forth herein. The United States and the State Agencies do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that Defendants' compliance with any aspect of this Consent Decree will result in compliance with provisions of the CWA, OPA, Pipeline Safety Laws, or any other provisions of federal, state, or local laws, regulations, or permits."

Docusign Envelope ID: 9F9AE68A-9C3E-498A-BC3C-5495CBB5978C

Stephen Laperouse
March 14, 2026
Page 3

Since 2016, State Parks has issued successive year-long right of entry permits in order to permit Sable (or its predecessors) access to the offline pipeline for general maintenance and monitoring. These permits have always been "expressly conditioned upon Permittee's obtaining any and all regulatory permits or approvals required by the relevant regulatory agencies for the Project and Permittee's use of the Property, and upon Permittee's compliance with all applicable municipal, state and federal laws, rules and regulations, including all State Park regulations." (Annual ROE, § 2.)

For years, State Parks understood Sable would ultimately abandon the current pipeline and replace and potentially realign the pipeline if it were to resume operations, and thus limited the ROE to those actions and access needs necessary for closure of the pipeline. Thus, the Annual ROE does not and cannot authorize operations. The second recital of the current Annual ROE states (omitting emphasis):

> Whereas, Permittee [Sable] has applied to State for permission to access Gaviota S.P. for purposes of carrying out Permittee's pipeline maintenance and access for existing Line 325 (formerly known as Line 903) that is currently subject to closure orders (the Project). This Permit is needed because the original easement facilitating Permittee's access to Line 325 in Gaviota S.P. has expired. Activities related to any new or future projects, including restarting Line 325 or constructing a new pipeline, are not included in the Project and are not covered by this Right of Entry. Instead, the parties are negotiating separate agreements regarding Permittee's activities with respect to restarting Line 325, including any preliminary work required by any regulatory oversight agencies to be completed prior to restart."

*Sable's Lack of Cooperation with State Parks, Violations of Past Permits, and Illegal Acts Damaging State Land*

Over the course of Sable and State Parks' negotiations, Sable has resisted every step of the process rather than working with State Parks. In July 2024, State Parks explained that Sable needed an easement in order to restart, and that a Right of Entry Permit for the anomaly digs would only be appropriate if the easement was near execution.

Instead of working with State Parks, Sable pushed for an immediate Right of Entry Permit, arguing there was no time for easement negotiations, despite the fact that State Parks had initiated the discussion about easement negotiations in July 2024. No law or contract required State Parks to continue working with Sable, or affiliated entities Exxon or Plains Pipeline, yet in order to provide physical access to the existing offline pipeline on public property, State Parks continued to offer a Right of Entry Permit so that Sable could have physical access to the property. State Parks did this with the

Docusign Envelope ID: 9E9AF68A-9C3E-498A-BC3C-5495CBB5978C

Stephen Laperouse
March 14, 2026
Page 4

understanding that if the pipeline company ever continued operations, it would need to construct a new pipeline.  The Consent Decree is clear that it does not waive any other requirements (see footnote 1), including legal authorization from State Parks to use and access the pipeline.

State Parks retains its usual discretion whether to grant an easement. Under Public Resources Code section 5012, State Parks may, but is not required to, grant an easement for pipeline purposes. Under State Parks' policy, encumbrances that do little or nothing to contribute toward State Parks' mission are presumed to be inappropriate, and State Parks is required to carefully analyze impacts before the encumbrance is approved by the State Parks Director. (State Parks' Department Operations Manual ("DOM"), § 2103.2.) Those requests that do little or nothing to contribute toward State Parks' mission must have no feasible offsite alternatives. Sable has stated that it has an offsite alternative. (https://sableoffshore.com/news/news-details/2025/Sable-Offshore-Corp--Announces-Alternative-Offtake-Strategy/default.aspx.)

Additionally, because Sable has requested a 30-year easement, State Parks has to be particularly careful in its analysis of whether and how to grant an easement that will impact this environmentally and culturally sensitive public land for decades. State Parks has informed Sable that under its policy "careful consideration must be given to impacts that may occur over the life of the encumbrance, including the burden and effect of ongoing maintenance or other intrusions." (DOM, § 2103.2.) In response, Sable has not provided sufficient information and follow State Parks' process and has shown time and again that it is not interested in complying with State Parks' process and will only be a burden and a liability to State Parks for the next three decades if it receives the right to operate within Gaviota State Park.

State Parks has always been clear that the annual Right of Entry Permit described above did not cover the extensive work involved with the anomaly digs. However, in February 2025, Sable elected to re-interpret the then-existing annual Right of Entry Permit and trespassed on State Parks' property, resulting in damage to natural resources. While Sable ceased work upon State Parks' demands, it showed that it is not a partner of the State and that obtaining full compensation and mitigation from Sable without litigation or other expensive, time consuming negotiations, is highly unlikely. Yet, State Parks cooperated with Sable's request and on May 8, 2025, State Parks issued a Right of Entry Permit for Sable's 18 anomaly digs ("Anomaly Dig ROE").

The Anomaly Dig ROE included restoration requirements which Sable has yet to perform, including restoration of a road that they demolished that provides access to an elementary school. Once the anomaly digs were complete[2], it became clear that Sable

---

[2] While the anomaly digs themselves were complete, Sable still has not finished completing the work required under the Anomaly Dig Right of Entry Permit, as noted above, including reconstruction of the

Stephen Laperouse
March 14, 2026
Page 5

needed a much wider footprint for its easement area than they had proposed in their easement request.

On May 22, 2025, State Parks and Sable met to discuss the requirements for the easement request. State Parks informed Sable that restart is not authorized without an easement in place. While the basis for this is basic real property law rather than laws specific to state property, State Parks has had to continually explain to Sable why Sable needs a land right in order to operate on property it does not own, and that a license or permit to access property is not a land right and does not govern continuing operations. State Parks has been clear and consistent on this basic real property principle since the beginning of negotiations.

As a result of (1) Sable's consistent reluctance to work with State Parks' process, (2) Sable's illegal destruction of public property, (3) State Parks' statutory obligation to "administer, protect, develop, and interpret the property under its jurisdiction for the use and enjoyment of the public," (Public Resources Code § 5003), (4) State Parks' general policy against granting encumbrances that do not directly serve that mission, and (5) Sable's indications that it has begun or imminently intends to begin restarting operations without securing all required state approvals or a new easement, State Parks is denying Sable's easement request.

As stated above, if State Parks does not receive a plan for removal of the pipeline within 10 days of the date of this letter, or if Sable does not confirm in writing to State Parks no later than 12 PM Pacific Time on Monday, March 16, 2026, that it has not restarted Line 325 traveling through Gaviota State Park and that it will not restart that pipeline until and unless it obtains all required state approvals and a new easement from State Parks or obtains a final judicial decision (inclusive of appeals) that any state approvals or easements are not needed, State Parks will pursue legal action to defend the State's property rights, and State Parks reserves the right to take all appropriate legal action in the interim.

Sincerely,

DocuSigned by:

*Tara E. Lynch*

F610A257FA1247D...

Tara E. Lynch
Chief Counsel

---

damaged road that provides access to a local elementary school, and revegetation of the anomaly dig area. Sable has claimed that the anomaly dig footprint is revegetated, but in fact it came back with invasives, which can be expected where the footprint was not reseeded with State Parks-approved native mix as required by the Right of Entry Permit.

Docusign Envelope ID: 9F9AE68A-9C3E-498A-BC3C-5495CBB5978C

Stephen Laperouse
March 14, 2026
Page 6

Enclosures
1. Annual ROE
2. Expired Easement

Cc:

    Anthony Duenner, Sable Offshore General Counsel
    Lee Alcock, Sable Offshore Assistant General Counsel
    Dena Bellman, Channel Coast District Superintendent, State Parks
    Katharine Wilson, Channel Coast District Planning Chief, State Parks
    Emma Siverson, Senior Staff Counsel, State Parks

## SUPERIOR COURT OF CALIFORNIA
## COUNTY OF SANTA BARBARA

Dated and Entered:   03/17/2026                                    Time:   8:30 AM
Judicial Officer:       Donna D Geck
Deputy Clerk:         Preston Frye                                    Dept:   SB Dept 4
Bailiff/Court Officer:  Brandon Thillman                         Case No: 25CV02244
Court Reporter:       Shelley Cockrell

---

### Center for Biological Diversity et al vs California Department of Forestry and Fire Protection et al

Parties Present:
Dintzer, Jeffrey D           Attorney for Real Parties in Interest
Dorsi, Michael S             Attorney for Respondents (via Zoom)
Krop, Linda J                Attorney for Petitioners Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, Santa Barbara Channelkeeper and Environmental Defense Center (via Zoom)
Large, Trevor                Attorney for Real Parties in Interest
Stanton, Garrett B           Attorney for Real Parties in Interest
Nimmer, Talia                Attorney for Petitioners Center for Biological Diversity and Wishtoyo Foundation
Frankel, Jeremy              Attorney for Petitioners Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, Santa Barbara Channelkeeper and Environmental Defense Center

---

### NATURE OF PROCEEDINGS: Ex Parte Hearing

The matter was called with appearances as stated above.

The Court continued the matters, as indicated below, to allow time for proper briefing.

Supplemental Opposition paperwork shall be filed no later than 4/1/2026. Supplemental Reply paperwork shall be filed no later than 4/8/2026.

Notice was waived by all parties.

*Future Scheduled Hearings:*
April 17, 2026 10:00 AM Ex Parte Hearing
Geck, Donna D- SB Dept 4

April 17, 2026 10:00 AM Ex Parte Hearing
Geck, Donna D- SB Dept 4

ANGELA BRAUN, EXECUTIVE OFFICER              Minutes Prepared by:

_____
                                                         Preston Frye                      , Deputy

SC-2411 (Revised July 1, 2013)              **MINUTE ORDER**

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Angela Braun, Executive Officer
4/1/2026 5:02 PM
By: Narzralli Baksh , Deputy

Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 884-7100
*Attorneys for Petitioners/Plaintiffs Center for Biological Diversity and Wishtoyo Foundation*

Linda Krop (Bar No. 118773)
lkrop@environmentaldefensecenter.org
Jeremy M. Frankel (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
Tara C. Rengifo (Bar No. 307670)
trengifo@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152
*Attorneys for Petitioners/Plaintiffs Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## IN AND FOR THE COUNTY OF SANTA BARBARA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,<br><br>Petitioners/Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive,<br><br>Respondents/Defendants.<br><br>SABLE OFFSHORE CORP., a Delaware Corporation; PACIFIC PIPELINE COMPANY, a Delaware Corporation; and DOES 11 through 20, inclusive,<br><br>Real Parties in Interest. | Case No.: 25CV02244<br>[Consolidated with Case No. 25CV02247]<br><br>**PETITIONERS AND PLAINTIFFS' COMBINED SUPPLEMENTAL OPPOSITION TO REAL PARTIES IN INTEREST'S EX PARTE APPLICATION FOR IMMEDIATE RESCISSION OF PRELIMINARY INJUNCTION**<br><br>Date:     April 17, 2026<br>Time:     10:00 a.m.<br>Dept.:     4<br>Judge:    Honorable Donna D. Geck<br><br>Action Filed: April 15, 2025 |

1

Petitioners and Plaintiffs' Combined Supplemental Opposition to Real Parties in Interest's Ex Parte Application

ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation,

                    Petitioners/Plaintiffs,

        v.

CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, an agency of the State of California; OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive,

                    Respondents/Defendants.

SABLE OFFSHORE CORP., a Delaware Corporation; and PACIFIC PIPELINE COMPANY, a Delaware Corporation,

                    Real Parties in Interest.

Petitioners and Plaintiffs' Combined Supplemental Opposition to Real Parties in Interest's Ex Parte Application

**TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................................ 6

II.     FACTUAL AND PROCEDURAL BACKGROUND.................................................. 7

    A.    Petitioners' Lawsuits and the PI Orders......................................................... 7

    B.    Sable's Attempts to Circumvent State Authority and Solicitation of the DPA Order................. 7

III.    LEGAL STANDARD................................................................................................. 8

IV.     ARGUMENT.............................................................................................................. 8

    A.    The DPA Order Does Not Preempt or Override this Court's PI Orders...................................... 8

        1.    Sable's Request Is Premature Because Federal Law Prohibits Restart. ................................... 9

        2.    Sable Cannot Meet the High Bar for Preemption. ..................................................... 10

            a.    Sable Can Comply with Both the DPA Order and this Court's PI Orders. ......................... 10

            b.    There Is No Clear and Manifest Evidence that Congress Conferred the Preemptive Power Sable Claims. ................................................................................. 12

    B.    Sable's Relinquishment of the State Waivers Does Not Render This Action Moot. ................ 15

V.      CONCLUSION......................................................................................................... 18

Petitioners and Plaintiffs' Combined Supplemental Opposition to Real Parties in Interest's Ex Parte Application

# TABLE OF AUTHORITIES

**Cases**

*Alario v. Knudsen* (D. Mont. 2023) 704 F. Supp. 3d 1061 ................................................................ 15

*Chamber of Com. v. Whiting* (2011) 563 U.S. 582 ............................................................................ 15

*Citizens for Open Government v. City of Lodi* (2006) 144 Cal.App.4th 865 .................................... 15

*Cucamongans United for Reasonable Expansion v. City of Ranch Cucamonga* (2000) 82 Cal.App.4th 473 ..................................................................................................................... 18

*Florida Lime & Avocado Growers, Inc. v. Paul* (1963) 373 U.S. 132 ............................................... 10

*Friends of the Eel River v. North Coast Railroad Authority* (2014) 178 Cal.Rptr.3d 752 ................ 15

*Hines v. Davidowitz* (1941) 312 U.S. 52 ............................................................................................ 15

*In re Agent Orange Product Liab. Litig.* (E.D.N.Y. 1984) 597 F. Supp. 740 ................................... 14

*Johnson v. Tyson Foods, Inc.* (N.D. Tex. 2022) 580 F. Supp. 3d 382 ............................................... 15

*La. Pub. Serv. Comm'n v. FCC* (1986) 476 U.S. 355 ........................................................................ 10

*Merck Sharp & Dohme Corp.* (2019) 587 U.S. 299 .......................................................................... 10

*Mi Familia Vota v. Fontes* (9th Cir. 2025) 129 F.4th 691 ................................................................... 9

*New York v. FERC* (2002) 535 U.S. 1 ................................................................................................ 10

*Oklahoma v. Castro-Huerta*, (2022) 597 U.S. 629 ............................................................................ 15

*Reed v. Tyson Foods, Inc.* (W.D. Tenn. Nov. 3, 2021) 2021 WL 5107725 ...................................... 15

*Sosa v. Alvarez-Machain* (2004) 542 U.S. 692 ................................................................................. 14

*Taylor v. United States* (9th Cir. 1999) 181 F.3d 1017 ........................................................................ 9

*United States v. Vertac Chem. Corp.* (8th Cir. 1995) 46 F.3d 803 ................................................. 9, 14

*Virginia Uranium, Inc. v. Warren* (2019) 139 S. Ct. 1894 ................................................................. 10

*Woodward Park Homeowners Assn. v. Garreks, Inc.* (2000) 77 Cal.App.4th 880 ............................. 15

*Wyeth v. Levine* (2009) 555 U.S. 555 ................................................................................................ 10

**Statutes**

49 U.S.C. § 60118(d) ......................................................................................................................... 10

50 U.S.C. § 4511 ........................................................................................................................... 12, 13

50 U.S.C. § 4533 ................................................................................................................................ 13

50 U.S.C. § 4557 ................................................................................................................................ 14

**Other Authorities**

Pub. L. 81-774, 64 Stat. 799, § 201 ................................................................................ 13

**Regulations**

10 C.F.R. § 217.20 ........................................................................................................ 12

10 C.F.R. § 217.50 ........................................................................................................ 13

10 C.F.R. § 217.54 ........................................................................................................ 13

10 C.F.R. § 217.55 ........................................................................................................ 12

49 CFR § 195.452(h)(4)(iii)(H) ...................................................................................... 10

49 CFR § 195.557 .......................................................................................................... 10

49 CFR § 195.559 .......................................................................................................... 10

49 CFR § 195.563 .......................................................................................................... 10

Petitioners and Plaintiffs' Combined Supplemental Opposition to Real Parties in Interest's Ex Parte Application

## I.    **<u>INTRODUCTION</u>**

Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company (together, "Sable") apply to this Court, for a second time, for an order rescinding the Court's July 29, 2025, Orders for Preliminary Injunction (the "PI Orders"). This time, it cites an order issued by the Secretary of Energy under the Defense Production Act (the "DPA Order"), arguing that the order preempts the PI Orders and renders them invalid. Sable's preemption theory, on which it has seized to unilaterally disregard the PI Orders, is brazen, unprecedented, and wrong from the start.

As an initial matter, because this action is litigated under color of *federal* authority, Sable's reliance on preemption is misplaced. As this Court has recognized, the PI Orders, like Petitioners' claims, flow from a federal Consent Decree that requires Sable to obtain approvals from the Office of the State Fire Marshal (OSFM) before restarting pipelines CA-324 and CA-325 (the "Pipelines")—the project challenged in this matter. (February 27, 2026, Minute Order, p. 9.) The DPA Order does not displace the Consent Decree, which remains binding on Sable. Whatever conflict remains is one between federal authorities that are incapable of preempting one another. And so long as that conflict persists, this Court's PI Orders remain consistent with federal law and cannot be preempted.

But even if the Court were to nonetheless delve into the potential preemptive effect of the DPA Order, it would find none, for at least two reasons. First, it is not impossible for Sable to comply with both this Court's PI Orders and the DPA Order, as Sable suggests. Second, even if it were, that would not end the inquiry: For the DPA Order to preempt state law, Sable must show that Congress clearly and manifestly intended to delegate the power (1) to issue an order that, like this one, patently exceeds the scope of the DPA, *and* (2) to override state law requirements. Sable has not, and cannot, identify any such clear intent. Sable's remaining preemption arguments, addressed in turn, are unavailing.

Lastly, Sable's theory that this case has been rendered moot by virtue of its purported relinquishment of the State Waivers defies controlling case law, which Sable failed to cite. The pertinent question is whether Sable has abandoned restart of the Pipelines entirely. Because it has not, and because it still needs authorizations for the project from OSFM, (*see* February 27, 2026, Minute Order, p. 9), the Court can still grant Petitioners effective relief as to how OSFM must carry out those authorizations.

Petitioners and Plaintiffs' Combined Supplemental Opposition to Real Parties in Interest's Ex Parte Application

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Petitioners' Lawsuits and the PI Orders

Petitioners' consolidated actions challenge the restart of the Pipelines, one of which caused one of the worst oil disasters in California history in 2015 (the "Restart Project"). (*See, e.g.*, Center for Biological Diversity et al. Petition and Complaint, ¶ 10 [construing the challenged project as "restart [of] the Santa Ynez Unit oil and gas operations and transport of oil though the Las Flores Pipeline[s]"].)

The Restart Project is overseen by Respondent OSFM, among other agencies, and is subject to a federal Consent Decree that requires Sable to obtain from OSFM several approvals and entitlements, including State Waivers and the approval of Restart Plans. (*See* February 27, 2026 Minute Order, p. 9 [recognizing that "the Federal Consent Decree by its terms requires authorization from the OSFM"].) Petitioners contend in their respective Petitions that the Restart Project is also subject to various federal and state laws with which OSFM failed to comply.

On July 29, 2025, the Court granted, in part, Petitioners' requests for a Preliminary Injunction, ordering that:

> The applications are granted to enjoin, pending the disposition of these proceedings or further order of the court, the restart of the Las Flores Pipelines, as herein defined, until 10 court days following the filing and service of notice by or on behalf of real parties in interest Sable Offshore Corp., and Pacific Pipeline Company (collectively, Sable) that Sable has received all necessary approvals and permits for restarting the Las Flores Pipelines and that Sable intends to commence such restart.

(PI Orders, p. 1.)

### B.    Sable's Attempts to Circumvent State Authority and Solicitation of the DPA Order

As this Court is aware, Sable previously moved to lift the PI Orders under the guise of preemption, claiming that OSFM no longer had jurisdiction over the Pipelines in light of recent actions taken, at Sable's request, by the federal Pipeline Hazardous Materials Safety Administration (PHMSA). The Court denied that motion, finding, in part, that "the Federal Consent Decree by its terms requires authorization from OSFM" in order to restart the Pipelines. (February 27, 2026, Minute Order, p. 9.)

Meanwhile, Sable was also, apparently, attempting to circumvent state authority by soliciting an "order" from the Secretary of Energy, pursuant to Section 101 of the DPA, "requiring" Sable to operate the Pipelines. (*See* Dintzer. Decl., Exh. B, pp. 3-4.) Sable wanted such an order, notwithstanding the

"severe penalties" it now complains of, (Memo. at p. 6), for one reason: Its "view" that the order would excuse its compliance with the Consent Decree and any conflicting state laws. (*Id.* at 4.)

On December 12, 2025, Sable sent a letter to the U.S. Department of Justice (DOJ) lamenting the Consent Decree and state requirements for restarting the Pipelines. (*See* Dintzer Decl., Exh. B, p. 3.) Then, on March 3, 2026, the DOJ issued a legal opinion, at Sable's behest, that advanced an unprecedented theory about the scope of the DPA. (*See id.* at 1.) It also suggested, conveniently, that a DPA order "requiring" restart could excuse Sable from complying with virtually all state and federal requirements standing as impediments to restart, embracing a version of Sable's preemption theory. (*Id.*)

Ten days later, the Secretary of Energy (the "Secretary") issued the DPA Order. (Dintzer Decl., Exh. A.) Although the Secretary stopped short of "requiring" Sable to operate the Pipelines, he instructed Sable "to immediately prioritize and allocate pipeline transportation services for hydrocarbons from the [Santa Ynez Unit] through the [Pipelines]." (*Id.* at 3.). The next day, in open defiance of this Court's PI Orders, Sable restarted the Pipelines. (Dintzer Decl., Exh. G.) It now urges the Court to embrace its preemption theory and dissolve those Orders or, in the alternative, to hold this matter moot.

## III.    LEGAL STANDARD

A court may modify an injunction or temporary restraining order only "upon a showing that there has been a material change in the facts upon which the injunction or temporary restraining order was granted, that the law upon which the injunction or temporary restraining order was granted has changed, or that the ends of justice would be served by the modification." (Code Civ. Proc., § 533.)

## IV.    ARGUMENT

### A.    The DPA Order Does Not Preempt or Override this Court's PI Orders.

As Sable sees it, the DPA Order "was issued pursuant to federal law," and because it is "physically impossib[le]" for Sable to comply with both the DPA Order and this Court's PI Orders, the latter must give way. (Memo. at p. 2.) Sable is mistaken. Its request is, at best, premature: Whether or not the DPA Order preempts *state* law, Sable is also precluded from restarting the Pipelines under *federal* law—including, but not limited to, the Consent Decree that still governs the Pipelines. That alone obviates any conflict. But even if this Court were to consider the preemptive effect of the DPA Order, it has none. It is not impossible for Sable to comply with both the PI Orders and the DPA Order.

And even if it were, Congress did not confer on the Secretary the power to issue the Order, let alone to override state-law restart requirements in doing so. Sable's remaining arguments are unavailing.

### 1.    Sable's Request Is Premature Because Federal Law Prohibits Restart.

To the extent Sable faces conflicting obligations, the conflict is first and foremost a conflict of *federal* law. Even if Sable were entitled to ignore state requirements for restarting the Pipelines, it still must comply with several federal requirements. As this Court recently recognized, the Consent Decree governing the Pipelines prohibits Sable from restarting them without first obtaining approval from OSFM. (*See* February 27, 2026, Minute Order, p. 9.) That Consent Decree is, like all final judgments of Article III courts, federal law. (*See Mi Familia Vota v. Fontes* (9th Cir. 2025) 129 F.4th 691, 717–18). Unless or until it is set aside, it "remains in force and is binding on all parties thereto." (*Ibid.*).

To get around this problem, Sable seems to suggest that the DPA Order sweeps its federal obligations aside, too. (*See* Memo. at p. 9.) That cannot be true: whatever its capacity to preempt *state* law, the DPA does not displace federal law. Nothing in its statutory text suggests otherwise, and the courts that have examined that question have decided against it. (*See United States v. Vertac Chem. Corp.* (8th Cir. 1995) 46 F.3d 803, 812 [holding that DPA did not displace CERCLA].) And in any event, no DPA order has the power to displace a decision from a coequal branch of government. The Executive Branch cannot, consistent with the separation of powers, "overturn[] or refuse[] faith and credit" to a federal court's final judgment, and it certainly cannot authorize a private entity to flout such a judgment. (*Taylor v. United States* (9th Cir. 1999) 181 F.3d 1017, 1024 [en banc].) And more to the point, this is not the proper forum to resolve Sable's concerns. If Sable believes that the Consent Decree should be set aside, the proper recourse is to ask the federal district court tasked with enforcing the Decree to do so.[1] But so long as the Consent Decree binds Sable, this Court's PI Orders do not conflict with Sable's obligations under federal law, and Sable's preemption concerns are premature.

Moreover, the Consent Decree's restrictions flow not from state requirements, but from federal ones that remain binding on Sable even if the decree is dissolved—including the federal Pipeline Safety Act's state waiver provisions and prohibitions on operating pipelines without anti-corrosion or effective

---

[1] As of March 30, 2026, that question is pending in federal district court, though not with great urgency: The United States has noticed the issue for a hearing in June. (*See* Motion for Order for Termination or Modification, Dkt. No. 49, *United States v. Plains All American*, No. 2:20-cv-02415 (C.D. Cal.).)

external coating. (49 U.S.C. § 60118(d); 49 CFR §§ 195.452(h)(4)(iii)(H), 195.563, 195.557, 195.559.) Indeed, it is only because the Consent Decree authorized Sable to restart the Pipelines *if* OSFM waived those requirements that Sable had any path at all to operating the Pipelines consistent with federal law. The DPA Order cannot override these laws any more than it can ignore the Consent Decree.

### 2.    Sable Cannot Meet the High Bar for Preemption.

In any event, Sable cannot show preemption. It faces a formidable task. While the Supremacy Clause "supplies a rule of priority" that, when state and federal law conflict, state law must give way, courts do not lightly invoke that rule. (*Virginia Uranium, Inc. v. Warren* (2019) 139 S. Ct. 1894, 1901 [lead opinion].) The "purpose of Congress" is "the ultimate touchstone in every pre-emption case." (*Wyeth v. Levine* (2009) 555 U.S. 555, 565, quotation omitted.) And courts assume that Congress does not supersede state law unless that is its "clear and manifest" intent. (*Ibid.*) When, as here, a litigant urges that a *secretarial* action has preemptive effect, courts must consider whether Congress delegated the authority to displace state law. (*La. Pub. Serv. Comm'n v. FCC* (1986) 476 U.S. 355, 374.) After all, "an agency literally has no power to act, let alone pre-empt" state law, "unless and until Congress confers powers upon it." (*New York v. FERC* (2002) 535 U.S. 1, 18.) Here, Sable makes little effort to make this showing. It merely claims that, because it is "impossible" to comply with both the DPA Order and the PI Orders, the latter must give way. Sable is wrong on two fronts: there is no impossibility issue here, and even if there were, the DPA Order has no preemptive effect, because there is no evidence—let alone a "clear and manifest" showing—that Congress delegated the power to issue an order of this nature at all, or, in doing so, to displace the state-law requirements for Sable to restart its pipelines.

### a.    Sable Can Comply with Both the DPA Order and this Court's PI Orders.

Even setting aside the problems with the DPA Order discussed below, Sable's impossibility preemption argument falls flat. Impossibility preemption is a "demanding" argument. (*Wyeth*, 555 U.S. at 573.) The "possibility of impossibility is not enough." (*Merck Sharp & Dohme Corp.* (2019) 587 U.S. 299, 314 [quotation and brackets omitted].) Rather, there must be a "physical impossibility" or an "inevitable collision" for a federal law to override its state counterpart. (*Florida Lime & Avocado Growers, Inc. v. Paul* (1963) 373 U.S. 132, 143.) Sable has not shown either here.

As Sable tells it, the DPA Order commands Sable to "commence the flow of crude" through the Las Flores pipelines, and "prioritize" and "allocate" hydrocarbon transportation services to this purpose, while this Court's PI Orders forbid it from doing so. (Notice at p. 4.) That is not what the DPA Order says, as discussed below. But even if it did, Sable could have complied with both orders—by working swiftly to obtain the approvals the PI Orders require, then reporting them to this Court and waiting ten days thereafter. All the more so because Sable has been aware of its obligations under the PI Orders for eight months—and because, by itself requesting the Secretary's intervention, Sable was well aware the DPA Order might be coming. Additionally, although incorrect, if Sable's position is that it now has all necessary approvals to restart by virtue of the DPA Order, nothing prevented Sable from complying with the PI Orders' modest requirement to provide 10 days' notice to the Court that it had obtained such approvals. Instead, Sable simply disregarded the PI Orders, depriving the Court of the opportunity it had carefully reserved to itself to determine whether Sable had, in fact, obtained all necessary approvals.

Sable's counter appears to be that the "immediate[]" action compelled by the DPA Order foreclosed these options, but that is neither helpful to Sable nor true. It does not explain why Sable sat on its hands prior to the DPA Order's issuance. Sable has had since last July—if not longer—to obtain all necessary permits. And in any event, Sable's interpretation is difficult to reconcile with the text of the DPA Order. The Order does not define the term "immediate," nor does Sable show it must mean in a matter of days rather than weeks or months. If anything, the surrounding context of highly complex hydrocarbon transactions suggests the latter. Nor does Sable explain why it could not swiftly "prioritize" one set of contractual obligations over another, or promptly "allocate" its services to one client or purpose over another, even if it would take time to complete those tasks.

Moreover, the DPA Order does not, in fact, compel Sable to commence the "flow" of anything. It requires that Sable "immediately commence performance" under certain contracts. Given that contract performance does not ordinarily entail violating conflicting laws, and *commencing* such performance suggests beginning the steps required to perform such a contract, the logical interpretation is that the Order requires Sable to work towards obtaining necessary regulatory approvals, not to ignore them.

And even setting all these issues aside, to the extent Sable could not comply fully with the DPA Order, the Department of Energy's DPA regulations explain that Sable's recourse is to comply to the

extent possible and notify the Department—not to simply ignore its conflicting obligations. (10 C.F.R. § 217.55.) Sable thus falls far below showing an inevitable collision of state and federal law.

          *b.   There Is No Clear and Manifest Evidence that Congress Conferred the Preemptive Power Sable Claims.*

Sable cannot overcome the deeper problem with its argument, either: It has made no showing that the DPA Order fell within the Secretary's authority in the first place, nor that Congress intended to confer on the President or his delegees the preemptive power Sable now claims for them.

Start with the shortfall in the Secretary's authority. As relevant here, the DPA authorizes two things. It creates a "priority" power, under which the President or his delegee can accord favored contracts or orders a special status that permits them to jump the queue over "any other contract or order." (50 U.S.C. § 4511(a), (c); *see also* Webster's 2d New Collegiate Dictionary 671 (1953) [a "priority" is a "wartime" or equivalent "preferential rating assigned by the government for the delivery of products according to the relative need of each" and "the proportionate allocation of scarce materials"].) And it creates an "allocation" power, under which the President or his delegee may "allocate"—that is, "control the distribution of"—certain materials, services, and facilities. (*See* 10 C.F.R. § 217.20; s*ee also* Webster's 2d at 24 [to "allocate" means "to distribute as a share, part, or the like; to assign, apportion"; the "government apportionment and distribution of available materials among producers"].) The DPA also makes both powers subject to various requirements and guardrails, including the requirement that delegee agencies "establish standards and procedures by which the priorities and allocations authority" shall be "used." (50 U.S.C. § 4511(d)(1).)

At least as interpreted by Sable, the DPA Order oversteps these authorities in several ways. First, rather than allocate shares or parts of an existing resource, it orders Sable to create a service that did not previously exist, following the catastrophic 2015 rupture when the Pipelines were shut down—pipeline transportation services through the Pipelines. Second, and similarly, it instructs Sable to "utilize" those pipelines' capacity. The DPA does not authorize compelling a new resource into existence, or commanding that it be "utilized" in a particular way. Indeed, Congress crafted entirely distinct provisions of the DPA to incentivize expanded production—provisions that notably rely on federal subsidies, not commands. (*See, e.g.*, 50 U.S.C. § 4533.) Third, the DPA Order instructs Sable to

Petitioners and Plaintiffs' Combined Supplemental Opposition to Real Parties in Interest's Ex Parte Application

"immediately commence" performance of contracts to deliver the services it compels into creation. But the DPA allows performance to be required only "for the purpose of assuring" that one contract receives priority over another. (50 U.S.C. § 4511(a).) Here, there is no evidence that Sable will or could accord priority to any other hydrocarbon transportation contracts. Fourth, the DPA Order ignores the requirements imposed by the binding regulations Congress required the Department of Energy to issue. (*See, e.g.*, 10 C.F.R. §§ 217.50, 217.54.) And fifth, the DPA Order omits the statutorily required findings that the services or materials at issue are "scarce, critical, and essential." (50 U.S.C. § 4511(c)(2)(A).)

But even if those problems could be overlooked, Sable cannot show that Congress intended for DPA prioritization and allocation orders to preempt state regulatory laws—or court orders—like those at issue here. To the contrary, every clue to statutory meaning conveys a much narrower intent.

First, in drafting Section 101 of the DPA, Congress created two narrow powers—the power to "prioritize" and the power to "allocate"—that both relate to the specific context of federal procurement and contracting. When Congress meant to confer powers that could interfere with *other* rights and interests, it said so—and it placed meaningful guardrails on doing so. For instance, when the DPA was first enacted, it included the power to "requisition" materials. (*See* Pub. L. 81-774, 64 Stat. 799, § 201.) That power enabled the President to seize property or require its use, if (and only if) the need was "immediate and impending," "will not admit of delay or resort to any other source of supply," and "all other means of obtaining the use of such property" were exhausted. (*Id.* § 201(a)(2)–(3).) Congress likewise included specific instructions for how the President could exercise that power consistent with the Fifth Amendment. (*See id.* § 201(a)(3), (b).) And it ordered the immediate return of requisitioned property following use. (*Id.* § 201(b)–(c).) That Congress included such significant protections from such a consequential power is little surprise.[2] But Congress included no similar protections or requirements in Title I. That conscious drafting choice strongly weighs against any suggestion that Congress intended the prioritization or allocation powers to authorize the President to seize state property rights or override state sovereignty, as Sable insists happened here. (*Sosa v. Alvarez-Machain*

_____

[2] Nor did such a consequential power last. After President Truman controversially seized the steel mills on a similar theory, Congress terminated the provision altogether. (Pub. L. 83-95, 67 Stat. 129 (1953).)

Petitioners and Plaintiffs' Combined Supplemental Opposition to Real Parties in Interest's Ex Parte Application

(2004) 542 U.S. 692, 711 n.9. ["[W]hen the legislature uses certain language in one part of the statute and different language in another," courts "assume[] different meanings were intended."].)

Moreover, the DPA includes a liability shield that conveys exactly where Congress wanted to displace competing obligations—and where it intended no such thing. Under that provision, Congress emphasized that no person may be "held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to this chapter." (50 U.S.C. § 4557.) Sable seizes on this language (Memo. at p. 9) to argue that Congress intended every prioritization and allocation order it issues to confer immunity for *any* actions a recipient might take thereunder—indeed, even to insulate it from injunctions that might restrict how it discharges those obligations. But that is a deeply implausible reading of the provision. Indeed, for decades courts construed it only to provide immunity from *contract* damages or penalties. Reasoning that the provision functions as a "quid pro quo to section 101," they surmised that the protection it affords "should correspond to the risk imposed"—such as the need to break contracts with third parties, or increased risks to employees. (*In re Agent Orange Product Liab. Litig.* (E.D.N.Y. 1984) 597 F. Supp. 740, 845; *see also, e.g.*, *Vertac*, 46 F.3d at 811–12.) And that conclusion makes sense. Congress knows how to draft expansive preemption clauses if it wishes. When it focuses a liability shield on a much narrower field, the inference is that Congress extended that shield as far as it intended.

None of Sable's counterpoints persuade. First, Sable's concerns about the "conflict in the Middle East" (Notice at p. 5) are not relevant because the DPA Order conspicuously omits any findings related to that conflict—or, indeed, about national security at all. Second, even if this Court were obligated to defer to the Executive's "evaluation of the facts" in this context (Memo. at p. 8), the DPA Order reflects no such evaluation. Third, to the extent Sable suggests that the DOJ opinion is entitled to special weight (Memo. at p. 2), it is mistaken. The authorities Sable cites concern courts' obligations to consider *state* attorney general opinions, and in any event, the premise animating that principle is inapplicable here. The Court cannot "presume" that Congress is aware of an opinion issued days before the DPA Order, especially one that makes a dramatic departure from prior understandings of the DPA.

Finally, the scant caselaw Sable cites in support of broader DPA preemption is unavailing. Those cases contain bare-bones reasoning, address distinct questions, or both. (*See, e.g.*, *Reed v. Tyson Foods,*

*Inc.* (W.D. Tenn. Nov. 3, 2021) 2021 WL 5107725, at *6 [federal officer removal)]; *Alario v. Knudsen* (D. Mont. 2023) 704 F. Supp. 3d 1061, 1085 [preemption under unrelated DPA provision].) And they by and large rely on the distinct theory of implied purposes-or-objectives preemption. (*See, e.g.*, *Johnson v. Tyson Foods, Inc.* (N.D. Tex. 2022) 580 F. Supp. 3d 382, 389.) That theory, which turns on a court's conclusion that a state law "stands as an obstacle to the accomplishment" of the goals the court believes the law was pursuing (*Hines v. Davidowitz* (1941) 312 U.S. 52, 67), faces a very "high threshold." (*Chamber of Com. v. Whiting* (2011) 563 U.S. 582, 607.) As the U.S. Supreme Court has cautioned, the Supremacy Clause cannot be deployed "'to elevate abstract and unenacted legislative desires above state law.'" (*Oklahoma v. Castro-Huerta*, (2022) 597 U.S. 629, 642 [quoting *Virginia Uranium, Inc. v. Warren* (2019) 587 U.S. 761, 778 (lead opinion)].) To invoke such a purpose, Sable must identify statutory *text* conveying Congress's purported purpose, which will, in turn, control over "purported legislative intentions unmoored from any statutory text." (*Id.*) Sable has not done so here, and thus cannot disturb this Court's PI Orders on that basis.

**B.    Sable's Relinquishment of the State Waivers Does Not Render This Action Moot.**

Sable contends, again, that this case is moot because it has purportedly relinquished the State Waivers it received from OSFM. Even assuming, *arguendo*, that Sable's February 26, 2026, letter to OSFM effectively invalidated the Waivers, Sable is incorrect.

Courts impose a very high bar for mootness. A case is moot only when a court's ruling "can have no practical impact or provide the parties effectual relief." (*Woodward Park Homeowners Assn. v. Garreks, Inc.* (2000) 77 Cal.App.4th 880, 888.)

Simply because a project approval has been rescinded—or in this case, relinquished—does not in itself render a case moot. (*See Citizens for Open Government v. City of Lodi* (2006) 144 Cal.App.4th 865, 873; *see also Friends of the Eel River v. North Coast Railroad Authority* (2014) 178 Cal.Rptr.3d 752, 767, *rev'd on other grounds*, 3 Cal.5th 677 (2017).) The pertinent inquiry in such circumstances is whether the project applicant has *abandoned* the project; if not, it may still be possible, as here, for the court to grant effective relief to petitioners. (*E.g., City of Lodi*, 144 Cal.App.4th at 873.)

*City of Lodi* is instructive. There, two non-profit groups filed separate petitions for writ of mandate against the City of Lodi challenging its certification of an Environmental Impact Report (EIR)

and approval of a use permit for construction of commercial retail space. (*Id.* at 868.) The trial court partially granted one of the petitions for writ of mandate on two of its claims, and thus set aside the approvals for the project. (*Id.* at 872-73.) The trial court denied in whole the other writ petition for failure to exhaust administrative remedies, and the non-profit appealed. (*Id.* at 872.)

On appeal, the City claimed that the petition was moot, arguing that "a trial court ruling in this case could no longer have any practical impact or provide effectual relief because the trial court has already set aside the project approvals as a result of a partial grant of the of the [companion] petition." (*Id.*). The appellate court disagreed. (*Id.*) It noted that the trial court had only granted partial relief, and "[t]here is no evidence before this court that the City and [the developer] have *abandoned* [the project]." (*Id.* at 873 (emphasis added).) If the trial court were to find petitioners' claims addressing additional issues with the EIR meritorious, it could order the City to address those deficiencies while it reconsiders the project, and thus "[e]ffective relief would still be possible in this case." (*Id.*)

*Friends of the Eel River* is perhaps even more on point. (178 Cal.Rptr.3d 752, *rev'd on other grounds*, 3 Cal.5th 677 (2017).) There, environmental groups filed petitions for writ of mandate challenging a state agency's certification of an EIR and approval of the resumption of railroad service on a line that "has a history of safety and maintenance issues." (*Id.* at 760.) As relevant here, the agency certified the EIR and approved resumed operations via a resolution it adopted. (*Id.* at 764.)

As petitioners' case was pending, the state agency rescinded the resolution in an attempt to evade judicial review. (*Id.* at 765.) Shortly thereafter, the agency filed a motion to dismiss the writ petitions as moot, citing the rescission. (*Id.* at 766.) The trial court denied the motion, concluding that the petitions were not mooted by the subsequent rescission because the applicant had not abandoned the project. (*Id.*)

On appeal, the state agency raised the same argument. It claimed that "this case is moot because the petitions for writ of mandate challenged the sufficiency of the EIR certified by resolution in 2011, and [the agency] has since rescinded that resolution." (*Id.* at 766.) "[B]ecause the railroad line is operating," they suggested, "and because no further approval is needed for those operations, this court lacks the ability to issue an order affecting railroad operations or the environmental review of those operations." (*Id.*) The appellate court disagreed. It explained that "[t]hough the resolution approving the EIR has been rescinded, there is no evidence the project it approved has been *abandoned*." (*Id.*

Petitioners and Plaintiffs' Combined Supplemental Opposition to Real Parties in Interest's Ex Parte Application

(emphasis added).) Thus, it reasoned, assuming the agency failed to prevail on its other, non-mootness claims, the court "would surely be empowered to grant the petitioners relief." (*Id.* at 767.)

So, as long as a project has not been abandoned, *City of Lodi* and *Friends of the Eel River* instruct that an action challenging the project may present a live controversy notwithstanding the lapse of an underlying approval, particularly where the action seeks relief pertaining to agency review that remains outstanding. And that is precisely the case here.

Sable has, quite obviously, *not* abandoned the Restart Project challenged in this matter and is instead pursuing it at all costs. And while Sable may prefer otherwise, it still needs approvals from OSFM in order to pursue the project, as expressly required by the Consent Decree, and as this Court has already recognized. (February 27, 2026, Minute Order, p. 9 ["[T]he Federal Consent Decree by its terms requires authorization from OSFM"].) Because Petitioners' challenge here asks for declaratory relief regarding what process OSFM must follow in issuing those approvals, and regarding the corollary rights of Petitioners to participate in that process, this Court can still afford effective relief to Petitioners notwithstanding Sable's purported relinquishment of the State Waivers. In other words, so long as the Consent Decree—which compels Sable to proceed through OSFM—remains in effect, and Sable has not abandoned its efforts to restart and operate the Pipelines, the relief requested by Petitioners will have a "practical impact" on OSFM's review, and thus their claims are not moot. (*Woodward Park*, 77 Cal.App.4th at 888; s*ee Lodi*, 144 Cal.App.4th at 873; *Friends of the Eel River*, 178 Cal.Rptr.3d at 767.)

To illustrate the point, consider what would occur, for example, if Sable's pleas for federal intervention—its pretext for unlawfully circumventing OSFM—fall flat. (*See State of California v. Chris Wright et al.*, Cal. C.D. Case No. 2:26-cv-03396 (challenging DPA Order); *State of California v. PHMSA*, 9th Circuit Case No. 26-508 (challenging PHMSA's federalization of the Pipelines).) Having given no indication that it intends to abandon the project, Sable will be right back to pursuing restart via OSFM. That would include, *inter alia*, renewing its requests for State Waivers under the statutory schemes of which Petitioners seek declaratory relief. Or, more cynically, Sable may simply attempt to walk back its purported relinquishment of the State Waivers; indeed, in its February 26, 2026, letter to OSFM, Sable cites no authority suggesting that a State Waiver can be invalidated by a unilateral communication from the operator. (Dintzer Decl., Exh. E.) In either case, the relief sought by Petitioners

Petitioners and Plaintiffs' Combined Supplemental Opposition to Real Parties in Interest's Ex Parte Application

will have a "practical impact," either by reforming OSFM's review process for the project, or by estopping Sable from relying on unlawfully-issued Waivers. (*Woodward Park*, 77 Cal.App.4th at 888.)

Of course, Sable remains bound by the Consent Decree, and it is thus *already* required to pursue the project through OSFM. (*See* February 27, 2026, Minute Order, p. 9.) But the above scenario elucidates why there remains an actual controversy to be resolved by this Court, and why the Court can afford Petitioners effective relief.

Similarly, even if this matter were moot by virtue of the purported relinquishment—which it is not—it would fit within a well-recognized exception to mootness that vests courts with "discretion to consider any matter . . . when there may be a recurrence of controversy between the parties." (*Cucamongans United for Reasonable Expansion v. City of Ranch Cucamonga* (2000) 82 Cal.App.4th 473, 479 [citation omitted].) As explained, because the Consent Decree remains in effect—and, separately, because the Pipelines are intrastate—Sable must return to its previous posture before OSFM to proceed, which will raise the same issues presented herein. (February 27, 2026, Minute Order, p. 9.)

Lastly, courts may also consider an otherwise moot action if "the case presents an issue of broad public interest that is likely to recur." (*Id.* at 479 [citation omitted].) Relevant here, the federal government is doing everything in its power to expand oil and gas development in California—an effort that will likely require resuscitating defunct facilities, including, as here, pipeline facilities under OSFM's jurisdiction. (*See, e.g.,* Notice of Intent to Prepare EIS, 90 Fed. Reg. 26602 (June 23, 2025) [for plan to open 850,000 acres of Central Coast land to oil and gas leasing].) Thus, the issues raised herein, which concern procedures germane to the restart of defunct facilities, are likely to recur.

In sum, this Court should roundly reject Sable's unfounded theory that a real party can moot a case simply by declaring, unilaterally, that it does not need to proceed through a respondent agency—especially when this Court has already held to the contrary. (*See* February 27, 2026, Minute Order, p. 9.) So long as OSFM has oversight over the project—either via the Consent Decree or by virtue of the Pipelines' intrastate status—and Sable has not abandoned its efforts to restart and operate the Pipelines, Sable's purported relinquishment of the Waivers is of no moment, and Petitioners' claims are not moot.

## V.    **CONCLUSION**

For the above reasons, Petitioners respectfully request that this Court deny Sable's Application.

Dated: April 1, 2026                   Respectfully submitted,


                                       /s/ *Linda Krop*

                                       Linda Krop
                                       Jeremy M. Frankel
                                       Tara C. Rengifo
                                       ENVIRONMENTAL DEFENSE CENTER
                                       906 Garden St.,
                                       Santa Barbara, CA 93101
                                       Tel. (805) 963-1622

                                       *Attorneys for Petitioners Environmental Defense Center, Get Out Oil!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper*

                                       /s/ *Julie Teel Simmonds*

                                       Julie Teel Simmonds
                                       David Pettit
                                       Talia Nimmer
                                       CENTER FOR BIOLOGICAL DIVERSITY
                                       2100 Franklin St., Ste. 375
                                       Oakland, CA 94612
                                       Tel. (510) 844-7100

                                       *Attorneys for Petitioners Center for Biological Diversity and Wishtoyo Foundation*

Petitioners and Plaintiffs' Combined Supplemental Opposition to Real Parties in Interest's Ex Parte Application

**PROOF OF SERVICE**

I, Jeremy M. Frankel, declare:

I am employed in the County of Santa Barbara, State of California. I am over the age of 18 and not a party to this action. My business address is 906 Garden Street, Santa Barbara, California 93101.

On April 1, 2026, I served the above document(s) described as **PETITIONERS AND PLAINTIFFS' COMBINED SUPPLEMENTAL OPPOSITION TO REAL PARTIES IN INTEREST'S EX PARTE APPLICATION FOR IMMEDIATE RESCISSION OF PRELIMINARY INJUNCTION** on the interested parties in this action, stated below, by the following means of service:

**See Attached Service List**

☒    **By e-mail or electronic transmission.** On the date above, I caused a copy of the document(s) described above to be served electronically on the recipients designated in the attached Service List.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on April 1, 2026, at Santa Barbara, California.

_____
Jeremy M. Frankel

1
Proof of Service

**SERVICE LIST**

| | |
|---|---|
| Michael S. Dorsi<br>Michael.Dorsi@doj.ca.gov<br>Myung Park<br>Myung.Park@doj.ca.gov<br>Matthew Bullock<br>Matthew.Bullock@doj.ca.gov<br>California Attorney General's Office<br>55 Golden Gate Avenue, Suite 11000<br>San Francisco, CA 94102 | ATTORNEYS FOR<br>RESPONDENTS/DEFENDANTS<br>California Department of Forestry and Fire Protection, Office of the State Fire Marshal; and Daniel Berlant, in his official capacity as State Fire Marshal |
| Duncan Joseph Moore<br>djmoore@paulhastings.com<br>Benjamin J. Hanelin<br>benjaminhanelin@paulhastings.com<br>Natalie C. Rogers<br>natalierogers@paulhastings.com<br>PAUL HASTINGS, LLP<br>1999 Avenue of the Stars, 27th Floor<br>Century City, CA 90067 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp. and Pacific Pipeline Company |
| Jeffrey D. Dintzer<br>Jeffrey.dintzer@alston.com<br>Matthew C. Wickersham<br>Matt.wickersham@alston.com<br>Garrett B. Stanton<br>Garrett.stanton@alston.com<br>ALSTON & BIRD LLP<br>350 South Grand Avenue, 51st Floor<br>Los Angeles, CA 90071 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp. and Pacific Pipeline Company |
| Trevor D. Large<br>tlarge@flasllp.com<br>Victoria C. Diffenderfer<br>vdiffenderfer@flasllp.com<br>FAUVER LARGE ARCHBALD & SPRAY<br>820 State Street, 4th Floor<br>Santa Barbara, CA 93101 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp. and Pacific Pipeline Company |

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Angela Braun, Executive Officer
4/1/2026 9:57 PM
By: Narzralli Baksh , Deputy

ROB BONTA
Attorney General of California
MYUNG J. PARK
Supervising Deputy Attorney General
MATTHEW BULLOCK (SBN 243377)
MICHAEL S. DORSI (SBN 281865)
Deputy Attorney General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3802
  Fax:  (415) 703-5480
  E-mail:  Michael.Dorsi@doj.ca.gov
*Attorneys for Respondents and Defendants
Department of Forestry and Fire Protection, by and
through the Office of the State Fire Marshal, an
agency of the State of California; Daniel Berlant, in
his official capacity as State Fire Marshal*

EXEMPT FROM FILING FEES
PURSUANT TO GOVERNMENT CODE
SECTION 6103

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SANTA BARBARA

| | |
|---|---|
| **CENTER FOR BIOLOGICAL DIVERSITY, et al.,**<br><br>Petitioner and Plaintiff,<br><br>v.<br><br>**CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, et al.,**<br><br>Respondents and Defendants,<br><br>**SABLE OFFSHORE CORP., et al.,**<br><br>Real Parties in Interest. | Case No. 25CV02244<br>Consolidated with Case No. 25CV02247<br><br>**RESPONDENTS CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, ET AL.'S BRIEF ON MOTIONS RE: ENFORCEMENT OR MODIFICATION OF PRELIMINARY INJUNCTION**<br><br>Date:         April 17, 2026<br>Time:        10:00 a.m.<br>Dept:         4<br>Judge:       Hon. Donna Geck |
| **ENVIRONMENTAL DEFENSE CENTER, et al.,**<br><br>Petitioners and Plaintiffs,<br><br>v.<br><br>**CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, et al.,**<br><br>Respondents and Defendants,<br><br>**SABLE OFFSHORE CORP., et al.,**<br><br>Real Parties in Interest. | Trial Date:   Not Set<br>Action Filed: April 15, 2025 |

1

Respondents' Brief on Motions re: Enforcement or Modification of Preliminary Injunction (25CV02244)

**TABLE OF CONTENTS**

**Page**

Introduction.........................................................................................................................7

Background ........................................................................................................................9

    I.     This Case, and Related Cases, Exist Because of the Refugio Oil Spill...................9

    II.    Sable Itself Sought and Obtained the Federal Government's Blessings as Pretexts to Disobey State Law and This Court's Injunction...................................9

Legal Standards..................................................................................................................11

Interest of Respondents......................................................................................................11

Argument ...........................................................................................................................11

    I.     Sable Violated the Preliminary Injunction and Has No Valid Defense.................11

    II.    Sable's Violation Prior to Moving to Amend the Injunction Should Result in Disentitlement.......................................................................................................13

    III.   The Defense Production Act Order Is Invalid .......................................................13

    IV.   The Defense Production Act Does Not Displace Existing State Law ...................14

        A.     The DPA Shields Sable Only from Contract Liability .............................14

        B.     Sable Has Not Proven Impossibility, Conflict, or Obstacle Preemption ...............................................................................................17

    V.    Sable Has No Material Claim to the Balance of Equities Because Sable Seeks to Perform Unlawful Activities .....................................................................19

        A.     Sable's Transportation of Crude Oil Violates Federal Pipeline Safety Law ...............................................................................................19

        B.     Sable's Transportation of Crude Oil Violates California Law ..................20

    VI.   This Case Is Not Moot ...........................................................................................21

Conclusion .........................................................................................................................21

Respondents' Brief on Motions re: Enforcement or Modification of Preliminary Injunction (25CV02244)

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Adams v. Pacific Bell Directory*
(2003) 111 Cal.App.4th 93 ...................................................................................................15

*Alioto Fish Co. v. Alioto*
(1994) 27 Cal.App.4th 1669 ...............................................................................................13

*Bean v. City of Thousand Oaks*
(2025) 114 Cal.App.5th 775 ...............................................................................................11

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*
(1989) 489 U.S. 141 ............................................................................................................18

*California by and through Becerra v. U.S. Environmental Protection Agency*
(9th Cir. 2020) 978 F.3d 708 ..............................................................................................12

*California Coastal Com'n v. Granite Rock Co.*
(1987) 480 U.S. 572 ............................................................................................................18

*Cedar Point Nursery v. Hassid*
(2021) 594 U.S. 139 ............................................................................................................20

*Citizens for Open Gov. v. City of Lodi*
(2006) 144 Cal.App.4th 865 ...............................................................................................21

*City of Palo Alto v. Service Employees Internat. Union*
(1999) 77 Cal.App.4th 327 .............................................................................................7, 12

*Civic W. Corp. v. Zila Indus., Inc.*
(1977) 66 Cal.App.3d 1 .......................................................................................................20

*Conn v. Superior Court*
(1987) 196 Cal.App.3d 774 ................................................................................................11

*Disney Enters., Inc. v. VidAngel, Inc.*
(9th Cir. 2017) 869 F.3d 848 ..............................................................................................19

*Ecological Rts. Found. v. Pac. Gas & Elec. Co.*
(9th Cir. 2017) 874 F.3d 1083 ............................................................................................16

*Freightliner Corp. v. Myrick*
(1995) 514 U.S. 280.............................................................................................................17

*Friends of the Eel River v. North Coast Railroad Authority*
(2017) 3 Cal.5th 677 ...........................................................................................................21

3

**TABLE OF AUTHORITIES**
(continued)

Page

*Hercules Inc. v. U.S.*
(1996) 516 U.S. 417.................................................................................................15, 16

*Hercules, Inc. v. U.S.*
(Fed.Cir. 1994) 24 F.3d 188...................................................................................15, 16

*In re Agent Orange Product Liability Litigation*
(E.D.N.Y. 1984) 597 F.Supp. 740 .................................................................................15

*Learning Res., Inc. v. Trump*
146 S. Ct. 628 (2026), 2025 WL 2772085....................................................................17

*Loeffler v. Medina*
(2009) 174 Cal.App.4th 1495 ........................................................................................11

*Loper Bright Enterprises v. Raimondo*
(2024) 603 U.S. 369......................................................................................................14

*Loving v. U.S.*
(1996) 517 U.S. 748......................................................................................................12

*MacPherson v. MacPherson*
(1939) 13 Cal.2d 271 .................................................................................................7, 13

*Mathews v. Becerra*
(2019) 8 Cal.5th 756 .....................................................................................................16

*McFarland v. Superior Court of Merced County*
(1924) 194 Cal. 407......................................................................................................12

*Missouri v. Holland*
(1920) 252 U.S. 416......................................................................................................11

*Nat'l Ass'n of Home Builders v. Norton*
(9th Cir. 2003) 340 F.3d 835 ........................................................................................14

*Orantes-Hernandez v. Holder*
(C.D. Cal. 2010) 713 F.Supp.2d 929 .........................................................................7, 13

*People v. Gonzalez*
(1996) 12 Cal.4th 804....................................................................................................12

*Printz v. U.S.*
(1997) 521 U.S. 898......................................................................................................20

Respondents' Brief on Motions re: Enforcement or Modification of Preliminary Injunction (25CV02244)

### TABLE OF AUTHORITIES
(continued)

Page

*Tafflin v. Levitt*
(1990) 493 U.S. 455.................................................................................................7

*U.S. v. Vertac Chemical Corp.*
(8th Cir. 1995) 46 F.3d 803 ...............................................................15, 16, 20

*United States v. Carmack*
(1946) 329 U.S. 230...............................................................................................21

*Walker v. City of Birmingham*
(1967) 388 U.S. 307...............................................................................................12

*Wyeth v. Levine*
(2009) 555 U.S. 555......................................................................................8, 14, 17

*Youngstown Co. v. Sawyer*
(1952) 343 U.S. 579...............................................................................................18

**STATUTES**

California Civil Code
§ 659.....................................................................................................................20
§ 829.....................................................................................................................20
§ 3517..............................................................................................................13, 19

California Code of Civil Procedure
§ 533.....................................................................................................................11

California Government Code
§ 51010, *et seq.* ................................................................................................20

California Public Resources Code
§ 21167(a) ........................................................................................................21
§ 21168.9............................................................................................................21

United States Code, Title 49
§ 60101(a)(8)(B) .............................................................................................18
§ 60101(a)(10) .................................................................................................18
§ 60104(c) ........................................................................................................18
§ 60105...............................................................................................................17
§ 60105(a) ...................................................................................................18, 20

United States Code, Title 50
§ 4511(a) ..........................................................................................................14
§ 4511(c) ..........................................................................................................14
§ 4557...........................................................................................................8, 15

5

**TABLE OF AUTHORITIES**
(continued)

**Page**

**REGULATIONS**

Code of Federal Regulations, Title 10
  § 217.20..................................................................................................................14
  § 217.31..................................................................................................................14
  § 217.54(a) .............................................................................................................14
  § 217.54(b) .............................................................................................................14
  § 217.55(c) .............................................................................................................13
  § 271.31..................................................................................................................14
  § 271.51(f) ..............................................................................................................14

Code of Federal Regulations, Title 49
  § 195.452(h)(4)(iii)(H).........................................................................................19
  § 195.563................................................................................................................9, 19

**OTHER AUTHORITIES**

Preemptive Effect of Defense Production Act Order on State Law
  50 Op. O.L.C. __ (Mar. 3, 2026) ......................................................................10

Brief for Respondent United States,
  *Hercules, Inc. v. U.S.*, No. 94-818 (516 U.S. 417), 1995 WL 495540 ....................................16

Opening Brief for the United States,
  *Learning Res., Inc. v. Trump*, No. 24-1287 (146 S. Ct. 628) 2025 WL 2772085 ...................17

Respondents' Brief on Motions re: Enforcement or Modification of Preliminary Injunction (25CV02244)

**INTRODUCTION**

This Court issued a preliminary injunction requiring Real Parties in Interest Sable Offshore Corp and Pacific Pipeline Company (Sable) to, ten days before restarting, file and serve "notice that Sable has received all necessary approvals and permits for restarting the Las Flores Pipelines and that Sable intends to commence such restart." (Preliminary Injunction Order, p. 18.) But Sable restarted the Las Flores Pipelines on March 14, 2026 without first providing the ten-day notice that the injunction required, and then three days later gave notice of its Ex Parte Application. The Court should enforce its own injunction, and decline to hear any motion from Sable while it is in defiance of this Court.

"As the United States Supreme Court has observed, 'it is beyond question that obedience to judicial orders is an important public policy. An injunction issued by a court acting within its jurisdiction must be obeyed until the injunction is vacated or withdrawn.'" (*City of Palo Alto v. Service Employees Internat. Union* (1999) 77 Cal.App.4th 327, 338–339, quoting *W.R. Grace & Co. v. Rubber Workers* (1983) 461 U.S. 757, 766, cleaned up.) Sable's federal-law defenses do not deprive this Court of its power. The Supreme Court has "consistently held that state courts have inherent authority, and are thus presumptively competent, to adjudicate claims arising under the laws of the United States." (*Tafflin v. Levitt* (1990) 493 U.S. 455, 458.) That includes—and requires—rejecting assertions of federal executive orders superseding state judicial orders, especially where those federal orders are contrary to law.

In considering Petitioners Center for Biological Diversity and Environmental Defense Center's request for an order to show cause for contempt, this is the beginning and the end of the inquiry. Sable sought leave, which the Court denied. So Sable simply defied this Court.

As to Sable's request to lift the injunction, the Court should deny it for two reasons:

First, Sable should not be permitted to obtain relief while it is in defiance of the order it seeks relief from. The disentitlement doctrine is well-established in California and federal law. (*MacPherson v. MacPherson* (1939) 13 Cal.2d 271, 277; *Orantes-Hernandez v. Holder* (C.D. Cal. 2010) 713 F.Supp.2d 929, 954.) If a party wishes to have an injunction lifted, it must make the motion to lift the injunction while in compliance with the injunction. In its moving papers,

Sable offered no contrary authority. This Court should rule that Sable must come into compliance with the preliminary injunction before the Court will consider Sable's Motion.

Second, Sable is wrong on the merits. Sable asks this Court to accept two federal actions as valid and controlling: one by the Pipeline and Hazardous Materials Safety Administration (PHMSA) asserting jurisdiction over pipeline safety, and a second by the Secretary of Energy invoking the Defense Production Act. This Court already declined to lift the injunction based on the first. There is no support for the proposition that the federal government's views about preemption hold any special weight. In fact, decisions of the United States Supreme Court hold the contrary: there is no deference to the federal government on questions of preemption. (*Wyeth v. Levine* (2009) 555 U.S. 555, 576.)

Both orders are abrupt reversals of the federal government's own positions. PHMSA had conceded for nearly a decade that the Las Flores Pipelines were subject to California's jurisdiction. It then abruptly reversed in response to Sable's request. And as to the Defense Production Act (DPA), the United States told appellate courts—and prevailed on its argument—that the shield against damages in penalties in the DPA, 50 U.S.C. § 4557, applies only to contract liability, not public safety regulations or contempt.

This Court is uniquely situated to address Sable's ongoing, unlawful operation of the Las Flores Pipelines. This Court has familiarity from the ongoing proceedings, including several rounds of briefing and hearings first seeking a preliminary injunction, and then later briefing seeking to dissolve that preliminary injunction based on the same PHMSA order Sable now reraises. This Court has considered disputes over evidence and is well-positioned to make credibility determinations. With its experience and competence, this Court should make one thing clear: Sable must comply with this Court's injunction unless or until this Court says otherwise. Sable's unilateral decision that it is no longer bound by this Court's rulings, and its self-help remedy of restarting the pipelines immediately and only seeking relief from this Court after it violated the Court's injunction, cannot be squared with the rule of law. The Court should make no ruling in favor of Sable where Sable has demonstrated that is the only type of order from this Court it will comply with. The Court should grant Petitioners' motion and deny Sable's motion.

8

## BACKGROUND

**I.   THIS CASE, AND RELATED CASES, EXIST BECAUSE OF THE REFUGIO OIL SPILL**

On May 19, 2015, the crude oil pipeline now known as CA-324 ruptured, releasing over 120,000 gallons of crude oil into the environment along the Santa Barbara coast. The resulting Refugio Oil Spill marred and closed Santa Barbara's landmark beaches, killed hundreds of birds and mammals, and closed fisheries. Plains ultimately paid hundreds of millions of dollars in settlements to local businesses and residents harmed by the spill, and tens of millions of dollars in natural resource damages and penalties to the State and federal government.

Federal regulations require, as they did in 2015, that CA-324 be protected by a "cathodic protection system" that counteracts the corrosive electrical charge caused by that exposure. (49 C.F.R. § 195.563.) However, the cathodic protection used to protect underground pipelines from corrosion is not effective when these underground pipelines are wrapped with insulation, as Line CA-324 was—and remains today. Neither Plains, who operated the pipelines in 2015, nor PHMSA, who regulated Plains, ensured that the necessary steps would be taken to address the ongoing corrosion. In 2016, PHMSA acknowledged that the pipelines are intrastate and transferred jurisdiction to the California Office of the State Fire Marshal (OSFM). In 2020, PHMSA, OSFM, other agencies, and Plains entered into a Consent Decree governing the restart of the Las Flores Pipelines. After an extensive process, OSFM issued the State Waivers, with conditions for Sable to complete prior to restart. Sable performed some but not all of the remediation it was required to perform prior to restart.[1] When OSFM informed Sable of its failure, Sable disputed OSFM's view of the requirements in the State Waivers, but did not dispute the underlying facts concerning remediation. And rather than come into compliance, Sable asked the federal government to help it avoid oversight.

**II.   SABLE ITSELF SOUGHT AND OBTAINED THE FEDERAL GOVERNMENT'S BLESSINGS AS PRETEXTS TO DISOBEY STATE LAW AND THIS COURT'S INJUNCTION**

Sable made two requests to the federal government. First, on November 26, 2025, Sable asked PHMSA to assert federal jurisdiction over the Las Flores Pipelines. (Granted RJN, Exh.

---

[1] For more extensive background, see Respondents' brief dated February 13, 2026.

Respondents' Brief on Motions re: Enforcement or Modification of Preliminary Injunction (25CV02244)

M.[2]) And on December 12, 2025, Sable sent a letter to the United States requesting that it issue an order under the Defense Production Act. (See Preemptive Effect of Defense Production Act Order on State Law, 50 Op. O.L.C. __at 3 (Mar. 3, 2026) [OLC Opinion], attached to March 16 Dintzer Decl. as Exhibit B.) PHMSA acted first, issuing orders on December 17, 22, and 23. (Granted RJN, Exhs. A-1, A-2, A-3.) In light of those orders, Sable moved to dissolve the injunction in this case. On February 26, 2026, this Court issued a tentative ruling that would deny Sable's motion, relying, in part, on the Consent Decree's provisions requiring OSFM, not PHMSA, to approve restart. Later that same day, Sable notified OSFM of its decision to abandon the State Waivers. Despite Sable's last-minute maneuvering, on Friday, February 27, 2026, this Court adopted its tentative ruling, declining to reconsider its injunction based on the PHMSA Orders.

On the following Tuesday, March 3, 2026, the United States Department of Justice Office of Legal Counsel (OLC) issued a memorandum opinion specific to assisting Sable in restarting its shuttered pipeline. OLC concluded that the President could issue an order under the DPA directing Sable to restart the Las Flores Pipelines free from all constraints, including state environmental and property laws, injunctions imposed over Sable's objections, or even the stipulated federal Consent Decree.

On March 13, 2026, the President issued an Executive Order delegating certain of his authorities under the DPA to the Secretary of Energy. Purportedly pursuant to that delegation, the same day the Secretary of Energy issued a "Pipeline Capacity Prioritization and Allocation Order" (DPA Order) which provides, among other things, that "Sable is directed to immediately commence performance under contracts or orders for service … for hydrocarbon transportation capacity . . . ." (Dintzer Decl., filed March 16, 2026, Exh. A.) On March 16, 2026, Sable issued a press release stating that it had commenced transporting oil through the Las Flores Pipelines as of Saturday, March 14, 2026. (Dintzer Decl., Exh. G.) That same day, Petitioners moved to enforce the injunction in this case, and Sable moved to dissolve that injunction. This Court set a briefing schedule for opposition and reply briefs.

_____

[2] This brief cites to documents attached to Respondents' Request for Judicial Notice filed on February 13, 2026. This Court granted that Request in full. To avoid duplicative filings, this brief refers to documents attached to the prior Request as exhibits to the "Granted RJN."

Respondents' Brief on Motions re: Enforcement or Modification of Preliminary Injunction (25CV02244)

Also on March 16, 2026, California agencies moved to enforce the Consent Decree in the federal District Court. (See *United States, et al. v. Plains All American Pipeline, et al*, C.D. Cal. Case No. 2:20-cv-2415, ECF 43.) The District Court denied emergency relief, but invited a noticed motion. (*Id.* at ECF 47.) The California agencies, the United States, Sable, and Plains agreed to a briefing schedule in the District Court, with hearing set on June 1, 2026. (*Id.* at ECF 48.) The United States filed the first brief in this sequence on March 30, 2026. (*Id.* at ECF 49.)

## LEGAL STANDARDS

The party seeking to enforce a court order bears the burden to show "(1) the rendition of a valid order, (2) actual knowledge of the order, (3) ability to comply, and (4) willful disobedience." (*Conn v. Superior Court* (1987) 196 Cal.App.3d 774, 784, citing Weil & Brown, *Cal. Practice Guide: Civil Procedure Before Trial* (Rutter Group 1987), ¶¶ 9:337–9:340.)

A party seeking to modify a preliminary injunction must prove a "material change in the facts . . , that the law . . . has changed, or that the ends of justice would be served." (Code Civ. Proc., § 533; see *Loeffler v. Medina* (2009) 174 Cal.App.4th 1495, 1504.)

## INTEREST OF RESPONDENTS

Respondents have an interest in opposing preemption that would displace California law. (*Missouri v. Holland* (1920) 252 U.S. 416, 431.) Established California law protects a party's right to oppose relief that is adverse to that party's interests, even against co-defendants. (See *Bean v. City of Thousand Oaks* (2025) 114 Cal.App.5th 775, 780.)

## ARGUMENT

### I.    SABLE VIOLATED THE PRELIMINARY INJUNCTION AND HAS NO VALID DEFENSE

The elements of contempt are (1) the court's issuance of a valid order, (2) the contemnor's knowledge of the order, (3) the contemnor's ability to comply, and (4) the contemnor's willful disobedience. (*Conn v. Superior Court* (1987) 196 Cal.App.3d 774, 784.) This Court issued a valid preliminary injunction order. Sable's counsel appeared at the hearing, where Sable did not contest the tentative ruling and did not appeal. Sable thus had knowledge. Sable was only required to refrain from action, not act affirmatively, so the Court may conclude, based on Sable's admissions, that Sable was able to comply but willfully disobeyed.

11

Sable is wrong in arguing that the DPA Order required it to violate the injunction. Even if this Court assumes that the DPA Order is valid, Sable was obligated to first seek relief from the Court's injunction before acting, not violate the injunction first and seek relief later. Under the United States Constitution, the Executive Branch lacks the power to authorize disobedience with court orders. Rather, "the separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties." (*Loving v. U.S.* (1996) 517 U.S. 748, 757.)

Changed circumstances may form the basis for a party to ask a court to modify an injunction, but changed circumstances are not a defense to violation of an injunction prior to modification by a court.[3] *McFarland v. Superior Court of Merced County* (1924) 194 Cal. 407, 423-424 [Evidence "that conditions have changed . . . would clearly be immaterial and irrelevant to the issue of contempt before the court."].) That the changed circumstances come in the form of an order does not create a defense to contempt—the court order takes precedence. (*City of Palo Alto v. Service Employees Internat. Union* (1999) 77 Cal.App.4th 327, 338 [holding that court order took precedence over arbitration order requiring reinstatement of an employee].) That the order here is from a federal agency is no help to Sable—federal law employs an even more restrictive "collateral bar rule." (*Walker v. City of Birmingham* (1967) 388 U.S. 307.) If federal rules applied, Sable would face the unbending rule that it "could not by-pass orderly judicial review of the injunction before disobeying it." (*Id.* at p. 320.)

This is consistent with how the United States ordinarily addresses changed circumstances when it is enjoined. In *California by and through Becerra v. U.S. Environmental Protection Agency* (9th Cir. 2020) 978 F.3d 708, 712, a federal District Court had imposed an injunction that required the United States Environmental Protection Agency (EPA) to comply with certain environmental requirements by a fixed date, relying on EPA regulations as the basis for the fixed date. EPA then, through a rulemaking, changed the underling regulations, rendering the fixed date inconsistent with law. EPA did not disobey the injunction; it complied with the injunction while making its (ultimately successful) motion for relief from the injunction.

---

[3] If the order was not "lawfully issued," i.e., void, as opposed to simply erroneous, that may form a defense. (*People v. Gonzalez* (1996) 12 Cal.4th 804, 816.) Sable has not contended that the preliminary injunction in this case was not "lawfully issued."

Sable points to no statement from any agency of the United States indicating that the federal government expected, much less had the power to order, Sable to act *before* lifting injunctions. The view that Sable was obligated to restart before addressing injunctions is not stated in the DPA Order. And even the DPA Order had stated that Sable had to transport oil immediately, Sable's inability to act under the DPA Order due to injunctions would have prevented the Department of Energy from penalizing Sable. (See 10 C.F.R. § 217.55(c).) Because Sable could have complied with the injunction while promptly moving to lift it, this Court should issue an order to show cause why Sable should not be found in contempt.

## II.    SABLE'S VIOLATION PRIOR TO MOVING TO AMEND THE INJUNCTION SHOULD RESULT IN DISENTITLEMENT

In California courts, a party cannot "ask the aid and assistance of a court in hearing his demands while he stands in an attitude of contempt to legal orders and processes of the courts of this state." (*MacPherson v. MacPherson* (1939) 13 Cal.2d 271, 277; *Alioto Fish Co. v. Alioto* (1994) 27 Cal.App.4th 1669, 1683, quoting 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 172, p. 184.) Federal courts follow a similar rule: "compliance is an important and often dispositive factor in deciding whether to lift an injunction." (*Orantes-Hernandez v. Holder* (C.D. Cal. 2010) 713 F.Supp.2d 929, 954, citing *Board of Educ. of Oklahoma City Public Schools, Independent School Dist. No. 89, Oklahoma County, Okl. v. Dowell* (1991) 498 U.S. 237, 249.)

Sable seeks equitable relief: the dissolution of an injunction. Before considering equitable relief for Sable, this Court should require Sable to come into compliance with the Court's prior order and commit to abiding by the Court's ultimate ruling. One who seeks equity must do equity. (Civ. Code, § 3517 [clean hands].) Sable has been less than forthcoming about whether it was in compliance with orders of this Court. Now, Sable is transporting oil in open violation of the Court's preliminary injunction. Sable cannot seek the aid of this Court while making clear it ignores decisions of this Court that it does not like. Sable is not entitled to seek relief from this Court while in defiance of this Court.

## III.    THE DEFENSE PRODUCTION ACT ORDER IS INVALID

Sable asserts preemption based on Executive Branch action. Because Sable invokes the

DPA Order, it bears the burden to show not only that the Order exists, but also that the DPA Order is valid. Sable receives no presumption in its favor; neither federal agency interpretations of law nor federal agency determinations of preemption are afforded deference. (*Loper Bright Enterprises v. Raimondo* (2024) 603 U.S. 369, 391; *Wyeth v. Levine* (2009) 555 U.S. 555, 576.)

An agency action that is inconsistent with federal statutes and regulations—including the agency's own regulations—is unlawful. (See *Nat'l Ass'n of Home Builders v. Norton* (9th Cir. 2003) 340 F.3d 835, 841, 852 ["Having chosen to promulgate the *DPS Policy,* the FWS must follow that policy."].) The DPA authorizes two things: allocation and prioritization. (See 50 U.S.C. § 4511(a), (c).) Department of Energy regulations define both. An allocation is "an official action to control the distribution of materials, services, or facilities," not an order to produce something new. (10 C.F.R. § 217.20.) For example, the DPA may authorize the allocation of steel under contract for automakers to be delivered to the U.S. Army. Similarly, a prioritization changes which order is filled first. (10 C.F.R. § 217.31.)

This DPA Order does not prioritize or allocate, as those words are defined. Rather, the DPA Order instructs Sable to sell to any willing buyer. Sable contends authorizes it to activate its otherwise-idle pipelines. This is not authorized by the DPA.

The DPA Order also makes no attempt to comply with applicable Department of Energy regulations governing the content of the Order. Priority orders must use priority ratings (DO or DX). (10 C.F.R. § 271.31.) All orders must contain detailed descriptions of what is to be prioritized or allocated. (10 C.F.R. §§ 271.51(f), 217.54(a).) Importantly—from the perspective of a state potentially subject to emergency powers—orders under the DPA must contain start and end dates. (10 C.F.R. §§ 271.51(f), 217.54(b).) The DPA Order does not satisfy any of these conditions. Because the DPA Order is invalid, it carries no preemptive force.

IV.    THE DEFENSE PRODUCTION ACT DOES NOT DISPLACE EXISTING STATE LAW

A.    The DPA Shields Sable Only from Contract Liability

Sable relies on an unsupportable maximalist view that the DPA grants nearly unlimited power to preempt federal and state law based on a provision that only prevents the imposition of liability "for damages or penalties." No appellate court has taken Sable's position. Two federal

14

appellate courts have concluded that this provision in fact protects parties only from liability for breach of contracts, not for torts or regulatory violations. (See *U.S. v. Vertac Chemical Corp.* (8th Cir. 1995) 46 F.3d 803, 812, citing *Hercules, Inc. v. U.S.* (Fed.Cir. 1994) 24 F.3d 188, 203–204.)

In *Vertac*, the Eighth Circuit Court of Appeals explained that the immunity conferred by the liability shield[4] "provid[es] a defense for a DPA contractor against a suit by a non-government customer in the event that the DPA contractor is forced to breach another contract to fulfill the government's requirements[,]" but does not provide immunity beyond contract liability. (*Vertac*, *supra*, 46 F.3d at p. 812.) As a result, the Eighth Circuit found that the DPA provided no defense to a suit to recover environmental response costs under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA). (*Ibid.*)

Similarly, in *Hercules*, *supra*, 24 F.3d 188, 203 (affirmed on other grounds in *Hercules Inc. v. U.S.* (1996) 516 U.S. 417), the Federal Circuit rejected an indemnity claim for contributions to a fund established by the settlement of *In re Agent Orange Product Liability Litigation* (E.D.N.Y. 1984) 597 F.Supp. 740 (affirmed on other grounds at *In re Agent Orange Product Liability Litigation MDL No. 381* (2d Cir. 1987) 818 F.2d 145). The Federal Circuit endorsed the analysis from the District Court's approval of a class action settlement of claims arising under state product liability laws. (*Hercules*, *supra*, 46 F.3d at p. 203, citing *Agent Orange*, *supra*, 597 F.Supp. at p. 845 [analysis], 879 [identifying state liability statutes].) The District Court also explained that if Congress had meant to provide a tort liability shield, it would have done so explicitly, as it did in other statutes. (*Agent Orange*, *supra*, 597 F. Supp. at p. 845.)

Sable relies on a new opinion by the United States Department of Justice for the contrary position. (Dintzer Decl., Exh. B [OLC Opinion].) Every part of Sable's argument is wrong.

First, neither the OLC Opinion nor Sable's moving papers distinguish—or even acknowledge—the contrary authority in *Vertac* and *Hercules*. Where all federal appellate courts to address a question of federal law reached the same result, this Court should too. (See *Adams v. Pacific Bell Directory* (2003) 111 Cal.App.4th 93, 98.)

_____

[4] The liability shield, enacted as Section 707 of the DPA, is codified at 50 U.S.C. § 4557. At the time of *Vertac* and *Hercules*, the same provision was codified at 50 U.S.C. app. § 2157.

Second, in its briefing to the United States Supreme Court, the United States argued that the Federal Circuit reached the correct conclusion in *Hercules*, explaining that "the language and statutory context of Section 707 show that it protects contractors from claims arising out of a DPA order's displacement of work for other customers, not from tort liability to parties who claim to have been injured . . . ." (Brief for Respondent United States, *Hercules, Inc. v. U.S.*, No. 94-818 (516 U.S. 417), 1995 WL 495540, at *34.) When briefing the Supreme Court, the United States agrees with *Vertac* and *Hercules*. This should carry more weight than an OLC memo.

Third, the reason that Sable provides for deference to Opinions of the Attorney General is that the Legislature presumably knows about such Opinions and can amend statutes in response. (Sable Mot. at p. 2 fn. 1.[5]) OLC issued the Opinion on which Sable relies on March 4, 2026—just under a month ago. In comparison, in the approximately 30 years since *Hercules* and *Vertac*, Congress re-authorized the DPA nine times, but did not amend the liability shield. If Congress impliedly ratified any position, its nine re-authorizations of the DPA ratified the position of the Federal Circuit and the Eighth Circuit, not the new OLC Opinion.

Fourth, OLC's analysis is wrong. OLC explains that after-the-fact liability has a similar function as prospective regulation, and because the purposes are the same, OLC asserts that the liability shield preempts both state liability law and state regulation. (OLC Opinion at p. 13, attached to Dintzer Decl. as Exh. B ["DPA's displacement of state regulatory law follows from the same principle" as the liability shield because "[s]tate regulation often accomplishes *ex ante* what private law accomplishes *ex post*."].) That is not how statutory authorization works. The State's sovereign authority cannot be blithely tossed aside by analogy.

The recent decision by the United States Supreme Court invalidating tariffs imposed under the International Emergency Economic Powers Act (IEEPA) is instructive. There, the United

---

[5] Sable's cited authorities address Opinions of the California Attorney General, not opinions by the United States Department of Justice Office of Legal Counsel. It appears that only one California appellate decision discusses an OLC Opinion. (See *Mathews v. Becerra* (2019) 8 Cal.5th 756, 775, 786 (maj. opn. of Liu, J.), 803 (dis. opn. of Cantil-Sakauye, C.J.).) Neither the majority nor the dissent in *Mathews* treated an OLC opinion as a precedent; both cited it for relevant background. (*Ibid.*) Federal courts have cited OLC opinions, but generally do not give them the weight of court precedents. (See, e.g., *Ecological Rts. Found. v. Pac. Gas & Elec. Co.* (9th Cir. 2017) 874 F.3d 1083, 1097, fn. 5 [no deference to OLC opinion].)

Respondents' Brief on Motions re: Enforcement or Modification of Preliminary Injunction (25CV02244)

States contended that imposing tariffs fell within "regulat[ing] . . . importation" under the IEEPA because a tariff has the effect of altering the volume of imports, functionally similar to quotas and other import restrictions. (Opening Brief for the United States, *Learning Res., Inc. v. Trump*, No. 24-1287, 146 S. Ct. 628 2025 WL 2772085, at *37 [United States arguing that "there is no substantive difference between directly specifying the quantities of a foreign product to be sold and exploiting price-demand curves (via tariffs) to achieve the same end."].) The Supreme Court rejected this argument. (*Learning Res., Inc. v. Trump* (2026) 146 S. Ct. 628, 646.) The Court explained that Congress uses different terms to confer different powers, and courts do not infer that Congress conferred a power based on a *functionally equivalent but different* power.[6] (*Id.* at p. 643.) The OLC Opinion is inconsistent with the Supreme Court opinion and makes no attempt to distinguish it. Instead, the OLC Opinion endorses the view that when Congress confers a power on the Executive, the Executive can exercise other powers that have a functionally similar result. (Dintzer Decl., Exh. B, at pp. 12–13.) *Learning Resources* rejects this logic and binds this Court to do so as well. As the Supreme Court held in *Learning Resources*, Congress conferring power to regulate does not confer power to tax. And under the DPA, Congress conferring power to preempt damages liability does not confer power for the Executive Branch to unilaterally excuse compliance with state law.

**B.    Sable Has Not Proven Impossibility, Conflict, or Obstacle Preemption**

Sable also asserts garden-variety preemption, based on impossibility, conflict, and obstacle preemption.[7] In applying these categories of preemption, courts apply a presumption against preemption, and "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." (*Wyeth v. Levine* (2009) 555 U.S. 555, 565, cleaned up.) In the DPA, there are two clear statements of preemption: the liability shield and the antitrust exemption. As explained above in

---

[6] Although the Court split into three groups, this holding is in Part II.B, which six of the nine justices joined. (*Learning Resources*, *supra*, 146 S. Ct. at p. 634.)

[7] The fourth variety of preemption, field preemption, requires that Congress, not the President, occupies an entire field. (See *Freightliner Corp. v. Myrick* (1995) 514 U.S. 280, 287.) But Congress expressly did not occupy the field and instead preserved, for the states, safety regulation of intrastate pipelines. (See, e.g., 49 U.S.C. § 60105.)

17

in Section III.A, the liability shield only protects Sable against liability for breach of contracts with buyers. And neither the OSFM State Waivers nor this Court's injunction are antitrust measures. There is no clear and manifest intent of Congress to preempt state environmental law.

More, an order by the Executive Branch cannot create federal preemption when Congress preserved a state's sovereign authority. (*See Youngstown Co. v. Sawyer* (1952) 343 U.S. 579, 637 ["When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb . . . ."].) "The case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there is between them." (*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.* (1989) 489 U.S. 141, 166–167, cleaned up.) Here, Congress not only stood by and tolerated state power; it expressly preserved state jurisdiction over intrastate pipelines. (49 U.S.C. §§ 60101(a)(8)(B), (a)(10), 60104(c); see also (49 U.S.C. § 60105(a) [prohibiting imposition of federal standards on pipelines subject to state jurisdiction].) Where Congress preserves state authority, the Executive Branch must take state law as it finds it. The Secretary of Energy cannot override this clear and specific reservation of state authority with a vaguely-worded order under a different statute.

Lastly, it was possible for Sable to comply with the State Waivers and this Court's injunction and still put the Las Flores Pipelines into service. For preemption, it must be impossible to comply with federal law and the conditions of a state permit; the requirement to obtain a state permit does not suffice to create impossibility. (See *California Coastal Com'n v. Granite Rock Co.* (1987) 480 U.S. 572, 593.) Neither OSFM nor this Court imposed a rule that Sable could never restart; they imposed conditions that Sable could have completed. OSFM required Sable to remediate more pipeline anomalies sooner than Sable wanted to. And this Court required Sable to obtain and provide notice of approvals before restart. Sable could have complied but chose not to.

A review of the timeline is instructive. Sable first contacted the Department of Energy to seek invocation of the DPA no later than December 12, 2025. (See OLC Opinion at p. 3, describing letter from Sable's counsel to Department of Energy, attached to March 16 Dintzer

Decl. as Exhibit B.) Sable then held its State Waivers for another two months (although it took no steps to complete the terms of the Waivers). Then, after receiving an adverse tentative ruling on its first motion to dissolve the preliminary injunction, Sable sent its letter abandoning the State Waivers. At that time, Sable knew it was seeking the DPA Order. It was not impossible for Sable to comply with the State Waivers and certainly not impossible to comply with this Court's order. It was Sable's choice. That is not impossibility and is not a basis for preemption.

**V.    SABLE HAS NO MATERIAL CLAIM TO THE BALANCE OF EQUITIES BECAUSE SABLE SEEKS TO PERFORM UNLAWFUL ACTIVITIES**

A party suffers no injury by being enjoined from carrying out an unlawful act. (See *Disney Enters., Inc. v. VidAngel, Inc.* (9th Cir. 2017) 869 F.3d 848, 867 [acknowledging "long-settled principle that harm caused by illegal conduct does not merit significant equitable protection."]; see Civ. Code, § 3517 [unclean hands].) Because Sable is seeking the Court's blessing to enable unlawful conduct, Sable has not offered a viable basis for relief from the preliminary injunction.

**A.    Sable's Transportation of Crude Oil Violates Federal Pipeline Safety Law**

The Las Flores Pipelines are buried pipelines that transport crude oil at high temperature. (Granted RJN, Exhs. A-3, I, J.) Federal law requires that these Pipelines operate with a functioning cathodic protection (*i.e.*, anti-corrosion) system. (49 CFR §§ 195.452(h)(4)(iii)(H), 195.563.) As memorialized in the Consent Decree, the Las Flores Pipelines cannot comply with federal pipeline safety regulations requiring effective cathodic protection.

Because Sable cannot comply with federal regulations, it needed specific permission to operate out of compliance with regulations. (Granted RJN, Exh. D, at p. 80.) Because the Las Flores Pipelines are intrastate pipelines,[8] federal law designates OSFM as the agency with the power to grant such waivers. (49 U.S.C. § 60105(a) ["the Secretary of Transportation may not prescribe or enforce safety standards and practices for an intrastate pipeline facility or intrastate

_____

[8] Sable asserts the Las Flores Pipelines are *inter*state pipelines, but offers no support beyond PHMSA's statements. Sable introduced this argument in its previous Motion for Reconsideration, which the Court denied. Sable has not meaningfully re-argued this point, and the Court should not revisit an issue not directly raised in this Motion. To the extent it does, the Court should consider the arguments in Parts II.B (Claim Preclusion) and II.D (Statutory Interpretation) in Respondents' Opposition to Sable's first motion for reconsideration, filed on February 13, 2026.

pipeline transportation to the extent that the safety standards and practices are regulated by a State authority . . . ."].) Sable never complied with the State Waivers, and abandoned them on February 26, 2026. But even if exclusive federal jurisdiction over the Pipelines were established, Sable would need a permit from PHMSA, and Sable's Emergency Special Permit from PHMSA expired on February 21, 2026.[9] Sable's operation of the Las Flores Pipelines violates the Consent Decree *and* federal regulations. This Court should not grant relief to enable Sable to violate federal law.

On this point, preemption does not help Sable. Even if Sable were correct and California was preempted from imposing standards, Sable needs California to grant permission to restart the Las Flores Pipelines when, absent that permission, federal law prohibits operation of the Las Flores Pipelines. Preemption does not excuse the federal-law need for a state waiver because the DPA does not displace federal law. (See *United States v. Vertac Chem. Corp.* (8th Cir. 1995) 46 F.3d 803, 812 [DPA did not displace CERCLA].) And federal law cannot compel a state to affirmatively act. (See *Printz v. U.S.* (1997) 521 U.S. 898, 925.)

**B.      Sable's Transportation of Crude Oil Violates California Law**

The California Elder Pipeline Safety Act, Gov. Code § 51010, et seq., incorporates the same rules as the federal Pipeline Safety Act with regard to cathodic protection (i.e., anti-corrosion systems). Violation of federal law in this area is also violation of state law. This Court should not grant Sable relief to enable violations of state pipeline safety law.

Sable's transportation of crude oil also violates California's laws that prohibit trespass on government property. Sable is transporting oil through Gaviota State Park, owned by the California Department of Parks and Recreation. As the landowner, State Parks has the right to prohibit subsurface transportation of oil across state land without an easement. (See Civ. Code, §§ 659, 829; see also *Civic W. Corp. v. Zila Indus., Inc.* (1977) 66 Cal.App.3d 1, 16.) To enable the prior operation of CA-325, Plains obtained a 30-year easement to transport oil through Gaviota State Park. (Bellman Decl., Exh. C, filed in this case on March 13, 2026.) That easement expired in 2016. (*Id.*) Neither the United States nor Sable can compel State Parks to permit Sable's trespass. (See *Printz v. U.S.* (1997) 521 U.S. 898, 925; see also *Cedar Point Nursery v. Hassid*

---

[9] That permit was also invalid, but because it expired, the Court need not reach this issue.

(2021) 594 U.S. 139, 140; *United States v. Carmack* (1946) 329 U.S. 230, 243-246.)

## VI.   THIS CASE IS NOT MOOT

Sable incorrectly asserts this case is moot. Under California law, a CEQA or related writ challenge does not become moot unless there is evidence that the planned course of action has been abandoned. (*Citizens for Open Gov. v. City of Lodi* (2006) 144 Cal.App.4th 865, 873 [rescinded approval did not moot case where there was no evidence that respondents intended to abandon project]; see also Pub. Resources Code, § 21167(a).) Sable has not indicated that it abandoned the Las Flores Pipelines. Instead, Sable alleges federal preemption.[10]

An assertion of preemption does not create mootness. The events in the trial and appellate court in *Friends of the Eel River v. North Coast Railroad Authority* (2017) 3 Cal.5th 677, 701, are instructive. There, the respondent rescinded its project approval and certification, asserting preemption of CEQA. The respondent (local agency) and real party (private railroad) then sought dismissal based on mootness. The trial court denied their mootness motion but entered judgment in their favor based on preemption. The Court of Appeal affirmed, finding that the case was not moot but preemption applied. (*Ibid*.) The California Supreme Court then reversed on the merits, instructing the respondent that CEQA was not preempted. This case is similar. This Court is within its power to maintain the injunction, as it would be if it held that additional environmental review was required, and the Court found it appropriate to impose an injunction while the agency performs the additional review prior to the return of writ. (See Pub. Resources Code, § 21168.9.)

### CONCLUSION

When Sable first moved for reconsideration of this Court's preliminary injunction, it complied with the injunction while seeking relief. The matter was fully briefed, and this Court denied relief. For its second attempt, Sable violated the injunction first, hopeful that defiance would improve its odds of success. But California and federal law clearly reject Sable's approach. This Court should reject Sable's motion out of hand while Sable stands in open defiance of the Court's injunction and set an Order to Show Cause re Contempt, as requested by Petitioners.

_____

[10] Notably, Sable has asserted preemption since filing its answer. It is not a new development.

Dated:  April 1, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
MYUNG PARK
Supervising Deputy Attorney General

MICHAEL S. DORSI
Deputy Attorney General
*Attorneys for Respondents and Defendants
Dept. of Forestry and Fire Protection, et al.*

LA2025400847
92105479

22

## DECLARATION OF SERVICE BY E-MAIL

| | |
|---|---|
| **Case Name:** | Center for Biological Diversity v. CalFire/OSFM |
| **Case Number:** | 25CV02244 |
| **Party Represented:** | Department of Forestry and Fire Protection, by and through the Office of the State Fire Marshal, an agency of the State of California; Daniel Berlant, in his official capacity as State Fire Marshal |

**Declaration of Electronic Service**

1. I am at least 18 years of age and not a party to this matter.

2. I am employed in the Office of the Attorney General of the State of California. My business address is 300 S. Spring St., Suite 1702 Los Angeles, CA 90013

3. My electronic service address is Joelma.Sissov@doj.ca.gov .

4. On April 1, 2026, I electronically served the following document[s]:

   a. **RESPONDENTS CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, ET AL.'S BRIEF ON MOTIONS RE: ENFORCEMENT OR MODIFICATION OF PRELIMINARY INJUNCTION**

5. I electronically served the aforementioned document[s] by emailing them to the following individual[s]:

| | |
|---|---|
| Linda Krop<br>Jeremy M. Frankel<br>Tara C. Rengifo<br>ENVIRONMENTAL DEFENSE CENTER<br>lkrop@environmentaldefensecenter.org<br>jfrankel@environmentaldefensecenter.org<br>trengifo@environmentaldefensecenter.org<br>*Attorneys for Petitioners*<br>*Environmental Defense Center* | Julie Teel Simmonds<br>David Pettit<br>Talia Nimmer<br>CENTER FOR BIOLOGICAL DIVERSITY<br>**Email Addresses:**<br>jteelsimmonds@biologicaldiversity.org<br>dpettit@biologicaldiversity.org<br>tnimmer@biologicaldiversity.org<br>*Attorneys for Petitioners Center for Biological Diversity* |

## DECLARATION OF SERVICE BY E-MAIL

**Case Name:**         Center for Biological Diversity v. CalFire/OSFM
**Case Number:**       25CV02244
**Party Represented:** Department of Forestry and Fire Protection, by and through the Office of the State Fire Marshal, an agency of the State of California; Daniel Berlant, in his official capacity as State Fire Marshal

| | |
|---|---|
| Duncan Joseph Moore<br>Benjamin J. Hanelin<br>Natalie C. Rogers<br>PAUL HASTINGS, LLP<br>**Email Addresses:**<br>djmoore@paulhastings.com<br>benjaminhanelin@paulhastings.com<br>natalierogers@paulhastings.com<br>***Attorneys for Real Parties in Interest***<br>***Sable Offshore Corp Pacific Pipeline Company*** | Brooke Bolender<br>Jeffrey Dintzer<br>ALSTON & BIRD, LLP<br>**Email Addresses:**<br>Brooke.Bolender@alston.com<br>jeffrey.dintzer@alston.com<br>***Attorneys for Real Parties in Interest***<br>***Sable Offshore Corp Pacific Pipeline Company*** |
| Trevor D. Large<br>FAUVER, LARGE, ARCHIBALD & SPRAY, LLP<br>**Email Address:** TLarge@FLASllp.com<br>***Attorney for Real Parties in Interest***<br>***Sable Offshore Corp Pacific Pipeline Company*** | |

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct, and that this declaration was executed on April 1, 2026.

<table>
<tr><td align="center">J. Sissov</td><td align="center">*/s/ J. Sissov*</td></tr>
<tr><td align="center">Declarant</td><td align="center">Signature</td></tr>
</table>

LA2025400847
92105480.docx



ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Angela Braun, Executive Officer
4/1/2026 11:31 PM
By: Narzralli Baksh , Deputy

Jeffrey D. Dintzer (SBN: 139056)
Garrett B. Stanton (SBN: 324775)
**ALSTON & BIRD, LLP**
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071
Tel: (213) 576-1000; Fax: (213) 576-1100
Jeffrey.Dintzer@alston.com
Garrett.Stanton@alston.com

Duncan Joseph Moore (SBN: 233955)
Benjamin J. Hanelin (SBN: 237595)
Natalie C. Rogers (SBN: 301254)
**PAUL HASTINGS LLP**
1999 Avenue of Stars, 27th Floor
Century City, CA 90067
Tel: (310) 620-5879; Fax: (310) 620-5899
djmoore@paulhastings.com
benjaminhanelin@paulhastings.com
natalierogers@paulhastings.com

Trevor D. Large (SBN: 214886)
Victoria C. Diffenderfer (SBN: 350018)
**FAUVER LARGE ARCHBALD & SPRAY**
820 State Street, 4th Floor
Santa Barbara, CA 93101
Tel: (805) 966-7000; Fax: (805) 966-7227
tlarge@flasllp.com
vdiffenderfer@flasllp.com

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SANTA BARBARA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION, <br><br> Petitioners/Plaintiffs, <br><br> v. <br><br> CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10; inclusive, <br><br> Respondents/Defendants. | Case No.: 25CV02244 <br> [Consolidated with 25CV02247] <br><br> **REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S SUPPLEMENTAL BRIEF IN SUPPORT OF *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER** <br><br> [*Filed concurrently with Request for Judicial Notice and Declarations of Michael A. Mische, Garrett B. Stanton, and Steve Rusch*] <br><br> Date:   April 17, 2026 <br> Time:   10:00 a.m. <br> Dept.:   4 |

REAL PARTIES IN INTERESTS SUPPLEMENTAL BRIEF IN SUPPORT OF
*EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

|  | Complaint Filed: April 15, 2025 |
|---|---|
|  | [Assigned for Purposes to the Honorable Donna D. Geck, Dept. 4] |
| SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive, |  |
| Real Parties in Interest |  |
| ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation, | Case No.: 25CV02247 |
| Petitioners/Plaintiffs, |  |
| v. |  |
| CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, an agency of the State of California; OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10; inclusive, |  |
| Respondents/Defendants. |  |
| SABLE OFFSHORE CORP., a Delaware Corporation, and PACIFIC PIPELINE COMPANY, a Delaware Corporation. |  |
| Real Parties in Interest. |  |

REAL PARTIES IN INTERESTS SUPPLEMENTAL BRIEF IN SUPPORT OF
*EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

## **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   ARGUMENT ...................................................................................................... 1

    A.    This Court Should Not Decide the Extra-Jurisdictional Issues Raised in Petitioners' and OSFM's Oppositions to Sable's Ex Parte Notice. ......................... 2

    B.    Petitioners Cannot Demonstrate a Likelihood of Success on the Merits. ............... 4

    C.    The Balance of Harms Weighs in Favor of Sable. ................................................. 6

        1.    Petitioners and OSFM cannot demonstrate any harm from Sable's compliance with the DPA Order. ................................................................... 7

        2.    The Preliminary Injunction creates an untenable obstacle to complying with the DPA Order, substantially harming Sable and the public. ............. 11

III.  CONCLUSION .................................................................................................. 14

REAL PARTIES IN INTERESTS SUPPLEMENTAL BRIEF IN SUPPORT OF
*EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Fisher v. City of Berkeley*
(1984) 37 Cal.3d 644 ...................................................................................................6

*Florida Lime & Avocado Growers, Inc. v. Paul*
(1963) 373 U.S. 132 ................................................................................................5, 6

*Holder v. Humanitarian L. Project*
(2010) 561 U.S. 1 .......................................................................................................12

*In re Neagle,*
135 U.S. 1 .....................................................................................................................6

*McGrath v. Potash*
(D.C. Cir. 1952) 199 F.2d 166 .....................................................................................2

*Olympic Pipe Line Co. v. City of Seattle*
(9th Cir. 2006) 437 F.3d 872 .......................................................................................7

*Pennsylvania v. Wheeling & Belmont Bridge Co.*
(1856) 59 U.S. 421 .......................................................................................................1

*People ex rel. Bonta v. GreenPower Motor Co., Inc.*
(2025) 113 Cal.App.5th 43 ...........................................................................................4

*People ex rel. Sneddon v. Torch Energy Services, Inc.*
(2002) 102 Cal.App.4th 181 .........................................................................................7

*Tully v. Mobil Oil Corp.*
(1982) 455 U.S. 245 .....................................................................................................2

STATUTES

49 U.S.C. §§ 60101 *et seq.*..............................................................................................7

49 U.S.C. § 60102...........................................................................................................7

49 U.S.C. § 60104(c) ......................................................................................................7

49 U.S.C. § 60112...........................................................................................................7

49 U.S.C. § 60118(c) ......................................................................................................9

50 U.S.C. § 4511(c) ...................................................................................................5, 12

i

50 U.S.C. § 4513 ..............................................................................................................12

**OTHER AUTHORITIES**

49 C.F.R. Parts 190-199 ......................................................................................................7

49 C.F.R. § 195.304 .......................................................................................................7, 10

49 C.F.R. § 195.452(h)(1)) .................................................................................................7

49 C.F.R. § 195.452(h)(4)(i) ..........................................................................................7, 10

49 C.F.R. § 195.452(j)(3) ...............................................................................................7, 10

Executive Order 14156 ..............................................................................................1, 9, 12

*Legal Authorities Available to the President to Respond to a Severe Energy Supply Interruption or Other Substantial Reduction in Available Petroleum Products,* (1982) 6 Op. O.L.C. 644 .........................................................................................................5

U.S. Constitution Art. VI, cl. 2 ...........................................................................................6

REAL PARTIES IN INTERESTS SUPPLEMENTAL BRIEF IN SUPPORT OF
*EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

## I.  **<u>INTRODUCTION</u>**

The question before this Court is whether the Preliminary Injunction can remain in the face of a DPA Order addressing a national emergency that threatens our national security. (See Declaration of Garrett B. Stanton ("Stanton Decl."), Ex. H [Executive Order 14156]; Dintzer Decl., Ex. A [DPA Order].)[1] The answer to that question is straightforward: because the Preliminary Injunction is an obstacle to that federal executive mandate, it must yield.

The DPA Order confronts California's collapsing in-state crude oil production, extreme reliance on foreign crude oil, and potential for gasoline, diesel, and jet fuel shortages that will be catastrophic to California's economy, as well as the national security of the United States. Military bases in California, Arizona, and Nevada rely on California refineries to provide the fuels necessary to ensure force readiness and national security. The DPA Order requires Sable to "immediately" commence the flow of hydrocarbons through the interstate Santa Ynez Pipeline System. Sable has complied with this executive directive with PHMSA's supervision. Moreover, Sable has relinquished its rights under the State Waivers issued by OSFM. ***The Petitions challenge only the sufficiency of the State Waivers and OSFM's process for issuing the State Waivers under CEQA and state and federal pipeline safety laws.*** Petitioners do not attack any other law or order related to the Santa Ynez Pipeline System, including the federal Consent Decree. Petitioners can no longer demonstrate a likelihood of success on the merits of their claims challenging OSFM's issuance of the State Waivers, which are now moot, and the balance of harms weighs strongly in favor of Sable and the national security of the United States. The Preliminary Injunction should therefore immediately dissolve.

## II.  **<u>ARGUMENT</u>**

The Court must not preserve its Preliminary Injunction when it "[can]not [] be carried into execution" (*Pennsylvania v. Wheeling & Belmont Bridge Co.* (1856) 59 U.S. 421, 436-37) or when

---

[1] All defined terms have the same meaning as set forth in Real Parties in Interest's March 16, 2026 *Ex Parte* Notice of Defense Production Act Order and Request for Immediate Recission of the Preliminary Injunction unless otherwise defined herein.

REAL PARTIES IN INTERESTS SUPPLEMENTAL BRIEF IN SUPPORT OF
*EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

the legal predicate for an injunction has disappeared. (See *Tully v. Mobil Oil Corp.* (1982) 455 U.S. 245, 247; see also *McGrath v. Potash* (D.C. Cir. 1952) 199 F.2d 166, 168 [explaining that where the legal basis of an injunction has disappeared, "the injunction should be vacated"].)

Here, the Preliminary Injunction cannot be enforced because it has been displaced by the DPA Order, a federal directive. "In providing for the common defense, Congress and the President have 'time and again, as exigencies arose,' taken actions that have displaced ordinary state laws, such as those pertaining to property or torts." (Dintzer Decl. B [OLC Memo], p. 10, citing *Bank Markazi v. Peterson* (2016) 578 U.S. 212, 235.) Moreover, the legal predicates for the Preliminary Injunction have disappeared because it is premised on a jurisdictional scheme that no longer exists and State Waivers that no longer have any effect. To the extent Petitioners challenge compliance with the federal Consent Decree, that is beyond the scope of their Petitions and the Court's purview here. Indeed, compliance with the Consent Decree is being litigated separately in federal court.

Additionally, Sable has already successfully restarted Segments CA-324 and CA-325 and transported hydrocarbons under PHMSA's direct supervision "without any signs of release or other safety issues." (Stanton Decl., Ex. M [Declaration of Dustin Hubbard in support of the United States' Motion to Terminate Consent Decree ("Hubbard Decl.")], ¶ 32.) Petitioners therefore cannot show a likelihood of success on the merits of their moot claims, and the balance of harms now weighs significantly in favor of Sable, the public, and most importantly, our nation's military readiness.

**A.     This Court Should Not Decide the Extra-Jurisdictional Issues Raised in Petitioners' and OSFM's Oppositions to Sable's *Ex Parte* Notice.**

Petitioners and OSFM advance a number of arguments for why the Preliminary Injunction should remain in place, including that OSFM, not PHMSA, retains jurisdiction to issue waivers for the Santa Ynez Pipeline System (OSFM Opp. at p. 12); Sable is violating State Park's property rights (OSFM Opp. at p. 13); the DPA Order does not comply with the DPA (Petitioners' Opp. at pp. 7-8); and the Consent Decree requires Sable to receive certain approvals from OSFM.

(Petitioners' Opp. at p. 12; OSFM Opp. at pp. 5-6.) But none of these extra-jurisdictional questions are at issue in this litigation. Petitioners' lawsuits narrowly challenge the validity of OSFM's State Waivers, which Sable has relinquished, OSFM has recognized are no longer in effect, and upon which Sable can no longer rely. (Dintzer Decl. ¶ 6, Ex. C [February 26, 2026 letter from Sable to OSFM relinquishing State Waivers]; Stanton Decl., ¶ 4, Ex. K [March 16, 2026 letter from OSFM to Sable's counsel acknowledging Sable's recission of State Waivers].)

Moreover, these extra-jurisdictional issues currently are being litigated in federal courts:

- The Ninth Circuit is considering Petitioners' and the State's challenges to PHMSA's jurisdiction over the Santa Ynez Pipeline System. (See OSFM Opp. at p. 12 ["the question of interstate vs intrastate status is presently before the Ninth Circuit in the consolidated petitions for review challenging PHMSA's December 2025 orders."].)

- The Central District of California is considering the property dispute between Sable and State Parks. (*California Department of Parks and Recreation v. Sable Offshore Corp. et al.*, Case No. 2:26-cv-2946 (C.D. Cal. 2026).)

- The State sued the Secretary of Energy in the Central District of California challenging the legality of the DPA Order. (See *State of California v. Wright*, Case No. 2:26-cv-3396 (C.D. Cal. 2026).) Recognizing that federal court is the appropriate venue, the State sought *ex parte* relief to compel Sable, which is not a party to the Consent Decree, to comply with the Consent Decree notwithstanding the DPA Order in the Central District. (Stanton Decl., ¶ 3, Ex. I [State's *Ex Parte* Motion to Enforce Consent Decree]; see also *id.*, ¶ 6, Ex. N [Declaration of Rod M. Seeley In Support of United States' Motion to Terminate Consent Decree ("Seeley Decl.")], Ex.1, ¶ 1 [agreeing only "to be bound by those provisions of the Consent Decree and Appendices B and D thereof that are specifically applicable to the Assets"].) ***The State's ex parte request was swiftly denied by the Central District.*** (*Id.*, ¶ 4, Ex. J [3/23/2026 Minute Order, Case No. 2:20-cv-02415-SVW-SSC, ECF No. 47] [finding "no evidence to support a showing of irreparable prejudice."].)

REAL PARTIES IN INTERESTS SUPPLEMENTAL BRIEF IN SUPPORT OF
*EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

- The Central District of California is considering the requirements of the Consent Decree, which the United States has moved to terminate altogether. (See *United States of America et al. v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*; see also Stanton Decl., ¶ 6, Exs. L, M, and N.)

In short, this Court need not decide these extra-jurisdictional issues, all of which are being litigated actively in federal district and appellate courts. Under the doctrine of exclusive concurrent jurisdiction, "when two or more courts have subject matter jurisdiction over a dispute, the court that first asserts jurisdiction assumes it to the exclusion of the others. The rule is based upon the public policies of avoiding conflicts that might arise between courts if they were free to make contradictory decisions or awards relating to the same controversy and preventing vexatious litigation and multiplicity of suits." (*People ex rel. Bonta v. GreenPower Motor Co., Inc.* (2025) 113 Cal.App.5th 43, 49, citations omitted.) Petitioners and OSFM instead invite the Court to decide these issues as sideshows. This Court need not—and indeed must not—accept the invitation. The Petitions challenge only the adequacy of the State Waivers and OSFM's compliance with CEQA and state and federal pipeline safety laws in approving those State Waivers. Petitioners' new extra-jurisdictional claims exceed the narrow scope of this litigation. Thus, all that is before this Court, and all that remains for this Court to decide, is whether the Preliminary Injunction can remain in place given the absence of any dispute as to the legitimacy of the relinquished State Waivers ***and a conflicting and preempting DPA Order.*** It cannot.

**B.   Petitioners Cannot Demonstrate a Likelihood of Success on the Merits.**

Petitioners and Respondent cannot demonstrate a likelihood of success on the merits of their claims because they are premised on inoperative State Waivers. The Petitions seek to enjoin restart of Lines CA-324 and CA-325 "under the State Waivers" and until OSFM and Sable complied with "federal and state pipeline safety laws." (EDC's Compl., at Prayer for Relief, at 2 ["That the Court issue temporary, preliminary, and permanent injunctive relief preventing restart of [Lines CA-324 and CA-325] *under the State Waivers*"], italics added; CBD's Compl., at Prayer

---

4

for Relief, at 2 ["For entry of temporary, preliminary, and permanent relief prohibiting Cal Fire and the Real Parties in Interest from conducting any further activity in furtherance of the Project *until Cal Fire complies with the requirements of CEQA and federal and state pipeline safety laws*."], italics added.) However, Sable has relinquished its rights under the State Waivers that are challenged by Petitioners. (See Dintzer Decl., ¶ 6, Ex. E; Stanton Decl., ¶ 5, Ex. K.) **Thus, there is no longer any effective relief the Court can grant in this case**.

Moreover, the Preliminary Injunction is preempted because it is in direct conflict with the mandates of the DPA Order. The Preliminary Injunction enjoins Sable from restarting Lines CA-324 and CA-325 until it provides 10 days' notice it has received "all necessary approvals and permits" from OSFM (See July 29, 2025 Preliminary Injunction at p. 18), while the DPA Order requires Sable to "*immediately* prioritize and allocate pipeline transportation services for hydrocarbons from the SYU [Santa Ynez Unit] through the SYPS [Santa Ynez Pipeline System], including transportation service activities at the *onshore facilities in Las Flores Canyon, California*, to the Pentland Station terminal in Pentland, California." (See Dintzer Decl. Ex. A at p. 3, italics added.) Sable could not meet both the Preliminary Injunction's requirements for restart and the DPA Order's requirements to "immediately" restart and operate the Santa Ynez Pipeline System. Under the DPA, Sable is exempt from compliance with the Preliminary Injunction threatening the ability to "maximize domestic energy supplies." (*Id.*, § 4511(c)(1).) The President's preemptive powers exist "even in the absence of a national-defense finding." (Dintzer Decl., Ex. B [OLC Memo], p. 19, citing *Legal Authorities Available to the President to Respond to a Severe Energy Supply Interruption or Other Substantial Reduction in Available Petroleum Products*, 6 Op. O.L.C. 644, 668 (1982).) Petitioners and OSFM now request that this Court disregard the DPA Order's terms requiring *immediate* action, which this Court cannot do.

As a result, "compliance with both federal law [the DPA Order] and state regulations [the Preliminary Injunction] is a physical impossibility." (*Florida Lime & Avocado Growers, Inc. v. Paul* (1963) 373 U.S. 132, 142.) Under the Supremacy Clause of the United States Constitution,

federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby," notwithstanding conflicting state laws. (U.S. Cons. Art. VI, cl. 2; *In re Neagle*, 135 U.S. 1, 62 ["While [the federal government] is limited in the number of its powers, so far as its sovereignty extends[,] it is supreme."]; see also *Fisher v. City of Berkeley* (1984) 37 Cal.3d 644, 655 [noting that California courts are "duty-bound" to follow federal law].) Therefore, the Preliminary Injunction must now immediately dissolve and yield to the superior DPA Order as a matter of law; this Court is without discretion to rule otherwise. *(Florida Lime & Avocado Growers, Inc.*, *supra*, 373 U.S. at p. 142.)

Because Petitioners' claims rest on State Waivers that are no longer in effect, and as any state effort to prevent the flow of hydrocarbons through the Santa Ynez Pipeline System is preempted by the DPA Order, Petitioners cannot show a likelihood of success on the merits.

**C.  The Balance of Harms Weighs in Favor of Sable.**

Petitioners' claims of irreparable harm were previously premised on the incorrect notion that "[t]he health and safety of Californians along the pipeline route and the area's sensitive resources are threatened by ***Cal Fire's decision to waive pipeline safety requirements*** and allow Sable to start transporting oil." (CBD's *Ex Parte* Application for TRO, p. 14, emphasis and italics added.) However, Petitioners no longer face *any* potential harm, as alleged, from OSFM's previously issued State Waivers, given that Sable has relinquished its rights under those Waivers. (See Stanton Decl. ¶ 5, Ex. K.) Likewise, no threat of irreparable harm exists warranting preliminary injunctive relief as Sable is subject to the federal Pipeline Safety Act and PHMSA's federal safety oversight, restart of the Santa Ynez Pipeline System successfully took place under PHMSA's supervision, and the Santa Ynez Pipeline System was subject to comprehensive environmental review that encompassed ongoing repairs and maintenance work on Segments CA-324 and CA-325 both prior to and after the resumption of petroleum transportation through the Segments. In contrast, Sable and the public face immediate and irreparable harm if the Preliminary Injunction remains in place.

REAL PARTIES IN INTERESTS SUPPLEMENTAL BRIEF IN SUPPORT OF
*EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

1.    <u>Petitioners and OSFM cannot demonstrate any harm from Sable's compliance with the DPA Order.</u>

Petitioners and OSFM do not face irreparable harm from Sable's operations of the Santa Ynez Pipeline System, including Segments CA-324 and CA-325, because Sable's operations are subject to the federal Pipeline Safety Act and PHMSA's oversight. (See 49 U.S.C. §§ 60101 *et seq.*; 49 C.F.R. Parts 190-199; Stanton Decl., Exhibit M [Hubbard Decl.], ¶ 34.) The Pipeline Safety Act's singular purpose is to ensure the safe operation of hazardous liquid pipelines. (49 U.S.C. § 60102; *Olympic Pipe Line Co. v. City of Seattle* (9th Cir. 2006) 437 F.3d 872, 877.)[2] Pipeline operators are required to "take prompt action to address all anomalous conditions in [any] pipeline" (49 C.F.R. § 195.452(h)(1)) and "schedule evaluation and remediation . . . within 180 days of discovery of" specified conditions on the pipelines. (*Id.*, § 195.452(h)(4)(iii).) Operators must also conduct certain design, corrosion control, operation, maintenance, and safety activities. (See, e.g., *id.*, §§ 195.110(b), 246, 248, 252(a), 414, 436, 569, 585.) The DPA Order does not purport to relieve Sable of these federal safety mandates, and "PHMSA retains authority pursuant to federal law (49 U.S.C. § 60112), to order the immediate shutdown of the [Santa Ynez Pipeline System] if PHMSA determines the pipeline is or would be hazardous to life, property, or the environment." (Stanton Decl., Exhibit M [Hubbard Decl.], ¶ 34.)

On December 9 through December 11, 2025, the director of the Western Region for the Office of Pipeline Safety ("OPS") at PHMSA and qualified PHMSA inspectors conducted an on-site inspection of "the Las Flores Pipeline and Santa Ynez Pipeline System as part of a jurisdictional audit. The inspection included reviewing Sable's written procedures and records and conducting field observations of the Las Flores pipeline facility, pump stations at Gaviota and Sisquoc, control room in Santa Maria, and the offshore Harmony platform." (*Id.*, Ex. M, ¶¶ 1, 6.)

---

[2] The Pipeline Safety Act "clearly expresses the intent of Congress to fully occupy the field of oil and gas operations and interstate pipeline safety so that any state law that touches upon the area, even consistent state law, is preempted." (*People ex rel. Sneddon v. Torch Energy Services, Inc.* (2002) 102 Cal.App.4th 181, as modified (Oct. 4, 2002).) It is unequivocal: "[a] State authority may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation." (49 U.S.C. § 60104(c).)

7

REAL PARTIES IN INTERESTS SUPPLEMENTAL BRIEF IN SUPPORT OF
*EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

Following PHMSA's scrutiny, it determined that the "Las Flores Pipeline is an interstate pipeline" (as it was designated while operating previously) subject to PHMSA's exclusive jurisdiction pursuant to the federal Pipeline Safety Act. (Stanton Decl., Ex. P [Declaration of J. Caldwell Flores in Support of Sable's Motion for Reconsideration ("Flores Decl. ISO Mot. for Reconsideration")], ¶ 3, Ex. A.) PHMSA "also reviewed Sable plans and procedures for restarting CA-324 and CA-325" and "discussed its processes and safety procedures for restart with Sable personnel." (*Id.*, Ex. M [Hubbard Decl.], ¶ 7; see *id.*, Ex. P [Flores Decl. ISO Mot. for Reconsideration], ¶ 4, Ex. B.)

On December 22, 2025, PHMSA approved the Restart Plan for Lines CA-324 and CA-325. (Stanton Decl., Ex. M [Hubbard Decl.], ¶ 8; *id.*, Ex. P [Flores Decl. ISO Mot. for Reconsideration], ¶ 4, Ex. B.) The Restart Plan "provide[d] for the gradual restart of CA-324 and CA-325 in phases[,]" and PHMSA assured that "[i]f at any time, there is an indication that pressure is not holding, the pipeline will be shut in and the reason for the pressure drop investigated and corrected before continuing." (See *id.*, Ex. M [Hubbard Decl.], ¶¶ 9-10.) PHMSA required that the "phased restart must be initiated during daylight hours to enable patrolling and communications as required by in advance and during the restart effort in coordination with local emergency response officials." (*Id.*, Ex. M, ¶ 11.) And previously, on July 25, 2024, and again on July 17, 2025, Sable held an oil spill response preparedness drill which included approximately 35 representatives from the U.S. Environmental Protection Agency, PHMSA, U.S. Coast Guard, National Oceanic and Atmospheric Administration Office of National Marine Sanctuaries, California Department of Fish and Wildlife's Office of Spill Prevention and Response, Santa Barbara County Air Pollution Control Department, Santa Barbara County Office of Emergency Management, the Santa Barbara County Fire Department, and the Santa Barbara County Certified Unified Program Agency. (*Id.*, Ex. Q [Declaration of J. Caldwell Flores in Support of Sable's Briefing In Support of United States' Motion to Terminate Consent Decree ("Flores Decl. ISO Mot. to Terminate")], ¶ 13; Declaration of Steve Rusch ("Rusch Decl.") ¶ 7.) Sable also conducted successful hydrotests along the Pipeline Segments under OSFM's supervision, which confirmed that Segments CA-324 and CA-325 could

REAL PARTIES IN INTERESTS SUPPLEMENTAL BRIEF IN SUPPORT OF
*EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

be operated at pressures in exceedance of Segments CA-324's and CA-325's maximum operating pressures for both short periods ("spike" hydrotests) and during longer durations. (Stanton Decl., Ex. Q, ¶ 12; Rusch Decl., ¶ 8.)

On December 23, 2025, PHMSA also issued an Emergency Special Permit for Lines CA-324 and CA-325, taking the place of OSFM's State Waivers.[3] (See Stanton Decl., Ex. P [Flores Decl. ISO Mot. for Reconsideration], Ex. C, p. 2.) In issuing the Emergency Special Permit, PHMSA "confirm[ed] that the special permit conditions ensure that [Sable] has an ongoing program to locate and remediate safety threats" and that "compliance with [permit] conditions . . . would provide an equivalent level of safety as compliance with [federal regulations]." (*Id.*, Ex. P, ¶¶ 5-6, Ex. C, p. 2.) PHMSA further found that "[g]ranting this special permit is necessary to address the emergency declared by the President in Executive Order 14156"[4] because "the special permit would enable and facilitate the [Las Flores Pipeline] to meet regional energy demands, reduce refinery feedstock prices, mitigate the risks of fuel shortages on the West Coast, and reduce United States dependency on imported oil and the associated energy security risks of such imports." (*Id.*, Ex. P [Flores Decl. ISO Mot. for Reconsideration], Ex. C, p. 3.)[5] Sable continues to work with PHMSA on additional operating conditions consistent with the Consent Decree and has committed to following the conditions of the Emergency Special Permit during the interim period before a regular permit is issued. (See *id.*, Ex. Q [Flores Decl. ISO Mot. to Terminate], ¶¶ 41-50; *id.*, Ex. O [Declaration of Jeffrey D. Dintzer In Support of Sable's Motion for Reconsideration ("Dintzer Decl. ISO Mot. for Reconsideration")], Ex. 4.) Indeed, the Emergency Special Permit's

---

[3] A special permit is an order that waives or modifies compliance with a regulatory requirement if the pipeline operator requesting it demonstrates the need and PHMSA determines that granting a special permit would be consistent with pipeline safety. (49 U.S.C. § 60118(c).)

[4] Executive Order 14156, issued January 20, 2025, declares a national energy emergency and vests federal agencies, including PHMSA, with authority to facilitate the identification, leasing, siting, production, transportation, refining, and generation of domestic energy resources. (Stanton Decl., Ex. H.)

[5] As more fully briefed in Sable's Reply in Support of its Motion for Reconsideration of the Preliminary Injunction, Petitioners and OSFM continue to confuse the Emergency Special Permit as a permit requirement to operate Lines CA-324 and CA-325, but it is not.

REAL PARTIES IN INTERESTS SUPPLEMENTAL BRIEF IN SUPPORT OF
*EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

conditions exceed PHMSA's regulatory standards and include additional requirements related to pressure testing, inspections, and repairs. (Compare Stanton Decl., Ex. P [Flores Decl. ISO Mot. for Reconsideration], Ex. C with 49 C.F.R. §§ 195.304, 195.452(j)(3), 195.452(h)(4)(i); see Stanton Decl., Ex. L [United States' Motion to Terminate Consent Decree], p. 14:21-25.)

Moreover, any claim of irreparable harm is unfounded because Sable's restart of the Santa Ynez Pipeline System (including Segments CA-324 and CA-325) pursuant to the DPA Order *occurred successfully* without any causing harm and with PHMSA's coordination and oversight. (Stanton Decl., Ex. M [Hubbard Decl.], ¶¶ 14-33; *id.*, Ex. Q [Flores Decl. ISO Mot. to Terminate], ¶¶ 23-40.) Qualified PHMSA personnel were onsite to observe the resumption of petroleum transportation through Segments CA-324 and CA-325, which occurred during daylight hours in accordance with the Restart Plan. (*Id.*, Ex. M [Hubbard Decl.], ¶¶ 11, 14.) Qualified PHMSA personnel monitored the pressure of Segments CA-324 and CA-325 for any fluctuations that could indicate a problem, confirmed Sable is performing regular flyovers of Segments CA-324 and CA-325, and conducted safety checks at valve and pump stations. (*Id.*, Ex. M, ¶¶ 15, 21, 31.) Qualified PHMSA personnel remained engaged in Sable's efforts, and based on their observations, Sable has safely filled Segments CA-324 and CA-325 with oil without incident, and "Sable has complied and continues to comply with the restart plan." (*Id.*, Ex. M, ¶¶ 32, 33.) Additionally, "PHMSA will continue to receive regular updates from Sable and a qualified PHMSA inspector will perform another on-site inspection and review of records a few weeks after steady-state operations are achieved." (*Ibid.*) And should any risk to the environment arise, PHMSA has authority to shut down Segments CA-324 and CA-325. (*Id.*, Ex. M, ¶ 34; see 49 U.S.C. § 60112(a) and (e).)

Claims of irreparable harm are further belied by Sable's repair and maintenance work that Sable undertook along Segments CA-324 and CA-325 prior to the resumption of petroleum transportation through those segments, and the Santa Ynez Pipeline System's comprehensive environmental review. Sable performed significant repairs to the Santa Ynez Pipeline System, which included further safety enhancements to comply with state law. (See Declaration of Brien

Vierra in support of Sable's Opposition to Preliminary Injunction.) With OSFM's coordination and oversight, Sable conducted repair and maintenance and installed 27 safety valves along Segments CA-324 and CA-325 in compliance with OSFM's approval. (See Rusch Decl., ¶ 6; Stanton Decl., Ex. Q [Flores Decl. ISO Mot. to Terminate], ¶ 8.) Upon installation of the valves, the potential worst-case oil spill volume on Line CA-324, where the Refugio spill occurred, has been reduced to approximately 1,935 barrels—significantly less than the 2015 Refugio oil spill volume and the potential volumes analyzed and disclosed under the EIR/EIS. (See Stanton Decl., Ex. R [2021 Line 901 Risk Assessment], p. 12, Table 4.A.1.) Likewise, the United States, a party to the Consent Decree, expressed its position to the Central District that "Sable has complied with the injunctive relief requirements" that apply to it under the Consent Decree. (*Id.*, Ex. N [Seeley Decl.], ¶ 17.)

Thus, Sable's operations do not present irreparable harm to Petitioners or the environment as they remain subject to the federal Pipeline Safety Act and PHMSA's supervision, were subject to environmental review, and occur after Sable's significant repairs and safety enhancements along Segments CA-324 and CA-325.

    2.  The Preliminary Injunction creates an untenable obstacle to complying with the DPA Order, substantially harming Sable and the public.

On the other hand, the Preliminary Injunction imposes significant irreparable harm upon Sable, the public, and our military readiness. Sable owns 16 federal oil and gas leases covering approximately 76,000 acres in federal waters of the Outer Continental Shelf ("OCS"), offshore California, and Sable's leases cover the most remaining resources among current OCS-producing fields in the United States. (Rusch Decl., ¶¶ 3-4, Ex. 1; Declaration of Michael Mische ("Mische Decl."), ¶¶ 29, 109.) Sable has invested significant capital, time, resources, and energy to resume oil production along the Outer Continental Shelf and transportation of crude oil through the Santa Ynez Pipeline System. (Rusch Decl., ¶¶ 5-8.) However, the Preliminary Injunction places Sable in an impossible situation. If the Preliminary Injunction remains in place, Sable must choose whether to abide by the DPA Order or the Preliminary Injunction. (*Id.*, ¶¶ 9-11.) But Sable cannot comply

with both. (*Ibid.*)

Violating the DPA Order subjects Sable to potential civil and criminal penalties and may impact Sable's existing contracts. (See 50 U.S.C. § 4513; see Rusch Decl., ¶¶ 11-12.)

Even more importantly, the Preliminary Injunction impermissibly frustrates the DPA Order that is designed to confront intensified concerns over the West Coast's energy supply and our national security. (See Stanton Decl., H [Executive Order 14156]; see generally Mische Decl.) "It is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation." (Dintzer Decl., Ex. B [OLC Memo], p. 9, quoting *Haig v. Agee* (1981) 453 U.S. 280, 307 [citation omitted].) Critically, "[t]he President determined that the Nation's 'insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy.'" (Dintzer Decl., Ex. B [OLC Memo], p. 2, quoting Executive Order 14156, § 1.)[6]

Failure to intervene on behalf of the common defense of the nation, as the President has, would have placed unnecessary stress on U.S. military forces and quite possibly, placed U.S. national security at considerable and unnecessary risk. (Mische Decl., ¶¶ 24, 27.) California faces tremendous oil and gas supply vulnerabilities and escalating consumer prices that must be immediately addressed by the increase in-state crude oil production. (*Id.*, ¶ 25.) Specifically, "California faces immediate risks to gasoline supply due to declining in-state production, refinery closures, and an imminent northbound pipeline collapse….The impending loss of two refineries and the collapse of the only remaining northern pipeline, together with increasing dependency on non-U.S. gasoline sources to California could drive the price of gasoline to double that of the

---

[6] "Congress recognized that 'the security of the United States is dependent on the ability of the domestic industrial base to supply materials and services for the national defense." (Dintzer Decl., Ex. B [OLC Memo], p. 11, citing 50 U.S.C. § 4502(a)(1).) To "assure the availability of domestic energy supplies," the DPA grants the President the ability to take actions and issue orders to "maximize domestic energy supplies." (50 U.S.C. § 4511(c).) Under the DPA, "it is the President who possesses the institutional competence to make such judgments on behalf of the Nation[.]" (Dintzer Decl., Ex. B [OLC Memo], p. 13, citing 50 U.S.C. §§ 4502(a)(1), 4511(a), (c) and *Holder v. Humanitarian L. Project* (2010) 561 U.S. 1, 33 [emphasizing the need to defer to the "evaluation of the facts by the Executive" in the national-security context].)

12

REAL PARTIES IN INTERESTS SUPPLEMENTAL BRIEF IN SUPPORT OF
*EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

national average by calendar year end 2026." (Mische Decl., ¶¶ 12, 106.) "California has made the choice to rely upon Iraq, U.A.E., Brazil, South Korea, India, Singapore, and the Bahamas for crude oil which it could produce itself and gasoline and jet fuel which it must now import in historical quantities due its inability to retain refineries." (*Id.*, ¶¶ 13, 28, 47, 66,100.) And "[i]n the face of collapsing in-state crude production, extreme reliance on the beneficence of foreign governments as a source of crude oil, gasoline and jet fuels, [and] the loss of two major in-state oil refineries, California is experiencing an inevitable and chillingly tightening of gasoline supplies and the potential for severe shortages. Severe gasoline shortages, as well as shortages in diesel fuels and jet fuels are potentially catastrophic to the economy of California, as well as to the national security of the U.S. Military bases in California, Arizona and Nevada that rely on California refineries to provide the fuels necessary to ensure force readiness and national security." (*Id.*, ¶¶ 31, 47.)

However, "[t]he SYU – which Sable leases and operates – is a critical energy resource on the West Coast." (Dintzer Decl., Ex. B [OLC Memo], p. 3.) "The production of oil from Sable's three offshore platforms, and the use of Sable's Santa Ynez Pipeline System, including Segments CA-324 and CA-325, to transport its offshore production to California refineries, will have an immediate and favorable impact on U.S. national security, as well as having a favorable influence on local employment and tax revenues and consumer retail gasoline, diesel and aviation fuel prices. The introduction of Sable production will displace a portion of foreign crude imports and will eliminate a portion of the risk and vulnerabilities created by over-reliance on foreign producers and foreign owned maritime shippers." (Mische Decl., ¶ 98.) Currently, Sable's operations represent a significant contribution of regional fuel and are "[t]he best, and essentially only way to achieve and sustain this benefit" of in-state crude oil production as Sable's operations represent an immediate injection of north of 51,000 barrels of in-state crude oil to local California refineries, and ultimately "[u]p to 100,000 barrels per day could be produced from Sable's leases in the federal waters in or near the Santa Barbara Channel." (*Id.*, ¶¶ 18.) "By directing this offshore production south, Southern California refineries would require fewer barrels of crude oil from the [San

13

Joaquin Valley] thereby allowing a substantial portion of Kern County crude which is highly compatible with Bay Area refinery designs, to be redirected north." (Mische Decl., ¶ 99.) Likewise, the "[f]ailure to act and failure to increase in-state crude oil production will only accelerate the exits of California refineries from the state, increase global GHG emissions, further California's contributions to environmental destruction, force greater reliance on foreign suppliers, increase consumer prices, and diminish U.S. national security." (*Id.*, ¶¶ 15, 26.)

Because the Petitioners and the environment do not face irreparable harm from Sable's operations, and as the DPA Order requiring Sable to operate the Santa Ynez Pipeline System addresses key concerns over our Nation's security and military preparedness, the balance of harms now clearly weigh in favor of Sable's operations and our highest public interest in promoting the Nation's defense, requiring that the Preliminary Injunction dissolve immediately.

## III.  CONCLUSION

The Preliminary Injunction directly conflicts with the DPA Order and is therefore preempted, invalid, and must be rescinded.

DATED:  April 1, 2026                Respectfully submitted,

**ALSTON & BIRD, LLP**

By:  _____
                    Jeffrey D. Dintzer

Attorneys for Real Parties in Interest
**SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY**

---

14

REAL PARTIES IN INTERESTS SUPPLEMENTAL BRIEF IN SUPPORT OF
*EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

**PROOF OF SERVICE**

I, **Josie Cisneros**, declare:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Alston & Bird LLP, 350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071.

On April 1, 2026, I served the document(s) **REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S SUPPLEMENTAL BRIEF IN SUPPORT OF EX PARTE NOTICE OF DEFENSE PRODUCTION ACT ORDER** on the interested parties stated below, by the following means of service:

**See Attached Service List**

(BY U.S. MAIL)  I am personally and readily familiar with the business practice of Alston & Bird LLP for collection and processing of correspondence for mailing with the United States Parcel Service, and I caused such envelope(s) with postage thereon fully prepaid to be placed in the United States Postal Service at Los Angeles, California.

(BY FACSIMILE)  I am personally and readily familiar with the business practice of Alston & Bird LLP for collection and processing of document(s) to be transmitted by facsimile and I caused such document(s) on this date to be transmitted by facsimile to the offices of addressee(s) at the numbers listed below.

(BY OVERNIGHT MAIL)  I am personally and readily familiar with the business practice of Alston & Bird LLP for collection and processing of correspondence for overnight delivery, and I caused such document(s) described herein to be deposited for delivery to a facility regularly maintained by Federal Express for overnight delivery.

☒ BY ELECTRONIC SERVICE on the date stated below, I caused the document(s) described above to be served electronically on the recipients designated on the Transaction Receipt pursuant to the parties' stipulation establishing the authorizing e-service of documents.

I declare under penalty of perjury under the laws of the State of California, that the above is true and correct.

Executed on April 1, 2026, at Los Angeles, California.

/s/   Josie Cisneros_____
Josie Cisneros

**SERVICE LIST**

| | |
|---|---|
| Julie Teel Simmonds, Esq.<br>David Pettit, Esq.<br>Talia Nimmer, Esq.<br>Center for Biological Diversity<br>2011 Franklin Street, Suite 375<br>Oakland, CA 94612<br>Tel.: (510) 844-7100<br>Fax: (510) 844-7150<br>jteelsimmonds@biologicaldiversity.org<br>dpettit@biologicaldiversity.org<br>tnimmer@biologicaldiversity.org | *Attorneys for Petitioners: Center for Biological Diversity and Wishtoyo Foundation* |
| Duncan Joseph Moore<br>Benjamin J. Hanelin<br>Natalie C. Rogers<br>**PAUL HASTINGS**<br>1999 Avenue of Stars, 27th Floor<br>Century City, CA 90067<br>Tel: (310) 620-5879<br>Fax: (310) 620-5899<br>djmoore@paulhastings.com<br>benjaminhanelin@paulhastings.com<br>natalierogers@paulhastings.com | *Attorneys for Real Parties in Interest: Sable Offshore Corp. and Pacific Pipeline Company* |
| Trevor D. Large (SBN: 214886)<br>Victoria C. Diffenderfer (SBN: 350018)<br>**FAUVER LARGE ARCHBALD & SPRAY**<br>820 State Street, 4th Floor<br>Santa Barbara, CA 93101<br>Tel: (805) 966-7000<br>Fax: (805) 966-7227<br>tlarge@flasllp.com<br>vdiffenderfer@flasllp.com | *Attorneys for Real Parties in Interest: Sable Offshore Corp. and Pacific Pipeline Company* |
| Linda Krop, Esq.<br>Jeremy M. Frankel, Esq.<br>Tara C. Rengifo, Esq.<br>ENVIRONMENTAL DEFENSE CENTER<br>906 Garden Street<br>Santa Barbara, CA 93101<br>Tel: (805) 963-1622; (510) 844-7100<br>Fax: (805) 962-3152; (510) 844-7150<br>lkrop@environmentaldefensecenter.org<br>jfrankel@environmentaldefensecenter.org<br>trengifo@environmentaldefensecenter.org | *Attorneys for Petitioners: Environmental Defense Center, a California non-profit corporation; Get Oil Out!, a California non-profit corporation, Santa Barbara County Action Network, a California non-profit corporation, Sierra Club, a national non-profit corporation, and Santa Barbara Channelkeeper, a California non-profit corporation* |
| Michael S. Dorsi, Esq.<br>California Attorney General's Office<br>55 Golden Gate Ave, Ste 11000<br>San Francisco, CA 94102 | *Attorneys for Respondents/Defendants: California Department of Forestry and Fire* |

**16**
**PROOF OF SERVICE**

| Tel.: (415) 510-3802<br>Michael.dorsi@doj.ca.gov | *Protection, Office of the State Fire Marshal, Daniel Berlant (in his official capacity as State Fire Marshal)* |
|---|---|