ROB BONTA
Attorney General of California
MYUNG J. PARK
Supervising Deputy Attorney General
MICHAEL S. DORSI
Deputy Attorney General
State Bar No. 281865
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA  94102-7004
 Telephone:  (415) 510-3802
 Fax:  (415) 645-2581
 E-mail:  Michael.Dorsi@doj.ca.gov
*Attorney for Respondents and Defendants*
*California Department of Forestry and Fire*
*Protection's Office of State Fire Marshal, et al.*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al.,<br><br>                    Petitioners and Plaintiffs,<br><br>          v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, et al.,<br><br>                    Respondents and Defendants,<br><br>SABLE OFFSHORE CORP., et al.,<br><br>                    Real Parties in Interest. | Case No. 2:26-cv-05242<br><br>**RESPONDENTS CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, ET AL.'S OPPOSITION TO MOTION FOR RECONSIDERAITON OF PRELIMINARY INJUNCTION** |
| ENVIRONMENTAL DEFENSE CENTER, et al.,<br><br>                    Petitioners and Plaintiffs,<br><br>          v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, et al.,<br><br>                    Respondents and Defendants,<br><br>SABLE OFFSHORE CORP., et al.,<br><br>                    Real Parties in Interest. | Date: June 29, 2026<br>Dept. 10A<br>Time: 1:30 p.m.<br>Judge: Hon. Stephen V. Wilson<br><br>Action Filed: April 15, 2025<br>Action Removed: May 15, 2026<br>Trial Date: TBD |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................1

BACKGROUND ................................................................................................2

LEGAL STANDARDS ......................................................................................2

ARGUMENT .....................................................................................................3

    I.    Sable's Motion is an Improper Appeal of State Court Orders .............3

    II.    Relief Is Unwarranted Because Sable Has Openly and Intentionally Defied the Court's Injunction...........................................4

    III.    The State Court Acted Reasonably in Light of the Consent Decree ...............................................................................................6

        A.    The Superior Court Reasonably Decided to Align its Interpretations of Law With the Consent Decree.....................6

        B.    The Superior Court's Rulings Were Not Clear Error on the Issue of Change in Law ................................................7

    IV.    Neither the Pipeline Safety Act nor the Defense Production Act Justifies Reconsideration of the Preliminary Injunction.....................8

        A.    Sable's New Defense Production Act Arguments Do Not Hold Water.........................................................................8

        B.    Sable's Pipeline Safety Act Arguments Lack Merit ...............10

            1.    The PSA Does Not Delegate Discretion to PHMSA to Decide Which Pipelines are Interstate ......................11

            2.    CA-324/325 are *Intra*state Pipelines.............................12

                a.    Sable's Unity of Ownership Argument is Contrary to the Pipeline Safety Act's Purpose and Text....................................................12

                b.    The PSA's Text and History Indicate that CA-324/325 are *Intra*state Pipelines....................13

                c.    PHMSA's Redesignation Is Inconsistent with the Statutory Term "Facility"..............................14

                d.    PHMSA's Redefinition Improperly Includes Facilities That Cannot Be Part of a Hazardous Liquid Pipeline Facility .....................17

                e.    PHMSA's December 17 Order Is Inconsistent With its Own Regulations ...............19

                F.    PHMSA's December 17 Order Sidestepped Section 60105(f)'s Requirements for Asserting Federal Jurisdiction Over Intrastate Pipelines..........................................................20

CONCLUSION................................................................................................21

CERTIFICATE OF COMPLIANCE................................................................22

# TABLE OF AUTHORITIES

**Page**

CASES

*Alto v. Black*
738 F.3d 1111 (9th Cir. 2013) ................................................................4

*Bd. of Educ. of Okla. City Pub. Schs. v. Dowell*
498 U.S. 237 (1991) ...............................................................................5

*BedRoc Ltd., LLC v. United States*
541 U.S. 176 (2004) ..........................................................................14, 16

*California ex rel. Becerra v. U.S. Environmental Protection Agency*
978 F.3d 708 (9th Cir. 2020) .................................................................5

*Carroll v. Nakatani*
342 F.3d 934 (9th Cir. 2003) .................................................................3

*Loper Bright Enters. v. Raimondo*
603 U.S. 369 (2024) .............................................................................11

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*
467 U.S. 837 (1984) .............................................................................11

*Conn. Light & Power Co. v. Fed. Power Comm'n*
324 U.S. 515 (1945) .............................................................................18

*Exxon Corp. v. U.S. Secretary of Transp.*
978 F. Supp. 946 (E.D. Wash. 1997) ...................................................13

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*
529 U.S. 120 (2000) .............................................................................9

*Friends of the Eel River v. North Coast R.R. Auth.*
3 Cal.5th 677 (2017) ............................................................................18

*FT Travel--New York, LLC v. Your Travel Ctr., Inc.*
112 F. Supp. 3d 1063 (C.D. Cal. 2015) ................................................12

*Hercules, Inc. v. United States*
24 F.3d 188 (Fed. Cir. 1994) ............................................................7, 10

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Hercules, Inc. v. United States*
516 U.S. 417 (1996) ...........................................................................7, 10

*Hooks v. Clark Cnty. Sch. Dist.*
228 F.3d 1036 (9th Cir. 2000) ...................................................................16

*In re Agent Orange Product Liability Litigation*
597 F. Supp. 740 (E.D.N.Y. 1984) ..............................................................9

*Johnson v. Tyson Foods Inc.*
580 F. Supp. 3d 382 (N.D. Tex. 2022) .................................................9, 10

*Karnoski v. Trump*
926 F.3d 1180 (9th Cir. 2019) .....................................................................3

*McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*
606 U.S. 146 (2025) ............................................................................10, 11

*Morton v. Ruiz*
415 U.S. 199 (1974) ...................................................................................19

*Nat'l Ass'n of Home Builders v. Norton*
340 F.3d 835 (9th Cir. 2003) .....................................................................19

*Orantes-Hernandez v. Holder*
713 F. Supp. 2d 929 (C.D. Cal. 2010) .........................................................5

*Pacific Pipeline Co. v. California*
Case No. BCV-25-103508........................................................................16, 20

*PLIVA, Inc. v. Mensing*
564 U.S. 604 (2011) ...................................................................................11

*Pugin v. Garland*
599 U.S. 600 (2023) ...................................................................................15

*Pulsifer v. United States*
601 U.S. 124 (2024) ...................................................................................17

*Reed v. Tyson Foods, Inc.*
No. 21-cv-01155, 2021 WL 5107725 (W.D. Tenn. Nov. 3, 2021)...................10

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Russello v. United States*
    464 U.S. 16 (1983) ...................................................................................17

*SEC v. Coldicutt*
    258 F.3d 939 (9th Cir. 2001).......................................................................5

*Sharp. Credit Suisse First Bos. Corp. v. Grunwald*
    400 F.3d 1119 (9th Cir. 2005)....................................................................3

*Sharp v. Weston*
    233 F.3d 1166 (9th Cir. 2000)...........................................................2, 3, 4

*Southern Pacific Pipe Lines Inc. v. U.S. Department of Transportation*
    796 F.2d 539 (D.C. Cir. 1986) ...........................................................12, 13

*United States v. Approximately 64,695 Pounds of Shark Fins*
    520 F.3d 976 (9th Cir. 2008)....................................................................14

*United States v. Vertac Chemical Corp.*
    46 F.3d 803 (8th Cir. 1995)............................................................7, 9, 10

*United States v. Youssef*
    547 F.3d 1090 (9th Cir. 2008)..................................................................17

*Util. Air Regul. Grp. v. E.P.A.*
    573 U.S. 302 (2014) .................................................................................9

*W. Virginia v. Env't Prot. Agency*
    597 U.S. 697 (2022) .................................................................................9

*Wickard v. Filburn*
    317 U.S. 111 (1942) ...............................................................................18

*Wyeth v. Levine*
    555 U.S. 555 (2009) ...............................................................................11

*Zamani v. Carnes*
    491 F.3d 990 (9th Cir. 2007)....................................................................12

# TABLE OF AUTHORITIES
## (continued)

**Page**

STATUTES

15 United States Code
§ 717 .................................................................................................................18

28 United States Code
§ 1450 ................................................................................................................ 1

49 United States Code
§ 10501(a)(2)(A)..............................................................................................18
§ 60101 ..............................................................................................................17
§ 60101(a)(3) .....................................................................................................18
§ 60101(a)(5) ..............................................................................14, 15, 16, 18
§ 60101(a)(6) .....................................................................................................18
§ 60101(a)(7), (8)(B) ......................................................................................13
§ 60101(a)(8)(A) ...............................................................................................18
§ 60101(a)(8)(B), (a)(10)................................................................................11
§ 60101(a)(10) ...................................................................................................14
§ 60101(a)(22) ...................................................................................................15
§ 60104(c)...........................................................................................................13
§ 60105(f) ..........................................................................................................20
§ 60119(b)...........................................................................................................11

50 United States Code
§ 4557 ...........................................................................................................8, 9

24 Stat. 379 (1887) ...............................................................................................18

49 Stat. 838 (1935) ...............................................................................................18

52 Stat. 31 (1938) .................................................................................................18

55 Stat. 203 (1941) ...............................................................................................18

108 Stat. 745 (1994) .............................................................................................17

123 Stat. 1776 (2009) ...........................................................................................9

# TABLE OF AUTHORITIES
## (continued)

**Page**

**COURT RULES**

Federal Rules of Civil Procedure
    Rule 54.................................................................................................3
    Rule 54(b)............................................................................................3
    Rule 59...........................................................................................3, 8
    Rule 59(e)............................................................................................3
    Rule 65................................................................................................3

**OTHER AUTHORITIES**

49 Code of Federal Regulations
    § 195.2........................................................................................19, 20

50 Federal Register
    39,011 (1985).....................................................................................13
    39008-02, 39010 (Sept. 26, 1985).......................................................19

Black's Law Dictionary (4th Ed. 1968)...................................................15

Black's Law Dictionary (5th Ed. 1979)...................................................15

Black's Law Dictionary (6th Ed. 1990)...................................................15

Brief for Respondent United States, *Hercules, Inc. v. United States*,
    No. 94 818 (516 U.S. 417), 1995 WL 495540.....................................10

*Comptroller Gen. Warren to the Adm'r, Civ. Aeronautics Admin.*
    31 Comp. Gen. 408 (Feb. 19, 1952)....................................................10

*Comptroller Gen. Warren to the Sec'y of Com.*
    32 Comp. Gen. 497 (May 8, 1953).......................................................10

*Preemptive Effect of Def. Prod. Act Ord. on State L.*, 50 Op. O.L.C.
    ___, 2026 WL 712392, at *2, *12-13 (Mar. 3, 2026)............................9

S. Rep. 82-1599 (1952)...........................................................................10

S. Rep. No. 96-182 (1979).......................................................................19

Webster's II, New Riverside University Dictionary 460 (1994)................16

**INTRODUCTION**

Sable Offshore Corp. makes what appears to be an unprecedented request to this Court. The Santa Barbara County Superior Court issued a preliminary injunction, imposing requirements prior to restarting crude oil pipelines CA-324/325. Sable violated that injunction. After violation, Sable asked the Superior Court to excuse its non-compliance and reconsider the preliminary injunction. The Superior Court considered and rejected Sable's arguments. Then Sable removed the case to this Court, causing the preliminary injunction to become an order of this Court. 28 U.S.C. § 1450. Now, Sable asks this Court to reconsider the Superior Court's order—not because something meaningful changed after the Superior Court's order, but because Sable thinks that order is wrong. ECF 43.

If a party believes a trial court's order is wrong, the remedy is appeal. Neither California nor federal law provides for a party to make a motion to one judge, obtain an unfavorable result, then move the case to a different judge, and ask the second judge to make a different decision on the same motion.

That Sable did this in the context of removal is particularly dangerous. If litigants facing enforcement of an injunction have the opportunity (1) to violate the state court order, (2) remove the case, and (3) ask a newly-assigned federal judge to change the state court order *while in violation*, it will set a precedent for disobeying the orders of state courts.

Many disputed issues overlap between this case, *United States, et al. v. Plains All-American Pipeline, et al.* (the Consent Decree case), and *California v. Wright* (challenge to Defense Production Act order). What differs in this case is Sable's clear and admitted violation of the preliminary injunction. Regardless of how this Court decides the other cases, it should reject Sable's attempt to circumvent the preliminary injunction.

1

**BACKGROUND**

The parties have extensively discussed the background of the crude oil pipelines CA-324/325 in multiple cases before this Court. We write here to emphasize only key points related to reconsideration:

On July 29, 2025, the Santa Barbara County Superior Court imposed a preliminary injunction against Sable Offshore Corp. as real party in interest in the then-parallel (later consolidated) cases. In January 2026, Sable sought reconsideration of that preliminary injunction based on the December 2025 orders by the Pipeline and Hazardous Materials Safety Administration (PHMSA). On February 27, 2026 the Santa Barbara County Superior Court denied this first motion for reconsideration.

In March 2026, Sable made its second motion reconsideration, based on the order by the Secretary of Energy under the Defense Production Act (DPA). On April 17, the Santa Barbara County Superior Court denied Sable's second motion for reconsideration. At the same hearing, the Santa Barbara County Superior Court continued Petitioners' Motion to Enforce to May 22. During that hearing, Sable's counsel admitted that Sable was in violation of the terms of the preliminary injunction. ECF 46-1 at 31-32

On May 14, 2026, Sable and the U.S. removed this case to the United States District Court for the Central District of California. The following day, Sable moved for reconsideration of the preliminary injunction. ECF 43. On June 8, this Court held its hearing on the motions to remand. Those motions are under submission. ECF 84.

**LEGAL STANDARDS**

"A party seeking modification or dissolution of an injunction bears the burden of establishing that a significant change in facts or law warrants revision or dissolution of the injunction." *Sharp v. Weston*, 233 F.3d 1166, 1170 (9th Cir. 2000) ("In reviewing denials of motions to dissolve injunctions, we do not consider

2

the propriety of the underlying order, but limit our review to the new material presented with respect to the motion to dissolve.").

Sable frames its motion as arising under FRCP 54(b), 59(e), and 65. All three reflect the rule in *Sharp*. FRCP 65 sets the rules for preliminary injunctions in the first instance. A motion under Rule 54 must present new facts or law, as required by *Sharp*. *Credit Suisse First Bos. Corp. v. Grunwald*, 400 F.3d 1119, 1124 (9th Cir. 2005). The standard for Rule 59 is roughly the same, requiring (1) newly discovered evidence, (2) clear error, or (3) a change in controlling law. *Carroll v. Nakatani*, 342 F.3d 934, 945 (9th Cir. 2003). "A Rule 59(e) motion may not be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation." *Id.*

The Central District of California addresses these situations in Local Rule 7-18, requiring that motions for reconsideration be made based on (a) materially different fact or law that a diligent party could not have known at the time of the first motion, (b) a change in facts or law after the preceding motion, or (c) "a manifest showing of a failure to consider material facts presented to the Court before the Order was entered."

If a party shows significant change in facts or law, it still bears the burden to prove the substantive basis for reconsideration. *Karnoski v. Trump*, 926 F.3d 1180, 1198 (9th Cir. 2019). The standard for reconsideration of a preliminary injunction is a mirror image of the standard to grant a preliminary injunction: the moving party—that is, the party burdened by the injunction—bears the burden to demonstrate likely success on the merits, irreparable harm, the balance of equities, and the public interest. *Id.*

## ARGUMENT

**I.    SABLE'S MOTION IS AN IMPROPER APPEAL OF STATE COURT ORDERS**

Motions to reconsider injunctions are not appeals. Rather, courts considering motions for reconsideration of injunctions "presume[] that the moving party could

3

have appealed the grant of the injunction but chose not to do so, and thus that a subsequent challenge to the injunctive relief must rest on grounds that could not have been raised before." *Alto v. Black*, 738 F.3d 1111, 1120 (9th Cir. 2013).[1] Sable bears the burden of showing: (1) a significant change in factual circumstances has occurred, and (2) the change warrants a dissolution of the injunction. *Sharp*, 233 F.3d at 1170.

Sable's arguments arise from two actions by the federal government: (1) a set of orders by PHMSA issued on December 17, 22, and 23, 2025, and (2) an order by the Secretary of Energy under the Defense Production Act issued on March 13, 2026. ECF 43 at 12:25, 14:23. In response to each action, Sable moved to reconsider. And in response to each action, the Superior Court denied Sable's motion. Sable's present Motion points to no new, intervening changes of fact or law that justify reconsideration. Sable reveals its improper attempt at an appeal in a bolded section heading, asserting that "The State Court Erred in Denying Sable's Motion to Dissolve the Preliminary Injunction Based Upon the DPA Order." ECF 43, at 24:18-19. Arguing that the Superior Court "erred" is not an argument about changed circumstances. That is an appellate argument. If Sable wanted appellate review, it should have appealed.

## II. RELIEF IS UNWARRANTED BECAUSE SABLE HAS OPENLY AND INTENTIONALLY DEFIED THE COURT'S INJUNCTION

There can be no reasonable dispute: Sable took affirmative steps to intentionally defy the Superior Court injunction that it now seeks to dissolve, both before and after unsuccessfully seeking to dissolve that injunction. *See, e.g.*, ECF 46-1 at 31-32 (transcript of Sable's attorney Jeffrey Dintzer to the Santa Barbara County Superior Court, stating "Now I realize that, look, it's not a -- it's not a common occurrence that I'm representing sophisticated clients in front of a Court

---

[1] *Alto* recognized an exception for parties joined after imposition of an injunction. That exception does not apply here; Sable was named and served at the case's outset.

4

where the Court has made an injunction and we have -- we're, you know, doing something different than what the Court has asked us to do . . . ." (emphasis added)).

A party's open and intentional defiance of an injunction, taking active steps to avoid complying, weighs in favor of denying a motion to dissolve that injunction. *Orantes-Hernandez v. Holder*, 713 F. Supp. 2d 929, 954 n.38 (C.D. Cal. 2010) (citing *Bd. of Educ. of Okla. City Pub. Schs. v. Dowell,* 498 U.S. 237, 249 (1991)) ("compliance is an important and often dispositive factor in deciding whether to lift an injunction"). This principle has a practical component: examining a defendant's compliance with court orders is a reasonable part of an inquiry into whether the defendant can be trusted to act lawfully in the future. *See, e.g.*, *SEC v. Coldicutt,* 258 F.3d 939, 942-43 (9th Cir. 2001) (examining defendant's compliance with injunction to determine likelihood of future violations).

Sable relies on *California ex rel. Becerra v. U.S. Environmental Protection Agency*, 978 F.3d 708, 713 (9th Cir. 2020), for the proposition that a court *must* modify an injunction. But there, EPA, subject to an injunction requiring completion of an act on a set timeline, sought relief from the district court prior to violating the injunction. Although the district court denied EPA's requested relief, it stayed the injunction and EPA pursued its (ultimately successful) appeal without first violating the injunction. *Id.* at 712.

Here, Sable did the opposite. Sable received the DPA Order on a Friday and, that same day, withdrew its application for an emergency hearing in the Superior Court that had been set for the following Monday. Sable then commenced its violations of the preliminary injunction over the weekend, and on Monday set a hearing on Tuesday to request relief from the preliminary injunction. When, after extended briefing, the Superior Court denied Sable's requested relief, Sable remained defiant, and seeking another opinion asked this Court to take a third bite at the Superior Court's apple. In total, Sable has been in intentional violation of

the preliminary injunction for over three months. Because Sable unilaterally took affirmative steps to defy the Superior Court's orders, without attempting to comply in good faith, dissolution of the injunction is unwarranted here.

## III. THE STATE COURT ACTED REASONABLY IN LIGHT OF THE CONSENT DECREE

### A. The Superior Court Reasonably Decided to Align its Interpretations of Law With the Consent Decree

Sable characterizes the Superior Court's order as "an apparent attempt to enforce the federal Consent Decree." ECF 43 at 17:18-19. This misstates what occurred in the Superior Court. What happened is that Sable raised arguments concerning preemption and the Superior Court looked to the Consent Decree for guidance in addressing those arguments.

The Superior Court first imposed a lawful preliminary injunction on July 29, 2025. Sable argued that PHMSA's December 2025 orders divested the Superior Court of jurisdiction. In response, OSFM correctly argued that the PHMSA orders did no such thing. The Pipeline Safety Act (PSA) does not delegate to PHMSA any discretion in the determination of which pipelines are interstate and subject to federal jurisdiction, and which pipelines are intrastate and subject state jurisdiction.[2] Petitioners Center for Biological Diversity and Environmental Defense Center (collectively CBD) and OSFM asked the Superior Court to decide the question of jurisdiction under the PSA, at least until a ruling by the Ninth Circuit, in their favor.

The Superior Court declined both invitations. Instead, it resolved the question by aligning its rulings with the Consent Decree. In this way, the Superior Court

---

[2] At the hearing on June 8, 2026, counsel for California and OSFM conceded that "[i]f PHMSA's determination is correct and the Pipeline Safety Act applies [to CA-324/325 as interstate pipelines] then California is preempted from regulating the pipeline." Counsel should have been more specific: if PHMSA's determination is correct, the State Fire Marshal is preempted from regulating pipeline *safety*, but other California agencies retain state powers beyond the scope of preemption under the PSA, including regulation of employment and state agencies' own property rights. California anticipates that Sable will agree concerning employment but will disagree about property rights.

gave comity to this Court, using the Consent Decree to guide its decision applying the PSA.

Sable tried again with the DPA. Again, CBD and OSFM argued that the federal agency acted wrongly. The arguments differed—unlike the PSA, the DPA does contain a delegation, but, as CBD and OSFM argued, the DPA does not preempt state pipeline safety law. *See United States v. Vertac Chemical Corp.*, 46 F.3d 803, 812 (8th Cir. 1995), *Hercules, Inc. v. United States*, 24 F.3d 188, 203–04 (Fed. Cir. 1994). The Superior Court noted that it found these cases persuasive but also aligned its analysis with the Consent Decree.[3]

The Superior Court acted reasonably and with deference to this Court's Consent Decree. Whether or not this Court ultimately decides to enforce or terminate the Consent Decree should not affect the analysis here regarding Sable's open defiance of a court order. The Superior Court had made a determination based in part on an analysis that respected a currently valid and enforceable federal judgment of the Consent Decree. That does not justify interference.

### B. The Superior Court's Rulings Were Not Clear Error on the Issue of Change in Law

Sable alleges that both the PSA and DPA orders are changes in law that compel the Superior Court (and this Court) to modify the preliminary injunction. This is plainly incorrect as to the PSA order. The pipelines, CA-324/325 are either *inter*state or *intra*state. There is no delegation of discretion to PHMSA to decide

---

[3] Sable did not address the Court of Appeals decisions in *Vertac* and *Hercules* in its briefing to the Superior Court. Sable did cite the U.S. Supreme Court's decision in *Hercules, Inc. v. United States*, 516 U.S. 417, 429 (1996)—the decision that affirmed the Federal Circuit on other grounds. Sable represented that the Supreme Court "explain[ed] that the Defense Production Act 'plainly provides immunity . . . [b]y expressly providing a defense to liability.'" ECF 43, 26:22-28. Sable did not apprise the Superior Court that, immediately after this statement, the U.S. Supreme Court made clear that this statement only acknowledged immunity from contract liability, declining to address the argument Sable now presents. *See* 516 U.S. at 430 ("We need not decide the scope of § 707 in this case because it clearly functions only as an immunity, and provides no hint of a further agreement to indemnify.").

which pipelines are *inter*state.[4] Sable's separate allegation that ownership and operation changed circumstances lacks merit, as explained in Part IV.B.

As to Sable's contention that a DPA order can be a "change in law" for purposes of modifying an injunction, Sable already made this argument and the Superior Court rejected it. The Superior Court reasonably followed two federal appellate decisions, finding that the DPA did not preempt state law. It is not "clear error" for a court to follow the persuasive precedent of federal appellate courts. And absent clear error, Sable has not satisfied its burden on a motion for reconsideration.

## IV. NEITHER THE PIPELINE SAFETY ACT NOR THE DEFENSE PRODUCTION ACT JUSTIFIES RECONSIDERATION OF THE PRELIMINARY INJUNCTION

For the reasons stated above, the Court should not reach the merits of Sable's arguments. If it does, it should reject them.  Sable offers variations on its previously-filed arguments arising under the PSA and the DPA. Both arguments are wrong. California and OSFM will be filing their court-ordered supplemental brief in this Court's other cases, and the Court will wish make consistent rulings on questions that arise in multiple cases. But Sable's arguments here differ from the arguments made by the U.S., and from Sable's arguments in the other cases. As a result, they merit a response.

### A. Sable's New Defense Production Act Arguments Do Not Hold Water

In these coordinated cases, many arguments concerning the DPA have received extensive briefing. As to those arguments, the Court should make consistent rulings across the cases. But Sable also introduces a new argument here. Specifically, Sable attempts to draw an inference from the differences between the text of Section 707 of the DPA (50 U.S.C. § 4557) and the text of an allegedly analogous provision in the Second War Powers Act of 1942. ECF 43 at 26. Sable

---

[4] In addition, the order denying Sable's first motion for reconsideration issued more than 28 days before the filing of this Motion, so reconsideration under Rule 59 is unavailable.

claims support from two 1950s-era letters from the Comptroller General. According to Sable, these decisions indicate that the phrase "no damages or penalties" is intended to displace all state law applicable to a party acting under the DPA.[5]

The problem with this interpretation is that it relies on obscure materials to interpret a long-standing and previously-litigated statute. "When an agency [of the Executive Branch] claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,' . . . [courts] typically greet its announcement with a measure of skepticism." *Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 324 (2014) (citing *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)[6]). When the Executive did not claim the relevant power and Congress declined to clearly delegate the new-found power, "there is every reason to 'hesitate before concluding that Congress' meant to confer" more power on the agency. *W. Virginia v. Env't Prot. Agency*, 597 U.S. 697, 725 (2022) (quoting *Brown & Williamson*, 529 U.S. at 159-60).

That is the case here. By claiming the broader application of the liability shield, the U.S. is asserting the power to have federal commands take the place of state law in nearly any industry. *See Preemptive Effect of Def. Prod. Act Ord. on State L.*, 50 Op. O.L.C. ___, 2026 WL 712392, at *2, *12-13 (Mar. 3, 2026). The prior position of the U.S.—that the DPA's liability shield, 50 U.S.C. § 4557, protects only against contract liability—is the long-established position of not only of the Executive Branch, but also of two federal courts of appeals and several federal district courts. *See, e.g.*, *United States v. Vertac Chemical Corp.*, 46 F.3d 803, 812 (8th Cir. 1995); *In re Agent Orange Prod. Liab. Litig.*, 597 F. Supp. 740, 843-45 (E.D.N.Y. 1984). From the 1950s through 2010s,[7] courts consistently

---

[5] Sable did not present this argument to the Superior Court. Accordingly, it cannot be clear error for the Superior Court to have not adopted this argument.

[6] Westlaw identifies *Brown & Williamson* as "superseded by statute." This is correct as to tobacco regulation, 123 Stat. 1776 (2009), but *Brown & Williamson* remains good law on principles of statutory interpretation.

[7] As explained we have explained, the 2020s featured at least one outlier:

(continued…)

9

applied the liability shield to only apply to change the risk of loss in contract liability, not create broader preemption. Brief for Respondent United States, *Hercules, Inc. v. United States*, No. 94 818 (516 U.S. 417), 1995 WL 495540, at \*37-38 ("every court that has considered the matter has, like the courts below, rejected the argument that Congress intended the DPA's protection to sweep as broadly as Thompson claims"). This Court should not indulge Sable's quest to find new meaning valuing obscure sources over established understandings.

More, the source material does not support Sable's claim. The best reading of the difference between the Second War Powers Act and the DPA is that Congress intended to allow a greater degree of protection for businesses further downstream in the supply chain. While the Second War Powers Act may have only provided immunity for the recipient of a DPA order who breaks a contract, the DPA was intended to encourage cooperation with businesses subject to DPA orders. *See* S. Rep. 82-1599 (1952). This is consistent with the letters from the Comptroller General cited by Sable: *Comptroller Gen. Warren to the Adm'r, Civ. Aeronautics Admin.*, 31 Comp. Gen. 408, 412 (Feb. 19, 1952), and *Comptroller Gen. Warren to the Sec'y of Com.*, 32 Comp. Gen. 497, 498 (May 8, 1953). Both opinions addressed liability protection for violation of contracts, including for contractors whose suppliers are subject to DPA orders. 32 Comp. Gen. at 498. None of this supports diverging from the holdings in *Hercules* and *Vertac*.

### B. Sable's Pipeline Safety Act Arguments Lack Merit

In these coordinated cases, the parties have spent many pages on the DPA, and far fewer on the PSA. Because Sable raised the PSA as a basis for relief, the underlying validity of the PSA order is reviewable here. *See McLaughlin*

*Johnson v. Tyson Foods Inc.*, 580 F. Supp. 3d 382, 388–89 (N.D. Tex. 2022). But there no party apprised the district court of the longstanding interpretation of the DPA. *Johnson et al v. Tyson Foods Inc.*, No. 2:21-cv-00156 (N.D. Tx.), ECF 6, 12, 14. Other cases concluded that the argument raised in *Johnson* presented a colorable defense, allowing removal, but did not weigh in on the merits. *See, e.g.*, *Reed v. Tyson Foods, Inc.*, No. 21-cv-01155, 2021 WL 5107725, at \*6 (W.D. Tenn. Nov. 3, 2021).

10

*Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146, 156 (2025); 49 U.S.C. § 60119(b) (providing that petitions to federal courts of appeals are not exclusive means to review orders under the PSA). Sable's PSA arguments fail for several reasons.

### 1. The PSA Does Not Delegate Discretion to PHMSA to Decide Which Pipelines are Interstate

Sable argues that PHMSA's assertion of federal jurisdiction deprives California agencies and courts of jurisdiction over the CA-324/325, and that California courts and agencies maintaining jurisdiction conflict with PHMSA's approvals. ECF 43 at 20.[8] But Sable offers no authority for the proposition that a federal agency's assertion of its position on interstate status and jurisdiction over a pipeline somehow binds courts. It does not. It is the PSA, not PHMSA, which defines interstate and intrastate pipelines. 49 U.S.C. § 60101(a)(8)(B), (a)(10). The Pipeline Safety Act does not delegate to PHMSA discretion to decide which pipelines are interstate. *See Wyeth v. Levine*, 555 U.S. 555, 576 & n.9 (2009) (comparing absence of delegation in that case with examples of statutes with delegations to grant and waive preemption).

PHMSA's determination is not afforded deference. Courts "do not defer to an agency's ultimate conclusion about whether state law should be pre-empted." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 613 n.3 (2011) (citing *Wyeth*, 555 U.S. at 576). Any deference previously afforded under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), is no longer effective because the Supreme Court overruled *Chevron*. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400-01 (2024) (Federal "agencies have no special competence in resolving statutory ambiguities. Courts do.").

---

[8] OSFM's counsel raised this at the June 8, 2026 argument. OSFM's understanding is that PHMSA agrees that it receives no delegation or deference—that it is obligated to correctly determine interstate vs intrastate status. It is odd that Sable asserts PHMSA's orders carry authority that PHMSA itself does not claim.

This conclusion has two implications:

First, PHMSA's Federalization Order is not a change in law. It is, at most, an (incorrect) statement indicating a belief that law or facts changed. But it does not satisfy the standards of FRCP 54, which applies here.

Second, because PHMSA is not afforded deference, Sable needed to explain to this Court why PHMSA is correct. Its moving papers did not do so, and the Court should not permit it to do so in reply papers. *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) (citation omitted) ("[D]istrict court[s] need not consider arguments raised for the first time in a reply brief."); *FT Travel--New York, LLC v. Your Travel Ctr., Inc.*, 112 F. Supp. 3d 1063, 1079 (C.D. Cal. 2015) ("Courts decline to consider arguments that are raised for the first time in reply.").

### 2.    CA-324/325 are *Intra*state Pipelines

Sable asserts that CA-324/325 are interstate pipelines subject to exclusive federal jurisdiction. This position is contrary to the Pipeline Safety Act.

#### a.    Sable's Unity of Ownership Argument is Contrary to the Pipeline Safety Act's Purpose and Text

To claim interstate status for pipelines located entirely within California, Sable relies on PHMSA's December 17 order, which in turn relies on a theory of unified ownership and operation of three facilities: the offshore emulsion pipeline (which all parties concede is interstate), the onshore processing facility at Las Flores Canyon (the "LFC Facilities"), and the onshore CA-324/325 pipelines. The basis for treating the three facilities as one—the unified ownership and operation—has no support in the Pipeline Safety Act. Sable points to no statute, regulation, or precedent that supports the notion that unified ownership or operation plays any role whatsoever in the jurisdictional determination of a hazardous liquid pipeline. In fact, the opposite holds true. In *Southern Pacific Pipe Lines Inc. v. U.S. Department of Transportation*, 796 F.2d 539, 541 (D.C. Cir. 1986), Southern Pacific owned oil pipeline systems containing main trunk lines that crossed into

other states and lateral lines entirely within California. Southern Pacific claimed that the California lateral lines were subject to exclusive federal regulation, on the theory that "the statutory definition of interstate pipeline facilities includes all facilities used as an integral part of an interstate system . . . ." *Id.* at 542 (emphasis in original). The D.C. Circuit rejected this argument, noting that most intrastate pipelines connect to interstate pipelines, so relying on such connections would undermine Congress' intent, "which has always recognized a major role for the states in pipeline safety." *Id.* (quoting 50 Fed. Reg. 39,011 (1985)).[9] This case is even clearer than *Southern Pacific*. Southern Pacific's lateral lines connected directly to its main trunk lines, moving the same product. Here, the offshore Oil Emulsion Pipeline connects to the LFC Facilities, where hydrocarbons are separated and treated, before a different product is delivered to Lines CA-324/325. *See also Exxon Corp. v. U.S. Secretary of Transp.*, 978 F. Supp. 946 (E.D. Wash. 1997) (the Pipeline Safety Act "says nothing about . . . the storage facility and the pipeline being owned in common").

### b.   The PSA's Text and History Indicate that CA-324/325 are *Intra*state Pipelines

The PSA distinguishes between interstate pipelines and intrastate pipelines. Sable correctly states that for interstate pipelines, the Pipeline Safety Act imposes exclusive federal jurisdiction, making PHMSA the regulator. But the Pipeline Safety Act preserves a role for states to regulate intrastate pipelines, including allowing state regulators to enforce standards more stringent than PHMSA's. 49 U.S.C. § 60104(c).

An "interstate hazardous liquid pipeline facility" is a pipeline facility that transports hazardous liquid "between (i) a place in a State and a place outside that State; or (ii) places in the same State through a place outside the State." 49 U.S.C. §

---

[9] 50 Fed.Reg. 39,011 (1985) goes on, "[s]tates are in the best position to assess the needs of their communities with respect to pipeline safety."

13

60101(a)(7), (8)(B). Conversely, "'intrastate hazardous liquid pipeline facility' means a hazardous liquid pipeline facility that is not an interstate hazardous liquid pipeline facility." *Id.* § 60101(a)(10). Because Lines CA-324/325 originate onshore in Santa Barbara County, California, and terminate in Kern County, California, without passing through any other state, they are an intrastate pipeline facility.

PHMSA's December 2025 orders confirm this understanding of the statute. What changed is PHMSA's definition of the relevant "facility." PHMSA historically identified Lines CA-324/325 themselves as the relevant "facility." *See* ECF 35.[10] at 142-43 (2016 Letter from PHMSA re: Intrastate Status), 77 (Complaint, *Pacific Pipeline Co. v. California*, Case No. BCV-25-103508, ¶ 19 (Kern County Superior Court) (referring to CA-324/325 as "the individual pipeline facilities"). Under that identification of the relevant "facility," Lines CA-324/325 did not extend to another state, and, as a result, they were intrastate. Now, PHMSA purports to redefine Lines CA-324/325 as part of a larger system that includes areas previously never considered as part of the "pipeline facility," including the offshore emulsion pipeline and the processing plant at Las Flores Canyon. The task here is to determine which interpretation comports with the statute; *i.e.*, whether Lines CA-324/325 are intrastate or interstate pipelines.

### c.   PHMSA's Redesignation Is Inconsistent with the Statutory Term "Facility"

"In determining the meaning of a statute, we first look to the language of the statute itself." *United States v. Approximately 64,695 Pounds of Shark Fins*, 520 F.3d 976, 980 (9th Cir. 2008). The Pipeline Safety Act defines a "hazardous liquid pipeline facility" to "include[] a pipeline, a right of way, a facility, a building, or equipment used or intended to be used in transporting hazardous liquid." 49 U.S.C. § 60101(a)(5). "Transporting hazardous liquid" is also a defined term in the

_____

[10] Citations to ECF 35 and 36 are to documents filed with the Superior Court in opposition to Sable's motions for reconsideration in that Court. Sable filed those documents with this Court shortly after removal.

Pipeline Safety Act, and:

(A) means--
(i) the movement of hazardous liquid by pipeline, or the storage of hazardous liquid incidental to the movement of hazardous liquid by pipeline, in or affecting interstate or foreign commerce; and
(ii) the movement of hazardous liquid through regulated gathering lines; but
(B) does not include moving hazardous liquid through--
(i) gathering lines (except regulated gathering lines) in a rural area;
(ii) onshore production, refining, or manufacturing facilities; or
(iii) storage or in-plant piping systems associated with onshore production, refining, or manufacturing facilities;

*Id.* § 60101(a)(22).

These definitions, read together, illuminate what constitutes a hazardous liquid pipeline facility under the statute. Equipment used to transport oil, including the pipeline and valves, are part of the transportation "facility." Storage incidental to transportation is also part of the "facility." But no part of the definitions of "hazardous liquid pipeline facility" or "transporting hazardous liquid" covers activities like separation of different hydrocarbons and sulfur products or treatment of crude oil—activities that happen at the LFC Facilities. Such activities are not part of "mov[ing]" the oil, or "stor[ing]" it "incidental to [such] movement." Those are the kind of activities completed as part of production, refining, or manufacturing.

This understanding is consistent with ordinary definitions of the word "facility." Because the Pipeline Safety Act does not define "facility," we look to dictionary definitions of "facility" from the time of the relevant statute's enactment. *See Pugin v. Garland*, 599 U.S. 600, 604 (2023). Here, Congress enacted the relevant provisions governing hazardous liquid (here, oil) pipelines first as part of the Hazardous Liquid Pipeline Safety Act in 1979, re-enacting those provisions in the Pipeline Safety Act—governing hazardous liquid and gas pipelines—in 1991, which Congress re-codified in its current form in 1994. The first definition of "facility" in Black's Law Dictionary is unchanged between the Fourth (1968), Fifth (1979), and Sixth (1990) editions: a "facility" is "Something that is built or installed

15

to perform some particular function …." This definition is in line with definitions in other dictionaries and adopted by courts in other contexts. *See, e.g.*, *Hooks v. Clark Cnty. Sch. Dist.*, 228 F.3d 1036, 1040 (9th Cir. 2000) (quoting Webster's II, New Riverside University Dictionary 460 (1994)) ("a 'facility' can be commonly defined as '[s]omething created to serve a particular function[]'").

Lines CA-324/325 constitute an onshore pipeline "facility" built and installed to serve a particular purpose: to transport the oil that is processed and treated in Las Flores Canyon, California, to Pentland, California.

PHMSA's new redefinition improperly attempts to expand Lines CA-324/325 via consolidation with the LFC Facilities, well beyond "the most natural interpretation" of the statute. *BedRoc Ltd., LLC v. United States,* 541 U.S. 176, 185 (2004) (distinguishing the meaning of coal from unprocessed gases and solids produced from mining coal). But the LFC Facilities perform vastly different functions than CA-324/325. They do not "transport[] hazardous liquid." 49 U.S.C. § 60101(a)(5). Instead, the plants treat and process the product arriving from the Offshore Emulsion Pipeline by separating and treating hydrocarbons and sulfur products, as well as storing the processed oil in two 270,000-gallon tanks. *See* ECF 35 at 170-76 (Air District Permit), 189-90 (Sable investor presentation with annotated image of Las Flores Canyon facilities); *see also* ECF 35 at 74 (Complaint, *Pacific Pipeline Co. v. California*, Case No. BCV-25-103508, ¶ 19 (Kern County Superior Court) ("The onshore facilities in Las Flores Canyon separate oil, propane, butane, sulfur products, and fuel quality gas."). This is a different purpose, and that purpose is not consistent with the statutory definitions of a "hazardous liquid pipeline facility" or "transporting hazardous liquid."

Further upstream, the Offshore Oil Pipeline performs yet another, different function than either Lines CA-324/325 or the LFC Facilities. Unlike Lines CA-324/325, the Offshore Oil Pipeline does not transport a hazardous liquid (oil) between two land-based locations. Instead, it delivers a "crude oil emulsion," *i.e.*, a

16

mix of oil, gas, water, and other substances, from offshore platforms to the LFC Facilities for processing and treatment. Thus, the Offshore Oil Pipeline serves a different function than either the LFC Facilities or Lines CA-234/235. As with the LFC Facilities, neither PHMSA's decision nor Sable's Motion makes an effort to reconcile these realities with statutory text.

### d.    PHMSA's Redefinition Improperly Includes Facilities That Cannot Be Part of a Hazardous Liquid Pipeline Facility

PHMSA purports to define Lines CA-324/325, the LFC Facilities, including the oil treatment plant and the undersea Offshore Emulsion Pipeline, as part of a single pipeline facility. For this definition to be consistent with the law, each of these components of the facility must perform functions that a hazardous liquid pipeline facility may perform, and not perform functions that a hazardous liquid pipeline facility, as defined by the Pipeline Safety Act, cannot perform. By sweeping the LFC Facilities into the same facility as Lines CA-324/325, PHMSA includes, in part, a treatment plant as a part of the pipeline. That is not just counterintuitive; it is contrary to the Pipeline Safety Act.

Statutory text must be interpreted in context. *Pulsifer v. United States*, 601 U.S. 124, 133–34 (2024). "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (citation omitted). This principle applies to provisions enacted together or provisions enacted separately but addressing related statutory schemes. *See United States v. Youssef*, 547 F.3d 1090, 1095 (9th Cir. 2008). Here, the pipeline safety statutes for gas and oil originated in separate but related statutes, with the natural gas statute enacted first, and the relevant provisions later re-enacted together as part of the Pipeline Safety Act. *See* 108 Stat. 745 (1994), codified at 49 U.S.C. § 60101, et seq.

17

Congress's choice of language with respect to gas pipeline regulation illuminates their intent as to oil pipelines.

The Pipeline Safety Act imposes broader exclusive federal jurisdiction for gas pipelines than for hazardous liquid (*e.g.*, oil) pipelines.[11] There are two key distinctions. First, the provision defining interstate gas pipelines includes pipelines that reach a place outside of the state—like for hazardous liquid pipelines—plus additional exclusive federal jurisdiction over gas pipelines that "affect[] any commerce" . . . "between a place in a State and a place outside that State."[12] 49 U.S.C. § 60101(a)(8)(A). No similar "affecting commerce" provision exists in the statute that applies to oil pipelines.

Second, the definition of a "gas pipeline facility" includes "equipment used in . . . treating gas." 49 U.S.C. § 60101(a)(3). In contrast, oil pipelines are governed by the definition of "hazardous liquid pipeline facility," which contains no similar reference to "treat[ment]." *Id.,* § 60101(a)(5).

---

[11] Federal jurisdiction over hazardous liquid pipelines is also narrower than federal jurisdiction over other comparable industries—all of which arise under older statutes. For electricity, the Federal Power Act, enacted in 1935, provides that wholesale electricity transactions, even if transmitting electricity entirely within a state, fall under exclusive federal jurisdiction. (*See Conn. Light & Power Co. v. Fed. Power Comm'n*, 324 U.S. 515, 518 (1945) (discussing Federal Power Act, 49 Stat. 838 (1935)). For railroads, preemption now codified under the Interstate Commerce Commission Termination Act (ICCTA) preempts state regulation "even [of] intrastate transportation so long as it is 'part of the interstate rail network.'" *Friends of the Eel River v. North Coast R.R. Auth.*, 3 Cal.5th 677, 707 (2017) (citing 49 U.S.C. § 10501(a)(2)(A)). This provision has its origin in the Interstate Commerce Act of 1887, 24 Stat. 379 (1887). Congress has the power to enact statutes that define interstate commerce far more broadly than it did in the Pipeline Safety Act. *See generally Wickard v. Filburn*, 317 U.S. 111, 125 (1942) (holding that Agricultural Adjustment Act, 52 Stat. 31 (1938), as amended, 55 Stat. 203 (1941), permissibly regulated a farmer growing wheat to feed his own livestock). In the case of oil pipelines, Congress unambiguously selected a narrower scope of exclusive federal jurisdiction.[12] The Pipeline Safety Act also limits the definition of an "interstate gas pipeline facility" to include only facilities "subject to the jurisdiction of the [Federal Energy Regulatory] Commission under the Natural Gas Act." 49 U.S.C. § 60101(a)(6) (referring to 15 U.S.C. 717 et seq.). This provision is similar to the reservation for states to regulate retail electricity transactions.

[12] The Pipeline Safety Act also limits the definition of an "interstate gas pipeline facility" to include only facilities "subject to the jurisdiction of the [Federal Energy Regulatory] Commission under the Natural Gas Act." 49 U.S.C. § 60101(a)(6) (referring to 15 U.S.C. 717 et seq.). This provision is similar to the reservation for states to regulate retail electricity transactions.

The distinct language makes a difference. An interstate oil pipeline *must reach a place outside of a state*—an effect on interstate commerce—even a significant effect—is not enough. And while a gas pipeline facility may include equipment used in treating the transported substance, an oil pipeline cannot.[13]

### e.   PHMSA's December 17 Order Is Inconsistent With its Own Regulations

An agency action that is inconsistent with federal regulations—even the agency's own regulations—is not in accordance with law, and therefore subject to challenge under the Administrative Procedure Act. *See Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 841, 852 (9th Cir. 2003) ("Having chosen to promulgate the *DPS Policy,* the FWS must follow that policy."); *Morton v. Ruiz*, 415 U.S. 199, 235 (1974) ("Where the rights of individuals are affected, it is incumbent upon agencies to follow their own policies."). PHMSA's inclusion, in part, of the LFC Facilities as part of a "pipeline facility" is inconsistent with the relevant regulations.

Federal regulations define a "pipeline facility" as "new and existing pipe, rights-of-way and any equipment, facility, or building used in the transportation of hazardous liquids or carbon dioxide." 49 C.F.R. § 195.2. The same regulation defines a "pipeline or pipeline system" as:

> all parts of a pipeline facility through which a hazardous liquid or carbon dioxide moves in transportation, including, but not limited to, line pipe, valves, and other appurtenances connected to line pipe, pumping units, fabricated assemblies associated with pumping units, metering and delivery stations and fabricated assemblies therein, and breakout tanks.

---

[13] The difference between the gas and hazardous liquid provisions is not a drafting accident. As originally introduced in the Senate, the definition of a "hazardous liquid pipeline facility" included "or the treatment of hazardous liquids during the course of transportation." The Senate Committee on Commerce, Science, and Transportation "deleted this portion" after "industry representatives pointed out that the processes used for liquid transported by pipeline make this portion of the definition inappropriate . . . ." S. Rep. No. 96-182 at 18 (1979). In a response to petitions for reconsideration of final rule, the Research and Special Programs Administration of the Department of Transportation acknowledged this change during the drafting process. 50 Fed. Reg. 39008-02, 39010 (Sept. 26, 1985).

*Id.* These definitions include the pipelines themselves and any appurtenances "used in the transportation of" oil through the pipelines, and nothing more. *Id.* Under this definition, a pipeline facility includes pipelines like CA-324 and CA-325, as well as attached valves, pumps, and metering stations. But none of these definitions describe the processing, treatment, and storage facilities at Las Flores Canyon, which "separate oil, propane, butane, sulfur products, and fuel quality gas." *See* ECF 35 at 74 (Complaint, *Pacific Pipeline Co. v. California*, Case No. BCV-25-103508 (Kern County Sup. Court), ¶ 19). PHMSA's categorization is inconsistent with its own regulations, because the LFC Facilities do not fit within the regulation's definitions of *pipeline*, *pipeline facility*, or *pipeline system*. 49 C.F.R. § 195.2.

In its December 17 order, PHMSA relies on 49 C.F.R. Part 195, Appendix A, Example 7, to support its new position that Lines CA-324/325 are interstate. Dorsi ECF 35 at 46-48 Example 7 depicts a pipeline running from Point A in the Gulf of Mexico to Point B in Texas. *See* ECF 35 at 178-83 (Liquid Pipeline Interstate/Intrastate Delineation Map). But Example 7 is equally consistent with PHMSA's prior position that the Offshore Emulsion Pipeline, as a separate facility, is an interstate pipeline, which starts in federal waters and terminates at the LFC Facilities. Example 7 says nothing about where one facility ends and the next begins, which is the question PHMSA purported to answer in its letter.

### f.  PHMSA's December 17 Order Sidestepped Section 60105(f)'s Requirements for Asserting Federal Jurisdiction Over Intrastate Pipelines

The Pipeline Safety Act does provide a way for PHMSA to assert federal jurisdiction over intrastate pipelines. *See* 49 U.S.C. § 60105(f). But that provision is limited to cases where the state is not satisfactorily enforcing compliance with federal standards, and it requires prior notice and an opportunity for a hearing. *Id*. Here, PHMSA gave no such notice, afforded no hearing, and made no determination of the State's regulatory insufficiency. Indeed, PHMSA does not

20

assert jurisdiction over Line CA-324/325 in order to "achieve adequate enforcement" of federal safety standards. *See id*. To the contrary, PHMSA has broadly signaled in its January 12, 2026, Limited Enforcement Discretion Policy that it does not intend to enforce certain federal safety standards. *See* PHMSA, Notice of Limited Enforcement Discretion and Statement of Policy for Issuing Special Permits in Response to National Energy Emergency (Jan. 12, 2026), https://www.phmsa.dot.gov/regulatory-compliance/phmsa-guidance/notice-limited-enforcement-discretion-and-statement-policy; *see also* ECF 36 at 350 (Sable letter relying on "Limited Enforcement Discretion and Statement of Policy" (Feb. 13, 2026)).

The December 17 order is an unlawful attempt to circumvent the procedural and substantive requirements that Congress imposed before PHMSA may take jurisdiction over an intrastate pipeline. It forms no basis for Sable to obtain relief.

## CONCLUSION

For the reasons stated, the Court should deny Sable's Motion for Reconsideration.

Dated:  June 15, 2026

Respectfully submitted,
ROB BONTA
Attorney General of California
MYUNG J. PARK
Supervising Deputy Attorney General

*/s/ Michael S. Dorsi*
MICHAEL S. DORSI
Deputy Attorney General
*Attorney for Plaintiffs California Department of Forestry and Fire Protection's Office of the State Fire Marshal, et al.*

21

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for California Department of Forestry and Fire Protection's Office of the State Fire Marshal, certifies that this statement contains 6,993 words, which complies with the word limit of L.R. 11-6.1.


Dated:  June 15, 2026

Respectfully submitted,
ROB BONTA
Attorney General of California
MYUNG J. PARK
Supervising Deputy Attorney General

*/s/ Michael S. Dorsi*
MICHAEL S. DORSI
Deputy Attorney General
*Attorney for Plaintiffs California Department of Forestry and Fire Protection's Office of the State Fire Marshal, et al.*