LINDA KROP (Bar No. 118773)
lkrop@environmentaldefensecenter.org
JEREMY M. FRANKEL (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
MARGARET M. HALL (Bar No. 293699)
trengifo@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622
Fax: (805) 962-3152

*Attorneys for Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper*

JULIE TEEL SIMMONDS (Bar No. 208202)
jteelsimmonds@biologicaldiversity.org
DAVID PETTIT (Bar No. 67128)
dpettit@biologicaldiversity.org
TALIA NIMMER (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin Street, Suite 375
Oakland, CA 94612
Phone: (510) 844-7100

*Attorneys for Center for Biological Diversity and Wishtoyo Foundation*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,<br><br>    Petitioners/Plaintiffs,<br><br>    v. | Case No.: 2:26-cv-05242<br><br>**PETITIONERS' OPPOSITION TO REAL PARTIES IN INTEREST'S MOTION FOR RECONSIDERATION AND TO DISSOLVE INJUNCTION** |

CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, et al.

     Respondents/Defendants.

SABLE OFFSHORE CORP., et al.

     Real Parties in Interest.

_____

ENVIRONMENTAL DEFENSE CENTER, et al.

     Petitioners/Plaintiffs,

  v.

CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, et al.

     Respondents/Defendants.

_____

SABLE OFFSHORE CORP., et al.

     Real Parties in Interest.

*[Filed concurrently with Declaration of Linda Krop]*

Date: June 29, 2026
Time: 1:30 p.m.
Judge: Hon. Stephen V. Wilson

# **TABLE OF CONTENTS**

TABLE OF CONTENTS...................................................................................................i

TABLE OF AUTHORITIES ........................................................................................iii

INTRODUCTION ........................................................................................................ 1

FACTUAL BACKGROUND ........................................................................................ 1

I.      Sable's Obligations Under the Consent Decree.............................................. 1

II.     The Basis for this Lawsuit and the State Court's Preliminary Injunctions ........ 2

III.    Sable's First Unsuccessful Attempt at Rescinding the Injunctions Based on PHMSA's Purported Seizure of the Pipelines.................................................. 3

IV.     Sable's Second Unsuccessful Attempt at Rescinding the Injunctions Based on the DPA Order ................................................................................................ 4

LEGAL STANDARDS ................................................................................................ 6

ARGUMENT ............................................................................................................... 7

I.      Sable's Motion is Improper and Should be Summarily Rejected..................... 7

    A.  Sable Cannot Seek Relief While in Violation of the Injunctions.................... 7

    B.  Sable's Third Request for Dissolution is Untimely, Impermissibly Successive, and a De Facto Appeal of the State Court's Orders. ................... 8

    C.  Sable's Requests for Reconsideration of the February and April Orders Are Likewise Improper................................................................................. 9

II.     As the State Court Already Found, PHMSA's Purported Seizure of the Pipelines Does Not Warrant Dissolution of the Injunctions. ........................... 9

    A.  The Consent Decree Remains in Effect and Requires OSFM Approval of State Waivers and Restart.............................................................................. 10

    B.  Petitioners Do Not Seek to Collaterally Litigate or Enforce the Consent Decree........................................................................................................... 11

    C.  Petitioners' Claims are not Moot................................................................. 11

III.    As the State Court Already Found, the DPA Order does not Preempt or Otherwise Override the Injunctions............................................................... 13

    A.  Sable's Motion does not Address the Continued Vitality of the Consent Decree, Which the State Court Found Dispositive. ..................................... 13

i

B. Sable Reads into the DPA's Liability Shield a Preemptive Power that Does Not Exist. ................................................................................................... 14

C. There Is No Clear and Manifest Showing that Congress Conferred the Preemptive Power Sable Claims for the DPA Order. .................................... 16

D. Sable Can Comply with Both the DPA Order and the Injunction. ................ 18

E. The State Court Explicitly Considered the DPA Order as a "Changed Circumstance." ....................................................................................... 20

CONCLUSION ........................................................................................................ 20

CERTIFICATE OF COMPLIANCE ....................................................................... 22

Petitioners' Opposition to Real Parties' Motion for Reconsideration and to Dissolve Injunction

## TABLE OF AUTHORITIES

**Cases**

*Birmingham Fire Fighters Ass'n 117 v. Jefferson County*,
290 F.3d 1250 (11th Cir. 2002) ....................................................................8

*Board of Educ. v. Dowell*,
498 U.S. 237 (1991).......................................................................................7

*Brown v. Duringer Law Grp. PLC*,
86 F.4th 1251 (9th Cir. 2023) .......................................................................9

*California Department of Parks and Recreation v. Sable Offshore Corp. et al.,* No.
2:26-cv-02946-SVW-SSC (C.D. Cal. May 28, 2026)...............................10

*Carroll v. Nakatani*,
342 F.3d 934 (9th Cir. 2003) ....................................................................6, 10

*Chafin v. Chafin*,
568 U.S. 165 (2013)................................................................................11, 12

*Citizens for Open Government v. City of Lodi*,
144 Cal.App.4th 865 (2006)...................................................................11, 12

*Credit Suisse First Boston Corp. v. Grunwald*,
400 F.3d 1119 (9th Cir. 2005) .......................................................................8

*Environmental Defense Center, et al. v. PHMSA*, *et al.*,
No. 25-8059 (9th Cir. 2026) ..........................................................................4

*Favia v. Ind. Univ. of Pac.*,
7 F.3d 332 (3d Cir. 1993) ..............................................................................8

*Florida Lime & Avocado Growers, Inc. v. Paul*,
373 U.S. 132 (1963).....................................................................................19

*Friends of the Eel River v. North Coast Railroad Authority*,
178 Cal.Rptr.3d 752 (2017), *rev'd on other grounds*, 3 Cal.5th 677 (2017) ......11, 12

*Gutierrez v. Saenz,*
606 U.S. 305 (2025)......................................................................................11

*Hercules, Inc. v. United States*,
24 F.3d 188 (Fed. Cir. 1994) ..................................................................15, 18

*In re "Agent Orange" Prod. Liab. Litig.,*
597 F. Supp. 740 (E.D.N.Y. 1984)......................................................14, 15, 18

Petitioners' Opposition to Real Parties' Motion for Reconsideration and to Dissolve Injunction

*La. Pu. Serv. Comm'n v. FCC*,
  476 U.S. 355 (1986)..................................................................................................17

*Merck Sharp & Dohme Corp.*,
  587 U.S. 299 (2009)..................................................................................................19

*Mi Familia Vota v. Fontes,*
  129 F.4th 691 (9th Cir. 2025). ................................................................................13

*Natural Resources Defense Council, Inc. v. Environmental Protection Agency*,
  490 F.Supp.3d 190 (D.D.C. 2020)............................................................................8

*Nehmer v. VA,*
  494 F.3d 846 (9th Cir. 2007) ..................................................................................10

*Noel v. Hall,*
  341 F.3d 1148 (9th Cir. 2003) ..............................................................................8, 9

*Orantes-Hernandez v. Holder*,
  713 F.Supp.2d 929 (C.D. Cal. 2010) ........................................................................7

*Searle v. Allen*,
  148 F.4th 1121 (9th Cir. 2025) ..................................................................................9

*Sharp v. Weston*,
  233 F.3d 1166 (9th Cir. 2000) ..................................................................................7

*Sosa v. Alvarez-Machain*,
  542 U.S. 692 (2004)..................................................................................................18

*State of California v. Chris Wright et al.*,
  No. 2:26-cv-03396 (C.D. Cal. 2026)........................................................................12

*State of California v. PHMSA*,
  No. 26-508 (9th Cir. 2026) ......................................................................................12

*Taylor v. United States,*
  181 F.3d 1017 (9th Cir. 1999) (en banc) ................................................................14

*United States v. Vertac Chem. Corp.*,
  46 F.3d 803 (8th Cir. 1995) ........................................................................14, 15, 18

*Woodward Park Homeowners Assn. v. Garreks, Inc.*,
  77 Cal.App.4th 880 (2000) ......................................................................................12

*Wyeth v. Levine*,
  555 U.S. 555 (2009)..................................................................................................18

iv

**Statutes**

49 U.S.C. § 60101 *et seq.*.................................................................................2

49 U.S.C. § 60104(c) ........................................................................................2

49 U.S.C. § 60105(a) ........................................................................................2

50 U.S.C. § 4511(a) ....................................................................................16, 17

50 U.S.C. § 4511(c) .........................................................................................16

50 U.S.C. § 4511(d)(1) ....................................................................................16

50 U.S.C. § 4533 .............................................................................................17

50 U.S.C. § 4557 .............................................................................................18

Defense Production Act Amendments of 1953, Pub. L. 83-95, 67 Stat. 129 (1953)...18

Defense Production Act of 1950, Pub. L. 81-774, 64 Stat. 799, § 201 (1950) ............18

**Other Authorities**

16 James W. Moore, et al., *Moore's Federal Practice*, § 59.30[7]................................6

32 Comp. Gen. 497. .........................................................................................16

Webster's 2d New Collegiate Dictionary 671, "Priority" (1953)................................16

Webster's 2d New Collegiate Dictionary, "Allocation" (1953) .................................16

**Rules**

C.D. Cal. Rule 7-18............................................................................................7

Fed. R. Civ. Pro. 59(e) ......................................................................................6

Fed. R. Civ. Pro. 65..........................................................................................7

**Regulations**

10 C.F.R. § 217.20 ...........................................................................................16

10 C.F.R. § 217.50 ...........................................................................................17

10 C.F.R. § 217.54 ...........................................................................................17

10 C.F.R. § 217.55 ...........................................................................................20

Petitioners' Opposition to Real Parties' Motion for Reconsideration and to Dissolve Injunction

## INTRODUCTION

In the face of having unsuccessfully tried on two separate occasions to rescind the Preliminary Injunctions in these consolidated cases, and having to now answer for openly defying them, Sable attempts to take a *third* bite at the apple by testing all of its already-rejected arguments in this Court. Sable's Motion should be summarily rejected because it is a forbidden de facto appeal, impermissibly successive, and untimely. And even if the Court were to delve into Sable's regurgitated arguments, nothing Sable raises warrants a different conclusion than that reached by the Superior Court for Santa Barbara County (the "State Court"): the Preliminary Injunctions remain effective and enforceable. Petitioners respectfully urge the Court deny Sable's improper and unjustified Motion.[1]

## FACTUAL BACKGROUND

This case arises from Sable's efforts to restart oil pipelines CA-324 and CA-325 (the "Pipelines"), the former of which ruptured in 2015 at Refugio State Beach, causing one of the worst oil disasters in California history. As was discovered after the spill, the Pipelines suffer from a critical design defect (ineffective cathodic protection) that leaves them vulnerable to pervasive corrosion and, consequently, another catastrophic rupture. Notably, in addition to sensitive coastal areas, the Pipelines pass through major sources of water supply; renowned parks and ecological reserves; and a populated suburban neighborhood in Buellton, California, complete with schools, parks, and dozens of residential homes.

### I.    Sable's Obligations Under the Consent Decree

Following the spill, the federal Pipeline and Hazardous Materials Safety Administration (PHMSA), various State agencies, and the then-owner of the Pipelines (Plains) negotiated a Consent Decree that, among other things, addressed the future of the Pipelines. Given the defective nature of the Pipelines, the Consent Decree contemplated

---

[1] Petitioners' Ex Parte Application for Immediate Remand and Respondent Office of the State Fire Marshal's Motion to Remand were heard by this Court on June 8, 2026. If granted, Sable's Motion for Reconsideration need not be heard.

Petitioners' Opposition to Real Parties' Motion for Reconsideration and to Dissolve Injunction

three options: (1) abandonment of the Pipelines; (2) replacement of the Pipelines; or (3) restart of the Pipelines, but only under strict conditions. Those conditions included, *inter alia*, obtaining from Respondent Office of the State Fire Marshal (OSFM) waivers for the "limited effectiveness of cathodic protection" and approval of a Restart Plan for each line. Notice of Removal, Exh. NN, p. 15.

Importantly, before the spill, the Pipelines were classified as *inter*state facilities that, pursuant to the federal Pipeline Safety Act ("PSA"), 49 U.S.C. § 60101 *et seq.*, fall under PHMSA's jurisdiction. *See, e.g.,* 49 U.S.C. § 60104(c). However, they were reclassified as *intra*state in 2016, rendering OSFM the proper regulator of the lines. *See id.* at 60105(a). Hence, the parties agreed that approval of any waivers or restart plans had to be sought from, and issued by, OSFM. Notice of Removal, Exh. NN, p. 31.

**II.    The Basis for this Lawsuit and the State Court's Preliminary Injunctions**

Sable purchased the defunct Pipelines in 2024 and, in doing so, agreed to assume the obligations of the Consent Decree.[2] Notice of Removal, Exh. MM, pp. 121–28. Then, relying on the Consent Decree, Sable began efforts to restart—rather than replace—the defective Pipelines (the "Restart Project"), including by applying to OSFM for State Waivers. In December 2024, OSFM issued the requested waivers—one for each pipeline—which excused Sable from complying with critical corrosion prevention and remediation requirements. The waivers became final in February 2025.

On April 15, 2025, two groups of Petitioners—one represented by the Center for Biological Diversity, and one by the Environmental Defense Center—filed companion lawsuits in State Court challenging the State Waivers and the broader Restart Project. *See, e.g.*, Notice of Removal, Exh. B, p. 5 (construing the challenged project as "restart [of] the Santa Ynez Unit oil and gas operations and transport of oil though the Las Flores Pipeline[s]"). The Petitions included claims that the Restart Project is subject to the California Environmental Quality Act, that OSFM failed to comply with procedural

---

[2] In addition, Sable was bound by the terms of the Consent Decree as a successor-in-interest. Notice of Removal, Exh. NN, p. 12.

2

Petitioners' Opposition to Real Parties' Motion for Reconsideration and to Dissolve Injunction

requirements of the federal and state pipeline safety acts, and that OSFM abused its discretion in issuing the State Waivers. Notice of Removal, Exhs. B-C.

On June 3, 2025, both groups of Petitioners applied for a Temporary Restraining Order enjoining restart of the Pipelines, which the State Court granted. Thereafter, on July 29, 2025, the State Court granted, in part, Petitioners' companion requests for a Preliminary Injunction, issuing two identical orders providing as follows:

> The applications are granted to enjoin, pending the disposition of these proceedings or further order of the court, the restart of the Las Flores Pipelines, as herein defined, until 10 court days following the filing and service of notice by or on behalf of real parties in interest Sable Offshore Corp., and Pacific Pipeline Company (collectively, Sable) that Sable has received all necessary approvals and permits for restarting the Las Flores Pipelines and that Sable intends to commence such restart.

Notice of Removal, Exh. D, p. 9 (the "Injunctions").

### III.    Sable's First Unsuccessful Attempt at Rescinding the Injunctions Based on PHMSA's Purported Seizure of the Pipelines

Shortly thereafter, on September 11, 2025, Sable submitted to OSFM updated Restart Plans for approval, as required by the Consent Decree. On October 22, 2025, OSFM responded by stating that "OSFM identified a requirement of the State Waivers that has not yet been met and that Sable must complete prior to any potential restart." Notice of Removal, Exh. LL, p. 71. This requirement pertained to the need for additional repair of anomalies on corroded sections of the Pipelines. *Id*.

Seeking to circumvent OSFM, Sable sent a letter to PHMSA on November 26, 2025, unilaterally determining that the Pipelines are "interstate," not "intrastate," and requesting that PHMSA thereby wrest jurisdiction of the Pipelines from OSFM. Notice of Removal, Exh. LL, p. 74. On December 17, 2025, PHMSA sent Sable a letter concurring in its "interstate" determination. *Id*. at 79. Therein, PHMSA advanced a novel and absurd theory that the Pipelines, Sable's oil and gas processing plants, and an offshore emulsion line form a single contiguous "pipeline" that extends from federal waters to Kern County, rendering the Pipelines segments of an *inter*state pipeline, rather than distinct *intra*state

3

Petitioners' Opposition to Real Parties' Motion for Reconsideration and to Dissolve Injunction

facilities. *Id.* Never in the forty-year history of these facilities had PHMSA considered them a single, interstate "pipeline facility."

Within days, PHMSA approved Restart Plans it received from Sable and granted Sable a Special Permit, the federal equivalent of a State Waiver, on an emergency basis. *Id*. at 132, 135. However, because the Consent Decree vests *OSFM* with exclusive authority over the Pipelines, and because the Pipelines, which begin and end fully within state boundaries, are *intra*state facilities, Petitioners filed a Petition for Review of PHMSA's decisions in the Ninth Circuit Court of Appeals on December 24, 2025. *Environmental Defense Center, et al. v. PHMSA, et al.*, No. 25-8059 (9th Cir. 2026). The case was consolidated with a separate Petition brought by the State, both of which are fully briefed with oral argument scheduled for July 7, 2026. *See id* at Dkt. No. 70.

Following PHMSA's actions, on January 5, 2026, Sable moved the State Court for the first time to reconsider and rescind the Injunctions on the grounds that PHMSA's actions rendered them moot. *See* Notice of Removal, Exh. E, p. 9. On February 27, 2026, the State Court rejected Sable's request (the "February Order"). In pertinent part, the court explained it "does not find the evidence of subsequent events involving PHMSA and federal appellate proceedings are sufficient to reconsider its ruling on the preliminary injunction or to modify or dissolve the preliminary injunction." Notice of Removal, Exh. OO, p. 19. Specifically, the court observed that, notwithstanding PHMSA's actions, the Consent Decree, which requires Sable to obtain approvals *from OSFM*, remained in effect; thus "it [was] not persuaded . . . that administrative actions taken by PHMSA necessarily eliminates OSFM participation in the restart process." *Id*.

IV.    **Sable's Second Unsuccessful Attempt at Rescinding the Injunctions Based on the DPA Order**

Unsatisfied with the State Court's first ruling and the various impediments it faced to restart, Sable turned to the United States Secretary of Energy. On March 13, 2026, at the behest of Sable, the Secretary issued a Defense Production Act order that directed Sable to "immediately prioritize and allocate pipeline transportation services for

4

Petitioners' Opposition to Real Parties' Motion for Reconsideration and to Dissolve Injunction

hydrocarbons" and "immediately commence performance under contracts or orders for service" (the "DPA Order"). Notice of Removal, p. 7, Exh. A. The next day, in reliance on the DPA Order, Sable restarted the Pipelines in open defiance of the Injunctions, which the State Court had just weeks ago affirmed remained in place.

Only after Sable violated the Injunctions did it then come back again and beseech the State Court to rescind and reconsider them. Notice of Removal, Exh. OO, pp. 146-147. As grounds therefor, Sable cited an alleged conflict between the Injunctions and the DPA Order as well as the fact it had purportedly now relinquished the State Waivers at issue. Petitioners opposed, and they sought two orders of their own: an order to immediately enforce the Injunctions and an order to show cause why Sable is not in contempt of court. Notice of Removal, Exh. E, p. 9.

On April 17, 2026, the State Court again denied Sable's request to rescind the Injunctions (the "April Order"). It re-emphasized that this case, and Petitioners' claims, flow from a *federal* Consent Decree that requires Sable to obtain favorable approvals from OSFM. Notice of Removal, Exh. E, pp. 2-17. Thus, the Court recognized that "[t]he conflict issue raised by Sable is not a conflict between state law and federal law, but a conflict between the DPA Order, as interpreted here by Sable, and the Federal Consent Decree." *Id*. at 14. And, in that regard, the Court found that the DPA Order did not, and could not, excuse Sable from compliance with the Consent Decree. Accordingly, the court explained that "there is no preemption issue," and "[t]he DPA Order therefore does not constitute a basis for dissolving or modifying the preliminary injunction." *Id.* at 14, 16.

As to Sable's mootness claim, the State Court again pointed to the Consent Decree, noting that, while perhaps not preferable to Sable, it was nonetheless required to proceed through OSFM. Thus, it could still afford Petitioners effective relief on their claims challenging the Restart Project and the propriety of OSFM's actions. *Id*., Exh. E, pp. 14, 16.

Ultimately, the Court "ma[de] its position clear as to the current vitality of the preliminary injunction[s] in light of recent events" and expressed its "deep[] concern[] with noncompliance with the preliminary injunction[s]." *Id.*, p. 17. With regard to Petitioners' requests for relief, the Court continued Petitioners' application to May 22, 2026. *Id.* at p. 6.

Just a week before the May 22 hearing, Sable and the United States filed an untimely and improper Notice of Removal along with the instant motion to reconsider and dissolve the Injunctions.

### LEGAL STANDARDS

Requests to reconsider an interlocutory order and requests to dissolve a preliminary injunction are governed by distinct legal frameworks.

Start with *reconsideration*:

> Technically, the Federal Rules of Civil Procedure do not recognize a motion for reconsideration. A reconsideration motion is construed in one of two ways. Courts have generally held that, regardless of the title, any motion for reconsideration filed within the time specified by Rule 59(e) [(i.e., 28 days)] is treated as a motion to alter or amend a judgment. A motion for reconsideration filed more than 28 days after entry of judgment is treated as a motion seeking relief from judgment under Rule 60(b).

16 James W. Moore, et al., *Moore's Federal Practice*, § 59.30[7].

Sable invokes only Rule 59(e). "While Rule 59(e) permits a district court to reconsider and amend a previous order, the rule offers an 'extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources.'" *Carroll v. Nakatani*, 342 F.3d 934, 945 (9th Cir. 2003) (citation omitted). Indeed, "a motion for reconsideration should not be granted, absent highly unusual circumstances, unless the district court is presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law." *Id.* (citation omitted). And, "[a] Rule 59(e) motion may not be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation." *Id.* (citation omitted).

Petitioners' Opposition to Real Parties' Motion for Reconsideration and to Dissolve Injunction

This Court's Local Rule 7-18 adds another wrinkle to motions for reconsideration: absent good cause shown, they must be brought within 14 days after entry of the subject order. Additionally, "no motion for reconsideration may in any manner repeat any oral or written argument made in support of, or in opposition to, the original motion." Local Rule 7-18.

As to motions to *dissolve* an injunction, Petitioners agree that such requests are cognizable under Rule 54.[3] However, "[a] party seeking modification or dissolution of an injunction bears the burden of establishing that a significant change in facts or law warrants revision or dissolution of the injunction." *Sharp v. Weston*, 233 F.3d 1166, 1170 (9th Cir. 2000).

## ARGUMENT

### I.   Sable's Motion is Improper and Should be Summarily Rejected.

Sable appears to make three distinct requests: (1) *reconsideration* of the April Order (2) *reconsideration* of the February Order; and (3) *dissolution* of the Injunctions. All three requests are improperly before this Court.

### A.   Sable Cannot Seek Relief While in Violation of the Injunctions.

Noncompliance with an injunction "is an important and often dispositive factor in deciding whether to lift an injunction." *Orantes-Hernandez v. Holder*, 713 F.Supp.2d 929, 954 n. 38 (C.D. Cal. 2010); *see Board of Educ. v. Dowel,l* 498 U.S. 237, 249 (1991) ("[I]n deciding whether to modify or dissolve a [court] decree," compliance "is obviously relevant"). Sable does not deny that it is in violation of the Injunctions. In fact, as soon as the ink dried on the April Order, Sable began a series of announcements that it had restarted operations *despite* that order. *See* Declaration of Linda Krop, Exhs. A, C. Indeed, Sable publicly stated that "The judge didn't stop anything . . . . We're producing just like we were yesterday and the day before and the day before that." *Id.* at Exh. B.

---

[3] Sable also invokes Rule 65, but that Rule does not, in itself, provide a basis to dissolve an injunction.

7

Unless and until Sable comes into compliance, this Court should not entertain any request to dissolve the Injunctions or for any other kind of equitable relief.

**B.      Sable's Third Request for Dissolution is Untimely, Impermissibly Successive, and a De Facto Appeal of the State Court's Orders.**

Sable's *third* attempt to challenge the Injunctions is based on all the same grounds it previously raised—i.e., PHMSA's actions and the DPA Order—which the State Court rejected. As such, Sable's request is improper for at least three reasons:

*First,* Sable's request is impermissibly successive. *See Birmingham Fire Fighters Ass'n 117 v. Jefferson County*, 290 F.3d 1250, 1253 (11th Cir. 2002) ("If a party whose motion for an injunction, or to dissolve or modify an injunction, is denied fails to file an appeal within the prescribed time-frame, it may not file a successive motion requesting the same relief . . . .")*; id*. at 1254 (A successive motion is only "a viable being in its own right" where there has been an intervening change in "circumstances, evidence, or law"); *see also Natural Resources Defense Council, Inc. v. Environmental Protection Agency*, 490 F.Supp.3d 190, 194-95 (D.D.C. 2020) ("[A] court's discretion under Rule 54(b) is 'limited by the law of the case doctrine and subject to the caveat that where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again.'" (citation omitted)).

*Second*, because Sable asks this Court to consider dissolution on the same grounds that the State Court already rejected, its request for dissolution is, for all practical purposes, a request to *reconsider* the Court's February and April Orders. *See Credit Suisse First Boston Corp. v. Grunwald*, 400 F.3d 1119, 1123 (9th Cir. 2005) (to determine whether a request is for reconsideration or for dissolution, "we must look beyond the motion's caption to its substance" (quoting *Favia v. Ind. Univ. of Pac.*, 7 F.3d 332, 337 (3d Cir. 1993)). Thus, like Sable's separate requests to reconsider those orders (addressed below), its request is untimely.

*Third*, Sable's request constitutes an improper "de facto appeal" of the State Court's adverse decisions. *See Noel v. Hall,* 341 F.3d 1148, 1158 (9th Cir. 2003) ("A

Petitioners' Opposition to Real Parties' Motion for Reconsideration and to Dissolve Injunction

federal district court dealing with a suit that is, in part, a forbidden de facto appeal from a judicial decision of a state court must refuse to hear the forbidden appeal"); *see also Searle v. Allen,* 148 F.4th 1121, 1128 (9th Cir. 2025) (a federal district court cannot hear matters "[1] brought by state-court losers [2] complaining of injuries caused by state-court judgments [3] rendered before the district court proceedings commenced and [4] inviting district court review and rejection of those judgments") (quoting *Brown v. Duringer Law Grp. PLC*, 86 F.4th 1251, 1253 (9th Cir. 2023)). Sable's request thus runs afoul of the well-settled "principle that there should be no appellate review of state court judgments by federal trial courts." *Noel,* 341 F.3d at 1155.

### C. Sable's Requests for Reconsideration of the February and April Orders Are Likewise Improper.

Sable was required to seek reconsideration of these orders, if at all, within fourteen days—i.e., March 12, 2026, for the February Order; and May 11, 2026, for the April Order. Local Rule 7-18. It failed to do so.

Additionally, Sable does not seek reconsideration of either order based on any new change in fact or law. Instead, it seeks to relitigate the arguments it already raised and were properly rejected by the State Court. Thus, it seeks, improperly, to "de facto" appeal the State Court's adverse decisions. *Noel,* 341 F.3d at 1155.

For the foregoing reasons, Sable's Motion should be summarily rejected.

## II.   As the State Court Already Found, PHMSA's Purported Seizure of the Pipelines Does Not Warrant Dissolution of the Injunctions.

Sable claims that PHMSA's seizure of the Pipelines nullified the Injunctions because "[o]nce PHMSA determined that the Pipelines w[ere] interstate, OSFM's authority to issue State Waivers ceased to be a predicate for restart," and thus "Sable does not require State Waivers for a pipeline that is not regulated by the State." Motion at 20-21. It also claims that its purported relinquishment of the State Waivers in the wake of PHMSA's seizure separately rendered Petitioners' claims moot. *Id.* at 23–24.

Petitioners' Opposition to Real Parties' Motion for Reconsideration and to Dissolve Injunction

All of these arguments were presented to the State Court and properly rejected in its February Order. By attempting to relitigate these issues for a second time, Sable is not presenting the Court with any *new* change in circumstances that have not already been considered. Instead, it is, effectively, seeking reconsideration of the State Court's conclusions in its February Order. Such request is not properly before this Court. *See, supra,* Part I. But if it were, the February Order would be reviewable only for "clear error," which the State Court did not commit. *Carroll*, 342 F.3d at 945.

**A.    The Consent Decree Remains in Effect and Requires OSFM Approval of State Waivers and Restart.**

As the State Court recognized, notwithstanding PHMSA's actions, the Consent Decree expressly requires Sable to obtain State Waivers *from OSFM* before restarting the Pipelines. Notice of Removal, Exh. OO (February Order), p. 19. Thus, "[t]he court [wa]s not persuaded . . . that administrative actions taken by PHMSA necessarily eliminates OSFM participation in the restart process." *Id.* at 19. This Court has likewise recognized that "[u]nder the binding Consent Decree. . . regulation of the Pipeline[s] is to be controlled by [OSFM]." *California Department of Parks and Recreation v. Sable Offshore Corp. et al.,* No. 2:26-cv-02946-SVW-SSC, Dkt. No. 60 at p. 7 (C.D. Cal. May 28, 2026).

Nothing has changed to date. The Consent Decree remains effective and binding on Sable and, as such, Sable must obtain State Waivers from OSFM. PHMSA's actions cannot obviate the Consent Decree, and neither PHMSA nor Sable can unilaterally excuse itself from its mandates. *See Nehmer v. VA,* 494 F.3d 846, 860 (9th Cir. 2007) (a party "cannot dictate the meaning of [a consent] decree to [a] court or relieve itself of its obligations under the decree without the [issuing] district court's approval").

Accordingly, as it stands, PHMSA's assertion of jurisdiction over the Pipelines does not change the fact that Sable must proceed with its Restart Project via OSFM, and it  thus has no bearing on either the validity of Petitioners' claims or the Injunctions. The State Court's conclusion to this effect was not "clear error."

Petitioners' Opposition to Real Parties' Motion for Reconsideration and to Dissolve Injunction

**B.      Petitioners Do Not Seek to Collaterally Litigate or Enforce the Consent Decree.**

To get around this, Sable argues that the Injunctions "impermissibly attempt to collaterally litigate issues that may only be—and in fact are—raised in the Consent Decree proceeding itself." Motion at 21. Sable misrepresents the State Court proceedings. Neither Petitioners nor the State Court have attempted to relitigate or "enforce" the Consent Decree. Rather, in each of its decisions, the State Court merely afforded the Consent Decree full faith and credit as a final judgment. *See* Notice of Removal, Exh. E (April Order), p. 14 ("In the present, the Federal Consent Decree remains a binding determination as to the requirements for operations of the Las Flores Pipelines."). Indeed, if anyone is seeking to litigate the validity of the Consent Decree in this matter, it is Sable, who has now on three separate occasions asked a court to ignore its obligations under the Consent Decree. *See id*. ("Against this legal backdrop, Sable argues that the DPA Order supersedes the requirements of the Federal Consent Decree.")

**C.      Petitioners' Claims are not Moot.**

Lastly, Sable incorrectly contends, again, that "no live controversy remains to support the Preliminary Injunction" given its purported relinquishment of the State Waivers. Motion at 24.

A case becomes moot only when it is "impossible for a court to grant any effectual relief whatever to the prevailing party." *Chafin v. Chafin,* 568 U.S. 165, 172 (2013). "As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Id.* (citation omitted); *see also Gutierrez v. Saenz,* 606 U.S. 305, 320 (2025).

Before the State Court, Petitioners cited, *inter alia*, two state cases that the State Court relied on in reaching its decision: *Citizens for Open Government v. City of Lodi*, 144 Cal.App.4th 865, 873 (2006) and *Friends of the Eel River v. North Coast Railroad Authority*, 178 Cal.Rptr.3d 752, 767 (2017), *rev'd on other grounds*, 3 Cal.5th 677 (2017). These cases hold that, simply because a project approval has been rescinded—or

11

Petitioners' Opposition to Real Parties' Motion for Reconsideration and to Dissolve Injunction

in this case, relinquished—does not in itself render a case moot. *See City of Lodi*, 144 Cal.App.4th at 873; *Friends of the Eel River*, 178 Cal.Rptr.3d at 767. The pertinent inquiry in such circumstances is whether the project applicant has *abandoned* the project; if not, it may still be possible, as here, for the court to grant effective relief to Petitioners. *See City of Lodi*, 144 Cal.App.4th at 873. The reasoning of these cases holds true here in the federal context, which has a nearly identical standard for mootness. *Compare Woodward Park Homeowners Assn. v. Garreks, Inc.*, 77 Cal.App.4th 880, 888 (2000) (a case is moot only when a court's ruling "can have no practical impact or provide the parties effectual relief"), *with Chaffin¸* 568 U.S. at 172 (the pertinent inquiry is whether the court can grant any "effectual relief").

Sable has, quite obviously, *not* abandoned the project challenged in this matter (restart of the Pipelines) and is instead pursuing it at all costs. And while Sable may prefer otherwise, it still needs approvals from OSFM in order to pursue the project, as expressly required by the Consent Decree and as both this Court and the State Court have already recognized. Because Petitioners' challenge here asks for relief regarding what process OSFM must follow in issuing those approvals, and what corollary rights Petitioners have to participate in that process, this Court can still afford effective relief to Petitioners notwithstanding Sable's purported relinquishment of the State Waivers. In other words, so long as the Consent Decree—which compels Sable to proceed through OSFM—remains in effect and Sable has not abandoned its efforts to restart and operate the Pipelines, the relief requested by Petitioners will have a practical impact on OSFM's review. Thus, Petitioners' claims are not moot. *See Chafin*, 568 U.S. at 172; *City of Lodi*, 144 Cal.App.4th at 873; *Friends of the Eel River*, 178 Cal.Rptr.3d at 767.

To illustrate the point, consider what would occur, for example, if Sable's pleas for federal intervention—its pretext for unlawfully circumventing OSFM—fall flat. *See, e.g., State of California v. Chris Wright et al.*, No. 2:26-cv-03396 (C.D. Cal. 2026) (challenging DPA Order); *State of California v. PHMSA*, No. 26-508 (9th Cir. 2026) (challenging PHMSA's federalization of the Pipelines). Having given no indication that it

12

intends to abandon the project, Sable will be right back to pursuing restart via OSFM. That would include, *inter alia*, renewing its requests for State Waivers under the statutory schemes of which Petitioners seek declaratory relief. Or, more cynically, absent having provided any authority suggesting that a State Waiver can be invalidated by a unilateral communication from the operator, Sable may simply attempt to walk back its purported relinquishment of the State Waivers. In either case, the Court can grant effectual relief, either by reforming OSFM's review process for the project, or by estopping Sable from relying on unlawfully-issued Waivers.

### III. As the State Court Already Found, the DPA Order does not Preempt or Otherwise Override the Injunctions.

Sable effectively appeals the April Order to this Court, claiming that the State Court committed "clear error" by (1) finding the DPA Order lacks the preemptive effect Sable claims and (2) failing to consider changed circumstances flowing from the DPA Order. Motion at 25. The State Court's ruling was correct on the merits, and Sable has not raised any circumstances that the State Court did not consider.

#### A. Sable's Motion does not Address the Continued Vitality of the Consent Decree, Which the State Court Found Dispositive.

In short, because this action is litigated under color of *federal* authority, Sable's reliance on "preemption" is altogether misplaced.

As the State Court recognized, the Injunctions, like Petitioners' claims, flow from a federal Consent Decree that requires Sable to obtain approvals from OSFM before restarting the Pipelines. Notice of Removal, Exh. E, p. 12. The Consent Decree is, like all final judgments of Article III courts, federal law. *See Mi Familia Vota v. Fontes,* 129 F.4th 691, 717–18 (9th Cir. 2025). To date, it remains in force and binding on all parties thereto. *Ibid.*

So long as federal law—i.e., the Consent Decree—precludes restart without authorization from OSFM, whatever conflict exists is one between federal authorities that

13

Petitioners' Opposition to Real Parties' Motion for Reconsideration and to Dissolve Injunction

are incapable of preempting one another. And so long as that conflict persists, the Injunctions remain consistent with federal law and cannot be preempted.

To get around this problem, Sable seems to suggest that the DPA Order sweeps its federal obligations aside, too. That cannot be true. Nothing in its statutory text suggests otherwise, and the courts that have examined that question have decided against it. *See, e.g., United States v. Vertac Chem. Corp.,* 46 F.3d 803, 812 (8th Cir. 1995) (holding that DPA did not displace CERCLA). And in any event, no DPA order has the power to displace a decision from a coequal branch of government. The Executive Branch cannot, consistent with the separation of powers, "overturn[] or refuse[] faith and credit" to a federal court's final judgment, and it certainly cannot authorize a private entity to flout such a judgment. *Taylor v. United States,* 181 F.3d 1017, 1024 (9th Cir. 1999) (en banc).

The State Court had it right: so long as the Consent Decree remains effective, the DPA Order has no preemptive effect on the Injunctions.

**B.    Sable Reads into the DPA's Liability Shield a Preemptive Power that Does Not Exist.**

As Sable tells it, "[s]ection 707 of the DPA, 50 U.S.C. § 4557, is an express preemption provision" which "[t]he state court mistakenly limited" to extending solely to contract liability. Motion at 25–26. Relying on two obscure Comptroller General opinions, it urges this Court to depart from the longstanding precedent that the State Court relied on, arguing that Congress intended Section 707 to confer a virtually unlimited shield of liability because: (1) instead of insulating entities for "default under any contract or order," as in the Second War Powers Act, the DPA refers to "any act or failure to act"; and (2) Congress amended Section 707 by deleting the word "his," which previously qualified "compliance." Motion at 26–27. Sable did not raise these arguments before, and it is thus precluded from doing so here. *Carroll*, 342 F.3d at 945.

In any event, as to (1), Sable's argument has already been considered and rejected by at least one federal court, which it fails to cite. In *In re "Agent Orange" Prod. Liab. Litig.,* 597 F. Supp. 740 (E.D.N.Y. 1984), a class of veterans and their families brought a

14

Petitioners' Opposition to Real Parties' Motion for Reconsideration and to Dissolve Injunction

products liability action against defendants the U.S. and a major portion of the chemical industry for injuries sustained from the use of Agent Orange herbicide during the Vietnam War. As here, "[t]he defendants argue[d] that the deletion of the reference to 'contract' in Section 707 . . . indicate a desire by Congress not to limit the immunity to contractual breaches." *Id.* at 844. The court roundly rejected this argument, explaining that:

> The deletion of the reference to contract and the inclusion of th[e] [amended] language in the legislative history are inconclusive at best and, in light of other factors, irrelevant. . . . Several factors militate against giving section 707 full literal effect. The first is that section 707 was enacted as the quid pro quo to section 101 . . . Logically, then, the protection afforded by section 707 should correspond to the risk imposed, viz, the possible need for the contractor to break its contracts with third parties. . . Second, it is unlikely that Congress would work such a major change in [liability] law without being explicit about it. This point is emphasized by the fact that when, in analogous areas, Congress did deal with the question of tort liability it was quite explicit about it.

*Id.* at 845.

About a decade later, two cases—which the State Court cited at length—confirmed that "the protection provided by DPA section 707 extends only to shield a contractor from breach of contract liability." *Hercules, Inc. v. United States*, 24 F.3d 188, 204 (Fed. Cir. 1994); *accord United States v. Vertac*, 46 F.3d 803, 812 (8th Cir. 1995) (agreeing with *Hercules*). As in its previous effort to rescind the Injunctions, Sable does not meaningfully addresses *Hercules* or *Vertac*, and it does not offer any persuasive justification for departing from these longstanding authorities.[4]

As to (2), and as noted by the Comptroller Opinion that Sable itself cites, this change (the deletion of "his") was merely intended to clarify that the liability shield should apply to downstream parties—e.g., "where a contractor is unable to carry out a

---

[4] Although Sable also argues that *Hercules* "left open the possibility that § 707 might provide immunity" in circumstances where indemnity is not sought from the United States (Motion at fn. 6), such assertion is belied by *In re Agent Orange*, where the court interpreted section 707 as not immunizing chemical companies from tort liability.

15

contract because his suppliers are prohibited from making or shipping him the parts he needs to carry out the contract" by a DPA order. 32 Comp. Gen. 497, 498. It does not bear on how to construe the *type* of liability shielded by Section 707.

Accordingly, the State Court's interpretation of the scope of Section 707 was correct, consistent with longstanding precedent, and, thus, did not amount to "clear error."

### C. There Is No Clear and Manifest Showing that Congress Conferred the Preemptive Power Sable Claims for the DPA Order.

Sable's preemption theory faces another hurdle: It has made no showing that the DPA Order fell within the Secretary's authority in the first place, nor that Congress intended to confer on the President or his delegees the preemptive power Sable now claims for them.

Start with the shortfall in the Secretary's authority. As relevant here, the DPA authorizes two things. It creates a "priority" power, under which the President or his delegee can accord favored contracts or orders a special status that permits them to jump the queue over "any other contract or order." 50 U.S.C. § 4511 (a), (c); *see also* Webster's 2d New Collegiate Dictionary 671 (1953) (a "priority" is a "wartime" or equivalent "preferential rating assigned by the government for the delivery of products according to the relative need of each" and "the proportionate allocation of scarce materials"). And it creates an "allocation" power, under which the President or his delegee may "allocate"—that is, "control the distribution of"—certain materials, services, and facilities. *See* 10 C.F.R. § 217.20; s*ee also* Webster's 2d at 24 (to "allocate" means "to distribute as a share, part, or the like; to assign, apportion"; the "government apportionment and distribution of available materials among producers"). The DPA also makes both powers subject to various requirements and guardrails, including the requirement that delegee agencies "establish standards and procedures by which the priorities and allocations authority" shall be "used." 50 U.S.C. § 4511 (d)(1).

Petitioners' Opposition to Real Parties' Motion for Reconsideration and to Dissolve Injunction

At least as interpreted by Sable, the DPA Order oversteps these authorities in several ways. First, rather than allocate shares or parts of an existing resource, it orders Sable to create a service that did not previously exist, following the catastrophic 2015 rupture when the Pipelines were shut down—pipeline transportation services through the Pipelines. Second, and similarly, it instructs Sable to "utilize" those pipelines' capacity. The DPA does not authorize compelling a new resource into existence, or commanding that it be "utilized" in a particular way. Indeed, Congress crafted entirely distinct provisions of the DPA to incentivize expanded production—provisions that notably rely on federal subsidies, not commands. *See, e.g.*, 50 U.S.C. § 4533. Third, the DPA Order instructs Sable to "immediately commence" performance of contracts to deliver the services it compels into creation. But the DPA allows performance to be required only "for the purpose of assuring" that one contract receives priority over another. 50 U.S.C. § 4511 (a). Here, there is no evidence that Sable will or could accord priority to any other hydrocarbon transportation contracts. Fourth, the DPA Order ignores the requirements imposed by the binding regulations Congress required the Department of Energy to issue. *See, e.g.*, 10 C.F.R. §§ 217.50, 217.54. And fifth, the DPA Order omits the statutorily required findings that the services or materials at issue are "scarce, critical, and essential." 50 U.S.C. § 4511(c)(2)(A).

But even if those problems could be overlooked, Sable cannot show that Congress intended for DPA prioritization and allocation orders to preempt state regulatory laws—or court orders—like those at issue here. *See La. Pu. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) (when, as here, a litigant urges that a secretarial action has preemptive effect, courts must consider whether Congress delegated the authority to displace state law). To the contrary, every clue to statutory meaning conveys a much narrower intent.

First, in drafting Section 101 of the DPA, Congress created two narrow powers— the power to "prioritize" and the power to "allocate"—that both relate to the specific context of federal procurement and contracting. When Congress meant to confer powers that could interfere with *other* rights and interests, it said so—and it placed meaningful

17

guardrails on doing so. For instance, when the DPA was first enacted, it included the power to "requisition" materials. *See* Pub. L. 81-774, 64 Stat. 799, § 201. That power enabled the President to seize property or require its use, if (and only if) the need was "immediate and impending," "will not admit of delay or resort to any other source of supply," and "all other means of obtaining the use of such property" were exhausted. *Id.* § 201 (a)(2)–(3). Congress likewise included specific instructions for how the President could exercise that power consistent with the Fifth Amendment. *See id.* § 201 (a)(3), (b). And it ordered the immediate return of requisitioned property following use. *Id.* § 201 (b)–(c). That Congress included such significant protections from such a consequential power is little surprise.[5] But Congress included no similar protections or requirements in Title I. That conscious drafting choice strongly weighs against any suggestion that Congress intended the prioritization or allocation powers to authorize the President to seize state property rights or override state sovereignty, as Sable insists happened here. *Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) ("[W]hen the legislature uses certain language in one part of the statute and different language in another," courts "assume[] different meanings were intended.").

Moreover, the DPA includes a liability shield that conveys exactly where Congress wanted to displace competing obligations—and where it intended no such thing. 50 U.S.C. § 4557. As discussed, for decades, courts have construed it only to provide immunity from *contract* damages or penalties. *In re Agent Orange*, 597 F.Supp. at 845; *Hercules*, 24 F.3d at 204; *Vertac*, 46 F.3d at 811–12.

**D.     Sable Can Comply with Both the DPA Order and the Injunction.**

Even setting all of the above aside, Sable's impossibility preemption argument still fails. Impossibility preemption is a "demanding" argument. *Wyeth v. Levine*, 555 U.S. 555, 573 (2009). The "possibility of impossibility is not enough." *Merck Sharp & Dohme*

---

[5] Nor did such a consequential power last. After President Truman controversially seized the steel mills on a similar theory, Congress terminated the provision altogether. Pub. L. 83-95, 67 Stat. 129 (1953).

Petitioners' Opposition to Real Parties' Motion for Reconsideration and to Dissolve Injunction

*Corp.*, 587 U.S. 299, 314 (2009) (quotation and brackets omitted). Rather, there must be a "physical impossibility" or an "inevitable collision" for a federal law to override its state counterpart. *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 143 (1963). Sable has not shown either here.

As Sable tells it, the DPA Order commands Sable to commence the flow of crude through the Pipelines while the Injunctions forbid it from doing so. That is not what the DPA Order says. But even if it did, Sable could have complied with both orders—by working swiftly to obtain the approvals the Injunctions require, then reporting them to the State Court and waiting ten days thereafter. All the more so, because Sable has been aware of its obligations under the Injunctions since July 2025—and because, by itself requesting the Secretary's intervention, Sable was well aware the DPA Order might be coming. Additionally, although incorrect, if Sable's position is that it now has all necessary approvals to restart by virtue of the DPA Order, nothing prevented Sable from complying with the Injunctions' modest requirement to provide 10 days' notice that it had obtained such approvals. Instead, Sable simply disregarded the Injunctions, depriving the State Court of the opportunity it had carefully reserved to itself to determine whether Sable had, in fact, obtained all necessary approvals.

Sable's counter appears to be that the "immediate[]" action compelled by the DPA Order foreclosed these options, but that is neither helpful to Sable nor true. It does not explain why Sable sat on its hands prior to the DPA Order's issuance. Sable has had since last July—if not longer—to obtain all necessary permits. And in any event, Sable's interpretation is difficult to reconcile with the text of the DPA Order. The Order does not define the term "immediate," nor does Sable show it must mean in a matter of days rather than weeks or months. If anything, the surrounding context of highly complex hydrocarbon transactions suggests the latter. Nor does Sable explain why it could not swiftly "prioritize" one set of contractual obligations over another, or promptly "allocate" its services to one client or purpose over another, even if it would take time to complete those tasks.

19

Petitioners' Opposition to Real Parties' Motion for Reconsideration and to Dissolve Injunction

And even setting all these issues aside, to the extent Sable could not comply fully with the DPA Order, the Department of Energy's DPA regulations explain that Sable's recourse is to comply to the extent possible and notify the Department—not to simply ignore its conflicting obligations. 10 C.F.R. § 217.55. Sable thus falls far below showing an inevitable collision of state and federal law.

**E.     The State Court Explicitly Considered the DPA Order as a "Changed Circumstance."**

Finally, Sable inaccurately argues that "[t]he state court failed to take into account the significant changed circumstances flowing from the DPA Order." Motion at 25. This is simply disingenuous. The State Court explicitly considered and rejected Sable's argument that the DPA Order warrants dissolution of the Injunctions. Notice of Removal, Exh. E, pp. 13–16. Sable offers no new information that the State Court did not already consider in its April Order denying Sable's request.

## CONCLUSION

Sable's Motion is patently improper and fails to present any legitimate justification for this Court to dissolve the Injunctions or reconsider the State Court's February and April Orders upholding them. Petitioners respectfully urge the Court to deny Sable's Motion.

Respectfully submitted this 15th day of June, 2026.

*/s/ Linda Krop*
Linda Krop
Margaret M. Hall
Jeremy M. Frankel
ENVIRONMENTAL DEFENSE
CENTER
*Counsel for Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, Santa Barbara Channelkeeper and Surfrider Foundation.*

20

Petitioners' Opposition to Real Parties' Motion for Reconsideration and to Dissolve Injunction

/s/ *Talia Nimmer*
Julie Teel Simmonds
David Pettit
Talia Nimmer
CENTER FOR BIOLOGICAL
DIVERSITY
*Counsel for Center for*
*Biological Diversity and*
*Wishtoyo Foundation*

21

## **CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, Santa Barbara Channelkeeper, Surfrider Foundation, Center for Biological Diversity, and Wishtoyo Foundation certifies that this brief contains 6,932 words, which complies with the word limit of L.R. 11-6.1.

Dated: June 15, 2026

*/s/ Linda Krop*
Linda Krop
Margaret M. Hall
Jeremy M. Frankel
ENVIRONMENTAL DEFENSE
CENTER
*Counsel for Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, Santa Barbara Channelkeeper and Surfrider Foundation.*

*/s/ Talia Nimmer*
Julie Teel Simmonds
David Pettit
Talia Nimmer
CENTER FOR BIOLOGICAL
DIVERSITY
*Counsel for Center for Biological Diversity and Wishtoyo Foundation*

22

Petitioners' Opposition to Real Parties' Motion for Reconsideration and to Dissolve Injunction