LINDA KROP (Bar No. 118773)
lkrop@environmentaldefensecenter.org
JEREMY M. FRANKEL (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622
Fax: (805) 962-3152

*Attorneys for Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper*

JULIE TEEL SIMMONDS (Bar No. 208202)
jteelsimmonds@biologicaldiversity.org
DAVID PETTIT (Bar No. 67128)
dpettit@biologicaldiversity.org
TALIA NIMMER (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin Street, Suite 375
Oakland, CA 94612
Phone: (510) 844-7100

*Attorneys for Center for Biological Diversity and Wishtoyo Foundation*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al.<br><br>          *Petitioners/Plaintiffs*,<br><br>     v. | Case No.: 2:26-cv-05242-SVW-SSC<br><br>**DECLARATION OF LINDA KROP IN SUPORT OF PETITIONERS' OPPOSITION TO REAL PARTIES IN INTEREST'S MOTION FOR** |

Declaration of Linda Krop ISO Petitioners' Opposition to Real Parties' Motion for Reconsideration and to Dissolve Injunction

CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, et al.

    *Respondents/Defendants*,

SABLE OFFSHORE CORP., a Delaware Corporation, et al.

    *Real Parties in Interest*.

_____

ENVIRONMENTAL DEFENSE CENTER, et al.

    *Petitioners/Plaintiffs*,

    v.

CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, et al.

    *Respondents/Defendants*,

SABLE OFFSHORE CORP., et al.

    *Real Parties in Interest*.

**RECONSIDERATION AND TO DISSOLVE INJUNCTION**

Date: June 29, 2026
Time: 1:30 p.m.
Judge: Hon. Stephen V. Wilson

Declaration of Linda Krop ISO Petitioners' Opposition to Real Parties' Motion for Reconsideration and to Dissolve Injunction

I, Linda Krop, hereby declare as follows:

1.      I am an attorney at law admitted to practice before this Court and am an attorney of record for Petitioners Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper. I have personal knowledge of the facts set forth herein, which are known by me to be true and correct, and if called as a witness, I could and would competently testify to them. I submit this declaration in support of Petitioners' Opposition to Real Parties in Interests' ("Sable") Motion for Reconsideration and to Dissolve Injunction.

2.      On April 20, 2026, Sable filed a Form-8K with the United States Securities and Exchange Commission ("SEC"), which I downloaded from the SEC's website at the following link: https://www.sec.gov/ix?doc=/Archives/edgar/data/0001831481/000183148126000037/socc-20260420.htm. Exhibit 99.2 to the report, titled "Presentation Materials," includes Sable's updated investor presentation for the month of April 2026. In that presentation, Sable indicates on page 4 that it has resumed transportation through the pipelines CA-324 and CA-325 (the "Pipelines") and on page 10 that it intends to continue to ramp up oil production and sales. A true and correct copy of this Exhibit 99.2 that I downloaded is attached hereto as **Exhibit A**.

3.      On April 26, 2026, the Pacific Coast Business Times published an article titled "Sable Continues Oil Production Despite Court Upholding Injunction," where Lee Danielson, Sable's Director of Government Affairs, is quoted saying: "The judge didn't stop anything. . . We're producing just like we were yesterday and the day before and the day before that." I downloaded this article from the Pacific Coast Business Times website at the following link: https://www.pacbiztimes.com/2026/04/26/sable-continues-oil-production-despite-

Declaration of Linda Krop ISO Petitioners' Opposition to Real Parties' Motion for Reconsideration and to Dissolve Injunction

court-upholding-injunction/. A true and correct copy of the news article I downloaded is attached hereto as **Exhibit B**.

4.    On May 6, 2026, Sable filed a 10-Q Quarterly Report with the SEC, which I downloaded from the SEC's website at the following link: https://www.sec.gov/ix?doc=/Archives/edgar/data/0001831481/000183148126000 049/socc-20260331.htm. Sable acknowledged on page 20 of the report that the Court's PIs prohibit Sable from resuming petroleum transportation through the Pipelines until ten court days after Sable files notice that Sable has received all necessary approvals and permits for such resumption. Sable also acknowledged that the Court has twice denied Sable's motions to have the PI Orders rescinded. Finally, on page 7, Sable stated that it resumed transportation of oil produced at the SYU on March 14, 2026, and initiated oil sales on March 29, 2026. A true and correct of the Quarterly Report that I downloaded is attached hereto as **Exhibit C**.

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 15, 2026, in Santa Barbara, California.



Linda J. Krop

2

Declaration of Linda Krop ISO Petitioners' Opposition to Real Parties' Motion for Reconsideration and to Dissolve Injunction

# EXHIBIT A

EX-99.2 3 sableoffshorecorpinvesto.htm EX-99.2



# Disclaimer

FORWARD LOOKING STATEMENTS

The information in this presentation includes "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. When used in this presentation, t "believe," "anticipate," "intend," "estimate," "expect," "project," "continue," "plan," "forecast," "predict," "potential," "future," "outlook," and "target," the negative of such terms and other forward-looking statements, although not all forward-looking statements will contain such identifying words. These statements are based on the current beliefs and expectations of Sa significant risks and uncertainties. Actual results may differ materially from those described in the forward-looking statements. Factors that could cause Sable's actual results to differ forward-looking statements include: the ability to recommence full production of the SYU assets; the cost and time required therefor, and production levels once recommenced; availa consummate a debt refinancing of our Senior Secured Term Loan and the timing and terms thereof; our financial performance; global economic conditions and inflation; increased op and production equipment, supplies, services and qualified personnel; geographical concentration of operations; environmental and weather risks; regulatory changes and uncertainti publicity; privacy and data protection laws, privacy or data breaches, or loss of data; our ability to comply with laws and regulations applicable to our business; and other one-time eve Sable's Annual Report on Form 10-K for the year ended December 31, 2025, which is filed with the Securities and Exchange Commission and is available on Sable's website (www.sa and Exchange Commission's website (www.sec.gov). Except as required by applicable law, Sable undertakes no obligation to publicly release the result of any revisions to these forw of events or circumstances that may arise after the date of this presentation.

USE OF PROJECTIONS AND ESTIMATES

This presentation contains financial projections and estimates for Sable, including with respect to its future capital expenditures, initial timing and production estimates and future cash reviewed, compiled or performed any procedures with respect to the projections and estimates for the purpose of their inclusion in this presentation, and, accordingly, no such auditor any other form of assurance with respect thereto for the purpose of this presentation. These projections and estimates are for illustrative purposes only and should not be relied upon results. The assumptions and estimates underlying the projected information are inherently uncertain and are subject to a wide variety of significant business, regulatory, economic ar could cause actual results to differ materially from those contained in the projected information. Even if the assumptions and estimates are correct, projections and estimates are inhe outside Sable's control. Accordingly, there can be no assurance that the projected results are indicative of Sable's future performance or that actual results will not differ materially fro information. Inclusion of the projected information in this presentation should not be regarded as a representation by any person, including, without limitation, Sable, that the results c achieved.

# Sable Offshore Corp. (NYSE: SOC)

## Sable's premier offshore asset is unleashed following the Defense Production Act Or

**United States Department of Energy invoked the Defense Production Act ordering Sable to bring its resource to market**

- First sales from the Santa Ynez Unit ("SYU") through the Santa Ynez Pipeline System ("SYPS") achieved in March 2026

- Three offshore platforms located in federal waters north of Santa Barbara, California

- Wholly owned onshore midstream processing facilities at Las Flores Canyon ("LFC")

- >100 identified infill drilling and step-out opportunities, along with low-cost production optimization operations on existing wellbores

**High Quality Asset Unleashed**



Santa

**Sable is well-qualified to operate the SYU and the SYPS**

- Exemplary track record of operating safely in California and offshore[1]

- Demonstrated expertise via numerous awards from state and federal agencies[1]

- Reviving premier offshore asset through close coordination with federal regulatory agencies

**Proven Operators with Regulatory Expertise**



LFC Midstream

(1)  While at Plains Exploration & Production, current Sable management team operated platforms included Irene at Point Pedernales and Hidalgo, Harvest and Hermosa at Point Ar

# SYU History

## Premier offshore project developed by Exxon over 40+ years

### SYU Development Background

- Discovered in 1968, over the course of 14 years Exxon consolidated more than a dozen offshore federal oil leases into a streamlined productio

  – SYU construction began in 1976 with Platform Hondo, with first production in 1981, followed by Platform Harmony and Platform Heritage (both online ir have dedicated rigs for future development. Production was initially processed in federal waters in an OS&T from 1981 to 1994.

  – SYU includes 112 wells (90 producers, 12 injectors, 10 idle); sizable inventory of infill drilling and additional step-out drilling opportunities[1]

  – Platforms located 5 to 9 miles offshore Santa Barbara County in shallow water depths of 900-1,200'[2]

- **Wholly owned midstream processing facilities at Las Flores Canyon (not visible from highway)**

- **Shut in from June 2015 to May 2025 due to pipeline issue (Plains All-American Pipeline ("AAPL") operated)**

  – Production at all Exxon platforms and facilities was safely suspended. SYU was placed into a preserved state with regular inspections and maintenance

  – AAPL received Consent Decree and began work to resume petroleum transportation

  – Exxon acquired pipeline from AAPL

- **Sable restarted production at SYU Platform Harmony in May 2025 and began flowing production to Las Flores Canyon**

- **Oil sales resumed through the SYPS in March 2026 following the Defense Production Act Order**



(1) Sable management have identified >100 infill drilling and step-out opportunities.
(2) Primary Reservoir: Miocene Monterey formation (Sour low-gravity oil (4-26 API); Secondary Reservoirs: Oligocene and Eocene oil/gas sandstone (Sweet high-gravity oil (35 API)

# SYU Technical Overview

## Significant production history and massive resource potential

### Santa Ynez Unit Overview

- **Between 1981 and 2014, SYU produced over 671 MMBoe**
  - Production averaged 29 MBbl/d and 27 MMcf/d in 2014 (gross), the last full year when the asset was online
  - Low, stable decline anticipated of ~8% on average annually from existing NSAI Low Estimate Base Contingent Resources over the next five years[1]
- **Sable has also identified >100 additional infill development and step-out opportunities across the leasehold**
  - In 2010, Exxon drilled the world's longest extended-reach well from an existing fixed platform drilling rig, increasing the ability to produce more oil from existing facilities; the well extends more than six miles horizontally



### Robust Production Prior to Pipeline Closure



### 1 Billion + Barrels Re



| | | |
|---|---|---|
| **SYU Reservoir Characterization** | 1,700' | Origi |
| | (300') | Depl |
| | (400') | Gas |
| | **1,000'** | **Oil C** |
| **Massive Resource** | 1,207 | MMB Reso |
| | (561) | MMB |
| | 646 | **MMB Estir** |

Note: Management estimates are inherently uncertain and subject to numerous risks. Actual results may differ in a material amount from management estimates and projections.
(1)  5-year period begins after production re-start.

# SYU Acreage Overview

## SYU leases are all located in Federal waters



- **Offshore Position**
  - 16 Federal Leases, ~76,000 acres
  - First leased in 1969
  - Product marketed through OS&T from 1981 – 1994

- **Santa Ynez Unit Agreement**
  - Effective date: November 12, 1970
  - Unit blocks: OCS-P 180, 181, 182, 183, 187, 188, 189, 190, 191, 192, 193, 194, 195, 326, 329, 461
  - Sable operated, 100% WI, 83.6% NRI
  - Annual lease extensions granted by the Bureau of Safety and Environmental Enforcement and authorized well re-work during shut-in; supported by quarterly updates

- **Onshore Position**
  - ~1,480 surface acres, facilities occupy ~35 acres
  - Facilities 100% Sable owned

Note: SYPS Segment 324 and Segment 325 were formerly known as Line 901 and Line 903, respectively.

# Las Flores Canyon Infrastructure

**Wholly owned infrastructure at Las Flores Canyon represents substantial capital investment**

### Las Flores Canyon Cogeneration & Midstream Processing Facilities

- **Fully integrated oil and gas midstream processing facilities handle 100% of the SYU produced volumes with additional capacity for future SYU development**

- **Co-Generation Power Plant promotes self sufficiency and low emission operations**

- **Gas and NGL volumes sold into the Southern California market to homes and businesses**

- **Oil volumes sold at Brent based pricing to Chevron's El Segundo refinery through the SYPS and Plains Line 2000**

**Transportation Terminal**

**Produce Pipe**

**Crude Storage Tanks**
- 540 kbbl capacity

**Biologic Water Treating**
- Free Oil Removal
- Degassing
- Biological Treatment

**Co-Generation Power Plant**
- Gas Turbine (40 MW)
- Steam Generation
- Steam Turbine (10 MW)

**Oil Treating**
- Crude Dehydration
- Crude Stabilization
- Gas Separation & Compression

- Gas Sweet
- Sulfur Reco
- NGL Fracti
- Fuel Gas s
- CCS oppor infrastructu

# SYU is a Prolific Offshore Asset

## SYU is a top producer with the most remaining resource among current OCS produci

| Cumulative Production | | | | | Estimated Remaining R | |
|---|---|---|---|---|---|---|
| Field Name | Prospect Name | Oil (MMBbl) | Gas (Bcf) | Total (MMBoe) | Field Name | Prospect Name |
| Mississippi Canyon 807 | MARS-URSA | 1,504 | 1,922 | 1,846 | Santa Ynez Unit | SYU |
| West Delta 30 | | 593 | 977 | 767 | Mississippi Canyon 807 | MARS-URSA |
| Bay Marchand 2 | | 547 | 576 | 649 | Mississippi Canyon 940 | VITO |
| Santa Ynez Unit | SYU | 507 | 984 | 671 | Mississippi Canyon 392 | APPOMATTOX |
| Eugene Island 330 | | 462 | 1,902 | 800 | Mississippi Canyon 778 | THUNDER HORSE |
| Green Canyon 640 | TAHITI/CAE/TONG | 436 | 289 | 487 | Walker Ridge 678 | SAINT MALO |
| Green Canyon 743 | ATLANTIS | 395 | 266 | 442 | Green Canyon 743 | ATLANTIS |
| Grand Isle 43 | | 382 | 1,658 | 677 | Keathley Canyon 875 | LUCIUS |
| Green Canyon 654 | SHENZI | 328 | 130 | 351 | Green Canyon 826 | MAD DOG |
| Grand Isle 16 | | 308 | 398 | 379 | Green Canyon 654 | SHENZI |
| Mississippi Canyon 776 | N.THUNDER HORSE | 291 | 285 | 342 | Green Canyon 640 | TAHITI/CAE/TONG |
| Garden Banks 426 | AUGER | 286 | 1,014 | 467 | Green Canyon 244 | TROIKA |
| West Delta 73 | | 280 | 692 | 403 | Mississippi Canyon 776 | N.THUNDER HORSE |
| Main Pass 41 | | 274 | 1,560 | 552 | Mississippi Canyon 84 | KING/HORN MT. |
| South Pass 61 | | 273 | 530 | 367 | Alaminos Canyon 857 | GREAT WHITE |
| Mississippi Canyon 84 | KING/HORN MT. | 271 | 285 | 322 | Garden Banks 171 | SALSA |
| South Timbalier 21 | | 259 | 427 | 335 | Grand Isle 43 | |
| Green Canyon 826 | MAD DOG | 233 | 68 | 245 | Garden Banks 426 | AUGER |
| Ship Shoal 208 | | 228 | 1,403 | 477 | Eugene Island 330 | |
| Mississippi Canyon 778 | THUNDER HORSE | 203 | 148 | 230 | Ship Shoal 208 | |
| South Pass 89 | | 197 | 875 | 353 | Viosca Knoll 956 | RAM-POWELL |
| Mississippi Canyon 194 | COGNAC | 183 | 764 | 319 | South Pass 61 | |
| Alaminos Canyon 857 | GREAT WHITE | 182 | 331 | 240 | Eugene Island 238 | |
| Green Canyon 244 | TROIKA | 181 | 345 | 243 | West Delta 73 | |
| South Timbalier 135 | | 170 | 628 | 282 | West Delta 30 | |

Source: BOEM 2021 report on top producing OCS fields. SYU historical production figures via ExxonMobil.
(1) Santa Ynez Unit EUR figures per Sable management, as published in our 1Q24 Contingent Resource Summary. Assumes SEC pricing as of April 2024 and effective date of May

# Undrilled Inventory

## New Drill Inventory Overview

- Technical opportunity inventory is based on 80-acre drainage area, maturing field from original 120 acre spacing
- Future development strategy focuses on the high-quality Monterey Upper Siliceous reservoir in areas that have undergone increased diag fractures, allowing for greater storage of oil and increased permeability
- Wellbores will be aligned to maximize contact with the primary fracture orientation for the field and average over 2,000' gross perforations



# SYU is Ramping Up to Full Production

## Initial production at Harmony and Heritage platforms have exceeded expectations



**Santa Ynez Pipeline System**

**Resumed Petroleum Transportation: May 2025**
- Fully hydrotested in May 2025
- Resumed transportation from Platform Harmony to LFC Midstream Processing Facilities in May 2025
- Resumed transportation from LFC Midstream Processing Facilities to Pentland and achieved first sales in March 2026

**Platform Harmony**

**Production Restart: May 2025**
- Estimated fully ramped gross sales: ~22,000 Bo/d
- Wells: 32[1]
- Available well slots: 23-27[2]

**Platform Heritage**

**Production Restart: April 2026**
- Estimated fully ramped gross sales: ~30,000 Bo/d
- Wells: 44[1]
- Available well slots: 15-17[2]

**Platform Hondo**

**Estimated Production Restart: June 2026**
- Estimated fully ramped gross sales: ~10,000 Bo/d
- Wells: 26[1]
- Available well slots: 10[2]

(1)  Includes both producers and injector wells
(2)  Available well slots include those either actively unused or available for opportunistic reclamation.

# Health, Safety, and Environmental Highlights

## Sable management team is an award-winning, safe, and prudent California Operator

### Offshore California Highlights



**2004:** Received Santa Barbara County's First and Only "Resolution for Good Operator" Recognizing PXP's Outstanding Operating Performance

**2008:** Santa Barbara County Commendation for Outstanding Maintenance Practices at LOGP



**2011:** Occupational Excellence Achievement Award for 21 PXP locations

**2009-2010:** Perfect Record Award for operating 11,390 employee hours without occupational injury or illness involving days away from work

**2009:** National Industry Leadership Award

**2007-2008:** Occupational Excellence Achievement Awards for Outstanding Safety Practices

Occupational Excellence Achievement Awards for Outstanding Safety Practices



BOEM [1]

**2004:** Ranked MMS's Best Operator in the Pacific OCS for Safety of Platform and Pipeline Operations

### Onshore California Highlights



**2006:** U.S. Bureau of Land Management Operator of the Year Award

**2006:** Best Management Practices National Award in Habitat Conservation

**CA Dept. of Conservation**

**2008-2004:** Recipient of the Environmental Lease Maintenance Award

**2006:** Recipient of the Clean Lease Awards

Division of Oil, Gas and Geothermal Resources (DOGGR) Lease Maintenance Award for Outstanding Safety and Lease Maintenance 12 years and 13 years in a row at Packard and San Vicente



**2010:** Occupational Excellence Achievement Award for PXP's California Los Angeles Basin San Vicente and Packard locations



Two commendations from the Air Pollution Control District for Emissions Reductions and Use of Innovative Emissions Control Technology at the Arroyo Grande Oil Field

### Risk Management Partner to Local Communities

- Sable Management has a track record of excellence as a safe and responsible steward of California's onshore and offshore resources
- As PXP, owned / operated offshore Point Arguello (Harvest Platform, Hermosa Platform, and Hidalgo Platform) and Point Pedernales (Irene Platform)
- Onshore operations included Arroyo Grande, Los Angeles Basin, and San Joaquin Valley assets

- *"Due to PXP's generosity and civic mindedness … [using] their facility, nearly 200 firefighters have received important Survival Training"* – Ron Lawrence, **Central Regional Training / Safety Captain LA County Fire Department**
- *"The Culver City Fire Department is forever grateful to Plains Exploration & Production Co. for their continued training support and expertise"* – Tim Wilson, **Captain / Training Officer, Culver City Fire Dept.**

(1) Minerals Management Service (MMS) was reorganized into Bureau of Ocean Energy Management (BOEM) and Bureau of Safety and Environmental Enforcement (BSEE) in 201

# California: Energy Island in Crisis

## The domestic energy market in California is struggling and needs local production fo



### Commentary

- Policy decisions have caused energy infrastructure closures and production decreases across all major segments: exploration & production, midstream transport, and refining and marketing

- Given the absence of domestic energy supply, California has relied on foreign nations to import the required oil supply to **meet the 1.5 MMBbl/d of demand**[1]

- California is in desperate need of increased local oil output, but a decades-long underinvestment in the supply chain due to the regulatory environment offers very little opportunity for immediate solutions outside of Sable

- **California consumers and the 40+ United States Military installations in state are vulnerable**



Source: EIA, California Energy Commission.
(1) 1.5 MMBbl/d of California petroleum consumption per EIA.
(2) List of countries that import oil into California is illustrative and not comprehensive.

# Sable Supports California Consumers and US Wa

## Newsom administration analysis states a need for 125MM barrels of oil produced loc



| Commentary | California Crude Oil Production Forecast (MMBbl/y |

- **California's stated goal is to produce 125MM barrels of oil per year locally to stabilize its refinery complex.**

- Even with potential SB-237 policy impacts, California cannot achieve the Newsom administration's target without the SYU.

- Sable's SYU barrels are the only solution to California's current energy crisis and buffer against a policy driven shortage of gasoline and aviation fuels, critical to West Coast and Pacific U.S. military supply lines.

- **SYU production is providing a real and immediate supply increase to California consumers and the U.S. military.**

Source: EIA, CalGEM presentation to the chairs of the Natural Resources, Transportation, and Utilities and Energy Committees of the California State Assembly on August 20, 2025.
Note: CalGEM presentation replicated to best extent possible, values are estimates. 2026 – 2028 California onshore production is Sable's internally estimated California onshore prod
based on operator commentary in public disclosures and sell-side equity research analysis.

# Key Milestones and Next Steps

## Key Milestones

☑ **Complete repairs on the SYPS** *(May 2025)*

☑ **Restart production at Platform Harmony** *(May 2025)*

☑ **Complete successful hydrotests on the SYPS** *(May 2025)*

☑ **Resume oil transportation through the SYPS to LFC Midstream Processing Facilities** *(May 202*

☑ **Federal regulatory oversight of the SYPS confirmed** *(December 2026)*

☑ **Defense Production Act Order** *(March 2026)*

☑ **Resume petroleum transportation through Segments 324 and 325 of the SYPS** *(March 2026)*

☑ **First Sales to Chevron from the SYPS** *(March 2026)*

☑ **Restart production at Platform Heritage** *(April 2026)*

## Next Steps

❑ **Refinance Senior Secured Term Loan with new debt capital** *(Expected Q2 2026)*

❑ **Commence commodity hedging program** *(Expected Q2 2026)*

❑ **Restart production at Platform Hondo** *(Expected Q2 2026)*

❑ **Implement shareholder return program** *(Expected post-refinancing)*

❑ **Continue to legally protect Sable's vested interests and pursue all monetary damages**

# Key Investment Highlights

## Premier asset and experienced management team drive shareholder value

✓ **Federal Oversight**
- Defense Production Act order requires oil transportation through the S
- Interstate pipeline determination requires federal regulatory oversight c
- Federal offshore development permitting regime through U.S. Departm

✓ **Attractive Returns**
- Low-cost, low-decline assets expected to enable a shareholder return
  repurchases and dividends

✓ **Primed for Low-Cost Production Growth**
- Modest reinvestment required in the near-term as Sable capitalizes on
  operations including workovers, perforation additions, and ESP[1] insta

✓ **Substantial Upside**
- De-risked reservoir first discovered in the 1960's along with 100+ locat
- Potential for substantial growth with accelerated development

✓ **High Operational Control**
- 100% operated with favorable 16.4% royalty burden
- Owned midstream infrastructure ensures safe and reliable transit to ma

✓ **Conservative Leverage Profile**
- Sable management targeting long-term leverage ratios of ~1.0x to max
  shareholder returns and future development

✓ **Access to Infrastructure & End Markets**
- Oil sales linked to Brent Crude pricing
- LA refinery complex seeks domestic oil production to offset import disr

✓ **HS&E Stewardship**
- Outstanding HS&E[2] and operational track record in California

**American Oil from American Soil**

(1) Electric Submersible Pump
(2) Health, safety and environment.

# EXHIBIT B

Case 2:26-cv-05242-SVW-SSC     Document 90-1     Filed 06/15/26     Page 22 of 79   Page ID #:19574



## Sable continues oil production despite court upholding injunction

**IN THIS ARTICLE**

- *Energy*Topic

- *Mike Harris*Author

By Mike Harris Sunday, April 26th, 2026

Sable Offshore Corp. is continuing oil production at its Santa Ynez Unit off Santa Barbara County's coast despite a judge upholding an injunction barring the company from using the unit's onshore pipeline system.

"The judge didn't stop anything," Lee Danielson, director of governmental affairs for Houston-based Sable, told the Business Times April 20.

"We're producing just like we were yesterday and the day before and the day before that," he said.

Santa Barbara County Superior Court Judge Donna Geck, on April 17, upheld her preliminary injunction, issued in July 2025, preventing Sable from restarting its Central Coast pipeline without required approvals.

"Sable has not met its burden to show that the preliminary injunction should be dissolved or modified," the judge wrote in her ruling.

"Sable's motion (to dismiss) will therefore be denied," Geck wrote.

But the company had already restarted operations March 14, one day after being ordered by the Trump Administration to do so under the Cold War-era federal Defense Production Act through an executive order from President Donald Trump.

The administration's order outraged state officials and environmental groups, which have filed a series of legal challenges in recent years in opposition to the restarting of the unit.

Sable said in an April 20 press release that the company "is coordinating with the federal government in various legal matters to defend its vested rights to operate its assets and ensure compliance with certain federal mandates, including the Defense Production Act (DPA)."

The 122-mile onshore Las Flores Pipeline System runs from the Las Flores Canyon oil processing facility in Santa Barbara County to the Pentland Terminal in Kern County.

It's partof Sable's Santa Ynez Unit, which also includes three oil and gas platforms in federal waters off Santa Barbara County's coast and offshore pipelines.

The unit had been turned off since one of its pipelines ruptured on May 19, 2015, spilling more than 2,900 barrels of heavy crude oil onto private property, Refugio State Beach and into the Pacific Ocean.

The facility was owned by Houston-based Plains All American Pipeline at the time of the spill.Sable bought the unit from ExxonMobil in 2024 and had been trying to restart it ever since.

In issuing the restart order, U.S. Energy Secretary Chris Wright said a significant share of the oil refined in California travels through the Strait of Hormuz.

Iran has blocked the strait on and off in retaliation for joint U.S. and Israeli airstrikes that began Feb. 28, presenting serious national security threats, Wright said.

In response, the U.S. has begun a blockade of Iranian ports.

Sable's attorneys have unsuccessfully tried to get the injunction dismissed a few times.

The injunction was obtained by the Environmental Defense Center, a Santa Barbara-based nonprofit law firm that had sued Sable and state officials.

Armed with Wright's restart order, Sable tried to get it dismissed again April 17.

The company's attorney argued at the hearing before Geck that the Defense Production Act order supersedes other court orders, including state court injunctions, according to Linda Krop, EDC's chief counsel.

The orders also include a binding federal court consent decree giving the state the final say over the restart of Sable's pipeline, Krop said.

Geck again rejected Sable's argument.

"Sable has not persuaded the court that the DPA order ... permits a party subject to a DPA order to violate other laws," she wrote in her ruling.

The judge is expected to hold a hearing in the coming weeks to determine if Sable is in compliance or in contempt of her order.

Environmental groups celebrated Geck's ruling.

They include EDC clients Get Oil Out!, the Santa Barbara County Action Network, the Sierra Club, and Santa Barbara Channelkeeper, all plaintiffs in the 2025 lawsuit.

"This is a very important ruling because this is the first time a judge has considered whether the Trump Administration's order allows Sable to restart, and the judge said no," Krop told the Business Times.

"The president does not have the power to just waive state laws or judicial orders," Krop said in a press release.

Sable has blatantly violated Geck's preliminary injunction by restarting the pipeline and has continued to operate it in violation of critical public safety and environmental laws, Krop said.

But the company said in the April 20 release that "the previously announced resumption of oil transportation through Segments 324 and 325 of the Santa Ynez Pipeline System was executed in compliance with all applicable safety standards through our comprehensive pipeline integrity management program."

Sable said the U.S. Department of Justice has moved to terminate or modify the consent decree in the U.S. District Court for the Central District of California.

The company is not a party to that litigation but is participating in the briefing.

The matter is set to be heard June 1.

"Sable is also actively pursuing damages and taking proactive legal action to curb state and county regulatory overreach," the company said.

Damages it's seeking include at least $347 million from the California Coastal Commission and more than $100 million from Santa Barbara County for withholding the transfer of certain permits to Sable from the prior operator.

Jim Flores, Sable's chair and CEO, said the company has produced more than one million barrels of oil since restarting the Santa Ynez Unit.

"We are working tirelessly to provide American oil from American soil to consumers in California and the U.S. military," he said.

"We look forward to achieving our financial objectives as we continue to operate in a safe and reliable manner to the benefit of all of our stakeholders," Flores said.

Sable's stock closed on April 21 at $14.08, up from $13.11 on April 17, the day Geck upheld her injunction, but below the $14.37 close on April 16, the day before her ruling.

*email: mharris@pacbiztimes.com*

**"The judge didn't stop anything."**

**Lee Danielson, Sable's Director of Governmental Affairs**

# EXHIBIT C

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

## FORM 10-Q

**(Mark One)**

☒    **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended March 31, 2026**

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____ to _____**

**Commission File No. 001-40111**

# SABLE OFFSHORE CORP.
**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| Delaware | 85-3514078 |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |
| 845 Texas Avenue, Suite 2920<br>Houston, TX 77002 | 77002 |
| **(Address of principal executive offices)** | **(Zip Code)** |

(713) 579-6161
**(Registrant's telephone number, including area code)**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading<br>Symbol(s) | Name of each exchange<br>on which registered |
|---|---|---|
| Common Stock, par value $0.0001 per share | SOC | The New York Stock Exchange |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act): Yes ☐ No ☒

Case 2:26-cv-05242-SVW-SSC    Document 90-1    Filed 06/15/26    Page 29 of 79    Page ID #:19581

As of May 5, 2026 there were 154,362,910 shares of Common Stock, $0.0001 par value, issued and outstanding.

# TABLE OF CONTENTS

|  |  |  | Page |
|---|---|---|---|
| **PART 1 – FINANCIAL INFORMATION** |  |  | 3 |
| Item 1. | Condensed Consolidated Financial Statements (unaudited) |  |  |
|  | Condensed Consolidated Balance Sheets |  | 3 |
|  | Condensed Consolidated Statements of Operations |  | 4 |
|  | Condensed Consolidated Statements of Changes in Stockholders' Equity |  | 5 |
|  | Condensed Consolidated Statements of Cash Flows |  | 6 |
|  | Notes to Condensed Consolidated Financial Statements |  | 7 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations |  | 25 |
| Item 3. | Quantitative and Qualitative Disclosures about Market Risk |  | 31 |
| Item 4. | Controls and Procedures |  | 32 |
| **PART II – OTHER INFORMATION** |  |  | 33 |
| Item 1. | Legal Proceedings |  | 33 |
| Item 1A. | Risk Factors |  | 33 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds |  | 33 |
| Item 3. | Defaults Upon Senior Securities |  | 33 |
| Item 4. | Mine Safety Disclosures |  | 33 |
| Item 5. | Other Information |  | 34 |
| Item 6. | Exhibits |  | 34 |
| SIGNATURES |  |  | 35 |

2

# PART I. FINANCIAL INFORMATION
## ITEM 1. CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)

**SABLE OFFSHORE CORP.**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
**(UNAUDITED)**
**(dollars in thousands, except par values)**

| | March 31, 2026 | December 31, 2025 |
|---|---|---|
| **Assets** | | |
| **Current assets:** | | |
| Cash and cash equivalents | $ 52,168 | $ 97,684 |
| Accounts receivable | 1,542 | — |
| Inventory | 6,306 | 12,078 |
| Materials and supplies | 14,403 | 14,658 |
| Prepaid expenses and other current assets | 10,594 | 11,282 |
| **Total current assets** | **85,013** | **135,702** |
| **Oil and gas properties (Successful efforts method)** | | |
| Oil and gas properties | 1,611,450 | 1,567,029 |
| Less: Accumulated depreciation, depletion and amortization | (9,933) | (5,977) |
| **Total oil and gas properties, net** | **1,601,517** | **1,561,052** |
| Other, net | 43,352 | 44,068 |
| **Total assets** | **$ 1,729,882** | **$ 1,740,822** |
| **Liabilities and Stockholders' Equity** | | |
| Accounts payable and accrued liabilities | $ 117,324 | $ 99,353 |
| Senior Secured Term Loan including paid-in-kind interest, net | 956,252 | 921,584 |
| Other current liabilities | 4,234 | 2,488 |
| **Total current liabilities** | **1,077,810** | **1,023,425** |
| Warrant liabilities | 81,895 | 37,738 |
| Asset retirement obligations | 116,466 | 113,181 |
| Deferred tax liability | 12,833 | 12,833 |
| Other | 19,015 | 19,342 |
| **Total liabilities** | **1,308,019** | **1,206,519** |
| **Commitments and Contingencies (Note 6)** | | |
| **Stockholders' Equity** | | |
| Preferred stock, $0.0001 par value; 1,000,000 shares authorized; none issued and outstanding at March 31, 2026 and December 31, 2025 | — | — |
| Common Stock, $0.0001 par value; 500,000,000 shares authorized; 150,321,586 and 144,961,796 issued and outstanding at March 31, 2026 and December 31, 2025, respectively | 16 | 15 |
| Additional paid-in capital | 1,727,331 | 1,642,746 |
| Accumulated deficit | (1,305,484) | (1,108,458) |
| **Total Stockholders' Equity** | **421,863** | **534,303** |
| **Total Liabilities and Stockholders' Equity** | **$ 1,729,882** | **$ 1,740,822** |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

3

**SABLE OFFSHORE CORP.**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**(UNAUDITED)**
**(dollars in thousands, except per share data)**

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2026 | 2025 |
| **Revenue** | | |
| Oil sales | $ 1,271 | $ — |
| Total revenue | 1,271 | — |
| **Operating Expenses** | | |
| Operations and maintenance expenses | 68,033 | 34,443 |
| Depletion, depreciation, amortization and accretion | 3,942 | 3,021 |
| General and administrative expenses | 48,050 | 22,332 |
| Total operating expenses | 120,025 | 59,796 |
| **Loss from operations** | **(118,754)** | **(59,796)** |
| **Other (income) expenses:** | | |
| Change in fair value of warrant liabilities | 44,157 | 21,295 |
| Other income | (553) | (3,440) |
| Interest expense | 34,668 | 21,010 |
| **Total other expense, net** | **78,272** | **38,865** |
| **Loss before income taxes** | **(197,026)** | **(98,661)** |
| Income tax expense | — | 10,883 |
| **Net loss** | **$ (197,026)** | **$ (109,544)** |
| **Basic and diluted net loss per Common Stock** | | |
| Weighted average Common Stock outstanding, basic and diluted | 143,670,869 | 84,436,726 |
| Basic and diluted net loss per Common Stock | $ (1.37) | $ (1.30) |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

4

**SABLE OFFSHORE CORP.**
**CONDENSED CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY**
**(UNAUDITED)**
**(dollars in thousands)**

| | Common Stock | | Additional Paid-In Capital | Accumulated Deficit | Total Stockholders' Equity |
|---|---|---|---|---|---|
| | Shares | Amount | | | |
| **BALANCE—December 31, 2025** | **144,961,796** | **$ 15** | **$ 1,642,746** | **$ (1,108,458)** | **$ 534,303** |
| Issuance of Common Stock, net | 5,359,790 | 1 | 70,757 | — | **70,758** |
| Share based compensation | — | — | 13,828 | — | **13,828** |
| Net loss | — | — | — | (197,026) | **(197,026)** |
| **BALANCE—March 31, 2026** | **150,321,586** | **$ 16** | **$ 1,727,331** | **$ (1,305,484)** | **$ 421,863** |

| | Common Stock | | Additional Paid-In Capital | Accumulated Deficit | Total Stockholders' Equity |
|---|---|---|---|---|---|
| | Shares | Amount | | | |
| **BALANCE—December 31, 2024** | **89,310,996** | **$ 8** | **$ 1,082,473** | **$ (698,296)** | **$ 384,185** |
| Share based compensation | 27,362 | — | 6,065 | — | **6,065** |
| Net loss | — | — | — | (109,544) | **(109,544)** |
| **BALANCE—March 31, 2025** | **89,338,358** | **$ 8** | **$ 1,088,538** | **$ (807,840)** | **$ 280,706** |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

5

**Table of Contents**

**SABLE OFFSHORE CORP.**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(UNAUDITED)**

| | Three Months Ending March 31, | |
| --- | --- | --- |
| *(dollars in thousands)* | **2026** | **2025** |
| **Cash flows from operating activities:** | | |
| Net loss | $ (197,026) | $ (109,544) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation, depletion, amortization and accretion | 3,942 | 3,021 |
| Share based compensation expense | 15,026 | 6,065 |
| Amortization of operating lease right-of-use asset | 369 | 406 |
| Amortization of debt issuance costs | 99 | 156 |
| Paid-in-kind interest | 34,569 | 20,854 |
| Deferred tax expense | — | 10,883 |
| Change in fair value of warrant liabilities | 44,157 | 21,295 |
| Changes in current assets and current liabilities, net of effect of acquisition: | | |
| Accounts receivable | (1,542) | — |
| Inventory | (3,186) | — |
| Materials and supplies | 252 | 257 |
| Prepaid expenses and other assets | 892 | (2,599) |
| Accounts payable and accrued liabilities | 20,224 | 1,271 |
| Net cash used in operating activities | (82,224) | (47,935) |
| | | |
| **Cash flows from investing activities:** | | |
| Payments for capital expenditures | (21,050) | (63,304) |
| Net cash used in investing activities | (21,050) | (63,304) |
| | | |
| **Cash flows from financing activities:** | | |
| Offering proceeds | 72,394 | — |
| Payment of equity issuance costs | (14,433) | (36) |
| Payment of debt issuance costs | (203) | — |
| Net cash provided by (used in) financing activities | 57,758 | (36) |
| **Net change in cash** | (45,516) | (111,275) |
| **Cash, cash equivalents and restricted cash, beginning of the period** | 97,684 | 335,772 |
| Cash, cash equivalents and restricted cash, end of the period | $ 52,168 | $ 224,497 |
| **Reconciliation of cash, cash equivalents and restricted cash to the unaudited condensed consolidated balance sheets** | | |
| Cash and cash equivalents | $ 52,168 | $ 188,987 |
| Restricted cash | — | 35,510 |
| **Total cash, cash equivalents and restricted cash** | $ 52,168 | $ 224,497 |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

6

**SABLE OFFSHORE CORP.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)**
**MARCH 31, 2026**

**Note 1 — Organization, Business Operations, and Going Concern**

**Organization and General**

Sable Offshore Corp. ("Sable," the "Company" or "we") (formerly known as Flame Acquisition Corp. or "Flame") is an independent oil and gas company headquartered in Houston, Texas. Flame was initially formed as a special purpose acquisition company for the purpose of entering into a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses.

On November 2, 2022, the Company entered into an agreement and plan of merger, dated as of November 2, 2022 (as amended, supplemented, or otherwise modified from time to time, the "Merger Agreement"), with Sable Offshore Corp., a Texas corporation ("SOC"), and Sable Offshore Holdings, LLC, a Delaware limited liability company and the parent company of SOC ("Holdco" and, together with SOC, "Legacy Sable"). Pursuant to the Merger Agreement, on February 14, 2024, (i) Holdco merged with and into Flame, with Flame surviving such merger (the "Holdco Merger") and (ii) Legacy Sable merged with and into Flame, with Flame surviving such merger (the "SOC Merger" and, together with the Holdco Merger, the "Mergers" and, along with the other transactions contemplated by the Merger Agreement, the "Merger").

On November 1, 2022, SOC, entered into a purchase and sale agreement (as amended, the "Sable-EM Purchase Agreement") with Exxon Mobil Corporation ("Exxon") and Mobil Pacific Pipeline Company ("MPPC," and together with Exxon, "EM") pursuant to which SOC agreed to acquire from EM certain assets constituting the Santa Ynez field in Federal waters offshore California ("SYU") and associated onshore processing and pipeline assets (such "Assets," as defined in the Sable-EM Purchase Agreement, collectively the "SYU Assets"). The SYU Assets include the Santa Ynez Pipeline System ("SYPS"), which is a single, integrated and continuous interstate pipeline system that transports crude oil from the SYU onshore and then inland. Specifically, the SYPS is primarily comprised of offshore pipeline segments that transport crude oil from the SYU onshore, midstream processing and storage facilities at Las Flores Canyon ("LFC") and onshore pipeline segments that transport crude oil to Pentland Station in Kern County, CA.

On February 14, 2024 (the "Closing Date"), the Company consummated the Merger and related transactions (the "Business Combination") contemplated by the Merger Agreement, following which Flame was renamed "Sable Offshore Corp.". Pursuant to the terms and subject to the conditions set forth in the Sable-EM Purchase Agreement, the transactions contemplated by the Sable-EM Purchase Agreement were also consummated on February 14, 2024 ("Sable-EM Closing Date"), immediately after the Business Combination, as a result of which Sable purchased the SYU Assets, effective as of January 1, 2022. On February 15, 2024, Sable's shares of Common Stock, par value $0.0001 per share ("Common Stock") and warrants to purchase Common Stock at an exercise price of $11.50 per share (the "Public Warrants") began trading on NYSE under the symbols, "SOC" and "SOC.WS," respectively.

On March 13, 2026, the President of the United States, Donald J. Trump, signed an Executive Order to, among other things, delegate certain authorities under the Defense Production Act of 1950 ("DPA") to the United States Secretary of Energy. Subsequently, on March 13, 2026, the United States Secretary of Energy, Chris Wright, issued an order to the Company invoking the DPA (the "DPA Order") to immediately prioritize and allocate pipeline transportation services for hydrocarbons from the SYU through the SYPS in order to address the energy scarcity and supply disruption risks caused by California policies that have left the region and U.S. military forces dependent on foreign oil.

On March 14, 2026, the Company resumed the transportation of hydrocarbons (oil) produced at the SYU through the SYPS at the direction of the United States Secretary of Energy, Chris Wright, in compliance with the DPA Order. In doing so, the Company facilitates the supply of domestically produced crude oil through U.S. pipeline infrastructure to U.S. refineries, supporting domestic consumers and the U.S. military.

On March 29, 2026, the Company initiated oil sales upon filling the SYPS, resulting in total oil sales volumes of approximately 13,380 barrels for the period ended March 31, 2026.

Unless otherwise noted or the context otherwise requires, references to (i) the "Company," "Sable," "we," "us," or "our" are to Sable Offshore Corp, a Delaware corporation, and its consolidated subsidiaries, following the Business Combination, (ii) "Flame" refers to Flame Acquisition Corp. prior to the Business Combination, (iii) the SYU refers to the 16 federal leases, three offshore production platforms (Hondo, Harmony, and Heritage), and associated ancillary facilities located in federal waters offshore California, and (iv) the SYPS refers to the interstate pipeline connecting the SYU to the Pentland Station terminal, inclusive of "Pipeline Segment 324" and "Pipeline Segment 325", or collectively referred to as "Pipeline

Segments 324 and 325" (formerly known as "901/903 Assets" and as defined in the Sable-EM Purchase Agreement), the Las Flores Canyon ("LFC") onshore processing, storage, and related pipeline assets, and the offshore pipeline connecting the SYU to LFC. The SYU Assets include the SYU and the SYPS.

These unaudited condensed consolidated financial statements and notes should be read in conjunction with our audited consolidated financial statements and the notes thereto included in our Annual Report on Form 10-K for the year ended December 31, 2025.

### Going Concern

The accompanying unaudited condensed consolidated financial statements have been prepared on a basis that assumes the Company will continue as a going concern. Prior to recommencing oil sales from the SYU Assets and to date, the Company experienced losses from operations and negative cash flows from operations much like other pre-revenue companies. Near-term capital funding needs have historically been addressed with proceeds from the issuance of the Company's Common Stock and proceeds from the exercise of warrants.

As of March 31, 2026, the Company reported unrestricted cash of $52.2 million, total debt of $956.3 million, and an accumulated deficit of $1.3 billion. On March 29, 2026, the maturity date of the Senior Secured Term Loan was accelerated to 90 days after the first sales of Hydrocarbons (as defined in the Senior Secured Term Loan), or June 26, 2026 (refer to *Note 4 — Debt* for additional details regarding the acceleration of the maturity date).

Due to the lack of assurance that additional financing, including the refinancing of the Company's Senior Secured Term Loan, will be available on commercially reasonable terms, or at all, substantial doubt exists about the Company's ability to continue as a going concern. The accompanying financial statements have been prepared assuming the Company will continue as a going concern and do not include any adjustments that might result from the outcome of this uncertainty, including adjustments to the carrying amounts of assets or the classification of liabilities.

### Note 2 — Significant Accounting Policies

### Basis of Presentation

The accompanying unaudited condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP") for interim financial information and in accordance with the instructions to Form 10-Q and Article 8 of Regulation S-X of the U.S. Securities and Exchange Commission ("SEC"). Certain information or footnote disclosures normally included in financial statements prepared in accordance with GAAP have been condensed or omitted, pursuant to the rules and regulations of the SEC for interim financial reporting. Accordingly, they do not include all the information and footnotes necessary for a complete presentation of financial position, results of operations, or cash flows. In the opinion of management, the accompanying unaudited condensed consolidated financial statements include all adjustments, consisting of a normal recurring nature, which are necessary for a fair presentation of the financial position, operating results and cash flows for the periods presented. Financial presentation in prior periods has been adjusted to conform with current period presentation. These unaudited condensed consolidated financial statements for the quarterly period ended March 31, 2026 may not be representative of the financial results for the full year 2026.

### Emerging Growth Company Status

The Company is an "emerging growth company," as defined in Section 2(a) of the Securities Act of 1933, as amended, (the "Securities Act"), as modified by the Jumpstart our Business Startups Act of 2012, (the "JOBS Act"), and it may take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not emerging growth companies including, but not limited to, not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act, reduced disclosure obligations regarding executive compensation in its periodic reports and proxy statements, and exemptions from the requirements of holding a nonbinding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved.

Further, Section 102(b)(1) of the JOBS Act exempts emerging growth companies from being required to comply with new or revised financial accounting standards until private companies (that is, those that have not had a Securities Act registration statement declared effective or do not have a class of securities registered under the Exchange Act) are required to comply with the new or revised financial accounting standards. The JOBS Act provides that a company can elect to opt out of the extended transition period and comply with the requirements that apply to non-emerging growth companies but any such election to opt out is irrevocable. The Company has elected not to opt out of such extended transition period which means that when a standard is issued or revised and it has different application dates for public or private companies. The Company, as an emerging growth company, can adopt the new or revised standard at the time private companies adopt

8

**Table of Contents**

the new or revised standard. This may make comparison of the Company's financial statements with another public company which is neither an emerging growth company nor an emerging growth company which has opted out of using the extended transition period difficult or impossible because of the potential differences in accounting standards used.

### Use of Estimates

The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of expenses during the reporting period. Significant estimates made by management include, among others, allocation assumptions and the carrying amount of asset retirement obligations, which are based on the timing and cost of future abandonments, inputs utilized to fair value warrant liabilities, and assumptions used to estimate deferred taxes.

While management believes these estimates are reasonable, changes in facts and assumptions or the discovery of new information may result in revised estimates. Actual results could differ from these estimates, and it is at least reasonably possible these estimates could be revised in the near term, and these revisions could be material.

### Revenue Recognition

The Company currently sells crude oil under a short-term agreement at prevailing market prices, with certain adjustments for product quality and geographic location. The Company recognizes revenue when control transfers to the purchaser at the delivery point and the customer has assumed the risk and rewards of ownership.

### Oil and Gas Properties

*Linefill.* The SYPS is an interstate pipeline that includes (among other pipeline segments and components) (i) Pipeline Segment 324, which extends from LFC to the Gaviota Pump Station in Santa Barbara County, California, and (ii) Pipeline Segment 325, which extends from the Gaviota Pump Station in Santa Barbara County, California, to Pentland Station in Kern County, California with an intermediate station at Sisquoc in San Luis Obispo, California. The Company classifies the quantity of oil used to fill Pipeline Segments 324 and 325 as linefill such that when an incremental barrel of oil is pumped into Pipeline Segments 324 and 325 it forces oil out at the Pentland Station sales point location. Pipeline Segments 324 and 325 have a capacity of approximately 540 MBbls. This linefill is accounted for at historical cost and recognized as a long term asset within Oil and gas properties on the unaudited condensed consolidated balance sheet as of March 31, 2026.

The Company capitalized costs incurred that were directly attributable to filling Pipeline Segments 324 and 325, including associated depreciation, depletion, and amortization. Linefill will not be depreciated, but is subject to impairment in accordance with Financial Accounting Standards Board ("FASB") guidance with respect to accounting for the impairment or disposal of long-lived assets. Carrying amounts that are not expected to be recoverable through future cash flows are written down to estimated fair value.

### Income Taxes

The Company accounts for income taxes under FASB Accounting Standards Codification ("ASC") Topic 740, "Income Taxes" ("ASC 740"). ASC 740 requires the recognition of deferred tax assets and liabilities for both the expected impact of differences between the financial statements and tax basis of assets and liabilities and for the expected future tax benefit to be derived from tax loss and tax credit carryforwards. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that included the enactment date. ASC 740 additionally requires a valuation allowance to be established when it is more likely than not that all or a portion of deferred tax assets will not be realized.

In accordance with ASC 740, the Company's effective tax rate was zero percent and negative 11.0% for the three months ended March 31, 2026 and 2025, respectively. For the three months ended March 31, 2026, the effective tax rate differed from the U.S. federal statutory tax rate of 21% primarily due to no income tax benefit being recognized in the current period as the tax benefit associated with the year–to–date pretax loss exceeds the amount expected to be realized through anticipated ordinary income in subsequent interim periods within the current fiscal year that is more likely than not to be realized. For the three months ended March 31, 2025, the variance from the statutory rate was primarily attributable to an increase in valuation allowance on deferred tax assets and nondeductible expenses.

9

Management's assessment of the realizability of deferred tax assets requires significant judgment and is subject to change in future periods. Changes in these estimates could materially affect the Company's income tax provision in the period of change.

**Accounts Payable and Accrued Liabilities**

Accounts payable and accrued liabilities include obligations incurred in the ordinary operation of the business for services performed and products received, including capital expenditures that are capitalized as oil and gas properties. Accounts payable and accrued liabilities consisted of the following as of:

| (in thousands) | March 31, 2026 | December 31, 2025 |
|---|---|---|
| Accounts payable | $ 37,657 | $ 25,239 |
| Accrued operations expenditures | 28,034 | 23,929 |
| Accrued general and administrative, and other | 51,633 | 50,185 |
| Total accounts payable and accrued liabilities | $ 117,324 | $ 99,353 |

**Net Loss Per Share of Common Stock**

The Company complies with accounting and disclosure requirements of FASB ASC Topic 260, *"Earnings Per Share."* Net loss per share of Common Stock is computed by dividing net loss by the weighted average number of shares of Common Stock outstanding for the period.

The following table reflects the calculation of basic and diluted net loss per share of Common Stock.

| | Three Months Ended March 31, | |
|---|---|---|
| (dollars in thousands, except per share amounts) | 2026 | 2025 |
| Net loss | $ (197,026) | $ (109,544) |
| Weighted average shares outstanding—Basic and diluted | 143,670,869 | 84,436,726 |
| Net loss per share—Basic and diluted | $ (1.37) | $ (1.30) |

The diluted net loss per share calculation excludes the anti-dilutive effect of 7,568,870 warrants, 11,237,090 restricted share units and 2,619,000 restricted share awards for the three months ended March 31, 2026, and 8,987,062 warrants and 4,901,632 restricted share awards for the three months ended March 31, 2025.

**Note 3 — Asset Retirement Obligations**

The Company's asset retirement obligations relate to the future plugging and abandonment of oil and gas properties and related facilities. The following table describes the changes to the Company's asset retirement obligations liability as of:

| (in thousands) | March 31, 2026 | December 31, 2025 |
|---|---|---|
| Beginning balance | $ 113,181 | $ 99,683 |
| Revision of previous estimate | — | 1,436 |
| Accretion | 3,285 | 12,062 |
| Ending balance | $ 116,466 | $ 113,181 |

**Note 4 — Debt**

**Senior Secured Term Loan**

The Company entered into the Senior Secured Term Loan with an initial principal of $625.0 million. The initial principal balance was increased by $16.6 million for material and supplies and $140.0 million for paid-in-kind interest from the effective date through the Closing Date less an $18.8 million cash deposit (which was paid on the Closing Date). The proceeds of the Senior Secured Term Loan were deemed funded on the Closing Date in connection with consummation of the Sable-EM Purchase Agreement. The Senior Secured Term Loan is secured by first-priority liens on substantially all assets of the Company.

On November 3, 2025, the Company and Exxon entered into an amendment (the "Second Debt Amendment") to the Senior Secured Term Loan, the effectiveness of which was contingent upon the satisfaction of certain conditions, including the

10

Company receiving equity contributions in an amount of no less than $225.0 million, net of underwriting fees and other transaction costs and expenses, and other customary closing conditions.

On November 24, 2025, the Second Debt Amendment became effective which extended the maturity date of the Senior Secured Term Loan to the earlier of (i) March 31, 2027 or (ii) 90 days after first sales of Hydrocarbons (as defined in the Senior Secured Term Loan). The Second Debt Amendment also increased the interest rate from ten percent (10%) per annum to fifteen percent (15%) per annum, compounded annually (computed on a 360-day year), payable in arrears on January 1st of each year following the effective date. At the Company's election, accrued but unpaid interest may be deemed paid on each interest payment date by adding the amount of interest owed to the outstanding principal (paid-in-kind) amount under the Senior Secured Term Loan. The Second Debt Amendment also includes additional reporting covenants and a financial liquidity covenant that require the Company to have not less than $25.0 million in unrestricted cash, measured at the end of each month.

On March 29, 2026, the Company initiated oil sales upon filling the SYPS, which accelerated the maturity date of the Senior Secured Term Loan to June 26, 2026.

Unless Sable elects in writing prior to an applicable interest payment date to pay accrued but unpaid interest in cash, all such accrued and unpaid interest shall be compounded annually on January 1st of each year by adding the relevant amount to the then outstanding principal amount of the Senior Secured Term Loan ("paid-in-kind interest").

*Debt Covenants.* The Senior Secured Term Loan, dated as of the Closing Date, by and among Sable, EM, as lender, and Alter Domus Products Corp., as the administrative agent for the benefit of the lender, requires that James C. Flores, our Chairman and Chief Executive Officer, remains directly and actively involved in the day-to-day management of our business, subject to the right of the holder of such indebtedness to approve his replacement, with such approval not to be unreasonably withheld.

Restrictive covenants in the Senior Secured Term Loan impose significant operating and financial restrictions on us and our subsidiaries and we may be prevented from taking advantage of business opportunities that arise because of the limitations imposed on us by the Senior Secured Term Loan unless we gain EM's consent. These restrictions limit our ability to, among other things: engage in mergers, consolidations, liquidations, or dissolutions; create or incur debt or liens; make certain debt prepayments; pay dividends, distributions, management fees or certain other restricted payments; make investments, acquisitions, loans, or purchase oil and gas properties; sell, assign, farm-out or dispose of any property; enter into transactions with affiliates; enter into, subject to certain exceptions, any agreement that prohibits or restricts liens securing the Senior Secured Term Loan, payments of dividends to us, or payment of debt owed to us and our subsidiaries; and change the nature of our business.

The Senior Secured Term Loan also contains representations and warranties, affirmative covenants, additional negative covenants and events of default (including a change of control). During the pendency of the Senior Secured Term Loan and in case of an event of default thereunder, EM may exercise all remedies at law or equity, and may foreclose upon substantially all of our assets and the assets of our subsidiaries, including, in the event of a deficiency, cash and any other assets not acquired from EM in the Business Combination to the extent constituting collateral under the applicable financing documents. We may not be able to obtain amendments, waivers or consents for potential or actual breaches of such representations and warranties or covenants, or we may be unable to obtain such amendments waivers or consents on acceptable terms, all of which could limit management's flexibility to operate the business. As of March 31, 2026, the Company was in compliance with all covenants under its Senior Secured Term Loan.

Debt consisted of the following as of:

| (in thousands) | March 31, 2026 | December 31, 2025 |
|---|---|---|
| Senior Secured Term Loan, including paid-in-kind interest | $ 956,437 | $ 921,868 |
| Less: Debt issuance costs, net | (185) | (284) |
| **Total short-term debt, net** | $ 956,252 | $ 921,584 |

For the three months ended March 31, 2026 and 2025, the Company incurred interest expense of $34.7 million and $21.0 million, respectively, which is included as Interest expense on the unaudited condensed consolidated statements of operations and the paid-in-kind interest is accrued and included in the Senior Secured Term Loan on the unaudited condensed consolidated balance sheets as of March 31, 2026 and December 31, 2025. For the three months ended March 31, 2026 and 2025, the Company's effective interest rate on the Senior Secured Term Loan was approximately 15% and 10%, respectively.

11

**Note 5 — Warrants**

There were 7,568,870 and 8,987,062 warrants outstanding as of March 31, 2026 and December 31, 2025, respectively. There were no changes in the number of warrants outstanding for the three months ended March 31, 2025. The table below reflects warrant activity during the three months ended March 31, 2026:

|  | Private Placement Warrants | Working Capital Warrants | Total |
|---|---|---|---|
| Outstanding Warrants as of December 31, 2025 | 5,680,692 | 3,306,370 | 8,987,062 |
| Expired | (1,418,192) | — | (1,418,192) |
| Outstanding Warrants as of March 31, 2026 | 4,262,500 | 3,306,370 | 7,568,870 |

There were no warrants exercised during the three months ended March 31, 2026 and 2025.

The Private Placement Warrants and Working Capital Warrants that remain outstanding as of March 31, 2026 and December 31, 2025 are accounted for as liabilities and marked-to-market at each reporting period, with changes in fair value included as Changes in fair value of warrant liabilities in the unaudited condensed consolidated statements of operations, refer to *Note 8 — Fair Value Measurements*.

**Note 6 — Commitments and Contingencies**

**Registration Rights**

The holders of the Founder Shares (defined below), Private Placement Warrants and Working Capital Warrants (and any shares of Common Stock issuable upon the exercise of such instruments) are entitled to registration rights pursuant to a registration rights agreement. The holders of these securities are entitled to make up to three demands, excluding short form demands, that the Company register such securities. In addition, the holders have certain "piggy-back" registration rights with respect to registration statements filed subsequent to the completion of a Business Combination. However, the registration rights agreement provides that the Company will not permit any registration statement filed under the Securities Act to become effective until termination of the applicable lockup period. The Company will bear the expenses incurred in connection with the filing of any such registration statements.

*Defense Production Act Order*

On March 13, 2026, the President of the United States, Donald J. Trump, signed an Executive Order to, among other things, delegate certain authorities under the DPA to the United States Secretary of Energy.

Subsequently on March 13, 2026, the United States Secretary of Energy, Chris Wright, issued the DPA Order to the Company in order to address the energy scarcity and supply disruption risks caused by California policies that have left the region and U.S. military forces dependent on foreign oil. The DPA Order directs Sable "to immediately prioritize and allocate pipeline transportation services for hydrocarbons from the SYU through the SYPS" and "immediately commence performance under contracts or orders for services… for hydrocarbon transportation capacity in the SYPS[.]" The DPA Order further requires Sable to "comply with this order immediately and maintain such compliance until such time as the conditions necessitating the issuance of this order abate or until Sable is directed otherwise." The DPA Order finds the "[a]n affordable and reliable domestic supply of energy is a fundamental requirement for the national and economic security of any nation" and these "problems are most pronounced in our Nation's West Coast, 'where dangerous State and local policies jeopardize our Nation's core national defense and security needs, and devastate the prosperity of not only local residents but the entire United States population.'" Finally, the DPA Order finds that the SYPS is a "critical energy resource on the West Coast" but "cannot be used to address the shortages identified in EO 14156 and the resulting vulnerabilities, including adversarial dependence" because "California agencies have deployed an array of state measures [] to block pipeline operations."

On March 23, 2026, the State of California filed a Complaint for Declaratory and Injunctive Relief alleging that the DPA Order violates provisions of the Administrative Procedure Act and the U.S. Constitution. The matter is captioned *State of California v. Chris Wright, et al.*, Case No. 2:26-cv-03396, in U.S. District Court, Central District of California.

*California Coastal Commission Matter*

On September 27, 2024, the California Coastal Commission (the "Coastal Commission") issued Notice of Violation No. V-9-24-0152 to Sable, which asserted that Sable's safety valve installation work and certain maintenance and repair activities undertaken by Sable on the Pipeline Segments 324 and 325 in the California coastal zone (the "Coastal Zone") to

12

address anomalies and install safety valves constituted unpermitted development activities under the California Coastal Act (Cal. Pub. Res. Code Section 30000, et seq.) (the "Coastal Act") and the County's Local Coastal Program ("LCP"). Sable undertook the subject repair and maintenance work, including the safety valve installation work, based on its understanding that no new coastal development permit or other Coastal Act authorization was required, consistent with the County's practice of authorizing repair work on the Pipeline Segments 324 and 325 since they were first permitted and built over 30 years ago. Following good faith negotiations with Coastal Commission staff, on November 12, 2024, the Coastal Commission issued Executive Director Cease and Desist Order No. ED-24-CD-02 (the "Order") requiring Sable to, among other requirements, prepare and submit an interim restoration plan and submit an application either to the Coastal Commission or the County to obtain a coastal development permit for the valve installation and other maintenance and repair work. In compliance with the Order, Sable prepared, submitted, and implemented the Interim Restoration Plan as approved by Coastal Commission staff. Sable separately submitted certain applications to the County related to some of the maintenance and repair work that was subject to Notice of Violation No. V-9-24-0152. The Order expired on February 10, 2025.

On February 11, 2025, the Coastal Commission issued Notice of Violation No. V-9-25-0013 to Sable, which asserted that certain maintenance and repair activities on the offshore pipeline segments of the SYPS in the Coastal Zone constituted unpermitted development activities under the Coastal Act. Sable undertook the subject maintenance and repair activities based on its understanding that no new coastal development permit or other Coastal Act authorization was required for such work, consistent with similar work that previously had been performed along the offshore pipeline segments of the SYPS by prior operators.

On February 12, 2025, the County delivered a letter to Sable confirming that certain Pipeline Segments 324 and 325 anomaly maintenance and repair work referenced in the Coastal Commission's Notice of Violation V-9-24-0152 was "authorized by the existing permits (Final Development Plan, Major Conditional Use Permit, and associated Coastal Development Permits) and was analyzed in the prior Environmental Impact Report/Environmental Impact Statement (EIR/EIS)." The letter states in part that "[t]he County previously exercised its authority under its Local Coastal Program and delegated Coastal Act authority in approving the permits and the requested anomaly repair work is within the scope of those approved permits." Sable subsequently recommended the repair and maintenance activities which were subject to Notice of Violation V-9-24-0152.

In addition, also on February 12, 2025, the County delivered a letter to the Coastal Commission. In this letter, the County responded to a request by the Coastal Commission to consent to a consolidated coastal development permit process for certain activities undertaken and planned by Sable on the SYPS. The County's letter also stated that certain maintenance and repair work on the Pipeline Segments 324 and 325 that was referenced in the Coastal Commission's Notice of Violation V-9-24-0152 is "authorized by the existing permits (Final Development Plan, Major Conditional Use Permit, and associated Coastal Development Permits) and was analyzed in the prior Environmental Impact Report/Environmental Impact Statement. Thus, no further application to or action by the County is required."

On February 14, 2025, Sable submitted a written response to the Coastal Commission's Notice of Violation V-9-24-0152 detailing that, consistent with the County's letters, certain of the alleged unpermitted development subject to the Notice of Violation was previously approved and that no further coastal development permit is required.

On February 18, 2025, Sable filed a complaint against the Coastal Commission in the Superior Court of the State of California for the County of Santa Barbara (Case No. 25CV00974). In the complaint, Sable challenges the Coastal Commission's prior Notices of Violations and Executive Director Cease and Desist Order as procedurally improper and asserts that the Coastal Commission lacks authority to prohibit work authorized by existing permits. Sable seeks a declaration that the Coastal Commission's actions are unlawful, an injunction prohibiting further enforcement actions by the Coastal Commission, damages for the alleged taking of property rights, and attorneys' fees and costs. The Coastal Commission proceeded to issue an Executive Director Cease and Desist Order to Sable on February 18, 2025, related to certain of Sable's pipeline repair and maintenance activities and safety valve installation work.

On April 10, 2025, the Coastal Commission approved Cease and Desist Order CCC-25-CD-01, Restoration Order CCC-25-RO-01, and Administrative Penalty Order CCC-25-AP3-01, whereby the Coastal Commission ordered the Company to cease and desist from all ongoing development in the Coastal Zone "as part of the effort to restart the SYU oil production operations and bring the pipelines back into use," apply for new Coastal Act authorization for all previously completed, ongoing, and future development in the Coastal Zone to the extent "part of the effort to restart the SYU oil production operations and bring the pipelines back into use," and imposed an administrative penalty of approximately $18.0 million on the Company. The Company does not believe this penalty is lawful and has not recognized any accrued expense as of March 31, 2026. Sable is prepared to vigorously pursue all available legal remedies related to the orders, including the administrative penalty, imposed by the Coastal Commission.

13

On April 16, 2025, the Coastal Commission filed a request in the Santa Barbara County Superior Court for a temporary restraining order against the Company to restrain the Company from violating the Cease and Desist Order CCC-25-CD-01 and to halt repair and maintenance activities on the Santa Ynez Pipeline System within the Coastal Zone. The request was filed within the Company's ongoing litigation against the Coastal Commission (Case No. 25CV00974). On April 17, 2025, the court denied the Coastal Commission's request for a temporary restraining order and set the matter for further hearing on May 14, 2025, which date was later continued to May 28, 2025.

On April 22, 2025, counsel for the Coastal Commission filed a Petition for Stay, Writ of Supersedeas, or Other Appropriate Order, and Request for Temporary Stay with the Second Division California Court of Appeal ("Court of Appeal"), seeking a temporary stay of the Santa Barbara County Superior Court's denial of the Coastal Commission's request for a TRO and an order requiring Sable to comply with the cease and desist order. Sable filed an Opposition to the Coastal Commission's Petition with the Court of Appeal on April 28, 2025. On May 15, 2025, the Court of Appeal denied the Coastal Commission's request for a temporary stay.

On May 28, 2025, the court granted the Coastal Commission's application for issuance of a preliminary injunction, enjoining Sable from conducting any further "development" in violation of Cease and Desist Order CCC-25-CD-01. On July 9, 2025, the court denied Sable's motion to stay the Cease and Desist Order CCC-25-CD-01. On July 16, 2025, Sable filed a notice of appeal challenging the court's issuance of preliminary injunction. On July 29, 2025, counsel for Sable filed a Petition for Writ of Mandate or Other Appropriate Relief with the Second Division California Court of Appeal, seeking a writ of mandate reversing the Santa Barbara County Superior Court's denial of Sable's motion to the stay Cease and Desist Order CCC-25-CD-01. On August 4, 2025, the Court of Appeal denied Sable's Petition for Writ of Mandate. On October 6, 2025, Sable filed a motion to file an amended complaint which quantifies its monetary damages in excess of $347.0 million. On October 15, 2025, the Santa Barbara County Superior Court denied the Company's request for the issuance of a writ of mandate on its first cause of action and set procedural motions related to Sable's four additional causes of action for December 3, 2025. On November 5, 2025, Sable filed its opening brief in support of its appeal challenging the Superior Court's issuance of the preliminary injunction with the Court of Appeal. Sable has also filed a Petition for Writ of Mandate or Other Appropriate Relief, seeking a writ of mandate reversing the Superior Court's October 15, 2025 denial of Sable's first cause of action. A hearing before the Court of Appeal on Sable's appeal is scheduled for May 14, 2026.

On December 3, 2025, the Santa Barbara Superior Court denied the Coastal Commission's motion for judgment on the pleadings as to its first amended cross complaint, granted Sable's motion to file the second amended complaint, and requested further briefing on Sable's four remaining causes of action. On February 18, 2026, the Santa Barbara Superior Court denied Sable's Motion for Reconsideration of the Preliminary Injunction for lack of jurisdiction pending Sable's appeal of the preliminary injunction to the Second Division California Court of Appeal. The Santa Barbara Superior Court also denied Sable's Motion for Reconsideration of Sable's Writ of Mandate. On March 18, 2026, the Coastal Commission filed a Motion for Judgment on the Pleadings ("MJOP"). On April 22, 2026, Sable filed its opposition to the Coastal Commission's MJOP. A hearing on the Coastal Commission's MJOP is set for May 20, 2026. On April 22, 2026, Sable also filed a motion for leave to file a third amended complaint to include allegations relating to PHMSA's jurisdiction and the DPA Order, which is set for hearing on May 20, 2026.

On December 23, 2025, the Coastal Commission's Executive Director sent PHMSA a letter requesting to review the Company's Restart Plan application materials pursuant to the Coastal Zone Management Act ("CZMA"), which PHMSA had approved on December 22, 2025. The letter also requested that PHMSA provide the Commission with the Company's Emergency Special Permit application materials to allow for a similar review by the Commission under the CZMA. The letter asserts that PHMSA's approval of the Company's Restart Plan and the Emergency Special Permit should be considered stayed pending the Commission's review. The letter also notified PHMSA that the Commission is reviewing PHMSA's concurrence with the Company's determination that Pipeline Segments 324 and 325 constitute part of an interstate pipeline facility under the PSA. On February 20, 2026, PHMSA responded to the Coastal Commission's December 23 letter, advising the Commission that PHMSA's records are available by submitting a request for information pursuant to the Freedom of Information Act, advising that some of the records may already be public owing to litigation that has been filed challenging the Restart Plan approval, and otherwise abstaining from comment owing to ongoing litigation.

*Zaca Preserve Matter*

On October 3, 2024, plaintiff Zaca Preserve LLC filed a California state court complaint against Sable, its subsidiary PPC, Plains All American Pipeline LP, and Plains Pipeline LP. The case is captioned 24CV05483 and is pending in Santa Barbara Superior Court, Anacapa Division. The plaintiff filed a First Amended Complaint on December 12, 2024, and served the complaint on Sable and PPC on December 18, 2024.

14

The plaintiff was a class member of the Grey Fox litigation that was settled effective September 17, 2024, and chose to opt out of the final settlement class. The plaintiff raises claims similar to the Grey Fox plaintiffs, namely that the pipeline easement on its property is no longer valid in light of the 2015 Refugio oil spill and the conduct of defendants. The plaintiff brings contract and tort claims and seeks declaratory and injunctive relief determining his easement terminated and prohibiting defendants from accessing or using his easement to resume pipeline operations. The plaintiff seeks compensatory, exemplary, and statutory damages, costs, attorneys' fees, and interest, as well as declaratory and injunctive relief. By stipulation, Sable and PPC's deadline to respond to the First Amended Complaint was March 4, 2025. Sable and PPC timely filed and served their Demurrer to the Plaintiff's First Amended Complaint and Sable filed and served a Motion to Strike the First Amended Complaint. The Demurrer and Motion to Strike were heard November 12, 2025. The court sustained the Demurrer, without leave to amend as to Plaintiff's causes of action for injunctive relief, negligent misrepresentation, negligence, UCL violation, permanent nuisance and threatened nuisance, and denied the Motion to Strike. Plaintiffs filed a Second Amended Complaint on December 12, 2025. Sable and PPC answered the Second Amended Complaint on February 11, 2026, and intend to defend the case vigorously. A case management conference is scheduled for June 10, 2026.

### BSEE Matter

On June 27, 2024, the Center for Biological Diversity and the Wishtoyo Foundation filed a complaint against Debra Haaland, Secretary of the U.S. Department of the Interior; the Bureau of Safety and Environmental Enforcement ("BSEE"); and Bruce Hesson, BSEE Pacific Regional Director in the U.S. District Court for the Central District of California (Case No. 2:24-cv-05459). Sable intervened and vigorously contests the plaintiffs' allegations. In the plaintiffs' January 2025 first supplemental and amended complaint, the plaintiffs alleged that BSEE: violated the National Environmental Policy Act ("NEPA"), the Outer Continental Shelf Lands Act ("OCSLA"), and the Administrative Procedure Act ("APA") in November 2023 by approving an extension to resume operations associated with the 16 oil and gas leases Sable holds in the SYU in federal waters offshore of California in the Santa Barbara Channel; and violated NEPA and the APA in September 2024 by approving applications for permits to modify for well reworking operations and by failing to conduct supplemental environmental analysis for oil and gas development and production in the SYU. The complaint asked for the court: to issue an order finding that BSEE violated NEPA, OCSLA and the APA; to vacate and remand the extension and the applications for permits to modify; to order BSEE to complete NEPA analysis by a date certain; to prohibit BSEE from authorizing further extensions, applications for permits to modify, or any other authorizations for resuming production until it complies with NEPA, OCSLA and the APA; and for an award of costs and attorneys' fees. Sable believes that the government's prior extensions to resume operations were both appropriate and authorized and independently that subsequent actions, including a May 28, 2025 Environmental Assessment (the "2025 Environmental Assessment") relied on by BSEE and a May 29, 2025 decision by BSEE approving the extension, render plaintiffs' corresponding claims moot. On September 24, 2025, the court denied cross-motions for summary judgment by all parties.

On November 7, 2025, the court approved a new scheduling order. On November 10, 2025, plaintiffs filed their second supplemental and amended complaint against Doug Burgum, Secretary of the U.S. Department of the Interior; BSEE; and Bobby Kurtz, BSEE Acting Pacific Regional Director. Plaintiffs added new claims to their existing complaint alleging that BSEE: violated NEPA and the APA in July 2025 by approving additional applications for permits to modify; and violated NEPA and the APA when issuing the May 29, 2025 decision approving the extension based upon the 2025 Environmental Assessment. In addition to the relief plaintiffs already sought, the second supplemental and amended complaint also asks the court: to issue an order finding that BSEE violated NEPA and the APA when issuing the July 2025 applications for permits to modify; to vacate and remand the July 2025 applications for permits to modify, the 2025 Environmental Assessment and Finding of No Significant Impact, and BSEE May 29, 2025 decision approving the extension. On November 24, 2025, Sable filed its answer to the second supplemental and amended complaint. The federal government lodged an updated administrative record on December 19, 2025. On January 16, 2026, plaintiffs filed a motion to compel completion and supplementation of the administrative record, which the court granted on March 12, 2026. The court's order required BSEE to supplement and complete the administrative record by May 11, 2026.

### BOEM Matter

On April 2, 2025, the Center for Biological Diversity and the Wishtoyo Foundation filed a complaint against Doug Burgum, Secretary of the U.S. Department of the Interior; BOEM; and Douglas Boren, BOEM Pacific Regional Director, in the U.S. District Court for the Central District of California (Case No. 2:25-cv-02840). On May 12, 2025, plaintiffs filed an amended complaint in which plaintiffs challenge BOEM's April 2025 decision determining that Sable is not required to revise the development and production plan for Platform Harmony in the SYU. The amended complaint asks for the court: to issue an order finding that BOEM's decision was not in accordance with OCSLA and violated the APA; order BOEM to

15

**Table of Contents**

require revision of the development and production plan for Platform Harmony; prohibit BOEM from authorizing new oil and gas drilling activity at the SYU unless and until revision of the development and production plan is complete; and for an award of costs and attorneys' fees. Sable intervened and vigorously contests the plaintiffs' allegations. On September 10, 2025, the court denied Sable's motion to dismiss based on plaintiffs' failure to provide notice under OCSLA's citizen suit provision. The court approved a scheduling order that provides for a hearing on cross-motions for summary judgment on May 15, 2026. Per the scheduling order, plaintiffs filed their motion for summary judgment on December 12, 2025. On February 6, 2026 the federal government filed and on February 20, 2026 Sable filed their respective oppositions to plaintiffs' motion for summary judgment and cross-motions for summary judgment. On February 20, 2026, the federal government and Sable filed motions to strike extra-record materials cited in plaintiffs' motion for summary judgment. The motions for summary judgment and motions to strike are fully briefed, and a hearing on these motions is scheduled for May 15, 2026.

*Regional Water Quality Control Board and Department of Fish and Wildlife Matters*

On December 13, 2024, the California Central Coast Regional Water Quality Control Board ("Regional Board") issued three letters to the Company related to Pipeline Segments 324 and 325 of the SYPS: (i) a Notice of Violation for an alleged unauthorized discharge of waste to waters of the state at an ephemeral stream in Santa Barbara County; (ii) a Directive to obtain regulatory coverage for an alleged unauthorized discharge of waste to waters of the state at the same ephemeral stream identified in item (i); and (iii) a First Notice of Non-Compliance for an alleged failure to obtain coverage under the Regional Board's General Permit for Construction Stormwater Discharges in Santa Barbara, San Luis Obispo, and Kern Counties.

On December 17, 2024, the California Department of Fish and Wildlife ("CDFW") issued a Notice of Potential Violation to Sable for alleged violations of the California Fish and Game Code at four separate sites within Santa Barbara County and San Luis Obispo County in California for alleged placement or fill of waste to waters.

On January 10, 2025, Sable submitted a written response to the Regional Board's December 2024 letters. On January 13, 2025, Sable submitted a written response to CDFW's December 2024 Notice of Potential Violation. On January 22, 2025, the Regional Board issued two additional letters to Sable related to Pipeline Segments 324 and 325: (i) a Second and Final Notice of Non-Compliance for an alleged failure to obtain coverage under the Regional Board's General Permit for Construction Stormwater Discharges in Santa Barbara, San Luis Obispo, and Kern Counties; and (ii) an order requiring Sable to submit a technical report associated with the discharge of earthen material to waters of the state.

On January 31, 2025, Sable submitted an application to the Regional Board for regulatory coverage for the alleged discharge of waste to waters of the state at the location identified in the Regional Board's December 13, 2024, Notice of Violation, and coverage was approved and issued by the Regional Board on March 20, 2025. On February 18, 2025, Sable submitted an application to CDFW for the same site, that application was deemed complete in March 2025, and work at the site was approved to proceed in May 2025. On February 21, 2025, the Company submitted a written response to the Regional Board's Second and Final Notice of Non-Compliance. On March 7, 2025, Sable submitted its initial responses to the Regional Board's order requiring Sable to submit a technical report, and on April 15, 2025, the Company submitted a supplemental response, that Sable committed to provide in its March initial response.

Sable submitted after-the-fact permitting applications to the Regional Board and CDFW with respect to potential discharges at the four sites identified in CDFW's December 2024 notice during the first two weeks of March 2025. The Regional Board provided responses and requests for additional information in April 2025, to which the Company provided supplemental information on April 25, 2025. These sites were fully permitted by the Regional Board in June 2025 and by CDFW as of September 2025.

On April 15, 2025, the Regional Board issued a second Notice of Violation to the Company for an alleged failure to provide a sufficient response to the Regional Board's request for a technical report and continued allegations of unauthorized discharges. On that same day, the Company submitted to the Regional Board further responses and additional information in response to the Regional Board's request for a technical report, in which the Company identified additional sites that may require after-the-fact permitting. On April 17, 2025, the Regional Board issued Resolution R3-2025-0024, which referred any assessment of civil liability, injunctive and declaratory relief against the Company for its alleged violations of the California Water Code to the California Attorney General via the California Superior Court. After the issuance of Resolution R3-2025-0024, the Company continued to work with the Regional Board and CDFW to identify locations and submit additional after-the-fact permit applications. On July 24, 2025, the Regional Board issued a third Notice of Violation, requiring the Company to provide additional information in order to satisfy the request for a technical report, to which the Company timely responded on August 13, 2025 with all requested information. As a result of this process, nine additional sites were identified. As of January 29, 2026, the Regional Board has issued permits for the nine

16

**Table of Contents**

additional locations (for a total of 14 locations) identified by the Regional Board, CDFW, and the Company. CDFW has issued a final Streambed Alteration Agreement for the nine locations, and the Company expects the agreement to be fully executed the week of May 4, 2026. Once the agreement is executed, all locations will be permitted. Based on the information provided by Sable in response to the Notices of Non-Compliance associated with the Regional Board's General Permit for Construction Stormwater Discharges, the Regional Board is not further requiring Sable to obtain coverage under that permit for the work performed.

On September 16, 2025, the Santa Barbara County District Attorney's office filed a criminal Complaint against the Company in Santa Barbara County Superior Court, with 21 Counts being pursued (sixteen (16) misdemeanors and five (5) felonies) for alleged violation of the California Fish & Game Code and Water Code and based on the same underlying activities that were the focus of the Regional Board and CDFW actions. The Complaint references some of the 14 locations where the Company has already sought after-the-fact permitting from the Regional Board and CDFW, but also includes other locations where neither the Regional Board nor the CDFW are requiring any further action or permitting. The Company has retained counsel for defense. On October 3, 2025, the Regional Board filed a civil action in Santa Barbara County Superior Court alleging that the Company failed to secure permits at the 14 locations prior to undertaking the work, though the Complaint also notes the Company's after-the-fact permitting efforts. The Complaint also alleges failure to comply with the request for a technical report. The Regional Board is seeking civil penalties and potentially limited injunctive relief. The Company filed its response to the Complaint on November 25, 2025. A case management conference is scheduled for May 15, 2026. The parties attended a mediation session on April 8, 2026 and agreed to further mediation on May 13, 2026.

### County Permit Transfer Matter

In October 2024, the County of Santa Barbara's Planning Commission approved the transfer of the Final Development Permits for the SYU, POPCO Facilities and Pipeline Segments 324 and 325 from Exxon and certain of its subsidiaries to the Company and its subsidiaries, PPC and POPCO, pursuant to Santa Barbara County Code Chapter 25B. That approval was appealed by various environmental advocacy groups to the Santa Barbara County Board of Supervisors. On February 25, 2025, the Board of Supervisors heard the appeals but, despite a County staff recommendation to reject the appeals, did not decide them, splitting 2-2 in a tie vote. As the appeals did not reverse the Planning Commission's decision, the Company thereafter sought the permit transfers from the County, but it was unsuccessful.

On May 8, 2025, the Company, its subsidiaries, PPC and POPCO, and Exxon and certain of its subsidiaries filed suit against the County of Santa Barbara and Board of Supervisors seeking a writ of mandamus directing Santa Barbara County to issue updated Final Development Permits reflecting the Sable plaintiffs as holders thereof, for declaratory relief finding that the County's Chapter 25B ordinances violate the United States and California Constitutions, and for damages. Several environmental advocacy groups intervened in the litigation. On September 12, 2025, after a hearing, the court issued an order of mandate requiring that "within 60 days of service of the writ of mandate on the Board, hold a de novo public hearing to affirm, reverse, or modify the Planning Commission's decision regarding Petitioners/Plaintiffs' Final Development Permit applications in this action in compliance with Santa Barbara County Code Chapter 25B-8, 9, and 10. If the Board is unable to reach a vote that affirms, reverses, or modifies the Planning Commission's decision, the Board shall hold another de novo public hearing within 45 days, and if unable again, every 45 days thereafter." The litigation was stayed pending the final action at the Board of Supervisors' re-hearing. The County set a hearing in this matter pursuant to the writ of mandate for November 4, 2025. At that hearing, the Board voted to continue the hearing until December 16, 2025, and directed County staff to prepare findings that would grant the appeals and deny the transfer of the permits to Sable for consideration at that hearing. At the December 16 hearing, the Board adopted the findings to grant the appeals and deny the transfer of the permits.

On March 16, 2026, Petitioners filed an amended petition for writ of mandate and complaint for declaratory relief and damages. On April 29, 2026 Respondents filed a Motion to Dismiss Complaint in Part, which is set for hearing on July 10, 2026. On April 30, 2026, certain intervenors also filed a motion to dismiss one of the causes of action in the Petitioners' amended petition. The intervenors' motion is also set for hearing on July 10, 2026. Sable continues to pursue the case vigorously.

### Johnson Class Action / Kelly and Vora Derivative Claims

On July 28, 2025, shareholder Tracy Johnson filed a putative class action complaint against the Company in the U.S. District Court for the Central District of California, captioned *Johnson v. Sable Offshore Corp., et al.*, Case No. 2:25-cv-06869 (C.D. Cal) (the "Johnson Action"). The complaint alleged violations of Sections 10(b) and 20(a) of the Exchange Act of 1934 and Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, on behalf of a putative class of investors who purchased or acquired Sable's publicly traded securities between May 19, 2025 and June 3, 2025, when the Company

17

engaged in a public offering, and/or pursuant and/or traceable to the offering. The complaint named as defendants the Company, certain of its officers, and the underwriters in the offering.

On October 27, 2025, the Court appointed a lead plaintiff. On November 10, 2025, the lead plaintiff filed an amended complaint purportedly on behalf of persons or entities who purchased or otherwise acquired publicly traded Sable securities between May 19, 2025 and November 4, 2025. The amended complaint dropped the claims under the Securities Act of 1933 and dropped the underwriters as defendants. On November 24, 2025, Defendants moved to dismiss the amended complaint. On December 8, 2025, the lead plaintiff filed a second amended complaint. The second amended complaint alleges, among other things, that the Company and certain of its officers made false and misleading statements or failed to disclose certain information regarding the Company's business activities at the SYU. The plaintiff seeks damages, costs, expenses, expert and attorneys' fees, and other unspecified relief. On January 5, 2026, Defendants moved to dismiss the second amended complaint. Plaintiff filed an opposition on January 12, 2026. Defendants' reply was filed on January 26, 2026, and the motion to dismiss was heard on February 23, 2026. The motion remains under consideration by the Court. The Company intends to vigorously defend against the claims in this lawsuit.

On August 21, 2025, shareholder Bryce Kelly filed a verified shareholder derivative complaint, purportedly on behalf of the Company, in the U.S. District Court for the Central District of California, captioned *Kelly v. Flores, et al.*, Case No. 2:25-cv-07848 (C.D. Cal.) (the "Kelly Action"). The complaint names as defendants the members of the Board of Directors of the Company, certain officers of the Company, and the underwriters of the Company's May 2025 public offering. The complaint alleges claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, unjust enrichment, waste of corporate assets, contribution under Section 10(b) and 21D of the Exchange Act of 1934, and contribution under Section 11(f) of the Securities Act of 1933, based on similar factual allegations to those at issue in the Johnson Action. On December 12, 2025, the Kelly Action was ordered stayed pending a ruling on the motion to dismiss filed in the Johnson Action.

On December 17, 2025, shareholder Udit Vora filed a verified shareholder derivative complaint, purportedly on behalf of the Company, in the U.S. District Court for the Central District of California, captioned *Vora v. Flores, et al.*, Case No. 2:25-cv-11944 (C.D. Cal.) (the "Vora Action"). The complaint names as defendants the members of the Board of Directors of the Company and certain officers of the Company. The complaint alleges claims for breach of fiduciary duties, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934, based on similar factual allegations to those at issue in the Johnson Action. On February 27, 2026, the Vora Action was ordered stayed pending a ruling on the motion to dismiss filed in the Johnson Action.

### CalGEM

On May 9, 2025, the California Department of Conservation's Geologic Energy Management Division ("CalGEM") issued a letter to the Company asserting that the Company's Las Flores Canyon Facility is a "production facility" under the California Public Resources Code and therefore subject to various statutory requirements applicable to such facilities. In that letter, CalGEM demanded that the Company post a bond of approximately $31.9 million, submit certain oil spill contingency response and management plans for CalGEM's review, and indicating that the failure to timely respond could result in civil penalties of up to $50,000 per day/per violation. On January 27, 2026, CalGEM issued a letter to the Company revising the bond amount to approximately $57.3 million based on CalGEM's material increases to the estimates for labor, equipment, transportation, engineering, and handling costs associated with decommissioning and remediation after an additional on-site inspection by CalGEM. Sable disputes that CalGEM possesses jurisdiction to impose those requirements. On February 17, 2026, Sable filed a lawsuit against CalGEM, the State Oil and Gas Supervisor, the California Department of Conservation, and its Director, seeking a writ of mandate against these agencies and officers prohibiting them from enforcing those provisions of the California Public Resources Code applicable to oil and gas production facilities against Sable, as well as a declaratory judgment that Sable's Las Flores Canyon Facility is not a "production facility" under California Public Resources Code section 3010. Separately, Sable and CalGEM are in disagreement over CalGEM's authority to inspect the Las Flores Canyon facilities, with Sable repeatedly expressing a willingness to permit an inspection within the procedural mechanisms established in the Civil Discovery Act in light of the ongoing litigation. On April 22, 2026, CalGEM asserted that Sable's request that CalGEM comply with the Civil Discovery Act constituted a denial of access to the facility and threatened to pursue enforcement action separate from the ongoing litigation.

### California Senate Bill 237

On September 13, 2025, the California Legislature passed Senate Bill 237 ("SB 237"). On September 19, 2025, Governor Gavin Newsom signed SB 237 into law. SB 237 became effective January 1, 2026. SB 237 added Section 51014.1 to the

18

California Government Code, which requires that an "existing oil pipeline … that has been idle, inactive, or out of service for five years or more, shall not be restarted without passing a spike hydrostatic testing program." SB 237 also amends Section 30262 of the California Coastal Act to provide that the "[r]epair, reactivation, [] maintenance," or "[d]evelopment associated with the repair, reactivation or maintenance of an oil pipeline that has been idled, inactive or out of service for five years or more" must obtain a "new coastal development permit."

On September 29, 2025, PPC filed a Complaint for Declaratory Relief against the State of California in Kern County Superior Court seeking a declaratory judgment that the SYPS is not subject to SB 237 because the SYPS is not "idle, inactive, or out of service," and because the Legislature did not give SB 237 retroactive effect. On January 21, 2026, the Company filed its First Amended Complaint adding a claim that the application of SB 237 to the SYPS is preempted by federal law. On February 20, 2026, the State of California removed the case to the U.S. District Court for the Eastern District of California.

On February 18, 2026, the Coastal Commission's Executive Director sent a letter to the Company asserting that "in order for Sable to reactivate" SYPS Pipeline Segments 324 and 325, Sable must "at a minimum, apply for and receive a [coastal development permit] from the [Coastal] Commission" pursuant to Section 30262 of the Coastal Act, as amended by SB 237. On March 1, 2026, the Company responded to the Commission's Executive Director and confirmed that the "legal issues raised in [the Director's] letter are being actively litigated." On March 19, 2026, the Coastal Commission's Executive Director sent a further letter to the Company asserting that, among other things, "any reactivation" of Pipeline Segments 324 and 325 "is unpermitted development" pursuant to SB 237 and "would be grounds for further enforcement action by the [Coastal] Commission." On March 20, 2026, the Company responded to the Commission's Executive Director and reconfirmed that "the legal issues pertaining to SB 237 … are the subject of litigation."

The State filed its Motion to Dismiss in the SB 237 litigation discussed above on March 30, 2026, which is set for hearing on June 15, 2026. PPC filed its opposition to the State's Motion to Dismiss on April 13, 2026. PPC filed a Motion for Leave to File Second Amended Complaint on April 10, 2026, which is set for hearing on May 11, 2026. Sable intends to continue to vigorously prosecute the action.

### Government Requests

On December 2, 2025, the Company received subpoenas from the United States Attorney's Office for the Southern District of New York ("SDNY") and SEC requesting documents (the "Government Requests"). The document requests relate to issues raised in an October 31, 2025 report published by Hunterbrook Media (the "Hunterbrook Report") and the trading of Company securities, as well as related issues. The Company is providing documents and cooperating with the Government Requests.

### State Parks Matters

On March 13, 2026, Sable and PPC filed suit against the California Department of Parks and Recreation ("State Parks") in U.S. District Court, Central District of California, captioned *Sable Offshore Corp., et al. v. Quintero*, Case No. 2:26-cv-02739. Sable is seeking declaratory judgment that (i) State Parks is preempted by federal law, and (ii) the Defense Production Act Order bars any legal or equitable action by State Parks seeking to prevent Sable from complying with the terms of the DPA Order. State Parks' response to the initial pleadings is due on May 18, 2026.

Separately, on March 17, 2026, State Parks filed a Complaint for Injunctive Relief in Superior Court of California (Santa Barbara County) alleging that, by transporting oil through the portions of the SYPS in Gaviota State Park, Sable and PPC are trespassing on State Parks' property. State Parks seeks an order (i) enjoining Sable and PPC from transporting oil through Gaviota State Park and (ii) directing Sable and PPC to remove that portion of SYPS Pipeline Segments 325 that runs under and through Gaviota State Park. State Parks also seeks declaratory relief as to its property rights within Gaviota State Park. On March 19, 2026, Sable filed notice of removal to federal court. On March 27, 2026, Parks filed a motion for Preliminary Injunction. On April 3, Sable filed its Opposition to the Motion for Preliminary Injunction. State Parks filed its reply on April 10, 2026. A hearing on the Motion for Preliminary Injunction was held on April 27, 2026, and the court took the matter under submission. The matter is being heard in the U.S. District Court, Central District of *California, caption California Department of Parks and Recreation v. Sable Offshore Corp., et al.*, Case No. 2:26-cv-02946. Sable's response to this complaint is due May 18, 2026.

19

**Table of Contents**

*Office of State Fire Marshal Matters*

On December 17, 2024, the California Office of the State Fire Marshal ("OSFM") approved Sable's implementation of enhanced pipeline integrity standards for the Pipeline Segments 324 and 325 by granting state waivers of certain regulatory requirements ("State Waivers") related to cathodic protection and seam weld corrosion for the Pipeline Segments 324 and 325.

On February 11, 2025, the Pipeline and Hazardous Materials Safety Administration ("PHMSA") notified the OSFM that PHMSA did not object to OSFM's granting of the State Waivers.

Two lawsuits were filed against OSFM (as Defendant) and Sable and PPC (as Real Parties in Interest) challenging OSFM's issuance of the State Waivers. On April 15, 2025, the Center for Biological Diversity and the Wishtoyo Foundation filed a Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief alleging that OSFM violated federal and state pipeline safety laws and the California Environmental Quality Act ("CEQA") in issuing the State Waivers. The Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper also filed a Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief against OSFM (as Defendant) and Sable and PPC (as Real Parties in Interest) alleging similar claims. Both groups of Petitioners seek a court order declaring the State Waivers void and directing OSFM to vacate and set aside the State Waivers until OSFM complies with its obligations under federal and state pipeline safety laws and CEQA.

A hearing was held on July 18, 2025, and on July 29, 2025, the court entered an order granting petitioners' application for issuance of preliminary injunction in part, ruling that, absent further order of the court, Sable may resume petroleum transportation through Pipeline Segments 324 and 325 ten court days after Sable files notice that Sable has received all necessary approvals and permits for such resumption. The court clarified that Sable is not prevented from taking steps toward resuming petroleum transportation through Pipeline Segments 324 and 325, and that OSFM is not prevented from taking steps it finds appropriate in its regulatory capacity with respect to Sable's Restart Plans as contemplated by the federal Consent Decree.

On January 5, 2026, the Company filed a Motion for Reconsideration of the Preliminary Injunction in the State Waivers litigation. The Motion requested that the preliminary injunction be rescinded as moot given PHMSA's determination and exercise of regulatory oversight for Pipeline Segments 324 and 325. On February 26, 2026, the Company notified OSFM that, effective immediately, it had "relinquishe[d], surrender[ed] and abandon[ed] the State Waivers" given PHMSA's determination and exercise of regulatory oversight for Pipeline Segments 324 and 325. On February 27, 2026, the Santa Barbara County Superior Court denied the Company's Motion for Reconsideration of the Preliminary Injunction. On March 16, 2026, Sable and PPC filed ex parte Notice of the Defense Production Act Order and Request for Immediate Recission of the Preliminary Injunction. On the same day, Plaintiffs filed ex parte Application for Enforcement of Preliminary Injunction and for an Order to Show Cause why Real Parties should not be found in contempt of Court. On March 17, 2026, the Court continued the hearing to April 17, 2026. On April 17, 2026, the Santa Barbara County Superior Court denied the Company's Motion for Reconsideration of the Preliminary Injunction and continued the hearing on Plaintiffs' Motion for an Order to Show Cause to May 22, 2026. Sable and PPC intend to continue to defend both cases vigorously.

*PHMSA Matters*

On October 22, 2025, OSFM sent a letter to Sable alleging deficiencies in the Company's compliance with the State Waivers. Sable strongly disagrees with the allegations, which are inconsistent with the plain language and numerous discussions with OSFM experts confirming that Sable was in compliance with the State Waivers. Sable provided its initial response to the OSFM on October 23, 2025, setting forth the Company's objections to OSFM's new interpretation of the State Waiver conditions.

On November 26, 2025, the Company notified PHMSA of its determination that the SYPS, including Pipeline Segments 324 and 325, constitutes an interstate pipeline facility under the Pipeline Safety Act ("PSA"), and requested that PHMSA exercise regulatory oversight over the SYPS and transition oversight from OSFM. On December 17, 2025, PHMSA issued a letter to the Company concurring in its determination that the SYPS is an interstate pipeline under the PSA, and informed the Company that "PHMSA is notifying OSFM that [Pipeline Segments 324 and 325 are] subject to the regulatory oversight of PHMSA." On December 22, 2025, PHMSA notified the Company that PHMSA had approved the Company's Restart Plan for Pipeline Segments 324 and 325 after reviewing extensive documentation provided by Sable to PHMSA and conducting a multi-day field inspection. On December 23, 2025, PHMSA issued an Emergency Special Permit to the Company related to cathodic protection and seam weld corrosion along Pipeline Segments 324 and 325.

20

Table of Contents

On December 24, 2025, in the U.S. Court of Appeals for the Ninth Circuit, the Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Santa Barbara Channelkeeper, the Center for Biological Diversity, and the Wishtoyo Foundation (as Petitioners) filed a Petition for Review and Emergency Motion to Stay with respect to PHMSA's approval of the Company's Restart Plan and issuance of the Emergency Special Permit (Case No. 25-8059) (the "PHMSA Litigation"). The Petitioners named the U.S. Department of Transportation and PHMSA and their respective heads as Respondents. On December 25, 2025, the Company and PPC filed an Emergency Motion for Leave to Intervene in the PHMSA Litigation. Both the U.S. government entities and the Company parties opposed the stay request. On December 31, 2025, the Ninth Circuit Court of Appeals granted the Company's Motion for Leave to Intervene and denied the Petitioners' Motion to Stay PHMSA's approval of the Company's Restart Plan and issuance of the Emergency Special Permit. The Court also granted expedited review of the Petition.

On January 23, 2026, a second petition was filed in the U.S. Court of Appeals for the Ninth Circuit by the State of California, also against the U.S. Department of Transportation; Sean Duffy, in his official capacity as Secretary of the U.S. Department of Transportation; Pipeline and Hazardous Materials Safety Administration (PHMSA); and Paul Roberti, in his official capacity as Administrator of PHMSA. The second petition, filed by the State of California, Attorney General and OSFM, challenges the Emergency Special Permit, but also challenges PHMSA's assertion of jurisdiction over the SYPS. The two petitions have been consolidated and Sable is participating in the consolidated matter. Sable intends to defend the cases vigorously.

### Consent Decree Matters

On March 16, 2026, OSFM and State Parks ("California Plaintiffs") filed an ex parte Emergency Motion to Enforce Consent Decree in *United States, et al. v. Plains All American Pipeline, L.P., et al.*, Case No. 2:20-cv-02415(C.D. Cal) in U.S. District Court seeking an order enforcing the Consent Decree and ordering Sable not to restart or continue operating Segments 324 and 325 of the SYPS. The Department of Justice ("DOJ"), on behalf of the United States of America (the "United States"), filed its opposition to California Plaintiffs' Ex Parte Motion on March 18, 2026. On March 23, 2026, the Court denied the California Plaintiffs' Ex Parte Motion, finding "no evidence to support a showing of irreparable prejudice" to California Plaintiffs' cause if required to seek relief through a regularly noticed motion. On March 30, 2026, the DOJ, on behalf of the United States, filed a Motion to Terminate or Modify the Consent Decree. On April 1, 2026, Defendants Plains All American Pipeline L.P. and Plains Pipeline L.P. filed Joinder to the United States' Motion to Terminate or Modify the Consent Decree. On the same day, Sable and PPC, as nonparties to the cases, filed a Memorandum in Support of the United States' Motion to Terminate Consent Decree, and filed a further brief in support, and in opposition to California's Motion to Enforce, on April 27, 2026. California Plaintiffs' Motion to Enforce Consent Decree and the United States' Motion to Terminate the Consent Decree are set for hearing on June 1, 2026.

### Note 7 — Stockholders' Equity

*Preferred Stock* — The Company is authorized to issue a total of 1,000,000 shares of preferred stock at par value of $0.0001 each. As of March 31, 2026 and December 31, 2025, there were no shares of preferred stock issued or outstanding.

*Common Stock* — The Company is authorized to issue a total of 500,000,000 shares of Common Stock at par value of $0.0001 each. As of March 31, 2026 and December 31, 2025, there were 150,321,586 and 144,961,796 shares issued and outstanding, respectively.

*Equity Issuance.* On February 2, 2026, the Company entered into a Sales Agreement (the "Agreement") with TD Securities (USA) LLC and Jefferies LLC, as agents (the "Agents"), under which the Company may offer and sell, from time to time at its sole discretion, an aggregate gross sale price of up to $250.0 million of shares of its Common Stock through the Agents, pursuant to an effective shelf registration statement on Form S-3 (Registration No. 333-286675), which was declared effective by the SEC on May 1, 2025. The Company filed a prospectus supplement with the SEC on February 2, 2026 in connection with the offering. Under the terms of the Agreement, the Agents may sell the Company's Common Stock by any method permitted by law deemed to be an "at the market offering" as defined in Rule 415 of the Securities Act of 1933, as amended.

During the three months ended March 31, 2026, the Company issued 5,359,790 shares of its Common Stock for aggregate gross proceeds of approximately $72.4 million. Associated marketing and legal fees of approximately $1.6 million were paid and recognized as an offset to the proceeds within Additional paid-in capital in the unaudited condensed consolidated balance sheet and statement of changes in stockholders' equity as of March 31, 2026.

Subsequent to March 31, 2026, the Company issued an additional 1,640,844 shares of its Common Stock for aggregate gross proceeds of approximately $22.6 million, and incurred approximately $0.4 million in associated marketing and legal fees.

21

### Note 8 — Fair Value Measurements

Certain of the Company's financial assets and liabilities are measured at fair value on the unaudited condensed consolidated balance sheets. Fair value measurements are classified within a hierarchy that prioritizes the observability of inputs used in determining fair value. Level 1 inputs represent unadjusted quoted prices in active markets for identical assets and liabilities that the Company can access at the measurement date. Level 2 inputs include observable inputs other than Level 1 quoted prices. Level 3 inputs are unobservable and reflect the Company's own assumptions.

### Recurring Fair Value Measurements

The following tables present the Company's assets and liabilities measured at fair value on a recurring basis, including the related fair value hierarchy:

| | As of March 31, 2026 | | | |
|---|---|---|---|---|
| *(in thousands)* | Quoted Prices in Active Markets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
| **Liabilities:** | | | | |
| Senior Secured Term Loan | $ — | $ 956,252 | $ — | $ 956,252 |
| Private Placement Warrants | — | — | 46,120 | 46,120 |
| Working Capital Warrants | — | — | 35,775 | 35,775 |
| Restricted Stock Unit Liability[1] | — | 1,917 | — | 1,917 |
| **Total** | **$ —** | **$ 958,169** | **$ 81,895** | **$ 1,040,064** |

[1] Certain restricted stock units qualify for liability treatment and are remeasured at the end of each reporting period.

| | As of December 31, 2025 | | | |
|---|---|---|---|---|
| *(in thousands)* | Quoted Prices in Active Markets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
| **Liabilities:** | | | | |
| Senior Secured Term Loan | $ — | $ 921,584 | $ — | $ 921,584 |
| Private Placement Warrants | — | — | 22,331 | 22,331 |
| Working Capital Warrants | — | — | 15,407 | 15,407 |
| Restricted Stock Unit Liability[1] | — | 719 | — | 719 |
| **Total** | **$ —** | **$ 922,303** | **$ 37,738** | **$ 960,041** |

[1] Certain restricted stock units qualify for liability treatment and are remeasured at the end of each reporting period.

The following tables present the changes in the fair value of the Level 3 Private Placement Warrants and Working Capital Warrants:

| *(in thousands)* | Private Placement Warrants (Level 3) | Working Capital Warrants (Level 3) | Total Level 3 Liabilities Fair Value |
|---|---|---|---|
| **Fair Value as of December 31, 2025** | **$ 22,331** | **$ 15,407** | **$ 37,738** |
| Expirations | (2,468) | — | (2,468) |
| Change in valuation inputs or other assumptions | 26,257 | 20,368 | 46,625 |
| **Fair Value as of March 31, 2026** | **$ 46,120** | **$ 35,775** | **$ 81,895** |

| *(in thousands)* | Private Placement Warrants (Level 3) | Working Capital Warrants (Level 3) | Total Level 3 Liabilities Fair Value |
|---|---|---|---|
| **Fair Value as of December 31, 2024** | **$ 79,263** | **$ 47,678** | **$ 126,941** |
| Change in valuation inputs or other assumptions | 13,492 | 7,803 | 21,295 |
| **Fair Value as of March 31, 2025** | **$ 92,755** | **$ 55,481** | **$ 148,236** |

22

There were no transfers in or out of Level 3 from other levels in the fair value hierarchy for the three months ended March 31, 2026 and 2025.

### Fair Value of Financial Assets and Liabilities

The carrying amount of cash and cash equivalents, prepaid expenses and other current assets, accounts payable, and accrued liabilities approximate their fair value because of the short-term nature of the instruments.

### Senior Secured Term Loan

As of March 31, 2026 and December 31, 2025, the estimated fair value of the Senior Secured Term Loan approximates the amount of principal and paid-in-kind interest outstanding because the interest rate is reflective of market rates and such outstanding amount may be repaid, in full or in part, at any time without penalty. The associated inputs are considered a Level 2 fair value measurement.

### Warrant Liabilities

The estimated fair values of the Private Warrants and the Working Capital Warrants are measured using the Modified Black-Scholes Optional Pricing Model, which utilizes Level 3 inputs. Inherent in a binomial options pricing model are assumptions related to expected share-price volatility, expected life, risk-free interest rate and dividend yield. A change in these significant unobservable inputs to a different value could result in a significantly higher or lower fair value measurement at future reporting dates. The Company estimates the volatility of its Common Stock based on historical volatility that matches the expected remaining life of the warrants. The risk-free interest rate is based on the U.S. Treasury zero-coupon yield curve on the grant date for a maturity similar to the expected remaining life of the warrants. The expected life of the warrants is assumed to be equivalent to their remaining contractual term. The dividend rate is based on the historical rate, which the Company anticipates to remain at zero. The aforementioned warrant liabilities are not subject to qualified hedge accounting. Changes in the estimated fair value of the Private Placement Warrants and Working Capital Warrants are included in the Change in fair value of warrant liabilities on the Company's unaudited condensed consolidated statement of operations for the three months ended March 31, 2026 and 2025.

The following table provides quantitative information regarding Level 3 fair value measurements used to determine the fair value of the Working Capital Warrants and the Private Placement Warrants as of March 31, 2026.

| Inputs | March 31, 2026 |
|---|---|
| Stock price | $ 16.52 |
| Strike price | $ 11.50 |
| Term (in years) | 2.88 |
| Volatility | 90.0 % |
| Risk-free rate | 3.74 % |
| Dividend yield | 0.00 % |

The following table provides quantitative information regarding Level 3 inputs used to determine the fair values of Private Placement Warrants held by FL Co-Investment and Intrepid Financial Partners as of December 31, 2025.

| Inputs | December 31, 2025 |
|---|---|
| Stock price | $ 9.02 |
| Strike price | $ 11.50 |
| Term (in years) | 0.15 |
| Volatility | 180.0 % |
| Risk-free rate | 3.64 % |
| Dividend yield | 0.00 % |

23

Table of Contents

The following table provides quantitative information regarding Level 3 fair value measurements used to determine the fair value of the Working Capital Warrants and the Private Placement Warrants, excluding Private Placement Warrants held by FL Co-Investment and Intrepid Financial Partners, as of December 31, 2025.

| Inputs | December 31, 2025 |
|---|---|
| Stock price | $ 9.02 |
| Strike price | $ 11.50 |
| Term (in years) | 3.12 |
| Volatility | 85.0 % |
| Risk-free rate | 3.50 % |
| Dividend yield | 0.00 % |

## Note 9 — Supplemental Cash Flow Information

The following table provides supplemental disclosure of substantive cash flow information:

| | Three Months Ended March 31, | |
|---|---|---|
| (in thousands) | 2026 | 2025 |
| Right-of-use assets obtained in exchange for operating lease liabilities | — | 307 |
| Change in capital expenditures included in accounts payable and accrued liabilities | 3,092 | 24,959 |
| Change in accrued equity issuance costs | 12,797 | 36 |
| Capitalization of depletion to inventory and linefill | 3,760 | — |
| Capitalization of other linefill related costs | 19,962 | — |
| Change in accrued debt issuance costs | 203 | — |

## Note 10 — Subsequent Events

The Company evaluated subsequent events and transactions that occurred after the unaudited condensed consolidated balance sheet date up to the date that the unaudited condensed consolidated financial statements were issued. Based upon this review, the Company, other than as previously described herein, did not identify any subsequent events that would have required adjustment or disclosure in the financial statements.

24

**Table of Contents**

**ITEM 2.     MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*Unless otherwise noted or the context otherwise requires, references to (i) the "Company", "Sable", "we", "us", or "our" in this Item 2 are to Sable Offshore Corp, a Delaware corporation, and its consolidated subsidiaries, following the Business Combination, (ii) "Flame" are to Flame Acquisition Corp. prior to the Business Combination, (iii) the "Santa Ynez Unit" or "SYU" are to the 16 federal leases, three offshore platforms (Hondo, Harmony and Heritage), and associated ancillary facilities located in federal water offshore California, and (iv) the "Santa Ynez Pipeline System" (or "SYPS") are to the interstate pipeline connecting the SYU to the Pentland Station terminal, inclusive of "Pipeline Segment 324" and "Pipeline Segment 325", or collectively referred to as "Pipeline Segments 324 and 325" (formerly known as "901/903 Assets" and as defined in the Sable-EM Purchase Agreement), the Las Flores Canyon ("LFC") onshore processing. storage, and related pipeline assets, and the offshore pipeline connecting the SYU to LFC. The SYU Assets include the SYU and the SYPS. The following discussion and analysis of our financial condition and results of operations should be read in conjunction with our financial statements and related notes thereto included elsewhere in this Quarterly Report. Certain information contained in the discussion and analysis set forth below includes forward-looking statements that involve risks and uncertainties.*

**Cautionary Note Regarding Forward-Looking Statements**

The unaudited condensed consolidated financial statements include forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended (the "Securities Act"), and Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). We have based these forward-looking statements on our current expectations and projections about future events. These forward-looking statements are subject to known and unknown risks, uncertainties and assumptions about us that may cause our actual results, levels of activity, performance or achievements to be materially different from any future results, levels of activity, performance or achievements expressed or implied by such forward-looking statements. In some cases, you can identify forward-looking statements by terminology such as "may," "should," "could," "would," "expect," "plan," "anticipate," "believe," "estimate," "continue," or the negative of such terms or other similar expressions. A number of factors could cause actual events, performance or results to differ materially from the events, performance and results discussed in the forward-looking statements. For information identifying important factors that could cause actual results to differ materially from those anticipated in the forward-looking statements, please refer to the risk factors described in Part I, Item 1A "Risk Factors" included in our Annual Report on *Form 10-K* for the year ended December 31, 2025, and those described in our other SEC filings. The Company's securities filings can be accessed on the EDGAR section of the Securities and Exchange Commission ("SEC") website at www.sec.gov. Except as expressly required by applicable securities law, the Company disclaims any intention or obligation to update or revise any forward-looking statements whether as a result of new information, future events or otherwise.

**Recent and Significant Events**

*Defense Production Act Order*

On March 13, 2026, the President of the United States, Donald J. Trump, signed an Executive Order to, among other things, delegate certain authorities under the Defense Production Act of 1950 ("DPA") to the United States Secretary of Energy. Subsequently, on March 13, 2026, the United States Secretary of Energy, Chris Wright, issued an order to the Company invoking the DPA (the "DPA Order") to immediately prioritize and allocate pipeline transportation services for hydrocarbons from the SYU through the SYPS in order to address the energy scarcity and supply disruption risks caused by California policies that have left the region and U.S. military forces dependent on foreign oil.

*Resuming Petroleum Transportation through SYPS Segments 324 and 325*

On March 14, 2026, the Company resumed the transportation of hydrocarbons (oil) produced at the SYU through the SYPS at the direction of the United States Secretary of Energy, Chris Wright, in compliance with the DPA Order. In doing so, the Company facilitates the supply of domestically produced crude oil through U.S. pipeline infrastructure to U.S. refineries, supporting domestic consumers and the U.S. military.

The resumption of oil transportation through Segments 324 and 325 of the SYPS was executed in compliance with all applicable safety standards through the Company's comprehensive pipeline integrity management program. Sable is pleased with its operational performance across the SYU and the SYPS during this critical period. Sable is also proud to create new, well-paying jobs for the people of California and throughout America.

*Initiation of Oil Sales*

On March 29, 2026, the Company initiated oil sales upon filling the SYPS, resulting in total oil sales volumes of approximately 13,380 barrels for the period ended March 31, 2026.

*Consent Decree*

The United States Department of Justice has moved to terminate or modify the Consent Decree in the United States District Court, Central District of California. Sable is not a party to this litigation, but is participating in briefing related to the Consent Decree termination or modification, which is set to be heard on June 1, 2026.

*Offshore Storage and Treating Vessel Offtake Strategy*

On September 29, 2025, Sable announced that it is evaluating and pursuing an offshore storage and treating vessel ("OS&T") strategy to provide access to domestic and global markets via shuttle tankers for federal crude oil produced from the SYU in the Pacific Outer Continental Shelf Area (the "OS&T Strategy"). On October 9, 2025, Sable submitted a Development and Production Plan update for the SYU to the Bureau of Ocean Energy Management ("BOEM"). Prior to implementation of the OS&T strategy, regulatory authorizations are required, including clearance from BOEM.

Following the resumption of oil transportation through Segments 324 and 325 of the SYPS, the OS&T Strategy is no longer the Company's primary development pathway. Under the DPA Order, the Company has been directed to immediately prioritize and allocate pipeline transportation services for oil transportation from the SYU through the SYPS. Nonetheless, the Company continues to evaluate the OS&T Strategy as a longer-term option to diversify sales channels, expand access to domestic and international purchasers, and provide additional flexibility in navigating potential regulatory developments.

*At–the–Market Common Stock Offering*

On February 2, 2026, the Company entered into a Sales Agreement (the "Agreement") with TD Securities (USA) LLC and Jefferies LLC, as agents (the "Agents"), under which the Company may offer and sell, from time to time at its sole discretion, an aggregate gross sale price of up to $250.0 million of shares of its Common Stock through the Agents, pursuant to an effective shelf registration statement on Form S-3 (Registration No. 333-286675), which was declared effective by the SEC on May 1, 2025. The Company filed a prospectus supplement with the SEC on February 2, 2026 in connection with the offering. Under the terms of the Agreement, the Agents may sell the Company's Common Stock by any method permitted by law deemed to be an "at the market offering" as defined in Rule 415 of the Securities Act of 1933, as amended.

During the three months ended March 31, 2026, the Company issued 5,359,790 shares of its Common Stock for aggregate gross proceeds of approximately $72.4 million. Associated marketing and legal fees of approximately $1.6 million were paid and recognized as an offset to the proceeds within Additional paid-in capital in the unaudited condensed consolidated balance sheet and statement of changes in stockholders' equity as of March 31, 2026.

**Recent Trends and Outlook**

*Trends*

Commodity prices were volatile during the first quarter of 2026, and the Company expects continued volatility for the remainder of 2026 due to macroeconomic conditions, evolving regulatory frameworks, geopolitical developments, and potential changes in trade policies, including the imposition of domestic and foreign tariffs. The Company's revenues, profitability, liquidity, and financial condition are expected to be impacted by market prices for crude oil and, to a lesser extent, NGLs and natural gas.

In July 2025, the One Big Beautiful Bill Act ("OBBBA") was enacted, and the current U.S. administration has issued executive orders and indicated the potential for additional regulatory and trade policy changes that may affect the oil and gas industry. The OBBBA may favorably affect the Company's future cash income tax obligations, including the potential deferral of certain federal income taxes; however, the extent and timing of such impacts remain uncertain. Changes in trade policy, including the potential imposition of tariffs, could result in reciprocal actions by foreign governments, which may affect demand for crude oil, increase costs for materials and services, and impact broader economic conditions, including interest rates.

The Company is subject to ongoing litigation and regulatory proceedings, including matters involving California state agencies, refer to *Note 6 — Commitments and Contingencies* for additional details. Continued regulatory scrutiny and legal

**Table of Contents**

proceedings contribute to an uncertain operating environment and may result in increased compliance costs, operational delays, or other constraints, which could adversely affect the Company's business, results of operations, financial condition, and capital expenditures.

*Outlook*

As of April 2026, approximately 40 wells at Platforms Harmony and Heritage are online, producing an average of approximately 750 gross barrels of oil per day per well. Upon bringing all 74 production wells on these platforms online, which is expected during the second quarter of 2026, the Company expects average production of approximately 700 gross barrels of oil per day per well. The Company expects Platform Hondo to commence production in June 2026.

The Company intends to pursue a refinancing of its Senior Secured Term Loan during the second quarter of 2026. In addition to engaging with its existing banking partners, the Company is evaluating potential federal credit support options. The Company also expects to implement a commodity hedging program designed to support cash flow stability while retaining exposure to favorable commodity price movements.

Sable is coordinating with the federal government in various legal matters to defend its vested rights to operate its assets and ensure compliance with certain federal mandates, including the Defense Production Act. Sable is also actively pursuing damages and taking proactive legal action to curb state and county regulatory overreach.

**Components of Results of Operations**

**Revenue**

On March 29, 2026, the Company initiated oil sales after filling the SYPS with oil produced from Platform Harmony. In April 2026, the Company resumed oil production from Platform Heritage with such produced oil contributing to sales thereafter. The Company expects to resume oil production from Platform Hondo by the end of the second quarter of 2026. The Company's revenue stems from the sale of the oil produced from the SYU, processed by LFC, and transported via the interstate SYPS to its ultimate sales point at Pentland Station.

**Operating Expenses**

- *Operations and maintenance.* The Company's most significant costs to operate and maintain its assets are direct labor and supervision, power, repair and maintenance expenses, and equipment rentals. Fluctuations in commodity prices impact operating cost elements both directly and indirectly. For example, commodity prices directly impact costs such as power and fuel, which are expenses that increase (or decrease) in line with changes in commodity prices. Commodity prices also affect industry activity and demand, thus indirectly impacting the cost of items such as labor and equipment rentals.

- *Depreciation, depletion, amortization, and accretion.* Depreciation, depletion and amortization are primarily determined under either the unit-of-production method or the straight-line method, which is based on estimated asset service life taking obsolescence into consideration. Also included in the financial statements is the accretion associated with the Company's estimated asset retirement obligations ("ARO"). The ARO liabilities are initially recorded at their fair value and then are accreted using the Company's applicable discount rate over the period for the change in their present value until the estimated retirement of the asset.

- *General and administrative.* General and administrative ("G&A") costs are comprised of overhead expenditures directly and indirectly associated with operating the assets. These support services include information technology, risk management, corporate planning, accounting, cash management, human resources, and other general corporate services. Increased general and administrative services may be required in the future, commensurate with planned operations activity levels.

- *Taxes other than income.* Management anticipates future increases in ad valorem taxes, in line with the restarting sales of production volumes.

27

### Results of Operations

The following review of operations for the three months ended March 31, 2026 and 2025 should be read in conjunction with the unaudited condensed consolidated financial statements of the Company and notes thereto included in this Quarterly Report on Form 10-Q.

### *Three Months Ended March 31, 2026 vs. Three Months Ended March 31, 2025*

The following table presents selected unaudited condensed consolidated financial results of operations for the three months ended March 31, 2026 and 2025.

| (in thousands) | Three Months Ended March 31, | | Increase (Decrease) | |
| --- | --- | --- | --- | --- |
| | **2026** | **2025** | **$** | **%** |
| **Revenue** | | | | |
| Oil sales | $ 1,271 | $ — | $ 1,271 | 100.0% |
| Total revenue | 1,271 | — | 1,271 | 100.0% |
| **Operating Expenses** | | | | |
| Operations and maintenance expenses | 68,033 | 34,443 | 33,590 | 98% |
| Depletion, depreciation, amortization and accretion | 3,942 | 3,021 | 921 | 30% |
| General and administrative expenses | 48,050 | 22,332 | 25,718 | 115% |
| Total operating expenses | 120,025 | 59,796 | 60,229 | 101% |
| **Loss from operations** | (118,754) | (59,796) | (58,958) | 99% |
| **Other (income) expenses:** | | | | |
| Change in fair value of warrant liabilities | 44,157 | 21,295 | 22,862 | nm |
| Other income | (553) | (3,440) | 2,887 | nm |
| Interest expense | 34,668 | 21,010 | 13,658 | 65% |
| **Total other expense, net** | 78,272 | 38,865 | 39,407 | nm |
| **Loss before income taxes** | (197,026) | (98,661) | (98,365) | 100% |
| Income tax expense | — | 10,883 | (10,883) | nm |
| **Net loss** | $ (197,026) | $ (109,544) | $ (87,482) | 80% |

nm: not meaningful

**Revenue.** The Company sold 13.4 Mboe, net, recognizing $1.3 million in net revenue for the three months ended March 31, 2026. No revenue was recognized during the three months ended March 31, 2025 as sales did not commence until March 2026.

***Operating and maintenance expenses.*** Operating and maintenance expenses were $68.0 million for the three months ended March 31, 2026, representing an increase of $33.6 million, or 98%, compared to $34.4 million for the three months ended March 31, 2025. The increase was primarily attributable to additional maintenance and restart–related activities including higher personnel costs driven by a 31% increase in operations headcount, as well as $12.0 million related to operator rights expenditures. This increases were partially offset by $3.8 million of operating expense capitalized to Inventory and linefill within Oil and gas properties on the unaudited condensed consolidated balance sheet as of March 31, 2026. Operations and maintenance expenses are expected to remain elevated for the remainder of 2026, as compared to the prior periods.

Case 2:26-cv-05242-SVW-SSC   Document 90-1   Filed 06/15/26   Page 68 of 79   Page ID #:19620

***Depletion, depreciation, amortization and accretion.*** Depletion, depreciation, amortization and accretion was $3.9 million for the three months ended March 31, 2026, an increase of $0.9 million, or 30%, compared to $3.0 million for the three months ended March 31, 2025. The increase was primarily attributable to the additional depreciation associated with the Company's office assets and the initial depletion expense recognized following the Company's commencement of oil sales during the period. For the three months ended March 31, 2025, depletion, depreciation, amortization and accretion primarily consisted of accretion expense related to asset retirement obligations. During the three months ended March 31, 2026, the Company recognized $4.0 million of depletion, depreciation and amortization associated with the SYU assets. However, as approximately 95% of the associated production was used to fill the SYPS or remained in storage tanks at LFC as of March 31, 2026, the related costs were capitalized to Inventory and linefill within Oil and gas properties on the unaudited condensed consolidated balance sheet (refer to *Note 1 — Organization, Business Operations, and Going*

28

*Concern* for additional details regarding linefill). Depletion, depreciation, amortization and accretion expense is expected to increase in future periods as production volumes and sales activity increase.

***General and administrative expenses.*** G&A expenses were $48.1 million for the three months ended March 31, 2026, an increase of $25.7 million, or 115%, compared to $22.3 million for the three months ended March 31, 2025. The increase was primarily attributable to $12.9 million of higher compensation expense, driven by an 8% increase in general and administrative headcount, and $12.6 million in higher legal expenses related to ongoing legal and regulatory matters.

***Total other expense, net.*** Total other expense, net was $78.3 million for the three months ended March 31, 2026, compared to total other expense, net of $38.9 million for the three months ended March 31, 2025, an increase of $39.4 million. The increase was primarily attributable to a $22.9 million change in the fair value of warrants, driven by a longer remaining term, an increase in the market price of the Company's Common Stock, and changes in market volatility. Other income decreased by $2.9 million due to lower interest income, reflecting a reduced average cash balance during the period. Interest expense increased by $13.7 million, primarily due to a higher debt balance and an increase in the applicable interest rate from 10% per annum to 15% per annum for the three months ended March 31, 2026.

***Income tax expense.*** Income tax expense for the three months ended March 31, 2026 was zero, compared to an income tax expense of $10.9 million for the three months ended March 31, 2025. The Company's effective tax rate was zero percent for the three months ended March 31, 2026. No income tax benefit was recognized in the current period as the tax benefit associated with the year–to–date pretax loss exceeds the amount expected to be realized through anticipated ordinary income in subsequent interim periods within the current fiscal year that is more likely than not to be realized.

The Company's effective tax rate was negative 11.0% for the three months ended March 31, 2025. Based on its ongoing assessment of the realizability of deferred tax assets, the Company concluded that it was more likely than not that a portion of such assets would not be realized. Accordingly, the Company recorded an additional valuation allowance in the prior-year period. This determination was primarily driven by limitations on the utilization of net operating losses, including the limitation to 80% of taxable income. As a result, the increase in the valuation allowance resulted in income tax expense in the prior-year period.

## Capital Resources and Liquidity

***Overview.*** Prior to commencing sales of production volumes through the SYPS, the Company incurred significant capital expenditures in excess of operating cash flows to achieve first sales. Additional capital will be required to resume oil production from the remaining wells at SYU, as well as to activate certain LFC facilities that are not yet fully operational. Historically, the SYU's primary source of liquidity has been operational cash flows. Based on the Company's current financial plan, management expects these cash flows to be sufficient to fund operating expenses and service indebtedness; however, this expectation is subject to commodity price volatility, regulatory developments, and other factors that could impact future liquidity.

***Planned Capital Expenditures.*** Capital expenditures across the Company's SYU Assets are expected to total approximately $180.0 million for the remainder of 2026, or approximately $203.3 million for the full year 2026 (excluding non-cash linefill capital expenditures), as the Company continues to focus on facility upgrades, maintenance capital, and low-cost production optimization initiatives. As previously discussed, the OS&T Strategy is not expected to be pursued in the near term and, accordingly, no material capital expenditures related to the OS&T Strategy are planned for 2026.

***Capital Raising Activities.*** Prior to commencing sales of production volumes through the SYPS, the Company's capital requirements were primarily funded through proceeds from equity issuances of Common Stock and warrant exercises. During the first quarter of 2026, the Company entered into an at-the-market equity offering program (the "ATM Program") to support its capital requirements and enhance liquidity, pursuant to which the Company may offer and sell, from time to time at its sole discretion, shares of its Common Stock having an aggregate gross sales price of up to $250.0 million.

Under the ATM Program, during the three months ended March 31, 2026, the Company issued 5,359,790 shares of its Common Stock for aggregate gross proceeds of approximately $72.4 million. Associated marketing and legal fees of approximately $1.6 million were paid and recognized as an offset to the proceeds within Additional paid-in capital in the unaudited condensed consolidated balance sheet and statement of changes in stockholders' equity as of March 31, 2026.

## Going Concern and Liquidity

As of March 31, 2026, the Company reported unrestricted cash of $52.2 million, total debt of $956.3 million, and an accumulated deficit of $1.3 billion. On March 29, 2026, the maturity date of the Senior Secured Term Loan was

**Table of Contents**

accelerated to 90 days after the first sales of Hydrocarbons (as defined in the Senior Secured Term Loan), or June 26, 2026 (refer to *Note 4 — Debt* for additional details regarding the acceleration of the maturity date).

The Company is currently evaluating additional debt financing alternatives, which may include the issuance of public or private debt securities, bank financing, or a combination thereof. There can be no assurance that such financing will be available on commercially reasonable terms, or at all. Additionally, the Senior Secured Term Loan contains restrictive covenants which limit our ability to, among others, create or incur debt or liens (refer to *Note 4 — Debt* for additional details regarding the restrictive covenants under the Senior Secured Term Loan). As of March 31, 2026, the Company was in compliance with all covenants under its Senior Secured Term Loan.

Following the increase in production sales during 2026, the Company expects operating cash flows to increase, which may support the funding of future capital expenditures. However, if the Company is unable to generate sufficient cash flows from operations or obtain additional financing as needed, it may not be able to fund the capital expenditures necessary to sustain production levels.

Prior to recommencing oil sales from the SYU Assets and to date, the Company experienced losses from operations and negative cash flows from operations much like other pre-revenue companies. Near-term capital funding needs have historically been addressed with proceeds from the issuance of the Company's Common Stock and proceeds from the exercise of warrants.

Due to the lack of assurance that additional financing, including the refinancing of the Company's Senior Secured Term Loan, will be available on commercially reasonable terms, or at all, substantial doubt exists about the Company's ability to continue as a going concern. The accompanying financial statements have been prepared assuming the Company will continue as a going concern and do not include any adjustments that might result from the outcome of this uncertainty, including adjustments to the carrying amounts of assets or the classification of liabilities.

**Cash Flows**

The following table summarizes cash flows from Operating, Investing and Financing activities:

| | Three Months Ended March 31, | | | | Change | |
|---|---|---|---|---|---|---|
| (dollars in thousands) | | **2026** | | **2025** | **$** | **%** |
| **Cash flows (used in) provided by:** | | | | | | |
| Operating activities | $ | (82,224) | $ | (47,935) $ | (34,289) | (72)% |
| Investing activities | | (21,050) | | (63,304) | 42,254 | 67% |
| | | | | | | nm |
| Financing activities | | 57,758 | | (36) | 57,794 | |
| **Net change in cash and cash equivalents** | $ | (45,516) $ | | (111,275) | | |

**nm:** not meaningful

*Cash Flows from Operating Activities.* Since the Company initiated oil sales on March 29, 2026, minimal operating revenues were recognized for the three months ended March 31, 2026, and no operating revenues were recognized for the three months ended March 31, 2025. Net cash used in operating activities was $82.2 million for the three months ended March 31, 2026, representing an increase of $34.3 million, or 72%, compared to net cash used in operating activities of $47.9 million for the three months ended March 31, 2025. The primary use of cash in both periods was attributable to maintenance and operational readiness activities.

For the three months ended March 31, 2026, we had a net loss of $197.0 million, which included non-cash charges of $44.2 million related to the increase in the fair value of warrants, $15.0 million of stock-based compensation, $34.7 million of interest expense, $3.9 million of depreciation, depletion, amortization and accretion, and zero income tax expense. Changes in accounts payable of $20.2 million were primarily attributable to decreases in accrued costs associated with the 2025 equity offerings. For the three months ended March 31, 2025 the Company incurred a net loss of $109.5 million, which included non-cash charges of $21.3 million related to the increase in fair value of warrants, $6.1 million of stock-based compensation, $21.0 million of interest expense, $3.0 million depreciation, depletion, amortization and accretion, and $10.9 million deferred tax expense.

*Cash Flows from Investing Activities.* Net cash used in investing activities was $21.1 million for the three months ended March 31, 2026, representing a decrease of $42.3 million, or 67%, compared to $63.3 million for the three months ended March 31, 2025. Cash used in investing actives in both periods primarily consisted of capital expenditures associated with restart efforts.

30

***Cash Flows from Financing Activities.*** Net cash provided by financing activities was $57.8 million for the three months ended March 31, 2026, primarily consisting of $72.4 million of gross proceeds from ATM Program, net of $14.4 million of offering costs related to the ATM Offering and the 2025 equity offerings. Net cash used in financing activities for the three months ended March 31, 2025 was less than $0.1 million.

## Contractual Obligations

Pursuant to the Senior Secured Term Loan, which financed most of the Purchase Price (as defined in the Senior Secured Term Loan), Sable incurred interest for the period prior to the effectiveness of the Second Debt Amendment of ten percent (10%) per annum, and fifteen percent (15%) per annum subsequent to the Second Debt Amendment, compounded annually (refer to *Note 4 — Debt* for additional details regarding the Second Debt Amendment). Interest on the Senior Secured Term Loan is payable in arrears on January 1st of each year but, at Sable's election, accrued but unpaid interest may be deemed paid on each interest payment date by adding the amount of interest owed to the outstanding principal (paid-in-kind) amount. The maturity date of the Senior Secured Term Loan is June 26, 2026.

Additional obligations include the performance of ARO as referenced under "*Critical Accounting Policies and Estimates—Asset Retirement Obligations*" included in our Annual Report on Form 10-K for the fiscal year ended December 31, 2025.

## Off Balance Sheet Arrangements

As of March 31, 2026, the Company had no off-balance sheet arrangements.

## Critical Accounting Policies and Estimates

The critical accounting policies and estimates applied in the preparation of the Sable's interim condensed consolidated financial statements for the three months ended March 31, 2026 are the same as those described in our Annual Report on Form 10-K for the fiscal year ended December 31, 2025 except as follows.

## Revenue Recognition

The Company currently sells crude oil under a short-term agreement at prevailing market prices, with certain adjustments for product quality and geographic location. The Company recognizes revenue when control transfers to the purchaser at the delivery point and the customer has assumed the risk and rewards of ownership.

## Oil and Gas Properties

*Linefill.* The SYPS is an interstate pipeline that includes (among other pipeline segments and components) (i) Pipeline Segment 324, which extends from LFC to the Gaviota Pump Station in Santa Barbara County, California, and (ii) Pipeline Segment 325, which extends from the Gaviota Pump Station in Santa Barbara County, California, to Pentland Station in Kern County, California with an intermediate station at Sisquoc in San Luis Obispo, California. The Company classifies the quantity of oil used to fill Pipeline Segments 324 and 325 as linefill such that when an incremental barrel of oil is pumped into Pipeline Segments 324 and 325 it forces oil out at the Pentland Station sales point location. Pipeline Segments 324 and 325 have a capacity of approximately 540 MBbls. This linefill is accounted for at historical cost and recognized as a long term asset within Oil and gas properties on the unaudited condensed consolidated balance sheet as of March 31, 2026. The Company capitalized costs incurred that were directly attributable to filling Pipeline Segments 324 and 325, including associated depreciation, depletion, and amortization. Linefill will not be depreciated, but is subject to impairment in accordance with Financial Accounting Standards Board ("FASB") guidance with respect to accounting for the impairment or disposal of long-lived assets. Carrying amounts that are not expected to be recoverable through future cash flows are written down to estimated fair value.

## Emerging Growth Company

We are an "emerging growth company," or EGC, as defined in Section 2(a) of the Securities Act, as modified by the JOBS Act, and it has elected to comply with certain reduced public company reporting requirements.

We will no longer be an EGC as of December 31, 2026, after which we will not be able to take advantage of such reduced reporting and disclosure requirements.

## Item 3.    Quantitative and Qualitative Disclosures About Market Risk

## Regulatory Risk

The Company's operations are subject to extensive regulation by federal, state, and local authorities, including regulatory oversight by BOEM, BSEE, and PHMSA. Additionally, California maintains a complex regulatory framework governing

31

Table of Contents

offshore and onshore oil and gas operations, pipeline transportation, environmental compliance, and permitting. Regulatory approvals required to modify infrastructure may be subject to additional conditions, delays, or legal challenge, which could increase costs or affect the timing of planned activities. Certain regulatory matters and related uncertainties are discussed in *Note 6 — Commitments and Contingencies* to the unaudited condensed consolidated financial statements. While the Company cannot reasonably quantify the financial impact of future regulatory actions, delays or changes in regulatory requirements, such occurrences could result in incremental capital expenditures, periods without revenue, or reduced cash flows, which could adversely affect the Company's liquidity as described in *Item 2—Management's Discussion and Analysis of Financial Condition and Results of Operations*.

**Debt Refinance and Liquidity Risk**

The Company's debt is set to mature on June 26, 2026. Accordingly, the Company is required to refinance its outstanding debt and is dependent on access to external capital and prevailing market conditions. The Company's ability to refinance or repay its debt will be influenced by factors including commodity prices and capital market conditions.

**Commodity Price Risk**

Following the commencement of production and oil sales, the Company expects its financial performance to be sensitive to fluctuations in crude oil prices. Changes in oil prices could materially affect revenues, operating cash flows, capital investment decisions, and the Company's ability to service debt. Crude oil prices are subject to significant volatility driven by global supply and demand, geopolitical events, regulatory actions, and regional market dynamics, including those specific to California. While the Company may consider risk management activities in the future, it does not currently have commodity price hedging arrangements in place. Accordingly, a sustained decline in oil prices could adversely affect the economics of production and the Company's financial condition.

**Item 4.    Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

Disclosure controls and procedures are controls and other procedures that are designed to ensure that information required to be disclosed in our reports filed or submitted under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed in Company reports filed or submitted under the Exchange Act is accumulated and communicated to management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosure. Management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives, and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

As required by Rules 13a-15 and 15d-15 under the Exchange Act, our Chief Executive Officer and Chief Financial Officer carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures as of March 31, 2026. Based upon their evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of March 31, 2026, our disclosure controls and procedures (as defined in Rules 13a-15 (e) and 15d-15 (e) under the Exchange Act) were effective at the reasonable assurance level as of March 31, 2026. Accordingly, management believes that the financial statements included in this Quarterly Report on Form 10-Q present fairly in all material respects our financial position, results of operations and cash flows for the periods presented.

**Changes in Internal Control over Financial Reporting**

During the quarterly period covered by this report there have been no changes in our internal controls over financial reporting that have materially affected, or are reasonably likely to materially affect, our internal controls over financial reporting.

32

**Table of Contents**

## PART II—OTHER INFORMATION

**Item 1.    Legal Proceedings.**

Refer to Part I, Item 1, *Note 6 — Commitments and Contingencies* of this Quarterly Report for a full description of our material pending legal and regulatory matters.

**Item 1A.    Risk Factors.**

Factors that could cause our actual results to differ materially from those in this report include the risks described under the heading "Risk Factors" included in our Annual Report on Form 10-K for the fiscal year ended December 31, 2025 (the "2025 10-K"). Any of these factors could result in a significant or material adverse effect on our results of operations or financial condition. Additional risk factors not presently known to us or that we currently deem immaterial may also impair our business or results of operations.

As of the date of this Quarterly Report, there have been no material changes to the risk factors disclosed in the 2025 10-K, except as described below. The following additional risk factors should be read in conjunction with those previously disclosed. We may disclose changes to such risk factors or disclose additional risk factors from time to time in our future filings with the SEC.

***We are an "emerging growth company" and the reduced reporting and disclosure requirements applicable to emerging growth companies could make our Common Stock less attractive to investors.***

We are an "emerging growth company," as defined in the JOBS Act. For as long as we remain an emerging growth company, we may choose to take advantage of exemptions from various reporting requirements applicable to other public companies but not to "emerging growth companies," including:

- not being required to have an independent registered public accounting firm audit our internal control over financial reporting under Section 404 of the Sarbanes-Oxley Act;

- reduced disclosure obligations regarding executive compensation in our periodic reports and annual reports on Form 10-K; and

- exemptions from the requirements of holding non-binding advisory votes on executive compensation and stockholder approval of any golden parachute payments not previously approved.

As a result, our stockholders may not have access to certain information that they may deem important.

Under the JOBS Act, emerging growth companies can also delay the adoption of new or revised accounting standards until such time as those standards apply to private companies. We may elect to take advantage of this extended transition period and as a result, our financial statements may not be comparable with similarly situated public companies.

We cannot predict if investors will find our Common Stock less attractive if we choose to rely on any of the exemptions afforded emerging growth companies. If some investors find our Common Stock less attractive because we rely on any of these exemptions, there may be a less active trading market for our Common Stock and the market price of our Common Stock may be more volatile and may decline.

We will no longer be an "emerging growth company" as of December 31, 2026, after which we will not be able to take advantage of the reduced reporting and disclosure requirements discussed above.

**Item 2.    Unregistered Sales of Equity Securities and Use of Proceeds.**

None.

**Item 3.    Defaults Upon Senior Securities.**

None.

**Item 4.    Mine Safety Disclosures.**

Not Applicable.

33

**Table of Contents**

**Item 5.   Other Information.**

(a) N/A.

(b) N/A.

(c)    During the three months ended March 31, 2026, no director or officer of the Company adopted or terminated a "Rule 10b5-1 trading arrangement" or "non-Rule 10b5-1 trading arrangement," as each term is defined in Item 408(a) of Regulation S-K.

### Item 6.   Exhibits.

The following exhibits are filed as part of, or incorporated by reference into, this Quarterly Report on Form 10-Q.

| | | Incorporate by Reference | | |
|---|---|---|---|---|
| No. | Description of Exhibit | Form | Exhibit | Filing Date |
| 3.1 | Second Amended and Restated Certificate of Incorporation of Sable Offshore Corp. | 8-K | 3.1 | 2/14/24 |
| 3.2 | Amended and Restated Bylaws of Sable Offshore Corp. | 8-K | 3.2 | 2/14/24 |
| 10.1 | Sales Agreement, dated as of February 2, 2026, by and between Sable Offshore Corp. and TD Securities (USA) LLC and Jefferies LLC. | 8-K | 1.1 | 2/2/26 |
| 31.1* | Certification of Principal Executive Officer Pursuant to Securities Exchange Act Rules 13a-14(a) and 15(d)-14(a), as adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 | — | — | — |
| 31.2* | Certification of Principal Financial Officer Pursuant to Securities Exchange Act Rules 13a-14(a) and 15(d)-14(a), as adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 | — | — | — |
| 32.1** | Certification of Principal Executive Officer Pursuant to 18 U.S.C. Section 1350, as adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | — | — | — |
| 32.2** | Certification of Principal Financial Officer Pursuant to 18 U.S.C. Section 1350, as adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | — | — | — |
| 101.INS* | XBRL Instance Document—the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document | | | |
| 101.CAL* | Inline XBRL Taxonomy Extension Calculation Linkbase Document | | | |
| 101.SCH* | Inline XBRL Taxonomy Extension Schema Document | | | |
| 101.DEF* | Inline XBRL Taxonomy Extension Definition Linkbase Document | | | |
| 101.LAB* | Inline XBRL Taxonomy Extension Labels Linkbase Document | | | |
| 101.PRE* | Inline XBRL Taxonomy Extension Presentation Linkbase Document | | | |
| 104* | Cover Page Interactive Data File (formatted as Inline XBRL and contained in Exhibit 101) | | | |

\* Filed herewith

\*\* Furnished

34

**Table of Contents**

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**SABLE OFFSHORE CORP.**

| | | |
|---|---|---|
| Date: May 6, 2026 | By: | /s/ James C. Flores |
| | Name: | James C. Flores |
| | Title: | Chairman and Chief Executive Officer (Principal Executive Officer) |

| | | |
|---|---|---|
| Date: May 6, 2026 | By: | /s/ Gregory D. Patrinely |
| | Name: | Gregory D. Patrinely |
| | Title: | Executive Vice President and Chief Financial Officer (Principal Financial and Accounting Officer) |

35